## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

ADVANCED MICRO DEVICES, INC., a )
Delaware corporation, and AMD )
INTERNATIONAL SALES & SERVICE, )       Civil Action No. 05-441
LTD., a Delaware corporation, )
                      )
                Plaintiffs, )
                      )
vs )
                      )
INTEL CORPORATION, a Delaware )
corporation, and INTEL KABUSHIKI )
KAISHA, a Japanese corporation, )
                      )
               Defendants. )

## PLAINTIFFS' MOTION FOR LEAVE TO SERVE DOCUMENT PRESERVATION SUBPOENAS

### INTRODUCTION

On June 27, 2005, Plaintiffs Advanced Micro Devices, Inc. and AMD International Sales & Service, Ltd. (jointly, "AMD") sued Intel Corporation and Intel Kabushiki Kaisha (jointly, "Intel") for antitrust violations. AMD alleges that Intel has unlawfully maintained its monopoly in the x86 microprocessor market by engaging in exclusionary business tactics that have the purpose and effect of preventing or severely restricting its customers' ability to deal with AMD, Intel's only real competitor. As recounted in AMD's 48-page complaint, among other things, Intel conditions various rebates, subsidies and marketing support on its customers' agreement to significantly limit their microprocessor purchases from AMD or to not do business with AMD altogether. Intel targets customers at all levels – from large, international computer manufacturers such as Hewlett Packard and IBM, to smaller regional system builders, to wholesale distributors, and to large retail chains – such as Best Buy and Office Depot.

1

So as to preserve evidence of Intel's marketplace conduct while the case gears up, on the day it filed its complaint, AMD sent notices to thirty-two computer makers, microprocessor distributors and computer retailers requesting that they suspend their normal document destruction policies and take reasonable steps to prevent evidence from being lost (The letters are collectively attached as Exhibit A to the Declaration of Charles P Diamond ("Diamond Decl")) The recipients of these letters are all large, well-heeled international corporations. Among the computer-makers notified were Dell, IBM, Lenovo, Hewlett-Packard, Gateway, Sony, NEC, Fujitsu, Toshiba and Hitachi Among the retailers were Best Buy, Circuit City, CompUSA, and Office Depot in the United States, Media Markt in Germany, and Dixons in the U.K.

To minimize the preservation burden, AMD asked only that the companies sequester the data of a small number of specifically identified employees known to engage with Intel's sales-force,[1] and it carefully limited the documents requested to narrowly drawn categories Thus, for example, AMD asked Lenovo to retain documents in sixteen categories belonging to eighteen employees (plus their assistants and chip-procurement direct reports and those above them in the reporting chain) In the case of Circuit City, AMD identified the six employees belonging to the company's computer buying department and those in their reporting chain, and it identified even a fewer number of categories AMD's preservation request invited all recipients who nonetheless considered the request too burdensome to engage AMD in discussions to find ways to ameliorate the burden.

The thirty-two recipients were asked to confirm by noon Thursday, June 30, 2005, that they would voluntarily preserve their evidence pending the opening of formal

---

[1] One category of documents is not tied to specific custodians: general corporate business records that contain quantitative information about dealings with Intel and other corporate metrics In addition to the named custodians and those in their reporting chain, AMD also asked for documents belonging to their predecessors, if any, up to 1/1/00 and, if they had left the company, their successors.

discovery. As of now, fourteen companies have responded, nine of which have indicated a willingness to work with AMD to arrive at a set of mutually acceptable preservation rules (Sony, Sun, Acer, Circuit City, Gateway, Lenovo, NEC-CI, Rackable, and Tech Data). AMD is in active and productive negotiations with these parties. One company, Best Buy, agreed to comply without limitation. Only Toshiba acknowledged receipt of the letter and refused to negotiate at all. CompUSA, Dell and Hitachi have simply acknowledged the letter, though in subsequent discussion Dell and Hitachi promised to consider the request further and respond later. Eighteen companies, however, have not responded.

AMD hopes to work out mutually satisfactory voluntary preservation programs with the dozen or so companies that have indicated a willingness to negotiate. As to them, AMD does not intend to serve preservation subpoenas, should the Court grant leave to do so, unless those negotiations break down. However, that leaves over half of the recipients of AMD's document preservation request. As to these, should leave be granted, AMD intends to serve preservation subpoenas in the form attached as Exhibit B to the Diamond Declaration. The balance of this Motion demonstrates that this relief is both authorized by the federal rules and appropriate under the circumstances.

## ARGUMENT

### I. PRESERVATION SUBPOENAS ARE A WELL-ACCEPTED TOOL USED TO PREVENT DOCUMENT DESTRUCTION

Document preservation subpoenas are a commonly used method to ensure third party evidence retention. In *Vezzetti v. Remec, Inc.*, No. 99 CV 0796, 2001 U.S. Dist. LEXIS 10462 (S.D. Cal. July 23, 2001)[2], for example, the court imposed a discovery stay pending resolution of a motion to dismiss in the case. Fearing that third parties would unintentionally destroy relevant documents during the discovery stay, the plaintiff sought

---

[2] Pursuant to Delaware Local Rule 7.1.3, a copy of this and all other unpublished decisions cited in this brief are attached as Exhibit 1.

leave to serve preservation subpoenas upon them. Despite minimal evidence of specific destruction policies, the court granted leave. It relied on *Neibert v. Monarch Dental Corp.*, No. 3-99 CV-762, 1999 U.S. Dist. LEXIS 22312 (N.D. Tex. Oct. 20, 1999), where the court similarly employed preservation subpoenas to ensure that third parties would retain evidence during a stay. Other examples abound. *See In re Emex Corp. Sec. Litig.*, No. 01 Civ. 4886, 2001 U.S. Dist. LEXIS 19785 (S.D.N.Y. Nov. 30, 2001) ("The motion [for leave to serve preservation subpoenas on third parties] is granted in view of the desirability of ensuring that potentially relevant documents are not destroyed during the pendency of defendants' dismissal motion. This order is without prejudice to the right of the subpoenaed parties to seek relief once the subpoenas have been served."); *Novak v. Kasaks*, No. 96 Civ. 3073, 1996 U.S. Dist. LEXIS 11778 (S.D.N.Y. Aug. 16, 1996) ("Plaintiffs' concern that nonparties may not consider themselves under an obligation to retain possession of relevant documents if discovery is stayed is easily remedied. The Court hereby orders that all nonparties upon whom subpoenas have been served in this action are to preserve all documents and other materials responsive to such subpoenas subject to further order of the Court.").[3] As these cases amply demonstrate, when balancing the burdens of document retention against the risk of spoliation of critical evidence, courts routinely favor the prophylactic issuance of preservation subpoenas.

## II.    WITHOUT PRESERVATION SUBPOENAS, CRITICAL EVIDENCE WILL BE DESTROYED

> In the modern world where documents in electronic form are being produced and destroyed by the millions every minute, there is an ever-present possibility that relevant documents may be destroyed or a least converted into forms which are inaccessible even after litigation is

---

[3] These cases were brought in response to the Private Securities Litigation Reform Act's, 15 U.S.C. § 78u-4 ("PSLRA") stay on discovery, but the reasons for departing from traditional discovery deadlines are the same in this case. In both contexts (1) the parties are presently unable to conduct discovery, (2) document destruction policies are in place which will eliminate relevant documents, and (3) preservation subpoenas can adequately assure the retention of the relevant documents.

commenced    This destruction or conversion may occur because a
company wants to destroy evidence or simply because the company has
failed to communicate to an employee that certain data should be
preserved   It may occur because the company has a wholly inadequate
and irrational document retention policy   It may also occur because the
company simply does not understand its duty to preserve   Regardless of
the reason for the destruction, the result is the same. Relevant data which
would help the court perform its truth-seeking function is destroyed or
converted and either cannot be retrieved or can only be retrieved at great
cost. The integrity of the fact-finding process is undermined.

John L. Carroll, *New Thoughts on an Old Issue – How Should Courts Resolve Requests
for Preservation Orders?*, Georgetown CLE, 2004 WL 2800777, at *1 (2004).

We live in a largely automated, electronic world where critical evidence can be

lost through no fault of the party creating or maintaining it. That is because most modern

companies, anxious about the ever-expanding volume of electronic materials their

employees create, deploy a variety of automated procedures and systems to cull and

purge their data. As detailed in the accompanying Declaration of Kelly J. Kuchta

("Kuchta Decl."), an experienced forensic discovery expert, at most sophisticated

companies, document destruction is the rule and preservation the exception. Most follow

automated document retention policies which weed out stale corporate email daily,

saving only the most recently created or received materials. Other media are equally

vulnerable to corporate destruction policies: Backup tapes are overwritten. Computer

hard drives are recycled. Reusable media is reused. Because of this, as Mr. Kuchta

explains, all of the critical third-parties in this case – high tech companies who deal in

high-tech products – are almost certainly already destroying relevant data on a daily basis.

Kuchta Decl. at ¶ 3.

Evidence that will likely be key to AMD's ability to prove its case is particularly

perishable. The complaint alleges intimidation by Intel designed to dissuade computer

makers, retailers and others in the supply chain from dealing with AMD.   As

knowledgeable industry observers can attest, Intel does not put threats in writing. *The Register*, a widely-read UK-based technology "e-zine," wrote recently:

> Intel, however, usually makes sure its executives and salesfolk don't put anything that could be construed as damaging down in writing. It's something Intel learned by watching Microsoft and during its first anti-trust battle with the US FTC (Federal Trade Commission), which produced a settlement forcing Intel to play nice.

Ashley Vance, *Can Anyone Compete with Intel? AMD Says, 'No!'*, The Register, June 28, 2005, *at* http://www.theregister.co.uk/2005/06/28/amd_suit_intel/. The recent determination by the Japanese Fair Trade Commission that Intel's sales practices violated Japanese competition law, Intel's decision not to contest the charges, and the pendency of a European investigation into its marketing behavior, likely have added to Intel's corporate circumspection about written records.

As a result, Intel footprints are likely to be found largely in the electronic files of its customers. And, AMD suspects, most of it will reside in email, "instant messaging," or other less formal means of communication exchanged internally among computer-maker procurement employees, buyers at the retailers, and others who deal with the Intel sales force. Predictably, lower-level employees who negotiate terms with Intel can be expected to report their dealings up the corporate ladder, particularly those tactics they consider unfair or overbearing. Yet, as Mr. Kuchta explains, these types of informal, intra-corporate communications are most vulnerable to routine destruction. Kuchta Decl. at ¶ 6. Indeed, as noted earlier, most corporations automate the process.

Human nature also poses a threat to the retention of key evidence. The computer industry employees to whom AMD addressed its document preservation request must necessarily deal with Intel during the pendency of this case and after its over. Intel is a potent and, in the eyes of some, a menacing force. As *Fortune Magazine* said, reporting on this week's events,

- 6 -

> A top-level executive at a major PC maker, who spoke on condition of
> anonymity because he did not want to risk angering Intel, says his
> experience with the chipmaker matches some of what is alleged in the
> lawsuit. Among other things, he cites instances when Intel told his
> company that if it refrained from building machines with AMD parts, Intel
> would reward it with money in the form of marketing subsidies and grants.
> It's too early to say if he would testify.

David Kirkpatrick, *AMD's Suit Against Intel: The First Punch*, Fortune, June 30, 2005 at

http://www.fortune.com/fortune/fastforward/0,15704,1078376,00.html.

Under the circumstances, few industry insiders would consider it career-advancing to be viewed as an Intel whistle-blower. Given the ease with which electronic documents can be made to disappear, and the multitude of explanations that can be offered for their disappearance, absent preservation at the corporate level, there is little to stop an employee, reluctant to have to recount at a deposition an episode memorialized in a saved email, from pressing the "delete" key.

## III.  PRESERVATION IMPOSES MINIMAL COSTS ON THIRD PARTIES

In contrast to the potential prejudice to AMD were important evidence lost, the burden on third parties required to preserve evidence is relatively minor. First, AMD is requesting preservation of only those documents created or accessible by a limited and identifiable number of employees – in the case of Office Depot, for example, only three custodians. Moreover, AMD has further limited the universe by specifying in reasonable detail the types of documents that those custodians need retain.

At this stage, a document-by-document review is unnecessary. Instead, a third party only needs to ensure that the relevant documents are preserved from accidental or intentional deletion or destruction. As Mr. Kuchta explains, the process is a familiar one for large companies that routinely are involved in litigation and face electronic discovery. Because AMD has narrowed its preservation request to a limited number of custodians, the third-party's burden in this case is dramatically reduced. The Kuchta Declaration lays

- 7 -

RLF1-2895554-1

out how the following steps allow a third party to preserve the relevant evidence without incurring unreasonable costs. These steps include: (1) suspending automated deletion of the identified custodians' files, (2) distributing and policing a "litigation hold" notice to each custodian identifying the categories of documents to be preserved, (3) mirroring each custodian's hard drive, (4) "sequestering" or setting aside the master backup tapes containing the data of the identified custodians, and (5) creating and retaining a backup of the company's sales database. Although the costs of these steps will vary depending on the structure of the third party's networks, for even the most complicated structure, the cost of this preservation is not likely to exceed $10,000-$30,000 to preserve the records of ten to thirty custodians for a three- to six-month period. This price is eminently reasonable given the stakes of the litigation, the public interests at issue in this case, and the resources of the third parties which must shoulder the burden.

The truth is preservation subpoenas promise to dramatically <u>reduce</u> the expenses of parties and third parties in this litigation. In absence of the requested relief, relevant documents <u>will</u> be destroyed before document production subpoenas can be served. To the extent that those documents are recoverable at all, AMD, Intel, and the third-parties will be relegated to costly and cumbersome forensic techniques to attempt to recover them. Kuchta Decl. at ¶ 15. As in other aspects of human affairs, with respect to e-discovery an "ounce of prevention is worth a pound of cure."

**CONCLUSION**

AMD respectfully submits that the Court should grant it leave to immediately serve document preservation subpoenas in the form attached to the Diamond Declaration as Exhibit B.[4]

Jesse A. Finkelstein (#1090)
Finkelstein@rlf.com
Frederick L. Cottrell, III (#2555)
Cottrell@rlf.com
Chad M. Shandler (#3796)
Shandler@rlf.com
Steven J. Fineman (#4025)
Fineman @rlf.com
Richards, Layton & Finger, PA
One Rodney Square
P.O. Box 551
Wilmington, Delaware 19899
(302) 651-7700
(302) 651-7701 (Fax)

OF COUNSEL:
Charles P. Diamond
Cdiamond@omm.com
Linda J. Smith
Lsmith@omm.com
O'MELVENY & MYERS LLP
1999 Avenue of the Stars, Suite 700
Los Angeles, CA 90067
(310) 553-6700

and

Mark A. Samuels
Msamuels@omm.com
O'MELVENY & MYERS LLP
400 South Hope Street
Los Angeles, CA 90071
(213) 430-6000

Dated: July 1, 2005

---

[4] A Proposed Order is attached to this Motion as Exhibit 2.

## CERTIFICATION PURSUANT TO LOCAL RULE 7.1.1

The undersigned certifies that counsel for Advanced Micro Devices, Inc. has called counsel for Intel Corporation about the subject matter of the attached Motion, and supplied counsel with a draft of the Motion, and Intel Corporation is opposed to the relief sought in the Motion

Frederick L. Cottrell, III (#2555)
cottrell@rlf.com

## CERTIFICATE OF SERVICE

I hereby certify that on July 1, 2005, I electronically filed the foregoing with the Clerk of

Court using CM/ECF and served the foregoing on the following counsel via Federal Express:

> Darren B. Bernhard, Esquire
> Howrey LLP
> 1299 Pennsylvania Avenue, N.W.
> Washington, D.C. 20004-2402

Frederick L. Cottrell, III (#2555)
cottrell@rlf.com