80    HP also withdrew precipitously from the Athlon64 launch after committing to participate  HP had agreed to support the launch by producing a promotional video and by sending senior executives to all three launch sites. Just before launch, however, HP manager, John Romano, pulled the video and announced that HP would only be sending a junior manager, and then only to Europe

81    Other AMD customers and channel partners reporting Intel coercion to withdraw from the Athlon64 launch were Lenovo, NEC-CI and Best Buy

82    Intel also disrupted AMD's launch of its Opteron server chip, which was rolled out on April 22, 2003, with few in attendance and little industry support  A computer industry journal reported Intel's fingerprints. "They all [vendors] told me that prior to the launch, they received a phone call from Intel. Intel asked if they were going to the launch. If they replied yes, the Intel rep asked them if it was 'important to them to go', or 'if they really wanted to go ' Pressing the vendors, I got the same response, 'Intel is too smart to threaten us directly, but it was quite clear from that phone call that we would be risking our various kickback money if we went '"

83.   Other companies that reported being intimidated from participating in the Opteron launch were MSI, Atipa, Solectron and Fujitsu-Siemens  Indeed, Intel representatives told Fujitsu-Siemens' executives in the weeks preceding the Opteron launch that if they attended, they would be the only Tier One OEM showing its support as all of the others would back out With the exception of IBM, Intel was right.

84.   These are not isolated examples, but rather illustrations of Intel's relentless campaign to undermine marketing efforts by its one remaining competitor. For example, IBM pulled its AMD-powered computers from the 2004 Palisades eServer and PC Show, citing a contractual agreement with Intel said to prohibit it from endorsing those competitive products And at the 2004 Super Computing Show, an annual conference devoted to high performance computing, Intel offered two other AMD customers money to remove AMD systems from their

29

booths. At CeBit, Intel threatened to pull a half million dollars of support from Fujitsu-Siemens for displaying AMD products (which were removed).

### f. *Product Bundling*

85.    Intel also uses product bundling as an exclusionary weapon in a variety of ways. Intel's most common deployment is in bidding for a new OEM platform: it bundles microprocessors with free (or heavily discounted) chipsets or motherboards, often offered in amounts exceeding the OEM's requirements for the new platform. (The excess, of course, is only compatible with Intel processors, thereby providing the OEM a strong inducement to go with Intel rather than AMD on uncommitted models.) AMD does not sell chipsets or motherboards; they are provided by independent suppliers such as ATI, nVidia and Via which incur their own costs and control their own pricing. Hence, to match Intel's bundled microprocessor-chipsets-motherboards offer, AMD must extend a discount on its microprocessors that will not only match any Intel discount on the microprocessors themselves but also will compensate the OEM for the savings it will lose on independent Intel chipset and motherboard purchases. The additional compensation AMD is forced to provide through a discount on the sale of microprocessors alone makes AMD's sale of microprocessors potentially unremunerative, and it also enables Intel to avoid competing with AMD directly on microprocessor price and quality by imposing disproportionate burdens on AMD that are wholly unrelated to AMD's product quality which, as has been demonstrated, is frequently superior to that of Intel's.

86    As retaliation for dealing with AMD, Intel has also used chipset pricing as a bludgeon. For example, in 2003, Acer had committed to launch the AMD Athlon XP. Acer executives worldwide had been working with AMD to bring the product to market post-launch. But, on the eve of the launch the Acer management in Taiwan pulled the plug. AMD learned from Acer executives that Intel had threatened to raise chipset prices by $10 on all Intel-based Acer systems if *any* processor business was awarded to AMD outside of Europe.

30

87    Intel's dealings with OEMs are unlawfully exclusionary, have no pro-competitive justification, and are intended to maintain its monopoly

### 2. Practices Directed At Distributors

88    Intel uses many of the same tactics it practices on OEMs to restrict distributors from carrying AMD processors or selling AMD products into markets it deems strategic. For example, it entered into an exclusive deal with Synnex, which is one of the largest U.S distributors  Given Intel's 80% plus market share, there is no pro-competitive justification for this arrangement

89.   As with OEMs, Intel offers discounts and rebates to distributors on the condition that they not do business with AMD, either worldwide or in strategic sub-markets. For example, in December 2004, Ingram Micro, Intel's biggest distributor in China, suddenly cut off discussions to distribute AMD chips as well  A high-ranking Ingram Micro official later reported to AMD that Ingram Micro had no choice because Intel proffered loyalty rebates that were too lucrative to pass up

90.   Intel also offers a panoply of special programs for distributors who carry Intel microprocessors exclusively: marketing bonuses, increased rebates, credit programs for new customers (credits that can be used for all products from Intel and any other suppliers), payment for normal freight charges, and special inventory assistance such as credits to offset inventory costs. When such more nuanced means of achieving exclusivity fail, Intel has simply bribed distributors not to do business with AMD. For example, a high-ranking Tech Data executive turned down $1 million to stop doing business with AMD, which caused the Intel representatives to ask, "How much would it take?"

91    Intel also offers retroactive rebates triggered when a distributor reaches a prescribed buying quota. Like the rebates offered to OEMs, the intent is to inflict economic punishment on those who do too much AMD business. But, unlike OEMs, distributors remain ignorant of the goals Intel has set for them or the precise consequences of failing to meet them.

31

Intel does not share this information with them, they simply receive a check at the end of a quarter  As a result, every AMD chip they purchase, they buy at their peril.

92    Finally, those distributors who choose to do business with AMD have been conditioned to expect Intel retaliation.  For example, when ASI, one of the largest computer hardware and software distributors, began distributing AMD processors, Intel demanded that it exclude AMD personnel from its ASI Technology Shows and its General Managers' meetings Until recently, ASI refused master distributor status from AMD, despite the financial benefits attached, because it feared that such a public alignment with AMD would trigger Intel retaliation.  When, in January 2005, it finally accepted Master Distributor status, Intel began reducing the level of market development funds ASI received

93.    Avnet Inc , one of the world's largest computer equipment distributors and an avid AMD supporter, has also received its share of Intel intimidation.  Thus, Avnet cited Intel as the reason it could not distribute AMD parts to the industrial sector.  And when AMD launched its Opteron server chip, Intel made clear it would make it "painful" for Avnet were it to begin distributing that chip  When Avnet did so anyway, Intel threatened to cut if off. Another distributor got even worse treatment  In retaliation for Supercom's AMD dealings in Canada, Intel pressured Supercom's customers to switch to another distributor.

94    These are not the only distributors that Intel has attempted to coerce from doing business with AMD  Others include R.I C. in Germany, Paradigit in the Netherlands, and Quote Components, also in the Netherlands.

95.    Intel's dealings with distributors are unlawfully exclusionary, have no pro-competitive justification, and are intended to maintain its monopoly.

### 3. Practices Directed At Retailers

96.    In both the U S. and internationally, approximately one fifth of desktop and notebook computers is purchased at retail stores.  A handful of retailers dominate the U.S PC market: Best Buy and Circuit City are the largest  Other significant but smaller retailers are Walmart/Sams Club, Staples, Office Depot and Office Max.

97    Most of the PCs sold at retail are sold during four or five "buying seasons" that correspond to events on the calendar ("Dads and Grads," "Back to School," "Holiday," etc ), and retailers refresh their inventory for each. A chipmaker faces a two-step process to get its platform on retail shelves: first, it must convince one or more OEMs to build machines using its microprocessor at a suggested price point (called "getting on the roadmap"); and second, it must convince the retailer to stock and devote shelf space to these machines  Shelf space does not come for free  The major retailers demand market development funds ("MDF") in exchange  MDF can consist of cooperative advertising support, but more frequently it comprises a marketing-related opportunity that a chipmaker must buy for tens of thousands of dollars, for example, space in a Sunday circular, an in-store display or an internet training opportunity with the chain's sales staff  The MDF required to secure shelf space can run as high as $25 per box depending on the computer price point and how urgently the competing chipmakers want the shelf space.

98.    Intel has historically enjoyed an advantage over AMD at retail because, using many of the strategies described above, it has had greater access to the OEMs' roadmaps and the ability to exert pressure to keep AMD out of their product plans  Also, it has significantly greater financial resources with which to buy retail shelf space

99.    But to leverage those advantages, Intel has also made exclusive deals with many key retailers around the world. For example, until recently Office Depot declined to stock AMD-powered notebooks regardless of the amount of MDF AMD offered, citing its "premier" status with Intel that would be put at risk  Fry's is Fujitsu's only retailer in the United States  When Intel learned that Fry's was very successfully marketing a Fujitsu's Athlon™ XP-based notebook, it offered Fry's a large payment to remove it from its shelves.

100.  The story is even worse in Europe. AMD has been entirely shut out from Media Markt, Europe's largest computer retailer, which accounts for 35% of Germany's retail sales. Intel provides Media Markt between $15-20 million of MDF annually, and since 1997 Media Markt has carried Intel computers exclusively.  Intel subsidies also foreclose AMD from Aldi,

33

a leading German food retail chain, whose PC sales account for an additional 15-20% of the German market.

101. In the United Kingdom, Intel has locked up substantially all of the business of DSG (Dixon Services Group), operator of three major chains including Dixon and PC World that collectively account for two thirds of the U.K. PC market. In exchange for Intel payments, DSG has agreed to keep AMD's share of its business below 10% Like Media Markt, DSG reports that Intel penalizes it with reduced MDF just on account of the small amount of business it does with AMD. Toys'R'Us in the U K. is also exclusive to Intel. Time, another U K. retailer (which builds computers as well), took a substantial MDF payment from Intel in exchange for near-exclusivity on notebooks during the first half of 2004, and it reports that Intel has withheld discounts because Time has introduced too many AMD Athlon64 desktop models In France, Intel has brought pressure on the largest retailers, including Conforama, Boulanger, causing them to cease dealing with AMD or drastically reduce their AMD business

102. AMD has nonetheless made some progress in gaining retail market share. Because of price/performance advantages, which are key in retail, OEMs build approximately 15% of their U S. domestic market desktops with AMD processors, within notebook roadmaps, AMD represents approximately 10% On a shelf-space to sales basis, AMD has generally outperformed Intel For instance, in the desktop segment during the fourth quarter of 2004, AMD-equipped computers captured between a 33%-38% share of Circuit City's sales, despite being limited to five of the 25 models (20%) on the Circuit City shelves. And with approximately 15% of the shelf space allotted to its products at Best Buy and CompUSA, AMD computers accounted for roughly 30% and 22% of their sales, respectively. These numbers confirm that AMD's products perform well at retail, provided that space is available

103. In fact, Intel's sales staff was instructed "not to let this happen again." As a result, Intel instituted a rebate program similar to what it foisted on OEMs, with similar exclusionary effect. Under this program, Intel provides full MDF payments to retailers, such as Best Buy and Circuit City, only if they agree to limit to 20% not just the shelf space devoted to AMD-

34

based products, but also the share of revenues they generate from selling AMD platforms  If AMD's share exceeds 20%, the offending retailer's marketing support from Intel is cut by 33% *across all products*

104. This is how the program works at Circuit City.  If less than 20% of Circuit City's notebook revenue derives from AMD-based computers (30% for desktops), Intel has agreed to pay Circuit City $15 in MDF per Intel-powered machine, but if the AMD percentage reaches or exceeds 20%, Circuit City's MDF subsidy is cut to $10.  This creates a $5 per box "tax" on the retailer for doing 20% or more of its dollar volume with AMD-powered machines; and this "tax" is applicable to all of the Intel-powered machines that the retailer buys, back to the very first machine.

105  The following illustrates the competitive disadvantage this creates for AMD: if Circuit City were to purchase only Intel-powered notebooks for its 200,000-unit inventory in a quarter, Intel would pay it $15 of MDF per computer, or a total of $3 million.  However, if Circuit City were to reduce its purchases of Intel-based notebooks to 80% (160,000 units) so that it could stock a modest number of AMD-powered computers, Intel MDF would fall to $1.6 million ($10 MDF/unit times 160,000 units).  Were AMD to match Intel's $10 per unit MDF on the 40,000 units it supplied, Circuit City would receive an additional $400,000, bringing its total MDF to $2 million, leaving it $1 million worse off for doing business with AMD.  For AMD to make Circuit City "whole," it would have to vastly increase its MDF on its 20% share to $35 MDF per unit (40,000 x $35 = $1.4M), which together with Intel's $1.6 million would bring the total MDF back to $3 million  In other words, to just capture a 20% share, AMD must offer two or three times as much MDF as Intel – because it has far fewer units over which to spread the difference.  Given these perverse economies, Circuit City is not likely to allocate less than 80% of its notebook sales to Intel, even if it means taking AMD stock off the shelves at the end of a quarter. (Indeed, to avoid inadvertently running afoul of the limitation, a prudent distributor would keep AMD's share well short of 20% )

35

106  Nor is Intel above threatening retailers to gain preferred treatment  For example, at the recent CeBit computer show in Hanover, Germany (the largest computer show in the world), a German chain, Vobis, hung an AMD Turion64 banner from its booth as part of a co-marketing agreement with AMD and its OEM partner (Yakamo) to announce AMD's new mobile microprocessor  Intel's German general manager and its vice president for mobile products demanded that the Turion64 banner be removed. When Vobis' CEO declined, the Intel representatives threatened immediately to stop microprocessor shipments to Vobis' supplier  The banner was removed before the CeBit show opened.

107. Intel's dealings with retailers are unlawfully exclusionary, have no pro-competitive justification, and are intended to maintain its monopoly

### 4. Intel's Standard Setting and Other Technical Abuses

#### a. Intel's Exclusion of AMD from Industry Standards

108. Companies within the computer industry often agree to design certain aspects of their products in accordance with industry standards to ensure broad compatibility. Indeed, standards are not only ubiquitous in the computer industry, they are essential. But when a company is unfairly excluded from the standards-setting process or is denied timely access to the standard, competition can be restrained in a way that reverberates throughout the entire market. Intel has employed, and continues to employ, a variety of tactics that have the purpose and effect of excluding and/or hampering AMD's full and active participation in the development of important industry standards. It has also worked to deny AMD timely access to such standards. Its efforts have hampered AMD's ability to vigorously compete in the market.

109. By way of example, Intel and AMD each develop and manufacture memory controller technologies that allow their processors and related components to communicate with memory  Intel designs and manufactures an entirely separate chip for this purpose, known as the Graphics and Memory Controller Hub, but AMD embeds its memory controllers directly into its processors, thus dispensing with the need for an extra chip and speeding up

36

communication  Both companies need to know and have access to memory standards well in advance of producing their processors and/or chipsets so that their memory controller designs will be compatible with the next generation of memory devices

110  The Joint Electron Device Engineering Council ("JEDEC") is the industry organization responsible for the standards governing the most recent generations of computer memory chips.  Even though JEDEC was already developing the standards for the next generation of memory chips, Intel convened a secret committee that it dubbed the Advanced DRAM Technology ("ADT") Consortium to develop a competing memory standard.

111  The ADT Consortium was cleverly structured with multiple tiers of membership, each with different levels of access to information.  The majority of companies were consigned to the lowest tier, meaning that they would receive access to the memory standard only upon its completion, but not during its development.  The actual development effort was undertaken by companies with the highest tier membership status, which Intel reserved for itself and the major memory manufacturers  No other companies were allowed input or full access to the standard during its development by the ADT Consortium.

112.  AMD desperately needed access to the developing standard, and input into its definition, in order to be able to launch a microprocessor with updated memory controller technology at the same time as Intel  AMD lobbied repeatedly for higher tier membership status, but was continually turned down  Intel had structured the ADT Consortium's rules to require a unanimous vote – a rule that gave Intel veto power – over any decision to allow AMD to join the development committee, and it used that veto power to cause the Consortium arbitrarily to reject AMD's application.

113  By foreclosing AMD from input or access to the memory standard during its development process, Intel deliberately placed AMD at a severe competitive disadvantage  As a consequence of its exclusion, AMD had no opportunity to monitor participants' suggestions and to object to Intel-proposed features that were without substantial benefit to consumers and were instead motivated by Intel's desire to disadvantage AMD's microprocessor architecture.

37

Furthermore, by keeping the ADT Consortium memory standard-setting process shrouded in secrecy, Intel was able to gain a significant head start. While the ADT Consortium was ultimately unsuccessful in implementing an industry standard, this type of exclusionary conduct exemplifies Intel's attempts to use industry standard-setting to competitively disadvantage AMD in an unlawfully exclusionary manner.

114. Indeed, Intel is attempting a repeat performance with respect to a new memory standard, this time excluding AMD by avoiding the open standard-setting committee entirely. Intel is currently coercing the major memory producers into signing non-disclosure agreements and working exclusively with Intel in a "secret" committee to develop the next generation memory interface standard. Once under this agreement, the memory manufacturers are prohibited from sharing information about their own product designs implementing the memory interface standard. This has the effect of preventing AMD from completing the design of its processor memory controllers until Intel permits memory manufacturers to communicate their interface specifications to the industry.

115. By this scheme, Intel tightens its control over the industry by converting what the component manufacturers intend as a public standard into a proprietary one, and thereby guarantees itself an undeserved head-start and unfair competitive advantage.

### b. *Intel's Promotion of Industry Standards that Disadvantage AMD*

116. Even where it has been unable to exclude AMD from participating in the development of industry standards, Intel has attempted to drive the adoption of standards having no substantial consumer benefit and whose sole or dominant purpose was to competitively disadvantage AMD based on its highly integrated microprocessor architecture.

117. As an example, in 2004, JEDEC began developing standards governing the design of the memory modules for next generation ("DDR3") memory devices. These modules, known as dual inline memory modules, or "DIMMs," consisted of printed circuit boards upon which a number of memory chips were mounted. The DIMMs connected the memory chips to the computer's motherboard through a series of metal connectors known as "pins." One

38

purpose of the JEDEC standards was to define the functions of these pins so as to enable chipmakers to design compatible memory controllers that would allow their microprocessors and the memory on the DIMMs to communicate.

118  The JEDEC committee, which consists of members representing companies throughout the computer industry, had already adopted a scheme for defining the pins for the previous generation ("DDR2") DIMMs used in desktop and laptop computers. When the JEDEC committee began work on standards for DDR3 memory modules for desktop computers, Intel proposed that the committee adopt a pin definition similar to that used for the DDR2 memory modules. This proposal made perfect sense, as Intel explained to the committee, because it allowed DDR3 memory controllers to be compatible with DDR2 and DDR3 memory modules.

119  However, when the JEDEC committee began to define the pins for DDR3 laptop memory modules in this consistent manner, Intel completely reversed its position, counter-proposing instead that the committee rearrange the pin definitions  Intel's proposal had no discernable technical merit or basis

120  In fact, Intel's motivation for proposing modification of the laptop memory module pin definition was to competitively disadvantage AMD. Any modification to the laptop memory module pin definition would require Intel and AMD to make corresponding modifications of their memory controllers  AMD's microprocessor design, while representing a huge breakthrough in integration, embeds the memory controller directly into its microprocessor  While this produces significant computing advantages, modification of an embedded memory controller requires significantly more time and expense

121  Knowing this vulnerability, Intel proposed its modified DDR3 memory module pin definition for laptop computers for the purpose of delaying AMD's introduction of a technologically superior part  While Intel's proposal was ultimately rejected by the JEDEC committee, confirming the proposal's complete lack of technical merit, this is yet another example of how Intel has attempted to drive industry standards to achieve its exclusionary ends.

*c. Intel's Leveraging of Its Other Product Lines to Unfairly Disadvantage*
   *AMD in the Marketplace*

122  Intel has also designed and marketed microprocessor-related products with the goal of compromising performance for those who opt for AMD solutions, even if it requires sacrificing its own product quality and integrity.

123. An example is Intel's compilers. Generally, independent software vendors ("ISVs") write software programs in high-level languages, such as C, C++, or Fortran. Before these programs can be understood by a computer system, they must be translated into object code – a machine-readable language – by a software program called a compiler. Different companies write compilers for different operating systems (Windows, Linux, etc.) and for different programming languages (C, C++, Fortran, etc.) Intel offers compilers for use with a variety of different operating systems and programming languages

124  Intel's compilers are designed to perform specialized types of optimizations that are particularly advantageous for ISVs developing software programs that rely heavily upon floating point or vectorized mathematical calculations  Such programs include, for example, mathematical modeling, multimedia, and video game applications.

125. Intel has designed its compiler purposely to degrade performance when a program is run on an AMD platform  To achieve this, Intel designed the compiler to compile code along several alternate code paths  Some paths are executed when the program runs on an Intel platform and others are executed when the program is operated on a computer with an AMD microprocessor  (The choice of code path is determined when the program is started, using a feature known as "CPUID" which identifies the computer's microprocessor.) By design, the code paths were not created equally. If the program detects a "Genuine Intel" microprocessor, it executes a fully optimized code path and operates with the maximum efficiency. However, if the program detects an "Authentic AMD" microprocessor, it executes a different code path that will degrade the program's performance or cause it to crash

40

126. ISVs are forced to choose between Intel's compilers, which degrade the performance of their software when operated with AMD microprocessors, or third-party compilers, which do not contain Intel's particular optimizations. Sadly for AMD and its customers, for legitimate reasons Intel's compilers appeal to certain groups of ISVs, especially those developing software programs that rely heavily on floating point and vectorized math calculations. Unbeknownst to them, performance of their programs is degraded when run on an AMD microprocessor not because of design deficiencies on the part of AMD, but deviousness on the part of Intel

### EFFECTS OF INTEL'S MISCONDUCT

127. Intel's unlawful conduct has caused and will continue to cause substantial harm to competition in the market for x86 microprocessors in domestic, import, and export trade. Were it not for Intel's acts, AMD and others would be able to compete for microprocessor business on competitive merit, both domestically and internationally, bringing customers and end-product consumers lower prices, enhanced innovation, and greater freedom of choice.

128. Intel's anticompetitive acts both inside and outside the territorial boundaries of the United States have a direct, substantial, and reasonably foreseeable effect on trade and commerce that is not trade and commerce with foreign nations, and on United States import trade and commerce. In maintaining its monopoly by unlawfully denying rivals a competitive opportunity to achieve minimum levels of efficient scale, Intel must necessarily exclude them from the product market worldwide. As the domestic U S market is but an integral part of the world market, successful monopolization of the U.S. market is dependent on world market exclusion, lest foreign sales vitalize a rival's U.S. competitive potential.

129 Intel's Sherman Act violative conduct throughout the world has caused and will continue to cause substantial harm to the business of AMD in the domestic, import, and export trades, in the form of artificially constrained market share, lost profits and increased costs of capital  Additionally, that same conduct has had, and will continue to have, a direct,

41

substantial, and reasonably foreseeable effect on AMD's ability to sell its goods to foreign customers in restraint of its U.S.-based and directed business, including its U S export business  These harms are evidenced by the following:

- When AMD first entered the server market in 2002 with its Athlon microprocessor – a part designed for desktops, not servers – the small OEMs and white-box vendors deploying the chip nonetheless managed to secure approximately 3% of the worldwide server market.  AMD introduced its next generation Opteron microprocessor for servers the following year, and the chip won rave reviews and passionate customer testimonials, including Best of Show at the June 2003 ClusterWorld Conference and Expo and Best Processor award in July 2003 from InfoWorld   Nonetheless, by means of its exclusionary and anticompetitive conduct, as of the Fourth Quarter 2004, Intel had limited AMD's worldwide server market share to less than 5%, not appreciably more than before it introduced the Opteron.

- Intel's exclusionary conduct has successfully boxed AMD out of the notebook sector.  Its exclusive deals with Dell, Sony and Toshiba alone bar AMD from a third of the world market and half of U.S. domestic sales   Intel's economic coercion and fidelity rebates have foreclosed AMD from an appreciable share of the remainder.

- AMD's Athlon64 is widely recognized as fully competitive with Intel's best desktop offering with the added benefit that it can run 64-bit software.  Nonetheless, with the exception of a channel-restricted HP machine and a single Fujitsu-Siemens' model, AMD has failed to get a single major OEM – which collectively dominate the lucrative commercial desktop sector – to launch broadly an Athlon64 commercial desktop. Fortune 500 companies won't take a chance on AMD unless it partners with a Tier One desktop OEM, but Intel's exclusionary conduct, including its economic coercion of Dell, HP, IBM, Gateway and Acer, prevents that from happening.  As a result, AMD's commercial desktop share is no greater now than it was in 2002

42

## CLAIMS FOR RELIEF

## CLAIM 1

### Willful Maintenance of a Monopoly
### In Violation of Sherman Act, Section 2

130   AMD realleges and incorporates by reference the averments set forth in paragraphs 1 through 129.

131   The x86 Microprocessor Market is a relevant product market within the meaning of the antitrust laws

132   The relevant geographic market is the world.

133   Intel possesses monopoly power in the relevant market, maintaining a market share of over 90% by revenue and 80% by unit volume.

134.  Substantial barriers to entry and expansion exist in the relevant market

135   Intel has the power to control prices and exclude competition.

136.  Intel has engaged in conduct with anticompetitive effects to unlawfully maintain and enhance its monopoly in the relevant market and to keep prices high, to stifle competition and to eliminate consumer choice through unlawfully exclusionary behavior designed to keep AMD weak, undersized, and unable to achieve a minimum efficient scale of operation needed to become a viable substitute for Intel with respect to significant customers, or to an essential portion of the market. It has done so with the intent to maintain its monopoly in the relevant market.

137   There is no legitimate business justification for Intel's conduct

138.  AMD has suffered and will continue to suffer injury to its business and property.

139   Intel's conduct has caused and will continue to cause injury to the relevant market in the form of higher prices and reduced competition, innovation and consumer choice.

## CLAIM 2

### Secret Discriminatory Rebates and Discounts
### In Violation of California Business and Professions Code § 17045

140  AMD realleges and incorporates by reference the averments in paragraphs 1 through 129.

141  California Business & Professions Code § 17045 provides in pertinent part:

> 17045  The secret payment or allowance of rebates, refunds,
> commissions, or unearned discounts, whether in the form of money
> or otherwise, or secretly extending to certain purchasers special
> services or privileges not extended to all purchasers purchasing
> upon like terms and conditions, to the injury of a competitor and
> where such payment or allowance tends to destroy competition, is
> unlawful

142  As set forth above, particularly in paragraphs 59 through 71, 89 through 91 and 103 through 105, Intel has systematically engaged in a scheme to extend discriminatory secret rebates and discounts to OEMs, distributors, retailers and others for the purpose of injuring AMD and tending to destroy competition.

143  Intel has also secretly given engineering funds, advance technical information, and other benefits to certain customers but not to others similarly situated.  This conduct constitutes special services or privileges not extended to all customers purchasing upon like terms and conditions  AMD has information that this practice is occurring, but due to Intel's nondisclosure agreements and engendered customer fear, AMD as well as Intel's other customers do not know the extent or degree of the preferential treatment

144.  Intel keeps secret its discriminatory rebates and discounts by, among other things, purposely concealing from one customer discounts it extends to another, and by signing customers, retailers and other beneficiaries of its secret discounts and rebates to nondisclosure and confidentiality agreements.

44

145. Intel's conduct emanated from its Santa Clara, California headquarters, and/or was intended to and did harm California residents, including AMD, and is therefore subject to California law

146 Intel's secret rebates, unearned discounts, and preferential treatment of certain customers are mechanisms to divert sales and customers away from AMD Intel targets these mechanisms at AMD's actual and potential customers. Intel bestows them to reward those customers who cease or curtail their dealings with AMD, and withholds them to punish customers who do not. As a result, AMD has lost millions of dollars in potential sales.

147 Intel's secret payment of rebates and unearned discounts, and its secret and discriminatory bestowal of special services and privileges, tend to diminish and destroy competition in the relevant product market.

### CLAIM 3

#### Interference with Prospective Economic Advantage
#### In Violation of California Business and Professions Code § 17045

148. AMD realleges and incorporates by reference the averments in paragraphs 1 through 129.

149 Intel intentionally interfered with AMD's prospective economic advantage.

150. AMD has enjoyed economic relationships with OEMs, distributors, retailers, and other actual and potential customers and partners which contained the probability of future economic benefit

151 With knowledge of these relationships, Intel has engaged in intentional, wrongful conduct designed to interfere with and disrupt AMD's relationships with these third parties As set forth above, Intel has made direct payments in return for exclusivity and near-exclusivity; offered discriminatory rebates, volume discounts and subsidies conditioned on customer "loyalty"; threatened economic retaliation against those who gave, or contemplated giving, too much of their business to AMD or who refused to limit AMD to Intel-approved

45

models, lines and/or sectors, or who cooperated too closely with AMD's promotion of its competitive processors

152. Intel's actions were independently wrongful as they violated federal and state law, were in restraint of trade, and were independently tortious.

153. Intel's intentional, wrongful conduct resulted in the actual disruption of AMD's relationships with these third parties. As set forth above, Intel's conduct caused these third parties (i) to cease purchasing microprocessors from AMD, (ii) to limit their purchases of microprocessors from AMD, (iii) to abstain from purchasing microprocessors from AMD in the first instance, (iv) to restrict sales of products containing AMD microprocessors, (v) to abandon planned AMD offerings, (vi) to restrict distribution and marketing of planned AMD offerings, and (vii) to withdraw from participating in AMD product launches and promotions.

154. AMD has suffered economic harm proximately caused by Intel's conduct in the form of artificially constrained market share, increased costs of capital, lost profits and sales, as well as lost publicity and promotion.

155. Intel's conduct emanated from its Santa Clara, California headquarters, and/or was intended to and did harm California residents, including AMD, and is therefore subject to California law

156. Intel is not entitled to the "competition privilege" because Intel employed improper means and intended to create and/or to continue an illegal restraint of competition.

157. Intel acted both oppressively and maliciously with intent to cause injury to AMD and with conscious disregard for the rights of others. As such, AMD is entitled to punitive damages, in addition to compensatory damages, as permitted by law.

46

## DEMAND FOR TRIAL BY JURY

158. Pursuant to Fed. R. Civ. P. 38(b), AMD demands trial by jury of all issues so triable under the law.

## PRAYER FOR RELIEF

WHEREFORE, AMD PRAYS THIS COURT:

A.      Find that Intel is wrongfully maintaining its monopoly in the x86 Microprocessor Market in violation of Section 2 of the Sherman Act and award AMD treble damages in an amount to be proven at trial, pursuant to Section 4 of the Clayton Act, 15 U.S.C. § 15(a).

B.      Find that Intel has made secret payments and allowance of rebates and discounts, and secretly and discriminatorily extended to certain purchasers special services or privileges, all in violation of California Business & Professions Code § 17045, and pursuant thereto award AMD treble damages for its resulting lost profits in an amount to be proven at trial.

C.      Find that Intel has intentionally interfered with valuable business relationships of AMD to its economic detriment and award AMD damages in an amount to be proven at trial for its resulting losses, as well as punitive damages, as permitted by law.

D.      Grant injunctive relief prohibiting Intel and all persons, firms and corporations acting on its behalf or under its direction or control from engaging in any further conduct unlawful under Section 2 of the Sherman Act or Section 17045 of the California Business and Professions Code.

E.      Award AMD such other, further and different relief as may be necessary or appropriate to restore and maintain competitive conditions in the x86 Microprocessor Market.

47

F    Award AMD attorney's fees and costs of the action

Respectfully submitted,

Jesse A. Finkelstein (#1090)
   finkelstein@rlf.com
Frederick L Cottrell, III (#2555)
   cottrell@rlf.com
Chad M. Shandler (#3796)
   shandler@rlf.com
Steven J Fineman (#4025)
   fineman@rlf.com
Richards, Layton & Finger, P A
One Rodney Square
P. O. Box 551
Wilmington, DE   19899
(302) 651-7700

Attorneys for Plaintiffs Advanced Micro
Devices, Inc and AMD International Sales &
Service, Ltd.

OF COUNSEL.
Charles P. Diamond, Esq
   cdiamond@omm.com
Linda J. Smith, Esq.
   lsmith@omm com
O'Melveny & Myers LLP
1999 Avenue of the Stars, 7th Floor
Los Angeles, CA  90067
(310) 246-6800

Mark A Samuels, Esq.
   msamuels@omm.com
O'Melveny & Myers LLP
400 South Hope Street
Los Angeles, CA 90071
213-430-6340

Dated:  June 27, 2005

48