**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE**

| | | |
|---|---|---|
| ADVANCED MICRO DEVICES, INC., a Delaware corporation, and AMD INTERNATIONAL SALES & SERVICES, LTD., a Delaware corporation, | ) ) ) ) ) | |
| Plaintiffs, | ) | C. A. No. 05-441 (JJF) |
| vs. | ) ) | |
| INTEL CORPORATION, a Delaware corporation, and INTEL KABUSHIKI KAISHA, a Japanese corporation | ) ) ) ) | |
| Defendants. | ) | |

## ANSWER

Defendants INTEL CORPORATION and INTEL KABUSHIKI KAISHA (collectively, "Intel"), by and through their undersigned attorneys, hereby file their Answer to Plaintiffs' Complaint dated June 27, 2005, admitting, denying and otherwise alleging as follows (the numbered paragraphs correspond to those in Plaintiffs' Complaint):

Intel has not violated any law or committed any wrongdoing. AMD's claims against Intel are factually incorrect and contradictory. The claims are factually incorrect because the evidence will show that every failure and setback for which AMD today seeks to blame Intel is actually a direct result of AMD's own actions or inactions. The claims are contradictory for several reasons. AMD is prosecuting this case for alleged antitrust violations that it claims have limited customer demand for its products, yet AMD says that it is "capacity constrained" – which means that it sells every product it can make with its available manufacturing capability. AMD recently claimed in a court document that Intel's competitive actions threaten it with becoming "non-viable," yet

AMD's Chairman and CEO recently told investors that AMD "is in the strongest position we've ever been in." Most significantly, AMD is seeking to prevent Intel from using discounts and other incentives that have the effect of lowering prices paid by customers, even though vigorous competition on price and continual improvements in consumer value are the very practices that the antitrust laws are designed to protect.

The semiconductor industry in which Intel and AMD compete did not exist 50 years ago; today this industry is valued at more than $226 billion in yearly revenues. The business model that has driven this industry's phenomenal growth provides steadily increasing value to consumers and business users based on three fundamental principles: production, product, and price. AMD's choices and behaviors with respect to each of these core principles over the period covered by its Complaint provide a compelling answer to the allegations it has made in this case.

Intel invented the microprocessor in 1971 and for more than three decades has delivered increasingly greater value to microprocessor consumers. Intel's success is due to both its consistent technological leadership over many years and its large investments based on its unwavering belief that the demand for reliable, price-competitive microprocessors will continue to grow. Intel has consistently chosen to invest in the capacity to meet this growing demand. Over the period covered by AMD's Complaint, Intel has made a series of multi-billion dollar investments to expand its manufacturing capacity and to fund research and development related to enhancing manufacturing production. In fact, even during the semiconductor recession of 2001 to 2003, Intel steadfastly followed this investment strategy, despite criticism from some outside analysts who argued that Intel was pursuing a risky path by expanding capacity during a

downturn. Today, even the staunchest critics concede, however, that this investment strategy was sound and has helped keep Intel in a leadership position: "Rather than pulling back, [Intel] invested more, and that is bearing fruit," wrote one analyst.

By contrast, AMD's investments in manufacturing capacity during this period were anemic – because AMD had elected to change course. Through the late 1990s, as AMD itself has acknowledged, AMD had persistent quality problems with manufacturing production and insufficient capacity. By 2002, its then-chairman and CEO Jerry Sanders – who once had taunted other semiconductor competitors in boasting that "real men have fabs,"[1] – said: "AMD will not need to expend billions and billions of dollars on incremental production facilities to achieve our market share objectives." Instead, AMD had embarked on a strategy to remedy its limited capacity through a partnership with chipmaker UMC and through what it hoped would be improvements in the design of its microprocessors, rather than through additional large investments in capacity. In the end, the partnership failed, and AMD never sold a single microprocessor produced through UMC. The design-based strategy also failed; AMD's highest-volume factory is producing less than one-half of the chip volume AMD promised in 2002. AMD's current constraints thus are a direct result of these business decisions and others, made by the company's management.

Intel's success is rooted in its ability to bring ever greater value to consumers through technology innovation, sound management, and considered risk-taking. Intel has

---

[1] A "fab" is a silicon wafer fabrication plant, a factory in which semiconductor devices are manufactured. Fabrication plants for the production of silicon based microprocessors routinely cost in excess of $2 billion to construct. Typically the time to bring a fab from construction to full production is three to four years.

achieved a succession of technology breakthroughs over many years that have allowed it to increase the functionality and performance of its microprocessor products while lowering their price, enabling computer manufacturers to give consumers more for less. Faster, better, and lower price microprocessors and related components have helped put powerful personal computers within reach of virtually every household and business desk. Consumers and businesses enjoy performance and productivity benefits on desktop or laptop computers today that ten years ago were the exclusive domain of mainframe computers costing in excess of $1 million, and an entry-level PC bought for under $300 today delivers the performance of a cutting-edge workstation that cost as much as 100 times more a decade ago. Since Intel invented the microprocessor in 1971, prices for microprocessors have declined and the capabilities have increased as in no other industry.

Intel's success also rides on its consistent performance over many years in providing its OEM customers with a combination of competitive products, reliable supply, and competitive cost. In contrast, AMD's reputation as a reliable supplier has been questioned over the years and continues to affect the company's business performance today. Only a few years ago, AMD suffered from such severe microprocessor supply problems that it cut off supplies to many of its customers. AMD later admitted it was unable to regain share at those customers whose needs it did not satisfy during "the production-limited [period] when shipments were prioritized to AMD strategic partners." Just a few weeks before AMD filed its Complaint, a major business publication reported that AMD still suffers from a "nagging doubt on the part of potential new customers about its ability to reliably deliver its chips."

At numerous times in the past five years, AMD has lagged behind Intel in its product offerings. A PC technology journal described AMD products in 2002 as "running out of gas" and emphasized that "AMD desperately needs to get new competitive products out the door" to be competitive with Intel. An investment bank in 2003 said that AMD's Athlon XP microprocessor line had grown "long in the tooth" and was overdue for replacement. AMD's replacement product, Athlon64, was delayed well beyond the expected introduction date.

More recently, AMD was slow to respond to new developments in the fast-growing and profitable segment for laptop computers. Growth in this segment took off two years ago as a result of Intel's introduction of the Pentium® M processor and the Centrino™ Mobile Technology, which helped to popularize wireless mobile computing. AMD released its competitive offering just three months before filing its Complaint.

Despite its protestations to the contrary, when AMD is able to combine competitive products with reliable supply, the market responds. After dedicating a significant portion of its capacity to producing its recent Opteron processors, AMD has seen gains in its share of microprocessor sales in the profitable server market segment. This is precisely what one would expect in a truly competitive industry. In part because of this increased penetration of this server segment, AMD has been able to increase its average selling prices and profits from the sale of microprocessors.

Intel does not and cannot force PC makers to buy Intel processors if they prefer AMD processors. PC manufacturers routinely exercise purchasing power that reflects their ability to divert portions of their business from one supplier to another. PC makers understand the importance of the microprocessor, and select suppliers by comparing

price, performance, quality, and reliability, as well as the strength and reliability of each supplier's expected future product offerings.

AMD claims that Intel sustains a monopoly that allows it to charge higher prices, but that it does so by *lowering* prices. This allegation is inherently contradictory. The discounts that Intel offers PC makers, and the support it gives distributors and retailers to assist them in expanding their sales, have the effect of lowering the prices that Intel charges its customers. While AMD claims that Intel should not be allowed to discount its prices, AMD's Complaint admits that AMD also offers potential customers price discounts and other inducements – sometimes successfully, sometimes not. This rivalry reflects the essence of competition: earning more sales by cutting prices and expanding markets, while delivering more benefits to consumers. AMD's attempt to limit Intel's ability to discount would only serve to raise prices.

AMD's Complaint presents a case study in legal dissonance. Although AMD has purportedly brought its Complaint to promote competition, its true aim is the opposite. Under the cover of competition law, AMD seeks to shield itself from competition. AMD seeks to impede Intel's ability to lower prices and thereby to allow AMD to charge higher prices. AMD's colorful language and fanciful claims cannot obscure AMD's goal of shielding AMD from price competition.

AMD ascribes its every business setback to nefarious conduct by Intel. This has been AMD's approach for many years. AMD would have the Court believe that – but for Intel's alleged behavior – AMD should find itself in a substantially better position than it does today, and that consumers would have benefited. As Intel will demonstrate in this lawsuit, the underlying facts do not support this view. AMD's position in the

marketplace reflects nothing more than the choices AMD has made and its track record with its own customers.

Intel thus denies the claims made in AMD's Complaint, and it seeks judgment in its favor.

### Response to Individual Allegations

1.     Intel admits that AMD competes with Intel in the sale of general-purpose microprocessors, but denies that there exists a separate market for x86 microprocessors. Intel further states that its success in its microprocessor business is attributable to competition on the merits and reflects Intel's technological leadership in microprocessor design and manufacturing, its willingness to incur risks to sustain that leadership, and its reputation as a reliable supplier. Intel denies AMD's allegations regarding its market share. Except as otherwise expressly admitted, Intel denies the allegations of paragraph 1.

2.     Intel states that many companies in the computer industry do have a preference for Intel microprocessors due to the price, performance, quality, reliability, and innovativeness of Intel's products, the strength of Intel's roadmap of planned future product offerings, Intel's superiority as a technology company and Intel's reliability as a microprocessor vendor. Intel has developed its relationships with its customers over many years. Such relationships do not arise quickly or as the result of one or two short term successes. Intel further states that it has engaged in vigorous, lawful competition with AMD in a manner that has benefited consumers. Except as otherwise expressly admitted, Intel denies the allegations of paragraph 2.

3.    Intel denies that it has coerced customers to cause them to exclude AMD and that it has avoided competition on the merits. Each of the third parties named in paragraph 3 of AMD's Complaint is a major supplier or distributor of AMD-based products. The decision whether to purchase from AMD, and in what quantity, is made by these customers without coercion or anticompetitive conditions. Intel denies the remaining allegations of paragraph 3.

4.    Intel admits that AMD introduced Opteron in 2003, and that both Opteron and Athlon64 are 64-bit processors compatible with 32-bit software. Intel specifically denies AMD has achieved technological leadership. Intel microprocessors are used in 333 of the world's top 500 supercomputers. By contrast, only 25 of those systems use AMD microprocessors. Except as otherwise expressly admitted, Intel denies the allegations of paragraph 4.

5.    Intel denies the allegations of paragraph 5. As AMD's own statements reveal, AMD made a conscious choice to forego expenditures on capacity expansion. As a result, AMD is now capacity-constrained and must live with the consequences of that decision. Intel also specifically denies the existence of any monopoly pricing or economic coercion within the semiconductor industry. At best AMD can only allege a pattern of price reductions and incentives offered by Intel to its customers which, if accepted, contribute to an overall lower price for Intel products than would be the case without such incentives. Customers are perfectly free to purchase products from Intel or from AMD based on each customer's own evaluation of the overall strengths and benefits

of the products offered. Except as otherwise expressly admitted, Intel denies the allegations of paragraph 5.

6.    Intel denies the allegations of paragraph 6. Intel specifically denies AMD's illogical claim that consumers pay higher prices because Intel competes by charging lower prices. Intel further denies AMD's characterization of the Japan Fair Trade Commission ("JFTC") proceedings. Intel admits that the JFTC issued a recommendation decision based an interpretation of Japanese law on March 8, 2005, and that Intel agreed not to contest the recommendation for purposes of that proceeding only. Intel did dispute the substance of the charges made by the JFTC and has stated publicly that it does not agree with the facts underlying the JFTC's allegations and the application of law in the recommendation decision. Except as otherwise expressly admitted, Intel denies the allegations of Paragraph 6.

7.    To the extent that Paragraph 7 purports to state a legal conclusion, Intel is not required to respond. Intel otherwise denies the allegations contained in Paragraph 7, including, in particular, the allegation that this Court has subject matter jurisdiction under the Sherman Act over the entirely foreign commerce that is alleged repeatedly throughout AMD's Complaint.

8.    To the extent that Paragraph 8 purports to state a legal conclusion, Intel is not required to respond.

9.    Intel admits the allegations of paragraph 9 regarding Advanced Micro Devices, Inc. Intel lacks sufficient information or belief to admit or deny the allegations in paragraph 9 regarding AMD International Sales & Services, Ltd., and on that basis denies them.

10.    Intel admits that Intel Corporation is incorporated in the State of Delaware and maintains its principal place of business in Santa Clara, California. Intel further admits that Intel Kabushiki Kaisha is a wholly-owned subsidiary of Intel Corporation and is incorporated in and maintains its principal place of business in Japan. Intel further admits that it has other wholly-owned subsidiaries and that it designs, produces, and sells a wide variety of microprocessors, flash memory devices, and silicon-based products for use in the computer and communications industries. Except as otherwise expressly admitted, Intel denies the allegations of paragraph 10.

11.    Intel admits that a general-purpose microprocessor is the brain of every computer and that the microprocessor is an integrated circuit capable of executing instructions and performing mathematical computations at very high speeds. Intel admits that different microprocessors may support different instruction sets, which represent the machine language instructions that each microprocessor understands. Intel admits that early microprocessors processed 4 bits and 8 bits at a time and that later microprocessors were capable of handling 16, 32, and 64 bits of data at a time, respectively. Intel admits that 32-bit microprocessors were capable of operating with Windows. Except as otherwise expressly admitted, Intel denies the allegations of paragraph 11.

12.    Intel admits that IBM designed a personal computer in the early 1980s and introduced the IBM PC in 1981, that IBM selected Intel's microprocessors over competing microprocessors, that Intel's microprocessors used an instruction set that was sometimes referred to as the "x86 instruction set," and that the IBM PC used Microsoft's DOS operating system. Intel further admits that, in 1981, Intel asked AMD to be a second source for certain Intel microprocessors, pursuant to the terms, conditions, and limitations of a Technology Sharing Agreement executed in 1982. Intel lacks sufficient information or belief to admit or deny the allegations in paragraph 12 regarding the state of mind of third parties and on that basis denies them. Except as otherwise expressly admitted, Intel denies the allegations of paragraph 12.

13.    Intel denies that it engaged in any anticompetitive conduct in connection with the 1982 Technology Sharing Agreement. Intel further states that, among other findings, the arbitrator concluded that AMD was not the "victim" of Intel's alleged plan, but was "victimized by its own inability to adjust to what it knew to be reality," and, with respect to AMD's delay in the development of competitive products, that "Intel's actions had very little to do with AMD's conduct." The arbitrator thus concluded that AMD's own strategic decisions and its execution of those decisions in the marketplace – rather than any alleged misconduct by Intel – were responsible for AMD's business performance, a fact that remains equally true today. Intel further states that the claims made in paragraph 13 of the Complaint were the subject of a prior antitrust suit brought by AMD against Intel, which AMD agreed to dismiss *with prejudice* in 1995 as part of a settlement in which AMD paid damages to Intel. Except as otherwise expressly admitted, Intel denies the allegations of paragraph 13.

14.    Intel denies the allegations of paragraph 14. Intel further states that AMD's claims in paragraph 14 were the subject of a prior antitrust suit brought by AMD against Intel, which AMD agreed to dismiss with prejudice in 1995 as part of a settlement in which AMD paid damages to Intel.

15.    Intel admits that in 1987 AMD petitioned to compel arbitration with respect to the 1982 Intel-AMD Technology Sharing Agreement and that paragraph 15 contains a quotation from the arbitrator's decision. However, Intel denies that it engaged in any anticompetitive conduct in connection with the 1982 Technology Sharing Agreement. Intel further states that among other findings, the arbitrator concluded that AMD was not the "victim" of Intel's alleged plan, but was "victimized by its own inability to adjust to what it knew to be reality," and, with respect to AMD's delay in the development of competitive products, that "Intel's actions had very little to do with AMD's conduct." The arbitrator thus concluded that AMD's own strategic decisions and its execution of those decisions in the marketplace – rather than any alleged misconduct by Intel – were responsible for AMD's business performance, a fact that remains equally true today. Intel further states that the claims made in paragraph 15 were the subject of a prior antitrust suit brought by AMD against Intel, which AMD agreed to dismiss *with prejudice* in 1995 as part of a settlement in which AMD paid damages to Intel. Except as otherwise expressly admitted, Intel denies the allegations of paragraph 15.

16.    Intel admits that in 1992 the arbitrator awarded AMD the remedies recited in paragraph 16 of AMD's Complaint, including a financial award of less than 1% of the amount sought by AMD, which was substantially less than the cost of litigation. Intel

admits that the litigation lasted five years and that in conclusion the arbitrator found that: "most of the many claims which AMD has made have come to naught" and that AMD's claims (many of which are repeated in the present Complaint) had a "big problem, [namely] that AMD assumes a somewhat romanticized factual situation which, like Camelot, never existed . ..." Intel further admits that the arbitrator's award was confirmed, and that paragraph 16 contains a partial quotation from the arbitrator's decision. Except as otherwise expressly admitted, Intel denies the allegations of paragraph 16.

17.    Intel admits that in 1995 Intel and AMD settled all the outstanding legal disputes that were then pending between the companies. However, Intel denies AMD's characterization of the 1995 settlement. The agreement in fact resulted in AMD paying Intel $58 million in damages for AMD's improper use of Intel's intellectual property. Intel further states that, as part of the 1995 settlement, AMD dismissed with prejudice all of the antitrust claims that it had asserted against Intel and agreed not to sue Intel for any claims based on conduct that occurred before January 6, 1995. Intel admits that AMD introduced the Athlon microprocessor in 1999, but specifically denies AMD's characterization of that product. Except as otherwise expressly admitted, Intel denies the allegations of paragraph 17.

18.    Intel admits that AMD introduced Opteron in 2003, and that Opteron and Athlon64 are 64 bit-processors that are compatible with 32-bit software. Intel also admits that the Itanium processor executes an instruction set that is not x86-compatible, but states that the Itanium processor was designed to execute x86 instructions as well as its

own advanced instruction set. Except as otherwise expressly admitted, Intel denies the allegations of paragraph 18.

19.    Intel admits that Microsoft has announced that Windows would support both AMD's and Intel's 64-bit instruction sets. Intel specifically denies that it copied AMD's 64-bit instruction set and that AMD holds a technology lead over Intel. Intel lacks sufficient information or belief to admit or deny the purported quotation from InfoWorld and on that basis denies it. Except as otherwise expressly admitted, Intel denies the allegations of paragraph 19.

20.    Intel specifically denies that AMD has seized technological leadership in the microprocessor industry. Intel lacks sufficient information or belief to admit or deny the allegation regarding the alleged extension of "AMD64 technology" to AMD's entire product line and on that basis denies it. Intel also lacks sufficient information or belief to admit or deny how many technology awards AMD has "won" or what those purported awards signify and on that basis denies those allegations. Intel states that it is responsible for a myriad of technological and manufacturing innovations in the microprocessor industry over its history and in the past several years, and that these innovations have benefited consumers and competition. Intel invented the microprocessor in 1971, and has been a technology leader at all times since. Its innovations include, among many others, the first dynamic random access memory (DRAM) chips (1970); the first microprocessor (1971); the first electrically programmable read-only memory (EPROM) chip (1971); the first digital signal processor (1979); the first math co-processor (1980); the first large-scale integration Ethernet adapter (1982); the first high-volume general-purpose 32-bit

14

processor (1985); the first single-chip cache memory controller (1985); the first general-purpose microprocessor supporting graphics rendering (1989); the first microprocessor for portable PCs (1990); the first microprocessor for notebook PCs (1992); the first microprocessor running at a multiple of its external clock speed (1992); the first superscalar microprocessor with on-board cache (1993); the first microprocessor supporting "glueless" multiprocessor support (1994); the first flash memory capable of storing two bits per cell (1997); the first supercomputer to attain more than 1 teraflop performance (1997); the first chipset to integrate core logic and graphics acceleration (1999); the first mobile microprocessor to change voltage to achieve power saving (2000); the first server-optimized microprocessor to operate at a 1 GHz speed (2000); the first microprocessor to perform arithmetic functions in half a clock cycle (2000); the first multithreaded microarchitecture process (2001); the first microprocessor to operate at under 1 volt (2001); the first single-chip Gigabit Ethernet controller (2001); the first microprocessor to attain the 2 GHz barrier (2001); the first microprocessor to attain the 3 GHz barrier (2002); the first microprocessor designed from the ground up for mobile applications (2003); the first microprocessor for client systems with a 1 MB cache (2003); the first high-volume manufacturing of strained silicon (2003); the first microprocessor for client systems with a 2 MB cache (2004); and the first dual-core microprocessors for client systems (2005). All of these innovations together have transformed computing to the benefit of consumers.

Intel also remains the semiconductor manufacturing leader. It was an early adopter of each new semiconductor process technology generation including, but not limited to, 0.50μ, 0.35μ, 0.25μ, 0.18μ, 0.13μ, and 90-nm technologies, and is in the

advanced stages of implementing the next-generation 65-nm technology in its factories, while AMD has just completed its conversion to 90-nm technology. Intel was also an early adopter of 12-inch (300-mm) wafers in its factories and enjoys tremendous efficiencies from this technology. Intel converted most of its microprocessors to 12-inch wafers by the end of 2004, while AMD still produces all of its microprocessors on 8-inch wafers that yield less than half as many chips per wafer.

Intel has continued its technological leadership. In 2003, Intel introduced the Pentium M processor, which was the first microprocessor ever to be designed from the ground up as a mobile microprocessor, and which has been the most successful mobile microprocessor in history. It took AMD two years after that to introduce its first processor that was designed as a mobile processor. Intel was the first company to deliver dual-core microprocessors to the desktop market segment, and is on track to be the first to deliver dual-core microprocessors to the mobile segment. Further, contrary to AMD's claim of technological leadership in the server segment, Intel's leadership is demonstrated by the fact that two-thirds of the world's 500 fastest supercomputers use Intel microprocessors, and that there are more than 13 times as many Intel-based systems among the top 500 supercomputers as there are AMD-based systems in that roster. Except as expressly admitted, Intel denies the allegations of paragraph 20.

21.    Intel denies the allegations of paragraph 21. Intel possesses no monopoly and its success is due to its own innovation, sound management, and risk-taking. AMD's successes and failures have been determined entirely by AMD's ability or inability to offer innovative products with reliable manufacturing. Intel specifically denies AMD's claim of "technical leadership." Intel lacks sufficient information or belief with which to

admit or deny AMD's assertion that its market share has not "kept pace" with its so-called "technical leadership" and on that basis denies it. However, to the extent that AMD's statement is accurate in any respect, Intel states that this is not the result of any misconduct by Intel, but rather of a marketplace perception created by AMD's sustained record of poor product performance, manufacturing problems, and unreliability as a supplier over a period of many years. Except as expressly admitted, Intel denies the allegations of paragraph 21.

22.    Intel admits that Windows runs on x86 processors. It states that Linux runs on multiple microprocessor architectures, including both x86 and non-x86 architectures. Except as otherwise expressly admitted, Intel denies the allegations of paragraph 22.

23.    Intel denies the allegations in paragraph 23.

24.    Intel admits that the relevant geographic market is the world but denies that the relevant market is a market for x86 microprocessors.

25.    Intel denies that a separate market exists for x86 microprocessors. Intel lacks sufficient information or belief as to the source of the information contained in the chart in paragraph 25 and on that basis denies the allegations contained in that chart. Intel denies all of the other allegations of paragraph 25. Intel further states that one or more of these market share claims is inconsistent with statements made by AMD to investors in company press releases.

26.    Intel admits that Cyrix no longer manufactures microprocessors; however, both Cyrix and IDT, another microprocessor maker, have been acquired by VIA Technologies, which does make microprocessors. Intel lacks sufficient information or belief to evaluate VIA's "prospects" and on that basis denies the allegations related to it. Intel admits that Transmeta has announced its intention to cease selling microprocessors. Except as otherwise expressly admitted, Intel denies the allegations of paragraph 26.

27.    Intel admits that construction of a chip fabrication plant may cost $2.5 billion or more. Intel specifically denies that the costs of a fab shield Intel from new competition. AMD is currently building a new fab in Dresden, Germany, with the aid of a subsidy of more than half a billion dollars from German governmental authorities. Intel further denies that any new entrant or a party seeking to expand its capacity to manufacture microprocessors would be required to build a new chip fabrication plant. Except where otherwise expressly admitted, Intel denies the allegations of paragraph 27.

28.    Intel admits that the consumption of x86 microprocessors is growing. Intel admits that microprocessors for servers currently command the highest prices. Intel lacks sufficient information or belief as to the specific percentage of AMD's overall microprocessor sales that are made to customers in the U.S. and on that basis denies that allegation. Intel further states that the Complaint's allegations attribute the majority of both AMD's actual microprocessor sales and the sales that it allegedly lost due to the conduct alleged in the complaint to foreign commerce that lacks a sufficient nexus to U.S. commerce to support jurisdiction under the Sherman Act. Except as otherwise expressly admitted, Intel denies the allegations in paragraph 28.

29.     Intel admits that the companies set forth in paragraph 29 are all significant companies that purchase microprocessors, based on their own individual competitive considerations and evaluation of the competing products. Intel further admits that HP and Dell are the largest OEMs based in the United States, that HP now owns Compaq, that IBM sold its PC business but not its server business to Lenovo, that Fujitsu-Siemens is a Europe-based joint venture, that IBM and Gateway/eMachines are based in the U.S., that Toshiba, Acer, NEC, and Sony are significant competitors in the notebook market segment, and that HP, Dell, IBM, and Sony have some U.S. manufacturing operations. Except as otherwise expressly admitted, Intel denies the allegations of paragraph 29.

30.     Intel lacks sufficient information or belief as to the source of the information contained in paragraph 30 and on that basis denies the allegations contained in that paragraph.

31.     Intel lacks sufficient information or belief as to what portion of AMD's sales is made through distributors, and on that basis denies that allegation. Intel admits that some portion of the production of microprocessors is sold to system builders and to independent distributors that sell to OEMs, computer assemblers, and other distributors. Except as otherwise expressly admitted, Intel denies the allegations of paragraph 31.

32.     Intel denies that Dell is the only OEM that markets its products only through the direct distribution channel. Intel admits the remaining allegations of paragraph 32.

33.    Intel admits that it offers market development funds to OEMs that promote the Intel® Inside and Centrino Mobile Technology brands to consumers. Except as otherwise expressly admitted, Intel denies the allegations of paragraph 33.

34.    Intel denies the allegations of paragraph 34. Intel denies that it has engaged or is engaging in coercion and states that customers benefit from, and are not coerced by, price reductions.

35.    Intel denies the allegations of paragraph 35. Intel further states that it offers certain discounts and other financial incentives that reduce the price of microprocessors to meet competition from AMD and to expand the demand for Intel microprocessors and the products containing those microprocessors. Intel further states that AMD seeks to stifle Intel's ability to meet competition and compete on the merits through lower pricing.

36.    Intel denies the allegations of paragraph 36. Intel further states that any competitive advantages that Intel possesses are due to the price, performance, quality, reliability, and innovativeness of Intel's products, the strength of Intel's roadmap of planned future product offerings, Intel's superiority as a technology company, Intel's reliability as a microprocessor vendor, and end-user customers' preference for Intel products. Intel further states that AMD's capacity constraints belie AMD's claims of customer coercion, as the constraints show that AMD is able to sell all the microprocessors that it makes and that AMD's real complaint is that Intel is engaged in price competition.

37.    Because this paragraph simply purports to characterize the remaining allegations as "examples," Intel incorporates by reference its responses to the remaining allegations of the Complaint. To the extent that paragraph 37 requires a response, Intel denies the allegations of paragraph 37.

38.    Intel admits that Dell has elected not to purchase AMD processors to date. Intel states that Dell has evaluated AMD processors on many occasions and that Dell has been free and remains free to purchase AMD processors. Intel further states that Dell's decision to offer Intel-based solutions has contributed to Dell's success in the marketplace. Intel admits that AMD has purported to include a partial quotation attributed to Dell CEO Kevin Rollins but lacks sufficient information or belief as to the accuracy of the quotation and on that basis denies the allegation. Except as otherwise expressly admitted, Intel denies the allegations of paragraph 38.

39.    Intel admits that Dell has elected not to purchase AMD processors to date. Intel states that Dell has evaluated AMD processors on many occasions and that Dell has been free and remains free to purchase AMD processors. Intel further states that Dell purchases from Intel based on the price, performance, quality, reliability, and innovativeness of Intel's products and the strength of Intel's roadmap of planned future product offerings, and that Dell has been very successful by offering Intel-based solutions. Except as otherwise expressly admitted, Intel denies the remaining allegations of paragraph 39.

40.    Intel denies that it made multi-million dollar payments to Sony "in exchange for absolute exclusivity." Intel states that in 2003 Sony changed its business strategy by reducing the number of suppliers to its business and focusing its engineering, development, and production efforts on a single platform for its desktop and notebook computers. Intel admits that, as part of that process, Sony chose to standardize based on Intel's microprocessors. Intel states that Sony has selected Intel microprocessors for its notebook and desktop products based on the price, performance, quality, reliability, and innovativeness of Intel's products and the strength of Intel's roadmap of planned future product offerings. Intel denies that it "accepted the JFTC charges of misconduct with respect to Sony," but states that Intel elected not to contest the JFTC's recommendation decision for purposes of that Japanese proceeding only. Intel did dispute the substance of the charges made by the JFTC and has stated publicly that it does not agree with the facts underlying the JFTC's allegations and the application of law in the recommendation decision. Except as otherwise expressly admitted, Intel denies the allegations of paragraph 40.

41.    Intel denies the allegations of paragraph 41, including, in particular, the allegation that Intel made substantial payments to Toshiba or conditioned market development funds to Toshiba on the requirement that Toshiba not use AMD microprocessors. Intel further states that Toshiba elected to purchase from Intel based on the price, performance, quality, reliability, and innovativeness of Intel's products and the strength of Intel's roadmap of planned future product offerings, and that Toshiba has been very successful by offering Intel-based solutions. Intel lacks information or belief to admit or deny any statement or representation of state of mind attributed by AMD to a

22

third party and on that basis denies them. Intel further denies the conduct attributed to it

by any purported third-party statement alleged in paragraph 41. Finally, Intel denies that

it "accepted the JFTC charges of misconduct with respect to Toshiba," but states that

Intel elected not to contest the JFTC's recommendation decision for purposes of that

Japanese proceeding only. Intel did dispute the substance of the charges made by the

JFTC and has stated publicly that it does not agree with the facts underlying the JFTC's

allegations and the application of law in the recommendation decision. Except as

otherwise expressly admitted, Intel denies the allegations of paragraph 41.

     42.    Intel denies that it has made payments to NEC "in exchange for caps on

NEC's purchases from AMD." Intel states that NEC chose to increase its purchases of

Intel microprocessors since the fourth quarter of 2002 based on the price, performance,

quality, reliability, and innovativeness of Intel's products and the strength of Intel's

roadmap of planned future product offerings. Intel lacks information or belief as to the

source of AMD's claimed share of NEC purchases of various microprocessors in

paragraph 42 and on that basis denies the allegations regarding such shares. Intel lacks

information or belief to admit or deny any statement or representation of state of mind

attributed by AMD to a third party and on that basis denies them. Intel further denies the

conduct attributed to it by any purported third-party statement alleged in paragraph 42.

Intel denies that it has "accepted the JFTC charges of misconduct with respect to NEC"

and states that Intel elected not to contest the JFTC's recommendation decision for

purposes of that Japanese proceeding only. Intel did dispute the substance of the charges

made by the JFTC and has stated publicly that it does not agree with the facts underlying

the JFTC's allegations and the application of law in the recommendation decision. Except as otherwise expressly admitted, Intel denies the allegations of paragraph 42.

43.    Intel denies that it has offered payments to Fujitsu conditioned on Fujitsu's agreement not to deal with AMD. Intel states that Fujitsu is one of AMD's largest customers in Japan and that AMD and Fujitsu have close and long-standing business relationships in multiple product lines, including a joint venture to produce flash memory chips that was active at the time of the alleged conduct. Intel further states that it is Fujitsu, not Intel, that determines the content and style of Fujitsu's website and product catalogues. Intel lacks information or belief to admit or deny any statement or representation of state of mind attributed by AMD to a third party and on that basis denies them. Intel denies that it pressured Fujitsu to remove AMD-based models from its web site. Intel denies that it has "accepted the JFTC charges of misconduct with respect to Fujitsu" and states instead that Intel elected not to contest the JFTC's recommendation decision for purposes of that Japanese proceeding only. Intel did dispute the substance of the charges made by the JFTC and has stated publicly that it does not agree with the facts underlying the JFTC's allegations and the application of law in the recommendation decision. Except as otherwise expressly admitted, Intel denies the allegations of paragraph 43.

44.    Intel denies that it has "purchased an exclusive dealing arrangement" with Hitachi. Intel further states that Hitachi chose to consolidate its microprocessor purchases with Intel based on price, performance, quality, reliability, and innovativeness of Intel's products, the strength of Intel's roadmap of planned future product offerings,

and Hitachi's desire to eliminate its costs associated with designing and maintaining separate platforms based on Intel and AMD systems. Intel denies that it has "accepted the JFTC charges of misconduct with respect to Hitachi" and states instead that Intel elected not to contest the JFTC's recommendation decision for purposes of that Japanese proceeding only. Intel did dispute the substance of the charges made by the JFTC and has stated publicly that it does not agree with the facts underlying the JFTC's allegations and the application of law in the recommendation decision. Except as otherwise expressly admitted, Intel denies the allegations of paragraph 44.

45.     Intel admits that in 2001 Gateway elected to use only Intel microprocessors in its PCs, but denies that it offered Gateway "large sums not to deal with AMD." Intel states that Gateway selected Intel microprocessors because of price, performance, quality, reliability, and innovativeness of Intel's products and the strength of Intel's roadmap of planned future product offerings. Intel lacks information or belief to admit or deny any statement or representation of state of mind attributed by AMD to a third party and on that basis denies them. Intel further denies the conduct attributed to it by any purported third-party statement alleged in paragraph 45. Except as otherwise expressly admitted, Intel denies the allegations of paragraph 45.

46.     Intel lacks information or belief as to the state of mind of Supermicro, and on that basis denies the allegation that Supermicro "feared" Intel retaliation. Intel further denies any conduct attributed to it by any purported third-party statements alleged in paragraph 46. Intel admits that, prior to the introduction of the Opteron-based server, Supermicro voluntarily purchased solely Intel microprocessors, based on the price,

performance, quality, reliability, and innovativeness of Intel's products and the strength

of Intel's roadmap of planned future product offerings. Intel further states that it did not

receive advance knowledge of Supermicro's release of the Opteron-based server, that it

did not forbid Supermicro from publicizing the product, and that it has made no threats

and engaged in no retaliation for Supermicro's use of AMD processors. Intel lacks

sufficient information or belief as to how Supermicro has marketed the Opteron-based

server to admit or deny those allegations, and on that basis denies them. Intel further

alleges that Supermicro's decisions as to when and how to promote an AMD product are

entirely its own. Except as otherwise expressly admitted, Intel denies the allegations of

paragraph 46.

47.    Intel states that it competes vigorously to sell its microprocessors for use

in commercial desktop systems and that it has been successful in its efforts to sell into

this market segment. Intel further states that corporate customers generally specify Intel

microprocessors for desktop systems based on the price, performance, quality, reliability,

and innovativeness of Intel's products, the strength of Intel's roadmap of planned future

product offerings, Intel's superiority as a technology company, and Intel's reliability as a

microprocessor vendor, and that OEM customers seek to satisfy the needs of their

customers by using Intel processors. Except as otherwise expressly admitted, Intel denies

the allegations of paragraph 47.

48.    Intel denies that it pressured or coerced HP into withdrawing the AMD

offering from its "Evo" brand or into withholding the AMD-powered computer from

HP's network of independent value-added resellers. Intel states that to the extent that HP

26

made decisions to use Intel processors in the place of AMD processors in commercial desktop products, HP made those decisions on the basis of the price, performance, quality, reliability, and innovativeness of Intel's products and the strength of Intel's roadmap of planned future product offerings. Intel lacks information or belief to admit or deny any statement or representation of state of mind attributed by AMD to a third party and on that basis denies them. Intel further denies the conduct attributed to it by any purported third-party statement alleged in paragraph 48. Except as otherwise expressly admitted, Intel denies the allegations of paragraph 48.

49.    Intel admits that HP was very successful with its offering of an Intel-powered DV 1000 notebook, incorporating the Quick Play feature. Intel states that HP brought this innovative product to market as a result of a joint Intel-HP development effort, including Intel's investment in the DV 1000 platform. Intel further states that HP did offer an AMD-powered PC with the DV 1000 feature. Except as otherwise expressly admitted, Intel denies the remaining allegations of paragraph 49.

50.    Intel admits that Gateway offers at least one AMD-based desktop model that is sold at Circuit City. Intel lacks information or belief about AMD's alleged renewed sales efforts with regard to Gateway after Gateway's merger with eMachines to admit or deny those allegations and on that basis denies them. Intel lacks information or belief to admit or deny any statement or representation of state of mind attributed by AMD to a third party and on that basis denies them. Intel further denies the conduct attributed to it by any purported third-party statement alleged in paragraph 50. Except as otherwise expressly admitted, Intel denies the remaining allegations of paragraph 50.

51.    Intel lacks information or belief regarding the nature of AMD's negotiations with IBM to admit or deny those allegations, and on that basis denies them. Intel lacks information or belief to admit or deny any statement or representation of state of mind attributed by AMD to a third party and on that basis denies them. Intel further denies the conduct attributed to it by any purported third-party statement alleged in paragraph 51. Except as otherwise expressly admitted, Intel denies the allegations of paragraph 51.

52.    Intel admits that IBM supported AMD's Opteron launch, and that IBM marketed an Opteron-based server model that was targeted for high performance and technical computing segment. Intel lacks information or belief to admit or deny any statement or representation of state of mind attributed by AMD to a third party and on that basis denies them. Intel further denies the conduct attributed to it by any purported third-party statement alleged in paragraph 52. Except as otherwise expressly admitted, Intel denies the allegations of paragraph 52, including in particular, the allegation that it paid IBM to halt further Opteron plans or development efforts.

53.    Intel denies that it "purchased IBM exclusivity" for its ThinkCentre desktop PCs. Intel lacks sufficient information or belief to admit or deny any statement or representation of state of mind attributed by AMD to a third party and on that basis denies them. Intel further denies the conduct attributed to it by any purported third-party statement alleged in paragraph 53. Except as otherwise expressly admitted, Intel denies the remaining allegations of paragraph 53.

54.    Intel admits that Fujitsu selected an Intel microprocessor over a competing AMD offering for its FMV Lifebook MG entry-level commercial notebook in the first quarter of 2003. Intel denies the allegation in paragraph 54 that it "purchased total exclusivity" for one of Fujitsu's consumer notebook lines. Intel states that AMD and Intel have competed vigorously over time for Fujitsu's consumer notebook business and that Fujitsu's selection of Intel microprocessors has been based on the price, performance, quality, reliability, and innovativeness of Intel's products and the strength of Intel's roadmap of planned future product offerings. Intel further states Fujitsu has increasingly relied on the Pentium M microprocessor and Celeron M microprocessor for notebook models based on the technical superiority of these microprocessors over any competing offering from AMD. Intel lacks sufficient information or belief to admit or deny any statement or representation of state of mind attributed by AMD to Fujitsu and on that basis denies them. Intel further denies the conduct attributed to it by any purported third-party statement alleged in paragraph 54. Except as expressly admitted, Intel denies the remaining allegations of paragraph 54.

55.    Intel lacks sufficient information or belief concerning AMD's allegations that Fujitsu-Siemens was a "mainstay" of its desktop business or that AMD at some unspecified point in time held a 30% share of Fujitsu-Siemens' consumer offerings and on that basis denies the allegations. Intel denies that it has offered Fujitsu-Siemens any "special discount" on Celeron processors in return for removing or otherwise reducing the visibility of Fujitsu-Siemens models utilizing AMD processors on Fujitsu-Siemens' website. Intel further states that Fujitsu-Siemens independently determines the content

and design of its own website. Except as otherwise admitted, Intel denies the allegations of paragraph 55.

56.     Intel denies that it has imposed "market restrictions" on the use of AMD processors by Fujitsu-Siemens. Intel further states that AMD's claims in paragraph 56 are internally inconsistent. AMD claims on the one hand that Fujitsu and/or Fujitsu-Siemens market an AMD-based notebook computer in the U.S. but are allegedly too intimidated by Intel to sell that notebook computer in Europe *and* on the other hand alleges that Fujitsu and/or Fujitsu-Siemens market another AMD-based notebook in Europe but are too intimidated by Intel to sell that notebook computer in North America. Upon information and belief, Intel states that Fujitsu-Siemens has declined to market the Lifebook S2010 commercial notebook in Europe based on sales results of this model in Japan and because the model's features are believed to be poorly suited for the needs of European customers. Intel lacks sufficient information or belief concerning an "FMC Lifebook MG Series" notebook designed by Fujitsu-Siemens and on this basis denies the allegations relating to that model. Intel states that Fujitsu-Siemens does offer commercial desktop models utilizing AMD processors in its Esprimo 5600 series. Intel further states that Fujitsu-Siemens promotes its AMD-based Esprimo P5600 and Esprimo E5600 on its web site. Except as otherwise expressly admitted, Intel denies the allegations of paragraph 56.

57.     Intel admits that NEC has supplied servers using AMD's Opteron microprocessors to Honda Motor Company. Intel states that NEC chose to use Intel Xeon microprocessors in subsequent bids for Honda's server business and has prevailed

in those bids against competitors offering server products based on AMD's Opteron microprocessors due to the superior performance of the Xeon processor-based products in executing Honda's software. Intel further states that NEC has offered Opteron-based server products to other customers in Japan. Except as otherwise expressly admitted, Intel denies the allegations of paragraph 57.

58.    Intel denies the allegations of paragraph 58. Intel further states that it has been particularly successful in the commercial desktop segment because of Intel's earned reputation for quality, innovation, reliability, and a stable roadmap of future products, all of which are factors particularly important to the Chief Technology Officers and IT department managers who control PC purchasing at corporations. OEMs use Intel processors to satisfy the requirements of their corporate customers.

59.    Intel denies the allegations of paragraph 59. Intel states that it offers a wide range of discounts without regard to the level of each customer's purchases of Intel microprocessors and that AMD's claims that it has been foreclosed from competing for a meaningful share of the market by Intel's conduct is contradicted by its allegation that it has been capacity constrained.

60.    Intel denies the allegations of paragraph 60.

61.    The majority of paragraph 61 is hypothetical and not factual in nature and therefore requires no response. Intel denies the allegations of paragraph 61 to the extent that it purports to state any facts.

62.    The majority of paragraph 62 is hypothetical and not factual in nature and therefore requires no response. Intel denies the allegations of paragraph 62 to the extent that it purports to state any facts.

63.    Intel admits that most major OEMs prefer to purchase Intel processors. Intel further states that some OEMs that purchase the majority of their microprocessors from AMD. Intel states that most OEMs purchase from Intel based on the price, performance, quality, reliability, and innovativeness of Intel's products and the strength of Intel's roadmap of planned future product offerings, as well as corporate purchasers' preference for Intel processors and the expectation that Intel will maintain reliable microprocessor specifications. Intel further states that AMD's allegation that it is capacity constrained shows that the constraint on AMD's growth is not any allegedly exclusionary conduct by Intel but, rather, AMD's own decisions regarding investments in manufacturing capacity. Except as otherwise expressly admitted, Intel denies the allegations of paragraph 63.

64.    Intel lacks sufficient information or belief to admit or deny the allegations regarding AMD's share of HP's U.S. consumer sales in the fourth quarter of 2004 and on that basis denies them. Intel further states that AMD's claim that it had captured a 60% share of HP's retail business is inconsistent with its claim that Intel uses discounts to prevent customers from using AMD processors or to limit customers' use of AMD processors. Except as otherwise expressly admitted, Intel denies the allegations of paragraph 64.

65.    Because AMD has not named the OEMs on which Intel has allegedly imposed the conditions alleged in paragraph 65, Intel lacks sufficient information or belief as to the identity of those OEMs and on that basis denies the allegations of paragraph 65. Intel further states that AMD is complaining about discounting that benefits consumers in the form of lower prices. Except as expressly admitted, Intel denies the allegations of paragraph 65.

66.    Intel denies the allegations of paragraph 66.

67.    Intel denies the allegations of paragraph 67. Intel further states that Intel's discounting and rebates promote competition and result in more affordable computers for consumers.

68.    The majority of paragraph 68 is hypothetical and not factual in nature and therefore requires no response. Intel denies the allegations of paragraph 68 to the extent that it purports to state any facts.

69    Paragraph 69 is hypothetical and not factual in nature and therefore requires no response. Intel denies the allegations of paragraph 69 to the extent that it purports to state any facts. Intel further states that it does not sell below cost and that AMD has not alleged the requisite facts to support a predatory pricing claim. AMD is complaining about having to compete on price and has predicated its claim on fanciful hypothetical recitals instead of facts.

70.    Paragraph 70 is hypothetical and not factual in nature and therefore requires no response. To the extent that a response is required, Intel denies the allegations of paragraph 70. Intel further states that AMD is complaining that discounts that result in above-cost prices for every unit sold are predatory in nature, which demonstrates that AMD's true complaint is that it must compete with Intel on price.

71.    Intel admits that OEMs incur expenses in designing and engineering new computers, and that they only make investment decisions that they believe to be economically justified. Except as otherwise expressly admitted, Intel denies the remaining allegations of paragraph 71.

72.    Much of paragraph 72 is hypothetical and not factual in nature and therefore requires no response. AMD's Complaint seems to allege both that granting discounts, rebates, or market development funds is unlawful and anticompetitive, and that the refusal to grant such discounts, rebates, or market development funds is unlawful and anticompetitive. To the extent that a response is required, Intel denies the allegations of paragraph 72.

73.    Intel lacks sufficient information or belief to admit or deny any statement or representation of state of mind attributed by AMD to a third party and on that basis denies them. Intel further denies the conduct attributed to it by any purported third-party statement alleged in paragraph 73. Except as expressly admitted, Intel denies the remaining allegations of paragraph 73.

74.    Intel denies the allegations of paragraph 74.

75.    Intel lacks sufficient information or belief to admit or deny any statement or representation of state of mind attributed by AMD to a third party and on that basis denies them. Intel further denies the conduct attributed to it by any purported third-party statement alleged in paragraph 75. Intel denies the remaining allegations in paragraph 75.

76.    Intel lacks sufficient information or belief to admit or deny any statement or representation of state of mind attributed by AMD to a third party, or as to the status of AMD's alleged negotiations with third-parties, and on that basis denies them. Intel further denies the conduct attributed to it by any purported third-party statement alleged in paragraph 76. Intel denies the remaining allegations in paragraph 76.

77.    Intel lacks sufficient information or belief as to "the key" to AMD's ability to gain "quick market acceptance" of a new microprocessor to admit or deny those allegations and on that basis denies them. Intel further denies that the success or failure of a microprocessor is based on "a successful and impressive 'launch'" and states that the success or failure of a microprocessor among computer professionals is based on its performance, reliability, and value, and the reputation of its supplier for quality, reliability, and innovativeness. Except as expressly admitted, Intel denies the remaining allegations of paragraph 77.

78.    Intel denies the allegations in paragraph 78, and incorporates its responses to the paragraphs below with respect to the alleged examples.

79.     Intel denies the allegations of paragraph 79 that purport to describe Intel conduct, including, in particular, that it engaged in any anticompetitive conduct or efforts to induce Acer from supporting AMD's product launch. Intel further states that Acer's Chairman and CEO, Stan Shih, has publicly stated that his conversation with Mr. Barrett, contrary to AMD's allegations, focused entirely on industry development and technology trends. He further stated that Acer has continued to do business with AMD. Except as expressly admitted, Intel denies the remaining allegations of paragraph 79.

80.     Intel lacks sufficient information or belief to admit or deny any statement or representation of state of mind attributed by AMD to a third party and on that basis denies them. Intel further denies the conduct attributed to it by any purported third-party statement alleged in paragraph 80.

81.     Intel lacks sufficient information or belief to admit or deny any statement or representation of state of mind attributed by AMD to a third party and on that basis denies them. Intel specifically denies the allegations of paragraph 81 to the extent that they purport to describe Intel conduct.

82.     Intel denies the allegations of paragraph 82, including, in particular, that it disrupted the Opteron launch or that it threatened any third party in connection with that launch. Intel lacks sufficient information and belief to admit or deny the quotation attributed to a purported unnamed "computer industry journal" and its unnamed sources, and on that basis denies the allegation. Except as expressly admitted, Intel denies the remaining allegations of paragraph 82.

83.    Intel denies the allegations of paragraph 83. Intel further states that MSI and Atipa issued press releases on or about April 22, 2003, in which they expressed support for AMD's Opteron launch, and that those releases are currently posted on the companies' web sites. Intel further states that a Fujitsu-Siemens endorsement of Opteron appears on the AMD web site.

84.    Intel lacks sufficient information or belief to admit or deny any statement or representation of state of mind attributed by AMD to a third party and on that basis denies them. Intel further denies the conduct attributed to it by any purported third-party statement alleged in paragraph 84. Intel denies that it is engaged in a relentless campaign to undermine AMD's marketing efforts and further denies that AMD is Intel's one remaining competitor. Intel denies that it offered any AMD customers money to pull AMD systems from their booths at the 2004 Super Computing Show. Intel further states that the Fujitsu-Siemens booth at the CeBit show was funded in part by promotional support from Intel and that AMD has no right to have its promotions funded by Intel. Except as otherwise expressly admitted, Intel denies the allegations of paragraph 84.

85.    Intel admits that ATI, nVidia, and VIA are among its many competitors in the supply of core logic chipsets. Except as otherwise expressly admitted, Intel denies the allegations of paragraph 85.

86.    Intel lacks sufficient information or belief to admit or deny AMD's allegations with respect to Acer's intentions regarding the Athlon XP and on that basis denies them. Intel specifically denies the allegations of paragraph 86 with respect to its alleged conduct. Intel denies the remaining allegations of paragraph 86.

87.    Paragraph 87 is pure conclusory legal argument. To the extent that a
response is required, Intel denies the allegations of paragraph 87. Discounting represents
the essence of competition, and it is AMD's attempt to use the antitrust laws to stifle
price competition that lacks a procompetitive justification.

88.    Intel denies the allegations of paragraph 88. Intel further states that it has
no "exclusive deal" with Synnex and that Synnex purchases Intel products based on their
price, performance, quality, reliability, and innovativeness of Intel's products and the
strength of Intel's roadmap of planned future product offerings.

89.    Intel lacks sufficient information or belief to admit or deny any statement
or representation of state of mind attributed by AMD to a third party and on that basis
denies them. Intel further denies the conduct attributed to it by any purported third-party
statement alleged in paragraph 89. Intel further states that AMD and Ingram Micro
recently entered into a global distribution agreement that, according to AMD, expanded
the two companies' relationships to "leverga[e] Ingram Micro's existing global
relationships with thousands of manufacturers, retailers and solution providers." Except
as otherwise expressly admitted, Intel denies the allegations of paragraph 89.

90.    Intel denies the allegations in paragraph 90, including, in particular, that it
has "bribed" distributors not to do business with AMD. Intel further states that, over
time, it has implemented various programs to assist its authorized distributors in
promoting and selling Intel products, and that its programs enhance competition. Intel
denies that any such programs require exclusivity on the part of a distributor. Intel lacks
information or belief to admit or deny any statement or representation of state of mind

38

attributed by AMD to a third party and on that basis denies them. Intel further denies the conduct attributed to it by any purported third-party statement alleged in paragraph 90.

91.    Intel denies the allegations in paragraph 91. AMD appears to be claiming that Intel punishes distributors by reducing its prices to them and coerces them to avoid doing business with AMD through purported threats that it never makes. Intel states that these allegations make it clear that AMD's real complaint is that Intel providing discounts to its customers.

92.    Intel lacks sufficient information or belief to admit or deny any statement or representation of state of mind attributed by AMD to a third party and on that basis denies them. Intel specifically denies the allegations of paragraph 92 that purport to describe Intel conduct.

93.    Intel lacks sufficient information or belief to admit or deny any statement or representation of state of mind attributed by AMD to a third party and on that basis denies them. Intel further denies the conduct attributed to it by any purported third-party statement alleged in paragraph 93. Intel further states that it encourages customers to purchase from Intel authorized distributors, that Intel works with such distributors to help them serve their customers, and that Supercom has never acted as an authorized Intel distributor. Intel denies that it has retaliated against Supercom in any way for dealing with AMD. Except as expressly admitted, Intel denies the remaining allegations of paragraph 93.

94.    Intel denies the allegations of paragraph 94.

95.    Paragraph 95 is pure conclusory legal argument. To the extent that a response is required, Intel denies the allegations of paragraph 95. Discounting represents the essence of competition, and it is AMD's attempt to use the antitrust laws to stifle price competition that lacks a procompetitive justification.

96.    Intel admits that a substantial portion of desktop and notebook computers is sold in retail stores both in the United States and internationally. Intel admits that the retailers named in paragraph 96 sell personal computers. Except as otherwise expressly admitted, Intel denies the allegations of paragraph 96.

97.    Intel admits that many PCs are sold during buying seasons that correspond to events on the calendar, but denies that paragraph 97 correctly describes those buying seasons. Intel admits that microprocessor suppliers market their products both to OEMs and to retailers. Intel further admits that many retailers demand market development funds for shelf space and that market development funds support cooperative advertising and other activities that promote the products of companies that pay these funds. Except as otherwise expressly admitted, Intel denies the allegations of paragraph 97.

98.    Intel admits that it has enjoyed an advantage over AMD because of, among other things, its reputation for superior performance, quality, innovativeness, and reliability. Except as otherwise expressly admitted, Intel denies the allegations of paragraph 98.

99. Intel lacks sufficient information or belief to admit or deny any statement or representation of state of mind attributed by AMD to a third party and on that basis denies them. Intel specifically denies the allegations of paragraph 99 that purport to describe its conduct. Intel denies the remaining allegations of paragraph 99.

100. Intel admits that MediaMarkt is a European computer retailer and that it has chosen to focus its efforts on the sale of PCs that incorporate Intel microprocessors. Intel admits that it provides MediaMarkt with market development funds to assist MediaMarkt to expand its business in the markets in which it competes and that those funds have been significant in the past year. Intel denies that it has made any payments to Aldi and that any Intel "subsidies" foreclose AMD from the Aldi account. Except as otherwise expressly admitted, Intel denies the allegations of paragraph 100.

101. Intel admits that Toys'R'Us has elected to standardize its PC offerings in the U.K. on Intel microprocessors. Intel states that DSG has issued a written statement in which it specifically denied the allegations of AMD's complaint that relate to it. Except as otherwise expressly admitted, Intel denies the allegations of paragraph 101.

102. Intel lacks sufficient information or belief as to the source of the purported data cited in paragraph 102 and on that basis denies AMD's allegations. Intel further states that AMD-based systems are readily available at retail accounts and are heavily advertised and promoted by major retailers. Except as expressly admitted, Intel denies the remaining allegations of paragraph 102.

103.    Intel denies the allegations of paragraph 103. Intel denies that it has entered into any agreements or made any payments to keep AMD from retailers' shelf space or that it has entered into agreements to limit the share of revenues that retailers derive from AMD-based systems.

104.    Intel denies the allegations of paragraph 104. Intel further states that AMD's share of sales at Circuit City stores has increased this year, which contradicts AMD's claims that Intel has prevented Circuit City from devoting more than 20% of its PC sales to AMD-based systems.

105.    Paragraph 105 is hypothetical and not factual in nature and therefore requires no response. Intel denies the allegations of paragraph 105 to the extent that it purports to state any facts. Indeed, AMD's increased share at Circuit City contradicts the inference that AMD has attempted to create in paragraph 105.

106.    Intel denies the allegations of paragraph 106. Intel specifically denies that it made any threats to induce Vobis to change its banner. Intel further states that Vobis replaced the AMD Turion64 banner with a banner that listed a number of Vobis's suppliers, including both AMD and Intel.

107.    Paragraph 107 is pure conclusory legal argument. To the extent that a response is required, Intel denies the allegations of paragraph 107. Intel further states that its dealings with retailers are procompetitive, and are intended to assist retailers to expand their markets through, among other things, promotions and consumer education.

42

108.    Intel admits that companies within the computer industry cooperate from time to time in the development of standards or specifications. Intel admits that standards are essential for some computer-related products. Except as otherwise expressly admitted, Intel denies the allegations of paragraph 108.

109.    Intel admits that both Intel and AMD develop and manufacture memory controllers, that Intel's memory controller hub is separate from the microprocessor, and that AMD's memory controller is incorporated into AMD's microprocessor. Intel denies that AMD's approach is superior. Intel admits that a microprocessor designer needs to understand the memory technologies with which its microprocessors work. Intel further states that AMD has received access to technical information regarding memory standards far in advance of the release of standards-compliant memory devices in a manner that has put it on equal footing with Intel in designing future products. Except as otherwise expressly admitted, Intel denies the allegations of paragraph 109.

110.    Intel admits that JEDEC is one of the organizations that has developed standards for memory chips. Intel admits that it participated in the Advanced DRAM Technology group but denies that the group was a "secret committee" or that participation in this group was inconsistent with JEDEC's efforts. Except as otherwise expressly admitted, Intel denies the allegations of paragraph 110.

111.    Intel admits that the ADT group had different membership tiers, based on the participants' consensus on the most effective organizational structure, and that the number of companies engaged in actual development of the technology was limited in order to enable the group to reach decisions efficiently. Intel further states that the ADT

43

group extended an invitation to AMD to join ADT as a "co-developer" with intellectual property rights equivalent to those of the highest tier, called "developers," as well as immediate access to the results of technical meetings. Except as otherwise expressly admitted, Intel denies the allegations of paragraph 111.

112.    Intel denies that AMD "desperately" needed access to a memory specification that was never adopted by any company, as was the case with ADT. Intel further states that the ADT group extended an invitation to AMD to join ADT as a "co-developer" with intellectual property rights equivalent to those of the highest tier, called "developers," as well as with immediate access to the results of technical meetings. Intel denies that it opposed allowing AMD to participate at the higher "developer" level. Except as otherwise expressly admitted, Intel denies the allegations of paragraph 112.

113.    Intel denies the allegations of paragraph 113. Intel states that AMD could not have suffered any disadvantage because, among other things, the ADT group never developed any standard. Intel further states that the ADT group extended an invitation to AMD to join ADT as a "co-developer" with intellectual property rights equivalent to those of the highest tier, called "developers," as well as with immediate access to the results of technical meetings, which belies AMD's claims of secrecy or manipulation of industry standards.

114.    Intel denies the allegations of paragraph 114. Intel further states that its research and development work with memory producers and others in the industry is procompetitive and has furthered, and is continuing to further, innovation. Intel states that it has entered into nondisclosure agreements to protect trade secrets and other

valuable intellectual property belonging to Intel. Intel further states that its nondisclosure agreements do not and cannot affect AMD's ability to design microprocessor products that comply with applicable industry standards in a timely manner, as all standards development work has been conducted through the procedures of the JEDEC organization. The rules of JEDEC provide all participants, including AMD, with a full opportunity to participate in the standards development process, propose any aspect of each standard, comment on any proposed standard, and suggest changes to any proposed standard before a standard is adopted. AMD's objection appears to be to the fact that Intel is engaged in exploratory research to identify memory technologies that may be suitable to support its future product needs.

115.    Intel denies the allegations of paragraph 115. The only "scheme" that AMD has identified is a scheme to promote technical progress.

116.    Intel denies the allegations of paragraph 116. Intel states that it has contributed a great deal of its technology to the industry as a whole, including AMD, to the benefit of consumers. For example, Intel developed the Universal Serial Bus (USB) Specification, which is used on virtually every desktop and notebook computer today (including AMD-based systems) to enable a simple and easy connection of peripheral devices to PCs. Intel has licensed its intellectual property related to USB on a royalty-free basis. Intel has done likewise with other industry specifications.

117.    Intel admits the allegations of paragraph 117.

118.    Intel admits that it initially proposed a pin definition for DDR3 memory modules similar to that used for DDR2 memory modules.  Except as otherwise expressly admitted, Intel denies the allegations of paragraph 118.

119.    Intel admits that it proposed a different pin definition for DDR3 laptop memory modules than for desktop memory modules in order to improve signal integrity in mobile systems.  Intel denies that it made its proposal in order to disadvantage AMD. Intel further states that when AMD objected to Intel's proposal on the ground that it had already begun designing some of its products based on the DDR2 pin configuration, Intel readily acceded to AMD's wishes and withdrew its alternative proposal.  Except as otherwise expressly admitted, Intel denies the allegations of paragraph 119.

120.    Intel denies the allegations of paragraph 120.  Intel states that it made its proposal to improve signal integrity in mobile systems.

121.    Intel denies the allegations of paragraph 121.  Intel further states that it withdrew its proposal for improving signal integrity in order to render the pin configuration compatible with AMD's microprocessor designs in progress and not because the proposal lacked technical merit.

122.    Intel denies the allegations of paragraph 122.

123.    Intel admits that many independent software vendors write software in high-level languages and that compilers translate the instructions of those languages to machine-readable instructions.  Intel admits that other software vendors supply compilers for various operating systems and computer languages, and that Intel is one of the many

46

companies that supply compilers for various operating systems and computer languages.
Intel further states that it possesses a low share of the sale or licensing of compilers, and
that users have a wealth of non-Intel compilers from which to choose. Except as
otherwise expressly admitted, Intel denies the allegations of paragraph 123.

124.    Intel admits that its compilers contain optimizations for programs that rely
on floating point calculations or vector computations. Intel further states that its
compilers contain optimizations to optimize performance on all microprocessors on
which programs compiled by its compilers may be run. Except as otherwise expressly
admitted, Intel denies the allegations of paragraph 124.

125.    Intel denies the allegations of paragraph 125. Intel further states that
alternative code paths permit software to be run on systems using a variety of
microprocessors and thereby optimize performance regardless of the system on which a
program is run. Intel denies that its compilers are programmed to cause AMD
microprocessors to crash. It further states that its compilers do not use the CPUID
instruction to generate a code path that is specifically reserved for AMD processors. Intel
further states that its compilers produce such excellent performance on AMD processors
that AMD has regularly elected to use Intel compilers (instead of the many competing
compilers available in the marketplace) for benchmarking the performance of its
microprocessors. AMD has also publicly posted benchmark results that reflect its choice
of Intel compilers as the compilers that provide the best results on AMD microprocessors.
Intel further states that AMD's claim that Intel compilers harm the performance of AMD

processors is belied by the fact that AMD recommends the use of Intel compilers in a publication that it makes available to software designers.

126.    Intel admits that its compilers appeal to certain ISVs based on their merits. Intel denies that the performance of its compilers is designed to be degraded when run on an AMD microprocessor, and states that its compilers do not use any paths that are used by AMD but not Intel microprocessors. Intel further states that AMD's election to use Intel compilers regularly for benchmarking the performance of its microprocessors embodies a recognition that AMD processors perform better with Intel compilers than with the many competing compilers, and thus contradict AMD's claims. Except as otherwise expressly admitted, Intel denies the allegations of paragraph 126.

127.    Intel denies the allegations of paragraph 127. Intel further states that it has invested billions of dollars in innovation and manufacturing, which have helped expand the microprocessor market, dramatically increase the capabilities of microprocessors and computers, and lower the cost of technology to consumers. Intel states that it competes fairly and in a manner that benefits consumers.

128.    Intel denies the allegations of paragraph 128. Intel further states that this Court lacks subject matter jurisdiction over alleged conduct outside of the United States involving the sale or purchase of AMD microprocessors manufactured outside the United States or AMD's alleged exclusion from selling such microprocessors outside the United States, the manufacture of computer systems outside the United States, or the distribution, marketing, or retail sale of computer systems outside the United States. Such alleged conduct did not and could not have had a direct, substantial, and reasonably

48

foreseeable effect (a) on United States trade or commerce which is not trade or commerce with foreign nations, or on import trade or import commerce with foreign nations; or (b) on United States export trade or export commerce with foreign nations, of a person engaged in such trade or commerce in the United States, as, *inter alia*, AMD manufactures 100 percent of its microprocessors in Dresden, Germany.

129.    Intel denies that the alleged conduct has had or will continue to have, a direct, substantial, and reasonably foreseeable effect on AMD's ability to sell or export U.S.-manufactured goods to foreign customers in restraint of its U.S.-based and directed business, as *inter alia*, AMD manufactures 100% of its microprocessors in Dresden, Germany. Intel denies that the alleged conduct has caused or will continue to cause substantial harm to the business of AMD, and states that AMD's allegation that its manufacturing facilities are capacity-constrained demonstrates that it has suffered no injury whatsoever. Intel lacks sufficient information or belief as to the source of the purported data cited in paragraph 129 and on that basis denies AMD's allegations regarding purported market shares. Intel admits that AMD introduced Opteron in 2003 but lacks sufficient information or belief to admit or deny AMD's allegations regarding the purported reviews or testimonials regarding Opteron and on that basis denies them. Intel denies that it has engaged in exclusionary conduct to "box" AMD out of the notebook market segment. Intel's success in the segment has been due to the superiority of its mobile offerings, and especially the Pentium M processor, which offered both extended battery life and superior computing performance as compared to AMD processors. As one major online technology journal observed, "the performance of the Pentium M represents a giant leap forward in low power, high performance mobile

processing." Intel further denies AMD's allegations regarding the reasons for its lack of success in the commercial desktop segment. Intel states that it has been particularly successful in the commercial desktop segment because Chief Technology Officers and IT department managers who control PC purchasing at corporations value Intel's reputation for quality, innovativeness, and reliability, and the stable roadmap of future products that it offers. Intel further states that this reputation stands in marked contrast to AMD's reputation as an unreliable supplier. Except as otherwise expressly admitted, Intel denies the allegations in paragraph 129.

130. Intel hereby incorporates by reference its responses to the allegations contained in Paragraphs 1-129 of the Complaint as set forth above.

131. Intel denies the allegations of paragraph 131.

132. Intel admits that the relevant geographic market is the world but denies that the relevant market is a market for x86 microprocessors.

133. Intel denies the allegations of paragraph 133.

134. Intel denies the allegations of paragraph 134.

135. Intel denies the allegations of paragraph 135. Intel further states that the conduct that is at the heart of AMD's complaint – the granting of discounts in order to meet competitive offers – demonstrates that Intel lacks the power to control price or exclude competition.

136.    Intel denies the allegations of paragraph 136. Intel further states that it has invested billions of dollars annually in R&D and new manufacturing facilities to propel innovation forward, dramatically increase the capabilities of microprocessors and computers, and lower the cost of technology to consumers. Intel states that it competes fairly and in a manner that benefits consumers.

137.    Intel denies the allegations of paragraph 137. Intel further states that the granting of discounts in order to compete is entirely justified, as no microprocessor competitor, large or small, is immune from having to compete in a market economy and because discounts increase consumer welfare and total output.

138.    Intel denies the allegations of paragraph 138. Intel further states that AMD has filed its complaint on the heels of the most successful period in its history as a microprocessor supplier. Only a few months before launching this unfounded antitrust action, AMD's Chairman and CEO Hector Ruiz told a leading business publication: "[t]his company is in the strongest position we've ever been in." AMD's claims of injury are directly contradicted by the public pronouncements of its own Chairman and CEO.

139.    Intel denies the allegations of paragraph 139. Intel further states that it is AMD that is seeking to stifle competition and harm consumers by preventing Intel from granting discounts to meet competition from AMD.

140.    Intel hereby incorporates by reference its responses to the allegations contained in Paragraphs 1-129 of the Complaint as set forth above.

141.    Paragraph 141 simply recites Section 17045 of the California Business & Professions Code, and therefore contains no factual allegations requiring a response.

142.    Intel hereby incorporates by reference its responses to paragraphs 59 through 71, 89 through 91 and 103 through 105. Except as otherwise expressly admitted, Intel denies the allegations in paragraph 142.

143.    Intel denies the allegations of paragraph 143.

144.    Intel denies the allegations of paragraph 144. Intel further alleges that its use of nondisclosure and confidentiality agreements is reasonable and intended to protect confidential trade secret and business information. Intel further alleges that AMD itself routinely enters into similar agreements.

145.    Intel admits that its headquarters is located in Santa Clara, California, and that it does business, and sells microprocessors, in California. Except as otherwise expressly admitted, Intel denies the allegations of paragraph 145.

146.    Intel denies the allegations of paragraph 146.

147.    Intel denies the allegations of paragraph 147. Intel further states that the discounting about which AMD complains is the essence of competition. Rather than promoting competition, AMD's Complaint seeks to stifle price competition.

148.    Intel hereby incorporates by reference its responses to the allegations contained in Paragraphs 1-129 of the Complaint as set forth above.

149.    Intel denies the allegations of paragraph 149.

150.    Intel admits that AMD has some form of business relationships with various companies to which it has sold products.  Except as otherwise expressly admitted, Intel denies the allegations of paragraph 150.

151.    Intel incorporates by reference its responses to AMD's prior allegations. Intel denies the allegations of paragraph 151.

152.    Intel denies the allegations of paragraph 152.

153.    Intel denies the allegations of paragraph 153.  Intel further states that it has competed lawfully in a highly competitive microprocessor market, and that Intel's performance in the marketplace, and AMD's performance in the marketplace, have been the result of that competition, and not as a result of any wrongful conduct of Intel.

154.    Intel denies the allegations of paragraph 154.  Intel further states that it has competed lawfully in a highly competitive microprocessor market, and that Intel's performance in the marketplace, and AMD's performance in the marketplace, have been the result of that competition, and not as a result of any wrongful conduct of Intel.  Intel further states that AMD has not suffered any economic harm, but rather has faced normal forces of competition that have forced it to charge lower prices than it would like to obtain from its customers.

155.    Intel admits that its headquarters is located in Santa Clara, California, and that it does business, and sells microprocessors, in California. Except as otherwise expressly admitted, Intel denies the allegations of paragraph 155.

156.    Intel denies the allegations of paragraph 156.

157.    Intel denies the allegations of paragraph 157.

158.    Paragraph 158 does not contain any factual allegations, and therefore requires no response.

## SEPARATE AND ADDITIONAL DEFENSES

Without assuming any burden of proof that it would not otherwise bear, Intel asserts the following separate and additional defenses:

### FIRST SEPARATE AND ADDITIONAL DEFENSE
### (Failure to State a Claim for Relief)

As a defense to AMD's Complaint and each and every allegation contained therein, Intel alleges that each of AMD's claims fails to state facts sufficient to constitute a claim for relief against Intel.

### SECOND SEPARATE AND ADDITIONAL DEFENSE
### (Lack of Subject Matter Jurisdiction)

As a defense to AMD's Complaint, Intel alleges that, pursuant to the Foreign Trade Antitrust Improvements Act of 1982 and principles of international comity, this Court lacks subject matter jurisdiction over claims based on alleged conduct affecting the sale or purchase of AMD microprocessors manufactured outside the United States or AMD's alleged exclusion from selling such microprocessors outside the United States,

the manufacture of computer systems outside the United States, or the distribution, marketing, or retail sale of computer systems outside the United States. This includes, but is not limited to, the allegations contained in paragraphs 40-44, 55, 65, 74, 75, 79, 86, 89, 93, 94, 100, 101 and 106 of Plaintiffs' Complaint. Such alleged conduct did not and could not have had a direct, substantial, and reasonably foreseeable effect (a) on United States trade or commerce which is not trade or commerce with foreign nations, or on import trade or import commerce with foreign nations; or (b) on United States export trade or export commerce with foreign nations, of a person engaged in such trade or commerce in the United States, as, *inter alia*, AMD manufactures 100 percent of its microprocessors in Dresden, Germany.

### THIRD SEPARATE AND ADDITIONAL DEFENSE
**(Privilege / Justification)**

As a defense to AMD's Complaint and each and every allegation contained therein, Intel alleges that its actions were privileged or justified under applicable law, and that AMD therefore should be barred from recovery.

### FOURTH SEPARATE AND ADDITIONAL DEFENSE
**(Good Faith / Legitimate Business Justification)**

As a defense to AMD's Complaint and each and every allegation contained therein, Intel alleges that its actions were undertaken in good faith to advance legitimate business interests and had the effect of promoting, encouraging and increasing competition.

## FIFTH SEPARATE AND ADDITIONAL DEFENSE
### (Meeting Competition)

As a defense to AMD's Complaint and each and every allegation contained therein, Intel alleges that its actions met competition and therefore each of AMD's claims is barred by the meeting competition defense.

## SIXTH SEPARATE AND ADDITIONAL DEFENSE
### (Statute of Limitations)

As a defense to AMD's Complaint and each and every allegation contained therein, Intel alleges that each of AMD claims is barred in whole or part by applicable statutes of limitations, including, but not limited to, 15 U.S.C. § 15(b) and California Code of Civil Procedure Sections 338(a), 339(1) and 340(a).

## SEVENTH SEPARATE AND ADDITIONAL DEFENSE
### (Laches)

As a defense to AMD's Complaint and each and every allegation contained therein, Intel alleges that by reasons of AMD's own conduct, statements, acts, and omissions it is barred from any equitable relief by the doctrine of laches.

## EIGHTH SEPARATE AND ADDITIONAL DEFENSE
### (Estoppel)

As a defense to AMD's Complaint and each and every allegation contained therein, Intel alleges that AMD is estopped from recovery by reason of its own conduct, acts, and omissions.

### NINTH SEPARATE AND ADDITIONAL DEFENSE
**(Unclean Hands)**

As a defense to AMD's Complaint and each and every allegation contained therein, Intel alleges that by reasons of AMD's own conduct, acts, and omissions, it is barred from any recovery by the doctrine of unclean hands.

### TENTH SEPARATE AND ADDITIONAL DEFENSE
**(*In Pari Delicto*)**

As a defense to AMD's Complaint and each and every allegation contained therein, and while expressly denying that it has committed any violation of law, or has otherwise acted improperly, Intel alleges that AMD's claims are barred in whole or part by the doctrine of *in pari delicto*.

### ELEVENTH SEPARATE AND ADDITIONAL DEFENSE
**(Release)**

As a defense to AMD's Complaint, Intel alleges that AMD's claims in part are barred by the release of claims in the January 1995 Settlement Agreement between Intel and AMD, which released both parties from claims arising from conduct occurring before the date of the release.

### TWELFTH SEPARATE AND ADDITIONAL DEFENSE
**(Res Judicata)**

As a defense to AMD's Complaint, Intel alleges that AMD's claims in part are barred by the doctrine of res judicata based on the 1995 Stipulation of Dismissal of AMD's antitrust case against Intel.

## THIRTEENTH SEPARATE AND ADDITIONAL DEFENSE
### (Standing)

As a defense to AMD's Complaint and each and every allegation contained

therein, Intel alleges that AMD lacks standing to assert some or all of the claims asserted

therein.

## FOURTEENTH SEPARATE AND ADDITIONAL DEFENSE
### (Injury-In-Fact / Antitrust Injury)

As a defense to AMD's Complaint and each and every allegation contained

therein, Intel alleges that AMD has not suffered an injury-in-fact or antitrust injury as a

result of Intel's challenged conduct.

## FIFTEENTH SEPARATE AND ADDITIONAL DEFENSE
### (Unjust Enrichment)

As a defense to AMD's Complaint and each and every allegation contained

therein, Intel alleges that AMD would be unjustly enriched were it allowed to recover any

relief claimed to be due.

## SIXTEENTH SEPARATE AND ADDITIONAL DEFENSE
### (Failure to Mitigate Damages)

As a defense to AMD's Complaint and each and every allegation contained

therein, Intel alleges that AMD has failed to mitigate its damages, if any, and that any

recovery should be reduced or denied accordingly.

## SEVENTEENTH SEPARATE AND ADDITIONAL DEFENSE
### (Commerce Clause)

Plaintiff's claims arising under California law (Claim 2 - California Business and

Professions Code section 17045 and Claim 3 - Intentional Interference of Prospective

Economic Advantage) are barred in whole or in part, because the application of these

claims to wholly interstate or foreign commerce violates the Commerce Clause of the United States Constitution and is otherwise beyond the scope of jurisdiction of those laws.

### EIGHTEENTH SEPARATE AND ADDITIONAL DEFENSE
**(Punitive Damages / Due Process)**

The imposition of punitive damages in this case would violate the Due Process Clauses of the Fifth and Fourteenth Amendments to the United States Constitution and Article I, Section 7 of the Constitution of California because the standards of liability for punitive damages under California law are unduly vague and subjective, and permit retroactive, random, arbitrary and capricious punishment that serves no legitimate governmental interest.

### NINETEENTH SEPARATE AND ADDITIONAL DEFENSE
**(Punitive Damages / Due Process)**

The imposition of punitive damages in this case would violate the Due Process Clauses of the Fifth and Fourteenth Amendments to the United States Constitution and Article I, Section 7 of the Constitution of California because standards for determining the amount of the award under California law are unduly vague and subjective, and permit arbitrary, capricious, excessive and disproportionate punishment that serves no legitimate governmental interest.

### TWENTIETH SEPARATE AND ADDITIONAL DEFENSE
**(Punitive Damages / Due Process)**

The imposition of punitive damages in this case would violate the Due Process Clauses of the Fifth and Fourteenth Amendments to the United States Constitution

because post-verdict review procedures for scrutinizing punitive damage verdicts do not

provide a meaningful constraint on the discretion of juries to impose punishment.

### TWENTY -FIRST SEPARATE AND ADDITIONAL DEFENSE
**(Punitive Damages / Due Process)**

The imposition of punitive damages in this case in the absence of the procedural

safeguards accorded to defendants subject to punishment in criminal proceedings,

including a reasonable doubt standard of proof, would violate the Fourth, Fifth, and Sixth

Amendments and the Due Process Clauses of the Fifth and Fourteenth Amendments to

the United States Constitution.

### TWENTY-SECOND SEPARATE AND ADDITIONAL DEFENSE
**(Punitive Damages / Due Process)**

The imposition of punitive damages in this case based upon evidence of Intel's

wealth or financial status would violate the Due Process Clauses of the Fifth and

Fourteenth Amendments to the United States Constitution.

### TWENTY-THIRD SEPARATE AND ADDITIONAL DEFENSE
**(Punitive Damages / Due Process)**

The imposition of punitive damages in this case in the absence of a showing of

malicious intent to cause harm to the plaintiff would violate the Due Process Clauses of

the Fifth and Fourteenth Amendments to the United States Constitution and Article I,

Section 7 of the Constitution of California.

### TWENTY-FOURTH SEPARATE AND ADDITIONAL DEFENSE
**(Punitive Damages / Due Process)**

The imposition of punitive damages in this case pursuant to California law to

punish defendant for conduct that occurred outside of California would violate the Due

Process Clauses of the Fifth and Fourteenth Amendments to the United States

Constitution as well as the Commerce Clause of the Constitution.

### TWENTY-FIFTH SEPARATE AND ADDITIONAL DEFENSE
**(Punitive Damages / Excessive Fines)**

Any award of exemplary, treble or punitive dates would violate the Excessive

Fines Clauses of the United States and California Constitutions.

### TWENTY-SIXTH SEPARATE AND ADDITIONAL DEFENSE
**(Punitive Damages / Commerce Clause, Equal Protection
and Privileges and Immunities)**

The imposition of punitive damages in this case based on the out-of-state conduct,

profits and aggregate financial status of defendant would violate the Commerce Clause,

the Equal Protection Clause, and the Privileges and Immunities Clause of the United

States Constitution.

### TWENTY-SEVENTH SEPARATE AND ADDITIONAL DEFENSE
**(Duplicative actions and requests for damages)**

This action is barred in part based on AMD's filing of duplicative actions in Japan

seeking recovery on the same alleged conduct, based on similar theories of recovery.  It

would violate principles of due process and international comity to allow duplicative

actions to proceed at the same time.

OF COUNSEL:

Robert E. Cooper, Esq.
Daniel S. Floyd, Esq.
Gibson, Dunn & Crutcher LLP
333 South Grand Avenue
Los Angeles, CA 900071
(213) 229-7000

Peter E. Moll, Esq.
Darren B. Bernhard
Howrey LLP
1299 Pennsylvania Avenue
N.W. Washington, DC 20004
(202) 783-0800

Dated:  September 1, 2005

697303

POTTER ANDERSON & CORROON LLP

By: _____
     Richard L. Horwitz (#2246)
     W. Harding Drane, Jr. (#1023)
     Hercules Plaza, 6th Floor
     1313 N. Market Street
     P.O. Box 951
     Wilmington, DE 19899-0951
     (302) 984-6000
     rhorwitz@potteranderson.com
     wdrane@potteranderson.com

*Attorneys for Defendants*
*Intel Corporation and Intel Kabushiki Kaisha*

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

## CERTIFICATE OF SERVICE

I, Richard L. Horwitz, hereby certify that on September 1, 2005, the attached

document was hand delivered to the following persons and was electronically filed with

the Clerk of the Court using CM/ECF which will send notification of such filing(s) to the

following and the document is available for viewing and downloading from CM/ECF:

Jesse A. Finkelstein
Frederick L. Cottrell, III
Chad M. Shandler
Steven J. Fineman
Richards, Layton & Finger
One Rodney Square
920 North King Street
Wilmington, DE 19801

I hereby certify that on September 1, 2005, I have Federal Expressed the

documents to the following non-registered participants:

Charles P. Diamond
Linda J. Smith
O'Melveny & Myers LLP
1999 Avenue of the Stars, 7th Floor
Los Angeles, CA 90067

Mark A. Samuels
O'Melveny & Myers LLP
400 South Hope Street
Los Angeles, CA 90071

By: _____

Richard L. Horwitz
Hercules Plaza, 6th Floor
1313 N. Market Street
Wilmington, Delaware 19899-0951
(302) 984-6000
rhorwitz@potteranderson.com

689962