# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| ADVANCED MICRO DEVICES, INC. and<br>AMD INTERNATIONAL SALES & SERVICE,<br>LTD., | ) <br> ) <br> ) <br> ) | |
| Plaintiffs, | ) <br> ) | C. A. No. 05-441 (JJF) |
| v. | ) <br> ) | |
| INTEL CORPORATION and<br>INTEL KABUSHIKI KAISHA, | ) <br> ) <br> ) | |
| Defendants. | ) <br> ) | |

| | | |
|---|---|---|
| IN RE: | ) <br> ) | |
| INTEL CORP. MICROPROCESSOR<br>ANTITRUST LITIGATION | ) <br> ) <br> ) | MDL Docket No. 05-1717 (JJF) |

| | | |
|---|---|---|
| PHIL PAUL, on behalf of himself<br>and all others similarly situated, | ) <br> ) | C.A. No. 05-485-JJF |
| Plaintiffs, | ) <br> ) | CONSOLIDATED ACTION |
| v. | ) <br> ) | |
| INTEL CORPORATION, | ) <br> ) | |
| Defendant. | ) <br> ) | |

**MEMORANDUM IN SUPPORT OF DEFENDANTS' MOTION TO DISMISS
AMD'S FOREIGN COMMERCE CLAIMS FOR LACK OF SUBJECT MATTER
JURISDICTION AND STANDING**

OF COUNSEL:

Robert E. Cooper
Daniel S. Floyd
Gibson, Dunn & Crutcher LLP
333 South Grand Avenue
Los Angeles, CA 900071
(213) 229-7000

Peter E. Moll
Darren B. Bernhard
Howrey LLP
1299 Pennsylvania Avenue
N.W. Washington, DC 20004
(202) 783-0800

Dated:  May 2, 2006

Richard L. Horwitz (#2246)
W. Harding Drane, Jr. (#1023)
POTTER ANDERSON & CORROON LLP
Hercules Plaza, 6th Floor
1313 N. Market Street
P.O. Box 951
Wilmington, DE 19899-0951
(302) 984-6000
rhorwitz@potteranderson.com
wdrane@potteranderson.com

Attorneys for Defendants
Intel Corporation and Intel Kabushiki Kaisha

# TABLE OF CONTENTS

Page(s)

I.      PRELIMINARY STATEMENT ............................................................................1

II.     STATEMENT OF THE CASE............................................................................5

        A.      Allegations of the Complaint..................................................................5

        B.      AMD's Initiation of Foreign Proceedings Concerning Its
                Alleged Foreign Harm ...........................................................................10

III.    LEGAL STANDARD OF REVIEW ...................................................................11

IV.     PLAINTIFFS' ALLEGATIONS REGARDING FOREIGN
        EFFECTS DO NOT SATISFY THE FTAIA'S
        JURISDICTIONAL REQUIREMENTS ...............................................................14

        A.      The FTAIA Limits the Subject Matter Jurisdiction of U.S.
                Courts to Conduct That Directly Caused a Substantial and
                Reasonably Foreseeable Domestic Effect................................................14

        B.      AMD's Claims of Lost Sales to Foreign Customers Do Not
                Involve Any Direct, Substantial and Reasonably
                Foreseeable Domestic Effect ..................................................................16

                1.      The Allegation that Foreign Customers Bought
                        Fewer of AMD's German-Manufactured
                        Microprocessors and That, as a Result, AMD
                        Missed an "Opportunity" to Achieve Efficient Scale
                        Is Not a Direct Domestic Effect......................................................18

                2.      The Allegation that the Relevant Microprocessor
                        Market Is Worldwide Does Not Create U.S.
                        Jurisdiction......................................................................20

        C.      Alleged Direct Foreign (Not Domestic) Effects "Gave Rise
                To" AMD's Claims......................................................................21

V.      PRINCIPLES OF PRESCRIPTIVE COMITY REQUIRE AMD
        TO SEEK REMEDY FOR FOREIGN INJURIES IN THE
        APPROPRIATE FOREIGN FORUM......................................................................25

VI.     PLAINTIFFS DO NOT HAVE STANDING TO ADVANCE
        THEIR CLAIMS UNDER THE SHERMAN ACT FOR
        INJURIES ARISING IN FOREIGN COMMERCE ...............................................27

VII.    THE COURT SHOULD DISMISS ALL ALLEGATIONS AND
        CLAIMS RELATING TO SALES OF FOREIGN MADE
        MICROPROCESSORS TO FOREIGN CUSTOMERS........................................29

VIII.   CONCLUSION.....................................................................................................31

# TABLE OF AUTHORITIES

## CASES

*Associated Gen. Contractors, Inc. v. Cal State Council of Carpenters,*
  459 U.S. 519 (1983)......................................................................................28

*Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.,*
  429 U.S. 477 (1977)......................................................................................28

*Cargill, Inc. v. Monfort of Colorado, Inc.,*
  479 U.S. 104 (1986)......................................................................................27

*City of Pittsburgh v. West Penn Power Co.,*
  147 F.3d 256 (3d Cir. 1998)............................................................................7

*Crosby v. National Foreign Trade Council,*
  530 U.S. 363 (2000)......................................................................................27

*CSR Ltd. v. Cigna Corp.,*
  405 F. Supp. 2d 526 (D.N.J. 2005) .................................................15, 18, 27

*De Atucha v. Commodity Exch., Inc.,*
  608 F. Supp. 510 (S.D.N.Y. 1985) ...................................................25, 28

*Den Norske Statis Oljeselskap v. HeereMac Vof,*
  241 F.3d 420 (5th Cir. 2002) .......................................................21, 24, 25

*Difalcie v. Aetna U.S. Healthcare,*
  346 F.3d 442 (3d Cir. 2003)............................................................................1

*Elliot v. State Farm Mut. Ins. Co.,*
  786 F. Supp. 487 (E.D. Pa. 1997) ...............................................................14

*Empagran S.A. v. F. Hoffman-Laroche, Ltd.,*
  417 F.3d 1267 (D.C. Cir. 2005) ........................................................ *passim*

*F. Hoffman-La Roche Ltd. v. Empagran S.A.,*
  542 U.S. 155 (2004)........................................................................... *passim*

*Gen. Elec. Co. v. Latin Am. Imps.,*
  2002 WL 1603093 (W.D. Ky. July 16, 2002) ...........................................24

*Holmes v. SIPC,*
  503 U.S. 258 (1992)......................................................................................28

*Info. Res., Inc. v. Dun & Bradstreet Corp.*,
    127 F. Supp. 2d 411 (S.D.N.Y. 2001).............................................................19

*In re Dynamic Random Access Memory Antitrust Litig.*,
    2006 U.S. Dist. LEXIS 8977 (N.D. Cal. Mar. 1, 2006).............................................22

*In re Microsoft Corp. Antitrust Litig.*,
    127 F. Supp. 2d 702 (D. Md. 2001) ..............................................17, 24, 28

*In re Monosodium Glutamate Antitrust Litig.*,
    2005 U.S. Dist. LEXIS 39641 (D. Minn. Oct. 26, 2005) .............................................22

*In re Rockefeller Ctr. Prop., Inc. Sec. Litig.*,
    184 F.3d 280 (3d Cir. 1999).............................................................7

*Kehr Packages, Inc. v. Fidelcor, Inc.*,
    926 F.2d 1406 (3d Cir. 1991).............................................................12

*Lantec, Inc. v. Novell*,
    2000 U.S. Dist. LEXIS 19905 (D. Utah Sept. 15, 2000).............................................21

*Latino Quimica-Amtex S.A. v. Azko Nobel Chemicals B.V., et al.*,
    2005 U.S. Dist. LEXIS 19788 (S.D.N.Y. Sept. 7, 2005)..........................12, 19, 22, 25

*Liamuiga Tours v. Travel Impressions, Ltd.*,
    617 F. Supp. 920 (E.D.N.Y. 1985) .............................................................24

*Lovelace v. Software Spectrum, Inc.*,
    78 F.3d 1015 (5th Cir. 1996) .............................................................7

*Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*,
    475 U.S. 574 (1986)..........................................................2, 14, 28, 29

*McElderry v. Cathay Pac. Airways Ltd.*,
    678 F. Supp. 1071 (S.D.N.Y. 1988).............................................................21

*Optimum, S.A. v. Legent Corp.*,
    926 F. Supp. 530 (W.D. Pa. 1996)..........................................................12, 15, 19

*PBGC v. White*,
    998 F.2d 1192 (3d Cir. 1993).............................................................7, 12

*Pfizer, Inc. v. Gov't of India*,
    434 U.S. 308 (1978).............................................................27

*The 'In' Porters, S.A. v. Hanes Printables, Inc.*,
    663 F. Supp. 494 (M.D.N.C. 1987) ............................................................24

*Turicentro, S.A. v. Am. Airlines, Inc.*,
    152 F. Supp. 2d 829 (E.D. Pa. 2001), *aff'd*, 303 F.3d 293 (3d Cir. 2002)..................12

*Turicentro, S.A. v. Am. Airlines, Inc.*,
    303 F.3d 293 (3d Cir. 2002)............................................................... *passim*

*United Phosphorus, Ltd. v. Angus Chem. Co.*,
    131 F. Supp. 2d 1003 (N.D. Ill. 2001), *aff'd*, 332 F.3d 942 (7th Cir. 2003) .........15, 16

*United Phosphorus, Ltd. v. Angus Chem. Co.*,
    322 F.3d 942 (7th Cir. 2003) ............................................................1, 13

*United States v. LSL Biotechnologies*,
    379 F.3d 672 (9th Cir. 2004) .......................................................13, 18, 19

## STATUTES AND RULES

15 U.S.C. § 1 ............................................................................................2, 14

15 U.S.C. § 2 ......................................................................................2, 14, 28

15 U.S.C. § 6a ..........................................................................................1, 15

15 U.S.C. § 15 ..............................................................................................27

Fed. R. Civ. P. 12(c) ......................................................................................28

Fed. R. Civ. P. 12(f) ......................................................................................14

Fed. R. Civ. P. 12(h)(3)..................................................................................11

## OTHER AUTHORITIES

FTAIA House Report, H.R. Rep. No. 97-686 ............................................16, 19

Foreign Trade Antitrust Improvements Act: Hearings on H.R. 2326................21

Wright & Miller, Civil 3d § 1350 (2004) ..................................................12, 14

## I.    PRELIMINARY STATEMENT

Defendants Intel Corporation and Intel Kabushiki Kaisha (collectively "Intel")
file this motion to dismiss the foreign commerce claims of plaintiffs Advanced Micro
Devices, Inc., and AMD International Sales and Service, Ltd. (collectively "AMD") for
lack of subject matter jurisdiction pursuant to the Foreign Trade Antitrust Improvements
Act of 1982, 15 U.S.C. § 6a (2004) (hereinafter "FTAIA").  On its face, much of AMD's
Complaint seeks damages and injunctive relief under the U.S. antitrust laws for claims
based on alleged Intel business practices affecting the sale of AMD's German-made
microprocessors in foreign countries, claims the FTAIA places outside the reach of
federal jurisdiction.  The motion is supported factually by citations to AMD's Complaint
and AMD's judicially recognizable public SEC filings.  As shown below, to adjudicate
the motion, there is no need for discovery or reference to extraneous facts outside these
sources.[1]

Intel has filed its Answer to AMD's Complaint, denying AMD's allegations, and
is prepared to defend itself vigorously.  But before subjecting Intel to the burden of
defending its foreign business practices in a U.S. court, AMD must meet the burden of
establishing that this Court has subject matter jurisdiction over AMD's foreign commerce
claims.  As set forth below, AMD cannot meet this burden for its antitrust claims based

---

[1]    The only fact subject to judicial notice for this motion is that AMD manufactures its
microprocessors in Dresden, Germany, and therefore is not engaged in U.S. and export
commerce when it sells them in foreign markets.  The underlying facts have been
referenced repeatedly by AMD in numerous public SEC filings and statements and
cannot be subject to dispute.  The Supreme Court suggested in *F. Hoffman-La Roche Ltd.
v. Empagran S.A.*, 542 U.S. 155, 169 (2004), that the important jurisdictional issues
raised by the FTAIA be resolved "simply and expeditiously."  *See also United
Phosphorus Ltd. v. Angus Chemical*, 322 F.3d 942, 952, (7th Cir. 2003).  It is appropriate,
therefore, for the Court to look beyond the four corners of the complaint to consider
judicially noticeable material that cannot reasonably be disputed.  *Cf. Difalcie v. Aetna
U.S. Healthcare*, 346 F.3d 442, 447 (3d Cir. 2003) (allowing court to look beyond the
four corners of complaint to determine whether by "artful pleading" a party has omitted
facts material to the issue of federal jurisdiction under ERISA).

on foreign effects of Intel's alleged conduct, and those claims therefore must be dismissed or stricken for lack of subject matter jurisdiction.

Even though AMD is headquartered in the United States, its manufacturing operations are foreign. AMD's microprocessors have been manufactured for a number of years in Germany by AMD's German subsidiary. AMD assembles its German-made microprocessors into final products in Malaysia, Singapore and China. More than 70% of AMD's microprocessors are sold to customers outside the United States who incorporate them into "AMD powered computers" that they then sell in foreign countries. Compl. ¶ 28.

To a large extent, AMD seeks recovery under U.S. antitrust law for lost sales of its foreign-made microprocessors to foreign companies in foreign locations. Much of AMD's claimed injury boils down to this contention: AMD was allegedly injured when its sales offices in Paris, Munich, Surrey, Beijing, Osaka, and other foreign cities failed to sell more of its German-manufactured microprocessors to French, German, British, Chinese, Japanese, and other foreign customers.

AMD cannot invoke the U.S. antitrust laws to attempt to address these alleged harms that occurred (if at all) outside the United States. It is well-settled – and has been for decades – that "American antitrust laws do not regulate the competitive conditions of other nations' economies." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 582 (1986). Instead, the Sherman Act generally applies only to "trade or commerce" among the several States and trade between the United States and foreign nations, *i.e.*, exports from and imports into the United States. 15 U.S.C. §§ 1, 2; *F. Hoffman-La Roche Ltd. v. Empagran S.A.*, 542 U.S. 155 (2004) (hereinafter "*Empagran*").

Congress enacted the FTAIA specifically to make clear that conduct that directly affects only foreign markets falls outside the reach of the U.S. antitrust laws. Congress carved out a narrow exception, allowing U.S. courts to take jurisdiction over conduct

involving trade or commerce with foreign nations only when: (1) the conduct has a "direct, substantial, and reasonably foreseeable effect" on U.S. commerce or export commerce, *and* (2) it is that domestic effect – and not the foreign effect – that "gives rise to" the plaintiff's claim. AMD does not – and cannot – meet either prong of this test for claims based on alleged lost sales of its German-manufactured microprocessors to foreign customers. (*See* Complaint ¶ 36 alleging "global" misconduct targeting "U.S. and off-shore customers" to "prevent AMD from building market share anywhere.")

In its recent *Empagran* decision, the Supreme Court unanimously reaffirmed the well-settled limitations restricting federal court Sherman Act jurisdiction to conduct causing direct domestic effects. In *Empagran*, the plaintiff vitamin purchasers alleged that a worldwide price-fixing conspiracy artificially raised the prices they paid abroad. 542 U.S. at 159. The *Empagran* plaintiffs, like AMD, claimed that the direct foreign impact of the conspiracy (higher prices to vitamin customers overseas) had harmed competition in the United States through higher prices for U.S. purchasers (who were not plaintiffs). The Supreme Court held that the federal courts did not have jurisdiction over this claim because plaintiffs' alleged injury – higher prices that they paid abroad – was based on a foreign effect of the alleged conduct and was outside the reach of the U.S. antitrust laws. *Id.* The Court found that the fact that some of the challenged conduct occurred in the United States was irrelevant to application of the "effects" test and did not provide a basis for U.S. subject matter jurisdiction.

The Supreme Court emphasized that the existence of jurisdiction under the FTAIA depends on the location of the alleged direct effects of the conduct, and not the location of the conduct itself. The Court further ruled that plaintiffs had to allege and prove that the direct domestic effect (and not the foreign effect) gave rise to *their* claim. *Id.* at 172-75. The Court remanded the case to the D.C. Circuit to consider whether plaintiffs' allegations that "the anticompetitive conduct's domestic effects were linked to the foreign harm," and that the price fixing conspiracy could not have been maintained

3

"but for" the domestic effect, were sufficient to support jurisdiction under the FTAIA. *Id.* at 174-75.

On remand, the D.C. Circuit answered these questions in the negative. The court affirmed the dismissal of the complaint because it was the foreign effects (higher prices paid by the plaintiffs abroad) that directly and proximately gave rise to plaintiffs' claim. Although the conspiracy also gave rise to domestic effects, the direct domestic effects were borne by others (not the plaintiffs). *Empagran S.A. v. F. Hoffman-Laroche, Ltd.,* 417 F.3d 1267 (D.C. Cir. 2005) (hereinafter "*Empagran Remand Decision*"). The court held that because "it was the foreign effects of price-fixing outside the United States that directly caused, or 'gave rise to,' [plaintiffs'] losses," the dismissal of the complaint was proper even if the U.S. effects of defendants' cartel were alleged to be integral to the overall success of the worldwide conspiracy. *Id.* at 1271. Thus, although the domestic effects of the same conspiracy gave rise to antitrust claims within the jurisdiction of the federal courts, the same courts lacked jurisdiction over the foreign effects of that conspiracy.

The FTAIA limits the antitrust jurisdiction of U.S. federal courts, forbidding a jurisdictional extension to claims based on effects in foreign markets. AMD's attempt to assert federal court jurisdiction over its foreign–based antitrust allegations is contrary to the FTAIA, *Empagran* and decades of antitrust jurisprudence. This Court lacks subject matter jurisdiction to consider allegations of conduct that (even if it occurred) only directly affected AMD's foreign subsidiaries' sales of its German-manufactured microprocessors to foreign customers throughout Europe, the Far East, and elsewhere outside the United States.

Nothing prevents AMD from seeking redress for the foreign harm it alleges before the appropriate foreign tribunal. Indeed, AMD is doing precisely that. AMD's Japanese subsidiary has filed virtually identical lawsuits in Japan seeking redress in Japan. AMD has publicly acknowledged its efforts to push investigations by the

European Commission and Korean Fair Trade Commission of the same business practices that are before this Court. AMD's attempts to seek redress from these foreign tribunals demonstrates that distinct and severable effects are at issue, that many of those alleged effects occurred in foreign countries, and that adjudication of these claims would require regulation of foreign economies. As the Supreme Court made clear in *Empagran*, these foreign forums are the proper venues for addressing such foreign effects because foreign sovereigns know "how best to protect [their] customers from anticompetitive conduct." *Empagran*, 542 U.S. at 165.

This Court's lack of subject matter jurisdiction is dispositive of many of AMD's claims. Accordingly, AMD's claims of foreign harm should be dismissed or, alternatively, stricken from the Complaint. The specific Complaint allegations of foreign harm include paragraphs 40-44, 54-57, 65, 74, 75, 81, 83, 86, 89, 93, 94, 100, 101 and 106. The portion of AMD's Complaint relating to alleged direct effects on U.S. commerce will remain, and this case will be complex enough, without the added burden of attempting to adjudicate AMD's claims that relate to competition in foreign countries, some of which are already before the appropriate foreign tribunals.[2]

## II.    STATEMENT OF THE CASE

### A.    Allegations of the Complaint

Intel is the world's leading manufacturer of microprocessors, and has been for years. Compl. ¶¶ 22, 25. Intel pioneered the x86 microprocessor architecture, which is

---

[2]    The present motion is not addressed to AMD's federal or state allegations of lost sales of its German-made microprocessors to U.S. customers. Nor does Intel move to dismiss for jurisdictional deficiencies AMD's allegations related to microprocessors that AMD actually manufactured in the United States prior to transferring all production to its German factories. In Section VII *infra*, we set out the precise relief sought and identify the AMD claims and allegations that should be dismissed for lack of subject matter jurisdiction.

incorporated into both Intel's and AMD's microprocessor products. Compl. ¶ 12.[3] Intel Kabushiki Kaisha ("Intel KK") is a wholly-owned subsidiary of Intel and is incorporated in and maintains its principal place of business in Japan. Compl. ¶ 10. Advanced Micro Devices, Inc., is headquartered in the United States, but as explained below, is a foreign manufacturer of microprocessors. AMD International Sales & Services, Ltd., also headquartered in the United States, sells AMD foreign-made microprocessors outside of North America. Compl. ¶ 9.

Microprocessors are small computer chips that function as the brains of computers and are capable of executing instructions and performing requested mathematical computations at very high speed. Compl. ¶ 11. Microprocessor technology has improved substantially since the first generation of microprocessors, and today's microprocessors are significantly faster and can carry significantly more data than prior generations. Compl. ¶ 11. Over the years, Intel has lowered the price of its microprocessors and given many of its customers substantial price discounts and rebates. *E.g.*, Compl. ¶¶ 39 ("favorable" pricing), 40 ("multimillion dollar" discounts), 41 ("tens of millions of dollars" in marketing support), 42 ("300 million yen per quarter"), 43 ("financial incentives").

AMD and Intel do not make computers. Rather, both sell microprocessors (an input product) to original equipment manufacturers ("OEMs"), which are companies that incorporate microprocessors into desktop and laptop computers and servers that they then sell to their customers. OEMs generally are large companies with household names. Compl. ¶ 29. Some, like Dell, IBM, Hewlett-Packard, and Gateway, are U.S. companies. But many of the major OEMs, including Lenovo, Fujitsu, Fujitsu-Siemens, Acer,

---

[3]    x86 microprocessors are microprocessors that utilize Intel's x86 instruction set. Compl. ¶¶ 11, 12. AMD alleges that there is a relevant worldwide x86 microprocessor market. All references to the microprocessor market herein are to the market AMD claims in the Complaint. Compl. ¶¶ 23, 24.

Toshiba, Hitachi, NEC, and Sony, are foreign. Compl. ¶¶ 29, 30. The OEMs sell the majority of their computers abroad. Intel and AMD also sell microprocessors to distributors who resell them, often to smaller OEMs. Compl. ¶ 31. AMD sells half of its microprocessors to distributors. *Id.* Many distributors are also foreign. Compl. ¶¶ 89 ("distributor in China"), 93 (Canada), 94 (Germany, Netherlands).

According to AMD's allegations, only 32% of the computers powered by x86 microprocessors are sold in the United States and only 29% of AMD's microprocessors end up in computers sold in the United States. Compl. ¶ 28.

AMD at one time manufactured microprocessors at a fabrication plant in Austin, Texas, but it has not manufactured microprocessors in the United States for a number of years. In June 2000, AMD opened a new microprocessor manufacturing facility ("Fab 30") in Dresden, Germany, operated by its indirect wholly-owned German subsidiary, AMD Saxony. AMD Saxony itself is owned by AMD Saxony Holding GmbH, another German company, which is wholly-owned by AMD.[4] Once the new manufacturing facility opened in June 2000, AMD shifted its manufacturing operations to the German facility, and phased out its United States microprocessor manufacturing operations.[5]

---

[4]    *See* AMD 2001 Annual Report (Form 10-K) at 11-12 & Exhibit 21 to 10-K (attached as Exhibit 1 to the Appendix of Exhibits In Support of Intel's Motion to Dismiss AMD's Foreign Commerce Claims For Lack of Subject Matter Jurisdiction (hereinafter cited to as ("App. Exh. __"))).

[5]    *See* AMD 2001 Annual Report (Form 10-K) at 9, 11 & Exhibit 13 thereto at 22 (App. Exh. 1); AMD 2002 Annual Report (Form 10-K) Part I at 8 (2002) (App. Exh. 2). The Complaint is silent on these facts, but this information is contained in AMD's filings with the Securities and Exchange Commission, the relevant portions of which are included as exhibits to the Appendix submitted in support of this Motion. This Court may take judicial notice of public records, such as SEC filings, where the parties do not contest their authenticity and they are material to the action. *See, e.g., City of Pittsburgh v. West Penn Power Co.,* 147 F.3d 256, 263 (3d Cir. 1998); *In re Rockefeller Ctr. Prop., Inc. Sec. Litig.,* 184 F.3d 280, 294 (3d Cir. 1999) (Nygaard, J., concurring in part and dissenting in part) (citing *Kramer v. Time Warner, Inc.,* 937 F.2d 767, 774 (2d Cir. 1991)), *Lovelace v. Software Spectrum, Inc.,* 78 F.3d 1015, 1018 (5th Cir. 1996); *PBGC v. White,* 998 F.2d 1192, 1196 (3d Cir. 1993); *see also* Footnote 1, *supra.*

AMD ceased manufacturing microprocessors in the United States altogether by the end of 2002.[6] In October 2005, AMD opened its second microprocessor fabrication plant in Dresden, Germany ("Fab 36").[7] AMD's two German plants manufacture 100% of AMD's microprocessors.[8]

After AMD's microprocessors are manufactured, they are shipped from Germany to assembly and testing plants in Malaysia, Singapore, and China, where they are assembled into chip packages and shipped to customers.[9] Foreign AMD entities in Surrey, Dublin, Paris, Antwerpen, Helsinki, Munich, Brno, Milan, Oslo, Warsaw, Osaka, Tokyo, Beijing, and Sydney (and other locations) sell the German-manufactured and Asian-assembled microprocessors to foreign customers located in European, Asian, and other foreign countries. Compl. ¶¶ 40-44 (Sony, Toshiba, NEC, Fujitsu and Hitachi in Japan), 54-58 (Fujitsu-Siemens and NEC in the European Union and Japan, respectively), 65 (European customer), 89 (Ingram Micro in China), 93 (Canadian distributor), 94 (R.I.C. in Germany, Paradigit and Quote Components in The Netherlands), 100 (German

---

[6]   *See* AMD, 2002 Annual Report (Form 10-K), Part I at 36 (App. Exh. 2); AMD 2003 Annual Report (Form 10-K), at 10 (App. Exh. 3) (setting out that all AMD computational products (microprocessors) are made in Dresden, Germany).

[7]   *See* AMD October 14, 2005 corporate press release, available at http://www.amd.com/us-en/Corporate/VirtualPressRoom/ 0,,51_104_543~101840,00.html (announcing new German plant) (attached at App. Exh. 4). Fab 36 is owned by a German limited partnership named AMD Fab 36 Limited Liability Company & Co. KG. AMD 2004 Annual Report (Form 10-K) at 39 (App. Exh. 5).

[8]   AMD 2005 Annual Report (Form 10-K), at 14 (App. Exh. 6) (setting out all of AMD's manufacturing plants). AMD Saxony in Germany has produced all of AMD's Opteron and Athlon 64 microprocessors, which were first released in 2003. *See* n.6, *supra* and Compl. ¶¶ 18-20.

[9]   *See* AMD 2004 Annual Report (Form 10-K), at 12-13 (App. Exh. 5).

food retail chain), 101 (British, German, and French retailers).[10]  AMD's German-manufactured microprocessors are also sold to U.S. companies, such as IBM, Hewlett-Packard, and Gateway.  Compl. ¶¶ 48-51.  The Complaint does not set out any percentage of AMD microprocessors that are imported into the United States, but does state that "U.S. sales of AMD-powered computers account for 29% of AMD's production."  Compl. ¶ 29.  Although AMD alleges, in purely conclusory terms, harm to its "export trade" (Compl. ¶ 130), it does not allege that it exports microprocessors manufactured in the United States to customers outside the United States.

AMD's Complaint challenges various forms of "direct payments," "discriminatory rebates," "discounts and subsidies conditioned on customer 'loyalty,'" and other financial inducements that Intel allegedly provided to the OEMs and other customers.  Compl. ¶ 35.  AMD states that this conduct "differ[ed] from customer to customer and segment to segment," but had the effect of excluding AMD from making sales to these customers.  *Id.*

The Complaint is replete with allegations concerning AMD's purported lost foreign sales from this alleged conduct by Intel.  For example, AMD complains about discounts and promotional support allegedly given to Sony (a Japanese company) and Sony's subsequent decision not to purchase AMD's German-made microprocessors.  Compl. ¶ 40.  AMD also complains of various payments made by Intel to Toshiba (also a Japanese company) that are alleged to have denied AMD Japanese sales.  *Id.* ¶ 41.  Intel

---

[10]    AMD's website states that dozens of non-party AMD entities sell its foreign-manufactured microprocessors in foreign countries throughout Europe, Latin America, and Asia. *See, e.g.*, http://www.amd.com/us-en/Processors/Technical Resources/0,,30_182_3559_710^767,00.html (App. Exh. 7); http://www.amd.com/us-en/Processors/Technical Resources/0,,30_182_3559_710^7233,00.html (App. Exh. 8) and http://www.amd.com/usen/Processors/TechnicalResources/ 0,,30_182_3559_710^764,00.html (App. Exh. 9).  As for the retailers, while they typically sell computer systems, and therefore do not purchase microprocessors directly, AMD's theory is that Intel's conduct with foreign retailers has limited AMD's sales in those foreign countries.  Compl. ¶¶ 100-01.

is alleged to have interfered with AMD's microprocessor sales to Fujitsu-Siemens in
Europe. Compl. ¶ 56. AMD claims that Intel "purchased" an exclusive-dealing
arrangement with Hitachi, the alleged direct effect of which is the loss of AMD
microprocessor sales into Japan. Compl. ¶ 44. AMD asserts that Intel made promotional
payments to a German food retailer (Aldi), a British electronics retailer (DSG), a British
PC retailer (Time), a German electronics retailer (MediaMarkt), a French electronics
retailer (Boulanger), and a French variety store (Conforama) to reduce their sales of
AMD-based systems. Compl. ¶¶ 100-01.

AMD's Complaint contains two theories under which this foreign conduct
allegedly "cause[d] substantial harm to competition in the market for x86
microprocessors in domestic import and export trade." Compl. ¶ 127. First, AMD
contends that Intel's discounts "artificially capped AMD's market share, and constrained
it from expanding to reach minimum efficient levels of scale necessary to compete with
Intel." Compl. ¶ 5. In other words, AMD's German subsidiary allegedly lost certain
foreign sales, which in turn reduced the revenue flow to AMD in the United States, which
in turn influenced AMD's investment decisions, which then prevented AMD from
expanding its manufacturing capabilities and achieving an efficient scale of
manufacturing, which in turn made AMD less competitive. Second, AMD claims that
Intel's discounts (and other conduct) ultimately led to inflated PC prices to consumers
and the "loss of freedom" for consumers to purchase the products they want. Compl. ¶ 6.

### B.    AMD's Initiation of Foreign Proceedings Concerning Its Alleged Foreign Harm

At about the same time that AMD filed this lawsuit in the United States, AMD's
wholly-owned Japanese subsidiary, AMD Japan Ltd., brought two separate civil actions
in Japan against Defendant Intel KK. AMD's complaints filed in Japan challenge the
very same conduct that AMD raises in this Court with regard to Intel's Japanese
customers. In particular, both the Japan complaints and AMD's U.S. Complaint in this

10

Court allege that Intel's discounting and other practices in Japan caused AMD Japan to lose prospective microprocessor sales to Japanese computer manufacturers (Sony, Toshiba, NEC, Fujitsu, and Hitachi).[11] U.S. Compl. ¶¶ 40-44; Japan High Court Compl. P. 7-15 (App. Exh. 10); Japan District Court Compl. P. 4-12 (App. Exh. 11). The Japanese lawsuits followed on the heels of a Japan Fair Trade Commission ("JFTC") investigation of Intel KK's sales practices in Japan brought at the urging of AMD.[12]

In 2000, AMD complained to the European Commission that Intel allegedly interfered with its microprocessor sales to customers in Europe. The European Commission publicly indicated that AMD's allegations were "unfounded," but AMD has since made additional allegations that the European Commission is now investigating. In addition, AMD has complained to the Korean Fair Trade Commission about Intel's conduct in Korea and an investigation was opened in 2005.[13]

### III.    LEGAL STANDARD OF REVIEW

Lack of subject matter jurisdiction can be raised *sua sponte* by the Court or by the parties at any time during the course of a case. Fed. R. Civ. P. 12(h)(3). Plaintiffs "must

---

[11]    AMD Japan Ltd. sued Intel KK in the Tokyo High Court, Civil Affairs Division and in the Tokyo District Court. Certified translations of these complaints are attached as App. Exhs. 10 & 11. The Japan complaints contain a limited number of additional allegations about sales conduct concerning, *inter alia,* an internet café, PC magazines in Japan, and a smaller computer company that are not asserted in AMD's U.S. Complaint.

[12]    In March 2005, Intel announced that Intel KK "accept[ed]" a JFTC Recommendation Decision, stating that "[a]lthough [Intel KK] accepts the Recommendation, the company does not agree with the facts underlying the JFTC's allegations and the application of law in the Recommendation." Intel KK stated that it "continues to believe its business practices are both fair and lawful," but accepted the Recommendation because its provisions would "not impair it from continuing to meet customer requirements." http://www.intel.com/pressroom/archive/ releases/20050331corp.htm.

[13]    In connection with their respective investigations, European Commission and Korea Fair Trade Commission investigators recently conducted on-premises document inspections of Intel facilities located within their jurisdictions.

bear the burden of persuasion" and establish that the court they have chosen has subject matter jurisdiction over the dispute they have filed. *Kehr Packages, Inc. v. Fidelcor, Inc.*, 926 F.2d 1406, 1409 (3d Cir. 1991); *see also Turicentro, S.A. v. Am. Airlines, Inc.*, 303 F.3d 293, 300 n.4 (3d Cir. 2002). As shown below, the Complaint's allegations are insufficient on their face to meet AMD's burden of pleading facts to establish U.S. jurisdiction under the FTAIA over AMD's claimed lost sales of German microprocessors to foreign customers.

In evaluating the motion, the Court is not required to accept the allegations supporting subject matter jurisdiction uncritically. On the contrary, "because of the importance of the issue to the federal judicial system, argumentative (as opposed to reasonable) inferences favorable to the pleader will not be drawn and conclusory allegations or conclusions of law will not be credited." 5B Charles A. Wright et al., Wright & Miller Federal Practice and Procedure § 1350 at 181-85 (3d ed. 2004). The Court may look beyond the face of the Complaint to indisputable securities filings and other AMD publications and statements. *See id.*; *PBGC v. White*, 998 F.2d 1192, 1196 (3d Cir. 1993) and footnote 5, *supra.*[14]

---

[14] Challenges to subject matter jurisdiction may be "facial" or "factual." *Turicentro, S.A. v. Am. Airlines, Inc.*, 303 F.3d 293, 300 & n.4 (3d Cir. 2002) (discussing standard). Facial attacks, like this one, contest the sufficiency of the complaint's allegations and other matters properly considered. Where plaintiff's allegations are facially defective and extraneous facts cannot alter the fundamental nature of plaintiff's claims, the courts have been swift to dismiss foreign commerce claims for lack of subject matter jurisdiction. *See, e.g., Latino Quimica-Amtex S.A. v. Azko Nobel Chems. B.V., et al.,* 2005 U.S. Dist. LEXIS 19788 (S.D.N.Y. Sept. 7, 2005) (dismissing claims under FTAIA despite plaintiff's submission of expert affidavit because essential nature of complaint revolved around foreign commerce and any amendment to complaint would be futile) (attached as Exh. A to the Appendix of Unpublished Authorities, hereinafter cited to as ("Appx. Exh. __")); *Turicentro, S.A. v. Am. Airlines, Inc.,* 152 F. Supp. 2d 829, 833-34 (E.D. Pa. 2001) (dismissing complaint after facial challenge because "assuming as true that the alleged conspiracy and the actions taken in furtherance thereof did occur within United States commerce, the plaintiffs aver nothing from which this court could find that defendants' purported conspiracy caused any injury which was felt in the U.S. or which affected the American economy in any way"), *aff'd*, 303 F.3d 293 (3d Cir. 2002); *Optimum, S.A. v.*

The Supreme Court has stated that the threshold jurisdictional standard of the FTAIA should be applied "simply and expeditiously." *Empagran,* 542 U.S. at 169. AMD's Complaint alleges antitrust violations by Intel in connection with Intel's sales to foreign customers, and expressly seeks recovery based on AMD's alleged lost sales of foreign-made microprocessors to these same foreign customers. Because the Complaint seeks recovery based on conduct "involving trade with foreign nations," where the alleged direct harm is foreign, it is facially defective under the FTAIA and the issue should be addressed promptly prior to extensive discovery and to avoid conflict with the economic policies of foreign nations. As the Seventh Circuit stated in *United Phosphorus, Ltd. v. Angus Chemical Co.*, 322 F.3d 942, 952 (7th Cir. 2003):

> [T]his important issue goes to subject matter jurisdiction [and] it can be resolved early in the litigation. If missed early on, it can be resolved whenever it becomes clear that the alleged anticompetitive activity does not have a substantial effect on United States commerce. If the parties do not raise the issue, a judge has an obligation to raise it. Treating the matter as one of subject matter jurisdiction reduces the potential for offending the economic policies of other nations. In short, FTAIA limits the power of the United States courts (and private plaintiffs) from nosing about where they do not belong. And the power of the courts is precisely what subject matter jurisdiction is about.

Numerous courts have held that dismissals under the FTAIA are appropriate where, as here, the allegations concern direct effects outside the United States. *See, e.g.,* Footnote 14 and cases cited therein. *See also Empagran Remand Decision*, 417 F.3d at 1270-71; *United States v. LSL Biotechnologies*, 379 F.3d 672 (9th Cir. 2004); *Den Norske Statis Oljeselskap v. HeereMac Vof*, 241 F.3d 420 (5th Cir. 2002). As an alternative to dismissal, the Court may strike the specific paragraphs containing the

---

*Legent Corp.,* 926 F. Supp. 530, 532-33 (W.D. Pa. 1996) (noting that "federal courts have repeatedly dismissed antitrust claims for lack of subject matter jurisdiction where a foreign company failed to demonstrate that the alleged conduct has a direct substantial and reasonably foreseeable effect in the United States").

allegations over which it has no jurisdiction as immaterial under Fed. R. Civ. P. 12(f).
*See* Wright & Miller, Civil 3d § 1350 at 115 (2004).

Although AMD has packaged its claims based on foreign harm with other claims
that allege domestic harm, that does not save the foreign-based claims – as *Empagran*
itself made clear in dismissing claims based on foreign effects (higher prices paid abroad)
despite the pendency of concurrent claims based on domestic effects (higher U.S. prices).
The Supreme Court noted that "[t]he issue before us concerns (1) significant foreign
anticompetitive conduct with (2) an adverse domestic effect and (3) an independent
foreign effect giving rise to the claim," and still concluded that the FTAIA jurisdictional
exception did not apply.  542 U.S. 159, 164-65.  Similarly, the foreign claims alleged by
AMD are distinct from AMD's domestic claims, as they involve allegations of effects in
foreign countries, *i.e.*, AMD's alleged lost sales to European and Asian customers.  *Elliot
v. State Farm Mut. Ins. Co.*, 786 F. Supp. 487, 489 (E.D. Pa. 1997) (a motion to dismiss
may be granted as to portions of a complaint).  AMD's decision to package a subset of its
U.S. allegations as separate claims in Japan reinforces this conclusion.

### IV.    PLAINTIFFS' ALLEGATIONS REGARDING FOREIGN EFFECTS DO NOT SATISFY THE FTAIA'S JURISDICTIONAL REQUIREMENTS

#### A.    The FTAIA Limits the Subject Matter Jurisdiction of U.S. Courts to Conduct That Directly Caused a Substantial and Reasonably Foreseeable Domestic Effect

By its terms, the Sherman Act is concerned only with the consequences of alleged
anticompetitive behavior on U.S. commerce, including direct effects on exports from and
imports into the United States. 15 U.S.C. §§ 1, 2.  The Supreme Court held in *Matsushita*
that interjecting the U.S. antitrust laws to address claims of foreign harm requires
regulation of "the competitive conditions of other nations' economies," which is "outside
the reach of the Sherman Act."  475 U.S. at 583.

14

The FTAIA sets out the Sherman Act's jurisdictional limits. The FTAIA was enacted "to make clear to American exporters (and to firms doing business abroad) that the Sherman Act does not prevent them from entering into business arrangements . . . however anticompetitive, as long as those arrangements adversely affect only foreign markets." *Empagran*, 542 U.S. at 161. Under the FTAIA, the Sherman Act does not apply to conduct involving commerce with foreign nations unless: (1) the alleged anticompetitive conduct causes a "direct, substantial, and reasonably foreseeable" effect on U.S. commerce, *and* (2) that domestic effect – and not a foreign effect – directly "gives rise to" plaintiff's claim. 15 U.S.C. § 6a; *Empagran,* 542 U.S. at 161-62.[15] In other words, the FTAIA sets out a rule that presumptively places all activity involving foreign commerce outside the Sherman Act's reach. It then brings back a limited class of such conduct within the Sherman Act's reach, provided that the plaintiff pleads and later establishes both the claimed requisite direct effect on domestic trade or export trade from the United States and further establishes that its claim arises from that domestic effect. *Empagran,* 542 U.S. at 161.

It is not enough to allege that the conduct at issue involved U.S. headquartered companies or was allegedly planned in the United States. The FTAIA was intended to exempt from U.S. antitrust law conduct that lacks the requisite direct domestic effect, "even where the antitrust conduct originates in the United States or involves American-owned entities operating abroad." *United Phosphorus Ltd. v. Angus Chem. Co.*, 131 F. Supp. 2d 1003, 1009-10 (N.D. Ill. 2001), *aff'd*, 332 F.3d 942 (7th Cir. 2003), quoting *Optimum*, 926 F. Supp. at 532; *CSR Ltd. v. Cigna Corp.*, 405 F. Supp. 2d 526, 546 (D.N.J. 2005) ("[T]he Court must reject any implication that the FTAIA's 'direct, substantial, and reasonably foreseeable effect' requirement is met because certain of

---

[15] The full text of the FTAIA, which is incorporated into the Sherman Act, is attached at App. Exh. 12.

Defendants' actions were taken or overseen in the United States"). As the FTAIA's legislative history states and as the U.S. Justice Department and Federal Trade Commission have recently pointed out, that foreign firms affected abroad are owned by U.S. shareholders is also insufficient to satisfy the FTAIA: "A transaction between two foreign firms, even if American-owned, should not, merely by virtue of the American ownership, come within the reach of our antitrust laws." FTAIA House Report, H.R. Rep. No. 97-686, at 9-10 (App. Exh. 13); Brief for the United States and Federal Trade Commission as Amici Curiae Supporting Petitioners in *Empagran* at 18 n.5 (App. Exh. 14) (citing this same legislative history with approval).

It is likewise insufficient to allege that a foreign input product sold in a foreign transaction satisfies the domestic effects requirement because it was subsequently incorporated into another product that was ultimately shipped to the United States. The alleged injury in such a case is indirect, and is therefore excluded from federal court jurisdiction under the FTAIA. *See, e.g., United Phosphorus,* 131 F. Supp. 2d at 1014 ("The FTAIA explicitly bars antitrust actions alleging restraints in foreign markets for inputs (such as AB) that are used abroad to manufacture downstream products (like ethambutol) that may later be imported into the United States."), *aff'd*, 332 F.3d 942 (7th Cir. 2003).

> ### B. AMD's Claims of Lost Sales to Foreign Customers Do Not Involve Any Direct, Substantial and Reasonably Foreseeable Domestic Effect

A German AMD entity manufactures AMD microprocessors in Dresden, Germany. Other AMD entities in Asia assemble them for shipment. Additional foreign AMD entities sell the great majority of these foreign-made and foreign-assembled microprocessors to foreign customers throughout Europe and Asia. AMD alleges that Intel prevented it (or its foreign subsidiaries) from selling more of its foreign microprocessors to specific customers in Canada, Japan, China, the United Kingdom,

France, Germany, The Netherlands, and other foreign countries. *See* Compl. ¶¶ 40-44, 55, 56, 65, 74, 75, 86, 89, 93, 94, 100, 101, 106. This is foreign, not domestic commerce, and the only direct effects of the alleged conduct are foreign on their face.

The Complaint does not allege facts showing that those lost foreign sales directly affected commerce in the United States. On the contrary, the Complaint alleges only direct foreign harm through AMD's alleged lost sales of foreign microprocessors to specifically identified foreign customers. AMD's own actions further reinforce the conclusion that any direct harm from the alleged conduct depriving AMD of foreign sales occurred abroad. AMD's lawsuits in Japan and its efforts to instigate investigations by foreign authorities are necessarily predicated on direct harm abroad and an acknowledgment that those foreign authorities have the responsibility to regulate commerce in their jurisdictions. The *Empagran* court observed that with the FTAIA "Congress sought to *release* domestic (and foreign) anticompetitive conduct from Sherman Act constraints when that conduct causes foreign harm." *Empagran*, 542 U.S. at 166 (emphasis in original). Likewise, in *Turicentro*, the Third Circuit held that where conduct allegedly violating the Sherman Act is directed at and affects foreign markets, it involves "foreign trade or commerce" that falls outside the reach of U.S. antitrust laws. 303 F.3d at 302. *Accord In re Microsoft Corp. Antitrust Litig.*, 127 F. Supp. 2d 702, 716 (D. Md. 2001) (Sherman Act's reach "obviously does not include engaging in a commercial transaction with a foreign firm solely within the geographical boundaries of a foreign country"), *aff'd sub nom on other grounds, Kloth v. Microsoft*, 2006 WL 998087 (4th Cir. 2006).

17

1.    **The Allegation that Foreign Customers Bought Fewer of AMD's German-Manufactured Microprocessors and That, as a Result, AMD Missed an "Opportunity" to Achieve Efficient Scale Is Not a Direct Domestic Effect**

A direct effect under the FTAIA is one that is an "immediate consequence" of the defendant's action, and does not depend on "intervening developments." *United States v. LSL Biotechnologies*, 379 F.3d 672, 680 (9th Cir. 2004) (relying on dictionary definition defining "direct" as "proceeding from one point to another in time or space without deviation or interruption," citing Webster's Third New International Dictionary 640 (1982) (the year the FTAIA was promulgated)); *CSR Ltd.,* 405 F. Supp 2d at 545 (following Ninth Circuit's definition of direct effect).

A substantial part of AMD's allegations are ones of different inducements that Intel allegedly provided to individual foreign customers to buy microprocessors from Intel. Compl. ¶ 35. AMD's purported injury when those inducements are made to foreign customers is the loss of a sale of a foreign-made microprocessor to a foreign customer. To the extent that there is any direct harm from Intel's alleged conduct, it occurs at the point of the lost sale in the foreign country. Ripple effects that might later be experienced down the line in the United States are not direct. *See Empagran,* 542 U.S. at 173 ("Congress would not have intended the FTAIA's exception to bring independently caused foreign injury within the Sherman Act's reach"); *LSL Biotechnologies*, 379 F.3d at 680.

AMD's allegation that the lost sales of its foreign-made microprocessors to foreign customers ended up causing AMD to miss an "opportunity to achieve minimum levels of efficient scale" (Compl. ¶ 128) presents, on its face, an assertion of an indirect effect in the United States. This contention that Intel's alleged foreign conduct injured U.S. domestic commerce is based on a chain of causation whereby the loss of the foreign sales caused the foreign AMD entity to be less profitable and to send less money back to its U.S. shareholders. AMD, in turn, passed up some unidentified "opportunity" to invest

18

in future manufacturing capacity, which in turn raised its costs, which in turn might have reduced its ability to compete in the United States. Such an uncertain string of events does not proceed from one point to another without deviation or interruption, as is necessary to find a direct domestic effect. It requires intervening decision-making, whose outcome is dependent on evaluation of the myriad factors affecting any major business investment decision, from overall economic conditions to the cost of financing, and is far removed from the "direct" domestic effect that the FTAIA requires.[16]

Congress foresaw the situation alleged by AMD here, and cut the chain of causation off at the first link. *LSL Biotechnologies*, 379 F.3d at 681. It debated and expressly rejected the proposition that U.S. courts had jurisdiction over an attenuated, indirect domestic effect. "A transaction between two foreign firms, even if American-owned, should not, merely by virtue of the American ownership, come within the reach of our antitrust laws." FTAIA House Report 5, H.R. Rep. No. 97-686 at 9-10 (App. Exh. 13); *see Empagran* Brief for the United States and Federal Trade Commission as Amici Curiae Supporting Petitioners at 18 n.5. (App. Exh. 14) Courts have agreed, holding that a U.S. shareholder's claim for allegedly diminished revenue from its foreign subsidiary's lost business abroad was an *indirect* effect on the United States and was barred by the FTAIA. *See Optimum*, 926 F. Supp. at 533 ("An allegation that income flows between corporations is insufficient to establish the requisite domestic effect"); *Info. Res., Inc. v. Dun & Bradstreet Corp.*, 127 F. Supp. 2d 411, 417 (S.D.N.Y. 2001) (reduced income flowing from a foreign subsidiary is not a "direct" domestic injury); *see also Latino Quimica-Amtex S.A.*, 2005 U.S. Dist. LEXIS 19788, at *24-25, 27, 33, 36 (S.D.N.Y.

---

[16] Among the many intervening factors that necessarily affect AMD's investment decisions, as explained in AMD's SEC filings, are the cyclical nature of the microprocessor industry, fluctuating demand for personal computers, the success or failure of research and development efforts, capital availability and requirements, and worldwide economic and political conditions. *See* AMD Annual Reports, 2001-2004, excerpted at App. Exh. 15.

Sept. 7, 2005) (FTAIA does not contemplate causes of action alleging direct foreign effects ultimately having "ripple effects" on U.S. domestic market) (Appx. Exh. A).

No court has ever sustained Sherman Act jurisdiction over claims based on foreign effects simply because the injured entity had U.S. shareholders. If that were the rule, U.S. courts' jurisdiction would extend to every foreign competitive dispute that affected the profits of a U.S. shareholder. *See Turicentro*, 303 F.3d at 301 & n.5 ("[w]hether plaintiffs are United States citizens is irrelevant to our inquiry"). This would make U.S. courts the overseers of the domestic economy of every foreign nation merely because the plaintiff was headquartered in the United States and *some* economic effects of conduct ultimately could be traced back to the United States. This is not what Congress intended when it enacted the FTAIA. *See Empagran*, 542 U.S. at 169 ("Congress designed the FTAIA to clarify, perhaps to limit, but not *to expand* in any significant way, the Sherman Act's scope as applied to foreign commerce") (emphasis in the original).

### 2. The Allegation that the Relevant Microprocessor Market Is Worldwide Does Not Create U.S. Jurisdiction

AMD's allegation that the relevant market for microprocessors is worldwide (Compl. ¶¶ 24, 128) also does not confer worldwide Sherman Act jurisdiction on United States courts. The concept of a relevant antitrust market is an economic concept that may transcend borders, and it most certainly is not a jurisdictional concept. Sherman Act jurisdiction, as set out in the FTAIA, is constrained by national boundaries. *Empagran* makes that clear. The *Empagran* plaintiffs alleged that the relevant vitamin market was worldwide. Neither the Supreme Court nor the D.C. Circuit on remand found this allegation sufficient to support subject matter jurisdiction. Notwithstanding an alleged worldwide market, plaintiffs' claims were dismissed because they were based on foreign harm. *Empagran,* 542 U.S. at 165 (rejecting argument that U.S. jurisdiction conferred by

allegation that defendants' conduct affected worldwide market for vitamins); *Empagran Remand Decision*, 417 F.3d at 1271 ("Although the appellants argue that the vitamin market is a single, global market facilitated by market division agreements so that their injuries arose from the higher prices charged by the global conspiracy (rather than from super-competitive prices in one particular market), they still must satisfy the FTAIA's requirement that the U.S. effects of the conduct give rise to their claims").[17]

### C.   Alleged Direct Foreign (Not Domestic) Effects "Gave Rise To" AMD's Claims

AMD also cannot satisfy the second prong of the FTAIA with regard to its foreign commerce allegations because the foreign effects of the alleged conduct, and not any domestic effects, gave rise to AMD's claims. Lost sales of German-manufactured microprocessors to customers in France, Germany, England, Japan, Taiwan, and other foreign countries (*e.g.,* Compl. ¶¶ 40-44, 54-57, 65, 74, 75, 81, 83, 86, 89, 93, 94, 100, 101, 106) are self-evidently foreign effects.

---

[17]    The FTAIA's adoption reflected Congress' intent to clarify with "our closest allies and trading partners [who] resent the extraterritorial reach of our antitrust laws" that the United States would respect their sovereignty. *See* Foreign Trade Antitrust Improvements Act: Hearings on H.R. 2326 Before the Subcommittee on Monopolies and Commercial Law of the Committee of the Judiciary, 97th Cong. (1981) (statement of Chairman Rodino, at 1) (App. Exh. 16). *See also McElderry v. Cathay Pac. Airways Ltd.,* 678 F. Supp. 1071, 1077 (S.D.N.Y. 1988) ("An anti-competitive effect on United States commerce is required for jurisdictional nexus, regardless whether there was anticompetitive conduct in the United States"); *Lantec, Inc. v. Novell,* 2000 U.S. Dist. LEXIS 19905, at *18, (D. Utah Sept. 15, 2000) (rejecting contention by foreign plaintiffs that subject matter jurisdiction exists under the FTAIA when injuries suffered in foreign markets are "'inextricably intertwined' with the injury inflicted on the domestic market," because plaintiffs failed to allege that defendants' "actions toward plaintiffs had a 'substantial' effect on the domestic market") (Appx. Exh. B); *Den Norske,* 241 F.3d at 428 (court lacked subject matter jurisdiction over plaintiff's claim, even though plaintiff alleged that the market allocation scheme had affected the price for heavy-lift barge services in the Gulf of Mexico, because the plaintiff's claim was based on injuries sustained in purchasing heavy-barge services in the North Sea).

Any claim based on the allegation that the effects of Intel's conduct in the United States and abroad were linked, or that AMD would have had more income to invest in manufacturing and consequently would have been more competitive in the United States "but for" Intel's foreign conduct, is also irrelevant and insufficient to support jurisdiction. The D.C. Circuit held on remand in *Empagran* that the type of "but for" causation alleged here, *i.e.*, that the defendants' conduct put in place a chain of events that ultimately had an adverse effect on U.S. commerce, did not confer subject matter jurisdiction on U.S. courts. As the D.C. Circuit stated, "'but-for' causation between the domestic effects and the foreign injury claim is simply not sufficient to bring anti-competitive conduct within the FTAIA exception. The statutory language -- 'gives rise to' -- indicates a direct causal relationship, that is, proximate causation, and is not satisfied by the mere but-for 'nexus' the appellants advanced in their brief." *Empagran Remand Decision*, 417 F.3d at 1270-71; *see also Empagran*, 542 U.S. at 172-75 ("[d]espite the [] linguistic logic" of plaintiffs' argument, the legislative history of the FTAIA makes clear that the plaintiffs' claims must each arise from the alleged direct domestic effect); *Latino Quimica-Amtex*, 2005 U.S. Dist. LEXIS 19788 (following D.C. Circuit's proximate cause test and dismissing allegations of foreign conduct under FTAIA) (Appx. Exh. A); *In re Monosodium Glutamate Antitrust Litig.*, 2005 U.S. Dist. LEXIS 39641 at *20 (D. Minn. Oct. 26, 2005) (following D.C. Circuit and holding that plaintiffs must allege that "domestic effect proximately caused their injuries") (Appx. Exh. C); *In re Dynamic Random Access Memory Antitrust Litig.*, 2006 U.S. Dist. LEXIS 8977 at *13 (N.D. Cal. Mar. 1, 2006) (following D.C. Circuit and rejecting claim that foreign injury that is "intertwined with the domestic effects" is sufficient to establish jurisdiction) (Appx. Exh. D).

Allegations of higher U.S. computer prices or a "loss of freedom" for computer purchasers (Compl. ¶ 6) also do not "give rise" to a claim by AMD and are insufficient to confer jurisdiction over the foreign commerce claims. These allegations relate to a

different market (the market for computers, not the allegedly relevant microprocessor market), and AMD does not allege either that it is a purchaser of computers in that downstream market, or that its claims are for harms in that market. The *Empagran* plaintiffs tried a similar tactic to support a claim of U.S. Sherman Act jurisdiction, pointing to harms allegedly borne by U.S. purchasers of vitamins (although not by themselves). The Supreme Court and the D.C. Circuit on remand rejected the argument that U.S. jurisdiction was appropriate simply because plaintiffs alleged that someone suffered a domestic effect. Instead, section 2 of the FTAIA made plain that plaintiffs had to allege and prove that their claims were directly caused by domestic (and not foreign) effects:

> [u]nder the [plaintiffs'] theory, it was the foreign effects of price-fixing outside of the United States that directly caused, or 'g[a]ve rise to,' their losses when they purchased vitamins abroad at super-competitive prices. That the [defendants] knew or could foresee the effect of their allegedly anticompetitive activities in the United States on the [plaintiffs'] injuries abroad or had as a purpose to manipulate United States trade does not establish that 'U.S. effects' proximately caused the [plaintiffs'] harm.

*Empagran Remand Decision*, 417 F.3d at 1270-71. The D.C. Circuit reached this conclusion despite plaintiffs' allegation that the foreign and domestic harms were inextricably intertwined. *Id.*

The Third Circuit reached a similar conclusion in *Turicentro*, which involved claims by foreign travel agents that defendants, U.S. airlines, had fixed the commission rates the travel agents could earn in Central America at artificially low levels. Plaintiffs there argued that U.S. courts had jurisdiction over their claims because U.S. travelers used their travel services. In affirming the dismissal of plaintiffs' claims, the Third Circuit emphasized that plaintiffs' alleged domestic injury may have affected U.S. travelers who booked their flights with plaintiffs, but it was not the injury that gave rise to plaintiffs' claims. 303 F.3d at 303 ("The alleged conspiracy in this case was directed at commission rates paid to foreign travel agents based outside the United States. That

some of the services plaintiffs offered were purchased by United States customers is not dispositive"). Instead, foreign effects – fixed commission rates in Central America – gave rise to plaintiffs' claims. *Id.*; *see also Liamuiga Tours v. Travel Impressions, Ltd.*, 617 F. Supp. 920, 924, 925 (E.D.N.Y. 1985) (foreign plaintiff's claim that it was excluded by a U.S. firm from operating a travel business in St. Kitts held barred by FTAIA because "the situs of these effects, however considerable, is St. Kitts").

The Fifth Circuit held similarly in *Den Norske*. There, a Norwegian oil corporation that owned and operated oil and gas drilling platforms in the North Sea claimed that the defendants conspired to fix bids and allocate customers, territories, and projects for their heavy-lift barge services to platforms located in the Gulf of Mexico, the North Sea and the Far East. 241 F.3d at 422. Even though plaintiff's injury arose off the coast of Britain and Norway, where it allegedly paid anticompetitive prices, the plaintiff argued that an American court had jurisdiction over its claim because of the "close relationship" of its injuries in the North Sea with other effects of the defendants' conduct in the United States – for example, higher prices paid by other, unrelated purchasers of the defendants' services in the Gulf of Mexico, and higher prices plaintiff itself charged in the downstream market for its oil in the United States as a result of paying the allegedly fixed prices. *Id.* at 427.

The Fifth Circuit rejected plaintiff's argument, holding that the plaintiff may have alleged domestic effects, but those domestic effects did not directly "give rise to" its claim. Instead, its claim directly arose from foreign effects (higher prices it paid abroad). The Court concluded that "the FTAIA requires more than a 'close relationship' between the domestic injury and the plaintiff's claim; it demands that the domestic effect 'gives rise' to the claim." *Id.*[18]

---

[18] *See also Gen. Elec. Co. v. Latin Am. Imps.*, 2002 WL 1603093 at * 5 (W.D. Ky. July 16, 2002) (Appx. Exh. E); *In re Microsoft Corp. Antitrust Litig.*, 127 F. Supp. 2d 702, 716 (D. Md. 2001); *The 'In' Porters, S.A. v. Hanes Printables, Inc.*, 663 F. Supp. 494, 498 (M.D.N.C. 1987) (anticompetitive domestic effect did not "give rise" to plaintiff's

As in *Empagran*, *Turicentro*, *Den Norske*, and *Latino Quimica-Amtex*, it is the alleged direct foreign effects – purported lost foreign sales – that give rise to much of AMD's claims. Any alleged effects on the U.S. computer market, or on AMD's worldwide investment decisions from those alleged lost foreign sales, were indirect and secondary.

### V.    PRINCIPLES OF PRESCRIPTIVE COMITY REQUIRE AMD TO SEEK REMEDY FOR FOREIGN INJURIES IN THE APPROPRIATE FOREIGN FORUM

AMD Japan's lawsuit filed in Japan, alleging direct harm in the form of lost microprocessor sales in that country, undermines the allegations that the U.S. AMD plaintiffs directly suffered any domestic U.S. harm from those same lost sales in Japan. AMD has brought an independent antitrust action in Japan premised on a subset of the same conduct alleged here (*see, e.g.,* Compl. ¶¶ 40-44), and has complained to foreign antitrust enforcers that it has suffered harm in foreign jurisdictions. In this litigation, however, it claims that the same lost sales abroad harmed it in the United States. AMD's tactic raises the prospect of simultaneous litigation of antitrust claims based on the same conduct in multiple jurisdictions here and abroad with often conflicting legal rules. Both the German and Japanese governments filed amicus briefs in *Empagran* arguing that applying U.S. remedies to conduct covered by their laws would upset the balance of competing considerations in their own domestic antitrust laws. *Empagran*, 542 U.S. at 167-70.

Where the foreign transactions at issue cause no direct, substantial and reasonably foreseeable domestic antitrust injury to U.S. commerce, there is "insubstantial" justification for the "serious risk of interference with a foreign nation's ability

_____

claims for lost sales in France); *De Atucha v. Commodity Exch., Inc.*, 608 F. Supp. 510 (S.D.N.Y. 1985) (conspiracy effect of silver prices on United States exchange did not "give rise" to plaintiff's injury on London exchange).

independently to regulate its own commercial affairs." *Empagran*, 542 U.S. at 165. In such circumstances, the foreign effects are governed by the rules established by the governments in the foreign jurisdictions where they allegedly occurred. Each foreign government, after all, knows "how best to protect [its] customers." *Id.* at 165. As the Supreme Court noted, when foreign effects are the issue, as here, "[w]hy should American law supplant . . . Canada's or Great Britain's or Japan's own determination about how best to protect Canadian or British or Japanese customers[?]" *Id.* This admonition is particularly pertinent here, as AMD also seeks broad worldwide injunctive relief (Prayer for Relief D) that would necessarily entail this Court's ongoing regulation of the competitive conditions and rules in foreign countries. AMD thus not only seeks to have this Court impose U.S. law on foreign markets, its Complaint (and the injunctive relief it seeks) virtually assure the type of jurisdictional conflict that the principles of international comity underlying the FTAIA seek to avoid.[19]

Accordingly, AMD's claims suffer irremediable jurisdictional deficiencies. Although portions of the Complaint allege anticompetitive conduct in transactions involving U.S. purchasers of AMD's microprocessors for use in domestic computer products and would remain, AMD's claims are substantially centered on the impact of

---

[19]  The Supreme Court held in *Empagran* that the authority to regulate economic conduct abroad rests with the affected foreign sovereigns:

> We conclude that principles of prescriptive comity counsel against the Court of Appeals' interpretation of the FTAIA. Where foreign anticompetitive conduct plays a significant role and where foreign injury is independent of domestic effects, Congress might have hoped that America's antitrust laws, so fundamental a component of our own economic system, would commend themselves to other nations as well. But, if America's antitrust policies could not win their own way in the international marketplace for such ideas, Congress, we must assume, would not have tried to impose them, in an act of legal imperialism, through legislative fiat.

542 U.S. at 169.

Intel's alleged conduct on AMD's sales of foreign-made microprocessors to foreign purchasers in foreign countries. These foreign claims do not (and cannot) implicate any direct impact on U.S. commerce in the relevant market, and give rise to no discernable claim of antitrust injury to AMD that is redressable in the United States.[20]

## VI.     PLAINTIFFS DO NOT HAVE STANDING TO ADVANCE THEIR CLAIMS UNDER THE SHERMAN ACT FOR INJURIES ARISING IN FOREIGN COMMERCE

The central purpose of the United States antitrust laws is to protect competition in the United States. *Pfizer, Inc. v. Gov't of India*, 434 U.S. 308, 314 (1978) ("Congress' foremost concern in passing the antitrust laws was the protection of Americans"). Claims to recover damages for foreign injuries are not actionable under Section 4 of the Clayton Act, which provides that "[a]ny person who shall be injured in his business or property by reason of anything forbidden in the antitrust laws may sue therefore . . . ." 15 U.S.C. § 15; *Cargill, Inc. v. Monfort of Colorado, Inc.*, 479 U.S. 104, 111 (1986). Plaintiffs have

---

[20]     Congress' intent and purpose to remove certain conduct having only direct foreign effects from federal jurisdiction and antitrust scrutiny also means that AMD's parallel state law causes of action, under Section 17045 of the California Business and Professions Code (prohibiting "secret rebates") and for intentional interference with prospective economic advantage (expressly based on the alleged "anticompetitive conduct") must also be dismissed, to the extent these claims are based on effects in foreign markets. *See, e.g., CSR Ltd. v. Cigna Corp.*, 405 F. Supp. 2d 526, 552 (D.N.J. 2005) (holding that the court's decision to dismiss the federal antitrust claims under the FTAIA mandates dismissal of the New Jersey state antitrust claims as well because "consonance between the federal and state enactments is required"). Indeed, allowing California law to regulate and punish conduct involving foreign trade that only directly causes foreign effects will "stand[] as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress" in passing the FTAIA. *See Crosby v. Nat'l Foreign Trade Council*, 530 U.S. 363, 373 (2000) (citation omitted). The FTAIA was enacted "to make clear to American exporters (and to firms doing business abroad) that the Sherman Act does not prevent them from entering into business arrangements . . . however anticompetitive, as long as those arrangements adversely affect only foreign markets." *Empagran*, 542 U.S. at 161. Permitting parallel state regulation of competitive behavior affecting foreign markets expressly excluded from regulation and Sherman Act jurisdiction by the FTAIA, whether through statute or common law, would stand as a direct obstacle to the FTAIA's fundamental purpose.

brought claims under Sherman Act section 2, which forbids monopolizing "any part of the trade or commerce among the several States, or with foreign nations." 15 U.S.C. § 2. But many of AMD's claimed injuries were not caused by alleged monopolization of the trade or commerce among the states or between the United States and foreign nations. Instead, most of AMD's claimed injuries occurred, if at all, because of alleged monopolization of trade among foreign nations.

The Supreme Court has made clear that Congress did not intend to "provide a remedy in damages for all injuries that might conceivably be traced to an antitrust violation." *Associated Gen. Contractors, Inc. v. Cal State Council of Carpenters*, 459 U.S. 519, 534 (1983). Where plaintiffs' injuries occurred in foreign markets, "[t]hey are not of the type Congress intended to prevent through the [FTAIA] or the Sherman Act." *Turicentro*, 303 F.3d at 307. Allowing AMD to recover for injuries that arose in foreign countries "divorces antitrust recovery from the purposes of the antitrust laws without a clear statutory command to do so." *Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.*, 429 U.S. 477, 487 (1977); *Matsushita*, 475 U.S. at 582-84 and nn. 6 & 7 (private plaintiffs can seek redress only for injuries that occur "in the American market").

The courts have consistently denied standing to parties that do not participate in U.S. commerce. *See, e.g., In re Microsoft*, 127 F. Supp. 2d at 713-716. *Accord Turicentro*, 303 F.3d at 307; *De Atucha*, 608 F. Supp. at 511-12. In *Microsoft*, as here, plaintiffs alleged that the defendant "engaged in worldwide monopolistic conduct that had a direct, substantial, and reasonably foreseeable effect on both domestic and export trade," and asserted that alleged injuries were the result of non-domestic events. The court held that a plaintiff who brings claims based on foreign injury lacks standing under the FTAIA. 127 F. Supp. 2d at 714-16. This holding aptly circumscribes AMD's standing to pursue its foreign claims in this case.[21]

---

[21] The Court can consider standing arguments, under Federal Rule of Civil Procedure 12(c), as a motion for judgment on the pleadings. Further, in *Holmes v. SIPC*, 503 U.S.

## VII.    THE COURT SHOULD DISMISS ALL ALLEGATIONS AND CLAIMS RELATING TO SALES OF FOREIGN MADE MICROPROCESSORS TO FOREIGN CUSTOMERS

The specific issue before the Court is a straightforward one: a significant portion of AMD's Complaint raises matters outside the reach of the U.S. antitrust laws and the subject matter jurisdiction of U.S. courts. While AMD may seek relief in this action for alleged domestic injury to its U.S. export and import commerce under the FTAIA, AMD may not pursue claims of injury arising out of conduct causing only direct harm to foreign commerce. The Complaint is intentionally silent on the identity or scope of AMD's import or export sales, presumably because identifying them would expose the Complaint's jurisdictional deficiencies. Indeed, the Complaint does not even expressly state that AMD's microprocessors are made in Germany, a fact that is repeatedly referenced in AMD's legally required SEC filings and is directly relevant to this Court's subject matter jurisdiction. At the same time, the Complaint affirmatively states that only 29% of AMD's microprocessors are used in computers sold in the United States, establishing that foreign commerce is the primary focus of the Complaint. Compl. ¶ 28.

It is clear under the law that AMD cannot ask this Court to adjudicate conduct that – by AMD's own allegations – allegedly interfered with the sale of its German-made, Asian-assembled microprocessors to foreign customers from London to Shanghai. That is a foreign antitrust injury (if it is one at all) for which the U.S. courts "cannot" provide relief. *Matsushita*, 475 U.S. at 584 n.7.

---

258, 268 (1992), the Supreme Court stated that "we held [in Associated Gen. Contractors] that a plaintiff's right to sue under § 4 [of the Clayton Act] required a showing that the defendant's violation not only was a 'but for' cause of his injury, but was the proximate cause as well." This formulation for standing is the same test set out in the second prong of the FTAIA – a test that, as shown above, AMD cannot meet.

Intel seeks an order dismissing or striking all claims that are based on alleged lost sales of AMD's German-made microprocessors to foreign customers,[22] or in the alternative striking all allegations that are so based, specifically:

- Paragraphs 40-44, 54, 57, 74, which all relate to the Japan OEMs (Sony, Toshiba, NEC, Fujitsu and Hitachi), and are the very same claims and allegations AMD raises in its lawsuits in Japan.

- Paragraphs 55, 56, 65, 75, 81, which relate to alleged interference with AMD's sales to European OEMs (Fujitsu-Siemens, NECCI and other unnamed European OEMs).

- Paragraphs 81, 83, 86, which relate to alleged interference with the launch of an AMD-based system by foreign OEMs or sales to these OEMs (Lenovo, NECCI, MSI, Atipa, Solectron and Fujitsu-Siemens).

- Paragraphs 89, 93, 94, which relate to alleged interference with foreign distributors' sales in foreign countries (Ingram Micro in China, R.I.C. in Germany, Paradigit and Quote Component in the Netherlands, Supercom in Canada).

- Paragraphs 100, 101, which relate to interference with sales to retailers in Europe (Media Markt and Aldi in Germany, DSG, Toys 'R' Us and Time Computer in England, Conforma and Boulanger in France).

- Paragraph 106, which alleges interference with the German retail chain Vobis hanging a banner advertising AMD products at the CeBit trade show in Hanover, Germany.

---

[22]   Intel acknowledges that AMD's claims that concern alleged lost import sales of AMD's German-manufactured chips into the United States to companies such as IBM, Hewlett-Packard and Gateway would facially be within the subject matter jurisdiction of this Court.  Thus, for example, Intel's motion does not challenge the Court's subject matter jurisdiction over Complaint ¶¶ 38-39, 45, 48-53, 64, 73, 76, 80 and 96, to the extent these allegations on their face appear to concern microprocessor sales AMD allegedly lost in the United States.  Moreover, it appears that prior to the 2002 closing of its microprocessor manufacturing plant in Austin, Texas, AMD produced a limited number of its microprocessors in the United States at that facility.  *See* Section II *supra*.  These microprocessors would have been sold in the United States  or exported from the United States.  This Court would likely have jurisdiction over claims relating to such sales (provided the sales occurred within the applicable four-year statute of limitations period) if AMD can allege and prove the requisite direct domestic effects.

## VIII.    CONCLUSION

The allegations in the Complaint of foreign conduct that allegedly interfered with the sale of foreign-manufactured microprocessors to foreign customers should be dismissed or, alternatively, stricken.

OF COUNSEL:

Robert E. Cooper
Daniel S. Floyd
Gibson, Dunn & Crutcher LLP
333 South Grand Avenue
Los Angeles, CA 900071
(213) 229-7000

Peter E. Moll
Darren B. Bernhard
Howrey LLP
1299 Pennsylvania Avenue
N.W. Washington, DC 20004
(202) 783-0800

Dated:  May 2, 2006
730447

POTTER ANDERSON & CORROON LLP


By:   */s/ Richard L. Horwitz*
        Richard L. Horwitz (#2246)
        W. Harding Drane, Jr. (#1023)
        Hercules Plaza, 6th Floor
        1313 N. Market Street
        P.O. Box 951
        Wilmington, DE 19899-0951
        (302) 984-6000
        rhorwitz@potteranderson.com
        wdrane@potteranderson.com

Attorneys for Defendants
Intel Corporation and Intel Kabushiki Kaisha

# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF DELAWARE

## CERTIFICATE OF SERVICE

I, Richard L. Horwitz, hereby certify that on May 2, 2006, the attached document

was hand delivered to the following persons and was electronically filed with the Clerk of

the Court using CM/ECF which will send notification of such filing(s) to the following

and the document is available for viewing and downloading from CM/ECF:

Jesse A. Finkelstein
Frederick L. Cottrell, III
Chad M. Shandler
Steven J. Fineman
Richards, Layton & Finger
One Rodney Square
920 North King Street
Wilmington, DE 19801

James L. Holzman
J. Clayton Athey
Eric M. Andersen
Prickett, Jones & Elliott, P.A.
1310 King Street
P.O. Box 1328
Wilmington, DE 19899

I hereby certify that on May 2, 2006, I have Federal Expressed the documents to

the following non-registered participants:

Charles P. Diamond
Linda J. Smith
O'Melveny & Myers LLP
1999 Avenue of the Stars, 7th Floor
Los Angeles, CA 90067

Mark A. Samuels
O'Melveny & Myers LLP
400 South Hope Street
Los Angeles, CA 90071

Salem M. Katsh
Laurin B. Grollman
Kasowitz, Benson, Torres & Friedman LLP
1633 Broadway, 22nd Floor
New York, New York 10019

Michael D. Hausfeld
Daniel A. Small
Brent W. Landau
Allyson B. Baker
Cohen, Milstein, Hausfeld & Toll , P.L.L.C.
1100 New York Avenue, N.W.
Suite 500, West Tower
Washington, D.C. 20005
mhausfeld@cmht.com
dsmall@cmht.com
blandau@cmht.com
abaker@cmht.com

Michael P. Lehman
Thomas P. Dove
Alex C. Turan
The Furth Firm LLP
225 Bush Street, 15th Floor
San Francisco, CA 94104
mplehmann@furth.com
tdove@furth.com
aturan@furth.com

Guido Saveri
R. Alexander Saveri
Saveri & Saveri, Inc.
111 Pine Street, Suite 1700
San Francisco, CA 94111
guido@saveri.com
rick@saveri.com

Steve W. Berman
Anthony D. Shapiro
Hagens Berman Sobol Shapiro, LLP
1301 Fifth Avenue, Suite 2900
Seattle, WA 98101
steve@hbsslaw.com
tony@hbsslaw.com

By:   */s/ Richard L. Horwitz*
      Richard L. Horwitz (#2246)
      W. Harding Drane, Jr. (#1023)
      POTTER ANDERSON & CORROON LLP
      Hercules Plaza, 6th Floor
      1313 N. Market Street
      P.O. Box 951
      Wilmington, DE 19899-0951
      (302) 984-6000
      rhorwitz@potteranderson.com
      wdrane@potteranderson.com

689962