IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| ADVANCED MICRO DEVICES, INC., a Delaware corporation, and AMD INTERNATIONAL SALES & SERVICE, LTD., a Delaware corporation,<br><br>Plaintiffs,<br><br>vs.<br><br>INTEL CORPORATION, a Delaware corporation, and INTEL KABUSHIKI KAISHA, a Japanese corporation,<br><br>Defendants. | Civil Action No. 05-441-JJF |
| IN RE INTEL CORPORATION MICROPROCESSOR ANTITRUST LITIGATION | MDL No. 05-1717-JJF |

**AMD'S BRIEF IN OPPOSITION TO INTEL'S MOTION TO
DISMISS FOREIGN COMMERCE CLAIMS FOR LACK OF SUBJECT MATTER
JURISDICTION AND STANDING**

OF COUNSEL:

Charles P. Diamond
Linda Smith
Mark Samuels
O'Melveny & Myers LLP
400 South Hope Street
Los Angeles, CA 90071-2899

Henry C. Thumann
O'Melveny & Myers
1625 Eye Street, NW
Washington, DC   20006

Dated: May 26, 2006

Jesse A. Finkelstein (#1090)
finkelstein@rlf.com
Frederick L. Cottrell, III (#2555)
cottrell@rlf.com
Chad M. Shandler (#3796)
shandler@rlf.com
Steven J. Fineman (#4025)
fineman@rlf.com
Richards, Layton & Finger
One Rodney Square
920 North King Street
Wilmington, DE 19801

*Counsel for Advanced Micro Devices, Inc. and
AMD International Sales & Services, Ltd.*

# TABLE OF CONTENTS

<u>Page</u>

TABLE OF AUTHORITIES ................................................................................. iii

INTRODUCTION AND SUMMARY OF ARGUMENT ........................................1

ARGUMENT................................................................................................5

I.    APPLICABLE STANDARD OF REVIEW...........................................5

II.   INTEL'S FOREIGN BUSINESS PRACTICES ARE AN
      ESSENTIAL PART OF AMD'S MONOPOLIZATION
      PROOF AND ADMISSIBLE AS FOREIGN CONDUCT
      AFFECTING THE DOMESTIC OR FOREIGN COMMERCE
      OF THE UNITED STATES ....................................................................6

      A.   Long-Standing Antitrust Case Law Makes Clear That
           the U.S. Antitrust Laws Apply to Foreign Conduct
           That Has a Substantial U.S. Effect..........................................7

      B.   The FTAIA Affirms This Established Law.................................13

III.  THE FTAIA DOES NOT PROHIBIT A SECTION 2
      PLAINTIFF FROM SEEKING EXTRATERRITORIAL
      REMEDIES, INCLUDING DAMAGES, WHERE, AS HERE,
      THOSE DAMAGES ARE INEXTRICABLY INTERTWINED
      WITH ANTITRUST INJURY TO U.S. COMMERCE ............................14

      A.   Under the FTAIA, If a Court Has Jurisdiction Over
           a "Claim," it Has Jurisdiction To Impose Remedies
           for That Claim, Including Damages.........................................16

      B.   Under the FTAIA, U.S. Courts Have the Power To
           Award Foreign Damages Where, as Here, Those
           Damages are "Inextricably Bound Up With" Domestic
           Anticompetitive Harm .............................................................17

      C.   The Court's Jurisdiction Over AMD's Foreign Damages
           Is Especially Appropriate Because AMD Is an American
           Competitor of an American Monopolist, Competing in an
           Integrated Global Market That Includes the United
           States .....................................................................................23

i

D.    The Pleadings Adequately Allege That AMD
Participates in United States Export Commerce
Since Its Microprocessors are Developed,
Designed and Engineered in the United
States...................................................................................26

IV.    COMITY WILL NOT STAND IN THE WAY OF A U.S.
COURT ENFORCING U.S. ANTITRUST LAWS AGAINST
A U.S. DEFENDANT WHO HARMS U.S. COMMERCE.....................27

V.    AMD HAS ANTITRUST STANDING TO PURSUE THE
ENTIRETY OF ITS CLAIM...................................................................29

CONCLUSION.....................................................................................31

ii

# TABLE OF AUTHORITIES

## CASES

*Associate General Contractors of California, Inc. v. California State Council State Council of Carpenters,*
 459 U.S. 519 (1983) ...................................................................................................29, 30

*Atlantic Richfield Co. v. USA Petroleum Co.,*
 495 U.S. 328 (1990) ...............................................................................................................30

*In re Automobile Refinishing Paint Antitrust Litigation,*
 No. 1426, 2004 U.S. Dist. LEXIS 29160 (E.D. Pa. Oct. 29, 2004) ......................................8

*Aventis Environmental Sci. USA LP v. Scotts Co.,*
 383 F. Supp. 2d 488 (S.D.N.Y. 2005) ..................................................................................24

*Blue Shield of Virginia v. McCready,*
 457 U.S. 465 (1982) ..............................................................................................................30

*Brader v. Allegheny General Hospital,*
 64 F.3d 869 (3d Cir. 1995) ....................................................................................................30

*Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.,*
 429 U.S. 477 (1977) ...........................................................................................................5, 30

*CSR Ltd. v. Cigna Corp.,*
 405 F. Supp. 2d 526 (D.N.J. 2005) .......................................................................................26

*Caribbean Broad., Ltd. v. Cable & Wireless PLC,*
 No. 93-2050, 1995 WL 767164 (D.D.C. Dec. 21, 1995) .....................................................20

*Caribbean Broad. System, Ltd. v. Cable & Wireless PLC,*
 148 F.3d 1080 (D.C. Cir. 1998) ......................................................................................19, 20

*City of Anaheim v. S. Cal. Edison,*
 955 F.2d 1373 (9th Cir. 1992) ...............................................................................................13

*City of Groton v. Connecticut Light & Power Co.,*
 662 F.2d 921 (2d Cir. 1981) ..................................................................................................13

*Continental Ore Co. v. Union Carbide Co.,*
 370 U.S. 690 (1962) ...................................................................................................... *passim*

*Coors Brewing Co. v. Miller Brewing Co.,*
 889 F. Supp. 1394 (D. Colo. 1995) ...................................................................................8, 24

iii

*Copperweld Corp. v. Independence Tube Corp.,*
    467 U.S. 752 (1984)................................................................................................................24

*De Atucha v. Commodity Exch., Inc.,*
    608 F. Supp. 510 (S.D.N.Y. 1985) .........................................................................29

*Empagran S.A. et al. v. F. Hoffman-LaRoche, Ltd., et al.,*
    417 F.3d 1267 (D.C. Cir. 2005)................................................................................21

*F. Hoffman-LaRoche Ltd. v. Empagran,*
    2004 WL 234125 (U.S. Dist. Col. June 14, 2004)..............................................................23

*F. Hoffman-LaRoche Ltd. v. Empagran S.A.,*
    542 U.S. 155 (2004)......................................................................................... *passim*

*Gordon v. Lewistown Hospital,*
    423 F.3d 184 (3d Cir. 2005)......................................................................................12

*Hartford Fire Insurance Co. v. California,*
    509 U.S. 764 (1993)................................................................................................8, 28

*Industria Siciliana Asfalti, Bitumi, S.p.A. v. Exxon Research & Engineering Co.,*
    No. 75 Civ. 5828-CSH, 1977 WL 1353 (S.D.N.Y., Jan.18, 1977)........................................11

*Industria Siciliana Asfalti v. Exxon Research and Eng'g Co.,*
    No. 75 Civ. 5828-CSH, 1977 U.S. Dist. LEXIS 17851 H.R. Rep. No. 97-686
    (1982 ........................................................................................................................18

*In re Kaiser Group International Inc.,*
    399 F.3d 558 (3d Cir. 2005)..........................................................................................6

*Laker Airways Ltd. v. Sabena, Belgian World Airlines,*
    731 F.2d 909 (D.C. Cir. 1984).................................................................................27, 28

*Latino Quimica-Amtex S.A. v. Akzo Nobel Chemicals B.V.,*
    No. 03 Civ. 10312 (HB), 2005 U.S. Dist. LEXIS 19788 (S.D.N.Y. Sept. 8, 2005)..........26

*Lavely v. Redheads, Inc.,*
    No. 03 Civ. 7752 (RMB), 2006 WL 318835 (S.D.N.Y. Feb. 9, 2006) ..............................28

*LePage's Inc. v. 3M,*
    324 F.3d 141 (3d Cir. 2003)...........................................................................................12

*Licata v. United States Postal Serv.,*
    33 F.3d 259 (3d Cir. 1994)...............................................................................................6

iv

*In re Lower Lake Erie Iron Ore Antitrust Litigation*,
  998 F.2d 1144 (3d Cir. 1993)...............................................................................30

*In re: Magnetic Audiotape Antitrust Litigation*,
  334 F.3d 204 (2d Cir. 2003)..................................................................................28

*In re Microsoft Corp. Antitrust Litigation*,
  127 F. Supp. 2d 702 (D. Md. 2001).......................................................................29

*Moore v. Little Giant Industrial, Inc.*,
  513 F. Supp. 1043 (D. Del. 1981), *aff'd*, 681 F.2d 807 (3d Cir. 1982)...............................28

*Mortensen v. First Federal Sav. & Loan Association*,
  549 F.2d 884 (3d Cir. 1977).....................................................................................6

*Optimum, S.A. v. Legent Corp.*,
  926 F. Supp. 530 (W.D. Pa. 1996)..........................................................................26

*Pennsylvania Dental Association v. Medical Serv. Association*,
  745 F.2d 248 (3d Cir. 1984).......................................................................................7

*Pfizer, Inc. v. Government of India*,
  434 U.S. 308 (1978).........................................................................................17, 23

*Simpson v. Union Oil Co.*,
  377 U.S. 13 (1964)...................................................................................................27

*Swift v. United States*,
  196 U.S. 375 (1905).................................................................................................13

*Tampa Electric Co. v. Nashville Coal Co.*,
  365 U.S. 320 (1961)..........................................................................................7, 12

*Timken Roller Bearing Co. v. United States*,
  341 U.S. 593 (1951)...................................................................................................8

RLF1-3018871-1

*Turicentro, S.A. v. America Airlines, Inc.*,
   303 F.3d 293 (3d Cir. 2002)......................................................................6, 25, 26, 29

*U.S. Information Resources, Inc. v. The Dun & Bradstreet Corp.*,
   127 F. Supp. 2d 411 (S.D.N.Y. 2001)..................................................................26

*United Phosphorous Ltd. v. Angus Chemical Co.*,
   131 F. Supp. 2d 1003 (N.D. Ill. 2001), *aff'd* 322 F.3d 942, 953 (7th Cir. 2002)...............26

*United States v. Aluminum Co. of America*,
   148 F.2d 416 (2d Cir. 1945)..............................................................................8, 12

*United States v. Grinnell Corp.*,
   384 U.S. 563 (1966).............................................................................................12

*United States v. Holophane Co.*,
   119 F. Supp. 114 (S.D. Ohio, 1954) ....................................................................15

*United States v. Holophane Co.*,
   1954 Trade Cas. (CCH) ¶ 69,182 VII (S.D. Ohio), *aff'd per curiam*, 352 U.S. 903
   (1956)..................................................................................................................15

*United States v. Nippon Paper Industrial Co.*,
   109 F.3d 1 (1st Cir. 1997)......................................................................................8

*United States v. Sisal Sales Corp.*,
   274 U.S. 268 (1927)................................................................................................8

*In re Vitamins Antitrust Litigation*,
   2001-2 Trade Cas. (CCH) P73 (D.D.C. 2001)......................................................24

*In re Vitamins Antitrust Litigation*,
   No. 99-197, 2001 U.S. Dist. LEXIS 8903 (D.D.C. Jun. 7, 2001).........................24

## STATUTES AND OTHER AUTHORITIES

15 U.S.C. § 6a ............................................................................................... *passim*

H.R. Rep. No. 97-686 (1982)..............................................................................14, 24, 25

Areeda & Hovenkamp, *Antitrust Law*, ¶ 275 (2000)..................................................15

Wilbur L. Fugate, *Foreign Commerce and the Antitrust Laws*, Vol. I, § 3.15 (1996) ..................15

## INTRODUCTION AND SUMMARY OF ARGUMENT

This lawsuit pits against one another two Silicon Valley technology companies separated by a three-mile stretch of U.S. Highway 101 (a five-minute drive except in rush hour). Though neighbors, the two are intense rivals in the development, manufacture, and sale of a uniquely American product, the PC microprocessor. For the past two and one half decades, AMD has battled Intel for the right to participate in what Intel concedes is a single, world-wide market for x86 chips, the brains of most business and consumer computers deployed around the world. As detailed in AMD's complaint, the fight has not been a fair one. For at least the past decade, Intel has used its enormous economic might to coerce customers from doing business with AMD. And with the door closed to AMD at key customers around the world, Intel has successfully marginalized AMD, relegating it year-after-year to an anemic 10% market share, and neutralizing its ability to mount a serious challenge to Intel's exclusionary practices.

Like the market for the product that both companies sell, Intel's misconduct, coordinated from its California base, has been global. Major microprocessor customers around the world (known in the industry as OEMs (*original equipment manufacturers*))—including Dell, HP, IBM (now Lenovo), and Gateway in the U.S., NEC-CI, Packard Bell, and Fujitsu-Seimens in Europe, Sony, NEC, Hitachi, Fujitsu, and Toshiba in Japan, and Acer in Taiwan—have confronted the choice of obeying Intel's dictates concerning what, when, and in what quantity they may purchase from AMD, or facing ruinous price increases and other economic retaliation on the portions of their microprocessor requirements they must buy from Intel regardless.

Trumpeting its motion as a means of dramatically scaling back discovery, relieving itself of "the burden of defending its foreign business practices" (Mot. at 1), and accelerating this case through the Court's calendar, Intel asks the Court to exclude at the pleading stage evidence of how it foreclosed AMD from selling microprocessors to companies situated outside of the

1

United States.[1]   Because AMD's American-designed processors are currently imbedded in silicon in Germany (and inspected and boxed in Asia), it argues that any harm AMD might have suffered from lost business opportunities abroad is purely foreign harm, of no concern to the U.S. antitrust laws. And, naturally, Intel seeks to contain AMD's damages to lost U.S. business, even before AMD has fully developed and presented its theories of damages.

Intel's motion conflates two issues that need to be separately addressed.    First, is evidence of Intel's exclusionary practices in the foreign part of what it admits is a single, unitary world-wide market properly considered in determining whether Intel has unlawfully maintained its monopoly in the U.S. commerce portion of that world-wide market? And second, consistent with the Foreign Trade Antitrust Improvements Act (the "FTAIA"),[2] may AMD recover for harms resulting from foreign foreclosure caused by Intel's world-wide monopolization (including its monopolization in the United States), not just its damages from lost U.S. business? For reasons summarized here, both questions must be answered in the affirmative.

1.      We demonstrate in Part II that Intel's unlawful conduct in the foreign portion of the world-wide x86 microprocessor market is not only relevant to AMD's monopolization claim but an essential part of its proof. As AMD explains in its complaint, given the world-wide nature of the microprocessor business, Intel's ability to coerce U.S. customers from giving AMD more business depends on keeping AMD economically powerless to make these customers whole for the costs Intel can impose on them. To so marginalize AMD, Intel has necessarily had to cut AMD off from business opportunities throughout the market, including opportunities with foreign customers. This is an essential part of its scheme, because if Intel did not cut AMD off

---

[1]      As Intel's counsel explained at the April 20, 2006 Initial Conference: "the ruling on this jurisdictional motion would have big implications as to what needs to be produced, what depositions need to be taken, and how fast the whole case can consequently move."

[2]      15 U.S.C. § 6a.

2

from foreign customers, and if AMD were to win any substantial share of the 70% of the business represented by foreign OEMs, AMD's enhanced economic vigor would cause Intel to lose its grip over the domestic OEMs. Intel's foreign conduct thus has direct domestic effects on the U.S. portion of this global business, and as Intel necessarily concedes, domestic effects are sufficient to confer U.S. antitrust jurisdiction.

Intel's exclusionary acts in the foreign portion of the world-wide x86 market thus fall squarely within the age-old antitrust doctrine extending the U.S. antitrust laws to foreign conduct that has a substantial U.S. effect. *See, e.g., Continental Ore Co. v. Union Carbide Co.*, 370 U.S. 690, 704 (1962). The FTAIA not only leaves this doctrine undisturbed, it expressly reaffirms federal antitrust jurisdiction over "'conduct involving trade or commerce with foreign nations . . . [having] a direct, substantial and reasonable effect . . . on domestic trade or commerce.'" *F. Hoffman-LaRoche Ltd. v. Empagran S.A.*, 542 U.S. 155, 161 (2004), quoting 15 U.S.C. § 6a (italics omitted).

Intel's argument for excluding evidence of its foreign misconduct proceeds from a gross mischaracterization of AMD's complaint, which it recasts as alleging a series of separate, unrelated exclusionary acts, some foreign and others domestic, each of which only affects the commerce of the locality in which the act was committed. Intel's brief reads as if AMD had pleaded dozens of separate Section 1 counts for a collection of exclusive deals with an assortment of customers around the world, each excluding AMD from a local opportunity, but having no direct effect beyond the local border. Indeed, the rewriting begins with Intel's very first sentence, in which it claims to be moving "to dismiss [AMD's] foreign commerce claims." Mot. at 1.

RLF1-3018870-1

But AMD is not making any separate "foreign commerce claims." Rather, this is a Section 2 case involving a single, unitary world-wide market. Proving monopolization of such a market requires proof of the exclusionary conduct by which the world-wide monopoly was willfully maintained, wherever that conduct occurs. And here, as part of that proof, Intel's foreign conduct is alleged to have domestic effects. That is all the FTAIA and case law require.

2.      The second question—whether, consistent with the FTAIA, AMD may recover damages for the foreign effects of Intel's global conduct—must also be answered in AMD's favor, as we demonstrate in Part III. It is premature to commit AMD to a specific measure of damages. But assuming AMD eventually seeks some sort of recovery for its exclusion from sales to foreign OEMs, that harm is as much attributable to the unlawful domestic effects of Intel's anticompetitive conduct as to the foreign effects. For, just as Intel's foreign exclusionary conduct is necessary to prevent AMD from successfully overcoming Intel's coercion of domestic customers, AMD's inability to win greater sales among foreign OEMs results from the effect of Intel's domestic conduct, which, in combination with foreign misconduct, has prevented AMD from building a sufficiently strong base of business to overcome Intel's coercion anywhere. In the words of the FTAIA, the "[domestic] effect [of Intel's practices] gives rise to" AMD's claimed harm, both domestic and foreign, since both are directly caused by the same indivisible global monopolization.

This is thus not a case, such as *Empagran*, where a foreign plaintiff complains of "foreign conduct caus[ing] *independent* foreign harm," and "that foreign harm *alone* gives rise to the plaintiff's claim." 542 U.S. at 165 (emphasis added). Nor is it a case where "the adverse foreign effect is *independent* of any adverse domestic effect." *Id.* at 164. Rather, both foreign and domestic harm stem from the cumulative effect of combined foreign and domestic conduct,

undertaken in coordination to entrench a single global monopoly by undermining AMD's competitiveness both here and abroad. As the case law makes clear, notwithstanding the FTAIA, federal antitrust jurisdiction extends to foreign injuries "inextricably bound up with . . . domestic restraints of trade." *Id.* at 171-72. And though Intel dismisses them, also of significance are the facts that an *American* company commenced this action, which concerns an *American* engineered and designed product the sales of which its *American* competitor frustrated to its detriment around the world.

  3.  Equally unavailing, as we demonstrate in Parts III and IV, is Intel's argument that the Court should stay its hand on principles of comity and its baseless assertion that AMD lacks antitrust standing. Intel concedes that comity will not stand in the way of the Court's jurisdiction where monopolization of a world-wide market had a direct, substantial and reasonably foreseeable effect on U.S. commerce—exactly what AMD has alleged. Likewise, AMD has standing to pursue its claim because it has alleged that Intel's world-wide anticompetitive market foreclosure has harmed AMD, an Intel rival. Such injury suffered at the hands of a competitor is "an injury of the type antitrust laws were intended to prevent," *see Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.*, 429 U.S. 477, 489 (1977), which is all that is required to confer antitrust standing.

## **ARGUMENT**

## I. **APPLICABLE STANDARD OF REVIEW**

  Defendants have expressly elected to pursue their challenge to subject matter jurisdiction as a "facial" attack. *See* Mot. at 12, n.14. Facial attacks brought pursuant to the FTAIA contest

only the sufficiency of the allegations in the complaint, which the trial court must accept as true. *Turicentro, S.A. v. Am. Airlines, Inc.*, 303 F.3d 293, 300 n.4 (3d Cir. 2002) (citation omitted).[3]

Because defendants have proceeded with a facial challenge, a court should "review only whether the allegations on the face of the complaint, taken as true, allege facts sufficient to invoke the jurisdiction of the district court." *Id.* at 300 n.4, quoting *Licata v. United States Postal Serv.*, 33 F.3d 259, 260 (3d Cir. 1994); *see also Mortensen v. First Fed. Sav. & Loan Ass'n*, 549 F.2d 884, 891 (3d Cir. 1977) (when considering a "facial" attack under Rule 12(b)(1), "the court must consider the allegations of the complaint as true"). Moreover, in evaluating defendants' motion to dismiss, all reasonable inferences must be drawn in favor of AMD. *In re Kaiser Group Int'l Inc.*, 399 F.3d 558, 561 (3d Cir. 2005) (in reviewing a facial challenge to subject matter jurisdiction, the court must "accept all well-pleaded allegations in the complaint as true and view them in the light most favorable to the plaintiff.") (citation omitted). Taking all of AMD's allegations as true and drawing all reasonable inferences in its favor, this Court has clear subject matter jurisdiction over AMD's monopolization claim, as demonstrated next.

## II.    INTEL'S FOREIGN BUSINESS PRACTICES ARE AN ESSENTIAL PART OF AMD'S MONOPOLIZATION PROOF AND ADMISSIBLE AS FOREIGN CONDUCT AFFECTING THE DOMESTIC OR FOREIGN COMMERCE OF THE UNITED STATES

Intel makes no effort to conceal that the purpose of this motion is to avoid having to defend its foreign business practices, practices that at least one governmental competition authority has condemned as anticompetitive.[4] (Mot. at 1.) But even if its motion were granted, evidence of Intel's foreign practices, and the discovery needed to develop it, would remain a part of the litigation. Even assuming AMD ceased being an exporter when it moved the fabrication

---

[3]    In contrast, in a "factual" attack to subject matter jurisdiction, a court does not accord plaintiff's allegations a presumption of truth and instead weighs the factual record presented by the parties. *Turicentro*, 303 F.3d at 300.

[4]    *See* Compl. ¶6.

part of its business overseas—a proposition AMD disputes—AMD continued to ship microprocessors fabricated in its U.S. facilities through at least 2002, solidly within the limitations period of AMD's complaint. Thus, Intel's foreign restraints by its own admission affected the export commerce of the U.S., as AMD alleges in its complaint, and they accordingly remain undisputed subjects for discovery and trial. (Mot. at 5 n.2, 8.)

In any event, Intel's foreclosure of AMD from foreign customers, no less than AMD's exclusion from U.S. customers, is relevant and essential to proving AMD's claim that Intel wilfully maintained its global monopoly, including in the domestic portion of what Intel concedes is a world-wide market.[5] As we show next, because Intel's offshore conduct directly affects the U.S. portion of that world-wide market, and thus affects U.S. domestic commerce, proof of that conduct is unquestionably relevant and admissible.

A. **Long-Standing Antitrust Case Law Makes Clear That the U.S. Antitrust Laws Apply to Foreign Conduct That Has a Substantial U.S. Effect**

It is settled that the United States antitrust laws apply to foreign conduct that has a direct and foreseeable effect on United States commerce. In *Continental Ore Co.*, for example, an American ore producer alleged that its competitors had monopolized the ore trade by driving it out of business through a course of conduct that included foreclosure of foreign customers. 370 U.S. at 704. The Supreme Court held that evidence of the plaintiff's exclusion from the foreign market was "relevant evidence of a violation of the Sherman Act," stating unequivocally that "[a] conspiracy to monopolize or restrain the domestic or foreign commerce of the United

---

[5]    In its Answer, Intel *expressly admits* that the relevant geographic antitrust market in which AMD's claim of monopolization must be measured is world-wide. Answer, ¶ 24; *see* Compl. ¶ 24. For antitrust purposes, the relevant geographic market is the "area of effective competition . . . in which the seller operates, and to which the purchaser can practicably turn for supplies." *Tampa Elec. Co. v. Nashville Coal Co.*, 365 U.S. 320, 327 (1961); *Pennsylvania Dental Ass'n v. Med. Serv. Ass'n*, 745 F.2d 248, 260 (3d Cir. 1984) ("The relevant geographic market is the area in which a potential buyer may rationally look for the goods or services he or she seeks . . . .") (citations omitted).

States is not outside the reach of the Sherman Act just because part of the conduct complained of occurs in foreign countries." *Id.* at 704. Myriad cases, decided both before and after the enactment of the FTAIA, reiterate this fundamental principle. *See, e.g., Hartford Fire Ins. Co. v. California*, 509 U.S. 764, 796 (1993) (Sherman Act "applies to foreign conduct that was meant to produce and did in fact produce some substantial effect in the U.S."); *Timken Roller Bearing Co. v. United States*, 341 U.S. 593 (1951) (Sherman Act applies to foreign conduct that affects U.S. export and import trade); *United States v. Sisal Sales Corp.*, 274 U.S. 268, 274-76 (1927) (foreign and domestic conduct having effect of monopolizing the "purchase, importation and sale of sisal" in the United States fell within jurisdiction of United States courts); *United States v. Aluminum Co. of America*, 148 F.2d 416, 443 (2d Cir. 1945) ("*Alcoa*") ("it is settled law . . . that any state may impose liabilities . . . for conduct outside its borders that has consequences within its borders which the state reprehends"); *see also, e.g., United States v. Nippon Paper Indus. Co.*, 109 F.3d 1 (1st Cir. 1997) (anticompetitive price fixing activities that took place entirely in Japan and had an intended, foreseeable, and substantial effect in the United States fell within the subject-matter jurisdiction of U.S. courts under the Sherman Act); *In re Auto. Refinishing Paint Antitrust Litig.*, No. 1426, 2004 U.S. Dist. LEXIS 29160, at *15 (E.D. Pa. Oct. 29, 2004) ("The Sherman Act encompasses conduct occurring outside our borders when that conduct has an effect on American commerce, even if the activities are not illegal in the countries where they are committed."); *Coors Brewing Co. v. Miller Brewing Co.*, 889 F. Supp. 1394 (D. Colo. 1995) (U.S. court had jurisdiction over anticompetitive conduct in Canada because that conduct had "a direct, substantial, and reasonably foreseeable effect not only on [plaintiff's] export trade with

8

Canada, but also, albeit less directly, on the United States beer market and the consumers in that market").[6]

AMD has alleged in straightforward terms a direct domestic effect of Intel's foreign conduct. In order to discourage a domestic OEM from shifting business to AMD as that business comes up for competition, Intel threatens economic retaliation—generally (but not exclusively) in the form of dramatically higher prices for microprocessors that the OEM will have to purchase from Intel anyway. (*See, e.g.,* Compl. ¶¶ 59-71.)[7] An attractive price alone is thus not sufficient for AMD to win the contestable business; it must also make the customer whole for the additional costs Intel will impose on the OEM for shifting business to AMD, costs that frequently exceed the value of the business AMD stands to gain. (Compl. ¶¶ 61-63.) With its chronic ten-percent marketshare, AMD lacks the economic wherewithal to compensate domestic customers for the costs Intel can and will impose. Growing its domestic business thus requires that AMD expand globally to a size and economic power that would make it a viable substitute source for the bulk of a U.S. OEM's requirements, thereby neutralizing Intel's coercive power. But Intel has removed this option too by imposing the same economic roadblocks to doing business with foreign OEMs that it has with respect to domestic ones. (*See, e.g.,* Compl. ¶¶ 38-

---

[6]    Indeed, even Intel's principal case, *F. Hoffman-La Roche Ltd. v. Empagran S.A.*, 542 U.S. 155, 163 (2004), recognizes that U.S. courts have "long held that application of our antitrust laws to foreign anticompetitive conduct is . . . reasonable" when that conduct has a direct and foreseeable effect in the United States.

[7]    Since AMD and Intel microprocessors are not interchangeable at the platform level, an OEM must source its microprocessors for an existing platform from the supplier for which the platform was engineered—generally Intel, since it controls 90% of the business. (Compl. ¶¶ 1, 25.) For a variety of reasons, continued production of platforms introduced in prior quarters comprise the great bulk of most OEM's offerings. Among Tier 1 OEMs, the resulting microprocessor "lock in" covers the great majority of the OEM's requirements. As a result, quarter-to-quarter, AMD can only compete for the small portion of the business represented by new platform introductions. (Compl. ¶ 63.)

44, 46-47, 54-57, 93-94, 100-101, 127-29.)  As the complaint makes explicit, Intel's foreign conduct is thus an essential part of its domestic monopolizing scheme:

> As the domestic U.S. market is but an integral part of the world market, successful monopolization of the U.S. market is dependent on world market exclusion, lest foreign sales vitalize a rival's U.S. competitive potential.

(Compl. ¶ 128.)

Foreign conduct that neuters a rival and makes it less able to compete domestically, like that set out in AMD's complaint, unquestionably falls within the purview of the Sherman Act. Indeed, that is the exact teaching of *Continental Ore*. There, plaintiff alleged that three U.S. vanadium mining and manufacturing companies conspired to monopolize domestic commerce in vanadium products by undermining plaintiff's ability to acquire ore and sell refined goods to its customers.  The plan included foreclosure of Canadian customers.  Using one of their Canadian subsidiaries, which had been given war-time allocation powers, defendants reassigned the business of Continental's Canadian customers to themselves.  The monopolists succeeded in "eliminating Continental entirely from the Canadian market," and ultimately driving it out of business. *Continental Ore*, 370 U.S. at 695.  In language quoted above, the Supreme Court reversed the district court's exclusion of the Canadian evidence, ruled it admissible proof of an effort to monopolize U.S. domestic commerce, and ordered a new trial.

AMD is in the same boat as Continental.  It asserts that Intel has kept it from selling microprocessors abroad with the purpose and effect of weakening it as a domestic rival.  Like that of the vanadium monopolists in *Continental*, Intel's foreign anticompetitive conduct, in combination with its U.S. anticompetitive conduct, has had the cumulative effect of maintaining a world-wide monopoly of which U.S. commerce is an indivisible part.  The only difference

between the two cases is that, unlike the vanadium monopolists, Intel has not driven its rival out of business—yet.

The important point here is not just that AMD's claim arises in the context of a world-wide market. Indeed, Intel's lead case, *F. Hoffmann-La Roche Ltd. v. Empagran S.A.*, 542 U.S. 155 (2004) (hereinafter "*Empagran*"), arose from price fixing conducted on a world-wide basis. Unlike *Empagran*, however, Intel's foreign conduct here does not result just in separate and independent foreign effects. Rather, in the words of *Empagran*, the non-U.S. effects of Intel's global monopolization are "inextricably bound-up" with the U.S. effects. *See id.* at 172 (quoting *Industria Siciliana Asfalti, Bitumi, S.p.A. v. Exxon Research & Eng'g Co.*, No. 75 Civ. 5828-CSH, 1977 WL 1353 (S.D.N.Y., Jan.18, 1977)).

Like the situation in *Continental Ore*, it is immaterial to Intel's monopoly maintenance strategy *where* in the world it keeps AMD from doing business with its customers, so long as AMD's remaining world-wide business opportunities are insufficient to generate the economic muscle necessary to mount a competitive challenge to Intel's monopoly power. (*See* Compl. ¶ 36 ("In maintaining its monopoly by unlawfully denying rivals a competitive opportunity to achieve minimum levels of efficient scale, Intel must necessarily exclude them from the product market worldwide.").) Conversely, unless Intel's exclusion is cumulatively sufficient on a world-wide basis, it cannot sustain its monopoly power within the U.S. commerce portion of the global market.[8]

---

[8] Thus, for example, if the approximately 70% of the x86 product market that represents non-U.S. purchases were unconstrained, AMD would over time have the opportunity to grow sufficiently to break Intel's monopoly grip world-wide, including in the United States. The ultimate result would be an AMD sufficiently large to afford all major x86 purchasers—including the OEMs that purchase in the U.S.—a commercially viable alternative product source that would by its very existence neutralize Intel's monopoly leverage over them. (*See* Compl. ¶ 36.)

The flaw in Intel's motion is that it treats AMD's Section 2 claim as if AMD had alleged a series of separate and independent Section 1 claims, arising out of a collection of exclusive or restrictive deals with customers around the world, each having a direct effect only with that customer. But this is a Section 2 case, one involving a global market in which the "relevant area of effective competition" is world-wide, so evidence of Intel's misconduct anywhere within that market is relevant to proving its willful maintenance of a monopoly of that market.[9] One could imagine a world-wide monopoly acquired or maintained by crippling or eliminating rivals exclusively through acts committed abroad, but with the result that consumers in the U.S. portion of the market paid monopoly prices. There is no serious dispute that a U.S. court would have jurisdiction to adjudicate the monopoly, and could properly entertain evidence of the foreign conduct by which it was acquired. *See, e.g., Alcoa*, 148 F.2d at 443 ("[I]t is settled law . . . that any state may impose liabilities . . . for conduct outside its borders that has consequences within its borders which the state reprehends.").

This conclusion is reinforced by the fact that, unlike Section 1 price-fixing claims (like the claims at issue in *Empagran*), Section 2 monopolization claims cannot be broken apart into

---

[9]    Indeed, in a case involving a global market, the basic elements of a Section 2 claim will generally *require* a court to look abroad for proof of a violation. For example, in addition to proof of anticompetitive conduct, a basic element of a Section 2 claim is proof that the monopolist has market power. *See, e.g., LePage's Inc. v. 3M*, 324 F.3d 141, 146 (3d Cir. 2003); *United States v. Grinnell Corp.*, 384 U.S. 563, 570-71 (1966) ("The offense of monopoly power under § 2 of the Sherman Act has two elements: (1) the possession of monopoly power in the relevant market and (2) the willful acquisition or maintenance of that power . . . ."). As noted above, in considering allegations involving market power, courts look to the entire "relevant area of effective competition." *Tampa Elec.*, 365 U.S. at 329; *see also, e.g., Gordon v. Lewistown Hosp.*, 423 F.3d 184, 212 (3d Cir. 2005). Here, because the United States makes up only about 30% of the x86 purchase market, proving Intel's market power requires proof of its power in the foreign portions of the worldwide market as well. In fact, it would likely be *impossible* to state a claim for monopolization of the worldwide market based on Intel's position in the United States alone. *See Alcoa*, 148 F.2d at 424 ("it is doubtful whether sixty or sixty-four percent [market share] would be enough [to constitute monopoly power]; and certainly thirty-three percent is not").

the series of constituent acts by which the monopoly was cumulatively acquired, each to be considered independently. Rather, plaintiffs must be "given the full benefit of their proof without tightly compartmentalizing the various factual components and wiping the slate clean after scrutiny of each." *Continental Ore*, 370 U.S. at 698-99. It is the "overall combined effect" of the alleged anticompetitive acts of a monopolist that proves a Section 2 claim. *City of Anaheim v. S. Cal. Edison*, 955 F.2d 1373, 1376 (9th Cir. 1992); *see also Swift v. United States*, 196 U.S. 375, 396 (1905) (a series of actions which, standing alone, would not be unlawful, can be, in combination, a violation of the Sherman Act); *City of Groton v. Connecticut Light & Power Co.*, 662 F.2d 921, 929 (2d Cir. 1981) (coordinated campaign of small-scale anticompetitive acts that, in the aggregate, had the requisite impact on the marketplace is unlawful). Indeed, if this were not the rule, a global corporation that wrongfully foreclosed 100% of all competition in a world-wide market, but did so through exclusionary conduct divided equally among 20 countries, could *never* be successfully prosecuted for monopolization in *any* jurisdiction. Each country would be restricted to examining the exclusionary acts committed within its borders, so none would be able to develop proof that the global corporation wrongfully foreclosed more than a small portion of the overall market. That cannot be, and is not, the law.

**B.    The FTAIA Affirms This Established Law**

The FTAIA expressly preserves this established law. The FTAIA's text explicitly confers U.S.-court jurisdiction over "conduct involving trade or commerce . . . with foreign nations" when that conduct has a "direct, substantial, and reasonably foreseeable effect" on U.S. commerce that "gives rise to a claim" under the Sherman Act. 15 U.S.C. § 6a. The House Report accompanying the FTAIA confirms that the Act was intended to preserve jurisdiction over foreign conduct even as to *foreign* firms if that conduct has a "direct, substantial, and

13

reasonably foreseeable effect on domestic commerce or a domestic competitor," H.R. Rep. No. 97-686, at 9 (1982); and it would make little sense to preserve jurisdiction over U.S. commerce affecting foreign conduct of *foreign* firms, but eliminate jurisdiction over such conduct when committed by *domestic* firms. Finally, consistent with the FTAIA's text and history, FTAIA case law unambiguously confirms that, under the Act, U.S. courts retain jurisdiction over foreign conduct that has a direct and foreseeable effect on U.S. commerce. In *Empagran*, for example—defendants' lead case—the Supreme Court expressly recognized that, while the FTAIA sought to release domestic and foreign anticompetitive conduct from Sherman Act constraints when it causes only independent foreign harm, Congress "ma[d]e an exception where that conduct also causes domestic harm." *Empagran*, 542 U.S. at 165.

AMD's claim fits squarely within these provisions. As discussed above, AMD asserts that the U.S. commerce portion of the world-wide x86 market (together with the rest of the market) has suffered a direct, substantial, and foreseeable anticompetitive effect as a result of Intel's world-wide monopolization. And it is for that monopolization—including its U.S. effect—that AMD seeks an antitrust remedy in a U.S. court. Under both long-standing antitrust precedent and the text of the FTAIA, this Court plainly has jurisdiction over the foreign conduct implicated by this claim.

## III. THE FTAIA DOES NOT PROHIBIT A SECTION 2 PLAINTIFF FROM SEEKING EXTRATERRITORIAL REMEDIES, INCLUDING DAMAGES, WHERE, AS HERE, THOSE DAMAGES ARE INEXTRICABLY INTERTWINED WITH ANTITRUST INJURY TO U.S. COMMERCE

It is equally clear that, as a part of their jurisdiction over foreign conduct having an anticompetitive effect on U.S. commerce, U.S. courts have the power to impose the remedies necessary to address that U.S. effect. Indeed, without this power, U.S. "jurisdiction" over foreign conduct would be meaningless, as it would leave courts powerless to address and correct

the anticompetitive effects of foreign conduct in the United States. Thus, for example, to redress a multinational market allocation conspiracy that limited both U.S. and foreign competition, the Supreme Court approved an antitrust decree prohibiting the U.S. defendant from honoring "Illegal Foreign Agreements" that would restrict competition "in any territory or market in the production, sale, or distribution of said products," which were sold world-wide. *United States v. Holophane Co.*, 1954 Trade Cas. (CCH) ¶ 69,182 at VII (S.D. Ohio), *aff'd per curiam*, 352 U.S. 903 (1956); *see also United States v. Holophane Co.*, 119 F. Supp. 114 (S.D. Ohio, 1954) (discussing world-wide apportionment among U.S. defendant and U.K. and French co-conspirators); Areeda & Hovenkamp, *Antitrust Law*, ¶ 275 at 410 (2000) (citing *Holophane* and noting that "the federal courts are authorized to order relief abroad"), Wilbur L. Fugate, *Foreign Commerce and the Antitrust Laws*, Vol. I, § 3.15, 306 (1996) ("It is generally acknowledged that a court having jurisdiction over the subject matter and over the parties may enjoin the doing of acts outside the territorial limits of a state . . . .").

Consistent with this established law, AMD is here seeking a variety of remedies that will address the world-wide monopolization conduct that preserves Intel's monopoly power in U.S. commerce. Because AMD's "claim" is a claim for monopolization of a global market, *only* a remedy that addresses Intel's conduct around the world can effectively redress the anticompetitive effects of Intel's conduct in the United States. *See* Section II.A. *supra*.

AMD is accordingly seeking an injunction to prevent Intel from engaging in such anticompetitive conduct around the globe. (*See* Compl. Prayer for Relief ¶ D.) And it is in parallel with that request that AMD seeks to recover damages proximately caused by Intel's foreign conduct affecting U.S. commerce, including the damages AMD suffered abroad. (*See id.* ¶¶ A-C.)

Intel's attempt to parse AMD's claim into foreign damages and domestic damages fails on a variety of levels. The FTAIA does not confer separate jurisdiction over "damages." Thus, if a court has jurisdiction over a plaintiff's "claim," such as that conferred by an allegation of harm arising from the domestic effects of a Section 2 violation, it has jurisdiction to impose the remedies necessary to redress the conduct underlying the claim, including damages wherever sustained. Supporting this conclusion, the case law makes clear that U.S. courts may award damages for injury suffered abroad where, as here, those damages are "inextricably bound up with" the domestic injury caused by the defendant's anticompetitive conduct. *See Empagran*, 542 U.S. at 170. This is particularly true in the case of an American company suffering foreign harm at the hands of an American monopolist in a global market that includes the United States.

A.    **Under the FTAIA, If a Court Has Jurisdiction Over a "Claim," it Has Jurisdiction To Impose Remedies for That Claim, Including Damages**

As noted above, the FTAIA confers jurisdiction over claims based on foreign conduct if the foreign conduct has a direct, substantial, and foreseeable effect in the United States, and "such effect gives rise to a *claim* under the provisions of [the Sherman Act]." 15 U.S.C. § 6a (emphasis added). The Act does not mention "damages," or in any other way suggest that a court's jurisdiction over "damages" can be separated from its jurisdiction over a plaintiff's "claim." Rather, under the terms of the Act, if a "claim" (1) concerns conduct that has an effect in the United States, and (2) arises out of that U.S. commerce effect, a U.S. court has jurisdiction over that "claim." Nothing in the statute, or in any case law advanced by Intel, purports to limit the particular remedies a plaintiff can seek once that plaintiff's "claim" falls within Paragraph 2 of the FTAIA.

Under these standards, this Court plainly has jurisdiction to award AMD's foreign damages, because there is no serious dispute that AMD's "claim" falls within the ambit of the

FTAIA. AMD's "claim" necessarily arises from the U.S. commerce effect of Intel's monopolization: it is because the global x86 market includes the U.S. that Intel's monopolization necessarily affects U.S. commerce and that AMD can bring suit here. And it is equally clear that AMD's "claim" necessarily involves Intel's foreign conduct: as discussed above, AMD likely could not even have *stated* its monopolization claim without reference to foreign conduct. *See supra* note 9 and accompanying text. Accordingly, because this Court has jurisdiction over AMD's "claim," and because that claim plainly implicates Intel's foreign conduct, the Court has jurisdiction to order appropriate remedies to redress that conduct, including by awarding damages for injury suffered abroad.[10]

**B.    Under the FTAIA, U.S. Courts Have the Power To Award Foreign Damages Where, as Here, Those Damages are "Inextricably Bound Up With" Domestic Anticompetitive Harm**

Even if a plaintiff's "damages" could be separated from its "claim"—and, under the text of the FTAIA, they cannot—the foreign damages here incurred are recoverable under the FTAIA. As noted, the FTAIA preserves jurisdiction over any Sherman Act "claim," so long as a "direct, substantial, and reasonably foreseeable effect" on U.S. commerce "gives rise to" that claim. 15 U.S.C. § 6a. Even if "claim" is read to mean "damages," AMD's damages here arise directly from the "effect" of Intel's conduct in U.S. commerce (and the rest of the world). Put simply, Intel's domestic and foreign conduct, in combination, create a unitary anticompetitive effect throughout the global x86 market—monopoly foreclosure that maintains monopoly prices—and as that effect includes U.S. commerce, it is an effect the Sherman Act was intended

---

[10]    *Cf. Pfizer, Inc. v. Gov't of India*, 434 U.S. 308, 314-15 (1978) ("If foreign plaintiffs were not permitted to seek a remedy for their antitrust injuries, persons doing business both in this country and abroad might be tempted to enter into anticompetitive conspiracies affecting American consumers in the expectation that the illegal profits they could safely extort abroad would offset any liability to plaintiffs at home. If, on the other hand, potential antitrust violators must take into account the full costs of their conduct, American consumers are benefited by the maximum deterrent effect of treble damages upon all potential violators.").

to prevent. Unlike in the Section 1 context, this effect cannot be divided into separate "effects" in different countries, because it is not possible to monopolize "part" of an indivisible market. And it is this unitary world-wide "effect" on the global x86 market that directly causes, or "gives rise to," AMD's Section 2 damages everywhere in the world.

This conclusion is fully supported by FTAIA case law, which establishes that where foreign conduct causes foreign injury that is inextricably intertwined with domestic antitrust injury or a domestic restraint of trade, United States courts have jurisdiction over and can award damages for both the U.S. and the foreign harm. *See* 15 U.S.C. § 6a; *Empagran*, 542 U.S. at 170 (plaintiffs can sue "based upon a purely foreign injury" where that injury is "'inextricably bound up with . . . domestic restraints of trade'") (quoting *Industria Siciliana Asfalti v. Exxon Research and Eng'g Co.*, No. 75 Civ. 5828-CSH, 1977 U.S. Dist. LEXIS 17851 (S.D.N.Y. Jan. 18, 1977)); H.R. Rep. No. 97-686 at 11-12 (1982).

In *Industria Siciliana*, a *foreign* plaintiff was permitted to seek its *foreign* damages in a United States court because the antitrust violation that caused its injury—reciprocal dealing—caused intertwined antitrust injury within the United States. The plaintiff in *Industria Siciliana* was an Italian petroleum refining corporation that solicited bids for the design of a refinery it was building in Italy. The plaintiff alleged that, during the bidding competition, an American subsidiary of Exxon coerced the plaintiff into rejecting a better bid from another American company by coupling acceptance of Exxon's bid with an offer for "a favorable refining contract" with another Exxon entity. *Industria Siciliana*, 1977 U.S. Dist. LEXIS 17851, at *3. Plaintiff sought treble damages for Exxon's design overcharge, asserting that Exxon's conduct constituted "reciprocal dealing prohibited by Section 1 of the Sherman Act." *Id.* at *6. The defendants

18

moved to dismiss, alleging that the plaintiff had an "insufficient connection with United States commerce to enable it to invoke the Sherman Act." *Id.* at *28.

The court disagreed. It reasoned that there are "two anticompetitive evils associated with reciprocal dealing: the foreclosure of competition from a particular market and the imposition upon a buyer of . . . an unwanted product." *Id.* at *29. Although the plaintiff in *Industria Siciliana* was a foreigner who suffered foreign injury as a result of the "imposition" of an unwanted contract, the "foreclosure" portion of the violation affected the commerce of the United States by excluding Exxon's American rival. Because the "imposition" suffered by the Italian plaintiff as a result of the reciprocal dealing was an intrinsic result of the same antitrust violation that inflicted "foreclosure" on U.S. commerce, the foreign plaintiff was permitted to seek its foreign damages under the Sherman Act.

The situation here is the same: AMD's foreign exclusion is an intrinsic part of the global monopolization that resulted in both the imposition of monopoly overcharges on U.S. microprocessor buyers and AMD's exclusion world-wide. Thus, AMD's foreign and domestic damages are "inextricably bound up" as direct results of a single, holistic antitrust violation.

Similarly, in *Caribbean Broad. Sys., Ltd. v. Cable & Wireless PLC*, 148 F.3d 1080 (D.C. Cir. 1998), the D.C. Circuit held that a *foreign* plaintiff that suffered damages abroad as a result of monopolization of a *foreign* market could seek recovery in a U.S. court, because that monopolization also caused antitrust injury in the United States. The plaintiff in *Caribbean Broadcasting* was a radio station located in the British Virgin Islands. It alleged that its competitor, a rival Caribbean radio station, had monopolized the market for English-language radio advertising in the Caribbean by, among other things, filing sham objections in the British Virgin Islands to the plaintiff's broadcast license application and falsely telling U.S. advertisers

that it could reach the entire Caribbean (hence eliminating the need to advertise on the plaintiff radio station). *See id.* at 1082, 1087; *see also Caribbean Broad., Ltd. v. Cable & Wireless PLC*, No. 93-2050, 1995 WL 767164, at *3 (D.D.C. Dec. 21, 1995) (discussing allegations of sham objections). The D.C. Circuit held that plaintiff's claim fell within U.S. jurisdiction under the Sherman Act because the defendant's monopolization, in addition to injuring the plaintiff by foreclosing its advertising sales, also had an intrinsic antitrust effect in the United States, where it forced U.S. advertisers to pay monopoly prices for Caribbean advertising. *See Caribbean Broad. Sys.*, 148 F.3d at 1085-87. Again, AMD's situation is identical: Intel's monopolization of the global x86 market caused antitrust injury to AMD (and American consumers) in the United States; and that same antitrust violation was the intrinsic and proximate cause of AMD's antitrust injury around the world.

Neither *Empagran* nor *Empagran II,* on which Intel purports to rely, is to the contrary. In fact, in *Empagran*, the Supreme Court took pains to emphasize that it did not have before it the proposition central to Intel's motion: whether the FTAIA permitted U.S. courts to assert jurisdiction over claims for foreign injury where (as here) that injury was inextricably intertwined with domestic antitrust injury or a domestic restraint of trade. Instead, the Court restricted its holding to situations where a course of foreign and domestic anticompetitive conduct "*independently* causes *separate* foreign injury." *Empagran*, 542 U.S. at 158. Making clear the limitations on its holding, the Court expressly noted that, at the time the FTAIA was enacted, U.S. courts had permitted plaintiffs to sue "based upon a purely foreign injury" where that injury was "inextricably bound up with . . . domestic restraints of trade," or where "the foreign injury was dependent upon, not independent of, domestic harm." *Id.* at 171-72 (internal quotation marks omitted). Nothing in *Empagran* or the FTAIA disturbs that rule.

20

In *Empagran II*, the D.C. Circuit held on remand from the Supreme Court that price-fixing claims against *foreign* vitamin manufacturers brought by *foreign* buyers purchasing in *foreign* countries for *foreign* distribution did not fall within Paragraph 2 of the FTAIA. *See Empagran S.A. et al. v. F. Hoffman-LaRoche, Ltd., et al.*, 417 F.3d 1267, 1271 (D.C. Cir. 2005). The foreign buyers sought to escape this result by arguing that, but for parallel elements of the conspiracy affecting the U.S. market, the foreign price-fixing conspiracy could not have been effective. *See id.* at 1270. In particular, plaintiffs argued that if the defendants had not conspired to divide the U.S. market from the foreign market and raise prices in the U.S. as well as abroad, international arbitrageurs would have sent cheap vitamins from the U.S. abroad, causing the foreign price-fixing conspiracy to fail. *Id.*

The D.C. Circuit acknowledged that the foreign plaintiffs had established a "but for" link between U.S. commerce and their foreign claims. *Id.* at 1270-71. But it dismissed the claims nonetheless, because the U.S. commerce effect plaintiffs invoked did not stand in "a direct causal relationship, that is, [a] proximate causation" relationship with the foreign harm. *Id.* at 1271. "While super-competitive prices in the United States may have facilitated the [defendants'] scheme to charge comparable prices abroad," the court reasoned, "this fact demonstrates at most but-for causation." *Id.*[11]

Intel intimates, and will doubtless argue on reply, that AMD's foreign damages are analogous to the foreign damages suffered by the foreign purchasers in *Empagran*, and thus that

---

[11]    The "proximate cause" analysis employed by the D.C. Circuit in *Empagran II* is fully consistent with the "inextricably bound up" analysis used in *Caribbean Broadcasting* and *Industria Siciliana*. Indeed, in *Empagran II*, the D.C. Circuit expressly reaffirmed both *Siciliana* and *Caribbean Broadcasting*, took pains to point out that both of those cases satisfied the "proximate cause" analysis, and further observed that in *Empagran*, the foreign damages were not inextricably intertwined with that which rendered the U.S. commerce effect a Sherman Act violation. *See Empagran II*, 417 F.3d at 1270-71.

21

there is only a "but-for" relationship between the effects of Intel's conduct in the U.S. and AMD's foreign harm. But that argument fails. Unlike the foreign plaintiffs in *Empagran*, who could trace their injury only incidentally to a U.S. price fix directed at U.S. purchasers, AMD is and has been Intel's intended target both here and abroad.

And, critically, AMD's claim is not simply that, as a *practical* matter, Intel could not have maintained its monopoly in the foreign portion of the x86 market if it had not also monopolized the United States portion. Rather, as a *legal* matter, AMD likely could not even have stated a *claim* under Section 2 except by reference to the cumulative effect of all Intel's conduct world-wide. As a result, it is *only* in combination with the rest of Intel's conduct that each anticompetitive act becomes actionable as part of a world-wide market exclusion that has been the sole proximate cause of AMD's antitrust damages, at home and abroad. Unlike the foreign purchasers' payment of conspiratorial overcharges in *Empagran*, each of which if in U.S. commerce would have given rise to a freestanding Section 1 claim, AMD's individual lost sales opportunities, whether in the U.S. or abroad, do not give rise, on their own, to a Section 2 monopolization claim. What causes those individual incidents to rise to the level of a Section 2 violation, and what renders the excluded sales recoverable under the antitrust laws, is the fact that, taken together, they constitute a single monopolization having a foreseeable and substantial effect on U.S. commerce. It is that single global *effect* that gives rise to AMD's claims for damages.[12]

---

[12]    Intel's motion assumes that AMD will measure its damages by aggregating each of the sales it lost at each of its customers due to Intel's exclusionary behavior. As discussed, Intel's motion fails even taking this assumption as true. But the assumption is, at best, premature, and may well prove false. In its complaint, AMD alleges that "Intel's conduct has unfairly and artificially capped AMD's market share, and constrained it from *expanding* to reach the minimum efficient levels of scale necessary to compete with Intel as a predominant supplier to major customers." (Compl. ¶5 (emphasis added); *see also* Compl. ¶ 128.) Under this theory,

C.   **The Court's Jurisdiction Over AMD's Foreign Damages Is Especially Appropriate Because AMD Is an American Competitor of an American Monopolist, Competing in an Integrated Global Market That Includes the United States**

Intel dismisses as without significance the facts that AMD and Intel are American competitors, and that they compete in an integrated world-wide market that includes the United States. But in determining the availability of foreign damages, these are highly relevant facts. As the Supreme Court has observed, "Congress' foremost concern in passing the antitrust laws was the protection of Americans." *Pfizer, Inc. v. Gov't of India*, 434 U.S. 308, 314; *see* U.S. DOJ Amicus Br. at 28, *F. Hoffman-LaRoche Ltd. v. Empagran*, 2004 WL 234125 (U.S. Dist. Col. June 14, 2004). Courts have thus readily asserted jurisdiction even for foreign damages when those damages arise out of anticompetitive injury caused by one American to another in an integrated, global market.

In the *Empagran* litigation, for example, the District Court split the case between foreign plaintiffs who purchased vitamins in a foreign market—claims that eventually became the subject of the Supreme Court case—and U.S. corporations and their subsidiaries who purchased vitamins *both* in the U.S. and abroad. The court held that *all* of these latter claims arose out of the U.S. effects of the global vitamin conspiracy "because the . . . plaintiffs [were] American

---

AMD's damages in any particular country will not necessarily consist of the sales specifically foreclosed by Intel's anticompetitive conduct in that country, but rather the difference between AMD's current market share in the global market, and the share AMD *would* have attained absent Intel's anticompetitive scheme to keep AMD marginalized. Those damages—the lost enterprise value attributable to Intel's strategy of keeping AMD small—are in *no* sense attributable to the particular lost sales specifically foreclosed by the anticompetitive exclusion occurring in just that particular country. Because AMD would have achieved much higher rates of growth and scale over time absent Intel's exclusion, its total lost enterprise value may well *exceed* the cumulative value of the sales specifically foreclosed by Intel's particular anticompetitive conduct. And because of the integrated nature of the world-wide market, there is no reason to assume AMD's lost enterprise value in any given country would be proportional to its lost sales in that country: enhanced opportunities in one country could well have led to increased growth elsewhere in the world.

RLF1-3018870-1

companies or subsidiaries of American companies that have purchased substantial volumes of vitamins for delivery both in the United States and abroad as part of a global procurement strategy formulated and directed by United States parent corporations whereby these plaintiffs suffered ultimate financial injury in the United States." *In re Vitamins Antitrust Litig.*, No. 99-197, 2001 U.S. Dist. LEXIS 8903, at *24 (D.D.C. Jun. 7, 2001). The court specifically distinguished the U.S. corporations' claims from those of the foreign plaintiffs in *Empagran*, who never participated in the U.S. market. *See id.* at 24-25. The court concluded that the U.S. corporations "were substantially injured in United States commerce," because their "purchases, including those of the foreign subsidiaries, were coordinated by the American parent companies and thus affected the financial status of these American companies." *Id.* at *25. Nothing in either the Supreme Court's opinion in *Empagran* nor the D.C. Circuit court's opinion in *Empagran II* questions the soundness of this decision.[13]

It bears emphasis that AMD is not alleging that the "mer[e]" fact of its "American ownership" affords this Court jurisdiction. H.R. Rep. No. 97-686, at 9 (1982). In addition, as in the *Vitamins* litigation, AMD's and Intel's competition around the world is planned and directed from the United States. Moreover, beyond the facts of the *Vitamins* litigation, this case involves two American competitors competing in an integrated, world-wide market. This means that Intel's monopolization around the world, no matter where it occurs, affects competition between American entities. *See Coors Brewing Co. v. Miller Brewing Co.*, 889 F. Supp. 1394, (D. Colo.

---

[13]    Although Intel attempts to draw a distinction between AMD and certain "[f]oreign AMD entities," *see, e.g.*, Mot. at 8, 16, for antitrust purposes, where parent and subsidiary companies act with a unity of interest, they are to be treated as one. *See Copperweld Corp. v. Independence Tube Corp.*, 467 U.S. 752, 777 (1984); *In re Vitamins Antitrust Litig.*, 2001-2 Trade Cas. (CCH) P73,325, *29 (D.D.C. 2001); *Aventis Envtl. Sci. USA LP v. Scotts Co.*, 383 F. Supp. 2d 488, 500 (S.D.N.Y. 2005) (holding that a U.S. parent company had standing to assert claims of foreign subsidiaries because plaintiff demonstrated that all three entities "were acting as a single enterprise and shared a complete unity of interests.").

1995) ("Given the integrated nature of the North American beer market and the fact the principal parties are American companies competing in that market, it seems a fine distinction indeed to assert defendants' alleged conduct impacts Canadian—but not American—markets, producers or consumers.").

Based on a distorted reading of the case law and a selective presentation of the FTAIA's legislative history, Intel argues that the Court should disregard AMD's U.S. base of world-wide operations. But Intel cites only *part* of the relevant House Report, the passage providing that "two foreign firms, even if American-owned, should not, *merely by virtue of the American ownership*, come within the reach of our antitrust laws." H.R. Rep. No. 97-686, at 9 (1982). The Report goes on in the very next sentence to state that American antitrust jurisdiction exists where there is "a direct, substantial and reasonably foreseeable effect on domestic commerce *or a domestic competitor.*" *Id.* at 9-10 (emphasis added). AMD is Intel's U.S. domestic competitor.

Intel's cases are similarly unavailing. For example, Intel quotes the Third Circuit's statement in *Turicentro*, 303 F.3d at 301 n.5, that the plaintiff's foreign citizenship was "irrelevant to [the court's] inquiry" regarding FTAIA jurisdiction. (*See* Mot. at 20.) But, the court was simply clarifying, in dicta, that foreign plaintiffs were permitted to sue under the U.S. antitrust laws when they participate in the U.S. market. It did not hold that a plaintiff's American citizenship was, under all circumstances, irrelevant to jurisdiction under the FTAIA. Further, *Turicentro* did not discount the significance of American citizenship in the context of conduct by an American competitor in an integrated, global market that squarely includes U.S. commerce. To the contrary, the court in *Turicentro* found that the alleged conspiracy at issue

25

had *no* direct, substantial, or reasonably foreseeable effect on U.S. commerce, and was directed

solely at foreign markets. *See Turicentro*, 303 F.3d at 305.[14]

In sum, the fact that AMD and Intel are American competitors competing around the

world in an integrated global market that includes the United States reinforces the propriety of

this Court's jurisdiction over AMD's foreign damages.

### D. The Pleadings Adequately Allege That AMD Participates in United States Export Commerce Since Its Microprocessors are Developed, Designed and Engineered in the United States

Although not essential for the disposition of Intel's motion, given the undeniable U.S.

domestic effects of its foreign monopolizing conduct, a second FTAIA ground exists to support

jurisdiction over AMD's claim: AMD microprocessor sales to foreign OEMs are part of the U.S.

export trade. Though presently fabricated in Germany, AMD's chips are developed, designed

and engineered in the U.S.[15] And it is this U.S. design, rather than the silicon that embodies it,

that constitutes the essence of the device. Indeed, if this were not so, a Warner Bros.

blockbuster, developed, produced, shot and edited entirely on its Burbank lot, would not

constitute U.S. export commerce when Warner Bros. delivered release prints struck in England

---

[14]    Intel's remaining cases are similarly distinguishable. None of these cases involved claims brought by one American competitor against another, alleging systematically inflicted anticompetitive injury in an integrated, global market that squarely includes U.S. commerce. As a result, none of Intel's cases considered the significance of these facts in a context analogous to that presented here. That alone is sufficient to render them inapposite. *Cf. United Phosphorous Ltd. v. Angus Chem. Co.*, 131 F. Supp. 2d 1003, 1009-10 (N.D. Ill. 2001), *aff'd* 322 F.3d 942, 953 (7th Cir. 2002) (monopolization of a wholly foreign market in which lone U.S. plaintiff was neither a competitor nor a consumer); *CSR Ltd. v. Cigna Corp.*, 405 F. Supp. 2d 526, 552 n.17 (D.N.J. 2005) (dismissing claim of foreign plaintiff but asserting jurisdiction over U.S. subsidiary's claim where foreign and domestic effects of Section 1 violation were "independent and easily separable"); *Optimum, S.A. v. Legent Corp.*, 926 F. Supp. 530 (W.D. Pa. 1996) (foreign plaintiff alleged no direct effect on U.S. commerce or U.S. competitor); *U.S. Info. Res., Inc. v. The Dun & Bradstreet Corp.*, 127 F. Supp. 2d 411 (S.D.N.Y. 2001) (only indirect effect on U.S. plaintiff); *Latino Quimica-Amtex S.A. v. Akzo Nobel Chemicals B.V.*, No. 03 Civ. 10312 (HB)(DF), 2005 U.S. Dist. LEXIS 19788 (S.D.N.Y. Sept. 8, 2005) (foreign purchasers conspiratorially overcharged for chemicals in foreign markets).

[15]    *See* AMD Annual Report (Form 10-K), at 12 (Mot. App. Exh. 6).

26

to European theaters. Were Intel's theory accepted, just by dint of where Warner Bros. converted its valuable intellectual property into tangible form, the antitrust laws could not reach a scheme by Paramount Pictures to coerce German distributors from exhibiting Warner Bros.' U.S.-made films, even though the two are head-to-head American competitors in a key U.S. export market. Taken a step further, U.S. products would cease being part of the U.S. export commerce if, while en route to foreign customers, they were packaged for delivery at some intermediate foreign location.

Such an elevation of form over reality would run contrary to the fundamental precepts that guide the application of the U.S. antitrust laws. *See, e.g.*, *Simpson v. Union Oil Co.*, 377 U.S. 13, 22 (1964) (Mere "clever manipulation of words" that does not affect any "differences in substance" disregarded in determination of antitrust violation.). Particularly in this era of outsourcing of the ministerial aspects of production, whether a U.S. designed and engineered good which undergoes a manufacturing step abroad is part of the U.S. export trade must take into account the substantiality of the U.S. contribution, not simply the situs of the last manufacturing, inspection or packaging step. Here, AMD alleges that its U.S. contribution qualifies its products as part of the U.S. export trade, which is all that is necessary to survive a Rule 12(b)(1) dismissal.

## IV. COMITY WILL NOT STAND IN THE WAY OF A U.S. COURT ENFORCING U.S. ANTITRUST LAWS AGAINST A U.S. DEFENDANT WHO HARMS U.S. COMMERCE

The fact that AMD and Intel are also engaged in litigation in Japan or that foreign authorities are investigating Intel's anticompetitive conduct has no impact on this Court's jurisdiction. *See Laker Airways Ltd. v. Sabena, Belgian World Airlines*, 731 F.2d 909, 927 n.48. (D.C. Cir. 1984) ("The mere filing of a suit in one forum does not cut off preexisting right of an independent forum to regulate matters subject to its prescriptive jurisdiction . . . [P]arallel

27

proceedings on the same *in personam* claim should ordinarily be allowed to proceed simultaneously, at least until a judgment is reached in one which can be pled as *res judicata* in the other."); *Moore v. Little Giant Indus., Inc.*, 513 F. Supp. 1043, 1050 (D. Del. 1981) (permitting parallel proceedings in United States District Court and in Utah state court), *aff'd*, 681 F.2d 807 (3d Cir. 1982).[16]  In invoking comity, the burden of proof is on the moving party,[17] and Intel has not provided any evidence that U.S. and foreign laws are even in tension, much less that compliance with both is impossible. *See Hartford Fire Ins. Co.*, 509 U.S. at 798-99 (holding that comity in the antitrust context does not prevent the exercise of jurisdiction where a defendant can comply with both the foreign and domestic laws).

Indeed, Intel concedes that where its conduct causes direct, substantial, and reasonably foreseeable injury to U.S. commerce, comity does not limit jurisdiction. (Mot. at 25.)  As demonstrated above, Intel's monopolization of the world-wide market had and continues to have a direct, substantial, and reasonably foreseeable effect on U.S. commerce by reducing competition in the U.S. portion of the market. *See Laker Airways Ltd.*, 731 F.2d at 955-56 (holding that comity did not prevent courts from enforcing U.S. antitrust laws against foreign defendants who engaged in a conspiracy to drive a foreign competitor in air travel out of

---

[16]    The only plaintiff in the Japanese litigation is the Japanese-commissioned-agent subsidiary of parent plaintiff AMD International Sales and Service, Ltd. ("AMD Sales").  The suit, brought under Japanese law, seeks damages for lost commissions the agent would have received from AMD Sales had Intel not foreclosed sales in Japan. (*See* Mot. App. Exhs. 10 & 11.)  Neither AMD nor AMD Sales seeks any double recovery as to those Japanese commissions.  Thus, any lost profit claim AMD or AMD Sales may present here will have to take account of any unrealized commissions that form the basis of recovery by their agent in Japan.

[17]    *See Lavely v. Redheads, Inc.*, No. 03 Civ. 7752 (RMB), 2006 WL 318835 (S.D.N.Y. Feb. 9, 2006) ("Since comity is an affirmative defense, the moving party has the burden of proving that it is appropriate."); *Cf. In re: Magnetic Audiotape Antitrust Litig.*, 334 F.3d 204, 209 (2d Cir. 2003) ("The dearth of evidence offered by [the moving party] prevents this court from properly considering its request for dismissal based on an issue of foreign law.").

business to and from the U.S., because the "intended and actual effect in the United States are

clear since [plaintiff], which was carrying up to one out of every seven transatlantic passengers,

was subsequently forced into liquidation.").[18]   There is accordingly no basis for any invocation

of comity here.

## V.    AMD HAS ANTITRUST STANDING TO PURSUE THE ENTIRETY OF ITS CLAIM

Intel alternatively argues that AMD does not have standing to pursue its claims.   But

preferring buzzwords to analysis, Intel provides little guidance as to why principles of antitrust

standing would be violated by allowing AMD's suit to proceed.[19]   They would not.   While

standing "implicates many of the same issues as the jurisdictional analysis under the Foreign

Trade Antitrust Improvements Act," *Turicentro*, 303 F.3d at 307, citing *Assoc. Gen. Contractors*

---

[18]    Intel also argues that the discussion of comity in *Empagran*, 542 U.S. 155, warrants dismissal on comity grounds here.   That contention is wholly without merit.   From a comity perspective, this is a significantly different case than *Empagran*, as *Empagran* involved a price-fixing claim where the antitrust harm involved a single transaction between a *foreign plaintiff* and a *foreign defendant* in a *foreign country*, that was not inextricably intertwined with effects in United States commerce.   *Id.*   The *Empagran* Court acknowledged that "principles of comity provide Congress greater leeway when it seeks to control through legislation the actions of *American* companies" such as those that are parties in this case.   *Id.* at 165 (emphasis in original) (citations omitted).   Moreover, the Court explicitly held that comity does not interfere with Congress' ability to apply the antitrust laws abroad in order to redress antitrust injury felt in, caused by effects in, or inextricably bound up with antitrust injury in the United States.   *See id.* at 164-67.

[19]    The cases Intel cites lend no support to its standing argument.   In the *Microsoft* case, foreign plaintiffs were denied standing because they "had not participated in the U.S. domestic market," and their injuries were far too remote from the alleged anticompetitive effects at issue in that case.   *In re Microsoft Corp. Antitrust Litig.*, 127 F. Supp. 2d 702, 716 (D. Md. 2001).   Similarly, in *DeAtucha*, the plaintiff was denied standing because he was "not an American consumer nor did he trade in American commerce," and because he was "injured entirely outside of United States commerce."   *De Atucha v. Commodity Exch., Inc.*, 608 F. Supp. 510, 518 (S.D.N.Y. 1985).   In *Turicentro*, the court concluded that because there was no jurisdiction under the FTAIA, plaintiffs did not have standing, and in any event, plaintiffs were injured exclusively in foreign markets by conduct not directly related to the United States.   *Turicentro*, 303 F.3d at 307.   In contrast to each of the cases Intel cites, here, AMD—undeniably a participant in the U.S. segment of the world-wide market—was injured as a direct result of Intel's global anticompetitive conduct.   *See supra* Sections II & III.

29

*of California, Inc. v. California State Council State Council of Carpenters*, 459 U.S. 519, 535-45 (1983), the key to antitrust standing is whether the plaintiff suffered antitrust injury, *Atl. Richfield Co. v. USA Petroleum Co.*, 495 U.S. 328, 334 (1990), and whether there is a sufficient "physical and economic nexus between the alleged violation and the harm to the plaintiff." *Blue Shield of Virginia v. McCready*, 457 U.S. 465, 478 (1982).

AMD plainly claims to have suffered antitrust injury—that is, "an injury of the type the antitrust laws were intended to prevent." *Brunswick Corp.*, 429 U.S. at 489. AMD has been injured through Intel's world-wide strategy of anticompetitive market foreclosure, which has artificially denied AMD a competitive opportunity to grow its business to a size that would permit it to escape Intel's exclusionary monopoly leverage. It is axiomatic that a plaintiff, alleging injury caused by the anticompetitive conduct of a competitor, suffers an injury of the kind the antitrust laws are intended to prevent. *See Brader v. Allegheny Gen. Hosp.*, 64 F.3d 869, 877 (3d Cir. 1995) (competitor had standing under Clayton Act where he alleged a loss of income due to anticompetitive behavior); *see also In re Lower Lake Erie Iron Ore Antitrust Litig.*, 998 F.2d 1144, 1164 n.14 (3d Cir. 1993) (finding standing where plaintiffs "themselves were direct competitors" of the defendants).

It is equally evident that there is a clear and direct nexus between Intel's cumulative anticompetitive conduct and AMD's injury. As discussed earlier, Intel's conduct has directly caused AMD's competitive injury, both in U.S. commerce and throughout the world-wide market of which the U.S. portion is but an indivisible part. Crediting these allegations, as the Court must for purposes of Intel's motion, there is no serious legal basis for any challenge of AMD's standing to pursue a remedy for this claimed violation of U.S. antitrust law. Certainly Intel's Memorandum has failed to articulate one.

30

## CONCLUSION

For the reasons set forth above, Intel's Motion to Dismiss should be denied.

OF COUNSEL:

Chuck Diamond
Linda Smith
Mark Samuels
O'Melveny & Myers LLP
400 South Hope Street
Los Angeles, CA 90071-2899

Henry C. Thumann
O'Melveny & Myers
1625 Eye Street, NW
Washington, DC    20006

Jesse A. Finkelstein (#1090)
finkelstein@rlf.com
Frederick L. Cottrell, III (#2555)
cottrell@rlf.com
Chad M. Shandler (#3796)
shandler@rlf.com
Steven J. Fineman (#4025)
fineman@rlf.com
Richards, Layton & Finger
One Rodney Square
920 North King Street
Wilmington, DE 19801

*Counsel for Advanced Micro Devices, Inc. and
AMD International Sales & Services, Ltd.*

31

## CERTIFICATE OF SERVICE

I hereby certify that on May 26, 2006, I electronically filed the foregoing document with

the Clerk of Court using CM/ECF and have sent by Hand Delivery to the following:

Richard L. Horwitz, Esquire
Potter Anderson & Corroon LLP
1313 North Market Street
P. O. Box 951
Wilmington, DE 19899

James L. Holzman, Esquire
Prickett, Jones & Eliott, P.A.
1310 King Street
P.O. Box 1328
Wilmington, DE 19899-1328

Robert D. Goldberg, Esquire
Biggs and Battaglia
921 North Orange Street
Wilmington, DE 19899-1489

and have sent by Federal Express to the following non-registered participants:

Darren B. Bernhard, Esquire
Howrey LLP
1299 Pennsylvania Avenue, N.W.
Washington, DC 20004-2402

Robert E. Cooper, Esquire
Daniel S. Floyd, Esquire
Gibson, Dunn & Crutcher LLP
333 South Grand Avenue
Los Angeles, California 90071-3197

Frederick L. Cottrell, III (#2555)
cottrell@rlf.com