**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF DELAWARE**

| | | |
|---|---|---|
| ADVANCED MICRO DEVICES, INC. and AMD INTERNATIONAL SALES & SERVICE, LTD., | ) ) ) ) | |
| Plaintiffs, | ) ) | C.A. No. 05-441 (JJF) |
| v. | ) ) | DM No. ____ |
| INTEL CORPORATION and INTEL KABUSHIKI KAISHA, | ) ) ) | |
| Defendants | ) | |

| | | |
|---|---|---|
| IN RE INTEL CORPORATION MICROPROCESSOR ANTITRUST LITIGATION | ) ) ) | C.A. No. 05-MD-1717 (JJF) |

## PLAINTIFFS' MOTION TO COMPEL

Pursuant to Rules 34(b) and 37 of the Federal Rules of Civil Procedure, plaintiffs ADVANCED MICRO DEVICES, INC. and AMD INTERNATIONAL SALES & SERVICE, LTD., (collectively "AMD") hereby move to compel discovery of the documents and things relating to Intel's foreign misconduct requested in AMD's First, Second, and Third Requests for Production of Documents and Things, by asking the Court to overrule the general and specific objections Defendants lodge in their Amended Responses based on the Foreign Trade Antitrust Improvements Act. AMD hereby certifies that it has conferred in good faith with defendants in an effort to secure disclosure of the objected-to documents and things without court action, and that this effort has proved unsuccessful. *See* Fed. R. Civ. P. 37(a)(2)(A).

1

## INTRODUCTION

AMD's Complaint alleges that, during the four years preceding its filing (June 26, 2005), Intel coerced x86 microprocessor customers from dealing with AMD in order to acquire and maintain a monopoly in violation of Section 2 of the Sherman Act. The Complaint details exclusive deals, market manipulation, threatened price increases, and other acts of retaliation that Intel deployed to perpetuate its monopoly in what Intel concedes is a single, worldwide market for x86 microprocessors. And the Complaint alleges harm not only to AMD's domestic business, but also lost opportunities to sell processors that, but for Intel's unlawful behavior, were or would have been manufactured in Austin, Texas and exported to foreign customers.

Notwithstanding these allegations, based solely on Judge Farnan's September 26, 2006 *Opinion and Order* granting Intel's Foreign Trade Antitrust Improvements Act ("FTAIA") motion, Intel has unilaterally drawn a curtain on its dealings with foreign microprocessor customers — customers who, by its own assertion, account for roughly 70% of worldwide sales. It thus refuses to produce the documents and other discovery that it previously agreed to produce that will demonstrate that Intel constrained foreign customers from dealing with AMD. The parties' "meet and confer" sessions have defined the universe in dispute. With respect to its dealings abroad, Intel declines to produce documents, including contracts and correspondence exchanged during sales negotiations, that might evidence (1) limitations on a customer's freedom to purchase microprocessors from AMD, (2) requirements that a customer purchase specified amounts or percentages from Intel, (3) other coercion, including threats of retaliation or retribution, for doing business with AMD (or not doing sufficient business with Intel), and (4) other quantity-forcing behavior. In addition, Intel intends to withhold documents (5) that might evidence other "foreign conduct" intended to handicap AMD in the marketplace, make its

2

products less desirable to customers and consumers or raise its costs of doing business. Additionally, Intel is not prepared to produce (6) internal communications bearing on any of the foregoing. Intel's position is not request-specific. Any materials called for by any of AMD's three hundred plus requests falling into any of these categories, says Intel, will be withheld. [1]

This motion presents the single, overriding issue of whether Judge Farnan's September 26, 2006 decision is the discovery show-stopper Intel suggests. It is not. Granted, the decision precludes AMD from pursuing damage claims based on "lost sales of AMD's German-made microprocessors to foreign customers." (Mem. Op. at 7). But it recognizes AMD's right to pursue claims for lost sales to *domestic* customers of microprocessors regardless of the product's origin (domestic commerce claims) and for lost sales of American-made microprocessors to *foreign* customers (export commerce claims). And, on its face, it leaves open, as it necessarily must, all discovery relevant to either remaining claim.

In the sections that follow, we demonstrate that the evidence of coercion of foreign customers and other foreign marketplace misconduct that Intel now asserts it may withhold is relevant to claims unaffected by Judge Farnan's Order. As to AMD's claims for harm to its export business, evidence that Intel coerced foreign customers to forego or limit purchases from AMD is obviously crucial. But evidence of foreign misconduct is also necessary to prove predicate elements of AMD's domestic commerce claim; namely, that Intel acquired or maintained its *worldwide* monopoly in an unlawful manner; and that the amount of domestic business that Intel excluded from AMD's reach, when combined with the magnitude of its

---

[1]    As a result, this motion addresses generally the relevance of AMD's foreign conduct discovery requests to its claims for U.S. and export-related damages. While a request-by-request discussion would not materially assist in its disposition, for the sake of completeness, in the accompanying Appendix, AMD identifies relevance in relation to each specific document request Intel has expressly objected to on FTAIA grounds.

3

wrongful exclusion elsewhere in the worldwide microprocessor market, constitutes a level of overall market foreclosure sufficient to render the domestic exclusion actionable under the antitrust laws.

Significantly, nothing in the FTAIA prevents an antitrust plaintiff from pursuing "foreign misconduct" discovery relevant to its claim. On the contrary, foreign discovery has regularly been permitted in antitrust cases as long as it meets the generally applicable discovery standards — *i.e.*, as long as it is reasonably calculated to lead to admissible evidence relevant to proving the claims at issue in the case, even if those claims concern a domestic market or domestic damages. *See, e.g., United States v. Dentsply Int'l*, 2000-1 Trade Cas. (CCH) ¶ 72,919 (D. Del. 2000) (foreign discovery permitted in case involving claims of monopolization of relevant market consisting only of the U.S., in order to permit comparison of defendant's foreign and U.S. conduct); *In re Plastics Additives Antitrust Litigation*, 2004-2 Trade Cas. (CCH) ¶ 74,620 (E.D. Pa. 2004) (foreign discovery permitted where it helped prove intent, motive, and opportunity to commit a U.S. antitrust violation).

The questions here thus resolve simply to ones of relevance: is evidence of Intel's coercion of foreign customers relevant to the claim that AMD was injured in its export business or relevant to proving some predicate to its domestic commerce claim? After a brief discussion of the test of relevance in antitrust cases, we show that both must be answered "yes."

## I.    COURTS CONSTRUE RELEVANCE BROADLY IN ANTITRUST CASES

Under Federal Rule of Civil Procedure 26(b)(1), a party may discover any information relevant to a claim or defense. The information sought need not be admissible itself, as long as it is reasonably calculated to lead to the discovery of admissible evidence.

While these rules are typically applied liberally, given the complexity inherent in antitrust

4

cases, courts take even a broader view of what is relevant to the subject matter of an antitrust claim. *See Kellam Energy, Inc. v. Duncan*, 616 F.Supp. 215 (D. Del. 1985) ("there is a general policy of allowing liberal discovery in antitrust cases"); ABA Section of Antitrust Law, Antitrust Law Developments (5th ed. 2002) ("ALD (Fifth)") 965. Courts are particularly reluctant to limit the geographic scope of antitrust discovery because evidence outside the relevant geographic market is often relevant to prove a defendant's violation of U.S. antitrust laws. As one commentator characterized the prevailing law, "[a]lthough the geographic scope of discovery depends on the facts of individual cases, the general policy is to allow liberal discovery because '[p]articularly where allegations of conspiracy or monopolization are involved, . . . broad discovery may be needed to uncover evidence of invidious design, pattern or intent.'" ALD (Fifth) at 965 (citing *In re Vitamins Antitrust Lit.*, 2001-2 Trade Cas. (CCH) ¶ 73,338, at 90,935-38 (D.D.C. 2001)).

The broad view of discovery in antitrust cases has led many courts to permit discovery of foreign conduct even where the foreign conduct has no effect on the U.S. market. *See, e.g., In re Plastics Additives*, 2004-2 Trade Cas. (CCH) ¶ 74620 (permitting foreign discovery of conduct that may have had no effect on the U.S. market, but that instead evidenced intent, motive, and opportunity to commit a U.S. antitrust violation); *In re Automotive Refinishing Paint Antitrust Litigation*, MDL No. 1426, 2004 U.S. Dist. Lexis 29160, at *14 (E.D. Pa. October 24, 2004) (despite defendant's argument that conduct had no direct effect on the United States market, the court permitted discovery of conduct that was relevant as potential evidence both of coordination (conspiracy) and "opportunity and ability to implement an illegal conspiracy").

Finally, in antitrust cases, just like any others subject to the Federal Rules, the operative pleadings frame the issues that define the scope of permissible discovery. *See e.g., In re PE*

5

*Corp. Securities Litigation*, 221 F.R.D. 20, 24 (D. Conn. 2003) (citing 6 Moore's Federal Practice § 26.41[6][c] (3d ed. 2002)) (facts germane to claim or defense alleged in pleadings proper subject of discovery); *Westchester Fire Ins. Co. v. Household Intern., Inc.*, No. Civ. A. 02-1328 (JJF), 2005 WL 23351, at *1-2 (D. Del. Jan. 5, 2005) (citations omitted) ("[p]arties may obtain discovery regarding any matter, not privileged, that is relevant to the claim or defense of any party") (quoting Fed. R. Civ. P. 26(b)(1)); *Fisher-Price, Inc. v. Safety 1st, Inc.*, 217 F.R.D. 329, 331 (D. Del. 2003) (same). *See also* Fed. R. Civ. P. 26(b)(1) advisory committee's note (2000) (The parties and court should focus on claims and defenses asserted in the pleadings to determine whether proposed discovery seeks relevant evidence.). Hence, for discovery purposes, a party's allegations control; if information sought in discovery appears relevant to the party's operative claim, no further showing is necessary.

## II.    EVIDENCE OF FOREIGN EXCLUSIONARY CONDUCT IS DISCOVERABLE BECAUSE IT IS RELEVANT TO AMD'S CLAIMS FOR DAMAGES BASED ON LOST EXPORT SALES

As Intel acknowledges, during the period covered by this suit, AMD engaged in U.S. export trade, selling microprocessors it manufactured in Austin, Texas to customers around the world. With respect to the export trade, paragraph 2 of the Complaint charges Intel with "engaging in a relentless, worldwide campaign to coerce customers to refrain from dealing with AMD." In paragraph 36, it alleges that Intel "has targeted both U.S. and offshore customers at all levels to prevent AMD from building market share anywhere." And in paragraph 129 (emphasis added), AMD alleges that

> "Intel's Sherman Act violative conduct throughout the world has caused and will continue to cause substantial harm to the business of AMD in the . . . *export trade*[], in the form of artificially constrained market share, lost profits and increased costs of

6

> capital. . . . [T]hat same conduct has had, and will continue to
> have, a direct, substantial and reasonably foreseeable effect on
> AMD's ability to sell its goods to foreign customers in restraint of
> its U.S.-based and directed business, including its U.S. *export
> business*."

There is no gainsaying that "[b]y its terms, the Sherman Act is concerned . . . with the consequences of alleged anticompetitive behavior on U.S. commerce, ***including direct effects on exports from . . . the United States,***" a statement that comes right from Intel's mouth. (Memorandum in Support of Defendants' Mot. to Dismiss AMD's Foreign Commerce Claims ("Defs.' Mot.") at 14 (emphasis added)). AMD has pleaded "anticompetitive behavior" by Intel (coercion of foreign customers) that directly affects "exports from the United States" (the sale of domestically manufactured AMD microprocessors).

Relevancy under the Federal Rules is determined by reference to the issues framed by the operative pleadings — not by reference to extraneous facts outside them. Having alleged foreign exclusionary conduct directly impacting its export business, AMD is entitled to inquire into Intel's foreign conduct so that it may prove by admissible evidence the anticompetitive behavior it has properly pleaded. So that there is no question about the bona fides of AMD's export claim, declaration testimony submitted with this motion establishes AMD's participation in the export market for microprocessors.

As the declarations of William Siegle and Dewey Overholser show, for most of its corporate existence, AMD has manufactured microprocessors *exclusively* from U.S. locations, initially in the Silicon Valley and more recently in Austin, Texas. As of the beginning of the limitations period (June 26, 2001), AMD was supplying customers both from its Fab 25 in Austin and a second fabrication plant it had brought on line in 2000 in Dresden, Germany. (Siegle Decl. ¶¶ 3, 8). Fab 25 continued to manufacture microprocessors until 2003, and AMD

7

continued to engage in the export sale of domestically manufactured microprocessors through April 2004. Indeed, during 2002 and 2003, two-thirds to three-quarters of Fab 25's output was sold abroad. (Overholser Decl. ¶¶ 3-4).

Intel acknowledges AMD's sales to foreign customers of domestically made microprocessors, even as it concedes that "the Court would likely have jurisdiction over claims relating to such sales (provided the sales occurred within the applicable four-year statute of limitations period)." (Defs.' Mot. at 30). Intel has it almost right — all except for the assertion that AMD's export claims must arise from foreign *sales*. This is a foreclosure case. AMD's claims arise not from sales it consummated but from sales Intel's misconduct *prevented*. *See, e.g.*, *United States v. Time Warner, Inc.*, 1997-1 Trade Cas. (CCH) ¶71,702 (D.D.C. Jan. 22, 1997) (exercising jurisdiction under FTAIA over claims that foreign conduct "may have *delayed* or *deterred* American exporters from entering foreign markets") (emphasis added). Thus, the operative inquiry is not what sales AMD *made* during the limitations period, but what sales it *would have made* in the absence of Intel's misconduct. And, as to foreign sales, the FTAIA necessitates a second inquiry into whether AMD would have sourced those additional microprocessors from its domestic production (or as Areeda and Hovenkamp put it, "whether the foreign conduct had a direct, substantial, and reasonably foreseeable effect on . . . *opportunities to export* from the United States." IB P. Areeda & H. Hovenkamp, Antitrust Law ¶ 272(i) at 288 (2006) (emphasis added) ("Antitrust Law")).

As is frequent in antitrust cases, the jury will inevitably be drawn to evaluating the world that would have existed in the absence of Intel's misconduct, or as one court put it, to constructing a reasonable universe free of the defendant's offending conduct "as a yardstick for measuring what, hypothetically, would have happened 'but for' the defendant's unlawful

8

activities." *LePage's Inc. v. 3M*, 324 F.3d 141,165 (3d Cir. 2003), *cert. denied*, 542 U.S. 953 (2004). Although certainly not its burden at the discovery stage, AMD supplies evidence with this motion showing that Intel's misconduct cost it "opportunities to export"; *e.g.*, that in the absence of Intel's restraint of trade, throughout the limitations period, AMD would have supplied greater numbers of processors to foreign customers (as well as to domestic ones) and that these processors would have come from Fab 25 in Austin, Texas, not from Dresden, Germany.

As detailed in the attached declaration of AMD's former head of manufacturing, William Siegle, Fab 30 in Dresden — which AMD built to take it to the next three generations of process technology — did not come on stream until 2000.[2] It then ramped up slowly to its rated capacity of 5,000 wafer-starts-per-week, not reaching that milestone until the second quarter of 2003 and, on a sustained basis, not until the third quarter of 2004. As Fab 30 ramped up, Austin's Fab 25 ramped down: its production declined from 31 million processors in 2000, to 22 million in 2001 and to 8.5 million in 2002. (Overholser Decl. ¶ 5). As Mr. Siegle explains, had there been more orders for AMD's products in 2001 and 2002, AMD would have sourced the additional microprocessors from Austin, its only manufacturing location with any significant excess capacity at that time. (Siegle Decl. ¶ 21).

More significantly, in the absence of Intel's misconduct and the consequent reduction in orders for AMD microprocessors, AMD would not have closed Fab 25 at the end of 2002. (Siegle ¶20). Instead, it would have continued microprocessor production at both Austin and

---

[2] AMD has generally never had the luxury of converting an existing facility to keep pace with technology since for most of its history its small marketshare has consigned it to a single microprocessor fab. In order to meet ongoing customer orders during the years required to construct and equip a new fab, AMD has necessarily had to leapfrog each existing facility with the next one. For this reason, Fab 25 in Austin was not a candidate for conversion until Fab 30 came on line.

9

Dresden. The company was very anxious to find a way to keep Fab 25 operating because of its investment in and commitment to its highly trained workforce and its obligations to the local community. As Mr. Siegle explains, the very favorable industry reception accorded AMD's sixth and seventh generation processors (K6 and K7) led the company to anticipate sufficient demand to justify keeping its Austin fab open. (Siegle Decl. ¶¶ 9-15). Indeed, AMD's then-chairman, Jerry Sanders, announced this supply strategy at the company's 2000 shareholder meeting (Siegle Decl. ¶ 12), and Mr. Siegle's lieutenants began planning a Fab 25 upgrade that would equip it to run three succeeding generations of technology. It was only when the anticipated demand for AMD processors failed to materialize – which AMD alleges was the exclusionary result of Intel misconduct – that AMD in 2002 began to transition Fab 25 to the production of lower-margin products. (Siegle Decl. ¶ 17-18).

The point here is not to prove AMD's claim; AMD's opportunity for that will be at trial.[3] Rather, the impact of Intel's exclusionary conduct on the continued operation of Fab 25 is provided to explain why discovery of Intel's dealings with foreign customers right up to the date specified in AMD's requests remains unquestionably relevant notwithstanding Judge Farnan's order. Intel's foreign misconduct artificially depressed the demand for AMD's products, preventing export sales of Austin-made microprocessors and ultimately leading to AMD's withdrawal from the U.S. export business. Intel's foreign misconduct is as relevant here as it

---

[3] As a general matter, the jury determines whether foreign conduct has had the requisite U.S. effect (either on domestic or export commerce) to be actionable under the Sherman Act. *See, e.g., Dee-K Enterprises, Inc. v. Heveafil Sdn. Bhd*, 299 F.3d 281, 285 (4th Cir. 2002) (jury considered whether conspiracy had the requisite effect on the U.S. market); *Industrial Inv. Development Corp. v. Mitsui & Co., Ltd.*, 855 F.2d 222 (5th Cir. 1988) (jury determined that the defendant's conduct did not have a direct or substantial effect on United States import commerce).

would be to an antitrust claim lodged by a U.S. businessman engaged exclusively in exporting who was driven under by anticompetitive conduct that cost him his foreign customers.

Intel will undoubtedly argue that, while all of this may be true, at the end of the day, Judge Farnan struck AMD's foreign misconduct allegations, and AMD is not entitled to develop proof of stricken allegations. But Judge Farnan's decision must be read in light of, and limited by, his holding: that the FTAIA bars AMD from pursuing claims based on "lost sales of AMD's German-made microprocessors to foreign customers." (Mem. Op. at 7). *See also* Mem. Op. at 15 ("[T]he Court concludes that it lacks subject matter jurisdiction under the FTAIA over AMD's claims, to the extent those claims are based on foreign conduct *and* foreign harm.") (Emphasis added).

That Judge Farnan could not have intended to eliminate consideration of the foreign conduct allegations that are relevant to claims based on lost sales of *U.S.-made microprocessors* is best evidenced by the fact that Intel never even asked for such a remedy. Rather, it requested that the Court strike "allegations and claims relating to sales of *foreign* made microprocessors to *foreign* customers." (Defs.' Mot. at 29 (emphasis added)). It specifically excluded from the motion's scope "AMD's allegations related to microprocessors that AMD actually manufactured in the United States." *Id* at 5, n.2. Judge Farnan cannot be presumed to have done something even Intel concedes the FTAIA would not support — indeed something so at odds with the statute's fundamental rationale that Intel itself felt compelled to exclude it from its motion. Having precisely granted Intel's requested remedy, Judge Farnan's order cannot reasonably be read as having silently granted a further remedy Intel expressly disclaimed.

11

III.   **EVIDENCE OF FOREIGN EXCLUSIONARY CONDUCT IS ALSO
DISCOVERABLE AND ADMISSIBLE TO PROVE MONOPOLIZATION IN THE
UNITED STATES**

A.   **Foreign Conduct Evidence Is Necessary To Establish Predicate Facts
Underlying AMD's Claim that its Exclusion from Domestic Business
Constitutes Actionable Monopolization of the Relevant Worldwide Market**

Accepting, for purposes of this motion, that Intel's exclusionary conduct directed at foreign sales may not have had a sufficiently direct and substantial effect on AMD's domestic sales to support a foreign recovery, evidence of such conduct is nonetheless discoverable (and admissible) to prove predicate facts necessary to establish AMD's damages claim for lost sales to U.S. customers. Specifically, to prove its claim under Section 2 of the Sherman Act, AMD must show (1) that Intel has market power in the relevant market, and (2) that Intel acquired or maintained its monopoly through anticompetitive means, rather than by means of a superior product, business acumen, or historical accident. Further, because AMD has alleged that Intel monopolized the x86 market through exclusionary conduct, AMD must show (3) that Intel's exclusionary conduct was sufficiently material in relation to the overall relevant market so as to violate U.S. antitrust laws. *See, e.g., United States v. Microsoft,* 253 F.3d 34, 68-71 (D.C. Cir. 2001).

As with any Section 2 claim, AMD must prove each of these elements in the context of the relevant market. In geographic terms, a market is defined as the area within which parties compete for business. *See, e.g., Tampa Elec. Co. v. Nashville Coal Co.,* 365 U.S. 320, 330-33 (1961). Identifying the relevant market is the "first step" in any antitrust action brought under Section 2. *Conwood Co., L.P. v. U.S. Tobacco Co.,* 290 F.3d 768, 782 (6th Cir. 2002). In the present case, the parties have *agreed* that the relevant market is worldwide. *See* Answer of Defendants Intel and Intel Kabushiki Kaisha at ¶ 24. Accordingly, AMD must prove the

12

elements set forth above in relation to the *worldwide* market for x86 microprocessors, even if it only seeks damages for lost sales to U.S. customers (or in the export trade). Because some 70% of that market lies outside U.S. borders, evidence of foreign conduct is not only relevant, but *essential* to proving Intel's liability for harm suffered within the United States.

In grudging recognition of this reality, Intel has agreed in its Amended Responses to Plaintiff's First Requests for the Production of Documents and Things to provide foreign price information "sufficient to establish" Intel's market share in the worldwide x86 market. But foreign marketshare is but a small fraction of what AMD will need to prove its claims. In order to establish Intel's liability under Section 2, AMD must show that Intel maintained its monopoly through anticompetitive conduct, and that its exclusionary conduct was sufficiently material within the overall market to render its U.S. conduct a violation of the Sherman Act. As we demonstrate next, the only way to satisfy these burdens in a relevant market that exists in major measure outside of the U.S. is through evidence of exclusion market-wide — in this case, world-wide. Given Intel's concession that the relevant market *is* worldwide, its refusal to allow foreign misconduct discovery is baseless.

1.    **Evidence of Foreign Exclusionary Conduct Is Relevant To Proving Intel's Market Power in the Relevant Market**

One key element of a Section 2 claim is proof that the defendant has monopoly power in the relevant market, here the worldwide market for x86 microprocessors. As to this element, evidence of Intel's foreign exclusionary conduct is highly relevant. As noted above, Intel has agreed to provide information relevant to showing Intel's market *share* throughout the x86 market, including sales in foreign countries. This is presumably because one common way to demonstrate market power is to establish that a defendant has a large market share, and that there

13

are significant barriers to entry in the relevant market. *See Microsoft*, 253 F.3d at 56-57; ALD (Fifth) at 234.

Evidence of a large market share, however, is only "circumstantial evidence of monopoly power." *Microsoft*, 253 F.3d at 51. Evidence of Intel's actual exclusionary conduct, in contrast, would constitute *direct* evidence of Intel's monopoly power, because monopoly power in a relevant geographic market consists of the power to set prices *or to exclude competition* within that market. *See, e.g.*, ALD (Fifth) at 233. "Direct evidence of the actual exercise of control over prices in the relevant market *and/or the actual exclusion of competition from the relevant market*" can therefore be used to demonstrate market power. *Id.* (emphasis added); *see also United States v. E. I. du Pont de Nemours & Co.*, 351 U.S. 377, 391 (1956) ("Monopoly power" within the meaning of the Sherman Act is the power to control prices or exclude competition); *Bradburn Parent Teacher Store, Inc. v. 3M*, 2005-2 Trade Cas. (CCH) ¶ 74,921 (E.D.Pa. June 9, 2005) (holding that power to exclude necessarily proves power to raise prices).

Because the "relevant market" in this case is worldwide, evidence of Intel's foreign exclusionary conduct constitutes direct evidence of Intel's power to exclude within the relevant market. *See Bradburn Parent Teacher Store, Inc. v. 3M*, 2005-1 Trade Cas. (CCH) ¶ 74,769 (E.D. Pa. Mar. 30, 2005) (holding that jury's finding in *LePage's*, that 3M excluded rivals with exclusive deals, necessarily meant that the jury also found that 3M possessed market power in the relevant market by finding that the defendant had the power to exclude competition); *aff'd on reh'g* 2005-2 Trade Cas. (CCH) ¶ 74,921 (E.D. Pa. 2005). Unless Intel is willing to stipulate that it has monopoly power in the relevant worldwide market, AMD must be entitled to discover and rely on such evidence, as it is directly relevant to an element of AMD's U.S.-related claims.

14

2.    **Evidence of Foreign Exclusionary Conduct Is Essential To Proving that Intel Maintained its Monopoly Through Anticompetitive Means**

To prove a Section 2 violation, a plaintiff must do more than show that the defendant has monopoly power in the relevant market:  possession of monopoly power, alone, does not violate the U.S. antitrust laws. *See, e.g., Microsoft*, 253 F.3d at 51, 58.  Rather, to show unlawful monopolization, a plaintiff must demonstrate that the defendant's monopoly power was obtained or maintained through improper means; specifically, through means other than "a superior product, business acumen, or historical accident." *United States v. Grinnell Corp.*, 384 U.S. 563, 571 (1966).  And again, because a Section 2 claim must be proved relative to the overall relevant market, AMD must make this showing with respect to Intel's monopoly power world-wide.

As a result, all conduct relevant to establishing the improper *manner* in which Intel achieved or maintained its monopoly power in the relevant worldwide market — including its foreign exclusionary conduct — is relevant to establishing a Section 2 violation within the United States.  But this is precisely the kind of evidence Intel has indicated it will not produce.  There is no basis for this refusal.  Unless Intel is willing to stipulate that it has maintained its monopoly in the relevant worldwide market by means other than a superior product, business acumen, or historical accident, AMD must be permitted to discover evidence relevant to proving this element of its Section 2 claim.

3.    **Evidence of Foreign Exclusionary Conduct Is Essential To Proving that Intel's Exclusionary Conduct Within the United States Is Sufficiently Material To Constitute a Section 2 Violation**

In addition — and closely related — evidence of Intel's foreign exclusionary conduct is discoverable because it is directly relevant to proving that Intel's exclusionary conduct within the U.S. is sufficiently material to constitute a violation of the Sherman Act.  AMD has alleged that

15

Intel violated Section 2 by engaging in exclusionary conduct. In order to establish a Section 2 claim based on exclusion, AMD must do more than simply show that Intel engaged in such conduct. Rather, it must show that Intel's exclusion of AMD from U.S. sales aggregated with its exclusion of AMD from the rest of the worldwide market constituted sufficient foreclosure from the overall market to give rise to a violation. *See, e.g., LePage's*, 324 F.3d at 157-59 (aggregating plaintiff's foreclosure from one segment of the transparent tape market by means of exclusive deals with its foreclosure from other segments of that market by means of bundled rebates).[4] "The standard universe in which to examine foreclosure is that in which the defendant's rivals sell . . . . The relevant market for this purpose includes the full range of selling opportunities reasonably open to rivals — namely, all the product and geographical sales they may readily compete for, using easily convertible plants and marketing organizations." IIA Antitrust Law ¶ 570 ; *see also Tampa Elec*, 365 U.S. at 330-33 (holding that the foreclosure of rival coal producers caused by an exclusive contract between a coal company and a utility customer must be analyzed within the context of the entire geographic market in which the rival coal producers operated); *United States v. Dentsply Int'l, Inc.*, 399 F.3d 181, 188-90 (3d Cir. 2005) (holding that the foreclosure resulting from the exclusionary conduct of a manufacturer of

---

[4] "[T]he use of exclusive dealing arrangements that do not foreclose, in the aggregate, any substantial share of the marketing opportunities available to rivals cannot create or maintain the monopolist's position and cannot therefore be considered exclusionary for Sherman Act §2 purposes." IIIA Antitrust Law ¶ 768(e) (2005). While no court has held that Section 2 requires a plaintiff to prove exclusion from a specific percentage of the relevant market, most courts have held that, at least with respect to unlawful exclusive deals, a defendant must exclude rivals in a significant way. *See Microsoft,* 253 F.3d at 68-71. Thus, while no showing of exclusion from a specific share of the overall market is required, the Court must allow AMD to show and aggregate foreign exclusion to prove that Intel excludes rivals from a substantively material part of the relevant market.

artificial teeth must be examined across all segments of the market in which the product was sold).

Put differently, it is not possible to show material exclusion from a worldwide relevant market — particularly one in which 70% of sales occur outside U.S. borders — simply by looking at exclusionary conduct in a small portion of that market. In the board game Monopoly, for instance, one could not show exclusion from the red properties — Illinois, Indiana, and Kentucky Avenues — by showing exclusion from Kentucky Avenue alone. Similarly, AMD's exclusion from one small U.S. OEM might not in isolation prove material market exclusion. But when such exclusion is aggregated with proof of exclusion from Sony, Toshiba, NEC, Fujitsu, Hitachi and Acer, it will demonstrate that Intel foreclosed AMD from a material sales channel market-wide, thereby establishing a violation of Section 2. Evidence of foreign exclusionary conduct is thus central to proof of Intel's violation of Section 2, even if AMD's damages are limited to lost sales to United States customers (and in the export trade). Unless Intel is willing to stipulate that any and all exclusion from a U.S. market opportunity constitutes material exclusion in violation of Section 2, AMD must be permitted to discover evidence relevant to foreign exclusionary conduct.

**B.    THE FTAIA DOES NOT PROHIBIT THE DISCOVERY OR USE OF FOREIGN CONDUCT EVIDENCE NECESSARY TO SHOW AN ACTIONABLE RESTRAINT OF DOMESTIC COMMERCE**

As previously noted, broad discovery is generally permitted in antitrust cases given the difficult and complex burdens an antitrust plaintiff must carry. Nothing in the FTAIA suggests more limited discovery when foreign conduct itself is not actionable but is nonetheless relevant to proving a necessary element of a domestic commerce claim. *See, e.g., In re Plastics Additives*,

17

2004-2 Trade Cas. (CCH) ¶ 74,620 (permitting foreign discovery of conduct that had no effect on the U.S. market, but that instead evidenced intent, motive, and opportunity to commit a U.S antitrust violation).

Similar to the situation here, in *In re Automotive Refinishing Paint*, MDL No. 1426, 2004 U.S. Dist. Lexis 29160, at *6, the defendants objected to requests for the production of foreign documents related to an alleged conspiracy to fix and maintain prices for paint sold in the United States. The defendants argued — like Intel — that the evidence was irrelevant because evidence of foreign price fixing activities did not have a direct, substantial, and reasonably foreseeable effect on the U.S. market. *See id.* at *13-14. Plaintiffs, in contrast, asserted that "because the global nature of the alleged conspiracy renders it impossible to draw a clear line between defendants' foreign and domestic pricing activities," it was entitled to the production of documents regarding defendants' pricing activities outside the United States. *Id.* at *9-10 (internal quotation marks omitted). The court agreed with the plaintiffs, holding that the foreign evidence was relevant as potential evidence of both coordination (conspiracy) and of the "opportunity and ability to implement an illegal conspiracy." *Id.* at *14. Furthermore, the foreign price-fixing activities were found relevant to determining the nature and scope of the alleged international conspiracy because "the character and effect of a conspiracy are not be judged by dismembering it and viewing its separate parts, but only by looking at it as a whole." *Id.* at *14-16 (quoting *Cont'l Ore Co. v. Union Carbide & Carbon Corp*, 370 U.S. 690, 699 (1962)).

Indeed, courts have permitted discovery of foreign evidence even when it was going to be used for *comparative* purposes, rather than as part of the direct proof of a violation. In *Dentsply*, the relevant market consisted only of the United States. 2000-1 Trade Cas. (CCH) ¶ 72,919.

18

The government alleged that the defendant, Dentsply International, a manufacturer of artificial teeth, unlawfully maintained its U.S. monopoly by, among other things, entering into exclusive deals with U.S. distributors.  When the government moved to compel Dentsply to produce documents concerning its foreign sales, Dentsply objected on the grounds that these documents were irrelevant to a U.S. violation, because the case only concerned the U.S. market.  The court disagreed and permitted foreign discovery, reasoning that foreign evidence would permit it to assess the U.S. competitive effects of Dentsply's allegedly unlawful exclusive deals by comparing the U.S. market to other markets where Dentsply did not have the same degree of market power.  *Id.*

AMD presents an even stronger case for international discovery than the government in *Dentsply.*  AMD competes with Intel in a worldwide market, meaning that its discovery request is no larger than the relevant market.  Furthermore, AMD is not seeking to use foreign evidence of exclusion simply to compare it to U.S. exclusion.  Instead, like the plaintiffs in *In re Automotive Refinishing*, AMD intends to offer evidence of foreign exclusion to prove necessary elements of its U.S. claims, such as power in and material foreclosure from the relevant market.  And, like the plaintiffs' case in *In re Automotive Refinishing*, AMD's monopolization claim cannot be dismembered:  AMD must be permitted to put on its full case.  *See also, e.g., In re Plastics Additives*, 2004-2 Trade Cas. (CCH) ¶ 74,620 (evidence submitted to foreign investigatory bodies is relevant and therefore discoverable to prove even a purely U.S. conspiracy); *In re Uranium Antitrust Litigation*, 480 F. Supp. 1138 (N.D. Ill. 1979) (court compelled defendant to produce foreign documents of an international conspiracy to fix prices); *Kellam Energy, Inc. v. Duncan*, 616 F. Supp. 215 (D. Del. 1985) (even though the relevant market was local, evidence of national anticompetitive conduct was discoverable because even

19

evidence outside of the relevant market is often critical to establishing monopolization and conspiracy claims).

## CONCLUSION

For the reasons set forth above, evidence of Intel's foreign exclusionary conduct is directly relevant to proof of AMD's claims for damages based on lost sales to U.S. customers and in the export trade. AMD's motion to compel Intel to produce foreign conduct documents and to strike Intel's FTAIA objections should accordingly be granted.

_/s/ C#3796)_

Jesse A. Finkelstein (#1090)
Frederick L. Cottrell, III (#2555)
Chad M. Shandler (#3796)
Steven J. Fineman (#4025)
Richards, Layton & Finger, P.A.
One Rodney Square
P.O. Box 551
Wilmington, Delaware 19899
(302) 651-7700
Finkelstein@rlf.com
Cottrell@rlf.com
Shandler@rlf.com
Fineman@rlf.com
Attorneys for Plaintiffs Advanced Micro
Devices, Inc. and AMD International Sales &
Service, Ltd.

Of Counsel:
Charles P. Diamond
Linda J. Smith
O'Melveny & Myers, LLP
1999 Avenue of the Stars
7th Floor
Los Angeles, CA 90067-6035
(310) 553-6700

Mark A. Samuels
O'Melveny & Myers, LLP
400 South Hope Street
Los Angeles, 90071
(213) 430-6340

Dated: October 30, 2006

## CERTIFICATION PURSUANT TO
## DISTRICT OF DELAWARE LOCAL RULE 7.1.1

Counsel for Plaintiffs has conferred with counsel for Defendants pursuant to District of Delaware Local Rule 7.1.1 concerning the subject matter of the attached motion and no agreement was reached.

_____

Chad M. Shandler (#3796)

# IN THE UNITED STATES DISTRICT COURT
## DISTRICT OF DELAWARE

### <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on October 30, 2006, I electronically filed the foregoing document

with the Clerk of Court using CM/ECF which will send notification of such filing(s) and have

sent by Hand Delivery to the following:

> Richard L. Horwitz, Esquire
> Potter Anderson & Corroon LLP
> 1313 North Market Street
> P. O. Box 951
> Wilmington, DE   19899

and have sent by Federal Express to the following non-registered participants:

> Darren B. Bernhard, Esquire
> Howrey LLP
> 1299 Pennsylvania Avenue, N.W.
> Washington, DC 20004-2402

> Robert E. Cooper, Esquire
> Daniel S. Floyd, Esquire
> Gibson, Dunn & Crutcher LLP
> 333 South Grand Avenue
> Los Angeles, California 90071-3197

> Steven J. Fineman (#4025)
> Richards, Layton & Finger, P.A.
> One Rodney Square
> P.O. Box 551
> Wilmington, Delaware 19899
> (302) 651-7700
> fineman@rlf.com

RLF1-2898648-1