# EXHIBIT 1

LEXSEE

**IN RE: AUTOMOTIVE REFINISHING PAINT ANTITRUST LITIGATION**

**MDL DOCKET NO. 1426**

**UNITED STATES DISTRICT COURT FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

**2004 U.S. Dist. LEXIS 29160**

**October 29, 2004, Decided**
**October 29, 2004, Filed**

**PRIOR HISTORY:** In re Auto. Refinishing Paint Antitrust Litig., 2003 U.S. Dist. LEXIS 26945 (E.D. Pa., Oct. 14, 2003)

**CASE SUMMARY:**

**PROCEDURAL POSTURE:** Suits were filed that asserted federal antitrust claims against defendants. The suits were consolidated in the court. Defendants filed a motion seeking clarification after the court ordered them to produce, in response to plaintiffs' discovery requests, documents "created" between 1993 and 1996. In their motion, defendants proposed that geographical limitations should be placed on their disclosure obligations under the court's order.

**OVERVIEW:** Plaintiffs alleged that defendants illegally conspired for eight years to fix, raise, maintain, or stabilize prices for automotive refinishing paint in the United States. They filed a production request, seeking disclosure of communications between defendants and their competitors, and documents that defendants had submitted to federal, state, or foreign governmental entities, relating to automotive refinishing paint. Defendants sought clarification as to the geographic scope of discovery, claiming that discovery should be limited to their activity in the United States. The court concluded that the discovery concerning defendants' foreign activities were relevant to plaintiffs' domestic antitrust claims; defendants' foreign activity evidenced the creation and maintenance of a worldwide price-fixing conspiracy in the automotive refinishing market, which conspiracy was carried forward into the United States. Discovery should not be limited under Fed. R. Civ. P.

26(b)(2) because the burden imposed on defendants was not extraordinary; extending the scope of discovery to encompass foreign price-fixing documents would not significantly increase defendants' discovery burden.

**OUTCOME:** The court denied defendants' motion for clarification. Defendants were ordered to produce responsive documents, found in the United States or globally, including those dealing with foreign manufacturing, sale, and/or distribution of automotive refinishing paint.

**CORE TERMS:** discovery, conspiracy, united states, automotive, paint, refinishing, competitor, price-fixing, pricing, clarification, antitrust, domestic, reflecting, relevance, global, Sherman Act, anticompetitive, geographic, governmental entity, worldwide, territories, circumstantial evidence, foreign countries, discovery request, commerce, interrogatory, investigatory, customers, burden of production, documents relating

**LexisNexis(R) Headnotes**

*Civil Procedure > Discovery > Disclosures > Motions to Compel*
*Civil Procedure > Discovery > Motions to Compel*
*Civil Procedure > Discovery > Relevance*
*Civil Procedure > Discovery > Undue Burdens*
*Evidence > Procedural Considerations > Burdens of Proof > Burden Shifting*
[HN1] The scope and conduct of discovery are within the sound discretion of the trial court. Fed. R. Civ. P. 37 authorizes a party who has received evasive or

incomplete answers to discovery authorized by Fed. R. Civ. P. 26(a) to bring a motion to compel disclosure of the materials sought. Fed. R. Civ. P. 37(a)(3). Once a party opposes a discovery request, the party seeking the discovery must demonstrate the relevancy of the information. When this showing of relevancy is made, the burden then shifts back to the party opposing discovery to show why the discovery should not be permitted. A party's statement that the discovery sought is overly broad, burdensome, oppressive, vague or irrelevant is not adequate to voice a successful objection.

***Civil Procedure > Discovery > Relevance***
[HN2] The relevance of the information requested is the touchstone of any discovery request.

***Civil Procedure > Discovery > Disclosures > Mandatory Disclosures***
[HN3] See Fed. R. Civ. P. 26(b)(1).

***Civil Procedure > Discovery > Disclosures > Motions to Compel***
***Civil Procedure > Discovery > Motions to Compel***
***Civil Procedure > Discovery > Relevance***
[HN4] For good cause, a court may order discovery of any matter relevant to the subject matter involved in the action.

***Antitrust & Trade Law > Clayton Act > General Overview***
***Antitrust & Trade Law > Sherman Act > General Overview***
***Civil Procedure > Discovery > Relevance***
***Evidence > Relevance > Circumstantial & Direct Evidence***
[HN5] In antitrust cases, courts often take a liberal view of relevance and permit broad discovery. Discovery in antitrust litigation is most broadly permitted, and the burden or cost of providing the information sought is less weighty a consideration than in other cases. Broad discovery is permitted because direct evidence of an anticompetitive conspiracy is often difficult to obtain, and the existence of a conspiracy frequently can be established only through circumstantial evidence, such as business documents and other records. Because direct evidence, the proverbial "smoking gun," is difficult to come by, plaintiffs have been permitted to rely solely on

circumstantial evidence (and the reasonable inferences that may be drawn therefrom) to prove a conspiracy. Proving a conspiracy is usually difficult and often impossible without resort to discovery procedures. This is particularly true in antitrust actions, where the proof is largely in the hands of the alleged conspirators. Discovery in an antitrust case is necessarily broad because allegations involve improper business conduct. Such conduct is generally covert and must be gleaned from records, conduct, and business relationships.

***Antitrust & Trade Law > Price Fixing & Restraints of Trade > Price Fixing***
[HN6] It is widely understood that trade associations can be used to facilitate the creation and maintenance of price-fixing conspiracies, especially when competitors share pricing or sales data. Cartels use trade associations to oversee price-fixing and other anticompetitive agreements. As a leading antitrust treatise explains, the antitrust concern resulting from trade association provision of price and output information is the facilitation of collusion or less formal coordination of output or price.

***Antitrust & Trade Law > Sherman Act > Claims***
[HN7] A trade association, in and of itself, is a unit of joint action sufficient to constitute a § 1 combination under the Sherman Act. Because trade associations are, by definition, organizations of competitors, they automatically satisfy the combination requirements of § 1 of the Sherman Act.

***Antitrust & Trade Law > Price Fixing & Restraints of Trade > Horizontal Restraints > Price Fixing***
***Civil Procedure > Discovery > Relevance***
[HN8] The opportunity to conspire is relevant circumstantial evidence to support a finding of a price-fixing conspiracy.

***Antitrust & Trade Law > Price Fixing & Restraints of Trade > Horizontal Restraints > Price Fixing***
***Civil Procedure > Discovery > Relevance***
[HN9] The United States District Court for the District of Columbia has granted discovery of documents relating to foreign price-fixing where it was relevant evidence of the creation and maintenance of an international conspiracy that also harmed domestic consumers.

*Antitrust & Trade Law > International Application of U.S. Law > Foreign Commerce*
*Antitrust & Trade Law > International Application of U.S. Law > Foreign Trade Antitrust Improvements Act*
*Civil Procedure > Discovery > Disclosures > Mandatory Disclosures*
*Civil Procedure > Discovery > Relevance*
[HN10] The United States District Court for the Eastern District of Pennsylvania does not agree with the United States Court of Appeals for the Eleventh Circuit's assertion, in Williamson Oil, that evidence of illegal anticompetitive action in foreign countries is a prerequisite for discovery of an alleged conspiracy's foreign activities. The Sherman Act encompasses conduct occurring outside the United States' borders when that conduct has an effect on American commerce, even if the activities are not illegal in the countries where they are committed. Foreign activities can give rise to a Sherman Act claim provided that the conduct both (1) sufficiently affects American commerce, i.e., it has a direct, substantial, and reasonably foreseeable effect on American domestic, import, or (certain) export commerce, and (2) has an effect of a kind that antitrust law considers harmful, i.e., the effect must give rise to a Sherman Act claim. 15 U.S.C.S. § 6a. A conspiracy to monopolize or restrain the domestic or foreign commerce of the United States is not outside the reach of the Sherman Act just because part of the conduct complained of occurs in foreign countries.

*Antitrust & Trade Law > International Application of U.S. Law > Foreign Commerce*
*Antitrust & Trade Law > International Application of U.S. Law > Foreign Trade Antitrust Improvements Act*
*Antitrust & Trade Law > Sherman Act > General Overview*
*Civil Procedure > Discovery > Relevance*
[HN11] Evidence of foreign price-fixing activities is relevant in determining the nature and scope of an alleged international conspiracy. The character and effect of a conspiracy are not to be judged by dismembering it and viewing its separate parts, but only by looking at it as a whole. Where allegations of conspiracy to restrain trade and intent to monopolize are at issue, a broad scope for discovery is appropriate because the conspiracy may involve actors outside of the plaintiff's geographic market and the scheme of monopolization may involve an area larger than the plaintiff's own limited sphere of operations.

*Civil Procedure > Discovery > Relevance*
*Civil Procedure > Discovery > Undue Burdens*
[HN12] Fed. R. Civ. P. 26(b)(2) allows for limiting discovery where the burden of production outweighs the likely benefit or where the discovery sought can be obtained through some less burdensome process. This burden is identified by looking at many of the factors listed in R. 26(b)(2), including relevance, the need for the documents, the breadth of the document request, the time period covered by such request, and the particularity with which the documents are described.

*Antitrust & Trade Law > International Application of U.S. Law > Foreign Commerce*
*Antitrust & Trade Law > International Application of U.S. Law > Foreign Trade Antitrust Improvements Act*
*Antitrust & Trade Law > Sherman Act > General Overview*
*Civil Procedure > Discovery > Relevance*
[HN13] Even in cases that assert antitrust claims based only on harm to domestic consumers, courts have granted extensive discovery involving international or foreign price-fixing activities when they are relevant to the plaintiffs' claims.

**COUNSEL:** [*1] For CONSEIL EUROPEEN DE L'INDUSTRIE DES PEINTURES, DES ENCRES D'IMPRIMERIE ET DES COULEURS D'ART, Respondent: GREGORY L. POE, ROBBINS RUSSELL ENGLERT ORSECK & UNTEREINER LLP, WASHINGTON, DC.

**JUDGES:** R. Barclay Surrick, Judge

**OPINION BY:** R. Barclay Surrick

**OPINION:**

### MEMORANDUM & ORDER

**SURRICK, J.**

Presently before the Court is Defendants' Motion for Clarification of the Court's October 14, 2003, Discovery Order (Doc. No. 113). This Order compelled Defendants to produce discovery for documents "created" between 1993 and 1996. (*Id.* at 1-3.) Because our discussion did not specifically address the geographic scope of Plaintiffs' requests, however, we take this opportunity to explain the scope of the Order, and to deny Defendants'

proposed limitations on discovery. n1

> n1 Defendants' Motion for Clarification was held in abeyance pending final approval of the Plaintiffs' settlement with E.I. DuPont de Nemours and Company, and DuPont Performance Coatings, Inc. (collectively "DuPont"); and BASF Aktiengesellschaft, BASF Coatings AG, and BASF Corporation (collectively "BASF").

[*2]

## DISCUSSION

Plaintiffs' Consolidated and Amended Class Action Complaint alleges that from January 1, 1993, to December 31, 2001, Defendants violated various federal antitrust laws by "conspiring to fix, raise, maintain or stabilize prices for automotive refinishing paint in the United States." (Am. Compl. P1.) In order to prove their allegations, Plaintiffs have requested documents related to Defendants' communications with their competitors, as well as documents produced or submitted to any federal, state, or foreign governmental entity, from 1990 to present. n2 Specifically, Plaintiffs' first set of document requests ask for:

> 4. All documents constituting, reflecting, or referring to any meeting within or outside of the United States at which your company and any competitor were present, which concerned, referred or related to: [pricing, practices, customers, accounts, pricing quotes, territories or markets, and competitive policies].
> 5. To the extent you did not produce such documents pursuant to Request No. 4, all documents constituting, reflecting, or referring to any communication within or outside the United States, whether oral or written, between your [*3] company and any competitor concerning, referring or relating to: [pricing, practices, customers, accounts, pricing quotes, territories or markets, and competitive policies].
> 6. All documents referring or relating to any actions taken by you or your

> competitors to ensure or maintain the confidentiality of any meetings, communications or agreements between you and any competitor relating to automotive refinishing paint, including without limitation, prices, pricing, discounts, lost business, customers, territories, allocation of business, terms and conditions of sale, or discontinuation of any class, type or category of product.
>
> . . . .
>
> 9. All documents which you submitted to the United States Department of Justice, the Federal Trade Commission, any Congressional Committee or other domestic or foreign governmental entity or investigatory body relating to the production, pricing, marketing, sale, or distribution of automotive refinishing paint . . . .
> 10. All civil investigative demands, subpoenas and requests for documents you have received from any federal, state or foreign governmental entity or investigatory body, referring or relating to the production, pricing, marketing, [*4] sale or distribution of automotive refinishing paint, and all correspondence with said entities discussing, reflecting or referring to any limitations placed upon the scope of your responses to such demands, subpoenas or requests.
>
> . . . .
>
> 18. All documents reflecting, referring or pertaining to territories or markets for sales or potential sales of automotive refinishing paint sold in the United States.
>
> . . . .
>
> 31. All documents, including invoices and bills of lading, reflecting, referring, or relating to sales or potential sales of automotive refinishing paint, or any component thereof, from any of your competitors.
> 32. All documents, including invoices and bills of lading, reflecting, referring, or relating to purchases or potential

purchases of automotive refinishing paint, or any component thereof, from any of your competitors

(Pls.' First Set Reqs. for Produc. of Docs. at 6-10, 12, 16.) In addition, two of Plaintiffs' interrogatories seek similar information:

6. Identify any meeting within or outside the United States between any officer, director, employee or agent of your company and any officer, director, employee or agent of any competitor during which [*5] there was any discussion or communication which reflected, referred to or related to any actual, proposed or prospective prices, price announcements, "minimum" prices, price lists, price changes or suggested prices of automotive refinishing paint.

7. To the extent such information was not provided in your response to interrogatory No. 6, identify any communication within or outside the United States, whether written or oral, between any officers, director, employee or agent of your company and any officer, director, employee or agent of any competitor reflecting, referring or relating to any actual, proposed or prospective prices, price announcements, "minimum" prices, price lists, price changes or suggested prices of automotive refinishing paint.

(Pls.' First Set of Interrogs. at 11-12.)

n2 We do not discuss the relevant time frame for production of documents as our prior Order was clear on that point.

Defendants do not object to "producing documents regarding the sale and distribution of automotive [*6] refinish paint in the United States," regardless of their location. (Defs.' Mem. Law in Support of Mot. for Clarification at 1.) However, Defendants seek clarification of our Order regarding the geographic scope of discovery, "given that [Plaintiffs'] far-flung, global requests cover a multitude of transactions having nothing

to do with paint sold in the United States." (*Id.* at 3.)

"It is well-established that [HN1] the scope and conduct of discovery are within the sound discretion of the trial court." *Gaul v. Zep Mfg. Co.*, No. 03-2439, 2004 U.S. Dist. LEXIS 1990, at *2-3 (E.D. Pa. Feb. 5, 2004) (quoting *Marroquin-Manriquez v. Immigration and Naturalization Serv.*, 699 F.2d 129, 134 (3d Cir. 1983)). "Federal Rule of Civil Procedure 37 authorizes a party who has received evasive or incomplete answers to discovery authorized by . . . Rule 26(a) to bring a motion to compel disclosure of the materials sought." *Northern v. City of Phila. Fire Dep't*, No. 98-6517, 2000 U.S. Dist. LEXIS 4278, at *3 (E.D. Pa. Apr. 4, 2000) (discussing Fed. R. Civ. P. 37(a)(3)). [*7] Once a party opposes a discovery request, the party seeking the discovery must demonstrate the relevancy of the information. 2000 U.S. Dist. LEXIS 4278 at *5. "When this showing of relevancy is made, the burden then shifts back to the party opposing discovery to show why the discovery should not be permitted." *Id.* A party's statement "that the discovery sought is overly broad, burdensome, oppressive, vague or irrelevant is 'not adequate to voice a successful objection.'" *Id.* (quoting *Josephs v. Harris Corp.*, 677 F.2d 985, 992 (3d Cir. 1982)).

**A. Relevance**

In our prior Order, we noted that [HN2] the "relevance" of the information requested is the "touchstone" of any discovery request. *EEOC v. Univ. of Pa.*, 850 F.2d 969, 979 (3d Cir. 1988), *aff'd*, 493 U.S. 182, 110 S. Ct. 577, 107 L. Ed. 2d 571 (1990); *see also* Fed. R. Civ. P. 26(b)(1) [HN3] ("Parties may obtain discovery regarding any matter, not privileged, that is relevant to the claim or defense of any party . . ."); *id.* [HN4] ("For good cause, the court may order discovery of any matter relevant to the subject matter involved in the action."). [HN5] In antitrust cases, courts often take a liberal [*8] view of relevance and permit broad discovery. *See, e.g., New Park Entm't, LLC v. Elec. Factory Concerts, Inc.*, 2000 U.S. Dist. LEXIS 531, No. 98-775, 2000 WL 62315, at *3 (E.D. Pa. Jan. 13, 2000) ("'Discovery in antitrust litigation is most broadly permitted and the burden or cost of providing the information sought is less weighty a consideration than in other cases.'" (quoting *United States v. Int'l Bus. Machs. Corp.*, 66 F.R.D. 186, 189 (S.D.N.Y. 1974))); *see also In re Microcrystalline Cellulose Antitrust Litig.*, 221 F.R.D. 428, 429-30 (E.D. Pa. 2004); *Callahan v. A.E.V. Inc.*, 947

F. Supp. 175, 179 (W.D. Pa. 1996). Broad discovery is permitted because direct evidence of an anticompetitive conspiracy is often difficult to obtain, and the existence of a conspiracy frequently can be established only through circumstantial evidence, such as business documents and other records. *See InterVest, Inc. v. Bloomberg, L.P., 340 F.3d 144, 159 (3d Cir. 2003)* ("Because direct evidence, the proverbial 'smoking gun,' is difficult to come by, 'plaintiffs have been permitted to rely solely on circumstantial evidence (and the reasonable inferences [*9] that may be drawn therefrom) to prove a conspiracy'" (quoting *Rossi v. Standard Roofing, Inc., 156 F.3d 452, 465 (3d Cir. 1998)*)). As the Third Circuit has noted, "proving a conspiracy is usually difficult and often impossible without resort to discovery procedures. This is particularly true in antitrust actions, where 'the proof is largely in the hands of the alleged conspirators'" *Mary Ann Pensiero, Inc. v. Lingle, 847 F.2d 90, 95 (3d Cir. 1988)* (quoting *Poller v. Columbia Broad. Sys. Inc., 368 U.S. 464, 473, 82 S. Ct. 486, 7 L. Ed. 2d 458 (1962)*); *see also Callahan, 947 F. Supp. at 179* ("Discovery in an antitrust case is necessarily broad because allegations involve improper business conduct. Such conduct is generally covert and must be gleaned from records, conduct, and business relationships.")

Here, Plaintiffs assert that they are entitled to seek discovery of Defendants' alleged foreign price-fixing activities because the "global nature" of the alleged conspiracy "renders it impossible to draw a clear line" "between defendants' 'foreign' and 'domestic' pricing activities." (Pls.' Mem. Law. Opp'n to Defs.' Mot. for Clarification at 1.) [*10] Documents regarding Defendants' pricing activities outside the United States, Plaintiffs assert, are relevant because they can help establish the existence of a conspiracy to set prices for the global market of automotive refinishing paint, and that in this conspiracy, Defendants' foreign pricing activities were "taken with an eye toward influencing domestic prices." (Id. at 5-7.) In support of this claim, Plaintiffs point to documents produced by Defendant Sherwin-Williams to a federal grand jury. These documents reveal that representatives or affiliates of all five original Defendants in this action were members of the European Council of the Paint, Printing Ink and Artists' Colours Industry, commonly referred to as "CEPE." (Id. at 5-7, Exs. A-C.) These CEPE members participated in the creation of a subgroup called "Worldwide P-O.G." (shorthand for Worldwide Product-Oriented Group). The worldwide P-O.G. was

concerned with the "global market" for the automotive refinishing business, "not only Europe but also the USA, Eastern Europe, Far East, etc." (Id. at 6-7, Exs. A.) Meeting notes from Worldwide P-O.G. reveal discussions among the member companies, including Defendants, [*11] about worldwide market volume of automotive refinishing paint and the entrance of new competitors. (Id. Ex. B.)

[HN6] It is widely understood that trade associations can be used to facilitate the creation and maintenance of price-fixing conspiracies, especially when competitors share pricing or sales data. *See, e.g., Nat'l Soc'y of Prof'l Eng'rs v. United States, 435 U.S. 679, 681-82, 98 S. Ct. 1355, 55 L. Ed. 2d 637 (1978)* (holding that an engineering trade association violated the antitrust laws because its members were prohibited from engaging in price-based competition); *United States v. Andreas, 216 F.3d 645, 657 (7th Cir. 2000)* (finding that "a trade association was formed to help cover up" the actions of a worldwide citric-acid cartel). *See generally* Christopher R. Leslie, *Trust, Distrust, and Antitrust, 82 Tex. L. Rev. 515 (2004)* (explaining how cartels use trade associations to oversee price-fixing and other anticompetitive agreements). As a leading antitrust treatise explains, "the antitrust concern resulting from trade association provision of price and output information is [the] facilitation of collusion or less formal coordination of output or price. [*12] " 13 Phillip Areeda & Herbert Hovenkamp, Antitrust Law P2112 (2d ed. 2000). Evidence of cooperation between Defendants in foreign price-fixing, through a trade association or otherwise, would certainly be relevant to establish the existence of an illegal combination or conspiracy in restraint of trade, which is a required element of a *§ 1 Sherman Act* claim. *See Alvord-Polk, Inc. v. F. Schumacher & Co., 37 F.3d 996, 1009 n.11 (3d Cir. 1994)* (stating that [HN7] "a trade association, in and of itself, is a unit of joint action sufficient to constitute a *section 1* combination" under the Sherman Act); *see also* Stephanie W. Kanwit, FTC Enforcement Efforts Involving Trade and Professional Associations, 46 Antitrust L.J. 640, 640 (1977) ("Because trade associations are, by definition, organizations of competitors, they automatically satisfy the combination requirements of *§ 1 of the Sherman Act*."). [HN8] Evidence of foreign price-fixing among Defendants would also be material to prove that they had the opportunity and ability to engage in domestic price-fixing for automotive refinishing paint. *See Weit v. Cont'l Ill. Nat'l Bank & Trust Co., 641 F.2d 457, 462 (7th Cir.*

1980) [*13] (concluding that "opportunity to conspire" is relevant "circumstantial evidence ... to support a finding of a price-fixing conspiracy" (citing *Interstate Circuit v. United States*, 306 U.S. 208, 59 S. Ct. 467, 83 L. Ed. 610 (1937))); *In re Vitamins Antitrust Litig.*, 2001 U.S. Dist. LEXIS 8904, No. 99-197, 2001 WL 1049433, at *11, *13 (D.D.C. June 20, 2001) [HN9] (granting discovery of documents relating to foreign price-fixing because it was relevant evidence of the creation and maintenance of an international conspiracy that also harmed domestic consumers).

Defendants cite the Eleventh Circuit's decision in *Williamson Oil Co., Inc. v. Philip Morris USA*, 346 F.3d 1287 (11th Cir. 2003) in support of their position. In *Williamson Oil*, the court concluded that "in the absence of some palpable tie between" evidence of illegal anticompetitive activity in other countries and "appellees' pricing actions in the United States, the foreign undertakings ... do not tend to exclude the possibility of independent action in the setting of domestic cigarette prices." *Id.* at 1317. Based on this reasoning, Defendants suggest that we should not permit broad geographic discovery because Plaintiffs [*14] have not shown the necessary nexus. We disagree.

First, Plaintiffs have demonstrated the relevance of international communications concerning other markets. As described above, Plaintiffs point to evidence of communications between Defendants regarding sales volume and other market information through the aegis of a trade association, which is relevant both as potential evidence of coordination among the Defendants and as opportunity and ability to implement an illegal conspiracy. Second, *Williamson Oil* is distinguishable. In *Williamson Oil*, the plaintiffs "baldly contended" that defendants had engaged in illegal or anticompetitive conduct in foreign markets, but could point to no evidence to support their allegations. *Id.* at 1316-17. Here, however, Plaintiffs cite "ongoing [antitrust] investigations in Canada and the European Union" regarding Defendants' activities in the global automotive refinishing market (Am. Compl. P49) as evidence of the creation and maintenance of a worldwide price-fixing conspiracy. (Pls.' Mem. Law. Opp'n to Defs.' Mot. for Clarification at 5.)

Finally, [HN10] we do not agree with *Williamson Oil's* assertion that evidence of illegal [*15] anticompetitive action in foreign countries is a prerequisite for discovery of an alleged conspiracy's foreign activities. The Sherman Act encompasses conduct occurring outside our borders when that conduct has an effect on American commerce, even if the activities are not illegal in the countries where they are committed. *F. Hoffman-La Roche Ltd. v. Empagran S.A.*, 542 U.S. 155, 124 S. Ct. 2359, 2365, 159 L. Ed. 2d 226 (2004) (stating that foreign activities can give rise to a Sherman Act claim "provided that the conduct both (1) sufficiently affects American commerce, i.e., it has a 'direct, substantial, and reasonably foreseeable effect' on American domestic, import, or (certain) export commerce, and (2) has an effect of a kind that antitrust law considers harmful, i.e., the 'effect' must 'give rise to a [Sherman Act] claim.'" (quoting 15 U.S.C. § 6a (2000) (emphases omitted)); *Cont'l Ore Co. v. Union Carbide & Carbon Corp.*, 370 U.S. 690, 704, 82 S. Ct. 1404, 8 L. Ed. 2d 777 (1962) ("A conspiracy to monopolize or restrain the domestic or foreign commerce of the United States is not outside the reach of the Sherman Act just because part of the conduct complained of occurs in foreign countries. [*16] "). In addition, [HN11] evidence of foreign price-fixing activities is relevant in determining the nature and scope of an alleged international conspiracy. As the Supreme Court has noted, "'the character and effect of a conspiracy are not to be judged by dismembering it and viewing its separate parts, but only by looking at it as a whole.'" *Cont'l Ore Co.*, 370 U.S. at 699 (quoting *United States v. Patten*, 226 U.S. 525, 544, 33 S. Ct. 141, 57 L. Ed. 333 (1913)); *see also Kellam Energy, Inc. v. Duncan*, 616 F. Supp. 215, 219 (D. Del. 1985) ("Where allegations of conspiracy to restrain trade and intent to monopolize are at issue, as in the instant case, a broad scope for discovery is appropriate, because the conspiracy may involve actors outside of the plaintiff's geographic market and the scheme of monopolization may involve an area larger than the plaintiff's own limited sphere of operations."). Consequently, we conclude that Plaintiffs' discovery requests with respect to Defendants' manufacture, sale, and/or distribution of automotive refinishing paint in foreign countries are relevant to their domestic antitrust claims.

**B. Burden**

[HN12] Federal Rule of Civil Procedure 26(b)(2) [*17] allows for limiting discovery where the burden of production outweighs the likely benefit, or where the discovery sought can be obtained through some less

burdensome process. This burden is identified by looking at many of the factors listed in Rule 26(b)(2), including "relevance, the need for the documents, the breadth of the document request, the time period covered by such request, [and] the particularity with which the documents are described." _Wyoming v. U.S. Dep't of Agric._, 208 F.R.D. 449, 452-53 (D.D.C. 2002).

Defendants object to the production of documents relating to their foreign activities, arguing that Plaintiffs request "would necessarily require a lengthy and expensive period of search," imposing an "extraordinary" burden on Defendants. (Defs.' Mem. Law in Support of Mot. for Clarification at 3, 5.) Although we recognize that Defendants have provided approximately 700,000 documents that were previously produced to the federal grand jury (Defs.' Reply Mem. in Support of Mot. for Clarification at 4), the scope of Plaintiffs' discovery request here is consistent with other antitrust litigation involving potential conspiracies of nationwide or global [*18] reach. _See, e.g.,_ _In re Fine Paper Antitrust Litig.,_ 685 F.2d 810, 818 (3d Cir. 1982) (finding no abuse of discretion where trial court permitted production of nearly two million documents in a complex, nationwide antitrust claim); _Int'l Bus. Machs. Corp. v. United States,_ 480 F.2d 293, 295 (2d Cir. 1973) (stating that defendant produced approximately seventeen million documents in discovery for a government antitrust case and a private multidistrict litigation action); _In re Lease Oil Antitrust Litig.,_ 186 F.R.D. 403, 429 (S.D. Tex. 1999) (noting that defendants produced millions of pages of documents in antitrust action over royalty payments by various oil companies); _In re Brand Name Prescription Drugs Antitrust Litig.,_ No. 94-897, MDL 997, 1996 U.S. Dist. LEXIS 1908, at *13 (N.D. Ill. Feb. 20, 1996) (stating that tens of millions of documents had been produced in action regarding alleged antitrust and price discrimination violations in the brand name prescription drug industry). [HN13] Even in cases like this one, that assert claims based only on harm to domestic consumers, courts have granted extensive discovery involving [*19] international or foreign price-fixing activities where they are relevant to the plaintiffs' claims. _See In re Vitamins Antitrust Litig.,_ 2001 U.S. Dist. LEXIS 8904, 2001 WL 1049433, at *11-13; n3 _Laker Airways Ltd. v. Pan Am. World Airways,_ 103 F.R.D. 42, 47, 49-50 (D.D.C. 1984); _In re Uranium Antitrust Litig.,_ 480 F. Supp. 1138, 1154-56 (N.D. Ill. 1979).

n3 Defendants suggest that _In re Vitamins_ is inapplicable because that case dealt with an alleged global conspiracy to control the market. Despite the fact that a global conspiracy was alleged, the court in that case limited Plaintiffs claims to those injuries "with a sufficient United States nexus," making that case quite analogous to the instant matter. _In re Vitamins Antitrust Litig.,_ 2001 U.S. Dist. LEXIS 8904, 2001 WL 1049433, at *11.

Moreover, we are not convinced that extending the scope of discovery to encompass foreign price-fixing documents will significantly increase Defendants' burden. Defendants have already agreed to produce all [*20] documents and information, regardless of their location, that relate to the United States, any other geographic region as a whole that includes the United States, and the world as a whole. (Defs. Mem. Law in Support of Mot. for Clarification at 6-7.) Under this proposal, Defendants will be required to search through all documents relating to automotive refinishing paint, no matter where they are located, and determine whether they relate in some way to the United States. Broadening the scope of discovery to include foreign activities will likely require Defendants to search through the same sets of documents, and will not obligate them to conduct a separate "filtering" process to separate out only those documents that relate to the United States. Additionally, a number of Plaintiffs' requests deal with documents previously produced to a federal, state, or foreign governmental entity or investigatory body, and reproduction of those documents to Plaintiffs should not cause an unnecessary burden or hardship on Defendants.

Because we conclude that the relevance of the materials requested, which all pertain to exchanges of information with a competitor or an investigation by a foreign [*21] or domestic body, significantly outweigh the burden of production to Defendants, we will deny Defendants' Motion for Clarification.

An appropriate Order follows.

**ORDER**

AND NOW, this 29th day of October, 2004, upon consideration of Defendants' Motion for Clarification of the Court's October 14, 2003, Discovery Order (Docket

2004 U.S. Dist. LEXIS 29160, *21

No. 113), all documents in support thereof, and in opposition thereto, it is ORDERED as follows:

1. Defendants' motion is DENIED.

2. Defendants shall produce all responsive documents, found in the United States or globally, in response to Plaintiffs' Document Requests and Interrogatories including those dealing with foreign manufacturing, sale, and/or distribution of automotive refinishing paint.

IT IS SO ORDERED

   BY THE COURT:

   R. Barclay Surrick, Judge

# EXHIBIT 2

LEXSEE

**BRADBURN PARENT TEACHER STORE, INC., On Behalf of Itself and Others
Similarly Situated v. 3M (MINNESOTA MINING AND MANUFACTURING
COMPANY)**

CIVIL ACTION NO. 02-7676

UNITED STATES DISTRICT COURT FOR THE EASTERN DISTRICT OF
PENNSYLVANIA

2005 U.S. Dist. LEXIS 5315; 2005-1 Trade Cas. (CCH) P74,769

**March 30, 2005, Decided**

**SUBSEQUENT HISTORY:** Amended by, On
reconsideration by Bradburn Parent Teacher Store, Inc. v.
3M, 2005 U.S. Dist. LEXIS 11375 (E.D. Pa., June 9,
2005)

**PRIOR HISTORY:** Bradburn Parent/Teacher Store, Inc.
v. 3M, 2004 U.S. Dist. LEXIS 25246 (E.D. Pa., Dec. 10,
2004)
Le Page's Inc. v. 3M, 2000 U.S. Dist. LEXIS 3087 (E.D.
Pa., Mar. 14, 2000)

**DISPOSITION:** Plaintiff's Motion for Partial Summary
Judgment was deied.

**CASE SUMMARY:**

**PROCEDURAL POSTURE:** Plaintiff purchaser
brought a class action suit against defendant, a supplier of
transparent tape, alleging monopolization in violation of
15 U.S.C.S. § 2 of the Sherman Act. The purchaser
moved for partial summary judgment under Fed. R. Civ.
P. 56(c) as to liability or, alternatively, to find that certain
facts were established pursuant to Rule 56(d).

**OVERVIEW:** The purchaser claimed that the supplier
maintained monopoly power in the transparent tape
market through bundled rebate programs and exclusive
dealing arrangements. The purchaser argued that a
previous suit between the supplier and a competitor had
established the supplier's liability. The court found that
partial summary judgment could not be granted because
fact issues remained as to whether the purchaser had
sustained antitrust injury. However, the prior litigation

established certain factual determinations through the
operation of collateral estoppel. The relevant product
market was actually litigated in the prior case even
though the jury's finding was based in part on a
stipulation. The jury necessarily found that the supplier
had the power to exclude competition and control prices;
however, specified alleged predatory or exclusionary
practices were not essential to the prior judgment and
therefore were not established. Use of offensive collateral
estoppel was not unfair; the purchaser could not have
easily intervened in the prior suit, and the fact that the
prior suit was brought by a competitor rather than a buyer
did not present an undue danger of distorting the issues.

**OUTCOME:** The purchaser's motion for partial
summary judgment was denied. The court found that
factual determinations were established concerning the
relevant market, that the supplier possessed and willfully
maintained monopoly power, and that the supplier's
predatory or exclusionary conduct harmed competition.

**CORE TERMS:** collateral estoppel, exclusionary,
predatory, monopoly power, antitrust, application of
collateral estoppel, relevant market, tape, time period,
offensive, summary judgment, customers, issue
preclusion, competitor, actually litigated, transparent,
rebate, power to exclude, partial, power to control,
estoppel, anti-competitive, joined, invisible, causation,
harmed, substantial controversy, earlier action, prior
judgment, consumer

**LexisNexis(R) Headnotes**

2005 U.S. Dist. LEXIS 5315, *; 2005-1 Trade Cas. (CCH) P74,769

*Civil Procedure > Pleading & Practice > Pleadings > General Overview*
*Civil Procedure > Summary Judgment > Standards > Legal Entitlement*
*Civil Procedure > Summary Judgment > Standards > Materiality*
[HN1] Summary judgment should be granted if the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c). An issue is "genuine" if the evidence is such that a reasonable juror could to return a verdict for the non-moving party. A dispute is "material" if the facts in question might affect the outcome of the case under governing law. When considering a motion for summary judgment, a court must accept as true the evidence presented by the non-moving party and draw all justifiable inferences its favor.

*Civil Procedure > Summary Judgment > Burdens of Production & Proof > General Overview*
*Civil Procedure > Summary Judgment > Supporting Materials > Affidavits*
*Evidence > Procedural Considerations > Burdens of Proof > Allocation*
[HN2] The party seeking summary judgment bears the initial burden of showing a basis for its motion and identifying those portions of the record that it believes demonstrate the absence of a genuine issue of material fact. Where the non-moving party bears the burden of proof on a particular issue at trial, the moving party can meet its burden simply by "showing"--that is, pointing out to the district court--that there is an absence of evidence to support the non-moving party's case. Once the moving party has met its initial burden, the adverse party's response, by affidavits or otherwise as provided in this rule, must set forth specific facts showing that there is a genuine issue for trial. Fed. R. Civ. P. 56(e). Summary judgment should be granted if the non-moving party fails to make a factual showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial.

*Civil Procedure > Summary Judgment > Partial Summary Judgments*
[HN3] See Fed. R. Civ. P. 56(c).

*Antitrust & Trade Law > Monopolization > Actual Monopolization > General Overview*
*Antitrust & Trade Law > Monopolization > Attempts to Monopolize > General Overview*
*Antitrust & Trade Law > Monopolization > Conspiracy to Monopolize > General Overview*
[HN4] See 15 U.S.C.S. § 2.

*Antitrust & Trade Law > Monopolization > Actual Monopolization > Monopoly Power*
*Antitrust & Trade Law > Private Actions > Injuries & Remedies > General Overview*
*Antitrust & Trade Law > Sherman Act > Claims*
[HN5] A violation of 15 U.S.C.S. § 2 consists of two elements: (1) possession of monopoly power and (2) maintenance of that power as distinguished from growth or development as a consequence of a superior product, business acumen, or historic accident. The plaintiff must also allege that it suffered antitrust injury as the result of the defendant's unlawful acts. Accordingly, in order to have a claim for relief, a plaintiff must establish not only antitrust law violation by the defendant but that he has been injured thereby. Proof of antitrust law violation alone is not enough. Proof of damage or injury to the plaintiff resulting therefrom is of the essence of the claim.

*Antitrust & Trade Law > Monopolization > Actual Monopolization > General Overview*
*Antitrust & Trade Law > Private Actions > Injuries & Remedies > General Overview*
*Civil Procedure > Summary Judgment > Partial Summary Judgments*
[HN6] As proof of antitrust injury is necessary to establish liability under 15 U.S.C.S. § 2 of the Sherman Act, a plaintiff is not entitled to partial summary judgment on the issue of liability unless it has established that there is no genuine issue as to the fact that it was injured as a result of the defendant's antitrust violations.

*Civil Procedure > Summary Judgment > Partial Summary Judgments*
*Civil Procedure > Summary Judgment > Standards > Genuine Disputes*
[HN7] If there is no liability without damage and damages are in dispute, summary judgment should not be granted pursuant to Fed. R. Civ. P. 56(c).

*Civil Procedure > Summary Judgment > Partial Summary Judgments*
*Civil Procedure > Summary Judgment > Time Limitations*
[HN8] The Federal Rules of Civil Procedure do not provide for partial summary judgment of a portion of a single claim.

*Civil Procedure > Summary Judgment > Partial Summary Judgments*
[HN9] See Fed. R. Civ. P. 56(d).

*Civil Procedure > Summary Judgment > Motions for Summary Judgment > General Overview*
*Civil Procedure > Summary Judgment > Partial Summary Judgments*
*Governments > Courts > Authority to Adjudicate*
[HN10] Fed. R. Civ. P. 56(d) empowers the court to withdraw some issues from the case and to specify those facts that really cannot be controverted. Indeed, Rule 56(d) imposes a duty on a court that does not fully adjudicate a case on a motion for summary judgment to make an order formulating the issues for trial, to the extent practicable. When issuing an order pursuant to Rule 56(d), the rule permits the court to retain full power to make one complete adjudication on all aspects of the case when the proper time arrives.

*Civil Procedure > Federal & State Interrelationships > Federal Common Law > General Overview*
*Civil Procedure > Judgments > Preclusion & Effect of Judgments > Estoppel > Collateral Estoppel*
[HN11] Courts apply federal common law principles of issue preclusion when determining the preclusive effect of a prior federal action. Under the doctrine of issue preclusion, once an issue is actually and necessarily determined by a court of competent jurisdiction, that determination is conclusive in subsequent suits based on a different cause of action involving a party to the prior litigation. The doctrine of issue preclusion is derived from the simple principle that later courts should honor the first actual decision of a matter that has been actually litigated. Collateral estoppel has the dual purpose of protecting litigants from the burden of relitigating an identical issue with the same party or his privy and of promoting judicial economy by preventing needless litigation.

*Civil Procedure > Judgments > Preclusion & Effect of Judgments > Estoppel > Collateral Estoppel*
[HN12] It is well-settled that a litigant who was not a party to a prior judgment may nevertheless use that judgment "offensively" to prevent a defendant from relitigating issues resolved in the earlier proceeding. This form of issue preclusion is also known as offensive non-mutual collateral estoppel.

*Civil Procedure > Judicial Officers > Judges > Discretion*
*Civil Procedure > Judgments > Preclusion & Effect of Judgments > Estoppel > Collateral Estoppel*
[HN13] A party seeking estoppel must show that the following four elements are satisfied: (1) the issue sought to be precluded is the same as that involved in the prior action; (2) that issue was actually litigated; (3) that issue was determined by a final and valid judgment; and (4) the determination was essential to the prior judgment. In addition, the application of offensive non-mutual collateral estoppel is subject to an overriding fairness determination by the trial judge. The trial court has broad discretion to determine when collateral estoppel should be applied.

*Civil Procedure > Judgments > Preclusion & Effect of Judgments > Estoppel > Collateral Estoppel*
[HN14] The first element that must be satisfied for the application of collateral estoppel is that the issue sought to be precluded is the same as that involved in the previous action. Identity of the issues is established by showing that the same general rules govern both cases and that the facts of both cases are indistinguishable as measured by those rules. To defeat a finding of legal identity for purposes of issue preclusion, the difference in the applicable legal standards must be "substantial." A finding of factual identity, on the other hand, is defeated if the party seeking collateral estoppel would have to introduce different evidence to prove the issue in the later litigation than was required in the prior action.

*Civil Procedure > Judgments > Preclusion & Effect of Judgments > Estoppel > Collateral Estoppel*
[HN15] It is axiomatic that collateral estoppel cannot apply to a jury's factual determinations in a prior case for a time period that was not at issue in that trial. A jury's findings necessarily are based upon the evidence adduced at trial, from which they cannot be severed without

mutilating their significance. At the same time, however, the issues litigated in the prior suit are not factually different from the issues in later litigation merely because the damages period in the later suit extends beyond the period which the jury considered in prior suit.

*Antitrust & Trade Law > Market Definition > General Overview*
[HN16] In antitrust actions, the relevant market is comprised of both a geographic and a product market.

*Antitrust & Trade Law > Market Definition > General Overview*
*Civil Procedure > Discovery > Methods > Stipulations*
*Civil Procedure > Judgments > Preclusion & Effect of Judgments > Estoppel > Collateral Estoppel*
[HN17] Collateral estoppel applies only as to those matters in issue or points controverted. The inquiry must always be as to the point or question actually litigated. Generally speaking, when a particular fact is established not by judicial resolution but by stipulation of the parties, that fact has not been "actually litigated" and thus is not a proper candidate for issue preclusion. This principle extends to stipulations regarding the product market in antitrust matters. Collateral estoppel is not appropriate where the product market has been stipulated to in the previous case.

*Civil Procedure > Discovery > Methods > Stipulations*
*Civil Procedure > Judgments > Preclusion & Effect of Judgments > Estoppel > Collateral Estoppel*
[HN18] Notwithstanding the general rule that collateral estoppel should not be applied to stipulated facts, courts have held that factual determinations made by judge or jury in a case that is actually litigated are not deprived of collateral estoppel effect merely because the determinations rest in part on admissions or stipulations

*Civil Procedure > Discovery > Methods > Stipulations*
*Civil Procedure > Judgments > Preclusion & Effect of Judgments > Estoppel > Collateral Estoppel*
*Criminal Law & Procedure > Trials > Examination of Witnesses > General Overview*
[HN19] Courts have applied collateral estoppel to issues determined in previous proceedings where the fact finder's determination of those issues was partially based upon facts stipulated by the parties.

*Civil Procedure > Discovery > Methods > Stipulations*
*Civil Procedure > Discovery > Misconduct*
*Civil Procedure > Judgments > Preclusion & Effect of Judgments > Estoppel > Collateral Estoppel*
[HN20] The decisive reasons for giving stipulations collateral estoppel effect are that a lawyer's recognition that the evidence is so stacked against him on some point that a failure to admit it will open him to sanctions under Fed. R. Civ. P. 37(c) is as good an indication of where the truth probably lies as a determination by a judge or a jury. Thus, the application of collateral estoppel to factual determinations based in part on stipulations is appropriate where the decision to agree to certain facts was a decision made by the defendant as part of its litigation strategy in the prior litigation. Moreover, where one party introduces evidence on a dispositive issue of fact, and an adverse party with opportunity and motive to contest the presentation chooses not to, the ensuing finding is entitled to the same respect as one litigated to the hilt.

*Civil Procedure > Judgments > Preclusion & Effect of Judgments > Estoppel > Collateral Estoppel*
[HN21] The third element that must be satisfied for the application of collateral estoppel is that the issue sought to be precluded was determined by a final and valid judgment in the previous action. Finality in this context means little more than that the litigation of a particular issue has reached such a stage that a court sees no really good reason for permitting it to be litigated again.

*Civil Procedure > Judgments > Preclusion & Effect of Judgments > Estoppel > Collateral Estoppel*
[HN22] The fourth element that must be satisfied for the application of collateral estoppel is that the issue sought to be precluded was essential to the judgment in the previous action. Under the generally accepted meaning of the term, a fact may be deemed essential to a judgment where, without that fact, the judgment would lack factual support sufficient to sustain it. Courts inquire into whether the issue was critical to the judgment or merely dicta when determining whether the issue sought to be precluded was essential to the prior judgment.

*Antitrust & Trade Law > Monopolization > Actual Monopolization > General Overview*
[HN23] It is apparent that the ability to exclude competition necessarily results in the ability to control prices. Once a monopolist achieves its goal by excluding

potential competitors, it can then increase the price of its product to the point at which it will maximize its profit. Indeed, the more competition a company faces, the less it can control prices because competitors will undercut its prices to secure market share. Conversely, a company that can exclude competition can sustain its ability to control prices. The power to control prices, by contrast, does not necessarily include the power to exclude competition. It is conceivable that if a company has obtained control over prices it still may not have the power to exclude other competitors from the market.

**Civil Procedure > Judgments > Preclusion & Effect of Judgments > Estoppel > Collateral Estoppel**
[HN24] To determine whether collateral estoppel can be applied offensively in an action, the court must engage in an overriding fairness inquiry. District courts have broad discretion to determine when a plaintiff who has met the requisites for the application of collateral estoppel may employ that doctrine offensively. However, the application of collateral estoppel is subject to a number of equitable exceptions designed to assure that the doctrine is applied in a manner that will serve the twin goals of fairness and efficient use of private and public litigation resources.

**Civil Procedure > Judgments > Preclusion & Effect of Judgments > Estoppel > Collateral Estoppel**
[HN25] Collateral estoppel has been denied in circumstances where preclusion would not serve judicial economy. Moreover, a finding of fairness to the defendant is a necessary premise to the application of offensive collateral estoppel. Accordingly, the United States Supreme Court has counseled against the application of offensive non-mutual collateral estoppel in instances where (1) the plaintiff could easily have joined in the earlier action; (2) the defendant had little incentive to defend vigorously in the earlier action; (3) the second action affords the defendant procedural opportunities unavailable in the first action that could readily cause a different result; or (4) where for other reasons, the application of offensive estoppel would be unfair to a defendant.

**Civil Procedure > Judgments > Preclusion & Effect of Judgments > Estoppel > Collateral Estoppel**
[HN26] It is undisputed that whatever values may be gained by nonmutual preclusion are substantially

diminished when the need to try related issues requires consideration of much the same evidence as bears on the issue tendered for preclusion.

**Antitrust & Trade Law > Monopolization > Actual Monopolization > General Overview**
[HN27] Once a monopolist achieves its goal by excluding potential competitors, it can then increase the price of its product to the point at which it will maximize its profit. This price is invariably higher than the price determined in a competitive market.

**Antitrust & Trade Law > Private Actions > Injuries & Remedies > General Overview**
**Civil Procedure > Judgments > Preclusion & Effect of Judgments > Estoppel > Collateral Estoppel**
[HN28] Once a jury has found that unlawful activity caused antitrust injury, the damages may be determined without strict proof of what act caused the injury, as long as the damages are not based on speculation or guesswork.

**Civil Procedure > Judgments > Preclusion & Effect of Judgments > Estoppel > Collateral Estoppel**
[HN29] As a general rule, in cases where a plaintiff could easily have joined in the earlier action a trial judge should not allow the use of offensive collateral estoppel.

**Civil Procedure > Judgments > Preclusion & Effect of Judgments > Estoppel > Collateral Estoppel**
[HN30] Courts have denied the use of offensive collateral estoppel where a plaintiff who could have joined the earlier action fails to present a valid reason for not joining it.

**Civil Procedure > Parties > Intervention > General Overview**
**Civil Procedure > Judgments > Preclusion & Effect of Judgments > Estoppel > Collateral Estoppel**
[HN31] A defendant must establish that a plaintiff's sole motivation in not joining an earlier action was the hope to obtain the benefit of issue preclusion before courts should deny use of collateral estoppel.

**Civil Procedure > Parties > Intervention > Right to Intervene**

2005 U.S. Dist. LEXIS 5315, *; 2005-1 Trade Cas. (CCH) P74,769

[HN32] Fed. R. Civ. P. 24(a)(2) provides that intervention as of right shall be granted upon timely application when the applicant claims an interest relating to the property or transaction which is subject of the action and the applicant is so situated that the disposition of the action may as a practical matter impair or impede the applicant's ability to protect that interest, unless the applicant's interest is adequately represented by existing parties. Fed. R. Civ. P. 24(a)(2). Representation is generally considered adequate if no collusion is shown between the representative and an opposing party, if the representative does not represent an interest adverse to the proposed intervenor and if the representative has been diligent in prosecuting the litigation.

*Civil Procedure > Parties > Intervention > Permissive Interventions*
*Civil Procedure > Parties > Intervention > Timeliness*
[HN33] Fed. R. Civ. P. 24(b)(2) provides that permissive intervention shall be granted upon timely application where an applicant's claim or defense and the main action have a question of law or fact in common. In exercising its discretion the court shall consider whether the intervention will unduly delay or prejudice the adjudication of the rights of the original parties. Fed. R. Civ. P. 24(b)(2). Generally, courts disfavor permissive intervention by class plaintiffs in actions brought by individual plaintiffs because such intervention tends to unduly delay and prejudice the adjudication of the rights of the original parties.

*Civil Procedure > Judgments > Preclusion & Effect of Judgments > Estoppel > Collateral Estoppel*
[HN34] Courts have denied the use of offensive estoppel where the risk of prejudice and confusion significantly outweighs any benefit that might be derived from applying collateral estoppel. Moreover, courts have recognized that the values gained by the use of issue preclusion are diminished where closely related issues must be tried and the application of collateral estoppel would substantially distort decision of the issues that remain open.

*Antitrust & Trade Law > Private Actions > General Overview*
*Civil Procedure > Judgments > Preclusion & Effect of Judgments > Estoppel > Collateral Estoppel*
[HN35] Courts have applied collateral estoppel to determinations of antitrust violations made in antitrust lawsuits between competitors to later antitrust actions brought by buyers.

**COUNSEL:**    [*1]    For    BRADBURN PARENT/TEACHER STORE, INC., ON BEHALF OF ITSELF AND OTHERS SIMILARLY SITUATED, Plaintiff: CHARLES M. JONES, JONES OSTEEN JONES & ARNOLD, HINESVILLE, GA; GREGORY BARUCH, BERRY & LEFTWICH, WASHINGTON, DC; J. DANIEL LEFTWICH, BERRY & LEFTWICH, WASHINGTON, DC; ROBERT STEPHEN BERRY, BERRY & LEFTWICH, WASHINGTON, DC.

For PUBLIX SUPER MARKETS, INC., Plaintiff: ANTHONY J. BOLOGNESE, BOLOGNESE & ASSOCIATES, LLC, PHILADELPHIA, PA; PAUL E. SLATER, CHICAGO, IL.

For    3M    (MINNESOTA,    MINING    AND MANUFACTURING COMPANY), Defendant: BRENT N. RUSHFORTH, HELLER EHRMAN WHITE & MCAULIFFE, LLP, WASHINGTON, DC; DAVID W. ENGSTROM,    HARKINS    CUNNINGHAM, PHILADELPHIA,    PA;    ELEANOR    ILLOWAY, HARKINS CUNNINGHAM LLP, PHILADELPHIA, PA;    JOHN    G.    HARKINS,    JR.,    HARKINS CUNNINGHAM, PHILADELPHIA, PA; KIT A. PIERSON, HELLER EHRMAN WHITE AND MCAULIFFE, LLP, WASHINGTON, DC; MARTINA M. STEWART, HELLER EHRMAN WHITE & MCAULIFFE LLP, WASHINGTON, DC; PAUL ALEXANDER, HELLER, EHRMAN, WHITE & MCAULIFFE, MENLO PARK, CA.

For HENKEL CORPORATION, Movant: ELIZABETH S. CAMPBELL, PEPPER HAMILTON LLP, PHILA, PA; MURRAY S. LEVIN, PEPPER HAMILTON L.L.P., PHILADELPHIA, PA

For MEIJER DISTRIBUTION, INC., MEIJER, INC. [*2]  , Movants: BRENT W. LANDAU, COHEN, MILSTEIN,    HAUSFELD    &    TOLL,    PLLC, WASHINGTON, DC; DANIEL A. SMALL, COHEN, MILSTEIN, HAUSFELD AND TOLL, WASHINGTON, DC; IRA NEIL RICHARDS, TRUJILLO RODRIQUEZ & RICHARDS, PHILADELPHIA, PA.

For HENKEL CONSUMER ADHESIVES, INC., Movant: MURRAY S. LEVIN, PEPPER HAMILTON

L.L.P., PHILADELPHIA, PA.

**JUDGES:** John R. Padova, J.

**OPINION BY:** John R. Padova

**OPINION: MEMORANDUM**

**Padova, J.**

Plaintiff, Bradburn Parent Teacher Store, Inc. ("Bradburn"), has brought this antitrust class action against Defendant 3M for damages arising out of 3M's anti-competitive conduct during the time period from October 2, 1998 through the present. Presently before the Court is Bradburn's Motion for Partial Summary Judgment pursuant to Federal Rule of Civil Procedure 56(c). For the reasons that follow, said Motion is denied. Pursuant to Rule 56(d), however, the Court finds that certain materia lfacts appear without substantial controversy and shall be deemed established upon the trial of this action.

I. BACKGROUND

The conduct of 3M which forms the basis of this class action lawsuit was the subject of a prior lawsuit in this Court, [*3] Le Page's, Inc. v. 3M, Civ. A. No. 97-3983 (E.D. Pa.). In that suit, LePage's, Inc., a competing supplier of transparent tape, sued 3M alleging, inter alia, unlawful maintenance of monopoly power in violation of Section 2 of the Sherman Act, 15 U.S.C. § 2. After a nine-week trial, the jury found in favor of LePage's on its unlawful maintenance of monopoly power claim. The jury awarded damages in the amount of $ 22,828,899.00, which were subsequently trebled to $ 68,486,697.00. See Le Page's Inc. v. 3M, 2000 U.S. Dist. LEXIS 3087, Civ. A. No. 97-3983, 2000 WL 280350 (E.D. Pa. Mar. 14, 2000) 3M filed a Motion for Judgment as a Matter of Law, which this Court denied on March 14, 2000. See id. 2000 U.S. Dist. LEXIS 3087, 3M thereafter appealed this Court's denial of its Motion for Judgment as a Matter of Law to the United States Court of Appeals for the Third Circuit ("Third Circuit") A Third Circuit panel initially reversed this Court's Order upholding the jury's verdict and directed the Court to enter judgment for 3M on LePage's' unlawful maintenance of monopoly power claim. LePage's, Inc. v. 3M, 277 F.3d 365 (3d Cir. 2002) ("LePage's I"). Upon rehearing en banc, the Third [*4] Circuit vacated the

panel decision and reinstated the original jury verdict against 3M. LePage's, Inc. v. 3M, 324 F.3d 141 (3d Cir. 2003) ("LePage's II"), cert. denied 159 L. Ed. 2d 835, 124 S. Ct. 2932 (2004).

The Complaint in the instant litigation alleges one count of monopolization in violation of Section 2 of the Sherman Act. The Complaint asserts that 3M unlawfully maintained monopoly power in the transparent tape market through its bundled rebate programs n1 and through exclusive dealing arrangements with various retailers. The Complaint asserts that, as a result of 3M's conduct, Bradburn and other class members n2 have "suffered antitrust injury." (Compl. P 27). The damages period in this case runs from October 2, 1998 to the present (Id. P 2). Bradburn now moves for partial summary judgment as to liability on Count One of the Complaint.

> n1 As described at length in the LePage's litigation, 3M's bundled rebate programs provided purchasers with significant discounts on 3M's products. However, the availability and size of the rebates were dependant upon purchasers buying products from 3M from multiple product lines. See LePage's II, 324 F.3d at 154-55

[*5]

> n2 On August 18, 2004, the Court certified as a class "all persons who directly purchased invisible or transparent tape from 3M between October 2, 1998 and the present, who have not purchased, for resale under the class member's own label, any 'private label' invisible or transparent tape from 3M or any of 3M's competitors at any time from October 2, 1988 to the present." (August 18, 2004 Memorandum and Order.)

II. LEGAL STANDARD

[HN1] Summary judgment should be granted "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show

that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). An issue is "genuine" if the evidence is such that a reasonable juror could return a verdict for the non-moving party. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248, 91 L. Ed. 2d 202, 106 S. Ct. 2505 (1986). A dispute is "material" if the facts in question might affect the outcome of the case under governing law. Id. [*6] When considering a motion for summary judgment, the Court must accept as true the evidence presented by the non-moving party and draw all justifiable inferences its favor. Id. at 255.

[HN2] The party seeking summary judgment bears the initial burden of showing a basis for its motion and identifying those portions of the record that it believes demonstrate the absence of a genuine issue of material fact. Celotex Corp. v. Catrett, 477 U.S. 317, 322, 91 L. Ed. 2d 265, 106 S. Ct. 2548 (1986). Where the non-moving party bears the burden of proof on a particular issue at trial, the moving party can meet its burden "simply by 'showing' - that is, pointing out to the district court -that there is an absence of evidence to support the non-moving party's case." Id. at 325. Once the moving party has met its initial burden, "the adverse party's response, by affidavits or otherwise as provided in this rule, must set forth specific facts showing that there is a genuine issue for trial." Fed. R. Civ. P. 56(e). Summary judgment should be granted if the non-moving party fails to make a factual showing "sufficient to establish the [*7] existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." Celotex, 477 U.S. at 322.

III. DISCUSSION

Bradburn argues that every element of liability on Count One of the Complaint has already been fully and fairly litigated and lost by 3M in LePage's, so that collateral estoppel now applies to the following five factual determinations:

> 1. The relevant market in this matter is the market for invisible and transparent tape for home and office use in the United States.

> 2. 3M possessed monopoly power in the relevant market, including the power to control prices and exclude competition in the relevant market, during the period

from June 11, 1993 to at least October 13, 1999 ("the relevant period").

> 3. 3M willfully maintained such monopoly power by predatory or exclusionary conduct during the relevant period.

> 4. 3M's predatory or exclusionary conduct during the relevant period included:

> a) 3M's rebate programs, such as Executive Growth Fund, Partnership Growth Fund, Brand Mix Program;

> b) 3M's Market Development Fund, and other payments to customers conditioned on customers achieving certain [*8] sales goals or growth targets;

> c) 3M's efforts to control, or reduce, or eliminate private label tape;

> d) 3M's efforts to switch customers to 3M's more expensive branded tape; and

> e) 3M's efforts to raise the price consumers pay for Scotch tape.

> 5. 3M's predatory or exclusionary conduct harmed competition

> during the relevant period. n3

> > n3 In its Motion for Partial Summary Judgment, Bradburn moved the Court for collateral estoppel as to 41 proposed 'findings.' (See Doc. No. 80). However, the Court understands that Bradburn has consolidated these 41 findings into five factual determinations in its Reply in Support of Motion for Partial Summary Judgment. (See Pl's Prop. Order, attached to Doc. No. 96; see also Tr. 11/05/2003 at 80.) Accordingly, the Court confines its analysis to the five issues enumerated above.

2005 U.S. Dist. LEXIS 5315, *8; 2005-1 Trade Cas. (CCH) P74,769

A. Propriety of Summary Judgment Procedure

Based on these five factual determinations, Plaintiff moves for partial summary judgment pursuant to Rule 56(c) as to liability [*9] on Count One of the Complaint. Rule 56(c) provides that [HN3] "[a] summary judgment, interlocutory in character, may be rendered on the issue of liability alone although there is a genuine issue as to the amount of damages." Fed. R. Civ. P. 56(c). Plaintiff argues that 3M's liability during the relevant period has been established because the jury in LePage's determined that 3M violated the antitrust laws by engaging in anti-competitive conduct. In response, 3M argues that partial summary judgment is not appropriate as to liability under Rule 56(c). 3M notes that, to establish liability under Section 2 of the Sherman Act, a plaintiff must prove not only that the defendant engaged in anti-competitive conduct, but also that the plaintiff suffered antitrust injury as a result of the defendant's unlawful acts. Accordingly, 3M contends that, because liability and damages in antitrust matters cannot be disaggregated in the manner contemplated by Rule 56(c), partial summary judgment on the issue of the existence of anti-competitive conduct alone would be improper.

Section 2 of the Sherman Act provides that [HN4] "every person who shall monopolize, or attempt [*10] to monopolize, or combine or conspire with any other person . . . to monopolize any part of the trade" is guilty of an offense and subject to penalties. 15 U.S.C. § 2. [HN5] "A violation of Section 2 consists of two elements: (1) possession of monopoly power and (2) '. . . maintenance of that power as distinguished from growth or development as a consequence of a superior product, business acumen, or historic accident.'" U.S. v. Dentsply Intern., Inc., 399 F.3d 181, 186 (3d Cir. 2005) (quoting Eastman Kodak Co. v. Image Technical Servs., Inc., 504 U.S. 451, 480, 119 L. Ed. 2d 265, 112 S. Ct. 2072 (1992)). The plaintiff must also allege that it suffered antitrust injury as the result of the defendant's unlawful acts LePage's v. 3M, 1997 U.S. Dist. LEXIS 18501, Civ. A. No. 97-3989, 1997 WL 734005, at *7 (E.D. Pa. Nov. 14, 1997). Accordingly,

> in order to have a claim for relief, a plaintiff must establish not only antitrust law violation by defendant but that he has been injured thereby. Proof of antitrust law violation alone is not enough. Proof of damage or injury to the plaintiff resulting

therefrom is of the essence of the claim.

Carswell Trucks, Inc. v. Int'l Harvester Co., 334 F. Supp. 1238, 1239 (S.D.N.Y. 1971) [*11] (citing McCleneghan v. Union Stock Yards of Ohmaha, 349 F.2d 53 (8th Cir. 1965); Winckler & Smith Citrus Products Co. v. Sunkist Growers, Inc., 346 F.2d 1012 (9th Cir. 1965); Haverhill Gazette Co. v. Union Leader Corp., 333 F.2d 798 (1st Cir. 1964); Herman Schwabe, Inc. v. United Shoe Mach. Corp., 297 F.2d 906, 909 n.4 (2d Cir. 1962)).

[HN6] As proof of antitrust injury is necessary to establish liability under Section 2 of the Sherman Act, Bradburn is not entitled to partial summary judgment on the issue of liability unless it has established that there is no genuine issue as to the fact that it was injured as a result of 3M's antitrust violations. See Oberweis Dairy, Inc. v. Associated Milk Producers, Inc., 553 F. Supp. 962, 965-66 (N.D. Ill. 1982) (denying plaintiff's motion for partial summary judgment as to antitrust liability where findings in prior action did not establish that defendant's antitrust violations proximately caused injury to plaintiff); Carswell, 334 F. Supp. at 1239-40 (denying plaintiff's motion for partial summary judgment as to antitrust liability where there was [*12] "sharp dispute between the parties" as to whether plaintiff was injured by defendant's antitrust actions; see generally 18 Charles A. Wright, et al., Federal Practice and Procedure § 2736, at 306 (2d ed. 2002) (hereinafter "Wright and Miller") (noting that [HN7] "if there is no liability without damage and damages are in dispute, summary judgment should not be granted" pursuant to Rule 56(c)). Here, the parties do not dispute that genuine issues remain as to whether Bradburn has sustained injury resulting from 3M's anti-competitive conduct. Accordingly, Bradburn's Motion for Partial Summary Judgment is denied pursuant to Rule 56(c). n4

> n4 The Court further notes that Bradburn seeks partial summary judgment as to liability only for the time period from June 11, 1993 through October 13, 1999, rather than for the entire period of time at issue in this litigation. However, [HN8] "the Federal Rules of Civil Procedure do not provide for partial summary judgment of a portion of a single claim." Connelly v. Wolf, Block, Schorr and Solis-Cohen, 463 F. Supp. 914, 919 (E.D. Pa. 1978) (citing

Page 9

Coffman v. Fed. Labs., Inc., 171 F.2d 94
(3d Cir. 1948)).

[*13]

Bradburn alternatively argues that the Court should invoke Rule 56(d) and find that the five proposed factual determinations set forth above are established without substantial controversy in this action. Federal Rule of Civil Procedure 56(d) provides that:

> [HN9] If on motion under [Rule 56] judgment is not rendered upon the whole case or for all the relief asked and a trial is necessary, the court . . . shall if practicable ascertain what material facts exist without substantial controversy . . . . It shall thereupon make an order specifying the facts that appear without substantial controversy . . . . Upon the trial of the action the facts so specified shall be deemed established, and the trial shall be conducted accordingly.

Fed. R. Civ. P. 56(d). [HN10] Rule 56(d) "empowers the court to withdraw some issues from the case and to specify those facts that really cannot be controverted." Cohen v. Bd. of Trs. of Univ. of Med. and Dentistry of N.J., 867 F.2d 1455, 1463 (3d Cir. 1989) (citations omitted). Indeed, "Rule 56(d) imposes a duty on a court that does not fully adjudicate a [*14] case on a motion for summary judgment to make an order formulating the issues for trial, to the extent practicable." Connelly, 463 F. Supp. at 919-20 (citing Associated Hardware Supply Co. v. Big Wheel Distrib. Co., 355 F.2d 114 (3d Cir. 1965)). When issuing an order pursuant to Rule 56(d), "permits the court to retain full power to make one complete adjudication on all aspects of the case when the proper time arrives." Colasanto v. Life Ins. Co. of N. America, 100 F.3d 203, 210 (1st Cir. 1996) (quoting Wright and Miller, supra, § 2737, at 318; see also Fed. Deposit Ins. Corp. v. Massingill, 24 F.3d 768, 774 (5th Cir. 1994). Accordingly, Court will next determine whether any of the above referenced factual determinations from LePage's may be deemed established in this case pursuant to Rule 56(d). See Connelly, 463 F. Supp. at 919-20.

B. Collateral Estoppel

[HN11] Courts apply federal common law principles of issue preclusion when determining the preclusive effect of a prior federal action. Burlington N. R.R. v. Hyundai Merchant Marine Co., 63 F.3d 1227, 1231 (3d Cir. 1995). [*15] n5 Under the doctrine of issue preclusion, "once an issue is actually and necessarily determined by a court of competent jurisdiction, that determination is conclusive in subsequent suits based on a different cause of action involving a party to the prior litigation." Montana v. United States, 440 U.S. 147, 153, 59 L. Ed. 2d 210, 99 S. Ct. 970 (1979). The doctrine of issue preclusion is derived from "the simple principle that later courts should honor the first actual decision of a matter that has been actually litigated." Burlington, 63 F.3d at 1231 (citation omitted). Collateral estoppel "has the dual purpose of protecting litigants from the burden of relitigating an identical issue with the same party or his privy and of promoting judicial economy by preventing needless litigation." Parklane Hosiery Co. v. Shore, 439 U.S. 322, 326, 58 L. Ed. 2d 552, 99 S. Ct. 645 (1979)

> n5 Throughout this opinion the Court will use the phrase "issue preclusion" and "collateral estoppel" interchangeably. See Witkowski v. Welch, 173 F.3d 192, 198 (3d Cir. 1999) (noting that the doctrine of collateral estoppel is now commonly referred to as issue preclusion).

[*16]

Here, Bradburn, which was not a party to the LePage's litigation, seeks to use issue preclusion offensively against 3M, which was a party to LePage's. [HN12] It is well-settled that "a litigant who was not a party to a prior judgment may nevertheless use that judgment 'offensively' to prevent a defendant from relitigating issues resolved in the earlier proceeding." Parklane, 439 U.S. at 326. This form of issue preclusion is also known as offensive non-mutual collateral estoppel. n6 Burlington, 63 F.3d at 1232.

> n6 For the sake of simplicity, the Court will refer to the doctrine of offensive non-mutual collateral estoppel as "collateral estoppel" and "offensive collateral estoppel" when addressing the legal rule which governs the preclusive effect of a prior judgment in this case. See

2005 U.S. Dist. LEXIS 5315, *16; 2005-1 Trade Cas. (CCH) P74,769

Raytech Corp. v. White, 54 F.3d 187, 190 n.5 (3d Cir. 1995).

[HN13] The party seeking estoppel must show that the following four elements are satisfied: "(1) the issue sought to be precluded [*17] [is] the same as that involved in the prior action; (2) that issue [was] actually litigated; (3) that issue [was] determined by a final and valid judgment; and (4) the determination [was] essential to the prior judgment." Nat'l R.R. Passenger Corp. v. Pa. Pub. Util. Comm'n, 342 F.3d 242, 252 (3d Cir. 2003) (quoting Nat'l R.R. Passenger Corp. v. Pa. Pub. Util. Comm'n, 288 F.3d 519, 525 (3d Cir. 2002)). In addition, the application of offensive non-mutual collateral estoppel is "subject to an overriding fairness determination by the trial judge." Burlington, 63 F.3d at 1232. The trial court has "broad discretion to determine when [collateral estoppel] should be applied." Parklane, 99 S. Ct. at 651.

As mentioned above, Bradburn seeks collateral estoppel as to the following five issues: (1) the definition of relevant market in this matter; (2) 3M's monopoly power in the relevant market from June 11, 1993 to October 13, 1999; (3) 3M's willful maintenance of such monopoly power; (4) the nature of 3M's predatory or exclusionary conduct during the relevant period; and (5) the harmful effect of 3M's conduct on competition [*18] during the relevant period. The Court will first determine whether these issues satisfy the four elements for collateral estoppel, and then resolve whether fairness considerations counsel against the application of collateral estoppel in this case.

1. Identity of the issues

[HN14] The first element that must be satisfied for the application of collateral estoppel is that the issue sought to be precluded is the same as that involved in the previous action. Burlington, 63 F.3d at 1231-32. "Identity of the issues is established by showing that the same general rules govern both cases and that the facts of both cases are indistinguishable as measured by those rules." Suppan v. Dadonna, 203 F.3d 228, 233 (3d Cir. 2000) (quoting Wright and Miller, supra, § 4425, at 656-57). To defeat a finding of legal identity for purposes of issue preclusion, "the difference in the applicable legal standards must be 'substantial.'" Raytech, 54 F.3d at 191 (quoting 1B James W. Moore et al., Moore's Federal Practice P 443[2], at 572). A finding of factual identity,

on the other hand, is defeated if the party seeking collateral estoppel would have [*19] to introduce different evidence to prove the issue in this litigation than was required in the prior action. See Lynne Carol Fashions, Inc. v. Cranston Print Works Co., 453 F.2d 1177, 1183 (3d Cir. 1972).

Bradburn, which initially sought to collaterally estop 3M from relitigating the five issues mentioned above for the entire span of time relevant to the instant litigation, has revised its Motion to cover only the time period from June 11, 1993, the date on which the conduct at issue in LePage's began, to October 13, 1999, the date on which the jury in LePage's rendered its verdict. (See Pl's Reply at 4-7; see also Tr. 11/05/03 at 81.) n7 3M argues that the issues for which Bradburn seeks collateral estoppel for the period from June 11, 1993 through October 13, 1999 are not factually identical to the issues determined by the jury in LePage's, because the evidence presented in LePage's "focused" on the time span from 1993 through 1998. (Def.'s Resp. at 6 n.4.) 3M, however, admits that "there was [sic] a small handful of exhibits in LePage's providing factual information relating to 1999." (Id.) In addition, neither the jury charge [*20] and the jury verdict form in the LePage's trial limited the jury's deliberations to a time period ending in 1998. See LePage'sTrial Tr. Vol. 34, pp. 109-180; LePage's Jury Verdict Form, Questions 1-6. Thus, while the "focus" of the LePage's trial may have been 3M's conduct between June 11, 1993 and 1998, the jury in fact considered 3M's conduct from June 11, 1993 through October 13, 1999, the date on which it rendered its verdict. Thus, for the period from June 11, 1993 through October 13, 1999, the issues for which Bradburn seeks collateral estoppel in this case are the same as those before the jury in LePage's. Accordingly, the Court finds that all five issues Bradburn seeks to preclude satisfy the first element for the application of collateral estoppel for the time period from June 11, 1993 through October 13, 1999.

> n7 Indeed, [HN15] it is axiomatic that collateral estoppel cannot apply to the jury's factual determinations in LePage's for a time period that was not at issue in that trial. The jury's findings in LePage's necessarily were based upon the evidence adduced at trial, "from which they cannot be severed without mutilating their significance." Int'l Shoe Mach. Corp. v.

United Shoe Machinery Corp., 315 F.2d 449, 456 (1st Cir. 1963). At the same time, however, the issues litigated in LePage's are not factually different from the issues in the instant litigation merely because the damages period here extends beyond the period which the jury considered in LePage's. See, e.g., Oberweis, 553 F. Supp. at 966 (collateral estoppel in antitrust action proper for time period at issue in prior proceeding even though later litigation alleged longer period of damages).

[*21]

2. Actual litigation

The second element that must be satisfied for the application of collateral estoppel is that the issue sought to be precluded was actually litigated in the previous action. Burlington, 63 F.3d at 1231-32. With the exception of the relevant market definition, 3M does not dispute that the issues for which Bradburn seeks collateral estoppel were actually litigated in LePage's. 3M argues that the definition of relevant market in this matter was not actually litigated in LePage's because the parties in LePage's had stipulated to the relevant product market. n8

> n8 [HN16] In antitrust actions, the relevant market is comprised of both a geographic and a product market. Fresh Made, Inc. v. Lifeway Foods, Inc., 2002 U.S. Dist. LEXIS 15098, No. Civ. A. 01-4254, 2002 WL 31246922, at *5 (E.D. Pa. Aug. 9, 2002) (citing Tunis Bros. Co. v. Ford Motor Co., 952 F.2d 715, 722-26 (3d Cir. 1992)).

[HN17] Collateral estoppel applies "only as to those matters in issue or points controverted [*22] . . . . The inquiry must always be as to the point or question actually litigated." Regions Hosp. v. Shalala, 522 U.S. 448, 464, 139 L. Ed. 2d 895, 118 S. Ct. 909 (1998) (quoting Cromwell v. County of Sac, 94 U.S. 351, 353, 24 L. Ed. 195 (1877)) (emphasis omitted). "Generally speaking, when a particular fact is established not by judicial resolution but by stipulation of the parties, that

fact has not been 'actually litigated' and thus is not a proper candidate for issue preclusion." Otherson v. Dep't of Justice, 228 U.S. App. D.C. 481, 711 F.2d 267, 274-75 (D.C. Cir. 1983); see also U.S. v. Botefuhr, 309 F.3d 1263, 1282 (10th Cir. 2002); Kane v. Town of Harpswell, 254 F.3d 325, 329 (1st Cir. 2001). This principle extends to stipulations regarding the product market in antitrust matters. See Jack Faucett Assocs., Inc. v. AT&T Co., 744 F.2d 118, 132 (D.C. Cir. 1984) (collateral estoppel not appropriate where product market had been stipulated to in previous case); Gen. Dynamics Corp. v. AT&T Co., 650 F. Supp. 1274, 1283 (N.D. Ill. 1986) (same); Glictronix Corp. v. AT&T Co., 603 F. Supp. 552, 583 (D.N.J. 1984) [*23] (same).

The general rule that collateral estoppel should not be applied to stipulations is based on the recognition that the interests of maintaining consistency and conserving private as well as judicial resources are less compelling when the issue on which preclusion is sought has not actually been litigated before. See Restatement (Second) of Judgments § 27 Cmt. e. In addition, granting preclusive effect to issues not actually litigated might discourage compromise, decrease the likelihood that the issues in an action would be narrowed by stipulation, and therefore intensify litigation. Id.

[HN18] Notwithstanding the general rule that collateral estoppel should not be applied to stipulated facts, courts have held that "factual determinations made by judge or jury in a case that is actually litigated are not deprived of collateral estoppel effect merely because the determinations rest in part on admissions or stipulations." Kairys v. I.N.S., 981 F.2d 937, 941 (7th Cir. 1992). Indeed,

> [a] contrary rule might discourage the use of admissions and stipulations, lest that use deprive the winning party of a judgment that [*24] he could use in a subsequent proceeding to foreclose relitigation of the facts that had been determined in his favor - or, conversely, might . . . encourage admissions or stipulations, by making them less costly in future consequences for the concessionary party.

Id. Accordingly, [HN19] courts have applied collateral

Page 12

estoppel to issues determined in previous proceedings where the fact finder's determination of those issues was partially based upon facts stipulated by the parties. See Otherson, 711 F.2d at 274 (collateral estoppel applies to determination of defendant's guilt in prior action where finding was based on stipulation regarding what witnesses would testify to at trial); Fairmont Aluminum Co. v. Comm'r of Internal Revenue, 222 F.2d 622, 625 (4th Cir. 1955) (collateral estoppel applies to judgment in taxpayer's previous suit even though judgment was based in part on a stipulation of fact between the parties); Williamson v. Columbia Gas & Electric Corp., 186 F.2d 464, 466-67 (3d Cir. 1950) (collateral estoppel proper in antitrust action even though prior case "was tried upon stipulation of fact"); Tillman v. Nat'l City Bank of N.Y., 118 F.2d 631, 635 (2d Cir. 1941) [*25] (holding that "there is no merit in defendant's contention that the prior judgment cannot be used as an estoppel because certain facts on which it rested were stipulated"); GAF Corp. v. Eastman Kodak Co., 519 F. Supp. 1203, 1213 (S.D.N.Y. 1981) (collateral estoppel applies to market definition and market power issues in antitrust action where determination of these issues in prior proceeding was partially based on stipulated facts).

The United States Court of Appeals for the Seventh Circuit has explained that

> [HN20] the decisive reasons for giving [stipulations] collateral estoppel effect is that a lawyer's recognition that the evidence is so stacked against him on some point that a failure to admit it will open him to sanctions under Fed. R. Civ. P. 37(c) is as good an indication of where the truth probably lies as a determination by a judge or a jury.

Kairys, 981 F.2d at 941. Thus, the application of collateral estoppel to factual determinations based in part on stipulations is appropriate where "the decision to agree to certain facts was a decision made by [the defendant] as part of its litigation [*26] strategy" in the prior litigation GAF Corp., 519 F. Supp. at 1213. Moreover, where one party "introduces evidence on a dispositive issue of fact, and an adverse party with opportunity and motive to contest the presentation chooses not to, the ensuing finding is entitled to the same respect as one litigated to

the hilt." Harris Trust & Sav. Bank v. Ellis, 810 F.2d 700, 705 (7th Cir. 1987); see also Adams v. Kinder-Morgan, Inc., 340 F.3d 1083, 1094 (10th Cir. 2003).

Here, it is undisputed that the jury's finding of the relevant market in LePage's was based only in part on the parties' stipulation that the relevant product market was the market for transparent and invisible tape for home and office use. See LePage's Trial Tr. Vol. 34, pp. 129-130. Moreover, 3M strategically agreed to stipulate to the relevant product market only *after* plaintiff had already introduced considerable testimony by an expert witness on this issue. The relevant product market was, therefore, actually litigated in LePage's for purposes of the doctrine of collateral estoppel. See Adams, 340 F.3d at 1094 (issue is actually litigated [*27] if it is stipulated to only after other party adduced evidence on it at trial). n9 Accordingly, the Court finds that all five issues Bradburn seeks to preclude satisfy the second element for the application of collateral estoppel.

> n9 The fact that plaintiff in LePage's had introduced substantial evidence regarding the product market at trial implicates the precise concerns underlying the doctrine of collateral estoppel (e.g., judicial economy and waste of private resources). Moreover, the introduction of evidence on the issue of product market in LePage's permitted the jury to independently determine that the product market was, in fact, the market for invisible and transparent tape for home and office use stipulated to by the parties.

### 3. Determination by valid and final judgment

[HN21] The third element that must be satisfied for the application of collateral estoppel is that the issue sought to be precluded was determined by a final and valid judgment in the previous action. Burlington, 63 F.3d at 1231-32. [*28] Finality in this context means "little more than that the litigation of a particular issue has reached such a stage that a court sees no really good reason for permitting it to be litigated again." Henglein v. Colt Indus., 260 F.3d 201, 209-10 (3d Cir. 2001) (quoting Lummus Co. v. Commonwealth Oil Refining Co., 297 F.2d 80, 89 (2d Cir. 1961)). 3M does not dispute that all five issues for which Bradburn seeks collateral estoppel

were decided by a valid and final judgment. Accordingly, the Court finds that all five issues Bradburn seeks to preclude satisfy the third element for the application of collateral estoppel.

4. Essentiality of issue to prior judgment

[HN22] The fourth element that must be satisfied for the application of collateral estoppel is that the issue sought to be precluded was essential to the judgment in the previous action. Burlington, 63 F.3d at 1231-32. "Under the generally accepted meaning of the term, a fact may be deemed essential to a judgment where, without that fact, the judgment would lack factual support sufficient to sustain it." Raytech, 54 F.3d at 193. Courts inquire into [*29] "whether the issue 'was critical to the judgment or merely dicta'" when determining whether the issue sought to be precluded was essential to the prior judgment. Nat'l R.R. Passenger Corp., 288 F.3d at 527 (quoting O'Leary v. Liberty Mut. Ins. Co., 923 F.2d 1062 (3d Cir. 1991)). With the exception of (1) its power to exclude competition and increase prices, and (2) the nature of its predatory or exclusionary conduct, 3M does not dispute that the issues for which Bradburn seeks collateral estoppel were essential to the judgment in LePage's.

3M argues that a finding that it was able to control prices and to exclude competition was not essential to the jury's monopoly power determination in LePage's because the Court defined monopoly power to the jury as the power to control prices or to exclude competition. n10 3M contends that it would, therefore, be improper to infer from the jury's monopoly power determination that 3M had both the ability to control prices and to exclude competition. 3M further argues that, because the jury verdict form does not specify on what grounds the jury based its determination of monopoly power, collateral estoppel [*30] can be applied to neither 3M's ability to exclude competition nor 3M's ability to control prices.

> n10 In LePage's, the Court instructed the jury as follows:
>
>> Monopoly power is defined as the power to control prices or exclude competition in a relevant market. Therefore, you must determine whether

3M could either control prices or exclude competition in the relevant market. The power to control prices is the power of a company to establish appreciably higher prices for its equivalent goods, without a substantial loss of business to its competitor.

The power to exclude competition means the power of a company to dominate a market by eliminating existing competition from that market, or by preventing new competition from entering that market.

LePage's Trial Tr. Vol. 34, pp. 132-33.

Where a party seeks collateral estoppel based upon a jury verdict, the court must determine "whether a rational jury could have grounded its verdict upon an issue other than" that sought to be precluded. [*31] Schiro v. Farley, 510 U.S. 222, 233, 127 L. Ed. 2d 47, 114 S. Ct. 783 (1994). If the court finds that the jury in the previous case necessarily determined the facts sought to be precluded, collateral estoppel applies to the jury's explicit findings as well as to those implicit findings which the jury rationally must have determined in order to come to a verdict. Chew v. Gates, 27 F.3d 1432, 1438 (9th Cir. 1994).

Bradburn persuasively argues that the jury in LePage's necessarily determined that 3M had the power to exclude competition, and that this power by definition also enabled 3M to control prices. Because 3M conceded that it possessed monopoly power in LePage's II, see 324 F.3d at 146, the Third Circuit did not expressly resolve whether 3M's monopoly power was based on its power to control prices, its power to exclude competition, or both. The Third Circuit did, however, make several observations that strongly support Bradburn's argument that the jury in LePage's necessarily determined that 3M had the power to exclude competition. For example, the Third Circuit observed that "3M's exclusionary conduct not only impeded [plaintiff's] [*32] ability to compete,

Case 1:05-cv-00441-JJF    Document 244-2    Filed 11/13/2006    Page 26 of 59

2005 U.S. Dist. LEXIS 5315, *32; 2005-1 Trade Cas. (CCH) P74,769

but also harmed competition itself, a sine qua non for a § 2 violation" and that 3M "strengthened its monopoly position by destroying competition." Id.

Indeed, based on the Court's instructions to the jury in LePage's, it is evident that the jury determined that 3M had the power to exclude competition. The jury in LePage's returned a verdict that 3M had unlawfully maintained monopoly power. LePage's Jury Verdict Form, Question 2. The Court charged the LePage's jury that, in order to find willful maintenance of monopoly power by 3M, it was first required to determine that 3M had engaged in predatory or exclusionary conduct. See LePage's Trial Tr. Vol 34, pp. 136-37. The Court went on to instruct the jury that "predatory or exclusionary conduct is conduct that has the effect of preventing or excluding competition, or frustrating or impairing the efforts of other firms to compete for customers within the relevant market." Id. By rendering a verdict that 3M had willfully maintained monopoly power, the jury in LePage's thus necessarily found that 3M had the power to exclude competition or frustrate the efforts of other firms to compete [*33] for customers, which is itself an exclusionary practice. This conclusion is further bolstered by the fact that the jury in LePage's explicitly found that 3M's maintenance of monopoly power had injured plaintiff, a competitor. See LePage's Jury Verdict Form, Question 2.1.

[HN23] It is equally apparent that the ability to exclude competition necessarily results in the ability to control prices. As the Third Circuit observed in LePage's II, "once a monopolist achieves its goal by excluding potential competitors, it can then increase the price of its product to the point at which it will maximize its profit." Id. at 164. Indeed, "the more competition a company faces, the less it can control prices because competitors will undercut its prices to secure market share. Conversely, a company that can exclude competition can sustain its ability to control prices." Pepsico, Inc. v. Coca-Cola Co., 315 F.3d 101, 107-08 (2d Cir. 2002) (citations omitted); see also LePage's II, 324 F.3d at 164 (exclusion of competitors allows companies to increase price of products); Barr Labs., Inc. v. Abbott Labs., 978 F.2d 98, 114 (3d Cir. 1992) [*34] (competition "would have prevented [defendant] from raising prices for any lengthy period of time"); Columbia Metal Culvert Co. v. Kaiser Aluminum & Chem. Corp., 579 F.2d 20, 26 (3d Cir. 1978) (ongoing competition "guards against the ability of the dominant entity to increase prices"); see

generally 2A Phillip E. Areeda, et al., Areeda & Hovenkamp's Antitrust Law, P 501, at 85-86 (2002). n11 Therefore, the Court concludes that 3M's ability to exclude competition and its ability to control prices were essential to the jury's determination that 3M had unlawfully maintained monopoly power.

> n11 The Court notes that the power to control prices, by contrast, does not necessarily include the power to exclude competition. See Shoppin' Bag of Pueblo, Inc. v. Dillon Cos., 783 F.2d 159, 164 (10th Cir. 1986) ("It is conceivable that if a company has obtained control over prices . . . it still may not have the power to exclude other competitors from the market.").

3M also argues [*35] that it was not essential to the jury's finding of unlawful maintenance of monopoly power in LePage's that 3M's predatory or exclusionary conduct included: (1) 3M's rebate programs, such as the Executive Growth Fund, the Partnership Growth Fund, and the Brand Mix Program; (2) 3M's Market Development Fund, and other payments to customers conditioned on customers achieving certain sales goals or growth targets; (3) 3M's efforts to control, or reduce, or eliminate private label tape; (4) 3M's efforts to switch customers to 3M's more expensive branded tape; and (5) 3M's efforts to raise the price consumers pay for Scotch tape. 3M argues that, pursuant to the Court's instructions, the jury in LePage's could have based its determination on the predatory or exclusionary nature of any one of these five alleged practices. In LePage's, the Court defined predatory or exclusionary conduct to the jury as follows:

> [Plaintiff] contends that the following conduct was exclusionary or predatory . . . :
>
> Number one, 3M's rebate program, such as the EGF, executive growth fund, or the PGF, the partnership growth fund, and the brand mix program.
>
> Number two, 3M's market development [*36] fund called the MDS in some of the testimony, and other

Case 1:05-cv-00441-JJF    Document 244-2    Filed 11/13/2006    Page 27 of 59

2005 U.S. Dist. LEXIS 5315, *36; 2005-1 Trade Cas. (CCH) P74,769

payments to customers conditioned on customers achieving certain sales goals or growth targets.

Third, 3M's efforts to control, or reduce, or eliminate private label tape.

Four, 3M's efforts to switch customers to 3M's more expensive branded tape, and

Five, 3M's efforts to raise the price consumers pay for Scotch tape.

[Plaintiff] claims that all of these things that I've just gone through was predatory or exclusionary conduct . . . .

Now, what is predatory or exclusionary conduct in the eyes of the law? Well, predatory or exclusionary conduct is conduct that has the effectofpreventingorexcludingcompetition, or frustrating or impairing the efforts of other firms to compete for customers within the relevant market . . . .

You should consider the following factors in determining whether 3M's conduct was predatory or exclusionary: its effect on its competitors, such as [plaintiff], its impact on consumers, and whether it has impaired competition, in an unnecessarily restrictive way. You may also consider the behavior that might otherwise not be of concern to the antitrust laws, or that might be viewed as pro-competitive, [*37] and take on an exclusionary connotation when practiced by a firm with monopoly power.

LePage's Trial Tr. Vol. 34, pp. 136-39.

Bradburn argues that, pursuant to these instructions, the jury in LePage's was required to find that either all or none of the five types of conduct alleged were predatory or exclusionary in nature. Thus, Bradburn argues that the jury's determination that 3M had engaged in predatory or exclusionary conduct necessarily included a determination that all five examples of 3M's conduct were predatory or exclusionary. However, the Court's instructions did not require the jury find that all five types of conduct were predatory or exclusionary in order to

conclude that 3M had engaged in predatory or exclusionary conduct. Rather, the Court explained to the jury what actions plaintiff alleged to have been predatory or exclusionary, and then charged the jury that it could consider all of these actions in determining whether 3M's conduct was predatory or exclusionary under the law. The jury in LePage's could, therefore, have based its finding of predatory or exclusionary conduct on any one of the five examples alone. The Court concludes that because [*38] none of the five alleged predatory or exclusionary practices were essential to the judgment in LePage's, collateral estoppel cannot be applied to this issue. See Schiro, 510 U.S. at 233. Accordingly, the Court finds that all issues Bradburn seeks to preclude, except for the nature of 3M's predatory or exclusionary practices, satisfy the fourth element for the application of collateral estoppel.

5. Fairness considerations

Pursuant to the above analysis, the following four issues satisfy all four elements for the application of collateral estoppel for the time period from June 11, 1993 through October 13, 1999:

1. The relevant market in this matter is the market for invisible and transparent tape for home and office use in the United States;

2. 3M possessed monopoly power in the relevant market, including the power to control prices and exclude competition in the relevant market;

3. 3M willfully maintained such monopoly power by predatory or exclusionary conduct; and

4. 3M's predatory or exclusionary conduct harmed competition.

[HN24] To determine whether collateral estoppel can be applied offensively in this action, the court must next engage in an overriding [*39] fairness inquiry. Burlington, 63 F.3d at 1232. District courts have "'broad discretion' to determine when a plaintiff who has met the requisites for the application of collateral estoppel may employ that doctrine offensively." Raytech, 54 F.3d at 195 (citing Parklane, 439 U.S. at 332). However, the application of collateral estoppel "is subject to a number

of equitable exceptions designed to assure that the doctrine is applied in a manner that will serve the twin goals of fairness and efficient use of private and public litigation resources." Nat'l R.R. Passenger Corp., 288 F.3d at 525. [HN25] Collateral estoppel has been denied in circumstances where preclusion would not serve judicial economy. See S.E.C. v. Monarch Funding Corp., 192 F.3d 295, 304 (2d Cir. 1999); see generally Wright and Miller, supra, § 4465, at 738-39. Moreover, "[a] finding of fairness to the defendant is . . . a necessary premise to the application of offensive collateral estoppel." Raytech, 54 F.3d at 195. Accordingly, the Supreme Court has counseled against the application of offensive non-mutual collateral [*40] estoppel in instances where (1) the plaintiff "could easily have joined in the earlier action"; (2) the defendant had "little incentive to defend vigorously" in the earlier action; (3) the second action "affords the defendant procedural opportunities unavailable in the first action that could readily cause a different result"; or (4) where "for other reasons, the application of offensive estoppel would be unfair to a defendant." Parklane, 493 U.S. at 330-31.

Here, 3M does not dispute that it had incentive to defend itself vigorously in the LePage's litigation, or that the procedural opportunities available in this action were available in the LePage's litigation as well. 3M does argue, however, that the Court should refuse to grant Bradburn the use of offensive collateral estoppel because its application would not serve judicial economy. In addition, 3M argues that Bradburn could have easily joined the LePage's litigation, and that granting collateral estoppel effect to the jury's determinations in LePage's would unduly prejudice 3M by distorting the issues and causing juror confusion.

### a. Judicial economy

3M argues that the Court should refuse [*41] to grant Bradburn's request for offensive collateral estoppel because the application of estoppel will not significantly expedite the trial of this case. 3M contends that the same evidence that would be required to establish that 3M had engaged in antitrust violations will have to be presented by Bradburn to establish causation and injury in this case. For example, 3M argues that a finding that 3M unlawfully maintained monopoly power will not be helpful to a determination of damages, because it does not indicate how 3M unlawfully maintained this power. Accordingly, 3M argues that Bradburn will in any event

have to establish the type of anti-competitive behavior 3M engaged in from 1993 through 1999, and prove that this behavior caused the monopoly overcharges Bradburn alleges it was forced to pay.

[HN26] It is undisputed that "whatever values may be gained by nonmutual preclusion are substantially diminished when the need to try related issues requires consideration of much the same evidence as bears on the issue tendered for preclusion." Wright and Miller, supra, § 4465, at 738. However, it will not be necessary for Bradburn to establish precisely how 3M excluded competition in order [*42] to establish causation and injury in this case. If collateral estoppel is invoked as to the jury's finding in LePage's that 3M's conduct "harmed competition" generally, a jury in the instant action could reasonably find, with the aid of expert testimony, that this harm to competition caused the super-competitive prices which Bradburn argues it was forced to pay. See LePage's II, 324 F.3d at 164 [HN27] ("Once a monopolist achieves its goal by excluding potential competitors, it can then increase the price of its product to the point at which it will maximize its profit. This price is invariably higher than the price determined in a competitive market.") Moreover, [HN28] "once a jury has found that the unlawful activity caused the antitrust injury, the damages may be determined without strict proof of what act caused the injury, as long as the damages are not based on speculation or guesswork." Id. at 166 (citing Bonjorno v. Kaiser Aluminum & Chem. Corp., 752 F.2d 802, 813 (3d Cir. 1984)). Accordingly, the application of collateral estoppel in this case will likely save significant time and private as well as judicial resources.

3M further argues [*43] that collateral estoppel should not be granted to the jury's determinations in LePage's because Bradburn will still have to prove market definition and market power issues for the time period from October 13, 1999 to the present, the portion of the class period not covered by the LePage's verdict. However, this argument fails to take into account that, as noted above, considerable private and judicial resources will be saved by the use of collateral estoppel to establish elements of Bradburn's claim for the period from October 2, 1998 to October 13, 1999. See Oberweis, 553 F. Supp. at 966 (applying collateral estoppel in antitrust action for time period at issue in prior proceeding even though present litigation alleged longer period of damages). Accordingly, the Court finds that the use of collateral

Page 17

estoppel in this case will promote the efficient use of private and judicial resources. n12

> n12 The Court notes that the only cases 3M has cited in which courts have denied the use of collateral estoppel for failure to significantly expedite the trial are personal injury class actions for negligence or product liability. In such actions, the jury must either evaluate the incident underlying each individual injury, or assess the likelihood that the incident at issue caused each particular set of symptoms in order to find causation and injury. See, e.g., Coburn v. Smithkline Beecham Corp., 174 F. Supp. 2d 1235, 1239-41 (D. Utah 2001) (denying application of collateral estoppel in product liability action because causation in such cases can only be established by proof of specific causation, which includes inquiry into dose of drug, duration, frequency and amount of exposure, and the effect of other agents and biochemical and metabolic interactions and processes, preexisting medical conditions, and environmental factors); see also Schneider a/k/a Nguyen Phi Khanh v. Lockheed Aircraft Corp., 212 U.S. App. D.C. 87, 658 F.2d 835, 852 (D.C. Cir. 1981) (denying collateral estoppel in action for product design defect); Rogers v. Ford Motor Co., 925 F. Supp. 1413, 1419 (N.D. Ind. 1996) (denying collateral estoppel in personal injury action for negligence). As discussed above, however, proof of causation and injury in antitrust actions is much less complicated once antitrust violations have been established.

[*44]

b. Ability to join LePage's

3M also argues that the Court should refuse to grant Bradburn the use of offensive collateral estoppel because Bradburn unduly delayed its filing of the instant litigation and could easily have joined the LePage's action. [HN29] As a general rule, "in cases where a plaintiff could easily have joined in the earlier action . . . a trial judge should not allow the use of offensive collateral estoppel." Parklane, 439 U.S. at 331. This rule recognizes that the availability of offensive non-mutual collateral estoppel

> could create an incentive for potential plaintiffs "to adopt a 'wait and see' attitude, in the hope that the first action will result in a favorable judgment," since such plaintiffs "will be able to rely on a previous judgment against a defendant but will not be bound by that judgment if the defendant wins."

Burlington, 63 F.3d at 1232 n.7 (quoting Parklane, 439 U.S. at 330). [HN30] Courts have denied the use of offensive collateral estoppel where a plaintiff who could have joined the earlier action failed to present a valid reason for not joining it. See Hauser v. Krupp Steel Producers, Inc., 761 F.2d 204, 207 (5th Cir. 1985). [*45] Here, 3M argues that Bradburn adopted a 'wait and see' approach because it did not join the LePage's litigation and did not file suit until October 2, 2002 -over two years after judgment in the LePage's lawsuit was entered.

3M, however, has offered no evidence that Bradburn's sole motivation in not joining LePage's was the hope of benefitting from the application of collateral estoppel. See McLendon v. Continental Group, 660 F. Supp. 1553,1564 (D.N.J.1987) [HN31] (defendant must establish that the plaintiff's sole motivation in not joining the earlier action was the hope to obtain the benefit of issue preclusion before courts should deny use of collateral estoppel). In any event, Bradburn persuasively argues that it could not easily have intervened in the LePage's litigation pursuant to Federal Rule of Civil Procedure 24. [HN32] Rule 24(a)(2) provides that intervention as of right shall be granted upon timely application when

> the applicant claims an interest relating to the property or transaction which is subject of the action and the applicant is so situated that the disposition of the action may as a practical matter [*46] impair or impede the applicant's ability to protect that interest, unless the applicant's interest is adequately represented by existing

parties

Fed. R. Civ. P. 24(a)(2). "Representation is generally considered adequate if no collusion is shown between the representative and an opposing party, if the representative does not represent an interest adverse to the proposed intervenor and if the representative has been diligent in prosecuting the litigation." Del. Valley Citizens' Council for Clean Air v. Commonwealth of Pennsylvania, 674 F.2d 970, 973 (3d Cir. 1982) 3M does not dispute that there was no collusion between the parties in LePage's, or that plaintiff in LePage's diligently prosecuted the litigation. Therefore, Bradburn could only have joined the previous litigation pursuant to Rule 24(a)(2) if plaintiff in LePage's had represented an interest adverse to Bradburn In the instant litigation, Bradburn bases its claim against 3M on the same conduct and for a violation of the same statute as plaintiff in LePage's. Indeed, Bradburn seeks collateral estoppel precisely because its interests are aligned [*47] with plaintiff's interests in LePage's. As plaintiff in LePage's did not represent an interest adverse to Bradburn, it is highly unlikely that Bradburn could have easily joined the LePage's litigation pursuant to Rule 24(a)(2).

[HN33] Rule 24(b)(2) provides that permissive intervention shall be granted upon timely application where

> an applicant's claim or defense and the main action have a question of law or fact in common    .  .  .    In exercising its discretion the court shall consider whether the intervention will unduly delay or prejudice the adjudication of the rights of the original parties.

Fed. R. Civ. P. 24(b)(2). Generally, courts disfavor permissive intervention by class plaintiffs in actions brought by individual plaintiffs because such intervention tends to unduly delay and prejudice the adjudication of the rights of the original parties See, e.g., Castano v. American Tobacco Co., 1994 U.S. Dist. LEXIS 7426, Civ. A. No. 94-1044, 1994 WL 247239, at *3 (E.D.La. June 1, 1994) (denying Rule 24(b)(2) motion by class of plaintiffs because granting intervention "would unduly expand the already voluminous litigation"); Jack Faucett Assocs. v. AT&T Co., 566 F. Supp. 296, 299 n.4 (D.D.C.

1983), [*48] rev'd on other grounds, 240 U.S. App. D.C. 103, 744 F.2d 118 (D.C. 1984) ("It is exceedingly unlikely that [the class of consumer plaintiffs] would have been permitted to join their class claims as customers to further complicate what was from its inception primarily a complex competitor's claim.").

Here, too, it is unlikely that the Court would have allowed Bradburn to intervene in LePage's pursuant to Rule 24(b)(2). The addition of an entire class of plaintiffs would have significantly increased the complexity of an already factually and legally complicated antitrust action. Moreover, Bradburn's intervention in the LePage's litigation would have turned an individual lawsuit into a class action. As a result, the parties would have been required to comply with the additional procedures mandated for class actions, which would have resulted in significant delay and prejudice to the original parties in the adjudication of their dispute. It also appears that the parties to the LePage's litigation would have strenuously objected to Bradburn's intervention. Indeed, 3M has admitted that it would have opposed Bradburn's motion for intervention pursuant to Rule 24(b)(2) (See Def's [*49] Mem. in Opp. at 36 n.28.) Accordingly, it is highly unlikely that Bradburn could have easily joined the LePage's litigation pursuant to Rule 24(b)(2). As Bradburn could not have easily intervened in the earlier action under Rule 24, the Court concludes that considerations of fairness do not preclude the application of collateral estoppel on grounds that Bradburn did not join the LePage's litigation. See Parklane, 439 U.S. at 331.

c. Distortion of issues and juror confusion

3M further argues that the Court should refuse to grant Bradburn the use of offensive collateral estoppel because the application of estoppel would unfairly prejudice 3M by distorting the issues in this case and creating juror confusion. [HN34] Courts have denied the use of offensive estoppel where "the risk of prejudice and confusion significantly outweighs any benefit that might be derived from applying collateral estoppel." Coburn, 174 F. Supp. 2d at 1241 Moreover, courts have recognized that the values gained by the use of issue preclusion are diminished where closely related issues must be tried and the application of collateral estoppel would "substantially distort [*50] decision of the issues that remain open."Phonetele, Inc. v. AT&T Co., 1984 U.S. Dist. LEXIS 20259, No. CV-74-3566-MML, 1984

Case 1:05-cv-00441-JJF    Document 244-2    Filed 11/13/2006    Page 31 of 59

2005 U.S. Dist. LEXIS 5315, *50; 2005-1 Trade Cas. (CCH) P74,769

WL 2943, at *2 (C.D. Cal. Jan. 19, 1984); see also Wright and Miller, supra, § 4465, at 738-39.

3M argues that the application of collateral estoppel to the jury's findings in LePage's would unfairly distort the issues in this case because the LePage's litigation involved a different type of plaintiff and a different theory of pricing and damages. Specifically, 3M points out that plaintiff in LePage's was a competitor who pursued a theory of predatory pricing, which is based on a decrease of prices below their competitive level. Bradburn, on the other hand, is a buyer who is pursuing a theory of monopoly overcharging, which is based on an increase of prices over their competitive level. [HN35] Courts, however, have applied collateral estoppel to determinations of antitrust violations made in antitrust lawsuits between competitors to later antitrust actions brought by buyers. See, e.g., Oberweis, 553 F. Supp. at 969.

Moreover, this Court has already held that Bradburn's theory of recovery is not necessarily inconsistent with the theory of anti-competitive [*51] conduct presented to the jury in the LePage's trial:

> According to [3M], [Bradburn's] claims cannot be reconciled with the fact that, at least while the bundled rebate program was being instituted, retailers received the bundled rebates paid less for the total amount of goods they received from [3M] than they would have paid had they bought these products from other suppliers. (Def's Reply Mem. at 5.) However, [Bradburn] does allege in the Complaint that [3M] "has maintained prices paid by direct purchasers to 3M well above competitive levels after any 3M's rebates (if any) attributable to tape purchases." (Compl. P 27.) (emphasis added). Thus, [Bradburn's] allegations, if proven, could establish that, were it not for [3M's] anti-competitive conduct, [Bradburn] would have paid less for transparent tape than it actually paid during the damages period, even when any bundled rebates or other discounts are taken into account.

(July 25, 2003 Memorandum and Order at 9.) Finally,

any residual danger that the application of collateral estoppel could distort the remaining issues in this case can be prevented through the use of appropriate jury instructions [*52] at trial. Accordingly, the Court finds that the danger of distorting the issues in the instant case does not substantially outweigh the benefits derived from the application of collateral estoppel.

3M also argues that the selective application of collateral estoppel to some of the facts found by the jury in LePage's creates a substantial risk of jury confusion. Specifically, 3M argues that if collateral estoppel is applied to the jury's finding in LePage's that 3M violated the antitrust laws and that this conduct harmed competition the jury will not understand the need to further determine that this harm to competition caused the price increases that Bradburn was forced to pay. 3M cites to Kramer v. Showa Denko K.K., 929 F. Supp. 733 (S.D.N.Y. 1996), a products liability action, in support of its argument that preclusion of generalized issues of causation could lead to confusion in the jury's consideration of specific causation in this case. In Kramer, the court declined to allow the plaintiff the use of a judgment in a prior consumer's action to collaterally estop the defendant from arguing that its drug was not defective and that the drug did not cause [*53] the plaintiff's injuries. Kramer, 929 F. Supp. at 749-51. The Kramer court reasoned that collateral estoppel would be inappropriate in such circumstances because

> a single products liability case typically involves individualized circumstances peculiar to that case alone, such as the age and health of the plaintiff, the conditions under which the product was used, or the precise circumstances surrounding plaintiff's injury. Such factual idiosyncrasies necessarily prevent a single finding from one such case to be applied to all other cases in cookie-cutter fashion.

Id. at 750-51. The court further noted that the drug the plaintiff had ingested and the drug that had been the subject of the prior action did not come from the same manufacturing lot, and that it was, therefore, impossible to determine from the previous verdict that the drug at issue in the case at bar had been defectively manufactured. Id. Here, by contrast, the "factual

Case 1:05-cv-00441-JJF    Document 244-2    Filed 11/13/2006    Page 32 of 59

2005 U.S. Dist. LEXIS 5315, *53; 2005-1 Trade Cas. (CCH) P74,769

idiosyncracies" are limited to the sole question of the amount of rebates each individual plaintiff received from 3M during the class period. Moreover, unlike in Kramer, Bradburn in this case [*54] bases its allegations of antitrust violations during the period for which it seeks collateral estoppel on the exact same conduct by 3M that was at issue in LePage's.

3M further cites Phonetele in support of its argument that the use of offensive collateral estoppel should be denied in antitrust actions. The Phonetele court denied plaintiff the use of collateral estoppel because its application to select "questions designated by [the plaintiff] would make a fair resolution of the remaining questions unacceptably difficult." Phonetele, Inc. v. AT&T, 1984 U.S. Dist. LEXIS 20259, 1984 WL 2943, at *5. The Phonetele court found that the issues of product market and competition could not be decided by collateral estoppel because it was doubtful whether the products and product markets at issue in the previous case were, in fact, the same as those involved in the later case. Id. 1984 U.S. Dist. LEXIS 20259, at *3. The Phonetele court concluded that this dispute would render the application of issue preclusion to the questions designated by the plaintiff unfair to the defendant. Id. 1984 U.S. Dist. LEXIS 20259 at *5. Here, by contrast, the Court has already concluded that the products and product markets at issue in the LePage's [*55] litigation are the same as those involved in the instant case for the period for which Bradburn seeks to invoke collateral estoppel. The Court, therefore, finds that the danger of prejudice to 3M does not substantially outweigh the benefits derived from the application of collateral estoppel. Accordingly, considerations of fairness do not preclude the application of collateral estoppel in this case.

## IV. CONCLUSION

For the foregoing reasons, Bradburn's Motion for Partial Summary Judgment is denied. However, pursuant to Rule 56(d), the Court finds that the following material facts appear without substantial controversy and shall be deemed established upon the trial of this action:

> 1. For the time period from June 11, 1993 to October 13, 1999, the relevant market in this matter is the market for invisible and transparent tape for home and office use in the United States;
>
> 2. For the time period from June 11,

1993 to October 13, 1999, 3M possessed monopoly power in the relevant market, including the power to control prices and exclude competition in the relevant market;

> 3. For the time period from June 11, 1993 to October 13, 1999, 3M willfully maintained such monopoly [*56] power by predatory or exclusionary conduct; and
>
> 4. For the time period from June 11, 1993 to October 13, 1999, 3M's predatory or exclusionary conduct harmed competition.

The Court notes that the application of collateral estoppel to these four determinations by the jury in LePage's does not establish that 3M violated Section 2 of the Sherman Act subsequent to October 13, 1999. Moreover, even for the period from June 11, 1993 through October 13, 1999, Bradburn will still be required to offer proof that 3M's antitrust violations caused Bradburn injury of the type the antitrust laws were intended to prevent.

An appropriate Order follows.

## ORDER

**AND NOW,** this 30th day of March, 2005, upon consideration of Bradburn's Motion for Partial Summary Judgment (Doc. No. 80), all briefing in response thereto, and the Argument held on November 5, 2003, **IT IS HEREBY ORDERED** that said Motion is **DENIED. IT IS FURTHER ORDERED** that pursuant to Federal Rule of Civil Procedure 56(d) the following material facts appear without substantial controversy and shall be deemed established upon the trial of this action:

> 1. For the [*57] time period from June 11, 1993 to October 13, 1999, the relevant market in this matter is the market for invisible and transparent tape for home and office use in the United States;
>
> 2. For the time period from June 11, 1993 to October 13, 1999, 3M possessed monopoly power in the relevant market, including the power to control prices and exclude competition in the relevant

2005 U.S. Dist. LEXIS 5315, *57; 2005-1 Trade Cas. (CCH) P74,769

market;

3. For the time period from June 11, 1993 to October 13, 1999, 3M willfully maintained such monopoly power by predatory or exclusionary conduct; and

4. For the time period from June 11, 1993 to October 13, 1999, 3M's predatory or exclusionary conduct harmed competition.

BY THE COURT:

John R. Padova, J.

# EXHIBIT 3

Westlaw.

752 F.2d 261
752 F.2d 261, 53 USLW 2345, 224 U.S.P.Q. 756
**(Cite as: 752 F.2d 261)**

Page 1

▷

United States Court of Appeals,
Seventh Circuit.
BRUNSWICK CORPORATION, a Delaware corpor-
ation, Plaintiff-Appellant,
v.
RIEGEL TEXTILE CORPORATION, a Delaware
corporation, Defendant-Appellee.
No. 84-1334.

Argued Sept. 19, 1984.
Decided Dec. 19, 1984.
Rehearing and Rehearing En Banc Denied Jan. 18,
1985.

Corporation brought suit against textile manufacturer
alleging that manufacturer violated the Sherman Act
by procuring a patent on antistatic yarn by fraud,
thereby monopolizing production of the yarn. The
United States District Court for the Northern District
of Illinois, Marvin E. Aspen, J., 578 F.Supp. 893,
granted manufacturer's motion to dismiss, and cor-
poration appealed. The Court of Appeals, Posner,
Circuit Judge, held that: (1) complaint which alleged
violation of Sherman Act by procuring a patent by
fraud stated no antitrust cause of action, since inven-
tion was patentable; (2) even if complaint did state
antitrust cause of action, action was barred by four-
year statute of limitations; (3) patent-interference
proceeding did not toll statute of limitations, since
patent validity is not within Patent Office's primary
jurisdiction; and (4) statute of limitations could not
be tolled on ground that damages were speculative at
time patent was issued.

Affirmed.

Harlington Wood, Jr., Circuit Judge, issued concur-
ring statement.

West Headnotes

**[1] Antitrust and Trade Regulation** ☞546
29Tk546 Most Cited Cases
    (Formerly 265k12(11/4))
A conspiracy between a corporation and its employ-
ees is not actionable under antitrust law.

**[2] Antitrust and Trade Regulation** ☞587(1)
29Tk587(1) Most Cited Cases
    (Formerly 265k12(15))
Getting a patent by means of a fraud on the Patent
Office can, but does not always, violate Section 2 of
the Sherman Act. Sherman Anti-Trust Act, § 2, 15
U.S.C.A. § 2.

**[3] Antitrust and Trade Regulation** ☞714
29Tk714 Most Cited Cases
    (Formerly 265k12(1.3))
To create, or attempt to create, or conspire to create,
monopoly power by improper means is to monopol-
ize or attempt to monopolize, or conspire to mono-
polize within meaning of Section 2 of Sherman Act.
Sherman Anti-Trust Act, § 2, 15 U.S.C.A. § 2.

**[4] Antitrust and Trade Regulation** ☞682
29Tk682 Most Cited Cases
    (Formerly 265k12(15))
For a patent fraud to actually create or threaten to
create monopoly power, and hence violate Section 2
of the Sherman Act, three conditions must be satis-
fied besides proof that defendant obtained a patent by
fraud: patent must dominate a real market; invention
sought to be patented must not be patentable; and pat-
ent must have some colorable validity, conferred for
example by patentee's efforts to enforce it by bring-
ing patent infringement suits. Sherman Anti-Trust
Act, § 2, 15 U.S.C.A. § 2.

**[5] Antitrust and Trade Regulation** ☞587(1)
29Tk587(1) Most Cited Cases
    (Formerly 265k12(15))
Stealing a valid patent is not the same thing, from an
antitrust standpoint, as obtaining an invalid patent;
until unmasked in an infringement or cancellation or
other proceedings, a patent on an unpatentable inven-
tion may create a monopoly by discouraging, through
litigation or other means, others from making the pat-
ented product, just as a valid patent may, but the
monopoly that such a patent creates is illegal, and
hence actionable under antitrust law; theft of a per-
fectly valid patent, in contrast, creates no monopoly
power; it merely shifts lawful monopoly into differ-
ent hands, and thus has no antitrust significance, al-

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

752 F.2d 261                                                    Page 2
752 F.2d 261, 53 USLW 2345, 224 U.S.P.Q. 756
(Cite as: 752 F.2d 261)

though it hurts lawful owner of monopoly power.

**[6] Antitrust and Trade Regulation ☞520**
29Tk520 Most Cited Cases
 (Formerly 265k12(1))
If no consumer interest can be discerned even remotely in an antitrust suit brought by competitor, and if a victory for the competitor can confer no benefit, certain or probable, present or future, on consumers, court is entitled to question whether violation of antitrust law is being charged.

**[7] Antitrust and Trade Regulation ☞587(1)**
29Tk587(1) Most Cited Cases
 (Formerly 265k12(15))
It is not a purpose of antitrust law to confer patents or to resolve disputes between rival applicants for a patent; from standpoint of antitrust law, concerned as it is with consumer welfare, it is a matter of indifference whether one rival applicant obtains the patent monopoly rather than another.

**[8] Antitrust and Trade Regulation ☞682**
29Tk682 Most Cited Cases
 (Formerly 265k12(15))
Complaint which alleged that, by procuring a patent on antistatic yarn by fraud and by defending patent's validity groundlessly in a patent-interference proceeding, defendant monopolized production of antistatic yarn, stated no antitrust cause of action, even assuming that business of making and selling antistatic yarn is an economically meaningful market, since complaint did not allege that process for making antistatic yarn was not patentable.

**[9] Limitation of Actions ☞58(1)**
241k58(1) Most Cited Cases
Antitrust action alleging that defendant, by procuring a patent on antistatic yarn by fraud and by defending patent's validity groundlessly in a patent-interference proceeding, monopolized production of antistatic yarn, was barred by four-year antitrust statute of limitations, because alleged fraud occurred in 1972, when patent was issued, yet suit was not brought until 1982. Clayton Act, § 4B, 15 U.S.C.A. § 15b.

**[10] Administrative Law and Procedure ☞228.1**
15Ak228.1 Most Cited Cases

 (Formerly 15Ak228)
Doctrine of primary jurisdiction, as distinct from that of exhaustion of administrative remedies, comes into play after suit is filed, when defendant asks that suit be stayed because a potentially controlling question is within an agency's exclusive jurisdiction to decide, at least in the first instance.

**[11] Limitation of Actions ☞105(1)**
241k105(1) Most Cited Cases
Patent-interference proceeding did not suspend statute of limitations applicable to plaintiff's antitrust claim that defendant, by procuring patent on antistatic yarn by fraud, illegally monopolized production of such yarn, since patent validity is not within Patent Office's primary jurisdiction. Clayton Act, § 4B, 15 U.S.C.A. § 15b.

**[12] Antitrust and Trade Regulation ☞553**
29Tk553 Most Cited Cases
 (Formerly 265k12(1.3))
Exclusion from a market is a conventional form of antitrust injury that gives rise to claim for damages as soon as the exclusion occurs, even though, in the nature of things, the victim's losses lie mostly in the future.

**[13] Limitation of Actions ☞58(1)**
241k58(1) Most Cited Cases
An antitrust plaintiff may be able to show that his future losses were so speculative at time of exclusion from the market that a judge or jury would not have been allowed to award damages for those losses at that time, in which event plaintiff may and indeed must wait to sue; but unless special circumstances preclude, as excessively speculative, an award of damages based on predicted, as distinct from realized losses, due to defendant's misconduct, antitrust statute of limitations is not tolled simply in order to wait and see just how well defendant does in the market from which he excluded plaintiff. Clayton Act, § 4B, 15 U.S.C.A. § 15b.

**[14] Limitation of Actions ☞58(1)**
241k58(1) Most Cited Cases
Statute of limitations applicable to plaintiff's claim that defendant, by procuring patent by fraud on antistatic yarn, monopolized production of patented

752 F.2d 261                                                                                                            Page 3
752 F.2d 261, 53 USLW 2345, 224 U.S.P.Q. 756
**(Cite as: 752 F.2d 261)**

device could not be tolled on grounds that plaintiff's damages were too speculative to be computed at time of alleged antitrust violation, since plaintiff could have gotten complete compensation in a suit brought at time patent was issued with much less uncertainty than is usual in antitrust damage actions, inasmuch as plaintiff could and did ask for defendant's profits from sale of antistatic yarn up to date of trial and for an assignment of defendant's patent rights to it, which would have enabled plaintiff to obtain future profits generated by patent by licensing it to textile manufacturers. Clayton Act, § 4B, 15 U.S.C.A. § 15b.

**[15] Limitation of Actions ☞58(1)**
241k58(1) Most Cited Cases
Fact that defendant charged with antitrust violation in form of procuring a patent by fraud defended itself in a patent-interference proceeding did not constitute exclusionary conduct that, when combined with original fraud, established an antitrust violation that continued into four-year limitations period, thus entitling plaintiff to complain about whole violation, no matter how long ago it began. Clayton Act, § 4B, 15 U.S.C.A. § 15b.

**[16] Antitrust and Trade Regulation ☞905(3)**
29Tk905(3) Most Cited Cases
   (Formerly 265k12(16.5))
Harassing competitors by litigation that can fairly be described as malicious prosecution or abuse of process can violate the antitrust laws.
*264 Erwin C. Heininger, Mayer, Brown & Platt, Chicago, Ill., for plaintiff-appellant.

J.D. Fleming, Sutherland, Asbill & Brennan, Atlanta, Ga., for defendant-appellee.

Before WOOD and POSNER, Circuit Judges, and CAMPBELL, Senior District Judge [FN*]

>        FN* Hon. William J. Campbell of the
>        Northern District of Illinois, sitting by desig-
>        nation.

POSNER, Circuit Judge.

Brunswick Corporation appeals from the dismissal, on the pleadings, of its antitrust suit against Riegel Textile    Corporation.         578    F.Supp.    893

   The appeal requires us to consider aspects of the relationship between patent and antitrust law.

The complaint alleges that in 1967 Brunswick invented a new process for making "antistatic yarn," which is used to make garments worn in hospital operating rooms and other areas where there are volatile gases that could be ignited by static electricity.    Brunswick, which is not itself a textile manufacturer, disclosed its invention to Riegel, which is    Riegel promised to keep the invention secret.    In April 1970 Brunswick applied for a patent on the new process and in August Riegel did likewise--in breach of its agreement with Brunswick.    (Riegel denies that this was a breach, but as Brunswick has been given no chance to substantiate the allegations of its complaint we must treat them as true for purposes of this appeal.)    Without considering Brunswick's application the Patent Office issued a patent to Riegel in 1972. The Patent Office discovered the Brunswick application in 1973, and in 1975 instituted a patent-interference proceeding to determine priority of invention between Riegel and Brunswick.    See 35 U.S.C. § 135; 1 Rosenberg, Patent Law Fundamentals § 10.02 (2d ed. 1984).    That proceeding was still pending before the Patent Office when Brunswick brought this lawsuit in 1982, but since then the Patent Office has held that although Brunswick indeed invented the process first, its patent application was invalid.    Brunswick has challenged this ruling in another lawsuit in the Northern District of Illinois, and it has also sued Riegel in an Illinois state court for unfair competition

[1] Brunswick's complaint in this case is that by procuring a patent by fraud and then defending the patent's validity groundlessly in the patent-interference proceeding, Riegel monopolized the production of antistatic yarn in violation of section 2 of the Sherman Act, 15 U.S.C. § 2    The complaint also describes Riegel's misconduct as an attempt to monopolize and as a conspiracy (with Riegel's agents and employees) to monopolize, which are also forbidden by section 2, except that a conspiracy between a corporation and its employees is not actionable under antitrust law.    University Life Ins. Co. v. Unimarc Ltd., 699 F.2d 846, 852 (7th Cir.1983)    The district court dismissed the suit on alternative grounds:    the

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works

752 F.2d 261
752 F.2d 261, 53 USLW 2345, 224 U.S.P.Q. 756
(Cite as: 752 F.2d 261)

complaint fails to state an antitrust cause of action;  the suit is barred by the antitrust statute of limitations.

[2][3] Getting a patent by means of a fraud on the Patent Office can, but does not always, violate section 2 of the Sherman Act.   See, e.g., _Walker Process Equipment, Inc. v. Food Machinery & Chem. Corp.,_ 382 U.S. 172, 86 S.Ct. 347, 15 L.Ed.2d 247 (1965); _United States v. Singer Mfg. Co.,_ 374 U.S. 174, 196-97, 83 S.Ct. 1773, 1784-85, 10 L.Ed.2d 823 (1963); _American Cyanamid Co. v. FTC,_ 363 F.2d 757, 770-71 (6th Cir.1966); see generally 3 Areeda & Turner, Antitrust Law ¶¶ 707a-b, d, f (1978).   A patent entitles the patentee to prevent others from making or selling the patented product or, as here, using the patented production process, and he may be able to use this legal right to restrict competition.   If antistatic yarn cannot be produced efficiently other than by using Riegel's patented process, Riegel may be able to exclude competition in the sale of such yarn, in which event it may have "monopoly power"--the "power to control prices or exclude competition." *265 _United States v. E.I. du Pont de Nemours & Co.,_ 351 U.S. 377, 391- 92, 76 S.Ct. 994, 1004-05, 100 L.Ed. 1264 (1956) (plurality opinion).   And to create (or attempt to create, or conspire to create) monopoly power by improper means is to monopolize (or attempt to monopolize, or conspire to monopolize) within the meaning of section 2 of the Sherman Act.   See, e.g., _United States v. Grinnell Corp.,_ 384 U.S. 563, 570-71, 86 S.Ct. 1698, 1703-04, 16 L.Ed.2d 778 (1966).

[4] But "may" is not "does"; and for a patent fraud actually to create or threaten to create monopoly power, and hence violate section 2, three conditions must be satisfied besides proof that the defendant obtained a patent by fraud:

1.  The patent must dominate a real market.   See _Walker Process Equipment, Inc. v. Food Machinery & Chem. Corp., supra,_ 382 U.S. at 177-78, 86 S.Ct. at 350-51; _American Hoist & Derrick Co. v. Sowa & Sons, Inc.,_ 725 F.2d 1350, 1366-67 (Fed.Cir.1984); _Handgards, Inc. v. Ethicon, Inc.,_ 601 F.2d 986, 993 n. 13 (9th Cir.1979).   Although the Patent Office will not issue a patent on an invention that has no appar-

ent utility, the invention need not have any commercial value at all (other products or processes may be superior substitutes), and it certainly need not have enough value to enable the patentee to drive all or most substitutes from the market.   If a patent has no significant impact in the marketplace, the circumstances of its issuance cannot have any antitrust significance.

2.  The invention sought to be patented must not be patentable.   If the invention is patentable, it does not matter from an antitrust standpoint what skullduggery the defendant may have used to get the patent issued or transferred to him.   The power over price that patent rights confer is lawful, and is no greater than it otherwise would be just because the person exercising the rights is not the one entitled by law to do so.   The distinction between a fraud that leads the Patent Office to issue a patent on an unpatentable invention (as in a case where the patent applicant concealed from the Patent Office the fact that the invention already was in the public domain) and one that merely operates to take the patent opportunity away from the real inventor (who but for the fraud would have gotten a valid patent that would have yielded him a royalty measured by the monopoly power that the patent conferred) is supported by analogy to cases holding that fraud on the Patent Office, to be actionable as patent fraud, must be material in the sense that the patent would not have been issued but for the misconduct.   See, e.g., _E.I. du Pont de Nemours & Co. v. Berkley & Co.,_ 620 F.2d 1247, 1274 (8th Cir.1980); _Norton v. Curtiss,_ 433 F.2d 779, 794 (C.C.P.A.1970).   Equally, for a fraud to be material in an antitrust sense the plaintiff must show that but for the fraud no patent would have been issued to anyone.   If a patent would have been issued to someone, the fraud could but have diverted market power from the one who had the right to possess and exploit it to someone else.

3.  The patent must have some colorable validity, conferred for example by the patentee's efforts to enforce it by bringing patent-infringement suits.   Indeed, some formulations of the antitrust offense of patent fraud make it seem that the offense is not the fraudulent procuring of a patent in circumstances that create monopoly power but the bringing of groundless suits

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

752 F.2d 261                                                                   Page 5
752 F.2d 261, 53 USLW 2345, 224 U.S.P.Q. 756
(Cite as: 752 F.2d 261)

for patent infringement. See, e.g., *Handgards, Inc. v. Ethicon, Inc., supra,* 601 F.2d at 993 and n. 13. This metamorphosis is natural because most patent-antitrust claims are asserted as counterclaims to patent-infringement suits and because the abusive prosecution of such suits could violate the antitrust laws even if the patent had not been obtained by fraud. See, e.g., *id.* at 994. But enforcement actions are not a *sine qua non* of monopolizing by patent fraud. Since a patent known to the trade to be invalid will not discourage competitors from making the patented product or using the patented process, and so will not confer monopoly power, suing an infringer is some evidence that the patent has (or at least the patentee is seeking to clothe it with) some colorable validity that *266 might deter competitors. But it is not indispensable evidence; the concern of section 2 is with exclusion of competition, not with the particular means of exclusion. Indeed, one might argue that just by virtue of being issued, a patent would have some apparent validity and that no more should be necessary. But this would go too far the other way. Since patents are issued in ex parte proceedings, and since by hypothesis the patent applicant had to use fraud to persuade the Patent Office to issue the patent, the patent might not fool anybody in the defendant's market.

Let us see whether these three conditions are satisfied by the complaint in this case. Right off the bat there is a problem with condition (1), as Brunswick's complaint does not allege that the business of making and selling antistatic yarn is an economically meaningful market. However, facts are pleaded that allow an inference that antistatic yarn probably does not have good substitutes, in which event its sole producer could maintain its price significantly above the cost of production and sale.

[5] There is a serious problem, however, with condition (2). Far from alleging that the process for making antistatic yarn that Riegel patented is not patentable, the complaint alleges that it is. Brunswick's only objection is to the patentee's identity; it thinks that it rather than Riegel should be the patentee. But as we have already suggested, to say that a patent should have been issued because the invention covered by it is patentable, but should have been is-

sued to a different person and would have been but for fraud (the breach of the promise to Brunswick not to disclose its invention), is to say in effect that the patentee stole the patent from its rightful owner; and stealing a valid patent is not at all the same thing, from an antitrust standpoint, as obtaining an invalid patent. Until unmasked in an infringement or cancellation or other proceeding, a patent on an unpatentable invention may create a monopoly by discouraging (through litigation or other means) others from making the patented product, just as a valid patent may, but the monopoly that such a patent creates is illegal, and hence actionable under antitrust law. The theft of a perfectly valid patent, in contrast, creates no monopoly power; it merely shifts a lawful monopoly into different hands. This has no antitrust significance, although it hurts the lawful owner of the monopoly power.

[6] The purpose of the antitrust laws as it is understood in the modern cases is to preserve the health of the competitive process--which means, so far as a case such as this is concerned, to discourage practices that make it hard for consumers to buy at competitive prices--rather than to promote the welfare of particular competitors. This point was implicit in the famous dictum of *Brown Shoe Co. v. United States,* 370 U.S. 294, 320, 82 S.Ct. 1502, 1521, 8 L.Ed.2d 510 (1962), that antitrust law (the Court was speaking of section 7 of the Clayton Act, but the point has been understood to be general) is concerned "with the protection of *competition,* not *competitors* " (emphasis in original), and has been repeated with growing emphasis in recent years by this and other courts. See, e.g., *Sutliff, Inc. v. Donovan Cos.,* 727 F.2d 648, 655 (7th Cir.1984), and cases cited there. True, competitors as well as consumers still have standing to complain about antitrust violations, but that is because competitors are thought to be effective (maybe indispensable) surrogates for the many consumers who do not realize they are the victims of monopolistic practices, or if they do may lack incentives to bring suit because the harm to an individual consumer may be tiny even though the aggregate harm is immense. See Landes, *Optimal Sanctions for Antitrust Violations,* 50 U.Chi.L.Rev. 652, 671-72 (1983); cf. *In re Industrial Gas Antitrust Litigation,* 681 F.2d 514, 520 (7th

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

752 F.2d 261                                                                                          Page 6
752 F.2d 261, 53 USLW 2345, 224 U.S.P.Q. 756
(Cite as: 752 F.2d 261)

Cir.1982). If no consumer interest can be discerned even remotely in a suit brought by a competitor--if, as here, a victory for the competitor can confer no benefit, certain or probable, present or future, on consumers--a court is entitled to question whether a violation of antitrust law is being *267 charged. See generally Easterbrook, The *Limits of Antitrust*, 63 Tex.L.Rev. 1, 33-39 (1984). If injury to a competitor, caused by wrongful conduct, were enough to bring the antitrust laws into play, the whole state tort law of unfair competition would be absorbed into federal antitrust law; it has not been: "unfair competition, as such, does not violate the antitrust laws." *Sutliff, Inc. v. Donovan Cos., supra*, 727 F.2d at 655; see also *Car Carriers, Inc. v. Ford Motor Co.*, 745 F.2d 1101, 1107-08 (7th Cir.1984); *Havoco of America, Ltd. v. Shell Oil Co.*, 626 F.2d 549, 554-59 (7th Cir.1980).

We cannot find the consumer interest in this case. Brunswick is complaining not because Riegel is gouging the consumer by charging a monopoly price for antistatic yarn, but because Riegel took away a monopoly that rightfully belonged to Brunswick as the real inventor. It is true that when Riegel got its patent Brunswick's patent application was still pending. But there is no suggestion that any other competitors were in the picture. If Riegel had not committed the alleged fraud, Brunswick would have had the whole field to itself--would have had the monopoly of antistatic yarn that it accuses Riegel of having stolen. This would be true even if Brunswick had not tried to get a patent on its process for making antistatic yarn. It still could, and as a rational profit-maximizer presumably would, have tried to license the invention as a trade secret; and a trade secret known only to, and licensed by, one firm may create as much monopoly power as a patent (more, even, if the secret can be kept for more than 17 years).

The nature of the remedy sought in an antitrust case is often, and here, an important clue to the soundness of the antitrust claim. Brunswick is asking, as a main part of the remedy, for an order transferring ownership of the patent from Riegel to itself. There is no contention that in asking for this Brunswick is motivated by altruism. It wants to make as much money as it can from the patent--as much as Riegel

made, or, if possible, even more. There is nothing discreditable in this ambition but we do not see how consumers can benefit from its achievement. The nature of the remedy sought shows that Brunswick, far from contesting the propriety of a patent monopoly of antistatic yarn, makes that propriety the very foundation for the judicial relief that it seeks.

It makes no difference that Brunswick, which as we said is not a textile manufacturer, says that if it owned the patent it would license production to several manufacturers. There would then be more manufacturers of antistatic yarn than there are today, but there would not be more competition if the "competitors" were constrained by the terms of the patent license to charge the monopoly price. And they would be. As a rational profit-maximizer Brunswick would charge its licensees a royalty designed to extract from them all the monopoly profits that the patent made possible; and the licensees would raise their prices to consumers to cover the royalty expense. The price to the consumer would be the same as it is, today, with Riegel the only seller in the market.

[7] It is not a purpose of antitrust law to confer patents or to resolve disputes between rival applicants for a patent. From the standpoint of antitrust law, concerned as it is with consumer welfare, it is a matter of indifference whether Riegel or Brunswick exploits a monopoly of antistatic yarn. Cf. *Products Liability Ins. Agency, Inc. v. Crum & Forster Ins. Cos.*, 682 F.2d 660, 665 (7th Cir.1982). Indeed, if anything, competitive pricing is more likely if Brunswick loses this suit than if it wins it. If Brunswick is confident that Riegel's patent is invalid, it can go into the antistatic-yarn business itself, with little fear of being held liable for patent infringement; and by entering, it will inject some competition into that market for the first time. Brunswick argues that it could not induce textile manufacturers to produce antistatic yarn under license from it since they would fear that Riegel would sue them, however baselessly, for patent infringement. But when a patentee (or, as in this case, a *268 patent applicant) licenses his patent to other firms, he typically agrees to indemnify them for any costs incurred in patent-infringement suits brought against them. Brunswick, a large cor-

752 F 2d 261                                                                                   Page 7
752 F 2d 261, 53 USL W 2345, 224 U S P Q. 756
(Cite as: 752 F.2d 261)

poration, can afford to indemnify its licensees and would promise to do so if it really believed that it and not Riegel was the lawful owner of the patent.

Our analysis is supported by a more illustrious case bearing Brunswick's name--*Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.,* 429 U.S. 477, 489, 97 S.Ct. 690, 697, 50 L.Ed.2d 701 (1977), which held that an antitrust plaintiff cannot prevail merely by showing that the defendant violated the antitrust laws and the violation hurt the plaintiff; he must also show that the injury is the sort of thing the antitrust laws seek to discourage, such as price above the competitive level and output below it. It would seem to follow that if a form of wrongdoing (stealing a patentable process) cannot cause antitrust injury to anyone, because it has no tendency to raise prices or reduce output or do anything else that hurts consumer or other interests protected by the antitrust laws, it does not violate those laws at all. It is then not a matter of the case having been brought by the wrong plaintiff, as in *Brunswick,* but of there being no possible plaintiff because the defendant's conduct has no tendency to injure anyone intended to be benefited by the antitrust laws. The Fifth Circuit so held recently in a case where the plaintiff had complained that the defendant was preventing it from exploiting a natural monopoly of the resale distribution of electricity *Almeda Mall, Inc. v. Houston Lighting & Power Co.,* 615 F.2d 343, 353 (5th Cir.1980); see also *Mishler v. St. Anthony's Hospital Systems,* 694 F.2d 1225, 1228 (10th Cir.1981)

[8] The third condition for a patent fraud to violate section 2 of the Sherman Act--that the defendant has made efforts to give the color of validity to his patent on an unpatentable invention--cannot be met in a case where the plaintiff himself asserts that the underlying invention is patentable. This reinforces our conclusion that the complaint states no antitrust cause of action

But in so concluding we have not considered any events after Riegel received the patent in 1972, though Brunswick argues that Riegel's subsequent conduct in defending itself in the patent-interference proceeding also violated section 2 This argument is also a cornerstone of Brunswick's challenge to the district court's alternative holding that Riegel's action was barred by the statute of limitations--a holding we shall now consider in part for the light it may cast on the more fundamental issue of the sufficiency of the complaint.

[9] Unless tolled for one reason or another, the four-year antitrust statute of limitations in section 4B of the Clayton Act, 15 U.S.C. § 15B, expired in 1976 on any cause of action that Brunswick might have had by reason of Riegel's alleged fraud, because the fraud had succeeded in 1972, when Riegel got its patent, yet this suit was not brought till 1982. Brunswick has abandoned its argument that the statute of limitations was tolled because of fraudulent concealment, but makes other arguments for extending the statute. One is that the Patent Office has primary jurisdiction over any dispute over patent validity, and that as a result the statute of limitations does not begin to run till its proceedings are final. Although this argument may seem to lead to the bizarre conclusion that Brunswick's suit is premature, because judicial review of the patent-interference proceeding is not yet complete, Brunswick was entitled to file this antitrust suit as a protective action so that if its primary-jurisdiction argument failed its suit would not be time-barred. And that is the spirit in which Brunswick filed; the only discovery it proposed to conduct before the patent-interference proceeding was resolved was deposing elderly witnesses who might die or whose memories might fade before the case was tried

[10] *Mt. Hood Stages, Inc. v. Greyhound Corp.,* 616 F.2d 394 (9th Cir.1980), *269 the case on which Brunswick relies for this ground for extending the statute of limitations, holds that the antitrust statute of limitations does not begin to run until the conclusion of any administrative proceedings that the plaintiff is required to pursue by the doctrine of primary-jurisdiction. This is a surprising holding because the doctrine of primary jurisdiction (as distinct from that of exhaustion of administrative remedies) ordinarily comes into play *after* suit is filed and the statute of limitations is thus stopped from running, when the defendant asks that the suit be stayed because a potentially controlling question is within an agency's exclusive jurisdiction to decide, at least in the first in-

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

752 F.2d 261                                                                                    Page 8
752 F.2d 261, 53 USLW 2345, 224 U.S.P.Q. 756
(Cite as: 752 F.2d 261)

stance.  See, e.g., _City of Peoria v. General Electric Cablevision Corp., 690 F.2d 116, 120-21 (7th Cir.1982)_.  Mt. Hood complained that a competing bus company had tried to drive it out of business by buying up bus companies with which it had connecting routes and then cancelling the connections so that it would be isolated.  Although the acquisitions had been approved by the Interstate Commerce Commission and by being approved had been immunized from an attack under the antitrust laws, Mt. Hood asked the Commission to rescind its approval on the ground that Greyhound had obtained it through misrepresentations;  and it was only after the Commission accepted the petition and rescinded its earlier approval that Mt. Hood filed its antitrust suit.  It could have sued before asking the Commission to rescind the original order, but had it done so Greyhound would have argued that the acquisitions were immune, Mt. Hood would have countered that the immunity rested on fraud, and the court would then (perhaps) have stayed the suit on the ground that the question whether the approval of the acquisitions had been fraudulently procured was within the primary jurisdiction of the ICC, requiring Mt. Hood to present its claim to the Commission before the court could resolve the issue of antitrust immunity.

To allow the statute of limitations to be tolled on the basis of a defense that might be raised if the suit were filed on time is unconventional;  and although, since it was very likely that a dispositive issue would have to be fought out in the Commission before the court could act, it may have made little difference whether Mt. Hood brought the suit within four years and then interrupted it for a proceeding before the ICC, or waited till that proceeding was over before suing, it could have made some difference, as the facts of the present case show.  The patent-interference proceeding began three years after Brunswick's cause of action arose, which means that the statute of limitations had one year left to run.  But for _Mt. Hood,_ Brunswick would have had to sue within another year, that is, while the patent-interference proceeding was going on.  The suit would have been stayed but would have resumed immediately upon the conclusion of that proceeding.  Under the principle of _Mt. Hood_ (if applicable to patent-interference proceedings), Brunswick would have had a year to bring suit _after_ the conclusion of the interference proceeding.  Considering that agency proceedings can greatly prolong antitrust litigation when primary jurisdiction is invoked -especially since the agency proceedings are not considered complete for these purposes until judicial review of the agency's determination is complete, see, e.g., _Ricci v. Chicago Mercantile Exchange, 409 U.S. 289, 306, 93 S.Ct. 573, 582, 34 L.Ed.2d 525 (1973)_ -we question the wisdom of allowing a plaintiff to wait for the unexpired portion of the statute of limitations to expire after the agency proceedings are complete before he sues, rather than suing if need be while those proceedings are going on and staying the suit till they have been completed.

[11] But sound or unsound, the principle of _Mt. Hood_ is not applicable to this case.  It certainly would not apply if the priority of the conflicting patent applications, Brunswick's and Riegel's, were the only issue in the patent-interference proceeding, for that is not a potentially dispositive issue in the antitrust case.  Brunswick's antitrust claim is that Riegel, by breaking its contract not to disclose Brunswick's *270 invention, defrauded Brunswick of its right to patent the process it had invented for producing antistatic yarn.  Even if the Patent Office decided that Riegel's patent was valid, Riegel might still have committed a fraud against Brunswick by applying for the patent itself.  Cf. _Hilborn v. Dann, 546 F.2d 401, 403 (C.C.P.A.1976)_.  True, the Patent Office might find, to the contrary, that Riegel's patent was invalid and Brunswick's patent application valid.  And it might seem that if Brunswick could get all the relief it wanted from the Patent Office it ought not to have to bring suit before it knew whether it had gotten that relief.  But there was no way that Brunswick could obtain complete relief from the Patent Office;  the Patent Office could not make Riegel compensate Brunswick for the money that Brunswick had lost because Riegel had gotten a patent first.  Thus, if priority of invention were the only issue in the patent-interference proceeding, that proceeding could provide at best some partial and parallel relief to the antitrust suit but would not be a condition precedent to it (as in _Deltec, Inc. v. Laster, 326 F.2d 443, 444 (6th Cir.1964)_ (per curiam)), or a complete substitute

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works

752 F 2d 261                                                                                                Page 9
752 F 2d 261, 53 USLW 2345, 224 U S P Q. 756
(Cite as: 752 F.2d 261)

for it, or even a proceeding that "promises to be of material aid in resolving" a potentially dispositive issue, _Ricci v. Chicago Mercantile Exchange, supra, 409 U.S. at 302, 93 S.Ct. at 580_, such as the issue of antitrust immunity in _Ricci_ and in _Mt. Hood_. The fact that Brunswick wanted to litigate the patent-interference proceeding to conclusion before actively litigating the present suit does not show that that proceeding "promise[d] to be of material aid in resolving" a potentially dispositive issue, but only that Brunswick had a preferred sequence for litigating its various claims (now pending in three different courts) against Riegel.

But all this assumes that priority is the only issue in a patent-interference proceeding, and we know from the fact that the Patent Office found that Brunswick's patent application was invalid that it is not. The Board of Patent Interferences is allowed to review a broad range of issues "ancillary" to priority. See 1 Rosenberg, _supra_, § 10.02[5][c], at p. 10-47. And the validity of Brunswick's patent is, as Brunswick has framed its antitrust suit, a potentially dispositive issue in the antitrust suit, since that whole suit is bottomed on the claim that Riegel took from Brunswick a patent opportunity that rightfully belonged to it However, this court has held recently that patent validity is not within the Patent Office's primary jurisdiction See _Johnson & Johnson, Inc. v. Wallace A. Erickson & Co., 627 F.2d 57, 61-62 (7th Cir.1980)_ The validity of a patent is a question of law, which a court decides with some but not great deference to decisions of the Patent Office. _Johnson & Johnson_ was not an antitrust case, but we think its teachings apply even more strongly to antitrust cases These cases are already sufficiently protracted without our making them more so by adopting a new principle under which patent-antitrust cases could be delayed indefinitely for proceedings before the Patent Office. As for the issue of fraud, apparently that was never presented to the Patent Office as part of the interference proceeding; and we doubt whether the Patent Office would be interested in adjudicating a dispute arising not from anything done in Patent Office proceedings but from Riegel's agreement with Brunswick not to disclose Brunswick's invention

Brunswick's separate argument that its damages were insufficiently definite to require it to bring suit back in 1972 when Riegel got its patent rests on _Zenith Radio Corp. v. Hazeltine Research, Inc., 401 U.S. 321, 338-42, 91 S.Ct. 795, 806-08, 28 L.Ed.2d 77 (1971)_, which held that if the victim's damages are too speculative to be computed at the time of the antitrust violation, the victim can (must, really) wait to sue until they become ascertainable. In _Zenith_ itself, the calculation of damages at the time of the violation (or even of the trial) would have required "predict[ing] market conditions and the performance of one competitor in that market five to 10 years hence " _Id. at 342, 91 S.Ct. at 808_. Calculating Brunswick's damages back in *271 1972 would have required predicting Riegel's success in selling antistatic yarn.

[12][13] But _Zenith_ has not been understood to toll the antitrust statute of limitations in every case where the plaintiff is seeking damages for being excluded from a market the profitability of which will be revealed only in the fullness of time. See, e g , _Charlotte Telecasters, Inc. v. Jefferson-Pilot Corp., 546 F.2d 570, 573 (4th Cir.1976); Ansul Co. v. Uniroyal, Inc., 448 F.2d 872, 885 (2d Cir.1971); Landon v. Twentieth Century-Fox Film Corp., 384 F.Supp. 450, 459 (S.D.N.Y.1974)_ Exclusion from a market is a conventional form of antitrust injury that gives rise to a claim for damages as soon as the exclusion occurs (which means, in this case, in 1972), even though, in the nature of things, the victim's losses lie mostly in the future. See, e g , 2 Areeda & Turner, Antitrust Law 232-33 (1978). In some cases, such as _Zenith_ itself, or our recent decision in _Ohio-Sealy Mattress Mfg. Co. v. Kaplan, 745 F.2d 441, 450 (7th Cir.1984)_, the plaintiff may be able to show that his future losses were so speculative at the time of exclusion that a judge or jury would not have been allowed to award damages for those losses at that time, in which event the plaintiff may and indeed must wait to sue (In _Kaplan_, to calculate damages would have required predicting how the defendants would resolve a number of legal questions that faced them; if the defendants answered them in a particular way, the anticompetitive activities would be discontinued and thus cease to hurt the plaintiff) But unless special circumstances preclude, as excessively speculative, an

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

752 F.2d 261                                                                                    Page 10
752 F.2d 261, 53 USLW 2345, 224 U.S.P.Q. 756
(Cite as: 752 F.2d 261)

award of damages based on predicted as distinct from realized losses due to the defendant's misconduct, the statute of limitations is not tolled simply in order to wait and see just how well the defendant does in the market from which he excluded the plaintiff. Otherwise it would be tolled indefinitely in a very large class of antitrust suits.

[14] The *Zenith* principle is particularly out of place in this case; for the nature of Brunswick's complaint is such that it could have gotten complete compensation in a suit brought in 1972 with much less uncertainty than is usual in antitrust damage actions. Brunswick could and did ask for Riegel's profits from the sale of antistatic yarn up to the date of trial and for an assignment of Riegel's patent rights to it, which would have enabled Brunswick to obtain the future profits generated by the patent by licensing it to textile manufacturers—maybe to Riegel itself.

[15] If the complaint can fairly be read to charge misconduct after 1972, when Riegel got its patent, this could provide another and better ground for tolling the statute of limitations, and also for finding in the later conduct some indication that a genuine antitrust violation, occurring within the limitations period, is being charged. But the only thing that happened after 1972 is that Riegel, when brought into the patent-interference proceeding initiated by the Patent Office, defended itself. Brunswick argues that in doing so Riegel engaged in exclusionary conduct that, when combined with the original fraud, establishes an antitrust violation that continued into the four-year limitations period that began in 1978; and it points out that if a continuing violation extends into the statutory period, the victim is entitled to complain about the whole violation, no matter how long ago it began (see, e.g., *Weber v. Consumers Digest, Inc.*, 440 F.2d 729, 731 (7th Cir.1971))—a rule necessary to head off multiple suits growing out of the same events. But if, as we stated earlier, the original fraud was not an antitrust violation because it had no tendency to harm consumer interests, we do not see how Riegel's refusing to acknowledge that fraud in the patent-interference proceeding could be an antitrust violation; it might serve to perpetuate a fraud, but a fraud harmless to the interests protected by the antitrust laws.

[16] Moreover, while harassing competitors by litigation that can fairly be described as malicious prosecution or abuse of process can violate the antitrust laws, see, e.g., *272*Grip-Pak, Inc. v. Illinois Tool Works, Inc., 694 F.2d 466, 470-73 (7th Cir.1982), we are pointed to no case where simply defending oneself in a proceeding brought by another has been held to be actionable. If it were, the following bizarre sequence would be implied: A gets a patent; B, a rival inventor, sues A in state court for unfair competition in having acquired the patent by fraud; years later B brings an antitrust suit against A, charging that A's refusal to cave in in the state-court action brought by B was exclusionary conduct forbidden by the antitrust laws.

Although the patent-interference proceeding was not instituted by Brunswick, but by the Patent Office, this is a technical distinction. Brunswick was the moving party, really, because the patent-interference proceeding was started only after Brunswick, by referring to Riegel's patent in Patent Office filings made in connection with Brunswick's own patent application, made the interference starkly apparent to the Patent Office. See 1 Rosenberg, *supra*, § 10.02[3], at p. 1032. You cannot start a suit, as Brunswick in effect did here, and then sue the defendant for refusing to default.

Brunswick argues, however, not only that Riegel should not have defended itself at all but also that in doing so Riegel falsified documents and engaged in other unethical conduct. We doubt that an antitrust case is the proper forum for deciding questions of legal ethics. But even if defending against a competitor's lawsuit could be (maybe because of the tactics employed) the kind of aggressive conduct that might in other circumstances violate the antitrust laws, it could not here, given our earlier point that all Brunswick is seeking is Riegel's profits plus the transfer of Riegel's patent to itself. Whoever owns the patent, the consumer will have to pay a royalty measured by the monopoly power conferred by the patent-provided the invention really is patentable, as Brunswick vigorously asserts it is.

AFFIRMED.

HARLINGTON WOOD, Jr., Circuit Judge, concur-

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

752 F.2d 261
752 F.2d 261, 53 USLW 2345, 224 U.S.P.Q. 756
(Cite as: 752 F.2d 261)

ring.

I join in the result reached in so much of Judge Pos-
ner's opinion as holds that the alleged cause of action
is barred by the statute of limitations. Judge Aspen's
Memorandum Opinion and Order in the district court,
*Brunswick Corp. v. Riegel Textile Corp., 578 F.Supp.
893 (N.D.Ill.1983)*, held that the cause of action was
barred by the statute of limitations, 15 U.S.C. Section
15b, that no exception was applicable, and that there
was no continuing antitrust violation to bring it with-
in that statute. I would affirm on the basis of Judge
Aspen's opinion.   Therefore, although enlightening, I
see no need for much of the antitrust-economic-
ic-patent discussion in Judge Posner's opinion.

752 F.2d 261, 53 USLW 2345, 224 U.S.P.Q. 756

END OF DOCUMENT

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

# EXHIBIT 4

Westlaw.

124 S.Ct. 2359                                                                                      Page 1
542 U.S. 155, 124 S.Ct. 2359, 159 L.Ed.2d 226, 72 USLW 4501, 2004-1 Trade Cases P 74,448, 04 Cal. Daily Op.
Serv. 5094, 2004 Daily Journal D.A.R. 6990, 17 Fla. L. Weekly Fed. S 374
**(Cite as: 542 U.S. 155, 124 S.Ct. 2359)**

▷

**Briefs and Other Related Documents**

Supreme Court of the United States
F. HOFFMAN-LA ROCHE LTD. et al., Petitioners,
v.
EMPAGRAN S.A. et al.
**No. 03-724.**

Argued April 26, 2004.
Decided June 14, 2004.

**Background:** Antitrust class action was brought on
behalf of foreign and domestic purchasers of vitam-
ins, alleging international price-fixing conspiracy by
manufacturers and distributors. The United States
District Court for the District of Columbia, Thomas
F. Hogan, J., 2001 WL 761360, dismissed suit as to
foreign purchasers for lack of subject matter jurisdic-
tion. On appeal, the United States Court of Appeals
for the District of Columbia Circuit, Harry T. Ed-
wards, Circuit Judge, 315 F.3d 338, reversed and re-
manded. Certiorari was granted.

**Holdings:** The Supreme Court, Justice Breyer, held
that:
(1) Foreign Trade Antitrust Improvements Act
(FTAIA) exclusionary rule was not limited only to
conduct involving exports;
(2) where price-fixing conduct significantly and ad-
versely affected customers both outside and within
United States, but adverse foreign effect was inde-
pendent of any adverse domestic effect, Foreign
Trade Antitrust Improvements Act (FTAIA) domestic
injury exception did not apply, and thus, neither did
Sherman Act, to claim based solely on foreign effect;
abrogating Kruman v. Christie's Int'l PLC, 284 F.3d
384; and
(3) on remand, Court of Appeals could consider
whether foreign purchasers properly preserved their
alternative argument that foreign injury was not in
fact independent of domestic effects and, if so, could
consider and decide related claim.
Vacated and remanded.

Justice Scalia filed opinion concurring in judgment in

which Justice Thomas joined.

Justice O'Connor did not participate.

West Headnotes

**[1] Antitrust and Trade Regulation ☞945**
29Tk945 Most Cited Cases
    (Formerly 265k12(7))
The Foreign Trade Antitrust Improvements Act
(FTAIA) general exclusionary rule does not apply
only to conduct involving American exports and in-
cludes commerce that is wholly foreign. Sherman
Act, § 7, as amended, 15 U.S.C.A. § 6a.

**[2] Antitrust and Trade Regulation ☞945**
29Tk945 Most Cited Cases
    (Formerly 265k12(7))
Where price-fixing conduct significantly and ad-
versely affects customers both outside and within
United States, but adverse foreign effect is independ-
ent of any adverse domestic effect, Foreign Trade
Antitrust Improvements Act (FTAIA)
domestic injury exception does not apply, and thus,
neither does Sherman Act, to claim based solely on
foreign effect; abrogating Kruman v. Christie's Int'l
PLC, 284 F.3d 384. Sherman Act, §§ 1 et seq., 7, as
amended, 15 U.S.C.A. §§ 1 et seq., 6a

**[3] International Law ☞10.1**
221k10.1 Most Cited Cases
Supreme Court ordinarily construes ambiguous stat-
utes to avoid unreasonable interference with sover-
eign authority of other nations.

**[4] International Law ☞10.1**
221k10.1 Most Cited Cases
Rule of statutory construction derived from principle
of "prescriptive comity" cautions courts to assume
that legislators take account of legitimate sovereign
interests of other nations when they write American
laws and thereby helps potentially conflicting laws of
different nations work together in harmony.

**[5] Antitrust and Trade Regulation ☞945**
29Tk945 Most Cited Cases
    (Formerly 265k12(7))

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

124 S Ct. 2359                                                                    Page 2
542 U.S. 155, 124 S Ct. 2359, 159 L.Ed.2d 226, 72 USLW 4501, 2004-1 Trade Cases P 74,448, 04 Cal. Daily Op.
Serv. 5094, 2004 Daily Journal D A R. 6990, 17 Fla. L. Weekly Fed. S 374
(Cite as: 542 U.S. 155, 124 S.Ct. 2359)

Application of United States antitrust laws to foreign anticompetitive conduct is reasonable and consistent with principles of prescriptive comity insofar as they reflect legislative effort to redress domestic antitrust injury that foreign anticompetitive conduct has caused

### [6] Antitrust and Trade Regulation ⊂⊃945
29Tk945 Most Cited Cases
   (Formerly 265k12(7))
Language and history of Foreign Trade Antitrust Improvements Act (FTAIA) suggest that Congress designed FTAIA to clarify, perhaps to limit, but not to expand in any significant way, Sherman Act's scope as applied to foreign commerce. Sherman Act, §§ 1 et seq., 7, as amended, 15 U.S.C.A. §§ 1 et seq., 6a.

### [7] Antitrust and Trade Regulation ⊂⊃960
29Tk960 Most Cited Cases
   (Formerly 265k28(1 6))
Unlike private antitrust plaintiff, government plaintiff must seek to obtain relief necessary to protect public from further anticompetitive conduct and to redress anticompetitive harm and has legal authority broad enough to allow it to carry out this mission. Clayton Act, § 15, 15 U.S.C.A. § 25.

### [8] Federal Courts ⊂⊃462
170Bk462 Most Cited Cases
On remand following vacatur by United States Supreme Court of decision reversing district court's dismissal, for lack of subject matter jurisdiction, of antitrust price-fixing conspiracy class action against vitamin manufacturers and distributors brought on behalf of foreign purchasers, Court of Appeals for Ninth Circuit could consider whether foreign purchasers properly preserved their alternative argument that foreign injury was not in fact independent of domestic effects and, if so, could consider and decide related claim. Sherman Act, § 7, as amended, 15 U.S.C.A. § 6a

**2360 *155 llabus [FN*]

> FN* The syllabus constitutes no part of the opinion of the Court but has been prepared by the Reporter of Decisions for the convenience of the reader. See *United States v. Detroit Timber & Lumber Co., 200 U.S.*

321, 337, 26 S.Ct. 282, 50 L.Ed. 499.

The Foreign Trade Antitrust Improvements Act of 1982 (FTAIA or Act) provides that the Sherman Act "shall not apply to conduct involving trade or commerce ... with foreign nations," 15 U.S.C. § 6a, but creates exceptions for conduct that significantly harms imports, domestic commerce, or American exporters. In this case, vitamin manufacturers and distributors had engaged in a price-fixing conspiracy, raising vitamin prices in the United States and foreign countries, in violation of the Sherman and Clayton Acts. As relevant here, defendants (petitioners) moved to dismiss the suit as to the *foreign* purchasers (respondents), foreign companies located abroad, who had purchased vitamins only outside United States commerce. **2361 In dismissing respondents' claims, the District Court applied the FTAIA and found none of its exceptions applicable. The Court of Appeals reversed, concluding that the FTAIA's exclusionary rule applied, but so did its exception for conduct that has a "direct, substantial and reasonably foreseeable effect" on domestic commerce that "gives rise to a [Sherman Act] claim," §§ 6a(1)(A), (2). Assuming that the foreign effect, *i e ,* higher foreign prices, was independent of the domestic effect, *i e ,* higher domestic prices, the court nonetheless concluded that the Act's text, legislative history, and policy goal of deterring harmful price-fixing activity made the lack of connection between the two effects inconsequential.

*Held*. Where the price-fixing conduct significantly and adversely affects both customers outside and within the United States, but the adverse foreign effect is independent of any adverse domestic effect, the FTAIA exception does not apply, and thus, neither does the Sherman Act, to a claim based solely on the foreign effect. Pp. 2364-2372.

(a) Respondents' threshold argument that the transactions fall outside the FTAIA because its general exclusionary rule applies only to conduct involving exports is rejected. The House Judiciary Committee changed the bill's original language from "export trade or export commerce," H.R. 5235, to "trade or commerce (other than import trade or import com-

124 S.Ct. 2359                                                                      Page 3
542 U.S. 155, 124 S.Ct. 2359, 159 L.Ed.2d 226, 72 USLW 4501, 2004-1 Trade Cases P 74,448, 04 Cal. Daily Op.
Serv. 5094, 2004 Daily Journal D.A.R. 6990, 17 Fla. L. Weekly Fed. S 374
**(Cite as: 542 U.S. 155, 124 S.Ct. 2359)**

merce)" deliberately to include commerce that did not involve American exports but was wholly foreign. Pp. 2365-2366.

**\*156** (b) The FTAIA exception does not apply here for two reasons. *First,* this Court ordinarily construes ambiguous statutes to avoid unreasonable interference with other nations' sovereign authority. This rule of construction reflects customary international law principles and cautions courts to assume that legislators take account of other nations' legitimate sovereign interests when writing American laws. It thereby helps the potentially conflicting laws of different nations work together in harmony. While applying America's antitrust laws to foreign conduct can interfere with a foreign nation's ability to regulate its own commercial affairs, courts have long held such application nonetheless reasonable, and hence consistent with prescriptive comity principles, insofar as the laws reflect a legislative effort to redress domestic antitrust injury caused by foreign anticompetitive conduct. However, it is not reasonable to apply American laws to foreign conduct insofar as that conduct causes independent foreign harm that alone gives rise to a plaintiff's claim. The risk of interference is the same, but the justification for the interference seems insubstantial. While some of the anticompetitive conduct alleged here took place in America, the higher foreign prices are not the consequence of any domestic anticompetitive conduct sought to be forbidden by Congress, which rather wanted to release domestic (and foreign) anticompetitive conduct from Sherman Act constraint when that conduct causes foreign harm. Contrary to respondents' claim, the comity concerns remain real as other nations have not in all areas adopted antitrust laws similar to this country's and, in any event, disagree dramatically about appropriate remedies. Respondents' alternative argument that case-by-case comity analysis is preferable to an across the board exclusion of foreign injury cases is too complex to prove workable. *Second,* the FTAIA's language and history suggest that Congress designed the Act to clarify, perhaps to limit, but not to expand, the Sherman Act's scope as applied to foreign commerce. There is no significant indication that at the time Congress wrote the FTAIA courts would have thought the **\*\*2362** Sherman Act applic-

able in these circumstances, nor do the six cases on which respondents rely warrant a different conclusion. Pp. 2365-2371.

(c) Respondents' additional linguistic arguments might show a natural reading of the statute, but the comity and history considerations previously discussed make clear that respondents' reading is not consistent with the FTAIA's basic intent. Their deterrence-based policy argument is also unavailing in light of the contrary arguments by the antitrust enforcement agencies. Pp. 2371-2372.

(d) On remand, the Court of Appeals may consider whether respondents properly preserved their alternative argument that the foreign **\*157** injury here was not in fact independent of the domestic effects; and, if so, it may consider and decide the related claim. P. 2372.

315 F.3d 338, vacated and remanded.

BREYER, J., delivered the opinion of the Court, in which REHNQUIST, C.J., and STEVENS, KENNEDY, SOUTER, and GINSBURG, JJ., joined. SCALIA, J., filed an opinion concurring in the judgment, in which THOMAS, J., joined, post, p. 2373. O'CONNOR, J., took no part in the consideration or decision of the case.

Stephen M. Shapiro, Chicago, IL, for petitioners.

R. Hewitt Pate, for the United States as amicus curiae, by special leave of the Court.

Thomas C. Goldstein, Washington, D.C., for respondents.

Stephen M. Shapiro, Tyrone C. Fahner, Andrew S. Marovitz, Jeffrey W. Sarles, Mayer, Brown, Rowe & Maw LLP, Chicago, IL, Arthur F. Golden, Counsel of Record, Lawrence Portnoy, Charles S. Duggan, William J. Fenrich, Davis, Polk & Wardwell, New York, NY, John M. Majoras, Daniel H. Bromberg, Washington, DC, Kenneth Prince, Stephen Fishbein, Richard Schwed, Shearman & Sterling LLP, New York, NY, Lawrence Byrne, Joseph P. Armao, White & Case LLP, New York, NY, Robert Pitofsky, Bruce L. Montgomery, Franklin R. Liss, Arnold & Porter

124 S.Ct. 2359                                                                                    Page 4
542 U.S. 155, 124 S.Ct. 2359, 159 L.Ed.2d 226, 72 USLW 4501, 2004-1 Trade Cases P 74,448, 04 Cal. Daily Op.
Serv. 5094, 2004 Daily Journal D.A.R. 6990, 17 Fla. L. Weekly Fed. S 374
**(Cite as: 542 U.S. 155, 124 S.Ct. 2359)**

LLP, Washington, DC, <u>D. Stuart Meiklejohn</u>, Stacey R. Firedman, Sullivan & Cromwell LLP, New York, NY, <u>Michael L. Denger</u>, <u>Miguel A. Estrada</u>, Gibson, Dunn & Crutcher LLP, Washington, DC, <u>Laurence T. Sorkin</u>, <u>Roy L. Regozin</u>, Cahill, Gordon & Reindel LLP, New York, NY, <u>Donald I. Baker</u>, <u>W. Todd Miller</u>, Baker & Miller PLLC, Washington, DC, <u>Alice G. Glass</u>, Special Counsel, Baker & Miller PLLC, Lyme, NH, <u>Donald C. Klawiter</u>, <u>Peter E. Halle</u>, <u>J. Clayton Everett, Jr.</u>, Morgan, Lewis & Bockius, LLP, Washington, DC, <u>Paul P. Eyre</u>, <u>Ernest E. Vargo</u>, Baker & Hostetler LLP, Cleveland, OH, <u>James R. Weiss</u>, Preston, Gates & Ellis LLP, Washington, DC, <u>Jim J. Shoemake</u>, <u>Kurt S. Odenwald</u>, <u>Mary Ann Ohms</u>, Guilfoil, Petzall & Shoemake, LLC, St. Louis, MO, <u>Thomas M. Mueller</u>, <u>Michael O. Ware</u>, Mayer, Brown, Rowe & Maw LLP, New York, NY, <u>Aileen Meyer</u>, Pillsbury Winthrop LLP, Washington, DC, <u>Sutton Keany</u>, <u>Bryan Dunlap</u>, Pillsbury Winthrop LLP, New York, NY, <u>Gary W. Kubek</u>, Debevoise & Plimpton, New York, NY, <u>Kenneth W. Starr</u>, <u>Karen N. Walker</u>, <u>Kannon K. Shanmugam</u>, Kirkland & Ellis LLP, Washington, DC, <u>Moses Silverman</u>, <u>Aidan Synnott</u>, Paul, Weiss, Rifkind, Wharton & Garrison LLP, New York, NY, <u>Mark Riera</u> Sheppard, Mullin, Richter & Hampton LLP, Los Angeles, CA, <u>Kevin R. Sullivan</u>, <u>Grace M. Rodriguez</u>, <u>Peter M. Todaro</u>, King & Spalding LLP, Washington, DC, <u>Jeffrey S. Cashdan</u>, King & Spalding LLP, Atlanta, GA, <u>William J. Kolasky</u>, <u>Edward DuMont</u> Wilmer, Cutler & **2363 Pickering, Washington, DC, for Petitioners.

<u>Michael D. Hausfeld</u>, <u>Paul T. Gallagher</u>, <u>Brian A. Ratner</u>, Cohen, Milstein, Hausfeld & Toll, P.L.L.C., Washington, DC, <u>Thomas C. Goldstein</u>, Counsel of Record, <u>Amy Howe</u>, Goldstein & Howe, P.C., Washington, DC, <u>Michael H. Gottesman</u>, Washington, DC, for respondents.

**\*158** Justice <u>BREYER</u> delivered the opinion of the Court.

The Foreign Trade Antitrust Improvements Act of 1982 (FTAIA) excludes from the Sherman Act's reach much anticompetitive conduct that causes only foreign injury. It does so by setting forth a general rule stating that the Sherman Act "shall not apply to

conduct involving trade or commerce ... with foreign nations." 96 Stat. 1246, <u>15 U.S.C. § 6a</u>. It then creates exceptions to the general rule, applicable where (roughly speaking) that conduct significantly harms imports, domestic commerce, or American exporters.

We here focus upon anticompetitive price-fixing activity that is in significant part foreign, that causes some domestic antitrust injury, and that independently causes separate foreign injury. We ask two questions about the price-fixing conduct and the foreign injury that it causes. First, does that conduct fall within the FTAIA's general rule excluding the Sherman Act's application? That is to say, does the price-fixing activity constitute "conduct involving trade or commerce ... with foreign nations"? We conclude that it does.

**\*159** Second, we ask whether the conduct nonetheless falls within a domestic-injury exception to the general rule, an exception that applies (and makes the Sherman Act nonetheless applicable) where the conduct (1) has a " direct, substantial, and reasonably foreseeable effect" on domestic commerce, and (2) "such effect gives rise to a [Sherman Act] claim." <u>§§ 6a(1)(A), (2)</u>. We conclude that the exception does not apply where the plaintiff's claim rests solely on the independent foreign harm.

To clarify: The issue before us concerns (1) significant foreign anticompetitive conduct with (2) an adverse domestic effect and (3) an independent foreign effect giving rise to the claim. In more concrete terms, this case involves vitamin sellers around the world that agreed to fix prices, leading to higher vitamin prices in the United States and independently leading to higher vitamin prices in other countries such as Ecuador. We conclude that, in this scenario, a purchaser in the United States could bring a Sherman Act claim under the FTAIA based on domestic injury, but a purchaser in Ecuador could not bring a Sherman Act claim based on foreign harm.

I

The plaintiffs in this case originally filed a class-action suit on behalf of foreign and domestic purchasers of vitamins under, *inter alia*, § 1 of the Sherman Act, 26 Stat. 209, as amended, <u>15 U.S.C. § 1</u>, and <u>§§ 4</u> and

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

124 S.Ct. 2359                                                                          Page 5
542 U.S. 155, 124 S.Ct. 2359, 159 L.Ed.2d 226, 72 USLW 4501, 2004-1 Trade Cases P 74,448, 04 Cal. Daily Op.
Serv. 5094, 2004 Daily Journal D.A.R. 6990, 17 Fla. L. Weekly Fed. S 374
**(Cite as: 542 U.S. 155, 124 S.Ct. 2359)**

16 of the Clayton Act, 38 Stat. 731, 737, as amended, 15 U.S.C. §§ 15, 26. Their complaint alleged that petitioners, foreign and domestic vitamin manufacturers and distributors, had engaged in a price-fixing conspiracy, raising the price of vitamin products to customers in the United States and to customers in foreign countries.

As relevant here, petitioners moved to dismiss the suit as to the *foreign* purchasers (**2364 the respondents here), five foreign vitamin distributors located in Ukraine, Australia, Ecuador, and Panama, each of which bought vitamins from petitioners *160 for delivery outside the United States. No. Civ 001686TFH, 2001 WL 761360, *4 (D.D.C., June 7, 2001) (describing the relevant transactions as "wholly foreign"). Respondents have never asserted that they purchased any vitamins in the United States or in transactions in United States commerce, and the question presented assumes that the relevant "transactions occurr[ed] entirely outside U.S. commerce, Pet. for Cert. (i)." The District Court dismissed their claims. 2001 WL 761360, at * 4. It applied the FTAIA and found none of the exceptions applicable. *Id.*, at *3-*4. Thereafter, the *domestic* purchasers transferred their claims to another pending suit and did not take part in the subsequent appeal. 315 F.3d 338, 343 (C.A.D.C.2003).

A divided panel of the Court of Appeals reversed. 315 F.3d 338. The panel concluded that the FTAIA's general exclusionary rule applied to the case, but that its domestic-injury exception also applied. It basically read the plaintiffs' complaint to allege that the vitamin manufacturers' price-fixing conspiracy (1) had "a direct, substantial, and reasonably foreseeable effect" on ordinary domestic trade or commerce, *i.e.*, the conspiracy brought about higher domestic vitamin prices, and (2) "such effect" gave "rise to a [Sherman Act] claim," *i.e.*, an injured *domestic* customer could have brought a Sherman Act suit, 15 U.S.C. §§ 6a(1), (2). Those allegations, the court held, are sufficient to meet the exception's requirements. 315 F.3d, at 341.

The court assumed that the foreign effect, *i.e.*, higher prices in Ukraine, Panama, Australia, and Ecuador, was independent of the domestic effect, *i.e.*, higher

domestic prices. *Ibid.* But it concluded that, in light of the FTAIA's text, legislative history, and the policy goal of deterring harmful price-fixing activity, this lack of connection does not matter. *Ibid.* The District of Columbia Circuit denied rehearing *en banc* by a 4-to-3 vote. App. to Pet. for Cert. 44a.

We granted certiorari to resolve a split among the Courts of Appeals about the exception's application. Compare *161*Den Norske Stats Oljeselskap As v. HeereMac Vof,* 241 F.3d 420, 427 (C.A.5 2001) (exception does not apply where foreign injury independent of domestic harm), with *Kruman v. Christie's Int'l PLC,* 284 F.3d 384, 400 (C.A.2 2002) (exception does apply even where foreign injury independent); 315 F.3d, at 341 (similar).

## II

The FTAIA seeks to make clear to American exporters (and to firms doing business abroad) that the Sherman Act does not prevent them from entering into business arrangements (say, joint-selling arrangements), however anticompetitive, as long as those arrangements adversely affect only foreign markets. See H.R.Rep. No. 97-686, pp. 1-3, 9-10 (1982), U.S.Code Cong. & Admin.News 1982, 2487, 2487-2488, 2494-2495 (hereinafter House Report). It does so by removing from the Sherman Act's reach, (1) export activities and (2) other commercial activities taking place abroad, *unless* those activities adversely affect domestic commerce, imports to the United States, or exporting activities of one engaged in such activities within the United States.

The FTAIA says:

"Sections 1 to 7 of this title [the Sherman Act] shall not apply to conduct involving trade or commerce (other than import trade or import commerce) with foreign nations unless--
**2365 "(1) such conduct has a direct, substantial, and reasonably foreseeable effect--

"(A) on trade or commerce which is not trade or commerce with foreign nations [*i.e.*, domestic trade or commerce], or on import trade or import commerce with foreign nations; or

"(B) on export trade or export commerce with foreign nations, of a person engaged in such trade or commerce in the United States [*i.e.*, on an Americ-

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

124 S.Ct. 2359                                                                    Page 6
542 U.S. 155, 124 S.Ct. 2359, 159 L.Ed.2d 226, 72 USLW 4501, 2004-1 Trade Cases P 74,448, 04 Cal. Daily Op.
Serv. 5094, 2004 Daily Journal D.A.R. 6990, 17 Fla. L. Weekly Fed. S 374
**(Cite as: 542 U.S. 155, 124 S.Ct. 2359)**

an export competitor]; and

*162 (2) such effect gives rise to a claim under the provisions of sections 1 to 7 of this title, other than this section.

"If sections 1 to 7 of this title apply to such conduct only because of the operation of paragraph (1)(B), then sections 1 to 7 of this title shall apply to such conduct only for injury to export business in the United States." 15 U.S.C. § 6a.

This technical language initially lays down a general rule placing *all* (non-import) activity involving foreign commerce outside the Sherman Act's reach. It then brings such conduct back within the Sherman Act's reach *provided that* the conduct *both* (1) sufficiently affects American commerce, *i.e.*, it has a "direct, substantial, and reasonably foreseeable effect" on American domestic, import, or (certain) export commerce, *and* (2) has an effect of a kind that antitrust law considers harmful, *i.e.*, the "effect" must "giv[e] rise to a [Sherman Act] claim." §§ 6a(1), (2).

We ask here how this language applies to price-fixing activity that is in significant part foreign, that has the requisite domestic effect, and that also has independent foreign effects giving rise to the plaintiff's claim.

### III

[1] Respondents make a threshold argument. They say that the transactions here at issue fall outside the FTAIA because the FTAIA's general exclusionary rule applies only to conduct involving exports. The rule says that the Sherman Act "shall not apply to conduct involving trade or commerce (other than import trade or import commerce) *with* foreign nations." § 6a (emphasis added). The word "with" means *between* the United States and foreign nations. And, they contend, commerce between the United States and foreign nations that is not import commerce must consist of export commerce--a kind of commerce irrelevant to the case at hand.

*163 The difficulty with respondents' argument is that the FTAIA originated in a bill that initially referred only to "export trade or export commerce." H.R. 5235, 97th Cong., 1st Sess., § 1 (1981). But the House Judiciary Committee subsequently changed that language to "trade or commerce (other than import

port trade or import commerce)." 15 U.S.C. § 6a. And it did so deliberately to include commerce that did not involve American exports but which was wholly foreign.

The House Report says in relevant part:

"The Subcommittee's 'export' commerce limitation appeared to make the amendments inapplicable to transactions that were neither import nor export, *i.e.*, transactions within, between, or among other nations .... *Such foreign transactions should, for the purposes of this legislation, be treated in the same manner as export transactions*--that is, there should be no American antitrust jurisdiction absent a direct, substantial and reasonably foreseeable effect on domestic commerce or a domestic competitor. The Committee Amendment therefore deletes references to 'export' trade **2366 and substitutes phrases such as 'other than import' trade. *It is thus clear that wholly foreign transactions as well as export transactions are covered by the amendment,* but that import transactions are not." House Report 9-10, U.S.Code Cong. & Admin.News 1982, 2487, 2494-2495 (emphases added).

For those who find legislative history useful, the House Report's account should end the matter. Others, by considering carefully the amendment itself and the lack of any other plausible purpose, may reach the same conclusion, namely that the FTAIA's general rule applies where the anticompetitive conduct at issue is foreign.

### IV

[2] We turn now to the basic question presented, that of the exception's application. Because the underlying antitrust *164 action is complex, potentially raising questions not directly at issue here, we reemphasize that we base our decision upon the following: The price-fixing conduct significantly and adversely affects both customers outside the United States and customers within the United States, but the adverse foreign effect is independent of any adverse domestic effect. In these circumstances, we find that the FTAIA exception does not apply (and thus the Sherman Act does not apply) for two main reasons.

[3] *First,* this Court ordinarily construes ambiguous

Case 1:05-cv-00441-JJF     Document 244-2     Filed 11/13/2006     Page 53 of 59

124 S.Ct. 2359                                                                    Page 7
542 U.S. 155, 124 S.Ct. 2359, 159 L.Ed.2d 226, 72 USLW 4501, 2004-1 Trade Cases P 74,448, 04 Cal. Daily Op.
Serv. 5094, 2004 Daily Journal D.A.R. 6990, 17 Fla. L. Weekly Fed. S 374
**(Cite as: 542 U.S. 155, 124 S.Ct. 2359)**

statutes to avoid unreasonable interference with the sovereign authority of other nations. See, e.g., _McCulloch v. Sociedad Nacional de Marineros de Honduras, 372 U.S. 10, 20-22, 83 S.Ct. 671, 9 L.Ed.2d 547 (1963)_ (application of National Labor Relations Act to foreign-flag vessels); _Romero v. International Terminal Operating Co., 358 U.S. 354, 382-383, 79 S.Ct. 468, 3 L.Ed.2d 368 (1959)_ (application of Jones Act in maritime case); _Lauritzen v. Larsen, 345 U.S. 571, 578, 73 S.Ct. 921, 97 L.Ed. 1254 (1953)_ (same). This rule of construction reflects principles of customary international law--law that (we must assume) Congress ordinarily seeks to follow. See _Restatement (Third) of Foreign Relations Law of the United States §§ 403(1), 403(2) (1986)_ (hereinafter Restatement) (limiting the unreasonable exercise of prescriptive jurisdiction with respect to a person or activity having connections with another State); _Murray v. Schooner Charming Betsy, 2 Cranch 64, 118, 2 L.Ed. 208 (1804)_ ("[A]n act of Congress ought never to be construed to violate the law of nations if any other possible construction remains"); _Hartford Fire Insurance Co. v. California, 509 U.S. 764, 817, 113 S.Ct. 2891, 125 L.Ed.2d 612 (1993)_ (SCALIA, J., dissenting) (identifying rule of construction as derived from the principle of "prescriptive comity")

[4] This rule of statutory construction cautions courts to assume that legislators take account of the legitimate sovereign interests of other nations when they write American laws. It thereby helps the potentially conflicting laws of different nations work together in harmony--a harmony particularly *165 needed in today's highly interdependent commercial world.

[5] No one denies that America's antitrust laws, when applied to foreign conduct, can interfere with a foreign nation's ability independently to regulate its own commercial affairs. But our courts have long held that application of our antitrust laws to foreign anticompetitive conduct is nonetheless reasonable, and hence consistent with principles of prescriptive comity, insofar as they reflect a legislative effort to redress _domestic_ antitrust injury that foreign anticompetitive conduct has caused. See **2367_United States v. Aluminum Co. of America, 148 F.2d 416, 443-444 (C.A.2 1945)_ (L. Hand, J.); 1 P. Areeda & D. Turner, Antitrust Law ¶ 236 (1978).

But why is it reasonable to apply those laws to foreign conduct _insofar as that conduct causes independent foreign harm and that foreign harm alone gives rise to the plaintiff's claim?_ Like the former case, application of those laws creates a serious risk of interference with a foreign nation's ability independently to regulate its own commercial affairs. But, unlike the former case, the justification for that interference seems insubstantial. See Restatement § 403(2) (determining reasonableness on basis of such factors as connections with regulating nation, harm to that nation's interests, extent to which other nations regulate, and the potential for conflict). Why should American law supplant, for example, Canada's or Great Britain's or Japan's own determination about how best to protect Canadian or British or Japanese customers from anticompetitive conduct engaged in significant part by Canadian or British or Japanese or other foreign companies?

We recognize that principles of comity provide Congress greater leeway when it seeks to control through legislation the actions of _American_ companies, see Restatement § 402; and some of the anticompetitive price-fixing conduct alleged here took place in _America._ But the higher foreign prices of which the foreign plaintiffs here complain are not the consequence*166 of any domestic anticompetitive conduct _that Congress sought to forbid,_ for Congress did not seek to forbid any such conduct insofar as it is here relevant, _i.e.,_ insofar as it is intertwined with foreign conduct that causes independent foreign harm. Rather Congress sought to _release_ domestic (and foreign) anticompetitive conduct from Sherman Act constraints when that conduct causes foreign harm. Congress, of course, did make an exception where that conduct also causes domestic harm. See House Report 13, U.S.Code Cong. & Admin.News 1982, 2487, 2498 (concerns about American firms' participation in international cartels addressed through "domestic injury" exception). But any independent domestic harm the foreign conduct causes here has, by definition, little or nothing to do with the matter.

We thus repeat the basic question: Why is it reasonable to apply this law to conduct that is significantly foreign _insofar as that conduct causes independent foreign harm and that foreign harm alone gives rise_

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

124 S.Ct. 2359                                                                                      Page 8
542 U.S. 155, 124 S.Ct. 2359, 159 L.Ed.2d 226, 72 USLW 4501, 2004-1 Trade Cases P 74,448, 04 Cal. Daily Op.
Serv. 5094, 2004 Daily Journal D.A.R. 6990, 17 Fla. L. Weekly Fed. S 374
**(Cite as: 542 U.S. 155, 124 S.Ct. 2359)**

to the plaintiff's claim? We can find no good answer to the question.

The Areeda and Hovenkamp treatise notes that under the Court of Appeals' interpretation of the statute

"a Malaysian customer could ... maintain an action under United States law in a United States court against its own Malaysian supplier, another cartel member, simply by noting that unnamed third parties injured [in the United States] by the American [cartel member's] conduct would also have a cause of action. Effectively, the United States courts would provide worldwide subject matter jurisdiction to any foreign suitor wishing to sue its own local supplier, but unhappy with its own sovereign's provisions for private antitrust enforcement, provided that a different plaintiff had a cause of action against a different firm for injuries that were within U.S. [other-than-import] commerce. It does not seem excessively rigid to infer that Congress would not have *167 intended that result." P. Areeda & H. Hovenkamp, Antitrust Law ¶ 273, pp. 51-52 (Supp.2003).

We agree with the comment. We can find no convincing justification for the extension **2368 of the Sherman Act's scope that it describes.

Respondents reply that many nations have adopted antitrust laws similar to our own, to the point where the practical likelihood of interference with the relevant interests of other nations is minimal. Leaving price fixing to the side, however, this Court has found to the contrary. See, e.g., _Hartford Fire, 509 U.S. at 797-799, 113 S.Ct. 2891_ (noting that the alleged conduct in the London reinsurance market, while illegal under United States antitrust laws, was assumed to be perfectly consistent with British law and policy); see also, e.g., 2 W. Fugate, Foreign Commerce and the Antitrust Laws § 16.6 (5th ed.1996) (noting differences between European Union and United States law on vertical restraints).

Regardless, even where nations agree about primary conduct, say price fixing, they disagree dramatically about appropriate remedies. The application, for example, of American private treble-damages remedies to anticompetitive conduct taking place abroad has generated considerable controversy. See, e.g., 2 ABA

Section of Antitrust Law, Antitrust Law Developments 1208-1209 (5th ed.2002). And several foreign nations have filed briefs here arguing that to apply our remedies would unjustifiably permit their citizens to bypass their own less generous remedial schemes, thereby upsetting a balance of competing considerations that their own domestic antitrust laws embody. E.g., Brief for Federal Republic of Germany et al. as Amici Curiae 2 (setting forth German interest "in seeing that German companies are not subject to the extraterritorial reach of the United States' antitrust laws by private foreign plaintiffs--whose injuries were sustained in transactions entirely outside United States commerce--seeking treble damages in private lawsuits against German companies"); Brief for Government **168 of Canada as Amicus Curiae 14 ("treble damages remedy would supersede" Canada's "national policy decision"); Brief for Government of Japan as Amicus Curiae 10 (finding " particularly troublesome" the potential "interfere[nce] with Japanese governmental regulation of the Japanese market").

These briefs add that a decision permitting independently injured foreign plaintiffs to pursue private treble-damages remedies would undermine foreign nations' own antitrust enforcement policies by diminishing foreign firms' incentive to cooperate with antitrust authorities in return for prosecutorial amnesty. Brief for Government of Federal Republic of Germany et al. as Amici Curiae 28-30; Brief for Government of Canada as Amicus Curiae 11-14. See also Brief for United States as Amicus Curiae 19-21 (arguing the same in respect to American antitrust enforcement).

Respondents alternatively argue that comity does not demand an interpretation of the FTAIA that would exclude independent foreign injury cases across the board. Rather, courts can take (and sometimes have taken) account of comity considerations case by case, abstaining where comity considerations so dictate. Cf., e.g., _Hartford Fire, supra, at 797, n. 24, 113 S.Ct. 2891; United States v. Nippon Paper Industries Co., 109 F.3d 1, 8 (C.A.1 1997); Mannington Mills, Inc. v. Congoleum Corp., 595 F.2d 1287, 1294-1295 (C.A.3 1979)_.

In our view, however, this approach is too complex to

124 S Ct 2359                                                                    Page 9
542 U.S. 155, 124 S.Ct. 2359, 159 L Ed 2d 226, 72 USLW 4501, 2004-1 Trade Cases P 74,448, 04 Cal. Daily Op.
Serv. 5094, 2004 Daily Journal D.A.R. 6990, 17 Fla. L. Weekly Fed. S 374
(Cite as: 542 U.S. 155, 124 S.Ct. 2359)

prove workable. The Sherman Act covers many different kinds of anticompetitive agreements. Courts would have to examine how foreign law, compared with American law, treats not only price fixing but also, say, information-sharing agreements, patent-licensing price conditions, territorial product resale limitations,**2369 and various forms of joint venture, in respect to both primary conduct and remedy. The legally and economically technical nature of that enterprise means lengthier proceedings, appeals, and more proceedings--to the point where procedural costs and delays could *169 themselves threaten interference with a foreign nation's ability to maintain the integrity of its own antitrust enforcement system. Even in this relatively simple price-fixing case, for example, competing briefs tell us (1) that potential treble-damage liability would help enforce widespread anti-price-fixing norms (through added deterrence) and (2) the opposite, namely that such liability would hinder antitrust enforcement (by reducing incentives to enter amnesty programs). Compare, e g , Brief for Certain Professors of Economics as Amici Curiae 2-4 with Brief for United States as Amicus Curiae 19-21. How could a court seriously interested in resolving so empirical a matter--a matter potentially related to impact on foreign interests--do so simply and expeditiously?

We conclude that principles of prescriptive comity counsel against the Court of Appeals' interpretation of the FTAIA. Where foreign anticompetitive conduct plays a significant role and where foreign injury is independent of domestic effects, Congress might have hoped that America's antitrust laws, so fundamental a component of our own economic system, would commend themselves to other nations as well. But, if America's antitrust policies could not win their own way in the international marketplace for such ideas, Congress, we must assume, would not have tried to impose them, in an act of legal imperialism, through legislative fiat.

[6] Second, the FTAIA's language and history suggest that Congress designed the FTAIA to clarify, perhaps to limit, but not to expand in any significant way, the Sherman Act's scope as applied to foreign commerce. See House Report 2-3, U S Code Cong. & Admin.News 1982, 2487, 2487-2488. And we have

found no significant indication that at the time Congress wrote this statute courts would have thought the Sherman Act applicable in these circumstances.

The Solicitor General and petitioners tell us that they have found no case in which any court applied the Sherman Act to redress foreign injury in such circumstances. Tr. of Oral Arg. 21; Brief for United States as Amicus Curiae 13; Brief *170 for Petitioners 13; see also Den Norske, 241 F.3d, at 429 ("[W]e have found no case in which jurisdiction was found in a case like this--where a foreign plaintiff is injured in a foreign market with no injuries arising from the anticompetitive effect on a United States market"). And respondents themselves apparently conceded as much at a May 23, 2001, hearing before the District Court below. 2001 WL 761360, at *4.

Nevertheless, respondents now have called to our attention six cases, three decided by this Court and three decided by lower courts. In the first three cases the defendants included both American companies and foreign companies jointly engaged in anticompetitive behavior having both foreign and domestic effects See Timken Roller Bearing Co. v. United States, 341 U.S. 593, 595, 71 S.Ct. 971, 95 L.Ed. 1199 (1951) (agreements among American, British, and French corporations to eliminate competition in the manufacture and sale of anti-friction bearings in world, including United States, markets); United States v. National Lead Co., 332 U.S. 319, 325-328, 67 S.Ct. 1634, 91 L.Ed. 2077 (1947) (international cartels with American and foreign members, restraining international commerce, including United States commerce, in titanium pigments); **2370United States v. American Tobacco Co., 221 U.S. 106, 171-172, 31 S.Ct. 632, 55 L.Ed. 663 (1911) (American tobacco corporations agreed in England with British company to divide world markets). In all three cases the plaintiff sought relief, including relief that might have helped to protect those injured abroad.

[7] In all three cases, however, the plaintiff was the Government of the United States. A Government plaintiff, unlike a private plaintiff, must seek to obtain the relief necessary to protect the public from further anticompetitive conduct and to redress anticompetitive harm. And a Government plaintiff has

© 2006 Thomson/West No Claim to Orig. U.S. Govt. Works.

Case 1:05-cv-00441-JJF    Document 244-2    Filed 11/13/2006    Page 56 of 59

124 S Ct 2359                                                                Page 10
542 U.S. 155, 124 S Ct 2359, 159 L Ed 2d 226, 72 USLW 4501, 2004-1 Trade Cases P 74,448, 04 Cal Daily Op
Serv 5094, 2004 Daily Journal D A R 6990, 17 Fla L Weekly Fed S 374
**(Cite as: 542 U.S. 155, 124 S.Ct. 2359)**

legal authority broad enough to allow it to carry out this mission. 15 U.S.C. § 25; see also, e g, *United States v. E.I. du Pont de Nemours & Co.*, 366 U.S. 316, 334, 81 S.Ct. 1243, 6 L.Ed.2d 318 (1961) ("[I]t is well settled that once the Government has *171 successfully borne the considerable burden of establishing a violation of law, all doubts as to the remedy are to be resolved in its favor") Private plaintiffs, by way of contrast, are far less likely to be able to secure broad relief. See *California v. American Stores Co.*, 495 U.S. 271, 295, 110 S.Ct. 1853, 109 L.Ed.2d 240 (1990) ("Our conclusion that a district court has the power to order divestiture in appropriate cases brought [by private plaintiffs] does not, of course, mean that such power should be exercised in every situation in which the Government would be entitled to such relief"); 2 P Areeda, H. Hovenkamp, & R. Blair, Antitrust Law ¶¶ 303d-303e, pp. 40-45 (2d ed 2000) (distinguishing between private and government suits in terms of availability, public interest motives, and remedial scope); Griffin, Extraterritoriality in U.S. and EU Antitrust Enforcement, 67 Antitrust L.J. 159, 194 (1999) ("[P]rivate plaintiffs often are unwilling to exercise the degree of self-restraint and consideration of foreign governmental sensibilities generally exercised by the U.S Government") This difference means that the Government's ability, in these three cases, to obtain relief helpful to those injured abroad tells us little or nothing about whether this Court would have awarded similar relief at the request of private plaintiffs

Neither did the Court focus explicitly in its opinions on a claim that the remedies sought to cure only independently caused foreign harm Thus the three cases tell us even less about whether this Court then thought that foreign private plaintiffs could have obtained foreign relief based solely upon such independently caused foreign injury

Respondents also refer to three lower court cases brought by private plaintiffs In the first, *Industria Siciliana Asfalti, Bitumi, S.p.A. v. Exxon Research & Engineering Co.*, No. 75 Civ. 5828-CSH, 1977 WL 1353 (S.D.N.Y., Jan.18, 1977), a District Court permitted an Italian firm to proceed against an American firm with a Sherman Act claim based upon a purely foreign injury, i.e., an injury suffered in Italy. The

court made clear, however, that the foreign injury was "*inextricably *172 bound up with . domestic restraints of trade*," and that the plaintiff "*was injured . by reason of an alleged restraint of our domestic trade*," id., at *11, *12 (emphasis added), i.e., the foreign injury was dependent upon, *not independent of*, domestic harm. See Part VI, *infra*

In the second case, *Dominicus Americana Bohio v. Gulf & Western Industries, Inc.*, 473 F.Supp. 680 (S.D.N.Y.1979), a District Court permitted Dominican and American firms to proceed against a competing American firm and the Dominican Tourist Information Center with a Sherman Act claim based upon injury apparently suffered in the Dominican Republic. The court, in finding the Sherman Act **2371 applicable, weighed several different factors, including the participation of American firms in the unlawful conduct, the partly domestic nature of both conduct and harm (to American tourists, a kind of "export"), and the fact that the domestic harm depended in part upon the foreign injury. Id., at 688. The court did not separately analyze the legal problem before it in terms of independently caused foreign injury. Its opinion simply does not discuss the matter. It consequently cannot be taken as significant support for application of the Sherman Act here.

The third case, *Hunt v. Mobil Oil Corp.*, 550 F.2d 68, 72 (C.A.2 1977), involved a claim by Hunt, an independent oil producer with reserves in Libya, that other major oil producers in Libya and the Persian Gulf (the "seven majors") had conspired in New York and elsewhere to make it more difficult for Hunt to reach agreement with the Libyan government on production terms and thereby eliminate him as a competitor. The case can be seen as involving a primarily foreign conspiracy designed to bring about foreign injury in Libya. But, as in *Dominicus*, the court nowhere considered the problem of independently caused foreign harm Rather, the case was about the "act of state" doctrine, and the sole discussion of Sherman Act applicability--one brief paragraph--refers to other matters. 550 F.2d, at 72, and n. 2. *173 We do not see how Congress could have taken this case as significant support for the proposition that the Sherman Act applies in present circumstances.

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

124 S.Ct. 2359                                                    Page 11

542 U.S. 155, 124 S.Ct. 2359, 159 L. Ed.2d 226, 72 USLW 4501, 2004-1 Trade Cases P 74,448, 04 Cal. Daily Op.
Serv. 5094, 2004 Daily Journal D.A.R. 6990, 17 Fla. L. Weekly Fed. S 374
**(Cite as: 542 U.S. 155, 124 S.Ct. 2359)**

The upshot is that no pre-1982 case provides significant authority for application of the Sherman Act in the circumstances we here assume. Indeed, a leading contemporaneous lower court case contains language suggesting the contrary. See *Timberlane Lumber Co. v. Bank of America, N.T. & S.A.,* 549 F.2d 597, 613 (C.A.9 1976) (insisting that the foreign conduct's domestic effect be "sufficiently large to present a cognizable injury *to the plaintiffs*" (emphasis added)).

Taken together, these two sets of considerations, the one derived from comity and the other reflecting history, convince us that Congress would not have intended the FTAIA's exception to bring independently caused foreign injury within the Sherman Act's reach.

### V

Respondents point to several considerations that point the other way. For one thing, the FTAIA's language speaks in terms of the Sherman Act's *applicability* to certain kinds of *conduct.* The FTAIA says that the Sherman Act applies to foreign "conduct" with a certain kind of harmful domestic effect. Why isn't that the end of the matter? How can the Sherman Act both *apply to the conduct* when one person sues but *not apply to the same conduct* when another person sues? The question of who can or cannot sue is a matter for other statutes (namely, the Clayton Act) to determine.

Moreover, the exception says that it applies if the conduct's domestic effect gives rise to "*a* claim," not to "*the plaintiff's* claim" or "*the* claim *at issue.*" 15 U.S.C. § 6a(2) (emphasis added). The alleged conduct here did have domestic effects, and those effects were harmful enough to give rise to "a" claim. Respondents concede that this claim is not their own claim; it is someone else's claim. But, linguistically *174 speaking, they say, that is beside the point. Nor did Congress place the relevant words "gives rise to a claim" in the FTAIA to suggest any geographical limitation; rather it did so for a here neutral reason, namely, in order to make clear that the domestic effect must be an *adverse* (as opposed to a beneficial) effect. See House **2372 Report 11, U.S. Code Cong. & Admin.News 1982, 2487, 2496 (citing *National Bank of Canada v. Interbank Card Assn.,* 666 F.2d 6, 8 (C.A.2 1981)).

Despite their linguistic logic, these arguments are not convincing. Linguistically speaking, a statute can apply and not apply to the same conduct, depending upon other circumstances; and those other circumstances may include the nature of the lawsuit (or of the related underlying harm). It also makes linguistic sense to read the words "a claim" as if they refer to the "plaintiff's claim" or "the claim at issue."

At most, respondents' linguistic arguments might show that respondents' reading is the more natural reading of the statutory language. But those arguments do not show that we *must* accept that reading. And that is the critical point. The considerations previously mentioned--those of comity and history--make clear that the respondents' reading is not consistent with the FTAIA's basic intent. If the statute's language reasonably permits an interpretation consistent with that intent, we should adopt it. And, for the reasons stated, we believe that the statute's language permits the reading that we give it.

Finally, respondents point to policy considerations that we have previously discussed, *supra,* at 2368, namely, that application of the Sherman Act in present circumstances will (through increased deterrence) help protect Americans against foreign-caused anticompetitive injury. As we have explained, however, the plaintiffs and supporting enforcement-agency *amici* have made important experience-backed arguments (based upon amnesty-seeking incentives) to the contrary. We cannot say whether, on balance, respondents' side of this empirically based argument or the enforcement agencies' side is correct. But we can say that the answer to the dispute is neither *175 clear enough, nor of such likely empirical significance, that it could overcome the considerations we have previously discussed and change our conclusion.

For these reasons, we conclude that petitioners' reading of the statute's language is correct. That reading furthers the statute's basic purposes, it properly reflects considerations of comity, and it is consistent with Sherman Act history.

### VI

[8] We have assumed that the anticompetitive con-

124 S.Ct. 2359

542 U.S. 155, 124 S.Ct. 2359, 159 L.Ed.2d 226, 72 USLW 4501, 2004-1 Trade Cases P 74,448, 04 Cal. Daily Op. Serv. 5094, 2004 Daily Journal D.A.R. 6990, 17 Fla. L. Weekly Fed. S 374
**(Cite as: 542 U.S. 155, 124 S.Ct. 2359)**

duct here independently caused foreign injury; that is, the conduct's domestic effects did not help to bring about that foreign injury. Respondents argue, in the alternative, that the foreign injury was not independent. Rather, they say, the anticompetitive conduct's domestic effects were linked to that foreign harm. Respondents contend that, because vitamins are fungible and readily transportable, without an adverse domestic effect (*i.e.*, higher prices in the United States), the sellers could not have maintained their international price-fixing arrangement and respondents would not have suffered their foreign injury. They add that this "but for" condition is sufficient to bring the price-fixing conduct within the scope of the FTAIA's exception.

The Court of Appeals, however, did not address this argument, 315 F.3d, at 341, and, for that reason, neither shall we. Respondents remain free to ask the Court of Appeals to consider the claim. The Court of Appeals may determine whether respondents properly preserved the argument, and, if so, it may consider it and decide the related claim.

For these reasons, the judgment of the Court of Appeals is vacated, and the case is remanded for further proceedings consistent with this opinion.

**\*\*2373** *It is so ordered.*

Justice O'CONNOR took no part in the consideration or decision of this case.

**\*176** Justice SCALIA, with whom Justice THOMAS joins, concurring in the judgment.

I concur in the judgment of the Court because the language of the statute is readily susceptible of the interpretation the Court provides and because only that interpretation is consistent with the principle that statutes should be read in accord with the customary deference to the application of foreign countries' laws within their own territories.

542 U.S. 155, 124 S.Ct. 2359, 159 L.Ed.2d 226, 72 USLW 4501, 2004-1 Trade Cases P 74,448, 04 Cal. Daily Op. Serv. 5094, 2004 Daily Journal D.A.R. 6990, 17 Fla. L. Weekly Fed. S 374

**Briefs and Other Related Documents (Back to top)**

• 2004 WL 1047902, 41 USLW 3686 (Oral Argument) Oral Argument (Apr. 26, 2004)

• 2004 WL 791686 (Appellate Brief) Reply Brief for Petitioners (Apr. 09, 2004)

• 2004 WL 533930 (Appellate Brief) Brief for Certain Professors of Economics as Amici Curiae in Support of Respondents (Mar. 15, 2004)

• 2004 WL 533931 (Appellate Brief) Brief of Amici Curiae Legal Scholars in Support of Respondents (Mar. 15, 2004)

• 2004 WL 533932 (Appellate Brief) Brief for Amici Curiae Committee to Support the Antitrust Laws and National Association of Securities and Consumer Attorneys in Support of Respondents (Mar. 15, 2004)

• 2004 WL 533933 (Appellate Brief) Brief Amici Curiae of Professors Darren Bush, John M. Connor, John J. Flynn, Shubha Ghosh, Warren Grimes, Joseph E. Harrington, Jr., Norman Hawker, Robert Lande, William G. Shepherd and Steven Semeraro in Support of Respondents (Mar. 15, 2004)

• 2004 WL 533934 (Appellate Brief) Brief of Amici Curiae Economists Joseph E. Stiglitz and Peter R. Orszag in Support of Respondents (Mar. 15, 2004)

• 2004 WL 533935 (Appellate Brief) Brief for Respondents (Mar. 15, 2004)

• 2004 WL 542780 (Appellate Brief) Brief of Amici Curiae Law Professors Ralf Michaels, Hannah Buxbaum and Horatia Muir Watt in Support of Respondents (Mar. 15, 2004)

• 2004 WL 531749 (Appellate Brief) Brief of Amicus Curiae Public Citizen in Support of Respondents (Mar. 12, 2004)

• 2004 WL 220706 (Appellate Brief) Brief of the Chamber of Commerce of the United States and the Organization for International Investment as Amici Curiae in Support of Petitioner (Feb. 03, 2004)

• 2004 WL 226388 (Appellate Brief) Brief of the

124 S. Ct. 2359

Page 13

542 U.S. 155, 124 S.Ct. 2359, 159 L. Ed.2d 226, 72 USLW 4501, 2004-1 Trade Cases P 74,448, 04 Cal. Daily Op.
Serv. 5094, 2004 Daily Journal D.A.R. 6990, 17 Fla. L. Weekly Fed. S 374
**(Cite as: 542 U.S. 155, 124 S.Ct. 2359)**

Governments of the Federal Republic of Germany and Belgium as Amici Curiae in Support of Petitioners (Feb. 03, 2004)

• 2004 WL 226389 (Appellate Brief) Brief for the Government of Canada as Amicus Curiae Supporting Reversal (Feb. 03, 2004)

• 2004 WL 226390 (Appellate Brief) Brief of the Government of Japan as Amicus Curiae in Support of Petitioners (Feb. 03, 2004)

• 2004 WL 226391 (Appellate Brief) Brief for Petitioners (Feb. 03, 2004)

• 2004 WL 226597 (Appellate Brief) Brief of the United Kingdom of Great Britain and Northern Ireland, Ireland and the Kingdom of the Netherlands as Amici Curiae in Support of Petitioners (Feb. 03, 2004)

• 2004 WL 234124 (Appellate Brief) Brief Amicus Curiae of European Banks in Support of Petitioners (Feb. 03, 2004)

• 2004 WL 234125 (Appellate Brief) Brief for the United States as Amicus Curiae Supporting Petitioners (Feb. 03, 2004)

• 2004 WL 239505 (Appellate Brief) Brief for Amicus Curiae the International Chamber of Commerce in Support of Petitioners (Feb. 03, 2004)

• 2004 WL 385670 (Joint Appendix) (Feb. 03, 2004)

• 2004 WL 214307 (Appellate Brief) Brief for Amicus Curiae the Business Roundtable in Support of Petitioners (Jan. 30, 2004)

• 2003 WL 22896686 (Appellate Petition, Motion and Filing) Brief of the Federal Republic of Germany as Amicus Curiae in Support of Petition for a Writ of Certiorari (Dec. 01, 2003)Original Image of this Document (PDF)

• 2003 WL 22879683 (Appellate Petition, Motion and Filing) Motion for Leave to File Brief as Amicus Curiae and Brief of the Chamber of Commerce of the United States as Amicus Curiae in Support of Petitioners (Nov. 26, 2003)Original Image of this Docu-

ment (PDF)

• 2003 WL 22879682 (Appellate Petition, Motion and Filing) Reply to Brief in Opposition (Nov. 24, 2003)Original Image of this Document (PDF)

• 03-724 (Docket) (Nov. 18, 2003)

• 2003 WL 22793763 (Appellate Petition, Motion and Filing) Respondents Brief in Opposition (Nov. 14, 2003)Original Image of this Document (PDF)

• 2003 WL 22762741 (Appellate Petition, Motion and Filing) Petition for a Writ of Certiorari (Nov. 13, 2003)Original Image of this Document with Appendix (PDF)

END OF DOCUMENT