# EXHIBIT 5

Westlaw.

114 F 3d 1467                                                    Page 1
114 F 3d 1467, 1997-1 Trade Cases P 71,818, 97 Cal. Daily Op. Serv. 3865, 97 Daily Journal D.A.R. 6578
**(Cite as: 114 F.3d 1467)**

▷

**Briefs and Other Related Documents**

United States Court of Appeals,
Ninth Circuit.
Mary FORSYTH; Marrietta Cade; Willie Andrews; Mary
Lou Buehler; Helen
Staves; Randolph Bratten; and Searle Auto Glass, Inc., d/
b/a Best Glass
Company, Plaintiffs-Appellants,
v.
HUMANA, INC., a Delaware corporation; Humana
Health Insurance of Nevada, Inc.,
a Nevada corporation; and DOES I through X, inclusive,
Defendants-Appellees.
**No. 94-16548.**

Argued and Submitted Dec. 4, 1995.
Opinion filed Nov. 5, 1996.
Opinion Withdrawn May 23, 1997.
Decided May 23, 1997.

Employers and employees who contracted for group
health coverage through employee benefit plans brought
action against insurer and hospital under Employee Re-
tirement Income Security Act (ERISA), Sherman Act, and
Racketeer Influenced and Corrupt Organizations Act
(RICO) for failing to disclose discount agreement and for
failing to pass discounts along in form of reduced premi-
ums or copayments. The United States District Court for
the District of Nevada, Philip M. Pro, J., 827 F.Supp.
1498, granted summary judgment for insurer and hospital
on all but ERISA breach of contract claim, and employers
and employees appealed. The Court of Appeals, David
R. Thompson, Circuit Judge, held that employees who
sought to require insurer to pass along discounts obtained
from hospital could not pursue ERISA claim against in-
surer for breach of fiduciary duty.

Affirmed in part; reversed in part; remanded.

Wallace, Circuit Judge, filed concurring and dissenting
opinion.

Superseding 99 F.3d 1504

West Headnotes

**[1] Federal Courts** ⚖➞730
170Bk730 Most Cited Cases
Plaintiffs' voluntary dismissal of their premature appeal
from judgment did not preclude review of that judgment
on subsequent appeal.

**[2] Federal Courts** ⚖➞585.1
170Bk585.1 Most Cited Cases
Judgment was not final, appealable order when it was
entered because district court had not then determined
amount of damages.

**[3] Federal Civil Procedure** ⚖➞852.1
170Ak852.1 Most Cited Cases
Plaintiff waives all claims alleged in dismissed complaint
which are not realleged in amended complaint; this rule is
premised on notion that amended complaint supersedes
original, latter being treated thereafter as nonexistent.

**[4] Federal Courts** ⚖➞773.1
170Bk773.1 Most Cited Cases
If plaintiff fails to include dismissed claims in amended
complaint, plaintiff is deemed to have waived any error in
ruling dismissing prior complaint.

**[5] Federal Civil Procedure** ⚖➞852.1
170Ak852.1 Most Cited Cases

**[5] Federal Courts** ⚖➞774
170Bk774 Most Cited Cases
Claims which district court dismissed pursuant to sum-
mary judgment rulings were not waived by plaintiffs' fail-
ure to reallege them in third amended complaint.

**[6] Federal Courts** ⚖➞774
170Bk774 Most Cited Cases
To extent that plaintiffs sought review of district court's
dismissal of their state law claims for failure to state
claim, such claims were waived by plaintiffs' failure to
reallege them in amended complaint after such dismissal.
Fed.Rules Civ.Proc.Rule 12(b)(6), 28 U.S.C.A.

**[7] Labor and Employment** ⚖➞643
231Hk643 Most Cited Cases
    (Formerly 296k85)

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

114 F.3d 1467                                                                                              Page 2
114 F.3d 1467, 1997-1 Trade Cases P 71,818, 97 Cal. Daily Op. Serv. 3865, 97 Daily Journal D.A.R. 6578
**(Cite as: 114 F.3d 1467)**

Employee beneficiaries of group health insurance policies who made coinsurance payments for health care received and who sought to require insurer to pass along discounts obtained from health care provider could not pursue ERISA claim against insurer for breach of fiduciary duty; remedy provided by ERISA for employee beneficiaries' harm was benefits claim for breach of contract and not claim for breach of fiduciary duty. Employee Retirement Income Security Act of 1974, § 502(a)(1, 3), 29 U.S.C.A. § 1132(a)(1, 3).

**[8] Antitrust and Trade Regulation ☞620**
29Tk620 Most Cited Cases
    (Formerly 265k12(1.3))
To prevail on claim of monopolization under Sherman Act, plaintiff must demonstrate possession of monopoly power in relevant submarket, willful acquisition or maintenance of that power, and causal antitrust injury. Sherman Act, § 2, as amended, 15 U.S.C.A. § 2.

**[9] Antitrust and Trade Regulation ☞641**
29Tk641 Most Cited Cases
    (Formerly 265k12(1.3))
"Monopoly power," for Sherman Act purposes, is power to control prices or exclude competition. Sherman Act, § 2, as amended, 15 U.S.C.A. § 2.

**[10] Antitrust and Trade Regulation ☞641**
29Tk641 Most Cited Cases
    (Formerly 265k12(1.3))
Plaintiff may demonstrate market power, for purposes of monopolization claim under Sherman Act, either by direct or circumstantial evidence. Sherman Act, § 2, as amended, 15 U.S.C.A. § 2.

**[11] Antitrust and Trade Regulation ☞641**
29Tk641 Most Cited Cases
    (Formerly 265k12(1.3))
Direct proof of market power, for purposes of Sherman Act monopolization claim, may be shown by evidence of restricted output and supracompetitive prices; such showing is direct proof of injury to competition which competitor with market power may inflict and, thus, of actual exercise of market power. Sherman Act, § 2, as amended, 15 U.S.C.A. § 2.

**[12] Antitrust and Trade Regulation ☞977(3)**
29Tk977(3) Most Cited Cases

    (Formerly 265k28(7.5))
Plaintiffs did not present direct evidence of market power for purposes of
their monopolization claim under Sherman Act, absent showing of restricted output. Sherman Act, § 2, as amended, 15 U.S.C.A. § 2.

**[13] Antitrust and Trade Regulation ☞977(3)**
29Tk977(3) Most Cited Cases
    (Formerly 265k28(7.5))
More common method of establishing monopoly power for Sherman Act purposes is by circumstantial evidence, and this requires plaintiff to define relevant market, show that defendant owns dominant share of that market, and show that there are significant barriers to entry and that existing competitors lack capacity to increase their output in short run. Sherman Act, § 2, as amended, 15 U.S.C.A. § 2.

**[14] Antitrust and Trade Regulation ☞644**
29Tk644 Most Cited Cases
    (Formerly 265k12(1.3))
It is impossible to determine market share without first defining relevant market for purposes of establishing monopoly power by circumstantial evidence. Sherman Act, § 2, as amended, 15 U.S.C.A. § 2.

**[15] Antitrust and Trade Regulation ☞644**
29Tk644 Most Cited Cases
    (Formerly 265k12(1.3))
Definition of relevant market, for purposes of establishing monopoly power by circumstantial evidence, cannot be performed with mathematical accuracy; it is simply recognition of field in which meaningful competition is said to exist. Sherman Act, § 2, as amended, 15 U.S.C.A. § 2.

**[16] Antitrust and Trade Regulation ☞644**
29Tk644 Most Cited Cases
    (Formerly 265k12(1.3))
Definition of relevant market, for purposes of establishing monopoly power by circumstantial evidence, is factual inquiry for jury, and court may not weigh evidence or judge witness credibility. Sherman Act, § 2, as amended, 15 U.S.C.A. § 2.

**[17] Antitrust and Trade Regulation ☞644**
29Tk644 Most Cited Cases
    (Formerly 265k12(1.3))

114 F.3d 1467                                                                                      Page 3
114 F.3d 1467, 1997-1 Trade Cases P 71,818, 97 Cal. Daily Op. Serv. 3865, 97 Daily Journal D.A.R. 6578
**(Cite as: 114 F.3d 1467)**

Submarket exists, for purposes of determining relevant market in monopolization claim under Sherman Act, if it is sufficiently insulated from larger market so that supply and demand are inelastic with larger market. Sherman Act, § 2, as amended, 15 U.S.C.A. § 2.

**[18] Antitrust and Trade Regulation ☜678**
29Tk678 Most Cited Cases
(Formerly 265k18)
Where health insurance policies had tie-in with hospital, employers and employees who contracted for group health coverage through employee benefit plans failed to establish submarket of acute care hospitals used by those insured by insurer for purposes of monopolization claim against insurer and hospital. Sherman Act, § 2, as amended, 15 U.S.C.A. § 2.

**[19] Antitrust and Trade Regulation ☜644**
29Tk644 Most Cited Cases
(Formerly 265k12(1.3))
Scope of relevant market, for purposes of establishing monopoly power by circumstantial evidence, is not governed by presence of price differential. Sherman Act, § 2, as amended, 15 U.S.C.A. § 2.

**[20] Antitrust and Trade Regulation ☜645**
29Tk645 Most Cited Cases
(Formerly 265k12(1.3))
When demand for commodity of one producer shows no relation to price for commodity of another producer, it supports claim that commodities are not in same relevant market for purposes of establishing monopoly power by circumstantial evidence. Sherman Act, § 2, as amended, 15 U.S.C.A. § 2.

**[21] Antitrust and Trade Regulation ☜645**
29Tk645 Most Cited Cases
(Formerly 265k12(1.3))
Specialty shops which offer only limited range of goods are generally considered in same market with larger, more diverse, one-stop shopping centers for purposes of determining relevant market with respect to monopoly claim. Sherman Act, § 2, as amended, 15 U.S.C.A. § 2.

**[22] Federal Civil Procedure ☜2484**
170Ak2484 Most Cited Cases
Evidence presented by employers and employees, who contracted for group health coverage through employee

benefit plans, was sufficient to withstand motion for summary judgment by insurer and hospital as to employers' and employees' asserted relevant submarket consisting of major for-profit acute care hospitals in county for purposes of monopolization claim. Sherman Act, § 2, as amended, 15 U.S.C.A. § 2; Fed.Rules Civ.Proc.Rule 56, 28 U.S.C.A.

**[23] Antitrust and Trade Regulation ☜713**
29Tk713 Most Cited Cases
(Formerly 265k12(1.3))

**[23] Antitrust and Trade Regulation ☜714**
29Tk714 Most Cited Cases
(Formerly 265k12(1.3))

**[23] Antitrust and Trade Regulation ☜715**
29Tk715 Most Cited Cases
(Formerly 265k12(1.3))
To prevail on Sherman Act attempted monopolization claim, plaintiff must demonstrate: specific intent to control prices or destroy competition; predatory or anticompetitive conduct directed toward accomplishing that purpose; dangerous probability of success; and causal antitrust injury. Sherman Act, § 2, as amended, 15 U.S.C.A. § 2.

**[24] Antitrust and Trade Regulation ☜678**
29Tk678 Most Cited Cases
(Formerly 265k18)
Employers and employees who contracted for group health coverage through employee benefit plans did not demonstrate that they suffered antitrust injury resulting from alleged kickback scheme for purposes of their Sherman Act claims; although employers and employees presented evidence that, as result of insurer's anticompetitive behavior, they paid higher copayments and premiums than they would have paid in competitive market, this evidence did not explain how scheme reduced competition in relevant market. Sherman Act, § 2, as amended, 15 U.S.C.A. § 2.

**[25] Federal Civil Procedure ☜2484**
170Ak2484 Most Cited Cases
Evidence presented by employers and employees, who contracted for group health coverage through employee benefits plans, was sufficient to withstand motion for summary judgment by insurer and hospital on issue of antitrust injury; employers and employees presented evid-

114 F.3d 1467                                                                                    Page 4
114 F.3d 1467, 1997-1 Trade Cases P 71,818, 97 Cal. Daily Op. Serv. 3865, 97 Daily Journal D.A.R. 6578
**(Cite as: 114 F.3d 1467)**

ence that hospital diverted indigent patients to other area hospitals and that insurer threatened physicians who did not support its monopoly. Sherman Act, § 2, as amended, 15 U.S.C.A. § 2; Fed.Rules Civ.Proc.Rule 56, 28 U.S.C.A.

**[26] States** ☞18.41
360k18.41 Most Cited Cases

**[26] Workers' Compensation** ☞1063
413k1063 Most Cited Cases
    (Formerly 217k4(2))
McCarran-Ferguson Act (MFA) was enacted, in part, to allow states to regulate business of insurance free from inadvertent preemption by federal statutes of general applicability. McCarran-Ferguson Act, § 1 et seq., 15 U.S.C.A. § 1011 et seq.

**[27] Insurance** ☞1100
217k1100 Most Cited Cases
    (Formerly 217k1644, 217k4(2))

**[27] States** ☞18.41
360k18.41 Most Cited Cases
McCarran-Ferguson Act (MFA) precludes application of federal statute to preempt state insurance law if statute does not specifically relate to business of insurance, acts challenged under statute constitute business of insurance, state has enacted law regulating challenged acts, and state law would be superseded, impaired, or invalidated by application of federal statute; all four factors must be satisfied. McCarran-Ferguson Act, § 2(b), 15 U.S.C.A. § 1012(b).

**[28] Insurance** ☞1103
217k1103 Most Cited Cases
    (Formerly 217k1645(1), 217k4(2))

**[28] States** ☞18.41
360k18.41 Most Cited Cases
Insurer's alleged acts of overcharging premiums and not reducing copayments constituted "business of insurance" for purposes of determining whether McCarran-Ferguson Act (MFA) precluded application of Racketeer Influenced and Corrupt Organizations Act (RICO) to preempt Nevada insurance law. 18 U.S.C.A. § 1961 et seq.; McCarran-Ferguson Act, § 2(b), 15 U.S.C.A. § 1012(b).

**[29] Insurance** ☞1103
217k1103 Most Cited Cases
    (Formerly 217k183.1)

**[29] Insurance** ☞2005
217k2005 Most Cited Cases
    (Formerly 217k1652(2), 217k4(2))

**[29] States** ☞18.41
360k18.41 Most Cited Cases
Nevada's Trade Practices and Frauds Financing of Premiums Act was enacted to regulate challenged practices of insurer, namely insurer's overcharging premiums and not reducing copayments, for purposes of determining whether McCarran-Ferguson Act (MFA) precluded application of Racketeer Influenced and Corrupt Organizations Act (RICO) to preempt Nevada insurance law. McCarran-Ferguson Act, § 1 et seq., 15 U.S.C.A. § 1011 et seq.; 18 U.S.C.A. § 1961 et seq.; N.R.S. 686a.010 et seq.

**[30] Insurance** ☞1103
217k1103 Most Cited Cases
    (Formerly 217k1652(2), 217k4(2))

**[30] Racketeer Influenced and Corrupt Organizations** ☞10
319Hk10 Most Cited Cases

**[30] States** ☞18.41
360k18.41 Most Cited Cases
McCarran-Ferguson Act (MFA) did not preclude application of Racketeer Influenced and Corrupt Organizations Act (RICO) to preempt Nevada insurance law; RICO permitted injured plaintiff to recover for fraudulent practices which Nevada administrative scheme proscribed, and this symmetry did not create conflict between federal and state law. McCarran-Ferguson Act, § 1 et seq., 15 U.S.C.A. § 1011 et seq.; 18 U.S.C.A. § 1961 et seq.

**[31] Racketeer Influenced and Corrupt Organizations** ☞25
319Hk25 Most Cited Cases

**[31] Racketeer Influenced and Corrupt Organizations** ☞34
319Hk34 Most Cited Cases
To state claim under Racketeer Influenced and Corrupt Organizations Act (RICO), plaintiff must demonstrate conduct of enterprise through pattern of racketeering activity. 18 U.S.C.A. § 1962(c).

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

114 F.3d 1467                                                                    Page 5
114 F.3d 1467, 1997-1 Trade Cases P 71,818, 97 Cal. Daily Op. Serv. 3865, 97 Daily Journal D.A.R. 6578
**(Cite as: 114 F.3d 1467)**

**[32] Postal Service** ⟶**35(2)**
306k35(2) Most Cited Cases

**[32] Telecommunications** ⟶**1014(2)**
372k1014(2) Most Cited Cases
   (Formerly 372k362)
Mail fraud requires showing of scheme to defraud involving use of United States mails with specific intent to defraud; wire fraud requires same showing, but involves use of United States wires. 18 U.S.C.A. §§ 1341, 1343.

**[33] Racketeer Influenced and Corrupt Organizations** ⟶**62**
319Hk62 Most Cited Cases
To maintain claim under Racketeer Influenced and Corrupt Organizations Act (RICO), plaintiff must show not only that defendant's violation was but for cause of his injury, but that it was proximate cause as well; this requires showing of direct relationship between injurious conduct alleged and injury asserted, and plaintiff must show concrete financial loss. 18 U.S.C.A. § 1961 et seq.

**[34] Racketeer Influenced and Corrupt Organizations** ⟶**79**
319Hk79 Most Cited Cases
Employers who contracted for group health coverage through employee benefit plans did not establish Racketeer Influenced and Corrupt Organizations Act (RICO) claims against insurer and hospital based on predicate acts of mail and wire fraud; employers failed to come forward with any evidence that insurer and hospital misrepresented how insurance premiums would be calculated. 18 U.S.C.A. §§ 1341, 1343, 1961 et seq.

**[35] Racketeer Influenced and Corrupt Organizations** ⟶**58**
319Hk58 Most Cited Cases
Employees who contracted for group health coverage through benefit plans and who alleged that they were induced to make inflated copayments due to nondisclosure of hospital discount in notice of coinsurance obligations sent to them were not entitled to Racketeer Influenced and Corrupt Organizations Act (RICO) damages in excess of overpayments, where they failed to present any evidence of financial harm resulting from misrepresentations by insurer and hospital except for amounts they overpaid as result of nondisclosure of discount. 18 U.S.C.A. § 1961 et seq.

**[36] Federal Courts** ⟶**817**
170Bk817 Most Cited Cases
Court of Appeals reviews for abuse of discretion district court's denial of motion to amend.

**[37] Federal Civil Procedure** ⟶**833**
170Ak833 Most Cited Cases
Leave to amend pleadings shall be freely given when justice so requires, and this rule is applied with extreme liberality. Fed.Rules Civ.Proc.Rule 15(a), 28 U.S.C.A.

**[38] Federal Civil Procedure** ⟶**824**
170Ak824 Most Cited Cases

**[38] Federal Civil Procedure** ⟶**834**
170Ak834 Most Cited Cases

**[38] Federal Civil Procedure** ⟶**851**
170Ak851 Most Cited Cases
Following factors guide court's determination of whether motion to amend should be granted: undue delay; bad faith; futility of amendment; prejudice to opposing party. Fed.Rules Civ.Proc.Rule 15(a), 28 U.S.C.A.

**[39] Federal Civil Procedure** ⟶**851**
170Ak851 Most Cited Cases
Plaintiffs were not entitled to amend their complaint to reassert their previously dismissed state law claims, where plaintiffs' state law claims were preempted by federal law and thus, amendment would be futile. Fed.Rules Civ.Proc.Rule 15(a), 28 U.S.C.A.

**[40] Federal Civil Procedure** ⟶**851**
170Ak851 Most Cited Cases
District court properly denied plaintiffs' motion to amend pleadings in civil action to assert criminal obstruction of justice claim that did not provide for private cause of action. 18 U.S.C.A. § 1503; Fed.Rules Civ.Proc.Rule 15(a), 28 U.S.C.A.

**[41] Federal Civil Procedure** ⟶**841**
170Ak841 Most Cited Cases
In light of determination that plaintiff class' Racketeer Influenced and Corrupt Organizations Act (RICO) claim was not barred by McCarran-Ferguson Act (MFA), class was entitled to amend its complaint to assert RICO conspiracy claim. McCarran-Ferguson Act, § 1 et seq., 15 U.S.C.A. § 1011 et seq.; 18 U.S.C.A. § 1961 et seq.; Fed.Rules Civ.Proc.Rule 15(a), 28 U.S.C.A.
**\*1471** Will Kemp, J. Randall Jones, Harrison, Kemp &

114 F.3d 1467                                                                    Page 6
114 F.3d 1467, 1997-1 Trade Cases P 71,818, 97 Cal. Daily Op. Serv. 3865, 97 Daily Journal D.A.R. 6578
(Cite as: 114 F.3d 1467)

Jones, Chtd., Las Vegas, NV, W.B. Markovits, Markovits & Greiwe, Cincinnati, OH, for plaintiffs-appellants.

David N. Frederick, Las Vegas, NV, Robert N. Eccles, O'Melveney & Myers, Washington, DC, for defendants-appellees.

Appeal from the United States District Court for the District of Nevada Philip M. Pro, District Judge, Presiding. No. CV-89-00249-PMP.

Before: WALLACE and THOMPSON, Circuit Judges, and THOMPSON, District Judge. [FN*]

> FN* The Honorable Gordon Thompson, Jr., United States District Court Judge for the Southern District of California, sitting by designation.

Opinion by Judge DAVID R. THOMPSON; Partial Concurrence and Partial Dissent by Judge WALLACE.

### ORDER

An opinion in this case was filed November 5, 1996, and published at 99 F.3d 1504 (9th Cir.1996).

On November 19, 1996, the appellees filed a petition for rehearing and suggestion for rehearing en banc. The panel voted unanimously to grant the petition for rehearing, withdraw the opinion filed November 5, 1996, and issue a new opinion. Judge D. Thompson voted to reject the suggestion for rehearing en banc, and Judges Wallace and G. Thompson so recommended. The full court was advised of the suggestion for rehearing en banc, and no judge of the court called for rehearing en banc.

As a result of the foregoing, the appellees' petition for rehearing is GRANTED. The opinion filed November 5, 1996, and published at 99 F.3d 1504 (9th Cir.1996) is WITHDRAWN. Pursuant to the order granting rehearing, a new majority opinion, together with a separate opinion by Judge Wallace, is filed contemporaneously with this order. The suggestion for en banc rehearing of the opinion filed November 5, 1996 is REJECTED.

### *1472 OPINION

DAVID R. THOMPSON, Circuit Judge.

There are two groups of plaintiffs in this case: (1) the employer purchasers of group health insurance policies issued by Humana Health Insurance of Nevada (Premium Payors); and (2) the employee beneficiaries of those policies who made coinsurance payments for health care received (Co-Payors).

The Co-Payors received hospital care from Humana Hospital-Sunrise (Sunrise Hospital), an acute care facility which is owned and operated by defendant Humana, Inc. Under its insurance agreements with the Co-Payors, Humana Health Insurance of Nevada (Humana Insurance) was obligated to pay 80% of the employees' hospital charges over and above a designated deductible amount; the Co-Payors were to pay the remaining 20%. Unknown to the plaintiffs, Humana Insurance negotiated a discount with Sunrise Hospital. Because of this discount, Humana Insurance ultimately paid significantly less than its 80% share of Sunrise Hospital's charges and the Co-Payors paid significantly more than their 20% co-payment share.

The Co-Payors contend Humana Insurance breached its contract with them, and violated the Employee Retirement Income Security Act (ERISA), 29 U.S.C. § 1001, et seq., by failing to pass along to them the Sunrise Hospital discounts in the form of reduced co-payments. The Co-Payors also contend the defendants violated ERISA by breaching fiduciary duties, engaging in prohibited transactions, and retaining excessive compensation. Both groups of plaintiffs contend that the defendants violated section 2 of the Sherman Act, 15 U.S.C. § 2, and engaged in a scheme to defraud in violation of the Racketeer Influenced and Corrupt Organizations Act (RICO), 18 U.S.C. §§ 1961-1968.

The district court granted summary judgment in favor of the defendants, rejecting all of the plaintiffs' claims except the Co-Payors' ERISA benefits breach of contract claim. This appeal followed.

We have jurisdiction under 28 U.S.C. § 1291. We affirm the district court's summary judgment on the ERISA claims, reverse the district court's summary judgment on the Sherman Act antitrust claims, and affirm in part and reverse in part summary judgment on the RICO claims.

### I
### FACTS

The plaintiffs contracted for health insurance, through employee benefit plans, with Humana Insurance during

114 F.3d 1467                                                                    Page 7
114 F.3d 1467, 1997-1 Trade Cases P 71,818, 97 Cal. Daily Op. Serv. 3865, 97 Daily Journal D.A.R. 6578
(Cite as: 114 F.3d 1467)

the period of 1985 through 1988.  Pursuant to an agreement made in 1984 between Humana Insurance and Sunrise Hospital, Humana Insurance would receive a discount for its portion of the hospital charges incurred by its insureds.  Unaware of this discount, the plaintiffs continued to pay their required premiums and undiscounted co-payments.  As a result, Humana Insurance ended up paying less than 80% of the hospital's charges for health care services, the Co-Payors paid more than 20% of these charges, and the Premium Payors paid the same premiums despite the reduced cost to Humana Insurance of the health care services.

The plaintiffs assert that Humana Insurance concealed the discount deal by writing checks to Sunrise Hospital for 80% of the billed charges.  Sunrise Hospital would then remit the clandestine discount to Humana Insurance through monthly intercompany transfers, in what the plaintiffs characterize as a "classic kickback scheme."

## II
### PROCEDURAL HISTORY

The plaintiffs filed this action in the district court on March 29, 1989, alleging both state and federal claims.  Six months later, the court granted the defendants' motion, pursuant to Federal Rule of Civil Procedure 12(b)(6), to dismiss the state law claims because those claims were preempted by ERISA.

The plaintiffs filed a first amended complaint on October 27, 1989. Following another round of motions, the district court upheld the sufficiency of the plaintiffs' ERISA claims, some of the RICO claims and the *1473 antitrust claims, and certified the two classes of plaintiffs, Premium Payors and Co-Payors.  At the district court's direction, the plaintiffs filed a second amended complaint.

The second amended complaint asserted three claims for relief: (1) an ERISA claim by the Co-Payor class against Humana Insurance alleging breach of fiduciary duty, prohibited transactions and retention of excessive compensation; (2) an antitrust claim under section 2 of the Sherman Act by both classes of plaintiffs alleging the defendants had monopolized or attempted to monopolize the market for acute care facilities in Clark County, Nevada; and (3) a RICO claim by both classes of plaintiffs alleging Humana Insurance marketed and administered its policies through repeated acts of mail and wire fraud.

Again, the defendants moved for summary judgment.  On July 21, 1993, after exhaustive briefing and argument, the district court granted the motion in its entirety ("the July 21, 1993 judgment"), but gave the plaintiffs leave to file a third amended complaint to assert on behalf of the Co-Payor class an ERISA benefits breach of contract claim against Humana Insurance under 29 U.S.C. § 1132(a)(1)(B).

The plaintiffs filed a third amended complaint.  In that complaint they asserted only one claim, a breach of contract claim under ERISA in which they alleged that the Co-Payor class was entitled to benefits under 29 U.S.C. § 1132(a)(1)(B), because Humana Insurance had not properly allocated the discount it received from Sunrise Hospital.

The Co-Payor class moved for summary judgment on this claim; Humana Insurance also moved for summary judgment as to the proper measure of damages.  The district court granted both motions on June 3, 1994 (the "June 3, 1994 judgment"), finding liability on the breach of contract claim, but limiting damages to the excess charges the Co-Payor plaintiffs paid, and specifying the methodology for calculating the damages for these class members.  Following further submissions by the parties, the district court entered an order on July 29, 1994 approving and adopting a schedule of damage awards by which the Co-Payors were to be reimbursed the amounts they had been overcharged on their co-payments.

On July 1, 1994, before the district court determined the damage awards, the plaintiffs filed a notice of appeal from the district court's June 3, 1994 judgment.  The plaintiffs voluntarily dismissed that appeal after we determined that the June 3, 1994 judgment was not a final, appealable order.  Thereafter, the plaintiffs filed a timely notice of appeal which brings this case before us.

The defendants have moved to dismiss this appeal in its entirety, or in the alternative to limit the appeal to the sole claim asserted in the plaintiffs' third amended complaint.  In the defendants' words, their motion to dismiss raises two jurisdictional issues: "(1) whether plaintiffs' voluntary dismissal of an earlier appeal from the June 3[, 1994] Judgment precludes review of that judgment here;  and (2) whether plaintiffs' failure to preserve in their Third Amended Complaint claims dismissed by the district

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

114 F.3d 1467                                                                                                                    Page 8
114 F.3d 1467, 1997-1 Trade Cases P 71,818, 97 Cal. Daily Op. Serv. 3865, 97 Daily Journal D.A.R. 6578
(Cite as: 114 F.3d 1467)

court's earlier Order of July 21, 1993, precludes review of that ruling in this appeal."

On the merits, the defendants dispute the plaintiffs' various claims of error, and ask us to affirm the district court across the board. We first consider the motion to dismiss or limit the appeal.

## III
## MOTION TO DISMISS OR LIMIT APPEAL

[1][2] The plaintiffs' voluntary dismissal of their premature appeal from the June 3, 1994 judgment does not preclude review of that judgment in this appeal. The June 3, 1994 judgment was not a final, appealable order when it was entered because the district court had not then determined the amount of damages. *See Brown v. United States Postal Serv., 860 F.2d 884, 886 (9th Cir.1988).* We deny the motion to dismiss the appeal in its entirety.

The defendants' contention that the appeal should be limited to the ERISA benefits breach of contract claim asserted in the third amended complaint presents a more complicated question. The plaintiffs did not reallege in that complaint any of the claims *1474 previously dismissed by the district court. The question is whether this omission precludes our review of the district court's dismissal of the previously asserted claims.

[3][4] It is the law of this circuit that a plaintiff waives all claims alleged in a dismissed complaint which are not realleged in an amended complaint. *London v. Coopers & Lybrand, 644 F.2d 811, 814 (9th Cir.1981); Sacramento Coca-Cola Bottling Co. v. Chauffeurs, Teamsters and Helpers Local No. 150, 440 F.2d 1096, 1098 (9th Cir.), cert. denied, 404 U.S. 826, 92 S.Ct. 57, 30 L.Ed.2d 54 (1971); Loux v. Rhay, 375 F.2d 55, 57 (9th Cir.1967).* This rule is premised on the notion that the "amended complaint supersedes the original, the latter being treated thereafter as non-existent." *Loux, 375 F.2d at 57.* If a plaintiff fails to include dismissed claims in an amended complaint, the plaintiff is deemed to have waived any error in the ruling dismissing the prior complaint. *London, 644 F.2d at 814; Sacramento Coca-Cola, 440 F.2d at 1098; Loux, 375 F.2d at 57.*

[5][6] We have declined, however, to extend the *London* rule to amended complaints that follow summary judgment. *See USS-POSCO Indust. v. Contra Costa County*

*Bldg. & Const. Trades Council, 31 F.3d 800, 812 (9th Cir.1994).* The rulings challenged by the plaintiffs in this appeal are rulings on summary judgment. As such, the claims which the court dismissed pursuant to these rulings have not been waived by the plaintiffs' failure to reallege them in the third amended complaint. *Id.* The defendants' motion to limit the issues in this appeal to the claim asserted in the plaintiffs' third amended complaint is therefore denied. To the extent, however, that the plaintiffs seek review of the district court's earlier dismissal of their state law claims pursuant to Federal Rule of Civil Procedure 12(b)(6), such claims were waived by the failure to reallege them after the Rule 12(b)(6) dismissal. *London, 644 F.2d at 814.*

## IV
## MERITS

A. Standard of Review

We review a grant of summary judgment de novo. *Warren v. City of Carlsbad, 58 F.3d 439, 441 (9th Cir.1995), cert. denied, 516 U.S. 1171, 116 S.Ct. 1261, 134 L.Ed.2d 209 (1996).* We must determine, viewing the evidence in the light most favorable to the nonmoving party, whether there are any genuine issues of material fact and whether the district court correctly applied the relevant substantive law. *Id.*

B. ERISA

[7] The district court concluded the Co-Payor plaintiff class had no standing to bring their ERISA claim under 29 U.S.C. § 1132(a)(3) for breach of fiduciary duty. The court determined that the remedy provided by ERISA for the Co-Payors' harm was a benefits claim for breach of contract pursuant to section 1132(a)(1)(B) and not a claim for breach of fiduciary duty under section 1132(a)(3).

While this appeal was pending the Supreme Court issued its decision in *Varity Corp. v. Howe, 516 U.S. 489, 116 S.Ct. 1065, 134 L.Ed.2d 130 (1996).* The Court held that an individual beneficiary may bring suit against a plan administrator for a breach of fiduciary duty under 29 U.S.C. § 1132(a)(3). Previous case law in this circuit had allowed such an action only in very limited circumstances not present in this case. *See, e.g., Amalgamated Clothing & Textile Workers Union v. Murdock, 861 F.2d 1406 (9th Cir.1988); Waller v. Blue Cross of California, 32 F.3d*

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

1337 (9th Cir.1994). The opinion in *Varity Corp* expands what we previously viewed as permissible actions under section 1132(a)(3), but not to the extent necessary to accommodate the Co-Payors' claim in this case.

In *Varity Corp* the Court emphasized that section 1132(a)(3) is a "catchall" provision that provides relief only for injuries that are not otherwise adequately provided for. 516 U.S. at ----, 116 S.Ct. at 1078.

> Thus, we should expect that where Congress elsewhere provided adequate relief for a beneficiary's injury, there will likely be no need for further equitable relief, in which case such relief normally would not be "appropriate."

*1475 The Supreme Court thus interpreted the statute to allow individual relief for a breach of fiduciary duty in an ERISA action only where no other adequate relief is available.

The Court distinguished *Massachusetts Mut. Life Ins. v. Russell*, 473 U.S. 134, 144, 105 S.Ct. 3085, 3091, 87 L.Ed.2d 96 (1985), which had interpreted section 1132(a)(2) to allow recovery for breach of fiduciary duty only where the relief is sought on behalf of the entire plan. Other than the fact that it had interpreted a different subsection of the statute, one of the factors which distinguished *Russell* was that another remedy, section 1132(a)(1), already provided specific relief for the sort of injury suffered in that case.

In the present case, the Co-Payors seek to recover individual relief under section 1132(a)(3) for Humana Insurance's breach of fiduciary duty. But the Co-Payors have already won a judgment for damages under section 1132(a)(1) for the injuries they suffered as a result of the defendant's actions. The district court determined, and we agree, that the Co-Payors are entitled to recover, in the form of damages pursuant to their claim under section 1132(a)(1), all amounts they were forced to pay over and above their contractual co-payment obligation.

In these circumstances, *Varity Corp.* does not authorize equitable relief under the catchall provision of section 1132(a)(3). Equitable relief under section 1132(a)(3) is not "appropriate" because section 1132(a)(1) provides an adequate remedy in this case.

We affirm the district court's summary judgment against the Co-Payors on their breach of fiduciary duty claim under section 1132(a)(3) of ERISA. We also affirm the district court's summary judgment in favor of the Co-Payors on their benefits breach of contract claim under section 1132(a)(1) of ERISA and the district court's computation of damages set forth in its July 29, 1994 order.

C. Antitrust

The plaintiffs sought approximately $181 million in damages against the defendants for monopolization and attempted monopolization under section 2 of the Sherman Act, 15 U.S.C. § 2. [FN1] The district court concluded the plaintiffs failed to produce evidence in support of this claim sufficient to survive a motion for summary judgment. Specifically, the district court determined the plaintiffs had not provided sufficient evidence in support of their claim of monopolization to establish the relevant submarkets they asserted, the exercise of market power, or antitrust injury.

> FN1. Title 15 U.S.C. § 2 provides:
> Every person who shall monopolize, or attempt to monopolize, or combine or conspire with any other person or persons, to monopolize any part of the trade or commerce among the several States, or with foreign nations, shall be deemed guilty of a felony, and, on conviction thereof, shall be punished by fine not exceeding $10,000,000 if a corporation, or, if any other person, $350,000, or by imprisonment not exceeding three years, or by both said punishments, in the discretion of the court.

[8] To prevail on a claim of monopolization under section 2 of the Sherman Act, a plaintiff must demonstrate: "(1) [p]ossession of monopoly power in the relevant submarket; (2) willful acquisition or maintenance of that power; and (3) causal antitrust injury." *Pacific Express, Inc. v. United Airlines, Inc.*, 959 F.2d 814, 817 (9th Cir.), *cert denied*, 506 U.S. 1034, 113 S.Ct. 814, 121 L.Ed.2d 686 (1992).

[9][10][11] Monopoly power, for the purpose of section 2 of the Sherman Act, is "the power to control prices or exclude competition." *United States v. Grinnell Corp.*, 384 U.S. 563, 571, 86 S.Ct. 1698, 1704, 16 L.Ed.2d 778 (1966) (quoting *United States v. E.I. du Pont de Nemours*

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

114 F.3d 1467                                                                    Page 10
114 F.3d 1467, 1997-1 Trade Cases P 71,818, 97 Cal. Daily Op. Serv. 3865, 97 Daily Journal D.A.R. 6578
(Cite as: 114 F.3d 1467)

& Co., 351 U.S. 377, 391, 76 S.Ct. 994, 1005, 100 L.Ed. 1264 (1956)). A plaintiff may demonstrate market power either by direct evidence or by circumstantial evidence. Rebel Oil Co. v. Atlantic Richfield Co., 51 F.3d 1421, 1434 (9th Cir.), cert. denied, 516 U.S. 987, 116 S.Ct. 515, 133 L.Ed.2d 424 (1995). Direct proof of market power may be shown by evidence of restricted output and supracompetitive prices. Id. Such a showing "is direct proof of the injury to competition which a competitor with market power may inflict, and thus, of the actual exercise of market power." Id.

*1476 [12] The plaintiffs submitted evidence that Sunrise Hospital routinely charged higher prices than other hospitals while reaping high profits. With no accompanying showing of restricted output, however, the plaintiffs have failed to present direct evidence of market power.

[13] The more common method of establishing monopoly power is by circumstantial evidence. This requires the plaintiff to: "(1) define the relevant market, (2) show that the defendant owns a dominant share of that market, and (3) show that there are significant barriers to entry and show that existing competitors lack the capacity to increase their output in the short run."

[14][15][16] It is impossible to determine market share without first defining the relevant market. Id. at 1434. Definition of the relevant market cannot be performed with mathematical accuracy; it is simply the recognition of a field in which meaningful competition is said to exist. See United States v. Continental Can Co., 378 U.S. 441, 449, 84 S.Ct. 1738, 1743, 12 L.Ed.2d 953 (1964). We have previously defined the relevant market as the group of sellers or producers who have the "actual or potential ability to deprive each other of significant levels of business." Thurman Indus., Inc. v. Pay 'N Pak Stores, Inc., 875 F.2d 1369, 1374 (9th Cir.1989). "[T]he definition of the relevant market is a factual inquiry for the jury, and the court may not weigh evidence or judge witness credibility." Rebel Oil, 51 F.3d at 1435. See also Thurman Indus., 875 F.2d at 1374.

[17] The district court held the relevant market was the general acute care hospital market in Clark County, Nevada, which consisted of seven facilities in addition to Sunrise Hospital. The plaintiffs contend the district court arrived at this conclusion by weighing competing evid-

ence. The plaintiffs argue the relevant market is smaller than the market found by the district court. They contend there are two distinct submarkets which the defendants monopolized or attempted to monopolize: (1) the acute care hospitals actually used by Humana insureds; and (2) the major for-profit acute care hospitals in Clark County, Nevada. "A submarket exists if it is sufficiently insulated from the larger market so that supply and demand are inelastic with the larger market." Morgan, Strand, Wheeler & Biggs v. Radiology, Ltd., 924 F.2d 1484, 1490 (9th Cir.1991).

In support of their first contention that the relevant submarket is the acute care hospitals actually used by Humana insureds, the plaintiffs submitted an affidavit indicating that 75% to 85% of Humana insureds used Sunrise Hospital, and that this high proportion was achieved through contractual disincentives such as higher deductibles and co-payments for other hospitals, and noncontractual disincentives such as delaying or denying payment to other hospitals which made it difficult for Co-Payors to use them.

[18] We reject the plaintiffs' attempt to limit the relevant market to acute care hospitals used by Humana insureds. The plaintiffs used Sunrise Hospital and obtained medical care from few other hospitals because of contractual provisions in their insurance policies. This tie-in defeats the plaintiffs' argument for a submarket consisting only of those hospitals Humana insureds actually used. See Eastman Kodak Co. v. Image Technical Services, Inc., 504 U.S. 451, 490-91, 112 S.Ct. 2072, 2094-95, 119 L.Ed.2d 265 (Scalia, J., dissenting) (1992). To succeed in the face of the contractual tie-in created by the insurance policies, the plaintiffs would have to make a showing of monopoly power in the health insurance market, and there is no evidence of this. See id.; Jefferson Parish Hosp. Dist. No. 2 v. Hyde, 466 U.S. 2, 13-14, 104 S.Ct. 1551, 1558-59, 80 L.Ed.2d 2 (1984).

The plaintiffs' second asserted relevant submarket consists of the major for-profit acute care hospitals in Clark County, Nevada. This submarket allegedly includes Sunrise Hospital, Valley Hospital, and Desert Springs Hospital. Excluded from this market are Clark County's five remaining acute care hospitals, Boulder City Hospital (Boulder City), Community Hospital of North Las Vegas (Community), St. Rose De Lima Hospital (St. Rose), Uni-

114 F.3d 1467                                                          Page 11
114 F.3d 1467, 1997-1 Trade Cases P 71,818, 97 Cal. Daily Op. Serv. 3865, 97 Daily Journal D.A.R. 6578
(Cite as: 114 F.3d 1467)

versity Medical Center (UMC), and Women's Hospital (Women's). The plaintiffs submitted evidence tending to support their contention that the five remaining*1477 acute-care hospitals in Clark County, which the district court included in its determination of the relevant market, were not competitors of Sunrise Hospital. For example, there was evidence that UMC charged patients 15 to 20 percent less than Sunrise Hospital. Yet, because UMC was considered a hospital for the indigent, patients with a choice, such as those with insurance, eschewed UMC in favor of the larger for-profit hospitals despite the significantly lower price at UMC.

[19][20] We recognize "the scope of the relevant market is not governed by the presence of a price differential." _Twin City Sportservice, Inc. v. Charles O. Finley & Co., 512 F.2d 1264, 1274 (9th Cir.1975)._ But when demand for the commodity of one producer shows no relation to the price for the commodity of another producer, it supports the claim that the two commodities are not in the same relevant market.

[21] There was also evidence that Boulder City, St. Rose, Community, and Women's were considered "niche" hospitals that did not offer the range of services available at Sunrise Hospital. This, alone, is not enough. Specialty shops which offer only a limited range of goods are generally considered in the same market with larger, more diverse, "one-stop shopping" centers. _Thurman Indust., 875 F.2d at 1374-77._ However, the plaintiffs also submitted documentary evidence, including an expert's affidavit and testimony before the Nevada legislature, which tended to support their contention that these specialty hospitals did not, in fact, compete with Sunrise Hospital.

We have not recounted the evidence submitted by the defendants, but it was substantial. Were we to weigh the evidence we might be inclined to find that the plaintiffs failed to establish their alleged submarket. On a motion for summary judgment, however, this would be inappropriate.

[22] We conclude the evidence the plaintiffs presented was sufficient to withstand the defendants' motion for summary judgment as to their second asserted relevant market.

The additional issues of monopoly power and the main-

tenance of monopoly power depend upon a resolution of the relevant market question. _Rebel Oil, 51 F.3d at 1434._ Whether the defendants engaged in anticompetitive behavior is dependent upon resolution of these issues. _See Pacific Express, 959 F.2d at 818._

[23] The same may be said of the plaintiffs' section 2 claim for attempted monopolization. To prevail on such a claim, a plaintiff must demonstrate four elements: (1) specific intent to control prices or destroy competition; (2) predatory or anticompetitive conduct directed toward accomplishing that purpose; (3) a dangerous probability of success; and (4) causal antitrust injury. _Rebel Oil, 51 F.3d at 1433._

The plaintiffs' claim of attempted monopolization was not directly addressed by the district court. Resolution of this issue, like the claim of actual monopolization, is dependent upon a definition of the relevant market. Without such a determination, we cannot assess whether challenged activity was anticompetitive. In sum, the determination of all these subsidiary issues depends on the determination of the question of the relevant market; and there is a genuine dispute of material fact as to that.

The plaintiffs should also survive summary judgment on the issue of causal antitrust injury. To survive summary judgment, the plaintiffs were required to offer some evidence demonstrating "the existence of an 'antitrust injury, which is to say injury of the type the antitrust laws were intended to prevent and that flows from that which makes defendant's acts unlawful.'" _Atlantic Richfield v. USA Petroleum, 495 U.S. 328, 334, 110 S.Ct. 1884, 1889, 109 L.Ed.2d 333 (1990)_ (quoting _Brunswick Corp. v. Pueblo Bowl-O-Mat, 429 U.S. 477, 489, 97 S.Ct. 690, 697, 50 L.Ed.2d 701 (1977)_)

[24] Here, the plaintiffs presented evidence that, as a result of Humana's anticompetitive behavior, they paid higher copayments and premiums than they would have paid in a competitive market. This evidence, while it shows that the plaintiffs paid high copayments and premium payments because *1478 of the kickback scheme, does not explain how the scheme reduced competition in the relevant market. We conclude, therefore, that the plaintiffs did not demonstrate that they suffered antitrust injury resulting from the kickback scheme. _See Atlantic Richfield, 495 U.S. at 344, 110 S.Ct. at 1894_ (observing

114 F.3d 1467                                                                                    Page 12
114 F.3d 1467, 1997-1 Trade Cases P 71,818, 97 Cal. Daily Op. Serv. 3865, 97 Daily Journal D.A.R. 6578
(Cite as: 114 F.3d 1467)

that "[t]he antitrust injury requirement ensures that a plaintiff can recover only if the loss stems from a competition-reducing aspect or effect of the defendant's behavior.").

The plaintiffs presented other evidence, however, that Humana engaged in impermissibly anticompetitive conduct in three ways: (a) Sunrise (the Humana-owned hospital) was the only area hospital certified to provide Level III neonatal care, but refused to provide Level III care under separate contract; (b) Sunrise diverted indigent or low-paying critical care patients to other area hospitals; and (c) Humana threatened physicians who did not support its monopoly.

This conduct describes antitrust violations. The plaintiffs presented evidence that Sunrise required customers who wanted to buy Level III neonatal care to also buy other neonatal services. Such a practice could constitute an anticompetitive tying arrangement. *See Datagate, Inc. v. Hewlett-Packard Co., 60 F.3d 1421, 1423 (9th Cir.1995)* (describing a tying arrangement as a "device used by a competitor with market power in one market ... to extend its market power into an entirely distinct market."). Sunrise's alleged policy of funneling indigent and low-paying patients to competitors raises a factual question whether such conduct increased the operating cost of those competitors by imposing on them the cost of caring for indigent patients. *See Multistate Legal Studies, Inc. v. Harcourt Brace Jovanovich Legal and Professional Publications, Inc., 63 F.3d 1540, 1553 (10th Cir.1995)* (stating that monopolist's practice of scheduling courses to conflict with competitor's courses could raise competitor's costs, and therefore, "would qualify as anticompetitive conduct"); *Premier Electrical Constr. Co. v. Nat'l Electrical Contractors Ass'n, 814 F.2d 358, 368 (7th Cir.1987)* (observing that, when defendant "raised its rivals' costs," it "raised the market price to its own advantage."); *see generally* T. Krattenmaker & S. Salop, Anticompetitive Exclusion: Raising Rivals' Costs to Achieve Power Over Price, 96 Yale L.J. 209, 235-262 (1986). Finally, the plaintiffs presented evidence that Humana's alleged practice of threatening physicians who disagreed with their monopoly limited competition by preventing physicians from referring patients to hospitals other than Sunrise. *See Potters Medical Center v. City Hospital Ass'n, 800 F.2d 568, 575 (6th Cir.1986)* (holding that hospital's alleged conduct in restricting privileges of physicians

"could state a monopolization claim.")

According to the plaintiffs' evidence, these anticompetitive practices enabled Sunrise to, and it did, charge higher prices for hospital services. These higher prices translated into higher copayments and premium payments. Such an increase in consumer prices caused by the asserted conduct would constitute antitrust injury of the type the antitrust laws were designed to prevent. *See Blue Shield of Virginia v. McCready, 457 U.S. 465, 102 S.Ct. 2540, 73 L.Ed.2d 149 (1982)* (holding that individual health care plan subscriber could sue health care provider for antitrust injury resulting from provider's alleged boycott of psychologists); *Reiter v. Sonotone Corp., 442 U.S. 330, 341, 99 S.Ct. 2326, 2332, 60 L.Ed.2d 931 (1979)* (holding that consumers of retail goods and services have standing to sue under the antitrust laws when they suffer a price increase resulting from anticompetitive conduct).

[25] We conclude, therefore, that the plaintiffs are entitled to survive summary judgment on the issue of antitrust injury. In calculating the plaintiffs' antitrust damages, the jury will be faced with the difficult task of separating the antitrust damages from the damages resulting from Humana's kickback scheme. Complex antitrust cases, however, invariably involve complicated questions of causation and damages. *See Potters Medical Center, 800 F.2d at 576* (observing that speculative nature of damages are "often the case in complex antitrust litigation and should not in itself foreclose antitrust standing.")

We reverse the district court's summary judgment in favor of the defendants on the plaintiffs' antitrust claim.

*1479 D. RICO

Both the Premium Payor and the Co-Payor classes alleged that during the period from 1985 through 1988, in violation of the civil RICO statute, 18 U.S.C. § 1964(c): [FN2] (1) Humana, Inc. and Humana Insurance acted as members of an "association in fact" enterprise, or alternatively, that Humana, Inc., a person within the meaning of 18 U.S.C. § 1961(3), associated with Humana Insurance, an enterprise within the meaning of 18 U.S.C. § 1961(4); (2) Humana Inc. and Humana Insurance entered into a secret agreement to give Humana Insurance an excessive discount for hospital charges incurred by its insureds; (3) Humana Inc. and Humana Insurance concealed and mis-

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

114 F.3d 1467                                                                                                Page 13
114 F.3d 1467, 1997-1 Trade Cases P 71,818, 97 Cal. Daily Op. Serv. 3865, 97 Daily Journal D.A.R. 6578
(Cite as: 114 F.3d 1467)

represented this agreement in numerous mailings, television and radio commercials, and telephone calls; and (4) such acts were intended to defraud the Premium Payor class into purchasing policies and the Co-Payor class into paying excessive co-payments.

> FN2. Title 18 U.S.C. § 1964(c) provides:
> Any person injured in his business or property by reason of a violation of section 1962 of this chapter may sue therefor in any appropriate United States district court and shall recover threefold the damages he sustains and the cost of the suit, including a reasonable attorney's fee.

The district court granted the defendants' motion for summary judgment because it found the plaintiffs' RICO claims were barred by the McCarran-Ferguson Act. Additionally, the district court determined that the Premium Payors' RICO claim failed because the Premium Payors failed to demonstrate a direct relationship between the alleged injurious conduct and the injury asserted (excessive premiums), or any " 'concrete financial injury,' for the purposes of RICO." The district court also held the defendants were "entitled to summary judgment on the Co-Payor class's RICO claim to the extent that the Co-Payor class [sought] damages in excess of the amount that could have been recovered under a proper interpretation of the co-payment provision."

1. The McCarran-Ferguson Act

[26] The MFA, 15 U.S.C. § 1011, et seq., was enacted, in part, to allow states to regulate the business of insurance free from inadvertent preemption by federal statutes of general applicability Merchants Home Delivery Serv., Inc. v. Frank B. Hall & Co., 50 F.3d 1486, 1488-89 (9th Cir.), cert. denied, 516 U.S. 964, 116 S.Ct. 418, 133 L.Ed.2d 335 (1995). Section 2(b) of the MFA provides in pertinent part:

> No Act of Congress shall be construed to invalidate, impair, or supersede any law enacted by any State for the purpose of regulating the business of insurance ... unless such Act specifically relates to the business of insurance.

[27] We have adopted a four-part test to determine when section 2(b) of the MFA precludes the application of a federal statute to preempt state insurance law. Merchants

Home, 50 F.3d at 1489. The MFA precludes such preemption by a federal statute if: "(1) the statute does not 'specifically relate' to the business of insurance, (2) the acts challenged under the statute constitute the business of insurance, (3) the state has enacted a law or laws regulating the challenged acts, and (4) the state law would be superseded, impaired or invalidated by the application of the federal statute." Id. All four factors must be satisfied. Id. Only the first factor is not disputed in this case-the parties concede RICO does not specifically relate to the business of insurance.

With regard to the second factor, the crux of the plaintiffs' claim is that Humana Insurance misrepresented how premiums would be calculated, leading the Premium Payors to believe a discount from Sunrise Hospital would lower their premium rates, and the defendants overcharged the Co-Payors by billing them for 20% of the undiscounted cost of their hospital care.

The plaintiffs argue these allegedly fraudulent acts cannot be part of the business of insurance because "[f]raud is not a legitimate aspect of risk management." In Merchants Home we rejected such an argument and we do so again. It is useless "to point to a practice forbidden by federal law ... and observe that this practice is not itself insurance." Id. at 1490 (quoting *1480NAACP v. American Family Mut. Ins. Co., 978 F.2d 287, 294 (7th Cir.1992), cert. denied, 508 U.S. 907, 113 S.Ct. 2335, 124 L.Ed.2d 247 (1993)). Such an interpretation would "read the McCarran-Ferguson Act out of existence" because "[a]ny practice which violated any federal statute would, by definition, not be the 'business of insurance,' resulting in all federal statutes applying to the business of insurance with their 'full rigor.' " Id.

The acts the plaintiffs challenge are analytically equivalent to the overcharging for premiums alleged in Merchants Home. There, the plaintiff asserted RICO claims for fraudulent insurance practices by the defendant. Id. at 1488. The plaintiff alleged three types of fraudulent practices: (1) overcharging for premiums on actual policies; (2) collecting premiums on fictitious policies; and (3) collecting money from the insured to pay uninsured claims which the insurer did not actually pay. Id. We held overcharging for premiums was part of the "business of insurance," though collection of premiums on nonexistent policies and collecting money from

114 F.3d 1467                                                                                                    Page 14
114 F.3d 1467, 1997-1 Trade Cases P 71,818, 97 Cal. Daily Op. Serv. 3865, 97 Daily Journal D.A.R. 6578
(Cite as: 114 F.3d 1467)

the insured for bogus uninsured claims were not part of such business. *Id.* at 1490.

[28] Consistent with *Merchants Home.* we conclude the challenged practices in this case of Humana Insurance overcharging premiums and not reducing co-payments is the "business of insurance" for the purpose of the MFA.

[29] The third factor in the preemption analysis is whether the state has enacted a law or laws regulating the challenged acts. We agree with the district court that the Nevada Act was enacted to regulate the acts challenged by the plaintiffs.

In 1971, Nevada adopted the Trade Practices and Frauds; Financing of Premiums Act (Act), N.R.S. § 686A.010, *et seq.* The purpose of the Act was:

> to regulate trade practices in the business of insurance in accordance with the intent of Congress as expressed in the [MFA], 15 U.S.C. §§ 1011 to 1015 inclusive, by defining, or providing for the determination of, all such practices in this state which constitute unfair methods of competition or unfair or deceptive acts or practices and by prohibiting the trade practices so defined or determined.

N.R.S. § 686A.010.

Under the Act, the Nevada Commissioner of Insurance is granted "exclusive jurisdiction" to regulate the trade practices of the business of insurance. N.R.S. § 686A.015. The Act specifically prohibits the dissemination of false or misleading information relating to the sale of policies or benefits. N.R.S. §§ 686A.030 & 686A.040. The plaintiffs' observation that the Act provides for only administrative remedies does not alter our finding that it regulates the challenged acts. The third factor is satisfied.

Applying the fourth factor, we consider whether the application of RICO would invalidate, impair, or otherwise supersede Nevada's legislation. In *Merchants Home,* we addressed, for the first time, the question whether a federal statute invalidated, impaired, or superseded a state law under section 2(b) of the MFA. *Merchants Home,* 50 F.3d at 1492. As in the present case, the state law in *Merchants Home* provided for only administrative remedies, but the federal law (RICO) provided for a private right of action. *Id.* We held the application of the federal statute,

although it "prohibited" acts which were also prohibited under the state's insurance law, did "not 'invalidate, impair, or supersede' the state's laws under § 2(b) of the Mc-Carran-Ferguson Act." *Id.*

[30] Here, as in *Merchants Home,* there is some symmetry between RICO's private right of action and Nevada's administrative scheme. RICO permits an injured plaintiff to recover for fraudulent practices which the Nevada administrative scheme proscribes. This symmetry, however, does not create a conflict between federal and state law. *Id.* Accordingly, the fourth factor is not present. The MFA does not preclude the plaintiffs' RICO claims. [FN3]

> FN3. The district court cannot be faulted for ruling to the contrary. It did not have the benefit of *Merchants Home,* decided in 1995, when it rendered its summary judgment in this case.

The next question we consider is whether the plaintiffs produced enough evidence in *1481 support of their RICO claims to survive summary judgment.

2. Premium Payors' Claim

[31][32] To state a claim under RICO, 18 U.S.C. § 1962(c), a plaintiff must demonstrate: (1) the conduct; (2) of an enterprise; (3) through a pattern; (4) of racketeering activity. [FN4] *Sun Sav. and Loan Ass'n v. Dierdorff,* 825 F.2d 187, 191 (9th Cir.1987). Racketeering activity is any act indictable under various provisions of 18 U.S.C. § 1961 and includes the predicate acts alleged in this case of mail fraud and wire fraud under 18 U.S.C. §§ 1341 and 1343. *Id.* Mail fraud under section 1341 requires the showing of a scheme to defraud involving use of the United States mails with the specific intent to defraud. *Schreiber Distributing Co. v. Serv-Well Furniture Co.,* 806 F.2d 1393, 1399-1400 (9th Cir.1986). Wire fraud under section 1343 requires the same showing, but involves use of United States wires. *Id.* at 1400.

> FN4. Title 18 U.S.C. § 1962(c) provides:
> It shall be unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity or

114 F.3d 1467                                                                        Page 15
114 F.3d 1467, 1997-1 Trade Cases P 71,818, 97 Cal. Daily Op. Serv. 3865, 97 Daily Journal D.A.R. 6578
(Cite as: 114 F.3d 1467)

collection of unlawful debt.

The district court held the Premium Payor class failed to demonstrate the requisite causal connection between the alleged predicate acts and the asserted damages. The court also held the class failed to demonstrate "concrete financial injury."

[33] To maintain a claim under RICO, a plaintiff must show not only that the defendant's violation was a "but for" cause of his injury, but that it was the proximate cause as well. *Imagineering, Inc. v. Kiewit Pacific Co., 976 F.2d 1303, 1311 (9th Cir.1992), cert. denied, 507 U.S. 1004, 113 S.Ct. 1644, 123 L.Ed.2d 266 (1993).* This requires a showing of a direct relationship between the injurious conduct alleged and the injury asserted. *Id.* The plaintiff must show a concrete financial loss. *Id.*

In the present case, the Premium Payor class had to establish that they relied on misrepresentations in buying their insurance policies, and that these misrepresentations directly caused them a concrete financial loss. They contend their claim is simple. Humana, Inc. and Humana Insurance represented to them, through mailings, television and radio commercials, and phone calls, that cost savings would be passed along to them in the form of reduced premiums. They relied on these representations in choosing Humana Insurance as their insurance carrier. The hospital discount Humana Insurance received from Sunrise Hospital was a form of cost saving, yet it was not incorporated into calculation of their premiums. Because their premiums did not reflect these discounts, the Premium Payors contend they suffered a financial loss.

The district court found no evidence in the record to support the Premium Payors' contention that the defendants fraudulently represented how premiums would be calculated. The class argues the myriad advertisements and promotions did just that. We disagree. The transcript of commercials submitted by the class fails to support their argument. The commercials simply state that because Humana Insurance can "control costs" the employers and employees can save money. The district court accurately described such statements as "puffery." The statements were too general to be interpreted as defining any calculation of insurance premiums.

The class also submitted Humana Insurance's annual re-

ports. Statements in the reports suggested patients were encouraged to attend Humana hospitals "where savings could be shared with employers and their employees through lower premiums." Like the advertisements, this statement did not make a specific representation as to how the premiums would be calculated sufficient to support a cause of action for fraud.

[34] Because we conclude the Premium Payor class failed to come forward with any evidence that the defendants misrepresented how the insurance premiums would be calculated, we do not reach the question of causation. The district court did not err in granting *1482 summary judgment against the Premium Payors on their RICO claim.

3. Co-Payors' Claim

The Co-Payors alleged the failure to disclose the Sunrise Hospital discount in the notice of coinsurance obligations sent to them induced them to make inflated co-payments. The Co-Payors were thus allegedly injured by the defendants' fraudulent failure to reduce their co-payment bills in accordance with the agreed ratio of 80% to 20%.

[35] Although these facts presented at least a triable issue of fact on the Co-Payors' RICO claim, the district court dismissed the claim as barred by the McCarran-Ferguson Act. As we have previously stated, the McCarran-Ferguson Act does not preclude a RICO claim in this case. The district court correctly held, however, that the Co-Payors failed to present any evidence of financial harm resulting from the misrepresentations, except for the amounts they overpaid as a result of the nondisclosure of the discount. Therefore, we affirm the district court's partial summary judgment in favor of the defendants as to any claim by the plaintiffs for RICO damages in excess of these overpayments.

E. Motion To Amend

The plaintiffs contend the district court erred in not granting them leave to amend their complaint. The plaintiffs sought leave to add three additional claims: (1) a RICO conspiracy claim; (2) a claim for obstruction of justice under 18 U.S.C. § 1503; and (3) their previously dismissed state law claims.

114 F.3d 1467                                                                    Page 16

114 F.3d 1467, 1997-1 Trade Cases P 71,818, 97 Cal. Daily Op. Serv. 3865, 97 Daily Journal D.A.R. 6578
**(Cite as: 114 F.3d 1467)**

[36] We review for abuse of discretion a district court's denial of a motion to amend. _DCD Programs, Ltd. v. Leighton,_ 833 F.2d 183, 186 (9th Cir.1987).

[37][38] Leave to amend pleadings "shall be freely given when justice so requires." Fed.R.Civ.P. 15(a). We apply this rule with "extreme liberality." _Morongo Band of Mission Indians v. Rose,_ 893 F.2d 1074, 1079 (9th Cir.1990). The following factors guide a court's determination of whether a motion to amend should be granted: (1) undue delay; (2) bad faith; (3) futility of amendment; and (4) prejudice to the opposing party. _Hurn v. Retirement Fund Trust of Plumbing, Etc.,_ 648 F.2d 1252, 1254 (9th Cir.1981). Of these elements, only the futility issue is relevant in this case.

[39][40][41] Because the plaintiffs' state law claims are preempted by ERISA, leave to amend to reassert the state law claims would be futile. The obstruction of justice claim under 18 U.S.C. § 1503 is also futile because 18 U.S.C. § 1503 is a criminal statute that does not provide for a private cause of action. _Hanna v. Home Ins. Co.,_ 281 F.2d 298, 303 (5th Cir.1960), cert. denied, 365 U.S. 838, 81 S.Ct. 751, 5 L.Ed.2d 747 (1961); _Odell v. Humble Oil & Refining Co.,_ 201 F.2d 123, 127 (10th Cir.), cert. denied, 345 U.S. 941, 73 S.Ct. 833, 97 L.Ed. 1367 (1953). With regard to the proffered RICO conspiracy claim, however, in light of our determination that the Co-Payor class's RICO claim is not barred by the MFA, we conclude the Co-Payor class should be allowed to amend its complaint to assert this claim.

### V
### CONCLUSION

The district court's grant of summary judgment is affirmed as to the ERISA issues, reversed and remanded as to the Sherman Act antitrust issues, affirmed as to the Premium Payor class's RICO claim, and affirmed as to partial summary judgment on the Co-Payor class's RICO claim. In addition, we grant the Co-Payor class leave to amend its RICO claim to allege a RICO conspiracy. The plaintiffs shall recover from the defendants one-half of the plaintiffs' cost of appeal.

AFFIRMED IN PART, REVERSED IN PART, AND REMANDED.

WALLACE, Circuit Judge, concurring and dissenting:

I concur with the majority in large measure, but its analysis of the antitrust claims in part IV.C. is so troubling that I cannot agree. Although reasonable minds can differ in this complex economic terrain, I am *1483 inclined to the position that the district court did not err in concluding that Forsyth's evidence for a submarket of for-profit hospitals was insufficient to survive summary judgment. The majority's analysis of this issue displays a subtle but important error of market definition theory. I would affirm.

Forsyth contends that Humana monopolized or attempted to monopolize a market for major for-profit acute care hospitals in Clark County, Nevada. The district court held that Forsyth failed to establish the existence of a separate market for for-profit hospitals within the general Clark County hospital market. In holding that there is a genuine factual dispute on this issue, the majority points to two categories of evidence submitted by Forsyth. The first depends on a faulty inference about cross-price elasticity of demand, and the second is insufficient to avoid summary judgment.

As evidence for the existence of a separate market, the majority states that although "UMC charged patients 15 to 20 percent less than Sunrise Hospital, ... patients with a choice, such as those with insurance, eschewed UMC in favor of the larger for-profit hospitals despite the significantly lower price at UMC." The majority interprets this consumer behavior as evidence that demand for for-profit hospitals is not responsive to the price charged by non-profit hospitals; "when demand for the commodity of one producer shows no relation to the price for the commodity of another producer, it supports the claim that the two commodities are not in the same relevant market."

The majority's test refers to the economic concept of cross-price elasticity of demand, which is a useful tool for evaluating whether products compete in the same market. Cross elasticity of demand measures the percentage change in the quantity which consumers demand of one product in response to a percentage change in the price of another.

> When the cross-price elasticity of demand for good $i$ with respect to the price of good $j$ is positive, an increase in [the price of] $j$ causes the demand for good $i$ to rise; in that case, the goods are _substitutes_ (as fuel oil and coal). Conversely, if the cross-price elasticity is

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

114 F.3d 1467                                                                          Page 17
114 F.3d 1467, 1997-1 Trade Cases P 71,818, 97 Cal. Daily Op. Serv. 3865, 97 Daily Journal D.A.R. 6578
(Cite as: 114 F.3d 1467)

negative, the goods are *complements* (as cigars and matches).

2A Phillip E. Areeda, et al., Antitrust Law 105 (rev. ed. 1995). A high cross elasticity of demand indicates that products are close substitutes, and should probably be treated as part of the same market. A low or zero cross elasticity of demand is evidence that products do not compete in the same relevant market.

By focusing on this relationship between the demand for one commodity and the price of another, the majority attempts to avoid the common but fallacious assumption that expensive products automatically compete in a separate market from inexpensive ones. *See Twin City Sportservice v. Charles O. Finley & Co., 512 F.2d 1264, 1274 (9th Cir.1975)* ("the scope of the relevant market is not governed by the presence of a price differential"). The majority reasons that if "patients with a choice" prefer Sunrise hospital even though it is more expensive, then demand for Sunrise "shows no relation" to the prices charged at UMC and the other "indigent" hospitals.

That inference causes me to depart from the majority. We cannot conclude that demand for Sunrise "shows no relation" to the prices at UMC without some evidence of how demand for Sunrise responds to a *change* in the prices at UMC. Cross elasticity of demand measures a dynamic relationship between two variables: the quantity demanded of product i, and the price of product j. That is, by economic formulation,

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

114 F.3d 1467                                                                                      Page 18
114 F.3d 1467, 1997-1 Trade Cases P 71,818, 97 Cal. Daily Op. Serv. 3865, 97 Daily Journal D.A.R. 6578
**(Cite as: 114 F.3d 1467)**

$$E_{ij}d = - \frac{(\text{change in}) \, Q_i d \, / \, Q_i d}{(\text{change in}) \, P_j \, / \, P_j}$$

114 F.3d 1467                                                    Page 19
114 F.3d 1467, 1997-1 Trade Cases P 71,818, 97 Cal. Daily Op. Serv. 3865, 97 Daily Journal D.A.R. 6578
(Cite as: 114 F.3d 1467)

2A Areeda, Antitrust Law at 105. Cross elasticity cannot be calculated or approximated without information about the quantity demanded of i at (at least) two different prices of j. The record does not reflect that Forsyth introduced any such evidence, and without it the majority's inference is inappropriate.

The following example may help in making my point. Suppose that Ford and Chevrolet each sell a light truck. The Ford has four-wheel drive, and costs $2000 more than the *1484 Chevrolet, which does not have four-wheel drive. Both trucks sell equally well. If Chevrolet cuts the price of its truck in half and Ford's sales are unaffected, we might infer that the two vehicles are in different relevant markets. But the majority would interpret the simple fact that some consumers buy the Ford, notwithstanding the price differential, as evidence that the trucks do not compete. That reasoning, it seems to me, is faulty.

If four-wheel drive is worth about $2000 to most consumers, for example, small changes in the price of the Ford could have a dramatic impact on demand for the Chevrolet. If the availability of the Chevrolet significantly limits the rational pricing strategies for Ford, then the two trucks "compete" in the sense that matters for antitrust market definition. Ford could not exact monopoly profits by raising the price of its truck, because it would lose too many customers to Chevrolet. *See Rebel Oil v. Atlantic Richfield, 51 F.3d 1421, 1434 (9th Cir.)* ("If the sales of other producers substantially constrain the price-increasing ability of the monopolist or hypothetical cartel, these other producers must be included in the market."), *cert. denied,* 516 U.S. 987, 116 S.Ct. 515, 133 L.Ed.2d 424 (1995).

The majority also points to certain documentary evidence, including an expert's affidavit and testimony before the Nevada legislature, which tended to support Forsyth's contention that the "niche" hospitals did not compete with Sunrise. "Niche" sellers are generally considered to be in the same market with larger, more diverse vendors which carry the same products. *See Thurman Industries v. Pay 'N Pak Stores, 875 F.2d 1369, 1374-77 (9th Cir.1989).* I do not believe that the district judge erred in concluding that Forsyth's evidence on this point was insufficient to create a triable issue of fact.

114 F.3d 1467, 1997-1 Trade Cases P 71,818, 97 Cal. Daily Op. Serv. 3865, 97 Daily Journal D.A.R. 6578

**Briefs and Other Related Documents (Back to top)**

• (Appellate Brief) Appellant's Brief (Apr. 12, 1996)Original Image of this Document (PDF)

• 1995 WL 17016712 (Appellate Brief) Plaintiffs-Appellants Reply Brief (Jan. 17, 1995)Original Image of this Document (PDF)

• 1994 WL 16014368 (Appellate Brief) Defendants/Appellees' Answering Brief (Dec. 21, 1994)Original Image of this Document (PDF)

• 1994 WL 16014367 (Appellate Brief) Opening Brief of Plaintiffs-Appellants (Nov. 08, 1994)Original Image of this Document (PDF)

END OF DOCUMENT

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

# EXHIBIT 6

Westlaw.

2006 WL 2742297
--- F.Supp.2d ----, 2006 WL 2742297 (D.Del.), 2006-2 Trade Cases P 75,435
**(Cite as: 2006 WL 2742297 (D.Del.))**

**H**

**Motions, Pleadings and Filings**

United States District Court,
D. Delaware.
In re: INTEL CORP. MICROPROCESSOR ANTI-
TRUST LITIGATION,
Advanced Micro Devices, Inc. and AMD Internation-
al Sales & Service, Ltd.,
Plaintiffs,
v.
Intel Corporation and Intel Kabushiki Kaisha, De-
fendants.
**Nos. MDL 05-1717-JJF, CIV.A. 05-441-JJF.**

Sept. 26, 2006.

**Background:** Competitors brought putative class ac-
tion in state court against microprocessor manufac-
turers, alleging antitrust claims under the Sherman
Act and violations of the California Business and
Professions Code. After removal, action was consol-
idated by Judicial Panel on Multidistrict Litigation
and transferred. Manufacturers moved to dismiss "for-
eign commerce claims" allegedly asserted by compet-
itors.

**Holdings:** The District Court, Farnan, J., held that:
(1) Foreign Trade Antitrust Improvements Act
(FTAIA) precluded competitors' antitrust claims
based on lost sales of their German-made micropro-
cessors to foreign customers, and
(2) competitors lacked standing under the Sherman
Act to pursue antitrust claims for injuries arising in
foreign commerce.
Motion granted.

**[1] Antitrust and Trade Regulation ☞945**

29Tk945 Most Cited Cases
Foreign Trade Antitrust Improvements Act (FTAIA)
precluded competitors' antitrust claims under the
Sherman Act against microprocessor manufacturers
based on lost sales of competitors' German-made mi-
croprocessors to foreign customers, where conduct
alleged in the complaint clearly applied to foreign

trade in that it concerned manufacturers' conduct
selling microprocessors to foreign companies located
in foreign countries, and manufacturers' foreign con-
duct did not have a direct, substantial, and foresee-
able effect on United States commerce. Sherman Act,
§ 7, 15 U.S.C.A. § 6a.

**[2] Antitrust and Trade Regulation ☞945**
29Tk945 Most Cited Cases
Under the Foreign Trade Antitrust Improvements Act
(FTAIA), allegations that plaintiff is a United States
citizen do not create jurisdiction over antitrust claims
without substantial, direct effects on the domestic
market. Sherman Act, § 7, 15 U.S.C.A. § 6a.

**[3] Antitrust and Trade Regulation ☞945**
29Tk945 Most Cited Cases

**[3] Antitrust and Trade Regulation ☞963(3)**
29Tk963(3) Most Cited Cases
Competitors lacked standing under the Sherman Act
to pursue antitrust claims against microprocessor
manufacturers for injuries arising in foreign com-
merce, where alleged injuries suffered by competit-
ors, which were foreign injuries that occurred in for-
eign markets resulting from manufacturers' foreign
conduct, were not the type of injury Congress inten-
ded to prevent through the Foreign Trade Antitrust
Improvements Act (FTAIA) or the Sherman Act.
Sherman Act, §§ 1 et seq., 7, 15 U.S.C.A. §§ 1 et
seq., 6a.

**[4] Antitrust and Trade Regulation ☞963(1)**
29Tk963(1) Most Cited Cases
To establish standing to bring an antitrust claim, the
plaintiff must have suffered an injury the antitrust
laws were intended to prevent, and the injury must
flow from that which makes the defendants' acts un-
lawful. Sherman Act, § 1 et seq., 15 U.S.C.A. § 1 et
seq.
Charles P. Diamond, Esquire; Linda Smith, Esquire
and Mark Samuels, Esquire of O'Melveny & Myers
LLP, Los Angeles, CA; Henry C. Thumann, Esquire
of O'Melveny & Myers LLP, Washington, D.C. Jesse
A. Finkelstein, Esquire; Frederick L. Cottrell, III, Es-
quire; Chad M. Shandler, Esquire and Steven J. Fine-

2006 WL 2742297                                                                                    Page 2
--- F.Supp.2d ----, 2006 WL 2742297 (D.Del.), 2006-2 Trade Cases P 75,435
(Cite as: 2006 WL 2742297 (D.Del.))

man, Esquire of Richards, Layton & Finger, Wilmington, for Plaintiffs Advanced Micro Devices, Inc. and AMD International Sales & Services, Ltd.

Robert E. Cooper, Esquire and Daniel S. Floyd, Esquire of Gibson, Dunn & Crutcher LLP, Los Angeles, CA, Peter E. Moll, Esquire and Darrent B. Bernhard, Esquire of Howrey LLP, N.W. Washington, D.C. Richard L. Horwitz, Esquire and W. Harding Drane, Jr., Esquire of Potter Anderson & Corroon LLP, Wilmington, for Intel Corporation and Intel Kabushiki Kaisha.

### MEMORANDUM OPINION

FARNAN, District Judge.

*1 Pending before the Court is the Motion of Defendants' Intel Corporation and Intel Kabushiki Kaisha To Dismiss AMD's Foreign Commerce Claims For Lack Of Subject Matter Jurisdiction And Standing (D.I. 111 in Civil Action No. 05-441; D.I. 64 in MDL Docket No. 05-1717). For the reasons discussed the Court will grant Defendants' Motion.

### BACKGROUND

Advanced Micro Devices, Inc. and AMD International Sales & Service, Ltd. (collectively, "AMD") filed this action against Intel Corporation and Intel Kabushiki Kaisha (collectively, "Intel") alleging antitrust claims under the Sherman Act and violations of the California Business and Professions Code. Specifically, AMD alleges that Intel has willfully maintained a monopoly in the x86 Microprocessor Market by engaging in anticompetitive conduct, including such activities as forcing major customers into exclusive or non-exclusive deals, conditioning rebates and other monetary incentives on customers' agreement to limit or forego purchases from AMD, forcing PC makers and technology partners to boycott AMD product launches and promotions and threatening retaliation against customers introducing AMD computer platforms. AMD also alleges that Intel has willfully interfered with AMD's economic relationships with its actual and potential customers and engaged in a scheme to extend secret and discriminatory rebates to customers for the purpose of injuring AMD in violation of the California Business and Professions Code.

Intel has filed an Answer to the Complaint denying AMD's allegations. In addition, Intel has filed the instant Motion To Dismiss contending that the Court lacks subject matter jurisdiction over AMD's antitrust claims, to the extent that those claims are based upon the foreign effect of Intel's alleged conduct.

### STANDARD OF REVIEW

Federal Rule of Civil Procedure 12(b)(1) authorizes the Court to dismiss a complaint if the Court lacks subject matter jurisdiction over the plaintiff's claim, or the plaintiff lacks standing to bring its claim. Motions brought under Rule 12(b)(1) may present either a facial or factual challenge to the Court's subject matter jurisdiction. In reviewing a facial challenge under Rule 12(b)(1), the standards relevant to Rule 12(b)(6) apply. In this regard, the Court must accept all factual allegations in the complaint as true and all reasonable inferences must be drawn in favor of the plaintiff. The Court's inquiry under Rule 12(b)(1) is limited to the allegations in the complaint, the documents referenced in or attached to the complaint, and matters in the public record. Gould Electronics Inc. v. U.S., 220 F.3d 169, 176 (3d Cir.2000). However, the Court may consider documents attached as exhibits to a motion to dismiss without converting the motion to dismiss to a motion for summary judgment, if the plaintiff's claims are based on the documents and the documents are undisputedly authentic. Pension Benefit Guaranty Corp. v. White Consolidated Indus., Inc., 998 F.2d 1192, 1196 (3d Cir.1993).

*2 In reviewing a factual challenge to the Court's subject matter jurisdiction, the Court is not confined to the allegations of the complaint, and the presumption of truthfulness does not attach to the allegations in the plaintiff's complaint. Mortensen v. First Fed. Sav. and Loan, 549 F.2d 884, 891 (3d Cir.1977). Instead, the Court may consider evidence outside the pleadings, including affidavits, depositions and testimony, to resolve any factual issues bearing on jurisdiction. Gotha v. United States, 115 F.3d 176, 179 (3d Cir.1997).

Pursuant to Rule 12(h)(3), subject matter jurisdiction may be challenged at any time during the course of a case and may be raised sua sponte by the Court. Once the Court's subject matter jurisdiction over a com-

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

2006 WL 2742297                                                                     Page 3
--- F.Supp.2d ----, 2006 WL 2742297 (D.Del.), 2006-2 Trade Cases P 75,435
(Cite as: 2006 WL 2742297 (D.Del.))

plaint is challenged, the plaintiff "must bear the burden of persuasion" and establish that subject matter jurisdiction exists. *Kehr Packages, Inc. v. Fidelcor, Inc.,* 926 F.2d 1406 (3d Cir.1991)

## DISCUSSION

### I. Whether AMD's Complaint Should Be Dismissed For Failure To Satisfy The Jurisdictional Requirements Of The Foreign Trade Antitrust Improvements Of 1982

The Foreign Trade Antitrust Improvements Act of 1982 ("FTAIA") amends the Sherman Act to clarify the extent to which the antitrust laws of the United States reach conduct concerning trade or commerce with foreign nations. The FTAIA provides:

[The Sherman Act] shall not apply to conduct involving trade or commerce (other than import trade or import commerce) with foreign nations unless--

(1) such conduct has a direct, substantial, and reasonably foreseeable effect-

(A) on trade or commerce which is not trade or commerce with foreign nations, or on import trade or import commerce with foreign nations; or

(B) on export trade or export commerce with foreign nations, of a person engaged in such trade or commerce in the United States; and

(2) such effect gives rise to a claim under the provisions of [the Sherman Act] other than this section.

If [the Sherman Act] appl[ies] to such conduct only because of the operation of paragraph (1)(B), then [the Sherman Act] shall apply to such conduct only for injury to export business in the United States.

15 U.S.C. § 6a (1997). Elaborating on this provision of the FTAIA, the United States Supreme Court explained that the FTAIA:

initially lays down a general rule placing *all* (non-import) activity involving foreign commerce outside the Sherman Act's reach. It then brings such conduct back within the Sherman Act's reach *provided that* the conduct *both* (1) sufficiently affects American commerce, *i.e.*. it has a "direct, substantial, and reasonably foreseeable effect" on American domestic, import or (certain) export commerce, *and* (2) has an effect of a kind that antitrust law considers harmful, *i.e.*, the "effect" must "giv[e] rise to a [Sherman Act] claim."

*F. Hoffmann-La Roche Ltd. v. Empagran S.A.,* 542 U.S. 155, 124 S.Ct. 2359, 159 L.Ed.2d 226 (2004) (emphasis and brackets in original).

*3 By its Motion, Intel contends that AMD's Complaint should be dismissed for failure to satisfy the jurisdictional requirements of the FTAIA. Specifically, Intel contends that AMD seeks relief for alleged business practices of Intel that affect the sale of AMD's microprocessors in foreign countries. Although AMD is headquartered in the United States, Intel points out that AMD's microprocessor manufacturing occurs in Germany and the assembly of the German-made microprocessors into final products occurs in Malaysia, Singapore and China. Intel contends that AMD seeks recovery for lost sales of these foreign-made microprocessors to foreign countries. Intel points out that AMD is seeking redress through the Japanese courts, the European Commission and the Korean Fair Trade Commission for the same business practices of Intel that are alleged here. Because any alleged harm suffered by Intel occurred outside of the United States and AMD is already seeking redress for that harm in the appropriate foreign tribunals, Intel contends that the Court lacks jurisdiction over Intel's "foreign commerce claims" under both the FTAIA and principles of foreign comity.

In response, AMD contends that it is not asserting any "foreign commerce claims." Rather, AMD contends that the x86 Microprocessor Market is a single, unitary world-wide market and that proof of its monopolization claim under Section 2 of the Sherman Act requires an examination into the foreign conduct of Intel which is alleged to have domestic effects. AMD contends that in this case Intel's foreign conduct and the foreign harm it caused are inextricably bound with Intel's domestic conduct restraining trade and the resulting domestic antitrust injury to AMD. As an American company selling an American engineered and designed product, AMD contends that it may invoke United States antitrust laws to address the conduct of its American competitor.

AMD also disputes Intel's assertion that it ceased being an exporter when it moved the fabrication portion of its business overseas. However, AMD contends that even if it is no longer an exporter, it continued to

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

2006 WL 2742297                                                                    Page 4
--- F.Supp.2d ----, 2006 WL 2742297 (D.Del.), 2006-2 Trade Cases P 75,435
(Cite as: 2006 WL 2742297 (D.Del.))

export microprocessors made in the United States through at least 2002, a period of time within the limitations period, and therefore, Intel's foreign restraints affected the export commerce of the United States.

AMD further contends that its litigation in foreign venues does not impact this Court's jurisdiction, because Intel has not advanced any evidence of any tension between United States antitrust laws and their foreign counterparts. Thus, AMD contends that parallel proceedings are appropriate and the interests of comity do not limit the Court's jurisdiction.

[1] After considering the allegations of the Complaint in the light most favorable to AMD and in the context of the applicable law and the parties' respective arguments, the Court concludes that it lacks jurisdiction over AMD's claims that are based on lost sales of AMD's German-made microprocessors to foreign customers as alleged in (1) paragraphs 40-44, 54, 57, and 74 relating to Japanese OEMs; (2) paragraphs 55, 56, 65, 75 and 81 related to European OEMs; (3) paragraphs 81, 83 and 86 relating to alleged interference with the launch of an AMD-based system by foreign OEMs or sales to these OEMs; (4) paragraphs 89, 93, 94 relating to interference with foreign distributors' sales in foreign countries; (5) paragraphs 100 and 101 relating to interference with sales to retailers in Europe; and (6) paragraph 106, which alleges interference with the German retail chain Vobis. As a threshold matter, the FTAIA applies to conduct involving trade or commerce with foreign nations. The Court does not understand the parties to contest that this threshold requirement is satisfied. The conduct alleged in the Complaint clearly applies to foreign trade in that it concerns Intel's conduct selling microprocessors to foreign companies located in foreign countries. Thus, the Court concludes that the first requirement of the FTAIA is satisfied.

*4 Because the alleged conduct comes within the purview of the FTAIA, the Court must next consider the "geographical effect of that conduct." _Turicentro, 303 F.3d 293, 301 (3d Cir.2002)._ Specifically, the Court must determine whether AMD has alleged that Intel's foreign conduct had a direct, substantial and foreseeable effect on United States commerce.

AMD contends that Intel's foreign conduct is an essential part of its domestic monopolization scheme. According to AMD, Intel's foreign conduct "neuters" AMD and makes it less able to compete domestically. In this regard, AMD alleges:

> In maintaining its monopoly by unlawfully denying rivals a competitive opportunity to achieve minimum levels of efficient scale, Intel must necessarily exclude them from the product market worldwide. As the domestic U.S. market is but an integral part of the world market, successful monopolization of the U.S. market is dependent on world market exclusion, lest foreign sales vitalize a rival's U.S. competitive potential.

(Compl.¶ 128). Explaining its position further, AMD contends that Intel has kept AMD "from selling microprocessors abroad with the purpose and effect of weakening AMD as a domestic rival." (D.I. 147 in Civil Action No. 05-441 at 10; D.I. 107 in MDL Docket No. 05-1717 at 10.) According to AMD, "Intel's ability to coerce U.S. customers from giving AMD more business depends on keeping AMD economically powerless to make these customers whole for the costs that Intel can impose on them. To so marginalize AMD, Intel has necessarily had to cut AMD off from business opportunities throughout the market, including opportunities with foreign customers." (_Id._ at 2.)

Courts discussing the "direct effects" requirement of the FTAIA have recognized that "direct effect" means that there must be an "immediate consequence" of the alleged anticompetitive conduct with no "intervening developments." _United States v. LSL Biotechnologies, 379 F.3d 672, 680 (9th Cir.2004)._ In the Court's view, however, AMD's chain of effects is full of twists and turns, which themselves are contingent upon numerous developments. Intel's characterization of AMD allegations, which the Court finds to be accurate, illustrates the Court's point:

> Thus, under AMD's logic, a deal between Intel and a German retailer to promote Intel-based systems (see Compl. ¶ 100) directly affect U.S. commerce because it reduces AMD's German subsidiary's sales of German-made microprocessors in Germany, which in turn affects the profitability of the

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

U.S. AMD parent, which in turn affects the funds that AMD has for discounting to U.S. customers, which in turn affects the discounts that it offers in particular U.S. transactions, which in turn affects its competitiveness in the United States, and which in turn affects U.S. commerce."
(D.I. 165 in Civil Action No. 05-441 at 6; D.I. 138 in MDL Docket No. 05-1717 at 6.) With respect to this specific example, courts have recognized that reduced income flowing from a foreign subsidiary to a domestic parent is not a direct domestic effect or injury. *Info. Res., Inc. v. Dun & Bradstreet Corp.,* 127 F.Supp.2d 411, 417 (S.D.N.Y.2001); *Optimum S.A. v. Legent Corp.,* 926 F.Supp. 530, 533 (W.D.Pa.1996) ("An allegation that income flows between corporations is insufficient to establish the requisite domestic effect."). More generally, however, AMD's primary contention that its lost foreign sales have resulted in lost profitability which in turn, has resulted in lost revenues to shareholders and missed opportunities to invest and compete in the United States is premised on a multitude of speculative and changing factors affecting business and investment decisions, including market conditions, the cost of financing, supply and demand, the success or failure of research and development efforts, the availability of funds and worldwide economic and political conditions. (D.I. 113 in Civil Action No. 05-441 at Exh. 15; D.I. 66 in MDL Docket No. 05-1717 at Exh. 15, excerpts from AMD Annual Reports, 2001-2004, discussing intervening factors that affect AMD's investment decisions.)

*5 [2] AMD places great weight on its allegations that it is an American company engaged in a worldwide market; however, such allegations do not create jurisdiction without substantial, direct effects on the domestic market. *See e.g., Turicentro,* 303 F.3d at 301 ("Whether plaintiffs are United States citizens is irrelevant to our inquiry."); *Den Norske Stats Oljeselskap As v. HeereMac Vof,* 241 F.3d 420, 425 (5th Cir.2001) (rejecting allegation of worldwide conspiracy as sufficient to satisfy jurisdictional requirements of FTAIA and stating that "[t]he assumed existence of a single, unified, global conspiracy does not relieve [plaintiff] of its burden of alleging that its injury arose from the conspiracy's proscribed effects on United States commerce") While the Court understands the nature of a global market, the allegations of foreign conduct here result in nothing more than what courts have termed a "ripple effect" on the United States domestic market, and the FTAIA prevents the Sherman Act from reaching such "ripple effects." *See Latino Quimica-Amtex v. Akzo Nobel Chems. B.V.,* 2005 WL 2207017, at *3, 5-7, 2005 U.S. Dist. LEXIS 19788, *24-25, 27, 33, 36 (S.D.N.Y. Sept. 8, 2005)

Because AMD has not alleged that Intel's conduct resulted in a substantial and direct domestic effect, AMD cannot demonstrate that any such domestic effect gives rise to its claim. The FTAIA requires a plaintiff to allege that its claims were directly caused by the domestic effects of the conduct and not the foreign effects. Stated another way, the "statutory language 'gives rise to'-- indicates a direct causal relationship, that is, proximate causation, and is not satisfied by the mere but-for 'nexus' " *Empagran S.A. v. F. Hoffmann-LaRoche, Ltd.,* 417 F.3d 1267, 1270-1271 (D.C.Cir.2005). In this case, any alleged harm suffered by AMD has been directly caused by the foreign effects of Intel's alleged conduct, namely lost foreign sales. The other "ripple effects" of Intel's foreign conduct on the U.S. market may not have arisen "but for" Intel's alleged conduct; however, "but for" causation is not the type of direct causation contemplated by the FTAIA.

AMD alleges in its Complaint that Intel's alleged conduct has resulted in higher PC prices and a "loss of freedom" or consumer choice for computer purchasers in the United States. (D.I. 1 in Civil Action No. 05-441 at ¶¶ 6, 136.) To the extent that these effects are based on Intel's alleged foreign conduct, the Court concludes that they too are insufficient to establish the proximate causation required by the FTAIA. As explained by the Court previously, these types of effects are not direct domestic effects of any alleged foreign conduct of Intel, but secondary and indirect effects that also are the by-product of numerous factors relevant to market conditions and the like. Second, AMD's allegations refer to the computer market and not the microprocessor market, and therefore, the effects to which AMD refers are not effects linked to the relevant market.

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

--- F.Supp.2d ----, 2006 WL 2742297 (D.Del.), 2006-2 Trade Cases P 75,435
**(Cite as: 2006 WL 2742297 (D.Del.))**

**\*6** AMD also argues that it has sufficiently alleged proximate causation because its foreign injury and the foreign effects of Intel's conduct are "inextricably bound up with domestic restraints of trade." In this regard, AMD contends that the individual instances of lost sales by AMD, whether in the United States or abroad, do not give rise to their own monopolization claim, but rather, that the individual incidents taken together constitute a single monopolization having a foreseeable and substantial effect on U.S. commerce. AMD argues that it is this "single global *effect* that gives rise to AMD's claim for damages." (D.I. 147 in Civil Action No. 05-441 at 22; D.I. 107 in MDL Docket No. 05-1717.)

In support of its position, AMD directs the Court to *Caribbean Broad. Sys., Ltd. v. Cable & Wireless PLC,* 148 F.3d 1080 (D.C.Cir.1998). According to AMD, the *Caribbean Broad.* court "held that a *foreign* plaintiff that suffered damages abroad as a result of a monopolization of a *foreign* market could seek recovery in a U.S. court, because that monopolization also caused antitrust injury in the United States." (D.I. 147 in Civil Action No. 05-441 at 20, emphasis in original; D.I. 107 in MDL No. 05-1717 at 20, emphasis in original.) However, the Court does not read the *Caribbean Broad.* case to support AMD's argument that foreign conduct with a direct foreign effect should be combined with domestic conduct in an attempt to confer jurisdiction over the foreign conduct under the rubric of a single claim. In *Caribbean Broad.,* U.S. companies advertised on a Caribbean radio station accused of misrepresenting its reach. The alleged misrepresentations caused harm to foreign and U.S. advertisers and resulted in U.S. advertisers paying ultra-competitive prices for advertising and losing U.S. sales.

The Court agrees with Intel that in *Caribbean Broad.,* the same conduct had simultaneous, direct foreign and direct domestic effects, with the plaintiffs' antitrust claim arising from those direct domestic effects. Here, there is no simultaneous direct domestic effect from Intel's alleged foreign conduct. Stated another way, the foreign harm for which AMD seeks to recover arises from the effects of the alleged foreign conduct and there is no direct link between the foreign conduct and the domestic antitrust injury. To the

extent that the alleged foreign conduct caused any domestic effects at all, those effects are outside of the direct causal chain, and thus, insufficient to support the exercise of the Court's jurisdiction over AMD's claim.

AMD relies on several cases, including *Continental Ore Co. v. Union Carbide,* 370 U.S. 690, 82 S.Ct. 1404, 8 L.Ed.2d 777 (1962) and *United States v. Aluminum Co. of Am.,* 148 F.2d 416 (2d Cir.1945) ("Alcoa"), to supports its claim that foreign conduct which makes a company less likely to compete domestically falls within the scope of the Sherman Act. In *Continental Ore,* the Supreme Court recognized that "[a] conspiracy to monopolize or restraining the domestic or foreign commerce of the United States is not outside the reach of the Sherman Act just because part of the conduct complained of occurs in foreign countries." 370 U.S. at 704, 82 S.Ct. 1404. However, *Continental Ore* and the majority of other cases relied upon by AMD predate the FTAIA and the Supreme Court's decision in *Empagran* elucidating the direct effects and causation requirements of the FTAIA. Further, much of the discussion relied upon by AMD in *Continental Ore* focuses on the substantive requirements of the Sherman Act and not on threshold jurisdictional questions like those raised by the FTAIA. *See United Phosphorus Ltd. v. Angus Chem. Co.,* 322 F.3d 942, 944-953 (7th Cir.2003) (recognizing that FTAIA present jurisdictional questions which are separate from substantive requirements of an antitrust claims). Because the cases relied upon by AMD do not require a direct effect on U.S. commerce, they are fundamentally inconsistent with the FTAIA and its purpose of limiting rather than expanding the Court's antitrust jurisdiction. *LSL Biotechnologies,* 379 F.3d at 679 (recognizing that pre-FTAIA cases like *Alcoa* do not contain the direct effects requirement of the FTAIA); *United Phosphorus,* 322 F.3d at 951 (stating that "the legislative history shows that jurisdiction stripping is what Congress had in mind in enacting the FTAIA"). Accordingly, the Court is not persuaded by AMD's arguments to the extent that they are premised on pre-FTAIA law.

**\*7** In sum, the Court concludes that it lacks subject matter jurisdiction under the FTAIA over AMD's claims, to the extent those claims are based on for-

eign conduct and foreign harm. AMD has not demon- strated that the alleged foreign conduct of Intel has direct, substantial and foreseeable effects in the United States which gives rise to its claim. AMD's al- legations, taken in the light most favorable to AMD, describe a foreign effect and a foreign harm that have had ripple effects for the domestic market, but have not had any direct, substantial and reasonable effect which would give rise to an antitrust claim within the jurisdictional reach of the Sherman Act. Accordingly, the Court will dismiss AMD's claims based on al- leged lost sales of AMD's microprocessors to foreign customers and strike the allegations in the Complaint forming the basis for those claims, namely para- graphs 40-44, 54-57, 74-75, 81, 83, 96, 89, 93-94, 100-101 and 106.

## II. Whether AMD's Complaint Should Be Dis- missed For Lack Of Standing

[3] In the alternative, Intel also contends that AMD lacks standing under the Sherman Act to pursue its claims for injuries arising in foreign commerce. Intel contends that AMD's claims are based on the alleged monopolization of trade among foreign nations and injuries in foreign markets cannot be redressed through the antitrust laws of the United States.

In response, AMD contends that a plaintiff who al- leges injury caused by the anticompetitive conduct of a competitor suffers an injury than can be redressed through the Sherman Act. AMD contends that "Intel's conduct has directly caused AMD's competitive in- jury, both in U.S. commerce and throughout the world-wide market of which the U.S. portion is but an indivisible part." (D.I. 147 in Civil Action No. 05-441 at 30; D.I. 107 in MDL Docket No. 05-1717 at 30.)

[4] To establish standing to bring an antitrust claim, the plaintiff "must have suffered an injury the anti- trust laws were intended to prevent, and the injury must flow from that which makes the defendants' acts unlawful." *Turicentro, 303 F.3d at 307.* As the Third Circuit has recognized, this analysis implicates many of the same jurisdictional issues under the FTAIA.

For the reasons discussed in the context of the

FTAIA, the Court concludes that the alleged injuries suffered by AMD as a result of Intel's foreign con- duct are foreign injuries that occurred in foreign mar- kets. Because such foreign injuries are "not the type of injury Congress intended to prevent through the [FTAIA] or the Sherman Act," the Court concludes that AMD lacks standing to pursue its claims based on foreign injury. Accordingly, for this additional reason, the Court will dismiss AMD's claims for for- eign injuries arising as a result of Intel's alleged for- eign conduct.

## CONCLUSION

For the reasons discussed, the Court will grant Intel's Motion To Dismiss AMD's Foreign Commerce Claims For Lack Of Subject Matter Jurisdiction And Standing.

**\*8** An appropriate Order will be entered.

## *ORDER*

At Wilmington, this 26 day of September 2006, for the reasons discussed in the Memorandum Opinion issued this date;

IT IS HEREBY ORDERED that:

1. The Motion of Defendants' Intel Corporation and Intel Kabushiki Kaisha To Dismiss AMD's Foreign Commerce Claims For Lack Of Subject Matter Juris- diction And Standing (D.I. 111 in Civil Action No. 05-441; D.I. 64 in MDL Docket No. 05-1717) is *GRANTED.*

2. AMD's claims based on alleged lost sales of AMD's microprocessors to foreign customers are *DISMISSED* and the allegations in the Complaint forming the basis for those claims, namely para- graphs 40-44, 54-57, 74-75, 81, 83, 96, 89, 93-94, 100-101 and 106, are *STRICKEN.*

--- F.Supp.2d ----, 2006 WL 2742297 (D.Del.), 2006-2 Trade Cases P 75,435

## Motions, Pleadings and Filings (Back to top)

• 2006 WL 1232487 (Trial Motion, Memorandum and Affidavit) Memorandum in Support of Defend- ants' Motion to Dismiss Amd's Foreign Commerce

2006 WL 2742297                                                                    Page 8
--- F Supp 2d ----, 2006 WL 2742297 (D.Del.), 2006-2 Trade Cases P 75,435
**(Cite as: 2006 WL 2742297 (D.Del.))**

Claims for Lack of Subject Matter Jurisdiction and
Standing (May 2, 2006)

• 2006 WL 845944 (Trial Motion, Memorandum and
Affidavit) Reply Memorandum of Cohen Milstein
Hausfeld & Toll, the Furth Firm, Hagens Berman So-
bol Shapiro, and Saveri & Saveri in Support of their
Application to be Appointed Interim Class Counsel
(Feb. 14, 2006)

• 2006 WL 845945 (Trial Motion, Memorandum and
Affidavit) The National Plaintiffs Group's Reply
Memorandum in Further Support of their Motion for
Consolidation and Appointment of Interim Class
Counsel and Liaison Counsel (Feb. 14, 2006)

• 2006 WL 691255 (Trial Motion, Memorandum and
Affidavit) The National Plaintiffs Group's Response
in Opposition to the San Francisco Group's Motion
for Appointment as Interim Class Counsel (Feb. 7,
2006)

• 2006 WL 691276 (Trial Motion, Memorandum and
Affidavit) The National Plaintiffs Group's Motion for
Consolidation and Appointment of Interim Class
Counsel and Liaison Counsel (Jan. 24, 2006)

• 2006 WL 691277 (Trial Motion, Memorandum and
Affidavit) The National Plaintiffs Group's Memor-
andum of Law IN Support of its Motion for Appoint-
ment of Interim Class Counsel and Liaison Counsel
and IN Opposition to the San Francisco Group's Mo-
tion for Consolidation and Appointment of CO-Lead
Counsel and Liaison Counsel (Jan. 24, 2006)

• 2005 WL 3874305 (Trial Motion, Memorandum
and Affidavit) Memorandum of Law in Support of
Motion for Consolidation and for Appointment of
Co-Lead Counsel and Liaison Counsel (Nov. 10,
2005)

• 2005 WL 2603876 (Trial Pleading) Answer (Sep. 1,
2005)Original Image of this Document (PDF)

• 2005 WL 2385585 (Trial Motion, Memorandum
and Affidavit) Objections of Non-Party NEC USA,
Inc. to Plaintiffs' Subpoena to Preserve Documents
(Jul. 29, 2005)Original Image of this Document
(PDF)

• 2005 WL 2385586 (Trial Motion, Memorandum
and Affidavit) Objections of Non-Party Nec Com-
puters Inc. to Plaintiffs' Subpoena to Preserve Docu-
ments (Jul. 29, 2005)Original Image of this Docu-
ment (PDF)

• 2005 WL 2385584 (Trial Motion, Memorandum
and Affidavit) Objections of Non-Party NEC USA,
Inc. to Plaintiffs' Subpoena to Preserve Documents
(Jul. 28, 2005)Original Image of this Document
(PDF)

• 2005 WL 2385693 (Trial Motion, Memorandum
and Affidavit) Objections of Non-Party Nec Com-
puters Inc. to Plaintiff'S Subpoena to Preserve Docu-
ments (Jul. 28, 2005)Original Image of this Docu-
ment (PDF)

• 2005 WL 1637869 (Trial Pleading) Complaint (Jun.
27, 2005)

• 2005 WL 1838069 (Trial Pleading) Complaint (Jun.
27, 2005)Original Image of this Document (PDF)

• 1:05cv00441 (Docket) (Jun. 27, 2005)

END OF DOCUMENT

# EXHIBIT 7

LEXSEE

**INVACARE CORPORATION, Plaintiff, v. RESPIRONICS, INC., Defendant.**

**CASE NO. 1:04 CV 1580**

**UNITED STATES DISTRICT COURT FOR THE NORTHERN DISTRICT OF OHIO, EASTERN DIVISION**

**2006 U.S. Dist. LEXIS 7602; 2006-1 Trade Cas. (CCH) P75,311**

**February 28, 2006, Decided**

**SUBSEQUENT HISTORY:** Summary judgment granted, in part, summary judgment denied, in part by, Motion denied by Invacare Corp. v. Respironics, Inc., 2006 U.S. Dist. LEXIS 77312 (N.D. Ohio, Oct. 23, 2006)

**PRIOR HISTORY:** Invacare Corp. v. Respironics, Inc., 2005 U.S. Dist. LEXIS 17439 (N.D. Ohio, Apr. 25, 2005)

**CORE TERMS:** discovery, mask, sleep, lab, interrogatory, therapeutic, anti-competitive, diagnostic, production of documents, time period, prescribe, objected, selling, patients, discovery of admissible evidence, applicable limitations period, reasonably calculated to lead, failure to cooperate, motion to compel, willfulness, relevance, extending, antitrust, genuine, fault, four-part, assess, background information, business relationship, requested discovery

**COUNSEL:** [*1] For Invacare Corporation, Plaintiff: John J. Eklund, Maura L. Hughes, Sharon A. Luarde, Gregory J. Phillips, Calfee, Halter & Griswold, Cleveland, OH; David A. Ruiz, Calfee Halter & Griswold LLP, Cleveland, OH.

For Respironics, Inc., Defendant: Michael E. Lowenstein, Natalie C. Moritz, Reed Smith, Pittsburgh, PA; George W. Rooney, Jr., Rachael L. Russo, Donald S. Scherzer, Roetzel & Andress, Cleveland, OH.

**JUDGES:** William H. Baughman, Jr., United States Magistrate Judge. JUDGE SOLOMON OLIVER, JR.

**OPINION BY:** William H. Baughman, Jr.

**OPINION:**

**MEMORANDUM OPINION AND ORDER**

**I. Introduction**

Before the Court is Invacare Corporation's ("Invacare") motion pursuant to Federal Rule of Civil Procedure 37(a)(2)(B) to compel Respironics, Inc. ("Respironics") to respond to certain interrogatories and requests for production of documents. Invacare further seeks attorney's fees from Respironics under the authority of Federal Rule of Civil Procedure 37(a)(4). Respironics opposes these motions. This matter has been referred to the Magistrate Judge for a determination.

**II. Facts**

Invacare brought an antitrust [*2] action against Respironics alleging that Respironics engaged in predatory pricing and tying arrangements in the sale of positive airway pressure devices ("PAPs") and the masks used with PAPs, as well as attempting to monopolize these markets, making illegal agreements in restraint of trade and otherwise engaging in unfair competition. n1

------

n1 ECF # 1.

------

These two products, which are therapeutic devices used in the treatment of obstructive sleep apnea ("OSA"), are defined in Invacare's complaint as "the relevant markets affected by the anti-competitive behavior of Respironics." n2

------

n2 *Id.* at P12.

------

2006 U.S. Dist. LEXIS 7602, *2; 2006-1 Trade Cas. (CCH) P75,311

The complaint specifically asserts that in transactions with dealers selling to consumers, Respironics improperly "bundled" PAPs with masks n3 It further alleges that Respironics sold these items below cost or provided them free to sleep labs, which [*3] often prescribe equipment to individual patients for treating OSA. n4

n3 *Id.* at P22.

n4 *Id.* at PP27-29.

Invacare argues that the complaint should not be read as limiting the underlying action to PAPs and masks. n5 Invacare notes that the complaint also asserts that "Respironics sells PAPs, Masks and *other equipment* to Sleep Labs ... [and that] the prices charged Sleep Labs for *such equipment* are well below its average variable costs (or any other reasonable measure of its costs) for *such equipment.*" n6

n5 ECF # 37 at 4.

n6 *Id.*, citing ECF # 1 at PP27, 28, 29 and 30 (PP28 and 29 quoted here, emphasis added).

In its first set of interrogatories, Invacare, at numbers 23 through 26, sought the following:

23. Identify each Sleep Lab with whom you have had any commercial or other business relationship since [*4] 1998.

24. Identify all documents that refer or relate to (a) any commercial or other business relationship with any Sleep Lab or (b) any proposal for or analysis of such relationship.

25. State whether you, or anyone acting on your behalf or with actual or apparent authority, has ever given a PAP, Mask or other product to any Sleep Lab.

26. If your answer to Interrogatory Number 25 is yes, state the following for

each such transaction: a) what product was given; b) to whom the product was given; c) identify all documents referring or relating to this transaction; d) identify each person with knowledge of Respironics' role in the transaction; and, e) what benefit, if any, You received as a result of the transaction. n7

n7 ECF # 37, Ex. 2 at PP23-26.

Invacare has also sought production of documents "from which the following can be ascertained: (a) Defendant's total sales and gross profit on an annualized basis beginning in 1998; and (b) Defendant's total sales of Masks and PAPs and Defendant's gross profit [*5] on such sales on an annualized basis beginning on January 1, 1998." n8 Consistent with this request for documents extending back to 1998, Invacare framed its interrogatories as seeking information dating to 1998. n9

n8 *Id.*, Ex. 1 at P10.

n9 *Id.*, Ex. 2 at PP3, 4, 5, 8, 9, 10, 11, 12, 13, 20, 22 and 23. Interrogatory 13 involves a request Respironics' federal income tax returns for the period 1993 through 1998.

Responding by letter on April 1, 2005 to Invacare's counsel concerning the request for production of documents and the interrogatories, Respironics claimed initially that "it will only produce documents from August 6, 2000 to the present," n10 such time representing both the statute of limitations for antitrust claims and the earliest date that Invacare marketed a competing product. n11

n10 *Id.*, Ex. 3 at P12.

n11 *Id.*, Ex. 8 at 1.

[*6]

Respironics further argued that it would not provide information concerning products not alleged in the

2006 U.S. Dist. LEXIS 7602, *6; 2006-1 Trade Cas. (CCH) P75,311

complaint to comprise the affected market. While conceding that there is "other ancillary equipment used in [the PAP and mask combination] such as the air hose that connects the device with the mask, clamps and the like," n12 Respironics objected to providing information concerning diagnostic, not therapeutic products that "Invacare does not even sell and are not at issue in this case." n13

n12 Id. at 3.

n13 Id. at 4.

Moreover, Respironics maintained that its position of limiting discovery to the product market alleged in the complaint was consistent with Invacare's own objections to parts of Respironics' request for production of documents and interrogatories. As quoted by Respironics, Invacare objected to requests for information "about Invacare's products other than those that are within the relevant product market as defined in Plaintiff's Complaint." n14

n14 Id. at 3, quoting Invacare's Answers and Objections to Respironics, Inc.'s First Set of Interrogatories.

[*7]

Respironics summarized its point here as follows:

By these objections, Invacare has made it clear that the proper scope of this case is PAPs and Masks -- the product markets "defined in Plaintiff's Complaint." Allowing Invacare's efforts to expand the scope of discovery clearly would require Respironics to provide discovery beyond which Invacare is willing to provide Respironics. n15

n15 Id. at 4.

In response, Invacare filed the present motion, essentially presenting three arguments:

(1) Respironics' answer to the interrogatories only provides information as to masks, not PAPs and other products, and so is unresponsive; n16

(2) The scope of discovery should not be limited to "a very narrow reading of the Complaint" but should include allegations that Respironics acted illegally with respect to "other equipment" as included in the complaint; n17 and

(3) Extending the time period to include 1998 to the present should be allowed since "it will provide useful background information [*8] as well as information concerning Respironics' course of dealing within the relevant markets. It may also yield evidence of invidious design, pattern or intent." n18

n16 ECF # 37 at 4.

n17 Id. at 4-5.

n18 Id. at 6.

Finally, Invacare seeks attorney's fees pursuant to Federal Rule of Civil Procedure 37(a)(4) because Respironics has "been derelict in providing discovery." n19

n19 Id. at 7.

Respironics has responded in opposition to Invacare's motion. n20 Invacare has replied to Respironics' response. n21 Respironics has, in turn, filed, with leave of the Court, a surreply brief. n22

n20 ECF # 40.

n21 ECF # 42.

n22 ECF # 45.

[*9]

### III. Analysis

The Court will first set forth the applicable law governing discovery and then individually address the four issues presented here. n23

> n23 (1) Respironics' allegedly incomplete answer; (2) discovery of dealings beyond PAPs and masks; (3) expanding the relevant time period beyond 2000 to 1998; and (4) attorney's fees.

### A. Applicable law

Federal Rule of Civil Procedure 26(b)(1) permits a litigant to "obtain discovery regarding any matter, not privileged, that is relevant to the claim or defense of any party ..." As the Sixth Circuit has stated:

> "The scope of examination permitted under Rule 26(b) is broader than that permitted at trial. The test is whether the line of interrogation is reasonably calculated to lead to the discovery of admissible evidence." However, "discovery of matter not 'reasonably calculated to lead to the discovery of admissible evidence' is not within the scope of Rule 26(b)(1). Thus, it is proper to deny discovery [*10] of matter that is relevant only to claims or defenses that may have been stricken, or to events that occurred before an applicable limitations period, unless the information sought is otherwise relevant to issues in the case." n24

> n24 Lewis v. ACB Bus. Servs., 135 F.3d 389, 402 (6th Cir. 1998) (citations omitted).

In this regard, "it is well-established that the scope of discovery is within the sound discretion of the trial court." n25 District courts have such broad discretion when determining relevancy for purposes of setting the scope of discovery. n26

> n25 Hayes v. Equitable Energy Resources Co., 266 F.3d 560, 571 (6th Cir. 2001) (citation omitted).

> n26 Green v. Nevers, 196 F.3d 627, 632 (6th Cir. 1999).

Where information being sought is likely to produce arguably relevant [*11] evidence that would, if introduced at trial, be "purely speculative," it is an abuse of discretion to deny discovery. n27 The test for denying requested discovery must be whether "the discovery requested would be irrelevant to the underlying issue to be decided." n28

> n27 Coleman v. American Red Cross, 23 F.3d 1091, 1097 (6th Cir. 1994).

> n28 United States v. Dairy Farmers of America, 426 F.3d 850, 862 (6th Cir. 2005) quoting Green, 196 F.3d at 632.

### B. Matters at issue

#### 1. Scope of Respironics' current answer

Here, as noted, Invacare's Interrogatories 23 through 26 seek information concerning Respironics' dealings with sleep labs.

The record shows, and the parties accept, that Respironics has provided answers to these interrogatories as to selling or providing masks to sleep labs. But, with respect to PAPs, it contends that since sleep labs are diagnostic facilities, not treatment or sales locations, "PAPs are not ordinarily provided [*12] to sleep labs." n29 While acknowledging that "Respironics may have provided a PAP to sleep labs from time to time for one reason or another," n30 it should not be required to go "on a wild goose chase on such a de minimis [sic] issue ..." n31

> n29 ECF # 40 at 8.

2006 U.S. Dist. LEXIS 7602, *12; 2006-1 Trade Cas. (CCH) P75,311

n30 *Id*

n31 *Id*

As noted, the test for permissible discovery is whether the information sought is "reasonably calculated to lead to the discovery of admissible evidence." n32 Determining if Respironics engaged in supplying sleep labs with PAPs, and the extent of such action, is relevant to, or designed to produce evidence relevant to, Invacare's allegations in its complaint that PAPs and masks are used together and that:

> The purpose and effect of Respironics selling equipment to Sleep Labs for prices below its costs is to induce the Sleep Labs to prescribe Respironics brand equipment, thereby destroying any competition in the relevant markets by foreclosing competitors from successfully marketing their products, and eliminating [*13] dealers' (and ultimately consumer/patients') options for equipment to treat OSA. n33

n32 *Lewis,* 135 F.3d at 402.

n33 ECF # 1 at P30.

Indeed, Respironics' defense for failing to answer these interrogatories as to provisions of PAPs to sleep labs that any such provision of PAPs has been *"de minimus,"* n34 as well as its acknowledgment that "some sleep labs do have a separate DME (durable medical equipment) outlet from which patients can purchase devices and masks," n35 merely argue against the weight of any evidence that may be produced by such discovery, not its relevance.

n34 ECF # 40 at 8.

n35 *Id* at 7, n.7.

Accordingly, Invacare's motion to compel Respironics to respond to Interrogatories 23 through 26 is

granted insofar as it seeks information concerning PAPs.

### 2. *Discovery of dealings* [*14] *beyond PAPs and masks*

Invacare also seeks responses to Interrogatories 23 through 26 from Respironics as to its "commercial dealings [with sleep labs] in more products than just masks [and] PAPS [but also] other products including diagnostics." n36 It construes the complaint, as noted earlier, to be significantly broader than masks and PAPs by virtue of its use of the phrase "other equipment" at various points. n37

n36 ECF # 37 at 5.

n37 *Id* at 4-5.

Invacare argues that while the complaint specifically names masks and PAPs, it "also specifically assert[s] the same illegal, predatory conduct with regard to 'other equipment.'" n38

n38 ECF # 42 at 3.

Respironics responds that a plain reading of the complaint as a whole shows that Invacare has alleged anti-competitive conduct affecting the market for therapeutic devices [*15] for OSA. n39 Respironics notes that Invacare has objected to discovery requests propounded by Respironics that seek "information and documents about Invacare's products other than those that are within the relevant markets as defined in Plaintiff's Complaint." n40

n39 ECF # 45 at 2-5.

n40 *Id* at 2, quoting Invacare's Answers and Objections to Respironics, Inc.'s First Set of Interrogatories and Responses and Objections to Respironics, Inc.'s First Request for Production of Documents.

Initially, it is clear that the complaint here specifically identifies the market affected by any

Case 1:05-cv-00441-JJF    Document 244-3    Filed 11/13/2006    Page 36 of 38

2006 U.S. Dist. LEXIS 7602, *15; 2006-1 Trade Cas. (CCH) P75,311

anti-competitive conduct by Respironics as PAPs and masks:

> There are two relevant markets affected by the anti-competitive behavior of Respironics. The first is the market for PAPs... Masks for use with PAPs is also a relevant market in which Respironics anti-competitive conduct has occurred and has caused anti-competitive effects. n41

n41 ECF # 1 at PP12, 13.

[*16]

Further, the complaint itself alleges that "Respironics sells PAPs, Masks and *other equipment* to Sleep Labs *for the diagnosis* and treatment of sleep disorders, including OSA." n42 Immediately after this statement, the complaint then alleges that "the prices Respironics has charged Sleep Labs for *such equipment* are well below its average variable costs..." n43

n42 *Id.* at P27 (emphasis added).

n43 *Id.* at P28 (emphasis added).

The complaint continues by asserting that "Sleep Labs are important to the distribution of PAPs and Masks" n44 and, therefore, "the purpose and effect of Respironics' selling *equipment* to Sleep Labs for prices below its costs is to induce the Sleep Labs to prescribe Respironics brand equipment, thereby destroying any competition in the relevant markets..." n45

n44 *Id.* at P29.

n45 *Id.* at P30 (emphasis added).

[*17]

Contrary to Respironics' contention, the complaint does clearly allege that Respironics sold diagnostic, as well as therapeutic, equipment to sleep labs at prices below cost. It further alleges that the intent of this conduct was to confer an economic benefit on the sleep lab, namely, a below market price, so that the sleep lab would, in turn, prescribe Respironics' therapeutic products to patients.

Respironics has not argued here that establishing that a sleep lab received a below market price on a piece of diagnostic equipment would be irrelevant to whether it might then reciprocate that benefit by prescribing its benefactor's therapeutic equipment for a client.

The fact that a competitor could be shown to have employed its ability to deliver below market pricing in one market, namely, diagnostic equipment, to produce an anti-competitive effect in another market, namely, therapeutic equipment, does not impermissibly widen the scope of the affected market but, rather, goes directly to the case alleged by Invacare.

The relevance of such a finding seems self-evident. Invacare's request for discovery here is supported both by the language of the complaint and the fact that the request [*18] for information as to Respironics' diagnostic sales is limited to sleep labs, which are alleged to have a crucial role in prescribing therapeutic equipment to treat OSA.

Accordingly, Invacare's motion to compel responses as to its inquiries concerning Respironics' dealings with sleep labs beyond PAPs and masks is granted.

### 3. Expansion of time period covered to 1998

The parties here agree that no authority requires an automatic bar to discovery prior to the applicable statute of limitations. However, as the Sixth Circuit has noted, "it is appropriate to deny discovery ... to events that occurred before an applicable limitations period, unless the information sought is otherwise relevant to issues in the case." n46

n46 *Lewis, 135 F.3d at 402* (citation omitted, emphasis added).

As Respironics suggests, this approach contemplates that the party seeking pre-limitations discovery should provide some basis by which a court could determine if such discovery might be "relevant to issues [*19] in the case." n47

n47 ECF # 40 at 9, quoting
Page 6

2006 U.S. Dist. LEXIS 7602, *19; 2006-1 Trade Cas. (CCH) P75,311

*Oppenheimer Fund v. Sanders*, 437 U.S. 340, 352, 98 S. Ct. 2380, 57 L. Ed. 2d 253 (1978).

The cases cited by Invacare do not contradict this point. Antitrust cases, while subject to an expansive interpretation as to the relevant time period for discovery, n48 also do not constitute a wholly separate category of actions where discovery antedating the applicable statute of limitations can be granted without a showing of relevancy.

n48 *See, American Health Sys. v. Liberty Health Sys.*, 1991 U.S. Dist. LEXIS 2612, No. 90-3112, 1991 WL 30726 at *2 (E.D. Pa. March 5, 1991).

Here, Invacare bases its contention that extending the discovery for two years beyond the limitations period is relevant because "it will provide useful background information as well as information concerning Respironics' course of dealing within relevant [*20] markets. It may also yield evidence of invidious design, pattern and intent." n49

n49 ECF # 37 at 6.

In this case, Invacare has not shown how information from an expanded time period would produce relevant evidence different in kind from that which it may obtain from the applicable limitations period. While mindful that relevance is the central focus in resolving discovery issues, n50 courts must still weigh the burden of proposed discovery against the likely benefit with an eye to finding the appropriate boundaries. n51

n50 *Dairy Farmers*, 426 F. 3d at 862.

n51 Fed. R. Civ. P. 26(b)(2).

Invacare's proposed additional discovery seems likely to produce merely cumulative evidence, which Federal Rule of Civil Procedure 26(b)(2)(i) specifically [*21] states is a reason for limiting otherwise permissible discovery, while imposing a significant burden on the

respondent not commensurate with any benefit. n52

n52 Fed. R. Civ. P. 26(b)(2)(iii).

Accordingly, absent any showing from Invacare that evidence of Respironics' dealings during the period 1998 to 2000 will likely be other than cumulative of the evidence of its dealings from 2000 forward, Invacare's motion to compel Respironics to comply with requested discovery seeking information relating to events prior to August 6, 2000 is denied.

**4. Attorney's fees**

Invacare has sought attorney's fees under Federal Rule of Civil Procedure 37 for Respironics' failure to comply with its discovery, claiming that Respironics' actions are "obstinate obstructionism ... which fully justify an award of sanctions under Civil Rule 37(a)." n53

n53 ECF # 42 at 7.

[*22]

Federal Rule of Civil Procedure 37(a)(4)(A) provides that no sanctions should be imposed if the court determines that "the opposing party's non-disclosure, response, or objection was substantially justified or that other circumstances make an award of expenses unjust." The Sixth Circuit has said that "substantial justification" under this Rule exists where "there is a genuine dispute, or if reasonable people could differ as to the appropriateness of the contested action." n54

n54 *Doe v. Lexington-Fayette Urban County Gov't*, 407 F. 3d 755, 765 (6th Cir. 2005) (citation omitted).

The Sixth Circuit has employed a four-part test to evaluate whether an imposition of sanctions under Federal Rule of Civil Procedure 37 is justified:

> The first factor is whether the party's failure to cooperate in discovery is due to willfulness, bad faith or fault; the second factor is whether the adversary was prejudiced by the party's [*23] failure to

cooperate in discovery; the third factor is whether the party was warned that failure to cooperate could lead to sanction; and the fourth factor in regard to a dismissal is whether less drastic sanctions were first imposed or considered n55

n55 *Id.* at 766.

Here, there can be little doubt that a "genuine dispute" existed, given that each party has been successful in maintaining a portion of its position before the Court. Further, the record demonstrates that Respironics has responded to other discovery requests and has engaged in written exchanges with Invacare over the disputed discovery in an attempt to either satisfactorily explain its position or elicit additional information for Invacare that might permit a resolution of the disputes. n56 As such, Invacare has not met the first part of the four-part test set forth in *Doe* since Respironics' actions are not due to "willfulness, bad faith or fault."

n56 See ECF # 37 at Ex. 7 (February 22, 2005 letter from Respironics' counsel to counsel for Invacare regarding discovery matters), Ex. 8 (April 1, 2005 letter from Respironics' counsel to counsel for Invacare regarding discovery matters).

[*24]

Further, it should be noted that Invacare has itself objected to discovery requests from Respironics in this case that it asserts are improperly over-broad. n57

n57 See Invacare objections discussed and quoted in ECF # 40 at 4-5.

Accordingly, since the Court finds that Respironics' objections here were the result of a "genuine dispute" and not the product of "willfulness, bad faith or fault," Invacare's motion to assess attorney's fees against Respironics pursuant to Federal Rule of Civil Procedure 37(a)(4) is denied.

**IV. Conclusion**

Accordingly, Invacare's motion to compel discovery from Respironics and assess attorney's fees against it for non-compliance with discovery is hereby granted in part and denied in part as is detailed herein.

IT IS SO ORDERED.

Dated: February 28, 2006

s/ William H. Baughman, Jr.

United States Magistrate Judge