# EXHIBIT 8

Westlaw.

324 F.3d 141                                                                    Page 1
324 F.3d 141, 2003-1 Trade Cases P 73,989, 61 Fed. R. Evid. Serv. 60
**(Cite as: 324 F.3d 141)**

▷

**Briefs and Other Related Documents**

United States Court of Appeals,
Third Circuit.
LEPAGE'S INCORPORATED; LePage's Manage-
ment Company, L.L.C., Appellees/Cross-
Appellants
v.
3M (MINNESOTA MINING AND MANUFAC-
TURING COMPANY); Kroll Associates, Inc.
Minnesota Mining and Manufacturing Company, Ap-
pellant/Cross-Appellee.
**Nos. 00-1368, 00-1473.**

Argued July 12, 2001.
Reargued En Banc Oct. 30, 2002.
Filed March 25, 2003.

Competitor brought antitrust action against manufac-
turer of transparent tape. The United States District
Court for the Eastern District of Pennsylvania, John
R. Padova, J., 2000 WL 280350, entered judgment in
favor of competitor on monopolization claim, and
manufacturer appealed. The Court of Appeals, 277
F.3d 365, reversed, and rehearing en banc was gran-
ted. On rehearing, the Court of Appeals, Sloviter,
Circuit Judge, held that: (1) manufacturer's exclusion-
ary conduct could violate Sherman Act's monopoliza-
tion provision, even if manufacturer never priced its
transparent tape below its cost; (2) manufacturer's
conduct had anticompetitive effect; (3) manufac-
turer's conduct did not have legitimate business justi-
fication; and (4) competitor's damages expert was not
required to disaggregate damages caused by manu-
facturer's unlawful activity from those caused by its
lawful activity when estimating damages.

Affirmed.

Greenberg, Circuit Judge, filed dissenting opinion in
which Circuit Judges Scirica and Alito joined.

West Headnotes

**[1] Antitrust and Trade Regulation ⟳641**

29Tk641 Most Cited Cases
(Formerly 265k12(1.3))
A monopolist willfully acquires or maintains mono-
poly power in violation of Sherman Act when it com-
petes on some basis other than the merits. Sherman
Act, § 2, as amended, 15 U.S.C.A. § 2.

**[2] Antitrust and Trade Regulation ⟳687**
29Tk687 Most Cited Cases
(Formerly 265k17(1.8))

**[2] Antitrust and Trade Regulation ⟳882**
29Tk882 Most Cited Cases
(Formerly 265k17(1.12), 265k17(1.8))
Exclusionary conduct of manufacturer with mono-
poly power in transparent tape market, such as offer-
ing bundled rebates and entering into exclusive deal-
ing contracts, could violate Sherman Act's monopol-
ization provision, even if manufacturer never priced
its transparent tape below its cost. Sherman Act, § 2,
as amended, 15 U.S.C.A. § 2.

**[3] Antitrust and Trade Regulation ⟳656**
29Tk656 Most Cited Cases
(Formerly 265k12(1.3))
Monopolist will be found to violate Sherman Act's
monopolization provision if it engages in exclusion-
ary or predatory conduct without a valid business jus-
tification. Sherman Act, § 2, as amended, 15
U.S.C.A. § 2.

**[4] Antitrust and Trade Regulation ⟳882**
29Tk882 Most Cited Cases
(Formerly 265k17(1.12))
Bundled rebates offered to retailers by manufacturer
with monopoly power in transparent tape market was
exclusionary conduct under Sherman Act's monopol-
ization provision, even if manufacturer's prices re-
mained above its costs; rebates were offered to many
of competitor's major customers and were condi-
tioned on purchases spanning six of manufacturer's
diverse product lines, and size of the rebates was
linked to number of product lines in which sales tar-
gets were met. Sherman Act, § 2, as amended, 15
U.S.C.A. § 2.

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

324 F.3d 141                                                                      Page 2
324 F.3d 141, 2003-1 Trade Cases P 73,989, 61 Fed. R. Evid. Serv. 60
**(Cite as: 324 F.3d 141)**

**[5] Antitrust and Trade Regulation ☞592**
29Tk592 Most Cited Cases
   (Formerly 265k17(2.2))
Exclusive dealing contracts entered into with large customers by manufacturer with monopoly power in transparent tape market, and its payments to other large customers that were designed to achieve sole-source supplier status was exclusionary conduct in violation of Sherman Act's monopolization provision. Sherman Act, § 2, as amended, 15 U.S.C.A. § 2.

**[6] Antitrust and Trade Regulation ☞659**
29Tk659 Most Cited Cases
   (Formerly 265k17(2.3))
Exclusivity arrangements may be an element in a monopolization claim. Sherman Act, § 2, as amended, 15 U.S.C.A. § 2.

**[7] Antitrust and Trade Regulation ☞687**
29Tk687 Most Cited Cases
   (Formerly 265k17(2.3))
Exclusionary conduct of manufacturer with monopoly power in transparent tape market, such as offering bundled rebates and entering into exclusive dealing contracts, had anticompetitive effect, as required to support monopolization claim under Sherman Act; demand for competitor's private-label tape decreased significantly following the introduction of manufacturer's rebates, and significant entry barriers prevent competitors from entering the tape market. Sherman Act, § 2, as amended, 15 U.S.C.A. § 2.

**[8] Antitrust and Trade Regulation ☞558**
29Tk558 Most Cited Cases
   (Formerly 265k12(1.3))
Courts must look to the monopolist's conduct taken as a whole rather than considering each aspect in isolation in determining whether the conduct had an anticompetitive effect. Sherman Act, § 2, as amended, 15 U.S.C.A. § 2.

**[9] Antitrust and Trade Regulation ☞687**
29Tk687 Most Cited Cases
   (Formerly 265k17(2.3))
Exclusionary conduct of manufacturer with monopoly power in transparent tape market, such as offering bundled rebates and entering into exclusive dealing contracts, did not have legitimate business justification, as defense to monopolization claim; acting

to further manufacturer's economic interests was not a valid business justification, and savings resulting from having single shipments and invoices did not approach millions of dollars manufacturer paid to its customers in rebates. Sherman Act, § 2, as amended, 15 U.S.C.A. § 2.

**[10] Antitrust and Trade Regulation ☞558**
29Tk558 Most Cited Cases
   (Formerly 265k12(1.3))
Defendant's assertion that it acted in furtherance of its economic interests does not constitute the type of business justification that is an acceptable defense to a monopolization claim. Sherman Act, § 2, as amended, 15 U.S.C.A. § 2.

**[11] Federal Courts ☞823**
170Bk823 Most Cited Cases
Court of Appeals reviews district court's decision to admit or exclude expert testimony for abuse of discretion.

**[12] Antitrust and Trade Regulation ☞983**
29Tk983 Most Cited Cases
   (Formerly 265k28(9))
Damages expert in monopolization action may construct a reasonable offense-free world as a yardstick for measuring what, hypothetically, would have happened "but for" the defendant's unlawful activities. Sherman Act, § 2, as amended, 15 U.S.C.A. § 2.

**[13] Antitrust and Trade Regulation ☞977(3)**
29Tk977(3) Most Cited Cases
   (Formerly 265k28(8))
Credibility of transparent tape manufacturer's and it competitor's damages experts was for the jury to determine in competitor's monopolization action against manufacturer. Sherman Act, § 2, as amended, 15 U.S.C.A. § 2.

**[14] Antitrust and Trade Regulation ☞985**
29Tk985 Most Cited Cases
   (Formerly 265k28(7.6))
Competitor's damages expert was not required to disaggregate damages caused by transparent tape manufacturer's unlawful activity from those caused by manufacturer's lawful activity when estimating damages in competitor's monopolization action; manufac-

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

turer's actions, taken as a whole, were found to violate Sherman Act's monopolization provision, making such disaggregation unnecessary, if not impossible. Sherman Act, § 2, as amended, 15 U.S.C.A. § 2.

**[15] Antitrust and Trade Regulation ☞981**
29Tk981 Most Cited Cases
   (Formerly 265k28(8))
Jury instructions in competitor's monopolization action against transparent tape manufacturer provided jury with adequate guidance of how to distinguish between unlawful predation and lawful conduct; district court told jury that to find for competitor, it had to find by preponderance of the evidence that manufacturer willfully maintained its monopoly power through exclusionary or predatory conduct, summarized actions that competitor contended were unlawfully exclusionary or predatory, and provided list of factors to determine whether manufacturer's conduct was exclusionary or predatory. Sherman Act, § 2, as amended, 15 U.S.C.A. § 2.

**[16] Federal Courts ☞822**
170Bk822 Most Cited Cases
In the absence of a misstatement of law, jury instructions are reviewed for abuse of discretion.
**\*143** Barbara W. Mather, Jeremy Heep, Pepper Hamilton LLP, Philadelphia, PA, Peter Hearn, Peter Hearn, P.C., Philadelphia, PA, Mark W. Ryan, Kerry Lynn Edwards, Donald M. Falk, Robert L. Bronston, David A.J. Goldfine, Mayer, Brown, Rowe & Maw, Washington, DC, Roy T. Englert, Jr. (Argued), Robbins, Russell, Englert, Orseck & Untereiner, Washington, DC, for Appellees/Cross-Appellants.

M. Laurence Popofsky (Argued), Stephen V. Bomse, Paul Alexander, Marie L. Fiala, Heller Ehrman White & McAuliffe, San Francisco, CA, John G. Harkins, Jr., Harkins Cunningham, Philadelphia, PA, for Appellant/Cross-Appellee.

Argued July 12, 2001.

BEFORE: SLOVITER, ALITO, and GREENBERG, Circuit Judges.

Reargued En Banc Oct. 30, 2002.

BEFORE: BECKER, Chief Judge, SLOVITER,

SCIRICA, NYGAARD, ALITO, McKEE, AMBRO, FUENTES, SMITH and GREENBERG, Circuit Judges.

Filed March 25, 2003.

**\*144 OPINION OF THE COURT**
SLOVITER, Circuit Judge.

SLOVITER, Circuit Judge, with whom Becker, Chief Judge, Nygaard, McKee, Ambro, Fuentes, and Smith, Circuit Judges, join:

Minnesota Mining and Manufacturing Company ("3M") appeals from the District Court's order entered March 14, 2000, declining to overturn the jury's verdict for LePage's in its suit against 3M under Section 2 of the Sherman Act ("§ 2"). 3M raises various objections to the trial court's decision but essentially its position is a legal one: it contends that a plaintiff cannot succeed in a § 2 monopolization case unless it shows that the conceded monopolist sold its product below cost. Because we conclude that exclusionary conduct, such as the exclusive dealing and bundled rebates proven here, can sustain a verdict under § 2 against a monopolist and because we find no other reversible error, we will affirm.

**I.**
**FACTUAL BACKGROUND**
3M, which manufactures Scotch tape for home and office use, dominated the United States transparent tape market with a market share above 90% until the early 1990s. It has conceded that it has a monopoly in that market. LePage's, [FN1] founded in 1876, has sold a variety of office products and, around 1980, decided to sell "second brand" and private label transparent tape, *i.e.*, tape sold under the retailer's name rather than under the name of the manufacturer. By 1992, LePage's sold 88% of private label tape sales in the United States, which represented but a small portion of the transparent tape market. Private label tape sold at a lower price to the retailer and the customer than branded tape.

> FN1. The plaintiffs in this action are LePage's Incorporated and LePage's Management Company, L.L.C. Inasmuch as we can discern no distinction between their in-

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

324 F.3d 141

324 F.3d 141, 2003-1 Trade Cases P 73,989, 61 Fed. R. Evid. Serv. 60

(Cite as: 324 F.3d 141)

terests, we refer to them jointly as LePage's.

Distribution patterns and consumer acceptance accounted for a shift of some tape sales from branded tape to private label tape. With the rapid growth of office superstores, such as Staples and Office Depot, and mass merchandisers, such as Wal-Mart and Kmart, distribution patterns for second brand and private label tape changed as many of the large retailers wanted to use their "brand names" to sell stationery products, including transparent tape. 3M also entered the private label business during the early 1990s and sold its own second brand under the name "Highland."

LePage's claims that, in response to the growth of this competitive market, 3M engaged in a series of related, anticompetitive acts aimed at restricting the availability of lower-priced transparent tape to consumers. It also claims that 3M devised programs that prevented LePage's and the other domestic company in the business, Tesa Tuck, Inc., from gaining or maintaining large volume sales and that 3M maintained its monopoly by stifling growth of private label tape and by coordinating efforts aimed at large distributors to keep retail prices for Scotch tape high [FN2]. LePage's claims that it barely was surviving at the time of trial and that it *145 suffered large operating losses from 1996 through 1999.

> FN2. It appears that at least at the times material to this action, there were no other domestic manufacturers of transparent tape. There were, however, foreign manufacturers but they did not play a significant role in the domestic market and 3M does not contend otherwise.

LePage's brought this antitrust action asserting that 3M used its monopoly over its Scotch tape brand to gain a competitive advantage in the private label tape portion of the transparent tape market in the United States through the use of 3M's multi-tiered "bundled rebate" structure, which offered higher rebates when customers purchased products in a number of 3M's different product lines. LePage's also alleges that 3M offered to some of LePage's customers large lump-sum cash payments, promotional allowances and oth-

er cash incentives to encourage them to enter into exclusive dealing arrangements with 3M.

LePage's asserted claims for unlawful agreements in restraint of trade under § 1 of the Sherman Act, monopolization and attempted monopolization under § 2 of the Sherman Act, and exclusive dealing under § 3 of the Clayton Act. After a nine week trial, the jury returned its verdict for LePage's on both its monopolization and attempted monopolization claims under § 2 of the Sherman Act, and assessed damages of $22,828,899 on each. It found in 3M's favor on LePage's claims under § 1 of the Sherman Act and § 3 of the Clayton Act. 3M filed its motions for judgment as a matter of law and for a new trial, arguing that its rebate and discount programs and the other conduct of which LePage's complained did not constitute the basis for a valid antitrust claim as a matter of law and that, in any event, the court's charge to the jury was insufficiently specific and LePage's damages proof was speculative [FN3]. The District Court granted 3M's motion for judgment as a matter of law on LePage's "attempted maintenance of monopoly power" claim but denied 3M's motion for judgment as a matter of law in all other respects and denied its motion for new trial. Le Page's Inc. v. 3M, No. CIV. A.97-3983, 2000 WL 280350 (E.D.Pa. Mar.14, 2000). The Court subsequently entered a judgment for trebled damages of $68,486,697 to which interest was to be added. LePage's filed a cross appeal on the District Court's judgment dismissing its attempted maintenance of monopoly power claim.

> FN3. 3M unsuccessfully had moved for a judgment as a matter of law at the close of LePage's case and after the close of the entire case.

On appeal, the panel of this court before which this case was originally argued reversed the District Court's judgment on LePage's § 2 claim by a divided vote. LePage's Inc. v. 3M, Nos. 00-1368 and 00-1473, 2002 WL 46961 (3d Cir. Jan. 14, 2002). This court granted LePage's motion for rehearing en banc and, pursuant to its practice, vacated the panel opinion. LePage's Inc. v. 3M, Nos. 00-1368 and 00-1473 (3d Cir. Feb. 25, 2002) (order vacating panel opinion). The appeal was then orally argued before

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

the court *en banc*

## II.

## JURISDICTION AND STANDARD OF REVIEW

The District Court had jurisdiction over this case pursuant to 28 U.S.C. §§ 1331 and 1337(a) because LePage's brought these claims under the Sherman and Clayton Acts. We have jurisdiction over this appeal pursuant to 28 U.S.C. § 1291.

We exercise plenary review over an order granting or denying a motion for judgment as a matter of law. *Shade v. Great Lakes Dredge & Dock Co.*, 154 F.3d 143, 149 (3d Cir.1998). When, as here, a defendant makes such a motion, a court should grant it "only if, viewing the evidence in the light most favorable to the nonmovant *146 and giving it the advantage of every fair and reasonable inference, there is insufficient evidence from which a jury reasonably could find liability." *Lightning Lube, Inc. v. Witco Corp.*, 4 F.3d 1153, 1166 (3d Cir.1993). Thus, we review the evidence on the appeal in the light most favorable to LePage's. As the historical facts are not in sharp dispute, and our opinion turns largely on legal determinations, we review questions of law underlying the jury verdict on a plenary basis. *Bloom v. Consolidated Rail Corp.*, 41 F.3d 911, 913 (3d Cir.1994).

Our review of a jury's verdict is limited to determining whether some evidence in the record supports the jury's verdict. *See Swineford v. Snyder County*, 15 F.3d 1258, 1265 (3d Cir.1994) ("A jury verdict will not be overturned unless the record is critically deficient of that quantum of evidence from which a jury could have rationally reached its verdict.")

## III.

## MONOPOLIZATION -- APPLICABLE LEGAL PRINCIPLES

Section 2 of the Sherman Act provides:

Every person who shall monopolize, or attempt to monopolize, or combine or conspire with any other person or persons, to monopolize any part of the trade or commerce among the several States, or with foreign nations, shall be deemed guilty of a felony, and, on conviction thereof, shall be punished by fine not exceeding $10,000,000 if a corporation, or, if any other person, $350,000, or by

imprisonment not exceeding three years, or by both said punishments, in the discretion of the court. 15 U.S.C. § 2 (2002). A private party may sue for damages for violation of this provision and recover threefold the damages and counsel fees. *Id.* § 15.

Because this section is in sweeping language, suggesting the breadth of its coverage, we look to the Supreme Court decisions for elucidation of the standard to be used in cases alleging monopolization. Elucidation came in *United States v. Grinnell Corp.*, 384 U.S. 563, 86 S.Ct. 1698, 16 L.Ed.2d 778 (1966), where the Court declared that a defendant company which possesses monopoly power in the relevant market will be found in violation of § 2 of the Sherman Act if the defendant willfully acquired or maintained that power. *Id.* at 570-71, 86 S.Ct. 1698.

In this case, the parties agreed that the relevant product market is transparent tape and the relevant geographic market is the United States. [FN4] Moreover, as to the issue of monopoly power, as we noted above, 3M concedes it possesses monopoly power in the United States transparent tape market, with a 90% market share. In fact, the evidence showed that the household penetration of 3M's Scotch-brand tape is virtually 100%. Therefore we need not dwell on the oft-contested issue of market power. *See* Robert Pitofsky, *New Definitions of Relevant Market and the Assault on Antitrust*, 90 Colum. L.Rev. 1805, 1807 (1990) ("In monopoly enforcement under section 2 of the Sherman Act, the pivotal inquiry is almost always whether the challenged party has substantial market power in its relevant market.")

> FN4. Although 3M originally challenged LePage's selection of the United States as the relevant geographic market, the District Court held that LePage's had introduced sufficient evidence from which the jury could properly find that the relevant geographic market is the United States and 3M does not challenge that market definition on appeal.

[1] The sole remaining issue and our focus on this appeal is whether 3M took steps to maintain that power in a manner *147 that violated § 2 of the Sherman Act. A monopolist willfully acquires or maintains

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works

324 F.3d 141

324 F.3d 141, 2003-1 Trade Cases P 73,989, 61 Fed. R. Evid. Serv. 60
(Cite as: 324 F.3d 141)

monopoly power when it competes on some basis other than the merits. *See Aspen Skiing Co. v. Aspen Highlands Skiing Corp., 472 U.S. 585, 605 n. 32, 105 S.Ct. 2847, 86 L.Ed.2d 467 (1985).*

[2] LePage's argues that 3M willfully maintained its monopoly in the transparent tape market through exclusionary conduct, primarily by bundling its rebates and entering into contracts that expressly or effectively required dealing virtually exclusively with 3M, which LePage's characterizes as *de facto* exclusive. 3M does not argue that it did not engage in this conduct. It agrees that it offered bundled rebates and entered into some exclusive dealing contracts, although it argues that only the few contracts that are expressly exclusive may be considered as such. Instead, 3M argues that its conduct was legal as a matter of law because it never priced its transparent tape below its cost. [FN5]

> FN5. 3M states that its pricing was above its costs however costs are calculated, and LePage's has not contested 3M's assertion.

This is the most significant legal issue in this case because it underlies 3M's argument. In its brief, 3M states "[a]bove-cost pricing cannot give rise to an antitrust offense as a matter of law, since it is the very conduct that the antitrust laws wish to promote in the interest of making consumers better off." Appellant's Br. at 30. For this proposition it relies on the Supreme Court's decision in *Brooke Group Ltd. v. Brown & Williamson Tobacco Corp., 509 U.S. 209, 222, 113 S.Ct. 2578, 125 L.Ed.2d 168 (1993).* It is an argument 3M repeated frequently during its oral argument before the *en banc* court. Counsel stated, "if the big guy is selling above cost, it has done nothing which offends the Sherman Act...." Tr. of Oral Argument, Oct. 30, 2002, at 11. This was the theory upon which 3M's counsel responded to all the questions from the court. When asked whether its theory is that because no one contended that 3M sold below its cost, that is "the end of the story," its counsel responded, "[w]ith the exception of the inconsequential express contract, absolutely." *Id.*

It is therefore necessary for us, at the outset, to examine whether we must accept 3M's legal theory that

after *Brooke Group,* no conduct by a monopolist who sells its product above cost -- no matter how exclusionary the conduct -- can constitute monopolization in violation of § 2 of the Sherman Act. The history of the interpretation of § 2 of the Sherman Act demonstrates the lack of foundation for 3M's premise.

Although § 2 of the Sherman Act may have received less judicial and scholarly attention than several of the other more frequently invoked antitrust provisions, the Supreme Court, in a series of decisions, has made clear the type of conduct that will be held to constitute monopolization in violation of § 2.

The modern era begins with the decision by Judge Learned Hand in *United States v. Aluminum Co. of America,* 148 F.2d 416 (2d Cir.1945) ("*Alcoa*"). Because four members of the Supreme Court were disqualified, the Supreme Court was required to apply the provision of the Expediting Act, Section 29 of Title 15, U.S.C., 1940 ed., currently 28 U.S.C. § 2109, to certify the case to the three most senior judges of the relevant circuit. [FN6] Under the statute, *148 the decision of that court was "final and conclusive," thus equating it to a decision of the Supreme Court.

> FN6. The three most senior judges of the circuit were, fortuitously, the legendary panel of Judges Learned Hand, Thomas Swan, and Augustus Hand.

At the time in question, Alcoa was the sole domestic producer of aluminum and thus had a monopoly that the Government sought to disband. In the opinion on liability, the court enunciated certain principles that remain fully applicable today. One such principle is that it does not follow that a company that has a monopoly has "monopolized" the market because "it may not have achieved monopoly; monopoly may have been thrust upon it." *Id.* at 429. As the court explained, "persons may unwittingly find themselves in possession of a monopoly, automatically so to say: that is, without having intended either to put an end to existing competition, or to prevent competition from arising when none had existed; they may become monopolists by force of accident." *Id.* at 429-30. On the other hand, the court then quoted

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

324 F.3d 141, 2003-1 Trade Cases P 73,989, 61 Fed. R. Evid. Serv. 60
**(Cite as: 324 F.3d 141)**

Justice Cardozo's statement in *United States v. Swift & Co.*, 286 U.S. 106, 116, 52 S.Ct. 460, 76 L.Ed. 999 (1932), that "size carries with it an opportunity for abuse that is not to be ignored when the opportunity is proved to have been utilized in the past." *Alcoa*, 148 F.2d at 430.

The court determined that Alcoa, which controlled over 90% of the aluminum market, had utilized its size for abuse. The court, noting that there had been at least "one or two abortive attempts" by others to enter the industry, concluded that Alcoa "effectively anticipated and forestalled all competition, and succeeded in holding the field alone." *Id.* at 430. Finding Alcoa in violation of § 2, the court continued:

> Nothing compelled it to keep doubling and redoubling its capacity before others entered the field. It insists that it never excluded competitors; but we can think of no more effective exclusion than progressively to embrace each new opportunity as it opened, and to face every newcomer with new capacity already geared into a great organization, having the advantage of experience, trade connections and the elite of personnel.

*Id.* at 431.

One year later, in *American Tobacco Co. v. United States,* 328 U.S. 781, 66 S.Ct. 1125, 90 L.Ed. 1575 (1946), the Supreme Court endorsed the *Alcoa* decision when upholding a jury verdict finding a § 2 violation. The government brought a criminal action against various tobacco companies that between 1931 and 1939 accounted at all times for more than 68%, and usually for more than 75%, of the nation's domestic cigarette production. Defendants were convicted and fined after the jury found they had violated §§ 1 and 2 of the Sherman Act by conspiring to control the price of leaf tobacco, to acquire less expensive supplies of tobacco that they did not need in order to deprive rival manufacturers of cheaper brands, to control cigarette prices, and to force cigarette distributors to treat rival brands less favorably.

The court of appeals affirmed, finding the verdicts to be supported by sufficient evidence. The Supreme Court granted the tobacco companies' petitions for certiorari only as to their § 2 claims, seeking to answer the specific question "whether actual exclusion

of competitors is necessary to the crime of monopolization under § 2 of the Sherman Act." *Id.* at 784, 66 S.Ct. 1125. Answering that question in the negative, the Court stated that "[n]either proof of exertion of the power to exclude nor proof of actual exclusion of existing or potential competitors is essential to sustain a charge of monopolization under the Sherman Act." *Id.* at 810, 66 S.Ct. 1125. Furthermore, and importantly, the Court explicitly "welcome[d] this opportunity to endorse" certain passages from Judge Hand's opinion. *Id.* at 813, 66 S.Ct. 1125.

**\*149** Of particular relevance, the *American Tobacco* Court endorsed Judge Hand's understanding of the Sherman Act, namely that the Act contemplated the notion that " 'unchallenged economic power deadens initiative' " and " 'that immunity from competition is a narcotic, and rivalry is a stimulant, to industrial progress.' " *Id.* (quoting *Alcoa*, 148 F.2d at 427). It further quoted *Alcoa* for the previously mentioned propositions that monopolies can be "thrust" upon entities rather than achieved and that specific intent under § 2 was not required " 'for no monopolist monopolizes unconscious of what he is doing.' " *Id.* at 813-14, 66 S.Ct. 1125 (quoting *Alcoa*, 148 F.2d at 432).

Section 2 of the Sherman Act was next considered by the Supreme Court in *Lorain Journal Co. v. United States,* 342 U.S. 143, 72 S.Ct. 181, 96 L.Ed. 162 (1951). The United States had brought a civil suit against the publisher of the Lorain Journal, the only business disseminating news and advertising in the town of Lorain, Ohio, alleging that it attempted to monopolize in violation of § 2 of the Sherman Act because it refused to sell advertising to persons that patronized the small radio station that was established in a nearby community. The Supreme Court held that although a trader has discretion as to the parties with whom he will deal "[i]n the absence of any *purpose* to create or maintain a monopoly," *id.* at 155, 72 S.Ct. 181 (quoting *United States v. Colgate & Co.,* 250 U.S. 300, 307, 39 S.Ct. 465, 63 L.Ed. 992 (1919)), the action of the Journal constituted a purposeful means of regaining its previous monopoly over the mass dissemination of news and advertising. *Id.* Because this was an attempt to monopolize in violation of § 2, the Court approved the entry of an injunction ordering the Journal to print the advertise-

324 F.3d 141                                                                    Page 8

324 F.3d 141, 2003-1 Trade Cases P 73,989, 61 Fed. R. Evid. Serv. 60
**(Cite as: 324 F.3d 141)**

ments of the customers of the radio station.

Thereafter, in _United States v. Grinnell Corp._, 384 U.S. 563, 86 S.Ct. 1698, 16 L.Ed.2d 778 (1966), the Supreme Court reiterated that monopoly power alone is not necessarily unlawful. The Court summarized its prior cases, stating that § 2 of the Sherman Act required two elements: "(1) the possession of monopoly power in the relevant market and (2) the willful acquisition or maintenance of that power as distinguished from growth or development as a consequence of a superior product, business acumen, or historic accident." 384 U.S. at 570-71, 86 S.Ct. 1698.

In _Grinnell_, the United States filed a civil suit against several companies that offered central station protective services, such as fire and burglary protective devices, alleging violations of §§ 1 and 2 of the Sherman Act. Referring to the two-pronged test under § 2, the Court found that both prongs had been satisfied. Not only did the companies have monopoly power (87% of the accredited central station service business), but also they largely achieved this power through the aid of pricing practices, acquisitions of competitors, and noncompetition covenants, all of which were deemed to be "unlawful and exclusionary practices." _Id._ at 576, 86 S.Ct. 1698.

The Court's later decision in _Aspen Skiing Co. v. Aspen Highlands Skiing Corp._, 472 U.S. 585, 105 S.Ct. 2847, 86 L.Ed.2d 467 (1985), is even more pertinent to the case before us. In _Aspen Skiing_, a case that also reached the Court only on the § 2 violation, Ski Co., the owner of three of the four major downhill skiing facilities in Aspen, Colorado, discontinued its prior practice of cooperating with the owner of the fourth facility by issuing an interchangeable 6-day pass that could be used on any of the four facilities. It replaced that pass with a 3-area, 6-day ticket featuring only its mountains. It offered the **\*150** plaintiff, Highlands, owner of the fourth facility, reinstatement of the 4-area ticket only if Highlands would accept a fixed percentage of the revenue that was considerably below Highlands' historical average based on usage. Ski Co. took additional actions that made it extremely difficult for Highlands to market its own multiarea package to replace the joint offering, and Highlands' share of the market declined along with its revenues

from associated skiing services. The jury found that Ski Co. possessed monopoly power and awarded Highlands a substantial money judgment as treble damages. The court of appeals affirmed, holding there was sufficient basis in Ski Co.'s actions to demonstrate an abuse of its monopoly power.

In the Supreme Court, Ski Co. argued "that even a firm with monopoly power has no duty to engage in joint marketing with a competitor, that a violation of § 2 cannot be established without evidence of substantial exclusionary conduct, and that none of its activities can be characterized as exclusionary." _Aspen Skiing_, 472 U.S. at 600, 105 S.Ct. 2847. The Supreme Court agreed with the legal proposition, but referred to its earlier opinion in _Lorain Journal_ where it held that a monopolist's right to refuse to deal was not unqualified. _Id._ at 600-01, 105 S.Ct. 2847. After reviewing all the circumstances, it affirmed the judgment for Highlands in a unanimous opinion. It held that the jury had ample basis to reject Ski Co.'s business justification defense and noted that Ski Co. failed to offer any efficiency justification whatever for its pattern of conduct. _Id._ at 608, 105 S.Ct. 2847. The Court stated, "[a]lthough Ski Co.'s pattern of conduct may not have been as 'bold, relentless, and predatory' as the publisher's actions in _Lorain Journal_, the record in this case comfortably supports an inference that the monopolist made a deliberate effort to discourage its customers from doing business with its smaller rival." _Id._ at 610, 105 S.Ct. 2847 (quoting _Lorain Journal_, 342 U.S. at 149, 72 S.Ct. 181 (citation omitted))

In a significant passage about the conduct that constitutes monopolization in violation of § 2, the Court stated that when the issue is monopolization rather than an attempt to monopolize, "evidence of intent is merely relevant to the question whether the challenged conduct is fairly characterized as 'exclusionary' or 'anticompetitive' -- to use the words in the trial court's instructions -- or 'predatory,' to use a word that scholars seem to favor." _Id._ at 602, 105 S.Ct. 2847. The Court continued, "[w]hichever label is used, there is agreement on the proposition that 'no monopolist monopolizes unconscious of what he is doing.' " _Id._ (quoting _Alcoa_, 148 F.2d at 432).

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

324 F.3d 141                                                                                          Page 9
324 F.3d 141, 2003-1 Trade Cases P 73,989, 61 Fed. R. Evid. Serv. 60
**(Cite as: 324 F.3d 141)**

In _Eastman Kodak Co. v. Image Technical Servs., Inc.,_ 504 U.S. 451, 112 S.Ct. 2072, 119 L.Ed.2d 265(1992), 18 independent service organizations ("ISO's") that serviced Kodak copying and micrographic equipment brought an antitrust action against Kodak for its policies that sought to limit the availability of Kodak parts to ISO's. They alleged Kodak's policies were unlawful under both §§ 1 and 2 of the Sherman Act. The Supreme Court considered the issues under the two provisions separately. In its analysis under § 2, the Court first held that Kodak's control of nearly 100% of the parts market and 80% to 95% of the service market was sufficient to support a claim of monopoly power (an issue that is conceded here). As to the issue whether Kodak adopted its parts and service policies as part of a scheme of willful acquisition or maintenance of monopoly power, the Court stated that there was evidence that Kodak "took exclusionary action to maintain its parts monopoly and used its control over parts to strengthen *151 its monopoly share of the Kodak service market." _Id._ at 483, 112 S.Ct. 2072. Thus, Kodak could escape liability under § 2 only if it could explain its actions on the basis of valid business reasons, an issue as to which there were factual questions which made the district court's grant of summary judgment for Kodak inappropriate. _Id._

This extensive review of the Supreme Court's § 2 decisions is set forth to provide the background under which we must evaluate 3M's contention that it was entitled to judgment as a matter of law on the basis of the decision in _Brooke Group Ltd. v. Brown & Williamson Tobacco Corp.,_ 509 U.S. 209, 113 S.Ct. 2578, 125 L.Ed.2d 168 (1993), a decision that was primarily concerned with the Robinson-Patman Act, not § 2 of the Sherman Act. In _Brooke Group,_ Liggett, a cigarette manufacturer responsible for the "innovative development" of generic cigarettes, claimed that Brown & Williamson, which introduced its own line of generic cigarettes, "cut prices on generic cigarettes below cost and offered discriminatory volume rebates to wholesalers to force Liggett to raise its own generic cigarette prices and introduce oligopoly pricing in the economy segment [of the national cigarette market]." _Brooke Group,_ 509 U.S. at 212, 113 S.Ct. 2578. It filed a Robinson-Patman action on the basis

of these allegations. Brown & Williamson's deep price discounts or rebates were concededly discriminatory, not cost justified, and resulted in substantial loss to it. The Supreme Court majority held that the defendant was entitled to judgment as a matter of law because there was no evidence of injury to competition. _Id._ at 243, 113 S.Ct. 2578. The Court also held that the evidence did not show that Brown & Williamson's alleged scheme "was likely to result in oligopolistic price coordination and sustained supracompetitive pricing in the generic segment of the national cigarette market. Without this, Brown & Williamson had no reasonable prospect of recouping its predatory losses and could not inflict the injury to competition the antitrust laws prohibit." _Id._ [FN7]

> FN7. In contrast, the District Court here noted that 3M had conceded that it " 'could later recoup the profits it has forsaken on Scotch tape and private label tape by selling more higher priced Scotch tape ... if there would be no competition by others in the private label tape segment when 3M abandoned that part of the market to sell only higher-priced Scotch tape.' " _Le Page's,_ 2000 WL 280350, at *7 (quoting Defendant's Mem. at 30).

Unlike 3M, Brown & Williamson was part of an oligopoly, six manufacturers whose prices for cigarettes "increased in lockstep" and who "reaped the benefits of prices above a competitive level." _Id._ at 213, 113 S.Ct. 2578. Brown & Williamson had 12% of the oligopolistic market. Its conduct and pricing were at all times necessarily constrained by the presence of competitors who could, and did, react to its conduct by undertaking similar price cuts or pricing behavior. [FN8]

> FN8. The _Brooke Group_ opinions, both for the majority and the dissent, discuss the responses by members of the oligopoly to the introduction of discounted cigarettes. _Id._ at 239-40, 113 S.Ct. 2578; _id._ at 247-48, 113 S.Ct. 2578 (Stevens, J., dissenting).

Assuming _arguendo_ that _Brooke Group_ should be read for the proposition that a company's pricing ac-

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

tion is legal if its prices are not below its costs, nothing in the decision suggests that its discussion of the issue is applicable to a monopolist with its unconstrained market power. Moreover, LePage's, unlike the plaintiff in *Brooke Group,* does not make a predatory pricing claim. 3M is a monopolist; a monopolist is not free to take certain actions that a company in a competitive (or even ***152** oligopolistic) market may take, because there is no market constraint on a monopolist's behavior. *See, e.g., Aspen Skiing,* 472 U.S. at 601-04, 105 S.Ct. 2847.

[3] Nothing in any of the Supreme Court's opinions in the decade since the *Brooke Group* decision suggested that the opinion overturned decades of Supreme Court precedent that evaluated a monopolist's liability under § 2 by examining its exclusionary, i.e., predatory, conduct. *Brooke Group* has been cited only four times by the Supreme Court, three times in cases that were not even antitrust cases for propositions patently inapplicable here. [FN9] In the only antitrust case of the four, *NYNEX Corp. v. Discon, Inc.,* 525 U.S. 128, 137, 119 S.Ct. 493, 142 L.Ed.2d 510 (1998), the Court considered whether the *per se* rule applicable to group boycotts under § 1 of the Sherman Act should be applied "where a single buyer favors one seller over another, albeit for an improper reason." *Id* at 133, 119 S.Ct. 493. Holding that the rule of reason applies, the Court quoted *Brooke Group* for the proposition that "[e]ven an act of pure malice by one business competitor against another does not, without more, state a claim under the federal anti-trust laws." *Id.* at 137, 119 S.Ct. 493 (quoting *Brooke Group,* 509 U.S. at 225, 113 S.Ct. 2578). The opinion does not discuss, much less adopt, the proposition that a monopolist does not violate § 2 unless it sells below cost. Thus, nothing that the Supreme Court has written since *Brooke Group* dilutes the Court's consistent holdings that a monopolist will be found to violate § 2 of the Sherman Act if it engages in exclusionary or predatory conduct without a valid business justification.

> FN9. *Brooke Group* is cited in *Gustafson v. Alloyd Co.,* 513 U.S. 561, 570, 115 S.Ct. 1061, 131 L.Ed.2d 1 (1995), for the statutory construction rule that identical words used in different parts of the same act are in-

tended to have the same meaning; in *Strickler v. Greene,* 527 U.S. 263, 300 n. 3, 119 S.Ct. 1936, 144 L.Ed.2d 286 (1999), a federal habeas case, by Justice Souter in his partial concurrence/partial dissent, in discussing the term "reasonable probability;" and in *Weisgram v. Marley Co.,* 528 U.S. 440, 454, 120 S.Ct. 1011, 145 L.Ed.2d 958 (2000), in connection with discussing the weight to be given an expert opinion.

## IV.
## MONOPOLIZATION -- EXCLUSIONARY CONDUCT
### A.
#### *Illustrative Cases*

Before turning to consider LePage's allegation that 3M engaged in exclusionary or anticompetitive conduct and the evidence it produced, we consider the type of conduct § 2 encompasses.

As one court of appeals has stated: " 'Anticompetitive conduct' can come in too many different forms, and is too dependent upon context, for any court or commentator ever to have enumerated all the varieties." *Caribbean Broad. Sys., Ltd. v. Cable & Wireless PLC,* 148 F.3d 1080, 1087 (D.C.Cir.1998) (reversing in part the district court's dismissal of complaint and holding that radio station's claim that defendants made misrepresentations to advertisers and the government in order to protect its monopoly stated § 2 Sherman Act claim).

Numerous cases hold that the enforcement of the legal monopoly provided by a patent procured through fraud may violate § 2. *Walker Process Equip., Inc. v. Food Mach. & Chem. Corp.,* 382 U.S. 172, 174, 86 S.Ct. 347, 15 L.Ed.2d 247 (1965); *see also* ***153** *Medtronic Ave, Inc. v. Boston Scientific Corp.,* No. CIV. A. 98-478-SLR, 2001 WL 652016 (D.Del. Mar.30, 2001) (patentee could have violated § 2 by bringing infringement action on patent procured by fraud). Predatory pricing by a monopolist can provide a basis for § 2 liability. *See U.S. Philips Corp. v. Windmere Corp.,* 861 F.2d 695 (Fed.Cir.1988) (reversing district court's directed verdict and ordering new trial on § 2 claims due to evidence that company had 90% of rotary electric shaver market, exist-

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

ence of substantial entry barriers, and company had drastically reduced prices to eliminate potential competitors). A monopolist's denial to competitors of access to its "essential" goods, services or resources has been held to violate § 2. *See Otter Tail Power Co. v. United States,* 410 U.S. 366, 93 S.Ct. 1022, 35 L.Ed.2d 359 (1973) (finding § 2 violation where monopolist utility company refused to sell wholesale to municipalities and refused to transfer competitors' power over its lines); *see also Fishman v. Estate of Wirtz,* 807 F.2d 520 (7th Cir.1986) (finding corporation liable under § 2 for refusing to lease Chicago Stadium to plaintiff, a potential buyer of the Chicago Bulls basketball team, after determining Stadium to be essential to professional basketball in Chicago area). An arbitrary refusal to deal by a monopolist may constitute a § 2 violation. *See Byars v. Bluff City News Co., Inc.,* 609 F.2d 843 (6th Cir.1979) (remanding case to district court for fact-finding to determine whether defendant possessed monopoly power and unlawfully refused to deal in violation of § 2). Even unfair tortious conduct unrelated to a monopolist's pricing policies has been held to violate § 2. *See Int'l Travel Arrangers, Inc. v. Western Airlines, Inc.,* 623 F.2d 1255 (8th Cir.1980) (upholding treble damages antitrust award against airline with monopoly power after finding sufficient evidence that airline placed false, deceptive, and misleading advertisements discouraging public patronage of travel group charters).

A recent decision of the United States Court of Appeals for the Sixth Circuit, *Conwood Co., L.P. v. U.S. Tobacco Co.,* 290 F.3d 768 (6th Cir.2002), *cert. denied,* 537 U.S. 1148, 123 S.Ct. 876, 154 L.Ed.2d 850 (2003), presents a good illustration of the type of exclusionary conduct that will support a § 2 violation. That court upheld the jury's award to plaintiff Conwood of $350 million, which trebled was $1.05 billion, against United States Tobacco Company ("USTC") because of USTC's monopolization. USTC was the sole manufacturer of moist snuff until the 1970's when Conwood, Swisher, and Swedish Match, other moist snuff manufacturers, entered the moist snuff market. Not unexpectedly, USTC's 100% market share declined and it took the action that formed the basis of Conwood's complaint against USTC al-

leging, *inter alia,* unlawful monopolization in violation of § 2 of the Sherman Act.

The evidence that the district court and the court of appeals held proved that USTC systematically tried to exclude competition from the moist snuff market included the following: USTC (1) removed and destroyed or discarded racks that displayed moist snuff products in the stores while placing Conwood products in USTC racks in an attempt to bury Conwood's products; (2) trained its "operatives to take advantage of inattentive store clerks with various 'ruses' such as obtaining nominal permission to reorganize or neaten the moist snuff section" in an effort to destroy Conwood racks; (3) misused its position as category manager (manages product groups and business units and customizes them on a store by store basis) by providing misleading information to retailers in an effort to dupe them into carrying USTC products and to discontinue carrying Conwood *154 products; and (4) entered into exclusive agreements with retailers in an effort to exclude rivals' products. *Id.* at 783.

On appeal, USTC -- like 3M -- did not challenge that it had monopoly power and agreed that the relevant product was moist snuff and the geographic market was nationwide. *Id.* at 782-83. Instead, USTC contended that Conwood had failed to establish that USTC's power was acquired or maintained by exclusionary practices rather than by its legitimate business practices and superior product. *Id.* at 783. Both the district court and the court of appeals rejected USTC's argument, finding that there was sufficient evidence for a jury to find willful maintenance by USTC of monopoly power by engaging in exclusionary practices in violation of § 2 of the Sherman Act. *Id.* at 788.

Similarly, 3M sought to meet the competition that LePage's threatened by exclusionary conduct that consisted of rebate programs and exclusive dealing arrangements designed to drive LePage's and any other viable competitor from the transparent tape market.

**B.**
*Bundled Rebates*

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

324 F.3d 141                                                                    Page 12
324 F.3d 141, 2003-1 Trade Cases P 73,989, 61 Fed. R. Evid. Serv. 60
(Cite as: 324 F.3d 141)

[4] In considering LePage's conduct that led to the jury's ultimate verdict, we note that the jury had before it evidence of the full panoply of 3M's exclusionary conduct, including both the exclusive dealing arrangements and the bundled rebates which could reasonably have been viewed as effectuating exclusive dealing arrangements because of the way in which they were structured.

Through a program denominated Executive Growth Fund ("EGF") and thereafter Partnership Growth Fund ("PGF"), 3M offered many of LePage's major customers substantial rebates to induce them to eliminate or reduce their purchases of tape from LePage's. Rather than competing by offering volume discounts which are concededly legal and often reflect cost savings, 3M's rebate programs offered discounts to certain customers conditioned on purchases spanning six of 3M's diverse product lines. The product lines covered by the rebate program were: Health Care Products, Home Care Products, Home Improvement Products, Stationery Products (including transparent tape), Retail Auto Products, and Leisure Time. Sealed App. at 2979. In addition to bundling the rebates, both of 3M's rebate programs set customer-specific target growth rates in each product line. The size of the rebate was linked to the number of product lines in which targets were met, and the number of targets met by the buyer determined the rebate it would receive on all of its purchases. If a customer failed to meet the target for any one product, its failure would cause it to lose the rebate across the line. This created a substantial incentive for each customer to meet the targets across all product lines to maximize its rebates.

The rebates were considerable, not "modest" as 3M states. Appellant's Br. at 15. For example, Kmart, which had constituted 10% of LePage's business, received $926,287 in 1997, Sealed App. at 2980, and in 1996 Wal-Mart received more than $1.5 million, Sam's Club received $666,620, and Target received $482,001. Sealed App. at 2773. Just as significant as the amounts received is the powerful incentive they provided to customers to purchase 3M tape rather than LePage's in order not to forego the maximum rebate 3M offered. The penalty would have been $264,000 for Sam's Club, $450,000 for Kmart, and

$200,000 to $310,000 for American Stores.

**\*155** 3M does not deny that it offered these programs although it gives different reasons for the discounts to each customer. Instead it argues that they were no more exclusive than procompetitive lawful discount programs. And, as it responds to each of LePage's allegations, it returns to its central premise "that it is not unlawful to lower one's prices so long as they remain above cost." Appellant's Br. at 36 (citing *Brooke Group,* 509 U.S. at 222, 113 S.Ct. 2578).

However, one of the leading treatises discussing the inherent anticompetitive effect of bundled rebates, even if they are priced above cost, notes that "the great majority of bundled rebate programs yield aggregate prices above cost. Rather than analogizing them to predatory pricing, they are best compared with tying, whose foreclosure effects are similar. Indeed, the 'package discount' is often a close analogy." Phillip E. Areeda & Herbert Hovenkamp, Antitrust Law ¶ 794, at 83 (Supp 2002).

The treatise then discusses the anticompetitive effect as follows:

> The anticompetitive feature of package discounting is the strong incentive it gives buyers to take increasing amounts or even all of a product in order to take advantage of a discount aggregated across multiple products. In the anticompetitive case, which we presume is in the minority, the defendant rewards the customer for buying its product *B* rather than the plaintiff's *B,* not because defendant's *B* is better or even cheaper. Rather, the customer buys the defendant's *B* in order to receive a greater discount on *A,* which the plaintiff does not produce. In that case the rival can compete in *B* only by giving the customer a price that compensates it for the foregone *A* discount.

*Id*

The authors then conclude:

> Depending on the number of products that are aggregated and the customer's relative purchases of each, even an equally efficient rival may find it impossible to compensate for lost discounts on products that it does not produce.

*Id.* at 83-84.

The principal anticompetitive effect of bundled rebates as offered by 3M is that when offered by a monopolist they may foreclose portions of the market to a potential competitor who does not manufacture an equally diverse group of products and who therefore cannot make a comparable offer. We recognized this in our decision in *SmithKline Corp. v. Eli Lilly & Co.*, 575 F.2d 1056 (3d Cir.1978), where we held that conduct substantially identical to 3M's was anticompetitive and sustained the finding of a violation of § 2. *SmithKline* is of interest not because the panel decision is binding on the *en banc* court but because the reasoning regarding the practice of bundled rebates is equally applicable here. The defendant in *SmithKline*, Eli Lilly & Company, the pharmaceutical manufacturer, sold three of its cephalosporins to hospitals under the trade names Kefzol, Keflin and Keflex. Cephalosporins are broad spectrum antibiotics that were at that time indispensable to hospital pharmacies. Lilly had a monopoly on both Keflin and Keflex because of its patents. However, those drugs faced competition from the generic drug cefazolin which Lilly sold under the trade name Kefzol and which plaintiff SmithKline sold under the trade name Ancef.

Lilly's profits on the patented Keflin were far higher than those it received from its sales of Kefzol where its pricing was constrained by the existence of SmithKline. To preserve its market position in Keflin and discourage sales of Ancef and *156 even of its own Kefzol, *id.* at 1061, Lilly instituted a rebate program that provided a 3% bonus rebate for hospitals that purchased specified quantities of any three of Lilly's five cephalosporins. SmithKline brought a § 2 monopolization claim, alleging that Lilly used these multi-line volume rebates to maintain its monopoly over the hospital market for cephalosporins.

The district court (Judge A. Leon Higginbotham, later a member of this court) found that Lilly's pricing policy violated § 2. *SmithKline Corp. v. Eli Lilly & Co.*, 427 F.Supp. 1089 (E.D.Pa.1976). We affirmed by a unanimous decision. Although customers were not forced to select which cephalosporins they purchased from Lilly, we recognized that the effect of the rebate program was to induce hospitals to conjoin their purchases of Kefzol with Keflin and Keflex, Lilly's "leading sellers." *SmithKline*, 575 F.2d at

As we stated, "[a]lthough eligibility for the 3% bonus rebate was based on the purchase of specified quantities of any three of Lilly's cephalosporins, in reality it meant the combined purchases of Kefzol and the leading sellers, Keflin and Keflex." *Id.* The gravamen of Lilly's § 2 violation was that Lilly linked a product on which it faced competition with products on which it faced no competition. *Id.* at 1065.

The effect of the 3% bundled rebate was magnified by the volume of Lilly products sold, so that "in order to offer a rebate of the same net dollar amount as Lilly's, SmithKline had to offer purchasers of Ancef rebates of some 16% to hospitals of average size, and 35% to larger volume hospitals." *Id.* at 1062. Lilly's rebate structure combining Kefzol with Keflin and Keflex "insulat[ed] Kefzol from true price competition with [its competitor] Ancef." *Id* at 1065.

LePage's private-label and second-tier tapes are, as Kefzol and Ancef were in relation to Keflin, less expensive but otherwise of similar quality to Scotch-brand tape. Indeed, before 3M instituted its rebate program, LePage's had begun to enjoy a small but rapidly expanding toehold in the transparent tape market. 3M's incentive was thus the same as Lilly's in *SmithKline*: to preserve the market position of Scotch-brand tape by discouraging widespread acceptance of the cheaper, but substantially similar, tape produced by LePage's.

3M bundled its rebates for Scotch-brand tape with other products it sold in much the same way that Lilly bundled its rebates for Kefzol with Keflin and Keflex. In both cases, the bundled rebates reflected an exploitation of the seller's monopoly power. Just as "[cephalosporins] [were] carried in ... virtually every general hospital in the country," *SmithKline*, 575 F.2d at 1062, the evidence in this case shows that Scotch-brand tape is indispensable to any retailer in the transparent tape market.

Our analysis of § 2 of the Sherman Act in *SmithKline* is instructive here where the facts are comparable. Speaking through Judge Aldisert, we said:

With Lilly's cephalosporins subject to no serious price competition from other sellers, with the barri-

ers to entering the market substantial, and with the prospects of new competition extremely uncertain, we are confronted with a factual complex in which Lilly has the awesome power of a monopolist. Although it enjoyed the status of a legal monopolist when it was engaged in the manufacture and sale of its original patented products, that status changed when it instituted its [bundled rebate program]. The goal of that plan was to associate Lilly's legal monopolistic practices with an illegal activity that directly affected the price, supply, and demand of Kefzol **\*157** and Ancef. Were it not for the [bundled rebate program], the price, supply, and demand of Kefzol and Ancef would have been determined by the economic laws of a competitive market. [Lilly's bundled rebate program] blatantly revised those economic laws and made Lilly a transgressor under § 2 of the Sherman Act.

*Id.* at 1065.

The effect of 3M's rebates were even more powerfully magnified than those in *SmithKline* because 3M's rebates required purchases bridging 3M's extensive product lines. In some cases, these magnified rebates to a particular customer were as much as half of LePage's entire prior tape sales to that customer. For example, LePage's sales to Sam's Club in 1993 totaled $1,078,484, while 3M's 1996 rebate to Sam's Club was $666,620. Similarly, LePage's 1992 sales to Kmart were $2,482,756; 3M's 1997 rebate to Kmart was $926,287. The jury could reasonably find that 3M used its monopoly in transparent tape, backed by its considerable catalog of products, to squeeze out LePage's. 3M's conduct was at least as anticompetitive as the conduct which this court held violated § 2 in *SmithKline*.

### C.
### *Exclusive Dealing*

[5] The second prong of LePage's claim of exclusionary conduct by 3M was its actions in entering into exclusive dealing contracts with large customers. 3M acknowledges only the expressly exclusive dealing contracts with Venture and Pamida which conditioned discounts on exclusivity. It minimizes these because they represent only a small portion of the market. However, LePage's claims that 3M made payments to many of the larger customers that were

designed to achieve sole-source supplier status.

[6] 3M argues that because the jury found for it on LePage's claims under § 1 of the Sherman Act and § 3 of the Clayton Act, these payments should not be relevant to the § 2 analysis. The law is to the contrary. [FN10] Even though exclusivity arrangements are often analyzed under § 1, such exclusionary conduct may also be an element in a § 2 claim. *U.S. Healthcare, Inc. v. Healthsource, Inc.*, 986 F.2d 589, 593 (1st Cir.1993) (observing that exclusivity may also "play a role ... as an element in attempted or actual monopolization").

> FN10. The jury's finding against LePage's on its exclusive dealing claim under § 1 of the Sherman Act and § 3 of the Clayton Act does not preclude the application of evidence of 3M's exclusive dealing to support LePage's § 2 claim. *See, e.g., Barr Labs., Inc. v. Abbott Labs.*, 978 F.2d 98, 110-12 (3d Cir.1992) (considering § 2 of the Sherman Act claims after rejecting claims based on the same evidence under § 1 of the Sherman Act and § 3 of the Clayton Act); *SmithKline*, 427 F.Supp. at 1092, *aff'd*, 575 F.2d 1056 (imposing § 2 Sherman Act liability for exclusionary conduct, after rejecting an exclusive dealing claim under § 3 of the Clayton Act).

3M also disclaims as exclusive dealing any arrangement that contained no express exclusivity requirement. Once again the law is to the contrary. No less an authority than the United States Supreme Court has so stated. In *Tampa Elec. Co. v. Nashville Coal Co.*, 365 U.S. 320, 327, 81 S.Ct. 623, 5 L.Ed.2d 580 (1961), a case that dealt with § 3 of the Clayton Act rather than § 2 of the Sherman Act, the Court took cognizance of arrangements which, albeit not expressly exclusive, effectively foreclosed the business of competitors. [FN11]

> FN11. If the dissent's citation to *FTC v. Motion Picture Advertising Serv. Co.*, 344 U.S. 392, 73 S.Ct. 361, 97 L.Ed. 426 (1953), suggests that a one year exclusive dealing contract should be considered as per se legal un-

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

324 F.3d 141                                                                                    Page 15
324 F.3d 141, 2003-1 Trade Cases P 73,989, 61 Fed. R. Evid. Serv. 60
(Cite as: 324 F.3d 141)

der § 2, that is not supported by a reading of the decision. In that case, the FTC had appealed from a decision of the Fifth Circuit holding that exclusive contracts are not unfair methods of competition. The Supreme Court reversed, supporting the FTC's decision that the exclusive contracts of the respondent (a producer and distributor of advertising motion pictures), unreasonably restrain competition and tend to monopoly. It was the respondent who argued that exclusive contracts of a duration in excess of a year are necessary for the conduct of the business of the distributors. This argument was rejected by the Supreme Court. The Supreme Court's decision did not suggest that exclusive dealing arrangements entered into by a monopolist (which the respondent in that case was not), together with other exclusionary action, did not violate § 2 of the Sherman Act.

*158 LePage's introduced powerful evidence that could have led the jury to believe that rebates and discounts to Kmart, Staples, Sam's Club, National Office Buyers and "UDI" were designed to induce them to award business to 3M to the exclusion of LePage's. Many of LePage's former customers refused even to meet with LePage's sales representatives. A buyer for Kmart, LePage's largest customer which accounted for 10% of its business, told LePage's: "I can't talk to you about tape products for the next three years" and "don't bring me anything 3M makes." App. at 302-03, 964. Kmart switched to 3M following 3M's offer of a $1 million "growth" reward which the jury could have understood to require that 3M be its sole supplier. Similarly, Staples was offered an extra 1% bonus rebate if it gave LePage's business to 3M. 3M argues that LePage's did not try hard enough to retain Kmart, its customer for 20 years, but there was evidence to the contrary. [FN12] In any event, the purpose and effect of 3M's payments to the retailers were issues for the jury which, by its verdict, rejected 3M's arguments.

> FN12. At trial, LePage's presented the testimony of James Kowieski, its former senior vice president of sales, who described

LePage's efforts following Kmart's rejection of its bid. LePage's made a desperate second sales presentation attended by its president, App. at 957 ("I felt it was very critical to our company's success or failure, so I insured that Mr. Les Baggett, our president, attended the meeting with me."), where LePage's vainly offered additional price concessions, App. at 959 ("We went through the cost savings, the benefits, and we came up with some, again, price concessions, and some programs of a special buy once a year, because, I mean, as far as we were concerned, we were on our last leg.").

The foreclosure of markets through exclusive dealing contracts is of concern under the antitrust laws. As one of the leading treatises states:

> unilaterally imposed quantity discounts can foreclose the opportunities of rivals when a dealer can obtain its best discount only by dealing exclusively with the dominant firm. For example, discounts might be cumulated over lengthy periods of time, such as a calendar year, when no obvious economies result.

3A Phillip E. Areeda & Herbert Hovenkamp, *Antitrust Law* ¶ 768b2, at 148 (2d Ed 2002); *see also* 11 Herbert Hovenkamp, *Antitrust Law* ¶ 1807a, at 115-16 (1998) (quantity discounts may foreclose a substantial portion of the market). Discounts conditioned on exclusivity are "problematic" "when the defendant is a dominant firm in a position to force manufacturers to make an all-or-nothing choice." *Id.* at 117 n. 7 (citing *LePage's, 1997 WL 734005 (E.D.Pa.1997)*).

The Court of Appeals for the District of Columbia relied on the evidence of foreclosure of markets in reaching its decision on liability in *United States v. Microsoft Corp., 253 F.3d 34, 69 (D.C.Cir.2001)*. In that case, the court of appeals concluded that Microsoft, a monopolist in the operating system market, foreclosed rivals in the *159 browser market from a "substantial percentage of the available opportunities for browser distribution" through the use of exclusive contracts with key distributors. *Id. at 70-71.* Microsoft kept usage of its competitor's browser below "the critical level necessary for [its rival] to pose a

324 F.3d 141                                                                                                    Page 16
324 F.3d 141, 2003-1 Trade Cases P 73,989, 61 Fed. R. Evid. Serv. 60
(Cite as: 324 F.3d 141)

real threat to Microsoft's monopoly." *Id.* at 71. The *Microsoft* opinion does not specify what percentage of the browser market Microsoft locked up -- merely that, in one of the two primary distribution channels for browsers, Microsoft had exclusive arrangements with most of the top distributors. *Id.* at 70-71. Significantly, the *Microsoft* court observed that Microsoft's exclusionary conduct violated § 2 "even though the contracts foreclose less than the roughly 40% or 50% share usually required in order to establish a § 1 violation." *Id.* at 70.

One noted antitrust scholar has written:

> We might thus interpret the *Microsoft* holding as follows: Conduct that intentionally, significantly, and without business justification excludes a potential competitor from outlets (even though not in the relevant market), where access to those outlets is a necessary though not sufficient condition to waging a challenge to a monopolist and fear of the challenge prompts the conduct, is "anticompetitive."

Eleanor M. Fox, *What Is Harm to Competition? Exclusionary Practices and Anticompetitive Effect,* 70 Antitrust L.J. 371, 390 (2002).

LePage's produced evidence that the foreclosure caused by exclusive dealing practices was magnified by 3M's discount practices, as some of 3M's rebates were "all-or-nothing" discounts, leading customers to maximize their discounts by dealing exclusively with the dominant market player, 3M, to avoid being severely penalized financially for failing to meet their quota in a single product line. Only by dealing exclusively with 3M in as many product lines as possible could customers enjoy the substantial discounts. Accordingly, the jury could reasonably find that 3M's exclusionary conduct violated § 2.

## V.
## ANTICOMPETITIVE EFFECT

[7] It has been LePage's position in pursuing its § 2 claim that 3M's exclusionary "tactics foreclosed the competitive process by preventing rivals from competing to gain (or maintain) a presence in the market." Appellee's Br. at 45-46. When a monopolist's actions are designed to prevent one or more new or potential competitors from gaining a foothold in the market by exclusionary, i.e. predatory, conduct, its success in that goal is not only injurious to the potential competitor but also to competition in general. It has been recognized, albeit in a somewhat different context, that even the foreclosure of "one significant competitor" from the market may lead to higher prices and reduced output. *Roland Mach. Co. v. Dresser Indus., Inc.,* 749 F.2d 380, 394 (7th Cir.1984).

The *Microsoft* court treated exclusionary conduct by a monopolist as more likely to be anticompetitive than ordinary § 1 exclusionary conduct. The inquiry in *Microsoft* was whether the monopolist's conduct excluded a competitor (Netscape) from the essential facilities that would permit it to achieve the efficiencies of scale necessary to threaten the monopoly. 253 F.3d at 70-71. [FN13] In *Microsoft,* the court of *160 appeals determined that Microsoft had foreclosed enough distribution links to undermine the survival of Netscape as a viable competitor. *Id.* at 71.

> FN13. In one of the two distribution channels available for browsers, Microsoft had locked up almost all the high volume distributors. *Microsoft,* 253 F.3d at 70-71. In the seminal *Terminal Railroad* case, an association of railroad operators locked up the cheapest route across the Mississippi river, the sole railroad bridge crossing at St. Louis. *United States v. Terminal R.R. Ass'n,* 224 U.S. 383, 32 S.Ct. 507, 56 L.Ed. 810 (1912). The Supreme Court determined that the defendant's agreement to provide access to the bridge to other railroads on discriminatory terms violated § 1 of the Sherman Act.

Similarly, in this case, the jury could have reasonably found that 3M's exclusionary conduct cut LePage's off from key retail pipelines necessary to permit it to compete profitably. [FN14] It was only after LePage's entry into the market that 3M introduced the bundled rebates programs. If 3M were successful in eliminating competition from LePage's second-tier or private-label tape, 3M could exercise its monopoly power unchallenged, as Tesa Tuck was no longer in the market.

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

324 F.3d 141
324 F.3d 141, 2003-1 Trade Cases P 73,989, 61 Fed. R. Evid. Serv. 60
**(Cite as: 324 F.3d 141)**

> FN14. In the transparent tape market, super-stores like Kmart and Wal-Mart provide a crucial facility to any manufacturer-they supply high volume sales with the concomitant substantially reduced distribution costs. By wielding its monopoly power in transparent tape and its vast array of product lines, 3M foreclosed LePage's from that critical bridge to consumers that superstores provide, namely, cheap, high volume supply lines.

The District Court, recognizing that "this case presents a unique bundled rebate program that the jury found had an anti-competitive effect," *Le Page's*, 2000 WL 280350, at *5, denied 3M's motion for judgment as a matter of law ("JMOL"), stating:

> Plaintiff introduced evidence that Scotch is a monopoly product, and that 3M's bundled rebate programs caused distributors to displace Le Page's entirely, or in some cases, drastically reduce purchases from Le Page's. Tr. Vol. 30 at 105-106; Vol. 27 at 30. Under 3M's rebate programs, 3M set overall growth targets for unrelated product lines. *In the distributors' view, 3M set these targets in a manner which forced the distributor to either drop any non-Scotch products, or lose the maximum rebate.* PX 24 at 3M 48136. Thus, in order to qualify for the maximum rebate under the EGF/PGF programs, the record shows that most customers diverted private label business to 3M at 3M's suggestion. Tr. Vol. 28 at 74-75; PX23, 28, 32, 34, 715. Similarly, under the newer Brand Mix rebate program, 3M set higher rebates for tape sales which produced a shift from private label tape to branded tape. Tr. Vol. 31 at 79. PX 393 at 534906
>
> *Furthermore, Plaintiff introduced evidence of customized rebate programs that similarly caused distributors to forego purchasing from Le Page's if they wished to obtain rebates on 3M's products.* Specifically, the trial record establishes that 3M offered Kmart a customized growth rebate and Market Development Funds payment. In order to reach the $15 million sales target and qualify for the $1 million rebate, however, Kmart had to increase its consumer stationary purchases by $5.5 million. Kmart substantially achieved this "growth"

> by dropping Le Page's and another private label manufacturer, Tesa. PX 51 at 3M 102175, PX 121 at 156838. Likewise, 3M customized a program with Staples that provided for an extra 1% bonus rebate on Scotch tape sales "if Le Page's business is given to 3M." PX 98 at 3M 149794. Finally, 3M provided a similar discount on Scotch tape to Venture Stores "based on the contingency of Venture dropping private label." PX 712 at 3M 450738. Thus, *161 the jury could have reasonably concluded that 3M's customers were forced to forego purchasing Le Page's private label tape in order to obtain the rebates on Scotch tape.
>
> *Id.* (emphasis added).

In the same opinion, the District Court found that "[LePage's] introduced substantial evidence that the anticompetitive effects of 3M's rebate programs caused Le Page's losses." *Id.* at *7. The jury was capable of calculating from the evidence the amount of rebate a customer of 3M would lose if it failed to meet 3M's quota of sales in even one of the bundled products. The discount that LePage's would have had to provide to match the discounts offered by 3M through its bundled rebates can be measured by the discounts 3M gave or offered. For example, LePage's points out that in 1993 Sam's Club would have stood to lose $264,900, Sealed App. at 1166, and Kmart $450,000 for failure to meet one of 3M's growth targets in a single product line. Sealed App. at 1110. Moreover, the effect of 3M's rebates on LePage's earnings, if LePage's had attempted to match 3M's discounts, can be calculated by comparing the discount that LePage's would have been required to provide. That amount would represent the impact of 3M's bundled rebates on LePage's ability to compete, and that is what is relevant under § 2 of the Sherman Act.

The impact of 3M's discounts was apparent from the chart introduced by LePage's showing that LePage's earnings as a percentage of sales plummeted to below zero-to negative 10%-during 3M's rebate program. App. at 7037; *see also* App. at 7044 (documenting LePage's healthy operating income from 1990 to 1993, rapidly declining operating income from 1993 to 1995, and large operating losses suffered from 1996 through 1999). Demand for LePage's tape, espe-

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

324 F.3d 141                                                                                    Page 18
324 F.3d 141, 2003-1 Trade Cases P 73,989, 61 Fed. R. Evid. Serv. 60
**(Cite as: 324 F.3d 141)**

cially its private-label tape, decreased significantly following the introduction of 3M's rebates. Although 3M claims that customers participating in its rebate programs continued to purchase tape from LePage's, the evidence does not support this contention. Many distributors dropped LePage's entirely.

Prior to the introduction of 3M's rebate program, LePage's sales had been skyrocketing. Its sales to Staples increased by 440% from 1990 to 1993. Following the introduction of 3M's rebate program which bundled its private-label tape with its other products, 3M's private-label tape sales increased 478% from 1992 to 1997. [FN15] LePage's in turn lost a proportional amount of sales. It lost key large volume customers, such as Kmart, Staples, American Drugstores, Office Max, and Sam's Club. Other large customers, like Wal-Mart, drastically cut back their purchases.

> FN15. In 1992, 3M's private-label tape sales were $1,142,000. By 1997, its private-label tape sales had increased to $5,464,222. Sealed App. at 489.

As a result, LePage's manufacturing process became less efficient and its profit margins declined. In transparent tape manufacturing, large volume customers are essential to achieving efficiencies of scale. As 3M concedes, " 'large customers were extremely important to [LePage's], to everyone.' ... Large volumes ... permitted 'long runs,' making the manufacturing process more economical and predictable." Appellant Br. at 10 (quoting trial testimony of Les Baggett, LePage's former president and CEO) (citation omitted).

There was a comparable effect on LePage's share of the transparent tape market. In the agreed upon relevant market for transparent tape in the United States, LePage's market share dropped 35% from 1992 to 1997. In 1992, LePage's net sales constituted 14.44% of the total transparent **\*162** tape market. By 1997, LePage's sales had fallen to 9.35%. Sealed App. at 489. Finally, in March of 1997, LePage's was forced to close one of its two plants. That same year, the only other domestic transparent tape manufacturer, Tesa Tuck, Inc., bowed out of the transparent tape

business entirely in the United States. Had 3M continued with its program it could have eventually forced LePage's out of the market.

[8] The relevant inquiry is the anticompetitive effect of 3M's exclusionary practices considered together. As the Supreme Court recognized in *Cont'l Ore Co. v. Union Carbide & Carbon Corp.,* 370 U.S. 690, 699, 82 S.Ct. 1404, 8 L.Ed.2d 777 (1962), the courts must look to the monopolist's conduct taken as a whole rather than considering each aspect in isolation. The Court stated, " 'in a case like the one before us [alleging § 1 and § 2 violations], the duty of the jury was to look at the whole picture and not merely at the individual figures in it' " *Id.* (citation omitted). *See also City of Anaheim v. S. Cal. Edison Co.,* 955 F.2d 1373, 1376 (9th Cir.1992) ("[I]t would not be proper to focus on specific individual acts of an accused monopolist while refusing to *consider their overall combined effect*. We are dealing with what has been called the 'synergistic effect' of the mixture of the elements.") (emphasis added). This court, when considering the anticompetitive effect of a defendant's conduct under the Sherman Act, has looked to the increase in the defendant's market share, the effects of foreclosure on the market, benefits to customers and the defendant, and the extent to which customers felt they were precluded from dealing with other manufacturers. *Barr,* 978 F.2d at 110-11.

The effect of 3M's conduct in strengthening its monopoly position by destroying competition by LePage's in second-tier tape is most apparent when 3M's various activities are considered as a whole. The anticompetitive effect of 3M's exclusive dealing arrangements, whether explicit or inferred, cannot be separated from the effect of its bundled rebates. 3M's bundling of its products via its rebate programs reinforced the exclusionary effect of those programs.

3M's exclusionary conduct not only impeded LePage's ability to compete, but also it harmed competition itself, a *sine qua non* for a § 2 violation. LePage's presented powerful evidence that competition itself was harmed by 3M's actions. The District Court recognized this in its opinion, when it said:
    The jury could reasonably infer that 3M's planned elimination of the lower priced private label tape,

as well as the lower priced Highland brand, would channel consumer selection to the higher priced Scotch brand and lead to higher profits for 3M. Indeed, Defendant concedes that "3M could later recoup the profits it has forsaken on Scotch tape and private label tape by selling more higher priced Scotch tape ... if there would be no competition by others in the private label tape segment when 3M abandoned that part of the market to sell only higher-priced Scotch tape."
*Le Page's*, 2000 WL 280350, at *7.

3M could effectuate such a plan because there was no ease of entry. *See Advo, Inc. v. Phila. Newspapers, Inc.*, 51 F.3d 1191, 1200 (3d Cir.1995) (commenting that ease of entry would prevent monopolist's predatory pricing scheme from succeeding); *see also* Edward A. Snyder & Thomas E. Kauper, *Misuses of the Antitrust Laws: The Competitor Plaintiff*, 90 Mich. L.Rev. 551, 564 (1991) (finding "barriers to entry" to be one of two necessary conditions for exclusionary conduct, the other being "market power").

**\*163** The District Court found that there was "substantial evidence at trial that significant entry barriers prevent competitors from entering the ... tape market in the United States. Thus, this case presents a situation in which a monopolist remains unchecked in the market." *Le Page's*, 2000 WL 280350, at *7. In the time period at issue here, there has never been a competitor that has genuinely challenged 3M's monopoly and it never lost a significant transparent tape account to a foreign competitor.

There was evidence from which the jury could have determined that 3M intended to force LePage's from the market, and then cease or severely curtail its own private-label and second-tier tape lines. For example, by 1996, 3M had begun to offer incentives to some customers to increase purchases of its higher priced Scotch-brand tapes over its own second-tier brand. The Supreme Court has made clear that intent is relevant to proving monopolization, *Aspen Skiing*, 472 U.S. at 602, 105 S.Ct. 2847, and attempt to monopolize, *Lorain Journal*, 342 U.S. at 154-55, 72 S.Ct. 181.

3M's interest in raising prices is well-documented in the record. In internal memoranda introduced into

evidence by LePage's, 3M executives boasted that the large retailers like Office Max and Staples had no choice but to adhere to 3M's demands. *See* Sealed App. at 2585 ("Either they take the [price] increase ... or we hold orders ..."); *see also* Sealed App. at 2571 (3M's directive when Staples objected to price increase was "orders will be held if pricing is not up to date on 1/1/98"). LePage's expert testified that the price of Scotch-brand tape increased since 1994, after 3M instituted its rebate program. App. at 3246-47. In its opinion, the District Court cited the deposition testimony of a 3M employee acknowledging that the payment of the rebates after the end of the year discouraged passing the rebate on to the ultimate customers. App. at 2092. The District Court thus observed, "the record amply reflects that 3M's rebate programs did not benefit the ultimate consumer." *Le Page's*, 2000 WL 280350, at *7.

As the foregoing review of the evidence makes clear, there was sufficient evidence for the jury to conclude the long-term effects of 3M's conduct were anticompetitive. We must therefore uphold its verdict on liability unless 3M has shown adequate business justification for its practices.

### VI.
### BUSINESS REASONS JUSTIFICATION

[9][10] It remains to consider whether defendant's actions were carried out for "valid business reasons," the only recognized justification for monopolizing. *See, e.g., Eastman Kodak*, 504 U.S. at 483, 112 S.Ct. 2072. However, a defendant's assertion that it acted in furtherance of its economic interests does not constitute the type of business justification that is an acceptable defense to § 2 monopolization. Paraphrasing one corporate executive's well publicized statement, whatever is good for 3M is not necessarily permissible under § 2 of the Sherman Act. As one court of appeals has explained:

> In general, a business justification is valid if it relates directly or indirectly to the enhancement of consumer welfare. Thus, pursuit of efficiency and quality control might be legitimate competitive reasons ..., while the desire to maintain a monopoly market share or thwart the entry of competitors would not.
> *Data Gen. Corp. v. Grumman Sys. Support Corp.*, 36

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

324 F.3d 141
324 F.3d 141, 2003-1 Trade Cases P 73,989, 61 Fed. R. Evid. Serv. 60
**(Cite as: 324 F.3d 141)**

F.3d 1147, 1183 (1st Cir.1994) (citing *164*Eastman Kodak*, 504 U.S. at 483, 112 S.Ct. 2072; *Aspen Skiing*, 472 U.S. at 608-11, 105 S.Ct. 2847).

It can be assumed that a monopolist seeks to further its economic interests and does so when it engages in exclusionary conduct. Thus, for example, exclusionary practice has been defined as "a method by which a firm ... trades a part of its monopoly profits, at least temporarily, for a larger market share, by making it unprofitable for other sellers to compete with it." Richard A. Posner, *Antitrust Law: An Economic Perspective* 28 (1976). Once a monopolist achieves its goal by excluding potential competitors, it can then increase the price of its product to the point at which it will maximize its profit. This price is invariably higher than the price determined in a competitive market. That is one of the principal reasons why monopolization violates the antitrust laws. The fact that 3M acted to benefit its own economic interests is hardly a reason to overturn the jury's finding that it violated § 2 of the Sherman Act.

The defendant bears the burden of "persuad[ing] the jury that its conduct was justified by any normal business purpose." *Aspen Skiing*, 472 U.S. at 608, 105 S.Ct. 2847. Although 3M alludes to its customers' desire to have single invoices and single shipments in defense of its bundled rebates, 3M cites to no testimony or evidence in the 55 volume appendix that would support any actual economic efficiencies in having single invoices and/or single shipments. It is highly unlikely that 3M shipped transparent tape along with retail auto products or home improvement products to customers such as Staples or that, if it did, the savings stemming from the joint shipment approaches the millions of dollars 3M returned to customers in bundled rebates.

There is considerable evidence in the record that 3M entered the private-label market only to "kill it." *See, e.g.,* Sealed App. at 809 (statement by 3M executive in internal memorandum that "I don't want private label 3M products to be successful in the office supply business, its distribution or our consumers/end users") That is precisely what § 2 of the Sherman Act prohibits by covering conduct that maintains a monopoly. Maintaining a monopoly is not the type of

valid business reason that will excuse exclusionary conduct. 3M's business justification defense was presented to the jury, and it rejected the claim. The jury's verdict reflects its view that 3M's exclusionary conduct, which made it difficult for LePage's to compete on the merits, had no legitimate business justification.

## VII.
## DAMAGES

As an alternative to its argument that it is entitled to JMOL on liability, 3M claims that it is entitled to a new trial due to the District Court's error in sustaining LePage's damages award. It gives two reasons. First, it contends that the damage theory proffered by Terry Musika, LePage's damages expert, was based on improper assumptions and should have been excluded. [FN16] Second, 3M argues that Musika's theory failed to disaggregate the damages *165 based on lawful versus unlawful conduct by 3M.

> FN16. 3M does not challenge Musika's expert qualifications. Nonetheless, we note that he holds a master's degree in public finance, is a former partner at a major accounting firm, and at the time of trial was President and CEO of a business consulting firm. Furthermore, Musika frequently has served as a court-appointed bankruptcy trustee, as an expert for various government agencies, including the Department of Justice and Securities and Exchange Commission, and as an expert witness in complex cases, including five antitrust cases.

[11] We review the District Court's decision to admit or exclude expert testimony for abuse of discretion. *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 152, 119 S.Ct. 1167, 143 L.Ed.2d 238 (1999). Furthermore, we review *de novo* LePage's damages evidence to determine whether as a matter of law it can support the jury's verdict. *Stelwagon Mfg. Co. v. Tarmac Roofing Svs., Inc.*, 63 F.3d 1267, 1271 (3d Cir.1995).

To determine the amount of profits LePage's lost between 1993 and 2000 due to 3M's antitrust violations, Musika constructed a "lost market share" model. Appellant's Br. at 72. Musika first calculated the

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

324 F.3d 141                                                                                                    Page 21
324 F.3d 141, 2003-1 Trade Cases P 73,989, 61 Fed. R. Evid. Serv. 60
**(Cite as: 324 F.3d 141)**

total United States transparent tape sales during the
damages period, using actual financial data from
1992 to 1997 and projecting total sales from 1998 to
2000. Next, he determined how those sales would be
divided between branded and private-label parts of
the market, projecting a 1% shift each year from
branded to private-label tape sales. In arriving at 1%,
Musika considered the actual growth in private-label
tape sales, the actual growth rate of all private-label
products (i.e. not just tape), the growth rate of large
customers, and 3M's internal projections.

After determining the size of both segments of the
market, Musika estimated LePage's share of the mar-
ket, predicting that LePage's would have retained its
3.5% share of the branded-label segment and its 88%
share of the private-label segment. He opined that
LePage's share of the overall market for transparent
tape would have increased from 14.44% in 1992 to
21.2% in 2000 but for 3M's unlawful conduct. Fi-
nally, Musika subtracted LePage's actual sales from
his projected sales to determine LePage's lost sales
due to 3M's unlawful conduct. He calculated
LePage's projected profit margin by looking at
LePage's actual profit margin for each year and ad-
justing it to show declining prices and LePage's con-
sequential decreasing efficiency due to decreasing
sales. Based on those adjustments, LePage's profit
margin decreased every year during the damages
period. Musika concluded that but for 3M's unlawful
conduct, LePage's would have earned an extra $36
million dollars.

[12] Importantly, 3M does not challenge Musika's ba-
sic approach to calculating damages, conceding that
"an expert may construct a reasonable offense-free
world as a yardstick for measuring what, hypothetic-
ally, would have happened 'but for' the defendant's
unlawful activities." Appellant's Reply Br. at
37(citing _Callahan v. A.E.V., Inc._, 182 F.3d 237,
254-58 (3d Cir.1999); _Rossi v. Standard Roofing,
Inc._, 156 F.3d 452, 484-87 (3d Cir.1998)).

Instead, 3M's motion for judgment as a matter of law
attacked Musika's underlying assumptions, the
primary assumption being that 3M did not want to
succeed in the private-label segment as it did not
want to harm its high-margin sales of Scotch brand.

The District Court rejected 3M's objections to
LePage's damages claims, stating that "the record ...
demonstrates that Mr. Musika's assumptions were
grounded in the past performances of Scotch, High-
land and Le Page's tapes, as well as 3M's own intern-
al projections for future growth." _Le Page's, 2000
WL 280350, at *8_

[13] The credibility of LePage's and 3M's experts was
for the jury to determine. _Inter Med. Supplies, Ltd. v.
EBI Med. Sys., Inc._, 181 F.3d 446, 462-63 (3d
Cir.1999). Musika was extensively cross-examined
and 3M presented testimony from its own damages
expert who predicted more conservative losses to
LePage's. In the end, the jury found Musika to be
**\*166** credible. 3M's disappointment as to the jury's
finding of credibility does not constitute an abuse of
discretion by the District Court in allowing Musika's
testimony.

[14] 3M next argues that Musika improperly failed to
disaggregate damages, thereby providing the jury
with no mechanism to discern damages arising from
3M's lawful conduct or other facts from damages
arising from 3M's unlawful conduct. According to
3M, this resulted in impermissible guesswork and
speculation on the part of the jury.

In _Bonjorno v. Kaiser Aluminum & Chem. Corp._, 752
F.2d 802, 812 (3d Cir.1984), this court stated that
"[i]n constructing a hypothetical world free of the de-
fendants' exclusionary activities, the plaintiffs are
given some latitude in calculating damages, so long
as their theory is not wholly speculative." _Id._ Once a
jury has found that the unlawful activity caused the
antitrust injury, the damages may be determined
without strict proof of what act caused the injury, as
long as the damages are not based on speculation or
guesswork. _Id._ at 813. The _Bonjorno_ court noted that
it would be extremely difficult, if not impossible, to
segregate and attribute a fixed amount of damages to
any one act as the theory was not that any one act in
itself was unlawful, but that all the acts taken togeth-
er showed a § 2 violation. _Id._

Similarly, 3M's actions, taken as a whole, were found
to violate § 2, thus making the disaggregation that
3M speaks of to be unnecessary, if not impossible. In

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

324 F.3d 141                                                                                                      Page 22
324 F.3d 141, 2003-1 Trade Cases P 73,989, 61 Fed. R. Evid. Serv. 60
(Cite as: 324 F.3d 141)

any event, we fail to see how the jury engaged in speculation or guesswork. The District Court clearly charged the jury to disregard losses not caused by 3M: "You may not calculate damages based only on speculation or guessing... You may not award damages for injuries or losses caused by other factors." App. at 5689. We find no evidence that the jury failed reasonably to follow these instructions.

For the foregoing reasons, we will not disturb the jury's damages award to LePage's.

## VIII.
## JURY INSTRUCTIONS

[15][16] 3M also argues that it should be awarded a new trial because of allegedly improper jury instructions. In the absence of a misstatement of law, jury instructions are reviewed for abuse of discretion. *Bhaya v. Westinghouse Electric Corp.*, 922 F.2d 184, 191 (3d Cir.1990). Because the District Court provided the jury with meticulous instructions, methodically explaining this area of the law in a manner understandable to lay persons, we conclude that it did not abuse its discretion.

The District Court, in instructing the jury on Count I, which encompassed LePage's claim of unlawful maintenance of monopoly power under § 2, explained:

Count I in this case is unlawful maintenance of monopoly power.

LePage's alleges that it was injured by 3M's unlawful monopolization in the United States market for invisible and transparent tape for home and office use.

To win on their claim of monopolization, LePage's must prove each of the following elements by a preponderance of the evidence.

First, that 3M had monopoly power in the relevant market.

Secondly, that 3M willfully maintained that power through predatory or exclusionary conduct...

And thirdly, that LePage's was injured in its business or property because *167 of 3M's restrictive or exclusionary conduct.

App. at 5663-64.

3M complains that the District Court failed to

provide guidance that would instruct the jury how to distinguish between unlawful predation and lawful conduct. However, in explaining LePage's maintenance of monopoly claim, the District Court told the jury that in order to find for LePage's, it would have to find by a preponderance of the evidence that 3M willfully maintained its monopoly power through exclusionary or predatory conduct. App. at 5663. It then summarized those of 3M's actions that LePage's contended were unlawfully exclusionary or predatory, including 3M's rebate program, market development fund, its efforts to control, reduce or eliminate private-label tape, and its efforts to raise the price consumers pay for Scotch tape. Thereafter, the judge provided the jury with the following factors to determine whether 3M's conduct was either exclusionary or predatory: "its effect on its competitors, such as LePage's, its impact on consumers, and whether it has impaired competition, in an unnecessarily restrictive way." App. at 5670.

Relevant portions of the charge were as follows:

The law directs itself not against conduct which is competitive, even severely so, but rather against conduct which tends to destroy competition itself.

App. at 5655.

LePage's must prove that 3M willfully maintained monopoly power by predatory or exclusionary conduct, rather than by supplying better products or services, or by exercising superior business judgment, or just by chance. So willful maintenance of monopoly power, that's an element LePage's has to prove.

App. at 5668.

To prove that 3M acted willfully, LePage's must prove either that 3M engaged in predatory or exclusionary acts or practices, with the conscious objective of furthering the dominance of 3M in the relevant market, or that this was the necessary direct consequence of 3M's conduct or business arrangement.

App. at 5668.

I'm now giving you what LePage's contentions are as to what 3M did or did not do, that constituted predatory or exclusionary conduct. Number one, 3M's rebate program, such as the EGF, executive growth fund, or the PGF, the partnership growth

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

324 F.3d 141                                                              Page 23

324 F.3d 141, 2003-1 Trade Cases P 73,989, 61 Fed. R. Evid. Serv. 60
(Cite as: 324 F.3d 141)

fund, and the brand mix program. Number two, 3M's market development fund called the MDS in some of the testimony, and other payments to customers conditioned on customers achieving certain sales goals or growth targets. Third, 3M's efforts to control, or reduce, or eliminate private label tape. Four, 3M's efforts to switch customers to 3M's more expensive branded tape, and Five, 3M's efforts to raise the price consumers pay for Scotch tape. LePage's claims that all of these things that I've just gone through was predatory or exclusionary conduct. Now, 3M denies in every respect that these actions were predatory or exclusionary. 3M contends that these actions were, in fact, pro-competitive.

App. at 5668-69.

Exclusionary conduct and predatory conduct comprehends, at the most, behavior that not only, one, tends to impair the opportunities of its rivals, but also, number two, either does not further competition on the merits, or does so in an unnecessarily restrictive way. If 3M has been attempting to exclude rivals on *168 some basis other than efficiency, you may characterize the behavior as predatory.

App. at 5670.

However, you may not find that a competent, willfully maintained monopoly power, if that company has maintained that power, solely through the exercise of superior foresight or skill in industry, or because of economic or technological efficiencies, or because of size, or because of changes in customer and consumer preferences, or simply because the market is so limited that it is impossible to efficiently produce the product, except by a plan large enough to supply the whole demand.

App. at 5670-71.

Now with respect to Count 1, unlawfully maintaining monopoly power, mere possession of monopoly power, if lawfully acquired, does not violate the antitrust laws.

App. at 5671.

In determining whether there has been an unlawful exercise of monopoly power, you must bear in mind that a company has not acted unlawfully simply because it has engaged in ordinary competitive behavior that would have been an effective

means of competition if it were engaged in by a firm without monopoly power, or simply because it is a large company and a very efficient one.

App. at 5672.

The trial court further noted that if the jury found the evidence to be insufficient to prove any of the elements, it had to find for 3M and against LePage's. It was careful to note that intense business competition was not considered predatory or exclusionary, explaining:

The acts or practices that result in the maintenance of monopoly power must represent something other than the conduct of business that is part of the normal competitive process or even extraordinary commercial success. [3M] must represent conduct that has made it very difficult or impossible for competitors to engage in fair competition.

App. at 5671.

The District Court closely followed the ABA sample instructions when instructing the jury as to predatory and exclusionary conduct, including its instructions distinguishing between procompetitive and anticompetitive conduct. *See* ABA, *Sample Jury Instructions in Civil Antitrust Cases* C-20 to C-21 (1999 Ed.). Furthermore, the jury instructions were a modified version of those given in *Aspen Skiing,* which the Supreme Court did not find objectionable 472 U.S. at 596-97, 105 S.Ct. 2847.

3M contends that the District Court was obligated to take into account the decision in *Brooke Group* when crafting its jury instructions. As we have explained, *Brooke Group* involved claims of predatory pricing, a claim LePage's never alleged against 3M. It follows that the District Court need not have, indeed should not have, instructed the jury as to claims not at issue in the case.

The jury was given the following questions on Count I:

(1) Do you find that LePage's has proven, by a preponderance of the evidence, that the relevant market is invisible and transparent tape for home and office use in the United States?

(2) Do you find that LePage's has proven, by a preponderance of the evidence, that 3M unlawfully

maintained monopoly power as defined under the instructions for Count I?; [and]

(2.1) Do you find that LePage's has proven, as a matter of fact and with a fair degree of certainty, that 3M's unlawful maintenance of monopoly power *169 injured LePage's business or property as defined in these instructions?

App. at 6523. The jury answered "yes" to each of the three questions. It awarded LePage's more than $22 million before trebling.

The District Court gave the jury a thorough, clear charge as to the § 2 claim. Based on its sound instructions, the jury decided that LePage's had met its evidentiary burden as to its § 2 claim. Nothing in the jury charge constitutes reversible error.

### IX.
### CROSS APPEAL
### ATTEMPTED MONOPOLIZATION

LePage's cross appeals from the District Court's order granting judgment as a matter of law to 3M on LePage's claim that 3M illegally attempted to maintain its monopoly. In overturning the jury's verdict for LePage's on this claim, the District Court stated that " 'an attempted maintenance of monopoly power' " is "inherently illogical." _Le Page's, 2000 WL 280350, at *2_

LePage's argues that the courts and commentators have repeatedly found that defendants can be guilty of both monopolization and attempted monopolization claims arising out of the same conduct. _See, e.g., Am. Tobacco Co., 328 U.S. at 783, 66 S.Ct. 1125_ (affirming judgment that defendants were guilty of monopolization and attempted monopolization); Earl Kintner, 2 _Federal Antitrust Law_ § 13.1 n.5 (1980). It emphasizes that in _Lorain Journal,_ the Supreme Court upheld a § 2 attempted monopolization judgment against the defendant newspaper, holding that "a single newspaper, already enjoying a substantial monopoly in its area, violates the 'attempt to monopolize' clause of § 2 when it uses its monopoly to destroy threatened competition." _342 U.S. at 154, 72 S.Ct. 181._

We need not consider the correctness of the District Court's ruling on the attempted monopolization claim

because we uphold its decision on the monopolization claim. The jury returned the same amount of damages on both claims and LePage's concedes that under those circumstances discussion of the attempted monopolization is unnecessary.

### X.
### CONCLUSION

Section 2, the provision of the antitrust laws designed to curb the excesses of monopolists and near-monopolists, is the equivalent in our economic sphere of the guarantees of free and unhampered elections in the political sphere. Just as democracy can thrive only in a free political system unhindered by outside forces, so also can market capitalism survive only if those with market power are kept in check. That is the goal of the antitrust laws.

The jury heard the evidence and the contentions of the parties, accepting some and rejecting others. There was ample evidence that 3M used its market power over transparent tape, backed by its considerable catalog of products, to entrench its monopoly to the detriment of LePage's, its only serious competitor, in violation of § 2 of the Sherman Act. We find no reversible error. Accordingly, we will affirm the judgment of the District Court.

GREENBERG, Circuit Judge, dissenting.

I respectfully dissent as I would reverse the district court's order denying the motion for judgment as a matter of law on the monopolization claim but affirm on LePage's's cross-appeal from the motion *170 granting 3M a judgment as a matter of law on the attempted maintenance of monopoly claim. While I recognize that the majority opinion describes the factual background of this case, I nevertheless also will set forth its background as I believe that a more specific exposition of the facts leads to a conclusion that LePage's case should not have survived 3M's motion for a judgment as a matter of law.

As the majority indicates, 3M dominated the United States transparent tape market with a market share above 90% until the early 1990s. LePage's around 1980 decided to sell "second brand" and private label tape, _i.e.,_ tape sold under the retailer's, rather than the

manufacturer's name, an endeavor successful to the extent that LePage's captured 88% of private label tape sales in the United States by 1992. Moreover, growth of "second brand" and private label tape accounted for a shift of some tape sales from branded tape to private label tape so the size of the private label tape business expanded. In the circumstances, not surprisingly, during the early 1990s, 3M also entered the private label tape business.

As the majority notes, LePage's claims that, in response to the growth of this competitive market, 3M engaged in a series of related, anticompetitive acts aimed at restricting the availability of lower-priced transparent tape to consumers. In particular, it asserts that 3M devised programs that prevented LePage's and the other domestic company in the business, Tesa Tuck, Inc., from gaining or maintaining large volume sales and that 3M maintained its monopoly by stifling growth of private label tape and by coordinating efforts aimed at large distributors to keep retail prices for Scotch tape high. LePage's barely was surviving at the time of trial and suffered large operating losses from 1996 through 1999.

This case centers on 3M's rebate programs that, beginning in 1993, involved offers by 3M of "package" or "bundled" discounts for various items ranging from home care and leisure products to audio/visual and stationery products. Customers could earn rebates by purchasing, in addition to transparent tape, a variety of products sold by 3M's stationery division, such as Post-It Notes and packaging products. There is no doubt but that these programs created incentives for retailers to purchase more 3M products and enabled them to have single invoices, single shipments and uniform pricing programs for various 3M products. 3M linked the size of the rebates to the number of product lines in which the customers met the targets, an aggregate number that determined the rebate percentage the customer would receive on all of its 3M purchases across all product lines. Therefore, if customers failed to meet growth targets in multiple categories, they did not receive any rebate, and if they failed to meet the target in one product line, 3M reduced their rebates substantially. These requirements are at the crux of the controversy here, as LePage's claims that customers could not meet these

growth targets without eliminating it as a supplier of transparent tape.

In practice, as 3M's rebate program evolved, it offered three different types of rebates: Executive Growth Fund, Partnership Growth Fund and Brand Mix Rebates. 3M developed a "test program" called Executive Growth Fund ("EGF") for a small number of retailers, 11 in 1993 and 15 in 1994. Under EGF, 3M negotiated volume and growth targets for each customer's purchases from the six 3M consumer product divisions involved in the EGF program. A customer meeting the target in three or more divisions earned a volume rebate of between 0.2-1.25% of total sales.

**\*171** Beginning in 1995, 3M undertook to end the EGF test program and institute a rebate program called Partnership Growth Fund ("PGF") for the same six 3M consumer products divisions. Under this program, 3M established uniform growth targets applicable to all participants. Customers who increased their purchases from at least two divisions by $1.00 and increased their total purchases by at least 12% over the previous year qualified for the rebate, which ranged from 0.5% to 2%, depending on the number of divisions (between two to five divisions) in which the customer increased its purchases and the total volume of purchases.

In 1996 and 1997, 3M offered price incentives called Brand Mix Rebates to two tape customers, Office Depot and Staples, to increase purchases of Scotch brand tapes. 3M imposed a minimum purchase level for tape set at the level of Office Depot's and Staples's purchases the previous year with "growth" factored in. To obtain a higher rebate, these two customers could increase their percentage of Scotch purchases relative to certain lower-priced orders.

The evidence at trial focused on the parties' dealings with a limited number of customers and demonstrated that LePage's problems were attributed to a number of factors, not merely 3M's rebate programs. Thus, I describe this evidence at length.

*Wal-Mart*

Before 1992, Wal-Mart bought private label tape

324 F.3d 141                                                    Page 26
324 F.3d 141, 2003-1 Trade Cases P 73,989, 61 Fed. R. Evid. Serv. 60
**(Cite as: 324 F.3d 141)**

only from LePage's but, in August 1992, decided to buy private label tape from 3M as well. In response, LePage's lowered its prices and increased its sales to Wal-Mart. In 1997, Wal-Mart stopped buying private label tape but offered LePage's's branded tape as its "second tier" offering. In 1998, however, Wal-Mart told LePage's that it was going to switch to tape program from 3M. LePage's's president then visited Wal-Mart following which it changed its plans and retained LePage's as a supplier. Afterwards, Wal-Mart designed a test comparing LePage's's brand against a 3M Scotch utility tape to determine who would win Wal-Mart's "second tier" tape business. LePage's added more inches (approximately 20% more) to its rolls of tape and won the test. 3M continued, however, to sell Scotch brand tapes to Wal-Mart, and LePage's saw its sales to Wal-Mart decline to approximately $2,000,000 annually by the time of trial. LePage's claims that Wal-Mart cut back on its tape purchases to qualify for 3M's bundled rebate of $1,468,835 in 1995.

### Kmart

Kmart accounted for 10% of LePage's's annual tape sales when LePage's lost its business to 3M in 1993. Kmart asked its suppliers, including 3M, to provide a single bid on its entire private label tape business for the following year. LePage's's president believed, however, that Kmart was "too lazy to make a change," and that it would "never put their eggs in one basket" by giving all its business to 3M. LePage's offered the same price it had offered the previous year but also offered a volume rebate. 3M offered a lower price and won the bid. Kmart asked for rebates and "market development" funds as part of the private label tape bid process. 3M offered $200,000 for promotional activities and a $300,000 volume rebate if Kmart purchased $10,000,000 of 3M's Stationery Division products.

LePage's claims that 3M offered Kmart $1,000,000 to eliminate LePage's and Tesa as suppliers and to make 3M its sole tape supplier. LePage's points to a 3M document outlining 3M's goal for Kmart to *172 exceed $15,000,000 in 3M purchases with the reward being that Kmart would receive $75,000 in each of the first two quarters and $100,000 in the last two quarters for promotional activities and would receive

$650,000 as a volume rebate if the sales exceeded $15,000,000. If the sales were less, 3M would decrease the rebate accordingly, e.g., a $400,000 rebate for $13,000,000 of sales. LePage's claims that, as a practical matter, Kmart had to eliminate LePage's and Tesa to reach the growth 3M required in order to qualify for the rebate. LePage's asserts that, despite its efforts to regain the private label business from Kmart, one Kmart buyer told it that he could not talk to LePage's about tape products for the next three years.

### Staples

Staples had been a LePage's customer for several years. From 1990 to 1993, LePage's increased its sales to Staples by 440%, growing from $357,000 to $1,954,000. In 1994, Staples considered reducing suppliers and asked LePage's and 3M for their best offers in 1994. LePage's assumed that if 3M did make a good offer, LePage's would have a chance to make a better proposal. LePage's did not make its lowest offer, and 3M won the account. When LePage's went back to Staples with a new price, it was told that the decision had been made. LePage's claims that 3M offered an extra 1% bonus rebate on Scotch products if Staples eliminated LePage's as a supplier (a "growth" rebate that only could be met by converting all of Staple's private label business to 3M). 3M paid Staples an advertising allowance in four payments totalling $1,000,000 in 1995 and gave it $500,000 in free merchandise delivered during Staples's fiscal year 1994. 3M refers to a "$1.5 million settlement" with Staples and refers to multiple payments for different purposes. LePage's, however, implies that these payments bore some connection to Staples's award of its second-tier tape business to 3M.

### Office Max

In 1998, after a dispute between Office Max and LePage's, Office Max accepted 3M's offer that matched but did not beat LePage's's price. LePage's objected to 3M's matching whatever price LePage's offered, and also objected to 3M's "clout" payment. Office Max required its suppliers to make payments to help advertise the Office Max name, and LePage's had paid this "clout" payment in the years previous to 1998 when it refused to pay it because of its dispute with Office Max. Nevertheless, the buyer for Office

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Max testified that its decision to give its business to 3M was not related to its pricing and rebate program but rather to the consistency of its service.

### Walgreens

Walgreens had purchased private label tape from LePage's from 1992 until 1998, when it decided to import tape from Taiwan. LePage's's chief executive officer acknowledged that LePage's did not lose the account due to 3M's activities.

### American Stores

Until 1995, LePage's's sales of private label tape to American Stores exceeded $1,000,000 annually. According to LePage's, a month after American Stores decided that it would try to maximize 3M's PGF rebate, it shifted its tape business to 3M. In 1995, American Stores decided to stop buying LePage's tape, principally because of quality concerns. In a letter to James Kowieski, Senior Vice President of Sales at LePage's, Kevin Winsauer, the manager of the private label department at American, wrote: "After much deliberation comparing the pros and cons of LePage's *173 program and 3M's program, I have decided to award the business to 3M. 3M's proposal was very competitive and I am sure LePage's would meet their costs to retain the business. *However, the decision to move to 3M is primarily based on Quality*" SJA 2050-51 (emphasis in original). When American Stores decided to purchase from 3M, it was not participating in any rebate programs, and Winsauer testified that he was not aware that there were rebate programs. He also testified that even without the volume incentive programs, 3M's price was still slightly lower than LePage's's.

### Dollar General, CVS, and Sam's Club

LePage's lost Dollar General's private label business to a foreign supplier but later won the business back. According to LePage's's president, Dollar General used the bid for imported tape to leverage a price reduction from LePage's. 3M bid on the CVS account, but LePage's retained CVS as a customer by lowering its prices and increasing its rebate. At Sam's Club, LePage's tape had been selling well when its buyers were directed by senior management to "maximize" all purchases from 3M to maximize the EGF/PGF rebate. Subsequently, Sam's Club stopped purchasing

from LePage's.

### Other distributors and buying groups

LePage's claimed that 3M's pricing practices prevented or hindered it from selling private label tape to certain companies: (1) Costco. Costco, however, never has sold private label tape. (2) Office Depot. Office Depot also never has sold private label tape. LePage's tried to convince Office Depot to buy private label tape in 1991 or 1992 (before 3M implemented the rebate programs), but Office Depot decided to continue purchasing 3M brand tape. (3) Pamida and Venture Stores. LePage's claimed that 3M offered these stores discounts conditioned on exclusivity, thereby preventing LePage's from selling private label tape to them. LePage's lost Venture Stores' business in 1989, five years before 3M provided the discount at issue. (4) Office Buying Groups. 3M offered an optional 0 3% price discount to certain buying groups if they exclusively promoted certain 3M products in their catalogs. If the buying group carried a lower value brand alternative to 3M's main brand (its second line), then the group would receive a lower annual volume rebate. LePage's viewed these kind of contract provisions as a "penalty" that coerced buying group members to purchase tape only from 3M. For example, if a buying group promoted the products of a competitor, it lost rebates for purchases in three categories of products. 3M argues that LePage's could have offered its own discount or rebate but instead refused in one instance to pay the standard promotional fee charged suppliers for inclusion in a catalog.

Notwithstanding the evidence which demonstrates that LePage's lost business for reasons that could not possibly be attributable to any unlawful conduct by 3M, it argues that 3M willfully maintained its monopoly through a "monopoly broth" of anticompetitive and predatory conduct. I would reject LePage's's argument as I agree with 3M that LePage's simply did not establish that 3M's conduct was illegal, as LePage's did not demonstrate that 3M's pricing was below cost (a point that is not in dispute) and, in the absence of such proof, the record does not supply any other basis on which we can uphold the judgment.

There are two elements of a monopolization claim

324 F.3d 141                                                                      Page 28

324 F.3d 141, 2003-1 Trade Cases P 73,989, 61 Fed. R. Evid. Serv. 60
(Cite as: 324 F.3d 141)

under section 2 of the Sherman Act: "(1) the posses-sion of monopoly power in the relevant market and (2) the *174 willful acquisition or maintenance of that power as distinguished from growth or develop-ment as a consequence of a superior product, busi-ness acumen, or historic accident." *United States v. Grinnell Corp.*, 384 U.S. 563, 570-71, 86 S.Ct. 1698, 1704, 16 L.Ed.2d 778 (1966). Willful maintenance involves using anticompetitive conduct to "foreclose competition, to gain a competitive advantage, or to destroy a competitor." *Eastman Kodak Co. v. Image Technical Servs.*, 504 U.S. 451, 482-83, 112 S.Ct. 2072, 2090, 119 L.Ed.2d 265 (1992) (internal quota-tion marks omitted). LePage's contends that 3M's bundled rebates were anticompetitive and predatory. It also argues that 3M's other practices, such as exclu-sionary contracts and the timing of its rebates, were also anticompetitive and predatory. I discuss these claims in the order I have stated them.

LePage's primarily complains of 3M's use of bundled rebates. While, as the majority recognizes, we have held that rebates on volume purchases are lawful, see *Advo, Inc. v. Philadelphia Newspapers, Inc.*, 51 F.3d 1191, 1203 (3d Cir.1995), LePage's seeks to avoid that principle by pointing out that 3M offered higher rebates if customers met their target growth rate in different product categories, in effect linking the sale of private label tape with the sale of other products, such as Scotch tape, which customers had to buy from 3M. Thus, LePage's explains:

> 3M understood that, as a practical matter, every re-tailer in the country had to carry Scotch-brand tape.... It therefore decided to structure its rebates into bundles that linked that product with the product segment in which it did face competition from LePage's (second-line tape).... To increase the leverage on the targeted segment, 3M further linked rebates on transparent tape with those for many other products.... The rival would have to 'compensate' the customer for the amount of rebate it would lose not only on the large volume of Scotch-brand tape it had to buy, but also for rebates on many other products purchased from 3M.

Br. of Appellee at 40.

In making its argument LePage's relies in part on *SmithKline Corp. v. Eli Lilly & Co.*, 575 F.2d 1056

(3d Cir.1978), which, as the majority notes, does not bind this en banc court but nevertheless can have pre-cedential value. In *SmithKline*, Eli Lilly & Co. had two products, Keflin and Keflex, on which it faced no competition, and one product, Kefzol, on which it faced competition from SmithKline's product, Ancef. *See id.* at 1061. Lilly offered a higher rebate of 3% to companies that purchased specified quantities of any three (which, practically speaking, meant combined purchases of Kefzol, Keflin and Keflex) of Lilly's cephalosporin products. *See id.* "Although hospitals were free to purchase SmithKline's Ancef with their Keflin and Keflex orders with Lilly, thus avoiding the penalties of a tie-in sale, [FN1] the practical effect of that decision would be to deny the Ancef purchaser the 3% bonus rebate on all its cephalosporin products." *Id.* at 1061-62 (internal footnote added). Because of Lilly's volume advantage, to offer a rebate of the same net dollar amount as Lilly's, SmithKline would have had to offer *175 companies rebates ran-ging from 16% for average size hospitals to 35% for larger volume hospitals for their purchase of Ancef. *See id.* at 1062.

> FN1. 3M also avoids the penalties of a tie-in sale, because its customers were free to pur-chase its Scotch tape by itself. To prove an illegal tie-in, a plaintiff must establish that the agreement to sell one product was condi-tioned on the purchase of a different or tied product; the seller "has sufficient economic power with respect to the tying product to appreciably restrain free competition in the market for the tied product and a 'not insub-stantial' amount of interstate commerce is affected." *Northern Pac. Ry. Co. v. United States*, 356 U.S. 1, 6, 78 S.Ct. 514, 518, 2 L.Ed.2d 545 (1958).

We concluded that Lilly willfully acquired and main-tained monopoly power by linking products on which it faced no competition (Keflin and Keflex) with a competitive product, resulting in the sale of all three products on a non-competitive basis in what other-wise would have been a competitive market between Ancef and Kefzol. *See id.* at 1065. Moreover, this ar-rangement would force SmithKline to pay rebates on one product equal to rebates paid by Lilly based on

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

324 F.3d 141, 2003-1 Trade Cases P 73,989, 61 Fed. R. Evid. Serv. 60
(Cite as: 324 F.3d 141)

sales volume of three products. *See id.* Expert testimony and the evidence on pricing showed that in the circumstances SmithKline's prospects for continuing in the Ancef market were poor.

LePage's argues that it does not have to show that 3M's package discounts could prevent an equally efficient firm from matching or beating 3M's package discounts. In its brief, LePage's contends that its expert economist explained that 3M's programs and cash payments have the same anticompetitive impact regardless of the cost structure of the rival suppliers or their efficiency relative to that of 3M. *See* Br. of Appellee at 43. LePage's alleges that the relative efficiency or cost structure of the competitor simply affects how long it would take 3M to foreclose the rival from obtaining the volume of business necessary to survive. *See id.* "Competition is harmed just the same by the loss of the only existing competitive constraints on 3M in a market with high entry barriers." *Id.* The district court stated that LePage's introduced substantial evidence that the anticompetitive effects of 3M's rebate program caused its losses. *See LePage's Inc. v. 3M,* No. Civ. A. 97-3983, 2000 WL 280350, at *7-*8 (E.D.Pa. Mar.14, 2000). The majority finds that "3M's conduct was at least as anticompetitive as the conduct which [we] held violated § 2 in SmithKline." Maj. Op. at 157.

I disagree with the majority's use of *SmithKline.* SmithKline *showed* that it could not compete by explaining how much it would have had to lower prices for both small and big customers to do so. SmithKline ascertained the rebates that Lilly was giving to customers on all three products and calculated how much it would have had to lower the price of its product if the rebates were all attributed to the one competitive product. In contrast, LePage's did not even attempt to show that it could not compete by calculating the discount that it would have had to provide in order to match the discounts offered by 3M through its bundled rebates, and thus its brief does not point to evidence along such lines.

While I recognize that it is obvious from the size of 3M's rebates as compared to LePage's's sales that LePage's would have had to make substantial reductions in prices to match the rebates 3M paid to partic-

ular customers, LePage's did not show the amount by which it lowered its prices in actual monetary figures or by percentage to compete with 3M and how its profitability thus was decreased. Rather, LePage's merely maintains, through the use of an expert, that it would have had to cut its prices drastically to compete and thus would have gone out of business. Furthermore, it is critically important to recognize that LePage's had 67% of the private label business at the time of the trial. Thus, notwithstanding 3M's rebates, LePage's was able to retain most of the private label business. In the circumstances, it is ironical that LePage's complains of 3M's use of monopoly power as the undisputed fact is that LePage's, not 3M, was the dominant supplier of private label tape both before and after 3M initiated *176 its rebate programs. Indeed, the record suggests that inasmuch as LePage's could not make a profit with a 67% share of the private label sales, it must have needed to be essentially the exclusive supplier of such tape for its business to be profitable as it in fact was when it had an 88% share of the private label tape sales business.

Although I am not evaluating the expert's method of calculating damages as I would not reach the damages issue, I emphasize that simply pointing to an expert to support the contention that the company would have gone out of business, without providing even the most basic pricing information, is insufficient. "Expert testimony is useful as a guide to interpreting market facts, but it is not a substitute for them." *Brooke Group Ltd. v. Brown & Williamson Tobacco Corp.,* 509 U.S. 209, 242, 113 S.Ct. 2578, 2598, 125 L.Ed.2d 168 (1993); *see also Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 594 n. 19, 106 S.Ct. 1348, 1360 n. 19, 89 L.Ed.2d 538 (1986); *Advo,* 51 F.3d at 1198-99; *Virgin Atlantic Airways Ltd. v. British Airways PLC,* 69 F.Supp.2d 571, 579 (S.D.N.Y.1999) ("[A]n expert's opinion is not a substitute for a plaintiff's obligation to provide evidence of facts that support the applicability of the expert's opinion to the case."), *aff'd,* 257 F.3d 256 (2d Cir.2001). Without such pricing information, it is difficult even to begin to estimate how much of the market share LePage's lost was due to 3M's bundled rebates. In fact, the evidence that I described above conclusively demonstrates that

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

324 F.3d 141    Page 30
324 F.3d 141, 2003-1 Trade Cases P 73,989, 61 Fed. R. Evid. Serv. 60
(Cite as: 324 F.3d 141)

LePage's lost private sale tape business for reasons not related to 3M's rebates. Furthermore, some experts have questioned the validity of attributing all the rebates to the one competitive product in situations such as these. [FN2] I do not need, however, to decide the validity of that method of calculation, as LePage's does not even attempt to meet that less strict test by calculating how much it would have had to lower its prices to match the rebates, even if they all were aggregated and attributed to private label tape. [FN3]

> FN2. One court has mentioned a hypothetical situation where a low-cost shampoo maker could not match a competitor's package discount for shampoo and conditioner even though both products were priced above their respective costs. *See Ortho Diagnostic Sys., Inc. v. Abbott Labs., Inc.,* 920 F.Supp. 455, 467 (S.D.N.Y.1996). In that case, the court suggested that the bundled price could be unlawful under section 2 even though neither item in the package was priced below cost. If the entire package discount were attributed to the one product where the two parties compete, the low-cost shampoo maker could not lower its prices on the product enough to match the total discount without selling below its cost. *See id.* at 467-69. Commentators, however, suggests that this analysis is incorrect. *See* III PHILLIP E. AREEDA & HERBERT HOVENKAMP, ANTITRUST LAW: AN ANALYSIS OF ANTITRUST PRINCIPLES AND THEIR APPLICATION ¶ 749, at 467 n 6 (rev. ed.1996).
> One aspect of this method of calculation worth noting is that the volume of the products ordered has a drastic effect on how much the competitor would have to lower its prices to compete. For example, suppose in a similar rebate program, a company was the only producer of products A and B but faced competition in C. If a customer orders 100 units each of A, B, and C at a price of $1.00 each, a 3% rebate would be $9.00 (3% of the total of $300.00). If the rebate on all three

products were attributed to product C, then the competitor would have to lower its price to $0.91 in order to compete with it. The results would be starkly different, however, if a customer orders 100 units of A and B but only needs 10 units of C. Then the 3% rebate on the total purchase amount of $210.00 would be $6.30. If the rebate was attributed solely to product C, then a competitor would have to lower its price to $.37 on product C in order to match the company's price.

> FN3. The closest LePage's comes to supplying such information in its brief is its statement that "LePage's made repeated efforts to save its tape business with Staples, reducing its prices to 1990 levels, and then reducing them again, to keep its plant open and people working." Br. of Appellee at 11. This is not close enough. Of course, Lepage's's prices overall were low enough for it to have 67% of the private label business.

**\*177** LePage's also has not satisfied the stricter tests devised by other courts considering bundled rebates in situations such as that here. In a case brought by a manufacturer of products used in screening blood supply for viruses, *Ortho Diagnostic Systems, Inc. v. Abbott Laboratories, Inc.,* 920 F.Supp. 455 (S.D.N.Y.1996), the district court held, *inter alia,* that the defendant's discount pricing of products in packages did not violate the Sherman Act. The defendant, Abbott Laboratories, manufactured all five of the commonly used tests to screen the blood supply for viruses. Ortho claimed that Abbott violated sections 1 and 2 of the Sherman Act by contracting with the Council of Community Blood Centers to give those members advantageous pricing if they purchased a package of four or five tests from Abbott, thereby using its monopoly position in some of the tests to foreclose or impair competition by Ortho in the sale of those tests available from both companies. *See id.* at 458. The district court stated that to prevail on a monopolization claim in "a case in which a monopolist (1) faces competition on only part of a complementary group of products, (2) offers the products both as a package and individually, and (3)

324 F.3d 141                                                                                     Page 31
324 F.3d 141, 2003-1 Trade Cases P 73,989, 61 Fed. R. Evid. Serv. 60
(Cite as: 324 F.3d 141)

effectively forces its competitors to absorb the differential between the bundled and unbundled prices of the product in which the monopolist has market power," the plaintiff must allege and prove "either that (a) the monopolist has priced below its average variable cost or (b) the plaintiff is at least as efficient a producer of the competitive product as the defendant, but that the defendant's pricing makes it unprofitable for the plaintiff to continue to produce." *Id.* at 469.

Holding that the discount package pricing did not violate the Sherman Act, the *Ortho* court explained that any other rule would involve too substantial a risk that the antitrust laws would be used to protect an inefficient competitor against price competition that would benefit consumers *See id.* at 469-70 ("The antitrust laws were not intended, and may not be used, to require businesses to price their products at unreasonably high prices (which penalize the consumer) so that less efficient competitors can stay in business.") (internal quotation marks omitted).

In this case, as the majority acknowledges, LePage's now does not contend that 3M priced its products below average variable cost, an allegation which, if made, in any event would be difficult to prove. *See Advo,* 51 F.3d at 1198-99. Moreover, LePage's's economist conceded that LePage's is not as efficient a tape producer as 3M. Thus, in this case <u>section 2</u> of the Sherman Act is being used to protect an inefficient producer from a competitor not using predatory pricing but rather selling above cost. While the majority contends that *Brooke Group,* a case on which 3M heavily relies, is distinguishable as none of the defendants there had a monopoly in the market, the fact remains that the Court in describing <u>section 2</u> of the Sherman Act said flat out in *Brooke Group* that "a plaintiff seeking to establish competitive injury from a rival's low prices must prove that the prices complained of are below an appropriate measure of its rival's costs." *Brooke Group,* 509 U.S. at 222, 113 S.Ct. at 2587. LePage's simply did not do this.

I realize that the majority indicates that "LePage's unlike the plaintiff in *Brooke Group.* does not make a predatory pricing *178 claim." Maj. Op. at 151. But that circumstance weakens rather than strengthens

LePage's's position as it merely confirms the lawfulness of 3M's conduct. Furthermore, the circumstance that 3M is not dealing in an oligopolistic market should not matter as the harm that LePage's claims to have suffered from the bundled rebates would be no less if inflicted by multiple competitors. Moreover, monopolist or not, 3M, even in the absence of LePage's and Tesa from the private label business, would not be the only supplier of private label tape for there are foreign suppliers as is demonstrated plainly by the evidence that both Walgreens and Dollar General dealt with such suppliers.

Contrary to the majority's view, this is not a situation in which there is no business justification for 3M's actions. This point is important inasmuch as it is difficult to distinguish legitimate competition from exclusionary conduct that harms competition, *see United States v. Microsoft Corp.,* 253 F.3d 34, 58 (D.C.Cir.), *cert. denied,* 534 U.S. 952, 122 S.Ct. 350, 151 L.Ed.2d 264 (2001), and some cases suggest that when a company acts against its economic interests and there is no valid business justification for its actions, then it is a good sign that its acts were intended to eliminate competition.

For example, *Aspen Skiing Co. v. Aspen Highlands Skiing Corp.,* 472 U.S. 585, 608, 105 S.Ct. 2847, 2860, 86 L.Ed.2d 467 (1985), discussed by the majority, sets forth the lack of a valid business reason as a basis for finding liability. In that case, the Court affirmed a jury verdict for the plaintiff under <u>section 2</u> of the Sherman Act where the defendant monopolist had stopped cooperating with the plaintiff to offer a multi-venue skiing package for Aspen skiers. The Court held that because the defendant had acted contrary to its economic interests, by losing business and customers, there was no other rationale for its conduct except that it wished to eliminate the plaintiff as a competitor. *See id.* at 608, 105 S.Ct. at 2860; *see also Eastman Kodak,* 504 U.S. at 483, 112 S.Ct. at 2091 (exclusionary conduct properly is condemned if valid business reasons do not justify conduct that tends to impair the opportunities of a monopolist's rivals or if a valid asserted purpose would be served fully by less restrictive means).

On the other hand, in *Concord Boat Corp. v. Brun-*

324 F.3d 141, 2003-1 Trade Cases P 73,989, 61 Fed. R. Evid. Serv. 60
**(Cite as: 324 F.3d 141)**

_swick Corp.,_ 207 F.3d 1039, 1043, 1063 (8th Cir.), _cert. denied,_ 531 U.S. 979, 121 S.Ct. 428, 148 L.Ed.2d 436 (2000), where boat builders brought an antitrust action against a stern drive engine manufacturer, the court held, _inter alia,_ that the evidence was insufficient to find that the engine manufacturer's discount programs restrained trade and monopolized the market. Brunswick offered a higher percentage discount when boat builders bought a higher percentage of their engines from it, but there was no allegation that its pricing was below cost. _See id._ at 1044, 1062. In _Concord Boat_ the district court cited the district court opinion in this case when 3M filed its motion to dismiss. _See LePage's Inc. v. 3M,_ No. Civ. A. 97-3983, 1997 WL 734005 (E.D.Pa., Nov.14, 1997). The _Concord Boat_ district court agreed with the plaintiff that it was not the price (above cost or not) that was relevant but the "strings" attached to the price and that the district court here was correct to distinguish _Brooke Group_ since there were no "strings" attached (bundled rebates) in _Brooke Group._ In _Concord Boat,_ the "strings" attached were the exclusivity provisions. _See Concord Boat Corp. v. Brunswick Corp.,_ 21 F.Supp.2d 923, 930 (E.D.Ark.1998).

The Court of Appeals for the Eighth Circuit, however, disagreed with the district *179 court in _Concord Boat._ The court of appeals opinion reflected an application of _Brooke Group's_ strong stance favoring vigorous price competition and expressing skepticism of the ability of a court to separate anticompetitive from procompetitive actions when it comes to above-cost strategic pricing. _See Concord Boat,_ 207 F.3d at 1061. More importantly, the court perceived that _Brooke Group_ should be considered even with claims based on pricing with strings. _See id._ "If a firm has discounted prices to a level that remains above the firm's average variable cost, the plaintiff must overcome a strong presumption of legality by showing other factors indicating that the price charged is anticompetitive." _Id._ (citing _Morgan v. Ponder,_ 892 F.2d 1355, 1360 (8th Cir.1989)) (internal quotation marks omitted). The court stated that a <u>section 2</u> defendant's proffered business justification is the most important factor in determining whether its challenged conduct is not competition on the merits. _See_

_id._ at 1062. The court distinguished cases such as _SmithKline_ and _Ortho_ where products were bundled since they involved two markets. _See id._ Of course, here we are dealing with a single market.

Unlike the situation of the defendant in _Aspen,_ 3M's pricing structure and bundled rebates were not contrary to its economic interests, as they likely increased its sales. In fact, that is exactly what LePage's is complaining about. Furthermore, other than the obvious reasons such as increasing bulk sales, market share and customer loyalty, there are several other potential "procompetitive" or valid business reasons for 3M's pricing structure and bundled rebates: efficiency in having single invoices, single shipments and uniform pricing programs for various products. Moreover, the record demonstrates that, with the biggest customers, 3M's rebates were not eliminating the competitive process, as LePage's still was able to retain some customers through negotiation, and even though it lost other customers, the losses were attributable to their switching to foreign suppliers or changing suppliers because of quality or service without regard to the rebates. Furthermore, overall LePage's was quite successful in holding its share of the private label sales as it had 67% of the business at the time of the trial.

In sum, I conclude that as a matter of law 3M did not violate <u>section 2</u> of the Sherman Act by reason of its bundled rebates even though its practices harmed its competitors. The majority decision which upholds the contrary verdict risks curtailing price competition and a method of pricing beneficial to customers because the bundled rebates effectively lowered their costs. I regard this result as a significant mistake which cannot be justified by a fear that somehow 3M will raise prices unreasonably later. In this regard I reiterate that in addition to LePage's there are foreign suppliers of transparent tape so that with or without LePage's there will be constraints on 3M's pricing.

LePage's also claims that, through a variety of other allegedly anticompetitive actions, 3M prevented LePage's from competing. LePage's asserts that 3M foreclosed competition by directly purchasing sole-supplier status. There was some dispute as to whether the contracts were conditioned on 3M being the sole

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

324 F.3d 141
324 F.3d 141, 2003-1 Trade Cases P 73,989, 61 Fed. R. Evid. Serv. 60
**(Cite as: 324 F.3d 141)**

Page 33

supplier, and 3M claims that there are only two customers for which there is any evidence of a sole supplier agreement. I recognize, however, that although most of 3M's contracts with customers were not conditioned on exclusivity, practically speaking some customers dropped LePage's as a supplier to maximize the rebates that 3M was offering. Moreover, **\*180**_United Shoe Machinery Corp. v. United States,_ 258 U.S. 451, 458, 42 S.Ct. 363, 365, 66 L.Ed. 708 (1922), explained that a contract that does not contain specific agreements not to use the products of a competitor still will come within the Clayton Act as to exclusivity if its practical effect is to prevent such use.

Even assuming, however, that 3M did have exclusive contracts with some of the customers, LePage's has not demonstrated that 3M acted illegally, as one-year exclusive contracts have been held to be reasonable and not unduly restrictive. _See Fed. Trade Comm'n v. Motion Picture Adver. Serv. Co.,_ 344 U.S. 392, 395-96, 73 S.Ct. 361, 363-64, 97 L.Ed. 426 (1953) (holding that evidence sustained the Commission's finding that the distributor's exclusive screening agreements with theater operators unreasonably restrained competition, but stating that the Commission had found that the term of one-year exclusive contracts had become a standard practice and would not be an undue restraint on competition). _See also Advo,_ 51 F.3d at 1204. In _Tampa Electric Co. v. Nashville Coal Co.,_ 365 U.S. 320, 327, 81 S.Ct. 623, 627-28, 5 L.Ed.2d 580 (1961), the Court stated that even if in practical application a contract is found to be an exclusive-dealing arrangement, it does not violate section 3 of the Clayton Act unless the court believes it probable that performance of the contract will foreclose competition in a substantial share of the line of commerce affected. Using that standard, although LePage's market share in private label tape has fallen from 88% to 67%, it has not been established that, as a result of the allegedly exclusive contracts, competition was foreclosed in a substantial share of the line of commerce affected. Indeed, in view of LePage's two-thirds share of the private label business, its attack on exclusivity agreements is attenuated.

There appear to be very few cases supporting liability

based on section 2 of the Sherman Act for exclusive dealing, as some cases suggest that if, as is the case here under the jury's findings, there is no liability under section 3 of the Clayton Act, it is more difficult to find liability under the Sherman Act since its scope is more restricted. [FN4] In any event, the record shows only two allegedly exclusive contracts (with the Venture and Pamida stores), and "[b]ecause an exclusive deal affecting a small fraction of a market clearly cannot have the requisite harmful effect upon competition, the requirement of a significant degree of foreclosure serves a useful screening function." _Microsoft,_ 253 F.3d at 69. The _Microsoft_ court explained that although exclusive contracts are commonplace, particularly in the field of distribution, in certain circumstances the use of exclusive contracts may give rise to a section 2 violation even though the contracts foreclose less than the roughly 40 to 50% share usually required to establish a section 1 violation. _See id._ at 69-70. In this case, it cannot be concluded that the two contracts with Venture and Pamida were responsible for the total drop in LePage's's market share. Furthermore, even if all 3M's contracts were considered exclusive, LePage's's total drop in market share was only 21%, and some of this loss was shown in the record to be due to quality or service consistency concerns, as well as foreign competition, rather than to 3M's tactics. Therefore, there was not enough foreclosure of the market to have an anticompetitive effect.

> FN4. It is more common for charges of exclusive dealing to be brought under section 1 of the Sherman Act or the Clayton Act, which the jury found that 3M did not violate. _See, e.g., Barr Labs., Inc. v. Abbott Labs.,_ 978 F.2d 98, 110 (3d Cir.1992).

LePage's also claims that by calculating the rebates only once a year, 3M made it **\*181** more difficult for a purchaser to pass on the savings to its customers, thereby making it harder for companies to switch suppliers and keeping retail prices and margins high. As I discussed above, one-year contracts may be considered standard, and even if they make it more unlikely that rebates are passed on in the form of lower retail prices, the discounts could be applied towards lowering retail prices the following year or towards

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

324 F.3d 141                                                                                                    Page 34
324 F.3d 141, 2003-1 Trade Cases P 73,989, 61 Fed. R. Evid. Serv. 60
**(Cite as: 324 F.3d 141)**

other costs by companies that are factored into the retail prices (such as advertising). In the circumstances, I am satisfied that this conduct does not qualify as predatory or anticompetitive so as to establish liability under section 2 of the Sherman Act.

LePage's also alleges that 3M entered the retail private label tape portion of the market to destroy the market and thereby increase its sales of branded tape, but the case law does not support liability under section 2 for this type of action. In Brooke Group, 509 U.S. at 215, 113 S.Ct. at 2584, Liggett/Brooke Group alleged that Brown & Williamson Tobacco Corporation ("B & W") sold generic cigarettes in order to decrease losses of sales in its branded cigarettes. B & W sold generic cigarettes at the same list price as Liggett but also offered large volume rebates to certain wholesalers so they would buy their generic cigarettes from B & W. See id. at 216, 113 S.Ct. at 2584. B & W wanted to take a larger part of the generic market from Liggett and drive Liggett to raise prices on generic cigarettes, which B & W would match, thereby encouraging consumers to switch back to branded cigarettes. See id. at 216- 17, 113 S.Ct. at 2584. The Court held that because B & W had no reasonable prospect of recouping its predatory losses and could not inflict the injury to competition that antitrust laws prohibit, it did not violate the Robinson-Patman Act or the Sherman Act. See id. at 243, 113 S.Ct. at 2598. In this case, however, 3M did not use below average variable cost pricing (LePage's does not charge predatory pricing) and therefore 3M did not have predatory costs to recoup.

I recognize that LePage's attempts to distinguish Brooke Group on the ground that "3M used other techniques [i.e., techniques other than predatory pricing] to extinguish the private-label category subjecting itself to different legal standards," Br of Appellee at 55, but I nevertheless cannot accept LePage's's argument on this point. While LePage's does not contend that 3M engaged in predatory pricing, it does contend that the goal of 3M's other conduct was "to extinguish the private-label category, subjecting itself to different legal standards" than those applicable in Brooke Group See id. Moreover, though 3M denies that it was attempting to eliminate the private label category of transparent tape, the record supports a finding that it had that intent. I am satisfied, however, that its efforts to eliminate the private label aspect of the transparent tape market are not unlawful as, "examined without reference to its effects on competitors," it is evident that in view of 3M's dominance in brand tape, that it was rational for it to want the sale of tape to be concentrated in that category of the market. See Stearns Airport Equip. Co. v. FMC Corp., 170 F.3d 518, 523 (5th Cir.1999). Thus, we should not uphold the verdict on that basis.

Accordingly, I conclude that 3M's actions in the record, including the bundled rebates and other elements of the "monopoly broth," were not anticompetitive and predatory as to violate section 2 of the Sherman Act. [FN5] Thus, I would reverse the **182** judgment of the district court and remand the case for entry of judgment in favor of 3M. Judge Scirica and Judge Alito join in this opinion.

> FN5. While I do not discuss the point I agree with the district court's disposition of the attempted maintenance of monopoly claim.

324 F.3d 141, 2003-1 Trade Cases P 73,989, 61 Fed. R. Evid. Serv. 60

**Briefs and Other Related Documents (Back to top)**

• 2002 WL 32157026 (Appellate Brief) Brief for Appellees/Cross-Appellants (Jan. 14, 2002)

• 2001 WL 34774659 (Appellate Brief) Reply Brief for Appelledes Cross-Appellants (Apr. 10, 2001)Original Image of this Document (PDF)

• 2001 WL 34774660 (Appellate Brief) Brief for Appellees Cross-Appellants (Apr. 02, 2001)Original Image of this Document with Appendix (PDF)

• 2001 WL 34136386 (Appellate Brief) Brief of Appellant/Cross-Appellee (Mar. 30, 2001)

• 2001 WL 34774661 (Appellate Brief) Brief of Appellant/Cross-Appellee (Mar. 30, 2001)Original Image of this Document with Appendix (PDF)

• 00-1473 (Docket) (May. 10, 2000)

• 00-1368 (Docket) (Apr. 28, 2000)

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works

324 F.3d 141

324 F.3d 141, 2003-1 Trade Cases P 73,989, 61 Fed. R. Evid. Serv. 60
**(Cite as: 324 F.3d 141)**


END OF DOCUMENT

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

# EXHIBIT 9

Westlaw.

135 F.3d 389                                                                          Page 1
135 F.3d 389, 39 Fed.R.Serv.3d 1376
**(Cite as: 135 F.3d 389)**

▷

Briefs and Other Related Documents

United States Court of Appeals,
Sixth Circuit.
William C. LEWIS, Plaintiff-Appellant,
v.
ACB BUSINESS SERVICES, INC., Defendant-Ap-
pellee (96-3093/3498),
American Express Travel Related Services Company,
Inc.; James P. Connors,
Defendants-Appellees (96-3498).
**Nos. 96-3093, 96-3498.**

Argued Jan. 28, 1997.
Decided Jan. 30, 1998.

Debtor brought action against debt collector, alleging
violations of Fair Debt Collection Practices Act
(FDCPA) and Ohio Consumer Sales Practices Act
(OCSPA). Following jury trial, the United States
District Court for the Southern District of Ohio, Mi-
chael R. Merz, United States Magistrate Judge, 911
F.Supp. 290, granted debt collector's motion for judg-
ment as a matter of law. After creditor sued debtor
in state court to recover unpaid balance, debtor filed
second action alleging that creditor, debt collector,
and attorney filed state action in retaliation, in viola-
tion of FDCPA, OCSPA, and Equal Credit Opportun-
ity Act (ECOA). Creditor and debt collector moved
to dismiss, and attorney moved to strike complaint
against him. The District Court, S. Arthur Spiegel,
J., granted motions, treating attorney's motion as one
for summary judgment. Debtor appealed judgments
in both cases. The Court of Appeals, Boggs, Circuit
Judge, held that: (1) letter that debt collector sent to
debtor after he had exercised statutory right to de-
mand cessation of communications was permissible
communication; (2) debt collector's use of pseud-
onym on letter sent to debtor did not violate FDCPA;
(3) debt collector established bona fide error defense
to debtor's FDCPA claim based on telephone contact
which occurred after debtor exercised right to de-
mand that collection communications cease; (4) debt-
or failed to state retaliation claim under ECOA based

on creditor's act in suing to collect undisputed debt;
(5) creditor's conduct in suing debtor in state court to
collect outstanding debt did not violate FDCPA; and
(6) creditor was not "supplier" within meaning of
OCSPA.

Affirmed.

Ryan, Circuit Judge, dissented and filed a separate
opinion.

West Headnotes

**[1] Federal Courts** ⟲⟹776
170Bk776 Most Cited Cases
Motions for judgment as a matter of law are reviewed
de novo.

**[2] Federal Courts** ⟲⟹764
170Bk764 Most Cited Cases

**[2] Federal Courts** ⟲⟹765
170Bk765 Most Cited Cases

**[2] Federal Courts** ⟲⟹798
170Bk798 Most Cited Cases

**[2] Federal Courts** ⟲⟹801
170Bk801 Most Cited Cases
On review of grant of motion for judgment as a mat-
ter of law, Court of Appeals does not weigh evidence,
evaluate credibility of witnesses, or substitute its own
judgment for that of jury; rather, court must view
evidence in light most favorable to nonmoving party
and give that party benefit of all reasonable infer-
ences.

**[3] Federal Courts** ⟲⟹764
170Bk764 Most Cited Cases

**[3] Federal Courts** ⟲⟹765
170Bk765 Most Cited Cases
On review of grant of motion for judgment as a mat-
ter of law, Court of Appeals must affirm district court
if it is convinced that there is complete absence of
pleading or proof on issue or issues material to cause
of action or when there are no controverted issues of
fact upon which reasonable men could differ.

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

135 F.3d 389                                                                                    Page 2
135 F.3d 389, 39 Fed.R.Serv.3d 1376
**(Cite as: 135 F.3d 389)**

**[4] Antitrust and Trade Regulation ☞214**
29Tk214 Most Cited Cases
     (Formerly 92Hk10 Consumer Protection)
Letter that debt collector sent to debtor who had exer-
cised statutory right to demand cessation of commu-
nications, giving debtor opportunity to pay debt
through various payment plans, was permissible com-
munication under provision of Fair Debt Collection
Practices Act (FDCPA) permitting debt collector to
notify debtor of collector's right to invoke specified
remedies, inasmuch as letter was properly construed
as type of settlement offer and debt collector nor-
mally invoked such remedy. Consumer Credit Protec-
tion Act, § 805(c)(2), as amended, 15 U.S.C.A. §
1692c(c)(2).

**[5] Antitrust and Trade Regulation ☞214**
29Tk214 Most Cited Cases
     (Formerly 92Hk3 Consumer Protection)

**[5] Antitrust and Trade Regulation ☞215**
29Tk215 Most Cited Cases
     (Formerly 92Hk3 Consumer Protection)
Fair Debt Collection Practices Act (FDCPA) is inten-
ded to eliminate unfair debt-collection practices, such
as late-night telephone calls, false representations,
and embarrassing communications. Consumer Credit
Protection Act, § 802 et seq., as amended, 15
U.S.C.A. § 1692 et seq.

**[6] Statutes ☞219(6.1)**
361k219(6.1) Most Cited Cases
Federal Trade Commission (FTC) advisory opinions
regarding Fair Debt Collection Practices Act
(FDCPA) are entitled to deference only to the extent
that their logic is persuasive. Consumer Credit Pro-
tection Act, § 802 et seq., as amended, 15 U.S.C.A. §
1692 et seq.

**[7] Antitrust and Trade Regulation ☞214**
29Tk214 Most Cited Cases
     (Formerly 92Hk10 Consumer Protection)
Letter which notified debtor who had demanded debt
collector to cease communications of debt collector's
right to invoke specified remedies was not trans-
formed into unlawful demand for payment due to
statement, at bottom of letter, that it was attempt to
collect debt; statement was required by version of

Fair Debt Collection Practices Act (FDCPA) then in
effect. Consumer Credit Protection Act, § 805(c)(2),
as amended, 15 U.S.C.A. § 1692c(c)(2); § 807(11),
as amended, 15 U.S.C.(1994 Ed.) § 1692e(11).

**[8] Antitrust and Trade Regulation ☞214**
29Tk214 Most Cited Cases
     (Formerly 92Hk10 Consumer Protection)
Debt collector's use of pseudonym on letter sent to
debtor did not violate provision of Fair Debt Collec-
tion Practices Act (FDCPA) proscribing use of false
representation or deceptive means to collect debt or
obtain information concerning consumer, even
though pseudonym was not assigned to particular in-
dividual and was used to alert employees to status of
account; debtor suffered no harm or prejudice as res-
ult of pseudonym's use, and only one notified of ac-
count status was debt collector, which was already
aware of it. Consumer Credit Protection Act, §
807(10), as amended, 15 U.S.C.A. § 1692e(10).

**[9] Antitrust and Trade Regulation ☞214**
29Tk214 Most Cited Cases
     (Formerly 92Hk10 Consumer Protection)
In determining whether debt collector's practice is de-
ceptive within meaning of Fair Debt Collection Prac-
tices Act (FDCPA), courts apply objective test based
on understanding of least sophisticated consumer.
Consumer Credit Protection Act, § 802 et seq., as
amended, 15 U.S.C.A. § 1692 et seq.

**[10] Antitrust and Trade Regulation ☞216**
29Tk216 Most Cited Cases
     (Formerly 92Hk10 Consumer Protection)
Debt collector established bona fide error defense to
debtor's Fair Debt Collection Practices Act (FDCPA)
claim based on telephone contact from debt collector
which occurred after debtor exercised right to de-
mand that collection communications cease; contact
resulted from coding error by creditor in returning
file to debt collector which made it appear that ac-
count was new, debt collector's manual and computer
systems were reasonably adapted to avoid such er-
rors, and error was corrected in time to prevent mail-
ing of related computer-generated letter. Consumer
Credit Protection Act, §§ 805, 813(c), as amended,
15 U.S.C.A. §§ 1692c, 1692k(c).

135 F.3d 389                                                                                          Page 3
135 F.3d 389, 39 Fed.R.Serv.3d 1376
(Cite as: 135 F.3d 389)

**[11] Antitrust and Trade Regulation ☞216**
29Tk216 Most Cited Cases
(Formerly 92Hk10 Consumer Protection)
To establish entitlement to bona fide error defense to Fair Debt Collection Practices Act (FDCPA) violation, debt collector must only show that violation was unintentional, not that communication itself was unintentional. Consumer Credit Protection Act, § 813(c), as amended, 15 U.S.C.A. § 1692k(c).

**[12] Federal Civil Procedure ☞1272.1**
170Ak1272.1 Most Cited Cases
Scope of discovery is within broad discretion of trial court.

**[13] Federal Courts ☞820**
170Bk820 Most Cited Cases

**[13] Federal Courts ☞891**
170Bk891 Most Cited Cases
Order denying further discovery will be grounds for reversal only if it was abuse of discretion resulting in substantial prejudice.

**[14] Federal Civil Procedure ☞1272.1**
170Ak1272.1 Most Cited Cases
**[14] Federal Civil Procedure ☞1401**
170Ak1401 Most Cited Cases
Scope of examination permitted under rule governing discovery is broader than that permitted at trial; test is whether line of interrogation is reasonably calculated to lead to discovery of admissible evidence. Fed.Rules Civ.Proc.Rule 26(b), 28 U.S.C.A.

**[15] Federal Civil Procedure ☞1272.1**
170Ak1272.1 Most Cited Cases
It is proper to deny discovery of matter that is relevant only to claims or defenses that have been stricken, or to events that occurred before applicable limitations period, unless information sought is otherwise relevant to issues in case. Fed.Rules Civ.Proc.Rule 26(b), 28 U.S.C.A.

**[16] Federal Civil Procedure ☞1587**
170Ak1587 Most Cited Cases
Denial of credit card debtor's motion to compel debt collector to produce remainder of contract between itself and creditor was not abuse of discretion with regard to debtor's claim that contract could have been used to show that debt collector could not collect debts from supplemental cardholders, when claim that debt collector violated Fair Debt Collection Practices Act (FDCPA) by trying to contact supplemental cardholder was dismissed as being outside pleadings, and district court found claim had not been tried by consent and was barred by statute of limitations. Consumer Credit Protection Act, § 802 et seq., as amended, 15 U.S.C.A. § 1692 et seq.

**[17] Federal Civil Procedure ☞1587**
170Ak1587 Most Cited Cases
Debtor was not entitled to discovery of contract between creditor and debt collector in action against debt collector for alleged violations of Fair Debt Collection Practices Act (FDCPA) and Ohio Consumer Sales Practices Act (OCSPA), given that debtor did not dispute existence of debt and debt collector did not dispute that it sent letter at issue, and therefore questions of whether letter was sent pursuant to contract or whether debt collector acted outside terms of contract were not relevant to issue of whether its actions constituted violations. Consumer Credit Protection Act, § 802 et seq., as amended, 15 U.S.C.A. § 1692 et seq.; Ohio R.C. § 1345.01 et seq.

**[18] Antitrust and Trade Regulation ☞365**
29Tk365 Most Cited Cases
(Formerly 92Hk40 Consumer Protection)
District court's opinion provided sufficient findings of fact and conclusions of law to support its decision that debt collector did not violate Ohio Consumer Sales Practices Act (OCSPA) when court fully detailed alleged violations of both OCSPA and Fair Debt Collection Practices Act (FDCPA), debtor did not put on additional evidence relevant to OCSPA claims, and court fully detailed reasons for rejecting FDCPA claims. Consumer Credit Protection Act, § 802 et seq., as amended, 15 U.S.C.A. § 1692 et seq.; Ohio R.C. §§ 1345.02(A), 1345.03(A).

**[19] Antitrust and Trade Regulation ☞353**
29Tk353 Most Cited Cases
(Formerly 92Hk37 Consumer Protection)
Statute of limitations for Fair Debt Collection Practices Act (FDCPA) claims is one year. Consumer Credit Protection Act, § 802 et seq., as amended, 15 U.S.C.A. § 1692 et seq.

**[20] Antitrust and Trade Regulation ☞369**

135 F.3d 389                                                                    Page 4
135 F.3d 389, 39 Fed.R.Serv.3d 1376
**(Cite as: 135 F.3d 389)**

29Tk369 Most Cited Cases
    (Formerly 92Hk39 Consumer Protection)
Debtor failed to show that debt collector was exposed
to treble actual damages or $200 statutory damages
pursuant to provision of Ohio Consumer Sales Prac-
tices Act (OCSPA) granting such damages for viola-
tions comparable to specific acts and practices previ-
ously determined to have violated OCSPA; debtor
improperly read cases upon which he relied too
broadly and without reference to specific acts com-
mitted in those cases. Ohio R.C. § 1345.09(B).

**[21] Federal Courts ☞776**
170Bk776 Most Cited Cases

**[21] Federal Courts ☞794**
170Bk794 Most Cited Cases
Dismissal of complaint for failure to state claim is
subject to de novo review and all factual allegations
are taken as true. Fed.Rules Civ.Proc.Rule 12(b)(6),
28 U.S.C.A.

**[22] Federal Civil Procedure ☞1773**
170Ak1773 Most Cited Cases
Complaint should not be dismissed for failure to state
claim unless it appears beyond doubt that plaintiff
can prove no set of facts in support of his claim
which would entitle him to relief. Fed.Rules
Civ.Proc.Rule 12(b)(6), 28 U.S.C.A.

**[23] Federal Civil Procedure ☞623**
170Ak623 Most Cited Cases
Fundamental purpose of pleadings under federal pro-
cedural rules is to give adequate notice to parties of
each side's claims and to allow cases to be decided on
merits after adequate development of facts. Fed.Rules
Civ.Proc.Rule 12(b)(6), 28 U.S.C.A.

**[24] Federal Civil Procedure ☞1835**
170Ak1835 Most Cited Cases
Only well-pleaded facts must be taken as true in de-
ciding motion to dismiss for failure to state claim; tri-
al court need not accept as true legal conclusions or
unwarranted factual inferences. Fed.Rules
Civ.Proc.Rule 12(b)(6), 28 U.S.C.A.

**[25] Federal Courts ☞794**
170Bk794 Most Cited Cases
Admonishment to construe liberally plaintiff's claim

when evaluating dismissal for failure to state claim
does not relieve plaintiff of his obligation to satisfy
federal notice pleading requirements and allege more
than bare assertions of legal conclusions. Fed.Rules
Civ.Proc.Rule 12(b)(6), 28 U.S.C.A.

**[26] Federal Civil Procedure ☞673**
170Ak673 Most Cited Cases
Complaint must contain either direct or inferential al-
legations respecting all material elements to sustain
recovery under some viable legal theory.

**[27] Consumer Credit ☞31**
92Bk31 Most Cited Cases
Violation of Equal Credit Opportunity Act (ECOA)
cannot be shown by simply alleging that creditor is
attempting to collect on debt. Consumer Credit Pro-
tection Act, § 701(a)(3), as amended, 15 U.S.C.A. §
1691(a)(3).

**[28] Consumer Credit ☞31**
92Bk31 Most Cited Cases
Consistent with burden allocation framework used in
retaliation-based employment claims, to make out
prima facie case of retaliation under Equal Credit Op-
portunity Act (ECOA), debtor had to allege facts suf-
ficient to show that (1) he engaged in statutorily pro-
tected activity, (2) suffered adverse credit action, and
(3) causal connection existed between two. Consumer
Credit Protection Act, § 701(a)(3), as amended, 15
U.S.C.A. § 1691(a)(3).

**[29] Consumer Credit ☞31**
92Bk31 Most Cited Cases
Debtor failed to state retaliation claim under Equal
Credit Opportunity Act (ECOA) based on creditor's
act in suing to collect undisputed debt after debtor as-
serted Fair Debt Collection Practices Act (FDCPA)
action against debt collector acting on creditor's be-
half; debtor did not suffer requisite adverse action,
given that ECOA did not cover actions taken in con-
nection with account in default or delinquency, nor
did he establish required causal connection between
his action and creditor's action. Consumer Credit Pro-
tection Act, §§ 701(a)(3), (d)(6), 802 et seq., as
amended, 15 U.S.C.A. §§ 1691(a)(3), (d)(6), 1692 et
seq.; 12 C.F.R. § 202.2(c)(2)(ii).

135 F.3d 389                                                    Page 5
135 F.3d 389, 39 Fed.R.Serv.3d 1376
**(Cite as: 135 F.3d 389)**

**[30] Consumer Credit** ⟲➞**31**
92Bk31 Most Cited Cases
Attorney who represented creditor and debt collector
acting on creditor's behalf was not "creditor" within
meaning of Equal Credit Opportunity Act (ECOA)
for purposes of debtor's retaliation claim, given ab-
sence of facts showing that attorney was creditor's as-
signee or that he regularly extended, renewed, or con-
tinued credit or regularly arranged for extension, re-
newal, or continuation of credit. Consumer Credit
Protection Act, §§ 701(a)(3), 702(e), as amended, 15
U.S.C.A. §§ 1691a(3), 1691a(e); 12 C.F.R. §§
202.2(*l*), 202.4, 202.5(a)

**[31] Consumer Credit** ⟲➞**31**
92Bk31 Most Cited Cases
Debt collector was not "creditor" within meaning of
Equal Credit Opportunity Act, for purposes of debt-
or's retaliation claim, given absence of evidence that
debt collector regularly extended, renewed, or contin-
ued credit or participated in any way in decision to
extend credit; rather, the record showed that debt col-
lector was simply attempting to collect on debt that
resulted from creditor's decision to extend credit.
Consumer Credit Protection Act, §§ 701(a)(3),
702(e), as amended, 15 U.S.C.A. §§ 1691(a)(3),
1691a(e); 12 C.F.R. §§ 202.2(*l*), 202.4, 202.5(a)

**[32] Consumer Credit** ⟲➞**31**
92Bk31 Most Cited Cases
Even if debt collector were "creditor" under Equal
Credit Opportunity Act (ECOA), debtor's retaliation
claim against debt collector based on debt collection
action brought by credit card company would fail,
inasmuch as debtor did not state claim that debt col-
lector independently violated ECOA and failed to
state ECOA claim against credit card company,
thereby defeating any claim against debt collector as
company's agent, assignee, transferee, or subrogee.
Consumer Credit Protection Act, § 701(a)(3), as
amended, 15 U.S.C.A. § 1691(a)(3)

**[33] Federal Civil Procedure** ⟲➞**2553**
170Ak2553 Most Cited Cases
Denial of debtor's motion for additional time to con-
duct discovery for purposes of opposing summary
judgment motion filed by creditor's attorney in debt-
or's Fair Debt Collection Practices Act (FDCPA) ac-

tion was not abuse of discretion, when attorney's affi-
davit demonstrated that he was not "debt collector"
under FDCPA, debtor had had ample time to conduct
discovery with regard to attorney's practice, debtor
was given additional time to respond to summary
judgment motion, and motion for additional discov-
ery and supporting affidavit provided nothing more
than bare allegations to support claim that defendants
and their witnesses were in exclusive control of evid-
ence at issue. Fed.Rules Civ.Proc.Rule 56(f), 28
U.S.C.A.

**[34] Federal Civil Procedure** ⟲➞**2553**
170Ak2553 Most Cited Cases
Party opposing summary judgment has no absolute
right to additional time for discovery. Fed.Rules
Civ.Proc.Rule 56(f), 28 U.S.C.A.

**[35] Federal Courts** ⟲➞**820**
170Bk820 Most Cited Cases
Court of Appeals reviews for abuse of discretion
denial of motion for additional time for discovery
filed by party opposing summary judgment.
Fed.Rules Civ.Proc.Rule 56(f), 28 U.S.C.A.

**[36] Federal Civil Procedure** ⟲➞**2553**
170Ak2553 Most Cited Cases
Rule permitting party opposing summary judgment to
seek additional time for discovery is not shield that
can be raised to block motion for summary judgment
without even slightest showing by movant that his
opposition is meritorious; movant must show how
postponement of ruling on summary judgment mo-
tion will enable him to rebut that motion. Fed.Rules
Civ.Proc.Rule 56(f), 28 U.S.C.A.

**[37] Antitrust and Trade Regulation** ⟲➞**212**
29Tk212 Most Cited Cases
    (Formerly 92Hk10 Consumer Protection)

**[37] Federal Civil Procedure** ⟲➞**2494.5**
170Ak2494.5 Most Cited Cases
    (Formerly 170Ak2481)
Attorney's summary judgment affidavit established
that he was not "debt collector" under Fair Debt Col-
lection Practices Act (FDCPA); affidavit showed that
overwhelming portion of attorney's practice consisted
of serving as defense attorney and that attorney had
never brought action exclusively on behalf of creditor

135 F 3d 389
135 F 3d 389, 39 Fed R Serv 3d 1376
(Cite as: 135 F.3d 389)

to collect consumer debt or engaged in practice consisting of debt collection. Consumer Credit Protection Act, § 802 et seq., as amended, 15 U.S.C.A. § 1692 et seq

**[38] Attorney and Client** ⟜11(2.1)
45k11(2.1) Most Cited Cases
Debtor failed to establish claim that debt collector engaged in unauthorized practice of law, based on allegations that debt collector hired attorney on creditor's behalf in connection with state court debt collection action, thereby improperly interposing itself between creditor and attorney, given absence of evidence that debt collector hired attorney and of allegations that debt collector, not creditor, was responsible for paying attorney's fees.

**[39] Antitrust and Trade Regulation** ⟜212
29Tk212 Most Cited Cases
(Formerly 92Hk10 Consumer Protection)
Creditor which was primarily in business of extending credit and which never attempted to collect debt under assumed name was not "debt collector" for purposes of Fair Debt Collection Practices Act (FDCPA), notwithstanding that it used interstate commerce and mails to collect debts. Consumer Credit Protection Act, § 803(6), as amended, 15 U.S.C.A. § 1692a(6)

**[40] Antitrust and Trade Regulation** ⟜213
29Tk213 Most Cited Cases
(Formerly 92Hk10 Consumer Protection)
Even assuming that creditor was debt collector for purposes of Fair Debt Collection Practices Act (FDCPA), its conduct in suing debtor in state court to collect outstanding debt did not violate FDCPA, notwithstanding debtor's claim that state court action was brought in retaliation for debtor's filing of FDCPA action against debt collector acting on creditor's behalf. Consumer Credit Protection Act, § 802 et seq., as amended, 15 U.S.C.A. § 1692 et seq.

**[41] Antitrust and Trade Regulation** ⟜152
29Tk152 Most Cited Cases
(Formerly 92Hk5 Consumer Protection)
Credit card company was not "supplier" within meaning of Ohio Consumer Sales Practices Act (OCSPA), in that OCSPA specifically excluded financial institutions and company fell within definition of "financial institution", in that it lent money when it extended

credit; therefore, company could not be held liable under OCSPA based on its filing of debt collection action in county other than that in which debtor had filed Fair Debt Collection Practices Act (FDCPA) action against debt collector acting on company's behalf. Consumer Credit Protection Act, § 802 et seq., as amended, 15 U.S.C.A. § 1692 et seq.; Ohio R.C. §§ 1345.01(A, C), 5725.01(A)

**[42] Antitrust and Trade Regulation** ⟜213
29Tk213 Most Cited Cases
(Formerly 92Hk36.1 Consumer Protection)
Dismissal of debtor's claims under Ohio Consumer Sales Practices Act (OCSPA) against debt collector and attorney who represented creditor in state court debt collection action was warranted when claims alleged that state-court action was filed in retaliation for debtor's Fair Debt Collection Practices Act (FDCPA) action against debt collector, debtor failed to show debt collector's independent involvement in filing of state-court action or agency relationship between attorney and debt collector with regard to that action, and also failed to show that attorney regularly filed collection suits as matter of choice in distant jurisdiction. Consumer Credit Protection Act, § 802 et seq., as amended, 15 U.S.C.A. § 1692 et seq.; Ohio R.C. § 1345.01 et seq

**[43] Federal Courts** ⟜106.5
170Bk106.5 Most Cited Cases
(Formerly 170Bk106)
District court did not abuse its discretion in denying debtor's motion for change of venue in which he sought to have action against debt collector transferred to venue of his subsequent action against debt collector, creditor, and creditor's attorney, which was consolidated with first action; two cases had to be dealt with separately, in that debtor consented to plenary magistrate judge jurisdiction in first, but not second, action, and the record supported finding that consolidation and motion for transfer of venue was attempt to avoid having cases decided by magistrate judge assigned to first case. 28 U.S.C.A. § 1404(a); Fed.Rules Civ.Proc.Rule 42(a), 28 U.S.C.A.

**[44] Federal Courts** ⟜819
170Bk819 Most Cited Cases
District court's denial of change of venue is reviewed

135 F.3d 389
135 F.3d 389, 39 Fed R.Serv.3d 1376
**(Cite as: 135 F.3d 389)**

Page 7

for abuse of discretion.

**[45] Federal Civil Procedure ⬸8.1**
170Ak8.1 Most Cited Cases
Cases consolidated pursuant to rule retain their separate identity. Fed.Rules Civ.Proc.Rule 42(a), 28 U.S.C.A.

**[46] Federal Civil Procedure ⬸8.1**
170Ak8.1 Most Cited Cases
Although consolidation is permitted as matter of convenience and economy in administration, it does not merge suits into single cause, or change rights of parties, or make those who are parties in one suit parties in another. Fed.Rules Civ.Proc.Rule 42(a), 28 U.S.C.A.

**[47] Federal Civil Procedure ⬸8.1**
170Ak8.1 Most Cited Cases
It is district court's responsibility to ensure that parties are not prejudiced by consolidation of cases. Fed.Rules Civ.Proc.Rule 42(a), 28 U.S.C.A.

**[48] Federal Courts ⬸105**
170Bk105 Most Cited Cases
While plaintiff's choice of forum should be given weight when deciding whether to grant motion to change venue, this factor is not dispositive.
**\*394** Jason D. Fregeau (argued and briefed), Yellow Springs, OH, for Plaintiff-Appellant.

James Patrick Connors (argued and briefed), Columbus, OH, for Defendants-Appellees.

Before: CONTIE, RYAN, and BOGGS, Circuit Judges.

**\*395** BOGGS, J., delivered the opinion of the court, in which CONTIE, J., joined. RYAN, J. (pp. 413-16), delivered a separate dissenting opinion.

## OPINION

BOGGS, Circuit Judge.

The two actions involved in this appeal arose out of William C. Lewis's credit relationship with American Express Travel Related Services Company, Inc. ("Amex"). Lewis owes a substantial sum of money to Amex for charges he made on his Gold Card. After he stopped making payment, Amex hired ACB Busi-

ness Services, Inc. ("ACB") to collect on the debt. These events led to the filing of three lawsuits, two by Lewis and one by Amex. At issue in this appeal are the two suits filed by Lewis. Because these suits are closely related, we deal with both in this opinion. The first suit was filed by Lewis in the Southern District of Ohio, Western Division at Dayton ("the Dayton case"). In this suit, Lewis alleged that ACB's collection efforts violated the Fair Debt Collection Practices Act ("FDCPA") and the Ohio Consumer Sales Practices Act ("OCSPA"). A jury trial was held, and at the conclusion of all the evidence, the court granted ACB's motion for judgment as a matter of law.

After the Dayton case had been filed, Amex sued Lewis in state court to recover the unpaid balance on the Gold Card. Lewis then filed suit in the Southern District of Ohio, Western Division at Cincinnati ("the Cincinnati case"). In this second action, Lewis alleged that ACB, Amex, and James P. Connors had filed the state court action in retaliation for Lewis having filed the Dayton case. He claimed that this violated the FDCPA, the OCSPA, and the Equal Credit Opportunity Act ("ECOA"). Amex and ACB moved to dismiss Lewis's complaint and Connors moved to strike the complaint against him. The district court granted defendants' motions. Lewis now appeals the judgments against him in both cases. We affirm.

### I

Lewis does not dispute that he ran up thousands of dollars in debt on his Amex Gold Card during 1992. [FN1] Amex hired ACB to collect this debt. Prior to the commencement of ACB's collection efforts, Lewis had negotiated with Amex over the debt and became upset when the account was referred to ACB for collection.

> FN1. At the time the June 3, 1993, collection letter was sent, Lewis owed Amex $14,429.54. At that same time, Lewis was also heavily in debt to other debt collectors and creditors in the amount of approximately $50,000.

ACB's collection efforts began in February 1993.

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

135 F.3d 389                                                                      Page 8
135 F.3d 389, 39 Fed.R.Serv.3d 1376
**(Cite as: 135 F.3d 389)**

On March 1, 1993, Lewis sent a letter to ACB, re-
questing that ACB cease communications in accord-
ance with 15 U.S.C. § 1692c. [FN2] At issue on this
appeal are two contacts ACB made after Lewis sent
this letter: (1) a letter ACB sent to Lewis on June 3,
1993, and (2) a telephone call placed by ACB to
Lewis on July 8, 1994. [FN3]

> FN2. The FDCPA allows a consumer to no-
> tify a debt collector in writing that he
> "wishes the debt collector to cease further
> communication with the consumer." 15
> U.S.C. § 1692c(c). This makes collection
> efforts more difficult for the debt collector.
> However, the Act does not require a debt
> collector to cease all collection efforts. *See*
> 15 U.S.C. § 1692c(c)(1)-(3); *see also*
> 398-400, *infra*.

> FN3. Lewis advanced several other claims
> of FDCPA violations. These claims,
> however, are not at issue on appeal. Non-
> etheless, because Lewis uses facts relevant
> to these claims to advance some of his argu-
> ments on appeal, we briefly set forth those
> claims. Lewis alleged that ACB violated
> the FDCPA when it sent a collection letter
> on February 23, 1993, which asked Lewis to
> call ACB but did not mention in the letter
> the writing on the reverse side that spelled
> out the consumer's rights, including the right
> to obtain verification of the debt under 15
> U.S.C. § 1692g. This claim was dismissed
> by the district court because it was barred by
> the one-year statute of limitations and be-
> cause Lewis had proved no damages prox-
> imately caused by the alleged violation.
> Lewis also claimed that ACB violated the
> FDCPA when it tried to contact his neigh-
> bors and Holly Phillips, a supplemental card
> holder, regarding the debt. This claim was
> dismissed by the district court as being out-
> side the pleadings.

*A. The June 3, 1993 letter*

On June 3, 1993, ACB sent a letter to Lewis. The
letter states in relevant part:

**\*396 YOUR ACCOUNT HAS BEEN TRANS-
FERRED TO MY OFFICE FOR FINAL RE-
VIEW.**
IN A PERCENTAGE OF CASES, I FIND THAT
PAYMENT ARRANGEMENTS MAY NOT
HAVE BEEN OFFERED BY OUR AFFILIATED
OFFICE. IN ORDER TO PROVIDE YOU WITH
AN OPPORTUNITY TO PAY THIS DEBT,
PLEASE SELECT ONE OF THE FOLLOWING
PAYMENT ARRANGEMENTS AND ENCLOSE
PAYMENT, OR PROVIDE ME WITH A NUM-
BER WHERE I CAN CONTACT YOU TO DIS-
CUSS TERMS.
...
**IT IS IMPORTANT THAT ARRANGEMENTS
BE MADE AS SOON AS POSSIBLE.**
IF YOU HAVE ANY QUESTIONS REGARDING
THE PAYMENT PLANS, GIVE ME A CALL OR
PROVIDE ME WITH A NUMBER WHERE I
CAN CONTACT YOU. FOR YOUR CONVENI-
ENCE, I CAN ARRANGE FOR YOU TO PAY
YOUR ACCOUNT USING VISA AND/OR MAS-
TERCARD.
CONTACT: M. HALL.
PAYMENT SUPERVISOR
(800) 767-5971
THIS IS AN ATTEMPT TO COLLECT A DEBT.
ANY INFORMATION OBTAINED WILL BE
USED FOR THAT PURPOSE.
YOUR ACCOUNT BALANCE MAY BE PERI-
ODICALLY INCREASED DUE TO THE ADDI-
TION OF ACCRUED INTEREST OR OTHER
CHARGES AS PROVIDED IN YOUR AGREE-
MENT WITH YOUR CREDITOR.

Although the letter indicates that Lewis should con-
tact "M. Hall," no such person existed at ACB. Nor
was the alias "M. Hall" assigned to any one person
there. The evidence showed that "M. Hall" was a
name used by ACB to alert its employees regarding
the status of the account. The evidence also showed,
however, that a specific representative had been as-
signed to Lewis's account. ACB attempted no further
contact relating to this letter, and after the letter had
been sent, ACB returned Lewis's account to Amex. It
was not until Lewis initiated suit in the Dayton case
that the account was returned to ACB. [FN4]

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

135 F.3d 389                                                                    Page 9
135 F.3d 389, 39 Fed.R.Serv.3d 1376
(Cite as: 135 F.3d 389)

FN4. The account was returned to ACB in accordance with a policy between ACB and Amex pursuant to which accounts are returned to ACB when a disgruntled debtor files a lawsuit against it so that ACB has the necessary information to defend the suit.

B. *The July 8, 1994 telephone call*

When Amex returned the account to ACB, Amex miscoded the account as a new referral, rather than a reopening. Thus, it appeared in ACB's computer system as a new account. Based on this miscoding, an initial collection letter was generated by ACB. Although the letter was never sent, an initial contact call, lasting approximately one minute, was made to Lewis on July 8, 1994, before the mistake was caught by ACB.

Janet Schohan, one of ACB's FDCPA compliance officers, discovered ACB's mistake after arriving at work in Phoenix. She was able to stop the letter from being sent, but the telephone call had already been placed because of the three hour time difference between the Phoenix and New Jersey offices. [FN5] When Schohan learned of the error, she immediately terminated all collection activity and ACB took no further action on the account.

FN5. The file had been sent to the New Jersey office because of the miscoding.

During discovery in the Dayton case, Lewis moved to compel ACB to produce "the balance of its contract with Amex," because he claimed that it controlled ACB's collection activities with respect to his account. [FN6] The court denied the request, finding that any contract between ACB and Amex had no relevance to the issue of whether ACB's collection efforts violated the FDCPA or the OCSPA. [FN7]

FN6. Lewis moved to compel discovery of only the balance of the contract because he already had a portion of the contract in his possession.

FN7. Lewis never requested discovery of this document in the Cincinnati case.

*397 Meanwhile, on October 14, 1994, before trial in the Dayton case, Amex filed suit against Lewis in Franklin County Common Pleas Court ("the state court action") to recover the unpaid balance on the Gold Card. Amex is represented in that case by Connors, who is also ACB's trial attorney in the Dayton case, as well as the trial attorney and a defendant in the Cincinnati case. As a result of Amex suing Lewis in state court, Lewis filed the Cincinnati case on March 27, 1995, shortly before the trial was originally scheduled to take place in the Dayton case. The two cases were consolidated at Lewis's request. He then tried to have venue of both cases transferred from Dayton to Cincinnati. The trial court consolidated the cases, but declined Lewis's request for change of venue. The Dayton case therefore remained before Magistrate Judge Merz for all purposes, the parties having agreed to plenary magistrate judge jurisdiction in that case pursuant to 28 U.S.C. § 636(c), and the Cincinnati case remained on Magistrate Judge Merz's docket for pretrial purposes only (since Lewis had specifically declined plenary magistrate judge jurisdiction in that case). The district court cited Lewis's attempt at forum shopping and the district's local rule for hearing consolidated cases in the venue in which the first case is filed as reasons for refusing the change in venue.

Lewis also made a motion to bring new claims in the Dayton case just before the trial was supposed to start. He contended that the new claims were necessary because they arose after Amex had returned his account to ACB on July 8, 1994. The district court granted Lewis's motion to amend the complaint and vacated the Dayton case trial date set for May 8, 1995. ACB sought reconsideration of this order, but its motion was denied.

A jury trial in the Dayton case was held on January 9 and 10, 1996, before Magistrate Judge Merz. At the conclusion of Lewis's proof, the court granted in part and denied in part ACB's Fed.R.Civ.P. 50 motion for judgment as a matter of law. At the conclusion of all the evidence, the court denied Lewis's motion for judgment as a matter of law and granted ACB's cross-motion, thus eliminating all remaining allegations against ACB.

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works

In the Cincinnati case, Mr. Lewis alleged that Amex, ACB, and Connors had used the state court action to retaliate against him because he had filed suit against ACB. He claimed that when Amex brought the state court action it, as well as ACB and Connors, violated the FDCPA, the OCSPA, and the Equal Credit Opportunity Act ("ECOA"). Amex and ACB moved to dismiss Lewis's complaint and Connors moved to strike the complaint against him. Because the parties presented matters outside the pleadings, Connors's motion was treated as one for summary judgment. After hearing argument, Magistrate Judge Merz filed a report and recommendation regarding the various motions. He recommended that Connors's motion for summary judgment be granted on the ground that Connors was not a debt collector as a matter of law. The magistrate judge also recommended that Lewis's remaining claims be dismissed for failure to state a claim. In addition, he denied Lewis's motions to strike and for a change in venue. District Judge Spiegel adopted the magistrate judge's report and recommendations.

On appeal, Lewis raises numerous claims of error. In the Dayton case, he argues that the district court erred in (1) granting ACB's motion for judgment as a matter of law on Lewis's FDCPA claims; (2) denying Lewis discovery of an agreement between Amex and ACB; and (3) granting ACB's motion for judgment as a matter of law on Lewis's OCSPA claims. In the Cincinnati case he claims that the district court erred in (1) dismissing his ECOA claim; (2) granting Connors's motion for summary judgment based solely on his affidavit; (3) finding that ACB did not illegally interpose itself between Connors and Amex; (4) finding that Amex is not a debt collector as defined by the FDCPA; (5) dismissing with prejudice Lewis's OCSPA claims; and (6) denying his motion to reconsider its decision declining to transfer venue back to Cincinnati. We address the issues in the order presented.

## II

Lewis raises three claims of error in the district court's order granting ACB's motion *398 for judgment as a matter of law on Lewis's FDCPA claims in the Dayton case: (1) that the June 3rd collection letter was a further communication in violation of 15 U.S.C. § 1692c(c); (2) that the June 3rd collection letter's use of the pseudonym "M. Hall" was a violation of 15 U.S.C. § 1692e(10); and (3) that ACB failed to prove the bona fide error defense with respect to the July 8th telephone call.

[1][2][3] Motions for judgment as a matter of law are reviewed de novo. We do not weigh the evidence, evaluate the credibility of witnesses, or substitute our own judgment for that of the jury. Rather, this court must view the evidence in the light most favorable to the non-moving party and give that party the benefit of all reasonable inferences. See O'Brien v. City of Grand Rapids, 23 F.3d 990, 995 (6th Cir.1994). We must affirm the district court if we are convinced that "there is a complete absence of pleading or proof on an issue or issues material to the cause of action or where there are no controverted issues of fact upon which reasonable men could differ." Ibid. (internal quotation omitted).

### A. The June 3rd collection letter as a remedy

[4] Lewis argues first that the district court erred in holding the June 3rd letter to be a permissible communication under 15 U.S.C. § 1692c(c)(2), even though sent after his demand to desist, because it is a notice of specified potential remedies ordinarily invoked by ACB. He argues that the Federal Trade Commission's statement of general policy on the FDCPA, which indicates that a "debt collector's response to a 'cease communication' notice from the consumer may not include a demand for payment, but is limited to the three statutory exceptions," 53 Fed.Reg. 50097, 50104 (Dec. 13, 1988), is dispositive because language in the letter indicates that it is a demand for payment couched as a remedy. While Lewis's argument is not wholly without merit, we cannot agree with his interpretation of § 1692c(c) because such an interpretation would be contrary to the purpose of the Act.

15 U.S.C. § 1692c(c) provides that "[i]f a consumer notifies a debt collector in writing that the consumer ... wishes a debt collector to cease further communication with the consumer, the debt collector shall not communicate further with the consumer with respect to such debt." The statute, however, permits the col-

135 F.3d 389                                                                                                    Page 11
135 F.3d 389, 39 Fed.R.Serv.3d 1376
**(Cite as: 135 F.3d 389)**

lector to make further communication with the consumer under three limited circumstances.  One of those circumstances allows the debt collector "to notify the consumer that the debt collector or creditor may invoke specified remedies which are ordinarily invoked by such debt collector or creditor."  15 U.S.C. § 1692c(c)(2).  We believe that the June 3rd letter fits within § 1692c(c)(2).

[5] Congress enacted the FDCPA to "eliminate abusive debt collection practices by debt collectors, to insure that those debt collectors who refrain from using abusive debt collection practices are not competitively disadvantaged, and to promote consistent State action to protect consumers against debt collection abuses."  15 U.S.C. § 1692(e).  Congress intended the Act to eliminate unfair debt-collection practices, such as late-night telephone calls, false representations, and embarrassing communications.  The Senate Report justified the need for legislation by stating:

> Collection abuse takes many forms, including obscene or profane language, threats of violence, telephone calls at unreasonable hours, misrepresentation of a consumer's legal rights, disclosing a consumer's personal affairs to friends, neighbors, or an employer, obtaining information about a consumer through false pretense, impersonating public officials and attorneys, and simulating legal process.

Sen. Rep. No. 382, 95th Cong., 1st Sess. 2 (1977), reprinted in 1977 U.S.C.C.A.N. 1695, 1696.

While Congress appears to have intended the act to eliminate abusive collection practices, the language of § 1692c(c) is broader: it not only states that a debt collector may not make a demand for payment following a cease-communication letter, but also prohibits its communication of any kind other than those falling within the three exceptions.  **\*399** Thus, at first glance, ACB's June 3rd letter does not appear to fall within the literal terms of § 1692c(c)(2) as a notice of remedy.  A close look at the letter, however, shows that the letter can be construed as a type of settlement offer and that ACB normally invokes such a remedy.  We believe that such a construction is warranted.

We believe that Lewis's interpretation of § 1692c(c)(2), which would prohibit collectors from sending noncoercive settlement offers as a remedy, is "plainly at variance with the policy of the legislation as a whole."  *United States v. American Trucking Ass'ns,* 310 U.S. 534, 543, 60 S.Ct. 1059, 1064, 84 L.Ed. 1345 (1940).  To hold that a debt collector cannot offer payment options as part of an effort to resolve an outstanding debt, possibly without litigation, would force honest debt collectors seeking a peaceful resolution of the debt to file suit in order to advance efforts to resolve the debt-- something that is clearly at odds with the language and purpose of the FDCPA.  Nothing ACB did in its June 3rd letter can be construed as an abusive collection practice.  It simply offered to settle Lewis's debt without litigation.  Allowing debt collectors to send such a letter is not only consistent with the Act but also may result in resolution of the debt without resorting to litigation, saving all parties involved the needless cost and delay of litigation as is exemplified by this very case.  And it is certainly less coercive and more protective of the interests of the debtor.  Moreover, while ACB's letter could have more clearly expressed its character as a notice of a normally invoked remedy had it included other typically invoked remedies, such as filing a lawsuit, nothing in the statute requires that the letter give notice of all of the remedies normally invoked by debt collectors, and the statute does not require that a debt collector invoke any specific type of remedy.  Rather, it allows the debt collector to notify the consumer of remedies *it* normally invokes.  The record in this case clearly demonstrates that ACB did just that. [FN8]

> FN8. Our conclusion is bolstered by the fact that, since a debt collector legitimately can tell a debtor that it ordinarily sues or recommends suit as a remedy, it is certainly within the purpose of the Act to allow a debt collector to make a truthful statement that various payment plans are available.  *Cf United States v. American Trucking Ass'ns,* 310 U.S. 534, 543-44, 60 S.Ct. 1059, 1063-64, 84 L.Ed. 1345 (1940) (courts' power in interpreting statutes is not limited to a "superficial examination" of particular statutory text, but rather includes power to effectuate underlying purpose of statute as inferred from

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

135 F.3d 389                                                                    Page 12
135 F.3d 389, 39 Fed.R.Serv.3d 1376
(Cite as: 135 F.3d 389)

the text of the statute as a whole).

[6] Additionally, we are unpersuaded by Lewis's argument that the Federal Trade Commission's statement on § 1692c(c) is dispositive. Initially we note the limited precedential value of FTC pronouncements regarding the FDCPA in light of the restricted scope of its power under the Act. FTC advisory opinions regarding the FDCPA are entitled to deference only to the extent that their logic is persuasive. *See Pressley v. Capital Credit & Collection Serv., 760 F.2d 922, 925 & n. 2 (9th Cir.1985); Fox v. Citicorp Credit Servs., Inc., 15 F.3d 1507, 1513 n. 4 (9th Cir.1994); Dutton v. Wolpoff & Abramson, 5 F.3d 649, 654 (3d Cir.1993).* More important, however, we find nothing in the FTC's policy statement that is inconsistent with our position. The June 3rd letter simply gave Lewis "an opportunity to pay [the] debt" though various payment plans. We therefore do not view it as an impermissible demand for payment.

[7] We note that the mere fact that the letter states at the bottom that it "is an attempt to collect a debt" does not transform the letter into an unlawful demand for payment. On the contrary, such a statement is required by the FDCPA. *See 15 U.S.C. § 1692e(11) (1987)* ("the failure to disclose clearly in *all* communications made to collect a debt or to obtain information about a consumer, that the debt collector is attempting to collect a debt and that any information obtained will be used for that purpose" is a violation of the FDCPA) (emphasis added). [FN9] Given the fervor with which Lewis seeks to *400 protect his rights under the FDCPA, he certainly would have called foul had this communication not included this necessary language. For example, we recently decided a case in which a plaintiff, also represented by Lewis's attorney, appealed from an award of attorney fees. In that case, the plaintiff suggested that a letter sent by a collection agency that failed to include language that the "debt collector is attempting to collect a debt ... [and that] any information obtained will be used for that purpose" gave rise to a § 1692e(11) violation. *See Lee v. Thomas & Thomas, 109 F.3d 302 (6th Cir.1997).* The debt collector settled and as a result we did not decide the issue of whether the failure to include such language violates that act. But given Lewis's choice of counsel, it is likely that had

ACB failed to include such a statement in its letter, Lewis would have brought an additional FDCPA claim based on ACB's failure to include the statutory language. To punish ACB for compliance with this provision just because the remedy letter states that it is an "attempt[ ] to collect on a debt" would be an absurd result that we decline to reach.

> FN9. Section 1692e(11) was amended in 1996. It now provides that in subsequent communications with the consumer the debt collector need only state that the communication is from a debt collector. The amendment, however, is not relevant to our analysis since ACB was attempting to comply with the requirements of the Act as it appeared when it sent the letter to Lewis.

B. *Use of the pseudonym "M. Hall"*

[8] Next, Lewis argues that ACB's use of the pseudonym "M. Hall" violates § 1692e(10) because its reference to a non-existent individual is deceptive. He argues that the letter "is replete with 'I' and 'Me', indicating that a 'Payment Supervisor' by the name of 'M Hall' exists and is giving the account personal attention[, when i]n fact, the designation 'M Hall' is a code that Defendant uses to alert its collectors and telephone operators." Appellant's Brief at 25. This is deceptive, he claims, because ACB "not only makes consumers believe that an individual by the name of 'M Hall' has an office where he or she is making a 'FINAL REVIEW,' but also uses the unwitting consumer to divulge information concerning the consumer's communication." *Ibid.* In essence, he argues that, simply by asking for "M. Hall," the consumer unknowingly discloses important information, such as the status of the account, to the debt collector at the other end of the phone. This, he argues, is a deceptive practice under the FDCPA. We disagree.

[9] The FDCPA prohibits the use of "any false, deceptive, or misleading representation or means in connection with the collection of any debt." 15 U.S.C. § 1692e. Section 1692e is broken into sixteen subsections, which provide a non-exhaustive list of prohibited practices. Subsection 1692e(10), at issue in this case, specifically prohibits "[t]he use of any

135 F.3d 389                                                    Page 13
135 F.3d 389, 39 Fed.R.Serv.3d 1376
(Cite as: 135 F.3d 389)

false representation or deceptive means to collect or attempt to collect any debt or to obtain information concerning a consumer." In determining whether a debt collector's practice is deceptive within the meaning of the Act, courts apply an objective test based on the understanding of the "least sophisticated consumer." *Bentley v. Great Lakes Collection Bureau, 6 F.3d 60, 62 (2d Cir.1993)*. Even with the least sophisticated consumer in mind, we do not believe that ACB's use of "M. Hall" was deceptive.

Rather, we believe this situation is analogous to the use of an alias by the debt collector in *Johnson v. NCB Collection Services, 799 F.Supp. 1298 (D.Conn.1992)*, even though the alias used in *Johnson*, "Althea Thomas," was assigned to a specific individual. This is because in *Johnson* the court found that a consumer asking for "Althea Thomas" was not automatically referred to that individual. Rather, the debt collector would refer the consumer to the next available representative and the consumer was not even told that the person he or she was speaking to was not the "true" pseudonymous "Althea Thomas." The court held that such a use of an alias was not a deceptive practice:

> While an allegedly deceptive practice is to be evaluated with reference to the effect on the least sophisticated debtor, it is clear to anyone (including the least sophisticated debtor) that a specific representative named in a collection mailing cannot and will not always be available 24 hours per day, 7 days per week. Therefore, no deception occurs even if the answering representative fails to offer that he or she is not "Althea Thomas." The use of an assigned alias or office name, even when considered from the standpoint of the least sophisticated debtor, does not misrepresent the *401 amount of a debt, the consequences of its non-payment, nor the rights of the contacted debtor. Indeed, at oral argument plaintiff's counsel was unable to adduce any prejudice or harm suffered as a result of the use of the alias in this case. Aliases and office names in fact have long been utilized by collection agencies for the protection of their employees. The burden to an ethical debt collector that would result from prohibiting the use of assigned aliases by designated employees clearly outweighs any abstract benefit to the debtor that such a prohibition might yield.

*Id* at 1304 (citation omitted). Here, as in *Johnson*, Lewis can show no prejudice or harm suffered as a result of the use of the alias "M. Hall." The only person notified of his account status through his reference to "M. Hall" was ACB--which *a fortiori* was already was aware of it. The consumer only discloses to ACB that the debtor has written a cease-communication letter and has been sent a final communication, indicating that the consumer may wish to pay off the debt using a payment plan. Not only is this not deceptively drawing out information from the consumer, but also it ensures that the agent to whom the consumer is referred will not attempt to resume collection efforts.

Moreover, we are unpersuaded by Lewis's attempt to analogize this case to the situation in *Bentley, 6 F.3d at 60*. This case is clearly distinguishable from *Bentley*, in which the Second Circuit found a letter to be a deceptive practice under the Act. The letter in *Bentley* indicated that Bentley's account had been referred to the desk of a particular decisionmaker, even though the account had never received personal attention from anyone at the collection agency. The letter to Bentley made several affirmative misrepresentations, including that her account was receiving personal attention and that someone had unsuccessfully attempted to contact her. Lewis's account, by contrast, had been assigned to a specific individual. It is of no moment that that individual was not specifically assigned the alias "M. Hall." Additionally, it is clear from the record that Lewis's account actually received personal attention, and that the letter was in no other respect deceptive.

C. *The bona fide error defense*

[10] We are also unpersuaded by Lewis's argument that the district court erred in entering judgment as a matter of law against him on his FDCPA claim because ACB had contacted him on July 8, 1994, in violation of 15 U.S.C. § 1692c. Contrary to Lewis's position, we believe that ACB has established beyond dispute that its actions meet the requirements of the bona fide error defense. In order to prove a bona fide error defense, a collector must show that the "vi-

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

olation was not intentional and resulted from a bona fide error notwithstanding the maintenance of procedures reasonably adapted to avoid any such error." 15 U.S.C. § 1692k(c). ACB has done just that.

If anything, this case presents even stronger evidence to support the bona fide error defense than the evidence we found sufficient in *Smith v. Transworld Systems, Inc.*, 953 F.2d 1025, 1031 (6th Cir.1992). In *Smith*, this court found that a collection letter mailed shortly after receiving the consumer's cease-communication letter constituted a bona fide error. In support of its defense, the defendant in *Smith* introduced an employee's procedural manual and two employee affidavits, which showed that the error was at most a clerical error. ACB in this case is not even responsible for committing a clerical error; it was Amex, and not ACB, that made the critical coding error before the file was returned to ACB.

[11] We also believe that ACB's manual and computer systems were "reasonably adapted" to avoid the error that occurred in this case and in fact were able to catch the error in a very short period of time. Ms. Schohan, one of ACB's FDCPA compliance officers, caught this mistake in time to prevent the computer-generated letter from being sent even if she was unable to stop the phone call. Contrary to Lewis's claim that the ACB agent's July 8th telephone call demonstrates ACB's intent to resume collection efforts, in fact it shows that the only reason ACB's agent contacted Lewis was because he believed that Lewis's account was new. This is simply not enough to show that ACB intended **\*402** to resume collection efforts in violation of the FDCPA. Inherent in Lewis's argument is a flawed understanding of the intent requirement of § 1692k(c). The debt collector must only show that the violation was unintentional, not that the communication itself was unintentional. To hold otherwise would effectively negate the bona fide error defense.

### III

Lewis also argues that the district court used an incorrect legal standard in denying his motion to compel ACB to produce the remainder of the contract between it and Amex. He contends that the contract itself would have been admissible evidence because

at trial employees of ACB referred to the agreement to support its case. He also contends that he made an offer of proof when requesting the document be produced that showed that the contract supported the argument that ACB, under its contract with Amex, was not authorized to collect from supplemental cardholders. Further, he argues that the contract could have led to admissible evidence because the contract controls ACB's collection activities and "could lead to collection activities required to be made by Defendant but not noted in its collection notes." Appellant's Brief at 33. Again we find no error.

[12][13] The scope of discovery is, of course, within the broad discretion of the trial court. *Ghandi v. Police Dep't of Detroit*, 747 F.2d 338, 354 (6th Cir.1984), *appeal after remand*, 823 F.2d 959 (6th Cir.1987), *cert. denied*, 484 U.S. 1042, 108 S.Ct. 774, 98 L.Ed.2d 861 (1988). "An order denying further discovery will be grounds for reversal only if it was an abuse of discretion resulting in substantial prejudice." *Ibid.*

[14][15] The scope of discovery under the Federal Rules of Civil Procedure is traditionally quite broad. *See Mellon v. Cooper-Jarrett, Inc.*, 424 F.2d 499, 501 (6th Cir.1970). "The scope of examination permitted under Rule 26(b) is broader than that permitted at trial. The test is whether the line of interrogation is reasonably calculated to lead to the discovery of admissible evidence." *Ibid.* (citation omitted); *see also Oppenheimer Fund, Inc. v. Sanders*, 437 U.S. 340, 351, 98 S.Ct. 2380, 2389- 90, 57 L.Ed.2d 253 (1978). However, "discovery of matter not 'reasonably calculated to lead to the discovery of admissible evidence' is not within the scope of Rule 26(b)(1). Thus, it is proper to deny discovery of matter that is relevant only to claims or defenses that have been stricken, or to events that occurred before an applicable limitations period, unless the information sought is otherwise relevant to issues in the case." *Id.* at 351-52, 98 S.Ct. at 2390 (quotation omitted).

[16] Lewis's first argument--that the requested documents could have been used as evidence to show that ACB could not attempt to collect from supplemental cardholders--is baseless. That claim was dismissed by the district court because it was outside the plead-

135 F.3d 389                                                         Page 15
135 F.3d 389, 39 Fed.R.Serv.3d 1376
(Cite as: 135 F.3d 389)

ings; moreover, the court found that "any attempt to amend after the close of plaintiff's evidence to plead such a claim was unfairly prejudicial to Defendant." *Lewis v. ACB Bus. Servs., Inc.,* 911 F.Supp. 290, 293 (S.D.Ohio 1996). Further, the district court found that such a claim had not been tried by consent of the parties and was barred by the statute of limitations. *Ibid.* We find no abuse of discretion by the district court in denying discovery of the remainder of the agreement based on this asserted purpose, as this issue was no longer relevant in the Dayton case.

[17] We also do not believe that the district court abused its discretion in finding that the document was not relevant to any of the issues remaining in the case. For one thing, Lewis never disputed that he owed the debt. And there was never any dispute that ACB had sent the June 3rd letter. Thus, questions of whether ACB sent Lewis the letter pursuant to a contract with Amex or whether ACB acted outside the terms of any contract it may have had with Amex had no relevance to whether ACB's activities at issue in the Dayton case were a violation of the FDCPA or the OCSPA. Likewise, the statements made by employees of ACB at trial mentioning an agreement between ACB and Amex were simply made in passing and did not make the contract relevant to the issues *403 in the Dayton case. [FN10] These statements simply explained why Lewis's file was again sent to ACB after the suit was filed. Thus, the district court's denial of Lewis's motion to compel production of the contract between ACB and Amex was not an abuse of discretion.

> FN10. Lewis points to a statement made by Mark Nakon in which he said that the request for the file to be returned to ACB after Lewis had filed a lawsuit was the result of the collection contract between Amex and ACB. The second statement appears to be a statement made by Schohan that the contract controls ACB's collection activities. These statements do not bear on whether the June 3rd letter or the July 8th phone call violated the FDCPA or OCSPA.

**IV**

Lewis's final assignment of error in the Dayton case is that the district court erred in finding that ACB's conduct did not violate Ohio Rev.Code §§ 1345.02(A) and 1345.03(A). [FN11] He argues that the district court erred in granting ACB's motion for judgment as a matter of law on his OCSPA claims in that (1) the district court failed to set forth specific findings of fact and conclusions of law; (2) the district court erred in denying him the opportunity to present evidence of damages concerning his OCSPA violations; and (3) the district court construed the application of prior decisions to his OCSPA violations too narrowly. Once again, we find no merit in Lewis's arguments.

> FN11. Section 1345.02(A) provides that "[n]o supplier shall commit an unfair or deceptive act or practice in connection with a consumer transaction. Such an unfair or deceptive act or practice by a supplier violates this section whether it occurs before, during, or after the transaction." Section 1345.03(A) provides that "[n]o supplier shall commit an unconscionable act or practice in connection with a consumer transaction. Such an unconscionable act or practice by a supplier violates this section whether it occurs before, during, or after the transaction." Although the OCSPA does not expressly address debt collection practices, Ohio courts have applied the OCSPA to such practices. See *Liggins v. May Co.,* 44 Ohio Misc. 81, 337 N.E.2d 816 (Ohio C.P. Cuyahoga County 1975).

*A. Failure of the district court to set forth specific findings of fact and conclusions of law*

[18] While Lewis correctly notes that the court's opinion regarding his OCSPA claims does not go through each alleged violation point by point, we believe that the court's opinion provides sufficient findings of fact and conclusions of law to support its decision. The district court fully detailed the actions alleged to have violated the FDCPA and the OCSPA. Thus, it did not need to set out separate facts for its OCSPA discussion because, as admitted by Lewis, he did not put on any additional evidence rel-

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

135 F.3d 389                                                                              Page 16
135 F.3d 389, 39 Fed.R.Serv.3d 1376
**(Cite as: 135 F.3d 389)**

evant to his OCSPA claims. Furthermore, the court fully detailed its reasons for rejecting Lewis's FD-CPA claims. While it is true that the OCSPA could have been violated independently, he did not provide any additional evidence to sustain those claims. He simply relied on the asserted violations of the FD-CPA to support his OCSPA claims. Given that the district court correctly determined that no FDCPA violation had occurred, we believe that the district court's opinion sufficiently addresses Lewis's OCSPA claims.

B. *Failure to provide an opportunity for Lewis to present evidence of damages concerning the OCSPA violations*

[19] Next, Lewis argues that the district court erred in failing to provide him the opportunity to present evidence concerning his actual damages regarding his claim that the February 23rd collection letter, which failed to inform the reader of the writing on the reverse side, the attempts to contact a supplemental cardholder, and the phone calls to neighbors regarding his debt, violated the OCSPA. He argues that the damage evidence was "likely excluded" because of confusion regarding the different statute of limitations for the OCSPA and the FDCPA. [FN12] He also contends that the district court "compounded the error by finding that [his] attempts to prove actual damages ... failed *404 under both statutes ... In other words, the Trial Court disallowed Lewis from presenting the full panoply of his damages, then stated that the evidence of damages by Lewis was insufficient *as a matter of weight and credibility* to support an award." Appellant's Brief at 40 (emphasis in original). This argument is unpersuasive.

> FN12. The OCSPA statute of limitations is two years. Ohio Rev.Code § 1345.10(C). The FDCPA statute of limitations is one year. *See Mace v. Van Ru Credit Corp.*, 109 F.3d 338, 344 (7th Cir.1997).

First, the district court did not exclude the claims relating to the February 23rd letter, the alleged phone calls by ACB to Lewis's neighbors, and the supplemental card holder simply because the statute of limitations under the FDCPA had run. Rather, the court

found that Lewis had proved no damages proximately caused by the February 23rd letter. Moreover, the court found that the claims regarding contacts with supplemental cardholders and Lewis's neighbors were outside the pleadings.

In addition, the district court fully explained why Lewis had failed to prove actual damages under both statutes:

> Mr. Lewis's attempts to prove actual damages also failed under both statutes. He did not attempt to prove any "economic" damages. Rather, he asserted he suffered mental distress resulting in headaches, indigestion, and fitful sleep throughout the period of ACB's attempted collection and continuing up to the time of trial. He offered no medical evidence and admitted that he had not seen a physician for any of the claimed ills, but had self-medicated with aspirin and Tums. The debt involved here is over $14,000. During 1994 Mr. Lewis admittedly had somewhere in the vicinity of $50,000 unpaid credit card debt outstanding. He had extensive negotiations with Amex over this particular debt and became involved in at least three lawsuits relating just to this debt. Even assuming that the efforts of ACB to collect the debt added to his distress, he offered no competent testimony linking his distress to those parts of ACB's efforts which he challenged as unlawful, as compared to, for example, his admitted upset that the case had been referred to a collection agency at all despite his ongoing conversations with Amex. Mr. Lewis could not remember either at deposition or trial, any details of any correspondence he received from ACB, yet his trial position was that the FD-CPA violations were in the details. Mr. Lewis had so little recollection of the July 8, 1994, telephone call, which lasted less than a minute, that he had remembered it as coming from a woman at 8:00 a.m. on a Sunday, whereas the proof showed that it occurred around 10:30 a.m on a Friday and the caller was male. This is not an adequate factual basis for an award of mental distress damages.
> *Lewis*, 911 F.Supp. at 295-96.

C. *The district court's construction of prior decisions*

[20] Additionally, Lewis claims that the district court

135 F.3d 389                                                                                                    Page 17
135 F.3d 389, 39 Fed.R.Serv.3d 1376
**(Cite as: 135 F.3d 389)**

erred in concluding that ACB "was not exposed to treble actual damages or $200 in statutory damages, pursuant to § 1345.09(B) of the OCSPA." Appellant's Brief at 41. Again, we find no merit in this argument.

Ohio Rev.Code § 1345.09(B) provides for treble actual damages or $200 in statutory damages:

[W]here the violation was an act or practice declared to be deceptive or unconscionable by ... an act or practice determined by a court of this state to violate section 1345.02 or 1345.03 of the Revised Code and committed after the decision containing the determination has been made available for public inspection under division (A)(3) of section 1345.05 of the Revised Code....

Under section 1345.05(A)(3) of the OCSPA, the Ohio Attorney General is directed to make available for public inspection all judgments and opinions by courts of Ohio "determining that specific acts or practices violate section 1345.02 or 1345.03 of the Revised Code."

Lewis relies on two opinions made available by the Ohio Attorney General pursuant to § 1345.05(A)(3) to support his claim that he was entitled to treble damages, *Liggins v. May Company,* 53 Ohio Misc. 21, 373 N.E.2d 404 (Ohio C.P. Cuyahoga County 1977), and *Brown v. Lyons,* 43 Ohio Misc. 14, 332 N.E.2d 380 (Ohio C.P. Hamilton County 1974). He argues that *Liggins* supports his claim for treble damages because in *Liggins* *405 the court found that the debt collector's "*false statements of fact.* false statements or implications about what [would] happen if the consumer fail[ed] to satisfy the claim, and misrepresentations about the law," violated the OCSPA. Appellant's Brief at 43 (quoting *Liggins,* 373 N.E.2d at 405) (emphasis in brief). He claims that this language in *Liggins* put ACB on notice that its actions relative to his account would violate the OCSPA. He also argues that *Brown* supports his claim for treble damages because in that case, "the court found that a supplier must comply with its legal obligations, must not knowingly make a misleading statement, and cannot continually stall or evade its legal obligations." Appellant's Brief at 43. We disagree.

In *Liggins.* the court held that the collection agency

committed deceptive and unconscionable acts and practices in sending collection notices that were designed to simulate official documents and misrepresented the pendency or immanency of official or judicial action. The letters were also found to contain false statements or implications about what would happen if the consumer failed to satisfy the claim. In addition, the communications made misrepresentations about the law. Thus, the actions in *Liggins* were far more outrageous than anything ACB allegedly did.

Lewis's reading of *Brown* is equally flawed. In *Brown,* the court rendered a number of conclusions of law at the behest of the Ohio Attorney General who had brought the case. Contrary to Lewis's position, there is nothing in this case similar to the facts in *Brown.* ACB never attempted to avoid its legal obligation to Lewis, never engaged in a pattern of inefficiency, incompetency, stalling or evasion, and never made any misleading statements of opinion. *See Brown,* 332 N.E.2d at 383-84. To read *Liggins* and *Brown* as broadly as Lewis suggests and without reference to the specific acts in those cases would allow the recovery of treble damages or the $200 in statutory damages under the OCSPA whenever there is any arguable misstatement of fact, a result the Ohio courts and legislature surely did not intend.

V

We next turn our attention to Lewis's claims of error in the Cincinnati case. Lewis raises several issues on this appeal as well. He argues that the district court erred in (1) dismissing his ECOA claim; (2) granting Connors's motion for summary judgment based solely on his affidavit; (3) finding that ACB did not illegally interpose itself between Connors and Amex; (4) finding that Amex is not a debt collector for purposes of the FDCPA; (5) dismissing with prejudice Lewis's OCSPA claims; and (6) denying his motion for reconsideration of his motion to move venue back to Cincinnati. We address the issues in the order presented.

Lewis argues first that the district court made two errors when granting defendants' motion to dismiss his ECOA claims: (1) holding that the filing of the state lawsuit by Amex was not discrimination under 15

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

135 F.3d 389                                                                 Page 18
135 F.3d 389, 39 Fed.R.Serv.3d 1376
(Cite as: 135 F.3d 389)

U.S.C. § 1691, and (2) holding that ACB and Connors are not "creditors" under the ECOA. We find no reversible error in these rulings.

[21][22][23][24][25][26] Initially we note that a dismissal of a complaint for failure to state a claim is subject to de novo review and all factual allegations are taken as true. *Mayer v. Mylod*, 988 F.2d 635, 637-38 (6th Cir.1993). " '[A] complaint should not be dismissed for failure to state a claim unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief.' The fundamental purpose of pleadings under the Federal Rules of Civil Procedure is to give adequate notice to the parties of each side's claims and to allow cases to be decided on the merits after an adequate development of the facts." *Id.* at 638 (citation omitted). Only well-pleaded facts, however, must be taken as true. The trial court need not accept as true legal conclusions or unwarranted factual inferences. *See Morgan v. Church's Fried Chicken*, 829 F.2d 10, 12 (6th Cir.1987). Moreover, "[t]he admonishment to liberally construe plaintiff's claim when evaluating a Rule 12(b)(6) dismissal does not relieve a plaintiff of his obligation to satisfy federal notice pleading requirements and allege more than bare assertions of legal conclusions." *406So-gevalor v. Penn Cent. Corp.*, 771 F.Supp. 890, 893 (S.D.Ohio 1991). "[A] complaint ... must contain either direct or inferential allegations respecting all the material elements to sustain a recovery under some viable legal theory." *Ibid* (quoting *Car Carriers, Inc. v. Ford Motor Co.*, 745 F.2d 1101, 1106 (7th Cir.1984), *cert. denied*, 470 U.S. 1054, 105 S.Ct. 1758, 84 L.Ed.2d 821 (1985)).

A. *Lewis's ECOA claim against Amex*

Lewis argues that the district court erred in finding that Amex had not discriminated against him when it filed the state suit to recover on the debt, in violation of 15 U.S.C. § 1691(a)(3). He claims that ACB had requested the file back from Amex for the "express purpose of filing the state court action against Mr. Lewis," thereby discriminating against him. Appellant's Brief at 15. "In fact," he claims, "the lawsuit against [him] was the first time Defendant ACB had ever hired an attorney to file suit on behalf of Amex

in Ohio." *Id.* at 16. We are unpersuaded by Lewis's argument.

[27] The ECOA prohibits discrimination in the extension of credit: "It shall be unlawful for any creditor to discriminate against any applicant, with respect to any aspect of a credit transaction ... because the applicant has in good faith exercised any right under this chapter." 15 U.S.C. § 1691(a)(3). The legislative history of the Act indicates that § 1691(a)(3) was "intended to bar retaliatory credit denials or terminations against applicants who exercise their rights under any part of the Consumer Credit Protection Act ... The 'good faith' qualification [also] recognizes[, however,] that some applicants may engage in frivolous or nuisance disputes which do reflect on their willingness to honor their obligations." Equal Credit Opportunity Act Amendments of 1976, Pub.L. No. 94-239, 1976 U.S.C.C.A.N. 403, 407. The Act was only intended to prohibit credit determinations based on "characteristics unrelated to creditworthiness." It was never intended to eliminate a "creditor's right to make a rational decision about an applicant's credit worthiness." *Id* at 404-05. Thus, an ECOA violation cannot be shown by simply alleging that the creditor is attempting to collect on the debt. Rather, "[i]n determining the existence of discrimination ... courts ... [should] look at the effects of a creditor's practices as well as the creditor's motives or conduct in individual transactions ... [and] judicial constructions of anti-discrimination legislation in the employment field ... are intended to serve as guides in the application of th[e] Act, especially with respect to the allocations of burdens of proof." *Id* at 406.

[28][29] Because the history suggests reviewing ECOA claims of discrimination using the same framework and burden allocation system found in Title VII cases, we adapt the burden allocation framework used in retaliation-based employment claims to Lewis's ECOA claim. Thus, in order for Lewis to make out a prima facie case of retaliation, he must allege facts sufficient to show that (1) he engaged in a statutorily protected activity; (2) suffered an adverse credit action; and (3) a causal connection exists between the two. *See Johnson v. United States Dep't of Health and Human Servs.*, 30 F.3d 45, 47 (6th Cir.1994). Lewis is simply unable to make such a

135 F.3d 389                                                                                                    Page 19
135 F.3d 389, 39 Fed.R.Serv.3d 1376
(Cite as: 135 F.3d 389)

showing.

The ECOA defines "adverse action" as:
   a denial or revocation of credit, a change in the
   terms of an existing credit arrangement, or a refusal
   to grant credit in substantially the amount or on
   substantially the terms requested. Such term does
   not include a refusal to extend additional credit un-
   der an existing credit arrangement where the ap-
   plicant is delinquent or otherwise in default, or
   where such additional credit would exceed a previ-
   ously established credit limit.
15 U.S.C. § 1691(d)(6). It also does not include
"*[a]ny action* or forbearance relating to an account
taken *in connection* with inactivity, *default, or delin-
quency* as to that account." 12 C.F.R. § 202.2(c)(2)(ii)
(emphasis added).

Although Lewis filed an FDCPA claim against ACB
in the Dayton case, he is unable to show that he
suffered an adverse action because the ECOA does
not cover "any action ... relating to an account taken
in connection with ... default[ ] or delinquency." 12
C.F.R. § 202.2(c)(2)(ii). Lewis's complaint shows
nothing more than a creditor taking a *407 necessary
action to recover thousands of dollars in undisputed
debt that the consumer refuses to honor. Amex is
certainly entitled to sue Lewis under such a circum-
stance, and Lewis's attempt to argue otherwise
amounts to nothing more than bare legal conclusions
and unwarranted factual inferences. [FN13]

        FN13. Lewis's complaint provides in relev-
        ant part:
        17. On October 14, 1994, Defendant Amex
        purportedly filed in the Court of Common
        Pleas, Franklin County, Ohio, case number
        94 CVH 10-7274 against Mr. Lewis. The
        state court case alleges that Mr. Lewis owes
        a debt to Defendant Amex.
        18. Defendant Amex did not directly file the
        state court lawsuit. Rather, Defendant ACB
        filed the state court lawsuit on behalf of De-
        fendant Amex. Defendant ACB filed the
        state court lawsuit pursuant to an assignment
        controlled by a collection agreement
        between Defendant ACB and Defendant
        Amex.

        19. Defendant Connors filed the state court
        lawsuit purportedly as the attorney for De-
        fendant Amex.
        20. Defendant Connors also was the attorney
        for Defendant ACB in the federal court law-
        suit brought by Mr. Lewis.

        24. Defendant ACB filed the state court law-
        suit in retaliation for Mr. Lewis having filed
        this federal court lawsuit against Defendant
        ACB, violating ECOA section 1691(a)(3),
        FDCPA section 1692e(5), and OCSPA sec-
        tions 1345.02-1345.03

        26. Defendant Amex knew that the state
        court lawsuit against Mr. Lewis was made in
        retaliation for Mr. Lewis' federal court law-
        suit and thereby violated ECOA section
        1691(a)(3)

Lewis's complaint also fails to show a causal connec-
tion between the Dayton suit and Amex's suit against
him in state court. His attempts at showing a retali-
atory motive on the part of Amex once again amount
to nothing more than unwarranted factual inferences
and legal conclusions that are insufficient to state a
claim of retaliation. To allow a claim to be stated
any time a consumer makes an unwarranted factual
inference or bare legal conclusion of retaliation in re-
sponse to a creditor's legal action seeking resolution
of an undisputed debt would be to create an incentive
on the part of consumer to file an ECOA claim
against creditors any time the debtor is unable or un-
willing to pay on the debt. The ECOA was certainly
never intended to act as a shield for consumers refus-
ing to pay their debts.

**B. *The district court finding that ACB and Connors
are not "creditors"***

[30] Next Lewis argues that the district court erred by
finding that ACB and Connors are not "creditors"
within the meaning of the Act. He claims that by
simply alleging that they are "creditors" he has met
his burden. Further, he claims that "ACB and Con-
nors are creditors because the debt allegedly owed by
Mr. Lewis to Defendant Amex was 'continued' by
[ACB and Connors]... Thus, Defendants ACB and

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Connors are creditors in that they are (1) agents of Defendant Amex who 'continued' the credit transaction, or (2) assignees, transferees, or subrogees of Amex' credit transaction with Mr. Lewis." Appellant's Brief at 17-18.  Further, he argues that a

> [c]reditor "also includes a person who, in the ordinary course of business, regularly refers applicants or prospective applicants to creditors, or selects or offers to select creditors to whom request for credit may be made."   The debt allegedly owed by Mr. Lewis to Defendant Amex was referred by defendants ACB and Connors to Defendant Amex for consideration of further credit.  In fact, Defendants ACB and Connors solicited payment arrangements with Mr. Lewis regarding the debt allegedly owed by Mr. Lewis, which constitutes a credit transaction under the ECOA.

*Id* at 18.

Under the Act, the term "creditor" is defined as "any person who regularly extends, renews, or continues credit; any person who regularly arranges for the extension, renewal, or continuation of credit; or any assignee of an original creditor who participates in the decision to extend, renew, or continue credit."  15 U.S.C. § 1691a(e).   The term also includes "a creditor's assignee, transferee, or subrogee who participates in the decision of whether or not to extend credit."  12 C.F.R. § 202.2(*l*).   And for purposes of §§ 202.4 [FN14] *408 and 202.5(a) [FN15] "the term also includes a person who, in the ordinary course of business, regularly refers applicants or prospective applicants to creditors, or selects or offers to select creditors to whom requests for credit may be made."  *Ibid*

> FN14.  That provision provides that "[a] creditor shall not discriminate against an applicant on a prohibited basis regarding any aspect of a credit transaction."
>
> FN15.  That provision provides that "[a] creditor shall not make any oral or written statement, in advertising or otherwise, to applicants or prospective applicants that would discourage on a prohibited basis a reasonable person from making or pursuing an application."

Connors clearly is not a "creditor" within the meaning of the Act.  On its face, Lewis's complaint contains nothing more than a bare legal conclusion in an attempt to show that Connors regularly extended, renewed, or continued credit or regularly arranged for the extension, renewal, or continuation of credit.  [FN16] The complaint also does not provide facts to show how Connors is an assignee of Amex.  At best, Lewis appears to suggest that because Connors offered to settle the case, he has in some sense extended an offer of credit to Lewis.  [FN17]  This is certainly not enough to make someone a creditor under the act.   Otherwise, an attorney would be a creditor under the ECOA anytime the attorney offered to settle a case.

> FN16.  Lewis's complaint simply provides that "Defendant Connors is a 'debt collector' as defined by FDCPA section 1692a(6), a 'supplier' as defined by OCSPA section 1345.01(C), and a 'creditor' as defined by ECOA section 1691a(e)."  Joint Appendix at 19, ¶ 10.
>
> FN17.  Lewis claims that an exhibit to his memorandum in opposition to defendants' motion to dismiss his complaint shows that defendants offered to give him "consideration for a new credit card."   The letter to which Lewis appears to be referring is a letter sent by his *own* attorney offering to settle the case.   One of the terms of the settlement was for Amex to reconsider Lewis "as a card holder immediately after the $7,500 is paid."   This settlement offer was never accepted by defendants.

[31][32]  ACB is also not a "creditor" within the meaning of the act.   Again, Lewis has failed to provide anything more than a bare legal conclusion to show that ACB regularly extends, renews, or continues credit or that ACB participates in any way in the decision to extend credit.   Rather, the record shows that ACB was simply attempting to collect on a debt that resulted from Amex's decision to extend credit.   Additionally, even were ACB a "creditor" under the act, Lewis's claim would fail.   He has failed to state any claim that ACB independently violated the

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

ECOA and, as discussed above, Lewis has failed to state an ECOA claim against Amex, so any ECOA claim against ACB as an agent or "assignee, transferee, or subrogee" of Amex must also fail.

## VI

Next, Lewis argues that the district court erred in dismissing his FDCPA claims against ACB, Amex, and Connors. He argues that the district court, "[w]ithout allowing any discovery to go forward, ... makes three disjointed factual and legal findings concerning the FDCPA: (1) defendant Connors is not a debt collector, (2) Defendant ACB did not interpose itself between defendants Connors and Amex, constituting the unauthorized practice of law, and (3) Defendant Amex is not a debt collector." Appellant's Brief at 19-20. Again, we find no reversible error.

A. *Connors as a debt collector within the meaning of the FDCPA*

[33] First, Lewis argues that the district court erred in granting Connors's motion for summary judgment, holding that Connors was not a debt collector. Lewis argues that the district court simply relied on Connors's affidavit and that he should have been allowed to continue discovery pursuant to his Rule 56(f) motion because such discovery would have shown that Connors is a debt collector as defined by the FDCPA. [FN18] This argument is without merit.

> FN18. A debt collector is defined as:
> any person who uses any instrumentality of interstate commerce or the mails in any business the principal purpose of which is the collection of any debts, or who regularly collects or attempts to collect, directly or indirectly, debts owed or due or asserted to be owed or due another....
> 15 U.S.C. § 1692a(6). The Supreme Court has held that the FDCPA applies to lawyers who "regularly" try to obtain payment of consumer debts through legal proceedings. *Heintz v. Jenkins*, 514 U.S. 291, 296-98, 115 S.Ct. 1489, 1492, 131 L.Ed.2d 395 (1995).

*409 A motion for summary judgment is appropriate

"if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." *Emmons v. McLaughlin*, 874 F.2d 351, 353 (6th Cir.1989). Once the movant has met his initial burden of demonstrating the absence of a genuine issue of material fact, the nonmoving party then "must set forth specific facts showing that there is a genuine issue for trial." Fed.R.Civ.P. 56(e). If the nonmoving party is unable to make such a showing, summary judgment is appropriate. *Emmons*, 874 F.2d at 353.

[34][35][36] A party opposing a motion for summary judgment may file a motion for additional time for discovery under Rule 56(f). That party, however, has no absolute right to additional time for discovery, and this court reviews the denial of a rule 56(f) motion for an abuse of discretion. *Id.* at 356. Rule 56(f) provides:

> Should it appear from the affidavits of a party opposing the motion [for summary judgment] that the party cannot for reasons stated present by affidavit facts essential to justify the party's opposition, the court may refuse the application for judgment or may order a continuance to permit affidavits to be obtained or depositions to be taken or discovery to be had or may make such other order as is just.

Rule 56(f), however, "is not a shield that can be raised to block a motion for summary judgment without even the slightest showing by the opposing party that his opposition is meritorious." The nonmoving party must show how postponement of a ruling on the motion will enable him to rebut the motion for summary judgment. *Emmons*, 874 F.2d at 356.

Lewis's claims against Connors were that (1) he violated the FDCPA by filing the state case as Amex's attorney because he knew that the state case was in retaliation for Lewis having filed the Dayton case and (2) Connors violated the FDCPA by filing the state action in the improper venue. *See* 15 U.S.C. § 1692i (directing where a debt collector may bring an action against a consumer).

[37] Connors's affidavit proves that, although he has been involved in cases where money damages and al-

135 F.3d 389                                                                                                    Page 22
135 F.3d 389, 39 Fed.R.Serv.3d 1376
**(Cite as: 135 F.3d 389)**

leged debts are disputed, he has never brought any action exclusively on behalf of a creditor client with the purpose of collecting a consumer debt, that he has never had a practice which consisted of debt collection on behalf of creditors, and that the overwhelming portion of his practice has been as a defense attorney. This affidavit, without evidence from Lewis creating an issue of material fact regarding Connors's practice, establishes that he is not a "debt collector" under the FDCPA because he is not a lawyer who "regularly" tries to obtain payment of consumer debts through legal proceedings. *See Heintz,* 514 U.S. at 291-94, 115 S.Ct. at 1489.

We believe that the district court did not abuse its discretion in refusing to give Lewis additional time for discovery as to Connors's practice. Lewis had ample opportunity to conduct discovery in the Dayton case, including discovery after Amex had filed the state court action. For example, he has taken depositions of two different representatives of ACB since the start of the state court proceeding, and in the Dayton case, he has cross-examined witnesses regarding the debt collection activities of ACB, including what happened after Mr. Lewis's account was returned to it. Further, the district court provided Lewis with an additional 10 days to respond to Connors's motion for summary judgment. This gave Lewis ample time to, at a minimum, discover some evidence regarding Connors's practice to support his motion for additional time pursuant to Rule 56(f).

Additionally, while Lewis's motion for additional discovery asserts that "[d]efendants and their witnesses are in exclusive control" of the evidence, Lewis's Rule 56(f) motion and supporting affidavit provide nothing more than bare allegations to support this claim. *See Emmons,* 874 F.2d at 356 (the "district court did not abuse its discretion in denying additional discovery because the affidavit in support of a Rule 56(f) motion asserted nothing more than bare allegations"). **\*410** The attached affidavit simply states that Connors "is a 'debt collector' as defined by FDCPA section 1692a(6)." Such an allegation without a shred of supporting proof is insufficient to support a Rule 56(f) motion, especially since a simple investigation could have easily uncovered some evidence concerning Connors's practice. And, although Lewis

claims that the lack of specificity is due to the fact that the evidence is exclusively controlled by defendants, Lewis could have obtained at least some information regarding Connors's practice without relying on defendants for that information. *See ibid* (Plaintiff's allegations did not hinge on information under the defendant's control). As it is, the affidavit simply does not provide the "slightest showing ... that his opposition is meritorious." *Emmons,* 874 F.2d at 356. And it certainly does not provide enough evidence for this court to conclude that the district court abused its discretion in denying his Rule 56(f) motion.

*B. ACB's actions as unauthorized practice of law*

[38] Next, Lewis argues that the district court erred when it found that ACB's actions did not constitute the unauthorized practice of law. He claims that ACB engaged in the unauthorized practice of law when it hired Mr. Connors on behalf of Amex, thus interposing itself between Amex and Connors:

> The [Magistrate Judge's] Substituted Report [and Recommendations] finds that Defendant Connors is not alleged to be an employee of Defendants ACB or Amex. Yet the Substituted Report does not divulge the legal significance of this finding. When an agent is acting pursuant to authority, a principal is responsible for the actions of the agent whether the agent is an employee or a contractor. Likewise, the agent is directly liable for its actions pursued on behalf of the principal. Defendant Connors is the agent of Defendant Amex and Defendant ACB in regard to the state court lawsuit against Mr. Lewis. Since Defendant ACB hired Defendant Connors for Defendant Amex, Defendant ACB is the agent of Defendant Amex. The actions of Defendant Connors can be attributed to Defendants ACB and Amex, and the actions of Defendant ACB can be attributed to defendant Amex.

Appellant's Brief at 26 (citation omitted). Lewis then proceeds to cite several Ohio court cases which he claims support his claim that ACB engaged in the unauthorized practice of law. *See Med Controls, Inc. v. Hopkins,* 61 Ohio App.3d 497, 573 N.E.2d 154 (1989) (collection agency found to have committed the unauthorized practice of law where it had discretion to institute legal action on its own initiative and had the sole authority to "employ counsel of [its]

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

135 F.3d 389                                                                          Page 23
135 F.3d 389, 39 Fed.R.Serv.3d 1376
(Cite as: 135 F.3d 389)

own and separate choosing" and was "responsible for the payment of any and all legal fees incident to said retention"); *United Radio, Inc. v. Cotton,* 61 Ohio App. 247, 22 N.E.2d 532 (1938) (where a collection agency agreed to handle the collection of accounts on a contingent fee basis, action of agency in furnishing an attorney, at its own expense, and filing lawsuits in hope of reimbursement through a larger commission in event of collection constituted the unlawful practice of law); *In re Incorporated Consultants,* 6 Ohio Misc. 143, 216 N.E.2d 912 (Ohio C.P. Cuyahoga County 1965) (an agreement between respondents and owners of promissory notes and accounts receivable which provided that the respondents employed, furnished, and recommended attorneys at law to render legal services was an unauthorized practice of law). Although we have some difficulty following Lewis's convoluted argument, we are convinced that it has no merit.

Although these cases, under different factual circumstances, could support a legal claim that a debt collector has been involved in the unauthorized practice of law by interposing itself between the creditor and the attorney, Lewis has failed to allege any factual basis for such a claim. Thus, this court need not accept this allegation as true. *See Church's Fried Chicken,* 829 F.2d at 12. There is simply no factual basis to support his assertion that ACB, and not Amex, was the party to hire Connors. In fact, the record shows the opposite: Connors signed on behalf of Amex as its attorney in pleadings to the court. Furthermore, Lewis's complaint in no way alleges that ACB, and not Amex, is responsible for paying Connors's fees. The *411 cases cited by Lewis in support of his claim of unauthorized practice of law by ACB require at a minimum that the firm be responsible for payment of the attorney's fees. [FN19]

> FN19. Because this case was dismissed for failure to state a claim, we need not address the affidavits of either Connors or Kane, an Amex employee. These affidavits, however, make clear that Amex and not ACB was responsible for and authorized the filing of the state court suit. Furthermore, they indicate that Connors is in no way associated with ACB outside of this case.

*C. Amex as a debt collector within the meaning of the FDCPA*

[39] Lewis also argues that the district court "without reasoning" found that Amex could not be a debt collector. He argues that Amex is liable under the FDCPA "for the collection actions of its agents of which it is aware and approves":

> There is no dispute that Defendant ACB requested Mr. Lewis' account back from Defendant Amex for the express purpose of filing the state court lawsuit on behalf of Defendant Amex. A fair inference must be made that, when Defendant ACB communicated with Defendant Amex, Defendant ACB stated the reason for the request, placing Defendant Amex on notice of Defendant ACB's intended actions. Since Defendant Amex returned the account to Defendant ACB, the reasonable inference must be made that Defendant Amex approved of Defendant ACB's retaliatory lawsuit.

Appellant's Brief at 27-28 (citations omitted).

Contrary to Lewis's assertion, Amex is not a debt collector for purposes of the FDCPA. Although it uses interstate commerce and the mails to collect debts, its "principal purpose" is not "the collection of debts." 15 U.S.C. § 1692a(6). Rather, Amex is primarily in the business of extending credit, which is not enough to turn an entity into a debt collector under the Act. *See Meads v. Citicorp Credit Servs., Inc.,* 686 F.Supp. 330, 333 (S.D.Ga.1988) ("actual creditors--the extenders of credit or bona fide assignees--generally are not subject to the Act ... [unless] the creditor attempts to collect the debt under an assumed name, or if the creditor was assigned the debt after default for the specific purpose of collection"); and *Kempf v. Famous Barr Co.,* 676 F.Supp. 937, 938 (E.D.Mo.1988) ("The definition of 'debt collector' does not include a creditor collecting his own debts so long as the employee acting on behalf of the creditor does not indicate that the employee works for a third person. The creditor will not be deemed a 'debt collector' so long as the employee acts 'in the name of the creditor' by informing the debtor that she is collecting the debt as an employee of the creditor."). Because Amex never attempted to collect the debt under an assumed name in order to collect the debt, it does not fall within the definition of a "debt collect-

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

or" under the Act.

[40] Moreover, even were Amex a debt collector, its actions did not violate the FDCPA. Lewis's complaint does nothing more than assert bare legal conclusions and unsupported factual inferences to show that Amex's actions were done in retaliation for Lewis having filed the Dayton case. And he has alleged nothing that would show that Amex's actions were somehow "false, deceptive, or misleading" as required by the FDCPA. All Amex has done is either (1) sue Lewis to collect on a legitimate debt or (2) hire ACB to collect on a legitimate debt. Congress has outlawed neither.

### VII

[41] Next, Lewis argues that the district court erred in summarily dismissing his OCSPA claims. He argues that he had no opportunity to address the substance of his OCSPA claims and was not required to do so under the pleading requirements of the federal rules and that any violation of the FDCPA is a violation of the OCSPA. Moreover, he claims error because the OCSPA has "its own independent reach":

In this case, Defendants' retaliatory lawsuit could be found to be an unfair or unconscionable act or practice under state law. Indeed, the practice of filing of lawsuits in a county other than a consumer's already has been found to violate OCSPA. Since Defendant Connors is a supplier--even if he is not [a] debt collector pursuant to the FDCPA--and since Defendants *412 Amex and ACB are suppliers and vicariously liable for the actions of their agents, the OCSPA applies to Defendants' unfair, deceptive, and unconscionable collection activities.

Appellant's Brief at 30 (citations omitted). We find no merit in this claim of error either. Because this claim rests on Amex's having filed suit in state court in Columbus, the key to finding liability under OCSPA is whether Amex is a "supplier" within the meaning of the OCSPA, and Amex is simply not a supplier within the meaning of the Act. While the term "supplier" [FN20] in the OCSPA is broader than the term "debt collector" in the FDCPA, the OCSPA specifically excludes "financial institutions" and "dealers in intangibles." Ohio Rev.Code § 1345.01(A). At a minimum, Amex fits within the definition of a

"financial institution" as it lends money when it extends credit. See Ohio Rev.Code § 5725.01(A).

> FN20. A supplier is defined as "a seller, lessor, assignor, franchiser, or other person engaged in the business of effecting or soliciting consumer transactions, whether or not he deals directly with the consumer." Ohio Rev.Code § 1345.01(C).

[42] The dismissal of OCSPA claims against ACB and Connors were proper as well. Lewis has failed to state a claim with sufficient specificity to show ACB's independent involvement in the filing of the state court lawsuit or the agency relationship between ACB and Connors with respect to that suit. As previously stated, the trial court need not accept as true unwarranted factual inferences. And while Connors filed the lawsuit as Amex's attorney, nothing alleged suggests that Connors regularly files collection suits as a matter of choice in a jurisdiction other than where the consumer resides or signed the contract in question. See Celebrezze v. United Research, Inc., 19 Ohio App.3d 49, 482 N.E.2d 1260 (1984) (it was unfair or deceptive consumer sales practice in violation of state law for a "supplier" to regularly file collection suits as a matter of choice in a jurisdiction other than where consumer resided or signed the contract in question). Key to a finding of OCSPA liability in Celebrezze was the fact that the "suppliers" in that case regularly sued consumers in a distant forum in order to take advantage of their consumers.

### VIII

[43] Finally, Lewis argues that the district court erred when it denied his motion to reconsider the court's previous order rejecting a change of venue. He argues that by trying the Dayton case separately, consolidation of the cases became one of name only and "nullified any consider[ation] of the common issues of law and fact." He argues that his choice of forum should have been given great weight, and thus, he should have been allowed to change the venue back to Cincinnati. Lewis's argument is again without merit.

[44] A district court's denial of change of venue is reviewed for abuse of discretion. See Philip Carey Mfg. v. Taylor, 286 F.2d 782, 784 (6th Cir.), cert

135 F.3d 389                                                          Page 25
135 F.3d 389, 39 Fed.R.Serv.3d 1376
(Cite as: 135 F.3d 389)

denied, 366 U.S. 948, 81 S.Ct. 1903, 6 L.Ed.2d 1242 (1961).

28 U.S.C. § 1404(a) provides that "[f]or the convenience of the parties and witnesses, in the interest of justice, a district court may transfer any civil action to any other district or division where it might have been brought." And a case may be consolidated "[w]hen actions involving a common question of law or fact are pending before the court." Fed.R.Civ.P. 42(a). When consolidating a case, a district court "may order a joint hearing or trial of any or all the matters in issue in the actions; it may order all the actions consolidated; and it may make such orders concerning proceedings therein as may tend to avoid unnecessary costs or delay." Ibid.

[45][46][47] Cases consolidated under Rule 42(a), however, retain their separate identity. Patton v. Aerojet Ordnance Co., 765 F.2d 604, 606 (6th Cir.1985). And although "consolidation is permitted as a matter of convenience and economy in administration, [it] does not merge the suits into a single cause, or change the rights of the parties, or make those who are parties in one suit parties in another." Johnson v. Manhattan Ry. Co., 289 U.S. 479, 53 S.Ct. 721, 77 L.Ed. 1331 (1933). Therefore, it is the district court's *413 responsibility to ensure that parties are not prejudiced by consolidation. See 9 Charles A. Wright and Arthur R. Miller, Federal Practice and Procedure § 2385 (2d ed.1994).

[48] While Lewis correctly points out that a plaintiff's choice of forum should be given weight when deciding whether to grant a motion to change venue, this factor is not dispositive. See DeMoss v. First Artists Production Co., 571 F.Supp. 409, 413 (N.D.Ohio 1983). And it is of no import that the cases were treated as consolidated for docketing purposes only. The two cases had to be dealt with separately because Lewis declined plenary magistrate judge jurisdiction in the Cincinnati case. To have allowed any greater consolidation would have prejudiced the parties, since in the later case both parties had not consented to plenary magistrate judge jurisdiction.

The record, moreover, supports the court's finding that Lewis's consolidation and motion for transfer of venue was an attempt to avoid having the cases decided by Magistrate Judge Merz, who Lewis perceived to be unreceptive to his claims.

IX

For the foregoing reasons, the district court's orders dismissing Lewis's claims against defendants in both the Dayton case and Cincinnati case are **AFFIRMED**.

RYAN, Circuit Judge, dissenting.

I believe the plain language of the Fair Debt Collection Practices Act (FDCPA), 15 U.S.C. § 1692 -1692, requires us to reverse the judgment of the district court. I also think the district court misapplied the standards for deciding motions under Fed.R.Civ.P. 12(b)(6) and 56. Therefore, I must respectfully dissent.

I.

The Dayton Case

In finding no violation of the FDCPA, the majority opinion relies heavily on legislative history and other decisional devices that are properly employed when a legislative enactment is vague, obscure, ambiguous, or inherently contradictory. If I thought for a moment that we were free to decide this case on the basis of "legislative history," "Senate Reports," "the purpose behind the [FDCPA]," what "Congress appears to have intended," "Federal Trade Commission advisory opinions," "the policy of the legislation as a whole," and whether ACB's collection practices are "less coercive" than litigation, as the majority apparently does, I might be tempted to sign on to the majority opinion. But I do not, and, therefore, I cannot.

There are very few propositions defining the proper scope of judicial review that are more firmly settled than the rule that when the language of a congressional enactment is clear and unambiguous, courts may not "interpret" or "construe" the meaning of the language of the law by resort to "legislative history," apparent "legislative policy," or "legislative intent," but must simply apply what Congress has said, assigning to the words used in the statute their primary and generally accepted meaning. The FDCPA is such a statute. There is nothing ambiguous, unclear,

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

vague, or inherently contradictory about any of the language of the FDCPA. As a matter of fact, the provisions of the statute are so painfully, some might think annoyingly, even nitpickingly, clear, and impose such unambiguous burdens upon even ethical debt collectors, that it is somewhat understandable that the majority opinion would resort to interpretation and construction to soften some of the harsh effects of the statute.

This case chronicles seemingly benign and ethical collection efforts by an apparently reputable company directed at an unappealing and even infuriating deadbeat debtor. Certainly, Congress did not intend to proscribe the legitimate collection of an undisputed debt, but it is our business to determine what Congress said, not what it probably intended. If this statute is harsh, inflexible, hypertechnical, unforgiving, and unfairly burdensome to debt collectors, and if it sweeps into the ambit of its prohibited practices the acts of the virtuous and the vicious alike, the problem is one for legislative correction, not judicial "interpretation."

*414 The majority opinion acknowledges that the broad and sweeping language of the FDCPA effectively forbids *any* communications by a collector to a debtor in the aftermath of the debtor's cease and desist letter, subject to three narrow exceptions. The three exceptions are that the debt collector may:

(1) ... advise the consumer that the debt collector's further efforts are being terminated;

(2) ... notify the consumer that the debt collector or creditor may invoke specified remedies which are ordinarily invoked by such debt collector or creditor; or

(3) where applicable, ... notify the consumer that the debt collector or creditor intends to invoke a specified remedy.

15 U.S.C. § 1692c(c)(1)-(3)

The majority opinion acknowledges that the June 3 collection letter ACB sent to Lewis does not literally fall within any one of the three exceptions and, as a matter of fact, explicitly states "THIS IS AN AT-TEMPT TO COLLECT A DEBT." But, according to the majority opinion, this plain and unambiguous language "can not be interpreted as a demand for pay-

ment" because the statement in the letter that "THIS IS AN ATTEMPT TO COLLECT A DEBT" was included in the letter merely to comply with 15 U.S.C. § 1692e(11), which has since been amended, and which read in relevant part that "the failure to disclose clearly in all communications ... that the debt collector is attempting to collect a debt and that any information obtained will be used for that purpose" is a violation of the FDCPA. But subsection 11 reads:

Except as otherwise provided for communications to acquire location information under section 1692b of this title, the failure to disclose clearly in all communications *made to collect a debt* or to obtain information about a consumer, that the debt collector is attempting to collect a debt and that any information obtained will be used for that purpose.

15 U.S.C. § 1692e(11) (emphasis added). Therefore, there was no need for ACB to comply with section 11 by declaring that its letter "is an attempt to collect a debt," unless the letter *was* indeed another "communication[ ] made to collect a debt," rather than one of the three types of notifications excepted from the bar of the statute in section 1692c(c)(1)-(3).

In addition to its puzzling explanation on that point, the majority opinion also mistakenly concludes that ACB's letter "can be construed as a type of settlement offer" and can be read as a notification to "the consumer[, under section 1692c(c)(2),] that the debt collector or creditor may invoke specified remedies which are ordinarily invoked by such debt collector or creditor." That "construction is warranted," the majority opinion concludes, despite that the text of the letter never uses the term "remedy," explicitly declares that the letter "IS AN ATTEMPT TO COL-LECT A DEBT," and offers "AN OPPORTUNITY TO PAY THIS DEBT" through "ONE OF THE FOL-LOWING PAYMENT ARRANGEMENTS."

The plain language of section 1692c(c)(2) permits a debt collector to notify a consumer of unilateral action the debt collector may take against the consumer, such as filing suit, issuing a prejudgment garnishment, or invoking such other "remedies" as are "ordinarily invoked." 15 U.S.C. § 1692c(c)(2). A letter declaring that "THIS IS AN ATTEMPT TO COLLECT A DEBT" and offering payment plans for doing so, is plainly and obviously not a letter notifying the debtor

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

135 F.3d 389

135 F.3d 389, 39 Fed.R.Serv.3d 1376

(Cite as: 135 F.3d 389)

that the "creditor may *invoke* specified remedies." *Id* (emphasis added). If it were, then a debt collector, despite receiving a cease and desist notice from the debtor, would never be barred from contacting a consumer to notify him or her that payment of the debt would "remedy" the problem. Witness Mark Nakon testified that the letter to Lewis is similar to letters used by ACB in situations where notice to cease further communications has *not* been received. Indeed the letter is nothing more than an attempt to bargain with Lewis regarding his debt, and is exactly what it says it is: " ... an attempt to collect a debt." The observations in the majority opinion that "the letter can be construed as a type of settlement offer" and should not be "construed as an abusive collection practice"; that it "may result in resolution **415** of the debt without resorting to litigation"; and "is certainly less coercive and more protective of the interests of the debtor" than costly and time-consuming litigation, are of course entirely beside the point. The letter is not a mere notification of the invocation of remedies ordinarily invoked; it is a debt collection letter, just as it says it is, and its issuance was a violation of the plain language of section 1692e.

Likewise, I must dissent from the majority's refusal to recognize a violation of section 1692e in ACB's use of the alias "M. Hall" in the June 3 letter. Although the use of the alias seems harmless, the plain language of the FDCPA prohibits "[t]he use of any false representation or deceptive means to collect or attempt to collect any debt or to obtain information concerning a consumer." 15 U.S.C. § 1692e(10). The defendants have admitted that there is no such person as "M. Hall." Thus, the letter, which purports to have been sent by a person named "M. Hall" and which utilizes the pronouns "I," "me," and "my" a total of eight times, is a "false and deceptive representation" that it was sent by a person named "M. Hall." The language of the letter and the use of the name "M. Hall" were designed to induce the debtor to believe that a specific individual named "M. Hall" was handling the debtor's case, and would assist him in making arrangements for payment of the debt, when ACB knew, that was not true.

Concededly it is difficult to see the harm caused by this particular deception, but the FDCPA unambigu-

ously proscribes deception in any form, not only in circumstances in which a debt collector or this court might think that the end justifies the means. In all events, to suggest, as ACB does, that using a "desk name" is proper because it has always been done that way, or that no harm has shown to have resulted in this instance, does not excuse compliance with the plain language of the statute; nor does it justify this court in applying basketball's "equitable" maxim of "no harm no foul."

## II.
### The Cincinnati Case
The district court held that Lewis's allegation in the Cincinnati suit, that in filing the state-court collection case in Columbus, Amex violated Lewis's rights under the Equal Credit Opportunity Act (ECOA), 15 U.S.C. § 1691-1691f, does not state an actionable claim under Fed.R.Civ.P. 12(b)(6). Lewis alleged that the collection suit was filed *in retaliation* for his exercising his rights under the FDCPA. The majority opinion holds that the district court correctly dismissed Lewis's ECOA claim because "he is unable to show that he suffered an adverse action because the ECOA does not cover '[a]ny action ... relating to an account taken in connection with ... default [ ] or delinquency.' " (Citing 12 C.F.R. § 202.2(c)(2)(ii) ) I disagree.

It is unnecessary to review here the well-settled jurisprudence of this circuit describing the heavy burden cast upon a party who seeks dismissal of a claimant's lawsuit on the basis of Rule 12(b)(6). It suffices to say that ACB's obligation here was to show that Lewis could prove no set of facts in support of his retaliation claims. *Saglioccolo v. Eagle Ins. Co.*, 112 F.3d 226, 228 (6th Cir.1997) (quoting *Conley v. Gibson*, 355 U.S. 41, 45-46, 78 S.Ct. 99, 101-02, 2 L.Ed.2d 80 (1957)). The burden is onerous, and in my judgment ACB has not carried it.

The ECOA makes it unlawful for any creditor to discriminate against a debtor who has exercised any right under the Consumer Credit Protection Act. *See* 15 U.S.C. § 1691-1691f; 12 C.F.R. Pt. 202. The majority opinion correctly observes that a claim of this sort is analyzed under the burden allocation framework established for Title VII retaliation in em-

135 F.3d 389
135 F.3d 389, 39 Fed.R.Serv.3d 1376
**(Cite as: 135 F.3d 389)**

ployment claims.    Consequently, to survive a
12(b)(6) dismissal motion Lewis was required to
plead that he (1) engaged in a statutorily protected
activity; (2) suffered an adverse credit action; and
that (3) there is a causal connection between 1 and 2.
*See Johnson v. United States Dep't of Health and Hu-
man Servs., 30 F.3d 45, 47 (6th Cir.1994).*   My col-
leagues think Lewis is "unable to make such a show-
ing" primarily because they think he will be unable to
prove that he suffered an adverse action since "the
ECOA does not cover '[a]ny action ... relating to an
***416** account taken in connection with .... default [ ]
or delinquency.' "    My brothers believe that Lewis
has pleaded nothing more than a creditor taking a
lawful "action to recover thousands of dollars in un-
disputed debt that the consumer refuses to honor."

I respectfully disagree that the ECOA does not pro-
scribe collection suits against defaulting debtors if
such suits are filed for retaliatory purposes.

In the first place, it is clear that the ECOA's definition
of an "adverse action" does not determine what con-
stitutes discrimination for purposes of section
1691(a), but rather determines what actions require
*notice compliance* under section 1691(d). Section
1691(a)(3) plainly makes unlawful a collection suit
filed in retaliation for an FDCPA enforcement ac-
tion.   Whether Lewis could succeed in persuading a
fact finder that the Columbus suit was filed for retali-
atory purposes is another matter.   It is possible, for
example, that Lewis could prove that Amex is usually
more patient with debtors and that Lewis was only
subjected to the Columbus collection suit because he
filed the Dayton suit.   Lewis's claim would be very
similar, for example, to an employment discrimina-
tion suit alleging retaliation for the filing of an EEOC
charge where the complaining employee has a poor
work history.

The district court reasoned that Lewis had *not
pleaded* the existence of similarly situated debtors
who had not been sued by Amex. But it is not neces-
sary in order to plead a retaliation claim that Lewis
plead even more facts than are necessary to establish
a *prima facie* case of unlawful retaliation.

The question is not, as the majority apparently thinks

it is, whether ACB has the right to sue to collect on a
debt; clearly it has.   The question is whether Lewis
can prove that the suit to collect on the debt was filed
in retaliation for exercising his protected right.   It
may well be that Lewis could not prove the causal
connection necessary to prevail on a retaliation
charge, yet under Rule 12(b)(6), the inquiry concerns
whether Lewis could establish his case under *any* set
of facts.   To me, it is clear that it is *possible* that he
could do so.

There are other conclusions in the majority opinion
with which I disagree, but those I have discussed are
the most serious, and no useful purpose will be
served by elucidating the rest.

I would reverse the judgment of the district court and
allow the case to be decided by the trier of fact on the
evidence.

135 F.3d 389, 39 Fed.R.Serv.3d 1376

**Briefs and Other Related Documents (Back to top)**

• 1998 WL 35031248 (Appellate Petition, Motion
and Filing) Petition for Rehearing and Suggestion for
Rehearing En Banc (Feb. 13, 1998)

END OF DOCUMENT

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.