# EXHIBIT 17

Westlaw.

51 F.3d 1421                                                                                                    Page 1
51 F.3d 1421, 1995-1 Trade Cases P 70,952
**(Cite as: 51 F.3d 1421)**

▷
<u>Briefs and Other Related Documents</u>
Rebel Oil Co., Inc. v. Atlantic Richfield Co.C.A.9
(Nev.),1995.

United States Court of Appeals,Ninth Circuit.
REBEL OIL COMPANY, INC., a Nevada corpora-
tion; Auto Flite Oil Company, Inc., a Nevada corpor-
ation, Plaintiffs-Appellants,
v.
ATLANTIC RICHFIELD COMPANY, a
Pennsylvania corporation, Defendant-Appellee.
**No. 92-16932.**

Argued and Submitted Dec. 16, 1993.
Decided April 7, 1995.

Self-serve gasoline retailers brought antitrust action
against competitor, alleging predatory pricing of gas-
oline by competitor in violation of Sherman Act and
Clayton Act. Competitor and retailer cross-moved for
partial summary judgment. The United States District
Court for the District of Nevada, <u>Philip M. Pro</u>, J.,
<u>808 F.Supp. 1464,</u> granted summary judgment for
competitor, determining that competitor's 44% share
of relevant market, which was all retail sales of gas-
oline in area, was insufficient to support antitrust
claims. Retailers appealed. The Court of Appeals,
<u>Beezer,</u> Circuit Judge, held that: (1) for purposes of
attempted monopolization claim under Sherman Act,
relevant market was all sales of retail gasoline in city,
including full-serve and self-serve gasoline; (2) fact
issue, as to whether competitor's 44% market share in
city gasoline retail market supported finding of mar-
ket power for purposes of attempted monopolization
claim, precluded summary judgment for competitor;
(3) competitor lacked sufficient market power as re-
quired for it to be liable on Sherman Act attempted
monopolization and vertical price-fixing conspiracy
claims; and (4) fact issue, as to whether competitor
had sufficient market power to maintain oligopoly
pricing in retail sale of gasoline, precluded summary
judgment for competitor on primary-line price fixing
claim under Clayton Act.

Affirmed in part, reversed in part, and remanded.
West Headnotes

**[1] Federal Courts 170B ⟨⟐⟩776**

170B Federal Courts
    170BVIII Courts of Appeals
        170BVIII(K) Scope, Standards, and Extent
            170BVIII(K)1 In General
                170Bk776 k. Trial De Novo. <u>Most Cited
Cases</u>
Court of Appeals reviews grant of summary judg-
ment de novo and evaluates evidence most favorably
to nonmoving party to determine whether any genu-
ine issues of material fact remain and whether district
court correctly applied relevant substantive law.
<u>Fed.Rules Civ.Proc.Rule 56, 28 U.S.C.A.</u>

**[2] Antitrust and Trade Regulation 29T ⟨⟐⟩713**

29T Antitrust and Trade Regulation
    29TVIII Attempts to Monopolize
        29TVIII(A) In General
            29Tk712 Elements in General
                29Tk713 k. In General. <u>Most Cited
Cases</u>
    (Formerly 265k12(1.3))

**Antitrust and Trade Regulation 29T ⟨⟐⟩714**

29T Antitrust and Trade Regulation
    29TVIII Attempts to Monopolize
        29TVIII(A) In General
            29Tk712 Elements in General
                29Tk714 k. Chance of Success in the
Relevant Market. <u>Most Cited Cases</u>
    (Formerly 265k12(1.3))

**Antitrust and Trade Regulation 29T ⟨⟐⟩715**

29T Antitrust and Trade Regulation
    29TVIII Attempts to Monopolize
        29TVIII(A) In General
            29Tk712 Elements in General
                29Tk715 k. Intent. <u>Most Cited Cases</u>
    (Formerly 265k12(1.3))
To establish Sherman Act violation for attempted
monopolization, private plaintiff seeking damages
must demonstrate four elements: specific intent to
control prices or destroy competition, predatory or

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

51 F.3d 1421                                                           Page 2
51 F.3d 1421, 1995-1 Trade Cases P 70,952
**(Cite as: 51 F.3d 1421)**

anticompetitive conduct directed at accomplishing that purpose, dangerous probability of achieving monopoly power, and causal antitrust injury. Sherman Act, § 2, as amended, 15 U.S.C.A. § 2.

**[3] Antitrust and Trade Regulation 29T ⟶ 963(2)**

29T Antitrust and Trade Regulation
    29TXVII Antitrust Actions, Proceedings, and Enforcement
        29TXVII(B) Actions
            29Tk959 Right of Action; Persons Entitled to Sue; Standing; Parties
                29Tk963 Injury to Business or Property
                    29Tk963(2) k. Causation. Most Cited Cases
    (Formerly 265k28(1.4))
Causal antitrust injury is element of all antitrust suits brought by private parties seeking damages under Clayton Act section which allows private parties to sue antitrust violators for damages. Clayton Act, § 4, 15 U.S.C.A. § 15.

**[4] Antitrust and Trade Regulation 29T ⟶ 963(1)**

29T Antitrust and Trade Regulation
    29TXVII Antitrust Actions, Proceedings, and Enforcement
        29TXVII(B) Actions
            29Tk959 Right of Action; Persons Entitled to Sue; Standing; Parties
                29Tk963 Injury to Business or Property
                    29Tk963(1) k. In General. Most Cited Cases
    (Formerly 265k28(1.4))
Under Clayton Act section which allows private parties to sue antitrust violators for damages, private plaintiffs can be compensated only for injuries that antitrust laws were intended to prevent. Clayton Act, § 4, 15 U.S.C.A. § 15.

**[5] Antitrust and Trade Regulation 29T ⟶ 963(1)**

29T Antitrust and Trade Regulation
    29TXVII Antitrust Actions, Proceedings, and Enforcement

        29TXVII(B) Actions
            29Tk959 Right of Action; Persons Entitled to Sue; Standing; Parties
                29Tk963 Injury to Business or Property
                    29Tk963(1) k. In General. Most Cited Cases
    (Formerly 265k28(1.4))
To show "antitrust injury" as element of antitrust suit brought by private party seeking damages under Clayton Act section which allows private parties to sue antitrust violators for damages, plaintiff must prove that his loss flows from anticompetitive aspect or effect of defendant's behavior, since it is inimical to antitrust laws to award damages for losses stemming from acts that do not hurt competition. Clayton Act, § 4, 15 U.S.C.A. § 15.

**[6] Antitrust and Trade Regulation 29T ⟶ 963(1)**

29T Antitrust and Trade Regulation
    29TXVII Antitrust Actions, Proceedings, and Enforcement
        29TXVII(B) Actions
            29Tk959 Right of Action; Persons Entitled to Sue; Standing; Parties
                29Tk963 Injury to Business or Property
                    29Tk963(1) k. In General. Most Cited Cases
    (Formerly 265k28(1.4))
For purposes of establishing antitrust injury required for action brought under Clayton Act section which allows private parties to sue antitrust violators for damages, if injury flows from aspects of defendant's conduct that are beneficial or neutral to competition, there is no "antitrust injury." Clayton Act, § 4, 15 U.S.C.A. § 15.

**[7] Antitrust and Trade Regulation 29T ⟶ 524**

29T Antitrust and Trade Regulation
    29TVI Antitrust Regulation in General
        29TVI(A) In General
            29Tk522 Constitutional and Statutory Provisions
                29Tk524 k. Construction. Most Cited Cases
    (Formerly 265k12(1.1))

51 F.3d 1421                                                                Page 3
51 F.3d 1421, 1995-1 Trade Cases P 70,952
(Cite as: 51 F.3d 1421)

For purposes of Sherman Act, "competition" consists of rivalry among competitors. Sherman Act, § 1 et seq., as amended, 15 U.S.C.A. § 1 et seq.

**[8] Antitrust and Trade Regulation 29T ☞560**

29T Antitrust and Trade Regulation
    29TVI Antitrust Regulation in General
        29TVI(D) Illegal Restraints or Other Misconduct
            29Tk560 k. In General. Most Cited Cases
      (Formerly 265k12(1.2))
For purposes of Sherman Act, conduct that eliminates rivals reduces competition. Sherman Act, § 1 et seq., as amended, 15 U.S.C.A. § 1 et seq.

**[9] Antitrust and Trade Regulation 29T ☞523**

29T Antitrust and Trade Regulation
    29TVI Antitrust Regulation in General
        29TVI(A) In General
            29Tk522 Constitutional and Statutory Provisions
            29Tk523 k. In General. Most Cited Cases
      (Formerly 265k12(1.2))
Reduction of competition does not invoke Sherman Act until it harms consumer welfare. Sherman Act, § 1 et seq., as amended, 15 U.S.C.A. § 1 et seq.

**[10] Antitrust and Trade Regulation 29T ☞520**

29T Antitrust and Trade Regulation
    29TVI Antitrust Regulation in General
        29TVI(A) In General
            29Tk520 k. In General. Most Cited Cases
      (Formerly 265k12(1))

**Antitrust and Trade Regulation 29T ☞811**

29T Antitrust and Trade Regulation
    29TX Antitrust and Prices
        29TX(A) In General
            29Tk811 k. In General. Most Cited Cases
      (Formerly 265k12(1))
For purposes of Sherman Act, consumer welfare is maximized when economic resources are allocated to their best use, and when consumers are assured competitive price and quality. Sherman Act, § 1 et seq.,

as amended, 15 U.S.C.A. § 1 et seq.

**[11] Antitrust and Trade Regulation 29T ☞811**

29T Antitrust and Trade Regulation
    29TX Antitrust and Prices
        29TX(A) In General
            29Tk811 k. In General. Most Cited Cases
      (Formerly 265k12(1))
Act is deemed "anticompetitive" under Sherman Act only when it harms both allocative efficiency and raises prices of goods above competitive levels or diminishes their quality. Sherman Act, § 1 et seq., as amended, 15 U.S.C.A. § 1 et seq.

**[12] Antitrust and Trade Regulation 29T ☞819**

29T Antitrust and Trade Regulation
    29TX Antitrust and Prices
        29TX(A) In General
            29Tk819 k. Price Cutting and Sales Below Cost in General. Most Cited Cases
      (Formerly 265k17(1.4))
Though rivals may suffer financial losses or be eliminated as a result of below-cost pricing, injury to rivals at this stage of predatory pricing scheme is of no concern to antitrust laws. Sherman Act, §§ 1, 2, as amended, 15 U.S.C.A. §§ 1, 2; Clayton Act, § 2(a), as amended by Robinson-Patman Price Discrimination Act, 15 U.S.C.A. § 13(a).

**[13] Antitrust and Trade Regulation 29T ☞832**

29T Antitrust and Trade Regulation
    29TX Antitrust and Prices
        29TX(D) Predatory Pricing
            29Tk832 k. In General. Most Cited Cases
      (Formerly 265k12(1.8))
For purposes of Sherman Act monopolization claim alleging predatory pricing scheme, market power may be demonstrated through direct evidence of injurious exercise of market power; if plaintiff puts forth evidence of restricted output and supracompetitive prices, that is direct proof of injury to competition which competitor with market power may inflict and, thus, of actual exercise of market power. Sherman Act, § 2, as amended, 15 U.S.C.A. § 2.

**[14] Antitrust and Trade Regulation 29T ☞832**

51 F.3d 1421                                                                              Page 4
51 F.3d 1421, 1995-1 Trade Cases P 70,952
(Cite as: 51 F.3d 1421)

29T Antitrust and Trade Regulation
   29TX Antitrust and Prices
      29TX(D) Predatory Pricing
         29Tk832 k. In General. Most Cited Cases
         (Formerly 265k12(1.3))
For purposes of Sherman Act monopolization claim alleging predatory pricing scheme, market power may be demonstrated through circumstantial evidence pertaining to structure of market; to demonstrate market power circumstantially, plaintiff must define relevant market, show that defendant owns dominant share of that market, and show that there are significant barriers to entry and that existing competitors lack capacity to increase their output in the short run. Sherman Act, § 2, as amended, 15 U.S.C.A. § 2.

[15] Antitrust and Trade Regulation 29T ⊂═644

29T Antitrust and Trade Regulation
   29TVII Monopolization
      29TVII(C) Market Power; Market Share
         29Tk643 Relevant Market
            29Tk644 k. In General. Most Cited Cases
   (Formerly 265k12(1.3))
For purposes of Sherman Act monopolization claim, circumstantial evidence of market power requires that plaintiff, at the threshold, define relevant market. Sherman Act, § 2, as amended, 15 U.S.C.A. § 2.

[16] Antitrust and Trade Regulation 29T ⊂═641

29T Antitrust and Trade Regulation
   29TVII Monopolization
      29TVII(C) Market Power; Market Share
         29Tk641 k. In General. Most Cited Cases
      (Formerly 265k12(1.3))
For purposes of Sherman Act monopolization claim, "market" is any grouping of sales whose sellers, if unified by monopolist or hypothetical cartel, would have market power in dealing with any group of buyers. Sherman Act, § 2, as amended, 15 U.S.C.A. § 2.

[17] Antitrust and Trade Regulation 29T ⊂═644

29T Antitrust and Trade Regulation
   29TVII Monopolization
      29TVII(C) Market Power; Market Share
         29Tk643 Relevant Market

         29Tk644 k. In General. Most Cited Cases
   (Formerly 265k12(1.3))
For purposes of defining "market" for Sherman Act monopolization claim, if sales of other producers substantially constrain price-increasing ability of monopolist or hypothetical cartel, those other producers must be included in market. Sherman Act, § 2, as amended, 15 U.S.C.A. § 2.

[18] Antitrust and Trade Regulation 29T ⊂═641

29T Antitrust and Trade Regulation
   29TVII Monopolization
      29TVII(C) Market Power; Market Share
         29Tk641 k. In General. Most Cited Cases
      (Formerly 265k12(1.3))
For purposes of Sherman Act monopolization claim, "market" is group of sellers or producers who have actual or potential ability to deprive each other of significant levels of business. Sherman Act, § 2, as amended, 15 U.S.C.A. § 2.

[19] Antitrust and Trade Regulation 29T ⊂═742

29T Antitrust and Trade Regulation
   29TVIII Attempts to Monopolize
      29TVIII(B) Particular Industries or Businesses
         29Tk742 k. Oil, Gas and Mining. Most Cited Cases
   (Formerly 265k12(2), 265k12(1.3))
For purposes of self-serve gasoline retailers' attempted monopolization claim against competitor under Sherman Act, relevant market consisted of all sales of retail gasoline in city, including full-serve gasoline as well as self-serve gasoline, despite expert opinion defining market to exclude full-serve gasoline based on demand elasticity; consideration of supply elasticity compelled inclusion of full-serve gasoline, as ease by which marketers could convert their full-serve facilities to increase their output of self-serve gasoline required that full-serve sales be part of relevant market. Sherman Act, § 2, as amended, 15 U.S.C.A. § 2.

[20] Antitrust and Trade Regulation 29T ⊂═713

29T Antitrust and Trade Regulation
   29TVIII Attempts to Monopolize
      29TVIII(A) In General

51 F.3d 1421                                                                                                    Page 5
51 F.3d 1421, 1995-1 Trade Cases P 70,952
**(Cite as: 51 F.3d 1421)**

29Tk712 Elements in General
    29Tk713 k. In General. Most Cited
Cases
(Formerly 265k12(1.3))
For purposes of Sherman Act attempted monopolization claim, if consumers view products as substitutes, products are part of same market. Sherman Act, § 2, as amended, 15 U.S.C.A. § 2.

**[21] Federal Civil Procedure 170A ⚖═══2484**

170A Federal Civil Procedure
  170AXVII Judgment
    170AXVII(C) Summary Judgment
      170AXVII(C)2 Particular Cases
        170Ak2484 k. Antitrust and Price Discrimination Cases Most Cited Cases
If self-serve gasoline retailer's evidence could not sustain jury verdict on issue of market definition in response to competitor's summary judgment motion, summary judgment for competitor would be appropriate on that issue for purposes of retailer's Sherman Act attempted monopolization claim against competitor. Sherman Act, § 2, as amended, 15 U.S.C.A. § 2.

**[22] Antitrust and Trade Regulation 29T ⚖═══980**

29T Antitrust and Trade Regulation
  29TXVII Antitrust Actions, Proceedings, and Enforcement
    29TXVII(B) Actions
      29Tk978 Trial, Hearing and Determination
        29Tk980 k. Questions of Law and Fact.
Most Cited Cases
(Formerly 265k28(8))
For purposes of Sherman Act attempted monopolization claim, definition of relevant market is factual inquiry for jury, and court may not weigh evidence or judge witness credibility in ruling on summary judgment motion. Sherman Act, § 2, as amended, 15 U.S.C.A. § 2.

**[23] Federal Civil Procedure 170A ⚖═══2470**

170A Federal Civil Procedure
  170AXVII Judgment
    170AXVII(C) Summary Judgment
      170AXVII(C)1 In General
        170Ak2465 Matters Affecting Right to Judgment
          170Ak2470 k. Absence of Genuine Issue of Fact in General. Most Cited Cases

**Federal Civil Procedure 170A ⚖═══2546**

170A Federal Civil Procedure
  170AXVII Judgment
    170AXVII(C) Summary Judgment
      170AXVII(C)3 Proceedings
        170Ak2542 Evidence
          170Ak2546 k. Weight and Sufficiency. Most Cited Cases
That issue is factual does not necessarily preclude summary judgment; if moving party shows that there is absence of evidence to support plaintiff's case, nonmoving party bears burden of producing evidence sufficient to sustain jury verdict on those issues for which it bears burden at trial. Fed.Rules Civ.Proc.Rule 56, 28 U.S.C.A.

**[24] Federal Civil Procedure 170A ⚖═══2546**

170A Federal Civil Procedure
  170AXVII Judgment
    170AXVII(C) Summary Judgment
      170AXVII(C)3 Proceedings
        170Ak2542 Evidence
          170Ak2546 k. Weight and Sufficiency. Most Cited Cases

**Federal Civil Procedure 170A ⚖═══2552**

170A Federal Civil Procedure
  170AXVII Judgment
    170AXVII(C) Summary Judgment
      170AXVII(C)3 Proceedings
        170Ak2547 Hearing and Determination
          170Ak2552 k. Ascertaining Existence of Fact Issue. Most Cited Cases
Rule, that if party moving for summary judgment shows there is absence of evidence to support plaintiff's case, nonmoving party bears burden of producing evidence sufficient to sustain jury verdict on those issues for which it bears burden at trial, does not direct courts to resolve questions of credibility or conflicting inferences; it does require courts to assess whether jury, drawing all inferences in favor of nonmoving party, could reasonably render verdict in fa-

51 F.3d 1421                                                                                                         Page 6
51 F.3d 1421, 1995-1 Trade Cases P 70,952
**(Cite as: 51 F.3d 1421)**

vor of nonmoving party in light of substantive law. Fed.Rules Civ.Proc.Rule 56, 28 U.S.C.A.

**[25] Federal Civil Procedure 170A** 🗝2546

170A Federal Civil Procedure
   170AXVII Judgment
      170AXVII(C) Summary Judgment
         170AXVII(C)3 Proceedings
            170Ak2542 Evidence
               170Ak2546 k. Weight and Sufficiency. Most Cited Cases
In ruling on properly supported summary judgment motion, determination, of whether jury, drawing all inferences in favor of nonmoving party, could reasonably render verdict in favor of nonmoving party in light of substantive law, requires application of standard that courts apply in motions for directed verdict or judgment notwithstanding the verdict. Fed.Rules Civ.Proc.Rule 56, 28 U.S.C.A.

**[26] Federal Civil Procedure 170A** 🗝2545

170A Federal Civil Procedure
   170AXVII Judgment
      170AXVII(C) Summary Judgment
         170AXVII(C)3 Proceedings
            170Ak2542 Evidence
               170Ak2545 k. Admissibility. Most Cited Cases
Expert opinion is admissible and may defeat summary judgment if it appears that affiant is competent to give expert opinion and that factual basis for opinion is stated in affidavit, even though underlying factual details and reasoning upon which opinion is based are not. Fed.Rules Civ.Proc.Rule 56, 28 U.S.C.A.

**[27] Antitrust and Trade Regulation 29T** 🗝977(1)

29T Antitrust and Trade Regulation
   29TXVII Antitrust Actions, Proceedings, and Enforcement
      29TXVII(B) Actions
         29Tk973 Evidence
            29Tk977 Weight and Sufficiency
               29Tk977(1) k. In General. Most Cited Cases

(Formerly 265k28(7.5))
In context of antitrust law, if there are undisputed facts about structure of market that render inference to be drawn from expert's summary judgment affidavit economically unreasonable, expert opinion is insufficient to support jury verdict. Sherman Act, §§ 1, 2, as amended, 15 U.S.C.A. §§ 1, 2; Clayton Act, § 2(a), as amended by Robinson-Patman Price Discrimination Act, 15 U.S.C.A. § 13(a); Fed.Rules Civ.Proc.Rule 56, 28 U.S.C.A.

**[28] Evidence 157** 🗝570

157 Evidence
   157XII Opinion Evidence
      157XII(F) Effect of Opinion Evidence
         157k569 Testimony of Experts
            157k570 k. In General. Most Cited Cases

**Evidence 157** 🗝574

157 Evidence
   157XII Opinion Evidence
      157XII(F) Effect of Opinion Evidence
         157k574 k. Conflict with Other Evidence. Most Cited Cases
When expert opinion is not supported by sufficient facts to validate it in eyes of law, or when indisputable record facts contradict or otherwise render opinion unreasonable, it cannot support jury's verdict. Sherman Act, §§ 1, 2, as amended, 15 U.S.C.A. §§ 1, 2.

**[29] Antitrust and Trade Regulation 29T** 🗝977(1)

29T Antitrust and Trade Regulation
   29TXVII Antitrust Actions, Proceedings, and Enforcement
      29TXVII(B) Actions
         29Tk973 Evidence
            29Tk977 Weight and Sufficiency
               29Tk977(1) k. In General. Most Cited Cases

(Formerly 265k28(7.5))
For purposes of antitrust action, expert testimony is useful as guide to interpreting market facts, but it is not substitute for them. Sherman Act, §§ 1, 2, as amended, 15 U.S.C.A. §§ 1, 2; Clayton Act, § 2(a),

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

as amended by Robinson-Patman Price Discrimination Act, 15 U.S.C.A. § 13(a).

**[30] Antitrust and Trade Regulation 29T ☞ 977(1)**

29T Antitrust and Trade Regulation
   29TXVII Antitrust Actions, Proceedings, and Enforcement
      29TXVII(B) Actions
         29Tk973 Evidence
           29Tk977 Weight and Sufficiency
              29Tk977(1) k. In General. Most Cited Cases
   (Formerly 265k28(7.5))
For purposes of antitrust action, expert opinion evidence has little probative value in comparison with economic factors that may dictate particular conclusion. Sherman Act, §§ 1, 2, as amended, 15 U.S.C.A. §§ 1, 2; Clayton Act, § 2(a), as amended by Robinson-Patman Price Discrimination Act, 15 U.S.C.A. § 13(a).

**[31] Federal Civil Procedure 170A ☞ 2545**

170A Federal Civil Procedure
   170AXVII Judgment
      170AXVII(C) Summary Judgment
         170AXVII(C)3 Proceedings
           170Ak2542 Evidence
              170Ak2545 k. Admissibility. Most Cited Cases
For summary judgment purposes, inquiry respecting expert's opinion is whether inference to be drawn from opinion is reasonable, given substantive law which is foundation for claim or defense. Fed.Rules Civ.Proc.Rule 56, 28 U.S.C.A.

**[32] Antitrust and Trade Regulation 29T ☞ 713**

29T Antitrust and Trade Regulation
   29TVIII Attempts to Monopolize
      29TVIII(A) In General
         29Tk712 Elements in General
           29Tk713 k. In General. Most Cited Cases
   (Formerly 265k12(1.3))
For purposes of Sherman Act attempted monopolization claim, price differential between two products

may reflect low cross-elasticity of demand, if higher priced product offers additional service for which consumers are willing to pay a premium. Sherman Act, § 2, as amended, 15 U.S.C.A. § 2.

**[33] Antitrust and Trade Regulation 29T ☞ 713**

29T Antitrust and Trade Regulation
   29TVIII Attempts to Monopolize
      29TVIII(A) In General
         29Tk712 Elements in General
           29Tk713 k. In General. Most Cited Cases
   (Formerly 265k12(1.3))
For purposes of Sherman Act attempted monopolization claim, defining market on basis of demand considerations alone is erroneous. Sherman Act, § 2, as amended, 15 U.S.C.A. § 2.

**[34] Antitrust and Trade Regulation 29T ☞ 713**

29T Antitrust and Trade Regulation
   29TVIII Attempts to Monopolize
      29TVIII(A) In General
         29Tk712 Elements in General
           29Tk713 k. In General. Most Cited Cases
   (Formerly 265k12(1.3))
Purpose of defining relevant market in attempt-to-monopolize claim under Sherman Act was to determine whether defendant had sufficient market power to pose threat of monopoly. Sherman Act, § 2, as amended, 15 U.S.C.A. § 2.

**[35] Antitrust and Trade Regulation 29T ☞ 625**

29T Antitrust and Trade Regulation
   29TVII Monopolization
      29TVII(B) Cartels, Combinations, Contracts, and Conspiracies
         29Tk625 k. In General. Most Cited Cases
   (Formerly 265k12(1.14))
Oligopoly is not per se illegal under Sherman Act section governing monopolization. Sherman Act, § 2, as amended, 15 U.S.C.A. § 2.

**[36] Federal Civil Procedure 170A ☞ 2484**

170A Federal Civil Procedure
   170AXVII Judgment

51 F.3d 1421                                                                    Page 8
51 F.3d 1421, 1995-1 Trade Cases P 70,952
(Cite as: 51 F.3d 1421)

170AXVII(C) Summary Judgment
170AXVII(C)2 Particular Cases
170Ak2484 k. Antitrust and Price Dis-
crimination Cases. Most Cited Cases

In ruling on competitor's summary judgment motion as to gasoline retailer's Sherman Act attempted monopolization claim against competitor, district court properly aggregated together all competitor-branded gasoline stations in subject city, including both stations directly operated by competitor and those operated by independent dealers who purchased gasoline at wholesale from competitor, in determining competitor's market share; given fact that no discovery was allowed on issue of collusion, all inferences on that issue had to be drawn in retailer's favor to properly determine motion. Sherman Act, § 2, as amended, 15 U.S.C.A. § 2; Fed.Rules Civ.Proc.Rule 56, 28 U.S.C.A.

**[37] Antitrust and Trade Regulation 29T ⬡➙713**

29T Antitrust and Trade Regulation
29TVIII Attempts to Monopolize
29TVIII(A) In General
29Tk712 Elements in General
29Tk713 k. In General. Most Cited
Cases
(Formerly 265k12(1.3))

For purposes of Sherman Act attempted monopolization claim, aggregation of market shares of several rivals is justified in determining market share if rivals are alleged to have conspired to monopolize. Sherman Act, § 2, as amended, 15 U.S.C.A. § 2.

**[38] Federal Civil Procedure 170A ⬡➙2484**

170A Federal Civil Procedure
170AXVII Judgment
170AXVII(C) Summary Judgment
170AXVII(C)2 Particular Cases
170Ak2484 k. Antitrust and Price Dis-
crimination Cases. Most Cited Cases

Genuine issue of material fact existed as to whether competitor's 44% market share in city gasoline retail market supported finding of market power for purposes of gasoline retailer's Sherman Act attempted monopolization claim against competitor, precluding summary judgment for competitor on claim. Sherman

Act, § 2, as amended, 15 U.S.C.A. § 2; Fed.Rules Civ.Proc.Rule 56, 28 U.S.C.A.

**[39] Antitrust and Trade Regulation 29T ⬡➙713**

29T Antitrust and Trade Regulation
29TVIII Attempts to Monopolize
29TVIII(A) In General
29Tk712 Elements in General
29Tk713 k. In General. Most Cited
Cases
(Formerly 265k12(1.3))

Minimum showing of market share required in Sherman Act attempted monopolization case is lower quantum than minimum showing required in actual monopolization case. Sherman Act, § 2, as amended, 15 U.S.C.A. § 2.

**[40] Antitrust and Trade Regulation 29T ⬡➙713**

29T Antitrust and Trade Regulation
29TVIII Attempts to Monopolize
29TVIII(A) In General
29Tk712 Elements in General
29Tk713 k. In General. Most Cited
Cases
(Formerly 265k12(1.3))

Proper approach for determining issue of market power in Sherman Act attempted monopolization case is by carefully analyzing certain telltale factors in relevant market: market share, entry barriers, and capacity of existing competitors to expand output. Sherman Act, § 2, as amended, 15 U.S.C.A. § 2.

**[41] Antitrust and Trade Regulation 29T ⬡➙713**

29T Antitrust and Trade Regulation
29TVIII Attempts to Monopolize
29TVIII(A) In General
29Tk712 Elements in General
29Tk713 k. In General. Most Cited
Cases
(Formerly 265k12(1.3))

For purposes of Sherman Act attempted monopolization claim, mere showing of substantial or even dominant market share alone cannot establish market power sufficient to carry out predatory scheme; plaintiff must show that new rivals are barred from entering market and show that existing competitors

51 F.3d 1421                                                                                                Page 9
51 F.3d 1421, 1995-1 Trade Cases P 70,952
**(Cite as: 51 F.3d 1421)**

lack capacity to expand their output to challenge predator's high price. Sherman Act, § 2, as amended, 15 U.S.C.A. § 2.

**[42] Antitrust and Trade Regulation 29T ☞647**

29T Antitrust and Trade Regulation
    29TVII Monopolization
        29TVII(C) Market Power; Market Share
            29Tk643 Relevant Market
                29Tk647 k. Entry Barriers. Most Cited Cases
  (Formerly 265k12(1.3))
For purposes of market power analysis under Sherman Act attempted monopolization claim, "entry barriers" are extra long-term costs which existing firms did not incur but which must be incurred by market entrants, or market factors deterring market entry but that permit existing firms to earn monopoly returns. Sherman Act, § 2, as amended, 15 U.S.C.A. § 2.

**[43] Antitrust and Trade Regulation 29T ☞713**

29T Antitrust and Trade Regulation
    29TVIII Attempts to Monopolize
        29TVIII(A) In General
            29Tk712 Elements in General
                29Tk713 k. In General. Most Cited Cases
  (Formerly 265k12(1.3))
For purposes of market power analysis under Sherman Act attempted monopolization claim, main sources of entry barriers are legal license requirements, control of essential or superior resource, entrenched buyer preferences for established brands, capital market evaluations imposing higher capital costs on new entrants, and, in some situations, economies of scale. Sherman Act, § 2, as amended, 15 U.S.C.A. § 2.

**[44] Antitrust and Trade Regulation 29T ☞713**

29T Antitrust and Trade Regulation
    29TVIII Attempts to Monopolize
        29TVIII(A) In General
            29Tk712 Elements in General
                29Tk713 k. In General. Most Cited Cases
  (Formerly 265k12(1.3))

For purposes of market power analysis under Sherman Act attempted monopolization claim, in evaluating entry barriers, Court of Appeals focuses on their ability to constrain not those already in market but, rather, those who would enter but are prevented from doing so. Sherman Act, § 2, as amended, 15 U.S.C.A. § 2.

**[45] Antitrust and Trade Regulation 29T ☞713**

29T Antitrust and Trade Regulation
    29TVIII Attempts to Monopolize
        29TVIII(A) In General
            29Tk712 Elements in General
                29Tk713 k. In General. Most Cited Cases
  (Formerly 265k17(1.3), 265k12(1.3))
For purposes of market power analysis under Sherman Act attempted monopolization claim, to justify finding that defendant has power to control prices, entry barriers must be significant; they must be capable of constraining normal operation of market to extent that problem is unlikely to be self-correcting. Sherman Act, § 2, as amended, 15 U.S.C.A. § 2.

**[46] Antitrust and Trade Regulation 29T ☞713**

29T Antitrust and Trade Regulation
    29TVIII Attempts to Monopolize
        29TVIII(A) In General
            29Tk712 Elements in General
                29Tk713 k. In General. Most Cited Cases
  (Formerly 265k12(1.3))
For purposes of market power analysis under Sherman Act attempted monopolization claim, barriers to market entry are "insignificant" when natural market forces will likely cure problem; in such cases, judicial intervention into market is unwarranted. Sherman Act, § 2, as amended, 15 U.S.C.A. § 2.

**[47] Antitrust and Trade Regulation 29T ☞692**

29T Antitrust and Trade Regulation
    29TVII Monopolization
        29TVII(E) Particular Industries or Businesses
            29Tk692 k. Oil, Gas and Mining. Most Cited Cases
  (Formerly 265k12(2))

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

**Antitrust and Trade Regulation 29T ☜══742**

29T Antitrust and Trade Regulation
    29TVIII Attempts to Monopolize
        29TVIII(B) Particular Industries or Businesses
            29Tk742 k. Oil, Gas and Mining. Most Cited Cases
    (Formerly 265k12(1.3))
Competitor lacked sufficient market power in city retail gasoline market as required for it to be liable to gasoline retailer on Sherman Act attempted monopolization predatory pricing claim, and any injury from competitor's alleged below-cost pricing was not "antitrust injury" under Act, where gasoline supply in city was highly elastic and other competitors could increase their output if competitor raised prices. Sherman Act, § 2, as amended, 15 U.S.C.A. § 2.

**[48] Federal Civil Procedure 170A ☜══2539**

170A Federal Civil Procedure
    170AXVII Judgment
        170AXVII(C) Summary Judgment
            170AXVII(C)3 Proceedings
                170Ak2536 Affidavits
                    170Ak2539 k. Sufficiency of Showing. Most Cited Cases

**Federal Courts 170B ☜══766**

170B Federal Courts
    170BVIII Courts of Appeals
        170BVIII(K) Scope, Standards, and Extent
            170BVIII(K)1 In General
                170Bk763 Extent of Review Dependent on Nature of Decision Appealed from
                    170Bk766 k. Summary Judgment. Most Cited Cases
Assertions in expert affidavits do not automatically create genuine issue of material fact for summary judgment purposes; Court of Appeals is obligated to look at record to determine whether, in light of any disputed facts, inferences to be drawn from expert's affidavits are reasonable. Fed.Rules Civ.Proc.Rule 56, 28 U.S.C.A.

**[49] Federal Civil Procedure 170A ☜══2546**

170A Federal Civil Procedure

    170AXVII Judgment
        170AXVII(C) Summary Judgment
            170AXVII(C)3 Proceedings
                170Ak2542 Evidence
                    170Ak2546 k. Weight and Sufficiency. Most Cited Cases
When opinion of expert of party opposing properly supported summary judgment motion is not supported by sufficient facts to validate it in eyes of law or when indisputable record facts contradict or otherwise render opinion unreasonable, summary judgment is appropriate. Fed.Rules Civ.Proc.Rule 56, 28 U.S.C.A.

**[50] Antitrust and Trade Regulation 29T ☜══713**

29T Antitrust and Trade Regulation
    29TVIII Attempts to Monopolize
        29TVIII(A) In General
            29Tk712 Elements in General
                29Tk713 k. In General. Most Cited Cases
    (Formerly 265k12(1.3))
For purposes of market power analysis under Sherman Act attempted monopolization claim, fact that market entry has occurred does not necessarily preclude existence of significant market entry barriers; if output or capacity of new entrant is insufficient to take significant business away from predator, they are unlikely to represent challenge to predator's market power. Sherman Act, § 2, as amended, 15 U.S.C.A. § 2.

**[51] Antitrust and Trade Regulation 29T ☜══713**

29T Antitrust and Trade Regulation
    29TVIII Attempts to Monopolize
        29TVIII(A) In General
            29Tk712 Elements in General
                29Tk713 k. In General. Most Cited Cases
    (Formerly 265k12(1.3))
For purposes of market power analysis under Sherman Act attempted monopolization claim, market barriers may still be significant, despite entry into market, if market is unable to correct itself despite entry of small rivals. Sherman Act, § 2, as amended, 15 U.S.C.A. § 2.

51 F.3d 1421                                                                Page 11
51 F.3d 1421, 1995-1 Trade Cases P 70,952
**(Cite as: 51 F.3d 1421)**

**[52] Antitrust and Trade Regulation 29T ☞976**

29T Antitrust and Trade Regulation
    29TXVII Antitrust Actions, Proceedings, and Enforcement
        29TXVII(B) Actions
            29Tk973 Evidence
                29Tk976 k. Presumptions and Burden of Proof. Most Cited Cases
        (Formerly 265k28(7.1))
For purposes of market power analysis under Sherman Act attempted monopolization claim, market power cannot be inferred solely from existence of market entry barriers and dominant market share; ability to control output and prices, which is essence of market power, depends largely on ability of existing firms to quickly increase their own output in response to contraction by defendant. Sherman Act, § 2, as amended, 15 U.S.C.A. § 2.

**[53] Antitrust and Trade Regulation 29T ☞713**

29T Antitrust and Trade Regulation
    29TVIII Attempts to Monopolize
        29TVIII(A) In General
            29Tk712 Elements in General
                29Tk713 k. In General. Most Cited Cases
        (Formerly 265k12(1.3))
For purposes of market power analysis under Sherman Act attempted monopolization claim, "excess capacity" is capacity of rivals in market to produce more than market demands at competitive price. Sherman Act, § 2, as amended, 15 U.S.C.A. § 2.

**[54] Antitrust and Trade Regulation 29T ☞713**

29T Antitrust and Trade Regulation
    29TVIII Attempts to Monopolize
        29TVIII(A) In General
            29Tk712 Elements in General
                29Tk713 k. In General. Most Cited Cases
        (Formerly 265k12(1.3))
For purposes of market power analysis under Sherman Act attempted monopolization claim, excess capacity is technical concept that is difficult to measure without analysis of firm's costs and, instead, evidence

of past output expansion may be used as surrogate; if there is undisputed evidence indicating that competitors have expanded output in recent past, or have ability to expand output in future, summary disposition against claim may be appropriate. Sherman Act, § 2, as amended, 15 U.S.C.A. § 2; Fed.Rules Civ.Proc.Rule 56, 28 U.S.C.A.

**[55] Antitrust and Trade Regulation 29T ☞882**

29T Antitrust and Trade Regulation
    29TX Antitrust and Prices
        29TX(G) Particular Industries or Businesses
            29Tk882 k. Manufacturers. Most Cited Cases
        (Formerly 265k17(1.8))
Fact that competitors may see proper, in exercise of their own judgment, to follow prices of another manufacturer, does not establish any suppression of competition or any sinister domination, and does not violate Sherman Act prohibition against monopolization. Sherman Act, § 2, as amended, 15 U.S.C.A. § 2.

**[56] Antitrust and Trade Regulation 29T ☞887**

29T Antitrust and Trade Regulation
    29TX Antitrust and Prices
        29TX(G) Particular Industries or Businesses
            29Tk887 k. Oil, Gas and Mining. Most Cited Cases
        (Formerly 265k17(1.8))
Competitor lacked sufficient market power in city retail gasoline market as required for it to be liable to gasoline retailer on Sherman Act vertical price-fixing conspiracy claim arising from competitor's alleged conspiracy with its largest independent retail dealer to fix retail gasoline prices at predatory below-cost levels, and any injury from competitor's alleged below-cost pricing was not "antitrust injury" under Act, where gasoline supply in city was highly elastic and other competitors could increase their output if competitor raised prices. Sherman Act, § 1, as amended, 15 U.S.C.A. § 1.

**[57] Antitrust and Trade Regulation 29T ☞832**

29T Antitrust and Trade Regulation
    29TX Antitrust and Prices
        29TX(D) Predatory Pricing

51 F.3d 1421                                                    Page 12
51 F.3d 1421, 1995-1 Trade Cases P 70,952
(Cite as: 51 F.3d 1421)

29Tk832 k. In General. Most Cited Cases
(Formerly 265k17(1.8))

**Antitrust and Trade Regulation 29T ☜963(2)**

29T Antitrust and Trade Regulation
    29TXVII Antitrust Actions, Proceedings, and En-
forcement
        29TXVII(B) Actions
            29Tk959 Right of Action; Persons Entitled
to Sue; Standing; Parties
                29Tk963 Injury to Business or Property
                    29Tk963(2) k. Causation. Most Cited
Cases
    (Formerly 265k17(1.8))
To establish Sherman Act violation for vertical, max-
imum price fixing, private plaintiff seeking damages
must demonstrate collusion to fix predatory prices,
and causal antitrust injury. Sherman Act, § 1, as
amended, 15 U.S.C.A. § 1.

**[58] Antitrust and Trade Regulation 29T ☜824**

29T Antitrust and Trade Regulation
    29TX Antitrust and Prices
        29TX(C) Resale Price Maintenance
            29Tk824 k. Per Se Illegality. Most Cited
Cases
    (Formerly 265k28(7.2))

**Antitrust and Trade Regulation 29T ☜976**

29T Antitrust and Trade Regulation
    29TXVII Antitrust Actions, Proceedings, and En-
forcement
        29TXVII(B) Actions
            29Tk973 Evidence
                29Tk976 k. Presumptions and Burden of
Proof. Most Cited Cases
    (Formerly 265k28(7.1))
For purposes of Sherman Act vertical, maximum
price-fixing claim, per se rules relieve plaintiffs of
burden of proving anticompetitive effects, which are
assumed, but they do not excuse plaintiffs from
showing that their injury was caused by anticompetit-
ive aspects of illegal act. Sherman Act, § 1, as
amended, 15 U.S.C.A. § 1.

**[59] Antitrust and Trade Regulation 29T ☜960**

29T Antitrust and Trade Regulation
    29TXVII Antitrust Actions, Proceedings, and En-
forcement
        29TXVII(B) Actions
            29Tk959 Right of Action; Persons Entitled
to Sue; Standing; Parties
                29Tk960 k. In General. Most Cited
Cases
    (Formerly 265k28(1.6))
Mere presence of per se violation under Sherman Act
section prohibiting contracts, combinations, and con-
spiracies in restraint of trade does not by itself bestow
on any plaintiff private right of action for damages.
Sherman Act, § 1, as amended, 15 U.S.C.A. § 1.

**[60] Antitrust and Trade Regulation 29T ☜
963(2)**

29T Antitrust and Trade Regulation
    29TXVII Antitrust Actions, Proceedings, and En-
forcement
        29TXVII(B) Actions
            29Tk959 Right of Action; Persons Entitled
to Sue; Standing; Parties
                29Tk963 Injury to Business or Property
                    29Tk963(2) k. Causation. Most Cited
Cases
    (Formerly 265k28(7.6))
Plaintiff asserting claim under Sherman Act section
prohibiting contracts, combinations, and conspiracies
in restraint of trade must prove that his injury flows
from anticompetitive aspect of defendant's conduct.
Sherman Act, § 1, as amended, 15 U.S.C.A. § 1.

**[61] Antitrust and Trade Regulation 29T ☜821**

29T Antitrust and Trade Regulation
    29TX Antitrust and Prices
        29TX(B) Price Fixing in General
            29Tk821 k. In General. Most Cited Cases
    (Formerly 265k17(1.8))

**Antitrust and Trade Regulation 29T ☜963(2)**

29T Antitrust and Trade Regulation
    29TXVII Antitrust Actions, Proceedings, and En-
forcement
        29TXVII(B) Actions
            29Tk959 Right of Action; Persons Entitled

51 F.3d 1421
51 F.3d 1421, 1995-1 Trade Cases P 70,952
(Cite as: 51 F.3d 1421)

to Sue; Standing; Parties
            29Tk963 Injury to Business or Property
                29Tk963(2) k. Causation. Most Cited
Cases
    (Formerly 265k17(1.8))
Although per se illegal under Sherman Act, maximum price fixing cannot cause antitrust injury, because low prices are the very essence of competition. Sherman Act, § 1, as amended, 15 U.S.C.A. § 1.

**[62] Antitrust and Trade Regulation 29T ☜══ 963(1)**

29T Antitrust and Trade Regulation
    29TXVII Antitrust Actions, Proceedings, and Enforcement
        29TXVII(B) Actions
            29Tk959 Right of Action; Persons Entitled to Sue; Standing; Parties
                29Tk963 Injury to Business or Property
                    29Tk963(1) k. In General. Most Cited
Cases
    (Formerly 265k17(1.12))
To show antitrust injury under Sherman Act section prohibiting contracts, combinations, and conspiracies in restraint of trade, plaintiff must show that predator has market power. Sherman Act, § 1, as amended, 15 U.S.C.A. § 1.

**[63] Antitrust and Trade Regulation 29T ☜══ 832**

29T Antitrust and Trade Regulation
    29TX Antitrust and Prices
        29TX(D) Predatory Pricing
            29Tk832 k. In General. Most Cited Cases
    (Formerly 382k914 Trade Regulation)
For purposes of price-fixing antitrust claim under Clayton Act, price discrimination between geographical markets, called "primary-line injury," occurs when seller charges predatory, below-cost prices in one market in attempt to eliminate competitors there, and charges supracompetitive prices in another market; competing seller in predated market may claim injury. Clayton Act, § 2(a), as amended by Robinson-Patman Price Discrimination Act, 15 U.S.C.A. § 13(a).

**[64] Antitrust and Trade Regulation 29T ☜══ 841**

29T Antitrust and Trade Regulation
    29TX Antitrust and Prices
        29TX(E) Price Discrimination
            29Tk841 k. Secondary Line Violations.
Most Cited Cases
    (Formerly 382k914 Trade Regulation)

**Antitrust and Trade Regulation 29T ☜══ 965**

29T Antitrust and Trade Regulation
    29TXVII Antitrust Actions, Proceedings, and Enforcement
        29TXVII(B) Actions
            29Tk959 Right of Action; Persons Entitled to Sue; Standing; Parties
                29Tk965 k. Consumers. Most Cited
Cases
    (Formerly 382k914 Trade Regulation)
For purposes of price-fixing antitrust claim under Clayton Act, as amended by Robinson-Patman Act, price discrimination in form of price differential between purchasers, called "secondary-line injury," occurs when seller grants favorable price to one purchaser but not another; in that case, disfavored purchaser may sue. Clayton Act, § 2(a), as amended by Robinson-Patman Price Discrimination Act, 15 U.S.C.A. § 13(a).

**[65] Antitrust and Trade Regulation 29T ☜══ 838**

29T Antitrust and Trade Regulation
    29TX Antitrust and Prices
        29TX(D) Predatory Pricing
            29Tk835 Probability of Success
                29Tk838 k. Recoupment. Most Cited
Cases
    (Formerly 382k951 Trade Regulation)
To hold defendant liable for primary-line predatory price fixing under Clayton Act, for charging below-cost prices, plaintiff must show that predator stands some chance of recouping his losses. Clayton Act, § 2(a), as amended by Robinson-Patman Price Discrimination Act, 15 U.S.C.A. § 13(a).

**[66] Antitrust and Trade Regulation 29T ☜══ 838**

29T Antitrust and Trade Regulation
    29TX Antitrust and Prices
        29TX(D) Predatory Pricing

51 F.3d 1421
51 F.3d 1421, 1995-1 Trade Cases P 70,952
(Cite as: 51 F.3d 1421)

Page 14

29Tk835 Probability of Success
29Tk838 k. Recoupment. Most Cited Cases
(Formerly 382k951 Trade Regulation)
To hold defendant liable for primary-line predatory price fixing under Clayton Act, as amended by Robinson-Patman Act, for charging below-cost prices, standard is "reasonable prospect of recoupment"; this requires plaintiff to show that predator has market power, or that he has some reasonable prospect of obtaining it. Clayton Act, § 2(a), as amended by Robinson-Patman Price Discrimination Act, 15 U.S.C.A. § 13(a).

[67] **Antitrust and Trade Regulation 29T** ⟜887

29T Antitrust and Trade Regulation
29TX Antitrust and Prices
29TX(G) Particular Industries or Businesses
29Tk887 k. Oil, Gas and Mining. Most Cited Cases
(Formerly 382k963 Trade Regulation)
For purposes of its primary-line price fixing claim under Clayton Act against competitor for charging below-cost prices for gasoline, to prove antitrust injury, gasoline retailer could not rely solely on evidence that competitor charged lower prices in relevant city than in comparison city; to demonstrate antitrust injury, retailer had to show that competitor had market power. Clayton Act, § 2(a), as amended by Robinson-Patman Price Discrimination Act, 15 U.S.C.A. § 13(a).

[68] **Antitrust and Trade Regulation 29T** ⟜963(1)

29T Antitrust and Trade Regulation
29TXVII Antitrust Actions, Proceedings, and Enforcement
29TXVII(B) Actions
29Tk959 Right of Action; Persons Entitled to Sue; Standing; Parties
29Tk963 Injury to Business or Property
29Tk963(1) k. In General. Most Cited Cases
(Formerly 265k28(1.4))
For purposes of federal antitrust law, "substantive liability" looks to whether defendant's conduct is forbidden; "antitrust injury" looks to whether claimed injury falls squarely within area of congressional concern. Sherman Act, §§ 1, 2, as amended, 15 U.S.C.A. §§ 1, 2; Clayton Act, § 2(a), as amended by Robinson-Patman Price Discrimination Act, 15 U.S.C.A. § 13(a).

[69] **Antitrust and Trade Regulation 29T** ⟜963(2)

29T Antitrust and Trade Regulation
29TXVII Antitrust Actions, Proceedings, and Enforcement
29TXVII(B) Actions
29Tk959 Right of Action; Persons Entitled to Sue; Standing; Parties
29Tk963 Injury to Business or Property
29Tk963(2) k. Causation. Most Cited Cases
(Formerly 265k28(1.4))
For purposes of Sherman Act, "antitrust injury" occurs only when claimed injury flows from acts harmful to consumers. Sherman Act, § 1 et seq., as amended, 15 U.S.C.A. § 1 et seq.; Clayton Act, § 2(a), as amended by Robinson-Patman Price Discrimination Act, 15 U.S.C.A. § 13(a).

[70] **Antitrust and Trade Regulation 29T** ⟜847

29T Antitrust and Trade Regulation
29TX Antitrust and Prices
29TX(E) Price Discrimination
29Tk847 k. Effect on Competition; Competitive Injury. Most Cited Cases
(Formerly 382k972 Trade Regulation)
Plaintiff alleging primary-line discrimination under Clayton Act, as amended by Robinson-Patman Act, must prove "antitrust injury" in same manner that Sherman Act plaintiff does, by showing that his injury flows from those aspects or effects of conduct that are harmful to consumer welfare. Sherman Act, § 1 et seq., as amended, 15 U.S.C.A. § 1 et seq.; Clayton Act, § 2(a), as amended by Robinson-Patman Price Discrimination Act, 15 U.S.C.A. § 13(a).

[71] **Antitrust and Trade Regulation 29T** ⟜814

29T Antitrust and Trade Regulation
29TX Antitrust and Prices

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

51 F.3d 1421                                                                Page 15
51 F.3d 1421, 1995-1 Trade Cases P 70,952
**(Cite as: 51 F.3d 1421)**

29TX(A) In General
29Tk812 Constitutional and Statutory Provisions
29Tk814 k. Purpose and Construction in General. Most Cited Cases
(Formerly 382k911 Trade Regulation)

In enacting Robinson-Patman Act amendments to Clayton Act, Congress intended to protect merchant from competitive injury attributable to discriminatory prices. Clayton Act, § 2(a), as amended by Robinson-Patman Price Discrimination Act, 15 U.S.C.A. § 13(a).

**[72] Antitrust and Trade Regulation 29T ☜887**

29T Antitrust and Trade Regulation
29TX Antitrust and Prices
29TX(G) Particular Industries or Businesses
29Tk887 k. Oil, Gas and Mining. Most Cited Cases
(Formerly 382k961.1 Trade Regulation)

For its primary-line price fixing claim under Clayton Act against competitor for charging below-cost prices for gasoline, to show lessening of competition for purposes of showing "antitrust injury," it was not enough to show that number of rivals had been reduced or that market was concentrated; rather, it had to be demonstrated that predator had reasonable prospect of enforcing oligopoly pricing in relevant city market and, thus, of recouping its predatory losses. Clayton Act, § 2(a), as amended by Robinson-Patman Price Discrimination Act, 15 U.S.C.A. § 13(a).

**[73] Federal Civil Procedure 170A ☜2484**

170A Federal Civil Procedure
170AXVII Judgment
170AXVII(C) Summary Judgment
170AXVII(C)2 Particular Cases
170Ak2484 k. Antitrust and Price Discrimination Cases. Most Cited Cases

Genuine issue of material fact existed as to whether competitor had sufficient market power to maintain oligopoly pricing in retail sale of gasoline in city market, precluding summary judgment for competitor on gasoline retailer's primary-line price fixing claim under Clayton Act against competitor for charging below-cost prices for gasoline. Clayton Act, § 2(a), as

amended by Robinson-Patman Price Discrimination Act, 15 U.S.C.A. § 13(a); Fed.Rules Civ.Proc.Rule 56, 28 U.S.C.A.

**[74] Antitrust and Trade Regulation 29T ☜836**

29T Antitrust and Trade Regulation
29TX Antitrust and Prices
29TX(D) Predatory Pricing
29Tk835 Probability of Success
29Tk836 k. In General. Most Cited Cases
(Formerly 382k961.1 Trade Regulation)

For purposes of primary-line price fixing claim under Clayton Act, degree of predator's market power need not be as high as that required for Sherman Act monopolization claim. Sherman Act, § 2, as amended, 15 U.S.C.A. § 2; Clayton Act, § 2(a), as amended by Robinson-Patman Price Discrimination Act, 15 U.S.C.A. § 13(a).

**[75] Antitrust and Trade Regulation 29T ☜977(5)**

29T Antitrust and Trade Regulation
29TXVII Antitrust Actions, Proceedings, and Enforcement
29TXVII(B) Actions
29Tk973 Evidence
29Tk977 Weight and Sufficiency
29Tk977(5) k. Pricing. Most Cited Cases
(Formerly 382k961.1 Trade Regulation)

Although evidence of predator's oligopoly pricing to prove market power cannot support claim of monopolization under Sherman Act, no such limitation exists when claim involves price discrimination under Clayton Act. Sherman Act, § 2, as amended, 15 U.S.C.A. § 2; Clayton Act, § 2(a), as amended by Robinson-Patman Price Discrimination Act, 15 U.S.C.A. § 13(a).

*1429 William H. Bode, William H. Bode & Associates, Washington, DC, for plaintiffs-appellants.
Donald C. Smaltz, Leighton M. Anderson, Christopher H. Benbow, Emily A. Breckenridge, Smaltz & Anderson, Los Angeles, CA, Thomas F. Kummer, Vargas & Bartlett, Las Vegas, NV, Paul J. Richmond,

51 F.3d 1421
51 F.3d 1421, 1995-1 Trade Cases P 70,952
**(Cite as: 51 F.3d 1421)**

Atlantic Richfield Co., Los Angeles, CA, for defendant-appellee.

Appeal from the United States District Court for the District of Nevada.

Before: POOLE, BEEZER and KLEINFELD, Circuit Judges.

BEEZER, Circuit Judge:

This case presents three antitrust claims arising from the defendant's conduct in the retail gasoline market in Las Vegas, Nevada. The plaintiffs contend that the defendant engaged in predatory pricing between 1985 and 1989, selling self-serve, cash-only gasoline below marginal cost. The plaintiffs claim that the alleged predatory pricing was an attempt by the defendant to monopolize the market, in violation of Sherman Act § 2. The plaintiffs also claim that the predatory pricing scheme involved a conspiracy to restrain trade, in violation of Sherman Act § 1, and primary-line price discrimination, in violation of Clayton Act § 2, as amended by the Robinson-Patman Act, 15 U.S.C. § 13(a).

The district court granted summary judgment in favor of the defendant on all three antitrust claims, concluding that the defendant did not possess enough power in the market to allow the predatory scheme to *1430 succeed, and therefore that the plaintiffs had not suffered any injury cognizable under the antitrust laws. We have jurisdiction over the plaintiffs' timely appeal. 28 U.S.C. § 1291. We affirm in part and reverse and remand in part.

I

The evidence before the district court on summary judgment reveals the following facts: Gasoline sold in Las Vegas is first produced from crude oil in Los Angeles refineries. Wholesale marketers then pump the gasoline to Las Vegas storage terminals via a common carrier pipeline operated by the Cal-Nev Pipeline Co. ("Cal-Nev"). Ninety-five percent of Las Vegas' gasoline travels this 250-mile route. Wholesale marketers sell the gasoline to retail marketers, who then sell the gasoline to Las Vegas motorists.

As of 1991, there were more than 275 retail gasoline stations in Las Vegas. Although the grades and types of fuel vary, retailers sell gasoline through two types of service. Some gasoline is sold only on a self-serve, cash-only basis. Motorists purchasing this product must pump their own gasoline and must pay cash. Other gasoline is sold on a full-serve basis. In full serve, a service station attendant pumps the gasoline for the consumer, checks the oil and tires, washes the windows and may perform other minor services. The motorist also has the option of paying either with cash or a credit card. The consumer pays a premium for these services, which means that the price for full-serve gasoline is generally higher than the price for self-serve gasoline. Some retail marketers sell only self-serve, cash-only gasoline; others sell both self-serve, cash-only gasoline *and* full-serve gasoline. No marketer sells only full-serve gasoline.

The plaintiffs, Rebel Oil Co., Inc., and Auto Flite Oil Co., Inc. (collectively "Rebel"), are retail marketers of gasoline in Las Vegas who sell only self-serve, cash-only gasoline. Rebel operates 16 retail stations under various gasoline brand names. Nine stations operate under the "Rebel" brand name, six stations operate under the "Unocal" brand name and one operates under the "Texaco" brand name. In addition to its retail sales, Rebel is one of the several wholesale marketers who ship gasoline via the Cal-Nev pipeline and sell to retail marketers.

The defendant, Atlantic Richfield Co. ("ARCO"), is a retail and wholesale marketer of gasoline in Las Vegas, as well as a major driller and refiner of crude oil in Los Angeles. ARCO supplies gasoline to 53 retail stations in Las Vegas bearing the "ARCO" brand name. These stations sell only self-serve, cash-only gasoline. Of those 53 stations, Prestige Stations, a subsidiary of ARCO, owns and operates 15 stations. The remaining 38 stations are owned and operated by independent dealers who purchase the gasoline wholesale from ARCO and then sell the product at retail for their own account. Thirteen of these dealer stations are leased from ARCO; the remaining 25 dealer stations are operated by "contract dealers" who either own the stations or lease from third parties. The largest "contract dealer" is Terrible Herbst, Inc. ("Terrible Herbst"), which controls 23 stations under the "ARCO" brand name.

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

51 F.3d 1421                                                                    Page 17
51 F.3d 1421, 1995-1 Trade Cases P 70,952
**(Cite as: 51 F.3d 1421)**

Besides Rebel and ARCO, other major retail mar-
keters of gasoline in Las Vegas are Southland Corp.
and Texaco Inc. As of 1991, Southland owned and
operated 89 "7-11" stations, and Texaco owned and
operated five gasoline stations. In addition, numerous
independent dealers sell under varying brand names.
These dealers either own the stations or are fran-
chised dealers. Although the parties offer conflicting
numbers, it is undisputed that at least 67 independent
dealers sell under the "Texaco" brand name; 16 inde-
pendent dealers sell under the "Unocal" brand name;
17 independent dealers sell under the "Chevron"
brand name; and 12 other independent marketers sell
under various names. The number of stations oper-
ated by a marketer does not necessarily determine
that marketer's share in gasoline sales. The "7-11"
stations, for example, sell far less volume in gasoline
than other marketers because their sales are primarily
in the grocery retail market.

The facts of this case developed against a backdrop
of change in the gasoline business. **\*1431** In the era
of high fuel consumption motor vehicles, major-
brand marketers affiliated with major oil companies
were dominant. They enjoyed superior locations and
facilities, national advertising, and customer loyalty.
Independent marketers, who purchased gasoline from
major oil companies for resale under their own brand
name, were minor participants-"middle-of-the-block
dumps," in ARCO's words. Because they sold only
self-serve, cash-only gasoline, independent marketers
enjoyed low overhead and, hence, could charge less
than stations selling equivalent quality gasoline under
major brand names. During the 1970s, a growing
number of cost-conscious motorists patronized these
independent marketers. Independent marketers saw
substantial growth in their business. Taking a cue,
ARCO in 1982 adopted a nationwide strategy to
compete directly with the independent discount mar-
keters. Developed by ARCO's Special Planning Unit
(SPU), the new strategy called for the elimination of
full-serve and credit-card sales. Under the SPU's new
strategy, all sales would be self-serve and cash-only.
Dealers would be provided with incentives, such as
volume discounts, to increase sales volume and
match the prices of the discount independents. In an
internal memorandum, the SPU predicted that

"depending on the degree and rapidity of competitive
attrition, a lasting period of quite acceptable profitab-
ility could ensue." ARCO's new strategy increased its
sales and market share nationwide.

In January, 1990, Rebel filed this antitrust suit
against ARCO, pursuant to Section 4 of the Clayton
Act, which allows private parties to sue antitrust viol-
ators for damages. Rebel claims that between 1985
and 1989, ARCO executed the SPU's new strategy in
Las Vegas with "more specific vengeance," charging
predatory prices in an attempt to take away market
shares from its competitors and, eventually, mono-
polize the gasoline market in Las Vegas. Relying on
affidavits obtained from former ARCO dealers, Rebel
claims that ARCO controlled not only the prices
charged at the 15 stations it operated through its sub-
sidiary, Prestige Stations, but also the prices charged
at the 38 stations operated by independent dealers.
Rebel also obtained affidavits from an expert who
compared ARCO's prices in Los Angeles and Las
Vegas markets. ARCO supplies both markets with
gasoline from the same Los Angeles refinery. The ex-
pert concluded retail prices in Las Vegas for self-
serve, cash-only gasoline, when adjusted for trans-
portation costs, were consistently 6 to 14 cents per
gallon below those charged in Los Angeles. The ex-
pert concluded that ARCO's retail prices in Las Ve-
gas were consistently below the wholesale prices of
all other wholesale suppliers in Las Vegas, and at
times were 10 cents or more per gallon below
ARCO's marginal cost.[FN1] Rebel contends that Ter-
rible Herbst, ARCO's major contract dealer, con-
spired with ARCO in the predatory scheme.

> FN1. Marginal cost is the cost that a firm in-
> curs in the production of one additional unit
> of output. Herbert Hovenkamp, Economics
> and Federal Antitrust Law 10 (1985). Rebel
> measured ARCO's marginal cost based upon
> an agreement that ARCO signed with Tosco
> Corp. to purchase incremental supplies of
> gasoline. Rebel claims that ARCO bought
> the additional supplies of gasoline from To-
> sco because it was expanding output but was
> unable to obtain the additional output from
> its own refineries. The cost of this "last bar-
> rel" of gasoline represents ARCO's marginal

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

51 F.3d 1421
51 F.3d 1421, 1995-1 Trade Cases P 70,952
(Cite as: 51 F.3d 1421)

Page 18

cost for gasoline.

Rebel asserts that ARCO's pricing scheme forced 37 competitors out of the Las Vegas gasoline market, including both independent discount marketers and major oil companies, such as Exxon, Shell, Conoco, Mobil and Philips. According to Rebel, non-ARCO stations decreased in number, from 258 to 222, during the alleged predation. Rebel contends that the marketwide attrition occurred despite the fact that Las Vegas is one of the fastest growing retail gasoline markets in the United States. Rebel's own share of the self-serve, cash-only gasoline market dropped from 30 percent in 1982 to less than 10 percent in 1990. Rebel claimed losses totalling $2 million. Rebel was forced to mostly withdraw from the retail market and instead concentrate on the wholesale market. Rebel claims it has stayed in business only through its non-gasoline revenues.

According to Rebel's expert affidavits, when the alleged predation ended in 1989 *1432 ARCO had captured 54 percent of the market for self-serve, cash-only gasoline. The experts contend that ARCO then engaged in price gouging in order to recoup the losses that resulted from the predatory scheme. To demonstrate that recoupment occurred, Rebel's experts compared ARCO's prices in Las Vegas with those charged in Los Angeles, adjusted for transportation costs. The data showed that from September 1989 through March 1990, and again from September 1990 through mid-April 1991, ARCO's prices in Las Vegas were between 4 to 19 cents per gallon higher than its prices in Los Angeles. Rebel contends that ARCO was able to charge prices above competitive levels without losing market share, demonstrating that ARCO had the power to harm competition in the gasoline market. Rebel contends that ARCO was able to maintain prices above competitive levels during the "recoupment" phase because Las Vegas marketers had been "disciplined" by ARCO's previous predation and refused to challenge ARCO's supra-competitive prices. In essence, Rebel contends that the Las Vegas gasoline market today is a "disciplined" oligopoly in which each oligopolist shares in the supracompetitive profits.

In the fall of 1990, the district court limited discovery

solely to the issue of whether ARCO had sufficient market power to charge prices above competitive levels. _Rebel Oil Co. v. Atlantic Richfield Co., 133 F.R.D. 41, 44 (D.Nev.1990)_. The district court justified the limited discovery on the ground that, absent a showing of market power, Rebel could not demonstrate that it suffered "antitrust injury." _Id._ There was no discovery on predatory pricing, intent and collusion.

In the fall of 1992, the parties filed cross motions for summary judgment. The district court granted summary judgment in favor of ARCO on all three antitrust claims. _Rebel Oil Co. v. Atlantic Richfield Co., 808 F.Supp. 1464 (D.Nev.1992)_. The court concluded that ARCO's market share in the retail gasoline market in Las Vegas was insufficient as a matter of law to establish market power. In addition, the court concluded that Rebel failed to demonstrate that barriers to entry prevented other retailers from entering the retail gasoline market. The combined lack of market share and entry barriers, the court said, indicated that ARCO lacked the power to charge prices above competitive levels as a means of recouping predatory losses. In essence, the district court held that Rebel failed to put forth sufficient evidence of market power to support a jury verdict. _See Celotex Corp. v. Catrett, 477 U.S. 317, 325, 106 S.Ct. 2548, 2553-54, 91 L.Ed.2d 265 (1986)_ (summary judgment appropriate if nonmoving party fails to put forth sufficient evidence for an element essential to case).

II

[1] Summary judgment is appropriate when the pleadings, affidavits and other material present no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. We review a grant of summary judgment _de novo_ and evaluate the evidence most favorably to the nonmoving party to determine whether any genuine issues of material fact remain and whether the district court correctly applied the relevant substantive law. _Thurman Industries, Inc. v. Pay 'N Pak Stores, Inc., 875 F.2d 1369, 1373 (9th Cir.1989)_.

Rebel contends that it produced sufficient evidence in the record regarding market power to create a genu-

51 F.3d 1421
51 F.3d 1421, 1995-1 Trade Cases P 70,952
(Cite as: 51 F.3d 1421)

ine issue of material fact for trial for each of its antitrust claims. Rebel also argues that the court erred as a matter of law by applying a "monopolization" standard rather than an "attempted monopolization" standard to the Sherman Act § 2 claim. Rebel also argues that while a showing of market power is necessary for the "attempt to monopolize" claim under Sherman Act § 2, no such showing is required for the price fixing claim under Sherman Act § 1 or the price discrimination claim under Clayton Act § 2. We analyze the issue of "market power" separately as to each of Rebel's three antitrust claims.

A

[2] Rebel's attempted monopolization claim is based on the theory that ARCO conspired with its dealers to set predatory prices in an attempt to gain monopoly power. To establish a Sherman Act § 2 violation for
**\*1433** attempted monopolization,[FN2] a private plaintiff seeking damages must demonstrate four elements: (1) specific intent to control prices or destroy competition; (2) predatory or anticompetitive conduct directed at accomplishing that purpose; (3) a dangerous probability of achieving "monopoly power"; and (4) causal antitrust injury. *McGlinchy v. Shell Chem. Co., 845 F.2d 802, 811 (9th Cir.1988).*

> FN2. Sherman Act § 2 states: "Every person who shall monopolize, or attempt to monopolize, or combine or conspire with any person or persons, to monopolize ... trade shall be guilty" of an antitrust violation. 15 U.S.C. § 2 (1994).

[3][4][5][6] The fourth element, causal antitrust injury, is an element of all antitrust suits brought by private parties seeking damages under Section 4 of the Clayton Act. *See Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc., 429 U.S. 477, 489, 97 S.Ct. 690, 697-98, 50 L.Ed.2d 701 (1977).* Under Section 4, private plaintiffs can be compensated only for injuries that the antitrust laws were intended to prevent. *Id.* To show antitrust injury, a plaintiff must prove that his loss flows from an anticompetitive aspect or effect of the defendant's behavior, since it is inimical to the antitrust laws to award damages for losses stemming from acts that do not hurt competition. *At-*

*lantic Richfield Co. v. USA Petroleum, Inc., 495 U.S. 328, 334, 110 S.Ct. 1884, 1889, 109 L.Ed.2d 333 (1990).* If the injury flows from aspects of the defendant's conduct that are beneficial or neutral to competition, there is no antitrust injury, even if the defendant's conduct is illegal *per se. See id.*

[7][8][9][10][11] In deciding whether the plaintiff was injured by an anticompetitive aspect or effect of the defendant's behavior, care must be taken in defining "competition." Competition consists of rivalry among competitors. *Hasbrouck v. Texaco, Inc., 842 F.2d 1034, 1040 (9th Cir.1987), aff'd, 496 U.S. 543, 110 S.Ct. 2535, 110 L.Ed.2d 492 (1990).* Of course, conduct that eliminates rivals reduces competition. But reduction of competition does not invoke the Sherman Act until it harms consumer welfare. *Products Liab. Ins. Agency, Inc. v. Crum & Forster Ins. Cos., 682 F.2d 660, 663 (7th Cir.1982); see Reiter v. Sonotone Corp., 442 U.S. 330, 343, 99 S.Ct. 2326, 2333, 60 L.Ed.2d 931 (1979)* (Congress designed the Sherman Act as a "consumer welfare prescription") (quoting Robert H. Bork, The Antitrust Paradox 66 (1978)). Consumer welfare is maximized when economic resources are allocated to their best use. *National Gerimedical Hosp. and Gerontology Ctr. v. Blue Cross of Kansas City, 452 U.S. 378, 387-88 & n. 13, 101 S.Ct. 2415, 2421 & n. 13, 69 L.Ed.2d 89 (1981),* and when consumers are assured competitive price and quality. *Products Liab. Ins., 682 F.2d at 663-64.* Accordingly, an act is deemed *anticompetitive* under the Sherman Act only when it harms both allocative efficiency *and* raises the prices of goods above competitive levels or diminishes their quality. *Cf. Brook Group Ltd. v. Brown & Williamson Tobacco Corp., 509 U.S. 209, ----, 113 S.Ct. 2578, 2588, 125 L.Ed.2d 168 (1993)* (below-cost pricing is not anticompetitive in itself because, although it causes allocative inefficiency, it brings lower aggregate prices in the market).

[12] The defendant's alleged conduct here involves predatory pricing. Predatory pricing occurs in two stages. In the first stage, or "price war" period, the defendant sets prices below its marginal cost hoping to eliminate rivals and increase its share of the market. During this phase, the predator, and any rival compelled to challenge the predatory price, will suf-

51 F.3d 1421
51 F.3d 1421, 1995-1 Trade Cases P 70,952
**(Cite as: 51 F.3d 1421)**

Page 20

fer losses.[FN3] Though rivals may suffer financial losses or be eliminated as a result of the below-cost pricing, injury to rivals at this stage of the predatory scheme is of no concern to the antitrust laws. *Id.* Only by adopting a long-run strategy is a predator able to injure consumer welfare. *See Cargill, Inc. v. Monfort of Colorado, Inc.,* 479 U.S. 104, 117, 107 S.Ct. 484, 493, 93 L.Ed.2d 427 (1986). A long-run strategy requires the predator to drive rivals from the market, or discipline them sufficiently so that they do not act as competitors normally *1434 should. *Id.* If the predator reaches this long-run goal, it enters the second stage, the "recoupment" period. It then can collect the fruits of the predatory scheme by charging supracompetitive prices-prices above competitive levels. The predator's hope is that the excess profits will allow it to recoup the losses suffered during the price war. *Brook Group,* 509 U.S. at ----, 113 S.Ct. at 2589.

> FN3. "Losses during a price war will be proportionally higher for the predator because he faces the necessity of expanding his output at ever higher costs, while the victim not only will not expand output but has the option of reducing it and so decreasing his costs." Robert H. Bork, The Antitrust Paradox 148 (1979).

In order unilaterally to raise prices above competitive levels, the predator must obtain sufficient market power. A predator has sufficient market power when, by restricting its own output, it can restrict marketwide output and, hence, increase marketwide prices. Phillip Areeda & Donald F. Turner, Antitrust Law ¶ 501, at 322 (1978) (hereinafter Areeda & Turner). Prices increase marketwide in response to the reduced output because consumers bid more in competing against one another to obtain the smaller quantity available *Ball Memorial Hosp., Inc. v. Mutual Hosp. Ins., Inc.,* 784 F.2d 1325, 1335 (7th Cir.1986). Without market power to increase prices above competitive levels, and sustain them for an extended period, a predator's actions do not threaten consumer welfare[FN4]

> FN4. Social welfare is maximized when the price of a good equals its marginal cost-the

cost of producing the last unit of output. When a firm with market power cuts output to increase prices, price exceeds marginal cost. This causes a loss to society of all that additional output which the firm could produce by lowering its price to marginal cost. *Janich Bros., Inc. v. American Distilling Co.,* 570 F.2d 848, 857 n. 9 (9th Cir.1977), *cert. denied,* 439 U.S. 829, 99 S.Ct. 103, 58 L.Ed.2d 122 (1978).

[13][14] Market power may be demonstrated through either of two types of proof. One type of proof is direct evidence of the injurious exercise of market power. If the plaintiff puts forth evidence of restricted output and supracompetitive prices, that is direct proof of the injury to competition which a competitor with market power may inflict, and thus, of the actual exercise of market power. *See FTC v. Indiana Fed'n of Dentists,* 476 U.S. 447, 460-61, 106 S.Ct. 2009, 2018-19, 90 L.Ed.2d 445 (1986). The more common type of proof is circumstantial evidence pertaining to the structure of the market. To demonstrate market power circumstantially, a plaintiff must: (1) define the relevant market, (2) show that the defendant owns a dominant share of that market, and (3) show that there are significant barriers to entry and show that existing competitors lack the capacity to increase their output in the short run. *See Ryko Mfg. Co. v. Eden Serv.,* 823 F.2d 1215, 1232 (8th Cir.1987), *cert. denied,* 484 U.S. 1026, 108 S.Ct. 751, 98 L.Ed.2d 763 (1988); *Ball Memorial Hosp.,* 784 F.2d at 1335.

In opposing ARCO's motion for summary judgment, and in supporting its own cross motion, Rebel submitted circumstantial evidence to the district court purporting to show that ARCO possessed market power. We must determine whether this circumstantial evidence was sufficient to create a genuine triable issue with regard to market power in the Sherman Act § 2 claim.

1

[15][16][17][18] We begin with the issue of market definition. As noted above, circumstantial evidence of market power requires that the plaintiff, at the threshold, define the relevant market. A "market" is

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

51 F 3d 1421                                                                          Page 21
51 F 3d 1421, 1995-1 Trade Cases P 70,952
**(Cite as: 51 F.3d 1421)**

any grouping of sales whose sellers, if unified by a monopolist or a hypothetical cartel, would have market power in dealing with any group of buyers. *See* Phillip Areeda & Herbert Hovenkamp, Antitrust Law, ¶ 518 1b, at 534 (Supp.1993) (hereinafter Areeda & Hovenkamp) If the sales of other producers substantially constrain the price-increasing ability of the monopolist or hypothetical cartel, these other producers must be included in the market. Stated differently, a "market" is the group of sellers or producers who have the "actual or potential ability to deprive each other of significant levels of business." *Thurman Indus., 875 F.2d at 1374*. Market definition is crucial Without a definition of the relevant market, it is impossible to determine market share

[19] There are two possible definitions of the market in the present case. Rebel contends the relevant market includes all retail sales of gasoline in Las Vegas, except for sales of full-serve gasoline. This is the market**\*1435** in which ARCO exclusively operates. ARCO disputes Rebel's narrow market definition. ARCO contends the market is broader, consisting of *all* sales of retail gasoline in Las Vegas, including full-serve gasoline

[20] The dispute between Rebel and ARCO focused on cross-elasticity of demand: whether consumers view the products as substitutes for each other *See* E. Thomas Sullivan & Jeffrey L. Harrison, Understanding Antitrust and Its Economic Implications § 6 04[2] (1988) (hereinafter Sullivan & Harrison). If consumers view the products as substitutes, the products are part of the same market Rebel's expert concluded that self-serve, cash-only gasoline and full-serve gasoline are not substitutes. He stated that consumers of full-serve gasoline base their purchase strictly on the availability of services, for which they pay a premium. Likewise, self-serve, cash-only gasoline consumers do not consider full-serve gasoline as a substitute, he said, because they will always buy the lower cost gasoline, even if the premium for full-service is less than the cost of the service

The district court accepted ARCO's position, concluding that both self-serve, cash-only gasoline and full-serve gasoline should be included in the relevant market. ARCO introduced affidavits from an expert

who said the two products were correlated in price, indicating that the products are substitutes for each other.[FN5] The court said ARCO's affidavits were "more persuasive" than those submitted by Rebel. Rebel contends that the district court's use of the word "persuasive" indicates that the court improperly weighed the evidence, a role inappropriate at summary judgment *See Lippi v. City Bank, 955 F.2d 599, 613 (9th Cir.1992)*.

> FN5. The price-correlation data purportedly showed that the prices of self-serve, cash-only gasoline and full-serve gasoline tend to move together, i.e, when one goes up, the other goes up, and vice versa. The expert noted that under the "Stigler" method of proving supply elasticity, high price correlation indicates that consumers view the products as substitutes for each other. *See* George J. Stigler & Robert A. Sherwin, *The Extent of the Market*, 28 J.L. & Econ. 555, 572-73 (1985). Self-serve sellers could not increase price and still expect to serve the same number of customers (and, hence, sell the same quantity of gasoline) as they did at the lower price.

[21][22][23][24][25] Rebel correctly points out that the definition of the relevant market is a factual inquiry for the jury, and the court may not weigh evidence or judge witness credibility. *High Technology Careers v. San Jose Mercury News, 996 F.2d 987, 990 (9th Cir.1993)* However, that an issue is factual does not necessarily preclude summary judgment. If the moving party shows that there is an absence of evidence to support the plaintiff's case, the nonmoving party bears the burden of producing evidence sufficient to sustain a jury verdict on those issues for which it bears the burden at trial. *Celotex, 477 U.S. at 324, 106 S.Ct. at 2553*. If Rebel's evidence cannot sustain a jury verdict on the issue of market definition, summary judgment is appropriate. *See id. at 325, 106 S.Ct. at 2553-54*. This rule does not direct courts to resolve questions of credibility or conflicting inferences. What it requires courts to do is assess whether the jury, drawing all inferences in favor of the nonmoving party, could reasonably render a verdict in favor of the nonmoving party in light of the

51 F.3d 1421
51 F.3d 1421, 1995-1 Trade Cases P 70,952
(Cite as: 51 F.3d 1421)

substantive law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249-52, 106 S.Ct. 2505, 2510-13, 91 L.Ed.2d 202 (1986). The determination requires application of the standard that courts apply in motions for a directed verdict or a judgment notwithstanding the verdict. *See id.* at 251, 106 S.Ct. at 2511-12.

[26][27][28][29][30][31] As a preliminary matter, we note that expert opinion is admissible and may defeat summary judgment if it appears that the affiant is competent to give an expert opinion and that the factual basis for the opinion is stated in the affidavit, even though the underlying factual details and reasoning upon which the opinion is based are not *Bulthuis v. Rexall Corp.*, 789 F.2d 1315, 1317 (9th Cir.1985). While the affidavit of Rebel's expert meets this basic standard, the inference to be drawn from expert affidavits must, as *Anderson* requires, be sufficient to support a favorable jury verdict. In the context of antitrust law, if there are undisputed facts about the structure of the market that render the inference economically unreasonable, the expert opinion is insufficient *1436 to support a jury verdict. *Eastman Kodak Co. v. Image Technical Serv., Inc.*, 504 U.S. 451, 468-69, 112 S.Ct. 2072, 2083, 119 L.Ed.2d 265 (1992). As the Supreme Court explained

When an expert opinion is not supported by sufficient facts to validate it in the eyes of the law, or when indisputable record facts contradict or otherwise render the opinion unreasonable, it cannot support a jury's verdict. Expert testimony is useful as a guide to interpreting market facts, but it is not a substitute for them. As we observed in *Matsushita*, "expert opinion evidence ... has little probative value in comparison with the economic factors" that may dictate a particular conclusion.

*Brook Group*, 509 U.S. at ----, 113 S.Ct. at 2598 (citations omitted) (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 594 n. 19, 106 S.Ct. 1348, 1360 n. 19, 89 L.Ed.2d 538 (1986)). The inquiry is whether the inference to be drawn from the expert's opinion is "reasonable given the substantive law which is the foundation for the claim or defense." *See Richards v. Neilsen Freight Lines*, 810 F.2d 898, 902 (9th Cir.1987).

[32][33] Our independent review of Rebel's expert af-

fidavits compels the conclusion that it would be unreasonable for a juror to infer from those affidavits that full-serve sales of gasoline should be excluded from the relevant market. Rebel's expert relied on "demand elasticity"-that is, whether a price rise in self-serve, cash-only gasoline would cause self-serve consumers to shift their demand to full-serve gasoline. A price differential between two products may reflect a low cross-elasticity of demand, if the higher priced product offers additional service for which consumers are willing to pay a premium. *Thurman Indus.*, 875 F.2d at 1376 (citing *Photovest Corp. v. Fotomat Corp.*, 606 F.2d 704, 715 (7th Cir.1979) (drive-thru photo processing, for which consumers paid a premium, was relevant market apart from conventional photo processing)). But defining a market on the basis of demand considerations alone is erroneous. *Virtual Maintenance, Inc. v. Prime Computer, Inc.*, 11 F.3d 660, 664 (6th Cir.1993) (citing Areeda & Hovenkamp, ¶ 518.1, at 543), *cert. dismissed*, 512 U.S. 1216, 114 S.Ct. 2700, 129 L.Ed.2d 829 (1994). A reasonable market definition must also be based on "supply elasticity." *Id.*. *Twin City Sportservice, Inc. v. Charles O. Finley & Co.*, 512 F.2d 1264, 1274 (9th Cir.1975). Supply elasticity measures the responsiveness of producers to price increases. Sullivan & Harrison, § 6.02 [3]. If producers of product X can readily shift their production facilities to produce product Y, then the sales of both should be included in the relevant market. Areeda & Turner ¶ 521a, at 354. The affidavit of Rebel's expert fails to account for the fact that sellers of full-serve gasoline can easily convert their full-serve pumps, at virtually no cost, into self-serve, cash-only pumps, expanding output and thus constraining any attempt by ARCO to charge supracompetitive prices for self-serve gasoline. The ease by which marketers can convert their full-serve facilities to increase their output of self-serve gasoline requires that full-serve sales be part of the relevant market; it is immaterial that consumers do not regard the products as substitutes, that a price differential exists, or that the prices are not closely correlated. Areeda & Turner ¶ 521, at 354.

[34][35] While sellers in a normally functioning market would convert their full-serve pumps to self-serve to restrain supracompetitive pricing by ARCO,

51 F.3d 1421                                                    Page 23
51 F.3d 1421, 1995-1 Trade Cases P 70,952
**(Cite as: 51 F.3d 1421)**

Rebel's expert contended that Las Vegas is not a normally functioning market. Rebel states: "As the market actually functions, the full-service islands simply do not represent any competition to supracompetitive pricing by ARCO." Rebel contends that ARCO's predatory below-cost pricing has so punished existing marketers of gasoline in Las Vegas that these marketers are now a "disciplined oligopoly" and have no incentive to convert their pumps to challenge ARCO's pricing. This contention is irrelevant to market definition in the present context. Rebel's theory has no bearing on the threshold question of whether those marketers are *potential* competitors who should be included in the relevant market. See *Thurman Indus., 875 F.2d at 1374* (a relevant market includes those sellers who have the "actual or *potential* ability" to compete and deprive the defendant*1437 of significant amounts of business). The fact that some marketers are oligopolists does not mean they cannot deter an attempted monopolization. Even oligopolists may compete (and the oligopoly will vanish) if one of their number strays from the pack with the intent to violate the Sherman Act. See Bork, The Antitrust Paradox 101-04 ("Nothing in the theory [of oligopoly] compels the conclusion that oligopolists do not behave as competitors."). [FN6]

> [FN6.] If we accepted Rebel's argument, we
> would be assuming the existence of ARCO's
> market power before defining the relevant
> market, a method of analysis that defies lo-
> gic. Moreover, the purpose of defining the
> relevant market in an attempt-to-monopolize
> claim is to determine whether ARCO has
> sufficient market power to pose a threat of
> *monopoly.* The fact that the market is an oli-
> gopoly is of no concern, as an oligopoly is
> not *per se* illegal under Sherman Act § 2.
> See *Indiana Grocery, Inc. v. Super Valu
> Stores, Inc., 864 F.2d 1409, 1415-16 (7th
> Cir.1989).*

Although Rebel failed to demonstrate its proposed definition of the relevant market, this is not fatal to Rebel's attempt-to-monopolize claim. In the alternative, Rebel claimed that even if full-serve gasoline is included in the relevant market, ARCO would have significant market power. The district court found

that the relevant product market included full-serve gasoline. We affirm that determination and are free to address the remaining issues regarding market power. See *R.C. Dick Geothermal Corp. v. Thermogenics, Inc., 890 F.2d 139, 144 (9th Cir.1989)* (en banc).

2

We next address the second factor in the market power analysis: market share. Measurement of market share is necessary to determine whether the defendant possesses sufficient leverage to influence marketwide output. With a dominant share of the market's productive assets, a firm may have the market power to restrict marketwide output and, hence, increase prices, as its rivals may not have the capacity to increase their sales quickly to make up for the reduction by the dominant firm. *Ball Memorial Hosp., 784 F.2d at 1335.*

[36] Rebel's experts contended that ARCO possessed a 44 percent share of the retail market consisting of both self-serve, cash-only gasoline and full-serve gasoline. As a preliminary matter, ARCO disputes Rebel's claim that it possesses 44 percent of the relevant market. The dispute essentially hinges on how to define ARCO as a "firm." ARCO directly operates 15 "ARCO"-branded stations in Las Vegas; another 38 "ARCO"-branded are operated by independent dealers who purchase the gasoline at wholesale from ARCO and sell at retail on their own account. ARCO points out that if only the 15 company-owned stations are aggregated, ARCO's market share is only 11.5 percent. Rebel contends that the sales capacity of the 38 dealer stations must be included in ARCO's market share because these independent dealers are not "independent" at all. Rebel claims that ARCO conspired with Terrible Herbst, the largest dealer and owner of 23 stations, in the predatory scheme.[FN7] As for the remaining ARCO dealers, Rebel presented affidavits from past and present dealers who stated that ARCO controls their retail prices. Rebel contends that because ARCO supplies gasoline at the wholesale level to these dealers, ARCO is in a position to influence the ultimate retail price. Rebel also cited pricing data showing that "ARCO"-branded stations are tightly clustered in product price and do not appear to act as independent entities.

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

51 F.3d 1421                                                          Page 24
51 F.3d 1421, 1995-1 Trade Cases P 70,952
(Cite as: 51 F.3d 1421)

FN7. As proof of conspiracy, Rebel submit-
ted an article in a trade publication in which
Ed Herbst, vice president of the family-
owned business, was quoted as saying:
"ARCO opened stores in Las Vegas and was
selling 5 to 7 cents a gallon below what we
paid wholesale. My dad said, 'If you can't
beat them, join them.' So we joined them."

[37] The aggregation of market shares of several
rivals is justified if the rivals are alleged to have con-
spired to monopolize.[FN8] *Cf* *1438 *United States v.
American Airlines, Inc.,* 743 F.2d 1114, 1122 (5th
Cir.1984), *cert. dismissed,* 474 U.S. 1001, 106 S.Ct.
420, 88 L.Ed.2d 370 (1985) (airline's unsuccessful at-
tempt to fix prices with rival required aggregation of
both firms' shares in attempt-to-monopolize claim).
For the purpose of the summary judgment motion,
the district court properly aggregated all
"ARCO"-branded stations together, accepting Rebel's
premise that ARCO's share was 44 percent.[FN9]

FN8. To prove a conspiracy to monopolize,
Rebel must show that the independent deal-
ers had the specific intent to conspire to
monopolize; it is not enough to show that
the dealers merely agreed to go along with
ARCO's pricing. *See Belfiore v. New York
Times Co.,* 826 F.2d 177, 183 (2d Cir.1987),
*cert. denied,* 484 U.S. 1067, 108 S.Ct. 1030,
98 L.Ed.2d 994 (1988).

FN9. While the issue of collusion is a matter
disputed by ARCO, the district court limited
discovery strictly to the issue of market
power. No discovery was allowed on collu-
sion. Given that fact, all inferences on the is-
sue of collusion must be drawn in Rebel's
favor to properly determine the summary
judgment motion. *See Fludd v. United States
Secret Serv.,* 771 F.2d 549, 554
(D.C.Cir.1985) (per curiam).

In granting summary judgment to ARCO, the district
court held that Rebel's evidence could not sustain a
jury verdict in its favor, because a 44 percent market
share was insufficient as a matter of law to give
ARCO market power. The court, citing *Twin City*

*Sportservice,* 512 F.2d at 1274, stated that "numerous
cases" hold that any market share below 50 percent is
insufficient.

[38] Rebel argues that evidence of a 44 percent mar-
ket share is enough to establish a genuine issue of
material fact regarding market share. It contends that
the district court erred because the court relied on a
"monopolization" rather than an
"attempt-to-monopolize" standard. Rebel argues that
when a claim involves an *attempt* to monopolize, the
quantum of market share necessary to create a genu-
ine issue is smaller than is required in a claim of *ac-
tual* monopolization.

[39][40] We agree with Rebel that the minimum
showing of market share required in an attempt case
is a lower quantum than the minimum showing re-
quired in an actual monopolization case. It is true, as
the district court stated, that numerous cases hold that
a market share of less than 50 percent is pre-
sumptively insufficient to establish market power.
*See, e.g., Dimmitt Agri Indus., Inc. v. CPC Int'l, Inc.,*
679 F.2d 516, 528 (5th Cir.1982), *cert. denied,* 460
U.S. 1082, 103 S.Ct. 1770, 76 L.Ed.2d 344 (1983);
*Twin City Sportservice,* 512 F.2d at 1274. However,
these cases and others cited by the district court in-
volve claims of *actual* monopolization. When the
claim involves attempted monopolization, most cases
hold that a market share of 30 percent is pre-
sumptively insufficient to establish the power to con-
trol price. *See Jefferson Parish Hosp. Dist. No. 2 v.
Hyde,* 466 U.S. 2, 26 n. 43, 104 S.Ct. 1551, 1566 n.
43, 80 L.Ed.2d 2 (1984); *A.A. Poultry Farms, Inc. v.
Rose Acre Farms, Inc.,* 881 F.2d 1396, 1403 (7th
Cir.1989), *cert. denied,* 494 U.S. 1019, 110 S.Ct.
1326, 108 L.Ed.2d 501 (1990); *Nifty Foods Corp. v.
Great Atl. & Pac. Tea Co.,* 614 F.2d 832, 841 (2d
Cir.1980); *M & M Medical Supplies & Serv., Inc. v.
Pleasant Valley Hosp., Inc.,* 981 F.2d 160, 168 (4th
Cir.1992), *cert. denied,* 508 U.S. 972, 113 S.Ct.
2962, 125 L.Ed.2d 662 (1993); Areeda & Turner ¶
835c, at 349. ARCO's market share of 44 percent is
sufficient as a matter of law to support a finding of
market power, if entry barriers are high and competit-
ors are unable to expand their output in response to
supracompetitive pricing.[FN10]

51 F.3d 1421
51 F.3d 1421, 1995-1 Trade Cases P 70,952
(Cite as: 51 F.3d 1421)

FN10. The Fourth Circuit has stated that claims involving shares between 30 and 50 percent "should usually be rejected, except when conduct is very likely to achieve monopoly or when conduct is invidious, but not so much so as to make the defendant per se liable." M & M Medical Supplies, 981 F.2d at 168 (citing Areeda & Turner ¶ 835c, at 350). This standard, initially proposed by Professors Areeda and Turner, would include predatory conduct in the "invidious" category. In addition, a separate standard would presume market power if the market share is greater than 50 percent, if the other substantive elements of an attempt to monopolize claim are satisfied. Id. at 168.

We are reluctant to apply such bright-line rules regarding market share in deciding whether a defendant has market power to restrict output or raise prices. Courts should be "wary of the numbers game of market percentage" when considering attempt-to-monopolize claims. Dimmitt Agri Industries, 679 F.2d at 533. As Professors Areeda and Turner admit, their refined rules may be "illusory" guides to deciding market power. Areeda & Turner ¶ 835c, at 350. The far wiser approach, which this circuit has observed if not explicitly adopted, is illustrated by Ball Memorial Hosp., 784 F.2d at 1335 (7th Cir.) and Ryko Mfg., 823 F.2d at 1232 (8th Cir.), where the issue of market power was decided by carefully analyzing certain telltale factors in the relevant market: market share, entry barriers and the capacity of existing competitors to expand output. We see no reason to depart from this mode of analysis.

*1439 3

[41] We next address the final factors in market power analysis: barriers to entry and barriers to expansion. A mere showing of substantial or even dominant market share alone cannot establish market power sufficient to carry out a predatory scheme. The plaintiff must show that new rivals are barred from entering the market and show that existing competit-

ors lack the capacity to expand their output to challenge the predator's high price. See Ryko Mfg., 823 F.2d at 1232.

[42][43][44] Entry barriers are "additional long-run costs that were not incurred by incumbent firms but must be incurred by new entrants," or "factors in the market that deter entry while permitting incumbent firms to earn monopoly returns." Los Angeles Land Co. v. Brunswick Corp., 6 F.3d 1422, 1427-28 (9th Cir.1993), cert. denied, 510 U.S. 1197, 114 S.Ct. 1307, 127 L.Ed.2d 658 (1994) (quoting Areeda & Hovenkamp, Antitrust Law § 409 at 509-10 (Supp.1992)). The main sources of entry barriers are: (1) legal license requirements;[FN11] (2) control of an essential or superior resource; (3) entrenched buyer preferences for established brands; (4) capital market evaluations imposing higher capital costs on new entrants; and, in some situations, (5) economies of scale. Id. at 1428 n. 4. In evaluating entry barriers, we focus on their ability to constrain not "those already in the market, but ... those who would enter but are prevented from doing so." United States v. Syufy Enter., 903 F.2d 659, 672 n. 21 (9th Cir.1990).

> FN11. "It is well known that some of the most insuperable barriers in the great race of competition are the result of government regulation." United States v. Syufy Enterprises, 903 F.2d 659, 673 (9th Cir.1990).

[45][46] To justify a finding that a defendant has the power to control prices, entry barriers must be significant-they must be capable of constraining the normal operation of the market to the extent that the problem is unlikely to be self-correcting. See Syufy Enter., 903 F.2d at 663. Barriers to entry are insignificant when natural market forces will likely cure the problem. In such cases, judicial intervention into the market is unwarranted. For example, with easy entry, a predator charging supracompetitive prices will quickly lose market share (as well as any chance of reaping monopoly profits) as new rivals enter the market and undercut its high price. See id. at 664.

[47] Rebel introduced affidavits from experts stating that potential new competitors in the Las Vegas market face high barriers to entry, the most significant

51 F.3d 1421
51 F.3d 1421, 1995-1 Trade Cases P 70,952
**(Cite as: 51 F.3d 1421)**

being a legal license. Since July 1, 1987, Nevada law has barred major oil refiners from entering the market and directly operating gasoline stations. Nevada Divorcement Law, 15 Nev.Rev.Stat. § 598.677 [FN12] The law contains a "grandfather" provision that permitted existing company-operated stations to remain. At the time, ARCO owned 15 stations in Las Vegas, far more than any other major oil company. Because major oil refiners, which includes all Los Angeles refiners, are barred from entering, Rebel contended that only independent "chain" marketers or individual entrepreneurs are candidates to enter the Las Vegas retail gasoline market. Rebel claims that neither is capable of effectively competing with ARCO.

> FN12. A refiner is barred if it meets three conditions: (1) produced more than 30 percent of the domestic and imported crude oil supplied to its refinery; (2) refines gasoline from crude oil; and (3) has a total refinery capacity of more than 175,000. 15 Nev.Rev.Stat. § 597.340.

Rebel's experts contend that the unique nature and structure of the gasoline market in Las Vegas is a barrier to independent "chain" marketers who would seek to enter the market. Rebel argues there is no year-round independent source of wholesale gasoline in Las Vegas, demonstrated by the fact that 95 percent of the gasoline sold in Las Vegas arrives via the Cal-Nev pipeline. The Cal-Nev pipeline requires a minimum shipment of 420,000 gallons. Rebel's experts contend that because costs and quality maintenance limit storage of any shipment to one month, a new entrant must have the capacity to sell 420,000 gallons a month, which would require the acquisition of 10 to 15 retail outlets.

**\*1440** Apart from the large capital investment associated with opening and operating 10 to 15 stations, Rebel contends that both independent "chain" marketers and individual entrepreneurs would have trouble ensuring a reliable wholesale supply of gasoline at a competitive price, for two reasons. First, wholesale sellers will simply note market conditions and raise their wholesale prices, seizing the excess profits that are made available if ARCO raises its prices. Rebel's expert contends that historical data in-

dicates that wholesale sellers have behaved in this manner. Second, since 1989, regulations in Clark County, Nevada, have required the use of oxygenated gasoline during six months each year. ARCO uses ethanol as an oxygenate, which is 3 cents per gallon cheaper than Methyl Tertiary Butyl Ether (MTBE), the oxygenate used by every other wholesale supplier. Rebel claims this is a significant cost disadvantage to new entrants. Rebel also introduced affidavits indicating that high capital costs of $7.5 to $15 million, the unavailability of loan capital, and the "chilling" effect of ARCO's prior predatory behavior discouraged potential new competitors in the market.

[48][49] Assertions in expert affidavits do not automatically create a genuine issue of material fact. As noted above, we are obligated to look at the record to determine whether, in light of any undisputed facts, the inferences to be drawn from the expert's affidavits are reasonable. *Eastman Kodak,* 504 U.S. at 468-69, 112 S.Ct. at 2083. "When the expert opinion is not supported by sufficient facts to validate it in the eyes of the law or when indisputable record facts contradict or otherwise render the opinion unreasonable," summary judgment is appropriate. *Brook Group,* 509 U.S. at ----, 113 S.Ct. at 2598.

It is undisputed that seven independent marketers, operating a total of 17 stations, entered the Las Vegas market between 1983 and 1990, not counting attempted entrants who failed in their first year of operation. [FN13] Most of the new rivals entered before 1988. Only two rivals entered after 1988, operating one station apiece.

> FN13. According to Rebel's own expert, these marketers included Domino's, Desert Bait, Green Valley, King 8 and Express.

Undisputed evidence of entry between 1983 and 1990, the alleged predation period, might contradict an inference that ARCO engaged in predatory pricing during that period, as a firm is unlikely to enter a market when a rival is selling products below cost. But it does not necessarily contradict the threat of market power, which is the issue in this appeal. The crux of Rebel's argument is that ARCO obtained or has come close to obtaining market power since the

51 F.3d 1421
51 F.3d 1421, 1995-1 Trade Cases P 70,952
**(Cite as: 51 F.3d 1421)**

enactment of the Divorcement Law and the oxygenate regulations in 1987 and 1988, respectively. We know of no authority that would require, as proof of market power, evidence of entry barriers throughout the period of predation. Indeed, predatory claims, including Rebel's, suggest that market power is not gained until after years of below-cost pricing, during which competitors exit the market and the defendant's market share increases. To determine whether Rebel's claim of entry barriers is reasonable, we must consider those entries occurring *after* 1988, when the alleged barriers were in place and when ARCO allegedly obtained the power to charge supracompetitive prices. *See Cargill,* 479 U.S. at 120 n. 15, 107 S.Ct. at 494 n. 15.

[50][51] The fact that entry has occurred does not necessarily preclude the existence of "significant" entry barriers. If the output or capacity of the new entrant is insufficient to take significant business away from the predator, they are unlikely to represent a challenge to the predator's market power. *See Oahu Gas Serv., Inc. v. Pacific Resources, Inc.,* 838 F.2d 360, 367 (9th Cir.1988), *cert. denied.* 488 U.S. 870, 109 S.Ct. 180, 102 L.Ed.2d 149 (1988); Department of Justice Merger Guidelines ¶ 3.0 (1992) (entry must be "timely, likely, and sufficient in magnitude, character and scope to deter or counteract the [anti]competitive effects of concern"). Barriers may still be "significant" if the market is unable to correct itself despite the entry of small rivals. This is the position taken by Rebel's expert. He claims the new *1441 entry after 1988 was *de minimis* because the new rivals were "all small independent dealers with insignificant volumes, whose operations do not contradict the existence of barriers to entry in the Las Vegas market."

We addressed a similar question in *Oahu,* which involved an appeal from the denial of a motion for judgment notwithstanding the verdict. In that case, we held that the entry of two rivals did not preclude the jury's finding that the defendant had actually monopolized the market. *Oahu,* 838 F.2d at 367. We explained that one rival's founder was a former executive for the monopolist, which supported the inference that his success in the market was not competition on the merits. As for the other rival, we noted

that "evidence that the firm remained very small could reasonably preclude a decision that [the rival's] entry reflected a breakdown of barriers to entry." *Id.* at 367.

The same reasoning applies here. The conclusion of Rebel's expert that "significant" entry barriers were erected by the Nevada Divorcement Law and the oxygenate regulations is not contradicted or rendered unreasonable by the fact that two small rivals entered the market after the enactment of these laws. ARCO operates or supplies 53 "ARCO"-branded gas stations. A juror could reasonably conclude that two gasoline stations would have insufficient capacity to offset supracompetitive pricing by a would-be monopolist. Rebel's evidence on entry barriers is sufficient to create a genuine issue of material fact, but this does not end our inquiry.

[52][53] Market power cannot be inferred solely from the existence of entry barriers and a dominant market share. The ability to control output and prices-the essence of market power-depends largely on the ability of existing firms to quickly increase their own output in response to a contraction by the defendant. *Ball Memorial Hosp.,* 784 F.2d at 1336. Competitors may not be able to increase output if there are barriers to expansion. One such barrier is lack of excess capacity. Excess capacity is the capacity of the rivals in a market to produce more than the market demands at a competitive price. Hovenkamp, Economics and Federal Antitrust Law § 6.10, at 182. If existing competitors are producing at full capacity, they may lack the ability to quickly expand supply and counteract a predator's supracompetitive pricing. *Id.* at 1335-36. On the other hand, if rivals have idle plants and can quickly respond to any predator's attempt to raise prices above competitive levels, the predator will suffer an immediate loss of market share to competitors. In that instance, the predator does not have market power. *See* Herbert Hovenkamp and Avarelle Silver-Westrick, *Predatory Pricing and the Ninth Circuit,* 1983 Ariz.St.L.J. 4433, 466 (1983).

[54] Excess capacity is a technical concept that is difficult to measure without an analysis of a firm's costs. Instead, evidence of past output expansion may be used as a surrogate. If there is undisputed evidence

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

51 F.3d 1421                                                                    Page 28
51 F.3d 1421, 1995-1 Trade Cases P 70,952
**(Cite as: 51 F.3d 1421)**

indicating that competitors have expanded output in the recent past, or have the ability to expand output in the future, summary disposition may be appropriate. *See International Distrib. Centers, Inc. v. Walsh Trucking Co.*, 812 F.2d 786, 792 (2d Cir.), *cert. denied*, 482 U.S. 915, 107 S.Ct. 3188, 96 L.Ed.2d 676 (1987); *cf Oahu*, 838 F.2d at 366 (no market power exists in "a market with low entry barriers *or other evidence of a defendant's inability to control prices or exclude competitors*") (emphasis added). Prior expansion by competitors would suggest that the defendant during that expansion lacked the market power to control marketwide output in the first place. *See id* at 792-93. If a firm has not obtained that power and is not reasonably close to obtaining it, "it matters little that high barriers to entry exist to help that firm maintain a monopoly power it could never achieve." *Indiana Grocery, Inc. v. Super Valu Stores, Inc.*, 864 F.2d 1409, 1415 (7th Cir.1989).

On this point, Rebel's claim of attempted monopolization falters. It is undisputed that in 1988 and 1989 two firms, Texaco and Southland, expanded their operations in Las Vegas by acquiring the assets of exiting or bankrupt rivals. Texaco acquired 14 gasoline stations from the Exxon Corporation and turned the stations into dealerships. Another 21 former "Circle K" outlets became Texaco dealerships while "Circle K" was in bankruptcy,**1442 and another 5 "Jet" stations became Texaco dealerships. In addition, the Southland Corporation added 32 more stores to its chain of "7-11" stores by acquiring the assets of "Stop N Go" markets in Las Vegas.

Rebel argues that these acquisitions do not prove "expansion" occurred, because the acquisitions involved gasoline stations already in the market. The upshot of Rebel's argument apparently is that because there is no increase in stations, Texaco and Southland dealers have no ability to increase *marketwide* output than they did before the acquisition. Rebel's argument ignores an important fact: gasoline stations do not produce gasoline. Stations are merely retail distribution outlets. Gasoline is produced in Los Angeles refineries, then shipped to Las Vegas via the Cal-Nev pipeline. Competitors do not have to build more gas stations to satisfy customers' wants. They can simply purchase and transport more gasoline via the pipeline. *Cf id* at 1414 (to increase output to offset, grocery stores need not build new productive assets but can deliver more groceries from suppliers). This means that, where sufficient competing retail outlets exist, a would-be monopolist must control marketwide output at the *wholesale* supply level in order to pose any threat of monopolizing the *retail* market. In essence, Rebel must show that ARCO had monopoly power, or was dangerously close to achieving it, at the wholesale supply level. *See Los Angeles Land Co.*, 6 F.3d at 1429 n. 6 (by failing to prove that defendant controlled the supply of bowling equipment, plaintiff failed to prove that defendant had market power in the retail bowling market).

As the expansion by Texaco and Southland suggests, the wholesale gasoline supply in Las Vegas is highly elastic, which does not support an inference that ARCO controls the supply of wholesale gasoline. Already supplying 22 dealers, Texaco undertook the task of supplying 34 more dealers in a very short time (six stations were not yet up and running). Although the volume of this increased supply is not contained in the record, it undoubtedly was substantial. Texaco's expansion occurred in 1989, about the time ARCO is supposed to have acquired market power. The expansion suggests that if ARCO attempted to curtail the total volume of gasoline sold to Las Vegas motorists, existing competitors could easily offset that action by delivering more gasoline. The expansion contradicts Rebel's position that ARCO is reasonably close to controlling the gasoline supply and retail gasoline prices. *See Indiana Grocery*, 864 F.2d at 1414.

Rebel's economic expert contends refiner-suppliers, such as Texaco, in reality will *not* deliver more gasoline to dealers if ARCO attempts to raise its price above competitive levels. Rebel explains that any retail dealers who attempt to challenge ARCO's high prices are prevented from doing so because refiner-suppliers are oligopolists who will raise their wholesale prices whenever ARCO raises its retail prices. As Rebel describes it, "retailers bear the brunt of bad times and are denied the fruits of good times."

To support his contention that refiner-suppliers are oligopolists who restrict the gasoline supply, Rebel's

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works

51 F.3d 1421                                                                                                    Page 29
51 F.3d 1421, 1995-1 Trade Cases P 70,952
**(Cite as: 51 F.3d 1421)**

expert relied on pricing data showing that, in two successive periods, prices in Las Vegas were 4 to 19 cents higher than prices in Los Angeles, when adjusted for transportation costs. This is direct proof, Rebel says, that ARCO actually exercised market power in Las Vegas in an attempt to recoup predatory losses, and that the oligopolist refiner-suppliers joined the supracompetitive pricing. Rebel's experts concluded that ARCO recouped more than $14 million, with no loss of market share.

[55] Rebel's evidence cannot, as a matter of law, be the basis for inferring market power in its attempted monopolization claim. Although oligopoly pricing cannot be ruled out as a plausible means to recoup predatory losses, *Brook Group*, 509 U.S. at ----, 113 S.Ct. at 2590, oligopoly pricing standing alone does not prove that ARCO has market power, at least not the degree of market power to raise the concerns of the Sherman Act. "The fact that competitors may see proper, in the exercise of their own judgment, to follow the prices of another manufacturer, does not establish any suppression of competition or any sinister domination," and does not violate the Sherman Act. *1443*In re Coordinated Pretrial Proceedings in Petroleum Prod. Antitrust Litigation, 906 F.2d 432, 444 (9th Cir.1990)* (quoting *United States v. International Harvester Co., 274 U.S. 693, 708-09, 47 S.Ct. 748, 753-54, 71 L.Ed. 1302 (1927)), cert. denied, 500 U.S. 959, 111 S.Ct. 2274, 114 L.Ed.2d 725 (1991).* The reason for this rule is clear. To pose a threat of monopolization, one firm *alone* must have the power to control market output and exclude competition. *Indiana Grocery, 864 F.2d at 1415.* An oligopolist lacks this unilateral power. By definition, oligopolists are interdependent. An oligopolist can increase market price, but only if the others go along. Areeda & Turner, ¶ 1410b, at 64.

In *Indiana Grocery,* the Seventh Circuit rejected an argument similar to Rebel's. The plaintiff, Indiana Grocery, claimed that the defendant's predatory pricing "disciplined" rivals to the extent that the defendant and his rivals had engaged in oligopoly pricing. The court rejected the plaintiff's argument that oligopoly pricing indicated market power, stating Indiana Grocery's theory does not implicate section 2 of the Sherman Act. At best, it poses the danger that

[the defendant's] anticompetitive conduct could result in diminished price competition in an oligopolistic ... market. Section 2, however, does not govern single-firm anticompetitive conduct aimed only at creating an oligopoly.... ["]Congress authorized scrutiny of single firms *only when they pose a danger of monopolization."*

*Indiana Grocery, 864 F.2d at 1416* (quoting *Copperweld Corp. v. Independence Tube Corp., 467 U.S. 752, 768, 104 S.Ct. 2731, 2740, 81 L.Ed.2d 628 (1984))* (citations omitted); *cf. Crimpers Promotions, Inc. v. Home Box Office, Inc., 724 F.2d 290, 291 n. 1 (2d Cir.1983), cert. denied, 467 U.S. 1252, 104 S.Ct. 3536, 82 L.Ed.2d 841 (1984)* (claim that two firms expressly colluded in an attempt to monopolize would be one of oligopoly under § 1 rather than monopoly under § 2). We recognize that a gap in the Sherman Act allows oligopolies to slip past its prohibitions, *see* Sullivan & Harrison, ¶ 6.07, at 262-63, but filling that gap is the concern of Congress, not the judiciary.

In summary, Rebel failed to establish a genuine issue of material fact on market power to support its attempted monopolization claim. Although there is a genuine issue regarding market share and entry barriers, there appears to be no genuine issue regarding the ability of ARCO's existing competitors to increase their output. The undisputed record indicates that the gasoline supply in Las Vegas is highly elastic and that competitors could increase their output if ARCO raised prices. Consequently, Rebel failed to produce sufficient evidence to support a finding that ARCO is dangerously close to obtaining the power to monopolize the market. Rebel's failure to make a sufficient showing of market power demonstrates that ARCO's alleged predatory pricing has not threatened consumer welfare in a manner cognizable under § 2 of the Sherman Act. For this reason, Rebel cannot obtain damages, because any injury from ARCO's alleged below-cost pricing is not antitrust injury under Sherman Act § 2.

B

[56][57] Rebel's claim under Sherman Act § 1 alleges that ARCO conspired with Terrible Herbst, its largest

Page 30

dealer, to fix retail gasoline prices in Las Vegas at predatory levels. To establish a Sherman Act § 1 violation for vertical, maximum price fixing,[FN14] a private plaintiff seeking damages must demonstrate: (1) collusion to fix predatory prices, and (2) causal antitrust injury. *See USA Petroleum, 495 U.S. at 335-45, 110 S.Ct. at 1889-95.*

> FN14. Section 1 states: "Every contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce ... is declared to be illegal." 15 U.S.C. § 1 (1994).

[58][59][60][61] Rebel argues that market power is not a prerequisite to antitrust injury if the claim is premised on Sherman Act § 1. It reasons that because vertical price fixing is *per se* illegal, *Arizona v. Maricopa County Medical Soc'y,* 457 U.S. 332, 347, 102 S.Ct. 2466, 2474-75, 73 L.Ed.2d 48 (1982), market analysis is not necessary. Rebel confuses proof of liability with proof of antitrust injury. *Per se* rules relieve plaintiffs of the burden of proving anticompetitive effects, which are assumed, but they do not excuse *1444 plaintiffs from showing that their injury was caused by the anticompetitive aspects of the illegal act. *Newman v. Universal Pictures,* 813 F.2d 1519, 1522-23 (9th Cir.1987), *cert. denied,* 486 U.S. 1059, 108 S.Ct. 2831, 100 L.Ed.2d 931 (1988). The "mere presence" of a *per se* violation under Sherman Act § 1 "does not by itself bestow on any plaintiff a private right of action for damages." *Indiana Grocery,* 864 F.2d at 1419. A plaintiff must prove that his injury flows from the *anticompetitive* aspect of the defendant's conduct. For example, in *USA Petroleum,* the plaintiff did not suffer antitrust injury from the defendant's conspiracy to fix low prices. Although *per se* illegal, maximum price fixing cannot cause antitrust injury because low prices are the "very essence of competition." *Id.* 457 U.S. at 338, 102 S.Ct. at 2469-70 (quoting *Matsushita,* 475 U.S. at 594, 106 S.Ct. at 1359-60).

[62] Unlike USA Petroleum, Rebel accuses ARCO of conspiring to fix predatory, *below-cost* prices. Some commentators have argued that a competitor harmed by a predator's below-cost pricing need not show market power in order to prove antitrust injury, because below-cost pricing harms consumer welfare by causing allocative inefficiency-that is, society's resources are allocated to the predated goods in amounts exceeding society's valuation of those goods.[FN15] *See* Roger D. Blair & Jeffrey L. Harrison, *Rethinking Antitrust Injury,* 42 Vand.L.Rev. 1539, 1564 (1989). The Supreme Court in *Brook Group* foreclosed this theory: "Although unsuccessful predatory pricing may encourage some inefficient substitution toward the product being sold at less than its cost, unsuccessful predation is in general a boon to consumers." *Brook Group,* 509 U.S. at ----, 113 S.Ct. at 2588. Because below-cost pricing is a "boon to consumers," the losses inflicted on Rebel by the pricing are not the stuff of antitrust injury. It would be incongruous to award damages to plaintiffs for actions that in general benefit consumer welfare. *See Indiana Grocery,* 864 F.2d at 1419. To show antitrust injury under Sherman Act § 1, a plaintiff must show that the predator has market power.

> FN15. To put it another way, pricing below marginal cost is socially wasteful because the seller produces goods at a cost which is greater than their value to consumers. *Janich Bros.,* 570 F.2d at 857-58; Hovenkamp, Economics and Federal Antitrust Law, at 46. As we have noted previously, allocative efficiency is synonymous with consumer welfare, *Chesapeake and Ohio R.R. Co. v. United States,* 704 F.2d 373, 376 (7th Cir.1983), and is the central goal of the Sherman Act. *Northern Pac. Ry. Co. v. United States,* 356 U.S. 1, 78 S.Ct. 514, 2 L.Ed.2d 545 (1958) (the Sherman Act "rests on the premise that the unrestrained interaction of competitive forces will yield the best allocation of our economic resources.")

Rebel does not allege that ARCO conspired with its competitors in Las Vegas to monopolize the market. Thus, for the same reasons that we stated in our analysis of Rebel's claim under Sherman Act § 2, Rebel's evidence is insufficient for a jury reasonably to conclude that ARCO possesses market power, or is dangerously close to obtaining it, under § 1. In light of this conclusion, any injury-in-fact suffered by Rebel as a result of ARCO's alleged predatory maximum

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works

51 F.3d 1421                                                                                          Page 31
51 F.3d 1421, 1995-1 Trade Cases P 70,952
**(Cite as: 51 F.3d 1421)**

price fixing does not constitute antitrust injury.

C

Rebel challenges the district court's summary judgment in favor of ARCO on its price discrimination claim. As with Rebel's other claims, the court concluded that Rebel could not prove antitrust injury, because Rebel had produced insufficient evidence that ARCO possessed market power. The issues we address are twofold: whether a showing of market power is required to demonstrate antitrust injury in a primary-line discrimination claim, and, if so, whether Rebel presented sufficient evidence of market power for a reasonable jury to decide in its favor.

Section 2(a) of the Clayton Act, as amended by the Robinson-Patman Act, prohibits price discrimination "where the effect of such discrimination may be substantially to lessen competition or tend to create a monopoly in any line of commerce, *or* to injure, destroy, or prevent competition with any person who either grants or knowingly receives the benefit of such discrimination, or with customers *1445 of either of them." 15 U.S.C. § 13(a) (emphasis added).

[63][64] Price discrimination occurs in two forms: as a price differential between geographical markets, and as a price differential between purchasers. Price discrimination in the former sense, called primary-line injury, occurs when the seller charges predatory, below-cost prices in one market in an attempt to eliminate competitors there, and charges supracompetitive prices in another market. A competing seller in the predated market may claim injury. Price discrimination in the latter sense, called secondary-line injury, occurs when a seller grants a favorable price to one purchaser but not another. In that case, the disfavored purchaser may sue.

Rebel's claim alleged primary-line discrimination. As proof, Rebel's expert relied on pricing data showing that for four years, between 1985 and 1989, ARCO charged predatory prices in Las Vegas that, when adjusted for transportation costs, were 6 to 14 cents per gallon below those charged in Los Angeles. Rebel's expert also produced data showing that, from 1989 to 1991, ARCO intermittently charged prices in Las Ve-

gas that were 4 to 19 cents per gallon higher than in Los Angeles. Rebel argues that this price discrimination shows that ARCO attempted to eliminate rivals and has charged supracompetitive prices to recoup its losses.

[65][66] Because primary-line injury is of the "same general character" as predatory pricing schemes actionable under Sherman Act § 2, *Brook Group*, 509 U.S. at ----, 113 S.Ct. at 2587, a primary-line injury plaintiff bears essentially the same substantive burden as a plaintiff under the Sherman Act. That is, to hold a defendant liable for charging below-cost prices, a primary-line plaintiff must show that the predator stands some chance of recouping his losses. *Id.* at ----, 113 S.Ct. at 2588.[FN16] Under the Clayton Act, as amended by the Robinson-Patman Act, the standard is a "reasonable prospect" of recoupment. *Id.* This requires the plaintiff to show that the predator has market power, or that he has some reasonable prospect of obtaining it. Absent any chance of such showing, the below-cost pricing poses no threat to competition. *Id.*

> FN16. The Supreme Court implicitly overruled *Utah Pie Co. v. Continental Baking Co.*, 386 U.S. 685, 87 S.Ct. 1326, 18 L.Ed.2d 406 (1967), a controversial case which set forth different standards for primary-line injury. The court explained that *Utah Pie* was merely an "early judicial inquiry." *Brook Group*, 509 U.S. at ----, 113 S.Ct. at 2587.

1

[67][68][69] The parties disagree over whether Rebel must show that ARCO has market power in order to satisfy the antitrust injury requirement. *Brook Group* is not necessarily controlling. *Brook Group* addressed only the standards for liability in a primary-line claim. The standards for proving a violation differ from the standards for proving antitrust injury. Indeed, the antitrust injury requirement imposes a more stringent standard than the rules of liability. *See J. Truett Payne Co. v. Chrysler Motors Corp.*, 451 U.S. 557, 562, 101 S.Ct. 1923, 1927, 68 L.Ed.2d 442 (1981). Substantive liability looks to whether the de-

51 F.3d 1421                                                                                                                   Page 32
51 F.3d 1421, 1995-1 Trade Cases P 70,952
**(Cite as: 51 F.3d 1421)**

fendant's conduct is forbidden; antitrust injury looks to whether the claimed injury "fall[s] squarely within the area of congressional concern." *Blue Shield of Virginia v. McCready*, 457 U.S. 465, 484, 102 S.Ct. 2540, 2551, 73 L.Ed.2d 149 (1982). "Thus, to define the scope of antitrust injury for a violation of the Clayton Act, it is the purpose of that legislation, and the interests it seeks to protect, which is controlling." *Greater Rockford Energy & Technology Corp. v. Shell Oil Co.*, 998 F.2d 391, 399 (7th Cir.1993), *cert. denied*, 510 U.S. 1111, 114 S.Ct. 1054, 127 L.Ed.2d 375 (1994). For example, because the Sherman Act's concern is consumer welfare, antitrust injury occurs only when the claimed injury flows from acts harmful to consumers.

[70] We conclude that a plaintiff alleging primary-line discrimination must prove antitrust injury in the same manner that a Sherman Act plaintiff does-by showing that his injury flows from those aspects or effects of the conduct that are harmful to consumer welfare. Legislative history supports our conclusion. Congress first prohibited primary-line*1446 discrimination with the Clayton Act of 1914. In its original enactment, the Clayton Act forbid discrimination that might "substantially ... lessen competition or tend to create a monopoly in any line of commerce." Clayton Antitrust Act, 38 Stat. 730 (1914). The statute specifically applied only to primary-line injury. Its purpose was to prevent large corporations from invading markets of small firms and charging predatory prices for the purpose of destroying marketwide competition. *See* H.R. No. 627, 63rd Cong., 2d Sess. 8 (1914); Sullivan & Harrison, § 8.03, at 321. Like the Sherman Act, the original Clayton Act's primary aim was to prevent harm to consumers. *See Janich Bros., Inc. v. American Distilling Co.*, 570 F.2d 848, 855 (9th Cir.1977) (both the Sherman Act and Clayton Act are "aimed at the same economic evil"), *cert. denied*, 439 U.S. 829, 99 S.Ct. 103, 58 L.Ed.2d 122 (1978).

[71] In holding that a primary-line plaintiff must demonstrate an injury flowing from an aspect of the defendant's conduct injurious to consumer welfare, we intend in no way to affect the standard for antitrust injury in secondary-line cases. Secondary-line discrimination is forbidden by the Robinson-Patman

Act, which amended the Clayton Act. It is clear that Congress intended the Robinson-Patman Act's provisions to apply only to secondary-line cases, not primary-line cases. *See* H.R. No. 2287, 74th Cong., 2d Sess. 8 (1936).[FN17] The Robinson-Patman Act stands on entirely different footing than the Sherman Act and Clayton Act. While the framers of the Sherman and Clayton Acts intended to proscribe only conduct that threatens consumer welfare, the framers of the Robinson-Patman Amendments intended to punish perceived economic evils not necessarily threatening to consumer welfare *per se*. Fairness and protection of secondary-line purchasers are the concerns of the Robinson-Patman Act, a conclusion that is confirmed by the language of the statute, legislative history and judicial precedent.[FN18] Accordingly, we have held that a secondary-line plaintiff can demonstrate antitrust injury if the price discrimination caused him to lose sales and profits; he need not demonstrate any injury to consumer welfare. *Hasbrouck v. Texaco, Inc.*, 842 F.2d 1034, 1042 (9th Cir.1987), *aff'd on other grounds*, 496 U.S. 543, 557-58, 110 S.Ct. 2535, 2543-44, 110 L.Ed.2d 492 (1990); *accord J.F. Feeser v. Serv-A-Portion, Inc.*, 909 F.2d 1524, 1540 (3d Cir.1990), *cert. denied*, 499 U.S. 921, 111 S.Ct. 1313, 113 L.Ed.2d 246 (1991); *1447*Alan's of Atlanta, Inc. v. Minolta Corp.*, 903 F.2d 1414, 1427 (11th Cir.1990), *but see Boise Cascade Corp. v. FTC*, 837 F.2d 1127, 1143 (D.C.Cir.1988) (injury to competitor may be rebutted by lack of consumer injury). As a case involving secondary-line injury, not primary-line injury, *Hasbrouck* is not implicated by the present case.

> FN17. The Robinson-Patman Act "attaches to competitive relations between a given seller and his several customers. It concerns discrimination between customers of the same seller. *It has nothing to do with ... requir[ing] the maintenance of any relationship in prices charged by a competing seller.*" H.R. Report No. 2287, 74th Cong., 2d Sess. 8 (1936).

> FN18. Enacted in 1936, the Robinson-Patman Act amendments were an outgrowth of dissatisfaction with the original Clayton Act's inability to prevent large retail chains

51 F.3d 1421                                                                                          Page 33
51 F.3d 1421, 1995-1 Trade Cases P 70,952
(Cite as: 51 F.3d 1421)

from obtaining "quantity discounts" from big suppliers, at the disadvantage of small retailers who competed with the chains. H.R. Report No. 2287, 74th Cong., 2d Sess. 3-4 (1936); S Rep. No. 1502, 74th Cong., 2d Sess. 4 (1936); *FTC v. Morton Salt Co., 334 U.S. 37, 43, 68 S.Ct. 822, 826-27, 92 L.Ed. 1196 (1948)*

The new law broadened the scope of the Clayton Act's provisions While the Clayton Act only proscribed conduct that may "substantially lessen competition or tend to create a monopoly[,]" the new law added the following crucial passage: "or to injure, destroy, or prevent competition *with any person* who either grants or knowingly receives the benefit of such discrimination, or with customers of either of them." The purpose of this passage was to relieve secondary-line plaintiffs-small retailers who are disfavored by discriminating suppliers-from having to prove harm to competition marketwide, allowing them instead to impose liability simply by proving effects to individual competitors. H.R. Report No. 2287, 74th Cong., 2d Sess. 8 (1936). As the House Report stated:

The existing law has in practice been too restrictive in requiring a showing of general injury to competitive conditions in the line of commerce concerned, whereas the more immediately important concern is in injury to the competitor victimized by the discrimination.

The Senate Report stated that the amendments aimed to prevent *competitor* injury as a means of preventing general market injury-"to catch the weed in the seed will keep it from coming to flower." S Rep. No. 1502, 74th Cong., 2d Sess. 4 (1936) As the Supreme Court long ago stated: "Congress intended to protect a *merchant* from competitive injury attributable to discriminatory prices ..." *Morton Salt Co., 334 U.S. at 49, 68 S.Ct. at 829-30; Greater Rockford Energy, 998 F.2d at 399-400 n. 11*

To prove antitrust injury, Rebel cannot rely solely on evidence that ARCO charged lower prices in Las Vegas than in Los Angeles. Lower prices, even if below cost, are the essence of competition and are a "boon to consumers." *Brook Group, 509 U.S. at ----, 113 S.Ct. at 2588.* To demonstrate antitrust injury in its primary-line claim, Rebel must show that ARCO has market power

[72] The required showing of market power in a primary-line claim is somewhat less than is required in a Sherman Act claim. In contrast to the Sherman Act, which speaks only of various forms of express agreement and monopoly, the Clayton Act, as amended by the Robinson-Patman Act, prohibits price discrimination that *may* lessen competition. *Brook Group, at ----, 113 S.Ct. at 2591.* Consequently, the Supreme Court has held that "excessive concentration, and the oligopolistic price coordination it portends, may be the injury to competition the Act prohibits." *Brook Group, at ----, 113 S.Ct. at 2591* (citing *United States v. Philadelphia Nat'l Bank, 374 U.S. 321, 83 S.Ct. 1715, 10 L.Ed.2d 915 (1963))* This suggests that Rebel need only prove that ARCO has a degree of market power to threaten oligopolization, not monopolization. Despite this difference, consumer welfare is still the lodestar for determining antitrust injury in a primary-line claim. To show a lessening of competition, it is not enough to show that the number of rivals has been reduced or that the market is concentrated. Rather, it must be demonstrated that a predator has a "reasonable prospect" of enforcing oligopoly pricing in Las Vegas, and thus of recouping its predatory losses. *Brook Group, 509 U.S. at ----, 113 S.Ct. at 2588*

2

[73] We now consider whether Rebel's evidence is sufficient to show antitrust injury in its price discrimination claim.

[74] In our discussion of Rebel's attempted monopolization claim, we concluded that Rebel's circumstantial evidence of market share and entry barriers in the retail market could not support a finding of market power to support an attempted monopolization claim,

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

in light of undisputed evidence of recent expansion by Texaco and Southland, two of ARCO's existing competitors. We must evaluate that evidence again to determine whether Rebel has raised a disputed issue of material fact as to whether ARCO has the market power to "lessen competition" by enforcing an oligopoly. The degree of market power need not be as high as in a monopolization claim. In light of this lesser standard, we conclude that Rebel has established a disputed issue of material fact as to its standing to state a cause of action under the Clayton Act.

Rebel produced data showing that, during the alleged recoupment period, ARCO's retail gasoline prices were higher in Las Vegas than in Los Angeles, when adjusted for transportation costs. Rebel's experts opined that this is direct evidence of supracompetitive pricing by ARCO, as Los Angeles is a highly competitive retail gasoline market. Further, Rebel produced evidence that ARCO's market share actually increased during the period when it was charging allegedly supracompetitive prices. Rebel contends that this evidence indicates that ARCO's existing competitors in the retail gasoline market have been "disciplined" by ARCO's pattern of below-cost predatory pricing, and are unwilling to risk price competition with ARCO. Rebel argues that this is evidence that ARCO has achieved the market power to enforce a classic disciplined oligopoly, one of the anticompetitive effects that the Clayton Act prohibits. *See Brook Group, 509 U.S. at ----, 113 S.Ct. at 2591.*

As we noted above, Rebel has produced evidence of significant barriers to entry in the Las Vegas retail gasoline market. This is crucial, because if entry is unimpeded, supracompetitive profit levels in the market would attract new competitors to the market, who could undercut ARCO's prices and prevent it from recouping its predatory losses. *1448 *See Brook Group, at ----, 113 S.Ct. at 2589.* We have already determined that Rebel's evidence indicates that these barriers to entry are significant, and thus that new competitors are unlikely to enter the market at price and volume levels sufficient to challenge ARCO.

[75] Rebel may rely on this evidence of oligopoly pricing to prove market power on its price discrimination claim. Although such evidence cannot support a

claim of monopolization under the Sherman Act, no such limitation exists when the claim involves price discrimination under the Clayton Act. *Brook Group, 509 U.S. at ----, 113 S.Ct. at 2591.* Further, the lack of evidence of output restriction is not so significant here. The economic forces at work in an oligopoly are very different than in a monopoly. A predator is able to establish and maintain supracompetitive prices in an oligopoly by making it too painful for its existing competitors to challenge its prices, and thus, "disciplining" them. This distinction between oligopolistic and monopolistic practices is crucial to the survival of Rebel's price discrimination claim. Read in the most favorable light, Rebel's evidence tends to indicate that no new competition can enter the market to challenge ARCO, and that the existing competition, while it may be *able* to challenge ARCO, lacks the will to do so.

We conclude that Rebel has produced sufficient evidence to create a disputed issue of material fact as to whether ARCO has sufficient market power to maintain oligopoly pricing. Summary judgment on Rebel's price discrimination claim was therefore improper; Rebel may be able to demonstrate antitrust injury on this claim.[FN19]

> FN19. ARCO argues that Rebel's continued presence in the Las Vegas Market undercuts Rebel's claim of antitrust injury. ARCO contends that, while oligopoly pricing hurts consumer welfare, Rebel, as a competitor in the market, stood to benefit from any oligopoly pricing. *See Matsushita, 475 U.S. at 574, 106 S.Ct. at 1348.* It is undisputed that during the peak of the alleged oligopoly pricing, when the cost of a gallon of gasoline was more than 19 cents higher in Las Vegas than in Los Angeles, Rebel's prices were within a penny of ARCO's prices. Rebel may have received gains during this period offsetting some of the lost profits it suffered during the period of ARCO's alleged below-cost pricing. Even if this is true, however, the argument goes to the *measure* of damages, rather than the *existence* of antitrust injury. If Rebel is ultimately able to prove injury resulting from anticompetitive conduct

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

51 F.3d 1421                                                    Page 35
51 F.3d 1421, 1995-1 Trade Cases P 70,952
**(Cite as: 51 F.3d 1421)**

on the part of ARCO, it should not be pre-
cluded from recovery simply because it was
not driven completely from the market.

### III

Rebel has failed to provide sufficient evidence to
support a jury verdict on the issue of ARCO's
"market power" under the Sherman Act. As a result,
Rebel cannot establish a genuine issue of fact regard-
ing antitrust injury on its Sherman Act § 1 and § 2
claims, and the district court properly granted sum-
mary judgment for ARCO on those claims. Rebel's
evidence is sufficient, however, to raise a disputed
question of material fact as to whether ARCO
achieved sufficient market power to enforce supra-
competitive oligopoly pricing. [FN20] This showing is
sufficient to allow Rebel to survive summary judg-
ment on the issue of antitrust injury resulting from
price discrimination under the Clayton Act.

> FN20. We, of course, express no opinion on
> the ultimate merits of the claim. At trial,
> Rebel may fail to establish a "reasonable
> prospect" of recoupment by ARCO, or
> ARCO may be able to prove facts sufficient
> to establish a defense to Rebel's claim.

The judgment of the district court is AFFIRMED in
part and REVERSED in part. We REMAND to the
district court for further proceedings consistent with
this opinion.

C.A.9 (Nev.),1995.
Rebel Oil Co., Inc. v. Atlantic Richfield Co.
51 F.3d 1421, 1995-1 Trade Cases P 70,952

Briefs and Other Related Documents (Back to top)

• 1993 WL 13010418 (Appellate Brief) Reply Brief
of Plaintiffs-Appellants (Apr. 14, 1993)
• 1993 WL 13010417 (Appellate Brief) Brief of De-
fendant-Appellee (Mar. 1993)

END OF DOCUMENT

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

# EXHIBIT 18

Westlaw.

Not Reported in F.Supp.
Not Reported in F.Supp., 1996 WL 71504 (S.D.N.Y.)
**(Cite as: Not Reported in F.Supp.)**

Page 1

**H**
Briefs and Other Related Documents
Sirohi v Trustees of Columbia Uni-
versityS.D.N.Y.,1996.Only the Westlaw citation is
currently available.
United States District Court, S.D. New York.
Ashish SIROHI, Plaintiff,
v.
TRUSTEES OF COLUMBIA UNIVERSITY, Karen
Blank, Moira Brown, Jonathan Cole, Deborah Doane,
Mary Dooley, Michael Feiler, Robert Goldberger,
Elizabeth Head, Roger Lehecka, Robert Pollack,
George Rupp, Michael Sovern, Blake Thurman, Wil-
liam Wiggins, Doe #1, Doe #2, Doe #3, and Doe #4,
Defendants.
**No. 94-CIV-6165 (JFK).**

Feb. 20, 1996.

Ashish Sirohi, New York City, for Plaintiff Pro Se.
Horowitz, Toback & Hyman, New York City, (Ar-
thur M. Toback, of counsel), for Defendants.

*OPINION and ORDER*
KEENAN, District Judge.
**\*1** The Defendant Trustees of Columbia University
("Columbia") and all other named Defendants
(collectively the "Individual Defendants") move for
an Order dismissing the Complaint pursuant to Fed.
R. Civ. P. 12(b)(1) and (b)(6). Defendants also move
for sanctions pursuant to Fed. R. Civ. P. 11. Plaintiff
cross-moves for sanctions. For the reasons discussed
below, Defendants' motion to dismiss is granted in
part and denied in part. Both motions for sanctions
are denied.

*Background*

This is an action brought *pro se* by a former under-
graduate student at Columbia University against the
University (through its Trustees), various officers of
the University, and nearly every administrator, clerk,
assistant or aide with whom Plaintiff came into con-
tact between September 1985 and the filing of the
Complaint in August 1994.

1. The Complaint

The Complaint contains 256 numbered paragraphs,
which ostensibly frame twenty-seven causes of action
and support twenty-nine individual demands for re-
lief, including demands for monetary damages in ex-
cess of $187,910,000 (which could be read to total
$378,410,000), of which $49,500,000 are punitive
damages. The factual assertions set forth in para-
graphs 24-127 of the Complaint are summarized be-
low.

A. Plaintiff's alleged oral contract

Plaintiff began his studies in September 1985 as an
engineering student at Columbia University's sub-
division School of Engineering and Applied Science
("SEAS"). In September 1987, Plaintiff allegedly
suffered financial difficulties which impaired his
ability to pay his bills, including amounts owed to the
SEAS. As a result these difficulties, Plaintiff sought
to transfer to Columbia University's sub-division
Columbia College ("College"). Plaintiff hoped that
the College would
consider using College money to pay off [Plaintiff's]
old dues from the 1986-1987 academic year at SEAS,
and consider allowing him immediate transfer to the
College starting fall 1987, and consider providing
him financial aid from fall 1987 onwards.

Compl. ¶ 27. Plaintiff alleges that in response to his
request for transfer and financial assistance, Plaintiff
engaged in numerous meetings and conversations
with various officials at the SEAS and the College,
including Defendant Blake Thurman, an Assistant
Dean of Students at the College. *See* Compl. ¶¶ 19,
26-30.

Plaintiff's principal assertion is that "[t]owards the
end of September, 1987," Plaintiff and Defendant
Columbia, through Defendant Thurman, entered into
an oral contract. Under the terms of the contract, the
College would "make funds available starting Janu-
ary 1988 should the Plaintiff wish to become a stu-
dent at the College starting from the spring 1988
semester," and would provide funds for the full
1988-89 academic year. Compl. ¶ 30. In considera-
tion for providing the funds, the College would bene-

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F Supp                                                                           Page 2
Not Reported in F Supp , 1996 WL 71504 (S D N Y )
**(Cite as: Not Reported in F.Supp.)**

fit from the "significant prestige" that would result from Plaintiff's mathematics theorems and research Compl. ¶¶ 28-30. Plaintiff does not allege that the College was obligated to provide Plaintiff any assistance for the fall 1987 semester or to cover any amounts Plaintiff may have owed to the SEAS.

**\*2** Plaintiff alleges that in late September or early October 1987, in reliance on the oral contract, he met with non-party administrators of the SEAS and arranged to remain at the SEAS for the fall 1987 term *See* Compl. ¶ 31. Also in October, the College, through Defendant Thurman, repudiated its obligation under the contract to make funds available to Plaintiff for the spring 1988 term. *See* Compl. 32. Plaintiff alleges that he continued to meet with Defendant Thurman who allegedly "informed plaintiff that [the College] would continue working on aid for spring 1988." Compl ¶ 33.

Plaintiff alleges that in early November 1987, he entered an agreement with the SEAS under which he would received financial assistance which would enable him to clear all back-due amounts with the SEAS prior to his transfer to the College for the spring 1988 term *See* Compl. ¶ 34. Plaintiff also alleges that despite his awareness that the College had repudiated its obligation to provide assistance for the spring 1988 term, Plaintiff relied on the original contract and turned down an offer from the SEAS of "continued financial support should [[[Plaintiff]] wish to continue to remain at SEAS and graduate from there " Compl. ¶ 34. Plaintiff claims that this reliance was justified by Defendant Thurman's assurances that the College was "working on aid for spring 1988." Com pl. ¶¶ 32-33. Plaintiff claims that he had "very frequent" meetings with Defendant Thurman from October 1987 through the end of the fall 1987 term. *See* Compl. ¶ 36.

Although the Complaint is unclear, Plaintiff appears to have transferred to the College in January 1988. At no time, however, did the College provide Plaintiff with financial assistance for the spring 1988 term. Nevertheless, Plaintiff continued meeting with Defendant Thurman from January through March 1988 seeking to obtain such assistance. *See* Compl. ¶¶ 35-38. Plaintiff admits that during these meetings, the

College's alleged obligation to provide Plaintiff financial assistance for the 1988-89 academic year was never discussed. *See* Compl. ¶ 37. Sometime in March 1988, Plaintiff questioned Defendant Thurman's representations that assistance would be arranged for the spring 1988 term, which was then three months expired. Plaintiff then stopped meeting with Defendant Thurman. *See* Compl. ¶ 39.

Plaintiff alleges no contact with the College, the SEAS, or any individual defendant from March 1988 through September 1988.

Plaintiff alleges that in September 1988 he met with Defendant Roger Lehecka, the Dean of Students of the College, and signed an agreement "by which plaintiff would pay and clear plaintiff's spring 1988 dues by October 1988 " Compl. ¶¶ 14, 40. Plaintiff alleges that the next day, he met with Defendant Deborah Doane, the Director of Financial Aid at the College, and was informed that no funds were available for Plaintiff for the 1988-89 academic year. *See* Compl. ¶¶ 9, 14.

**\*3** Plaintiff alleges that in October 1988, in response to a request from Plaintiff for financial assistance for the 1988-89 academic year, Defendant Lehecka reported to Plaintiff for the first time that either the College or the University (the Complaint is unclear) maintains a policy whereby the SEAS is required to provide the funds for a transferring student's financial aid for the first year after the student transfers from the SEAS to the College. Under this rule, Plaintiff was never eligible for aid from the College for either the spring 1988 term or the fall 1988 term. *See* Compl. ¶¶ 42-44. Plaintiff alleges that had he been informed of the rule in September 1987, he would not have relied on the alleged oral contract by transferring to the College, but would have remained enrolled in, and graduated from, the SEAS. *See* Compl ¶ 44.

Plaintiff alleges breach of the oral contract Plaintiff also alleges that Defendant Thurman's representations to Plaintiff, insofar as they were contrary to the College or University rule, support a claim for fraud based on the same facts *See* Compl ¶¶ 128-48 (Pl.'s First through Fifth Causes of Action).

Not Reported in F.Supp.                                                                          Page 3
Not Reported in F.Supp., 1996 WL 71504 (S.D.N.Y.)
(Cite as: Not Reported in F.Supp.)

### B. Defendants' investigation of the contract claim

Plaintiff admits that he breached his September 1988 agreement to pay the College by October 1988 the amounts due from the spring 1988 semester. *See* Compl. ¶ 45. Plaintiff contends that he would have met his obligations under the September 1988 agreement if the College had provided him aid for the 1988-89 academic year. *See* Compl ¶ 45. Plaintiff admits that in October 1988, the University cancelled Plaintiff's registration because he had not paid the amounts due, and that without registration, Plaintiff was evicted from University housing. *See* Compl. 46.

Plaintiff then alleges various acts, communications, and meetings from November 1988 through April 1990 involving an investigation by Defendants of Plaintiff's allegations concerning the alleged contract and fraudulent representations made to Plaintiff. *See* Compl. ¶¶ 47-79. Plaintiff alleges various fraud and breach of contract claims arising out of Defendants' handling of the investigation. *See* Compl ¶¶ 149-86 (Pl.'s Sixth through Thirteenth Causes of Action).

### C. Plaintiff's FERPA request

Plaintiff next alleges that on May 26, 1993, Plaintiff filed a request with the Office of the Dean of Students at the College to inspect his student file, pursuant to the Family Educational Rights and Privacy Act of 1974 ("FERPA"). *See* Compl ¶ 80; 29 U.S.C. § 1232g(a)(1)(A) (1990). Plaintiff alleges that he was not permitted to inspect his file within the forty-five day period prescribed in FERPA. *See* 34 CFR § 99.10 (1993). Plaintiff further alleges that between July 6 and July 19, 1993, Defendant Karen Blank, Associate Dean of Students of Columbia College, while aware of Plaintiff's pending request to review his file, examined the file and selectively removed and destroyed a large volume of documents which "would go against the deans" and support Plaintiff's allegations regarding the aid he was promised and the handling of the subsequent investigation. *See* Compl. ¶¶ 6, 81-82.

**\*4** Plaintiff alleges that on July 19 and 21, 1993, Plaintiff was permitted to review his file in the presence of Defendant Blank. Plaintiff alleges that he not

only informed Defendant Blank that various documents were missing, but identified many of the missing documents. Plaintiff alleges that Defendant Blank admitted to Plaintiff that she had removed and destroyed various documents "in the last few days, and [that] it was normal procedure that all deans carry out as part of the review process." Compl. ¶¶ 83-98. Plaintiff alleges that Defendants Dooley, McDermott, Lehecka, and Brown were aware of Defendant Blank's activities with regard to the destruction of various documents in Plaintiff's files, either before their destruction or after having been so informed by Plaintiff in July and August 1993. *See* Compl. ¶¶ 99-103. Plaintiff alleges that the conduct of Defendants Blank, Dooley, McDermott, Lehecka, and Brown violates FERPA, § 1983, the Fifth and Fourteenth Amendments of the United States Constitution, and Article 1, § 6 of the New York State Constitution, and also constitutes a common law conversion. *See* Compl. ¶¶ 187-208 (Pl.'s Fourteenth through Eighteenth Causes of Action).

### D. Defendants' investigation of the FERPA claim

Plaintiff next alleges that from August 1993 through August 1994, Plaintiff sought redress from Columbia and the Individual Defendants for his claims regarding the alleged destruction of documents in his student file, the representations made to him about financial aid, and the investigation of his claims. Plaintiff alleges that the Defendants collectively acted to obstruct an investigation of Plaintiff's complaints and to inflict serious emotional harm upon Plaintiff. *See* Compl. ¶¶ 103-26. Plaintiff alleges that these acts support claims for breach of contract, conversion, negligence, failure to supervise, harassment, intentional infliction of emotional distress, "failure to discharge," as well as violations of § 1983, the Fifth and Fourteenth Amendments to the United States Constitution, and Article 1, § 6 of the New York State Constitution. *See* Compl. ¶¶ 209-56 (Pl.'s Nineteenth through Twenty-seventh Causes of Action).

### 2. Procedural background

Plaintiff filed the current Complaint on August 26, 1994. On September 14, 1994, the Court granted Plaintiff's request for referral to the Pro Bono list for

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F Supp.
Not Reported in F.Supp., 1996 WL 71504 (S.D.N.Y.)
(Cite as: Not Reported in F.Supp.)

Page 4

the Southern District of New York.

On October 21, 1994, Defendants filed their current motions to dismiss and for sanctions. On February 9, 1995, Plaintiff cross-moved for sanctions. On March 3, 1995, Plaintiff attempted to file a sur-reply memorandum. On March 6, 1995, the Court rejected the filing pursuant to the Court's individual practices, then informed the parties that the motion was fully submitted. Nevertheless, on March 13, 1995, Plaintiff delivered to the Court a two-page sur-reply letter.

Sometime thereafter, the Court was informed that Plaintiff's case had inadvertently been removed from the Pro Bono list. The Court held the motions in abeyance while it attempted to secure *pro bono* counsel for Plaintiff. Between September 1, 1995 and February 1, 1996, the Clerk of the Court circulated Plaintiff's case file to at least four potential *pro bono* attorneys for consideration. Each declined to accept the case. The Court therefore resumed active consideration of the current motions.

### 3 The current motions

*5 Defendants allege that this Court lacks subject matter jurisdiction over Plaintiff's claims. Defendants allege that diversity is lacking, that no Defendant is a state actor supporting a direct constitutional claim, and that there is no private right of action under FERPA. Defendants allege that without diversity or federal question jurisdiction, the Court should dismiss Plaintiff's state law contract and tort claims.

Defendants also allege that Plaintiff's claims should be dismissed pursuant to Fed. R. Civ. P. 12(b)(6) because they were not brought within the applicable statutes of limitations, they are barred by the doctrine of *res judicata*, they fail to state claims upon which relief may be granted, and they fail to state a proper measure of damages.

Defendants' also move for sanctions pursuant to Fed. R. Civ. P. 11. Defendants' seek monetary sanctions against Plaintiff for filing the current Complaint in bad faith, for misrepresenting to the Court the fact of Plaintiff's residence in New York, and for not informing the Court of the decision in a recent action between Plaintiff and many of the same defendants in

New York State Supreme Court. Defendants also seek an order enjoining Plaintiff from filing additional actions against them in other courts.

Plaintiff cross-moves for sanctions for "various false statements and other frivolous behavior in [Defendants'] papers." Pl.'s Aff. Opp. & Supp. of Cross-Mot. ¶ 33.

### Discussion

### 1 Defendants' motion to dismiss

Defendants move to dismiss the Complaint pursuant to Fed. R. Civ. P. 12(b)(1) and (b)(6).

#### A. Subject matter jurisdiction

Defendants correctly state that there is no private right of action under FERPA. *See Fay v. South Colonie Cent. School Dist.*, 802 F.2d 21, 33 (2d Cir. 1986). But Defendants neglect Plaintiff's proper assertion that the alleged FERPA violations may be actionable under § 1983. *See id. at 33; Maynard v. Greater Hoyt School Dist.*, 876 F. Supp. 1104, 1107 (D.S.D. 1995); *Belanger v. Nashua, New Hampshire, School Dist.*, 856 F. Supp. 40, 46-50 (D.N.H. 1994). Pending the Court's examination below of the merits of Plaintiff's FERPA claims, the Court finds that Plaintiff has sufficiently pleaded federal question jurisdiction for his § 1983 claims.[FN1] Plaintiff's state law claims may be entertained under the Court's supplemental jurisdiction because they arise out of the same incidents. The Court therefore denies Defendants' motion to dismiss pursuant to Fed. R. Civ. P. 12(b)(1).

#### B. Statute of limitations, *res judicata,* and failure to state a claim

Plaintiff's Complaint ostensibly states twenty-seven causes of action. Upon full review, the Court finds that these twenty-seven causes state only four distinct factual claims supported by potentially viable legal theories.

##### 1. Plaintiff's alleged oral contract

Plaintiff's first through fifth causes of action all state the same claim for breach of contract, or in the altern-

Not Reported in F.Supp.                                                    Page 5
Not Reported in F.Supp., 1996 WL 71504 (S.D.N.Y.)
(Cite as: Not Reported in F.Supp.)

ative for fraud, arising out of the alleged oral contract between Plaintiff and the College and out of the related alleged misrepresentations of Defendant Thurman. *See* Compl. ¶¶ 128-48.

**\*6** Without admitting that a contract existed, Defendants argue that any claims for fraud or breach arising out of any oral contract are time barred by New York's six-year statute of limitations. *See* New York C.P.L.R. § 213 (McKinney's 1994). The Court agrees. The contract Plaintiff alleges was formed "[t]owards the end of September, 1987." Compl. ¶ 30. Under the terms alleged, the College would "make funds available starting January 1988" and for the full 1988-89 academic year. *See id.* Compl. ¶ 30.

As early as October 1987, the College repudiated its obligation to make funds available to Plaintiff for the spring 1988 term. *See* Compl. ¶ 32. Plaintiff did not act on this repudiation. *See* Compl. ¶ 36.

In January 1988, the College breached the alleged contract by failing to provide Plaintiff with financial assistance for the spring 1988 term. Plaintiff admits the occurrence of the breach, insofar as he continued meeting with Defendant Thurman from January through March 1988 seeking to obtain such assistance. *See* Compl. ¶¶ 35-38. Plaintiff's admission that Defendants breached the contract as early as January 1988 and no later than March 1988 triggers the six-year limitations period. Since Plaintiff filed his Complaint in August 1994, Plaintiff's claims involving the alleged oral contract are untimely.

Moreover, even if these claims were not time barred, the Court finds that the Complaint fails to state a cognizable claim for breach of any oral contract. The statements and representations which Plaintiff attributes to Defendant Thurman are too vague and indefinite to create a binding and enforceable oral contract. The Complaint fails to allege any representations as to the amount of aid to be provided, any payment schedule, any repayment schedule or terms such as interest, the source of any funds, or any restrictions on their use. Without at least a basic representation of these or any other terms, no enforceable contract arises. Plaintiff's attempt to rephrase the breach of contract claim as a fraud claim is similarly untimely

and deficient on its face.

The Court therefore grants Defendants' motion to dismiss Plaintiff's first through fifth causes of action.

2. Defendants' investigation of the contract claim

Plaintiff's sixth through thirteenth causes of action attempt to state claims for breach of contract and fraud arising out of Defendants' alleged improper investigation of Plaintiff's claims involving the alleged oral contract and the alleged misrepresentations by Defendant Thurman. *See* Compl. ¶¶ 149-86. To the extent that these claims rely upon a finding of liability on Plaintiff's time-barred claims, they are also dismissed as time-barred. To the degree that these claims rely upon an alleged contractual or tort-based duty of Defendants' to investigate Plaintiff's concerns, they are dismissed for failure to state a claim. No such duties exist.

The Court therefore grants Defendants' motion to dismiss Plaintiff's sixth through thirteenth causes of action.

3. Plaintiff's FERPA request

**\*7** Plaintiff's fourteenth through eighteenth causes of action allege claims for violation of § 1983, the Fifth and Fourteenth Amendments to the United States Constitution, and Article 1, § 6 of the New York State Constitution, breach of contract and conversion.

Plaintiff's contract and tort claims are dismissed for the reasons discussed above. No conversion claim is stated because Plaintiff does not have a possessory interest in the contents of a student file maintained by Defendants. Plaintiff's claims under the United States Constitution and the New York State Constitution are dismissed because Defendants are not state actors and because the constitutional provisions cited by Plaintiff are inapplicable to the facts alleged in the Complaint.

Plaintiff's claims under 42 U.S.C. § 1983 alleging underlying violations of FERPA survive Defendants' motion. Plaintiff has adequately pleaded that Defendants knowingly and intentionally failed to permit Plaintiff to inspect his student file within the pre-

Not Reported in F.Supp                                                                              Page 6
Not Reported in F.Supp., 1996 WL 71504 (S.D.N.Y.)
(Cite as: Not Reported in F.Supp.)

scribed forty-five day period, and knowingly and intentionally destroyed documents in Plaintiff's file while Plaintiff's request was pending. If proven, such conduct would violate FERPA, and the Second Circuit has held that violations of FERPA are actionable under § 1983. *See Fay, 802 F.2d at 33.*

Plaintiff's § 1983 claims are not barred by the doctrine of *res judicata,* because Justice Schackman in the New York State Supreme Court did not address allegations that Defendants destroyed documents, and did not fully adjudicate any § 1983 claim. On the contrary, Justice Schackman specifically noted that Plaintiff had failed to allege a claim under § 1983. *See* Toback Aff. in Supp. Ex. D, at 5. Defendant argues that the doctrine of *res judicata* should be applied to Plaintiff's claims of document destruction because Plaintiff "could have" brought them in the state court proceeding. The Court disagrees, in part but not wholly because of Plaintiff's *pro se* status.

The Court therefore grants Defendants' motion to dismiss Plaintiff's fourteenth, sixteenth, and seventeenth causes of action in their entirety. The Court denies Defendants' motion to dismiss Plaintiff's fifteenth and eighteenth causes of action to the extent that they state claims under § 1983 predicated on underlying violations of FERPA. The Court grants Defendants' motion to dismiss Plaintiff's fifteenth and eighteenth causes of action in all other respects.

#### 4 Defendants' investigation of the FERPA claim

Plaintiff's nineteenth through twenty-seventh causes of action allege claims for breach of contract, negligence, conversion, failure to supervise, intentional infliction of emotional distress, harassment, "failure to discharge," and violations of § 1983, the Fifth and Fourteenth Amendments to the United States Constitution, and Article 1, § 6 of the New York State Constitution. *See* Compl. ¶¶ 209-56.

Plaintiffs claims for conversion, negligence, breach of contract, and violations of the United States Constitution and the New York State Constitution are dismissed for the reasons stated above. Plaintiff's claims for intentional infliction of emotional distress, "harassment," failure to supervise, and "failure to dis-

charge" are dismissed for failure to state a claim. Plaintiff's § 1983 claim is dismissed, insofar as no federally protected right is implicated by the factual allegations supporting Plaintiff's twenty-sixth cause of action.

**\*8** The Court therefore grants Defendants' motion to dismiss Plaintiff's nineteenth through twenty-seventh causes of action.

#### C. Surviving claims and damages

For the reasons discussed above, the Court dismisses Plaintiff's first through fourteenth, sixteenth, seventeenth, and nineteenth through twenty-seventh causes of action in their entirety, and Plaintiff's fifteenth and eighteenth causes of actions to the extent that they state claims other than violations of § 1983. Accordingly, paragraphs 128-90, 196-203, and 209-256 are stricken from the Complaint. In addition, the factual allegations relating only to the dismissed claims, as stated in paragraphs 28-79 and 104-17, are stricken from the Complaint. Insofar as Defendants Cole, Doane, Feiler, Goldberger, Head, Pollack, Rupp, Sovern, Thurman, Wiggins, and Does #1-4 are named only in the dismissed causes of action, the Complaint is dismissed in its entirety as to them.

The Complaint is narrowed to those portions of Plaintiff's fifteenth and eighteenth causes of actions which state claims under § 1983 predicated on underlying violations of FERPA, as stated in paragraphs 191-95 and 204-08 of the Complaint, and as supported by the factual allegations in paragraphs 80-103. Only Defendants Blank, Brown, Dooley, Lehecka, McDermott, and the Trustees of Columbia University remain. In that regard, the Court notes that Defendant McDermott has not been listed in the caption, although she is named in the Complaint and service upon her has been acknowledged. The Court directs that the caption be amended not only to reflect the dismissal of the ten individual defendants and Does #1-4, but to include Defendant McDermott.

With respect to damages, Plaintiff claimed $19.5 million in monetary damages on the fifteenth cause of action, of which $16.5 million was allegedly compensatory and $3 million was punitive. On the eight-

Not Reported in F.Supp.                                                                          Page 7
Not Reported in F.Supp., 1996 WL 71504 (S.D.N.Y.)
**(Cite as: Not Reported in F.Supp.)**

eenth cause of action, Plaintiff claimed $20.8 million in damages, of which $16.5 million was allegedly compensatory and $4.3 million punitive. *See* Compl. at 40, ¶¶ 15 & 18. Finding no basis for it in the facts alleged, the Court strikes Plaintiff's claim for punitive damages. The Complaint therefore survives with portions of two causes of action, seeking a total of $16.5 million dollars in compensatory damages. Although this figure appears fanciful to the Court, it is arguably justified as an attempt to represent the present value of the lifetime earnings (assuming towering salaries and lofty interest rates) of a mathematician whose career could have spanned decades into the next millennium but for Defendants' for Defendants' alleged conduct.

### 1. Cross-motions for sanctions

In light of Plaintiff's *pro se* status, the Court denies Defendants' motion for sanctions at this time, without prejudice to any future application. The Court admonishes Plaintiff to review Fed. R. Civ. P. 11 prior to any new filings with the Court, and to take heed that Plaintiff's *pro se* status will not shield Plaintiff on any future application.

**\*9** The Court denies Plaintiff's motion for sanctions as without merit.

### 2. Discovery and summary judgment

Plaintiff had filed a "First Request to Produce Documents" in September 1994. This request and all other discovery was stayed pending the Court's decision on the current motions. Having now significantly narrowed the Complaint, the Court strikes all pending discovery notices and requests, including the September 1994 requests.

The Court refers this action to Magistrate Judge Theodore H. Katz for the supervision of discovery. The parties are directed to contact the Magistrate Judge to schedule an initial pre-discovery conference. Neither party shall prepare, draft, serve or file any discovery request prior to the conference unless so directed by the Magistrate Judge or unless any such request is jointly prepared by the parties and agreed to by stipulation.

The parties are directed to complete discovery in this action on or before May 31, 1996. Any request for an extension of discovery should be presented to the Magistrate Judge.

Any party seeking to move for summary judgment should notify the Court by letter within thirty days after the completion of discovery. The party should include in the letter a copy of the party's statement pursuant to Local Rule 3(g). Neither party should file a motion for summary judgment prior to obtaining leave from this Court.

### *Conclusion*

For the reasons discussed above, both motions for sanctions are denied. Defendants' motion to dismiss is granted as to Plaintiff's first through fourteenth, sixteenth, seventeenth, and nineteenth through twenty-seventh causes of action in their entirety, and Plaintiff's fifteenth and eighteenth causes of actions to the extent that they state claims other than violations of § 1983. Defendants' motion to dismiss is denied as to those portions of Plaintiff's fifteenth and eighteenth causes of actions which state claims under § 1983 predicated on underlying violations of FERPA.

SO ORDERED.

> FN1. Defendants also argue that diversity is not complete. Because the Court finds subject matter jurisdiction under 28 U.S.C. § 1331 and 42 U.S.C. § 1988, the Court does not reach the issue of diversity under 28 U.S.C. § 1332. The Court notes, however, that Plaintiff's papers are incomplete and contradictory on the issue. Plaintiff claims to be a citizen of India, but does not state his citizenship in the Complaint. *See* Compl. ¶¶ 1 & 3. Plaintiff admits residing in New York from September 1985 through the present, and does not allege any intention to return to India or any other domicile. Plaintiff admits having "lost legal immigration status" in October 1988, but does not explain his continued presence in the United States. *See* Compl. ¶ 119. The Court advises Plaintiff to cla-

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.                                                                Page 8
Not Reported in F.Supp., 1996 WL 71504 (S.D.N.Y.)
**(Cite as: Not Reported in F.Supp.)**


       rify these deficiencies in future submissions
       and immediately to resolve with the Immig-
       ration and Naturalization Service any issues
       regarding his immigration status.

S.D.N.Y.,1996.
Sirohi v. Trustees of Columbia University
Not Reported in F.Supp., 1996 WL 71504 (S.D.N.Y.)

Briefs and Other Related Documents (Back to top)

• 1:94cv06165 (Docket) (Aug. 26, 1994)

END OF DOCUMENT

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

# EXHIBIT 19

Westlaw.

113 S.Ct. 884                                                          Page 1
506 U.S. 447, 113 S.Ct. 884, 122 L.Ed.2d 247, 61 USLW 4123, 1993-1 Trade Cases P 70,096
**(Cite as: 506 U.S. 447, 113 S.Ct. 884)**

▷
Briefs and Other Related Documents
Spectrum Sports, Inc. v. McQuillanU.S.Cal.,1993.
Supreme Court of the United States
SPECTRUM SPORTS, INC., et al., Petitioners
v.
Shirley McQUILLAN, et vir, dba Sorboturf Enter-
prises.
No. 91-10.

Argued Nov. 10, 1992.
Decided Jan. 25, 1993.

Former distributors brought action against manufac-
turer and other distributors to recover for violations
of the Sherman Act. The District Court entered judg-
ment and jury verdict in favor of former distributor,
and defendants appealed. The Court of Appeals for
the Ninth Circuit affirmed, 907 F.2d 154. On certior-
ari, the Supreme Court, Justice White held that: (1)
intent to monopolize is not, alone, sufficient to justify
dangerous probability of success, and (2) there must
be showing of relevant product in geographic markets
and the defendant's economic power in that market.

Reversed and remanded.
West Headnotes
**[1] Antitrust and Trade Regulation 29T ☜631**

29T Antitrust and Trade Regulation
    29TVII Monopolization
        29TVII(B) Cartels, Combinations, Contracts,
and Conspiracies
            29Tk630 Participants
                29Tk631 k. In General. Most Cited
Cases
    (Formerly 265k12(1.3))
The conduct of a single firm governed by the mono-
poly provision of the Sherman Act is unlawful only
when it threatens actual monopolization. Sherman
Anti-Trust Act, § 2, as amended, 15 U.S.C.A. § 2.

**[2] Antitrust and Trade Regulation 29T ☜713**

29T Antitrust and Trade Regulation
    29TVIII Attempts to Monopolize
        29TVIII(A) In General

            29Tk712 Elements in General
                29Tk713 k. In General. Most Cited
Cases
    (Formerly 265k12(1.6), 265k12(1.3))

**Antitrust and Trade Regulation 29T ☜714**

29T Antitrust and Trade Regulation
    29TVIII Attempts to Monopolize
        29TVIII(A) In General
            29Tk712 Elements in General
                29Tk714 k. Chance of Success in the
Relevant Market. Most Cited Cases
    (Formerly 265k12(1.6), 265k12(1.3))

**Antitrust and Trade Regulation 29T ☜715**

29T Antitrust and Trade Regulation
    29TVIII Attempts to Monopolize
        29TVIII(A) In General
            29Tk712 Elements in General
                29Tk715 k. Intent. Most Cited Cases
    (Formerly 265k12(1.6), 265k12(1.3))
To demonstrate attempted monopolization, plaintiff
must prove that defendant has engaged in predatory
or anticompetitive conduct with specific intent to
monopolize and that there is a dangerous probability
of defendant achieving monopoly power. Sherman
Anti-Trust Act, § 2, as amended, 15 U.S.C.A. § 2.

**[3] Antitrust and Trade Regulation 29T ☜
977(3)**

29T Antitrust and Trade Regulation
    29TXVII Antitrust Actions, Proceedings, and En-
forcement
        29TXVII(B) Actions
            29Tk973 Evidence
                29Tk977 Weight and Sufficiency
                    29Tk977(3) k. Monopolization or At-
tempt to Monopolize. Most Cited Cases
    (Formerly 265k28(7.5))
Proof of unfair or predatory conduct, alone, is not
sufficient to make out the offense of attempted mono-
polization. Sherman Anti-Trust Act, § 2, as amended,
15 U.S.C.A. § 2.

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

113 S Ct. 884                                                                      Page 2
506 U S. 447, 113 S Ct. 884, 122 L Ed.2d 247, 61 USL W 4123, 1993-1 Trade Cases P 70,096
**(Cite as: 506 U.S. 447, 113 S.Ct. 884)**

[4] **Antitrust and Trade Regulation 29T** 714

29T Antitrust and Trade Regulation
  29TVIII Attempts to Monopolize
    29TVIII(A) In General
      29Tk712 Elements in General
        29Tk714 k. Chance of Success in the
Relevant Market. Most Cited Cases
  (Formerly 265k28(7 5))
Dangerous probability of success of attempted mono-
polization requires proof of more than intent alone.
Sherman Anti-Trust Act, § 2, as amended, 15
U.S.C.A. § 2.

[5] **Antitrust and Trade Regulation 29T** 528

29T Antitrust and Trade Regulation
  29TVI Antitrust Regulation in General
    29TVI(A) In General
      29Tk527 Purpose of Antitrust Regulation
        29Tk528 k. In General. Most Cited
Cases
  (Formerly 265k10)
Purpose of the Sherman Act is not to protect busi-
nesses from the workings of the market; it is to pro-
tect the public from the failure of the market. Sher-
man Anti-Trust Act, § 2, as amended, 15 U.S.C.A. §
2.

[6] **Antitrust and Trade Regulation 29T** 529

29T Antitrust and Trade Regulation
  29TVI Antitrust Regulation in General
    29TVI(A) In General
      29Tk527 Purpose of Antitrust Regulation
        29Tk529 k. Protection of Competition
Rather Than Competitors. Most Cited Cases
  (Formerly 265k12(1 2))
Sherman Act directs itself, not against conduct which
is competitive, even severely so, but against conduct
which unfairly tends to destroy competition itself; it
does so, not out of solicitude for private concerns, but
out of concern for the public interest. Sherman Anti-
Trust Act, § 2, as amended, 15 U.S.C.A. § 2.

[7] **Antitrust and Trade Regulation 29T** 714

29T Antitrust and Trade Regulation
  29TVIII Attempts to Monopolize

    29TVIII(A) In General
      29Tk712 Elements in General
        29Tk714 k. Chance of Success in the
Relevant Market. Most Cited Cases
  (Formerly 265k12(1 6))

**Antitrust and Trade Regulation 29T** 715

29T Antitrust and Trade Regulation
  29TVIII Attempts to Monopolize
    29TVIII(A) In General
      29Tk712 Elements in General
        29Tk715 k. Intent. Most Cited Cases
  (Formerly 265k12(1 6))
Fact that defendant has engaged in unfair and predat-
ory tactics may prove the necessary intent to mono-
polize, which is something more than an intent to
compete vigorously, but demonstrating the dangerous
probability of monopolization in attempt case also re-
quires inquiry into relevant product and geographic
markets and the defendant's economic power in that
market. Sherman Anti-Trust Act, § 2, as amended, 15
U.S.C.A. § 2.

[8] **Antitrust and Trade Regulation 29T** 714

29T Antitrust and Trade Regulation
  29TVIII Attempts to Monopolize
    29TVIII(A) In General
      29Tk712 Elements in General
        29Tk714 k. Chance of Success in the
Relevant Market. Most Cited Cases
  (Formerly 265k12(1 6), 265k12(1 3))

**Antitrust and Trade Regulation 29T** 715

29T Antitrust and Trade Regulation
  29TVIII Attempts to Monopolize
    29TVIII(A) In General
      29Tk712 Elements in General
        29Tk715 k. Intent. Most Cited Cases
  (Formerly 265k12(1 6))
Defendants may not be held liable for attempted
monopolization under Sherman Act absent proof of
dangerous probability that they would monopolize
particular market and specific intent to monopolize.
Sherman Anti-Trust Act, § 2, as amended, 15
U.S.C.A. § 2.
**885 *447 Syllabus FN*

113 S.Ct. 884                                                                                                          Page 3
506 U.S. 447, 113 S.Ct. 884, 122 L.Ed.2d 247, 61 USLW 4123, 1993-1 Trade Cases P 70,096
**(Cite as: 506 U.S. 447, 113 S.Ct. 884)**

FN* The syllabus constitutes no part of the opinion of the Court but has been prepared by the Reporter of Decisions for the convenience of the reader. See *United States v. Detroit Lumber Co.*, 200 U.S. 321, 337, 26 S.Ct. 282, 287, 50 L.Ed. 499.

Shortly after the manufacturer of sorbothane-a patented elastic polymer with shock-absorbing characteristics-informed respondents, distributors of medical, athletic, and equestrian products made with sorbothane, that it would no longer sell them the polymer, petitioner Spectrum Sports, Inc., became the national distributor of sorbothane athletic products. Respondents' business failed, and they filed suit in the District **886 Court against petitioners and others, seeking damages for alleged violations of, *inter alia*, § 2 of the Sherman Act, which makes it an offense for any person to "monopolize, or attempt to monopolize, or combine or conspire ... to monopolize any part of the trade or commerce among the several States." A jury found that the defendants violated § 2 by, in the words of the verdict sheet, "monopolizing, attempting to monopolize, and/or conspiring to monopolize." The Court of Appeals affirmed, noting that, although the jury had not specified which of the three possible § 2 violations had occurred, the verdict stood because the evidence established a case of attempted monopolization. Relying on its earlier rulings in *Lessig v. Tidewater Oil Co.*, 327 F.2d 459, and its progeny, the court held that the jury could have inferred two of the elements of that offense-a specific intent to achieve monopoly power and a dangerous probability of monopolization of a relevant market-from evidence showing the defendants' unfair or predatory conduct, without any proof of relevant market or the defendants' market power, and that the jury was properly instructed that it could make such inferences.

*Held:* Petitioners may not be liable for attempted monopolization under § 2 absent proof of a dangerous probability that they would monopolize a relevant market and specific intent to monopolize. The conduct of a single firm, governed by § 2, is unlawful "only when it threatens actual monopolization." *Copperweld Corp. v. Independence Tube Corp.*, 467 U.S. 752, 767, 104 S.Ct. 2731, 2739, 81 L.Ed.2d 628.

Consistent with this approach, Courts of Appeals other than the court below have generally required a plaintiff in an attempted monopolization case to prove that (1) the defendant has engaged in predatory or anticompetitive conduct with (2) a specific intent to monopolize and (3) a dangerous probability of achieving monopoly power. Unfair or predatory conduct may be sufficient to prove the necessary intent to *448 monopolize. However, intent alone is insufficient to establish the dangerous probability of success, *Swift & Co. v. United States*, 196 U.S. 375, 402, 25 S.Ct. 276, 282, 49 L.Ed. 518 which requires inquiry into the relevant product and geographic market and the defendant's economic power in that market. There is little if any support in the statute or case law for *Lessig 's* contrary interpretation of § 2. Moreover, *Lessig* and its progeny are inconsistent with the Sherman Act's purpose of protecting the public from the failure of the market. The law directs itself only against conduct that unfairly tends to destroy competition, and, thus, courts have been careful to avoid constructions of § 2 which might chill competition rather than foster it. The concern that § 2 might be applied so as to further anticompetitive ends is plainly not met by inquiring only whether the defendant has engaged in "unfair" or "predatory" tactics. Since the jury's instructions and the Court of Appeals' affirmance both misconstrued § 2, and since the jury's verdict did not negate the possibility that it rested on the attempt to monopolize ground alone, the case is remanded for further proceedings. Pp. 889-892

907 F.2d 154 (CA 9 1990), reversed and remanded.

WHITE, J., delivered the opinion for a unanimous Court.

James D. Vail, Cleveland, OH, for petitioner.
Robert A. Long, Jr., DC, for U.S. as amicus curiae supporting the petitioners.
Jeffrey M. Shohet, San Diego, CA, for respondents.
Justice WHITE delivered the opinion of the Court.
Section 2 of the Sherman Act, 26 Stat. 209, as amended, 15 U.S.C. § 2, makes it an offense for any person to "monopolize, or attempt to monopolize, or combine or conspire with any other person or persons, to monopolize any part of the trade or com-

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

113 S.Ct. 884                                                                                   Page 4
506 U.S. 447, 113 S.Ct. 884, 122 L. Ed.2d 247, 61 USLW 4123, 1993-1 Trade Cases P 70,096
(Cite as: 506 U.S. 447, 113 S.Ct. 884)

merce among the several States ...." The **887 jury in this case returned a verdict finding that petitioners had monopolized, attempted to monopolize, and/or conspired to monopolize. The District Court entered a judgment ruling*449 that petitioners had violated § 2, and the Court of Appeals affirmed on the ground that petitioners had attempted to monopolize. The issue we have before us is whether the District Court and the Court of Appeals correctly defined the elements of that offense.

I

Sorbothane is a patented elastic polymer whose shock-absorbing characteristics make it useful in a variety of medical, athletic, and equestrian products. BTR, Inc. (BTR), owns the patent rights to sorbothane, and its wholly owned subsidiaries manufacture the product in the United States and Britain. Hamilton-Kent Manufacturing Company (Hamilton-Kent) and Sorbothane, Inc. (S.I.), were at all relevant times owned by BTR. S.I. was formed in 1982 to take over Hamilton-Kent's sorbothane business.[FN1] App. to Pet. for Cert. A3. Respondents Shirley and Larry McQuillan, doing business as Sorboturf Enterprises, were regional distributors of sorbothane products from 1981 to 1983. Petitioner Spectrum Sports, Inc. (Spectrum), was also a distributor of sorbothane products. Petitioner Kenneth B. Leighton, Jr., is a co-owner of Spectrum. Ibid. Kenneth Leighton, Jr., is the son of Kenneth Leighton, Sr., the president of Hamilton-Kent and S.I. at all relevant times.

FN1. Sorbothane, Inc., was formerly called Sorbo, Inc. App. 67.

In 1980, respondents Shirley and Larry McQuillan signed a letter of intent with Hamilton-Kent, which then owned all manufacturing and distribution rights to sorbothane. The letter of intent granted the McQuillans exclusive rights to purchase sorbothane for use in equestrian products. Respondents were designing a horseshoe pad using sorbothane.

In 1981, Hamilton-Kent decided to establish five regional distributorships for sorbothane. Respondents were selected to be distributors of all sorbothane

products, including medical products and shoe inserts, in the Southwest. Spectrum *450 was selected as distributor for another region. Id., at A4-A5.

In January 1982, Hamilton-Kent shifted responsibility for selling medical products from five regional distributors to a single national distributor. In April 1982, Hamilton-Kent told respondents that it wanted them to relinquish their athletic shoe distributorship as a condition for retaining the right to develop and distribute equestrian products. As of May 1982, BTR had moved the sorbothane business from Hamilton-Kent to S.I. Id., at A6. In May, the marketing manager of S.I. again made clear that respondents had to sell their athletic distributorship to keep their equestrian distribution rights. At a meeting scheduled to discuss the sale of respondents' athletic distributorship to petitioner Leighton, Jr., Leighton, Jr., informed Shirley McQuillan that if she did not come to agreement with him she would be " 'looking for work.' " Id., at A6. Respondents refused to sell and continued to distribute athletic shoe inserts.

In the fall of 1982, Leighton, Sr., informed respondents that another concern had been appointed as the national equestrian distributor, and that they were "no longer involved in equestrian products." Id., at A7. In January 1983, S.I. began marketing through a national distributor a sorbothane horseshoe pad allegedly indistinguishable from the one designed by respondents. Ibid. In August 1983, S.I. informed respondents that it would no longer accept their orders. Ibid. Spectrum thereupon became national distributor of sorbothane athletic shoe inserts. Pet. for Cert. 6. Respondents sought to obtain sorbothane from the BTR's British subsidiary, but were informed by that subsidiary that it would not sell sorbothane in the United States. Respondents' business failed. App. to Pet. for Cert. A8.

**888 Respondents sued petitioners seeking damages for alleged violations of §§ 1 and 2 of the Sherman Act, 15 U.S.C. §§ 1 *451 and 2,[FN2] § 3 of the Clayton Act, 38 Stat. 730, 731, 15 U.S.C. § 14, the Racketeer Influenced and Corrupt Organizations Act (RICO), 18 U.S.C. § 1962, and two provisions of California business law. Respondents also alleged fraud, breach of oral contract, interference with pro-

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

113 S.Ct. 884                                                                                    Page 5
506 U.S. 447, 113 S.Ct. 884, 122 L.Ed.2d 247, 61 USLW 4123, 1993-1 Trade Cases P 70,096
**(Cite as: 506 U.S. 447, 113 S.Ct. 884)**

spective business advantage, bad-faith denial of the existence of an oral contract, and conversion.

> FN2. Two violations of § 1 were alleged, re-sale price maintenance and division of territories. Attempted monopolization, monopolization, and conspiracy to monopolize were charged under § 2. All in all, four alleged violations of federal law and seven alleged violations of state law were sent to the jury.

The case was tried to a jury, which returned a verdict against one or more of the defendants on each of the 11 alleged violations on which it was to return a verdict. All of the defendants were found to have violated § 2 by, in the words of the verdict sheet, "monopolizing, attempting to monopolize, and/or conspiring to monopolize." App. 410. Petitioners were also found to have violated civil RICO and the California unfair practices law, but not § 1 of the Sherman Act. The jury awarded $1,743,000 in compensatory damages on each of the violations found to have occurred.[FN3] This amount was trebled under § 4 of the Clayton Act. The District Court also awarded nearly $1 million in attorney's fees and denied motions for judgment notwithstanding the verdict and for a new trial.

> FN3. The special verdict form advised the jury as follows:
> "The following pages identify the name of each defendant and the claims for which plaintiffs contend that the defendant is liable. If you find that any of the defendants are liable on any of the claims, you may award damages to the plaintiffs against those defendants. Should you decide to award damages, please assess damages for *each* defendant and *each* claim separately and without regard to whether you have already awarded the same damages on another claim or against another defendant. The court will insure that there is no double recovery. The verdict will *not* be totaled." App. 416.

**\*452** The Court of Appeals for the Ninth Circuit affirmed the judgment in an unpublished opinion. Judgt. order reported at 907 F.2d 154 (1990). The

court expressly ruled that the trial court had properly instructed the jury on the Sherman Act claims and found that the evidence supported the liability verdicts as well as the damages awards on these claims. The court then affirmed the judgment of the District Court, finding it unnecessary to rule on challenges to other violations found by the jury. App. to Pet. for Cert. A28. On the § 2 issue that petitioners present here, the Court of Appeals, noting that the jury had found that petitioners had violated § 2 without specifying whether they had monopolized, attempted to monopolize, or conspired to monopolize, held that the verdict would stand if the evidence supported any one of the three possible violations of § 2. *Id.,* at A15. The court went on to conclude that a case of attempted monopolization had been established.[FN4] The court rejected petitioners' argument that attempted monopolization had not been established because respondents had failed to prove that petitioners had a specific intent to monopolize**\*889** a relevant market. The court also held that in order to show that respondents' **\*453** attempt to monopolize was likely to succeed it was not necessary to present evidence of the relevant market or of the defendants' market power. In so doing, the Ninth Circuit relied on *Lessig v. Tidewater Oil Co.,* 327 F.2d 459 (CA9), cert. denied, 377 U.S. 993, 84 S.Ct. 1920, 12 L.Ed.2d 1046 (1964), and its progeny. App. to Pet. for Cert. A18-A19. The Court of Appeals noted that these cases, in dealing with attempt to monopolize claims, had ruled that "if evidence of unfair or predatory conduct is presented, it may satisfy both the specific intent and dangerous probability elements of the offense, without any proof of relevant market or the defendant's marketpower *[sic]*" *Id.,* at A19. If, however, there is insufficient evidence of unfair or predatory conduct, there must be a showing of "relevant market or the defendant's marketpower *[sic]*" *Ibid.* The court went on to find:

> FN4. The District Court's jury instructions were transcribed as follows:
> "In order to win on the claim of attempted monopoly, the Plaintiff must prove each of the following elements by a preponderance of the evidence: first, that the Defendants had a specific intent to achieve monopoly

power in the relevant market; second, that the Defendants engaged in exclusionary or restrictive conduct in furtherance of its specific intent; third, that there was a dangerous probability that Defendants could sooner or later achieve [their] goal of monopoly power in the relevant market; fourth, that the Defendants' conduct occurred in or affected interstate commerce; and, fifth, that the Plaintiff was injured in the business or property by the Defendants' exclusionary or restrictive conduct.

. . . .

"If the Plaintiff has shown that the Defendant engaged in predatory conduct, you may infer from that evidence the specific intent and the dangerous probability element of the offense without any proof of the relevant market or the Defendants' marketing *[sic]* power." *Id.* at 251-252. See also App. to Pet. for Cert. A16, A20.

"There is sufficient evidence from which the jury could conclude that the S.I. Group and Spectrum Group engaged in unfair or predatory conduct and thus inferred that they had the specific intent and the dangerous probability of success and, therefore, McQuillan did not have to prove relevant market or the defendant's marketing power." *Id.* at A21.

The decision below, and the *Lessig* line of decisions on which it relies, conflicts with holdings of courts in other Circuits. Every other Court of Appeals has indicated that proving an attempt to monopolize requires proof of a dangerous probability of monopolization of a relevant market.[FN5] We *454 granted certiorari, 503 U.S. 958, 112 S.Ct. 1557, 118 L.Ed.2d 206 (1992), to resolve this conflict among the Circuits.[FN6] We reverse.

FN5. See, *e.g.*, *CVD, Inc. v. Raytheon Co.*, 769 F.2d 842, 851 (CA1 1985), cert. denied, 475 U.S. 1016, 106 S.Ct. 1198, 89 L.Ed.2d 312 (1986); *Twin Laboratories, Inc. v. Weider Health & Fitness*, 900 F.2d 566, 570 (CA2 1990); *Harold Friedman, Inc. v. Kroger Co.*, 581 F.2d 1068, 1079 (CA3 1978); *Abcor Corp. v. AM Int'l, Inc.*, 916

F.2d 924, 926, 931 (CA4 1990); *C.A.T. Industrial Disposal, Inc. v. Browning-Ferris Industries, Inc.*, 884 F.2d 209, 210 (CA5 1989); *Arthur S. Langenderfer, Inc. v. S.E. Johnson Co.*, 917 F.2d 1413, 1431-1432 (CA6 1990), cert. denied, 502 U.S. 808, 899, 112 S.Ct. 51, 274, 116 L.Ed.2d 29, 226 (1991); *Indiana Grocery, Inc. v. Super Valu Stores, Inc.*, 864 F.2d 1409, 1413-1416 (CA7 1989); *General Industries Corp. v. Hartz Mountain Corp.*, 810 F.2d 795, 804 (CA8 1987); *Colorado Interstate Gas Co. v. Natural Gas Pipeline Co. of America*, 885 F.2d 683, 693 (CA10 1989), cert. denied, 498 U.S. 972, 111 S.Ct. 441, 112 L.Ed.2d 424 (1990); *Key Enterprises of Delaware, Inc. v. Venice Hospital*, 919 F.2d 1550, 1565 (CA11 1990); *Neumann v. Reinforced Earth Co.*, 252 U.S.App.D.C. 11, 15-16, 786 F.2d 424, 428-429, cert. denied, 479 U.S. 851, 107 S.Ct. 181, 93 L.Ed.2d 116 (1986); *Abbott Laboratories v. Brennan*, 952 F.2d 1346, 1354 (CA Fed.1991), cert. denied, 505 U.S. 1205, 112 S.Ct. 2993, 120 L.Ed.2d 870 (1992).

FN6. Our grant of certiorari was limited to the first question presented in the petition: "Whether a manufacturer's distributor expressly absolved of violating Section 1 of the Sherman Act can, without any evidence of market power or specific intent, be found liable for attempting to monopolize solely by virtue of a unique Ninth Circuit rule?" Pet. for Cert. i.

II

While § 1 of the Sherman Act forbids contracts or conspiracies in restraint of trade or commerce, § 2 addresses the actions of single firms that monopolize or attempt to monopolize, as well as conspiracies and combinations to monopolize. Section 2 does not define the elements of the offense of attempted monopolization. Nor is there much guidance to be had in the scant legislative history of that provision, which was added late in the legislative process. See 1 E. Kintner, Legislative History of the Federal Anti-

113 S.Ct. 884                                                                 Page 7
506 U.S. 447, 113 S.Ct. 884, 122 L.Ed.2d 247, 61 USLW 4123, 1993-1 Trade Cases P 70,096
**(Cite as: 506 U.S. 447, 113 S.Ct. 884)**

trust Laws and Related Statutes 23-25 (1978); 3 P. Areeda & D. Turner, Antitrust Law ¶ 617, pp. 39-41 (1978). The legislative history does indicate that much of the interpretation of the necessarily broad principles of the Act was to be left for the courts in particular cases. See, *e g.*, 21 Cong.Rec. 2460 (1890) (statement of Sen. Sherman). See also 1 **890 Kintner, *supra*, at 19; 3 Areeda & Turner, *supra*, ¶ 617, at 40.

This Court first addressed the meaning of attempt to monopolize under § 2 in *Swift & Co. v. United States, 196 U.S. 375, 25 S.Ct. 276, 49 L.Ed. 518 (1905).* The Court's opinion, written by Justice Holmes, contained the following passage:
*455 "Where acts are not sufficient in themselves to produce a result which the law seeks to prevent-for instance, the monopoly-but require further acts in addition to the mere forces of nature to bring that result to pass, an intent to bring it to pass is necessary in order to produce a dangerous probability that it will happen. *Commonwealth v. Peaslee, 177 Massachusetts 267, 272 [59 N.E. 55, 56 (1901)].* But when that intent and the consequent dangerous probability exist, this statute, like many others and like the common law in some cases, directs itself against that dangerous probability as well as against the completed result." *Id., at 396, 25 S.Ct., at 279.*

The Court went on to explain, however, that not every act done with intent to produce an unlawful result constitutes an attempt. "It is a question of proximity and degree." *Id., at 402, 25 S.Ct., at 281. Swift* thus indicated that intent is necessary, but alone is not sufficient, to establish the dangerous probability of success that is the object of § 2's prohibition of attempts.[FN7]

> FN7. Justice Holmes confirmed that this was his interpretation of *Swift* in *Hyde v. United States, 225 U.S. 347, 32 S.Ct. 793, 56 L.Ed. 1114 (1912).* In dissenting on that case on other grounds, the Justice, citing *Swift,* stated that an attempt may be found where the danger of harm is very great; however, "combination, intention and overt act may all be present without amounting to a criminal attempt.... There must be dangerous

proximity to success." *225 U.S., at 387-388, 32 S.Ct., at 810.*

The Court's decisions since *Swift* have reflected the view that the plaintiff charging attempted monopolization must prove a dangerous probability of actual monopolization, which has generally required a definition of the relevant market and examination of market power. In *Walker Process Equipment, Inc. v. Food Machinery & Chemical Corp., 382 U.S. 172, 177, 86 S.Ct. 347, 350, 15 L.Ed.2d 247 (1965),* we found that enforcement of a fraudulently obtained patent claim could violate the Sherman Act. We stated that, to establish monopolization or attempt to monopolize under § 2 of the Sherman Act, it would *456 be necessary to appraise the exclusionary power of the illegal patent claim in terms of the relevant market for the product involved. *Ibid.* The reason was that "[w]ithout a definition of that market there is no way to measure [the defendant's] ability to lessen or destroy competition." *Ibid.*

[1] Similarly, this Court reaffirmed in *Copperweld Corp. v. Independence Tube Corp., 467 U.S. 752, 104 S.Ct. 2731, 81 L.Ed.2d 628 (1984),* that "Congress authorized Sherman Act scrutiny of single firms only when they pose a danger of monopolization. Judging unilateral conduct in this manner reduces the risk that the antitrust laws will dampen the competitive zeal of a single aggressive entrepreneur." *Id., at 768, 104 S.Ct., at 2740.* Thus, the conduct of a single firm, governed by § 2, "is unlawful only when it threatens actual monopolization." *Id., at 767, 104 S.Ct., at 2739.* See also *Lorain Journal Co. v. United States, 342 U.S. 143, 154, 72 S.Ct. 181, 187, 96 L.Ed. 162 (1951); United States v. Griffith, 334 U.S. 100, 105-106, 68 S.Ct. 941, 945, 92 L.Ed. 1236 (1948); American Tobacco Co. v. United States, 328 U.S. 781, 785, 66 S.Ct. 1125, 1127, 90 L.Ed. 1575 (1946).*

[2] The Courts of Appeals other than the Ninth Circuit have followed this approach. Consistent with our cases, it is generally required that to demonstrate attempted monopolization a plaintiff must prove (1) that the defendant has engaged in predatory or anticompetitive conduct with (2) a specific intent to monopolize and (3) a dangerous **891 probability of

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

113 S.Ct. 884                                                                                    Page 8
506 U.S. 447, 113 S.Ct. 884, 122 L. Ed.2d 247, 61 USLW 4123, 1993-1 Trade Cases P 70,096
**(Cite as: 506 U.S. 447, 113 S.Ct. 884)**

achieving monopoly power See 3 Areeda & Turner, *supra*, ¶ 820, at 312. In order to determine whether there is a dangerous probability of monopolization, courts have found it necessary to consider the relevant market and the defendant's ability to lessen or destroy competition in that market [FN8]

> FN8. See, *e g*, *Arthur S. Langenderfer, Inc. v. S.E. Johnson Co.*, 917 F.2d, at 1431-1432; *Twin Laboratories, Inc. v. Weider Health & Fitness*, 900 F.2d, at 570; *Colorado Interstate Gas Co. v. Natural Gas Pipeline Co. of America*, 885 F.2d, at 693; *Indiana Grocery, Inc. v. Super Valu Stores, Inc.*, 864 F.2d, at 1413-1416; *General Industries Corp. v. Hartz Mountain Corp.*, 810 F.2d, at 804.

[3] *457 Notwithstanding the array of authority contrary to *Lessig,* the Court of Appeals in this case reaffirmed its prior holdings; indeed, it did not mention either this Court's decisions discussed above or the many decisions of other Courts of Appeals reaching contrary results Respondents urge us to affirm the decision below We are not at all inclined, however, to embrace *Lessig's* interpretation of § 2, for there is little, if any, support for it in the statute or the case law, and the notion that proof of unfair or predatory conduct alone is sufficient to make out the offense of attempted monopolization is contrary to the purpose and policy of the Sherman Act

The *Lessig* opinion claimed support from the language of § 2, which prohibits attempts to monopolize "any part" of commerce, and therefore forbids attempts to monopolize any appreciable segment of interstate sales of the relevant product. See *United States v. Yellow Cab Co.*, 332 U.S. 218, 226, 67 S.Ct. 1560, 1564-1565, 91 L.Ed. 2010 (1947). The "any part" clause, however, applies to charges of monopolization as well as to attempts to monopolize, and it is beyond doubt that the former requires proof of market power in a relevant market *United States v. Grinnell Corp.*, 384 U.S. 563, 570-571, 86 S.Ct. 1698, 1704, 16 L.Ed.2d 778 (1966); *United States v. E.I. du Pont de Nemours & Co.*, 351 U.S. 377, 404, 76 S.Ct. 994, 1012, 100 L.Ed. 1264 (1956) [FN9]

> FN9. *Lessig* cited *United States v. Yellow*

*Cab Co.*, 332 U.S., at 226, 67 S.Ct., at 1564-1565, in support of its interpretation, but *Yellow Cab* relied on the "any part" language to support the proposition that it is immaterial how large an amount of interstate trade is affected, or how important that part of commerce is in relation to the entire amount of that type of commerce in the Nation.

[4] In support of its determination that an inference of dangerous probability was permissible from a showing of intent, the *Lessig* opinion cited, and added emphasis to, this Court's reference in its opinion in *Swift* to " 'intent and the *consequent* dangerous probability' " 327 F.2d at 474, n. 46, quoting 196 U.S., at 396, 25 S.Ct., at 279. But any question whether dangerous *458 probability of success requires proof of more than intent alone should have been removed by the subsequent passage in *Swift* which stated that "not every act that may be done with intent to produce an unlawful result ... constitutes an attempt. It is a question of proximity and degree." *Id.*, at 402, 25 S.Ct., at 281.

The *Lessig* court also relied on a footnote in *du Pont & Co., supra*, 351 U.S., at 395, n. 23, 76 S.Ct., at 1008, n. 23, for the proposition that when the charge is attempt to monopolize, the relevant market is "not in issue." That footnote, which appeared in analysis of the relevant market issue in *du Pont*, rejected the Government's reliance on several cases, noting that "the scope of the market was not in issue" in *Story Parchment Co. v. Paterson Parchment Paper Co.*, 282 U.S. 555, 51 S.Ct. 248, 75 L.Ed. 544 (1931) That reference merely reflected the fact that, in *Story Parchment*, which was not an attempt to monopolize case, the parties did not challenge the definition of the market adopted by the lower courts. Nor was *du Pont* itself concerned with the issue in this case

[5][6][7] It is also our view that *Lessig* and later Ninth Circuit decisions refining and applying it are inconsistent with the policy of the Sherman Act. The purpose of the Act is **892 not to protect businesses from the working of the market; it is to protect the public from the failure of the market. The law directs itself not against conduct which is competitive, even

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

severely so, but against conduct which unfairly tends to destroy competition itself. It does so not out of solicitude for private concerns but out of concern for the public interest. See, e.g., *Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.,* 429 U.S. 477, 488, 97 S.Ct. 690, 697, 50 L.Ed.2d 701 (1977); *Cargill, Inc. v. Monfort of Colorado, Inc.,* 479 U.S. 104, 116-117, 107 S.Ct. 484, 492-493, 93 L.Ed.2d 427 (1986); *Brown Shoe Co. v. United States,* 370 U.S. 294, 320, 82 S.Ct. 1502, 1521, 8 L.Ed.2d 510 (1962). Thus, this Court and other courts have been careful to avoid constructions of § 2 which might chill competition, rather than foster it. It is sometimes difficult *459 to distinguish robust competition from conduct with long-term anticompetitive effects; moreover, single-firm activity is unlike concerted activity covered by § 1, which "inherently is fraught with anticompetitive risk." *Copperweld,* 467 U.S. at 767-769, 104 S.Ct. at 2739-2740. For these reasons, § 2 makes the conduct of a single firm unlawful only when it actually monopolizes or dangerously threatens to do so. *Id.,* at 767, 104 S.Ct. at 2739. The concern that § 2 might be applied so as to further anticompetitive ends is plainly not met by inquiring only whether the defendant has engaged in "unfair" or "predatory" tactics. Such conduct may be sufficient to prove the necessary intent to monopolize, which is something more than an intent to compete vigorously, but demonstrating the dangerous probability of monopolization in an attempt case also requires inquiry into the relevant product and geographic market and the defendant's economic power in that market.

III

[8] We hold that petitioners may not be liable for attempted monopolization under § 2 of the Sherman Act absent proof of a dangerous probability that they would monopolize a particular market and specific intent to monopolize. In this case, the trial instructions allowed the jury to infer specific intent and dangerous probability of success from the defendants' predatory conduct, without any proof of the relevant market or of a realistic probability that the defendants could achieve monopoly power in that market. In this respect, the instructions misconstrued § 2, as did the Court of Appeals in affirming the judgment of the District Court. Since the affirmance of the § 2 judg-

ment against petitioners rested solely on the legally erroneous conclusion that petitioners had attempted to monopolize in violation of § 2 and since the jury's verdict did not negate the possibility that the § 2 verdict rested on the attempt to monopolize ground alone, the judgment*460 of the Court of Appeals is reversed, *Sunkist Growers, Inc. v. Winckler & Smith Citrus Products Co.,* 370 U.S. 19, 29-30, 82 S.Ct. 1130, 1136, 8 L.Ed.2d 305 (1962), and the case is remanded for further proceedings consistent with this opinion. FN10

> FN10. Respondents conceded in their brief that the case should be remanded to the Court of Appeals if we found error in the instruction on attempt to monopolize. Brief for Respondents 45-46.

*So ordered.*

U.S.Cal.,1993.
Spectrum Sports, Inc. v. McQuillan
506 U.S. 447, 113 S.Ct. 884, 122 L.Ed.2d 247, 61 USLW 4123, 1993-1 Trade Cases P 70,096

Briefs and Other Related Documents (Back to top)

• 1992 WL 687874 (Oral Argument) Oral Argument (Nov. 10, 1992)
• 1992 WL 545113 (Appellate Brief) REPLY BRIEF FOR PETITIONERS (Jul. 24, 1992)
• 1992 WL 545111 (Appellate Brief) BRIEF ON THE MERITS BY RESPONDENTS (Jun. 26, 1992)
• 1993 WL 469177 (Appellate Brief) BRIEF FOR PETITIONERS (May. 28, 1992)
• 1992 WL 12012034 (Appellate Petition, Motion and Filing) Brief for the United States as Amicus Curiae Supporting Petitioners (May. 27, 1992) Original Image of this Document (PDF)
• 1992 WL 12012035 (Appellate Petition, Motion and Filing) Brief in Response to Brief for the United States as Amicus Curiae (Mar. 02, 1992) Original Image of this Document (PDF)
• 1991 WL 11009335 (Appellate Petition, Motion and Filing) Petition for a Writ of Certiorari (Jul. 01, 1991) Original Image of this Document with Appendix (PDF)

END OF DOCUMENT

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.