# EXHIBIT 19

United States Court of Appeals,
Ninth Circuit.
LOS ANGELES LAND CO.; Sierra Palm Partners; West Lanes Inc., Plaintiffs-Appellees,
v.
BRUNSWICK CORPORATION, Defendant-Appellant.
No. 92-55134.

Argued and Submitted July 12, 1993.
Decided Oct. 13, 1993.

Developer of bowling centers brought antitrust and state tort claims against defendant which manufactured bowling equipment and owned and operated its own bowling centers. The United States District Court for the Central District of California, Mariana R. Pfaelzer, J., awarded treble damages on antitrust claim and, alternatively, one third that amount under state claim. Defendant appealed. The Court of Appeals, Cynthia Holcomb Hall, Circuit Judge, held that: (1) defendant did not have monopoly power in relevant geographic market; (2) defendant was not a stranger to relationship between plaintiff and finance company, as required for claim of tortious interference with prospective economic advantage; and (3) privilege of competition protected defendant from claim that it tortiously interfered with plaintiff's prospective economic advantage by prevailing upon construction company not to deal with plaintiff.

Reversed and remanded with directions.

West Headnotes

[1] Antitrust and Trade Regulation ⚷ 621
29Tk621 Most Cited Cases
(Formerly 265k12(1.3))

[1] Antitrust and Trade Regulation ⚷ 644
29Tk644 Most Cited Cases
(Formerly 265k12(1.3))
In order to establish violation of § 2 of Sherman Anti-Trust Act, plaintiff has to prove possession of monopoly power in relevant market; willful acquisition or maintenance of that power; and causal antitrust injury. Sherman Anti-Trust Act, § 2, 15 U.S.C.A. § 2.

[2] Antitrust and Trade Regulation ⚷ 641
29Tk641 Most Cited Cases
(Formerly 265k12(1.3))
For purposes of claim under § 2 of Sherman Anti-Trust Act, "monopoly power" is power to control prices or exclude competition. Sherman Anti-Trust Act, § 2, 15 U.S.C.A. § 2.

[3] Antitrust and Trade Regulation ⚷ 696
29Tk696 Most Cited Cases
(Formerly 265k12(6))
Operator of bowling center did not have power to control prices or exclude competition, and thus lacked monopoly power in relevant market, as required to establish violation of § 2 of Sherman Anti-Trust Act; although operator owned only existing retail bowling center in relevant market during relevant time period, there was no evidence suggesting that withdrawal of competitors was in any way attributable to operator's competitive conduct or any market conditions, and there was no evidence of supracompetitive pricing by operator. Sherman Anti-Trust Act, § 2, 15 U.S.C.A. § 2.

[4] Federal Courts ⚷ 765
170Bk765 Most Cited Cases
On review of denial of motion for judgment notwithstanding verdict, Court of Appeals applies law truly controlling the case, regardless of jury instructions.

[5] Antitrust and Trade Regulation ⚷ 641
29Tk641 Most Cited Cases
(Formerly 265k12(1.3))
Plaintiff cannot establish monopolization offense by a firm without market power solely on basis of undesirable or even significantly anticompetitive behavior. Sherman Anti-Trust Act, § 2, 15 U.S.C.A. § 2.

[6] Antitrust and Trade Regulation ⚷ 647
29Tk647 Most Cited Cases
(Formerly 265k12(1.3))
For purposes of monopolization claim, "entry barrier" may be defined as either additional long-term costs which are not incurred by incumbent firms but must be incurred by new entrance, or factors that deter entry into the market while permitting incumbent firms to earn monopoly

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.



returns. Sherman Anti-Trust Act, § 2, 15 U.S.C.A. § 2.

[7] Torts 🔑 213
379k213 Most Cited Cases
(Formerly 379k10(1))
Under California law, tortious interference with prospective economic advantage involves economic relationship containing probability of future economic benefit to plaintiff; knowledge by defendant of existence of relationship; intentional acts on part of defendant designed to disrupt the relationship; actual disruption of relationship; and damages to plaintiff proximately caused by defendant's acts.

[8] Torts 🔑 241
379k241 Most Cited Cases
(Formerly 379k10(3))
Bowling equipment seller was not a stranger to relationship between prospective buyer of its equipment and firm that would finance that purchase, as required for buyer to maintain claim under California law that seller tortiously interfered with buyer's prospective economic advantage.

[9] Torts 🔑 241
379k241 Most Cited Cases
(Formerly 379k10(3))
Under California law, privilege of competition protected defendant, which sold bowling equipment and owned and operated bowling centers, from claim of tortious interference with competitor's prospective economic advantage by prevailing upon construction company not to deal with competitor; because competitor's contractual relations with construction company were merely contemplated or potential, defendant was free to refuse to deal with construction company unless it ceased dealing with competitor.

***1423** Stephen M. Shapiro, Mayer, Brown & Platt, Washington, DC, for defendant-appellant

Eliot G. Disner, Shapiro, Posell & Close, Los Angeles, CA, for plaintiff-appellee.

Appeal from the United States District Court for the Central District of California.

Before: Floyd R. GIBSON, [FN*] HALL and KLEINFELD, Circuit Judges.

FN* The Honorable Floyd R. Gibson, Senior Circuit Judge for the Eighth Circuit, sitting by designation

CYNTHIA HOLCOMB HALL, Circuit Judge:

Brunswick Corporation ("Brunswick") appeals from the district court's judgment following a jury verdict awarding to Los Angeles Land Company ("L.A. Land") $15,168,000 under section 2 of the Sherman Act, and, alternatively, one-third that amount under California common law governing tortious interference with prospective economic advantage. Brunswick contends that the district court should have granted its motions for directed verdict and judgment notwithstanding the verdict because L.A. Land failed to prove violations of federal antitrust law or state tort law. This case centers on the competing efforts of the two parties to build a bowling center in Palmdale in the Antelope Valley (a portion of Los Angeles County) at a time when Brunswick owned the only existing center in the Valley.

***1424** The district court had jurisdiction over the federal antitrust claims under 15 U.S.C. §§ 15, 26, and pendent jurisdiction over the state law claims. We have jurisdiction to review the district court's final judgment under 28 U.S.C. § 1291 We reverse.

## I. FACTS AND PROCEEDINGS BELOW

Brunswick wholly owns two subsidiaries--one which manufactures and sells bowling equipment, and another which owns and operates bowling centers in the United States and abroad. One of the centers under the control of the latter subsidiary is the Sands Bowl in the Antelope Valley. In spring of 1988, the Sands Bowl was the only bowling center in the Antelope Valley, an area with a rapidly expanding population

L.A. Land is a real estate development company which, among various other enterprises, owns and operates three bowling centers in Southern California. In 1987, L.A. Land set in motion a plan to build a bowling center in the Antelope Valley In April 1988, it sent an order for equipment to Brunswick, with specified conditions. About that time, Brunswick itself developed an interest in opening a new bowling center in the Antelope Valley.

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works

Westlaw.

In 1986, Brunswick had formed an agreement with Deutsche Credit Corporation ("DCC") under which Brunswick helped its customers to obtain equipment financing from DCC by guaranteeing through a contingent repurchase arrangement that Brunswick rather than DCC would bear most of the risk of borrower default. The agreement required Brunswick to assume contingent liability for the loan, gather information for the loan application package and transmit the package to DCC, and prepare a market survey to help DCC assess the viability of any new bowling center. When L.A. Land sought to purchase equipment from Brunswick for its proposed Antelope Valley center, it also sought equipment financing from DCC. However, DCC refused to accept a loan application directly from L.A. Land and instead directed it to process the application through Brunswick. L.A. Land began attempting to arrange the financing through Brunswick sometime about April 1988.

Previous to the key events at issue in this case, L.A. Land opened a bowling center in San Dimas, California. It purchased the equipment for that center from Brunswick, financed the purchase through DCC, and contracted with Timberlake Construction Company ("Timberlake") to build the center. L.A. Land asked Timberlake to build its proposed center in the Antelope Valley, but Timberlake declined, citing a policy of not building in Brunswick market areas (i.e., areas where Brunswick owned and operated bowling centers.) As of 1988, Timberlake had for some time built all of Brunswick's new U.S. bowling centers.

By August of 1988 (and possibly earlier), Brunswick decided to go ahead with plans to build a new bowling center in the Antelope Valley. Brunswick had forwarded L.A. Land's equipment financing application to DCC at the end of July 1988. L.A. Land alleges that Brunswick delayed transmittal of the application so that Brunswick could get a head start on the construction of its own new bowling center in the Antelope Valley. Ultimately, DCC turned down L.A. Land's financing application, Brunswick built a new bowling center in the Antelope Valley, and L.A. Land did not.

L.A. Land commenced this action on August 30, 1988, and immediately requested a temporary restraining order to enjoin Brunswick's construction of its new center arguing that "the market can adequately bear just one more bowling center"; the district court denied the request. At trial, L.A. Land contended that Brunswick committed three acts which violated federal antitrust law and constituted torts under California law: (1) Brunswick delayed transmission of L.A. Land's financial information to DCC; (2) Brunswick submitted to DCC an inaccurate market survey; and (3) Brunswick restricted Timberlake from building a bowling center in the Antelope Valley for L.A. Land.

Brunswick moved for a directed verdict after L.A. Land presented its case in chief and at the end of trial. The district court denied those motions and sent the case to the jury, which rendered a verdict in favor of L.A. Land. The court also denied Brunswick's motion for judgment notwithstanding the verdict, and entered a judgment awarding ***1425** L.A. Land the trebled sum of $15,168,000 on the antitrust claim or, alternatively, $5,056,000 on the tort claim, and $1,435,974.80 in attorneys' fees and costs. This appeal of that judgment followed.

II. STANDARD OF REVIEW

The standard for determining the propriety of a directed verdict or a judgment notwithstanding the verdict is the same for district and appellate courts: "whether, viewing the evidence as a whole, there is substantial evidence present that could support a finding ... for the nonmoving party." *Syufy Enters. v. American Multicinema, Inc.*, 793 F.2d 990, 992 (9th Cir.1986) (internal quotation omitted), *cert. denied,* 479 U.S. 1031, 107 S.Ct. 876, 93 L.Ed.2d 830 (1987). "Substantial evidence is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Id.* (internal quotation omitted).

In deciding this appeal from the denial of motions for directed verdict and judgment notwithstanding the verdict, we "review the evidence on [the] factual issues in the light most favorable to [L.A. Land] and draw all reasonable inferences in its favor." *Oahu Gas Service, Inc. v. Pacific Resources Inc.*, 838 F.2d 360, 364 (9th Cir.), *cert. denied,* 488 U.S. 870, 109 S.Ct 180, 102 L.Ed.2d 149 (1988). The question whether a party possesses monopoly power is essentially one of fact. *Id.* at 363. However, the question whether specific conduct is anticompetitive in violation of the Sherman Act is one of law which we therefore review de novo. *Id.* at 368.

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.



Likewise, we review de novo the question whether specific conduct constitutes a tort under California law. *Salve Regina College v. Russell,* 499 U.S. 225, 231-32, 111 S.Ct. 1217, 1221, 113 L.Ed.2d 190 (1991) (a court of appeals should review de novo a district court's determination of state law).

III. DISCUSSION

*A. Antitrust Claim*

[1] In a nutshell, L.A. Land's antitrust theory is that Brunswick monopolized the market for retail bowling services in Palmdale, and committed three specific acts in order to exclude L.A. Land from that market and thereby maintain its monopoly. At trial, L.A. Land had to prove three elements in order to establish a Sherman Act § 2 violation on its theory: (1) possession of monopoly power in the relevant market; (2) willful acquisition or maintenance of that power; and (3) causal antitrust injury. *Pacific Express, Inc. v. United Airlines, Inc.,* 959 F.2d 814, 817 (9th Cir.), *cert. denied,* 506 U.S. 1034, 113 S.Ct. 814, 121 L.Ed.2d 686 (1992); *Universal Analytics v. MacNeal-Schwendler Corp.,* 914 F.2d 1256, 1257 (9th Cir.1990). The relevant product and geographic markets were conclusively defined before trial as retail bowling services in the Antelope Valley and are not contested; otherwise, all three elements are disputed in this appeal.

[2][3] We begin and end our inquiry with the question whether the record supports the jury's finding on the first element, i.e., that Brunswick possessed monopoly power in the relevant market. [FN1] We believe L.A. Land's whole antitrust claim founders on this issue. The definition of monopoly power is clearly established in the case law: "Monopoly power is the power to control prices or exclude competition." *United States v. E.I. duPont de Nemours & Co.,* 351 U.S. 377, 391, 76 S.Ct. 994, 1005, 100 L.Ed. 1264 (1956). Viewing the evidence in the light most favorable to L.A. Land, the record simply does not support a finding that Brunswick had power to control prices or exclude competition.

FN1. L.A. Land contends that Brunswick failed to dispute the sufficiency of the evidence to support a finding of monopoly power in its motion for directed verdict, and therefore waived the right to raise this challenge on appeal. This contention is clearly spurious, as L.A. Land itself noted in court that Brunswick raised the question of market power in its argument on the directed verdict motion. R.T. at 1843.

Brunswick contends that, in order to prove monopoly power, L.A. Land relied solely on the fact that Brunswick owned the only existing retail bowling center in the Antelope Valley during the relevant time period. Brunswick argues that proof of its 100% market share does not demonstrate that it had the power to control prices or exclude competition in the absence of any evidence that it could prevent entry of other market participants. Case law supports this argument. **1426 See Oahu,* 838 F.2d at 366 ("A high market share, though it may ordinarily raise an inference of monopoly power, will not do so in a market with low entry barriers or other evidence of a defendant's inability to control prices or exclude competitors.") (internal citation omitted); *United States v. Syufy Enters.,* 903 F.2d 659, 664 & n. 6, 671 (9th Cir.1990).

[4] L.A. Land responds with several arguments. First, L.A. Land points out that the evidence presented to the jury showed that Brunswick's share of the relevant market increased over time until it reached 100%. Brunswick's market share increased because two competitors withdrew from the market. One bowling center closed in 1979 after a fire, and the other, a 10-lane bowling center in Lancaster, closed in Spring 1988. Neither case which L.A. Land cites supports its assertion that the jury could properly rely on this evidence of withdrawals from the market to infer that Brunswick possessed monopoly power. [FN2] One, *Oahu,* 838 F.2d at 366, does not discuss withdrawal; the other, *Greyhound Computer Corp. v. International Business Machines,* 559 F.2d 488, 497 (9th Cir.1977), *cert. denied,* 434 U.S. 1040, 98 S.Ct. 782, 54 L.Ed.2d 790 (1978), states that the fact that "[t]wo substantial competitors who met IBM in the marketplace .. bowed out after sustaining heavy losses" helped support an inference of IBM's market dominance. In this case, however, L.A. Land does not suggest (and directs the court to no evidence which suggests) that the withdrawal of Brunswick's two competitors was in any way attributable to Brunswick's competitive conduct or any market conditions. Indeed, the evidence does not reveal any reason for their departures from the market, other than that one of the competitors chose not to reopen

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.



after a fire. Thus, we do not see how this evidence could support a finding of monopoly power.

FN2. The jury instruction concerning monopoly power, to which Brunswick apparently did not object, did permit the jury to consider the departure of companies from the market as an indication of Brunswick's monopoly power. However, on review of a denial of a JNOV motion, this court applies the law truly controlling the case, regardless of the jury instructions. *Air-Sea Forwarders, Inc. v. Air Asia Co., Ltd.*, 880 F.2d 176, 182-83 & n. 5 (9th Cir 1989), *cert. denied*, 493 U.S. 1058, 110 S.Ct. 868, 107 L.Ed.2d 952 (1990).

Second, L.A. Land contends that the evidence showed that Brunswick charged monopoly prices. However, it points to no actual evidence of supracompetitive pricing, and the record reveals none. L.A. Land does point out that the prices Brunswick charged at the Sands Bowl (the single bowling center in the market before L.A. Land sought to enter) were "comparable" to prices Brunswick charged at bowling centers which were in better condition and which had automatic scorers. But L.A. Land cites no authority, and we are aware of none, which supports the notion that "comparable" prices may be considered supracompetitive, even considering some difference in quality.

The only other pricing evidence to which L.A. Land points concerns the fact that the average price [FN3] Brunswick charged at Vista Lanes (the bowling center it built in Palmdale after L.A. Land failed to enter the market) during its first 11 months of operation was higher than the prices it charged at any other center during that time. However, considering the record as a whole, this evidence does not support an inference of monopoly pricing. Testimony at trial, apparently uncontradicted, established that at least by the time of trial Vista's prices were lower than some and higher than others in the greater Los Angeles area, and indeed lower than the prices L.A. Land charged at its bowling center in San Dimas. Thus, the record does not support a conclusion that Brunswick had the power to control prices in the relevant market.

FN3. Average price is a composite of all the different prices charged in a bowling center and does not represent the actual price paid by any consumer.

[5] Third, L.A. Land asserts that the evidence established that Brunswick successfully excluded all competitors from the relevant market. We note that in order to prove Brunswick's possession of monopoly power, it was incumbent on L.A. Land to show that Brunswick had the power to exclude *competition* from the relevant market generally, ***1427** not just to exclude a particular *competitor*. Courts have consistently confirmed that the goal of the antitrust laws is to protect competition rather than competitors. *See Spectrum Sports, Inc. v. McQuillan*, 506 U.S. 447, ----, 113 S.Ct. 884, 892, 122 L.Ed.2d 247 (1993) (the Sherman Act "directs itself not against conduct which is competitive, even severely so, but against conduct which unfairly tends to destroy competition itself"); *Syufy*, 903 F.2d at 668 ("It can't be said often enough that the antitrust laws protect competition, *not* competitors.") (emphasis in original); *Oahu*, 838 F.2d at 370 ("The goal of the antitrust laws ... unlike that of business tort or unfair competition laws, is to safeguard general competitive conditions, rather than to protect specific competitors."); *Hunt-Wesson Foods, Inc. v. Ragu Foods, Inc.*, 627 F.2d 919, 927 (9th Cir 1980) ("Of course, it is free and open competition that the Sherman Act protects, and not any right of one competitor to be free of rough treatment at the hands of another."), *cert. denied*, 450 U.S. 921, 101 S.Ct. 1369, 67 L.Ed.2d 348 (1981). A key problem in this case is that rather than adducing evidence of Brunswick's ability to impair competition generally (such as evidence that Brunswick could prevent competitor access to necessary supplies from any provider), L.A. Land focussed primarily on proving particular anticompetitive acts. But a plaintiff can not establish a monopolization offense by a firm without market power solely on the basis of undesirable or even significantly anticompetitive behavior. 3 Areeda & Turner, *Antitrust Law* ¶ 810 at 296 (1978).

The only evidence of power to exclude competition to which L.A. Land directs our attention concerns particular anticompetitive acts aimed at Harold Gelber in 1985, and others aimed at L.A. Land itself. The latter acts are the subject of this litigation; though these acts may arguably have been unjustifiable, it is not possible to ascertain whether they are related to the maintenance of monopoly power and therefore "exclusionary" in the antitrust sense without proof of market power. *See*

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.



*id.* ¶ 813 at 301. In other words, evidence of these acts does not prove power to exclude competition. Assuming without deciding that the record fully supports findings that, as L.A. Land sought to prove at trial, Brunswick prepared a false or misleading market survey, delayed transmittal to DCC of L.A. Land's financing application, and prevailed upon Timberlake not to contract with L.A. Land, these findings only support the conclusion that Brunswick committed anticompetitive acts. Whether those acts maintained a Brunswick monopoly is a question which logically requires some other proof of monopoly power. If this assessment were not correct then "possession of monopoly power" and "willful acquisition or maintenance of that power," *Pacific Express*, 959 F.2d at 817, would not be separate elements of a section 2 claim; rather, the latter would prove the former.

As to the Gelber evidence, even accepting L.A. Land's description of the evidence as accurate, it establishes no more than that Brunswick dissuaded Gelber from entering the market by threatening to compete (that is, by indicating that it intended to open a second bowling center in the market.) L.A. Land does not suggest that Brunswick set up any actual barriers to Gelber's entry into the market. *See Syufy*, 903 F.2d at 668 (a strong competitor's ability to deter entry by others is not a "structural barrier to entry"). Evidence of threatened competition can not rationally support an inference of power to exclude competition, particularly where a court has already determined that the acts in question were not exclusionary--Gelber brought an antitrust suit based on these events and lost. Thus, this evidence does not support a finding of monopoly power.

[6] Finally, L.A. Land contends it proved that substantial barriers to entry existed in the relevant market. It argues that evidence of "Brunswick's systematic campaign to exclude competitors, such as L.A. Land and Gelber" readily supports a jury finding of high barriers to entry. We reject this argument for the simple reason that anticompetitive conduct by one firm against another is not an "entry barrier." Barriers to entry may be defined as either "additional long-run costs that were not incurred by incumbent firms but must be incurred by new entrants," or "factors in the market that deter entry while permitting incumbent firms to earn ***1428** monopoly returns." Areeda & Hovenkamp, *Antitrust Law* ¶ 409' at 509-10 (1992 Supp.) (internal quotation omitted). [FN4] The evidence of Brunswick's behavior toward L.A. Land and Gelber fits neither definition.

FN4. The main sources of entry barriers are: (1) legal license; (2) control over an essential or superior resource; (3) entrenched buyer preferences for established brands or company reputations; and (4) capital market evaluations imposing higher capital costs on new entrants. Economies of scale may also be considered an entry barrier in some situations. 2 Areeda & Turner, *Antitrust Law* ¶ 409b at 299-300 (1978). L.A. Land points to no evidence which fits in any of these categories.

L.A. Land also argues that the difficulty of obtaining financing for a new center's bowling equipment is a barrier to entry. This is a more serious proposition. There is some evidence in the record that lenders generally have trepidations about financing bowling equipment purchases. Though there was also evidence that some 19 different lenders have financed purchases of Brunswick equipment since 1986, the jury was entitled to find that bowling equipment financing is hard to obtain. However, the jury could not rationally construe this factor as a barrier to entry, as there was no evidence that the lenders who were willing to finance bowling equipment imposed higher financing costs on new entrants than on established firms. *See* note 4. The fact that many lenders do not understand the bowling market does not mean that the capital costs for new entrants and incumbents in the market differ, or that it is any more difficult for new entrants to obtain financing than incumbents. *Cf. Morgan, Strand, Wheeler & Biggs v. Radiology, Ltd.*, 924 F.2d 1484, 1490 (9th Cir.1991) (a jury could not reasonably find cost of equipping a physician's office to be a significant entry barrier where evidence does not permit comparing that cost to potential competitors' resources or expected returns). The disadvantage of new entrants as compared to incumbents is the hallmark of an entry barrier. *See* 2 Areeda & Turner, *Antitrust Law* ¶ 409e at 303 ("The mere fact that entry requires a large absolute expenditure of funds does not constitute a 'barrier to entry'; a new entrant is disadvantaged only to the extent that he must pay more to attract those funds than would an established firm."). Thus, the record does not support a finding of significant entry barriers.

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.



The fundamental problem in this case is that L.A. Land pursued a flawed theory, which the district court should not have sent to the jury. L.A. Land's antitrust theory was a source of considerable confusion and controversy throughout this litigation in the district court. Early on in the case, L.A. Land chose *not* to allege that Brunswick monopolized the market for bowling equipment--that is, L.A. Land specifically eschewed a supply monopoly theory; consequently, it was precluded from obtaining discovery on that theory. Throughout the litigation, the question surfaced whether L.A. Land could prove its case without showing monopolistic control over the supply of equipment and access to lenders and builders. The district court on several occasions expressed its doubt about L.A. Land's theory, [FN5] but sent it to the jury nonetheless. For example, in denying Brunswick's mid-trial directed verdict motion, the court stated:

FN5. In its February 27, 1989 order denying Brunswick's first motion for summary judgment, the court stated the following:

On the present record, plaintiffs have not met their burden of submitting sufficient evidence to make out a prima facie case for all the elements of the alleged antitrust offenses. Nevertheless, the Court believes that plaintiffs should have more time to engage in discovery to support their claims.... The Court cautions plaintiffs, however, that the theory of their case is confused and problematic.

Despite plaintiffs' insistence that the Brunswick market study is patently false, because the survey states that Palmdale can support only one new center, plaintiffs themselves argued to this Court during a prior hearing that Palmdale could only add one new center. Moreover, plaintiffs must offer proof that Brunswick's position as a manufacturer of bowling equipment gives Brunswick control of the many banks from which plaintiffs could receive financing. There is already some evidence that Brunswick has no such power in the financial markets.

Because L.A. Land rejected a supply monopoly theory, it apparently never did offer proof that Brunswick, as a supplier, controlled all sources of financing.

I have decided to deny the motion. However, in denying the motion, I do not want ***1429** to indicate that I think there is not any merit in what the defendants say. I think that there is enough to go to the jury, but I must tell you, Mr. Disner, that there are a couple of things in there that bother me tremendously and what bothers me is that . . because there were other lenders and there were other builders available, you just wonder if they couldn't have gone to those builders or those lenders, and that has been a problem all during the time we were arguing the motion.

R.T. at 1648.

In the factual circumstances of this case, a rational jury could not conclude that Brunswick possessed the power to exclude competition from the relevant market without hearing evidence that Brunswick had monopoly control of the equipment market. *Cf. Indiana Grocery, Inc. v. Super Valu Stores, Inc.*, 864 F.2d 1409, 1414 (7th Cir.1989). [FN6] L.A. Land never alleged that Brunswick had power to exclude from the market a potential competitor that chose to purchase equipment from a company other than Brunswick, nor did it prove that other suppliers did not exist. [FN7] A supply monopoly theory, if it could be substantiated, logically would have led to proof of Brunswick's power to exclude competition in the retail bowling market. The theory which L.A. Land did pursue, however, apparently led it to focus on proof of particular anticompetitive acts and leave unsatisfied the requirement that it show Brunswick possessed the power to control prices or exclude competition. Consequently, because the evidence does not support a finding of monopoly power, the antitrust claim must fail. *See Syufy*, 903 F.2d at 671 n. 21 (plaintiff can not prevail on section 2 claim without proof of defendant's power to exclude competition).

FN6. In *Indiana Grocery*, the court observed that "[t]he output of the Indianapolis retail grocery market is, of course, groceries, *and Indiana Grocery concedes that Kroger could never control the supply of groceries in the Indianapolis retail market.* If so, it is very difficult to see how Kroger could ever restrict total market output and thereby raise prices." *Id.* (emphasis in original). The court further noted that "while market share may indicate market power in certain cases, the two are not necessarily the same. Market share indicates market power only when sales reflect control of the productive assets in the business, for only then does it reflect an ability to curtail total market output." *Id.* By failing to prove a supply monopoly, L.A. Land essentially failed to

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.



prove that Brunswick controlled access to the productive assets of the retail bowling services market.

FN7 The jury could have inferred from the evidence presented, however, that Brunswick was a desirable supplier at the relevant time.

*B. Tort Claims*

[7] L.A. Land's tort claims were based on Brunswick's alleged interference in L.A. Land's business relationships with DCC and Timberlake. In order to succeed at trial on its claims of tortious interference with prospective economic advantage, L.A. Land had to prove these elements: (1) an economic relationship containing the probability of future economic benefit to L.A. Land; (2) knowledge by Brunswick of the existence of the relationship; (3) intentional acts on the part of Brunswick designed to disrupt the relationship; (4) actual disruption of the relationship; and (5) damages to L.A. Land proximately caused by Brunswick's acts. *Buckaloo v. Johnson*, 14 Cal.3d 815, 122 Cal.Rptr. 745, 752, 537 P.2d 865, 872 (1975).

The jury specifically answered in the affirmative the question whether Brunswick "intentionally and improperly interfere[d], without justification or privilege, with any prospective economic advantage of" L.A. Land. The jury further replied affirmatively to the question whether "any such act of interference proximately cause[d] damage" to L.A. Land. Because the form of verdict did not distinguish between Brunswick's alleged interference in L.A. Land's relationship with DCC and in its relationship with Timberlake, we consider both claims.

1. L.A. Land-DCC Relationship.

[8] Brunswick argues that, as a matter of law, L.A. Land's allegations fail to support a tort claim because Brunswick was not a stranger to the relationship between L.A. Land and DCC, and indeed had a financial stake in that relationship. Brunswick contends, relying on *Gianelli Distributing Co. v. Beck & Co.*, 172 Cal.App.3d 1020, 219 Cal.Rptr. 203, 221 (1985), that evidence in the ***1430** record must support a finding of an independent economic relationship between L.A. Land and DCC. Brunswick correctly asserts that evidence in the record instead shows that, because of its agreement with DCC, Brunswick was a necessary party to the prospective relationship between DCC and L.A. Land. *See, e.g.*, R.T. at 2275 (testimony by DCC official: "We weren't willing to make loans on new centers without some form of recourse guarantee[ ] from Brunswick so we wouldn't have made any of these loans without it."); R.T. at 2263 (testimony that DCC required Brunswick to prepare loan application packages for potential purchasers); R.T. at 2276 (testimony that DCC required Brunswick to prepare market surveys as part of loan packages because of Brunswick's superior knowledge of bowling industry).

L.A. Land does not point to any evidence which indicates an independent relationship between itself and DCC, or which contradicts evidence that DCC would not be in the business of financing equipment purchases by Brunswick's customers without Brunswick's financial participation and information-gathering. Instead, L.A. Land counters Brunswick's argument by asserting that Brunswick's defense that its interference was justified by its repurchase obligations under the DCC-Brunswick agreement is pretextual because there was no evidence that any perceived risks motivated Brunswick to discourage DCC from lending to L.A. Land. Apparently, L.A. Land fails to see that the issue is not Brunswick's motivation for interference as a matter of fact, but whether the tort claim falls as a matter of law because Brunswick was not a third party to the prospective relationship between L.A. Land and DCC. Brunswick could not have "interfered" if there was no independent economic relationship between DCC and L.A. Land in which to interfere. *See Kruse v. Bank of America*, 202 Cal.App.3d 38, 248 Cal.Rptr. 217, 234 (1988) ("The tort of intentional interference with economic advantage affords a remedy for wrongful interference with an economic relationship by a *third party*.") (emphasis in original), *cert. denied*, 488 U.S. 1043, 109 S.Ct. 869, 102 L.Ed.2d 993 (1989). [FN8] Thus, we conclude that Brunswick has the better argument on this issue.

FN8. Contrary to an assertion by L.A. Land in this appeal, Brunswick's reliance on *Kruse* does not mean that its argument rests on the premise that it and DCC were "identical." Given the evidence in the record that Brunswick was not a disinterested

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.



"third party" to the relationship between L.A. Land and DCC, *Kruse* merely supports the proposition that L.A. Land's allegations do not state a tort claim as a matter of law because Brunswick was not a third party.

L.A. Land also contends that Brunswick's argument is "moot" because Brunswick did not request the jury to be instructed on the issue of L.A. Land's independent relationship with DCC. L.A. Land cites no authority for this proposition, and we reject it on the basis of *Air-Sea Forwarders,* which holds that the truly applicable law rather than the jury instructions governs review of a denial of a directed verdict or judgment notwithstanding the verdict. 880 F.2d at 182-83 & n. 5. Finally, L.A. Land argues that Brunswick's defense does not apply because the jury implicitly found malicious conduct by awarding one dollar in punitive damages. The only authority which L.A. Land provides to support this contention is a "Cf." citation to a case, *Lowell v. Mother's Cake & Cookie Co.*, 79 Cal.App.3d 13, 144 Cal.Rptr. 664 (1978), which does not support its proposition either directly or inferentially. We are aware of no other authority which supports L.A. Land's argument.

2. L.A. Land-Timberlake Relationship.

[9] Brunswick argues that because it and L.A. Land were competitors for the services of bowling center builders, the "privilege of competition" protects it from liability for the pressure it applied on Timberlake not to build for L.A. Land. *See Buckaloo,* 122 Cal.Rptr. at 752, 537 P.2d at 872 ("Perhaps the most significant privilege or justification for interference with a prospective business advantage is free competition."). Assuming without deciding that the record supports a finding that Brunswick prevailed upon Timberlake not to deal with its competitor, a number of authorities establish that Brunswick had the right under state law to do so.

In *A-Mark Coin Co. v. General Mills, Inc.*, 148 Cal.App.3d 312, 195 Cal.Rptr. 859, ***1431** 867 (1983), the court held that a firm's interference with another's prospective economic relation falls within the privilege of competition as long as: (1) the relation concerns a matter involved in the competition between the firm and the other; (2) the firm does not employ wrongful means; (3) the firm's action does not create or continue an unlawful restraint of trade; and (4) the firm's purpose is "at least in part" to advance its interest in competing with the other. *Id.* (quoting Restatement (Second) of Torts § 768.) This court confirmed in *Pacific Express* that a firm's motive need only stem *in part* from a genuine competitive purpose. 959 F.2d at 819-20. Because the record shows that L.A. Land's contractual relations with Timberlake were "merely contemplated or potential," Brunswick was free to "refuse to deal with third parties [e.g., Timberlake] unless they cease dealing with" L.A. Land. *A-Mark Coin,* 195 Cal.Rptr. at 867 (internal quotation omitted); *see New Kids on the Block v. News America Publishing, Inc.*, 971 F.2d 302, 310 (9th Cir.1992). L.A. Land points to no evidence in the record that shows Brunswick's sole motive in wedging itself between L.A. Land and Timberlake, if it did so at all, was other than to advance its own economic interest, or that otherwise suggests that the conditions for the privilege outlined above did not exist. [FN9]

FN9. An exception is that L.A. Land does assert (presumably relying on evidence pertaining to the antitrust claim) that the interference here created an unlawful restraint of trade. Because we reverse the district court's judgment on the antitrust claim, no basis for this assertion remains.

In addition, L.A. Land's proposition is belied by the facts of *A-Mark Coin,* which did not involve competition for a customer, but rather for a particular good. In that case, the court held that the privilege of competition protected the actions of a successful bidder for a coin collection against an allegation by the unsuccessful bidder of intentional interference with prospective economic advantage. *A-Mark Coin,* 195 Cal.Rptr. at 861-64. Thus, Brunswick's conduct with respect to Timberlake is privileged.

IV. CONCLUSION

We conclude that the evidence regarding the antitrust claim does not support a finding that Brunswick possessed monopoly power. We further conclude that L.A. Land's claim that Brunswick interfered with its prospective relationship with DCC fails as a matter of law because Brunswick was not a stranger to that relationship. Also, the privilege of competition protected Brunswick's conduct with respect to the prospective relationship

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.



between L.A. Land and Timberlake. Therefore, we reverse the district court's judgment and remand with directions to enter judgment in favor of Brunswick on L.A. Land's claims of both monopolization and tort. Consequently, we deny L.A. Land's request for attorneys' fees on appeal.

6 F.3d 1422, 1993-2 Trade Cases P 70,381

END OF DOCUMENT

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

