EXHIBIT 27

25 S.Ct. 276  
196 U.S. 375, 25 S.Ct. 276, 49 L.Ed. 518  
(Cite as: 196 U.S. 375, 25 S.Ct. 276)

▷

Page 1

Supreme Court of the United States.
SWIFT & COMPANY et al., Appts.,
v.
UNITED STATES.
No. 103.

Argued January 6, 9, 1905.
Decided January 30, 1905.

APPEAL from the Circuit Court of the United States for the Northern District of Illinois to review a decree on demurrer, granting an injunction against alleged violations of the act of July 2, 1890 (26 Stat. at L. 209, chap. 647, U. S Comp. Stat. 1901, p. 3200), to protect trade and commerce against unlawful restraints and monopolies. Modified by making the injunction more specific, and *as modified affirmed*.

See same case below, 122 Fed. 529.

The facts are stated in the opinion.

West Headnotes

Commerce ◆ 60(2)
83k60(2) Most Cited Cases
   (Formerly 83k41(1))

Antitrust and Trade Regulation ◆ 582
29Tk582 Most Cited Cases
   (Formerly 265k17(1.3), 265k17(1.1))
Trade in fresh meat is sufficiently shown to be commerce among the states, protected from restraint by Act July 2, 1890, c. 647, 26 Stat. 209 15 U.S.C.A. § 1, et seq., by allegations in a bill charging meat dealers with violations of that act, which, even if they import a technical passing of title at the slaughtering places in cases of sales, also import that the sales are to persons in other states, and that the shipments to other states are pursuant to such sales, and by allegations charging sales of such meat by their agents in other states, which indicate that some, at least, of the sales were in the original packages.

Commerce ◆ 62.10(2)
83k62.10(2) Most Cited Cases
   (Formerly 83k62.11, 265k17(1.3))

Antitrust and Trade Regulation ◆ 677
29Tk677 Most Cited Cases
   (Formerly 265k12(2))
A combination of independent meat dealers, in aid of an attempt to monopolize commerce in fresh meat among the states, to restrict the competition of their respective agents when purchasing stock for them in the stockyards, is an interference with interstate commerce, forbidden by Act July 2, 1890, c. 647, 26 Stat. 209, 15 U.S.C.A. § 1 et seq., to protect trade and commerce against unlawful restraints and monopolies, where such dealers and their slaughtering establishments are largely in different states from those of the stockyards, and the sellers of the cattle largely in different states from either.

Antitrust and Trade Regulation ◆ 677
29Tk677 Most Cited Cases
   (Formerly 265k12(2), 265k17(1.3))
A combination to secure less than lawful freight rates, entered into by independent meat dealers with the intent to monopolize commerce in fresh meat among the several states, is forbidden by Act July 2, 1890, c. 647, 26 Stat. 209, 15 U.S.C.A. §§ 1-7, 15 note, to protect trade and commerce against unlawful restraints and monopolies.

Antitrust and Trade Regulation ◆ 872
29Tk872 Most Cited Cases
   (Formerly 265k17(1.10), 265k17(1.3))
Interstate commerce is unlawfully restrained, in violation of Act July 2,
1890, c. 647, 26 Stat. 209, 15 U.S.C.A. §§ 1-7, 15 note, by a combination of independent meat dealers, in aid of an attempt to monopolize commerce in fresh meat among the states, to bid up prices for live stock for a few days at a time, in order to induce cattle men in other states to make large shipments to the stockyards, or by a combination for the same purpose of fix the selling price of fresh meat, and to that end to restrict shipments, when necessary, to establish a uniform rule of credit to dealers, and to keep a black list, or by a combination, in aid of such purpose, to make uniform and improper charges for cartage for the delivery of meat sold to be shipped to dealers and consumers in the several states.

Antitrust and Trade Regulation ◆ 972(3)
29Tk972(3) Most Cited Cases
   (Formerly 265k24(10.1), 265k24(10))

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

25 S.Ct. 276
(Cite as: 196 U.S. 375, 25 S.Ct. 276)

Page 2

A bill charges a violation of Act July 2, 1890, c. 647, 26 Stat. 209, 15 U.S.C.A. §§ 1-7, 15 note, to protect trade and commerce against unlawful restraints and monopolies, as against the objections of want of equity, multifariousness, and failure to set forth sufficient definite or specific facts, where it avers the existence of a combination of a dominant proportion of the dealers in fresh meat throughout the United States not to bid against each other in the live stock markets of the different states to bid up prices for a few days in order to induce shipments to the stock yards, to fix selling prices, and to that end to restrict shipments of meat when necessary, to establish a uniform rule of credit to dealers, and to keep a black list, to make uniform and improper charges for cartage, and to secure less than lawful freight rates, to the exclusion of competitors.

Antitrust and Trade Regulation ⟸ 972(3)
29Tk972(3) Most Cited Cases
   (Formerly 265k24(10.1), 265k24(10))
A general allegation of intent may color and apply to all the specific charges of a bill which seeks relief against alleged violations of Act July 2, 1890, c. 647, 26 Stat. 209, 15 U.S.C.A. §§ 1-7, 15 note, to protect trade and commerce against unlawful restraints and monopolies.

Antitrust and Trade Regulation ⟸ 972(3)
29Tk972(3) Most Cited Cases
   (Formerly 265k24(10.1), 265k24(10))
Vagueness cannot be asserted of a charge in a bill seeking relief against an attempt to monopolize commerce in fresh meat among the states, in violation of Act July 2, 1890, c. 647, 26 Stat. 209, 15 U.S.C.A. §§ 1-7, 15
note, that a combination exists among independent meat dealers to restrain their respective agents from bidding against each other when purchasing live stock for them in the stockyards.
**277 Messrs. *376 John S. Miller and *Merritt Starr* for appellants.

*384 *Attorney General* Moody and Mr. W. A. *385 Day for appellee.

*390 Mr. Justice Holmes delivered the opinion of the court:

This is an appeal from a decree of the circuit court, on demurrer, granting an injunction against the appellants' commission of alleged violations of the act of July 2, 1890 (26 Stat. at L. 209, chap. 647, U. S. Comp. Stat. 1901, p. 3200), "to Protect Trade and Commerce against Unlawful Restraints and Monopolies." It will be necessary to consider both the bill and the decree. The bill is brought against a number of corporations, firms, and individuals of different states, and makes the following allegations: 1. The defendants (*391 appellants) are engaged in the business of buying live stock at the stock yards in Chicago, Omaha, St. Joseph, Kansas City, East St. Louis, and St. Paul, and slaughtering such live stock at their respective plants in places named, in different states, and converting the live stock into fresh meat for human consumption. 2. The defendants "are also engaged in the business of selling such fresh meats, at the several places where they are so prepared, to dealers and consumers in divers states and territories of the said United States other than those wherein the said meats are so prepared and sold as aforesaid, and in the District of Columbia, and in foreign countries, and shipping the same meats, when so sold, from the said places of their preparation, over the several lines of transportation of the several railroad companies serving the same as common carriers, to such dealers and consumers, pursuant to such sales." 3. The defendants also are engaged in the business of shipping such fresh meats to their respective agents at the principal markets in other states, etc., for sale by those agents in those markets to dealers and consumers. 4. The defendants together control about six tenths of the whole trade and commerce in fresh meats among the states, territories, and District of Columbia, and, 5, but for the acts charged would be in free competition with one another.

6. In order to restrain competition among themselves as to the purchase of live stock, defendants have engaged in, and intend to continue, a combination for requiring, and do and will require, their respective purchasing agents at the stock yards mentioned, where defendants buy their live stock (the same being stock produced and owned principally in other states and shipped to the yards for sale), to refrain from bidding against each other, 'except perfunctorily and without good faith,' and by this means compelling the owners of such stock to sell at less prices that they would receive if the bidding really was competitive.

7. For the same purposes the defendants combine

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

25 S.Ct. 276
(Cite as: 196 U.S. 375, *391, 25 S.Ct. 276, **277)

Page 3

to bid up, through their agents, the prices of live stock for a few days at *392 a time, 'so that the market reports will show prices much higher than the state of the trade will warrant,' thereby inducing stock owners in other states to make large shipments to the stock yards, to their disadvantage.

8. For the same purposes, and to monopolize the commerce protected by the statute, the defendants combine "to arbitrarily, from time to time, raise, lower, and fix prices, and to maintain uniform prices at which they will sell" to dealers throughout the states. This is effected by secret periodical meetings, where are fixed prices to be enforced until changed at a subsequent meeting. The prices are maintained directly, and by collusively restricting the meat shipped by the defendants, whenever conducive to the result, by imposing penalties for deviations, by establishing a uniform rule for the giving of credit to dealers, etc., and by notifying one another of the delinquencies of such dealers, and keeping a black list of delinquents, and refusing to sell meats to them.

9. The defendants also combine to make uniform charges for cartage for the delivery of meats sold to dealers and consumers in the markets throughout the states, etc., shipped to them by the defendants through the defendants' agents at the markets, when no charges would have been made but for the combination.

10. Intending to monopolize the said commerce, and to prevent competition therein, the defendants "have all and each engaged in and will continue" arrangements with the railroads whereby the defendants received, by means of rebates and other devices, rates less than the lawful rates for transportation, and were exclusively to enjoy and share this unlawful advantage to the exclusion of competition and the public. By force of the consequent inability of competitors to engage or continue in such commerce, the defendants are attempting to monopolize, have monopolized, and will monopolize, the commerce in live stock and fresh meats **278 among the states and territories and with foreign countries, and, 11, the defendants are and have been in conspiracy with each other, with *393 the railroad companies, and others unknown, to obtain a monopoly of the supply and distribution of fresh meats throughout the United States, etc. And to that end defendants artificially restrain the commerce and put arbitrary regulations in force affecting the same from the shipment of the live stock from the plains to the final distribution of the meats to the consumer. There is a prayer for an injunction of the most comprehensive sort, against all the foregoing proceedings and others, for discovery of books and papers relating directly or indirectly to the purchase or shipment of live stock, and the sale or shipment of fresh meat, and for an answer under oath. The injunction issued is appended in a note. [FN<<dagger>>]

> FN<<dagger>> "And now, upon motion of the said attorney, the court doth order that the preliminary injunction heretofore awarded in this cause, to restrain the said defendants and each of them, their respective agents and attorneys, and all other persons acting in their behalf, or in behalf of either of them, or claiming so to act, from entering into, taking part in, or performing any contract, combination, or conspiracy, the purpose or effect of which will be, as to trade and commerce in fresh meats between the several states and territories and the District of Columbia, a restraint of trade, in violation of the provisions of the act of Congress approved July 2, 1890, entitled 'An Act to Protect Trade and Commerce against Unlawful Restraints and Monopolies,' either by directing or requiring their respective agents to refrain from bidding against each other in the purchase of live stock; or collusively, and by agreement, to refrain from bidding against each other at the sales of live stock; or, by combination, conspiracy, or contract, raising or lowering prices or fixing uniform prices at which the said meats will be sold, either directly or through their respective agents; or by curtailing the quantity of such meats shipped to such markets and agents; or by establishing and maintaining rules for the giving of credit to dealers in such meats, the effect of which rules will be to restrict competition; or by imposing uniform charges for cartage and delivery of such meats to dealers and consumers, the effect of which will be to restrict competition; or by any other method or device, the purpose and effect of which is to restrain commerce as aforesaid; and also from violating the provisions of the act of Congress approved July 2, 1890, entitled 'An Act to Protect Trade and Commerce against Unlawful Restraints and Monopolies,' by combining or conspiring together, or with each other and others, to monopolize or attempt to monopolize any part of the trade and commerce in fresh meats among the

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

25 S.Ct. 276  
(Cite as: 196 U.S. 375, *393, 25 S.Ct. 276, **278)

Page 4

several states and territories and the District of Columbia, by demanding, obtaining, or, with or without the connivance of the officers or agents thereof, or any of them, receiving from railroad companies or other common carriers transporting such fresh meats in such trade and commerce, either directly or by means of rebates, or by any other device, transportation of or for such meats, from the points of the preparation and production of the same from live stock or elsewhere, to the markets for the sale of the same to dealers and consumers in other states and territories than those wherein the same are so prepared, or the District of Columbia, at less than the regular rates which may be established or in force on their several lines of transportation, under the provisions in that behalf of the laws of the said United States for the regulation of commerce, be, and the same is hereby, made perpetual.

"But nothing herein shall be construed to prohibit the said defendants from agreeing upon charges for cartage and delivery, and other incidents connected with local sales, where such charges are not calculated to have any effect upon competition in the sales and delivery of meats; nor from establishing and maintaining rules for the giving of credit to dealers where such rules in good faith are calculated solely to protect the defendants against dishonest or irresponsible dealers, nor from curtailing the quantity of meats shipped to a given market where the purpose of such arrangement in good faith is to prevent the over-accumulation of meats as perishable articles in such markets.

"Nor shall anything herein contained be construed to restrain or interfere with the action of any single company or firm, by its or their officers or agents (whether such officers or agents are themselves personally made parties defendant hereto or not), acting with respect to its or their own corporate or firm business, property, or affairs."

*394 To sum up the bill more shortly, it charges a combination of a dominant proportion of the dealers in fresh meat throughout the United States not to bid against each other in the live-stock markets of the different states, to bid up prices for a few days in order to induce the cattle men to send their stock to the stock yards, to fix prices at which they will sell, and to that end to restrict shipments of meat when necessary, to establish a uniform rule of credit to dealers, and to keep a black list, to make uniform and improper charges for cartage, and finally to get less than lawful rates from the railroads, to the exclusion of competitors. It is true that the last charge is not clearly stated to be a part of the combination. But as it is alleged that the defendants have each and all made arrangements with the railroads, that they were exclusively to enjoy the unlawful advantage, and that their intent in what they did was to monopolize the commerce and to prevent competition, and in view of the general allegation to which we *395 shall refer, we think that we have stated correctly the purport of the bill. It will be noticed further that the intent to monopolize is alleged for the first time in the 8th section of the bill as to raising, lowering, and fixing prices. In the earlier sections, the intent alleged is to restrain competition among themselves. But, after all the specific charges, **279 there is a general allegation that the defendants are conspiring with one another, the railroads and others, to monopolize the supply and distribution of fresh meat throughout the United States, etc., as has been stated above, and it seems to us that this general allegation of intent colors and applies to all the specific charges of the bill. Whatever may be thought concerning the proper construction of the statute, a bill in equity is not to be read and construed as an indictment would have been read and construed a hundred years ago, but it is to be taken to mean what it fairly conveys to a dispassionate reader by a fairly exact use of English speech. Thus read this bill seems to us intended to allege successive elements of a single connected scheme.

We read the demurrer with the same liberality. Therefore we take it as applying to the bill generally for multifariousness and want of equity, and also to each section of it which makes a charge, and to the discovery. The demurrer to the discovery will not need discussion in the view which we take concerning the relief, and therefore we turn at once to that.

The general objection is urged that the bill does not set forth sufficient definite or specific facts. This objection is serious, but it seems to us inherent in the nature of the case. The scheme alleged is so vast that it presents a new problem in pleading. If, as we must assume, the scheme is entertained, it is, of course, contrary to the very words of the statute. Its size makes the violation of the law more conspicuous, and yet the same thing makes it impossible to fasten the principal fact to a certain time and place. The elements, too, are so numerous

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

and shifting, even the constituent parts alleged are, and from their nature must be, so extensive in time *396 and space, that something of the same impossibility applies to them. The law has been upheld, and therefore we are bound to enforce it notwithstanding these difficulties. On the other hand, we equally are bound, by the first principles of justice, not to sanction a decree so vague as to put the whole conduct of the defendants' business at the peril of a summons for contempt. We cannot issue a general injunction against all possible breaches of the law. We must steer between these opposite difficulties as best we can.

The scheme as a whole seems to us to be within reach of the law. The constituent elements, as we have stated them, are enough to give to the scheme a body and, for all that we can say, to accomplish it. Moreover, whatever we may think of them separately, when we take them up as distinct charges, they are alleged sufficiently as elements of the scheme. It is suggested that the several acts charged are lawful, and that intent can make no difference. But they are bound together as the parts of a single plan. The plan may make the parts unlawful. *Aikens v. Wisconsin*, 195 U.S. 194, 206, 25 Sup. Ct. Rep. 3, 49 L. ed. 154. The statute gives this proceeding against combinations in restraint of commerce among the states and against attempts to monopolize the same. Intent is almost essential to such a combination, and is essential to such an attempt. Where acts are not sufficient in themselves to produce a result which the law seeks to prevent,--for instance, the monopoly,--but require further acts in addition to the mere forces of nature to bring that result to pass, an intent to bring it to pass is necessary in order to produce a dangerous probability that it will happen. *Com. v. Peaslee*, 177 Mass. 267, 272, 59 N.E. 55. But when that intent and the consequent dangerous probability exist, this statute, like many others, and like the common law in some cases, directs itself against that dangerous probability as well as against the completed result. What we have said disposes incidentally of the objection to the bill as multifarious. The unity of the plan embraces all the parts.

One further observation should be made. Although the *397 combination alleged embraces restraint and monopoly of trade within a single state, its effect upon commerce among the states is not accidental, secondary, remote, or merely probable. On the allegations of the bill the latter commerce no less, perhaps even more, than commerce within a single state, is an object of attack. See *Leloup v. Port of Mobile*, 127 U.S. 640, 647, 32 L. ed. 311, 314, 2 Inters. Com. Rep. 134, 8 Sup. Ct. Rep. 1380; *Crutcher v. Kentucky*, 141 U.S. 47, 59, 35 L. ed. 649, 652, 11 Sup. Ct. Rep. 851; *Allen v. Pullman's Palace Car Co*, 191 U.S. 171, 179, 180, 48 L. ed. 134, 138, 24 Sup. Ct. Rep. 39. Moreover, it is a direct object; it is that for the sake of which the several specific acts and courses of conduct are done and adopted. Therefore the case is not like *United States v. E.C. Knight Co*, 156 U.S. 1, 39 L. ed. 325, 15 Sup. Ct. Rep. 249, where the subject-matter of the combination was manufacture, and the direct object monopoly of manufacture within a state. However likely monopoly of commerce among the states in the article manufactured was to follow from the agreement, it was not a necessary consequence nor a primary end. Here the subject-matter is sales, and the very point of the combination is to restrain and monopolize commerce among the states in respect to such sales. The two cases are near to each other, as sooner or later always must happen where lines are to be drawn, but the line **280 between them is distinct. *Montague & Co. v. Lowry*, 193 U.S. 38, 48 L. ed. 608, 24 Sup. Ct. Rep 307.

So, again, the line is distinct between this case and *Hopkins v. United States*, 171 U.S. 578, 43 L. ed. 290, 19 Sup. Ct. Rep. 40. All that was decided there was that the local business of commission merchants was not commerce among the states, even if what the brokers were employed to sell was an object of such commerce. The brokers were not like the defendants before us, themselves the buyers and sellers. They only furnished certain facilities for the sales. Therefore, there again the effects of the combination of brokers upon the commerce was only indirect, and not within the act. Whether the case would have been different if the combination had resulted in exorbitant charges was left open. In *Anderson v. United States*, 171 U.S. 604, 43 L. ed. 300, 19 Sup. Ct. Rep. 50, the defendants were buyers and sellers at the stock yards, but their agreement was merely not to employ brokers, or to *398 recognize yard-traders, who were not members of their association. Any yard-trader could become a member of the association on complying with the conditions, and there was said to be no feature of monopoly in the case. It was held that the

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

25 S.Ct. 276
(Cite as: 196 U.S. 375, *398, 25 S.Ct. 276, **280)

Page 6

combination did not directly regulate commerce between the states, and, being formed with a different intent, was not within the act. The present case is more like *Montague & Co. v. Lowry*, 193 U. S. 38, 48 L. ed 608, 24 Sup. Ct. Rep. 307.

For the foregoing reasons we are of opinion that the carrying out of the scheme alleged, by the means set forth, properly may be enjoined, and that the bill cannot be dismissed.

So far it has not been necessary to consider whether the facts charges in any single paragraph constitute commerce among the states or show an interference with it. There can be no doubt, we apprehend, as to the collective effect of all the facts, if true, and if the defendants entertain the intent alleged. We pass now to the particulars, and will consider the corresponding parts of the injunction at the same time. The first question arises on the 6th section. That charges a combination of independent dealers to restrict the competition of their agents when purchasing stock for them in the stock yards. The purchasers and their slaughtering establishments are largely in different states from those of the stock yards, and the sellers of the cattle, perhaps it is not too much to assume, largely in different states from either. The intent of the combination is not merely to restrict competition among the parties, but, as we have said, by force of the general allegation at the end of the bill, to aid in an attempt to monopolize commerce among the states.

It is said that this charge is too vague and that it does not set forth a case of commerce among the states. Taking up the latter objection first, commerce among the states is not a technical legal conception, but a practical one, drawn from the course of business. When cattle are sent for sale from a place in one state, with the expectation that they will end their transit, after purchase, in another, and when in effect *399 they do so, with only the interruption necessary to find a purchaser at the stock yards, and when this is a typical, constantly recurring course, the current thus existing is a current of commerce among the states, and the purchase of the cattle is a part and incident of such commerce. What we say is true at least of such a purchase by residents in another state from that of the seller and of the cattle. And we need not trouble ourselves at this time as to whether the statute could be escaped by any arrangement as to the place where the sale in point of law is consummated. See *Norfolk & W. R. Co. v. Sims*, 191 U. S. 441, 48 L. ed. 254, 24 Sup. Ct. Rep. 151. But the 6th section of the bill charges an interference with such sales, a restraint of the parties by mutual contract, and a combination not to compete in order to monopolize. It is immaterial if the section also embraces domestic transactions.

It should be added that the cattle in the stock yard are not at rest even to the extent that was held sufficient to warrant taxation in *American Steel & Wire Co. v. Speed*, 192 U. S. 500, 48 L. ed. 538, 24 Sup. Ct. Rep. 365. But it may be that the question of taxation does not depend upon whether the article taxed may or may not be said to be in the course of commerce between the states, but depends upon whether the tax so far affects that commerce as to amount to a regulation of it. The injunction against taking part in a combination, the effect of which will be a restraint of trade among the states, by directing the defendants' agents to refrain from bidding against one another at the sales of live stock, is justified so far as the subject-matter is concerned.

The injunction, however, refers not to trade among the states in cattle, concerning which there can be no question of original packages, but to trade in fresh meats, as the trade forbidden to be restrained, and it is objected that the trade in fresh meats described in the 2d and 3d sections of the bill is not commerce among the states, because the meat is sold at the slaughtering places, or, when sold elsewhere, may be sold in less than the original packages. But the **281 allegations of the 2d section, even if they import a technical passing *400 of title at the slaughtering places, also import that the sales are to persons in other states, and that the shipments to other states are part of the transaction,--"pursuant to such sales,"--and the 3d section imports that the same things which are sent to agents are sold by them, and sufficiently indicates that some, at least, of the sales, are of the original packages. Moreover, the sales are by persons in one state to persons in another. But we do not mean to imply that the rule which marks the point at which state taxation or regulation becomes permissible necessarily is beyond the scope of interference by Congress in cases where such interference is deemed necessary for the protection of commerce among the states. Nor do we mean to intimate that the statute under

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

25 S.Ct. 276
(Cite as: 196 U.S. 375, *400, 25 S.Ct. 276, **281)

consideration is limited to that point. Beyond what we have said above, we leave those questions as we find them. They were touched upon in *Northern Securities Co. v. United States*, 193 U. S. 197, 48 L. ed. 679, 24 Sup. Ct. Rep. 436.

We are of opinion, further, that the charge in the 6th section is not too vague. The charge is not of a single agreement, but of a course of conduct intended to be continued. Under the act it is the duty of the court, when applied to, to stop the conduct. The thing done and intended to be done is perfectly definite: with the purpose mentioned, directing the defendants' agents and inducing each other to refrain from competition in bids. The defendants cannot be ordered to compete, but they properly can be forbidden to give directions or to make agreements not to compete. See *Addyston Pipe & Steel Co. v. United States*, 175 U. S. 211, 44 L. ed. 136, 20 Sup. Ct. Rep. 96. The injunction follows the charge. No objection was made on the ground that it is not confined to the places specified in the bill. It seems to us, however, that it ought to set forth more exactly the transactions in which such directions and agreements are forbidden. The trade in fresh meat referred to should be defined somewhat as it is in the bill, and the sales of stock should be confined to sales of stock at the stock yards named, which stock is sent from other states to the stock yards for sale, or is bought at those yards for transport to another state.

*401 After what we have said, the 7th, 8th, and 9th sections need no special remark, except that the cartage referred to in § 9 is not an independent matter, such as was dealt in in *New York ex rel. Pennsylvania R. co. v. Knight*, 192 U. S. 21, 48 L. ed. 325, 24 Sup. Ct. Rep. 202, but a part of the contemplated transit,--cartage for delivery of the goods. The general words of the injunction "or by any other method or device, the purpose and effect of which is to restrain commerce as aforesaid," should be stricken out. The defendants ought to be informed, as accurately as the case permits, what they are forbidden to do. Specific devices are mentioned in the bill, and they stand prohibited. The words quoted are a sweeping injunction to obey the law, and are open to the objection which we stated at the beginning, that it was our duty to avoid. To the same end of definiteness, so far as attainable, the words "as charged in the bill," should be inserted between "dealers in such meats," and "the effect of which rules,' and two lines lower, as to charges for cartage, the same words should be inserted between 'dealers and consumers" and "the effect of which."

The acts charged in the 10th section, apart from the combination and the intent, may, perhaps, not necessarily be unlawful, except for the adjective which proclaims them so. At least we may assume, for purposes of decision, that they are not unlawful. The defendants severally lawfully may obtain less than the regular rates for transportation if the circumstances are not substantially similar to those for which the regular rates are fixed. Act of Feb. 4, 1887, 24 Stat. at L. 379, chap. 104, § 2, U. S. Comp. Stat. 1901, p. 3155. It may be that the regular rates are fixed for carriage in cars furnished by the railroad companies, and that the defendants furnish their own cars and other necessities of transportation. We see nothing to hinder them from combining to that end. We agree, as we already have said, that such a combination may be unlawful as part of the general scheme set forth in the bill, and that this scheme as a whole might be enjoined. Whether this particular combination can be enjoined, as it is, apart from its connection with the other *402 elements, if entered into with the intent to monopolize, as alleged, is a more delicate question. The question is how it would stand if the 10th section were the whole bill. Not every act that may be done with intent to produce an unlawful result is unlawful, or constitutes an attempt. It is a question of proximity and degree. The distinction between mere preparation and attempt is well known in the criminal law. *Com. v. Peaslee*, 177 Mass. 267, 272, 59 N. E. 55. The same distinction is recognized in cases like the present. *United States v. E. C. Knight co.* 156 U. S. 1, 13, 39 L. ed. 325, 329, 15 Sup. Ct. Rep. 249; *Kidd v. Pearson*, 128 U. S. 1, 23, 24, 32 L. ed. 346, 351, 2 Inters. Com. Rep. 232, 9 Sup. Ct. Rep. 6. We are of opinion, however, that such a combination is within the meaning of the statute. It is obvious that no more **282 powerful instrument of monopoly could be used than an advantage in the cost of transportation. And even if the advantage is one which the act of 1887 permits, which is denied, perhaps inadequately, by the adjective 'unlawful,' still a combination to use it for the purpose prohibited by the act of 1890 justifies the adjective, and takes the permission away

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

25 S.Ct. 276
(Cite as: 196 U.S. 375, *402, 25 S.Ct. 276, **282)

It only remains to add that the foregoing question does not apply to the earlier sections, which charge direct restraints of trade within the decisions of the court, and that the criticism of the decree, as if it ran generally against combinations in restraint of trade or to monopolize trade, ceases to have any force when the clause against 'any other method or device' is stricken out. So modified it restrains such combinations only to the extent of certain specified devices, which the defendants are alleged to have used and intent to continue to use.

*Decree modified and affirmed.*

196 U.S. 375, 25 S.Ct. 276, 49 L.Ed. 518

END OF DOCUMENT

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.