EXHIBIT 18

Page 1

Not Reported in F.Supp.
Not Reported in F.Supp., 1997 WL 118413 (D.D.C.), 65 USLW 2550, 1997-1 Trade Cases P 71,702
(Cite as: 1997 WL 118413 (D.D.C.))

C

Motions, Pleadings and Filings

United States District Court,
District of Columbia.
UNITED STATES of America, Petitioner,
v.
TIME WARNER INC., et al., Respondents.
No. MISC.A. 94-338(HHG).

Jan. 22, 1997.

OPINION

GREENE, J.

*1 Before the Court is the petition of the United States to enforce civil investigative demands (CIDs) issued by the Department of Justice under the Antitrust Civil Process Act (ACPA), 15 U.S.C. § 1312 (1994). The CIDs seek information located in the United States relating to "[r]estraints or monopolization of domestic and international markets for cable, wire and satellite-delivered music programming through price-fixing cartels and overbroad joint ventures." Respondents are the world's major producers of prerecorded music and music videos: Time Warner Inc., Sony Corporation of America, MCA, PolyGram Holding Inc., EMI Music Inc., and Bertelsmann, Inc. Time Warner is an American company; the other respondents are American subsidiaries of foreign parents.

The basic issue is whether under the circumstances here presented the United States is entitled to investigate the factual basis for possible antitrust claims. Under the ACPA, the Department of Justice has the authority to conduct such an investigation if it has "reason to believe" that the requested information is "relevant to a civil antitrust investigation." 15 U.S.C. § 1312.

Respondents seek to set aside the CIDs insofar as they relate to their foreign activities, contending that the Department lacks jurisdiction to investigate this conduct for three reasons: (1) respondents are exempt from the antitrust laws under the Foreign Trade Antitrust Improvements Act (FTAIA), 15 U.S.C. § 6a; (2) the transactions sought to be investigated are moot; and (3) principles of comity bar the Department's investigation.

I
*Factual Background*

The CIDs seek information related to an antitrust investigation of respondents' potentially anticompetitive conduct in the United States and abroad. The Justice Department claims that such an investigation might uncover possible violations of the Sherman Act in the form of a worldwide price-fixing conspiracy or a monopoly of music programming markets with respect to several areas, as follows.

First, the major focus of the antitrust investigation is on access to prerecorded music and music videos. Respondents control at least 80 per cent of the market for prerecorded music [FN1] and music videos. They market their music videos to music video programmers who broadcast the videos over cable and satellite television. The music companies control the intellectual property rights that attach to their prerecorded music and music videos. These property rights vary from country to country, but in many foreign countries it is not permitted to broadcast a music video without a license for the right to perform the video--the "public performance right"--typically held by the music company.

Respondents control various "performance rights societies," which act as collective licensing bodies for performance rights. At the time the government issued its civil investigative demands, respondents licensed the rights to their music and music videos exclusively through such societies, including both national performance right societies, such as Video Performance, Ltd. (VPL) in Britain, and umbrella international copyright societies, such as the International Federation of the Phonographic Industry, (IFPI). In order to broadcast any music videos produced by respondents on their networks outside of the United States, music programming services (such as MTV or Country Music Television) must pay a blanket licensing fee to the national performance rights society of the country in which the music videos would be broadcast (although such videos could be broadcast for free on networks in the United States). The Justice Department seeks to investigate whether these performance rights societies have impeded U.S. exporters of music videos and original non-music programming (*i.e.*, traditional television

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.
(Cite as: 1997 WL 118413, *1 (D.D.C.))

programming) from entering foreign markets.

*2 Respondents claim that VPL and several other performance rights societies in Europe have been restructured so that they no longer hold the exclusive rights to their members' music and music videos, and that foreign record companies may now negotiate individually with music programmers. However, because respondents have refused to produce documents related to their foreign conduct, the Department asserts that it is unable to determine precisely how the performance right societies have been restructured. [FN2] Indeed, based upon an examination of some documents related to the restructuring of VPL, the Department claims to have reason to believe that the exclusivity may not have been terminated. It appears to be certain that access to the withheld documents would enable the Department to investigate "the existence, scope and likely permanence of such restructurings, the existence or likelihood of de facto exclusivity, and the possibility of continued collusion through participation in such societies." Petitioner's Memorandum in Support of Motion to Set a Hearing Date, at 5.

Second, the Department seeks to investigate the European performance rights society, Phonographic Performance, Ltd. (PPL), that collectively licenses broadcasting rights to digital radio programmers and digital radio programming joint ventures formed by respondents. The Department posits that these activities may have raised the price of foreign and domestic digital radio broadcasting rights and reduced United States exports of digital radio programming. [FN3]

Third, the Department also seeks to inquire into joint ventures for programming services. One such joint venture, formed to produce a United States music video channel, has been terminated since the CIDs were issued, and respondents argue that any such investigation into this venture therefore is moot. However, the Department seeks to investigate also whether respondents are likely to re-form a similar joint venture in the United States, as has apparently been reported in the music industry press, and whether respondents have agreed to provide exclusive licenses for music videos to this venture in order to boycott competitors such as MTV. See e.g., Brett Atwood, *Majors Eye New Options for Vid Channel*, THE BILLBOARD. July 22, 1995. The Department also claims to be concerned that American programmers may have been denied access to music videos in an Asian venture formed by some of respondents.

Fourth, the Department seeks to investigate possible antitrust violations in various worldwide license agreements entered into by some of the respondents that may have extracted higher than competitive fees for such licenses from American programmers, and it has submitted to the Court one such worldwide agreement. *See* Exhibit 1B to United States' Reply in Support of Petition to Enforce CIDs, December 22, 1994 (filed under seal).

II
*General Legal Principles*
Oklahoma Press Publishing Co. v. Walling, 327 U.S. 186, 209 (1946), the seminal case on administrative subpoenas, held that, in contrast to the showing of probable cause required for issuance of a search warrant, a court may enforce an administrative subpoena upon a showing only that "the investigation is authorized by Congress, is for a purpose Congress can order, and the documents sought are relevant to the inquiry." *Oklahoma Press* concerned the authority of the Administrator of the Wage and Hour Division of the Department of Labor to issue subpoenas duces tecum to secure evidence in an investigation of a possible violation of the Fair Labor Standards Act by a publishing company. The company refused to comply, but the Supreme Court held that "Congress has authorized the Administrator, rather than the district courts in the first instance, to determine the question of coverage in the preliminary investigation of possibly existing violations." *Id.* at 214.

*3 Judge June Green of this Court previously held that there is "little, if any, difference between the standards that have been traditionally applied in subpoena enforcement cases such as *Oklahoma Press* and those that should be applied to CIDs under the APCA." *Australia/Eastern U.S.A. Shipping Conference v. United States*, 1982-1 Tr. Cas (CCH) ¶ 64,721, at 74,063 (D.D.C. 1981). The undersigned agrees with this statement of the principle.

Like this case, which involves an asserted exemption under the Foreign Trade Antitrust

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.
(Cite as: 1997 WL 118413, *3 (D.D.C.))

Improvements Act for foreign conduct that has no substantial effect on domestic commerce, *Australia/Eastern* involved a Justice Department investigation into alleged antitrust violations [FN4] which had been given statutory exemption from the antitrust laws in some circumstances. The court ruled that because "it is possible that factual development proceeding from the investigation will uncover non-exempt conduct, the CIDs should be enforced." *Id.* at 74,063.

The short of it is that, barring a patent lack of jurisdiction, courts have not upheld jurisdictional challenges to CIDs. Respondents rely essentially only on an out-of-context snippet of the legislative history of the ACPA. The House Report on this statute indicates that "CID recipients may ... refuse to comply with any CID if the Division has no jurisdiction to conduct an investigation-- which will be the case if the activities at issue enjoy a clear exemption for the antitrust laws." H.R.Rep. No. 1343, 94th Cong., 2d Sess. 11. However, the same House Report goes on to state: the "Committee stresse[s] that the scope of many antitrust exemptions is not precisely clear.... In these many cases, the applicability of an asserted exemption may well be a central issue in the case. If so, the mere assertion of the exemption should not be allowed to halt the investigation." *Id.* at n. 30. So, too, here, it would be premature to halt the investigation unless it is clear that the Antitrust Division has no jurisdiction to investigate this conduct. This, patently, is not the case.

Respondents argue that the government must affirmatively establish the basis for its subject matter jurisdiction in order to conduct an investigation. But this would rewrite *Oklahoma Press* and the legislative history of the ACPA, both of which suggest that the standard for enforcement of regulatory subpoenas is the same as that applied to grand jury investigations. *Oklahoma Press*, 327 U.S. at 216 (citing *Blair v. United States*, 250 U.S. 273, 282 (1919)); *Associated Container Transp. (Australia) Ltd. v. United States*, 705 F.2d 53, 58 (2d Cir. 1983) ("the House report accompanying the 1976 amendments to the ACPA reveals a preference for the less stringent grand jury subpoena standard"). The grand jury historically has had the "authority and jurisdiction to investigate the facts in order to determine the question whether the facts show a case within [its] jurisdiction." *Blair*, 250 U.S. at 283. And as the Court of Appeals for the Second Circuit has said, "the ACPA's legislative history indicates that the Justice Department is to be given wide latitude when issuing CIDs, ... [and] the unmistakable purpose of the ACPA was to facilitate the Justice Department's efforts to obtain evidence during the course of a civil investigation." *Associated Container*, 705 F.2d at 58.

*4 Although the *Oklahoma Press* doctrine does not require the Department to establish its ultimate subject matter jurisdiction at the outset of its investigation, respondents argue that the Department does not have the authority to conduct an unlimited fishing expedition. This is clearly true. However, for the reasons cited *supra*, this situation is far from that.

The Court now turns to the one issue which respondents have expressly identified as a possible exemption under the antitrust laws: respondents' foreign activities.

### III
### *Foreign Activities*

Under the FTAIA, conduct is exempt from the Sherman Act if it does not have a "direct, substantial, and reasonably foreseeable effect" on United States commerce. 15 U.S.C. § 6a. Respondents argue that even if one assumes the Department's assertions are true--that the performance right societies operate as price-fixing cartels--the Justice Department does not have jurisdiction to investigate this conduct because respondents' conduct abroad produces merely "ordinary" export effects. This argument is grounded in a reference in the House Report on the FTAIA: "[A] price-fixing conspiracy directed solely to exported products or services absent a spillover effect on the domestic marketplace ... would normally not have the requisite effects on domestic or import conduct." H.R.Rep. No. 686, 97th Cong. 2d Sess. 10 (1982). Respondents argue that "normally" refers to the "ordinary" effects of price-fixing, and that accordingly, the FTAIA confers jurisdiction over foreign price-fixing only in the exceptional case when there is a "spillover effect" in domestic markets, such as was true with respect to the OPEC cartel.

However, neither the plain language of the FTAIA, which does not identify particular categories of

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.
(Cite as: 1997 WL 118413, *4 (D.D.C.))

Page 4

exempted conduct, nor its legislative history considered in full supports respondents' argument about the restrictive scope of the FTAIA. The purportedly dispositive sentence about "spillover" effects appears in a section of the legislative history referring to the standing of injured foreign buyers, not injured U.S. exporters. Moreover, as the late Professor Areeda (formerly of counsel to respondent PolyGram Holding, Inc. in this matter) noted in his treatise:

... this conclusion [that "normally" excludes from the U.S. antitrust laws all "ordinary" export effects] is not absolutely certain, for the paragraph containing the "normally" quote is followed immediately by ...
"If such solely export-oriented conduct affects export commerce of another person doing business in the United States ... [jurisdiction is preserved] insofar as there is injury to that person. Thus a domestic exporter is assured a remedy under our antitrust laws for injury caused by a competing United States exporter. But a foreign firm whose non-domestic operations were [thus injured] ... would have no remedy under our antitrust laws."
Areeda & Hovenkamp, *Antitrust Law* ¶ 236', at 337 (1996 supp.) (quoting H.R.Rep. No. 686, 97th Cong., 2d Sess. at 10-11 (1982)).

*5 In short it is clear that respondents are not exempt from the Sherman Act if their export-oriented conduct had the direct effect of injuring competing U.S. exporters. This is the question that the Justice Department is in the midst of investigating: Did foreign price-fixing affect access to music videos and prerecorded music; and if so, did such price-fixing injure American exporters, such as Country Music Television, which provide music programming services abroad by beaming their signal unchanged from the United States to foreign countries?

This case is unlike *Eurim-Pharm GmbH v. Pfizer Inc.*, 593 F.Supp. 1102 (S.D.N.Y.1984), where the district court dismissed a complaint for failing to allege any effect on U.S. trade or commerce. The plaintiff in *Pfizer* argued that defendants' activities had a "spillover effect" on domestic commerce, but the plaintiff could not allege any facts causally linking a price increase in the United States with the defendants' foreign conduct. Here, as outlined above, the Justice Department has identified several possible effects on United States commerce from respondents' foreign activities: (1) by fixing prices and thereby increasing the price for music videos abroad, the copyright societies' collective licensing scheme may have delayed or deterred American exporters from entering foreign markets; (2) these copyright societies may have limited exports of non-music, traditional television programming (such as "Beavis and Butthead"); and (3) respondents may have extracted higher than competitive fees for world-wide licenses. The Department's conclusions are, of course, speculative at this stage because respondents have precluded them from examining documents related to these activities. The point of the CIDs is to determine whether the facts support the government's theory.

Even if this Court were to agree with respondents that the "ordinary" effects of foreign price-fixing are exempt from the Sherman Act, the FTAIA would still confer jurisdiction for boycott activity that excludes other United States exports. See Areeda & Hovenkamp, *Antitrust Law* ¶ 236', at 338. The Department alleges that these performance-rights societies engaged in boycott activity by collectively refusing to deal except through a common agent and collectively refusing to grant world-wide licenses. *See Zenith Radio Corp. v. Hazeltine Research, Inc.*, 395 U.S. 100, 118 (1969) (conspiring to deny licenses to foreign-intellectual property rights is a group boycott). Further, respondents allegedly formed downstream programming services in Europe and Asia, to which they may have agreed to grant exclusive music video rights--a group boycott that may violate the antitrust laws. *See United States v. Columbia Pictures Industries, Inc.*, 507 F.Supp. 412, 428 (S.D.N.Y.1980). Finally, although the Court recognizes that not every price-fix is a boycott, *Hartford Fire Ins. Co. v. California*, 509 U.S. 794, 800-811 (1993) (opinion of Scalia, J.), the fact that boycott activity implements a price-fixing arrangement does not preclude jurisdiction over such activity. *See F.T.C. v. Superior Court Trial Lawyers Ass'n*, 493 U.S. 411, 423 (1990).

*6 Interwoven with respondents' jurisdictional arguments is the claim that compliance with the CIDs would be burdensome. "[T]he question is whether the demand is *unduly* burdensome or *unreasonably* broad." *F.T.C. v. Texaco, Inc.*, 555 F.2d 862, 882 (D.C.Cir.) (emphasis in original), cert. denied, 431 U.S. 974 (1977). The burden of

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works

Not Reported in F.Supp.
(Cite as: 1997 WL 118413, *6 (D.D.C.))

Page 5

demonstrating that the CIDs are unreasonable is on the subpoenaed party. *United States v. Powell*, 379 U.S. 48, 58 (1964). Respondents have not met this standard for showing undue burden or unreasonable breadth. As to subsequent, more specific objections to burdensomeness and ambiguity, the Court encourages the parties to attempt to resolve such objections through negotiation.

### IV
### *Comity*

Finally, it is premature to consider the issue of international comity at this stage of the investigation. *See Associated Container*, 705 F.2d at 61 (declining to halt investigation under act of state doctrine where Justice Department had met *Oklahoma Press* standard of demonstrating reasonable basis to believe that requested information was relevant to a legitimate antitrust investigation). The Executive Branch, of which the Justice Department is a part, is charged with determining whether "the importance of antitrust enforcement outweighs any relevant foreign policy concerns: "It is not the Court's role to second-guess the executive branch's judgment as to the proper role of comity concerns under these circumstances." *United States v. Baker Hughes, Inc.*, 731 F.Supp. 3, 6 n. 5 (D.D.C.1990), *aff'd*, 908 F.2d 981 (D.C.Cir.1990). To that end, the Court defers to the executive branch's judgment as to comity and declines to halt an on-going investigation.

The decision that the *Oklahoma Press* doctrine and the FTAIA do not bar enforcement of the challenged CIDs merely means that the investigation may go forward. The Court in no way indicates how it or any other court would rule on the merits after the investigation is completed, in the event that the Justice Department decides to charge respondents with antitrust violations.

The petition to enforce the civil investigative demands will be granted.

### ORDER

For the reasons stated in the opinion issued on this same date, it is:

ORDERED that the petition of the United States to enforce the civil investigative demands issued by the Department of Justice is GRANTED.

FN1. Prerecorded music consists of records, tapes, and compact discs.

FN2. Of course, the Court is likewise unable to do so.

FN3. Since the Justice Department issued the CIDs at issue, Congress enacted a compulsory digital radio licensing system pursuant to which, in the absence of an agreement between a licensor and licensee, domestic licenses are set by arbitration. Digital Performance Right in Sound Recordings Act of 1995, (codified at 17 U.S.C. § 115). Accordingly, the Court is requiring that the CIDs shall be modified to preclude investigation into any effects, occurring after the effective date of this Act, of the digital radio performance rights society on the price of domestic digital radio broadcasting rights. However, for the reasons outlined *infra*, the Justice Department may investigate the effect of the digital radio-related activities on U.S. exports of digital radio programming.

FN4. Those violations involved the ocean shipping industry.

Not Reported in F.Supp., 1997 WL 118413 (D.D.C.), 65 USLW 2550, 1997-1 Trade Cases P 71,702

Motions, Pleadings and Filings (Back to top)

. 1:94mc00338 (Docket) (Nov. 03, 1994)

END OF DOCUMENT

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.