# EXHIBIT 24

# Antitrust Law

An Analysis of Antitrust Principles and Their Application

**Volume II**
**Second Edition**

**Phillip E. Areeda**
*Late Langdell Professor of Law*
Harvard University

**Herbert Hovenkamp**
*Ben V. & Dorothy Willie*
*Professor of Law*
University of Iowa

**Roger D. Blair**
*Huber Hurst*
*Professor of Economics*
University of Florida

LIBRARY
JUL 11 2001
O'MELVENY & MYERS



ASPEN LAW & BUSINESS
A Division of Aspen Publishers, Inc.

"relates back" to the date the contracts were formed when the decision to discriminate was implemented. On roughly analogous facts the *Grand Rapids Plastics* court barred an action filed more than four years after the contracts were formed.[59] The subsequent sales under the contracts were not "new and independent" acts; they were merely "a reaffirmation of a previous act"—namely the formation of the discriminatory contracts.

**320c4.  *Monopolization; single versus ongoing exclusionary practices.*** By contrast to the above situations, consider discrete or ongoing exclusionary practices said to constitute unlawful monopolization or attempt to monopolize. If monopolization is successful, the resulting higher prices could last for many years, although in other cases the monopolization may be of short duration. In the typical attempt case the monopoly never materializes or is short-lived. Once the monopoly has been attained, the monopolist's setting of its own prices is a unilateral act, and even the monopolist is free to set its own prices.[60] In both monopolization and attempt cases the exclusionary practices could consist of a single act, such as the monopoly created by a wrongful patent infringement suit[61] or a finite period of predatory pricing.[62] Or the practice could be something that is ongoing, such as the continuous or repeated refusal to sell aftermarket parts to rivals[63] or the repeated insistence on renting but not selling one's equipment.[64]

The courts consistently hold that if the monopoly is created by a single identifiable act and is not perpetuated by an ongoing policy, the statute of limitation runs from the commission of the act, notwithstanding that high prices may last indefinitely into the future. Thus, for example, the limitation period for monopolization by a wrongfully filed lawsuit runs from either the date the suit is filed or the date that the suit's defendant receives the process. That date is not continued by subsequent pleadings, motions, trial, and the like.[65] The "initiation of a lawsuit is the final, immutable act of en-

---

59. *Grand Rapids Plastics*, note 21.
60. See ¶720 (rev. ed.).
61. See ¶709 (rev. ed.).
62. See Ch. 7C (rev. ed.).
63. *Eastman Kodak Co. v. Image Technical Services*, 504 U.S. 451 (1992).
64. E.g., *Hanover Shoe*, note 5; *United Shoe Machinery*, note 6.
65. *Pace*, note 22. See also *Al George v. Entrotech Corp.*, 939 F.2d 1271 (5th Cir. 1991) (last overt act on allegedly wrongful patent infringement suit was the filing of the suit itself); *Chest Hill Co. v. Guttman*, 1981-2 Trade Cas. ¶64,417 (S.D. Ohio) (same). See also *B.V. Optische Industrie de Oude Delft v. Hologic*, 909 F.Supp. 162 (S.D.N.Y. 1995) (limitation period on allegedly improperly brought patent infringement suit began to run when process was served and the duty to defend thus arose, not when the complaint itself was filed); *Northern Trust Co. v. Ralston Purina Co.*, 1995-1 Trade Cas. ¶70,874 (N.D. Ill.) (statute of limitation on claim of fraudulently brought patent infringement suit began to run when the infringement suit was settled,

218

---

forcement of an allegedly illegal contract.... All subsequent acts are controlled by the exigencies of litigation, not enforcement of the contract."[66] The *Pace* court demanded "a new and independent act that is not merely a reaffirmation of a previous act" and that inflicts "new and accumulating injury on the plaintiff."[67] Similar reasoning dated a claim that the defendant monopolized by obtaining a patent fraudulently from the last overt act in the patent application process rather than from subsequent use of the patent or failure to notify officials of the invalidity.[68]

By contrast, in *Hanover Shoe*[69] the act of monopolization was the defendant's refusal to sell its shoe-manufacturing machinery and insistence on leasing it. The court treated this as an ongoing act of maintaining an improper monopoly and held that each refusal to sell started the statute of limitation anew.

In the Second Circuit's important *Berkey Photo* decision, the plaintiff had brought one portion of its suit as a purchaser of Kodak's film and color paper.[70] The conduct that had allegedly created monopolies in the products had occurred more than four years prior to the lawsuit, but high prices did not result until long thereafter. First, the circuit court rejected the district court's conclusion that the statute of limitation began to run from the occurrence of the exclusionary practices alleged to create the monopoly.[71] The circuit court then noted this difference between competitor and purchaser lawsuits challenging a monopoly:

Although the business of a monopolist's rival may be injured at the time the anticompetitive conduct occurs, a purchaser, by contrast, is not harmed until the monopolist actually exercises its illicit power to extract an excessive price. The case of predatory pricing illustrates the point clearly. As soon as the dominant firm commences such a policy, other producers, who may be driven out of the market, are injured. But, clearly, purchasers are not, for they receive the temporary boon of artificially low prices. It is only when the monopolist, having de-

---

more than four years before current claim was brought). Cf. *Mir v. Little Company of Mary Hosp.*, 844 F.2d 646 (9th Cir. 1988) (antitrust defendant's prior defense of plaintiff's state court complaint against denial of hospital staff privileges was not itself part of the alleged violation and thus did not restart the limitations period).

66. *Pace*, note 22, 813 F.2d at 238. The court rejected the contention that antitrust damages would be based on the costs of defending the earlier suit, which would not be known until that suit was concluded. The court also doubted the merits of the plaintiff's claim and was disturbed by the plaintiff's failure to attack the original suit directly via a counterclaim.

67. *Pace*, note 22, at 238.
68. *Wolf v. Wagner Spray Tech Corp.*, 715 F. Supp. 504 (S.D.N.Y. 1989).
69. Note 5.
70. *Berkey Photo v. Eastman Kodak Co.*, 603 F.2d 263 (2d Cir. 1979), cert. denied, 444 U.S. 1093 (1980).
71. Id., 603 F.2d at 295.

219

voured its smaller rivals, enjoys the spoils of its conquest by boosting its price to excessive levels that a purchaser "feels the adverse impact" of the violation. And if the monopolist never consummates its scheme by taking this final step, the purchaser has no cause of action.[72]

But the court also added the following:

So long as a monopolist continues to use the power it has gained illicitly to overcharge its customers, it has no claim on the repose that a statute of limitations is intended to provide. Thus, in this setting, as in "the context of a continuing conspiracy to violate the antitrust laws . . . each time a plaintiff is injured by an act of the defendants a cause of action accrues to him to recover the damages caused by that act. . . . [A]s to those damages, the statute of limitations runs from the commission of the act."[73]

That language appears to conflict with numerous decisions of other circuits holding that a "continuing violation" tolls the statute of limitation only if the acts that are alleged to continue the violation are sufficiently independent of the initial unlawful act. The monopolist's simple charging of its profit-maximizing price is a naturally expected consequence of monopoly and can hardly be said to be independent. But the court also added this limiting language:

Plainly, at the time a monopolist commits anticompetitive conduct it is entirely speculative how much damage that action will cause its purchasers in the future. Indeed, some of the buyers who will later feel the brunt of the violation may not even be in existence at the time. . . . Not until the monopolist actually sets an inflated price and its customers determine the amount of their purchases can a reasonable estimate be made. The purchaser's cause of action, therefore, accrues only on the date damages are "suffered." . . .[74]

[A] purchaser suing a monopolist for overcharges paid within the previous four years may satisfy the conduct prerequisite to recovery by pointing to anticompetitive actions taken before the limitations period. It should not be inferred that this ruling grants antitrust plaintiffs a license to embark on a search for Ichthyosauria — that is, on a time-warped fishing expedition. A trial court in its discretion may always "set a reasonable cut-off date, evidence before which point is to be considered too remote to have sufficient probative value to justify burdening the record with it" . . . Moreover, the trial court might not be without flexibility to limit proof where delay in bringing suit may have caused injustice to the defendants.

Id. at 296, citing ¶62B in a previous edition.

---

72. Ibid.
73. Ibid., quoting Zenith, note 3, 401 U.S. at 338.
74. Berkey Photo, note 70, at 295. The court later added:

---

In sum,

1. When the monopolist creates its monopoly by a single discrete act injuring rivals, the statute runs against the injured rivals from the time the act is committed.

2. When the monopolist creates its monopoly by a series of repeated or re-asserted acts designed to maintain its monopoly, the statute of limitation is restarted, provided that the subsequent acts fall within the definition of independent predicate acts, as given above. An example might be the defendant who repeatedly leases and re-leases its equipment, while continually refusing to sell it.[75]

3. Customers of the monopolist are not injured until after the monopolist causes them injury through higher prices, which may occur later than the exclusionary practices creating the monopoly. For example, competitors are injured immediately by predatory pricing, but customers would not be injured until much later, when the predation has done its work and the monopolist raises its price. Once customers have reason to know of the violation and their damages are sufficiently ascertainable to justify an antitrust action, the statute begins to run against them. When a §2 action is filed in a timely fashion, the customer will be able to collect damages for the four years prior to filing and will be able to rely on pre-limitation conduct in order to establish the exclusionary practices portion of a monopolization claim.

320c5. *Mergers.* The limitation rule governing damage actions for unlawful mergers would be quite straightforward were it not for some unfortunate dicta in a Supreme Court decision. *First*, §7 of the Clayton Act makes it unlawful to "acquire," and says nothing about the independent lawfulness of post-merger prices, even if they are monopolistic. Thus the merger is unlawful only if the acquisition itself is unlawful, and the acquisition is generally public and occurs on a reasonably certain date. *Second*, any "continuing violation" rule to the effect that each sale by the post-merger firm restarts the statute would leave mergers open to perpetual challenge. Clearly, Congress did not intend to exempt mergers from the antitrust statute of limitation. Antitrust policy generally regards

---

75. E.g. *Hanover Shoe*, note 5.

self depressed the government ceiling, which had been "based on prices in effect at the time controls were imposed."[19] If the plaintiff could show "that the price of crude oil would have been set at a different level but for the allegedly illegal agreement," it could recover.[20]

Other independent forces breaking the connection between violation and claimed injury appear in several cases alleging that a supplier unlawfully limited the territory in which the plaintiff dealer could sell. Recovery was denied because state law independently prevented the dealer from selling elsewhere,[21] because the illegal contractual provision had not been enforced against the plaintiff,[22] or because the damages sought flowed not from the illegal territorial limitation but from an independently grounded and lawful termination of the dealership.[23]

338c. **Insufficient logical connection.** Summary judgment will be granted against the plaintiff who "has failed to develop a theory or set out any facts … which would show a causal link between [defendant's] acts and [plaintiff's] losses…."[24] Indeed, the plaintiff's theory of the violation may demonstrate a lack of injury. For example, the plaintiff suffers no injury-in-fact from its rivals' illegal output limitation, which can only benefit the plaintiff with greater profits from enhanced volume or prices.[25] Similar was the would-be newspaper distributor who alleged that dealers had agreed unlawfully with a publisher that they would not handle rival publications.[26] Obstructing rival publishers would not give the plaintiff

---

19. 872 F.2d at 1409.
20. Ibid. See also *Kaiser Cement Corp. v. Fishbach & Moore*, 793 F.2d 1100 (9th Cir. 1986), cert. denied, 479 U.S. 949 (1986). Plaintiff Kaiser received bids from several electrical contractors and selected defendant Foley. When the parties subsequently disputed the fee, Foley obtained an award by binding arbitration. Later, Kaiser accused Foley of bidrigging in the setting of the fee. The court dismissed on the ground that Kaiser had not shown "actual injury" from the alleged violation because Kaiser's payment to Foley has been caused not by the conspiracy but by the supervening arbitrators who "awarded Foley an amount they considered fair without regard to any bid-rigging."

   Cf. *Callahan v. A.E.V.*, 182 F.3d 237 (3d Cir. 1999) (evidence that customers switched from plaintiffs' stores to defendants' in response to their concerted efforts to force plaintiffs to pay higher wholesale prices than defendants paid, supported by experts' "but for" model, sufficient to show causation).

21. E.g., *Lamp Liquors v. Adolph Coors Co.*, 410 F. Supp. 536 (D. Wyo. 1976).
22. E.g., *Response of Carolina v. Leasco Response*, 537 F.2d 1307 (5th Cir. 1976).
23. E.g., *Morton Buildings v. Morton Buildings*, 531 F.2d 910 (8th Cir. 1976).
24. *Sound Ship Building Corp. v. Bethlehem Steel Co.*, 533 F.2d 96, 98 (3d Cir.), cert. denied, 429 U.S. 860 (1976). See also *Yoder Bros. v. California-Florida Plant Corp.*, 537 F.2d 1347, 1369–1372 (9th Cir. 1976), cert. denied, 429 U.S. 1094 (1977) (no theory of how antitrust violation caused the injury).
25. See ¶348b (2d).
26. *Bowen v. New York News*, 522 F.2d 1242, 1255 (2d Cir. 1975).

---

ports criticizing alcohol-blended fuels, state laws requiring special pump notices for such fuel, elimination of favorable tax treatment for ethanol, and a general decline in fuel prices. The court thought it impossible to disentangle these several factors:

Standing alone one of these alternative causes of the plaintiffs' injuries might be insufficient to put causation-in-fact in question. Taken together, however, the plaintiffs have failed to show with a fair degree of certainty that "but for" the alleged antitrust violation, the plaintiffs would not have suffered the injuries of which they complain."[15]

To be sure, dispositive weight should not be given to lists of possible alternative causes, which virtually any defendant can generate. If the plaintiff's claim of causation is plausible, it should not be dismissed summarily merely because alternative causation stories are plausible as well. However, when other forces overwhelm the alleged violation in explaining the plaintiff's situation, then the violation would not be a significant, substantial, or material cause.

338b. **Independent cause fully accounts for claimed injury.** On occasion, a force other than the antitrust violation fully accounts for the plaintiff's injury.[16] For example, a plaintiff cannot be injured in fact by private conduct excluding it from the market when a statute prevents the plaintiff from entering that market in any event.[17]

Of course, the defendant's reliance on supervening government action or other independent cause must be examined closely. For example, several defendant buyers of crude oil allegedly conspired to pay the seller too little.[18] Because federal price ceilings prevented them from paying more, the defendants argued that their alleged fixing of buying prices could not have harmed the plaintiffs. However, the court concluded that a cartel depressing buying prices it-

---

15. *Greater Rockford*, note 7, at 404.
16. This factor also helps explain some substantive antitrust doctrines. For example, lobbying for anticompetitive government action is not an antitrust violation because, in part, the anticompetitive impact of government action is caused by the independent decision of the government rather than by the private party that sought such action. See ¶201 (2d).
17. E.g., *Axis v. Micofil*, 870 F.2d 1105 (6th Cir.), cert. denied, 493 U.S. 823 (1989) (no standing for plaintiff who was unable to obtain a government-required license to enter the market from which the defendant allegedly excluded him). But see *City of Pittsburgh v. West Penn Power Co.*, 147 F.3d 256 (3d Cir. 1998), which denied a municipality as consumer to challenge a local utility's acquisition of its only incipient rival on the theory that the rival had not yet obtained a permit to enter the market in competition with the other firm, even though it was likely that the permit would have issued in the future.
18. *City of Long Beach v. Standard Oil Co. of Cal.*, 872 F.2d 1401, 1408 (9th Cir. 1989), amended, 886 F.2d 246 (9th Cir. 1989), cert. denied, 493 U.S. 1076 (1990).