

**Richard L. Horwitz**
Partner
Attorney at Law
rhorwitz@potteranderson.com
302 984-6027  Direct Phone
302 658-1192  Fax

1313 North Market Street
P.O. Box 951
Wilmington, DE  19899-0951
302 984-6000

www.potteranderson.com

March 5, 2007

**VIA ELECTRONIC FILING**

The Honorable Joseph J. Farnan, Jr.
United States District Court
District of Delaware
J. Caleb Boggs Federal Building
844 N. King Street, Room 4124
Wilmington, DE 19801

    Re: *Advanced Micro Devices, Inc., et al. v. Intel Corporation, et al.*,
C. A. No. 05-441-JJF;
*In re Intel Corp.*, C.A. No. 05-1717-JJF; and
*Phil Paul v. Intel Corporation*, C. A. No. 05-485-JJF (Consolidated)

Dear Judge Farnan:

    In connection with the March 7, 2007 Status Conference, Intel Corporation and Intel Kabushiki Kaisha (collectively "Intel") submit this letter to advise the Court of some document retention lapses that have occurred, related primarily to emails generated *after* the filing of complaint, and the extensive steps Intel is undertaking to address these issues.  We will be prepared to discuss these matters at the upcoming Status Conference.

    Intel advised counsel for AMD of the document retention issues it was addressing on February 8, 2007, and alerted lead class counsel the next week.  On February 22, 2007, Intel met in person with counsel for AMD to provide more detailed information about the retention issues, including a spreadsheet of some of the issues discovered by Intel.  At the time of the meeting, Intel's counsel cautioned AMD that the information being provided was preliminary and subject to revision and supplementation.  During the meeting Intel also obtained AMD's input on the remedial plan to be undertaken.  Although these discussions are still underway, Intel thought it was appropriate at this time to provide the Court with an overview of the issue as we now understand it.

    A.    **Intel's Tiered Preservation Process**

    Intel acted swiftly after learning of the filing of the complaint on June 27, 2005 to address document retention, putting into place a tiered process to identify and preserve potentially relevant paper and electronic records.  The process was extraordinarily complex in light of the broad-ranging allegations of the AMD complaint which, as pled, reached the worldwide activities of Intel – a company with approximately 100,000 employees at the time, most with

The Honorable Joseph J. Farnan, Jr.
March 5, 2007
Page 2

individual computers – and with hundreds of computing systems that are geographically dispersed throughout the world. The tiered process is premised on preserving records utilizing, *inter alia*, the Information Technology ("IT") group, and includes harvesting hard drives and documents on Intel's systems, creating back-up tapes and requiring individual employees to save materials. The enormous scope of potentially producible documents makes the document retention issues far more complex than in an ordinary case. A summary of this tiered process is described below – which is necessary to understand the lapses that occurred.

- The day after the AMD complaint was filed, Intel instructed its IT group to preserve a one time company-wide snapshot of email and other electronic documents that were stored on Intel's servers, including Exchange servers that store emails. This was accomplished by taking a complete set of back-up tapes and preserving them, rather than recycling them to be written-over, as is the normal process. This generated thousands of back-up tapes ("Complaint Freeze Tapes").

- On July 1, 2005, Intel also sent litigation hold notices to hundreds of employees who it then believed, based on the complaint, were most likely to possess relevant documents – instructing them to retain all relevant documents, broadly defined, including email. The first notice went to more than 600 employees. The basic form of notice had been used in previous Intel litigation. On a rolling basis, throughout 2005, 2006 and 2007, retention notices were sent out to additional employees who were later identified as also likely to have relevant information.

- Starting July 8, 2005, Intel sent a team out to numerous Intel facilities to begin harvesting, i.e., collecting, documents of key employees most likely to possess relevant material. The "harvesting" included copying all information on the employee's computer hard drive, including any emails or documents maintained by that employee on Intel's servers as of the date of harvest. To date, Intel has harvested documents from over eight hundred employees.

- As a secondary measure, in the middle of October 2005, Intel began implementing a program of creating weekly back-up tapes on a going-forward basis for several hundred employees from whom documents might be requested. Given the number of Intel employees, and the number of servers at Intel, for practical reasons this required the affirmative step of moving the relevant individuals from their existing servers to separate, dedicated servers that were then backed-up weekly.[1]

---

[1] As will be explained in greater detail in any final report on this issue, Intel does not have weekly back-up tapes for every custodian on the final Custodian List. Some were inadvertently not migrated to the server in 2005 and some, who were later identified, were not migrated upon such identification. In addition, some weekly back-up tapes appear to have been recycled.

The Honorable Joseph J. Farnan, Jr.
March 5, 2007
Page 3

In summary, Intel put in place comprehensive processes to preserve a very broad universe of documents for possible production. It generated tapes representing an electronic snap-shot of electronic data stored on the company's servers immediately after the filing of the complaint. It sent hundreds of employees likely to have relevant documents and emails specific instructions to retain that material and began promptly harvesting documents for production. And then it added a program of creating back-up tapes as a fail-safe, to be used as a last resort if there were any lapses in individual employees' retention efforts.

From a process standpoint, Intel acted promptly to set up a reasonable and thorough tiered process that exemplified best practices in such a massive case. Intel made good decisions about what procedures to implement. Intel's objective was to go beyond the standard of reasonableness, even though it recognized that the actual production, while enormous, would necessarily be a small sub-set of that being preserved. Intel communicated its retention program to AMD by letter in October 2005. AMD sent Intel a similar letter, which described a parallel effort.

### B.    Document Retention Issues

Despite these measures, Intel has identified a number of inadvertent mistakes in the implementation of the above described preservation process. These document retention issues are the result of human errors in implementation, and include the following: some employees' retention practices were incomplete on an individual level, some employees were not given timely notice to retain materials, some terminated employees' documents may not have been saved, and the fail-safe plan to prepare back-up tapes missed some employees.

The human errors in executing the preservation plan were independent of the plan itself, and to some extent, in retrospect, were the consequence of the huge undertaking that document retention and production entailed in this case, involving employees scattered throughout the world, an evolving retention list, which, as of today, includes approximately 1,400 individual employees,[2] and a major redeployment and layoff of approximately 9,000 employees in 2006 necessitated by business conditions.

With respect to email, the retention issues primarily include:

- Certain employees complied with the retention notice by moving emails from their inbox to their hard drive, but failed to move emails from their sent box to their hard drive, and those sent items were purged by Intel's system of automatically deleting emails after they have aged for a certain period of time;[3]

---

[2] This includes employees who were sent litigation hold notices, but who no longer are employed by Intel.

[3] Like many companies, Intel's email system routinely deletes emails remaining in the mailbox after they have aged a certain period of time. Aging does not apply to emails moved to a person's hard drive or personal folders. The system is common in many companies to

[Footnote continued on next page]

The Honorable Joseph J. Farnan, Jr.
March 5, 2007
Page 4

- A few employees thought Intel's IT group was automatically saving their emails; and

- Some employees may not have moved all the emails called for by the sweeping requests to their hard drives.

Another lapse occurred during the on-going effort to refine the custodian list, when Intel identified employees to add in lieu of employees previously designated on the list. Because everyone recognized from the start of the litigation that not all of the potentially relevant information in such a massive case realistically could be produced or maintained, the parties cooperatively negotiated a series of agreements to narrow and focus discovery. An agreement was reached to use a "custodian based" approach to the preservation, collection, review and production of documents. In May 2006, AMD and Intel entered into a Stipulation and Proposed Order Regarding Document Production, pursuant to which the parties agreed that Intel and AMD would each designate "custodians" (employees) with "an appreciable quantity of non-privileged, material, non-duplicative documents and things" responsive to the document requests.

In negotiating the Stipulation, there were discussions about the number of employees each party would be obligated to put on its respective list. Intel agreed to put in excess of 1000 employees on its list. AMD committed to place at least 400 employees on its list. On June 1, 2006, Intel designated more than 1000 such custodians and AMD designated approximately 440.

The Stipulation provided that each party was required to identify a sub-set of its list of employees (at least 20%) for initial document production purposes, to provide a "comprehensive response" to the requests. Intel designated 217 employees to comply with that agreement, and Intel is currently reviewing and producing documents from these 217 employees. Under the Stipulation, the next step is for AMD to select another sub-set of employees on Intel's list for production. AMD has the right to select approximately 254 more Intel employees for document production (and has identified 74 such additional employees to date). Thus, the maximum

---

[Footnote continued from previous page]

maintain the efficient functioning of the complex, dynamic environment of email servers. Intel employees are educated on the operation of the purge system and instructed on the methods of saving emails to prevent them rolling off the system once they reach the end of the aging period. Congress recently enacted Rule 37(f) of the Federal Rules of Civil Procedure in recognition of the unique document preservation challenges presented by the manner in which most large computer systems operate. The Committee Notes regarding the impetus for Rule 37(f) point out that: "[T]he regular purging of e-mails or other electronic communications is necessary to prevent a build-up of data that can overwhelm the most robust electronic information systems." *See* Report of the Judicial Conference, Committee on Rules of Practice and Procedure (Sept. 2005) at 14.

The Honorable Joseph J. Farnan, Jr.
March 5, 2007
Page 5

number of Intel employees from whom Intel may be required to produce documents will not exceed 471, absent good cause.[4]

During the process of selecting employees for its final version of the Custodian List, in mid-2006 Intel identified an additional 400 or so employees to add to the list, supplanting other employees already on Intel's retention list. These new designees had not previously been provided with a retention notice. Although the additional employees were slated to be put on retention in mid-2006, Intel recently realized that, notwithstanding its intention to do so, it had failed to send retention notices to most of these additional designees. This was essentially a single mistake, as it was a failure to circle back after the creation of the final list of additional custodians. This error was corrected promptly upon discovery.

Before Intel caught its error in failing to send these additional retention notices, it had already instructed more than 1000 employees to retain documents, including hundreds of employees that ultimately were not included on Intel's final custodian list. Although there is a process set forth in the Stipulation to remove persons from retention once the final custodians have been selected, none of these people who were on the initial retention list, but not included on the final list, were taken off retention and they continue to be a potential source of documents if necessary.

Intel also is currently investigating the completeness of its efforts to collect documents from terminated employees, and there may be some lapses in that regard. Intel had significant redeployments and lay-offs in 2006, which in hindsight made it more difficult to adhere to Intel's policies requiring collection of electronic information from departing employees subject to litigation holds.

    C.    **Intel's Ongoing Review and Remediation Efforts**

While Intel is continuing its review of these various document retention issues, Intel has developed and it is in the process of implementing a plan to address each of these issues. These remedial actions include the following steps:

First, another round of litigation hold notices has been sent to all employees who are currently employed by Intel and appear on Intel's Custodian List, including those who were missed earlier.

Second, the overall scope of the emails and documents Intel will be producing is sweeping in breadth and magnitude – and will encompass the equivalent of tens of millions of pages of material from many hundreds of employees with overlapping involvement in communications, both internal and external. These materials should span the full breadth and provide a comprehensive picture of Intel's business activities that might be relevant in the

---

[4] AMD and Intel also have the right to supplementation from a specific number of custodians after the main production.

The Honorable Joseph J. Farnan, Jr.
March 5, 2007
Page 6

lawsuit, which involves an evaluation of the competition between Intel and AMD and the terms and conditions of the parties' sales, which is evidenced in multiple ways, from multiple sources.

Third, Intel expects the Complaint Freeze Tapes that were retained immediately after the complaint will be substantially complete, but is in the process of confirming this fact. Intel is specifically aware of only one likely exception at this point involving a small number of back-up tapes from its Munich facility. Intel has a huge project underway to collect and (using multiple vendors) to restore and index all the back-up tapes made at the time the complaint was filed. Only then will Intel be in a position to confirm definitively the status of those back-up tapes. Those tapes will be used as a basis for additional production as may be necessary of emails in existence when the complaint was filed.

Fourth, Intel is producing massive volumes of emails and other materials gathered by its ongoing harvesting of materials of employees maintained on their computer hard drives and servers, and that process to capture and preserve materials is continuing unabated.

Fifth, the weekly back-up tapes (initiated in October/November 2005) will supplement the email production for many of the employees who might be missing some emails generated after the complaint was filed. As is the case with the Complaint Freeze Tapes, Intel is in the process of restoring and indexing all such back-up tapes, and, when that work is completed, Intel will be in position to confirm the emails captured on those tapes.

Sixth, emails that may be missing from the production of some employees are likely to be picked up in the retained emails of other employees who were addressees or received copies.

Seventh, Intel is implementing a new email archiving system to replace the reliance on the individual custodians and the secondary weekly back up tapes for preservation. The system will use software developed by EMC, Inc. Once fully implemented, the archive will preserve all sent and received emails of all of the employees subject to the legal hold notice. Intel has been beta testing the system over the last two months and it is moving quickly to implement the system.

In light of the multiple layers of retention, it is necessary to restore and compare these various sources of information to evaluate Intel's document retention. It is not a matter of simply adding up the number of persons who have some form of retention issue at one level of the retention process. Many of the issues are limited in scope or time, or are addressed by specific back-up materials, and must be evaluated in the context of the multiple sources of retained materials and the actual email and retention practices of the various individuals.

As one example of how the multiple layers of retention may minimize what would otherwise appear to be a loss of emails, set forth below is an explanation of the means by which Intel can and will search for the emails from the "sent" items folders of employees who failed to affirmatively save emails from their "sent" items, which is the most common lapse on an individual employee basis.

The Honorable Joseph J. Farnan, Jr.
March 5, 2007
Page 7

     First, some of these employees copy themselves on "sent" emails, which then would be archived from their inboxes. Second, a meaningful percentage of emails are responded to, and therefore the underlying "sent" email is preserved. Third, Intel believes that it has the Complaint Freeze Tapes for almost all of the employees on the Custodian List. Fourth, for many of these individuals, Intel has harvested their electronic data, including email. Fifth, for many of the individuals, Intel has their weekly back-up tapes. Sixth, for many of the individuals, Intel has both their harvested materials and their weekly back-up tapes. Seventh, for those custodians for whom Intel does not have the weekly back-up tapes, Intel will identify other employees with whom the non-complying individual regularly corresponded and search the emails of those additional employees. Finally, for a particular customer, where the key communications will be in the files of several individuals, the fact that one employee may not have perfectly retained documents will not mean that all key communications about a customer will not be produced. To the contrary, there will be massive duplication in what is produced because of the practice of Intel employees to copy multiple recipients on important communications.

     In closing, Intel is taking this matter very seriously. It very much regrets this happened. At every step of the way, Intel had the best intentions regarding developing and implementing reasonable and comprehensive tiered preservation processes. It should be noted that the non-compliance issue is largely limited to post-complaint e-mail and that literally millions of email and other documents have been appropriately preserved and produced or in the process of being produced. Intel voluntarily disclosed this matter in good faith to AMD and the Class after it had completed its preliminary review. Intel is undertaking these remediation efforts at great expense. In addition, Intel has made it clear to counsel for AMD and the class that it is prepared to share information regarding Intel's efforts in that regard and to work with them going forward in addressing the issues and minimizing any potential losses, if any, of information.

     In terms of moving forward, Intel respectfully requests that it be given a short period of time to complete our review, continue the above described remediation efforts and, thereafter, make a more detailed report to the Court. And we would welcome this Court's or Special Master Poppiti's oversight. We look forward to discussing these matters with the Court on March 7, 2006.

                                              Respectfully,

                                              */s/ Richard L. Horwitz*

                                              Richard L. Horwitz

/msb
781165 / 29282

cc     The Honorable Vincent J. Poppiti (via electronic mail)
        Charles Diamond, Counsel for AMD (via electronic mail)
        Michael Hausfeld, Interim Class Counsel (via electronic mail)
        Frederick L. Cottrell, III (via electronic mail)
        James L. Holzman (via electronic mail)