# EXHIBIT H

# SEALED DOCUMENT

# EXHIBIT I

1

1          IN THE UNITED STATES DISTRICT COURT

2            FOR THE DISTRICT OF DELAWARE

3

ADVANCED MICRO DEVICES,    )

4                      )

    Plaintiffs,        )  Civil Action No.

5                    )  05-441-JJF

v.                  )

6                    )

INTEL CORPORATION,        )

7                    )

    Defendant.        )

8

    Teleconference in above matter taken pursuant to

9    notice before Renee A. Meyers, Registered Professional

    Reporter and Notary Public, in the offices of Blank

10    Rome, LLP, 1201 North Market Street, Wilmington,

    Delaware, on Tuesday, July 31, 2007, beginning at

11    approximately 3:00 p.m., there being present:

12

BEFORE:

13

    THE HONOROABLE VINCENT J. POPPITI, SPECIAL MASTER

14

APPEARANCES:

15

    O'MELVENY & MYERS

16    CHARLES DIAMOND, ESQ.

    MARK SAMUELS, ESQ.

17    LINDA SMITH, ESQ.

     1999 Avenue of the Stars

18     Los Angeles, California  90067

    for AMD

19

20

21          CORBETT & WILCOX

    Registered Professional Reporters

22    230 North Market Street    Wilmington, DE 19899

         (302) 571-0510

23    www.corbettreporting.com

    Corbett & Wilcox is not affiliated

24    With Wilcox & Fetzer, Court Reporters

Unsigned

1     imposition on Your Honor's time.

2          SPECIAL MASTER POPPITI:  Not a problem.

3          MR. SAMUELS:  Your Honor will recall in

4     bifurcating discovery into Intel's evidence preservation

5     issues, Your Honor originally proposed a July 31

6     deadline, later extended by stipulation of the parties

7     to August 31, and that's the deadline for completing

8     remediation discovery.  The particulars of what the

9     initial discovery would entail were agreed upon by the

10    parties on July the 3rd.

11         Your Honor, it's now, I guess, August 1

12    tomorrow and we are now 31 days out from this August 31

13    deadline, and Intel's production of documents in

14    response to our initial remediation discovery has been,

15    in AMD's view, very slow.  Against the volume we have

16    been told to expect, only a small fraction of it has yet

17    hit our doors.

18         When we complained about that to Intel

19    middle of last week, we were told on Friday evening by

20    Intel's counsel that it would be, and I am quoting here,

21    At least two to three weeks before that initial document

22    production could be completed.  That, of course, was

23    very concerning to us in the face of an August 31

24    completion date and would obviously impose on our right

1    to conduct follow-up discovery and to conduct

2    depositions.

3            Prompted, I assume, by our request to speak

4    with Your Honor this afternoon, I received a letter last

5    night from Intel counsel, which I am, if I am reading

6    correctly, contains a commitment by Intel to complete

7    its production of documents in response to the initial

8    remediation discovery by August 10.

9            SPECIAL MASTER POPPITI:  Okay.

10           MR. SAMUELS:  And I would like, if I am

11   reading that correctly, for Mr. Floyd, or someone else

12   from the Intel side, to confirm it because it's very

13   important to us that this initial discovery be completed

14   without any further delay.

15           SPECIAL MASTER POPPITI:  For Intel.

16           MR. FLOYD:  I will take a couple minutes and

17   then I will obviously respond directly to Mr. Samuels'

18   question.

19           The order was actually entered on July 10,

20   and we have -- one of the issues we have, we have six

21   custodians, one of which is a third party.  You know, I

22   understand Mr. Samuels' frustration.  I am not really

23   quarrelling with it.  I understand.  If I was in his

24   position, I'd want the documents as soon as possible.  I

1    want to assure that we have a team that's working on it.

2    There are issues in terms of getting those third-party

3    documents.  There are a lot of privilege issues that we

4    have to deal with.

5         So, in light of, you know, Mr. Samuels'

6    letter, which I would have responded to regardless of

7    whether or not he had requested a conference, but,

8    obviously, you are here to assist us, and, you know, we

9    recognize that, I have gone back and I have tried very

10   hard to talk to the people that are working on it, push,

11   and do the things that you, you know, should do to try

12   to move things along.

13        So, I have, in fact, indicated to

14   Mr. Samuels in writing that we will have -- we have, at

15   this point, three additional custodians, and then there

16   are two faces to the production, there is a group of

17   documents that we can turn over relatively easily and

18   others that require redaction or some additional looking

19   at to confirm issues regarding privilege.  So we are

20   going to have another production on Friday, which will

21   take care of --

22        SPECIAL MASTER POPPITI:  This Friday?

23        MR. FLOYD:  This Friday, which will take

24   care of, we believe, the additional Intel custodians,

1    the two, sometime early next week, the third-party

2    production, and then we have said they intend to get it

3    all done by the 10th, and then there is some additional

4    summaries and things that we have promised to get them,

5    which we will get also when we set forth a schedule on

6    that.

7          So, I don't, at this point, I don't see any

8    problem with that.  I am certainly going to push as hard

9    as I possibly can.  I can't always predict what happens

10   in the world, but I feel comfortable in making the

11   representation and we will certainly follow-up on it to

12   make sure it gets done.  If something unusual happens,

13   we will address it immediately and deal with it.

14         MR. SAMUELS:  Your Honor, that's acceptable.

15   We really want to keep the remediation discovery in the

16   window that is in Your Honor's order, and we appreciate

17   Mr. Floyd's commitment and apologize for having to

18   burden Your Honor with this.

19         SPECIAL MASTER POPPITI:  Not at all.

20         MR. FLOYD:  We have got a 30(b)6), we have

21   had a couple informal technical exchanges.  We

22   understand the situation.  We are not -- we understand

23   where we are and the need to get it done.  We will work

24   diligently to do so.

1      SPECIAL MASTER POPPITI:  I appreciate the

2    work that you have done to get to the point of offering

3    the things that you did and certainly stand ready to

4    accept a call if there are any problems.  Okay?  Thank

5    you all very much.

6          MR. DIAMOND:  Your Honor, it's Charles

7    Diamond.

8          SPECIAL MASTER POPPITI:  Yes.

9          MR. DIAMOND:  I rarely participate in these

10   calls lately.

11         SPECIAL MASTER POPPITI:  I haven't heard

12   your voice for a while, Mr. Diamond.

13         MR. DIAMOND:  Not for lack of interest.

14   Mr. Samuels had been carrying the water for us on the

15   remediation issues, and ably so, in our opinion, so I

16   have not interfered.  But I just -- this is sort of in

17   the nature of a head's up that you can expect a parallel

18   negotiation as sort of part of our discussions of

19   spoliation and remediation.

20         As much as Mr. Samuels is concerned about

21   the pace of the remediation discovery, I grow

22   increasingly concerned about the pace of discovery

23   generally.  As I wrote to Mr. Cooper last week, we are a

24   good six months beyond what is the deadline for an

# EXHIBIT J

```
----- Original Message -----
From: Kochenderfer, Kay E. <KKochenderfer@gibsondunn.com>
To: Pearl, James
Cc: Cooper, Robert E. <RCooper@gibsondunn.com>; Floyd, Daniel S. <DFloyd@gibsondunn.com>;
Samuels, Mark; Herron, David
Sent: Tue Aug 28 09:34:43 2007
Subject: RE: Intel's Production of Documents Relating to Remediation
```

Bo --  Intel has substantially completed its remediation production of documents, and
expects to complete the production by this Friday.  The outstanding documents to be
produced include the remaining exemplars of the 2005 and 2006 litigation hold notices, the
third-party vendor materials for which we have confidentiality issues to resolve, and a
summary of the harvest 2 dates and departed employee hard drive collection.

```
From: Pearl, James [mailto:JPearl@OMM.com]
Sent: Saturday, August 25, 2007 2:14 PM
To: Kochenderfer, Kay E.
Cc: Cooper, Robert E.; Floyd, Daniel S.; Samuels, Mark; Herron, David
Subject: Intel's Production of Documents Relating to Remediation
```

Kay -- on Wednesday, I sent Intel a letter regarding production of Intel's 2005 hold
notices to which you responded on Wednesday afternoon.  However, in that letter I also
asked Intel to confirm that it has fully complied with its remediation discovery
obligations and commitments.  We received no such confirmation.  More specifically, can
Intel now confirm that it has completed its production of remediation documents?  If not,
what is still yet to be produced and when can we expect that production?

Thanks.

Bo
James Bo Pearl
Counsel
O'Melveny & Myers LLP
1999 Avenue of the Stars, Ste. 700
Los Angeles, CA 90067
(310) 246-8434
(310) 246-6779 (Fax)

This message and any attached documents contain information from the law firm
of O'Melveny & Myers LLP that may be confidential and/or privileged. If you are
not the intended recipient, you may not read, copy, distribute, or use this
information. If you have received this transmission in error, please notify the
sender immediately by reply e-mail and then delete this message.

```
=============================================================================
```

This message may contain confidential and privileged information. If it has been sent to
you in error, please reply to advise the sender of the error and then immediately delete
this message.
```
=============================================================================
```

# EXHIBIT K



# O'MELVENY & MYERS LLP

BEIJING

BRUSSELS

HONG KONG

LONDON

LOS ANGELES

NEWPORT BEACH

1999 Avenue of the Stars, 7th Floor
Los Angeles, California 90067-6035

TELEPHONE (310) 553-6700
FACSIMILE (310) 246-6779
www.omm.com

NEW YORK

SAN FRANCISCO

SHANGHAI

SILICON VALLEY

TOKYO

WASHINGTON, D.C.

February 15, 2007

OUR FILE NUMBER
0008346-163

**VIA E-MAIL AND U.S. MAIL**

WRITER'S DIRECT DIAL
(310) 246-6789

Robert E. Cooper, Esq.
Gibson, Dunn & Crutcher
333 South Grand Avenue
Los Angeles, California 90071-3197

WRITER'S E-MAIL ADDRESS
cdiamond@omm.com

Re:    *AMD v. Intel -- Document Retention Issues*

Dear Bob:

I have your Thursday email concerning the apparent lapse in Intel's document retention program and your efforts to identify and mitigate the loss of data. I worry that you understate the gravity of the situation. The retention problems and irretrievable loss of important data you describe appear to be broad in scope affecting as many as 20% to 30% of Intel's custodians.

Frankly, we saw this coming. In Fall of 2005, John Rosenthal generally described Intel's reliance on custodians to identify and retain relevant materials, but stated that Intel did not automatically delete email. He later corrected himself and informed us that Intel had not disabled an automatic delete system that purged custodian email after 35 days. But he mollified us with assurances that Intel intended to back-up all custodial email weekly. We shouldn't have been reassured. The Intel custodian-based "honor system" was defeated by a combination of custodian error and Intel's faulty retention instructions. And the back-ups that were supposed to backstop the "honor system" failed to capture and preserve email for what appears to be well in excess of 200 of your 1027 custodians.

At a time when the profession is so focused on doing e-discovery and document retention right, we find these breakdowns, and the consequent irrevocable loss of critical evidence, very troubling. Nor are we comforted that the loss may be mainly of "Sent" email. While some outgoing email might be captured in the in-boxes of other custodians (assuming the recipient took the steps necessary to save it), critical communications with Intel customers and others outside the Intel organization would not be.[1] But the loss is not confined to sent email: in the

---

[1] The parties also acknowledged the practical problem of matching a "received" item in one custodian's production with a missing "sent item" in another's production when we agreed to de-duplicate data on a custodian-by-custodian basis. Thus, even if the email is not irretrievably lost, finding and using it will be made much harder, at least.

O'MELVENY & MYERS LLP

Robert E. Cooper, Esq., February 15, 2007 - Page 2

absence of backups for 20-30% of Intel custodians, we have no faith that the Intel "honor system" will work to provide us a complete, unabridged collection of even their out-going emails. Anecdotally, our review of Intel custodian data so far reveals worrisomely low volumes of email.

We consider Intel's decision to rely on these risky preservation techniques in a case of this magnitude and scope to be improvident. And we also feel that we were not being told the whole story when Intel pressed us for agreement on what we consider premature collection dates for key custodians and unreasonably limited "re-harvest" protocols, which would have masked the document retention issues you surfaced last week.

Notwithstanding this, as we discussed yesterday, we are prepared to meet with you and your colleagues early next week to assess the problem and to discuss appropriate next steps. In advance of the meeting, could you please undertake to determine and communicate to us the following:

1. Since you will obviously need to restore pre-litigation email back-ups (e.g., the "Complaint Freeze Tapes") in order to recapture all relevant email, could you please confirm that such usable tapes exist for all 1,027 individuals listed on Intel's preservation list? Please be prepared to advise us of any deficiencies.

2. AMD needs to understand the exact nature and scope of the retention problems you have identified on both the macro and custodian-specific levels. We would appreciate your supplying the following information, preferably in a spreadsheet or similar format: (a) the custodian's name; (2) whether that custodian has been designated by Intel on its "20% list" or, alternately, adversely designated by AMD; (3) the "harvest" date, i.e., date that the custodian's data was collected (if applicable); (4) the date upon which the custodian's email was migrated to the dedicated server, if it was; (5) a useful description of the exact nature of any retention deficiency or data loss; (6) the date that Intel discovered the retention deficiency or data loss; and (7) the time period during which these problems persisted.

   We expect that AMD will be able to discern from this information the identity of the custodians who failed to comply with Intel's litigation "hold notice" and, for each, the precise nature of the failure and its duration. This will also reveal the 151 "original" custodians and the "subsequently added" custodians whose emails the Intel IT Department did not migrate to dedicated servers and thus did not back up weekly. Of course, this will permit identification of custodians for whom there are no presently-identified retention issues.

3. Please also identify (either in the spreadsheet or similar format referenced above or separately) the European custodians whose backed-up email was lost when Intel's IT Department began recycling tapes and, for each, provide us with the dates of back-ups that do exist.

O'MELVENY & MYERS LLP

Robert E. Cooper, Esq., February 15, 2007 - Page 3

4.  We believe that these failures calls into question Intel's overall preservation effort. We therefore renew our request, first made in September 2005, for detailed information about the preservation instructions Intel gave to custodians. We will do the same and stipulate that any disclosure will not otherwise waive any applicable privilege.

5.  Finally, please confirm that for those custodians produced thus far, Intel has worked from a restored email collection, not simply the custodian's "honor system" archive.

Since harvesting of some custodians is on-going and since the parties contemplate updating the harvesting for at least selected witnesses, we urge that you immediately suspend the automatic deletion of any custodian email, and inform us when that has happened. In view of the failure of the current system to capture and retain all relevant material and your need to restore backups, Intel also should cease relying on custodians' selections (if it has) and instead go back and review the entirety of its custodians' email collections, as AMD has done from the very beginning.

Finally, we grow increasingly uncomfortable in keeping these problems from class counsel. We understand your desire to surface the issue with class counsel only when you have the complete facts. But we think it would be better to notify them of the problems discovered thus far and invite them to the table next week.

Let us know what days and times are convenient.

Sincerely,

Charles P. Diamond
of O'MELVENY & MYERS LLP

CC1:757969.2

# EXHIBIT L

| From: | Pearl, James |
|---|---|
| Sent: | Tuesday, June 26, 2007 2:23 PM |
| To: | 'Kochenderfer, Kay E.'; 'Cooper, Robert E.'; 'Floyd, Daniel S.' |
| Cc: | Samuels, Mark; Herron, David; Fowler, Jeffrey |
| Subject: | Follow-Up to Meet & Confer on Intel Remediation Document Production |

Kay, Bob and Dan -- On Friday, we discussed several topics relating to Intel's production of documents and data. Principally, we tried to narrow down Intel's custodian list to ease any Intel burden and expense associated with the remediation document production, while still allowing us to get the documents we need to respond to the remediation plan. As discussed, we need the following information from Intel.

**1) Preliminary Production from the Following Custodians (AMD reserves its rights to request others from Intel's list or others identified during discovery):**
- Malcolm Harkins (Backup Tapes)
- Todd Buelt (EMC Archive)
- Dave Pistone (2007 Reharvest)
- Carolynne Joyce (Revised Policies for Departing Employees)

Based on the information you provided on Friday, we have selected the following custodians who we believe will have a representative sampling of documents on the relevant categories. For these custodians and the other fifteen identified by Intel, Intel was going to provide us how much data existed for each custodian and whether their data was easily accessible. If the data exists in specified archives, we discussed producing from those archives rather than using search terms across the corpus of that custodian's data. We prefer that approach if feasible. We also asked for an IT org chart which Dan said he would try to provide.

**2) Representations from Intel Regarding Which Custodians Will Have Documents Responsive to Each Individual AMD Request**
     You have agreed that the 19 custodians collectively constitutes a "comprehensive" response to AMD's remediation discovery requests. As we discussed on Friday, we need to know who at Intel or its consultants would have the largest volume documents responsive to each request? We would like a date by which Intel can make those representations so that we will know we have received a complete production.

**3) Timeframe for Providing "Documents Sufficient To Show" on Document Requests**
     In Dan Floyd's June 14 draft stipulation on initial remediation discovery, Intel offers to produce "complete written summaries containing the information called for by Request Nos. 5, 8, and 13 of the Initial Remediation Discovery." We would like a date certain for production of those summaries.

**4) Production of "Investigation" Documents**
     In an April 25, 2007 letter from Dan Floyd, Intel represented its counsel "collected documents **relating to Intel's remediation efforts**. The process of collection was custodian based, and involved obtaining documents from 17 people in the legal and IT departments of Intel who were identified to include the key players in the **creation and implementation of the retention plan**. The searches were targeted to retention and remediation issues generally, focused on time frames the individuals were actively involved in the process, generally run through the time period January 2007, but did not involve the type of comprehensive document

collection that the parties have undertaken in the underlying case on the merits.  From those documents, Intel has prepared a subset (encompassing approximately 8 bankers boxes) that are the universe of historical documents for the relevant time period that it used in connection with preparing its report.  In preparing this collection, Intel included every document containing substantive and non-duplicative information.  Intel did not differentiate between those documents reflecting positively on Intel's efforts and those that may not."   We want immediate production of those documents.

**5) Data Runs from First Advantage and OnSite Covering Backup Tape Restoration to Date**
- Total email count for each custodian whose data has been restored, from all backup tapes, by month, post de-duplication against backup tapes, broken down by Sent Items, Inbox, and Deleted Items.
- Total email count for each custodian whose data has been restored from all backup tapes, by month, post de-duplication against backup tapes and the first harvest, broken down by Sent Items, Inbox, and Deleted Items.
- Total email count for each custodian whose data was obtained in the first harvest, by month, broken down by Sent Items, Inbox, and Deleted Items.
- Number of corrupted tapes, time periods for those tapes, and custodians on each tape, if available.
- Start date of weekly backup tapes for each of the 293 custodians whose data has been restored from backup tapes, and any missing or weekly backup tapes for each custodian.
- Schedule for completion of backup tape restoration for remaining 732 custodians.

It should be noted that these data requests are the first of AMD's data requests and would not cover all of the data we are going to want relating to Intel's remediation.  We will still need, at the very least, data relating to Intel's reharvest, the restoration of other Intel custodians, the creation of the global database, the Archive and other sources of relevant custodian data including, but not limited to, the data tallies referenced in AMD's harvest date cut-off proposal.

**6) Production of Intel Consultants Most Knowledgeable about Intel's Remediation Efforts**
As we have proposed previously, we will agree to Intel's Paragraph 7 language (excerpted below) if Intel will agree to produce from the consultants most knowledgeable about the design and implementation of Intel's remediation plan, including but not limited to Adam Pollitt (who Bob indicated was the closest thing to a project manager as to Intel's remediation efforts).  Intel will also produce from any other custodians we identify who AMD believes have documents responsive to AMD's remediation document requests.   AMD shall not request production from more than 5 consultant custodians under this agreement.

**Agreement on Waiver from Dan Floyd's June 14 draft stipulation on initial remediation discovery**: "The parties agree that to avoid potentially lengthy disputes over whether documents constitute work product, or whether Plaintiffs can meet the standards in Rule 26(b)(3) of the Federal Rules of Civil Procedure for the production of certain work product, it is agreed that in producing documents pursuant to this Order, Intel shall not withhold any attorney work product unless it contains the mental impressions, conclusions, opinions, or legal theories of an attorney within the meaning of F.R.C.P. 26(b)(3), and Intel's production of such materials will not be deemed a waiver of any protection applicable to such "opinion work product" under F.R.C.P. 26(b)(3).  However, AMD and Class Plaintiffs fully reserve any and all other rights or grounds to challenge any assertions of privilege or work product protection.  The parties agree that paragraph 35 of the Second Amended Stipulation Regarding Electronic Discovery and Format of Document Production will apply to this production."

**7) Date for Informal Technical Exchange with EED**
     We need dates from you as to when your vendor will be available so we can clear a date with Mr. Friedberg.

This would all be reduced to a stipulation.

Can we discuss tomorrow afternoon?

Thanks.

Bo

JAMES BO PEARL
COUNSEL
O'MELVENY & MYERS LLP
1999 AVENUE OF THE STARS, STE. 700
LOS ANGELES, CA 90067
(310) 246-8434
(310) 246-6779 (FAX)

*This message and any attached documents contain information from the law firm of O'Melveny & Myers LLP that may be confidential and/or privileged. If you are not the intended recipient, you may not read, copy, distribute, or use this information. If you have received this transmission in error, please notify the sender immediately by reply e-mail and then delete this message.*

# EXHIBIT M



# O'MELVENY & MYERS LLP

BEIJING

BRUSSELS

HONG KONG

LONDON

LOS ANGELES

NEWPORT BEACH

1999 Avenue of the Stars
Los Angeles, California 90067-6035

TELEPHONE (310) 553-6700
FACSIMILE (310) 246-6779
www.omm.com

NEW YORK

SAN FRANCISCO

SHANGHAI

SILICON VALLEY

TOKYO

WASHINGTON, D.C.

OUR FILE NUMBER
008.346.163

WRITER'S DIRECT DIAL
310.246.8434

WRITER'S E-MAIL ADDRESS
jpearl@omm.com

July 2, 2007

**VIA EMAIL**

Kay Kochenderfer, Esq.
Gibson, Dunn & Crutcher
333 South Grand Avenue
Los Angeles, California 90071-3197

Re:    *AMD v. Intel*

Dear Kay:

As we discussed last week, we need a timeframe for Intel's production of the data we requested from First Advantage and OnSite. In our first informal technical exchange, First Advantage and OnSite were adamant about their ability to easily generate detailed reports tracking the data recovered from Intel's Complaint Freeze Tapes and Weekly Backup Tapes as well as data from the original harvest. After the informal technical exchange, you indicated a willingness to produce such reports if we told you the type of report we wanted.

Last week, you seemed to backtrack on that promise but you said you would get back to us on whether you would be willing to produce the reports as requested and, if not, if there were any types of reports you would be willing to provide. We have heard no response.

If you are unwilling to provide this data voluntarily, we will serve a subpoena as this information is relevant to the remediation plan and to the ultimate issue of loss. We think this will unnecessarily delay the process but will proceed formally if necessary.

As you recall, this is the data we requested last Tuesday in my email to you, Bob and Dan (which I have attached).

- Total email count for each custodian whose data has been restored, from all backup tapes, by month, post de-duplication against backup tapes, broken down by Sent Items, Inbox, and Deleted Items.

- Total email count for each custodian whose data has been restored from all backup tapes, by month, post de-duplication against backup tapes and the first harvest, broken down by Sent Items, Inbox, and Deleted Items.

O'MELVENY & MYERS LLP

Kay Kochenderfer, Esq., July 2, 2007 - Page 2

- Total email count for each custodian whose data was obtained in the first harvest, by month, broken down by Sent Items, Inbox, and Deleted Items.

- Number of corrupted tapes, time periods for those tapes, and custodians on each tape, if available.

- Start date of weekly backup tapes for each of the 293 custodians whose data has been restored from backup tapes, and any missing weekly backup tapes for each custodian.

- Schedule for completion of backup tape restoration for remaining 732 custodians.

It should be noted that these data requests are the first of AMD's data requests and would not cover all of the data we are going to want relating to Intel's remediation. We will still need, at the very least, data relating to Intel's re-harvest, the restoration of other Intel custodians, the creation of the global database, the Archive and other sources of relevant custodian data including, but not limited to, the data tallies referenced in AMD's harvest date cut-off proposal.

Please let us know by close of business Thursday what Intel's position is on these data requests.

Thanks.

Very truly yours,

James M. Pearl

JMP:deb

| From: | Pearl, James |
|---|---|
| Sent: | Tuesday, June 26, 2007 2:23 PM |
| To: | 'Kochenderfer, Kay E.'; 'Cooper, Robert E.'; 'Floyd, Daniel S.' |
| Cc: | Samuels, Mark; Herron, David; Fowler, Jeffrey |
| Subject: | Follow-Up to Meet & Confer on Intel Remediation Document Production |

Kay, Bob and Dan -- On Friday, we discussed several topics relating to Intel's production of documents and data. Principally, we tried to narrow down Intel's custodian list to ease any Intel burden and expense associated with the remediation document production, while still allowing us to get the documents we need to respond to the remediation plan. As discussed, we need the following information from Intel.

**1) Preliminary Production from the Following Custodians (AMD reserves its rights to request others from Intel's list or others identified during discovery):**
- Malcolm Harkins (Backup Tapes)
- Todd Buelt (EMC Archive)
- Dave Pistone (2007 Reharvest)
- Carolynne Joyce (Revised Policies for Departing Employees)

Based on the information you provided on Friday, we have selected the following custodians who we believe will have a representative sampling of documents on the relevant categories. For these custodians and the other fifteen identified by Intel, Intel was going to provide us how much data existed for each custodian and whether their data was easily accessible. If the data exists in specified archives, we discussed producing from those archives rather than using search terms across the corpus of that custodian's data. We prefer that approach if feasible. We also asked for an IT org chart which Dan said he would try to provide.

**2) Representations from Intel Regarding Which Custodians Will Have Documents Responsive to Each Individual AMD Request**
You have agreed that the 19 custodians collectively constitutes a "comprehensive" response to AMD's remediation discovery requests. As we discussed on Friday, we need to know who at Intel or its consultants would have the largest volume documents responsive to each request? We would like a date by which Intel can make those representations so that we will know we have received a complete production.

**3) Timeframe for Providing "Documents Sufficient To Show" on Document Requests**
In Dan Floyd's June 14 draft stipulation on initial remediation discovery, Intel offers to produce "complete written summaries containing the information called for by Request Nos. 5, 8, and 13 of the Initial Remediation Discovery." We would like a date certain for production of those summaries.

**4) Production of "Investigation" Documents**
In an April 25, 2007 letter from Dan Floyd, Intel represented its counsel "collected documents **relating to Intel's remediation efforts**. The process of collection was custodian based, and involved obtaining documents from 17 people in the legal and IT departments of Intel who were identified to include the key players in the **creation and implementation of the retention plan**. The searches were targeted to retention and remediation issues generally, focused on time frames the individuals were actively involved in the process, generally run through the time period January 2007, but did not involve the type of comprehensive document

collection that the parties have undertaken in the underlying case on the merits. From those documents, Intel has prepared a subset (encompassing approximately 8 bankers boxes) that are the universe of historical documents for the relevant time period that it used in connection with preparing its report. In preparing this collection, Intel included every document containing substantive and non-duplicative information. Intel did not differentiate between those documents reflecting positively on Intel's efforts and those that may not." We want immediate production of those documents.

**5) Data Runs from First Advantage and OnSite Covering Backup Tape Restoration to Date**

- Total email count for each custodian whose data has been restored, from all backup tapes, by month, post de-duplication against backup tapes, broken down by Sent Items, Inbox, and Deleted Items.
- Total email count for each custodian whose data has been restored from all backup tapes, by month, post de-duplication against backup tapes and the first harvest, broken down by Sent Items, Inbox, and Deleted Items.
- Total email count for each custodian whose data was obtained in the first harvest, by month, broken down by Sent Items, Inbox, and Deleted Items.
- Number of corrupted tapes, time periods for those tapes, and custodians on each tape, if available.
- Start date of weekly backup tapes for each of the 293 custodians whose data has been restored from backup tapes, and any missing or weekly backup tapes for each custodian.
- Schedule for completion of backup tape restoration for remaining 732 custodians.

It should be noted that these data requests are the first of AMD's data requests and would not cover all of the data we are going to want relating to Intel's remediation. We will still need, at the very least, data relating to Intel's reharvest, the restoration of other Intel custodians, the creation of the global database, the Archive and other sources of relevant custodian data including, but not limited to, the data tallies referenced in AMD's harvest date cut-off proposal.

**6) Production of Intel Consultants Most Knowledgeable about Intel's Remediation Efforts**

As we have proposed previously, we will agree to Intel's Paragraph 7 language (excerpted below) if Intel will agree to produce from the consultants most knowledgeable about the design and implementation of Intel's remediation plan, including but not limited to Adam Pollitt (who Bob indicated was the closest thing to a project manager as to Intel's remediation efforts). Intel will also produce from any other custodians we identify who AMD believes have documents responsive to AMD's remediation document requests. AMD shall not request production from more than 5 consultant custodians under this agreement.

**Agreement on Waiver from Dan Floyd's June 14 draft stipulation on initial remediation discovery**: "The parties agree that to avoid potentially lengthy disputes over whether documents constitute work product, or whether Plaintiffs can meet the standards in Rule 26(b)(3) of the Federal Rules of Civil Procedure for the production of certain work product, it is agreed that in producing documents pursuant to this Order, Intel shall not withhold any attorney work product unless it contains the mental impressions, conclusions, opinions, or legal theories of an attorney within the meaning of F.R.C.P. 26(b)(3), and Intel's production of such materials will not be deemed a waiver of any protection applicable to such "opinion work product" under F.R.C.P. 26(b)(3). However, AMD and Class Plaintiffs fully reserve any and all other rights or grounds to challenge any assertions of privilege or work product protection. The parties agree that paragraph 35 of the Second Amended Stipulation Regarding Electronic Discovery and Format of Document Production will apply to this production."

**7) Date for Informal Technical Exchange with EED**

      We need dates from you as to when your vendor will be available so we can clear a date with Mr. Friedberg.

This would all be reduced to a stipulation.

Can we discuss tomorrow afternoon?

Thanks.

Bo

JAMES BO PEARL
COUNSEL
O'MELVENY & MYERS LLP
1999 AVENUE OF THE STARS, STE. 700
LOS ANGELES, CA 90067
(310) 246-8434
(310) 246-6779 (FAX)

*This message and any attached documents contain information from the law firm of O'Melveny & Myers LLP that may be confidential and/or privileged. If you are not the intended recipient, you may not read, copy, distribute, or use this information. If you have received this transmission in error, please notify the sender immediately by reply e-mail and then delete this message.*

# EXHIBIT N

# GIBSON, DUNN & CRUTCHER LLP

### LAWYERS

A REGISTERED LIMITED LIABILITY PARTNERSHIP
INCLUDING PROFESSIONAL CORPORATIONS

333 South Grand Avenue  Los Angeles, California 90071-3197
(213) 229-7000
www.gibsondunn.com

KKochenderfer@gibsondunn.com

July 6, 2007

Direct Dial
(213) 229-7712

Fax No.
(213) 229-6712

Client No.
42376-00830

<u>VIA EMAIL</u>

James (Bo) M. Pearl
O'Melveny & Myers LLP
1999 Avenue of the Stars
Los Angeles, CA 90067-6035

Re:    *AMD v. Intel*

Dear Bo:

This is in response to your July 2, 2007 letter requesting information concerning Intel's vendors First Advantage and Onsite.  Addressed below are your specific requests.

**Schedule For Completion of Backup Tapes**

With respect to your question as to the "schedule for completion of backup tape restoration for the remaining 732 custodians," First Advantage has provided a rough estimate of four to six weeks to complete this task.  First Advantage, however, has indicated that it needs a few more days to conduct further analysis in order to provide a more accurate estimate.  As soon as I obtain an updated estimate, I will forward that information to you.

**Start Date Of Weekly Backup Tapes And Information Regarding Missing Tapes**

With respect to your request for the "[s]tart date of weekly backup tapes for each of the 293 custodians whose data has been restored from the backup tapes," that information already has been provided to you in Exhibit F to Intel's April 23, 2007 Report and Proposed Remediation Plan.  Similarly, Intel already has provided you with the requested information concerning "any missing backup tapes for each custodian."  That information was provided in the detailed 80 page "Weekly Backup Tapes" report filed with the Special Master and served on May 23, 2007.

GIBSON, DUNN & CRUTCHER LLP

James M. Pearl
July 6, 2007
Page 2

### Number Of Corrupt Tapes

You have requested information concerning the "number of corrupted tapes, time period for those tapes, and custodians on each tape, if available." Intel will provide you with information from First Advantage and Onsite as to the number of tapes they were unable to read in order to complete the catalog process, which you know from the informal exchange of technical information was a very small percentage of the tapes. Intel expects that it will be able to provide you with this information by the end of next week. As indicated during the information exchange of technical information, since the vendors were unable to read and catalog certain tapes, they also were unable to ascertain the time period for the tapes or identify the custodians, if any, on such tapes.

### Request To Prepare Detailed Reports

You have asked for three detailed reports as follows:

1.      "Total email count for each custodian whose data has been restored, from all backup tapes, by month, post de-duplication against backup tapes, broken down by Sent Items, Inbox, and Deleted Items;"

2.      "Total email count for each custodian whose data has been restored, from all backup tapes, by month, post de-duplication against backup tapes and the first harvest, broken down by Sent Items, Inbox, and Deleted Items;" and

3.      "Total email count for each custodian whose data was obtained in the first harvest, by month, broken down by Sent Items, Inbox, and Deleted Items."

None of these reports already exist, and while the underlying data does exist, it nevertheless will require some time, and a not insignificant expense to prepare them. Moreover, at this point in the overall process of creating the global database, the reports you request would be premature since they could only provide an interim report that does not take into account the entire global data base. Also, the reports do not seem likely to provide detail that would be of any assistance in evaluating Intel's proposed Remediation Plan; rather, they seem to be directed to the next phase of the process – the evaluation of the success achieved by the remediation effort.

In order to prepare the requested reports, they would need to be generated by EED from the global database, which by next week should contain the emails from the complaint freeze tapes, the weekly backup tapes, the pre-2007 harvest materials and the 2007 harvest materials collected to date for the first 293 custodians. Onsite would not be in a position to prepare the reports at all since they were only involved in the cataloging of approximately 2,230 of the over 8,500 tapes and were not involved in the restoration of the emails for any of the custodian data. First Advantage would not be able to prepare the third report with complete information since

# GIBSON, DUNN & CRUTCHER LLP

James M. Pearl
July 6, 2007
Page 3

First Advantage has not processed the harvested materials for all of the custodians from the first harvest.

EED has estimated that it would take approximately four weeks from the date of this letter to prepare the reports and has provided a preliminary cost estimate of $50,000 to generate the reports.[1] If AMD is prepared to pay for the cost of preparing the reports, understanding the time parameters involved and the limited nature of the reports, Intel will instruct EED to commence preparation of the reports.

As you may recall from one of our meet and confer sessions, we anticipate that Intel may incur approximately $20 million in out of pocket expenses in connection with its Remediation Plan as currently proposed. Intel already has incurred approximately $6.6 million in fees alone to outside vendors First Advantage, Onsite and EED in connection with their ongoing work in processing the backup tapes, restoring emails on the backup tapes, processing harvested emails and then loading the resulting email data into the global database. As you know from our informal exchange of technical information, the tapes containing the Exchange server accounts of the first 293 custodians have been restored and it is an ongoing process to restore the backup tapes as to the remaining of the 1,023 custodians, after which the data will need to be loaded into the global database. Intel has retained three vendors who are working extremely hard to process and restore the data as quickly as possible, but given the staggering amounts of data it is a time consuming and expensive process. Until the process is completed, the interim reports you have requested will be incomplete.

In your letter you indicated you plan to serve a subpoena on First Advantage and Onsite if Intel is not willing to provide you with the requested reports. We do not believe this is appropriate for the following two reasons. One, Intel already has agreed to produce existing documents from the First Advantage project manager on this matter, Adam Pollitt, related to his work on processing and restoring the tapes.[2] Second, a subpoena can only be used to compel the production of existing documents, not to compel a third party to create new documents or generate new analyses or reports.

---

[1] First Advantage has provided us with an estimate of a minimum of four weeks to generate the reports and a cost estimate higher than the estimate we received from EED. Furthermore, as indicated earlier, First Advantage has less processed data than EED.

[2] Intel obviously will not be producing all of the emails contained in the backup tapes and harvested materials that First Advantage has been processing and restoring, but rather will produce documents from Adam Pollitt's own documents regarding the process he followed in completing his work on this project.

**GIBSON, DUNN & CRUTCHER LLP**

James M. Pearl
July 6, 2007
Page 4

Finally, I unfortunately need to respond to two inaccuracies in your letter. First, you state that First Advantage and Onsite were "adamant about their ability to easily generate detailed reports. . ." Your characterization of their statements is clearly overstated. As explained in this letter, in order to prepare the requested reports, whether EED or First Advantage prepare the reports, it will take an estimated four weeks and cost at least tens of thousands of dollars. Therefore, while technically possible to generate the reports, it is a very time consuming and expensive project.

Second, you incorrectly claim in your letter that I "seemed to backtrack on a promise" a sentence after stating that I "indicated a willingness" to provide reports if you told me which reports you wanted. During our meeting after the informal exchange of technical information, you asked whether Intel would agree to produce documents from First Advantage and Onsite. This was in the context of AMD raising, for the first time, the request that Intel produce documents from its vendors in addition to documents from some of Intel's IT personnel. At that point Bob Cooper, Tom Dillickrath and I asked you to provide a description of the documents you were seeking so we could evaluate whether Intel would be willing to do so. Contrary to your characterization, no "promise" was made After evaluating your requests, Intel has agreed to produce existing documents from the files of Adam Pollitt of First Advantage, and will instruct EED to prepare the reports you requested in your letter on the condition that AMD bear the cost of such interim reports.

Sincerely,

Kay E. Kochenderfer

KEK/kek

100257352_1 (2).DOC