## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| ADVANCED MICRO DEVICES, INC. and AMD INTERNATIONAL SALES & SERVICE, LTD., | ) ) ) ) | |
| Plaintiffs, | ) ) | |
| v. | ) | C.A. No. 05-441 (JJF) |
| INTEL CORPORATION and INTEL KABUSHIKI KAISHA, | ) ) ) | |
| Defendants. | ) | |

| | | |
|---|---|---|
| IN RE INTEL CORPORATION MICROPROCESSOR ANTITRUST LITIGATION | ) ) ) | C.A. No. 05-MD-1717 (JJF) |

| | | |
|---|---|---|
| PHIL PAUL, on behalf of himself and all others similarly situated, | ) ) ) | C.A. No. 05-485 (JJF) |
| Plaintiffs, | ) ) | CONSOLIDATED ACTION |
| v. | ) ) | |
| INTEL CORPORATION | ) ) | |
| Defendant. | ) ) | |

## REPLY OF INTEL CORPORATION AND INTEL KABUSHIKI KAISHA TO THE RESPONSE OF ADVANCED MICRO DEVICES, INC., AMD INTERNATIONAL SALES & SERVICE, LTD. AND CLASS PLAINTIFFS TO PAGES 30-39 OF INTEL'S PROPOSED REMEDIATION PLAN

OF COUNSEL:
Robert E. Cooper, Esq.
Daniel S. Floyd, Esq.
GIBSON, DUNN & CRUTCHER LLP
333 South Grand Avenue
Los Angeles, CA 90071
(213) 229-7000

Peter E. Moll, Esq.
Darren B. Bernhard, Esq.
Howrey LLP
1299 Pennsylvania Avenue
N.W. Washington, DC 20004
(202) 783-0800

Dated: September 25, 2007

Richard L. Horwitz (#2246)
W. Harding Drane, Jr. (#1023)
POTTER ANDERSON & CORROON LLP
Hercules Plaza, 6th Floor
1313 North Market Street
P.O. Box 951
Wilmington, DE 19899-0951
(302) 984-6000
rhorwitz@potteranderson.com
wdrane@potteranderson.com

*Attorneys for Defendants*
*Intel Corporation and Intel Kabushiki*
*Kaisha*

**TABLE OF CONTENTS**

Page

I.     INTRODUCTION ........................................................................................... 1

II.    INTEL HAS BEEN FORTHRIGHT IN PROVIDING INFORMATION TO
       PLAINTIFFS AND THE COURT REGARDING REMEDIATION............................. 4

III.   INTEL HAS UNDERTAKEN EXTENSIVE STEPS, AT GREAT EXPENSE,
       TO COLLECT, PROCESS AND RESTORE CUSTODIAL EMAIL FROM THE
       REMEDIAL SOURCES ............................................................................... 10

IV.    INTEL WILL PREPARE AND PRODUCE APPROPRIATE REPORTS
       WITHIN A REASONABLE PERIOD OF TIME AFTER THE GLOBAL
       DATABASE HAS BEEN COMPLETELY LOADED AND THE REMEDIAL
       PRODUCTION HAS BEEN COMPLETED ..................................................... 14

V.     PLAINTIFFS' ALLEGATIONS OF EXTENSIVE DATA LOSS ARE BASED
       ON SPECULATION AND ASSUME AN INABILITY TO REMEDIATE................ 17

VI.    PLAINTIFFS' ALLEGATIONS REGARDING AUTO-DELETE ARE
       PREMATURE AND WRONG ...................................................................... 21

VII.   CONCLUSION ......................................................................................... 24

# TABLE OF AUTHORITIES

## STATUTES AND RULES

Page

Fed. R. Civ. P. 37(f) ............................................................................................................ 4, 22

Intel Corporation and Intel Kabushiki Kaisha ("Intel") hereby submit their Reply to the Response of Advanced Micro Devices, Inc., AMD International Sales & Service, Ltd. and Class Plaintiffs (collectively, "Plaintiffs") to pages 30-39 of Intel's Report and Proposed Remediation Plan.

## I.    INTRODUCTION

As confirmed in the last telephonic hearing, Plaintiffs have conceded that the document remediation plan Intel voluntarily created and promptly, months ago, began to implement is the right plan and that Intel is doing everything that can be done to remediate.[1]  In essence, Plaintiffs ask that Intel be ordered to continue to do what it already is doing:  "AMD and Class Plaintiffs respectfully urge that Intel be ordered to complete the remediation as proposed in the Remediation Plan. . . ." (Response, p. 22)  Intel has no objection to such an order, and in fact, has already begun the production of remedial documents.[2]

Plaintiffs also ask that Intel be ordered to account to them, by preparing seven specific reports, with regard to the status of its remediation efforts. (Response, pp. 21, 22)  Intel does not object to detailed remediation reporting, and, indeed, has always expected it would report to Plaintiffs, the Special Master, and the Court concerning its remediation efforts.  However, those

---

[1]  After stating that Intel is already doing everything that can reasonably be done to remediate any data loss in this case (Response, p. 10), Plaintiffs shift gears and argue that there are a few more things that Intel could be doing, or could have done. (Response, p. 19)  However, Intel either took those steps, considered them and determined they were not useful, or could not do them because they were impossible to do (such as reading unreadable tapes).  Furthermore, on the record during the September 20, 2007 telephonic hearing, Plaintiffs conceded they are not requesting that Intel take any additional remedial steps.

[2]  Plaintiffs also requested that the Court order Intel to produce all remediation documents by December 31, 2007 (Response, p. 20), but, since that request, the parties have entered into a comprehensive agreement that settles the date for such production, with some agreed upon exceptions, as February 15, 2008.  Thus, that issue is now moot.  Intel already has made an initial production of remedial documents, and will continue to produce such documents on a rolling basis until the process is completed.

reports must be reasonable in scope, designed to contain information relevant to remediation, and must be timely - i.e., made after the Intel remediation database has been completely loaded, the production of remediation materials has been completed, and the results are known. The seven reports proposed by Plaintiffs, for reasons stated below (*infra* at Section IV), do not meet those conditions.

Furthermore, there are ambiguities in the description of some of the specific requested reports that need clarification, and Intel does not agree that the requested reports can be used to assess the effectiveness of overall remediation. Nevertheless, Intel will make herein an alternative proposal for a set of reports that contain clarifications and modifications to Plaintiffs' requested reports, and is prepared to meet and confer with the Plaintiffs, with the assistance of the Court's neutral expert, to design the exact parameters of appropriate reports for the Court the Special Master and the parties.

While Intel would prefer to simply move on to complete its remediation, Plaintiffs' allegation of "stonewalling" and lack of transparency about the remediation process requires a response. The fact is, as will be shown here, during the remediation phase of this case, Intel has, at great cost, provided a vast amount of information to Plaintiffs. Through both formal and informal procedures, at some times involving only the parties, and at others also involving the Court's neutral expert, Intel has shared extensive data with Plaintiffs - documents, reports, depositions, and informal meetings - concerning the design and execution of its remediation effort. Plaintiffs have not, as they now incorrectly claim, been kept in the dark.[3]

---

[3] The amount of time, effort and expense associated with collecting the information and data for remediation purposes has been extraordinary. Intel expects that it will spend over $20 million (not including attorney and Intel personnel time) to implement its Proposed Remediation Plan. In order to avoid delay, Intel has been

[Footnote continued on next page]

In addition, with apparently nothing much to say about remediation, Plaintiffs have chosen to jump ahead to the next phase of this proceeding[4], attempted to assign fault for data losses they only assume have occurred, and then claim, *before they even know the results of Intel's remediation effort*, that there has been a massive, hundreds of years long, loss of data. Before they see any of the reporting they urge the Court to require, Plaintiffs are prepared to say that Intel's remediation effort is bound to fail.

Intel continues to believe, as it has previously stated, and intends to prove, to the satisfaction of the Court, that its remediation effort will be successful, and that nothing of genuine significance will have been lost. To reach this result, as will be described below, Intel is creating a massive global database, from multiple sources of email, at great cost, which can be efficiently searched to fill in the gaps of any imperfect production from any Intel custodian. Documents which do not exist from one source likely will be found in another. That is the purpose of Intel's remediation work - collecting and restoring email data from backup tapes, harvested materials, and other sources to find all copies of relevant emails. The results of this effort cannot, and should not, be prejudged.

Finally, again jumping ahead to fault, Plaintiffs' argument that Intel had an inexpensive and effective "silver bullet" available to it - suspending the auto-delete function for email across the entire company at the beginning of this case - is similarly off the mark. Not only is such a

---

[Footnote continued from previous page]

steadfastly and aggressively working towards remediation even during this interim period before the Special Master or the Court has ordered Intel to incur the burden outlined in the Plan. Intel's ultimate document production in this case will be among the largest, if not the largest, in the history of litigation. Yet the number of pages of documents that ultimately will be used at trial is likely to be far less than one-hundredth of one percent of the volume produced during discovery.

[4]   In the June 20, 2007 Stipulation and Order Bifurcating Discovery into Intel's Evidence Preservation Issues, the Court ordered that the parties deal only with remediation in the first phase of this proceeding, leaving any issue of fault to be resolved only after the remediation plan had been set.

3

step explicitly not required by Rule 37(f) of the Federal Rules of Civil Procedure, but, as described below (*infra* at Section VI), turning off the auto-delete feature for all Exchange mailboxes posed an unacceptable risk to business continuity, business performance and the relevant servers over time. Instead, Intel put in place a preservation plan designed to retain relevant materials in multiple locations, and believes, at the end of the remediation process, that will prove to have been the right approach.

## II.    INTEL HAS BEEN FORTHRIGHT IN PROVIDING INFORMATION TO PLAINTIFFS AND THE COURT REGARDING REMEDIATION

Plaintiffs' allegation of "stonewalling" and "delay" in providing information during the remediation process is disingenuous, as shown by the ongoing and extensive nature of information flow from Intel to Plaintiffs. Indeed, if Plaintiffs had truly believed that Intel was denying them essential information about remediation, they had multiple opportunities to file a motion with the Special Master, yet chose not to do so, further undercutting their newly minted "stonewalling" claim.[5]

The information provided to Plaintiffs includes the production of over a half a million pages of documents related to remediation issues, approximately 400 pages of written descriptions regarding the retention practices of over 1,000 Intel custodians,[6] detailed

---

[5]   Although Plaintiffs complain in their Response about Intel's privilege assertions, Plaintiffs are not entitled to Intel's privileged communications as a matter of law.

[6]   Intel has interviewed all currently employed custodians (with one exception which is being scheduled) regarding their individual retention practices, and has provided Plaintiffs, the Special Master and the Court with a detailed written description of the information provided by each custodian during the interviews. In the written descriptions provided to date, Intel also has provided the following information regarding the preservation of data with respect to each of the currently and formerly employed custodians: (1) whether Intel has a Complaint Freeze Tape that contains that custodian's email data; (2) whether Intel has Weekly Backup Tapes that contain that custodian's email data, and if so, for what time period; and (3) whether Intel has

[Footnote continued on next page]

information regarding thousands of back-up tapes covering a period of approximately 72 weeks, informal technical exchanges with three Intel vendors working on the remediation, detailed information about Intel's IT system, a full day 30(b)(6) deposition regarding remediation issues (followed by detailed supplementation intended to provide further information on the topics covered), detailed information regarding the journaling and archive system used by Intel, and updates on the progress of searching for, collecting and processing over 60 million emails[7] from multiple media sources for over 1,000 custodians across the world for purposes of loading the de-duplicated set into the global database for implementation of Intel's Proposed Remediation Plan.[8] All of this discovery, formal and informal, was conducted through a series of meet and confers, with all parties working diligently.

Furthermore, Plaintiffs' allegation that Intel waited until the end of the remediation discovery process to provide them with significant information is similarly incorrect. Set forth below is a chronology showing Intel's activities in providing information to Plaintiffs during the remediation process:

- 02/08/07: Intel advised AMD that it had discovered some document retention lapses.[9]
- 02/22/07: Intel conducted an in person meeting with counsel for AMD during which

---

[Footnote continued from previous page]
harvested the email data for that custodian, and if so, on what date or dates. Intel is in the process of making its bests efforts to contact and interview former Intel custodians regarding their individual retention practices before they left Intel's employ. (Some former Intel custodians, however, left Intel prior to the filing of the complaint and therefore would not have any individual retention obligations.)

[7]  There are over 155 million "Email Items" that have been processed, which include emails, attachments, calendar items, tasks, notes, contacts, journal entries and other Microsoft Outlook items.

[8]  Once the de-duplicated set of emails are loaded into the global database, a relevance and privilege review will be conducted and Intel will make a remedial production of the non-duplicative, relevant, non-privileged materials as set forth in Intel's Proposed Remediation Plan. *See infra* at n.28.

[9]  Plaintiffs' Response, p. 3.

Intel provided more detailed information regarding retention issues, including a spreadsheet of preliminary information regarding the retention practices of 239 custodians and whether Intel had weekly back-up tapes for such custodians.[10]

- <u>03/05/07</u>: Intel filed and served a letter advising the Court of document retention lapses Intel had discovered.[11]

- <u>03/07/07</u>: A hearing was held before Judge Farnan, and a hearing was held later the same day before Special Master Poppiti.

- <u>03/16/07</u>: Intel provided plaintiffs with a list of custodians who first received a litigation hold notice in 2007, a list of custodians who left Intel after the filing of the lawsuit and did not receive a notice before they left, and a list of some of the Intel custodians who were not migrated in 2005 to specified servers.[12]

- <u>03/20/07</u>: Intel provided plaintiffs with information regarding the journaling and archive system used by Intel.[13]

- <u>03/28/07</u>: Intel provided plaintiffs with additional information regarding the journaling and archive system.[14]

- <u>03/29/07</u>: Intel provided plaintiffs with its best approximation of the date on which each of 93 specific custodians was migrated to specified servers.[15]

- <u>04/23/07</u>: Intel filed and served its Report and proposed Remediation Plan, which included accompanying exhibits providing the following information: (1) for each of the 1023 custodians, the first date on which Intel has a Weekly Backup Tape containing that custodian's email data; (2) for each of the 1023 custodians, whether Intel has a Complaint Freeze Tape containing that custodian's email data; (3) for each of the 1023 custodians, whether Intel had harvested the email data for that custodian, and if so, on what date or dates; (4) the employment status (active or terminated) of each of the 1,023 custodians; (5) for each of the 1,023 custodians, Intel's best approximation of the date each was

---

[10]  Exhibit D attached to Plaintiffs' Response.

[11]  Intel's March 5, 2007 letter brief to Judge Farnan.

[12]  Letter from Robert Cooper to Charles Diamond and Daniel Small dated March 16, 2007.

[13]  Letter from Robert Cooper to Charles Diamond and Daniel Small dated March 20, 2007.

[14]  Letter from Robert Cooper to Mark Samuels dated March 28, 2007.

[15]  Letter from Kay Kochenderfer to Mark Samuels and Daniel Small dated March 29, 2007.

migrated to specified servers; (6) an accounting of the first eight weeks of Weekly Backup Tapes for 121 custodians; (7) a detailed written description of the individual retention practices for each of the 239 custodians initially designated by the parties; and (8) a list of the Intel custodians who first received a litigation hold notice in 2007, and the specific date each custodian received such notice.

- <u>04/27/07</u>: Intel filed and served written descriptions regarding the retention practices of over 100 custodians. (Written descriptions regarding additional Intel custodians were prepared, filed and served on a rolling basis thereafter.)

- <u>05/11/07</u>: Intel filed and served written descriptions regarding the retention practices of an additional set of Intel custodians.

- <u>05/18/07</u>: Intel filed and served written descriptions regarding the retention practices of an additional set of Intel custodians.

- <u>05/23/07</u>: Intel filed and served a detailed 80 page "Weekly Backup Tapes" report that provided an accounting on a week-by-week basis for approximately 72 weeks for each of the 1,023 custodians separately as to whether Intel has a weekly back-up tape for each custodian for each week.

- <u>05/25/07</u>: Intel filed and served written descriptions regarding the retention practices of an additional set of Intel custodians.

- <u>06/01107</u>: Intel filed and served written descriptions regarding the retention practices of an additional set of Intel custodians.

- <u>06/08/07</u>: Intel filed and served written descriptions regarding the retention practices of an additional set of Intel custodians. (And a revised version of the 05/25/07 submission.)

- <u>06/15107</u>: Intel filed and served written descriptions regarding the retention practices of an additional set of Intel custodians.

- <u>06/18/07</u>: Intel provided plaintiffs with information about the type of work being performed by its three vendors on remediation issues (First Advantage, Onsite and Electronic Evidence Discovery).[16]

- <u>06/20/07</u>: Intel voluntarily agreed to an informal technical exchange during which plaintiffs' counsel and their expert were able to ask questions to Intel's vendors First Advantage and Onsite regarding their work on the remediation.

- <u>06/22/07</u>: Intel filed and served written descriptions regarding the retention practices of

---

[16] Email from Kay Kochenderfer to Mark Samuels dated June 18, 2007.

an additional set of Intel custodians.

- 06/26/07: Intel provided plaintiffs with information regarding the design of Intel's Proposed Remediation Plan.[17]

- 06/29/07: Intel produced Malcolm Harkins to testify as its 30(b)(6) witness regarding aspects of Intel's remediation.

- 06/29/07: Intel filed and served written descriptions regarding the retention practices of an additional set of Intel custodians.

- 07/06/07: Intel provided plaintiffs with an estimated schedule for completion of back up tape restoration, weekly back-up tape information and report capability information.[18]

- 07/06/07: Intel filed and served written descriptions regarding the retention practices of an additional set of Intel custodians.

- 07/13/07: Intel provided plaintiffs with a detailed status report on the work being performed by Electronic Evidence Discovery in connection with Intel's proposed Remediation Plan, and produced a list of the back-up tapes that Intel's vendors were unable to read out of the approximately 8,500 back-up tapes collected.[19]

- 07/13/07: Intel filed and served written descriptions regarding the retention practices of an additional set of Intel custodians.

- 07/16/07: Intel voluntarily agreed to an informal technical exchange during which plaintiffs' counsel and their expert were able to ask questions to Intel's vendor Electronic Evidence Discovery regarding their work on the remediation.

- 07/18/07: Intel provided plaintiffs with a response to their inquiry about the de-duplication protocols followed by vendors Electronic Evidence Discovery and First Advantage.[20]

- 07/20/07: Intel produced documents regarding remediation issues, and continued to produce documents thereafter on a rolling basis.

---

[17]  Letter from Robert Cooper to Mark Samuels and Brent Landau dated June 26, 2007, Exhibit B to Plaintiffs' Response.

[18]  Letter from Kay Kochenderfer to James Pearl dated July 6, 2007.

[19]  Letter from Kay Kochenderfer to James Pearl dated July 13, 2007.

[20]  Email from Tom Dillickrath to James Pearl dated July 18, 2007.

- 07/20/07: Intel filed and served written descriptions regarding the retention practices of an additional set of Intel custodians.

- 07/23/07: Intel provided plaintiffs with a response to their inquiry regarding backup tapes.[21]

- 07/27/07: Intel produced an additional set of documents regarding remediation issues.

- 07/27/07: Intel filed and served written descriptions regarding the retention practices of an additional set of Intel custodians.

- 08/03/07: Intel provided plaintiffs with: (a) a written summary of identifying individuals involved in the design of Intel's Remediation Plan; (b) a written summary of the expenses that Intel has incurred and expects to incur in connection with executing its proposed Remediation Plan; and (c) a written summary of the protocols and other information regarding the re-harvesting of data from currently employed Intel custodians.[22]

- 08/03/07: Intel filed and served written descriptions regarding the retention practices of an additional set of Intel custodians.

- 08/04/07: Intel produced an additional set of documents regarding remediation issues.

- 08/07/07: Intel produced additional documents regarding remediation issues, including documents from Intel's vendor First Advantage.

- 08/10/07: Intel produced an additional set of documents regarding remediation issues.

- 08/10/07: Intel filed and served written descriptions regarding the retention practices of an additional set of Intel custodians.

- 08/15/07: Intel provided plaintiffs with supplemental information in connection with specific questions asked during the 30(b)(6) deposition of Malcolm Harkins.

- 08/17/07: Intel filed and served written descriptions regarding the retention practices of an additional set of Intel custodians.

- 08/20/07: Intel provided plaintiffs with further information regarding the reharvesting process.[23]

---

[21]  Email from Tom Dillickrath to James Pearl dated July 23, 2007.

[22]  Letter from Kay Kochenderfer to James Pearl dated August 3, 2007, Exhibit B to Plaintiffs' Response.

[23]  Letter from Kay Kochenderfer to James Pearl dated August 20, 2007.

- <u>08/22/07</u>: Intel produced to plaintiffs an exemplar of Intel's July 1, 2005 litigation hold notice.[24]

- <u>08/24/07</u>: Intel provided plaintiffs with response to inquiry regarding back-up tapes.[25]

- <u>8/30/07</u>: Intel produced to plaintiffs documents from its set of Investigation Documents.

- <u>8/31/07</u>: Intel produced to plaintiffs additional remediation related documents.

- <u>8/31/07</u>: Intel provided to plaintiffs a list of each of the dates on which the materials for each of approximately 880 currently employed Intel custodians were re-harvested, and a list of the date(s) on which the hard drive was harvested or captured, if so, for former Intel employees.[26]

- <u>09/07/07</u>: Intel filed and served written descriptions regarding the retention practices of an additional set of Intel custodians.

As the above description makes clear, contrary to Plaintiff's assertion that they were

". . . stonewalled in their efforts to understand the full magnitude of Intel's 'lapses,' and to assess

the efficacy of Intel's Remediation Plan" (Response, p. 2), they were provided extensive, regular

and detailed information about what Intel was doing, and after reviewing it, could think of

nothing to ask the Special Master or the Court to order Intel to do for remediation that it was not

already doing.

## III.    INTEL HAS UNDERTAKEN EXTENSIVE STEPS, AT GREAT EXPENSE, TO COLLECT, PROCESS AND RESTORE CUSTODIAL EMAIL FROM THE REMEDIAL SOURCES

Intel has engaged in an exhaustive search for email data from available sources for

remediation purposes.  To date, Intel has searched for, collected and processed over 60 million

---

[24]  Letter from Kay Kochenderfer to James Pearl dated August 22, 2007.

[25]  Letter from Kay Kochenderfer to James Pearl dated August 24, 2007.

[26]  Letter from Kay Kochenderfer to James Pearl dated August 31, 2007.

emails from multiple media sources for over 1,000 custodians across the world. These emails are in the process of being de-duplicated and then loaded into a global database, which will be used for purposes of making emails available for remedial document productions. Intel expects that the "out of pocket costs" it will incur in connection with the implementation of its Proposed Remediation Plan will exceed $20 million.[27]

Set forth below is a description of the extensive steps that Intel has undertaken to date to collect, process and restore emails from the thousands of Complaint Freeze Tapes and Weekly Backup Tapes, and the voluminous materials collected from custodians during the Harvest 1 and Harvest 2 process. Intel has devoted enormous resources to this project, both in terms of human labor and expense.

Shortly after the discovery of retention lapses by some individual Intel custodians, Intel commenced the process of collecting the thousands of Complaint Freeze Tapes and Weekly Backup Tapes from multiple Intel sites across the world. Intel also has been engaged in the process of harvesting and re-harvesting electronic documents (Harvest 2 materials) of currently employed custodians on Intel's Custodian List. The materials of approximately 882 custodians, located in 43 different countries on six different continents, and 22 states within the United States, are being collected during the Harvest 2 process.

In order to index and restore the email data from the Exchange environment of the Intel custodians on the thousands of preserved and collected Complaint Freeze Tapes and Weekly

---

[27] Intel's remediation effort is gathering extensive information for all of the 1023 custodians on the June 1, 2006 Custodian List, even though the parties have agreed that such information will be produced for only 376, or about a third, of them. See paragraph 2 of the Stipulated Case Management Order #3. This enormous effort, which, in the end, will far exceed Intel's actual obligations to produce, further demonstrates that Intel's extraordinary efforts with respect to the remediation process.

Backup Tapes, Intel retained two vendors – First Advantage and Onsite. Given the massive volume of data involved, this has been a time-consuming and expensive process. There are two fundamental steps in this initial work performed by First Advantage and Onsite. The first step, which has been completed, involves indexing or cataloging each of the tapes to determine which tapes contain Exchange data, and then to determine which individual Intel Custodians' data exists on those tapes. The second step (which is near completion and is being done by First Advantage) involves restoring the email data and performing mailbox extractions for Intel Custodians.

Intel has retained a third vendor – Electronic Evidence Discovery ("EED") – to create a global database for remediation purposes that will contain the email data for each of the 1,023 Intel Custodians that has been collected and restored from the Complaint Freeze Tapes and Weekly Backup Tapes, and from the Harvest 1 and Harvest 2 process. To date, EED has processed over 11 terabytes of email item data from each of the key four remedial sources, which is the equivalent of over 60 million emails. Once the emails are processed, EED will perform a de-duplication procedure, and load the de-duplicated set of custodial email into the global database. The global database will be used for purposes of making emails available for remedial document productions[28] and for purposes of reporting and analytics on the remediation process.

---

[28] As stated in Intel's Report and Proposed Remediation Plan, Intel will produce the following remedial materials: (1) For the 217 custodians on Intel's Party Designated Production Custodian list, Intel will produce responsive, non-privileged and non-duplicative documents through June 1, 2006, from all available data sources for that Custodian (Complaint Freeze Tapes, Weekly Backup Tapes, and harvests); (2) For all custodians that plaintiffs identify on the Adverse Party-Designated Production Lists, Intel will produce documents through March 1, 2007, from all available data sources for that custodian (Complaint Freeze Tapes, Weekly BackUp Tapes and harvests); and (3) From the global database, Intel will search for any document sent from, or to (including cc and bcc), any Party Designated Custodian or Adverse Party Designated Custodian -- and Intel will produce any responsive, non-privileged and non-duplicative material for these custodians located by the searches. The date

[Footnote continued on next page]

EED has devoted vast resources to this project. For example, EED has devoted approximately 300 to 350 man hours per week over the course of the last several months for the work done in connection with creating the global database and loading custodian email data into the global database.

In addition to pursuing the steps that Intel originally suggested in its Proposed Remediation Plan, Intel sought Plaintiffs' input during the process.[29]  As a result, Intel voluntarily agreed to undertake an additional step once a potential issue was brought to Intel's attention during one of the informal technical exchanges between Intel's vendors and Plaintiffs' counsel and expert. This step involved processing tapes for an additional time period.[30]

By any measure, Intel has engaged in extraordinary efforts to search for, collect, restore and process potential remedial email data for purposes of executing its Proposed Remediation Plan, as expeditiously and completely as possible.

---

[Footnote continued from previous page]
cutoff for any such supplementation would be June 1, 2006, for Party Designated Custodians, and March 1, 2007, for Adverse Party Designated custodians.

[29] Letter from Kay Kochenderfer to James Pearl, dated July 13, 2007. ("As we have indicated before, we are interested in your ongoing thoughts on the Remediation Plan so we can address them.")

[30] Letter from Kay Kochenderfer to James Pearl, dated July 13, 2007. ("One issue, for example, that was pointed out during the informal technical exchange with First Advantage and Onsite was the fact that the vendors performed a date search on the backup tapes they received and included tapes from June 23 to July 7, 2005 ("complaint freeze tapes") and from November 2005 to March 2007 ("weekly backup tapes") in their subsequent work. We have asked our vendors to go ahead and process the tapes in the interim period of July 8, 2005 through October 31, 2005 and include any custodian Exchange email data from those tapes in the global database.")

## IV.    INTEL WILL PREPARE AND PRODUCE APPROPRIATE REPORTS WITHIN A REASONABLE PERIOD OF TIME AFTER THE GLOBAL DATABASE HAS BEEN COMPLETELY LOADED AND THE REMEDIAL PRODUCTION HAS BEEN COMPLETED

Plaintiffs have requested that Intel prepare and produce seven specific reports in connection with its production of documents. While Intel does not agree that the requested reports can be used to assess the effectiveness of overall remediation, and Intel will be designing and preparing its own reports to assess remediation, Intel has no objection in principle with providing Plaintiffs with certain reports within a reasonable period of time after the global database has been completely loaded, and after the production of remedial materials has been completed. Until all such data is loaded and the remedial production has been made, any reports would be premature and inaccurate. Plaintiffs acknowledged this during the last telephonic hearing, as evidenced by the exchange below:

> MR. COOPER [Counsel for Intel]: . . . Obviously, these reports will become something that can be created as a practical matter, in our view, after the remediation has been completed, that is, after we have pull[ed] together the complete global database and then managed to pull from that global database that which will be used to remediate the report for the individual custodians who are at issue.

> MR. SAMUELS [Counsel for AMD]: Your honor, this is Mark Samuels. I think that makes a lot of sense. A lot of this data really can't be generated until the remediation has been -- until all the remedial data has been produced.[31]

Furthermore, in light of the heightened urgency expressed by Plaintiffs in having the remedial production of documents completed by February 15, 2008, Intel must make sure that its

---

[31]  *See* Transcript of September 20, 2007 Special Master Conference, at 14:22-15:11.

14

resources, and the resources of its vendors, are focused on completing the remedial production and not be diverted until that process is finished.

As to the reports requested by Plaintiffs, there is ambiguity in the description of some the reports that need clarification, and one of the requested reports (number 5) appears to seek information regarding non-remedial data. Intel objects to report number 5 and has set forth its position below as to how each of the remaining requested reports should be clarified:

**Intel's Proposed Reports**

1a.[32]    Total email count for each Designated Custodian[33] whose data has been restored from Complaint Freeze Tapes, by month,[34] that are uniquely on the Complaint Freeze Tapes compared against Harvest 1 materials.[35]

1b.    Total email count for each Designated Custodian whose data has been restored from Weekly Backup Tapes, by month, that are uniquely on the Weekly Backup Tapes compared against Harvest 1 materials.

---

[32]  The numbering of the Proposed Reports is intended to track the numbering of AMD's requested reports.

[33]  "Designated Custodian" refers to Party-Designated Custodians, Adverse-Designated Custodians and Free Throw custodians as those terms are defined in the May 2006 Stipulation and Proposed Order Regarding Document Production.

[34]  Intel interprets "by month" in reports one through six to mean the date that an email was sent or received.

[35]  One common problem with reports one through six is that they request statistics broken down by "Archived Items," "Sent Items," "Inbox," and "Deleted Items." As custodians have the ability to save email under different naming conventions, comparisons using the requested breakdown will not be consistent or accurate, and do not speak to remediation. For example, when Custodian A sends an email to Custodian B, the email will reside in Custodian A's "Sent Items" (or any other location where Custodian A chooses to save it) and in Custodian B's "Inbox" (or any other location where Custodian B chooses to save it). Therefore, an analysis broken down by email storage location as proposed by Plaintiffs would be like comparing apples and oranges, and would be misleading.

2a.    Total email count for each Designated Custodian whose data has been restored from the files of other Intel custodians, by month, that are uniquely on the Complaint Freeze Tapes compared against the Harvest 1 materials of all custodians.

2b.    Total email count for each Designated Custodian whose data has been restored from the files of other Intel custodians, by month, that are uniquely on the Weekly Back Tapes compared against the Harvest 1 materials of all custodians.

3.    Total email count for each Designated Custodian whose data was obtained in the First Harvest, by month.

4.    Total email count for each Designated Custodian whose data was obtained in the Harvest 2 process.

5.    Intel objects to the preparation of report number 5 proposed by Plaintiffs. This proposed report seeks information regarding email counts in the EMC Archive,[36] which is not remedial data and is not included in the global database. The email in the EMC Archive is not remedial because the Archive was designed to capture all of the custodians' Exchange email transmissions to and from the custodians as of the date the custodians were put on the Exchange journaling system, which was by March 2007 for all custodians (and no earlier than December 2006 for some custodians).[37]  There is no need for remediation within the Archive data set on a forward going basis, and the

---

[36]  Intel has implemented an industry leading e-mail archive system by EMC. The system is composed of several inter-related components of EMC's e-mail archiving solution including EmailXtender, DiskXtender and Centera (collectively the "Archive"). The Archive is designed to capture all of the currently employed 1,023 custodians' Exchange e-mail transmissions to and from any custodian-owned mailbox as of the date such mailbox was put on the Exchange journaling system.

[37]  The Archive is not configured to captured system generated email, e.g., an internal notice that an email was delayed.

Archive was not populated with legacy email that could be used to remediate data sets on an historical basis. Furthermore, since the EMC Archive materials do not exist in the global database, the requested de-duplication process is not feasible.

      6.    Total unique email count from all remedial sources (Complaint Freeze Tapes, Weekly Backup Tapes, Harvest 1 and Harvest 2) for each Designated Custodian.

      7.    List and description of all corrupted .pst files.

While Intel believes that the reports described above accomplish what Plaintiffs are requesting in terms of information, as discussed in the most recent telephone hearing, Intel is prepared to engage in a meet and confer process with Plaintiffs' counsel and experts, utilizing the assistance of the Court's neutral expert, to further discuss the specific parameters of appropriate reports. Furthermore, the proposed reports above are solely for the purpose of attempting to provide Plaintiffs with the types of information they appear to be seeking. Intel will be preparing its own reports, not listed above, for the purpose of assessing remediation, and the final versions of such reports will also be provided to the Court and Plaintiffs.

## V.    PLAINTIFFS' ALLEGATIONS OF EXTENSIVE DATA LOSS ARE BASED ON SPECULATION AND ASSUME AN INABILITY TO REMEDIATE

Plaintiffs' allegations of extensive data loss ignore remedial data, are based upon speculation, and disregard the custodian based approach to which the parties agreed. Because plaintiffs have agreed to Intel's Remediation Plan, their speculation as to any alleged loss of data is simply premature. Nonetheless, Intel will briefly address some of plaintiffs' points in order to illustrate the speculative nature of their assertions.

Plaintiffs presume that there is a substantial data loss while seemingly ignoring the simple concept that something is not lost merely because one person may not have received a

litigation hold notice or preserved a particular email.  Consequently, Plaintiffs' claim that Intel has lost more than 220 years worth of data is mere unsubstantiated hyperbole.[38]  Plaintiffs reach this conclusion by focusing on the 378 individuals, who due to an unintentional oversight, did not receive litigation hold notices until February or March of 2007 and claim that "there is no reason to believe that any" of these custodians "would have taken regular, affirmative steps" to preserve electronic data.

Plaintiffs focus on these 378 custodians without acknowledging most of these custodians have limited relevance to the action based on their job responsibilities and the geographies in which they are located.  In fact, more than three-fourths of the custodians who did not receive a timely litigation hold notice were located outside the United States and are unlikely to have significant relevance to the US litigation.  By agreement, AMD has limited the number of custodians it can select for document production purposes, and as a result, will likely not select a large portion of these custodians.  Furthermore, to date, AMD has only selected a handful of these custodians as adverse designees, which is consistent with their concession that these custodians would only comprise a "distinct minority of the entire custodian populations."[39]  Consequently, throwing out statistics without identifying the relevant custodian group at issue simply skews the reality of the massive amount of information Intel has maintained.

Plaintiffs also ignore information Intel has provided about these custodians.  Intel employees regularly preserve business data by moving email from their Inbox to designated folders as part of their regular business practices.  By doing this, the employees avoid losing the

---

[38]  Indeed, the overblown and sensational nature of this contention makes Intel wonder to whom it was addressed. Not surprisingly it was this commentary that the media reported.

[39]  Letter from Charles Diamond to Robert Cooper, dated August 30, 2007, at 3.

emails by virtue of any auto-deletion process since once the emails are in folders they are not subject to auto-delete. The custodian summaries Intel served indicated that out of the 316 of the 378[40] custodians who received notice for the first time in 2007, more than 35% of them stated they were saving electronic data consistent with the litigation hold notice. Even though these custodians had not previously seen the notice, their retention practices in the normal course of their business was to retain the types of emails that, in hindsight, would be covered by the litigation hold notice. Furthermore, more than an additional 25% of these custodians indicated they were saving documents for business needs or were saving relevant documents but could not confirm that they maintained all documents within the scope of the litigation hold notice. Another 10% of these custodians indicated they were saving their inbox email, but may not have regularly preserved their sent items. Thus, despite plaintiffs' assumptions to the contrary, more than 70% of these custodians were taking "regular, affirmative" steps to preserve electronic data.[41]

Plaintiffs' accusation similarly ignores the fact that there are multiple locations where relevant data may be stored. It is typical to find multiple copies of the same email or email string in a production. The enormous duplication minimizes the risk that anything actually was "lost." After all, data only becomes "lost" if – and only if – an individual did not preserve an email (or email string), the email was not captured on the Complaint Freeze Tapes or Weekly Backup Tapes for that custodian, the email was not captured when that custodian's computer was

---

[40] The balance of the 378 custodians are former employees.

[41] By agreement, AMD can only select up to 376 of the 1,023 Intel custodians – just over a third of the total number of custodians on the June 1, 2006 Custodian List. *See* paragraph 2 of the Stipulated Case Management Order #3.

harvested either during the Harvest 1 or Harvest 2 process, and none of the other custodian-recipients maintained a copy of that email, had a copy of that email on their Complaint Freeze Tapes or Weekly Backup Tapes or in their Harvest 1 or Harvest 2 materials. While Plaintiffs blithely assume "loss" occurred for hundreds of custodians and thousands of emails, obviously this is not the case in the real world.

For example, Plaintiffs claim that 148 of Intel's designated custodians identified a "retention issue."[42] While Intel does not necessarily agree with plaintiffs' assertion of 148 custodians as reporting a retention issue, even assuming that were the case, Plaintiffs ignore that approximately 70 of the custodians who identified a retention issue were placed on Weekly Backup Tapes in November 2005 and approximately another 14 were placed on Weekly Backup Tapes in July 2006.[43] Similarly Plaintiffs claim that nearly 87 designated custodians did not have a Weekly Backup Tape prior to 2007 or a Complaint Freeze Tape,[44] but ignore that approximately 20 of these individuals indicated they had preserved electronic data consistent with the litigation hold notice. In reality, even beyond the Weekly Backup Tapes and Complaint Freeze Tapes of the custodians themselves, there will be a massive duplication in what is preserved because of the practice of Intel employees to copy multiple recipients on important communications, including communications with third-parties.[45] Thus, while Plaintiffs can mix

---

[42]  Plaintiffs' Response at 8.

[43]  The custodians placed on Weekly Backup Tapes in November 2005 include Messrs. Otellini, Barrett, and Maloney, all of whom also had their computers harvested in July 2005.

[44]  Again Intel does not agree with plaintiffs' assertions of 87 designated custodians.

[45]  Coupled with the total disregard of remedial data sources, plaintiffs also ignore the variations in the type of retention issues, which include what plaintiffs themselves describe as "common and accidental inconsequential

[Footnote continued on next page]

and match numbers and make assumptions about alleged data loss, any attempt to quantify potential loss of data, if any, at this point in the remediation process is simply speculative.

Finally, Plaintiffs' repeated complaints of data loss are also disingenuous in light of the scope of the litigation and document production to date, including their own admissions that most documents are not relevant, and "will never see the light of day."[46]  To date, Intel has already produced the electronic equivalent of over 40 million pages of documents, and expects to be producing millions more.  In light of the enormous amount of data that exists, the parties recently entered a Stipulation to limit and expedite the document production, limit the number of adverse-designated custodians, and limit the number of documents that each party could identify and process for ultimate use as an exhibit in the litigation.[47]  Plaintiffs cannot complain, on one hand, there is too much data to review and that the parties "risk drowning [them]selves in useless volumes of materials"[48] and, on the other hand, argue that there are hundreds of years in allegedly lost data that is essential to their prosecution of this action.

## VI.    PLAINTIFFS' ALLEGATIONS REGARDING AUTO-DELETE ARE PREMATURE AND WRONG

Plaintiffs' allegations regarding Intel's auto-delete protocols, if they are relevant at all, go the issue of fault, and thus, at this stage, are premature.  If they are raised later in this proceeding,

---

[Footnote continued from previous page]
losses of electronic evidence that often occur in litigation, despite reasonable preservation efforts."  Plaintiffs' Response at 2.

[46]  Letter from Charles Diamond to Robert Cooper, dated July 25.

[47]  Stipulated Case Management Order #3.

[48]  Letter from Charles P. Diamond to Robert E. Cooper, dated July 25, 2007, at 1.

Intel will deal with them at that time. Suffice it to say here that what Plaintiffs say about auto-delete ignores a number of relevant facts, which Intel will touch on briefly.

Like many companies, Intel's email system routinely purges emails remaining in the mailbox after they have "aged" a certain period of time. Aging does not apply to emails moved to a person's hard drive or personal folders. The system is common in large companies to maintain the efficient functioning of the complex, dynamic environment of email servers. Rule 37(f) of the Federal Rules of Civil Procedure was recently promulgated in recognition of the unique document preservation challenges presented by the manner in which most large computer systems operate. The Committee Notes regarding the impetus for Rule 37(f) point out that: "[T]he regular purging of e-mails or other electronic communications is necessary to prevent a build-up of data that can overwhelm the most robust electronic information systems."[49]

After the complaint was filed, Intel considered whether it could turn off the auto-delete system for all of the Exchange mailboxes, as it would affect 137 different Exchange servers located in different countries. It concluded it could not, as a practical matter, be turned off. In light of the enormous volume of email generated by the thousands of employees at Intel, turning off the auto-delete feature for all Exchange mailboxes posed an unacceptable risk to business continuity, business performance and the relevant servers over time.[50] Instead, Intel put in place

---

[49] *See* Report of the Judicial Conference, Committee on Rules of Practice and Procedure (Sept. 2005) at 14.

[50] Plaintiffs also claim that the cost of turning off the auto-delete was only $55,000. Yet, Plaintiffs take this expense completely out of context. Intel represented that once the journaling system was set up for these custodians on a separate server, the costs of adding add additional servers to facilitate turning off the auto-delete was approximately $55,000. This says nothing as to the expense Intel would have incurred if it had disabled the auto-delete function at the outset.

a preservation plan designed to retain relevant materials in multiple locations, and believes, at the end of the remediation process, that will prove to have been the right approach.

As an alternative to disabling the auto-delete, Intel adopted a plan to preserve Weekly Backup Tapes for employees subject to the litigation hold notice.[51]  Intel disclosed to AMD in October 2005 that Intel had an auto-delete policy relating to email and AMD did not challenge the practice.  It is only in hindsight that Plaintiffs now challenge Intel's decision, and only challenge it in light of the unforeseen human error that resulted certain Weekly Backup Tapes not being preserved.  Despite Plaintiffs' current position concerning Intel's decision not to disable the auto-delete function, Intel's decision at the outset to utilize Weekly Backup Tapes was a reasonable plan to back-up this information.

---

[51]  Intel made this decision knowing that its employees are educated on the operation of the purge system and instructed on the methods of saving emails to prevent them rolling off the system once they reach the end of the aging period.  In fact, Intel posts on its intranet site its email retention policies, which includes the standard aging periods.

# VII.    CONCLUSION

Intel respectfully requests that the Special Master approve the proposed Remediation

Plan set forth in this Report.

OF COUNSEL:                                    POTTER ANDERSON & CORROON LLP

Robert E. Cooper, Esq.                         By:  */s/ W. Harding Drane, Jr.*
Daniel S. Floyd, Esq.                               Richard L. Horwitz (#2246)
Gibson, Dunn & Crutcher LLP                         W. Harding Drane, Jr. (#1023)
333 South Grand Avenue                              Hercules Plaza, 6th Floor
Los Angeles, CA  90071                              1313 N. Market Street
(213) 229-7000                                      P.O. Box 951
                                                    Wilmington, DE 19899-0951
Peter E. Moll                                       (302) 984-6000
Darren B. Bernhard                                  rhorwitz@potteranderson.com
HOWREY LLP                                          wdrane@potteranderson.com
1299 Pennsylvania Avenue N.W.
Washington, DC 20004
(202) 783-0800

Dated:  September 25, 2007


821350v1/29282