# EXHIBIT 1

OAO 88 (Rev. 12/06) Subpoena in a Civil Case

## Issued by the

# UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

Advanced Micro Devices, Inc., and
AMD International Sales & Services, Ltd.

V.

Intel Corporation and Intel Kabushiki Kaisha

In Re: Intel Corp Microprocessor Antitrust Litigation

**SUBPOENA IN A CIVIL CASE**

Case Number:[1] 05-441-JJF, MDL 05-1717-JJF
United States District Court
District of Delaware

TO: ERS Group
2000 Powell Street, Ste. 500
Emeryville, CA 94608

☐ YOU ARE COMMANDED to appear in the United States District court at the place, date, and time specified below to testify in the above case.

| PLACE OF TESTIMONY | COURTROOM |
|---|---|
|  | DATE AND TIME |

☐ YOU ARE COMMANDED to appear at the place, date, and time specified below to testify at the taking of a deposition in the above case.

| PLACE OF DEPOSITION | DATE AND TIME |
|---|---|

☒ YOU ARE COMMANDED to produce and permit inspection and copying of the following documents or objects at the place, date, and time specified below (list documents or objects):

For a description of the documents, please see Schedule A attached to this subpoena.

| PLACE   Howrey LLP, 525 Market Street, St. 3600, San Francisco, CA 94105 Attention: David R. Stewart | DATE AND TIME 9/3/07  5:00 p.m. |
|---|---|

☐ YOU ARE COMMANDED to permit inspection of the following premises at the date and time specified below.

| PREMISES | DATE AND TIME |
|---|---|

Any organization not a party to this suit that is subpoenaed for the taking of a deposition shall designate one or more officers, directors, or managing agents, or other persons who consent to testify on its behalf, and may set forth, for each person designated, the matters on which the person will testify. Federal Rules of Civil Procedure, 30(b)(6).

| ISSUING OFFICER'S SIGNATURE AND TITLE (INDICATE IF ATTORNEY FOR PLAINTIFF OR DEFENDANT) | DATE 8-3-07 |
|---|---|

ISSUING OFFICER'S NAME, ADDRESS AND PHONE NUMBER
Darren B. Bernhard, Esq., Howrey LLP, 1299 Pennsylvania Avenue, N.W., Washington, DC 20004, 202-783-0800

(See Rule 45, Federal Rules of Civil Procedure, Subdivisions (c), (d), and (e), on next page)

[1] If action is pending in district other than district of issuance, state district under case number.

American LegalNet, Inc.
www.FormsWorkflow.com

AO 88 (Rev 12/06) Subpoena in a Civil Case

## PROOF OF SERVICE

| | DATE | PLACE |
|---|---|---|
| SERVED: | | |

| SERVED ON (PRINT NAME) | MANNER OF SERVICE |
|---|---|
| | |

| SERVED BY (PRINT NAME) | TITLE |
|---|---|
| | |

## DECLARATION OF SERVER

I declare under penalty of perjury under the laws of the United States of America that the foregoing information contained in the Proof of Service is true and correct.

Executed on _____
                    DATE

_____
SIGNATURE OF SERVER

_____
ADDRESS OF SERVER

Rule 45, Federal Rules of Civil Procedure, Subdivisions (c), (d), and (e), as amended on December 1, 2006:

(c) PROTECTION OF PERSONS SUBJECT TO SUBPOENAS.

(1) A party or an attorney responsible for the issuance and service of a subpoena shall take reasonable steps to avoid imposing undue burden or expense on a person subject to that subpoena. The court on behalf of which the subpoena was issued shall enforce this duty and impose upon the party or attorney in breach of this duty an appropriate sanction, which may include, but is not limited to, lost earnings and a reasonable attorney's fee.

(2) (A) A person commanded to produce and permit inspection, copying, testing, or sampling of designated electronically stored information, books, papers, documents or tangible things, or inspection of premises need not appear in person at the place of production or inspection unless commanded to appear for deposition, hearing or trial.

(B) Subject to paragraph (d)(2) of this rule, a person commanded to produce and permit inspection, copying, testing, or sampling may, within 14 days after service of the subpoena or before the time specified for compliance if such time is less than 14 days after service, serve upon the party or attorney designated in the subpoena written objection to producing any or all of the designated materials or inspection of the premises — or to producing electronically stored information in the form or forms requested. If objection is made, the party serving the subpoena shall not be entitled to inspect, copy, test, or sample the materials or inspect the premises except pursuant to an order of the court by which the subpoena was issued. If objection has been made, the party serving the subpoena may, upon notice to the person commanded to produce, move at any time for an order to compel the production, inspection, copying, testing, or sampling. Such an order to compel shall protect any person who is not a party or an officer of a party from significant expense resulting from the inspection, copying, testing, or sampling commanded.

(3) (A) On timely motion, the court by which a subpoena was issued shall quash or modify the subpoena if it

(i) fails to allow reasonable time for compliance;

(ii) requires a person who is not a party or an officer of a party to travel to a place more than 100 miles from the place where that person resides, is employed or regularly transacts business in person, except that, subject to the provisions of clause (c)(3)(B)(iii) of this rule, such a person may in order to attend trial be commanded to travel from any such place within the state in which the trial is held;

(iii) requires disclosure of privileged or other protected matter and no exception or waiver applies; or

(iv) subjects a person to undue burden.

(B) If a subpoena

(i) requires disclosure of a trade secret or other confidential research, development, or commercial information, or

(ii) requires disclosure of an unretained expert's opinion or information not describing specific events or occurrences in dispute and resulting from the expert's study made not at the request of any party, or

(iii) requires a person who is not a party or an officer of a party to incur substantial expense to travel more than 100 miles to attend trial, the court may, to protect a person subject to or affected by the subpoena, quash or modify the subpoena or, if the party in whose behalf the subpoena is issued shows a substantial need for the testimony or material that cannot be otherwise met without undue hardship and assures that the person to whom the subpoena is addressed will be reasonably compensated, the court may order appearance or production only upon specified conditions.

(D) DUTIES IN RESPONDING TO SUBPOENA.

(1) (A) A person responding to a subpoena to produce documents shall produce them as they are kept in the usual course of business or shall organize and label them to correspond with the categories in the demand.

(B) If a subpoena does not specify the form or forms for producing electronically stored information, a person responding to a subpoena must produce the information in a form or forms in which the person ordinarily maintains it or in a form or forms that are reasonably usable.

(C) A person responding to a subpoena need not produce the same electronically stored information in more than one form.

(D) A person responding to a subpoena need not provide discovery of electronically stored information from sources that the person identifies as not reasonably accessible because of undue burden or cost. On motion to compel discovery or to quash, the person from whom discovery is sought must show that the information sought is not reasonably accessible because of undue burden or cost. If that showing is made, the court may nonetheless order discovery from such sources if the requesting party shows good cause, considering the limitations of Rule 26(b)(2)(C). The court may specify conditions for the discovery.

(2) (A) When information subject to a subpoena is withheld on a claim that it is privileged or subject to protection as trial-preparation materials, the claim shall be made expressly and shall be supported by a description of the nature of the documents, communications, or things not produced that is sufficient to enable the demanding party to contest the claim.

(B) If information is produced in response to a subpoena that is subject to a claim of privilege or of protection as trial-preparation material, the person making the claim may notify any party that received the information of the claim and the basis for it. After being notified, a party must promptly return, sequester, or destroy the specified information and any copies it has and may not use or disclose the information until the claim is resolved. A receiving party may promptly present the information to the court under seal for a determination of the claim. If the receiving party disclosed the information before being notified, it must take reasonable steps to retrieve it. The person who produced the information must preserve the information until the claim is resolved.

(e) CONTEMPT. Failure of any person without adequate excuse to obey a subpoena served upon that person may be deemed a contempt of the court from which the subpoena issued. An adequate cause for failure to obey exists when a subpoena purports to require a nonparty to attend or produce at a place not within the limits provided by clause (ii) of subparagraph (c)(3)(A).

American LegalNet, Inc.
www.FormsWorkflow.com

## SCHEDULE A

### DEFINITIONS

In addition to the definitions set forth in Rule 26 of the Federal Rules of Civil Procedure, the following definitions apply to each of the following requests:

1.     The term "AMD" means Advanced Micro Devices, Inc. and AMD International Sales & Service, Ltd. and any parent, subsidiary or affiliate entities, as well as the owners, partners, officers, directors, employees, agents, and other representatives of Advanced Micro Devices, Inc., and AMD International Sales & Service, Ltd.

2.     The term "Intel" means Intel Corporation and Intel Kabushiki Kaisha and any parent, subsidiary or affiliate entities, as well as the owners, partners, officers, directors, employees, agents, and other representatives of Intel Corporation and Intel Kabushiki Kaisha.

3.     The term "ERS Group" means ERS Group located at 2000 Powell Street, Suite 500, Emeryville, California 94608, and any parent, subsidiary or affiliate entities, as well as the owners, partners, officers, directors, employees, agents and other representatives of ERS Group.

4.     The term "Complaint" means the complaint filed by AMD against Intel in the United States District Court for the District of Delaware on June 27, 2005, case number CA 05-441.

5.     The term "document" is synonymous in meaning and equal in scope to the usage of the term in Fed. R. Civ. P. 34(a), including, without limitation, electronic or computerized data compilations. A draft or non-identical copy constitutes a separate document within the meaning of the term.

6.     The terms "relate to," "relating to," "related to," and "concerning" mean constituting, pertaining to, making reference to, comprising, evidencing, alluding to, responding to, connected with, commenting on, with respect to, about, regarding,

resulting from, embodying, explaining, supporting, discussing, showing, describing, reflecting, analyzing, setting forth, in respect of, having a direct relationship to or in any way being factually, legally or logically connected to, in whole or in part, the stated subject matter.

      7.     Any term stated in the singular includes the plural and vice versa.

      8.     "Any" and "each" are understood to include and encompass "all."

      9.     Whenever the conjunctive is used, it shall also be taken in the disjunctive, and vice versa.

## INSTRUCTIONS

The following instructions apply to the document requests below and should be considered as part of each such request:

      1.     Furnish all responsive documents that are in your possession, custody or control or in the possession, custody or control of your representatives and agents, including all former and current counsel.

      2.     This document request requires the production of all original documents, all non-identical copies of such documents, all versions of such documents, and any preliminary drafts thereof that are within your possession, custody, or control or in the possession or control of your representatives and agents, including all former and current counsel.

      3.     This request requires the production of electronic documents. To the extent both identical paper and electronic versions of a document may exist, please produce only the electronic versions of the document at this time. Intel, however, reserves the right to later request the paper version of the document.

      4.     If any portion of a document is responsive to any request, the entire document must be produced.

5.      With respect to any responsive documents which you decline to produce because of a claim of privilege, provide the following information as to each document: the date, author and type of document; the names and job titles of the persons to whom the document was sent; a summary of the content of the document; and a detailed description of the grounds for the claim of privilege.

6.      All documents that respond, in whole or in part, to any part of any request herein, should be produced in their entirety, in unredacted form, including all attachments and enclosures, as they are kept in the ordinary course of business. If any information specified in any request appears on any page of any document, all pages of the document should be produced in response to the request.   To the extent you redact any document covered by this discovery request, furnish a list specifying: (a) the document and pages redacted; (b) the nature of the material redacted, and (c) the basis of the redaction.

7.      The document requests herein shall be deemed continuing requests, and you must supplement your answers promptly if and when you obtain, create, discover, or become aware of additional documents relevant to any of these requests.

### DOCUMENTS REQUESTED

1.   The economic report on Intel profits from microprocessor sales prepared by Dr. Michael A. Williams of ERS Group in Emeryville, California and referenced in the AMD press release of August 2, 2007.

2.   All documents relied upon, consulted or used in the preparation and drafting of Michael A. Williams' economic report referenced in Document Request No. 1 above, including, but not limited to, all work papers and other documents reflecting the calculations and conclusions in the report.

3

# EXHIBIT 2

**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF CALIFORNIA**

| | |
|---|---|
| ADVANCED MICRO DEVICES, INC., a Delaware corporation, and AMD INTERNATIONAL SALES & SERVICE, LTD., a Delaware corporation, <br><br>             Plaintiffs, <br><br>       vs. <br><br> INTEL CORPORATION, a Delaware corporation, and INTEL KABUSHIKI KAISHA, a Japanese corporation, <br><br>             Defendants. | Civil Action No. 05-441 JJF <br> United States District Court <br> District of Delaware |
| IN RE: <br><br> INTEL CORPORATION | Civil Action N. 05-MD-1717-JJF <br> United States District Court <br> District of Delaware |

**OBJECTIONS OF THIRD PARTY ERS GROUP AND OF PLAINTIFFS ADVANCED MICRO DEVICES, INC. AND AMD INTERNATIONAL SALES & SERVICE, LTD. TO INTEL CORPORATION'S AND INTEL KABUSHIKI KAISHA'S SUBPOENA ISSUED TO ERS GROUP**

Pursuant to the Federal Rules of Civil Procedure, including Rules 26 and 45, and the Local Rules of the United States District Court for the District of Delaware, third party ERS Group and plaintiffs Advanced Micro Devices, Inc., and AMD International Sales & Service, Ltd. (collectively, "AMD"),[1] each on its own behalf and together, hereby object to the subpoena

---

[1] In the subpoena, AMD is defined to include, among other things, its "agents and representatives" and AMD asserts these objections on their behalf, including on behalf of its counsel, O'Melveny & Myers LLP. For the avoidance of doubt, however, O'Melveny & Myers LLP also separately objects to the production of material sought by this subpoena, including

served upon ERS Group ("ERS") by defendants Intel Corporation and Intel Kabushiki Kaisha (collectively, "Intel").

### GENERAL OBJECTIONS

ERS and AMD each assert the following General Objections in response to each and every Request in the subpoena, whether or not they are separately stated in each response:

1.    ERS and AMD each objects to each and every Request, and to the subpoena in its entirety, on the ground that it is an inappropriate effort to invade the attorney-client privilege and work product privileges and is propounded for improper tactical purposes and not for the purpose of obtaining discoverable information. ERS and AMD also each objects to the subpoena as a whole and to each individual Request on the ground that it specifically calls for information that is protected from disclosure by the attorney-client privilege, the attorney work product doctrine, and other applicable privileges and protections. ERS will not provide any such privileged or protected information.

2.    ERS and AMD each objects to each and all of Intel's purported "Instructions" to the extent they purport to impose obligations that are unauthorized by, additional to, or inconsistent with Rules 26 or 45 of the Federal Rules of Civil Procedure or applicable Local Rules. ERS will not comply with any such unauthorized, additional, or inconsistent instructions.

3.    ERS and AMD each objects to each and every Request to the extent it calls for information that contains or reveals trade secrets or other confidential research, development, commercial, financial, or personnel information, which, if disclosed or disseminated without restriction to Intel or third parties, could adversely impact AMD's or ERS's business. ERS will not produce any such confidential information except pursuant to the protective order.

---

material that is protected from disclosure by the attorney-client privilege, the attorney work product doctrine, and other applicable privileges or protections.

RLF1-3191034-1

4.    ERS and AMD each objects to each and every Request to the extent it calls for information held subject to contractual or other legal obligations of confidentiality owed to its employees, clients, customers, or other third parties. ERS will not produce any such third party confidential information except pursuant to the protective order.

5.    ERS and AMD each objects to Intel's definition of the words "relate to," "related to," and "concerning," as vague, ambiguous and overbroad. Using that definition renders these Requests unduly burdensome, and results in their seeking information that is not relevant to the claim or defense of any party or reasonably calculated to lead to the discovery of admissible evidence.

6.    ERS and AMD each objects to each and every Request to the extent it is premature, inconsistent with, and/or contrary to the Amended Stipulation and Protective Order Regarding Expert Discovery, stipulated by the parties and entered by the Court on May 11, 2007 and to the extent it purports to impose obligations that are unauthorized by, additional to, or inconsistent with Rules 26(a)(2)(B) of the Federal Rules of Civil Procedure or applicable Local Rules.

7.    ERS and AMD each objects to the Requests in that they seek information that is neither material to the claims or defenses of a party nor reasonably likely to lead to the discovery of admissible evidence, and information that, even if it were material, could be obtained from other sources that would not require the production of information protected by the attorney-client privilege, the work product doctrine, or other applicable privileges and protections.

8.    ERS and AMD would be willing, and hereby offer, to meet and confer with Intel about Intel's Requests and ERS' and AMD's objections.

3

## RESPONSES TO REQUESTS

### REQUEST NO. 1:

The economic report on Intel profits from microprocessor sales prepared by Dr. Michael A. Williams of ERS Group in Emeryville, California and referenced in the AMD press release of August 2, 2007.

### RESPONSE TO REQUEST NO. 1:

ERS and AMD incorporate their General Objections into this Response. ERS and AMD also object to this Request on the ground that it calls for the production of documents and information concerning the opinion of someone who has not been designated as a testifying expert by any party, and whose opinion, accordingly, is neither material to the claims or defenses of a party nor reasonably likely to lead to the discovery of admissible evidence. ERS and AMD also object to this Request on the grounds that information and data regarding Intel profits from microprocessor sales are in the process of being analyzed and calculated by AMD's counsel and experts retained by AMD, including ERS. ERS and AMD further object to this Request to the extent that it impermissibly seeks the premature and non-reciprocal disclosure of experts and expert information, and/or requires ERS and AMD to produce factual analyses, comparative analyses, opinions or theories that will be the subject of expert testimony, all in a manner and at a time that is inconsistent with and contrary to the Amended Stipulation and Protective Order Regarding Expert Discovery, as entered by the Court on May 11, 2007, and with Rule 26(a)(2)(B) of the Federal Rules of Civil Procedure. ERS and AMD will not produce documents in response to this request as drafted.

4

**REQUEST NO. 2:**

All documents relied upon, consulted or used in the preparation and drafting of Michael A. Williams' economic report referenced in Document Request No. 1 above, including, but not limited to, all work paper and other documents reflecting the calculations and conclusions in this report.

**RESPONSE TO REQUEST NO. 2:**

ERS and AMD incorporate their General Objections into this Response. ERS and AMD also object to this Request on the ground that it calls for the production of documents and information concerning the expert opinion of someone who has not been designated as a testifying expert by any party, and whose opinion, accordingly, is neither material to the claims or defenses of a party nor reasonably likely to lead to the discovery of admissible evidence. ERS and AMD also object to this Request on the grounds that information and data regarding Intel profits from microprocessor sales are in the process of being analyzed and calculated by AMD's counsel and experts retained by AMD, including ERS. ERS and AMD further object to this Request to the extent that it impermissibly seeks the premature and non-reciprocal disclosure of experts and expert information, and/or requires ERS and AMD to produce factual analyses, comparative analyses, opinions or theories that will be the subject of expert testimony, all in a manner and at a time that is inconsistent with and contrary to the Amended Stipulation and Protective Order Regarding Expert Discovery, as entered by the Court on May 11, 2007, and Rule 26(a)(2)(B) of the Federal Rules of Civil Procedure. ERS and AMD will not produce documents in response to this request as drafted.

5

OF COUNSEL:
Charles P. Diamond, Esq.
  cdiamond@omm.com
Linda J. Smith, Esq.
  lsmith@omm.com
O'Melveny & Myers LLP
1999 Avenue of the Stars, 7th Floor
Los Angeles, CA 90067
(310) 246-6800

Mark A. Samuels, Esq.
  msamuels@omm.com
400 South Hope Street
Los Angeles, CA 90071
(213) 430-6340


Dated: August 17, 2007

*/s/ Frederick L. Cottrell, III  #2555*
Jesse A. Finkelstein (#1090)
  finkelstein@rlf.com
Frederick L. Cottrell, III (#2555)
  cottrell@rlf.com
Chad M. Shandler (#3796)
  shandler@rlf.com
Steven J. Fineman (#4025)
  fineman@rlf.com
Richards, Layton & Finger, P.A.
One Rodney Square
P.O. Box 551
Wilmington, DE 19899
(302) 651-7700


*Attorneys for Plaintiffs Advanced Micro Devices, Inc. and AMD International Sales & Service, Ltd.*

6

## CERTIFICATE OF SERVICE

I hereby certify that on the 17th day of August, 2007, true and correct copies of the foregoing were caused to be served on counsel of record at the following addresses as indicated:

**VIA HAND DELIVERY**
Richard L. Horwitz, Esq.
Potter Anderson & Corroon LLP
1313 North Market Street
P.O. Box 951
Wilmington, DE 19899

James L. Holzman, Esq.
Prickett, Jones & Eliott, P.A.
1310 King Street
P.O. Box 1328
Wilmington, DC 19899-1328

**VIA FEDERAL EXPRESS**
Darren B. Bernhard, Esq.
Howrey LLP
1299 Pennsylvania Ave., N.W.
Washington, DC 20004-2402

Daniel A. Small, Esq.
Cohen Milstein Hausfeld & Toll, LLC
1100 New York Avenue, N.W.
Suite 500, West Tower
Washington, DC 20005

Robert E. Cooper, Esq.
Daniel S. Floyd, Esq.
Gibson, Dunn & Crutcher, LLP
333 South Grand Avenue
Los Angeles, CA 90071-3197


*/s/ Frederick L. Cottrell, III*
Frederick L. Cottrell, III (#2555)
Cottrell@rlf.com

# EXHIBIT 3



Home | Worldwide | Contact Us | Search | Select Site:

| Processors | ATI Products | Embedded Solutions | Support & Drivers | About AMD | Where To Buy |
| Corporate Information | Corporate Responsibility | Investor Relations | News Room | Careers |

**Press Resources**
News Room Home
Press Release Archives
  by Year
  by Subject
News Events
Logos
Images
Video & Audio
Quotes
PR Contacts
RSS Feed
**Related Links**
Articles & Reviews
Exec Photos and Bios
Exec Speeches

### AMD Files Antitrust Complaint Against Intel In U.S. Federal District Court

*– Complaint Details Worldwide Coercion of Computer-Makers, System-Builders, Distributors and Retailers from Dealing with AMD –*
*– Intel's Illegal Acts Inflate Computer Prices and Limit Choices for Businesses and Consumers –*

**SUNNYVALE, Calif. — June 28, 2005** —AMD (NYSE: AMD) announced today that it filed an antitrust complaint against Intel Corporation ("Intel") yesterday in U.S. federal district court for the district of Delaware under Section 2 of the Sherman Antitrust Act, Sections 4 and 16 of the Clayton Act, and the California Business and Professions Code. The 48-page complaint explains in detail how Intel has unlawfully maintained its monopoly in the x86 microprocessor market by engaging in worldwide coercion of customers from dealing with AMD. It identifies 38 companies that have been victims of coercion by Intel – including large scale computer-makers, small system-builders, wholesale distributors, and retailers, through seven types of illegality across three continents.

"Everywhere in the world, customers deserve freedom of choice and the benefits of innovation – and these are being stolen away in the microprocessor market," said Hector Ruiz, AMD chairman of the board, president and chief executive officer. "Whether through higher prices from monopoly profits, fewer choices in the marketplace or barriers to innovation – people from Osaka to Frankfurt to Chicago pay the price in cash every day for Intel's monopoly abuses."

x86 microprocessors run the Microsoft Windows®, Solaris and Linux families of operating systems. Even Apple®, a pioneer of the PC and one of the industry's enduring innovators, announced that it would switch exclusively to x86 processors to run Mac OS® software beginning in 2006. Intel's share of this critical market currently counts for about 80 percent of worldwide sales by unit volume and 90 percent by revenue, giving it entrenched monopoly ownership and super-dominant market power.

This litigation follows a recent ruling from the Fair Trade Commission of Japan (JFTC), which found that Intel abused its monopoly power to exclude fair and open competition, violating Section 3 of Japan's Antimonopoly Act. These findings reveal that Intel deliberately engaged in illegal business practices to stop AMD's increasing market share by imposing limitations on Japanese PC manufacturers. Intel did not contest these charges.

The European Commission has stated that it is pursuing an investigation against Intel for similar possible antitrust violations and is cooperating with the Japanese authorities.

"You don't have to take our word for it when it comes to Intel's abuses; the Japanese government condemned Intel for its exclusionary and illegal misconduct," said Thomas M. McCoy, AMD executive vice president, legal affairs and chief administrative officer. "We encourage regulators around the world to take a close look at the market failure and consumer harm Intel's business practices are causing in their nations. Intel maintains illegal monopoly profits at the expense of consumers and computer manufacturers, whose margins are razor thin. Now is the time for consumers and the industry worldwide to break free from the abusive Intel monopoly."

The 48-page complaint, drafted after an intensive investigation by AMD's lead outside counsel, Charles P. Diamond of O'Melveny & Myers LLP, details numerous examples of what Diamond describes as "a pervasive, global scheme to coerce Intel customers from freely dealing with AMD to the detriment of customers and consumers worldwide." According to the complaint, Intel has unlawfully maintained its monopoly by, among other things:

- Forcing major customers such as Dell, Sony, Toshiba, Gateway, and Hitachi into Intel-exclusive deals in return for outright cash payments, discriminatory pricing or marketing subsidies conditioned on the exclusion of AMD;
  - According to industry reports, and as confirmed by the JFTC in Japan, Intel has paid Dell and Toshiba huge sums not to do business with AMD.
  - Intel paid Sony millions for exclusivity. AMD's share of Sony's business went from 23 percent in '02 to 8% in '03, to 0%, where it remains today.

- Forcing other major customers such as NEC, Acer, and Fujitsu into partial exclusivity agreements by conditioning rebates, allowances and market development funds (MDF) on customers' agreement to severely limit or forego entirely purchases from AMD;
  - Intel paid NEC several million dollars for caps on NEC's purchases from AMD. Those caps assured Intel at least 90% of NEC's business in Japan and imposed a worldwide cap on the amount of AMD business NEC could do.

- Establishing a system of discriminatory and retroactive incentives triggered by purchases at such high levels as to have the intended effect of denying customers the freedom to purchase any significant volume of processors from AMD;
  - When AMD succeeded in getting on the HP retail roadmap for mobile computers, and its products sold well, Intel responded by withholding HP's fourth quarter 2004 rebate check and refusing to waive HP's failure to achieve its targeted rebate goal; it allowed HP to make up the shortfall in succeeding quarters by promising Intel at least 90% of HP's mainstream retail business.

- Threatening retaliation against customers for introducing AMD computer platforms, particularly in strategic market segments such as commercial desktop;

- o Then-Compaq CEO Michael Capellas said in 2000 that because of the volume of business given to AMD, Intel withheld delivery of critical server chips. Saying "he had a gun to his head," he told AMD he had to stop buying.
- o According to Gateway executives, their company has paid a high price for even its limited AMD dealings. They claim that Intel has "beaten them into 'guacamole'" in retaliation.

- Establishing and enforcing quotas among key retailers such as Best Buy and Circuit City, effectively requiring them to stock overwhelmingly or exclusively, Intel computers, artificially limiting consumer choice;
  - o AMD has been entirely shut out from Media Markt, Europe's largest computer retailer, which accounts for 35 percent of Germany's retail sales.
  - o Office Depot declined to stock AMD-powered notebooks regardless of the amount of financial support AMD offered, citing the risk of retaliation.

- Forcing PC makers and tech partners to boycott AMD product launches or promotions;
  - o Then-Intel CEO Craig Barrett threatened Acer's Chairman with "severe consequences" for supporting the AMD Athlon 64™ launch. This coincided with an unexplained delay by Intel in providing $15-20M in market development funds owed to Acer. Acer withdrew from the launch in September 2003.

- Abusing its market power by forcing on the industry technical standards and products that have as their main purpose the handicapping of AMD in the marketplace.
  - o Intel denied AMD access to the highest level of membership for the Advanced DRAM technology consortium to limit AMD's participation in critical industry standard decisions that would affect its business.
  - o Intel designed its compilers, which translate software programs into machine-readable language, to degrade a program's performance if operated on a computer powered by an AMD microprocessor.

To view the full text of the complaint, please visit http://www.amd.com/breakfree.

Leading publications such as The Wall Street Journal, The Washington Post, The Economist, San Jose Mercury News and CNET have recognized AMD as a leader in microprocessor innovation. AMD has achieved technological leadership in critical aspects of the x86 market, particularly with its AMD Opteron™ microprocessor, the first microprocessor to take x86 computing from 32 to 64 bits, and with its dual-core processors. The company has also stated its commitment to help deliver basic computing and Internet connectivity to 50 percent of the world's population by the year 2015.

**Press and Analyst Conference Call**
Hector Ruiz, AMD chairman, president and CEO; Thomas M. McCoy, AMD executive vice president, legal affairs and chief administrative officer; and Charles P. Diamond, partner at O'Melveny & Myers, LLP and AMD's lead outside counsel will discuss the details of the antitrust complaint against Intel at 9:15 AM PDT today on an audio conference call. Following their remarks, there will be a question and answer session.

Dial-in number: (651) 291-0618
Code: 786995
Replay number:
(800) 475-6701 in North America
(320) 365-3844 outside the U.S.
Code: 786995
The audio conference will be available live and for 10 days after the conference call at www.amd.com/breakfreewebcast.
AMD's Position on Fair and Open Competition AMD stands for fair and open competition and the value and variety competition delivers to the marketplace. Innovative AMD technology allows users to break free to reach new levels of performance, productivity and creativity. Businesses and consumers should have the freedom to choose from a range of competitive products that come from continuous innovation. When market forces work, consumers have choice and everyone wins. For more information, please visit http://www.amd.com/breakfree.

**About AMD**
AMD (NYSE:AMD) designs and produces innovative microprocessors, Flash memory devices and low-power processor solutions for the computer, communications and consumer electronics industries. AMD is dedicated to delivering standards-based, customer-focused solutions for technology users, ranging from enterprises to government agencies and individual consumers. For more information, visit www.amd.com.

**AMD, the AMD Arrow logo and combinations thereof, are trademarks of Advanced Micro Devices, Inc. Other names are for informational purposes only and may be trademarks of their respective owners.**

Rate this page [+]

©2007 Advanced Micro Devices, Inc.   |   Contact AMD   |   Terms and Conditions   |   Privacy   |   Trademark Information   |   Site Map

# EXHIBIT 4

**AMD** Smarter Choice

Home | Worldwide | Contact Us    Search _____    Select Site: ___

| Processors | ATI Products | Embedded Solutions | Support & Drivers | About AMD | Where To Buy |

| Corporate Information | Corporate Responsibility | Investor Relations | News Room | Careers |

**Press Resources**
**News Room Home**
Press Release Archives
  by Year
  by Subject
News Events
Logos
Images
Video & Audio
Quotes
PR Contacts
RSS Feed

**Related Links**
Articles & Reviews
Exec Photos and Bios
Exec Speeches

## AMD Comments On Intel's Answer To AMD's U.S. Federal District Court Antitrust Complaint

**SUNNYVALE, Calif. — September 1, 2005** --AMD (NYSE: AMD) released the following statement today regarding Intel Corporation's answer to AMD's complaint filed in U.S. federal district court in the district of Delaware on June 27, 2005, which asserts that Intel committed illegal antitrust violations to exclude competition.

"Intel's response is not surprising considering what they are trying to hide, but the facts of illegal monopoly abuse are clear and undeniable," said Thomas M. McCoy, AMD executive vice president, legal affairs and chief administrative officer. "Intel's anticompetitive business practices are under intense scrutiny by governments around the world. The Fair Trade Commission of Japan found Intel guilty of antitrust violations that harmed consumers based on direct evidence, and still Intel refuses to acknowledge wrongdoing. Intel's illicit conduct forces customers and consumers to pay artificially higher prices and limits their ability to choose the best products available."

On June 27th, AMD filed an antitrust lawsuit against Intel under Section 2 of the Sherman Antitrust Act, and Sections 4 and 16 of the Clayton Act, as well as the California Business and Professions Code. The complaint addresses how Intel has unlawfully maintained its x86 microprocessor market monopoly by engaging in worldwide coercion of customers to refrain from dealing with AMD. To view the full text of the complaint, visit http://www.amd.com/breakfree.

"We look forward to presenting our evidence in front of the entire industry and the entire world. Let's put the truth on the table and let the court decide," McCoy continued.

The Japanese Government recognized Intel's competitive harms on March 8, 2005, when its Fair Trade Commission (JFTC) recommended that Intel be sanctioned for its exclusionary misconduct directed at AMD. Intel chose not to contest the charges. AMD Japan also filed two claims against Intel K.K., its Japanese subsidiary, in the Tokyo High Court and Tokyo District Court for antitrust violations.

Additionally, the European Commission -- in coordination with national competition authorities - recently raided Intel offices across Europe, as well as a number of other IT firms manufacturing or selling computers, as part of its ongoing investigation into Intel for antitrust violations.

South Korean antitrust authorities are also investigating the marketing and rebate practices of Intel. They have conducted preliminary investigations into five South Korean PC makers supplied by Intel for the case and asked Intel to provide related documents by the end of August.

**AMD's Position on Fair and Open Competition**
AMD stands for fair and open competition and the value and variety competition delivers to the marketplace. Innovative AMD technology allows users to break free to reach new levels of performance, productivity and creativity. Businesses and consumers should have the freedom to choose from a range of competitive products that come from continuous innovation. When market forces work, consumers have choice and everyone wins. For more information, please visit http://www.amd.com/breakfree.

**About AMD**
AMD (NYSE:AMD) designs and produces innovative microprocessors, Flash memory devices and low-power processor solutions for the computer, communications and consumer electronics industries. AMD is dedicated to delivering standards-based, customer-focused solutions for technology users, ranging from enterprises to government agencies and individual consumers. For more information, visit www.amd.com.

AMD, the AMD Arrow logo and combinations thereof, are trademarks of Advanced Micro Devices, Inc. Other names are for informational purposes only and may be trademarks of their respective owners.

Rate this page [+]

©2007 Advanced Micro Devices, Inc.   |   Contact AMD   |   Terms and Conditions   |   Privacy   |   Trademark Information   |   Site Map

# EXHIBIT 5

**AMD**
Smarter Choice

Home | Worldwide | Contact Us   Search          Select Site:

| | Processors | ATI Products | Embedded Solutions | Support & Drivers | About AMD | Where To Buy |

| | Corporate Information | Corporate Responsibility | Investor Relations | News Room | Careers |

**Press Resources**
**News Room Home**
Press Release Archives
   by Year
   by Subject
News Events
Logos
Images
Video & Audio
Quotes
PR Contacts
RSS Feed
**Related Links**
Articles & Reviews
Exec Photos and Bios
Exec Speeches

### Tokyo District Court Denies Intel K.K. Argument To Keep Evidence Obtained By JFTC Of Illegal Business Practices From The Public Record

*Fair Trade Commission of Japan to Turn Over Evidence Collected In Its Investigation of Intel K.K. By March 17, 2006*

**TOKYO, Japan -- December 16, 2005** --Tokyo District Court today required the disclosure of evidence collected by the Fair Trade Commission of Japan (JFTC) during its investigation of Intel K.K. ("Intel") for violating the country's Antimonopoly Act. The evidence, discovered in raids of Intel K.K. offices as well as major Japanese OEM manufacturers in April, 2004, formed the basis of the JFTC's Recommendation against Intel. Legal counsel for AMD Japan intends to use the JFTC's evidence as part of its law suit against Intel in Japan, filed June 30th, 2005.(*AMD Japan v. Intel K.K.*).

The ruling was issued at the conclusion of a hearing in which counsel for both AMD Japan and Intel addressed the production of documents collected by the JFTC during its year-long investigation into Intel for violating Japan's Antimonopoly Act.

"Today's court ruling sends the message that the truth about Intel's illegal monopoly abuse will soon see the light of day," said Thomas M. McCoy, AMD executive vice president, legal affairs and chief administrative officer. "We thank the court for its sound decision, and we believe that it sends a clear message worldwide that Intel cannot hope to hide the truth about its anti-competitive business practices any longer; not from the law or from consumers everywhere who deserve to know the facts. We believe the JFTC's evidence will show what people inside our industry already know well – that Intel abuses its monopoly position to threaten and intimidate OEMs not to do business with AMD."

McCoy continued, "What's at stake is the future of computing in a world economy that grows more dependent on microprocessors daily. Consumers across the globe are being harmed by Intel's abusive monopoly- preservation tactics through higher prices, stifled innovation and reduced choice."

**The JFTC Recommendation Against Intel**
On March 8, 2005, the JFTC found that Intel abused its monopoly power to exclude fair and open competition, violating Section 3 of Japan's Antimonopoly Act. The findings revealed that Intel used coercive, illegal tactics to stop AMD's growing success and increasing market share, which reached 22% in 2002, by imposing limitations on Japanese PC manufacturers (which sell notebook and desktop computers to customers around the world).

The JFTC Recommendation was the culmination of an 11-month investigation that has established patterns of anti-consumer and anti-competitive behavior. The commission found that, because of AMD's inroads into Intel's market share, Intel deliberately set out to artificially limit AMD by imposing conditions on five Japanese manufacturers (later revealed to be NEC Corp., Toshiba Corp., Hitachi Ltd., Sony Corp., and Fujitsu, Ltd.) that together represented 77% of all CPUs sold in Japan. Specifically, the JFTC found that:

- One manufacturer was coerced to buy 100% of its CPUs from Intel; another manufacturer was forced to curtail its non-Intel purchases to 10% or less;
- Intel separately conditioned rebates on the exclusive use of Intel CPUs throughout an entire series of computers sold under a single brand name in order to exclude AMD CPUs from distribution;
- The mechanisms used to achieve these ends included rebates and marketing practices that includes the "Intel Inside" program and market development funds provided through Intel's corporate parent in the United States.

The Recommendation noted that Intel imposed these restrictions in direct response to AMD's growing market share from 2000-2002. The Recommendation also noted that as a result of this misconduct, the combined market share of AMD and a second, much smaller CPU company fell from 24% in 2002 to 11% in 2003.

The JFTC imposed a number of restrictions on Intel. Among them, it must notify its customers and educate its employees that it may no longer provide rebates and other funds to Japanese computer manufacturers on conditions that exclude competitors' CPUs.

The investigations into Intel's business practices by the European Commission and the Fair Trade Commission of Korea for violations similar to those found in Japan by the JFTC remain ongoing.

**AMD's Position on Fair and Open Competition**
AMD stands for fair and open competition and the value and variety competition delivers to the marketplace. Innovative AMD technology allows users to break free to reach new levels of performance, productivity and creativity. Businesses and consumers should have the freedom to choose from a range of competitive products that come from continuous innovation. When market forces work, consumers have choice and everyone wins. For more information, please visit http://www.amd.com/breakfree.

**About AMD**
AMD (NYSE:AMD) designs and produces innovative microprocessors, Flash memory devices and low-power processor solutions for the computer, communications and consumer electronics industries. AMD is dedicated to delivering standards-based, customer-focused solutions for technology users, ranging from enterprises to government agencies and individual consumers. For more information visit www.amd.com.

**AMD, the AMD Arrow logo and combinations thereof, are trademarks of Advanced Micro Devices, Inc. Other names are for informational purposes only and may be trademarks of their respective owners.**

Rate this page [+]

©2007 Advanced Micro Devices, Inc.   |   Contact AMD   |   Terms and Conditions   |   Privacy   |   Trademark Information   |   Site Map

# EXHIBIT 6

**AMD**
Smarter Choice

Home | Worldwide | Contact Us   Search            Select Site:

| Processors | ATI Products | Embedded Solutions | Support & Drivers | **About AMD** | Where To Buy |

Corporate Information | Corporate Responsibility | Investor Relations | News Room | Careers

Press Resources
News Room Home
Press Release Archives
  by Year
  by Subject
News Events
Logos
Images
Video & Audio
Quotes
PR Contacts
RSS Feed
**Related Links**
Articles & Reviews
Exec Photos and Bios
Exec Speeches

## AMD Supports Korean Fair Trade Commission Dawn Raids As Part Of Investigation Into Possible Intel Antitrust Violations

*- KFTC Raids Intel Offices, Offices of Major Korean PC Manufacturers -*
*- Intensifying Global Scrutiny into Intel's Illegal, Anti-competitive Business Practices -*

**SUNNYVALE, Calif. -- February 9, 2006 --**AMD (NYSE: AMD) released the following statement today regarding the Korean Fair Trade Commission's (KFTC) dawn raids as part of their investigation into possible violations by Intel Corporation of that country's Monopoly Regulation and Fair Trade Act:

"The dawn raids in Korea make it abundantly clear that competition authorities worldwide are intensifying their investigative efforts into Intel's anticompetitive business practices because they have good reason to believe evidence of illegal monopoly abuse is there to be found," said Thomas M. McCoy, AMD executive vice president, legal affairs and chief administrative officer. "Similar dawn raids conducted by competition authorities in Japan revealed evidence of illegal business practices that violated that country's Antimonopoly Act. The JFTC ruled that Intel conditioned deals with Japanese PC OEMs based on excluding competition. Last year, the European Commission also conducted dawn raids across Europe to gather evidence of Intel monopoly abuse within the European Union. How many raids in how many countries need to happen before Intel accepts responsibility for its anticompetitive actions and ceases its unlawful business practices?"

The KFTC's dawn raids are part of an investigation into Intel's business dealings with four South Korean PC makers. AMD continues to believe - as specified in its private U.S. antitrust complaint filed on June 27, 2005 in U.S. federal court in Delaware - that PC manufacturers worldwide are victims of Intel's monopoly power.

The dawn raids in Korea take place against a backdrop of increasing scrutiny of Intel's business practices.

AMD's complaint against Intel explains in detail how Intel unlawfully maintained its monopoly in the x86 microprocessor market by engaging in worldwide coercion of customers from dealing with AMD. It identifies 38 companies that have been victims of coercion by Intel – including large scale computer-makers, small system-builders, wholesale distributors, and retailers, through seven types of illegality across three continents. AMD's complaint is available for download at http://www.amd.com/breakfree.

The U.S. litigation follows a March, 2005 ruling from the Fair Trade Commission of Japan (JFTC), which found that Intel abused its monopoly power to exclude fair and open competition, violating Section 3 of Japan's Antimonopoly Act. These findings reveal that Intel deliberately engaged in illegal business practices to stop AMD's increasing market share by imposing limitations on Japanese PC manufacturers. Intel did not contest these charges.

AMD Japan filed two claims on June 30, 2005 against Intel Corporation's Japanese subsidiary, Intel K.K., in the Tokyo High Court and the Tokyo District Court for damages arising from violations of Japan's Antimonopoly Act. On December 16, 2005, the Tokyo District Court issued a ruling which denied Intel K.K.'s request to keep evidence of its illegal business practices from the public record and required the JFTC to turn over the evidence it obtained during its year-long investigation of Intel to the court, AMD and Intel.

In July 2005, the European Commission – in close coordination with national competition authorities – conducted dawn raids against Intel offices and the offices of major European PC manufacturers and retailers to gather evidence as part of their ongoing investigation into Intel's business practices.

AMD continues to work with antitrust authorities around the world to look at the market failure and consumer harm Intel's business practices are causing in their nations.

**AMD's Position on Fair and Open Competition**
AMD stands for fair and open competition and the value and variety competition delivers to the marketplace. Innovative AMD technology allows users to break free to reach new levels of performance, productivity and creativity. Businesses and consumers should have the freedom to choose from a range of competitive products that come from continuous innovation. When market forces work, consumers have choice and everyone wins. For more information, please visit http://www.amd.com/breakfree.

**About AMD**
Advanced Micro Devices (NYSE: AMD) is a leading global provider of innovative microprocessor solutions for computing, communications and consumer electronics markets. Founded in 1969, AMD is dedicated to delivering superior computing solutions based on customer needs that empower users worldwide. For more information visit www.amd.com.

**AMD, the AMD Arrow logo and combinations thereof, are trademarks of Advanced Micro Devices, Inc. Other names are for informational purposes only and may be trademarks of their respective owners.**

Rate this page [+]

©2007 Advanced Micro Devices, Inc.   |   Contact AMD   |   Terms and Conditions   |   Privacy   |   Trademark Information   |   Site Map

# EXHIBIT 7


**Smarter Choice**

Home | Worldwide | Contact Us | Search              Select Site:

| Processors | ATI Products | Embedded Solutions | Support & Drivers | **About AMD** | Where To Buy |

| Corporate Information | Corporate Responsibility | Investor Relations | **News Room** | Careers |

**Press Resources**
**News Room Home**
Press Release Archives
  by Year
  by Subject
News Events
Logos
Images
Video & Audio
Quotes
PR Contacts
RSS Feed
 **Related Links**
Articles & Reviews
Exec Photos and Bios
Exec Speeches

### Federal Court Orders Intel Corporation and Third Parties To Produce Foreign Discovery in AMD VS. INTEL U.S. Antitrust Suit

*- Court Finds Production of Foreign Discovery Illustrating Global Misconduct is Essential Given Undisputed Global Nature of Microprocessor Market -*

**SUNNYVALE, Calif. -- December 28, 2006 --**AMD (NYSE: AMD) today announced a significant legal victory in its ongoing antitrust suit against Intel Corporation. In an order effective yesterday, the Federal District Court in Delaware overruled Intel's objections and ordered it to produce documents and other evidence bearing upon Intel's exclusionary conduct outside of U.S. borders.

AMD believes that the production of this foreign discovery will contain evidence of anticompetitive business practices that show clear violations of not only the Sherman Antitrust Act but also generally accepted anti-monopoly laws worldwide.

"Intel's acquiescence to the Special Master's findings is a big win for AMD," said Thomas M. McCoy, AMD executive vice president, legal affairs and chief administrative officer. "This case remains firmly focused on the worldwide misbehavior of a global monopolist. This ruling also removes any basis for Intel or its foreign customers to withhold evidence of Intel's exclusion, regardless of where it occurred. We will proceed vigorously to prove that Intel abuses its global monopoly power by limiting or excluding competition, which ultimately hurts consumers worldwide."

Yesterday's order resulted from Intel's decision to accept Special Master Vincent Poppiti's findings of December 15th, which recommended to presiding Judge Joseph Farnan that "as the undisputed geographic market is global, and approximately 68% of the total worldwide production of computers powered by x86 microprocessors are sold to non-U.S. customers evidence of foreign exclusionary conduct is essential for AMD to demonstrate" that Intel has violated U.S. antitrust laws. Judge Farnan appointed Special Master Poppiti to preside over all discovery disputes in the case.

Special Master Poppiti's December 15 recommendation that Intel be ordered to produce foreign discovery is available for download at http://www.amd.com/breakfree.

**AMD's Position on Fair and Open Competition**
AMD stands for fair and open competition and the value and variety competition delivers to the marketplace. Innovative AMD technology allows users to break free to reach new levels of performance, productivity and creativity. Businesses and consumers should have the freedom to choose from a range of competitive products that come from continuous innovation. When market forces work, consumers have choice and everyone wins. For more information, please visit http://www.amd.com/breakfree.

**About AMD**
Advanced Micro Devices (NYSE: AMD) is a leading global provider of innovative microprocessor solutions for computing, graphics and consumer electronics markets. AMD is dedicated to delivering superior computing solutions based on customer needs that empower users worldwide. For more information, visit www.amd.com.

AMD, the AMD Arrow logo and combinations thereof, are trademarks of Advanced Micro Devices, Inc. Other names are for informational purposes only and may be trademarks of their respective owners.

Rate this page [+]

©2007 Advanced Micro Devices, Inc.  |  Contact AMD  |  Terms and Conditions  |  Privacy  |  Trademark information  |  Site Map

# EXHIBIT 8

**AMD**
Smarter Choice

Home | Worldwide 🌐 | Contact Us | Search _____ | Select Site: [____] ▶

| Processors | ATI Products | Embedded Solutions | Support & Drivers | **About AMD** | Where To Buy |

Corporate Information | Corporate Responsibility | Investor Relations | **News Room** | Careers

**Press Resources**
**News Room Home**
Press Release Archives
  by Year
  by Subject
News Events
Logos
Images
Video & Audio
Quotes
PR Contacts
RSS Feed
**Related Links**
Articles & Reviews
Exec Photos and Bios
Exec Speeches

### European Commission Charges Intel with Antitrust Violations

**BRUSSELS/SUNNYVALE, Calif. -- July 27, 2007** --The European Commission (EC) today confirmed that it has charged Intel with violating EU competition laws by abusing its dominant position in the global microprocessor market. The Commission said in a press briefing today that "in the short, medium and long-term, we think that the actions of Intel are bad news for competition and consumers." http://ec.europa.eu/avservices/ebs/schedule.cfm.

The EC's Statement of Objections is based on evidence collected in a thorough, multi-year investigation of the company's business practices which the European Commission characterized as "extremely rigorous." Evidence seized from Intel offices and collected from PC manufacturers across Europe provided the foundation for the European Commission's strong antitrust case.

"Consumers know today that their welfare has been sacrificed in the illegal interest of preserving monopoly profits. Intel has circled the globe with a pattern of conduct, including direct payments, in order to enforce full and partial boycotts of AMD. The EU action obviously suggests that Intel has, once again, been unable to justify its illegal conduct," said Thomas M. McCoy, AMD executive vice president legal affairs and chief administrative officer.

The EC specified (http://europa.eu/rapid/pressReleasesAction.do?reference=MEMO/07/314&format=HTML&aged=0&language=EN&guiLanguage=en) that the charges cover:

> "First, Intel has provided substantial rebates to various Original Equipment Manufacturers (OEMs) conditional on them obtaining all or the great majority of their CPU requirements from Intel.
>
> Secondly, in a number of instances, Intel made payments in order to induce an OEM to either delay or cancel the launch of a product line incorporating an AMD-based CPU.
>
> Thirdly, in the context of bids against AMD-based products for strategic customers in the server segment of the market, Intel has offered CPUs on average below cost."

The EC charges against Intel are the latest step in a series of global investigations into Intel's abusive business practices.

In March 2005, Japan's Fair Trade Commission ruled that Intel had violated the country's anti-monopoly laws by illegally forcing full or partial exclusivity with five Japanese PC makers.

An active antitrust investigation - with data seizures similar to those in Japan and Europe - continues in South Korea, and AMD has brought antitrust civil actions in Japan and the United States.

Allegations of Intel misconduct are also echoed in a U.S. class-action complaint filed by Dell shareholders in January 2007, which claims that Intel illegally paid Dell in excess of a billion dollars a year to not purchase microprocessors from its competitors.

For more information on AMD's commitment to fair and open competition, please visit http://www.amd.com/breakfree.

**About AMD**
Advanced Micro Devices (NYSE: AMD) is a leading global provider of innovative processing solutions in the computing, graphics and consumer electronics markets. AMD is dedicated to driving open innovation, choice and industry growth by delivering superior customer-centric solutions that empower consumers and businesses worldwide. For more information, visit www.amd.com.

Rate this page [•]

©2007 Advanced Micro Devices, Inc.  |  Contact AMD  |  Terms and Conditions  |  Privacy  |  Trademark Information  |  Site Map

# EXHIBIT 9



Home | Worldwide 🌐 | Contact Us  Search                    Select Site: 🔲 ▶

| Processors | ATI Products | Embedded Solutions | Support & Drivers | **About AMD** | Where To Buy |

Corporate Information | Corporate Responsibility | Investor Relations | News Room | Careers

**Press Resources**
**News Room Home**
Press Release Archives
  by Year
  by Subject
News Events
Logos
Images
Video & Audio
Quotes
PR Contacts
RSS Feed
**Related Links**
Articles & Reviews
Exec Photos and Bios
Exec Speeches

### New Economic Study Finds Intel Extracted Monopoly Profits of $60 Billion Since 1996

*Also Finds Consumers and Computer Manufacturers Could Gain Over $80 Billion from Full Competition in Microprocessor Market*

**Sunnyvale, Calif. -- August 2, 2007 --**A new economic study issued today by Dr. Michael A. Williams, Director, ERS Group, found that Intel has extracted monopoly profits from microprocessor sales of more than $60 billion in the period 1996-2006. Dr. Williams' analysis explains why pro-competitive justifications for Intel's monopoly profits are implausible.

Williams also found that consumers and computer manufacturers could gain over $80 billion over the next decade if the microprocessor market were open to competition. The analysis noted that consumers would save at least $61 billion over the period, with computer manufacturers projected to save another $20 billion, enabling them to increase their investment in R&D; create improved products and greater product variety; and provide additional innovation benefits to computer buyers around the world.

The ERS Group is an economic and financial consulting firm retained by AMD's outside counsel, O'Melveny & Myers LLP.

Dr. Williams said, "Intel has extracted $60 billion in monopoly profits over the past decade; over the next decade consumers and computer manufacturers would save over $80 billion from a fully competitive market."

Williams continued, "In light of the recent European Commission decision and prior Japan Fair Trade Commission actions, this analysis asks not whether Intel has engaged in anticompetitive conduct, but how much Intel has gained from the alleged conduct."

Thomas M. McCoy, AMD executive vice president, legal affairs and chief administrative officer stated, "Intel's monopoly profits of $60 billion directly contradict Intel's claim that its business practices have resulted in lower prices -- in fact this study shows that billions of dollars have moved straight from consumers' pockets to Intel's monopoly coffers."

McCoy continued, "That $80 billion translates into an Intel monopoly tax on every consumer who purchases a computer. That's a jaw-dropping figure that helps explain why the European Commission brought antitrust charges against Intel -- the real harm that its abuse of monopoly power causes competition and consumers."

A summary of the study is attached.

**About Dr. Michael Williams and ERS Group**
ERS Group is an economic and financial consulting firm that specializes in analyses for complex business litigation. Over 3,000 clients, including Fortune 500 companies, law firms, universities, industry trade associations and government agencies, have retained ERS Group professionals in a wide variety of cases involving numerous industries.

Michael Williams, Ph.D. is a Director of ERS Group. He specializes in antitrust, industrial organization, and regulation. As an economist in the Antitrust Division of the U.S. Department of Justice and as a consultant, he has examined and provided expert testimony on a variety of antitrust and regulatory issues, including monopolization, price fixing and tying arrangements. He has served as a consultant to the U.S. Department of Justice and the Federal Trade Commission in such matters as the proposed mergers of Exxon and Mobil, BP Amoco and ARCO, and in litigated matters such as FTC v. Rambus and U.S. et al. v. Oracle. His Ph.D. in economics is from the University of Chicago. He presented testimony this year as part of the joint DOJ-FTC examination on the future of the antitrust rules governing single-firm conduct.

For more information on AMD's commitment to fair and open competition, visit http://www.amd.com/breakfree

**About AMD**
Advanced Micro Devices (NYSE: AMD) is a leading global provider of innovative processing solutions in the computing, graphics and consumer electronics markets. AMD is dedicated to driving open innovation, choice and industry growth by delivering superior customer-centric solutions that empower consumers and businesses worldwide. For more information, visit www.amd.com.

**A Quantification of Intel's Historical Monopoly Profits from the Sale of Microprocessors and a Projection of Future Consumer and Computer Manufacturing Gains in a Fully Competitive Marketplace**

**A report by Dr. Michael A. Williams, Director, ERS Group**

**KEY STUDY FINDINGS:**

- Intel extracted monopoly profits from the sale of microprocessors of approximately **$60 billion** in the period 1996 - 2006.
- Pro-competitive explanations for Intel's $60 billion monopoly profits are implausible for the following reasons:
  - Recent European Commission charges and prior findings from the Japan Fair Trade Commission;
  - The rarity of firms that achieved a 16-percent or more economic return;
  - An examination of strong companies that have much lower economic returns, including Pfizer, Wyeth, ExxonMobil Corp., and Target;

- o Intel's reported losses on its non-microprocessor businesses, showing that Intel lacks sustained, competitive advantages from brand-name loyalty and other factors;
  - o Negative average economic returns earned by other semiconductor companies.
- Consumers and computer manufacturers would conservatively gain approximately **$81 billion** in the next decade from full competition in the microprocessor market.
  - o Consumers, including both home and business users, would save at least **$61 billion**.
  - o Computer manufacturers are projected to save at least another **$20 billion** over the next 10 years.
- That represents a consumer savings of approximately **1.5%** off the retail price of a $1,000 high-performance desktop computer in a fully competitive market.
- Computer manufacturer savings would result in: (1) increased research and development, (2) greater product variability, and (3) further innovation, providing additional benefits to computer buyers.

**Monopoly Profits**

- Intel's economic return on its microprocessor business was calculated using publicly available information and standard economic methodology. The method begins with standard financial statements and derives from them the information necessary to calculate a firm's economic profits. It is based on Nobel Prize-winning research conducted by Merton Miller and Franco Modigliani and used by more than half the Fortune 1,000 firms to analyze their economic performance; Wall Street investment banks to assess potential investments; and leading management consulting firms, such as McKinsey & Co. and Stern Stewart & Co.

| | |
|---|---|
| Intel's Total Profits (total return 25.95%) | $141.8 billion |
| Competitive Profits (cost of capital 9.94%) | - 54.2 billion |
| Result: Economic Profits (economic return 16.01%) | $87.7 billion |
| Portion of Economic Profits Attributed to Assumed Advantages (5.0%) | - $27.3 billion |
| **Result:** Monopoly Profits (11.01%) | = $60.4 billion |

- Intel's economic profit ($88 billion) was calculated by first determining total profits ($142 billion) and subtracting from that value its cost of capital ($54 billion—which includes a normal profit), resulting in economic profits of $88 billion.
- Intel's economic profit margin of 16-percent (the $88 billion) stands in stark contrast to the economic returns of 498 other public companies examined. Like Intel, they had capital of $1 billion or more in 1996. Of these companies, the average economic return was less than one percent. Intel earned an economic return higher than 99-percent of these large companies, including companies with strong brands, research and development, or intellectual property rights, such as Pfizer, Wyeth, ExxonMobil Corp., and Target.
- Only four companies earned economic returns of 16 percent or more ~ Microsoft (38.25%), UST Inc. (28.54%), Coca-Cola Co. (16.58%), and Intel (16.01%) – and each of these companies has been associated with antitrust determinations. Of course, high economic returns by themselves do not demonstrate anticompetitive conduct.
- To be conservative, the study next provided Intel with a generous assumption that 5 percentage points ($28 billion) of its economic return were attributable to legitimate advantages. That left the $60 billion monopoly profit figure.

**Consumer and Computer Manufacturer Savings**

- The calculation of future consumer and computer manufacturer gains employed four conservative assumptions:
  - o Intel's price premiums would fall by 50% over five years; price premiums were calculated by comparing Intel products with their AMD counterparts.
  - o AMD's market share of units sold would rise from 27% to 35% over five years.
  - o Total industry sales would grow at only half the historical growth rates.
  - o OEMs would pass-through 75% of cost savings to computer buyers.
- Data from 2Q2006 through 1Q2007 were used as the basis for projecting consumer benefits from increased competition over 10 years.
  - o Consumer benefits for 2012-2016 set equal to benefits in 2011.
- As an example of consumer savings on a specific computer purchase, the study notes that consumers would save more than 1.5 percent off the cost of a $1,000 performance desktop computer.

| | |
|---|---|
| Intel microprocessor ASP – 2006 | $121.12 |
| Intel microprocessor ASP – 2011 (projected) | - $101.30 |
| Total price reduction for computer manufacturer: | $19.82 (16 percent less) |
| Savings passed on to consumer: | 75% |
| Total consumer savings per computer: | **$14.87**, or 1.5% of a $1000 performance desktop computer |

**About Dr. Michael A. Williams and ERS Group**

- ERS Group is an economic and financial consulting firm that specializes in analyses for complex business litigation. Over 3,000 clients, including Fortune 500 companies, law firms, universities, industry trade associations and government agencies, have retained ERS Group professionals in a wide variety of cases involving numerous industries.
- The ERS Group, an economic and financial consulting firm retained by AMD's outside counsel, O'Melveny & Myers LLP, specializes in analyses for complex business litigation.
- Michael Williams, Ph.D. is a Director of ERS Group. He specializes in antitrust, industrial organization, and regulation. As an economist in the Antitrust Division of the U.S. Department of Justice and as a consultant, he has examined and provided expert testimony on a variety of antitrust and regulatory issues, including monopolization, price fixing, and tying arrangements.
- Williams has served as a consultant to the U.S. Department of Justice and the Federal Trade Commission in such matters as the proposed mergers of Exxon and Mobil, BP Amoco and ARCO, and in litigated matters such as FTC v. Rambus and U.S. et al. v. Oracle. His Ph.D. in economics is from the University of Chicago. He presented testimony this year as part of the joint DOJ-FTC hearings on the future of the antitrust principles governing single-firm conduct.

Rate this page [+]

©2007 Advanced Micro Devices, Inc.   |   Contact AMD   |   Terms and Conditions   |   Privacy   |   Trademark Information   |   Site Map

# EXHIBIT 10



# AMD In The 'Chips' At Least For Today
By Jim Goldman Silicon Valley Bureau Chief
**cnbc.com**
| 10 Sep 2007 | 05:46 PM ET

This is a big day for **Advanced Micro Devices** , with the company releasing its long-delayed Quad-Core Opteron server chip.

It's also a big day for CEO Hector Ruiz who tells me this morning in an exclusive interview that he can't underestimate just how frustrating the year delay for this product was; but that now is not the time to kick his people. Nor was their time to do that while the company scrambled to get this chip out the door.

AMD will have plenty of time to do so as the company tries to get itself back on track. Meantime, I did spend some interesting time with Ruiz who didn't pull any punches when it came time to discuss the rivalry between his company and **Intel**  , ten times his size.

He confirmed to me that this new Opteron would be in high performance desktop PCs by year end. He told me Intel's good financial news, upping its revenue range to as much as $9.8 billion is actually good news for AMD as well. "A wonderful time" to introduce new technology when the market is doing so well.

He says despite the rough time for his shares this past year that he still enjoys the full support of his board.

Sources at his company tell me tonight's splashy event at George Lucas' sprawling San Francisco campus will include news of a deepening partnership between the two companies, and that could be important: AMD is already a key supplier to the Lucas server farm with Lucas already buying thousands of processors from AMD. That could be significant, both financially and public-relations wise.

But he reserved his choice comments for Intel, saying the anti-trust suit is "real" and that it will be "awful for them." He says comments from Japan, Korea, the European Union and "several countries to come" show real evidence of predatory, monopolistic behavior by the world's largest chipmaker. He says if it "walks like a duck, talks like a duck, and does other things ducks do," it's obvious Intel has been breaking the law.

Ruiz was clear and he says Intel's practices have created what he calls a "monopoly tax" costing businesses and consumers an extra $60 billion in revenue they shouldn't have had to pay.

He has no doubts AMD will prevail in its fight with Intel; but no matter what, he's happy that his company is finally able to offer "real choice, real alternatives" in the marketplace. Michael Dell says the days of "single source" chip supplies are over, a badge of honor Ruiz says he wears proudly.

Meantime, if you think Intel is merely ignoring AMD, consider the company tried to undercut AMD by unveiling its new Xeon processor last week; tried to steal AMD's thunder today by announcing a new revenue range. When I asked Ruiz if it felt good that such a large competitor was spending its time trying to steal AMD's spotlight, his answer: "You're damn right."

And he laughed.

*Questions? Comments?* TechCheck@cnbc.com

© 2007 CNBC, Inc. All Rights Reserved

URL: http://www.cnbc.com/id/20706219/

MSN Privacy . Legal
© 2007 CNBC.com

# EXHIBIT 11

# COMPETITION LAW360

Portfolio Media, Inc. | 648 Broadway, Suite 200 | New York, NY 10012 | www.law360.com

Phone: +1 212 537 6331 | Fax: +1 212 537 6371 | customerservice@portfoliomedia.com

## Intel, AMD War Narrows To One Term--"Rebates"

By **Christine Caulfield** , christine.caulfield@portfoliomedia.com

*Friday, Sep 21, 2007* --- The antitrust battle being waged between the two biggest players in the microprocessor world is not just a spat over lost e-mails, it's a war of semantics too.

When the U.S. case pitting Intel Corp. against its smaller rival, Advanced Micro Devices, finally exits the discovery phase and goes to trial on the merits, it just might turn on a word.

On the one hand there's Intel, which claims its pricing structure is founded on rebates to loyal customers. On the other hand there's AMD, which argues these rebates are really penalties for disloyal customers.

AMD's Executive Vice President of Legal Affairs Tom McCoy, who filed the lawsuit in the U.S. District Court for the District of Delaware in mid-2005, said the microprocessor giant, which is facing scrutiny not just in the U.S. but in the EU, Japan and Korea as well, had yet to persuade anyone with its so-called rebate defense.

"Why is Intel losing their argument? The answer is that the practice in question is not a pricing discount, it's not a subsidy or a rebate. It is a disguised, coercive practice long recognized by antitrust regulators as only being available to a dominant company," McCoy said. "What they call a rebate is conditional on boycotting a rival."

The heart of AMD's claims is the allegation that Intel discounts its chips to computer manufacturers if, and only if, these companies agree to keep the use of competitors' chips at a low 10%. Because AMD sells its rival product at a cheaper rate, Intel's aggressive tactics keep prices artificially steep, which in turn hurts consumers, according to AMD.

"We are the price leader. We're trying to get market access so we can compete head to head," said McCoy, who was snatched from O'Melveny & Myers LLP 13 years ago to serve as AMD's in-house counsel.

"Intel says there's no consumer harm. We say there is a reason why they are losing their argument with conservative antitrust regulators. Consumer harm is obvious, demonstrable, quantifiable...it's huge."

Intel spokesman Chuck Mulloy says claims of consumer harm are not demonstrable but laughable, and will be fiercely argued at trial. Computer prices, he says, have consistently dropped over the years, in relative and

All Content Copyright 2007, Portfolio Media, Inc.

# COMPETITION LAW360

absolute terms. AMD is spouting its imaginary tale of consumer harm to trigger baseless investigations by competition regulators across the globe, he added.

One such investigation, by Japan's Fair Trade Commission, concluded in March 2005 with an injunction against Intel. Korea's antitrust watchdog recently concluded its two-year probe with a statement of objections, as did the European Commission.

"There are no consumers claiming they have been harmed; there is one competitor who continues to assert that our conduct is unlawful," Mulloy said. "The consumer's complaint is a mirror of AMD's complaint. That lawsuit would not exist if it weren't for AMD."

AMD's claim that Intel has been illegally discounting its products flies in the face of assertions that this very conduct injures consumers, Mulloy argues.

"When you have discounting, consumers under U.S. law are deemed to have benefited," he said.

Not so, argues McCoy, who said Intel drove AMD's market share in Japan down from 26% to 11% from 2000 to 2006 with its rebates. Sales of its microprocessors to Sony, for instance, went from 40% of AMD's overall Japanese sales in 2002 to zero in 2004.

"Consumers really got hurt by what they did in Japan," McCoy said, adding that cost savings pocketed by original equipment manufacturers that favored AMD over Intel were directly beneficial to consumers, who were awarded with increased DRAM memory, more software options and other innovations.

"You'd have to be deaf and blind not to see that consumers are being hurt, and the consumers ARE being hurt," said McCoy. "I can prove consumers are not benefiting."

To make its point, AMD recently released the results of an economic study on the impact of Intel's pricing tactics on end users. Authored by economist Dr. Mike Williams, who has served as a consultant for the U.S. Federal Trade Commission, the study claims $60 billion of Intel's worldwide profits from 1996 to 2006 were attributable to anti-competitive conduct.

The study also projected that if Intel's alleged anti-competitive conduct were to cease, savings to OEMs and consumers would be in excess of $80 billion in the next 10 years.

Defending his study against claims by Intel that it was "wildly speculative," Williams said he based his calculations on conservative assumptions and used mathematical models well-recognized by the business community. One assumption, he said, was that Intel had engaged in anti-competitive behavior.

"The study is quite simple, and I believe quite conservative," said Williams.

All Content Copyright 2007, Portfolio Media, Inc.

# COMPETITION LAW360

"Intel's total microprocessor profits over the past ten years total more than $140 billion. In a competitive industry the profits would have been $87.7 billion. This is not a particularly controversial calculation."

Wildly speculative was not the only disparaging label Intel gave to the Williams' study. It was also a PR ploy, said Molloy, who noted AMD had bought full-page ads in the Wall Street Journal and the New York Times in anticipation of the report's release.

"The economic study ...essentially proves that if you pay someone enough money they'll say almost anything. Based on what I've seen here, there's no basis for the conclusions that were reached," he said.

Moreover, said Mulloy, the two sides were still stuck in the discovery phase of the U.S. lawsuit, and were in no position to start taking expert witness testimony.

The companies have been exchanging documents as part of discovery for more than a year, and the process is far from over, with Intel's now famous e-mail retention "lapses" pushing back the trial date to April 2009.

Intel's senior vice president Bruce Sewell said the company would be more than ready by then to defend itself against AMD's spurious claims.

Sewell, who described as "rubbish" the characterization of Intel's rebate as a boycott, said AMD had manipulated the statistics to prove its unprovable point.

Where AMD has a relatively strong share of a particular market, Intel offers discounts to keep its products attractive, he said. In other markets, AMD is the one aggressively discounting. The rebate has nothing to do with a boycott.

"If that were true then AMD would not be selling to Hewlett Packard to Dell," Sewell said. "If Intel were forcing exclusivity then be definition that strategy has failed miserably," he said.

The upshot of the price war, he said, was to lower the overall average price of computers today. The problem with AMD, he added, was that it does not want to compete in a competitive market.

On the contrary, says McCoy: AMD is not trying to manipulate or retard natural market forces that favor the strong company over the weak, Intel is.

Rather than merely enjoying the fruits of its success, Intel was abusing its monopoly power. The market, he said, is indifferent to who produces the microprocessors, so long as they work.

"Intel is erecting these artificial barriers to prevent the market from functioning," said McCoy. "The purpose of the antitrust laws is to make sure

# COMPETITION LAW360

that the law of the jungle applies."

All Content Copyright 2007, Portfolio Media, Inc.