# EXHIBIT A

# GIBSON, DUNN & CRUTCHER LLP

## LAWYERS

A REGISTERED LIMITED LIABILITY PARTNERSHIP
INCLUDING PROFESSIONAL CORPORATIONS

333 South Grand Avenue  Los Angeles, California 90071-3197
(213) 229-7000
www.gibsondunn.com

DFloyd@gibsondunn.com

September 14, 2007

Direct Dial
(213) 229-7148

Fax No.
(213) 229-6148

Client No.
T 42376-00764

Linda J. Smith
O'Melveny & Myers LLP
1999 Avenue of the Stars
7th Floor
Los Angeles, CA  90067

Re:   *AMD v. Intel*

Dear Linda:

I'm writing this letter to raise a few new discovery issues that we need to address, as well as finally resolve the issues you most recently addressed in your July 30, 2007 letter to Peter Moll. I've personally dug into all the correspondence, and have some follow-up items. I think we should arrange a face to face meet and confer, and would be free the last few days of next week or the week after.

**Privilege Review and Logs**

As part of the ongoing discussions we've had with Chuck and your team on modifying the document production obligations of the parties, we agreed to a standstill on the privilege logs, with the agreement that the issues would then be addressed separately. Given that we appear to be finalizing a definitive agreement, we wanted to get this process rolling. On the table so far are reductions in the number of custodians from which logs need to be prepared, as well as our proposals concerning changing some of the protocols concerning log preparation. We also have a few issues arising from Kenyon Wooley's letter addressing our questions concerning AMD's logs, which we believe can be wrapped in and resolved in any overall discussion.

**Intel's Meet and Confer Regarding AMD's Document Responses**

The issues concerning the harvest dates and timing of production are being addressed in the overall discussions. Your July 30, 2007 letter expressed some frustration that you have fully

# GIBSON, DUNN & CRUTCHER LLP

Linda J. Smith
September 14, 2007
Page 2

addressed Intel's issues, but having looked closely at the correspondence, there are some issues that remain that we need to clarify. First, let me start with what I believe is clear from your correspondence: to the extent AMD made objections to requests, but nevertheless agreed to produce documents, you have indicated that your production is complete, i.e., you have not withheld documents based on the objections (other than for privilege). We accept that representation, and do not need a further formal response. Notwithstanding that explanation, two issues remain: (1) requests where AMD indicated it was objecting and not producing documents; and (2) requests AMD designated as corporate requests.

1. **"Complete Objections"**

There are several requests where AMD made "complete" objections and did not indicate that it was intending to produce any documents. For example, these include Requests 193, relating to communications with breakfree@amd.com, and Request No. 206, which includes communications between AMD and McKinsey & Company. Paragraph 10 of the Stipulation and Order Regarding Document Production addresses where a party has refused to produce any documents. Additional requests that fit into this category include 161, 162, 168, 169, 195, 203 and 207. We need to know whether custodians were designated to address these requests, and any others where a "complete" objection was made, and whether responsive documents contained in the files of the designated custodians have been produced.

2. **Corporate Requests**

A number of the categories we raised in our April 6, 2007 meet and confer letter were "corporate" requests – 19-22, 27, 51-53, 70-71, and 99. I do not believe that either party has made their "corporate" productions yet, and so we need to understand whether the limitations set forth in your responses will be applied when you ultimately produce from the corporate files, or whether you will accept any of our proposals concerning those requests. Our understanding otherwise is that to the extent responsive documents to the above requests are contained in custodian files, they are being produced. Let me know if that understanding is incorrect. This raises an overall issue, which is that we need to work through the corporate requests on both sides and reach closure on the scope of data and non-data corporate production, and need to wrap up the ongoing discussions between Jeff Fowler and Tom Dillickrath relating to share drives. I understand from Chuck that Mike Maddigan will be working on the corporate requests, and am obviously happy to work with him on those.

**Glover Park Subpoena**

We understand that you are objecting to the subpoena on privilege and work product grounds, and believe that no privilege log is required pursuant to paragraph (1) of our Stipulation Regarding the Preparation of Privilege Logs. The stipulation, however, does not prevent a party (or either of us) from challenging the privilege assertions. We would request that you provide us

## GIBSON, DUNN & CRUTCHER LLP

Linda J. Smith
September 14, 2007
Page 3

with the following information to allow us to evaluate the assertion of privilege: (1) the date range of otherwise responsive documents for which privilege or work production protection is being claimed; (2) in general the purpose and scope of Glover Park's retention; and (3) the identity of the retaining party. This should not be burdensome, but will give us the basic information necessary to evaluate the privilege and work product assertions. In addition, given Glover Park's role as we understand it, we would expect there would be responsive communications with third parties that would not be subject to any claim of privilege, and that you invite a meet and confer on those communications. We would like to put that on the agenda for discussion.

**ERS Subpoena**

We would also like to meet and confer on your objections to the ERS subpoena. While you did not provide a particularized basis, our position is that AMD has waived any privilege, work product, FRCP 26(b)(4)(B) and/or protection under the parties' expert stipulation when it requisitioned and broadcast a report, the purpose of which seems to be to part of a public relations campaign directly related to the lawsuit, as it purports to quantify the "harm" from what your expert characterizes as an unlawful "monopoly." An integral part of the protections afforded by the various doctrines, rules and stipulation above is that confidentiality be maintained to preserve a privilege for the work of a consulting expert. No one questions the ability of both parties to have consulting experts, free from discovery except in extraordinary circumstances, but when a report purporting to quantify Intel's alleged "monopoly profits" is announced in a press release, and that report is referred to by AMD publicly as supporting its claims, Intel believes the report and the underlying work is subject to discovery.

**Rule 26**

I wanted to clarify what our concerns are concerning the Rule 26 disclosure. We think the parties should agree to a timetable to update the disclosures. Our concern is two-fold: that AMD listed only a handful of third party witnesses, notwithstanding the many companies it has identified in its complaint and discovery responses, and our concern that the listing of the AMD related witnesses at this point are too broad and with boilerplate descriptions. A simple way to address the issue without having to fight about the adequacy of either party's initial efforts would be to select a date to supplement the disclosures under Rule 26(e), so the parties could rely upon the disclosures for purposes of deposition selection.

One final note. While it is probably inevitable in a case of this magnitude and complexity that the rhetoric in correspondence begins to escalate, we have, over the life of this case, managed to negotiate and resolve a large number of issues. Indeed, the stipulation the parties are now finalizing represents significant work and compromises on both sides. We seek

## GIBSON, DUNN & CRUTCHER LLP

Linda J. Smith
September 14, 2007
Page 4

to resolve these issues in the spirit of that agreement, – not to unnecessarily burden either party, but to address some issues we think are important and to clarify other points so we can move forward to complete these massive productions. I look forward to hearing from you.

Sincerely,

Daniel S. Floyd

DSF/dsf

Document2

# EXHIBIT B

# O

## O'MELVENY & MYERS LLP

BEIJING  
BRUSSELS  
HONG KONG  
LONDON  
LOS ANGELES  
NEWPORT BEACH  

1999 Avenue of the Stars  
Los Angeles, California 90067-6035  

TELEPHONE (310) 553-6700  
FACSIMILE (310) 246-6779  
www.omm.com  

NEW YORK  
SAN FRANCISCO  
SHANGHAI  
SILICON VALLEY  
TOKYO  
WASHINGTON, D.C.  

OUR FILE NUMBER  
008.346.163  

WRITER'S DIRECT DIAL  
(310) 246-6801  

WRITER'S E-MAIL ADDRESS  
lsmith@omm.com  

September 27, 2007

**VIA E-MAIL & U.S. MAIL**

Daniel S. Floyd, Esq.  
Gibson, Dunn & Crutcher LLP  
333 South Grand Avenue  
Los Angeles, California 90071-3197

Re: *AMD v. Intel*

Dear Dan:

As with all else in this highly complex case, it is not easy to even write a letter that says "this letter is in response to your letter of X date." So here goes: This letter responds to your letter of September 14th responding to my letter of July 30th and the recently agreed to Case Management Order #3 entered on September 18, 2007 by Special Master Poppiti and So Ordered on September 19th by United States District Court Judge Farnan, plus the additional discussions that have taken place between you and Mike and between you and me.

I will address the issues in the order set forth in your letter:

**Privilege Review and Logs**

Pursuant to Case Management Order #3, paragraph 6, the parties have agreed to negotiate in good faith to arrive at significant modifications in approach, timing and number of privilege logs that will be required in the future. You and I have agreed to meet and confer on privilege log protocols on Monday, October 8, 2007.

**Intel's Meet and Confer Regarding AMD's Document Responses**

We confirm that to the extent AMD made objections to Intel's First, Second, and Third Requests for Production but nevertheless agreed to produce documents, AMD made a complete production notwithstanding those objections (other than for privilege).

Your September 14 letter raised several questions about AMD's responses to certain of Intel's document requests -- specifically, those requests to which AMD asserted objections and did not agree to produce documents. First, you asked whether AMD designated custodians to address those requests. The answer is that AMD did not separately designate custodians whom it

CC1:771464.1

O'MELVENY & MYERS LLP

Daniel S. Floyd, Esq.,
September 27, 2007 - Page 2

would not otherwise have designated solely for the purpose of responding to those requests. Second, you inquired whether documents responsive to those requests were produced from the files of custodians designated for those requests. Because no custodians were designated specifically for the purpose of responding to those requests, the answer is no. Whether AMD produced documents responsive to these requests from the files of custodians designated for other purposes, however, depends upon the particular request. For example, we produced documents from designated custodians' files that we believe would be responsive to a reasonable interpretation of Requests 161, 162, and 168. We would be pleased to discuss these requests, our interpretation of them, and what we have produced in response to them, further with you. We also would like you to provide the same information you have requested with respect to Intel's responses to AMD's document requests and look forward to discussing Intel's objections to AMD's requests at the same time.

Your September 14 letter also discusses "corporate requests" and asks us to confirm that AMD has been producing documents responsive to corporate requests from custodian files. We can confirm that AMD has been doing so, consistent with the terms of the parties' agreed-upon document production protocol. Please confirm that Intel has as well. We also agree with your suggestion that we need to reach closure as soon as possible on production from databases and shared drives, as well as on any remaining issues regarding the corporate requests. I understand that you and Mike Maddigan are planning on meeting tomorrow on these issues.

**Glover Park Subpoena**

In your September 14 letter, you also asked for information that you contend would help you evaluate AMD's privilege objections to the subpoena Intel issued to Glover Park. In response to your questions: (1) Glover Park was retained by O'Melveny & Myers LLP as of January 1, 2005; (2) AMD is asserting privilege with respect to documents from November 1, 2004, when Glover Park began working on AMD's behalf, through the present; and (3) the general purpose and scope of Glover Park's retention is to provide such services as O'Melveny & Myers LLP may require, including assisting in the testing and development of litigation and jury themes, preparing both AMD's legal and company spokespeople and written materials concerning the litigation; and providing expertise to help make this dispute understandable to legal and non-legal audiences. While we are not entirely sure what you mean when you refer to "responsive communications with third parties that would not be subject to any claim of privilege," we would indeed, as your letter anticipates, be willing to meet and confer with you regarding inquiry about those communications. We suggest that you and Mike address this issue as well.

**ERS Subpoena**

As pertains to Requests 257 and 258, Dr. Williams and the ERS Group are economic consultants retained by O'Melveny and Myers to assist counsel in understanding certain economic matters, including Intel's economic profitability. Intel's requests invade the attorney-client and work product privileges in seeking the premature and non-reciprocal disclosure of

CC1:771464.1

O'MELVENY & MYERS LLP

Daniel S. Floyd, Esq.,
September 27, 2007 - Page 3

expert information in a manner and time that is inconsistent with the Amended Stipulation and Protective Order as entered by the Court on May 11, 2007, and with FRCP 26(a)(2)(B). Nor has AMD's public reference to certain of Dr. William's findings resulted in any override of these controlling provisions. Waiver is not the issue. The federal rules do not permit a party to conduct discovery for the purpose of publicly rebutting expert opinions its adversary may have injected into the public debate. Neither Dr. Williams nor ERS Group has as yet been designated as an expert witness by any party, and their opinion, whether or not publicly referenced, is presently immaterial to this action. Any ultimate materiality--together with Intel's concomitant right to inquire--will only ripen if and when Intel finds itself having to refute their opinion in this litigation. That will happen, if at all, only after the parties exchange their respective expert reports.

**Rule 26**

In your letter you write: "I wanted to clarify what our concerns are concerning the Rule 26 disclosure. We think the parties should agree to a timetable to update the disclosures. Our concern is two-fold: that AMD listed only a handful of third party witnesses, notwithstanding the many companies it has identified in its complaint and discovery responses, and our concern that the listing of the AMD related witnesses at this point are too broad and with boilerplate descriptions. A simple way to address the issue without having to fight about the adequacy of either party's initial efforts would be to select a date to supplement the disclosures under Rule 26(e), so the parties could rely upon the disclosures for purposes of deposition selection."

This is very puzzling to us given both the language of Rule 26(e) and the lengthy history of this case. The language of Rule 26(e) which addresses "Supplementation of Disclosures and Responses" provides that:

"A party is under a duty to supplement at appropriate intervals its disclosures under subdivision (a) if the party learns that in some material respect the information disclosed is incomplete or incorrect and if the additional or corrective information has not otherwise been made known to the other parties during the discovery process or in writing."

In this case, we negotiated the Custodian Stipulation and Order, which provided for each party's identification of the Master Custodians pursuant to an articulated (and highly negotiated) standard requiring the representation by both parties that "After reasonable investigation, AMD/Intel hereby represents that the individuals below are believed to comprise all of its and its subsidiaries' personnel in possession of an appreciable quantity of non-privileged, material, non-duplicative documents and things." It goes on to address former employees and to set out a four-pronged test for the 20% Party-Designated Production Custodians consisting of:

"The Party-Designated Production Custodian List shall constitute a representation by the party that the individual custodians are believed in good faith to include: (i) the most important custodians with knowledge of the issues framed by the pleadings; (ii) the custodians believed

O'MELVENY & MYERS LLP

Daniel S. Floyd, Esq.,
September 27, 2007 - Page 4

likely to have the most non-privileged, non-duplicative documents responsive to the other party's Initial Document Requests; (iii) the custodians whose files, taken together, constitute a comprehensive response to the other party's Initial Document Requests; and (iv) all persons whom the party then reasonably believes likely to be called by the party as a witness at trial."

The Custodian Stipulation and Order further sets out an informal discovery process pursuant to which Intel and AMD exchanged both organization charts and 100s of pages of responses to two separate rounds of requests plus follow ups including detailed descriptions of each custodian's job responsibilities. See, for example, Intel's request which asks:

## AMD ACCOUNT TEAMS//SALES & MARKETING GROUP

1. For each of the following accounts – Acer, Alienware Corporation, Appro International, Asus Computer International, Averatec, Dell, Egenera, Fujitsu, Fujitsu-Siemens, Gateway, Hewlett-Packard, Hitachi, IBM, Lenovo, LG, MPC Computers, MSI Computer Corp., NEC, NEC-CI, Network Appliance, Rackable Systems, Samsung, Solectron, Sharp, Sony, Sun Microsystems, Supermicro Computers, Toshiba, Trigem, ASI, Avnet, Bell Microproducts, D&H Distributing, Epox International, Foxconn, Hon Hai Precision, Ingram Micro, Intcomex, Mitex, Supercom, Synnex, Tech Data, Tyan, Aldi, Best Buy, Circuit City, CompUSA, Costco, Dixon's (DSG), Fry's, MediaMarkt, Office Depot, Office Max, Toys R Us, Vobis, Wal-Mart, Staples, Time Computers, Carrefour Conforama (PPRP), Yakamo – please answer the following questions:[1]

---

[1] To date, AMD has provided the following information regarding its account teams: Barton Arnold ("works on the IBM account"); Donna Becker (Manager, Microsoft Alliance Marketing); James Beggans (HP Sales Development Manager); Christopher Calandro (Global Account Manager, Gateway); Jerome Carpentier ("he focuses on working with HP, IBM, and Sun"); Brian Casto (IBM Sales Development Manager); Walter Cataldo (Account Executive); Ted Donnelly (IBM Global Account Manager); James Elder (Account Exec., WW Avnet); Anne Flaig (Director, Sales for HP; Director, Sun); Jeff Fonseka (Senior Sales Rep. – Sony); Bradley Fryer (Channel Sales Manager – Fry's, Costco, Future Shop, Best Buy Canada, Amazon.com, Walmart); Jeff Hartz (Channel Sales Manager – Walmart, Sam's Club, Radio Shack, CompUSA, Office Depot, and Tiger Direct); Yoshimi Ikeda ("responsible for the Hitachi account in 2003 and also had a previous relationship with Toshiba"); Masato Ishii (Regional Sales Manager – Sony, Toshiba, Hitachi, PCS, NEC); Takayuki Kuroshima (Regional Sales Manager – Japan tier one OEM accounts); JD Lau ("manages the Lenovo account in China"); Makato Matsunaga ("worked on the Fujitsu account, among others"); Takamichi Miyamoto (FSE NEC); Tetsuji Murai ("worked on the Toshiba account"); Ken Oberman ("at various times had responsibility for the Averatec, Acer, Fujitsu, Sony, Sun Micro, and Toshiba accounts"); Naoko Ohgimi (Customer Support Engineer – Fujitsu); Gerard Poulizac (Regional Sales Manager – HP EMEA, NEC-CI); Derek Reaves (Distribution Business Manager – Avnet); Tom Rogers (Channel Sales Manager – Best Buy, Office Max, Micro Center); Claudia Santos (Business Development, Regional Manager – Toshiba, Sun, HP, IBM, Positive, Procomp, Novadata, Itautec, Semp); Takeshi Shimizu (FSE – IBM, Sun and Cray (Japan)); Masahide Shuyama (Sales Manager – NEC); Kelly Talbot (Channel Sales Manager – Circuit City, Staples, Business Depot, Hartco); Adam Tarnowski (Senior Account Manager – Appro, Rackable); Dwight Tausz (Global Account

O'MELVENY & MYERS LLP

Daniel S. Floyd, Esq.,
September 27, 2007 - Page 5

    a.    Who is the current Account Manager or person at AMD with primary responsibility for managing the account? How long have they been in this role? What are their primary duties and responsibilities in this role? To whom do they report?

    b.    Since January 1, 2000, what other individuals have served as Account Manager or had primary responsibility for managing the account? For each, please identify the time period during which they held this position, their responsibilities (if different from above), the person they reported to, and their current position.

    c.    Since January 1, 2000, what other individuals have been assigned to the account or account team with responsibilities that included directly dealing with customers? For each, please identify the position held, their primary responsibilities, the time period during which they held the position, the person they reported to, and their current position.

    d.    For the period January 1, 2000 to present, what individual or individuals at AMD had primary responsibility for negotiating directly with the account regarding the sale of AMD microprocessors or products incorporating AMD microprocessors? Please identify the time period during which each individual was in this role.

    e.    For the period January 1, 2000 to present, what individual or individuals at AMD had primary responsibility for dealing or negotiating with the account with respect to any type of marketing or promotional program?

In addition to the footnote, AMD responded to this request with a 71 page spreadsheet response, which was then followed-up by further Intel requests and AMD submissions.

The Custodian Stipulation and Order established corporate requests, and a protocol for Adverse-Party Production Custodians and Free Throw Custodians. Intel altered its Master Custodian and 20% Party-Designated Custodian list to delete Intel custodians after the decision on Intel's Motion to Dismiss based on the Foreign Trade Antitrust Improvements Act and put them back on the lists after the decision on AMD's Motion to Compel. The Custodian Stipulation and Order has been the basis on which both parties have conducted document production since the middle of May 2006. The parties have laboriously worked to revise certain of these protocols (but not the manner and designation of the custodians) in Case Management Order #3. It is hard to imagine a case where the disclosure of the party witnesses and their roles and responsibilities is more complete than this one.

---

Manager – IBM, Lenovo); Chris Towne (Corporate Distribution Business Manager – ASI, Bell Microproducts); Keisuke Toyooka (Sales Manager – Sony); Renato Urani (Account Manager – Acer); Jeff Venditte (Sr. Sales Account Manager – HP); Lanzhi Wang (OEM Account Manager – China OEMs); Alan Windler (responsible for Gateway account).

O'MELVENY & MYERS LLP

Daniel S. Floyd, Esq.,
September 27, 2007 - Page 6

With respect to third parties, we have jointly -- with AMD taking the lead -- proceeded on a custodian by individual custodian basis to identify (and narrow) the list of key custodians for each of the subpoenaed third parties. Again, it is hard to imagine a case where the disclosure of third party witnesses is more robust than this one.

Accordingly, we do not believe that Rule 26(e) supplementation is required. That said, both parties have an interest once we commence the deposition phase of discovery and have made our way through the majority of the deposition process in making sure that the witnesses each party intends to call at trial have been identified and an opportunity provided for the other side to depose those witnesses.

I look forward to discussing these matters with you.

Very truly yours,

Linda J. Smith
of O'Melveny & Myers LLP

LJS:deb

CC1:771464.1