RICHARDS, LAYTON & FINGER
A PROFESSIONAL ASSOCIATION
ONE RODNEY SQUARE
920 NORTH KING STREET
WILMINGTON, DELAWARE 19801
(302) 651-7700
FAX: (302) 651-7701
WWW.RLF.COM

CHAD M. SHANDLER
DIRECTOR

DIRECT DIAL NUMBER
302-651-7836
SHANDLER@RLF.COM

February 22, 2008

**VIA ELECTRONIC MAIL & HAND DELIVERY**

REDACTED PUBLIC VERSION

The Honorable Vincent J. Poppiti
Blank Rome LLP
Chase Manhattan Centre, Suite 800
Wilmington, DE 19801-4226

Re: Advanced Micro Devices, Inc., et al. v. Intel Corporation, et al. C.A. No. 05-441-JJF, In re Intel Corporation, C.A. No. 05-1717-JJF, and Phil Paul, et al. v. Intel Corporation, C.A. 05-485-JJF

Dear Judge Poppiti:

AMD and Class Plaintiffs oppose Intel's February 15, 2008 request that the Court impose rigid and draconian limits on the number and length of depositions that may be taken in these cases. We argue in Part I that given the very limited time the parties have had to review documents, and the huge outstanding volume of unreviewed (and, to some extent, yet-to-be-produced) materials, neither the parties nor the Court can determine the appropriate number of depositions or the appropriate duration of any particular deposition. In Part II, we demonstrate that, in any event, Intel's proposed limits are absurdly low and seriously (and perhaps purposefully) out of sync with the level of effort required of plaintiffs to build a case. In Part III, we cross-move for the adoption of an alternative approach to the control of deposition discovery – one that is more consistent with both the nature and importance of this case and its current posture, fairer to all parties, and yet still effective in allowing the Court to move this case forward toward trial.[1]

---

[1] Although styled as a request for a conference, AMD interprets Intel's February 15 letter as a motion asking the Special Master to recommend that the Court impose numeric and temporal limitations on the depositions in this action. As a result, AMD combines in this single letter brief both an opposition to Intel's motion and a separate cross-motion asking the Special Master instead to recommend a deposition window approach. Accordingly, this letter is eight pages long, combining the four pages available for AMD's opposition and the four pages available for its separate cross-motion. Intel rejected our suggested briefing schedule, which would have provided for sequential (as opposed to simultaneous) briefs allowing each side to reply to the other's opposition. As a result, we invited Intel to file its motion and indicated that we might cross-move for a different order. While we agree that Intel may reply to our opposition to its proposal, we similarly reserve the right to reply

RLF1-3256457-1

The Honorable Vincent J. Poppiti
Page 2
February 22, 2008

I.   **IT IS PREMATURE TO IMPOSE DEPOSITION LIMITS.**

Although these cases have been pending nearly three years, the parties are only now beginning – and we emphasize beginning – to get their arms around the facts. That is because Intel has taken nearly three years to serve up the documents – or that portion not lost through faulty preservation – that reflect how it has maintained its monopoly over the past eight years. This cache, according to Intel, will ultimately comprise "approximate[ly] *140 million pages*." (2/15/08 letter at 1) (emphasis added). As of year-end, however, Intel, by AMD's count, had only produced the equivalent of 29.1 million pages. Hence, AMD and Class have yet to begin to digest over 75% of Intel's production. And this does not include Intel's yet-to-be-completed production of documents it maintains in centralized files (as opposed to the files of individual custodians). The deadline for production of these materials is April 15, 2008, still some two months off.

Moreover, for those Intel custodians whom Intel identified as its Party Designated Custodians, "the most important custodians with knowledge of the issues framed by the pleadings," production has only been made through June 1, 2006. As these folks as well as the 107 AMD Adverse Designated Intel Custodians are selected as Deposition Reharvest Custodians, Intel will then harvest and produce all documents pursuant to customized search terms from each custodian through an as to be agreed-upon date. That production will likely encompass another 2 years worth of documents from these key custodians. Production is due 60 days after the identification of the custodian as a Deposition Reharvest Custodian and the production then will have to be reviewed.

Production of documents by Intel's customers – likely to be the Rosetta stone of Intel's anticompetitive schemes – is at an even more preliminary stage. Collectively, documents have been subpoenaed from nearly 70 global computer OEMs (Tier 1), Tier 2 and regional OEMs, value-added resellers and so-called "white box" manufacturers, parts distributors, and computer retailers. While not all are expected to produce documents, the three or so dozen who will are for the most part just beginning to turn their materials over, many only after the development of search terms so as to streamline the productions. Just by way of example, using the largest worldwide computer companies, HP, now the largest computer company in the world, has yet to begin its production. Dell, formerly the largest computer company in the world, has just made another production and just received a second set of search terms to apply across its custodian base. IBM has been producing in waves and, when it finishes its first production, will then turn to responding to a second set of search terms across its custodian database as provided by its production agreement with plaintiffs.

Without reviewing the documents, it is impossible to identify the relevant witnesses and even more difficult to evaluate their relative importance. Given the state of the document productions, no one can reliably predict how many depositions will be necessary in this case,

---

to any opposition it may file to the proposal contained in Part III. We also understand that neither Intel's proposal nor ours addresses expert discovery.

RLF1-3256457-1

The Honorable Vincent J. Poppiti
Page 3
February 22, 2008

how many days any particular deposition may last, or how the available deposition slots should be allocated among party and non-party witnesses.

Nor is there any compelling reason to establish deposition limits now. Instead, the parties should be encouraged to begin depositions promptly and to get as many completed as possible, while simultaneously reviewing the party and third-party document productions. Once that review is complete, hopefully by mid-year, the parties will be in a position to evaluate their deposition needs, to attempt to hammer out a compromise that fairly reflects the complexity and importance of this case, and failing compromise, to return to the Court for an adjudication of their remaining differences.

## II. IN ANY EVENT, INTEL'S PROPOSAL WOULD UNFAIRLY AND UNJUSTIFIABLY HOBBLE PLAINTIFFS IN PROVING THEIR CASE.

### A. Intel's Proposed Restrictions On the Number and Duration of Depositions Are Objectively Unreasonable.

The federal courts recognized that the scope, timing and duration of deposition discovery are not matters that should be fixed simply to achieve the objective of "getting it over," but rather must take into account the importance, complexity and proof challenges of the case in hand. *See e.g. Steelcase Inc. v. Haworth, Inc.*, 954 F. Supp. 1195 (W.D. Mich. 1997) ("nature and scope of proofs" at trial guide scope of pre-trial discovery). This is particularly true in antitrust cases because anticompetitive conduct comes in "many forms" and is "dependent upon context." *Le Page's, Inc. v. 3M*, 324 .F. 3d 141, 152 (3d Cir. 2003). Indeed, in antitrust cases "the courts must look to the monopolist's conduct taken as a whole rather than considering each aspect in isolation" and the duty of the jury is "to look at the whole picture and not merely at the individual figures in it." *Id.* at 162.

It is difficult to imagine a private litigation more important or more rife with public policy considerations than this one. It has been estimated that, in the past decade, fully 50% of worldwide productivity gains have resulted from advances in information technology.[2] Knowledgeable commentators have singled out progress in microprocessors as being the single greatest driver of IT gains. The outcome of this case will largely determine whether competition in this space will flourish and drive further innovation or whether the industry will once again be in the iron grip of a dominant, single-source as it was during the 1980s and much of the 1990s. That is why the matter has drawn the attention of competition authorities in Japan, South Korea, and the EU, as well as, just recently, the Attorney General of the State of New York.

As important as it is to the world economy, it is also difficult to imagine an antitrust case in which proof could be more difficult to assemble. As the Court knows, central to this case is Intel's practice of granting rebates and discounts on microprocessors that customers must

---

[2] *See e.g. Stephen D. Oliver and David E. Sichel*, "The Resurgence of Growth in the Late 1990's: Is Information Technology The Story?" *The Journal of Economic Perspectives*, Vol. 14, No. 4 (Autumn, 2000), pp. 3-22.

RLF1-3256457-1

The Honorable Vincent J. Poppiti
Page 4
February 22, 2008

necessarily buy from Intel conditioned on the customer's purchase of Intel chips for that portion of its business that it could as easily procure and use, and might prefer, from AMD. Intel will undoubtedly attempt to hold AMD to the burden of proving that this practice has excluded AMD from a substantial portion of the x86 microprocessor market, which both sides agree is worldwide. To meet such a burden, AMD will have to develop and present evidence that Intel imposed conditional rebates and other exclusionary deal terms on a substantial portion of the computer eco-system, which constitutes its worldwide customer base. That means depositions of large, often global OEMs (such as Dell, HP, Lenovo, IBM, Sony, NEC, Toshiba, Gateway, and others), key whitebox manufacturers and value added resellers (such as SuperMicro and Rackable among others); a significant number of distributors (including Ingram, Synnex, Tech Data, and others); and the key retailers over whom AMD and the Class have subpoena power (BestBuy, Circuit City, Fry's, and others).

Adding to the complexity, we have not yet found a single Intel deal at any customer that extends over the entire limitations period. To the contrary, chip suppliers negotiate purchase terms with chip customers for shorter terms, often quarterly. Hence, for some customers that Intel has subjected to quantity forcing terms, AMD and Class may have to delve into as many as twenty-eight or thirty-two quarters (one agreement per quarter times seven or eight years) in order to show significant exclusion over the entire period.

But that is not the half of it. Proving quantity forcing behavior will not be a simple matter of, for example, authenticating a contract because Intel does not extort using contracts. Rather, Intel and its customers appear to hammer out deal terms through endless email exchanges involving large numbers of customer personnel. Sometimes, the conditional nature of the rebate or discount is express. But, more frequently, the condition is implied or not written at all, in which case the evidence consists largely of internal *customer* communications. But in almost all cases it has to be pieced together from oblique and cryptic references.

**REDACTED**

Compounding all these other proof challenges, at none of the customers (or at Intel) is there a single decision maker. Teams, not individuals, are involved in the dealmaking, and those teams regularly turn over.

**REDACTED**

The Honorable Vincent J. Poppiti
Page 5
February 22, 2008

**REDACTED**

These are just a few examples, but the pattern is pervasive.

The multiplicity of transactions per year, years at issue, e-mail exchanges, and witnesses per transaction produces a daunting challenge. Establishing the exclusionary nature of so many deals at *thirty* or more Intel customers over a **seven** or *eight-year* period involving ever-changing, *multi-member* teams of Intel and customer negotiators will present AMD and the Class with a canvass of literally hundreds of potential deponents. This does not count the number of witness AMD and the Class will need to depose to prove non-financial exclusionary conduct (*e.g.*, knee-capping, payments to delay or cancel AMD product launches, and manipulation of technology and standard setting to raise AMD's costs).

It is thus simply not credible for Intel to suggest with a straight face that AMD and the Class collectively be limited to seventy-five depositions (only 25 of which could be of third-party witnesses) comprising a total of not more than 110 days of depositions. This is not a proposal born out of concerns for efficiency and a frank recognition of what "can reasonably be accomplished"; rather, it is an attempt to asphyxiate plaintiffs' claims before they can be substantiated by choking off their access to the evidence. Intel wants to win even before the first deposition is taken.

We doubt that even Intel takes its own proposal seriously. Among other reasons, it already anticipated deposition limits far in excess of the numbers it asks the Court to impose. The issue came up in connection with the number of custodians whose document productions would need to be updated in advance of their depositions. In an agreement now embodied in Case Management Order No. 3, Intel agreed to 120 deposition reharvests of Intel witnesses (and accepted 60 from AMD) signifying at least an equal number of depositions. (Clearly, there would be no need to undertake a "deposition reharvest" of documents from a custodian were he or she not going to be deposed.) How when it once acknowledged that at least 120 Intel depositions would be necessary and appropriate can Intel now ask the Court to cut that number to 50?

Moreover, Intel's proposed number is wildly out of sync with the custodian population Intel has conceded possess relevant information. At the outset of discovery, Intel put over 1,000 employees on its Master Custodian List, signifying that each possessed "an appreciable quantity of non-privileged, material, non-duplicative" evidence. Intel then identified and produced documents from the 221 whom it represented to be its "most important custodians with knowledge of the issues framed by the pleadings." Yet now that we have reached the critical testimonial evidence gathering stage, it seeks to limit AMD and Class to less than 5% of the Intel employees it concedes possess relevant information, just over 15% of the custodians from whom Intel has produced or will produce documents, and only 40% of the individuals it agreed would be reharvested in advance of their depositions.

RLF1-3256457-1

The Honorable Vincent J. Poppiti
Page 6
February 22, 2008

Finally, Intel's proposed meager allotment of depositions cannot be defended on the ground of scarcity of legal resources to take and defend depositions. To date, Intel has retained at least six different law firms for these cases, and approximately 50 lawyers have been admitted *pro hac vice* to represent Intel in this matter. Thus, Intel clearly has the attorney bandwidth required to defend a substantial number of depositions – far more than the 50 depositions Intel proposes – and Intel would not have assembled so massive a legal army if it had seriously believed that depositions could and should be limited to the extraordinary degree it now advocates.

    B.    **Intel's Demand For Deposition Parity, After Implicitly Conceding That AMD And Class Should Receive Access To Twice The Information Intel Receives, Is Manifestly Unreasonable.**

Intel's demand that it be allowed to take the same number of depositions as AMD and Class combined flies in the face of not only reason but also of the two-to-one allocation built into every discovery formula the parties have asked the Court to approve. The two-to-one ratio governed the minimum number of witnesses the parties were required to identify for their Master Custodian Lists (1000 for Intel and 400 for AMD), the number of custodian "free throws" the parties could use to supplement document production (100 for AMD and 50 for Intel), and the number of deposition reharvests (120 for AMD and 60 for Intel).

Intel did not accidentally agree to take on a disproportionately higher burden of producing evidence. Rather, the two-to-one formula recognizes both that Intel has far more key players than AMD, and that AMD and the Class bear the burden of proof. And it makes sense. AMD and the Class will need to prove Intel engaged in illegal quantity forcing and other exclusionary behavior, and must do so with witnesses they do not control. It will almost invariably require multiple witnesses to establish the facts concerning just a single incident. Intel, on the other hand, can simply have its witnesses deny any wrongdoing, which it can and undoubtedly will do though employee witnesses it has no need to depose.

    C.    **Intel's Demand that AMD and Class Pre-Identify Potential Deponents Is Unnecessary and Unduly Invades Their Work Product Privilege**

Intel's request that the parties "should up front identify their initial proposed list of deponents" is similarly unprecedented and unjustified for several reasons. First, as explained, the primary problem with Intel's proposal is that AMD and the Class are not yet in a position – and cannot fairly be required – to identify a list of deponents at this point. Given the status of the document production and review, it simply is premature for the parties to do so. Second, even if AMD could do so, nothing in the Federal Rules requires the parties to identify anticipated deponents or potential witnesses so far in advance, and Intel's suggestion that the parties be required to do so at the outset of deposition discovery is nothing more than an effort to hamstring AMD and to obtain information about AMD's strategy to which it is not entitled. Third, under the deposition scheduling protocols the parties already have agreed to, the parties will identify and notice at the beginning of each month the depositions that they intend to take during the

The Honorable Vincent J. Poppiti
Page 7
February 22, 2008

following month (*i.e.*, the parties will identify in the beginning of August the witnesses they seek to depose in September). Thus, under those protocols, the parties typically will have more than one month notice of each deposition, far more than is required under the Federal Rules and more than enough necessary for Intel to prepare and defend its witnesses

### III. A DEPOSITION WINDOW WOULD ACCOMMODATE THE CASE MANAGEMENT CONCERNS OF BOTH THE COURT AND THE PARTIES WITHOUT UNFAIRLY DISADVANTAGING AMD OR UNDULY BURDENING INTEL.

Instead of prematurely imposing restrictions on the number of depositions or the time permitted for each deposition, AMD and Class urge the Court to adopt the concept of a multi-track "deposition window." Used successfully in other complex cases, this approach will ensure an appropriate scope for deposition discovery, enable the Court and the parties to manage that discovery effectively, and keep the case moving expeditiously toward trial.

Specifically, AMD and the Class suggest that the Court establish a time period, or "window," in which deposition discovery would take place. AMD respectfully suggests that that window be from Monday, March 17, 2008 through Friday, December 12, 2008. Within that window, AMD proposes that depositions proceed on five separate tracks, three for party witnesses and two for non-parties. Specifically, we propose that Intel be allocated one track and AMD and the Class be allocated two tracks, all three running from March 17 to December 12. (Granting plaintiffs a combined number of deposition days twice that afforded Intel is consistent with every other allocation the parties have agreed to, and appropriately mirrors both Intel's substantially larger size and AMD's burden of proof.) Each party track would thus be thirty-nine weeks long and allow for a maximum of 195 days of deposition (although we do not think it is realistic to expect that all these days will be used). We also propose two shorter tracks, running from April 21 to December 19, for third party depositions, one allocated to Intel and a second to be shared by AMD and the Class combined. Each third party track would be 34 weeks long and allow for a maximum of 170 deposition days (although given the particular difficulties of scheduling third-parties, it is not likely that we will be able to utilize all of them). Within its allocated track, a party would be free to use its time as it sees fit, spending more time with more important witnesses and less time with the less significant ones. The constraint would not be on duration but the total number of available deposition days.

As we see it, there are four primary advantages to this approach. First, it effectively establishes real limits to deposition discovery, without imposing artificial and inappropriate ones, by specifying a date by which fact witness deposition discovery will be completed. Second, while giving the parties appropriate freedom and flexibility to manage the deposition process in an informed manner, it simultaneously imposes real constraints by restricting the number of days available to conduct depositions. Third, the "deposition window" approach will enable the Court to keep the case moving steadily toward trial by allowing deposition discovery to be completed in 2008. Finally, if additional deposition days are needed, the Court can simply extend the window an appropriate number of weeks without embroiling itself in the issue of the appropriate absolute "number" of depositions.

RLF1-3256457-1

The Honorable Vincent J. Poppiti
Page 8
February 22, 2008

     Clearly, Intel should not be heard to complain that it lacks sufficient legal talent to cover multiple deposition tracks. Intel's six law firm army of lawyers should be up to defending what will be at most, and likely only sporadically, two simultaneous depositions while it deploys another one of its fifty lawyers to depose an AMD witness. Given the realities of scheduling third-party witnesses, covering those tracks will only present an intermittent burden.

     Besides being more suitable for the nature and posture of this case, the deposition window approach also is consistent with the federal rules and with federal practice. Under the Federal Rules, additional depositions are appropriate when: (1) they are not unreasonably cumulative or duplicative; (2) a party has not already had ample opportunity to obtain the information sought from the deposition; and (3) the burden or expense of the proposed deposition does not outweigh its likely benefit, taking into account the needs of the case, the amount in controversy, the parties' resources, the importance of the issues at stake in the litigation, and the importance of the proposed discovery in resolving the issues. *See, e.g.,* FRCP 30(a), 26(b)(2). Here, as noted, the issues at stake affect the entire worldwide computer market, the amount of controversy is enormous, and the resources of the parties – particularly Intel – are substantial. Indeed, it is hard to envision a case where, because of the nature of the case and the significance of the issues, broad deposition discovery would be more appropriate.

     The strict and severe limits proposed by Intel also would be inconsistent with federal practice in a case of this size and scope. Indeed, based just on our informal review, we have identified a number of federal court case management orders in cases that are not significantly smaller and less complicated than this one, in which courts either rejected strict numerical limits in favor of a more flexible approach, or adopted very high numerical limits in order to allow the parties to prove their respective cases. *See e.g., Amex v. Visa* (Ex. A) (rejecting defendants' proposal for 155 depositions and instead permitted 8 months of depositions without imposing any numerical limitation); *U.S. v. Philip Morris* (allowing each side 1,000 hours of deposition to be allocated in its discretion); *In re Public Securities Litigation* (allowing 560 depositions). The Court should take the same approach here and adopt AMD's flexible "deposition window" proposal as the best way for the parties to complete deposition discovery in an effective and expeditious fashion that keeps this case progressing toward trial.

                                            Respectfully submitted,

                                            /s/ *Chad M. Shandler*

                                            Chad M. Shandler

CMS:ps
Enclosure
cc:    Clerk of the Court (via electronic filing)
        Charles P. Diamond, Esq. w/ enclosure (via electronic filing)
        Richard L. Horwitz, Esq. w enclosure (via electronic filing)
        James L. Holzman, Esq. w/ enclosure (via electronic filing)