**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| IN RE ) | |
| INTEL CORP. MICROPROCESSOR ) | |
| ANTITRUST LITIGATION ) | MDL Docket No. 05-1717-JJF |
| ) | |
| ADVANCED MICRO DEVICES, INC., a ) | |
| Delaware corporation, and AMD ) | |
| INTERNATIONAL SALES & SERVICE LTD, ) | |
| a Delaware corporation,, ) | |
| ) | |
| Plaintiffs, ) | |
| ) | Civil Action No. 05-441-JJF |
| v. ) | |
| ) | |
| INTEL CORPORATION, a Delaware ) | |
| corporation, and INTEL KABUSHIKI KAISHA, ) | |
| a Japanese corporation, ) | |
| ) | |
| Defendants. ) | |
| ) | |
| ) | |

**SPECIAL MASTER'S REPORT AND RECOMMENDATION (DM 8)**

These are antitrust actions brought by Advanced Micro Devices, Inc. and AMD

International Sales and Services, Ltd. (collectively "AMD") against Intel Corporation ("Intel"),

as manufacturers of microprocessors that run the Microsoft Windows and Linux families of

operating systems. Intel is alleged to hold a worldwide market share measured as 80% of the

market in units and 90% of the market in revenues. Presently before the Special Master is Intel's

Motion to Compel (the "Motion") (D.I. No. 639 in D. Del. C.A. No. 05-1717; D.I. No. 452 in D.

Del. C.A. No. 05-441) AMD and the ERS Group (collectively "AMD"), a non-party to the

litigation, to produce a report generated by Dr. Michael A. Williams (the "Report"), including all

documents used in its preparation.

Having read and considered the papers submitted by the parties and having heard and considered its oral arguments made before the Special Master in a hearing on January 10, 2008, the Special Master recommends that Intel's Motion be GRANTED.

## BACKGROUND

Intel maintains that, since the commencement of this action, AMD has engaged in a public relations campaign aimed at tarnishing Intel's reputation and promoting its theory of the case – namely that Intel has, among other things, participated in unfair business practices.[1] Intel asserts that in furtherance of this effort AMD issued a press release (the "press release") (attached as Exhibit 1) on August 2, 2007 announcing the existence of the Report. (D.I. 452, Ex. 9).

The press release, quoting AMD's executive vice president of legal affairs, Tom McCoy, stated, "this study shows that billions of dollars have moved straight from consumers' pockets to Intel's monopoly coffers" and that Intel's "$60 billion in monopoly profits . . .helps explain why the European Commission brought antitrust charges against Intel." *Id.* Dr. Williams is also quoted as saying that, "in light of the recent European Commission decision [to charge Intel with violating applicable EU antitrust laws] and prior Joint Federal Trade Commission actions," he questions "how much Intel has gained from the alleged conduct." (D.I. 452, Ex. 9 at 1).

The press release also contains a seemingly-detailed summary of "Key Study Findings," a description of the methodology used to arrive at the claimed resulting "Monopoly Profits" and a calculation of what the "Consumer and Computer Manufacturer Savings" would be absent

---

[1] Intel provided the Special Master with other examples of the so called media campaign. AMD in turn asserts that Intel on its part has sought out journalists to publish Intel's spin, namely that Intel's actions are justified in a fiercely competitive market. The Special Master gives weight to the motives/actions relative to a public relations campaign of a party, only when as discussed herein where motives/actions have an impact on matters before the Court.

2

Intel's asserted monopolistic practices. Since the press release, AMD has referenced the Report

on a number of occasions.[2]

On August 3, 2007, the District Court for the Northern District of California[3] issued a

subpoena, commanding AMD to produce the Report and all documents used in preparation of

the Report.

On August 17, 2007, AMD objected to the subpoena, asserting *inter alia*, the attorney-

client privilege and work-product protection. AMD also asserted that: (1) the information sought

was for "improper tactical purposes and not for the purpose of obtaining discoverable

information"; (2) the documents contained trade secrets and confidential research and were

subject to "other legal obligations of confidentiality"; (3) the documents are not likely to lead to

the discovery of admissible evidence; and, (4) Williams is not an expert slated for trial. (D.I.

452, Ex. 2 at 2-3).

In the absence of AMD showing Fed. R. Civ. P. 45(d)(2)(A)'s particularized basis to

support the assertion of either the attorney-client privilege or work-product protection, Intel by

letter dated September 14, 2007 stated its position to AMD as follows:

> [O]ur position is that AMD has waived any privilege,
> work-product, FRCP 26 (b)(4)(B) and/or protection under
> the parties' expert stipulation when it requisitioned and
> broadcast a report, the purpose of which seems to be part of
> a public relations campaign directly related to the lawsuit,
> as it purports to quantifying "harm" from what [Dr.
> Williams] characterizes as an unlawful "monopoly". An

---

[2] Intel asserts that on September 10, 2007, AMD's CEO, Hecter Ruitz in what is described as a clear reference to the Report was quoted as saying that "Intel's practices have created what he calls a 'monopoly tax' costing businesses and consumers an extra $60 billion in revenue that they shouldn't have had to pay." (D.I. 452, Ex. 10 at 1). Intel further asserts that the Report was also discussed in a September 21, 2007 article, which noted that AMD had commissioned the Report and released its results "to make its point" that Intel had made $60 billion in illegal monopoly profits over the past ten years.

[3] *See* November 3, 2005 Transfer Order (D.I. 76), ordering that the ten actions in the Northern District of California and four actions in the District of Delaware be transferred to the District of Delaware, consolidated, and assigned to the Honorable Joseph J. Farnan, Jr.

3

> integral part of the protections afforded by the various
> doctrines, rules and stipulation above is that confidentiality
> be maintained to preserve a privilege for the work of a
> consulting expert. No one questions the ability of both
> parties to have consulting experts, free from discovery
> except in extraordinary circumstances, but when a report
> purporting to quantify Intel's alleged "monopoly profits" is
> announced in a press release, and that report is referred to
> by AMD publicly as supporting its claims, Intel believes
> the report and the underlying work is subject to discovery.

(D.I. 454 Ex. A, p. 3).[4]

By letter dated September 27, 2007, AMD responded as follows:

> As pertains to Request 257 and 258, Dr. Williams and the
> ERS Group are economic consultants retained by
> O'Melveny and Myers to assist counsel in understanding
> certain economic matters, including Intel's economic
> profitability. Intel's requests invade the attorney-client and
> work-product privileges in seeking the premature and non-
> reciprocal disclosure of expert information in a manner and
> time that is inconsistent with the Amended Stipulation and
> Protective Order as entered by the Court on May 11, 2007,
> and with FRCP 26(a)(2)(b). Nor has AMD's public
> reference to certain of Dr. Williams's findings resulted in
> any override of these controlling provisions. Waiver is not
> the issue. The federal rules do not permit a party to
> conduct discovery for the purpose of publicly rebutting
> expert opinions its adversary may have injected into the
> public debate. Neither Dr. Williams nor ERS Group has as
> yet been designated as an expert witness by any party, and
> their opinion whether or not publicly referenced, is
> presently immaterial to this action. Any ultimate
> materiality – together with Intel's concomitant right to
> inquire – will only ripen if and when Intel finds itself
> having to refute their opinion in this litigation. That will

---

[4] The Amended Stipulation and Protective Order Regarding Expert Discovery entered on May 11, 2007 provides:

> Unless independently discoverable, a party or its agents need not
> produce documents prepared, collected or considered by a non-
> testifying expert or consultant (or permit testimony about them)
> that were not provided to and considered by an expert witness in
> forming opinions in this matter. (D.I. 341 at ¶ 4).

> happen, if at all, only after the parties exchange their
> respective expert reports.

(D.I. 454 at Ex. B, pp. 2-3).

Intel, not having received the requested production and not being satisfied with the

position of AMD, filed the instant motion on November 2, 2007 arguing in substance as follows:

- The study and analysis of AMD's theory of this case, articulated in the Report and its underlying materials, would permit Intel to critically scrutinize the Report's conclusions and methodology, thus putting Intel in a position to "debunk" it – that is meet the articulated theory as part of its merits defense.

- AMD has waived both the attorney-client privilege and the work-product protection.

- The public release of the existence of the Report, its Key Findings and its methodology waived the protection of Fed. R. Civ. P. Rule 26(b)(4)(B).[5]

Like ships passing in the night, AMD, although asserting the attorney-client privilege and

work-product protection in their objection to the August 3, 2007 subpoena, failed to address

either the privilege or protection in their November 9, 2007 response to the Motion. Rather

AMD argued:

- The so called "safe-harbor provisions" of Fed. R. Civ. P. 26(b)(4)(B) apply to the Report and any underlying materials.

- The Report and underlying materials are not at issue in these actions unless and until Dr. Williams is designated as an expert witness.

- Intel cannot make the case for "exceptional circumstances" contemplated by Fed. R. Civ. P. Rule 26(b)(4)(B).

- A waiver analysis is not appropriate in the context of the Fed. R. Civ. P. Rule 26 (b)(4)(B)'s safe-harbor.

(D.I. 455).

Making AMD's position somewhat more elusive, at the January 10, 2008 hearing on the

Motion, counsel for AMD engaged in the follow colloquy with the Special Master:

> Special Master Poppiti: Let me ask this, . . . It seems to me
> that a number of courts have spent not an insignificant
> amount of time on their analysis of safe-harbor issues
> discussing a safe harbor, discussing a part of privilege, if
> you will and discussing, within the context of safe harbor
> and . . . that sort of privilege, waiver, have they not?

> Mr. Diamond: Well yes. The question really is: Is it – if
> you have a close call of somebody who has been designated
> and then pulled back, you have an issue of, well, are they
> non-testifying or are they testifying? And if someone is
> labeled testifying, can they [be] re-labeled non-testifying?
> Obviously, those are dicey issues.

> We have never steered Dr. Williams into the harbor. Dr.
> Williams isn't even in the ocean. He is not even involved
> in the litigation. The only appearance he has made so far
> has been in the Wall Street Journal.

> So, it is not a close case of whether somebody is in the safe
> harbor or out of the safe harbor. . . . I mean, he is not even
> floating. We don't have a whole lot to talk about in terms
> of whether a privilege has been waived.

(Tr. at 29:14-30:13).

Later in the hearing although counsel for AMD admitted that Dr. Williams was retained

for litigation purposes (Tr. at 39:15-17), AMD's counsel also conceded that the issue of Intel's

illicit monopoly profits is relevant but asserted that Intel will have to wait to depose whomever is

designated as an expert to opine on the issue. (Tr. at 39:17 – 40:2).

What is clear then, is that AMD does not rely on either the attorney-client privilege or the

work-product protection to shield the Report from discovery. The Special Master will, however,

discuss both in the context of the Special Master's conclusions related to the waiver of the so-

called safe-harbor provisions of Fed. R. Civ. P. 26(b)(4)(B).

---

[5] Intel, while not explicitly citing the provisions of Fed. R. Civ. P. Rule 26(b)(4)(B), in its November 2,
2007 Motion argues decisional law that addresses same. (D.I. 452).

## DISCUSSION AND CONCLUSIONS

Fed. R. Civ. P. 26 is the main pretrial disclosure and discovery provision in the Federal

Rules of Civil Procedure. Moore's Federal Practice, Ch. 26. The Supreme Court in the leading

case of *Hickman v. Taylor*, 329 U.S. 495, 500 (1947), describes the framework of the Federal

Rules of Civil Procedure addressing discovery:

> The pre-trial deposition-discovery mechanism established by Rules 26 to 37 is one of the most significant innovations of the Federal Rules of Civil Procedure. Under the prior federal practice . . . [i]nquiry into the issues and facts before trial was narrowly confined and was often cumbersome in method. The new rules . . . invest the deposition-discovery process with a vital role in the preparation for trial. The various instruments of discovery now serve (1) as a device, along with the pre-trial hearing under Rule 16, to narrow and clarify the basic issues between the parties, and (2) as a device for ascertaining the facts, or information as to the existence or whereabouts of facts, relative to those issues. Thus, civil trials in the federal courts no longer need be carried on in the dark. The way is now clear, consistent with recognized privileges, for the parties to obtain the fullest possible knowledge of the issues and facts before trial. (Internal citations omitted).

The purpose of the Federal Rules of Civil Procedure addressing discovery together with

pre-trial procedures is to "make a trial less a game of blind man's bluff and more a fair contest

with the basic issues and facts disclosed to the fullest practicable extent." *U.S. v. Procter &*

*Gamble Co.*, 356 U.S. 677, 682 (1958).

The Special Master is, of course, mindful that, "[p]erhaps the single most important word

in Rule 26(b)(1) is 'relevant' for it is only relevant matter that may be the pulpit of discovery."

Wright, Miller and Marcus, Federal Practice and Procedure: Civil 2d § 2008. Fed. R. Civ. P. 26

(b)(1) provides:

> Parties may obtain discovery regarding any matter, not privileged, that is relevant to the claim or defenses of any

7

> party, including the existence, description, nature, custody, condition and location of any books, documents, or other tangible things and the identity and location of persons having knowledge of any discoverable material. For good cause the court may order discovery of any matter relevant to the subject matter involved in the action. Relevant information need not be admissible at trial if the discovery appears reasonably calculated to lead to the discovery of admissible evidence.

It is clear from the language of the rule itself, from the commentary to the rule, from well settled case law and from commentators that:

> The key phrase in the definition – "relevant to the subject matter involved in the pending action" –has been construed broadly to encompass any matter that bears on, or that reasonably could lead to the matters that could bear on, any issue that is or may be in the case. *See Hickman v. Taylor*, 329 U.S. 495, 501. . . (1947). Consistently with the notice-pleading system established by the Rules, discovery is not limited to issues raised by pleadings, for discovery itself is designed to help define and clarify issues. *Id.* at 500-501. Nor is discovery limited to the merits of a case, for a variety of fact-oriented issues may arise during litigation that are not related to the merits.

*Oppenheimer Fund Inc. v. Sanders*, 437 U.S. 340, 357 (1978).[6]

---

[6] The Special Master is mindful that the operative language of the rule at the time when the Supreme Court issued the decision in *Openheimer Fund Inc.* was different from the language of the current rule. In the Special Master's view, the difference in the rule's language does nothing to militate against the teaching in *Openheimer Fund Inc.* The Advisory Committee's Notes to the Rule 2000 Amendments provide:

> The amendments also modify the provisions regarding discovery of information not admissible in evidence. As added in 1946, this sentence was designed to make clear that otherwise relevant material should not be withheld because it was hearsay or otherwise inadmissible. The Committee was concerned that the 'reasonably calculated to lead to the discovery of admissible evidence' standard set forth in this sentence might swallow any other limitation on the scope of discovery. Accordingly, the sentence has been amended to clarify that information must be relevant to be discoverable, even though inadmissible and that discovery of such material is permitted if reasonably calculated to lead to the discovery of admissible evidence. As used here,

8

In addition to the scope and limits of discovery that fit within the concept of relevancy and subject to the so-called proportionality requirements of Fed. R. Civ. P. 26(b)(2)(c)(i-iii), the Federal Rules also address the discoverability of both Trial Preparation Materials, that is work-product, as well as the discoverability of information, including facts and opinions obtained by a party from an expert retained in relation to litigation. Fed. R. Civ. P. 26(b)(4)(A) – (B).

Fed. R. Civ. P. 26(b)(4)(B), which the Special Master concludes is applicable to the facts *sub judice*,[7] addresses the discovery of information, including facts and opinions, of experts not retained for trial and provides:

> A party may, through interrogatories or by deposition discover facts known or opinions held by an expert who has been retained or specially employed by another party in anticipation of litigation or preparation for trial and who is not expected to be called as a witness at trial . . . upon a showing of exceptional circumstances under which it is impracticable for the party seeking discovery to obtain facts or opinions on the same subject by other means.

Unlike the terms of Fed. R. Civ. P. 26(b)(4)(A) which provide for automatic discovery of experts who are expected to testify at trial, Fed. R. Civ. P. 26(b)(4)(B) creates a qualified protection or safe-harbor, a protection from the waves of discovery where counsel are free to diligently explore, consult, prepare and ultimately pursue their theories and strategies of the case with the consulting expert. Moore's Federal Practice, § 26.80[2]; Wright Miller Marcus, Federal

---

> 'relevant' means within the scope of discovery as defined in this subdivision, and it would include information relevant to the subject matter involved in the action if the court has ordered discovery to that limit on a showing of good cause. (Fed. R. Civ. P. 26(b)(1) Advisory Committee's Notes).

[7] The Special Master does not accept the assertion of AMD that the Report and underlying papers are not discoverable because they are not relevant. In point of fact, the entire premise of both Fed. R. Civ. P. 26(b)(4) (A) and (B) is to the contrary. Fed. R. Civ. P. 26(b)(4)(A) and (B) start with the premise that information, facts and opinions obtained by a party from either a testifying expert or an expert retained in anticipation of litigation or preparation for trial are relevant to the litigation. Fed. R. Civ. P. 26(b)(4)(A)

9

Practice and Procedures § 2032. The Court in *Plymovent Corp. v. Air Technology Solutions,*

*Inc.*, 243 F.R.D. 139, 143 (D.N.J. 2007), noted that some courts have construed Fed. R. Civ. P.

26(b)(4)(B) as creating a privilege against disclosure. It describes the policy considerations

underlying the rule:

> (1) encouraging counsel to obtain necessary expert advice without fear that the adversary may obtain such information; (2) preventing unfairness that would result from allowing an opposing party to reap the benefits from another party's efforts and expense; (3) preventing a chilling effect on experts serving as consultants if their testimony could be compelled; and (4) preventing prejudice to the retaining party if the opposing party were allowed to call at trial an expert who provided an unfavorable opinion to the party who first retained them. *See Callaway Golf Co. v. Dunlop Slazenger Group Americas, Inc.,* 2002 WL 1906628 at *1 n. 3, 2002 U.S. Dist. LEXIS 15429 at *5 n. 3 (D.Del. Aug. 14, 2002). Moreover, while discovery with respect to testifying experts is essential to allow opposing counsel to adequately prepare for cross-examination, and to eliminate surprise at trial, "there is no need for a comparable exchange of information regarding non-witness experts who act as consultants and advisors to counsel regarding the course litigation should take." *Mantolete v. Bolger,* 96 F.R.D. 179, 181 (D.Ariz.1982).

*See also In re Shell Oil Refinery,* 132 F.R.D. 437, 440 (E.D. La. 1990); *House v. Combined Ins.*

*Co. of America,* 168 F.R.D. 236, 245 (N.D. Iowa 1996); *Employer's Reinsurance Corp. v.*

*Clarendon National Ins. Co.,* 213 F.R.D. 422, 426-27 (D. Kan. 2003).

As Fed. R. Civ. P. 26(b)(4)(B) creates a protection from the disclosure and advances

similar goals and policies underlying the attorney-client privilege and the work-product

protection, courts have called upon the principles developed under both to assist in the analysis

of matters implicating the operation of Fed. R. Civ. P. 26 (b)(4)(B). *In re PolyMedica Corp.*

*Securities Litigation,* 235 F.R.D. 28, 31-32 (D. Mass. 2006)(holding that the "burden of

---

and (B) then address the mechanics of discoverability – in the case of non-testifying experts only upon the

establishing" the protection of Fed. R. Civ. P. 26(b)(4)(B) as the same as the burden for work-product protection and using the attorney-client and work-product waiver analysis when analyzing waiver of Fed. R. Civ. P. 26(b)(4)(B) protection); *Johnson v. Gmeinder*, 191 F.R.D. 638, 642-648 (D. Kan. 2000); *Dayton-Phoenix Group Inc. v. General Motors Corp.*, 1997 WL 1764760 at *1, n.2 (S.D. Ohio 1977) (stating that Fed. R. Civ. P. 26(b)(4)(B) is a "specialized application of the work-product doctrine").

The Special Master concludes that looking to the principles of either attorney-client privilege or work-product protection to assist with the analysis of a Fed. R. Civ. P. 26(b)(4)(B) question is not inconsistent with the 1970 Advisory Committee Notes Subdivision 26(b)(4), which state that the provisions of b(4) "reject as ill-considered the decisions which have sought to bring expert information within the work-product doctrine. (Omits internal cites). The provisions adopt a form of the more recently developed doctrine of 'unfairness'." (Omits internal cites). Fed. R. Civ. P. 26(b)(4) Advisory Committee's Notes.

## A. CAN A PARTY WAIVE THE PROTECTION OF FED. R. CIV. P. 26(B)(4)(B)?

The Special Master concludes that the answer is unequivocally yes.

While the ultimate outcome on the question of waiver depends on the extant facts of the matter at hand, no case has been brought to the Special Master's attention that holds otherwise. To the contrary, a long line of cases clearly establish that the safe-harbor afforded the non-designated expert can, in appropriate circumstances, be waived, and in some circumstances, where no waiver had occurred, the safe-harbor protection remained in tact. *See Atari Corp. v. Sega of America,* 161 F.R.D. 417, 418-20 (N.D.Cal. 1994) (holding that voluntarily providing videotape of non-testifying expert's interview and report during settlement discussions waives

---

required showing of exceptional circumstances and the payment of certain expenses.

Rule 26(b)(4)(B) protection); *U.S. v. Hooker Chemicals & Plastics Corp.,* 112 F.R.D. 333, 339 (W.D.N.Y. 1986)("when a party offers an affidavit of an expert witness in opposition to, or in support of a motion for summary judgment, it waives its right not to have the deposition of said expert taken."); *Reino de Espana v. American Bureau of Shipping,* 2006 WL 3208579, at \*7 (S.D.N.Y.)(holding that Spain failed to meet its burden of establishing Rule 26(b)(4)(B) protection where it voluntarily disclosed a report to two third-parties and thereby waived the protection); *Gmeinder*, 191 F.R.D. at 649; *CP Kelco U.S. Inc. v. Pharmacia Corp.*, 213 F.R.D. 176 (D.Del. 2003). *Compare Hartford Fire Ins. Co. v. Pure Air on the Lake Ltd. P'ship,* 154 F.R.D. 202, 211 (N.D.Ind.1993)(holding that the party had not waived the protections afforded under Rule 26(b)(4)(B)); *PolyMedica*, 235 F.R.D. at 31-32 (holding that waiver did not apply to documents underlying and related to a disclosed report used in another litigation).

## B. WHAT IS THE APPLICABLE BURDEN OF PROOF?

It is AMD's burden to establish the existence of the protection, and it is Intel's burden to prove that the protection has been waived. *See Gmeinder*, 191 F.R.D. at 644-46, and cases cited therein.

## C. ARE THE REPORT AND ITS UNDERLYING DOCUMENTS SUBJECT TO THE PROTECTION OF FED. R. CIV. P. 26(b)(4)(B)?

The Special Master concludes that the answer is yes.

It is not disputed that Dr. Williams and his firm, ERS Group, were retained by counsel for AMD in early 2007 "to assist counsel in understanding certain economic matters at issue in this litigation." (D.I. 454, Diamond Declaration at ¶2). It is also not disputed that Dr. Williams was asked by counsel for AMD "to analyze and quantify the profits Intel had extracted from its x86 microprocessor monopoly that could not be attributed to pro-competitive justifications." (D.I. 456 ¶2). Finally, there is no dispute that Dr. Williams prepared a report concluding that,

12

"Intel has extracted monopoly profits from microprocessor sales of more than $60 billion in the

period 1996-2006." (D.I. 456, Ex. 9 at 1).

### D.    WAS THE FED. R. CIV. P. 26(b)(4)(B) PROTECTION AFFORDED THE REPORT AND ITS UNDERLYING DOCUMENTS WAIVED BY THE ACTIONS OF AMD AS WELL AS DR. WILLIAMS ACTING ON ITS BEHALF?

The Special Master concludes that the answer is yes.

The published press release issued on August 2, 2007 contained a summary of the Report

which included:

- Key Study Findings describing:

  o monopoly profits from the sale of microprocessors of approximately $60 billion from 1996-2006;

  o pro-competitive explanations for the profits are "implausible" for a number of reasons;

  o consumers and computer manufacturers would conservatively gain $81 billion from full competition in the next decade;

  o the savings to consumers of approximately 1.5% of the retail price of a $1,000 desktop computer; and,

  o the collateral benefit to manufactures in increased R&D, in greater product variability and further innovation.

- The methodology used in calculating the monopoly profits.

- The comparison of Intel's economic profit margin compared to 498 other public companies examined.

- The methodology/assumptions used in calculating consumers and manufacturers' savings.

(D.I. 452, Ex. 9 at 1-2).

In the matter *sub judice*, AMD voluntarily disclosed the existence of the Report, the name

of the expert/consultant who prepared it, the Report's Key Findings and its methodology to the

13

world. The basic policies underlying the protective safe-harbor provisions of Fed. R. Civ. P. 26(b)(4)(B) are in no way fostered by AMD's actions.

First, whereas the Fed. R. Civ. P. 26(b)(4)(B) encourages counsel to obtain necessary expert advice without fear that the adversary may obtain such information, here AMD trumpeted the existence of the expert and essentially what the expert had to say about a core issue in the litigation for all the world to see.

Second, whereas the Fed. R. Civ. P. 26(b)(4)(B) is designed to prevent the unfairness that would result from an opposing party reaping the benefits from another party's efforts and expense, here AMD willingly shared the fruits of its efforts and expense at no cost to the interested public. Were AMD to have argued unfairness, the Special Master concludes that it rings hollow in the circumstances presented.

Third, whereas the Fed. R. Civ. P. 26(b)(4)(B) would prevent a chilling effect on experts serving as consultants if the opposing party could compel them to answer questions under oath, here Dr. Williams appears to have already made statements and/or answered questions for the general public beyond his written report. The press release itself appears in the Special Master's view to make a distinction between what Dr. Williams/the Report "found" or what "the analysis noted" and what Dr. Williams himself "said." (D.I. 452, Ex. 9 at 1). In any event, even were this not a fair reading of the press release, for the purpose of drawing the distinction suggested, there can be no question that in the September 21, 2007 article by Christine Caulfield, "Intel, AMD War Narrows to One Term – 'Rebates'", Dr. Williams was responding to the author's questions where the article reads:

> Defending his study against claims by Intel that it was "widely speculative," Williams said he based his calculations on conservative assumptions and used mathematical models well-recognized by the business

14

> community. One assumption, he said, was that Intel had engaged in anti-competitive behavior.
>
> The study is quite simple, and I believe quite conservative, said Williams. Intel's total microprocessor profits over the past ten years total more than $140 billion. In a competitive industry the profits would have been $87.7 billion. This is not a particularly controversial calculation.

(D.I. 452, Ex. 10 at 2-3).

In sum, the identity of the consultant/expert, the existence of the Report, Dr. Williams's statements about the Report and AMD's statements about the Report were clearly not meant to be a matter internal to AMD as part of its litigation plan. Rather it is clear that Dr. Williams, his report and statements from AMD and/or Dr. Williams about the report served a completely different purpose. Namely, they formed the components of a well credentialed[8] media campaign that was clearly designed to tarnish Intel's image as being anti-competitive and/or boost its own, as a ship equipped for battle outside the protection of a safe harbor.

The Special Master concludes that to afford Fed. R. Civ. P. 26(b)(4)(B) protection to Dr. Williams, his report and its underlying documents would permit AMD to "hypocritical[ly] . . . claim that [they are] confidential one moment and then so share such [information] with a host of others to be used for something other then litigation." *NXIVM Corp. v. O'Hara*, 241 F.R.D. 109, 142 (N.D.N.Y. 2007). *See also Westmoreland v. CBS, Inc.*, 97 F.R.D. 703, 706 (S.D.N.Y. 1983) (In a defamation action, plaintiff was entitled to production of a report prepared by defendants notwithstanding the claim of a privilege for confidential self-evaluation, where the existence of the report as well as a summary of what it stated and concluded had been released to the public.). *Westmoreland* observed:

---

[8] Dr. Williams's credentials are set out in the press release. (D.I. 452, Ex. 9 at 3).

> The . . . investigation and report are central to the public message of the [press release]. [The press release] offers the fact of [defendant's] undertaking the investigation as a demonstration of its good faith and responsibility. The [press release] goes on to proclaim the thoroughness and professionalism with which [the investigator] conducted his investigation. It summarized evidence which [he] found. It purports to state what was [his] conclusion . . ., and finally it implies, or states that the . . . report substantiates the conclusion of the . . . broadcast [in question].

*Id.* at 706.

The Court went on to conclude, "CBS cannot at once hold out the . . . Report to the public . .

.and, when challenged, . . . decline to reveal the Report." *Id.*

The circumstances in the matter *sub judice* are strikingly similar to *Westmoreland*:

- AMD asserting its "commitment to fair and open competition" announced the issuance of the Williams's Report. (D.1. 452 at p. 1).

- AMD touted the credentials of both Dr. Williams and the ERS Group. (*Id.*, Ex. 9, pp. at 2-3).

- AMD provided a summary of the study which included key study findings, methodology, a calculation of monopoly profits, and a calculation of consumer and computer manufacturers savings. (*Id.*, Ex. 9).

- The statement of AMD's CEO, Hector Ruitz, that the anti-trust suit is "real" and that it will be "awful for [Intel]," clearly referenced the Report when he was reported as saying that Intel's practice created a "monopoly tax" resulting in a cost to businesses and consumers" an extra $60 billion in revenue that they shouldn't have had to pay. (D.I. 452, Ex. 10 at p. 1).

- AMD was reported to make its point that in the words of Tom McCoy, Executive Vice President of Legal Affairs, "You'd have to be deaf and blind not to see that consumers are being hurt, and the consumers ARE being hurt" and "I can prove consumers are not benefiting", by releasing the results of the Report. (D.I. 452, Ex. 11 at p. 2).

- AMD apparently bought full page adds in The Wall Street Journal and The New York Times in anticipation of the Report's release. (*Id.*, Ex. 11 at p. 3).

While in an admittedly different context, namely, the redesignation of an expert from one

who will be testifying under Fed. R. Civ. P. 26(b)(4)(A) to one who will not be testifying

16

pursuant to Fed. R. Civ. P. 26(b)(4)(B), a distinction which the Special Master concludes is

without a difference in so far as the underlying principles are concerned, this Court in *Kelco*, 213

F.R.D. at 179, observed:

> Waiver is the deliberate relinquishment of a right which
> might otherwise be claimed. . .
>
> In the context of an assertion of privilege, the inviolability
> of that rule is of fundamental importance. It would be
> manifestly unfair to allow a party to use the privilege to
> shield information which it deliberately chose to use
> offensively . . . . Hence the truism that a privilege cannot
> be used as both a shield and a sword. (Internal cite
> omitted). The non-legal equivalent of that truism is equally
> to the point: "You can't have it both ways."

AMD's decision relative to the public disclosure of the Report in the Special Master's

view represents a "deliberate, affirmative and selective strategic decision to disclose this

information for another benefit other than aiding a lawyer pitched in the battle of litigation."

*NXIVM*, 241 F.R.D. at 142. As in *NXIVM*, so here the Special Master concludes that

"longitudinal expectation was to make the content of the Report fodder for grander public

disclosure. A party cannot selectively share work-product and then expect it to remain as a

shield." *Id.* Stated another way:

> Where society has subordinated its interests in the search
> for truth in favor of allowing certain information to remain
> confidential, it need not allow that confidentiality to be
> used as a tool for manipulation of the truth-seeking process.
> Dean Wigmore has stated the basic doctrine with respect to
> implied waiver:
>
> > Regard must be had to the double elements that are
> > predicated in every waiver, *i.e.*, not only the
> > element of implied intention, but also the element of
> > fairness and consistency. A privileged person
> > would seldom be found to waive, if [the] intention
> > not to abandon could alone control the situation.
> > There is always also the objective consideration that
> > when [the] conduct touches a certain point of

17

> disclosure, fairness requires that [the] privilege shall
> cease whether [the result was intended or not].
> [One] cannot be allowed, after disclosing as much
> as [one] pleases to withhold the remainder.

*In re Sealed Case*, 676 F.2d 793, 807 (C.A.D.C. 1982); s*ee also Westinghouse Electric Corp. v.*

*The Republic of the Philippines*, 951 F.2d 1414, 1429 (3d Cir. 1991) (In the context of either the

attorney-client privilege or the work-product protection, a party should only be able to continue

to assert the privilege when the disclosure furthers the underlying goals of the

privilege/protection.).

The Special Master can find no set of facts, indeed none have been presented, from which

to conclude that any goal of Fed. R. Civ. P. 26 (b)(4)(B) is furthered by the press release of the

Report.

## E.    DOES WAIVER OF THE FED. R. CIV. P. 26(b)(4)(B) PROTECTION ENTITLE INTEL TO A COPY OF THE REPORT?

The Special Master concludes that the answer is yes.

Once the Court determines the existence of a waiver, the question becomes what is the

extent of the waiver – the scope of the waiver? In the absence of any Federal Rule addressing

the issue, we are left to "the principles of the common law as they may be interpreted by the

courts of the United States in light of reason and experience." Fed. R. Evid. 501.

The Federal Courts that have addressed the matter have not surprisingly adopted different

standards to analyze scope of waiver issues. In the absence of any guidance on the issue from

either the Third Circuit or the Delaware District Court, the Special Master believes it would be

helpful to briefly explicate various approaches for the purpose of adopting an approach in this

case.

1. The Subject Matter Analysis

18

The Court in *Sealed Case* describes the principle in the context of the waiver of the

attorney-client privilege as follows:

> Any disclosure inconsistent with maintaining the confidential nature of the attorney-client relationship waives the privilege. When a party reveals part of a privileged communication to gain an advantage in litigation, it waives the privilege as to all communications relating to the same subject matter because "the privilege of secret consultation is intended only as an incidental means of defense and not an independent means of attack, and to use it in the latter character is to abandon it in the former." (Internal cites omitted).

*Sealed*, 676 F.2d at 818.

The Special Master is mindful that the Court in *Sealed*, while acknowledging the more

complex purpose of the work-product protection, ultimately adopted the same approach to

disclosure of underlying documents to reports already submitted to the SEC, because the Court

concluded that in appropriate circumstances where the work-product protection is being

manipulated, "justice compels disclosure" of the otherwise protected subject matter. *Id.* at 818,

825.

AMD has released a summary of the Report consisting of Key Findings, as well as

methodologies and calculations used. In addition, AMD's officers and Dr. Williams have

publicly commented about the content of the Report and its implication for AMD's success in

this suit.

The Special Master concludes that AMD has waived the Fed. R. Civ. P. 26 (b)(4)(B)

protection to all portions of the Report relating to the same subject matter of what has already

been discussed. If AMD believes that there are portions of the Report that were not the subject

matter of either the initial press release or the later referenced public comments regarding same,

AMD can, if it wishes, produce the Report for an *in camera* review with suggested redactions.

19

The Special Master will in turn make an ultimate recommendation of what AMD must produce to Intel.

It appears to the Special Master that the same subject matter analysis is the approach taken by a majority of the Federal Courts that have addressed the extent of a waiver for a privilege or protection and the approach that should be adopted in this case. *PolyMedica Corp.*, 235 F.R.D. at 28; *Sealed*, 676 F.2d at 818; *Katz v. AT & T Corp.*, 191 F.R.D. 433, 440 (E.D.Pa. 2000); *In re Grand Jury Proceedings*, 78 F.3d 251, 255 (6th Cir. 1996); *Board of Trustees of Leland Stanford Junior University v. Roche Molecular Systems*, 237 F.R.D. 618, 626 (N.D.Cal. 2006); *In re EchoStar Communications Corp.*, 448 F.3d 1294, 1303 (C.A.Fed. 2006).

2. The Completeness Doctrine

Similar to the same subject matter doctrine, some writers and courts have suggested that "the standard for the scope of waiver should be analogous to that which governs the completeness doctrine . . . *e.g.*, revealing some details of a meeting with counsel is a waiver as to other details or that the introduction of a letter from counsel regarding settlement negotiations is a waiver as to the client's response to the overtures." Wright and Graham, Federal Practice and Procedure: Evidence § 5729 at p. 563. (citing among other cases, *International Paper Co. v. Fibreboard Corp.*, 63 F.R.D. 88, 92 (D. Del. 1974)).

It is evident to the Special Master that the doctrines of "same subject matter" and "completeness" are essentially the same principles relative to the disclosure of different types of information, the "same subject matter" doctrine addressing documents and the "completeness" doctrine addressing a broader range of information, *e.g.*, the content of oral communications.

In any event, the Special Master concludes that the policy underlying the completeness doctrine militates in favor of the disclosure of the Report.

20

3. Significant Part Analysis

The significant part analysis adopted by some courts appears to relate to, if not have its

genesis in, rejected Fed. R. Evid. 511 which reads:[9]

> A person upon whom these rules confer a privilege against
> disclosure of the confidential matter or communication
> waives the privilege if he or his predecessor while holder of
> the privilege voluntarily discloses or consents to disclosure
> of a significant part of the matter or communication. This
> rule does not apply if the disclosure is itself a privileged
> communication.

While the phrase "significant part" in the rejected Fed. R. Evid. 511 relates to the actual

waiver of the privilege in question in the first instance, some courts and writers have grappled

with the phrase in the context of the scope of the waiver as well. Wright and Graham describe

the conundrum as follows:

> The Rejected Rule provides that any disclosure of a
> significant "part" is a waiver as to the "whole" of the
> privileged matter or communication. Yet without any way
> to measure the "whole" it is difficult to say what is a
> "significant part" and even more difficult to say how far the
> waiver extends. Is a "confidential communication" to be
> measured sentence by sentence or is every conversation a
> single "communication"?

Wright & Graham, Federal Practice and Procedure: Evidence § 5729, p. 560.

Concluding that the principle is better suited to the issue of the existence of a waiver, the

Special Master declines to consider the application of the "significant part analysis" in

addressing the scope of Fed. R. Civ. P. 26(b)(4)(B) in this matter.

---

[9] For a comprehensive analysis of rejected Fed. R. Evid. 501 and its impact on the developing statutory
and common law of waiver, *see* Wright & Graham, Federal Practice and Procedure: Evidence § 5721, *et
seq.*

21

## F.    DOES WAIVER OF THE FED. R. CIV. P. 26(b)(4)(B) PROTECTION ENTITLE INTEL TO THE PRODUCTION OF DOCUMENTS UNDERLYING THE REPORT?

The Special Master concludes that the answer is yes.

Whether the Special Master adopts either the same subject matter analysis or the

completeness doctrine, it appears that either approach is grounded in the principle in the

commentary to the rejected Fed. R. Evid. 511, namely that the scope of the waiver should be

determined by the scope of the privilege or protection in question. The Advisory Committee's

Note is instructive:

> The central purpose of most privileges is the promotion of
> some interest or relationship by endowing it with a
> supporting secrecy or confidentiality. It is evident that the
> privilege should terminate when the holder by his own act
> destroys the confidentiality. (Internal cite omitted). The
> rule is designed to be read with a view to what it is that the
> particular privilege protects. For example, the lawyer-
> client privilege covers only communications, and the fact
> that a client has discussed a matter with his lawyer does not
> insulate the client against disclosure of the subject matter
> discussed, although he is privileged not to disclose the
> discussion itself. (Internal citation omitted). The waiver
> here provided is similarly restricted. There a client merely
> by disclosing a subject which he had discussed with his
> attorney, would not waive the applicable privilege; he
> would have to have to make a disclosure of the
> communication itself in order to effect a waiver.

Cited in Wright & Graham, Federal Practice and Procedure: Evidence at § 5721, p. 504-505.

The analysis begins then with an examination of what the "particular privilege protects."

As described herein, the Fed. R. Civ. P. 26(b)(4)(B) protection that is afforded an "expert who

has been retained or especially employed by another party in anticipation of litigation or

preparation for trial and who is not expected to be called as a witness for trial" is the protection

from having to submit to discovery "through interrogatories, or by deposition: of facts known or

22

opinions held" unless the requesting party can show "exceptional circumstances under which it is impracticable for the party seeking discovery to obtain facts or opinions on the same subject by other means." Fed. R. Civ. P. 26(b)(4)(B). The safe-harbor is then created by the barrier of the "exceptional circumstances" requirement. In a very real sense, but for the protection afforded by the "exceptional circumstance requirement," the consultant/expert's information, facts and opinions would be subject to the full discovery permitted by the Federal Rules of Civil Procedure bounded only by the relevancy standard and tempered by requirements for proportionality. Fed. R. Civ. P. 26(b)(4)(B).

The afforded protection is then *sui generis* in that"

> These new provisions of (b)(4) repudiate the few decisions that have held an expert's information privileged simply because of his status as an expert. (Internal citations omitted). They also reject as ill-informed the decisions which have sought to bring expert information within the work-product doctrine. (citations omitted.)

Fed. R. Civ. P. 26(b)(4) Advisory Committee's Notes. No such protection is afforded to a "person who has been identified as an expert whose opinion may be presented at trial." Fed. R. Civ. P. 26(b)(4)(A).

Having concluded that AMD has waived the Fed. R. Civ. P. 26(b)(4)(B) protection, the Special Master has been offered no reason and can find none as to why the Report or its underlying counts should yet be afforded the "exceptional circumstance" protection from the disclosure of information, including facts known or opinions held.

Dr. Williams's status after AMD's press release is in a very real sense no different than any third-party witness who is in a position to provide information including facts known or opinions held that are admittedly relevant to AMD's claims. (Tr. at 39:17-20) (Tr. at 37:1-5).

23

## G.    WHEN SHOULD THE PRODUCTION CONTEMPLATED BY THE SPECIAL MASTER FINDINGS AS RECOMMENDATIONS OCCUR?

Mindful of the vital role the discovery rules play in the parties' preparation for trial and further mindful of the Special Master's responsibility in managing the timing of the discovery under the Rules to achieve that end (D.I. 106), the Special Master concludes that the production contemplated herein should occur at this time but should occur no earlier than the commencement of expert discovery unless the parties otherwise agree to a different time frame. In the Special Master's view, the timing of the discovery should have nothing to do with a desire on the part of Intel to go head-to-head with AMD in the media.

## CONCLUSION

For the reasons set forth above, the Special Master concludes that AMD and ERS must product the Report as well as any underlying documents. The Special Master also concludes that said production should occur no earlier than the commencement of expert discovery, unless the parties otherwise agree to a different time frame.

IT IS THEREFORE, HEREBY RECOMMENDED THAT:

(a)    Intel's Motion to Compel be Granted (D.I. No. 639 in D. Del. C.A. No. 05-1717; D.I. No. 452 in D. Del. C.A. No. 05-441).

(b)    Production shall occur no earlier than the commencement of expert discovery unless the parties otherwise agree.

**The Special Master's Report and Recommendations will become a final order of the Court unless objection is taken within five (5) business days as provided by the Court's Order of June 28, 2006. (D.I. 334)**

ENTERED this
*6th* day of March, 2008

Vincent J. Poppiti  (DSBA No. 100614)
Special Master

24

062038.00616/40173298v.1
062038.00616/40173298v.1

# EXHIBIT 1



Home | Worldwide ✈ | Contact Us  Search           Select Site: 🔲 ▶

| Processors | ATI Products | Embedded Solutions | Support & Drivers | About AMD | Where To Buy |

| Corporate Information | Corporate Responsibility | Investor Relations | News Room | Careers |

**Press Resources**
**News Room Home**
**Press Release Archives**
  by Year
  by Subject
**News Events**
**Logos**
**Images**
**Video & Audio**
**Quotes**
**PR Contacts**
**RSS Feed**
**Related Links**
**Articles & Reviews**
**Exec Photos and Bios**
**Exec Speeches**

## New Economic Study Finds Intel Extracted Monopoly Profits of $60 Billion Since 1996

*Also Finds Consumers and Computer Manufacturers Could Gain Over $80 Billion from Full Competition in Microprocessor Market*

**Sunnyvale, Calif. — August 2, 2007 —**A new economic study issued today by Dr. Michael A. Williams, Director, ERS Group, found that Intel has extracted monopoly profits from microprocessor sales of more than $60 billion in the period 1996-2006. Dr. Williams' analysis explains why pro-competitive justifications for Intel's monopoly profits are implausible.

Williams also found that consumers and computer manufacturers could gain over $80 billion over the next decade if the microprocessor market were open to competition. The analysis noted that consumers would save at least $61 billion over the period, with computer manufacturers projected to save another $20 billion, enabling them to increase their investment in R&D; create improved products and greater product variety; and provide additional innovation benefits to computer buyers around the world.

The ERS Group is an economic and financial consulting firm retained by AMD's outside counsel, O'Melveny & Myers LLP.

Dr. Williams said, "Intel has extracted $60 billion in monopoly profits over the past decade; over the next decade consumers and computer manufacturers would save over $80 billion from a fully competitive market."

Williams continued, "In light of the recent European Commission decision and prior Japan Fair Trade Commission actions, this analysis asks not whether Intel has engaged in anticompetitive conduct, but how much Intel has gained from the alleged conduct."

Thomas M. McCoy, AMD executive vice president, legal affairs and chief administrative officer stated, "Intel's monopoly profits of $60 billion directly contradict Intel's claim that its business practices have resulted in lower prices – in fact this study shows that billions of dollars have moved straight from consumers' pockets to Intel's monopoly coffers."

McCoy continued, "That $80 billion translates into an Intel monopoly tax on every consumer who purchases a computer. That's a jaw-dropping figure that helps explain why the European Commission brought antitrust charges against Intel – the real harm that its abuse of monopoly power causes competition and consumers."

A summary of the study is attached.

**About Dr. Michael Williams and ERS Group**
ERS Group is an economic and financial consulting firm that specializes in analyses for complex business litigation. Over 3,000 clients, including Fortune 500 companies, law firms, universities, industry trade associations and government agencies, have retained ERS Group professionals in a wide variety of cases involving numerous industries.

Michael Williams, Ph.D. is a Director of ERS Group. He specializes in antitrust, industrial organization, and regulation. As an economist in the Antitrust Division of the U.S. Department of Justice and as a consultant, he has examined and provided expert testimony on a variety of antitrust and regulatory issues, including monopolization, price fixing and tying arrangements. He has served as a consultant to the U.S. Department of Justice and the Federal Trade Commission in such matters as the proposed mergers of Exxon and Mobil, BP Amoco and ARCO, and in litigated matters such as FTC v. Rambus and U.S. et al. v. Oracle. His Ph.D. in economics is from the University of Chicago. He presented testimony this year as part of the joint DOJ-FTC examination on the future of the antitrust rules governing single-firm conduct.

For more information on AMD's commitment to fair and open competition, visit http://www.amd.com/breakfree

**About AMD**
Advanced Micro Devices (NYSE: AMD) is a leading global provider of innovative processing solutions in the computing, graphics and consumer electronics markets. AMD is dedicated to driving open innovation, choice and industry growth by delivering superior customer-centric solutions that empower consumers and businesses worldwide. For more information, visit www.amd.com.

**A Quantification of Intel's Historical Monopoly Profits from the Sale of Microprocessors and a Projection of Future Consumer and Computer Manufacturing Gains in a Fully Competitive Marketplace**

A report by Dr. Michael A. Williams, Director, ERS Group

**KEY STUDY FINDINGS:**

- Intel extracted monopoly profits from the sale of microprocessors of approximately $60 billion in the period 1996 - 2006.
- Pro-competitive explanations for Intel's $60 billion in monopoly profits are implausible for the following reasons:
  - Recent European Commission charges and prior findings from the Japan Fair Trade Commission;
  - The rarity of firms that achieved a 16-percent or more economic return;
  - An examination of strong companies that have much lower economic returns, including Pfizer, Wyeth, ExxonMobil Corp., and Target;

- o Intel's reported losses on its non-microprocessor businesses, showing that Intel lacks sustained, competitive advantages from brand-name loyalty and other factors;
- o Negative average economic returns earned by other semiconductor companies.
- Consumers and computer manufacturers would conservatively gain approximately **$81 billion** in the next decade from full competition in the microprocessor market.
  - o Consumers, including both home and business users, would save at least **$61 billion**.
  - o Computer manufacturers are projected to save at least another **$20 billion** over the next 10 years.
- That represents a consumer savings of approximately **1.5%** off the retail price of a $1,000 high-performance desktop computer in a fully competitive market.
- Computer manufacturer savings would result in: (1) increased research and development, (2) greater product variability, and (3) further innovation, providing additional benefits to computer buyers.

## Monopoly Profits

- Intel's economic return on its microprocessor business was calculated using publicly available information and standard economic methodology. The method begins with standard financial statements and derives from them the information necessary to calculate a firm's economic profits. It is based on Nobel Prize-winning research conducted by Merton Miller and Franco Modigliani and used by more than half the Fortune 1,000 firms to analyze their economic performance; Wall Street investment banks to assess potential investments; and leading management consulting firms, such as McKinsey & Co. and Stern Stewart & Co.

| | |
|---|---|
| Intel's Total Profits (total return 25.95%) | $141.8 billion |
| Competitive Profits (cost of capital 9.94%) | - 54.2 billion |
| Result: Economic Profits (economic return 16.01%) | $87.7 billion |
| Portion of Economic Profits Attributed to Assumed Advantages (5.0%) | - $27.3 billion |
| Result: Monopoly Profits (11.01%) | = $60.4 billion |

- Intel's economic profit ($88 billion) was calculated by first determining total profits ($142 billion) and subtracting from that value its cost of capital ($54 billion—which includes a normal profit), resulting in economic profits of $88 billion.
- Intel's economic profit margin of 16-percent (the $88 billion) stands in stark contrast to the economic returns of 498 other public companies examined. Like Intel, they had capital of $1 billion or more in 1996. Of these companies, the average economic return was less than one percent. Intel earned an economic return higher than 99-percent of these large companies, including companies with strong brands, research and development, or intellectual property rights, such as Pfizer, Wyeth, ExxonMobil Corp., and Target.
- Only four companies earned economic returns of 16 percent or more – Microsoft (38.25%), UST Inc. (28.54%), Coca-Cola Co. (16.58%), and Intel (16.01%) – and each of these companies has been associated with antitrust determinations. Of course, high economic returns by themselves do not demonstrate anticompetitive conduct.
- To be conservative, the study next provided Intel with a generous assumption that 5 percentage points ($28 billion) of its economic return were attributable to legitimate advantages. That left the $60 billion monopoly profit figure.

## Consumer and Computer Manufacturer Savings

- The calculation of future consumer and computer manufacturer gains employed four conservative assumptions:
  - o Intel's price premiums would fall by 50% over five years; price premiums were calculated by comparing Intel products with their AMD counterparts.
  - o AMD's market share of units sold would rise from 27% to 35% over five years.
  - o Total industry sales would grow at only half the historical growth rates.
  - o OEMs would pass-through 75% of cost savings to computer buyers.
- Data from 2Q2006 through 1Q2007 were used as the basis for projecting consumer benefits from increased competition over 10 years.
  - o Consumer benefits for 2012-2016 set equal to benefits in 2011.
- As an example of consumer savings on a specific computer purchase, the study notes that consumers would save more than 1.5 percent off the cost of a $1,000 performance desktop computer.

| | |
|---|---|
| Intel microprocessor ASP – 2006 | $121.12 |
| Intel microprocessor ASP – 2011 (projected) | - $101.30 |
| Total price reduction for computer manufacturer: | $19.82 (16 percent less) |
| Savings passed on to consumer: | 75% |
| Total consumer savings per computer: | **$14.87**, or 1.5% of a $1000 performance desktop computer |

## About Dr. Michael A. Williams and ERS Group

- ERS Group is an economic and financial consulting firm that specializes in analyses for complex business litigation. Over 3,000 clients, including Fortune 500 companies, law firms, universities, industry trade associations and government agencies, have retained ERS Group professionals in a wide variety of cases involving numerous industries.
- The ERS Group, an economic and financial consulting firm retained by AMD's outside counsel, O'Melveny & Myers LLP, specializes in analyses for complex business litigation.
- Michael Williams, Ph.D. is a Director of ERS Group. He specializes in antitrust, industrial organization, and regulation. As an economist in the Antitrust Division of the U.S. Department of Justice and as a consultant, he has examined and provided expert testimony on a variety of antitrust and regulatory issues, including monopolization, price fixing, and tying arrangements.
- Williams has served as a consultant to the U.S. Department of Justice and the Federal Trade Commission in such matters as the proposed mergers of Exxon and Mobil, BP Amoco and ARCO, and in litigated matters such as FTC v. Rambus and U.S. et al. v. Oracle. His Ph.D. in economics is from the University of Chicago. He presented testimony this year as part of the joint DOJ-FTC hearings on the future of the antitrust principles governing single-firm conduct.

Rate this page [+]

©2007 Advanced Micro Devices, Inc.    |    Contact AMD    |    Terms and Conditions    |    Privacy    |    Trademark Information    |    Site Map