## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

|  |  |
|---|---|
| IN RE: INTEL CORPORATION<br>MICROPROCESSOR ANTITRUST<br>LITIGATION | ) ) ) ) )  MDL No. 05-1717-JJF |
| ADVANCED MICRO DEVICES, INC. and<br>AMD INTERNATIONAL SALES &<br>SERVICE, LTD., | ) ) ) ) ) |
| Plaintiffs, | ) ) |
| v. | ) )  Civil Action No. 05-441-JJF |
| INTEL CORPORATION and INTEL<br>KABUSHIKI KAISHA, | ) ) ) |
| Defendants. | ) ) |
| PHIL PAUL, *on behalf of himself and all*<br>*others similarly situated,* | ) ) ) ) |
| Plaintiffs, | ) ) |
| v. | )  Civil Action No. 05-485-JJF )<br>)  CONSOLIDATED ACTION |
| INTEL CORPORATION, | ) ) |
| Defendant. | ) |

## BRIEF IN SUPPORT OF:

### 1) MOTION OF UNION FEDERALE DES CONSOMMATEURS – QUE CHOISIR TO INTERVENE FOR THE LIMITED PURPOSE OF SEEKING MODIFICATION TO PROTECTIVE ORDERS; AND

### 2) APPLICATION PURSUANT TO 28 U.S.C. § 1782 FOR AN ORDER REQUIRING INTEL AND THIRD PARTIES TO PROVIDE ACCESS TO DOCUMENTS AND DEPOSITION TESTIMONY FOR USE IN FOREIGN PROCEEDINGS

Of Counsel:

Jon T. King
COHEN MILSTEIN HAUSFELD &
  TOLL, P.L.L.C.
One Embarcadero Center
Suite 2440
San Francisco, CA  94111
Telephone:  (415) 229-2080
Facsimile:  (415) 986-3643
jking@cmht.com

Vincent Smith
COHEN, MILSTEIN, HAUSFELD &
  TOLL, L.L.P.
25 Southampton Buildings
London
WC2A 1AL
United Kingdom
Telephone: +44 (0)20 3170 7725
Facsimile: +44 (0)20 3170 7729
vsmith@cmht.com

James L. Holzman (#663)
J. Clayton Athey (#4378)
Laina M. Herbert (#4717)
Melissa N. Donimirski (#4701)
PRICKETT JONES & ELLIOTT, P.A.
1310 King Street
P.O. Box 1328
Wilmington, DE  19899
jlholzman@prickett.com
jcathey@prickett.com
lmherbert@prickett.com
mndonimirski@prickett.com
Telephone:     (302) 888-6500
Facsimile:     (302) 658-8111

*Counsel for Union Federale des
Consommateurs - Que Choisir*

Dated: April 9, 2008

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES……………………………………………………… ................. ii

I.    STATEMENT OF NATURE AND STAGE OF PROCEEDINGS ................................... 1

II.   SUMMARY OF ARGUMENT ...................................................................................... 1

III.  STATEMENT OF FACTS ............................................................................................. 3

    A.    Background on UFC-Que Choisir .......................................................................... 3

    B.    The European Commission Proceedings Against Intel .......................................... 6

    C.    General Background on European Commission Procedures and European
           Consumer Damages Actions .................................................................................. 8

    D.    The Protective Orders ........................................................................................... 9

IV.   ARGUMENT ................................................................................................................ 11

    A.    The Court Should Grant UFC-Que Choisir's Motion to Intervene ...................... 11

    B.    The Court Should Allow UFC-Que Choisir's Requested Modifications to the
           Protective Orders ................................................................................................. 15

    C.    The Court Should Grant UFC-Que Choisir's Application Pursuant to 28 U.S.C. §
           1782 for an Order Requiring Intel and Third Parties to Provide Access to
           Documents and Deposition Testimony for Use in Foreign Proceedings ............. 17

    D.    The Proposed Modifications to the Protective Orders .......................................... 23

CONCLUSION ...................................................................................................................... 1

## TABLE OF AUTHORITIES

**Cases**

*Advanced Micro Devices, Inc. v. Intel Corp.*,
  2004 WL 2282320 (N.D. Cal. Oct. 4, 2004) ................................................................. 21, 22, 23

*Arkansas Elec. Energy Consumers v. Middle S. Energy, Inc.*,
  772 F.2d 401 (8th Cir. 1985) ....................................................................................... 11

*Equal Employment Opportunity Comm'n
  v. Nat'l Children's Ctr., Inc.*,
  146 F.3d 1042 (D.C. Cir. 1998) ("*EEOC*") ............................................................... 12

*Grove Fresh Distributors, Inc. v. Everfresh Juice Co.*,
  24 F.3d 893 (7th Cir. 1994) ......................................................................................... 15

*Harris v. Pernsely*,
  820 F.2d 592 (3d Cir. 1987) ....................................................................................... 11

*In re Application of Bayer AG*,
  146 F.3d 188 (3d Cir. 1998) ....................................................................................... 17

*In re Application of Hill*,
  2005 WL 1330769 (S.D.N.Y. June 3, 2005) .............................................................. 19

*In re Baycol Products Litig.*,
  2003 WL 22331293 (D. Minn. May 6, 2003) .................................................... passim

*In re Linerboard Antitrust Litig.*,
  333 F. Supp. 2d 333 (E.D. Pa. 2004) ............................................................. 13, 14, 17

*In re Vitamins Antitrust Litig.*,
  2001 WL 34088808 (D.D.C. March 19, 2001) ................................................ 11, 12, 13, 14

*Intel Corp. v. Advanced Micro Devices, Inc.*,
  542 U.S. 241 (2004) .............................................................................................. 18, 19

*Pansy v. Borough of Stroudsburg*,
  23 F.3d 772 (3d Cir. 1994) ................................................................. 11, 12, 14, 15

**Statutes**

28 U.S.C. § 1782 ........................................................................................................ passim

**Rules**

D. Del. LR 7.1.3(d) ........................................................................................................ 3

Fed. R. Civ. P. 24(b) .................................................................................................... 11

Fed. R. Civ. P. 24(b)(2) ................................................................................................ 12

Rule 24 ......................................................................................................................... 11

Rule 24(b)(1) ................................................................................................................ 11

Rule 24(c) ..................................................................................................................... 11

**Law Review Articles**

Smit, International Litigation under the United States Code, 65 Colum. L.Rev. 1015, 1027 (1965).....................................................................................................................19

**Other Authorities**

Treaty establishing the European Community, Article 211.............................................................8

Council of the European Union, Regulation 1/2003 of January 4, 2003 – L1/1 .........................8, 9

Commission of the European Communities, Regulation 773/2004, April 27 2004, L123/18, Article 15(2) ................................................................................................................9

French Consumer Code..............................................................................................................3, 4

French Commercial Code ..........................................................................................................3, 4

*Courage v Creehan*, European Court of Justice, case C-453/99, [2001] ECR-I 6297 ...................9

French Ministry of the Economy, Finance and Industry, Order of 27 July 2006 renewing authorization of UFC-Que Choisir..............................................................................................3

## I.    STATEMENT OF NATURE AND STAGE OF PROCEEDINGS

Pursuant to Rule 24(b) of the Federal Rules of Civil Procedure, Union Federale des Consommateurs - Que Choisir ("UFC-Que Choisir") moves to intervene in this action for the limited purpose of seeking modifications to the Confidentiality Agreement and Protective Orders entered by the Court on September 26, 2006 in the above-captioned actions (the "Protective Orders", D.I. 276,277 in 05-MD-1717, D.I. 216 in 05-CV-441 and D.I. 201 in 05-CV-485). UFC-Que Choisir additionally applies, pursuant to 28 U.S.C. § 1782, for an Order requiring defendant Intel and third parties to provide access to documents and deposition testimony for use in foreign proceedings.

UFC-Que Choisir is a French consumer association that has been granted permission by the European Commission (the "EC" or "Commission") to appear as an interested third party in the Commission proceedings regarding Intel's alleged abuse of a dominant position in the market for x86 Computer Processing Units ("CPUs"). The allegations in the Commission proceedings are essentially identical to those in the present litigation. UFC-Que Choisir moves herein to modify certain provisions of the Protective Orders to allow it access to materials produced in this litigation by Intel and third parties, and deposition transcripts, as such access will assist it in efficiently participating in the EC proceedings as well as in consumer damages litigation in Europe that is likely to follow the EC proceedings.

In the present litigation, document discovery is underway, and no merits depositions have commenced.

## II.    SUMMARY OF ARGUMENT

UFC-Que Choisir moves to intervene in the present litigation to seek a modification of the Protective Orders, as specifically detailed herein *infra*, so that it may 1) effectively seek to

influence the outcome of the EC proceedings and represent the interests of consumers; and 2) seek, via subsequent and related judicial proceedings, compensation for consumers who have been overcharged due to Intel's alleged monopolistic conduct.

Courts have repeatedly held that a motion to intervene is the proper procedural vehicle for third parties that seek to modify protective orders, including parties involved in foreign litigation. Once a court grants the motion to intervene, it then must analyze the analytically distinct question as to whether it will allow the proposed modifications. An analogous statute, 28 U.S.C. § 1782, also provides a method for district courts to provide assistance related to proceedings before foreign tribunals, including proceedings that have not yet commenced. UFC-Que Choisir proposes herein reasonable modifications to the Protective Orders that will 1) allow it in related European proceedings to make efficient use of discovery materials obtained in this case; and 2) allow for the appropriate treatment of confidential information from the present litigation in the EC Proceedings and any related consumer damages litigation in Europe.

### III.    STATEMENT OF FACTS

#### A.    Background on UFC-Que Choisir

UFC-Que Choisir is a French consumer association founded in 1951 that is comprised of approximately 170 local associations with more than 124,000 members. *See* Declaration of Jon T. King ("King Decl."), at ¶ 4. UFC-Que Choisir is solely dedicated to representing the interests of consumers, *i.e.*, ensuring the recognition and respect of consumer rights and the free expression of consumer opinions, and defending consumer interests individually and collectively. *Se Id.* It also is dedicated to representing consumers' legal, financial, and moral interests in all appropriate forums. *See id.* UFC-Que Choisir also publishes a monthly magazine, *Que Choisir*, read by more than 4.5 million readers, which details consumer product testing and reviews on the basis of value, safety, energy consumption and other criteria.[1]

The French government Ministry (the Ministry of Justice), has approved UFC-Que Choisir to exercise rights on behalf of consumers pursuant to the French Consumer Code (the "Code"), most recently by decision dated July 27, 2006. *See* King Decl., ¶ 5, Exhs. 1 and 2.[2] In particular, by virtue of this decision, UFC-Que Choisir is authorized to do the following:

- intervene in criminal proceedings to claim compensation for consumers harmed by the criminal acts being prosecuted (Code, Art. L421-1; King Decl., Exhs. 3, 4);

- bring civil proceedings requiring the cessation of unlawful trading practices (Code, Art. 421-6; King Decl. Exhs. 3, 4);

---

[1] More information about UFC-Que Choisir is available at its French language website <http://www.quechoisir.org/>.

[2] Consistent with D. Del. LR 7.1.3(d), where UFC-Que Choisir relies on foreign language exhibits, it has also included an English translation, along with a certification that the translation is true and correct.

- bring representative civil proceedings for damages on behalf of two or more consumers before any court (Code, Art. L422-1; King Decl. Exhs. 3, 4); and

- bring a complaint on behalf of consumers before the French Competition Council (Commercial Code Art. L462-1; King Decl. Exhs. 5, 6).

UFC-Que Choisir is also a founding member of the European Bureau of Consumer Unions (BEUC). *See* King Decl., at ¶ 11. The BEUC is based in Brussels and represents the interests of more than 40 consumer organizations across Europe. *See id.* The BEUC, like UFC-Que Choisir, has been granted permission by the EC to intervene in the Intel proceedings, and appeared in March at the recent EC hearing in Brussels (as discussed in more detail below) to present its views on behalf of consumers. *See id.* The BEUC noted the following in a press release regarding its intervention in the EC proceedings: "In competition cases, particularly between companies that do not sell directly to consumers, there can be a tendency to give too much weight to the interests of the companies involved and not sufficient weight to the downstream interests, direct and indirect, of consumers." *See* King Decl., Exh. 7. The BEUC further stated the following regarding "Why the Intel case is important from a consumer perspective":

- computer chips are a significant element of computers and their prices directly impact on the final price that consumers pay for computers;

- since computers are used everywhere in business nowadays the price of computer chips has a direct effect on business costs and therefore on consumer prices;

- in this quickly developing sector, access to the most innovative technology is a major element of consumer choice and should not be stifled by anti-competitive practices.

*Id.*

UFC-Que Choisir has appeared before the Commission in other cases in a similar capacity and before the French Competition Council, including in matters involving the mobile telephone industry. *See* King Decl, ¶ 13. UFC-Que Choisir also has a demonstrated history of litigation on behalf of consumers in French courts. For example, following UFC-Que Choisir's complaint to the French Competition Council in February 2002 that three French telecommunications companies were illegally engaged in cartel activity, the Council fined Orange, SFR and Bouygues a total of more than €500 million in 2005. *See id.* UFC-Que Choisir is currently assisting more than 12,000 consumers and acting in its own name in the Paris courts to obtain damages from the companies for the losses caused by this cartel. *See id.*

UFC-Que Choisir is also currently awaiting the decision of the Competition Council following a complaint made in February 2007 concerning an apparent cartel in the retail sale of toys – the retail prices of the most popular toys in France were the same in each distribution channel in between 70% and 90% of cases. *See id.,* ¶ 15.

UFC-Que Choisir has also been active in asserting consumer rights in the consumer electronics and related sectors. For example, it took court action against Sony France and Sony UK in 2005 as a result of which those companies were condemned for having mislead consumers by unlawfully preventing paid music downloads from Sony's proprietary internet site from working with music players made by other manufacturers. *See id.,* ¶ 15. A similar action against Apple is ongoing. *See id.* And UFC-Que Choisir is currently engaged in litigation against two

large French retail chains and HP (Hewlett Packard) for only selling computers to consumers

with pre-installed software (despite provisions in French law giving consumers the right to refuse

bundled software). *See id.*, ¶ 16.

## B.    The European Commission Proceedings Against Intel

On July 27, 2007, the EC issued a press release and stated in part the following:

> The European Commission can confirm that it has sent a Statement
> of Objections (SO) to Intel on 26th July 2007. The SO outlines the
> Commission's preliminary view that Intel has infringed the EC
> Treaty rules on abuse of a dominant position (Article 82) with the
> aim of excluding its main rival, AMD, from the x86 Computer
> Processing Units (CPU) market.

> In the SO, the Commission outlines its preliminary conclusion that
> Intel has engaged in three types of abuse of a dominant market
> position. First, Intel has provided substantial rebates to various
> Original Equipment Manufacturers (OEMs) conditional on them
> obtaining all or the great majority of their CPU requirements from
> Intel. Secondly, in a number of instances, Intel made payments in
> order to induce an OEM to either delay or cancel the launch of a
> product line incorporating an AMD-based CPU. Thirdly, in the
> context of bids against AMD-based products for strategic
> customers in the server segment of the market, Intel has offered
> CPUs on average below cost.

> These three types of conduct are aimed at excluding AMD, Intel's
> main rival, from the market. Each of them is provisionally
> considered to constitute an abuse of a dominant position in its own
> right. However, the Commission also considers at this stage of its
> analysis that the three types of conduct reinforce each other and are
> part of a single overall anti-competitive strategy.

*See* King Decl., Exh. 8.

On February 12, 2008, the Commission issued another press release and stated in part the

following:

> The European Commission can confirm that on 12th February
> 2008, Commission officials carried out unannounced inspections at
> the premises of a manufacturer of Central Processing Units (CPUs)
> and a number of personal computer (PC) retailers. The

> Commission has reason to believe that the companies concerned
> may have violated EC Treaty rules on restrictive business practices
> (Article 81) and/or abuse of a dominant market position (Article
> 82).
>
> The Commission officials were accompanied by their counterparts
> from the relevant national competition authorities.
>
> Surprise inspections are a preliminary step in investigations into
> suspected infringements of EC competition law."

*See* King Decl., Exh. 9.

Intel confirmed that the EC's inspection occurred at its Feldkirchen, Germany offices. *See* King Decl., Exh. 10, Intel Corp. U.S. S.E.C. Form 10-K, dated February 20, 2008, at 87, Note 21. Additionally, the Agence France-Presse news agency reported that French retailing group PPR, British company DSG International, and German Store chain MediaMarkt all confirmed that EC antitrust inspectors had visited their premises. *See* King Decl., Exh. 11, "*EU regulators raid Intel, computer retailers in antitrust probe*," February 12, 2008.

On February 26, 2008, UFC-Que Choisir applied to the EC Hearing Officer to be heard as an interested third party in the EC proceedings. *See* King Decl., Exh. 12. On March 6, 2008, UFC-Que Choisir received permission to appear at the Commission closed hearings in the Intel matter, and presented its views on behalf of consumers to the Commission during the hearing on March 11th in Brussels. *See id.*; King Decl., ¶ 26. In that hearing, UFC-Que Choisir expressed to the EC that it was contemplating the eventual institution of damages litigation. *See* King Decl., ¶ 26.

The Commission proceedings are likely to continue into 2009, including hearings on possible remedies, should the EC make a determination adverse to Intel, as well as possible judicial appeals to the European Union's Court of First Instance and then to the European Court of Justice.

C.    **General Background on European Commission Procedures and European Consumer Damages Actions**

The European Commission cannot compensate consumers itself. Its powers are limited to investigation and sanction, through the public law, of suspected breaches of the competition rules using powers as specified in the EU Treaty.[3] In the field of competition, those powers are contained in Articles 81 and 82 of the Treaty and in the regulations made under those Articles. In particular, the main enabling Regulation, 1/2003,[4] provides that the powers of the Commission in the competition area shall be those set out in that Regulation.[5] Those powers are as follows:

- to make a finding of an infringement of the EC law of competition and to impose fines;

- to take interim measures to prevent serious and irreparable harm to competition in the EU;

- to accept 'commitments' (settlement undertakings) to close investigations; and

- to make a finding that competition law has not been infringed in exceptional cases.

The Commission also possesses a range of powers (for example the power to enter premises, seize documents, etc.) used to investigate possible breaches of EU competition law throughout the EU.

Nowhere in this extensive list of powers is there a provision permitting the Commission

---

[3] Article 211 of the EU Treaty provides, in pertinent part, the following: "In order to ensure the proper functioning and development of the common market, the Commission shall: — ensure that the provisions of this Treaty and the measures taken by the institutions pursuant thereto are applied . . . ." *See* King Decl., Exh. 13.

[4] *See* Regulation 1/2003 of January 4, 2003 —Official Journal of the European Communities, 2003, L1/1, attached as Exh. 14 to the King Decl.

[5] *See Id.,* Article 4.

to require compensation to be paid to customers or consumers.

The proceedings before the Commission are in principle confidential and information collected by the Commission for the purposes of its investigation shall only be used for the purpose for which it was acquired.[6]   Although the parties against whom the Commission proposes to make an infringement decision may inspect the file of documents which the Commission relies on to support its case, that file does not include the business secrets of the parties to the case nor other information covered by a secrecy obligation.[7]   Furthermore, documents obtained through access to the file may only be used for the purposes of judicial or administrative proceedings for the application of the EU competition rules.[8]

As a matter of European Union law, any person who can show that they have suffered loss arising from a breach of EU competition law is entitled to claim damages.[9]   In many Member States of the EU, a decision of the European Commission finding an infringement is (after any applicable appeals have been exhausted) conclusive proof in the civil courts of the participation of the addressees of the decision in the unlawful conduct described in the decision.

### D.    The Protective Orders

On September 26, 2006, the Court in the present case entered the Protective Orders.  The Protective Orders state, *inter alia*, the following:

> "Except as set forth in this Protective Order, Confidential Discovery Material, or information derived therefrom, shall be used solely by the Parties for purposes of the AMD Litigation or the Class Litigation, and shall not be used for any other purpose,

---

[6] *See Id.,* Article 28.

[7] *See* Commission Regulation 773/2004, April 27 2004, Official Journal L123/18, Article 15(2), attached as Exh. 15 to the King Decl.

[8] *See Id.*, Article 15(4).

[9] *See* the European Court of Justice decision in *Courage v Creehan* (case C-453/99, [2001] ECR-I 6297) attached as Exh. 16 to the King Decl.

including, without limitation, any business or commercial purposes, or dissemination to the media." (Protective Orders, ¶ 1)

"Confidential Discovery Material shall not, directly or indirectly, be disclosed or otherwise provided to anyone except to: [listing exceptions]." (Protective Orders, ¶ 6).

"Nothing in this Order shall be construed to allow any Third Party to obtain access to any Confidential Discovery Material produced by any Party, Class Party, or other Third Party." (Protective Orders, ¶ 15).

## IV.    ARGUMENT

### A.    The Court Should Grant UFC-Que Choisir's Motion to Intervene

Rule 24 of the Federal Rules of Civil Procedure governs intervention of right and permissive intervention.    With respect to permissive intervention, Rule 24(b)(1) states in pertinent part that "[o]n timely motion, the court may permit anyone to intervene who:  (A) is given a conditional right to intervene by a federal statute; or (B) has a claim or defense that shares with the main action a common question of law or fact."   Fed. R. Civ. P. 24(b).   A determination on a motion for permissive intervention is a matter of discretion for a trial court. *See Harris v. Pernsely*, 820 F.2d 592, 597 (3d Cir. 1987).   Rule 24(b)(3) states that "[i]n exercising its discretion, the court must consider whether the intervention will unduly delay or prejudice the adjudication of the original parties' rights."   Finally, Rule 24(c) states that "[t]he motion must state the grounds for intervention and be accompanied by a pleading that sets out the claim or defense for which intervention is sought."

Rule 24 "is to be liberally construed, and doubts should be resolved in favor of allowing intervention." *Arkansas Elec. Energy Consumers v. Middle S. Energy, Inc.*, 772 F.2d 401, 404 (8th Cir. 1985) (citation omitted).   The Third Circuit has "routinely found, as have other courts, that third parties have standing to challenge protective orders and confidentiality orders [footnote omitted] in an effort to obtain access to information or judicial proceedings." *Pansy v. Borough of Stroudsburg*, 23 F.3d 772, 777 (3d Cir. 1994) ("*Pansy*").   Permissive intervention "is appropriately used to enable a litigant who was not an original party to an action to challenge protective or confidentiality orders entered in that action." *See also In re Vitamins Antitrust Litig.*, 2001 WL 34088808, at *2 (D.D.C. March 19, 2001) ("federal appellate courts considering the issue have interpreted the requirements of Rule 24 flexibly and have uniformly concluded

that third parties may permissively intervene for the purpose of contesting protective orders.").

Permissive intervention ordinarily requires independent jurisdictional grounds, but "in cases where intervenors seek to modify an order of the court, the court has jurisdiction based on the fact that it already has the power to modify the protective order and no independent jurisdictional basis is needed." *Pansy* at 778, n.3.

Courts interpret the requirement that a claim present "common legal or factual issues" with the main action with "considerable breadth." *Equal Employment Opportunity Comm'n v. Nat'l Children's Ctr., Inc.*, 146 F.3d 1042, 1046 (D.C. Cir. 1998) ("*EEOC*"). In *EEOC*, the Court stated that "we have eschewed strict readings of the phrase 'claim or defense,' allowing intervention even in 'situations where the existence of any nominate 'claim' or 'defense' is difficult to find.'" *Id.*

The Third Circuit and numerous other courts have held that a challenge to a protective order alone meets the requirement of a common question of law or fact. *See Pansy*, 23 F.3d at 778 ("By virtue of the fact that the Newspapers challenge the validity of the Order of Confidentiality entered in the main action, they meet the requirement of Fed. R. Civ. P. 24(b)(2) that their claim must have 'a question of law or fact in common' with the main action."). *See also Vitamins*, 2001 WL 34088808, at *4 ("[o]ther courts have interpreted this requirement even more liberally, holding that 'the issue of the scope or need for the confidentiality order itself presents a common question that links the movant's challenge with the main action.'") (*citing EEOC* at 1047). In *Vitamins*, the court further noted that "there is no need to rely on the more liberal construction of the commonality requirement afforded by some circuits because the Canadian Plaintiffs' suits share many common questions with the *Vitamins* action." 2001 WL 34088808, at *4. Moreover, "when intervention is sought in an action alleging anticompetitive

conduct, 'no stringent showing of a strong nexus of common fact or law is required.'" *Id.* (citations omitted*)*.

Courts have routinely found that litigants before a foreign tribunal may properly intervene in U.S. courts for the purpose of challenging provisions of protective orders. *See, e.g., In re Linerboard Antitrust Litig.*, 333 F. Supp. 2d 333, 340 (E.D. Pa. 2004). In *Linerboard*, the court granted the motion of a Canadian class action plaintiff to intervene in similar litigation in the United States, and stated the following:

> As for defendants' argument that moving under Rule 24(b) is a "novel" or "unconventional" approach under the circumstances, the Court notes that Canadian plaintiffs have sought similar relief under Rule 24(b) in both the *Vitamins Antitrust Litigation* in the United States District Court for the District of Columbia and the *Baycol Products Litigation* in the United States District Court for the District of Minnesota.
>
> In *Vitamins*, the District Court found the criteria for intervention had been met but deferred ruling on movants' request to modify the protective order pending the outcome of proceedings in Canada that could moot the need for the materials. [citation omitted]. In *Baycol*, the District Court allowed Canadian plaintiffs to intervene under Rule 24(b) and modified the protective order covering the litigation to allow the Canadian intervenors to access discovery. Thus, defendants assertions that Rule 24(b) is an improper vehicle for the relief movant seeks are rejected.

333 F. Supp. 2d at 341 (citations omitted). In *Vitamins*, a Canadian appellate court subsequently dismissed a related appeal, thus allowing U.S. production to occur, upon a concession that the Canadian plaintiffs would only seek access to documents already produced in the U.S., as opposed to seeking to conduct their own new discovery via the U.S. court. *See In re Baycol Products Litig.*, 2003 WL 22331293, at *5-6 (D. Minn. May 6, 2003) (discussing subsequent history in *Vitamins*).

In the present case, just as in *Vitamins*, common questions abound between the actions at issue, as Intel's alleged monopolistic conduct is the linchpin of the EC proceedings, the present

19684.1\365831v2

13

case, and any future litigation initiated by UFC-Que Choisir on behalf of consumers. Moreover, UFC-Que Choisir seeks to modify the Protective Orders in this case, which *ipso facto* confers a right to intervention. *See, e.g., Pansy*, 23 F.3d at 778.

Rule 24's requirement that a prospective intervenor proceed by "timely motion" has also been broadly interpreted. In *Pansy*, the court referenced a "growing consensus among the courts of appeal that intervention to challenge confidentiality orders may take place long after a case has been terminated." 23 F.3d at 779 (citations omitted). *See also Vitamins*, 2001 WL 34088808, at *4 ("[t]he Canadian Plaintiffs seek to intervene in ongoing litigation in which the parties have not yet even concluded discovery. Given that many courts have held that intervention is timely long after the termination of the litigation, the Canadian Plaintiffs' motion certainly appears to meet the timeliness requirement.")(citations omitted),. Here, UFC-Que Choisir's Motion unquestionably is timely, as discovery is many months from concluding, and the potentially hundreds of merits depositions have not even commenced.

Where the public or the press has sought access to discovery information for their own uses, the party that seeks to protect materials from disclosure bears the burden of demonstrating prejudice. *See Linerboard*, 333 F. Supp. 2d at 339. If and when such a showing is made, courts then balance the interests of disclosure and secrecy, bearing in mind the principle that "the general public must be afforded access to discovery material whenever possible." *Id.* (*citing* authority). When collateral litigants are concerned, however, as here, "the court need not balance the prejudice against secrecy because secrecy can be preserved by subjecting the intervenor to the provisions of a protective order." *Id.* at 340 (*citing* authority). In such circumstances, "access should be granted 'even if the need for the protected materials is minimal.'" *Id.* (citations omitted).

Further weighing in favor of access is where, as here, "movant has, in its filings in this Court, expressly submitted to the personal jurisdiction of this Court for the purpose of enforcement of the Confidentiality Order." *Id.* In the present case, UFC-Que Choisir, by filing its Motion, submits to the jurisdiction of this Court for the purposes of enforcement of the Protective Orders, presuming that the Court allows UFC-Que Choisir's requested modifications.

Upon consideration of the factors detailed above, the Court should grant UFC-Que Choisir's motion to intervene for the limited purpose of seeking modifications to the Protective Order. As the Third Circuit held in *Pansy*, and numerous other courts have held, intervention is the correct procedural vehicle for a third party to request modification of a protective order.

### B.     The Court Should Allow UFC-Que Choisir's Requested Modifications to the Protective Orders

Once the Court determines that UFC-Que Choisir has the *right* to intervene, it must then analyze the related, but analytically distinct, question of whether it will grant UFC-Que Choisir's request to modify the Protective Orders. Courts have broad discretion in deciding whether to amend protective orders. *See Grove Fresh Distributors, Inc. v. Everfresh Juice Co.*, 24 F.3d 893, 896 (7th Cir. 1994) ("*Grove Fresh*"). Protective orders may be amended to allow non-parties to have access to materials for use in other litigation. *See id.* Courts should "weigh the policy considerations of efficient resolution of litigation through the avoidance of duplicative discovery against any prejudice that may result to the substantial rights of the party opposing amendment." *Baycol*, 2003 WL 22331293, at *6 (*citing Grove Fresh*). Even if prejudice would result, a court "has broad discretion in determining whether the injury outweighs the benefits of modification." *Grove Fresh*, 24 F.3d at 896.

In the present case, no prejudice to Intel or third parties will result from the Court's

granting of UFC-Que Choisir's proposed modifications. As discussed in more detail herein *infra*, UFC-Que Choisir will be bound (just like the parties and third parties in the present case) by the provisions of the Protective Orders as modified regarding 1) the meet/confer process with respect to de-designating Confidential Information; 2) a protocol for filing materials under seal with the EC and/or any court or tribunal presiding over any EU consumer damages litigation; and 3) an additional meet/confer process before the time of any trial. Therefore, no prejudice to Intel's or any third parties' rights will occur; all protections remain intact. Additionally, because UFC-Que Choisir only seeks access to discovery materials generated by others in this case, as opposed to seeking to conduct its own new discovery, its limited participation will not occasion any delay in the case schedule.

Moreover, great efficiencies will be gained by not requiring UFC Que-Choisir to "reinvent the wheel" in terms of gathering evidence regarding Intel's alleged abuse of a dominant market position in Europe, and establishing and quantifying attendant harm to consumers. The allegations in the present case appear substantially to overlap with those in the EC proceedings. In *Baycol*, the court noted that "the Canadian Plaintiffs have presented similar claims to those at issue in the United States . . . it follows that the evidence sought by the Canadian Plaintiffs would be relevant to their claims." 2003 WL 22331293, at *7. The same is true here; both the present litigation and the EC proceedings contain allegations that Intel monopolized the world market for x86-based CPUs. Allowing discovery access to UFC-Que Choisir here will greatly streamline its efforts to reach its goal of evaluating the impact of Intel's conduct on consumers, and seeking redress for them.

19684.1\365831v2

**C.    The Court Should Grant UFC-Que Choisir's Application Pursuant to 28 U.S.C. § 1782 for an Order Requiring Intel and Third Parties to Provide Access to Documents and Deposition Testimony for Use in Foreign Proceedings**

28 U.S.C. § 1782 provides a method for district courts to provide assistance related to proceedings before foreign tribunals. It states in pertinent part the following:

> "(a) The district court of the district in which a person resides or is found may order him to give his testimony or statement or to produce a document or other thing for use in a proceeding in a foreign or international tribunal, including criminal investigations conducted before formal accusation. The order may be made pursuant to a letter rogatory issued, or request made, by a foreign or international tribunal or upon the application of any interested person and may direct that the testimony or statement be given, or the document or other thing be produced, before a person appointed by the court."

In *In re Application of Bayer AG*, 146 F.3d 188, 197 (3d Cir. 1998), the Third Circuit stated the following regarding 28 U.S.C. § 1782: "Consistent with the statute's modest prima facie elements and Congress's goal of providing equitable and efficacious discovery procedures, district courts should treat relevant discovery sought pursuant to § 1782 as discoverable unless the party opposing the application can demonstrate facts sufficient to justify the denial of the application."

In circumstances regarding foreign proceedings, third parties can bring both a motion to intervene as well as an application pursuant to 28 U.S.C. § 1782, as UFC-Que Choisir has done herein. *See Baycol*, 2003 WL 22331293, at *2 ("[i]n conjunction with the motion to intervene, the Canadian Plaintiffs have filed an application for discovery pursuant to 28 U.S.C. § 1782."). Even where foreign third parties only file a motion to intervene, courts look to the policy of 28 U.S.C. § 1782. For example, in *Linerboard*, the court, in granting a motion for permissive intervention under Rule 24, examined the policy of 28 U.S.C. § 1782 and noted that "one of the goals of that legislation is to provide 'efficient means of assistance to participants in international

19684.1\365831v2

17

litigation in our federal courts and encourage foreign countries by example to provide similar means of assistance to our courts . . .'" *Linerboard*, 333 F. Supp. 2d at 342 (citation omitted). The court concluded that granting a permissive motion to intervene "promotes that end." *Id.*

In *Intel Corp. v. Advanced Micro Devices, Inc.*, 542 U.S. 241, 246 (2004) ("*Intel*"), the United States Supreme Court addressed "the authority of federal district courts to assist in the production of evidence for use in a foreign or international tribunal" pursuant to 28 U.S.C. § 1782. The Court made several holdings that are relevant here. First, it held that "[a] complainant before the European Commission, such as AMD, qualifies as an 'interested person' within §1782(a)'s compass." Second, it held that the European Commission is "a §1782(a) 'tribunal' when it acts as a first-instance decisionmaker." *Id.* at 246-47. Third, the Court held that "the 'proceeding' for which discovery is sought under §1782(a) must be in reasonable contemplation, *but need not be 'pending' or 'imminent.'*" *Id.* at 247 (emphasis added). Finally, the Court held that "§1782(a) contains no threshold requirement that evidence sought from a federal district court would be discoverable under the law governing the foreign proceeding." *Id.*

With respect to the definition of "interested person" under §1782(a), the Court noted that "[t]he text of §1782(a), 'upon the application of any interested person,' plainly reaches beyond the universe of persons designated 'litigant.'" *Id.* at 256. The Court continued that "in addition to prompting an investigation, the complainant has the right to submit information for the DG-Competition's consideration, and may proceed to court if the Commission discontinues the investigation or dismisses the complaint." *Id.* The Court also quoted with approval a law review article stating that "'any interested person' is intended to include not only litigants before foreign or international tribunals, but also foreign and international officials as well as *any other person* whether he be designated by foreign law or international convention or merely possess a

*reasonable interest* in obtaining the assistance." 542 U.S. at 256, *quoting* Smit, International

Litigation under the United States Code, 65 Colum. L.Rev. 1015, 1027 (1965) (the "Smit

Article") (emphasis added).

In the present case, it is clear that the European Commission considers UFC-Que Choisir

to have a sufficient interest to intervene in its current proceedings. *See* King Decl., Exh. 12.

UFC-Que Choisir has already given its preliminary observations at the EC hearing on March 11,

2008 in Brussels. *See* King Decl., ¶ 16. UFC-Que Choisir thus clearly has a "reasonable

interest" in obtaining the Court's assistance here.

The Court in *Intel* expanded on its holding that the proceedings for which discovery is

sought need not be "pending" or "imminent." Specifically, the Court held that "we hold that

§1782(a) requires only that a dispositive ruling by the Commission, reviewable by the European

court, *be within reasonable contemplation.*" *Id.* at 259 (emphasis added). The Court also quoted

the Smit Article as follows: "*It is not necessary . . . for the [adjudicative] proceeding to be*

*pending at the time the evidence is sought, but only that the evidence is eventually to be used in*

*such a proceeding.*" *Id.*, *quoting* Smit Article at 1026 (emphasis added). In *In re Application of*

*Hill*, 2005 WL 1330769, at *5 n.4 (S.D.N.Y. June 3, 2005), the court applied *Intel* and stated the

following:

> Even if the requested evidence is not used specifically in either the
> Hong Kong or Bermuda liquidation proceedings, the Supreme
> Court has noted that a broad range of discovery under § 1782 is
> available in civil investigations so long as a proceeding is "within
> reasonable contemplation." *Intel Corp.,* 124 S.Ct. at 2480. Despite
> Ernst & Young USA's position that the Liquidators must identify,
> at this time, their proposed claims, legal theories and the pending
> or imminent proceeding in which they plan to bring any resultant
> causes of action, the Court declines to graft such restrictive
> requirements onto § 1782 . . . Without commenting on whether the
> various branches of Ernst & Young were aware of this alleged
> fraud and subsequently failed to disclose the accounting

> regularities [sic], the Court concludes that litigation against Ernst
> & Young HK and other third parties may be considered
> "reasonably contemplated."

In the present case, the EC proceedings unquestionably are pending.  Furthermore, a related damages action initiated by UFC-Que Choisir is "within reasonable contemplation," and the evidence examined and marshaled in the present case by UFC-Que Choisir is "eventually to be used" by it in its anticipated litigation on behalf of consumers.  The EC's letter to UFC-Que Choisir, dated March 6, 2008, and attached hereto as Exhibit 12 to the King Declaration, references UFC-Que Choisir's "stated purpose to possibly demand in your own name damages before national courts in the future . . ."  UFC-Que Choisir clearly has a "reasonable interest" in obtaining this Court's assistance.

The Court in *Intel* noted "factors that bear consideration in ruling on a § 1782(a) request." 542 U.S. at 265.  Those factors are as follows:

> "First, when the person from whom discovery is sought is a
> participant in the foreign proceeding (as Intel is here), the need for
> § 1782(a) aid generally is not as apparent as it ordinarily is when
> evidence is sought from a nonparticipant in the matter arising
> abroad . . .
>
> Second . . . a court presented with a § 1782(a) request may take
> into account the nature of the foreign tribunal, the character of the
> proceedings underway abroad, and the receptivity of the foreign
> government or the court or agency abroad to U.S. federal-court
> judicial assistance. . .
>
> [Third], a district court could consider whether the § 1782(a)
> request conceals an attempt to circumvent foreign proof-gathering
> restrictions or other policies of a foreign country or the United
> States.
>
> [Fourth], unduly intrusive or burdensome requests may be rejected
> or trimmed."

*Id.* (citations omitted).

On remand, the district court denied AMD's amended application for discovery.  *See*

*Advanced Micro Devices, Inc. v. Intel Corp.*, 2004 WL 2282320 (N.D. Cal. Oct. 4, 2004) ("*Intel II*"). The court noted that "AMD's application consists of seventy (70) document requests, sixty-seven (67) of which essentially seek Intel documents produced to Intergraph corporation in an action between the parties in the Northern District of Alabama, *Intergraph Corporation v. Intel Corporation . . .*" *Id.* at *1. The court continued as follows:

> The Intergraph case included allegations of patent infringement, state law violations, and antitrust claims that were reportedly based upon assertions that Intel's decision not to supply Intergraph with the patented Intel sample and pre-release microprocessors constituted monopolization of the microprocessor market; that Intel violated Section 2 of the Sherman Act by using its monopoly microprocessors to leverage a competitive advantage in the downstream markets of workstations, graphics accelerators and chipsets; and that Intel conspired with Intergraph workstation competitors to hinder Intergraph's sale of workstations to selected digital animation customers.

*Id.* Notably, the court in *Intel II* observed that the Alabama district court rejected Intergraph's antitrust claims against Intel at the summary judgment stage. *See Intel II*, 2004 WL 2282320 at *1.

The court in *Intel II* found that the factors outlined by the Supreme Court weighed against granting AMD's application. First, it found that because Intel was a participant in the EC proceedings, the EC could ask Intel to produce the material that AMD sought from the failed *Intergraph* Alabama patent case, and that the EC had made no such request. *Id.* at *2. Second, it found that the EC was not receptive to receiving the dismissed *Intergraph* case documents, as the EC had informed the Supreme Court via *amicus curiae* briefs that it "does not need or want" the Court's assistance to obtain those documents; that the EC "does not consider it necessary to request or even subsequently to review the documents sought" by AMD; and that granting AMD's request would jeopardize "vital Commission interests." *Id.* Third, the district court found that AMD's application "appears to be an attempt to circumvent the EC decision to not

19684.1\365831v2

21

pursue such discovery." *Id.* at *3. Fourth, the court found that AMD's 70 document requests were overbroad. *See id.*

With respect to the first *Intel* factor for trial court guidance, regarding whether a person from whom discovery is sought is a participant in the foreign proceedings, the present circumstances are distinguishable from those in *Intel II.* While it is true that Intel is a participant in the EC proceedings and would be an adverse party in any related European damages litigation, the numerous third parties that have produced documents in the present case are *not* participants in the EC proceedings. In *Intel II*, the only entity from whom discovery was sought was Intel, a participant in the EC proceedings.

The second *Intel* factor relates to a district court's consideration of, among other things, the receptivity of the foreign government or court to United States judicial assistance. In *Intel II*, the district court found it persuasive that the EC made its views known in no uncertain terms that it did not wish United States judicial assistance in obtaining access to the *Intergraph* Alabama patent case materials (in which the antitrust claims against Intel were dismissed at the summary judgment stage). Here, there is no such opposition by the EC. Additionally, unlike in *Intel II*, the applicant here under 28 U.S.C. § 1782 -- UFC-Que Choisir -- is not simply seeking evidence to possibly provide to the EC; it also is seeking evidence relevant to the potential institution of separate litigation in civil courts in one or more Member States of the European Union. There is no reason to suspect that a civil court would be unreceptive to evidence gathering in the present case; the gained efficiencies would be beneficial, rather than detrimental, to any court. Recognizing this principle in *Baycol*, the court, in granting the Canadian plaintiffs' application pursuant to 28 U.S.C. § 1782, held that "allowing the Canadian plaintiffs access to discovery materials already produced will not offend the Canadian tribunal." 2003 WL 22331293, at *6.

The same holds true here. Granting UFC-Que Choisir access to discovery materials in this case will not offend the EC or European tribunals.

Additionally, there is no attempt to circumvent foreign proof-gathering restrictions or other policies here. The court in *Intel II* found that AMD's application was such an attempt, in view of the EC's stated desire to prevent AMD from presenting it with the ill-fated *Intergraph* Alabama patent case materials. *See Intel II*, 2004 WL 2282320 at *3. No such circumstances exist with respect to UFC-Que Choisir.

Finally, there are no unduly burdensome or intrusive requests here, such as the court in *Intel II* found existed. In fact, there are *no requests* here, as contrasted to the 70 document requests in *Intel II*. UFC-Que Choisir simply seeks access to materials already at issue in the present case – whether via 28 U.S.C. § 1782, Fed. R. Civ. P. 24 or both – and does not seek access to any privileged documents. There is no unique burden or intrusion associated with UFC-Que Choisir's presence in the case. UFC-Que Choisir is not a multinational corporation with seemingly unlimited resources, such as Intel, AMD, and many of the third parties. It has neither the time nor the resources to troll through millions of pages of documents, attend the potentially hundreds of depositions, or create any unnecessary burdens or intrusions in the case to gain any supposed tactical advantages. As a practical matter, its presence in this case will probably be hardly noticed by the Court, Intel, AMD, and third parties for most of this litigation. It intends to work with Class Counsel in an effort to efficiently hone in on core documents that will help in their shared interests of demonstrating and quantifying consumer harm.

### D.    The Proposed Modifications to the Protective Orders

UFC-Que Choisir proposes the following modifications to the Protective Orders:

(to be added to the section titled "Definitions"): "Q. 'Third Party UFC-Que Choisir' means Union Federale des Consommateurs - Que Choisir, a third party granted access to the Confidential Discovery Information of Intel and Third Parties by way of Court order dated _____."

(to be added to the section titled "Definitions"): "R. 'EC Proceedings' means the European Commission proceedings regarding Intel's alleged abuse of a dominant position in the x86 CPU market."

(to be added to the section titled "Definitions"): "S. 'EU Consumer Damages Litigation' means present or future judicial proceedings in one or more Member States of the European Union and relating to Intel's alleged abuse of a dominant position in the x86 CPU market contrary to Article 82 of the EC Treaty."

(to be added to "Terms and Conditions of Protective Order" section): "1a. Third Party UFC-Que Choisir may use Confidential Discovery Material produced by Intel or Third Parties, or information derived therefrom, for purposes of participating in the EC Proceedings and/or preparing or participating in EU Consumer Damages Litigation."

(to be added to "Terms and Conditions of Protective Order" section, "Access to Confidential Discovery Material" subsection): "6.(i)    Third Party UFC-Que Choisir, who may receive Confidential Discovery Material produced by Intel or Third Parties, or information derived therefrom, for purposes of participating in the EC Proceedings and/or preparing or participating in EU Consumer Damages Litigation."

(to be added to "Terms and Conditions of Protective Order" section, "Access to Confidential Discovery Material" subsection): "6.(j)    The European Commission, by Third Party UFC-Que Choisir for purposes of participating in the EC Proceedings."

(to be added to "Terms and Conditions of Protective Order" section, "Access to Confidential Discovery Material" subsection): "6.(k)  Any court or tribunal or related personnel in any European Union Member States, by Third Party UFC-Que Choisir for purposes of participating in any EU Consumer Damages Litigation, subject to filing it under seal in such forums pursuant to paragraphs 21, 22, and 23 of this Order."

(to be added to the "Terms and Conditions of Protective Order" section, "Third Parties" subsection.  Non-bold text is in

original, **bold text** to be added): "Nothing in this Order shall be construed to allow any Third Party to obtain access to any Confidential Discovery Material produced by any Party, Class Party, or other Third Party, **except that Third Party UFC-Que Choisir may obtain access to Confidential Discovery Material produced by Intel or Third Parties, or information derived therefrom, for purposes of participating in the EC Proceedings and/or preparing or participating in EU Consumer Damages Litigation."**

With the above proposed modifications in place, UFC-Que Choisir will then be bound by the Protective Orders, including their provisions in Paragraph 16 regarding the meet/confer process with respect to de-designating Confidential Information (¶16). Paragraph 16 provides an efficient means for UFC-Que Choisir, Intel, and any appropriate third parties to confer about what documents of interest to UFC-Que Choisir truly are Confidential Information, and for the Court to resolve any remaining disputes. The proposed additions above also provide a means for UFC-Que Choisir to file materials under seal with the EC and/or any court or tribunal presiding over any EU consumer damages litigation. UFC-Que Choisir also will be bound by paragraph 14 of the Protective Orders, which provide for an additional meet/confer process before the time of trial.

Any initial concerns of Intel or third parties should therefore be assuaged; UFC-Que Choisir will treat Confidential Information just as the parties and numerous third parties in the present case are treating it. Moreover, upon the Court's granting of the relief sought herein, UFC-Que Choisir intends to confer with Class Counsel to devise an efficient method to obtain only those documents relevant to an assessment of demonstrating and quantifying harm to consumers.

## CONCLUSION

For the reasons stated herein, UFC-Que Choisir respectfully requests that the Court 1) grant its motion to intervene for the limited purpose of seeking modifications to the Protective Orders; 2) grant its application pursuant to 28 U.S.C. 1782(a) for access to discovery materials from Intel and third parties; and 3) modify the Protective Orders to allow it to obtain access to confidential discovery material produced by Intel and third parties, or information derived therefrom, for purposes of participating in the EC proceedings and/or preparing or participating in EU consumer damages litigation.

Dated: April 9, 2008

PRICKETT JONES & ELLIOTT, P.A.

By: ___/s/ J. Clayton Athey___
   James L. Holzman (#663)
   J. Clayton Athey (#4378)
   Laina M. Herbert (#4717)
   Melissa N. Donimirski (#4701)
   1310 King Street
   P.O. Box 1328
   Wilmington, DE  19899
   jlholzman@prickett.com
   jcathey@prickett.com
   lmherbert@prickett.com
   mndonimirski@prickett.com
   Telephone: (302) 888-6500
   Facsimile: (302) 658-8111

Of Counsel:

Jon T. King
COHEN MILSTEIN HAUSFELD &
  TOLL, P.L.L.C.
One Embarcadero Center
Suite 2440
San Francisco, CA  94111
Telephone:  (415) 229-2080
Facsimile:  (415) 986-3643
jking@cmht.com

Vincent Smith
COHEN, MILSTEIN, HAUSFELD &
  TOLL, L.L.P.
25 Southampton Buildings
London
WC2A 1AL
United Kingdom
Telephone: +44 (0)20 3170 7725
Facsimile: +44 (0)20 3170 7729
vsmith@cmht.com

*Counsel   for   Union   Federale   des*
*Consommateurs - Que Choisir*