# PRICKETT, JONES & ELLIOTT
A PROFESSIONAL ASSOCIATION

1310 KING STREET, BOX 1328
WILMINGTON, DELAWARE 19899
TEL: (302) 888-6500
FAX: (302) 658-8111
http://www.prickett.com

Writer's Direct Dial:
(302)888-6507
Writer's Telecopy Number::
(302)658-8111
Writer's E-Mail Address:
JCATHEY@prickett.com

Dover Office:
11 NORTH STATE STREET
DOVER, DELAWARE 19901
TEL: (302) 674-3841
FAX: (302) 674-5864

April 28, 2008

*Via eFiling and Hand Delivery*

The Honorable Vincent J. Poppiti
Blank Rome LLP
Chase Manhattan Centre, Suite 800
1201 North Market Street
Wilmington, DE 19801

    Re:    **DM No. 12**
                *In re Intel Corp. Microprocessor Antitrust Litigation*, MDL No. 05-1717-JJF;
                *Phil Paul v. Intel Corp.*, Cons. C.A. No. 05-485-JJF;
                *Advanced Micro Devices, Inc. et al. v. Intel Corp., et al.*, C.A. No. 05-441-JJF

Dear Judge Poppiti:

       Proposed Intervenor Union Federale des Consommateurs – Que Choisir ("QC") submits this letter brief in support of its proposed briefing schedule on its motion to intervene and related application pursuant to 28 U.S.C. § 1782 ("QC's Motion"). On April 22, 2008, at the initial hearing on establishing a briefing schedule, Your Honor requested submissions on the time-sensitivity of QC's Motion, *i.e.*, on the status of the European Commission ("EC") proceedings against Intel. QC provides that information herein, based on the accompanying Declaration of Vincent Neil Smith ("Smith Declaration" or "Smith Decl."). Additionally, QC refutes Intel's contentions that 1) QC was dilatory with respect to the EC proceedings and/or moving to intervene in the present case; and 2) the EC already obtained all documents that could be of interest to it.

       As his Declaration details, until recently Mr. Smith served as the Senior Director for Competition and Director of the Competition Enforcement Division at the Office of Fair Trading ("OFT"), the United Kingdom's ("UK") principal public competition authority. *See* Smith Decl., ¶¶ 2-4. In that capacity, he led the OFT's first phase merger control, cartel enforcement and antitrust enforcement and policy formation under the UK Competition Act of 1998 and Articles 81 and 82 of the EC Treaty and related legislation. *See id.*, ¶2. The nearest equivalent position in the United States is the Federal Trade Commission's Director of the Bureau of Competition. *See id.*

       During the April 22, 2008 hearing, Intel contended that QC's Motion is not time-sensitive because QC "sat on their hands" and "[t]he statement of objections in this matter in the EC was . . . July 2007. Intervenors knew about this way back then." Transcript of April 22, 2008 hearing ("Tr.") at pp.10-11. Intel further claimed that the EC "on its own already got the documents that

it asked for with its own power and chose not to use the [28 U.S.C. § 1782] power that the proposed Intervenor is proposing to use here." Tr. at p.12. Finally, Intel stated that "the record is closed for third parties in the [EC] proceedings on this statement of objections" and that QC "cannot submit anything into the file before the European Commission." Tr. at p. 11. QC refutes each of these points below.

### Timeline to Present of EC Proceedings and QC's Participation

On July 26, 2007, the EC's Competition Directorate General ("DG Comp") sent a Statement of Objections ("SO") to Intel in this case. *See* Smith Decl., ¶6. The SO was not shown to Advanced Micro Devices until December 2007 due to the need to redact from it information in respect of which Intel asserted confidentiality protection under Article 16 of Commission Regulation 773/2004 (the "Commission Regulation"). *See id.*

On February 12, 2008, DG Comp announced that it had conducted unannounced inspections at the premises of a manufacturer of CPUs and a number of retailers of consumer computers in connection with this case. *See id.*, ¶7. Intel confirmed that its facilities in Germany were raided, and the French retailing group PPR was also among those raided. *See id.*; QC Motion at 7. It was only when QC learned of the February 12, 2008 raid in France and the accompanying Intel raid in Germany, that it felt that a sufficient critical mass of information was in the public record, in particular regarding potential harm to consumers, to require of it an effort to participate in the EC proceedings.[1] Within approximately two weeks, and after consultation with internal and external legal counsel, on February 26, 2008 QC applied to the EC Hearing Officer to be heard as an interested party in the EC proceedings. *See* Smith Decl., ¶7; QC Motion at 7.

On March 6, 2008, QC received permission from the EC to participate in the March 11 and 12 hearing in Brussels. *See* Smith Decl., ¶7; QC Motion at 7. QC did not receive a summary of the redacted SO from the EC until March 7, 2008. *See* Smith Decl., ¶6.

The EC hearing required under Article 12 of the Commission Regulation took place in Brussels at DG Comp premises on March 11 and 12, 2008. *See* Smith Decl., ¶8. QC attended that hearing as a third party and made an oral submission. *See id.* QC subsequently had a brief e-mail correspondence with the EC that confirmed that any further written submission that related to matters raised at the hearing should be received by DG Comp by March 26, 2008. *See id.* It was not possible for QC to intervene in this case, review evidence, and prepare a full submission to the EC all between March 12 and March 26.

---

[1] QC is a French consumer association dedicated to representing the legal, financial and moral interests of consumers. QC Motion at 3. Under French law, QC has the power to intervene in criminal proceedings on behalf of consumers, bring civil actions to enjoin unlawful trading practices or seek damages on behalf of consumers, and bring complaints on behalf of consumers before the French Competition Council. *Id.* at 3-4. Founded in 1951, QC is comprised of approximately 170 local associations and has more than 124,000 members. *Id.* at 3.

On April 9, 2008, less than a month after the EC Brussels hearing, QC filed its motion to intervene in the present case, after consultation with internal counsel, its European outside counsel Mr. Smith, and its United States counsel.

Importantly, in the instant action Class Plaintiffs' motion for class certification is due to be filed on May 16, 2008, along with an expert report from Class Plaintiffs' economist that will be filed under seal. QC believes that the expert report will be based in part on documents that have been marked as confidential in this case, and anticipates that, as is customary, the expert report will address the impact of Intel's conduct on consumers based on the assumption that Intel has in fact engaged in monopolization, that in Europe is equivalent to the prohibited "abuse of a dominant position." QC believes that the report will be precisely the type of synthesized and concise material that will be of assistance to the EC, reducing the need for the EC to pore through millions of pages of documents on its own. See id., ¶9.

QC could not have already presented the consumer impact report to the EC by March 26 because Class Plaintiffs' expert has not yet completed it. The May 16 consumer impact filing in the present proceedings also is relevant to Intel's point made at the April 22 hearing before Your Honor in which Intel stated that the EC "on its own already got the documents that it asked for with its own power and chose not to use the [28 U.S.C. § 1782] power that the proposed Intervenor is proposing to use here." Tr. at 12. This point largely goes to the substance of QC's Motion, and should not be argued at length in this round of briefing. For present purposes, QC submits only that the EC could not have asked for and obtained something that does not yet exist in final form, and will not be filed in this case until May 16.

Consideration of the above timeline reveals that QC did not "sit on its hands" in any sense, and has proceeded appropriately as circumstances have dictated.

### Timeline of Future EC Proceedings

The next step in the EC proceedings will be for DG Comp to prepare a draft Decision on the basis of the evidence it has gathered, taking into account the representations from the parties and others that it has received. See Smith Decl., ¶10. There is nothing in European law that prevents the EC from considering and sending fresh documentary evidence to the parties after it has issued the SO and on which it wishes to rely in its draft Decision, provided that the proposed addressees of the Decision have an adequate opportunity to submit their observations on the new documentation. See id. Where the new evidence requires a substantial change to the EC's case, it may need to issue a further SO supplementing its original SO, so as to set out fully the new case against the parties. See id. However, where the new evidence tends to support the EC's existing case and the proposed addressees of the Decision have had a sufficient opportunity to comment, it is not necessary to restart the procedure by sending a supplementary SO. See id.

The EC is not required to set any timetable for the procedure following the hearing. It would be rare for it to do so, and it has not done so in this case. See Smith Decl., ¶11. However, a Decision is normally issued by the EC on recommendation from DG Comp six to nine months after the hearing has taken place, unless the EC decides to issue a further SO. See id. In this

case, this schedule suggests the Decision will be issued sometime between September and December of 2008. *See id.*

Before making a final Decision, the EC is required to send a copy of the final draft Decision to the competition authorities of the 27 Member States of the EU ("NCAs") for their comment. *See* Smith Decl., ¶ 12. Where there is significant disagreement among DG Comp and the NCAs, a formal meeting of the Advisory Committee on Restrictive Practices and Dominant Positions, comprised of representatives of the NCAs, will be called and will issue an opinion of the Committee that will be put to the meeting of the EC at which the Decision is to be adopted. *See id.* No part of this procedure is public or open to the parties or to third parties. *See id.* In practice this means that the draft decision that is put to the NCAs will be in a final form taking account of all the evidence DG Comp has in its possession at that time. *See id.* DG Comp will therefore normally allow 4-6 weeks before the date it wishes to publish the Decision to send the draft Decision to the NCAs for comment. *See id.* In this case this could be as early as September 2008. *See id.* It is therefore unlikely that the EC would wish to consider any evidence put to it after approximately mid-July of this year. *See id.*

It is not currently clear how DG Comp will proceed following its recent raids in February of this year of, among other companies, Intel's premises in Germany and the French retailer PPR. *See* Smith Decl., ¶ 13. DG Comp may open a new file solely against the retailers concerned, it may use any evidence it has found during the inspections to change its objections against Intel in the current proceeding, or it may combine these approaches. *See id.* If DG Comp decides to change significantly the objections raised against Intel in this case, it would issue a further SO setting out the EC's revised case. *See id.* Were this to happen, the timing outlined above would be extended significantly. *See id.* However, DG Comp would be in a significantly better position to consider further evidence from QC as well as from the parties. *See id.* It is not DG Comp's usual practice to inform the parties or third parties of its exact approach to an investigation until the time it announces that the EC has sent a further SO. *See id.*

In summary, the sooner QC can put additional evidence before the EC for its possible consideration, the better chance there is that it can be considered in the EC's proceedings. QC presented a reasonable briefing schedule to Your Honor at the April 22 hearing that takes into account both 1) that QC Motion's is time-sensitive due to the status of the EC proceedings; and 2) the need for all concerned parties to have ample time to brief the relevant issues. QC respectfully requests that Your Honor adopt its proposed briefing schedule.

Respectfully,

J. Clayton Athey
(DE Bar #4378)

Enclosures

Hon. Vincent J. Poppiti
April 28, 2008
Page 5

cc:  Clerk of the Court (*by electronic filing*)
     Richard L. Horwitz, Esq. (*by electronic filing and hand delivery*)
     Frederick L. Cottrell, III, Esq. (*by electronic filing and hand delivery*)
     James L. Holzman, Esq. (*office*)