# EXHIBIT 4

Avis juridique important

## 61994A0334

**Judgment of the Court of First Instance (Third Chamber, extended composition) of 14 May 1998. - Sarrió SA v Commission of the European Communities. - Competition - Article 85(1) of the EC-Treaty - Concept of single infringement - Information exchange - Order to desist - Fine - Determination of the amount - Method of calculation - Statement of reasons - Mitigating circumstances. - Case T-334/94.**

*European Court reports 1998 Page II-01439*

---

**Summary**
**Parties**
**Grounds**
**Decision on costs**
**Operative part**

## Keywords

*1 Competition - Administrative procedure - Observance of the rights of the defence - Scope of that principle*

*(Council Regulation No 17, Art. 19(1); Commission Regulation No 99/63, Arts 2 and 4)*

*2 Competition - Agreements, decisions and concerted practices - Participation in meetings of undertakings with an anti-competitive object - Ground for concluding that an undertaking participated in the subsequent cartel, if it has not distanced itself from the decisions taken*

*(EC Treaty, Art. 85(1))*

*3 Competition - Agreements, decisions and concerted practices - Where an undertaking agrees to set up and participate in meetings of a body whose anti-competitive object was known and accepted by the undertakings which established it - Ground for concluding that the undertaking participated in the subsequent cartel*

*(EC Treaty, Art. 85(1))*

*4 Competition - Agreements, decisions and concerted practices - Agreements and concerted practices constituting a single infringement - Undertakings to which an infringement in the form of participation in an overall cartel may be imputed - Criteria*

*(EC Treaty, Art. 85(1))*

*5 Competition - Administrative procedure - Cessation of the infringements - Obligations imposed on the undertakings - Proportionality - Criteria*

*(Council Regulaiton No 17, Art. 3(1))*

*6 Competition - Fines - Amount - Determination thereof - Criteria - Gravity of the infringements - Aggravating circumstances - Concealment of the cartel - Proof inferred from the absence of notes on meetings of cartel members*

*(Council Regulation No 17, Art. 15)*

*7 Competition - Fines - Amount - Determination thereof - Criteria - Gravity and duration of the infringements - Criteria to be applied - Possibility of increasing the fines in order to strengthen their deterrent effect*

*(Council Regulation No 17, Art. 15(2))*

*8 Acts of the institutions - Statement of reasons - Obligation - Scope - Decision imposing fines on several undertakings for an infringement of the competition rules*

*(EC Treaty, Art. 190; Council Regulation No 17, Art. 15)*

*9 Competition - Fines - Amount - Determination thereof - Turnover figure to be taken into account - Turnover figure sent to the Commission in response to a request for information*

*(Council Regulation No 17, Art. 15)*

*10 Competition - Fines - Amount - Methods of calculation - Conversion into ecus of the undertakings' turnover figure for the reference year on the basis of the average exchange rate over the same year - Whether permissible*

*(Council Regulation No 17, Art. 15)*

## Summary

*1 It follows from Article 19(1) of Regulation No 17, read in conjunction with Articles 2 and 4 of Regulation No 99/63, that the Commission must communicate the objections which it raises against the undertakings and associations concerned and may adopt in its decisions only objections on which those undertakings and associations have had the opportunity to make known their views. Similarly, due observance of the rights of the defence in a proceeding in which sanctions such as those in question may be imposed requires that the undertakings and associations of undertakings concerned must have been afforded the opportunity during the administrative procedure to make known their views effectively on the truth and relevance of the facts and circumstances alleged and objections raised by the Commission.*

*2 The fact that an undertaking does not abide by the outcome of meetings which have a manifestly anti-competitive purpose is not such as to relieve it of full responsibility for the fact that it participated in the cartel, if it has not publicly distanced itself from what was agreed in the meetings. Even assuming that the applicant's conduct on the market was not in conformity with the conduct agreed, that in no way affects its liability for an infringement of Article 85(1) of the Treaty.*

*3 The fact that an undertaking has agreed to set up and participate in meetings of a body whose anti-competitive object - in particular, the discussion of future price increases - was known to and accepted by the undertakings which originally established it, constitutes a sufficient ground for considering that that undertaking is liable for collusion on prices.*

*4 For the Commission to be entitled to hold that each undertaking addressed in a decision applying the competition rules is responsible for an overall cartel covering various anti-competitive actions during a given period, it must demonstrate that they each either consented to the adoption of an overall plan comprising the constituent elements of the cartel or participated directly in all those elements during that period. An undertaking may also be held responsible for an overall cartel even though it is shown that it participated directly only in one or some of the constituent elements of that cartel, if it knew, or must have known, that the collusion in which it participated was part of an overall plan and that the overall plan included all the constituent elements of the cartel. Where that is the case, the fact that the undertaking concerned did not participate directly in all the constituent elements of the overall cartel cannot relieve it of responsibility for the infringement of Article 85(1) of the Treaty. Such a circumstance may nevertheless be taken into account when assessing the seriousness of the infringement which it is found to have committed.*

*5 Article 3(1) of Regulation No 17 may be applied so as to include an order directed at bringing an end to certain acts, practices or situations which have been found to be unlawful, and also at prohibiting the adoption of similar conduct in the future. Moreover, since that provision is to be applied according to the nature of the infringement found, the Commission has the power to specify the extent of the obligations on the undertakings concerned in order to bring an infringement to an end. Such obligations on the part of the undertakings may not, however,*

exceed what is appropriate and necessary to attain the objective sought, namely to restore compliance with the rules infringed.

A prohibition fails to satisfy the conditions required for application of Article 3(1) of Regulation No 17 if it seeks to prevent the exchange of purely statistical information which is not in, or capable of being put into, the form of individual information where it is not apparent from the decision that the Commission considered the exchange of statistical data to be in itself an infringement of Article 85(1) of the Treaty; furthermore, the mere fact that a system for the exchange of statistical information might be used for anti-competitive purposes does not make it contrary to Article 85(1) of the Treaty, since in such circumstances it is necessary to establish its actual anticompetitive effect.

6 The fact that the undertakings participating in price collusion orchestrated the announcement of the concerted price increases and that they were discouraged from taking notes on the meetings to discuss this proves that they were aware of the unlawfulness of their conduct and that they took steps to conceal the collusion. The Commission is entitled to hold those steps to be aggravating circumstances when assessing the gravity of the infringement.

The absence of official minutes and the almost total absence of internal notes relating to the meetings may constitute, having regard to the number of such meetings, to the length of time for which they continued and to the nature of the discussions in question, sufficient proof that the participants were discouraged from taking notes.

7 When the amount of the fine for infringement of the Community competition rules is determined, regard is to be had to both the gravity and the duration of the infringement. The gravity of infringements falls to be determined by reference to a number of factors including, in particular, the specific circumstances and context of the case, and the deterrent character of the fines; moreover, no binding or exhaustive list of the criteria which must be applied has been drawn up.

When assessing the general level of fines the Commission is entitled to take account of the fact that clear infringements of the Community competition rules are still relatively frequent and that, accordingly, it may raise the level of fines in order to strengthen their deterrent effect. Consequently, the fact that in the past the Commission has applied fines of a certain level to certain types of infringement does not mean that it is estopped from raising that level, within the limits set out in Regulation No 17, if that is necessary in order to ensure the implementation of Community competition policy.

Furthermore, in fixing the general level of fines, the Commission is entitled to take into account, in particular, the lengthy duration and obviousness of an infringement of Article 85(1) of the Treaty which has been committed despite the warning which the Commission's previous decisions should have provided.

8 The purpose of the obligation to give reasons for an individual decision is to enable the Community judicature to review the legality of the decision and to provide the party concerned with an adequate indication as to whether the decision is well founded or whether it may be vitiated by some defect enabling its validity to be challenged; the scope of that obligation depends on the nature of the act in question and on the context in which it was adopted.

As regards a decision imposing fines on several undertakings for infringement of the Community competition rules, the scope of the obligation to state reasons must be assessed in the light of the fact that the gravity of infringements falls to be determined by reference to numerous factors including, in particular, the specific circumstances and context of the case and the deterrent character of the fines; moreover, no binding or exhaustive list of criteria to be applied has been drawn up.

Furthermore, when fixing the amount of each fine, the Commission has a margin of discretion and cannot be considered obliged to apply a precise mathematical formula for that purpose.

The reasons for a decision must appear in the actual body of the decision and, save in exceptional circumstances, explanations given ex post facto cannot be taken into account.

When the Commission finds in a decision that there has been an infringement of the competition rules and imposes fines on the undertakings participating in it, it must, if it has systematically taken into account certain basic factors in order to fix the amount of fines, set out those factors in

the body of the decision in order to enable the addressees of the decision to verify that the level of the fine is correct and to assess whether there has been any discrimination.

9 The Commission is entitled to adopt, as its basis for calculating fines for infringement of the Community competition rules, the turnover figure sent by the undertaking concerned in response to a request for information, rather than a corrected figure which has been sent later. An undertaking which, during the administrative procedure before the Commission, corrects a figure, such as a turnover figure, previously sent to the Commission in reply to one of its requests for information, must set out in detail the reasons for which the figure initially sent should no longer be adopted for the remainder of the procedure.

10 When the Commission imposes fines on several undertakings for infringement of the Community competition rules, nothing precludes it from expressing the amount of the fines in ecus, a monetary unit which is convertible into national currency. That also allows the undertakings more easily to compare the amounts of the fines imposed. Moreover, the fact that the ecu may be converted into national currency distinguishes it from the `unit of account' referred to in Article 15(2) of Regulation No 17, the use of which - since it is not a currency in which payment is made - necessarily means that the amount of the fine must be determined in national currency.

In calculating the fine, the Commission is entitled to use a method whereby it converts into ecus each undertaking's reference turnover at the average exchange rate for that same year, not the exchange rate in force on the date when the decision was adopted.

First of all, the Commission should ordinarily use one and the same method of calculating the fines imposed on the undertakings penalised for having participated in the same infringement. Second, in order to be able to compare the different turnover figures sent to it, which are expressed in the respective national currencies of the undertakings concerned, the Commission must convert those figures into a single monetary unit such as the ecu, the value of which is determined in accordance with the value of each national currency of the Member States.

Furthermore, in the first place, the taking into account of the turnover achieved by each undertaking during the reference year, that is to say, the last complete year of the period of infringement found, enables the Commission to assess the size and economic power of each undertaking and the scale of the infringement committed by each of them, those aspects being relevant for an assessment of the gravity of the infringement committed by each undertaking. In the second place, the taking into account, in order to convert the turnover figures in question into ecus, of the average exchange rates for the reference year adopted, enables the Commission to prevent any monetary fluctuations occurring after the cessation of the infringement from affecting the assessment of the undertakings' relative size and economic power and the scale of the infringement committed by each of them and, accordingly, its assessment of the gravity of that infringement. The assessment of the gravity of an infringement must have regard to the economic reality as revealed at the time when that infringement was committed.

Consequently, the method whereby the fine is calculated by using the average rate of exchange for the reference year makes it possible to avoid the uncertain effects of changes in the real value of the national currencies which may arise between the reference year and the year in which the decision is adopted. Although this method may mean that a given undertaking must pay an amount, expressed in national currency, which is in nominal terms greater or less than that which it would have had to pay if the rate of exchange at the date of adoption of the decision had been applied, that is merely the logical consequence of fluctuations in the real values of the various national currencies.

## Parties

In Case T-334/94,

Sarrió SA, a company incorporated under Spanish law, established at Pamplona, Spain, represented by Antonio Creus Carreras, of the Barcelona Bar, Alberto Mazzoni, of the Milan Bar, Antonio Tizzano and Gian Michele Roberti, of the Naples Bar, with an address for service in Luxembourg at the Chambers of Alain Lorang, 51 Rue Albert 1er,

*applicant,*

*v*

*Commission of the European Communities, represented by Richard Lyal, of its Legal Service, acting as Agent, and by Alberto Dal Ferro, of the Vicenza Bar, with an address for service in Luxembourg at the office of Carlos Gómez de la Cruz, of its Legal Service, Wagner Centre, Kirchberg,*

*defendant,*

*APPLICATION for annulment of Commission Decision 94/601/EC of 13 July 1994 relating to a proceeding under Article 85 of the EC Treaty (IV/C/33.833 - Cartonboard, OJ 1994 L 243, p. 1),*

*THE COURT OF FIRST INSTANCE OF THE EUROPEAN COMMUNITIES*

*(Third Chamber, Extended Composition),*

*composed of: B. Vesterdorf, President, C.P. Briët, P. Lindh, A. Potocki and J.D. Cooke, Judges,*

*Registrar: J. Palacio González, Administrator,*

*having regard to the written procedure and further to the hearing which took place from 25 June to 8 July 1997,*

*gives the following*

*Judgment*

## Grounds

*Facts*

*1 This case concerns Commission Decision 94/601/EC of 13 July 1994 relating to a proceeding under Article 85 of the EC Treaty (IV/C/33.833 - Cartonboard, OJ 1994 L 243, p. 1), as corrected prior to its publication by a Commission decision of 26 July 1994 (C(94) 2135 final) (hereinafter `the Decision'). The Decision imposed fines on 19 producers supplying cartonboard in the Community on the ground that they had infringed Article 85(1) of the Treaty.*

*2 The product with which the Decision is concerned is cartonboard. The Decision refers to three types of cartonboard, designated as `GC', `GD' and `SBS' grades.*

*3 GD grade cartonboard (hereinafter `GD cartonboard') is white-lined chipboard (recycled paper) which is normally used for the packaging of non-food products.*

*4 GC grade cartonboard (hereinafter `GC cartonboard') is cartonboard with a white top layer and is normally used for the packaging of food products. GC cartonboard is of higher quality than GD cartonboard. During the period covered by the Decision there was normally a price differential of approximately 30% between those two products. High quality GC cartonboard is also used, but to a lesser extent, for graphic purposes.*

*5 SBS is the abbreviation used to refer to cartonboard which is white throughout (hereinafter `SBS cartonboard'). The price of this cartonboard is approximately 20% higher than that of GC cartonboard. It is used for the packaging of foods, cosmetics, medicines and cigarettes, but is designated primarily for graphic uses.*

*6 By letter of 22 November 1990, the British Printing Industries Federation (`BPIF'), a trade organisation representing the majority of printed carton producers in the United Kingdom, lodged an informal complaint with the Commission. It claimed that the producers of cartonboard supplying the United Kingdom had introduced a series of simultaneous and uniform price increases and it requested the Commission to investigate whether there had been an infringement of the Community competition rules. In order to ensure that its initiative received publicity, the BPIF issued a press release. The content of that press release was reported in the specialised trade press in December 1990.*

*7 On 12 December 1990, the Fédération Française du Cartonnage also lodged an informal complaint with the Commission, making allegations relating to the French cartonboard market which were similar to those made in the BPIF complaint.*

*8 On 23 and 24 April 1991, Commission officials acting pursuant to Article 14(3) of Council Regulation No 17 of 6 February 1962, First Regulation Implementing Articles 85 and 86 of the Treaty (OJ, English Special Edition 1959-1962, p. 87, hereinafter `Regulation No 17'), carried out simultaneous investigations without prior notice at the premises of a number of undertakings and trade associations operating in the cartonboard sector.*

*9 Following those investigations, the Commission sent requests for both information and documents to all the addressees of the Decision pursuant to Article 11 of Regulation No 17.*

*10 The evidence obtained from those investigations and requests for information and documents led the Commission to conclude that from mid-1986 until at least (in most cases) April 1991 the undertakings concerned had participated in an infringement of Article 85(1) of the Treaty.*

*11 The Commission therefore decided to initiate a proceeding under Article 85 of the Treaty. By letter of 21 December 1992 it served a statement of objections on each of the undertakings concerned. All the addressees submitted written replies. Nine undertakings requested an oral hearing. A hearing was held on 7, 8 and 9 June 1993.*

*12 At the end of that procedure the Commission adopted the Decision, which includes the following provisions:*

*`Article 1*

*Buchmann GmbH, Cascades SA, Enso-Gutzeit Oy, Europa Carton AG, Finnboard - the Finnish Board Mills Association, Fiskeby Board AB, Gruber & Weber GmbH & Co KG, Kartonfabriek "de Eendracht NV" (trading as BPB de Eendracht NV), NV Koninklijke KNP BT NV (formerly Koninklijke Nederlandse Papierfabrieken NV), Laakmann Karton GmbH & Co KG, Mo Och Domsjö AB (MoDo), Mayr-Melnhof Gesellschaft mbH, Papeteries de Lancey SA, Rena Kartonfabrik A/S, Sarrió SpA, SCA Holding Ltd (formerly Reed Paper & Board (UK) Ltd), Stora Kopparbergs Bergslags AB, Enso Española SA (formerly Tampella Española SA) and Moritz J. Weig GmbH & Co KG have infringed Article 85(1) of the EC Treaty by participating,*

*- in the case of Buchmann and Rena from about March 1988 until at least the end of 1990,*

*- in the case of Enso Española, from at least March 1988 until at least the end of April 1991,*

*- in the case of Gruber & Weber from at least 1988 until late 1990,*

*- in the other cases, from mid-1986 until at least April 1991,*

*In an agreement and concerted practice originating in mid-1986 whereby the suppliers of cartonboard in the Community*

*- met regularly in a series of secret and institutionalised meetings to discuss and agree a common industry plan to restrict competition,*

*- agreed regular price increases for each grade of the product in each national currency,*

*- planned and implemented simultaneous and uniform price increases throughout the Community,*

*- reached an understanding on maintaining the market shares of the major producers at constant levels, subject to modification from time to time,*

*- increasingly from early 1990, took concerted measures to control the supply of the product in the Community in order to ensure the implementation of the said concerted price rises,*

*- exchanged commercial information on deliveries, prices, plant standstills, order backlogs and machine utilisation rates in support of the above measures.*

*...*

*Article 3*

*The following fines are hereby imposed on the undertakings named herein in respect of the infringement found in Article 1:*

*...*

*(xv) Sarrió SpA, a fine of ECU 15 500 000;*

*...'*

*13 According to the Decision, the infringement took place within a body known as the `Product Group Paperboard' (hereinafter `the PG Paperboard'), which comprised several groups or*

*committees.*

*14 In mid-1986 a group entitled the `Presidents Working Group' (hereinafter `the PWG') was established within that body. This group brought together senior representatives of the main suppliers of cartonboard in the Community (some eight suppliers).*

*15 The PWG's activities consisted, in particular, in discussion and collaboration regarding markets, market shares, prices and capacities. In particular, it took broad decisions on the timing and level of price increases to be introduced by producers.*

*16 The PWG reported to the `President Conference' (hereinafter `the PC'), in which almost all the managing directors of the undertakings in question participated (more or less regularly). The PC met twice each year during the period in question.*

*17 In late 1987 the Joint Marketing Committee (hereinafter `the JMC') was set up. Its main task was, on the one hand, to determine whether, and if so how, price increases could be put into effect and, on the other, to prescribe the methods of implementation for the price initiatives decided by the PWG, country-by-country and for the major customers, in order to achieve a system of equivalent prices in Europe.*

*18 Lastly, the Economic Committee discussed, inter alia, price movements in national markets and order backlogs, and reported its findings to the JMC or, until the end of 1987, to the Marketing Committee, the predecessor of the JMC. The Economic Committee was made up of marketing managers of most of the undertakings in question and met several times a year.*

*19 According to the Decision, the Commission also took the view that the activities of the PG Paperboard were supported by an information exchange organised by Fides, a secretarial company, whose registered office is in Zurich, Switzerland. The Decision states that most of the members of the PG Paperboard sent periodic reports on orders, production, sales and capacity utilisation to Fides. Under the Fides system, those reports were collated and the aggregated data were sent to the participants.*

*20 The applicant, Sarrió SA (Sarrió), is the result of a merger in 1990 between the cartonboard division of the largest Italian producer, Saffa, and the Spanish producer Sarrió (point 11 of the Decision). In 1991 Sarrió also acquired the Spanish producer Prat Carton (ibidem).*

*21 Sarrió was considered to be responsible for the involvement of Prat Carton in the cartel for the whole of the period of its participation (point 154 of the Decision).*

*22 Sarrió manufactures principally GD grade cartonboard, but also produces GC grade.*

*Procedure*

*23 The applicant brought this action by application lodged at the Registry of the Court on 14 October 1994.*

*24 Sixteen of the eighteen other undertakings held to be responsible for the infringement have also brought actions to contest the Decision (Cases T-295/94, T-301/94, T-304/94, T-308/94, T-309/94, T-310/94, T-311/94, T-317/94, T-319/94, T-327/94, T-337/94, T-338/94, T-347/94, T-348/94, T-352/94 and T-354/94).*

*25 The applicant in Case T-301/94, Laakmann Karton GmbH, withdrew its action by letter lodged at the Registry of this Court on 10 June 1996 and the case was removed from the Register by order of 18 July 1996 (Case T-301/94 Laakmann Karton GmbH v Commission, not published in the ECR).*

*26 Four Finnish undertakings, members of the trade association Finnboard, and as such held jointly and severally liable for payment of the fine imposed on Finnboard, have also brought actions against the Decision (Joined Cases T-339/94, T-340/94, T-341/94 and T-342/94).*

*27 Lastly, an action was also brought by an association, CEPI-Cartonboard, which was not an addressee of the Decision. However, it withdrew its action by letter lodged at the Registry of the Court on 8 January 1997 and the case was removed from the Register of the Court by order of 6 March 1997 (Case T-312/94 CEPI-Cartonboard v Commission, not published in the ECR).*

*28 By letter of 5 February 1997 the Court requested the parties to take part in an informal meeting with a view, in particular, to their presenting observations on a possible joinder of Cases T-295/94, T-304/94, T-308/94, T-309/94, T-310/94, T-311/94, T-317/94, T-319/94, T-327/94, T-334/94, T-337/94, T-338/94, T-347/94, T-348/94, T-352/94 and T-354/94 for the purposes of the*

*oral procedure. At that meeting, which took place on 29 April 1997, the parties agreed to such a joinder.*

*29 By order of 4 June 1997 the President of the Third Chamber, Extended Composition, of the Court, in view of the connection between the abovementioned cases, joined them for the purposes of the oral procedure in accordance with Article 50 of the Rules of Procedure and allowed an application for confidential treatment submitted by the applicant in the present case.*

*30 By order of 20 June 1997 he allowed an application for confidential treatment submitted by the applicant in Case T-337/94 which related to a document produced in response to a written question from the Court.*

*31 Upon hearing the report of the Judge Rapporteur, the Court (Third Chamber, Extended Composition) decided to open the oral procedure and adopted measures of organisation of procedure in which it requested the parties to reply to certain written questions and to produce certain documents. The parties complied with those requests.*

*32 The parties in the cases referred to in paragraph 28 above presented oral argument and gave replies to the Court's questions at the hearing which took place from 25 June to 8 July 1997.*

*Forms of order sought*

*33 The applicant claims that the Court should:*

*- annul the Decision;*

*- in the alternative, annul Article 2 of the Decision, and also Article 3 thereof in so far as it imposes on the applicant a fine of ECU 15 500 000;*

*- in the further alternative, reduce the amount of that fine;*

*- order the defendant to pay the costs.*

*34 The Commission contends that the Court should:*

*- dismiss the application;*

*- order the applicant to pay the costs.*

*The application for annulment of the Decision A - The plea relating to procedure and requirements of form, grounded upon infringement of the rights of the defence*

*Arguments of the parties*

*35 The applicant claims that its rights of defence were infringed when the Commission (in point 79 of the Decision) took into account, as evidence of the infringement, a document discovered at Finnboard (UK) Ltd during investigations carried out in April 1991 (hereinafter `the Finnboard price list'). It observes that this document was sent to it only on 28 April 1994, that is to say, well after the date on which it lodged its reply to the statement of objections and after the hearing before the Commission. That unjustified delay deprived it of the opportunity to express its views on the actual significance of the document, the context in which it was drawn up and the conclusions drawn by the Commission from it (Case 85/76 Hoffmann-La Roche v Commission [1979] ECR 461). Furthermore, the communication of the document on 28 April 1994 has not remedied that infringement.*

*36 The Commission counters by stating that the document in question was sent to Sarrió with a covering letter of 28 April 1994 fully explaining the tenor of the document and the conclusions drawn by the Commission. Since the letter of 28 April 1994 also offered the applicant an opportunity to submit any observations in writing, it was able to put forward at the appropriate time its view of the probative value of the document in question (see Case T-4/89 BASF v Commission [1991] ECR II-1523, paragraph 36).*

*Findings of the Court*

*37 The Finnboard price list was obtained by the Commission during its investigations at the offices of Finnboard (UK) Ltd in April 1991 and was communicated to the applicant with a covering letter 16 months after the despatch of the statement of objections.*

*38 According to the case-law of this Court, it follows from Article 19(1) of Regulation No 17, read in conjunction with Articles 2 and 4 of Commission Regulation No 99/63/EEC of 25 July 1963 on the hearings provided for in Article 19(1) and (2) of Council Regulation No 17 (OJ, English Special Edition 1963-1964, p. 47), that the Commission must communicate the objections which it raises*

*against the undertakings and associations concerned and may adopt in its decisions only objections on which those undertakings and associations have had the opportunity to make known their views (Joined Cases T-39/92 and T-40/92 CB and Europay v Commission [1994] ECR II-49, paragraph 47).*

*39 Similarly, due observance of the rights of the defence in a proceeding in which sanctions such as those in question may be imposed requires that the undertakings and associations of undertakings concerned must have been afforded the opportunity during the administrative procedure to make known their views effectively on the truth and relevance of the facts and circumstances alleged and objections raised by the Commission (Hoffmann-La Roche v Commission, cited above, paragraph 11, and Joined Cases T-10/92, T-11/92, T-12/92 and T-15/92 Cimenteries CBR and Others v Commission [1992] ECR II-2667, paragraph 39).*

*40 In the present case, no new objection over and above those appearing in the statement of objections was raised by the sending of the document concerned. It is clear from the letter sent with the Finnboard price list that the list merely constituted additional evidence of a common plan to fix prices, an objection which had already been fully explained in the statement of objections.*

*41 In any event, the applicant was expressly offered an opportunity in the letter sent with that document to make known its views on that evidence, during the administrative procedure and within a period of ten days. In those circumstances, the Commission did not prevent the applicant from putting forward at the appropriate time its view of the probative value of the document sent (Hoffmann-La Roche v Commission, paragraph 11, and Case 107/82 AEG v Commission [1983] ECR 3151, paragraph 27).*

*42 It follows that this plea must be rejected as unfounded.*

*B - Substance*

*The plea as to the absence of collusion on transaction prices and infringement of the obligation to state reasons*

*Arguments of the parties*

*43 The applicant acknowledges that it took part in concerted action relating to announced prices but disputes that this action related to transaction prices. Apart from the documents submitted with its pleadings, which show that transaction prices did not follow announced prices, it points, in support of its assertion, to each customer's power of negotiation, to changes in demand and in production costs and to the characteristics peculiar to the cartonboard market, particularly the regularity with which price increases were announced and the high degree of market transparency.*

*44 It considers that the Commission has not explained clearly whether it was alleging that there had been collusion not only on announced prices but also on transaction prices. On account of their different effects, the distinction between those two types of collusion is, contrary to the Commission's claims, of major importance (see Joined Cases C-89/85, C-104/85, C-114/85, C-116/85, C-117/85 and C-125/85 to C-129/85 Ahlström Osakeyhtiö and Others v Commission [1993] ECR I-1307). In its reply the applicant submits that the uncertainty regarding the subject-matter of the collusion constitutes in itself a breach of the obligation to give and explain the reasons for decisions which find that there has been an infringement of the competition rules. Consequently, that breach seriously affects the legitimate rights of the defence.*

*45 The Commission states that it does not understand how the applicant can at one and the same time claim that it took part in concerted action on prices and submit that the price increases applied were not the result of that collusion. It points out that the Decision (in particular points 72 to 102) refers both to documents showing consultation in regard to each increase announced in the context of the cartel and to the documents by which each producer actually announced the increase in question.*

*46 It also contends that the distinction between collusion on announced prices and on transaction prices is not relevant in the present case. The collusion in the PWG and the JMC did not solely concern announced prices but also the adoption of decisions relating to periodical price increases for each type of product and the application of those simultaneous increases throughout the Community (see the documentary evidence referred to in points 74 to 90, 92 and 94 to 96 of the Decision).*

*47 Moreover, having regard to the evidence of collusion within the committees in which the applicant participated, it is impossible to claim that the price announcements did not eliminate each undertaking's uncertainty about its competitors' conduct and that the applicant made the price increases without reference to the collusion (see Case T-1/89 Rhône-Poulenc v Commission [1991] ECR II-867, paragraphs 122 and 123).*

*Findings of the Court*

*48 According to Article 1 of the Decision, the addressees of that decision infringed Article 85(1) of the Treaty by participating, during the relevant period, in an agreement and concerted practice whereby the suppliers of cartonboard in the Community, inter alia, `agreed regular price increases for each grade of the product in each national currency' and `planned and implemented simultaneous and uniform price increases throughout the Community'.*

*49 The applicant acknowledges that it participated in the four bodies of the PG Paperboard and has not disputed, either in its pleadings or its replies to the questions put by the Court at the hearing, that it took part in concerted action on announced prices with effect from 1988.*

*50 Before dealing with the applicant's submission that the collusion did not relate to transaction prices, it is necessary to determine whether the Commission actually asserted in the Decision that the collusion related to those prices.*

*51 In that regard, first, Article 1 of the Decision does not specify the price which was the subject-matter of the concerted increases.*

*52 Second, it is not apparent from the Decision that the Commission had maintained that the producers had fixed, or even intended to fix, uniform transaction prices. In particular, points 101 and 102 of the Decision, dealing with `the effect of the concerted price initiatives on price levels', show that the Commission considered that the price initiatives concerned list prices and aimed to bring about an increase in transaction prices. It is stated in particular as follows: `Even if all the producers stayed resolute on introducing the full increase, the possibilities for customers of switching to a cheaper quality or grade meant that a supplying producer might have to make some concessions to its traditional customers as regards timing or give additional incentives in the form of tonnage rebates or large order discounts in order for the customer to accept the full basic-price increase. A price increase would therefore inevitably take some time before it worked through' (point 101, sixth paragraph, of the Decision).*

*53 It is also apparent from the Decision that the Commission considered that the purpose of the collusion between the producers in regard to prices was that the announced concerted price increases should lead to an increase in transaction prices. According to the first paragraph of point 101 of the Decision, `the producers not only announced the agreed price increases but also with few exceptions took firm steps to ensure that they were imposed on the customers'. The situation in the present case is therefore different from that before the Court of Justice in Ahlström Osakeyhtiö and Others v Commission, cited above, since, unlike the decision with which that judgment was concerned, the Commission does not assert in the Decision that the undertakings took concerted action directly on transaction prices.*

*54 That analysis of the Decision is confirmed by the documents produced by the Commission.*

*55 In particular, appendix 109 to the statement of objections contains the minutes of a meeting of the JMC of 16 October 1989 in which it is stated, inter alia, as follows:*

*`d) Holland ...*

*Big problems with the major purchasers, particularly Imca, to which Cascades and Van Duffel are still offering crazy prices and making life hard for both KNP and the Finns.*

*...*

*f) Belgium*

*Similar situation to that in Holland. Finnboard had already succeeded with the price increase at Van Genechten but, owing to concessions from Belgium (Cascades), had to have a further discussion. A tough line will continue and this is also expected from Beghin, Cascades and KNP.*

*...*

*h) Italy*

*Saffa has very great problems with the import prices charged by Kopparfors, Finnboard and also Cascades.*

*There has been a heavy fall in Saffa's deliveries, imports have greatly increased.*

*Saffa calls on importers to keep absolutely to the price guidelines that have been issued.'*

*56 That document clearly shows that although the producers accepted in general terms that each of them should negotiate its transaction prices with its customers, each of the producers, and in particular the applicant, which is expressly referred to in the abovementioned appendix, expected that its competitors would apply transaction prices conforming to the agreed prices, at least in the sense that individual negotiations were not to deprive the agreed increases in list prices of their effect.*

*57 Furthermore, the applicant acknowledged at the hearing that announced prices served as a preliminary basis for negotiations with customers on transaction prices, which confirms that the ultimate aim was to increase transaction prices. In that regard, it suffices to state that the fixing of uniform list prices agreed by the producers would have been rendered absolutely irrelevant if those prices had not actually had any effect on transaction prices.*

*58 As regards the applicant's claim that the uncertainty regarding the subject-matter of the collusion is in itself a breach of the obligation to furnish reasons, it must be pointed out that Article 1 of the Decision does not identify the specific price on which the collusion took place.*

*59 In such circumstances, it is settled law that the operative part of the decision must be considered in the light of its statement of reasons (see, for example, the judgment in Joined Cases 40/73 to 48/73, 50/73, 54/73, 55/73, 56/73, 111/73, 113/73 and 114/73 Suiker Unie and Others v Commission [1975] ECR 1663, paragraphs 122 to 124).*

*60 In the present case, it follows from the foregoing that the Commission adequately explained in the grounds of the Decision that the concerted action related to list prices and aimed to bring about an increase in transaction prices.*

*61 Consequently, the plea must be rejected as unfounded. Non-participation by the applicant in an agreement to freeze market shares and control supply*

*Arguments of the parties*

*62 This plea is in three parts.*

*63 In the first part of the plea the applicant claims that the Commission has no evidence of the existence of concerted action to freeze market shares or to control supply. Even assuming that those concerted actions had been proved to the standard required by law, the Commission would not have proved that the applicant participated in those concerted actions. In particular, the applicant disputes the probative value of several appendices to the statement of objections on which the Commission based its findings in the Decision.*

*64 First, appendix 73, an internal Mayr-Melnhof note, could only prove collusion on prices, explain the consequences of a rigorous pricing policy and show that there was no pressure by the applicant on Mayr-Melnhof to cause the latter to refrain from increasing its market shares through a reduction in its prices. In that regard, the applicant relies on the explanation given by Mayr-Melnhof in its letter of 23 September 1991 (appendix 75 to the statement of objections).*

*65 Second, appendix 102, a note by Rena, relates to a meeting of the Nordic Paperboard Institute (`NPI'), an association of which the applicant was not a member.*

*66 Third, Stora's statements cannot in themselves constitute adequate evidence. Moreover, Stora repeatedly stressed the relative autonomy enjoyed by the various undertakings as regards, in particular, production volumes and the time when they chose to stop production (see points 57, 59, 60, 69, 70 and 71 of the Decision). Stora's statements also confirm that no system for the monitoring of any understanding on quantities had been established. The absence of a system for monitoring quantity changes clearly refutes the existence of any understanding on that subject. Moreover, Stora's statements merely express its own opinion regarding the importance of adopting measures to monitor production quantities and sales.*

*67 In the second part of the plea the applicant claims that the changes in the market shares of various undertakings show that no concerted action to freeze market shares took place or, even if it were assumed that concerted action had taken place between some undertakings, that the*

*applicant had not in any event taken part in it.*

*68 As regards the general changes in market shares, it maintains that some producers, in particular Iggesund (MoDo) and Mayr-Melnhof, brought significant new capacity into service during the period in question.*

*69 The applicant also observes that its own overall share of the Community market fell from 14.3% in 1987 to 11.7% in 1990. It claims that such a fall is incompatible with the Commission's assertion that it took part in an agreement to freeze the market shares of the various producers. As regards Prat Carton, the reduction, from 1987 to 1990, of approximately 9% of its overall share of the Community market also demonstrates the complete absence of participation in any concerted action to freeze market shares.*

*70 In the third part of the plea the applicant submits that its behaviour in regard to production stoppages and exports to markets outside Europe is also incompatible with the Commission's assertions.*

*71 As to the first part of the plea, the Commission considers that the evidence on which it relied, in particular Stora's statements (appendices 39 and 43 to the statement of objections) and appendices 73 and 102 to the statement of objections, amply demonstrate the existence of an agreement to freeze market shares and to control supply, and also the applicant's participation in those aspects of the cartel.*

*72 As regards the second part of the plea, it observes that it based itself on documentary evidence of an understanding on freezing market shares and it submits that the applicant's argument relating to the change in market shares of various undertakings is therefore irrelevant to the question whether such an understanding existed. Moreover, it is expressly accepted in the Decision that the market shares of certain undertakings did creep up, market shares being renegotiated each year (points 60 and 131 of the Decision). In any event, Article 85 prohibits agreements, decisions or concerted practices which have as their object or effect the restriction of competition, irrespective of the extent to which they succeed.*

*73 As regards, more particularly, the applicant's arguments relying on changes in its own market shares, the Commission observes that the infringement concerned the whole of the Community market. The applicant was a member of the PWG, in which the discussions on market shares took place. In 1989 Saffa's managing director was even appointed vice-president of the PG Paperboard.*

*74 The Commission observes, lastly, that there is no evidence to support the applicant's contention that it always behaved independently. Moreover, even assuming that the applicant did not abide by the understanding, that in no way alters the infringement committed (Rhône-Poulenc v Commission, cited above).*

*75 Lastly, as to the third part of the plea, the Commission contends that Stora confirmed in appendix 39 to the statement of objections that the PWG had planned and established a scheme for achieving a balance and controlling production in such a way as to maintain prices at a constant level. Consequently, the fact that as a result of the market situation or the proper working of the cartel the applicant was not, as it claims, required to have recourse to concerted production stoppages is irrelevant to its responsibility or its participation in the agreement to control market shares and quantities.*

*Findings of the Court*

*1. Existence of concerted action to freeze market shares and to control supply*

*76 As regards the first part of the plea, it should be observed that, according to Article 1 of the Decision, the undertakings referred to in that article infringed Article 85(1) of the Treaty by participating, during the relevant period, in an agreement and concerted practice whereby the suppliers of cartonboard in the Community `reached an understanding on maintaining the market shares of the major producers at constant levels, subject to modification from time to time' and `increasingly from early 1990, took concerted measures to control the supply of the product in the Community in order to ensure the implementation of the said concerted price rises'.*

*77 According to the Commission, those two types of collusion, dealt with in the Decision under the heading `volume control', were initiated during the reference period by the participants in the PWG meetings. It is apparent from the third paragraph of point 37 of the Decision that the true*

*purpose of the PWG, as described by Stora, `included "discussions and concertation on markets, market shares, prices, price increases and capacity"'.*

*78 As to the PWG's role in relation to the collusion on market shares, the Decision (point 37, fifth paragraph) states as follows: `In connection with the moves to increase prices, the PWG held detailed discussions on the market shares in western Europe of the national groupings and of individual producer groups. As a result, certain "understandings" were reached between the participants as to their respective market shares, the object being to ensure that the concerted price initiatives were not jeopardised by excess of supply over demand. The large producer groups in effect agreed to maintain their market shares at the levels disclosed for each year by the annual production and sales figures and available in definitive form through Fides in March of the following year. Market share developments were analysed in each meeting of the PWG on the basis of the monthly Fides returns and if significant fluctuations emerged, explanations would be sought from the undertaking presumed responsible.'*

*79 According to point 52 of the Decision: `The agreement reached in the PWG during 1987 included the "freezing" of the west European market shares of the major producers at existing levels, with no attempts to be made to win new customers or extend existing business through aggressive pricing'.*

*80 The first paragraph of point 56 states: `The basic understanding between the major producers on maintaining their respective market shares continued throughout the period covered by this Decision'. According to point 57: `"Market share development" was analysed at each meeting of the PWG on the basis of provisional statistics'. Finally, the last paragraph of point 56 states: `The undertakings which took part in these discussions on market shares were those represented in the PWG, namely Cascades, Finnboard, KNP (until 1988), [Mayr-Melnhof], MoDo, Sarrió, the two Stora group producers CBC and Feldmühle, and (from 1988) Weig'.*

*81 The Court therefore considers that the Commission correctly established the existence of collusion on market shares between the participants in the meetings of the PWG.*

*82 The Commission's analysis is in essence based on Stora's statements (appendices 39 and 43 to the statement of objections) and is confirmed by appendix 73 to the statement of objections.*

*83 In appendix 39 to the statement of objections, Stora states: `The PWG met from 1986 to assist in the introduction of discipline in the market. ... Among other (legitimate) activities, its purpose included discussion and concertation on markets, market shares, prices, price increases, demand and capacity. Its role included assessing and explaining to the President Conference the precise state of supply and demand on the market and the measures to be taken to attempt to bring order to the market.'*

*84 As regards more specifically the collusion on market shares, Stora indicates that `the shares taken by national groups of EC, EFTA and other countries supplied by members of the PG Paperboard were considered in the PWG' and that the PWG `discussed the possibility of holding market shares at the previous year's level' (appendix 39 to the statement of objections, point 19). It also states (same document, point 6) that `[d]iscussions about producers' European market shares also took place during this period, the first reference period being 1987 levels'.*

*85 In a reply to a request by the Commission of 23 December 1991, sent on 14 February 1992 (appendix 43 to the statement of objections), Stora also states: `The understandings on market share levels reached by the PWG members related to Europe as a whole. The understandings were based on the previous total year figures, usually definitively available by the following March' (point 1.1).*

*86 That assertion is confirmed in the same document as follows: `... the discussions led to understandings usually in March of each year between members of the PWG to maintain their market shares at the previous year's level' (point 1.4). Stora reveals that `no measures were taken to ensure respect for the understandings' and that the participants in the meetings of the PWG `were aware that if they took exceptional positions in certain markets supplied by others, those others could retaliate in other markets' (ibidem).*

*87 Lastly, it states that Saffa took part in the discussions concerning market shares (point 1.2).*

*88 Stora's assertions concerning collusion on market shares are supported by appendix 73 to the statement of objections. That document, found at FS-Karton, is a confidential note dated 28*

*December 1988 sent by the marketing director of the Mayr-Melnhof Group in Germany (Mr Katzner) to the General Manager of Mayr-Melnhof in Austria (Mr Gröller) concerning the market situation.*

*89 According to that document, cited in points 53 to 55 of the Decision, the closer cooperation within the `Presidents' grouping' (`Präsidentenkreis') decided on in 1987 had produced `winners' and `losers'. The author of the note considers Mayr-Melnhof to be amongst the losers for various reasons, including the following:*

*`(2) An agreement could only be reached by our being "punished" - we were asked to make "sacrifices".*

*(3) Market shares had to be "frozen" at 1987 levels, existing contacts maintained and no new activities or grades obtained via pricing (the result will be apparent in January 1989 - if all are honest)'.*

*90 Those sentences must be read in the more general context of the note.*

*91 In that regard, the author of the note refers by way of introduction to the closer cooperation within the `Presidents' grouping'. That expression was interpreted by Mayr-Melnhof as a general reference to both the PWG and the PC, that is to say, without reference to a specific event or meeting (appendix 75 to the statement of objections, point 2.a). It is unnecessary to consider that interpretation in the present context.*

*92 The author goes on to indicate that this cooperation had led to `price discipline' which had produced `winners' and `losers'.*

*93 It is necessary, therefore, to understand the phrase relating to the market shares which were to be frozen at 1987 levels against the background of that discipline decided upon by the `Presidents' grouping'.*

*94 Moreover, the reference to 1987 as reference year is consistent with Stora's second statement (appendix 39 to the statement of objections; see paragraph 84 above).*

*95 As to the role played by the PWG in the collusion on the control of supply, which was a feature of the consideration of machine downtime, the Decision states that the PWG played a decisive role in implementing downtime when, from 1990, production capacity increased and demand fell: `From the beginning of 1990 ... the industry leaders ... considered it necessary to concert on the need for taking downtime in the forum of the PWG. The major producers recognised that they could not increase demand by lowering prices and that maintaining full production would simply bring prices down. In theory, the amount of downtime required to bring supply and demand back into balance could be calculated from the capacity reports' (point 70 of the Decision).*

*96 It is also observed: `However, the PWG did not formally allocate the "downtime" to be taken by each producer. According to Stora, there were practical difficulties in reaching a coordinated plan on downtime to cover all the producers. Stora says that for these reasons only "a loose system of encouragement existed"' (point 71 of the Decision).*

*97 The Court finds that the Commission adequately established the existence of collusion on downtime between the participants in the meetings of the PWG.*

*98 The documents it produces support its analysis.*

*99 In its second statement (appendix 39 to the statement of objections, point 24), Stora gives the following explanation: `With adoption by the PWG of the policy of price before tonnage and the gradual implementation of an equivalent price system from 1988, members of the PWG recognised that downtime would have to be taken to maintain those prices in the face of a reduced growth in demand. Without taking downtime the producers would have been unable to maintain agreed price levels in the face of an increasing excess of capacity'.*

*100 In point 25 of its statement, Stora adds: `In 1988 and 1989 the industry was able to run at near full capacity. Downtime in addition to normal closure for repairs and holidays became necessary from 1990. ... Ultimately downtime had to be taken when the order flow ceased in order to maintain the price before tonnage policy. The amount of downtime required to be taken by producers (to maintain the balance between production and consumption) could be calculated from the capacity reports. No formal allocation of downtime was made by the PWG, although a loose system of encouragement existed ...'.*

*101 As to appendix 73 to the statement of objections, the reasons adduced by the author of the note in order to explain why he considered Mayr-Melnhof to be a 'loser' at the time when the note was written are significant evidence of the existence of collusion on downtime between the participants in the meetings of the PWG.*

*102 The author states:*

*'(4) It is at this point that there begins to be a difference in opinion between the parties involved as to what is desired.*

*...*

*(c) All sales representatives and European agents were released from their quantity budgets and a pricing policy followed which admitted of practically no exceptions (our employees often did not understand our changed attitude to the market - in the past they were just required to go for tonnage and now the sole objective is price discipline with the danger of having to stop machines).'*

*103 Mayr-Melnhof states (appendix 75 to the statement of objections) that the passage reproduced above refers to its own internal situation. However, when considered in the light of the more general background to the note, that passage reflects the implementation, at the level of sales personnel, of a rigorous policy adopted within the 'Presidents' grouping'. The document must therefore be construed as meaning that the participants in the 1987 agreement, that is to say, the participants in the meetings of the PWG at least, undoubtedly weighed up the consequences the agreed policy would have if it were to be applied rigorously.*

*104 The fact that discussions relating to consideration of downtime took place between the manufacturers when they prepared price increases is corroborated, in particular, by a Rena note dated 6 September 1990 (appendix 118 to the statement of objections), which refers to the amounts of price increases in several countries, the dates for the future announcements of those increases and the state of the order backlogs expressed in working days for several manufacturers.*

*105 The author of the document notes that certain manufacturers were providing for downtime, which he illustrates as follows:*

*'Kopparfors 5 - 15 days 5/9 will stop for five days'.*

*106 On the basis of the foregoing, the Commission has proved to the requisite legal standard that there was collusion on market shares between the participants in the meetings of the PWG and that there was collusion on downtime between those same undertakings. Since it is not disputed that Sarrió took part in the meetings of the PWG and that that undertaking is expressly referred to in the main inculpatory evidence (Stora's statements and appendix 73 to the statement of objections), the Commission was fully entitled to hold the applicant liable for its participation in those two types of collusion.*

*107 The applicant's criticism of Stora's statements to the Commission and appendix 73 to the statement of objections, by which it disputes the probative value of those documents, does not weaken that finding.*

*108 As regards, first of all, Stora's successive statements to the Commission, it is not disputed that they are made by one of the undertakings regarded as having participated in the alleged infringement and that they contain a detailed description of the nature of the discussions held in the bodies of the PG Paperboard, of the objective pursued by the undertakings which met within it, and of the participation of those undertakings in the meetings of its various bodies. Since this central evidence is corroborated by other documents, it constitutes a sound basis for the Commission's assertions.*

*109 Second, as regards appendix 73 to the statement of objections, the applicant argues that this annex demonstrates only concerted action on prices, because the variations in the sales referred to therein are simply regarded as the consequence of the pricing policy. It relies in that regard on Mayr-Melnhof's interpretation of that document (appendix 75 to the statement of objections).*

*110 However, that construction by the applicant does not accord with an interpretation of the document in its context and Mayr-Melnhof's interpretation of that document is of no avail.*

*111 According to appendix 75 to the statement of objections, appendix 73 'is a general*

*description of the situation drawn up by the sales director of FS-Karton for the group management which is nothing more than an attempt to give reasons to the group management for the stagnation in turnover of FS-Karton by relying essentially on the new policy, which obliged the subsidiaries to observe absolute price discipline, even at the cost of losing turnover'. Moreover, according to Mayr-Melnhof: `"the freezing of market shares" meant that in order to achieve a higher price level within the Mayr-Melnhof Group there should be no attempt to try to obtain greater market shares by selling additional quantities to new customers or new types of products at unprofitable prices. The objective was, in contrast, to maintain existing relationships with customers despite the increase in prices.'*

*112 Those general considerations are not reconcilable with the reference made at the beginning of the document to the `Presidents' grouping' and the whole of the document must be understood in the light of that reference.*

*113 Since the indications in appendix 73 relating to the `freezing' of market shares and to the regulation of supply correspond to those in Stora's statements, the Commission justifiably considered that those documents, read together, show the existence of a joint intention which went beyond collusion on prices alone.*

*114 Since the Commission has proved the existence of the two types of collusion in question, it is unnecessary to consider the applicant's criticism of appendix 102 to the statement of objections.*

*2. The applicant's actual conduct*

*115 Nor is it possible to uphold the second and third parts of the plea, according to which the undertakings' actual conduct is irreconcilable with the Commission's assertions concerning the existence of the two disputed types of collusion.*

*116 First, the existence of collusion between the members of the PWG on the two aspects of the `price before tonnage policy' should not be confused with their implementation. The probative value of the proof adduced by the Commission is such that information as to the applicant's actual conduct on the market cannot affect the Commission's conclusions concerning the fact of the existence of collusion on the two aspects of the policy at issue. At the very most, the applicant's contentions might tend to show that its conduct did not follow that agreed by the undertakings which met in the PWG.*

*117 Second, the Commission's conclusions are not contradicted by the information supplied by the applicant. It must be emphasised that the Commission expressly accepts that the collusion on market shares involved `no formal machinery of penalties or compensation to reinforce the understanding on market shares' and that the market shares of some large producers did creep up from year to year (see, in particular, points 59 and 60 of the Decision). Moreover, the Commission acknowledges that since the industry had operated at full capacity until the beginning of 1990, practically no downtime was required until that date (point 70 of the Decision).*

*118 Third, it is settled law that the fact that an undertaking does not abide by the outcome of meetings which have a manifestly anti-competitive purpose is not such as to relieve it of full responsibility for the fact that it participated in the cartel, if it has not publicly distanced itself from what was agreed in the meetings (see, for example, the judgment in Case T-141/89 Tréfileurope Sales v Commission [1995] ECR II-791, paragraph 85). Even assuming that the applicant's conduct on the market was not in conformity with the conduct agreed, that in no way affects its liability for an infringement of Article 85(1) of the Treaty.*

*Error by the Commission regarding the duration of concertation on prices*

*Arguments of the parties*

*119 The applicant claims that concertation on announced prices took place, at least as concerns the applicant, only with effect from 1988. The January 1987 price increase in the United Kingdom was merely a natural reaction by producers in the face of the weakness of the pound sterling in relation to other European currencies and the uniform nature of that increase was the result of market transparency. Economic operators are not prohibited from adapting their conduct to the perceived or expected conduct of their competitors (Suiker Unie and Others v Commission, cited above). Moreover, neither appendices 44 and 61 to the statement of objections nor document A-17-2 prove concertation on prices between undertakings. In any event, they do not concern the applicant.*

*120 As to the question when concertation on prices ended, the Commission wrongly found the date to be April 1991, the last concerted price increase having been announced in September/October 1990.*

*121 The Commission observes that the applicant took part in the meetings of the PWG and of the JMC from their establishment and was still a member in 1991. It states that, although documents found at the premises of one of the undertakings involved show that at the end of 1987 an agreement had been concluded on the linked issues of volume control and price discipline (point 53 of the Decision), that is not inconsistent with the fact that the producers in question held a series of secret meetings before that date in order to discuss a plan intended to eliminate competition (see, in particular, point 161 of the Decision). Appendices 35 and 43 to the statement of objections confirm that assertion. The Commission adds that the correctness of its deductions concerning the duration of the infringement is also borne out by the price increases made by the producers since 1987.*

Findings of the Court

*122 According to Article 1 of the Decision, the applicant infringed Article 85(1) of the Treaty by participating, from mid-1986 until at least April 1991, in an agreement and concerted practice whereby the suppliers of cartonboard in the Community, inter alia, agreed price increases for cartonboard and planned and implemented simultaneous and uniform price increases throughout the Community. Point 74 of the Decision explains that the first concerted price initiative in which the applicant participated (annex A to the Decision) was in the United Kingdom at the end of 1986 `while the new mechanism of the PG Paperboard was still being set up'.*

*123 The second paragraph of point 161 of the Decision states moreover that the majority of the addressees of the Decision participated in the infringement from June 1986 onward, the date when `the PWG was set up and the collusion between the producers intensified and started to be more effective'.*

*124 In support of its claims concerning the beginning of price concertation, the applicant disputes the probative value of appendices 61 and 44 to the statement of objections and of document A-17-2.*

*125 Appendix 61 to the statement of objections is a note found at the United Kingdom sales agent of Mayr-Melnhof. The Commission considers that it is an `internal note made at a President Conference [corroborating] Stora's admission that the President Conference did in fact discuss collusive pricing' (third paragraph of point 41 and second paragraph of point 75 of the Decision).*

*126 That document, which relates to a meeting held in Vienna on 12 and 13 December 1986, contains the following:*

`UK pricing

*Recent Fides meeting included the representative of Weig stating that they thought 9% too high for the United Kingdom and were settling at 7%! Great disappointment as it signals a "negotiating" level for everybody else. UK pricing policy will be left to RHU with the support of [Mayr-Melnhof] even if it means a temporary reduction in tonnes while we attempt (and be seen to attempt) to pursue 9%. [Mayr-Melnhof]/FS maintain a growth policy for UK but reduced returns are serious and we have to fight to regain control on pricing. [Mayr-Melnhof] accept that it doesn't help that they are known to have increased their tonnes in Germany by 6 000!'*

*127 According to Mayr-Melnhof (reply to a request for information, appendix 62 to the statement of objections), the Fides meeting referred to at the beginning of the passage quoted is probably the PC meeting of 10 November 1986.*

*128 The document in question shows that Weig reacted to an initial level of price increase by indicating its future pricing policy in the United Kingdom.*

*129 It cannot, however, be considered to prove that Weig reacted in relation to a particular level of price increase agreed between the undertakings within the PG Paperboard before 10 November 1986.*

*130 The Commission does not rely on any other evidence to that effect. Moreover, Weig's reference to a price increase of `9%' may be explained by the price increase in the United Kingdom announced by Thames Board Ltd on 5 November 1986 (annex A-12-1). That*

*announcement was made public shortly afterwards, as is clear from a press cutting (annex A-12-3). Lastly, the Commission has not produced any other document capable of constituting direct evidence that discussions on price increases took place at meetings of the PC. In those circumstances, it cannot be ruled out that Weig's remarks, as related in appendix 61 to the statement of objections, were made on the fringe of the meeting of the PC on 10 November 1986, as Weig repeatedly submitted at the hearing.*

*131 The minutes of a Feldmühle (UK) Ltd board meeting of 7 November 1986 (annex A-17-2), on which the Commission relies in the Decision (third paragraph of point 74), merely confirm that this United Kingdom subsidiary of Feldmühle was aware prior to 10 November 1986 of Thames Board Ltd's announcement of a price increase of approximately 9%:*

*'TBM and the Fins (sic) have announced price increases of approximately 9% to be effective from February 1987 and it would appear that most other mills will be looking for the same sort of increase' [annex A-17-2 cited by the Commission in point 74 of the Decision].*

*132 As regards appendix 44 to the statement of objections, which consists of a handwritten note in the desk diary of a Feldmühle employee on the pages for 15 to 17 January 1987, the Commission considers that this constitutes 'further evidence of concertation' (third paragraph of point 75 of the Decision).*

*133 However, that note does not have the probative value accorded it by the defendant. There is no identification of the meeting of which it is an account, so that the possibility cannot be ruled out that it concerns an internal Feldmühle meeting. Moreover, since the note probably dates from mid-January 1987, it does not prove that the application of the price increase 'TBM included' was the result of concertation, it being possible that the note was only an observation.*

*134 Some indications in the note are even such as to contradict the Commission's claim that the note confirms the existence of collusion in regard to the decision to increase prices in the United Kingdom. In particular, the statement that the director of Feldmühle had declared that he was 'sceptical' of Kopparfors and had regarded Mayr-Melnhof as 'irresponsible' (ohne Verantwortung) cannot be regarded as supporting the Commission's contention. The position is the same in regard to the statement: 'Finnboard: Preisautonomie auch f. Tako' ['Finnboard: price autonomy also for Tako'].*

*135 It follows from the foregoing that the Commission has not proved that the undertakings agreed to increase prices in the United Kingdom in January 1987 nor, a fortiori, that the applicant was involved in discussions to that end.*

*136 Nevertheless, in its capacity as an undertaking which, as it has admitted, had participated in the meetings of the PWG since that body of the GP Paperboard was created towards the middle of 1986, the applicant must be held liable for collusion on prices from that date.*

*137 The PWG was set up by certain undertakings, including the applicant, for an essentially anti-competitive purpose. As Stora stated (appendix 39 to the statement of objections, point 8), it 'met from 1986 to assist in the introduction of discipline to the market' and its purpose included 'discussion and concertation on markets, market shares, prices, price increases and capacity' (appendix 35 to the statement of objections, point 5(iii)).*

*138 The role played by the undertakings meeting in that body in regard to collusion on market shares and on downtime has been described in the previous plea (see paragraphs 78 to 106 above). The undertakings which met in that body also discussed price initiatives. According to Stora (appendix 39 to the statement of objections, point 10), '[f]rom 1987 the PWG reached an agreement and took broad decisions on both the timing ... and level of price increases to be introduced by cartonboard producers.'*

*139 Consequently, the fact that they had agreed to set up and participate in meetings of a body whose anti-competitive object, in particular the discussion of future price increases, was known to and accepted by the undertakings which originally established it, constitutes a sufficient ground for considering that the applicant is liable for collusion on prices with effect from mid-1986, the date from which the applicant accepts that it participated in the PWG.*

*140 As regards the date when collusion on prices ceased, the Commission rightly took this date to be April 1991, the month in which the Commission's agents carried out investigations at the premises of several undertakings in accordance with Article 14 of Regulation No 17. The last*

*concerted price increase, announced in October 1990 by the applicant, was applied from January 1991 and the level of list prices agreed between the undertakings was still in force in April 1991.*

*141 This plea must therefore be rejected.*

*Error of the Commission regarding the duration of the understanding on the freezing of market shares and on controlling supply*

*Arguments of the parties*

*142 The applicant submits that, even assuming that an understanding on the freezing of market shares and on controlling supply were to be taken as proved, the Commission committed an error of assessment as regards its duration, because the evidence upon which it relies demonstrates that there was no understanding before the end of 1988. In its reply, it adds that appendix 102 to the statement of objections, a Rena note concerning an NPI meeting of 3 October 1988, shows that there was no such understanding at the point when that note was written, the author referring in it only to the possibility of considering regulation of supply should difficulties be met in the matter of prices.*

*143 The Commission refers to the arguments which it submitted in the context of the plea alleging an error in regard to the duration of the concertation on prices (see paragraph 121 above).*

*Findings of the Court*

*144 The Court has already found (see paragraphs 78 to 106 above) that the Commission has proved that the undertakings meeting in the PWG participated in collusion on market shares and in collusion on downtime.*

*145 It is apparent from the Decision that the `freezing' of market shares and the consideration of downtime began to be specifically discussed by the participants in the meetings of the PWG from the end of 1987 so as to ensure the success of the price initiatives taken with effect from 1988 (see, in particular, points 51 to 60 of the Decision). In that regard, the Decision states: `All members of the PWG were concerned that the relaunched price initiatives should not be undermined by substantial increases in the volume sold. This was referred to by Stora as a "price before tonnage" policy' (first paragraph of point 51 of the Decision). The Commission also observes that the main features of the `price before tonnage policy', which characterised the PG Paperboard from the end of 1987 until April 1991, were the `"freezing" of the market shares of the major producers originally on the basis of their 1987 positions' and `the coordination of "downtime" by the major producers instead of reduction in prices (mainly from 1990)' (second paragraph of point 130 of the Decision).*

*146 Those assertions of the Commission are based essentially on appendices 39 and 73 to the statement of objections.*

*147 In the document constituting appendix 39 (point 5) Stora states: `Linked with the pricing initiative from 1987 was the need to maintain a near balance between production and consumption (price before tonnage policy)'.*

*148 As regards the beginning of collusion on market shares, it follows from appendix 73 to the statement of objections (see paragraph 89 above) that the `Presidents' grouping' (`Präsidentenkreis') had decided to cooperate more closely from October or November 1987. The result of that cooperation was collusion on market shares with effect from that date.*

*149 As regards the beginning of collusion on downtime, Stora states: `With adoption by the PWG of the policy of price before tonnage and the gradual implementation of an equivalent price system from 1988, members of the PWG recognised that downtime would have to be taken to maintain those prices in the face of a reduced growth in demand. Without taking downtime the producers would have been unable to maintain agreed price levels in the face of an increasing excess of capacity' (appendix 39, point 24).*

*150 Stora adds: `In 1988 and 1989 the industry was able to run at near full capacity. Downtime in addition to normal closure for repairs and holidays became necessary from 1990. ... Ultimately downtime had to be taken when the order flow ceased in order to maintain the price before tonnage policy' (appendix 39, point 25).*

*151 In view of that evidence, the Commission has proved that the undertakings which*

*participated in the meetings of the PWG adopted a so-called `price before tonnage' policy at the end of 1987 and that one aspect of that policy, namely collusion on market shares, was applied with immediate effect, whereas the aspect relating to downtime fell to be applied in fact only from 1990.*

*152 It follows from the foregoing that this plea must be rejected as unfounded.*

*Error of assessment by the Commission as regards the Fides information exchange system*

*153 In its reply, the applicant submits that the Fides information exchange system was not capable of promoting collusive conduct and that it was therefore not incompatible with Article 85 of the Treaty. It claims that there are significant differences between the facts of the present case and those underlying Commission Decision 87/1/EEC of 2 December 1986 relating to a proceeding under Article 85 of the EEC Treaty (IV/31.128 - Fatty Acids, OJ 1987 L 3, p. 17), on which the Commission relies in point 134 of the Decision.*

*154 In its rejoinder, the Commission sets out its reasons for referring to the `Fatty Acids' decision. It contends that in the present case the information exchange system had, at least, the effect of facilitating the cartel.*

*155 In response to this plea the Court observes that, by virtue of the first subparagraph of Article 48(2) of the Rules of Procedure, no new plea in law may be introduced in the course of proceedings unless it is based on matters of law or of fact which come to light in the course of the procedure.*

*156 The plea alleging an error of appraisal by the Commission in regard to the Fides information exchange system was raised by the applicant for the first time only in its reply and is not based on matters of fact or of law which have come to light in the course of the procedure.*

*157 This plea is accordingly inadmissible.*

*Error committed by the Commission in considering that there was one overall infringement and that Sarrió was responsible for it as a whole*

*Arguments of the parties*

*158 The applicant contests the Commission's conclusion that there was one single infringement and that the applicant was responsible for it in full.*

*159 First, it maintains that the Commission's approach is essentially based on an `accusatory principle', since it has no direct evidence of a fully-fledged cartel. It is, however, for the Commission to prove whether and, if so, to what extent the applicant participated in each of the elements of a single infringement. Where infringements of Community competition law are concerned, the principle of strictly individual responsibility must be applied, because the notion of collective responsibility is incompatible with the quasi-criminal nature of the penalties which may be imposed for such infringements. Consequently, the Commission is wrong in arguing that it is unnecessary to prove that the applicant actively participated in each element of the infringement. On the contrary, it is necessary both to determine the precise nature of the infringement committed and to investigate any individual participation by each undertaking in order to be able correctly to determine individual responsibility and, in consequence, the appropriate individual penalty.*

*160 Second, the applicant argues that it is also contrary to the fundamental principles of Community law, and particularly the principle governing the burden of proof, to base an undertaking's individual responsibility for an infringement solely on its membership of an association whose activities were, at least in part, lawful.*

*161 Third, the applicant claims that the Commission did not give due consideration to its specific position on the market and within the PG Paperboard. In particular, the purpose of its request in 1986 to participate in the meetings of the PG Paperboard was to compete more effectively with its competitors.*

*162 The Commission contends that it has proved the existence of the cartel and the applicant's active participation as ringleader in it. It therefore based its analysis on specific, well-established facts and the applicant's arguments regarding a kind of `collective responsibility' or an `accusatory principle' are without foundation.*

*163 It claims, moreover, that it did not base the applicant's responsibility solely on its*

*membership of the PG Paperboard. It had in fact taken into account the applicant's active participation in the meetings of the various committees of the PG Paperboard which had an anti-competitive object and also the fact that the applicant subsequently adopted the conduct agreed at those meetings.*

*Findings of the Court*

*164 First of all, the Commission found that the applicant had infringed Article 85(1) of the Treaty by participating, from mid-1986 until at least April 1991, in an agreement and a concerted practice which started in mid-1986 and which consisted of several separate constituent elements.*

*165 According to the second paragraph of point 116 of the Decision, the `whole gravamen of the infringement lies in the combination of the producers over several years in a joint unlawful enterprise pursuant to a common design'. That view of the infringement is also expressed in point 128 of the Decision: `It would however be artificial to subdivide what is clearly a continuing common enterprise having one and the same overall objective into several discrete infringements (see again judgment of the Court of First Instance in Case T-13/89, Imperial Chemical Industries v Commission, at point 260)'.*

*166 Consequently, even though the Commission did not expressly use the concept of a `single infringement' in the Decision, it implicitly referred to that concept, as is shown by the reference to paragraph 260 of the judgment of this Court in Case T-13/89 ICI v Commission [1992] ECR II-1021.*

*GROUNDS CONTINUED UNDER DOC.NUM: 694A0334.1*

*167 Furthermore, the Commission's repeated use of the word `cartel' to cover the various kinds of anti-competitive conduct which it found expresses a comprehensive view of the infringements of Article 85(1) of the Treaty. As is clear, in fact, from point 117 of the Decision, the Commission's view is as follows: `The proper approach in a case such as the present one is to demonstrate the existence, operation and salient features of the cartel as a whole and then to determine (a) whether there is credible and persuasive proof to link each individual producer to the common scheme and (b) for what period each producer participated'. It adds (ibidem): `The Commission ... is not required to compartmentalise the various constituent elements of the infringement by identifying each separate occasion during the duration of the cartel on which a consensus was reached on one or another matter or each individual example of collusive behaviour and the[n] exonerating from involvement on that occasion or in that particular manifestation of the cartel any producer not implicated on that occasion by direct evidence'. It also states (in point 118): `There is ample direct evidence to prove the adherence of each suspected participant to the infringement', without distinguishing between the constituent elements of the overall infringement.*

*168 Thus, the single infringement, as conceived by the Commission, is bound up with `the cartel as a whole' or `the overall cartel' and is characterised by a continuous course of action adopted by a number of undertakings pursuing a common unlawful objective. That view of a single infringement gives rise to the system of proof set out in point 117 of the Decision and to unitary responsibility, in the sense that any undertaking `linked' to the overall cartel is held responsible for it whatever the constituent elements in which it is proved to have participated.*

*169 In order to be entitled to hold each addressee of a decision, such as the present decision, responsible for an overall cartel during a given period, the Commission must demonstrate that each undertaking concerned either consented to the adoption of an overall plan comprising the constituent elements of the cartel or that it participated directly in all those elements during that period. An undertaking may also be held responsible for an overall cartel even though it is shown that it participated directly only in one or some of the constituent elements of that cartel, if it is shown that it knew, or must have known, that the collusion in which it participated was part of an overall plan and that the overall plan included all the constituent elements of the cartel. Where that is the case, the fact that the undertaking concerned did not participate directly in all the constituent elements of the overall cartel cannot relieve it of responsibility for the infringement of Article 85(1) of the Treaty. Such a circumstance may nevertheless be taken into account when assessing the seriousness of the infringement which it is found to have committed.*

*170 In the present case, it is apparent from the Decision that the infringement found in Article 1 consisted of collusion on three matters which were different but which pursued a common*

objective. Those three types of collusion must be regarded as the constituent elements of the overall cartel. According to that article, each of the undertakings mentioned infringed Article 85(1) of the Treaty by participating in an agreement and concerted practice by which the undertakings (a) agreed regular price increases for each grade of the product in each national currency and planned and implemented those increases; (b) reached an understanding on maintaining the market shares of the major producers at constant levels, subject to modification from time to time; and (c) increasingly, from early 1990, took concerted measures to control the supply of the product in the Community in order to ensure the implementation of the concerted price rises.

171 Despite its view that there was a `single' infringement, the Commission explains in the Decision that `[t]he "core" documents which prove the existence of the overall cartel or individual manifestations thereof often identify participants by name, and there is also a vast body of further documentary evidence showing the role of each producer in the cartel and the extent of its involvement' (point 118, first paragraph, of the Decision).

172 The Court must therefore consider, in the light of the foregoing considerations, whether the Commission has proved the applicant's participation in the cartel, as found in Article 1 of the Decision.

173 As has already been held (see paragraph 48 et seq. and paragraph 76 et seq. above), the Commission has proved that, as an undertaking which took part in the meetings of the PWG from its establishment, the applicant participated, from mid-1986, in collusion on prices and, from the end of 1987, in collusion on market shares and in collusion on downtime, that is to say, in the three constituent elements of the infringement found in Article 1 of the Decision. It was therefore fully entitled to decide to hold the applicant responsible for an infringement consisting of those three types of collusion pursuing the same objective.

174 So the Commission did not place on the applicant responsibility for the conduct of other producers and did not hold it responsible on the sole basis of its participation in the PG Paperboard.

175 This plea must therefore be rejected and it is not necessary to consider the other arguments raised by the applicant.

Failure of the Commission to take the Spanish market situation into consideration

176 In its reply, the applicant contends that the Commission did not define precisely the geographic market on which the alleged infringement took place and that, in particular, it did not adequately analyse the situation on the Spanish market and the conduct on that market of the undertakings concerned. It states that it has already pointed out in its application that the only reference in the Decision to the Spanish market consists of two footnotes in tables E and G annexed thereto.

177 The Commission contends that this plea, raised for the first time in the reply, should be barred.

178 The Court observes that, according to the first paragraph of Article 48(2) of the Rules of Procedure, no new plea in law may be introduced in the course of proceedings unless it is based on matters of law or of fact which come to light in the course of the procedure.

179 The plea that the Commission failed to take the situation of the Spanish market into consideration was raised for the first time by the applicant in its reply. The only argument in the application relating to the Spanish market is raised in support of the plea that Prat Carton did not participate in the infringement in question. Apart from the title of this plea, the supporting argument merely states that table G annexed to the Decision, mentioning the announcements of price increases on the Spanish market in January 1991 by producers operating on it, makes no reference to Prat Carton. It cannot therefore be construed as a complaint that the Spanish market was not taken into consideration.

180 In those circumstances, since this plea was raised for the first time in the reply and is not based on matters of law or of fact which came to light in the course of the procedure, it must be declared inadmissible.

Non-participation of Prat Carton in the infringement

Arguments of the parties

*181 The applicant contends that the Commission has not demonstrated Prat Carton's participation in any infringement. In particular, the footnote to table G of the Decision (relating to a price increase in January 1991 on the Spanish market) makes no reference to Prat Carton.*

*182 It asserts that Prat Carton participated only very sporadically in the meetings of some committees of the PG Paperboard. Moreover, it participated in the JMC only from June 1990 to March 1991. Furthermore, the mere fact that Stora stated that it thought that the Spanish producers were generally informed of the results of the meetings by Saffa or by Finnboard (appendix 38 to the statement of objections) does not constitute evidence of Prat Carton's participation in the alleged infringement.*

*183 The applicant disputes that documents F-15-9, G-15-7 and G-15-8 (annexed to the statement of objections), on which the Commission relies, show Prat Carton's participation in concerted price increase initiatives in April 1990. In its reply to a written question put by this Court it states that document F-15-9 dates from February 1991 and not, as the Commission claimed, February 1990. Document G-15-7 is solely evidence of the practice in the sector of applying annual increases in April and of Prat Carton's uncertainty as to the level of the increase and the date of its entry into force.*

*184 The Commission contends that Prat Carton participated in the cartel from the outset as is shown by the documents supplied with the statement of objections (the `individual particulars'). It observes, first, that Prat Carton was present at numerous meetings of the PC between 29 March 1986 and 28 November 1989, at three meetings of the Economic Committee between October 1988 and October 1989, and at various meetings of the JMC between June 1990 and 5 March 1991 (see tables 3 to 7 annexed to the Decision). Since it therefore participated directly in meetings during which decisions were taken relating to the cartel, Prat Carton is responsible for it (see Rhône-Poulenc v Commission, cited above). Moreover, there is no official record of the participation of the various undertakings in the JMC meetings before the Commission's investigations or in the PWG meetings before February 1990. The mere fact that the documents supplied by the undertakings give no specific indication of Prat Carton's presence at the various meetings does not therefore prove that it did not take part in them.*

*185 Second, the Commission observes that, as Stora stated (appendix 38 to the statement of objections), Prat Carton was informed of the outcome of the PWG meetings.*

*186 Third, Prat Carton applied the price initiatives agreed in the various bodies of the PG Paperboard during the period concerned. Slight differences in the timing or in the amounts of the increases made by Prat Carton and by the other producers do not show that Prat Carton did not participate in the cartel. However, the Commission accepts that document F-15-9 dates from February 1991 and not from February 1990 and that it does not therefore have evidence capable of proving Prat Carton's actual participation in price increase initiatives prior to January 1991. As regards the price increase initiative of January 1991, the Commission refers in particular to document G-15-8, dated 26 September 1990, in which Prat Carton expressly states that it is planning to increase prices in all countries in January 1991.*

*Findings of the Court*

*187 The Court observes first of all that the applicant acquired a 100% interest in Prat Carton in February 1991 and that it does not dispute its responsibility for any participation by Prat Carton in an infringement of Article 85(1) of the Treaty. In point 154 of the Decision it is stated that, on account of the acquisition of Prat Carton, the applicant `became responsible for the involvement of this Spanish producer in the cartel for the whole of the period of its participation'. Moreover, Article 1 of the Decision merely holds the applicant responsible for the infringement objected to including its alleged commission by Prat Carton, and the Decision is addressed to the applicant without mention of Prat Carton (Article 5 of the Decision).*

*188 In those circumstances, and inasmuch as it has already been held that the Commission has demonstrated that the applicant itself participated in the infringement described in Article 1 of the Decision, this plea, if it were to be upheld, could not justify total or partial annulment of that article. However, since Prat Carton was acquired by the applicant only in February 1991, which was two months before the end of the period of infringement found by the Decision, a reduction in the fine would be justified if it were to be concluded that Prat Carton's individual participation in the constituent elements of the cartel before February 1991 has not been demonstrated by the*

*Commission. Moreover, the fines imposed under Article 3 of the Decision were calculated on the basis, inter alia, of the turnover of each of the undertakings in 1990, a year in which Prat Carton was not yet part of the applicant's group. Consequently, it is appropriate to consider here the arguments relied on in the context of this plea.*

*189 The Court will examine first the question whether the Commission has proved that Prat Carton participated in an infringement of Article 85(1) of the Treaty as regards the period from mid-1986 until June 1990, the date from which Prat Carton admits that it began to participate in the meetings of the JMC. Second, the Court will examine the question whether the Commission has proved the participation of Prat Carton in an infringement of Article 85(1) of the Treaty as regards the remaining period, namely from June 1990 to February 1991, the date on which Prat Carton was acquired by the applicant.*

*1. Period from mid-1986 to June 1990*

*190 In order to prove Prat Carton's participation in an infringement of the Community competition rules during the period in question the Commission relies on that undertaking's participation in the meetings of the PC on 29 May 1986, 25 May 1988, 17 November 1988 and 28 November 1989 and in the meetings of the Economic Committee of 20 September 1988, 8 May 1989 and 3 October 1989. Moreover, it relies on a statement by Stora (appendix 38 to the statement of objections). Lastly, the Commission claims that the mere fact that the documents supplied by the undertakings do not give precise information regarding Prat Carton's presence at the meetings of the JMC does not prove that it did not take part in those meetings.*

*191 It is necessary to consider each item of evidence in the abovementioned order.*

*(a) Participation of Prat Carton in meetings of the PC*

*192 As regards Prat Carton's participation in four specific meetings of the PC, the Commission does not advance any evidence as to the object of those meetings. Consequently, when it refers to that participation as evidence of the undertakings's participation in an infringement of Article 85(1) of the Treaty, it necessarily bases its assertion on the general description, set out in the Decision, of the object of the meetings of that body and on the evidence put forward in the Decision in order to support that description.*

*193 In that regard, the Decision states: `As Stora has explained one of the PWG's functions included explaining to the President Conference the measures which were necessary to bring order to the market ... In this way, the managing directors attending the President Conferences were informed of the decisions taken by the PWG and of the instructions to be given to their sales departments to implement the agreed price initiatives' (point 41, first paragraph, of the Decision). The Commission also observes: `The PWG invariably met before each scheduled President Conference, and since the same person was in the chair at both meetings, it was no doubt he who communicated the result of the PWG deliberations to others among the so-called "Presidents" who were not members of the inner circle' (point 38, second paragraph, of the Decision).*

*194 Stora has indicated that the participants in PC meetings were informed of decisions adopted by the PWG (appendix 39 to the statement of objections, point 8). However, the correctness of that assertion is contested by several of the undertakings which took part in PC meetings, including the applicant. Consequently, Stora's statements relating to the PC's role cannot, unless supported by other evidence, be considered sufficient evidence of the object of the meetings of that body.*

*195 Admittedly, there is a document in the file, a statement of 22 March 1993 by a former member of the management of Feldmühle (Mr Roos), which at first sight corroborates Stora's assertions. Mr Roos indicates, inter alia, as follows: `The content of the discussions in the PWG was communicated to the undertakings not represented in that group at the immediately following Presidents' Conference, or, if there was no immediate Presidents' Conference, at the JMC'. However, even though there is no express reliance on that document in the Decision in support of the Commission's assertions as to the object of the PC meetings, it cannot, on any view, be considered to constitute evidence supplementing Stora's statements. As those statements are a synthesis of the replies submitted by each of the three undertakings, including Feldmühle, owned by Stora during the period of the infringement, the former member of the management of Feldmühle necessarily constitutes one of the sources for the statements by Stora*

*itself.*

*196 As to the other evidence relied on in order to establish the object of the PC meetings, the Commission considers in the Decision that appendix 61 to the statement of objections (referred to in paragraphs 125 and 126 above) is an internal note, made at a meeting of the PC, which corroborates Stora's admission that the PC in fact discussed collusive pricing (point 41, third paragraph, of the Decision). However, as already stated (see paragraphs 125 to 135 above), that note does not constitute evidence of collusion in regard to the January 1987 price initiative in the United Kingdom. Moreover, contrary to the Commission's claim, Stora never accepted that the PC in fact discussed collusive price fixing. According to Stora, the meetings of the PC were merely the occasion for the undertakings meeting in the PWG to communicate the adopted decisions to the undertakings not represented in that body.*

*197 Lastly, the Commission states that '[d]ocumentation found by the Commission at FS-Karton (part of the M-M group) confirms that at the end of 1987 agreement had been reached in the two Presidents' groups on the linked issues of volume control and price discipline' (point 53, first paragraph, of the Decision). It refers in that regard to appendix 73 to the statement of objections (see paragraph 88 above). As has already been observed (paragraph 91 above), the author of that document refers, by way of introduction, to the closer cooperation at European level within the 'Presidents' grouping' ('Präsidentenkreis'), an expression interpreted by Mayr-Melnhof as referring both to the PWG and the PC in a general context, that is to say, without reference to a specific event or meeting (appendix 75 to the statement of objections, point 2.a).*

*198 It is true that appendix 73 to the statement of objections is corroborative evidence of Stora's statements concerning the existence of collusion on market shares between the undertakings allowed to participate in the 'Presidents' grouping' and of collusion on downtime between those same undertakings (see paragraphs 84 to 114, and in particular paragraph 110, above). However, there is no other evidence to confirm the Commission's claim that the object of the PC was, inter alia, to discuss collusion on market shares and control of production volume. Consequently, the expression 'Presidents' grouping' ('Präsidentenkreis') used in appendix 73 to the statement of objections cannot, despite the explanation supplied by Mayr-Melnhof, be construed as referring to bodies other than the PWG.*

*199 Having regard to the foregoing, the Commission has not proved that the meetings of the PC had an anti-competitive function alongside its lawful activities. It follows that it was not entitled to infer from the evidence relied upon that the undertakings which participated in meetings of the PC had taken part in an infringement of Article 85(1) of the Treaty.*

*200 As a consequence the Court must find that Prat Carton's participation in an infringement of the competition rules during the period from mid-1986 until June 1990 has not been proved by reliance on its participation in four meetings of the PC.*

*(b) Participation of Prat Carton in certain meetings of the Economic Committee*

*201 It is not disputed that Prat Carton participated in three meetings of the Economic Committee on 20 September 1988, 8 May 1989 and 3 October 1989. Moreover, a document reproduces the tenor of the meeting of 3 October 1989 (appendix 70 to the statement of objections). The first matter to be considered, therefore, is whether the Economic Committee's meetings had an anti-competitive object and then whether it may be inferred from appendix 70 to the statement of objections that Prat Carton participated in discussions having an anti-competitive object.*

*(i) Object of the Economic Committee's meetings in general*

*202 The Decision states that 'the "central theme" of the discussions of the Economic Committee was the analysis and assessment of the cartonboard market in the various countries' (point 50, first paragraph, of the Decision). The Economic Committee 'discussed inter alia price movements in national markets and order backlogs and reported its findings to the JMC (or its predecessor the Marketing Committee before the end of 1987)' (point 49, first paragraph, of the Decision).*

*203 According to the Commission, '[t]he discussions on market conditions were not unfocused; talks on the state of each national market must be seen in the context of the planned price initiatives, including the perceived need for temporary plant shutdowns to support price increases' (point 50, first paragraph, of the Decision). Furthermore, the Commission considers that: '[t]he Economic Committee may have been less directly concerned with price fixing as such but it is not credible that those who attended were unaware of the illicit purpose for which the*

*Information they knowingly provided to the JMC was to be used' (point 119, second paragraph, of the Decision).*

*204 To support its contention that the discussions held in the Economic Committee had an anti-competitive object, the Commission refers to a single document, a confidential note by a representative of FS-Karton concerning the essential points of the Economic Committee's meeting of 3 October 1989 (appendix 70 to the statement of objections), a meeting in which Prat Carton took part.*

*205 In the Decision the Commission summarises the content of that document as follows:*

*`... in addition to a detailed survey of demand, production and orders in hand in each national market, the meeting was concerned with:*

*- perceived strong customer resistance to the last GC price increase, effective on 1 October,*

*- the respective state of the order backlog of the GC and GD producers, including individual positions,*

*- reports on downtime taken and planned,*

*- the particular problems of implementing the price increase in the United Kingdom and its effect on the necessary price differential between GC and GD grades,*

*- the comparison against budget of incoming orders for each national grouping' (point 50, second paragraph, of the Decision).*

*206 That description of the content of the document is, in essence, correct. However, the Commission does not rely on any evidence to support its assertion that appendix 70 to the statement of objections may be regarded `as indicative of the real nature of the deliberations of that body' (point 113, last paragraph, of the Decision). Furthermore, Stora states: `[T]he JMC was set up at the end of 1987 and held its first meeting in early 1988 taking over part of the functions of the Economic Committee from that time. The other functions of the Economic Committee were taken over by the Statistical Committee' (appendix 39 to the statement of objections, point 13). At least as regards the period which commenced at the beginning of 1988, the only period in which Prat Carton participated in meetings of the Economic Committee, Stora's statements do not therefore contain any evidence supporting the Commission's assertion concerning the allegedly anti-competitive object of that body's discussions. Nor, lastly, does the Commission refer to any evidence to support the view that the participants in the meetings of the Economic Committee were informed of the precise nature of the meetings of the JMC, the body to which the Economic Committee reported. Consequently, it cannot be ruled out that some participants in the Economic Committee's meetings who did not also participate in the meetings of the JMC were not aware of the precise use to which the reports prepared by the Economic Committee were put by the JMC.*

*207 Consequently, appendix 70 to the statement of objections does not demonstrate the true nature of the discussions which took place at meetings of the Economic Committee.*

*(ii) Meeting of the Economic Committee of 3 October 1989*

*208 The subject-matter of the Economic Committee's meeting of 3 October 1989 is given by appendix 70 to the statement of objections. The question arises as to whether Prat Carton's participation in that meeting constitutes sufficient evidence of its participation in an infringement of Article 85(1) of the Treaty.*

*209 First, the discussions on prices which took place at that meeting concerned the reactions of customers to the increase in prices of GC cartonboard applied by the majority of producers of that cartonboard with effect from 1 October 1989, after its announcement on the market some months previously. According to the Commission, that price increase also concerned SBS cartonboard, but not GD cartonboard. As to the discussions during the meeting in question, the Court considers that they went beyond what is permitted by the Community competition rules, in particular in that it was stated that it would be `a mistake to depart from the presently established important GC price level ...'. By so expressing the common intention firmly to apply the new price level for GC cartonboard, the producers did not independently determine the policy which they intended to pursue on the market and thus undermined the concept inherent in the provisions of the Treaty relating to competition (see, inter alia, Suiker Unie and Others v Commission, cited above, paragraph 173).*