*210 However, there is nothing to suggest that Prat Carton participated in collusion on the October 1989 price increase before it was implemented and, moreover, that it actually increased its prices for GC cartonboard at that time. It is apparent from the applicant's replies to the written questions put by the Court that Prat Carton's production in 1989 was made up as to more than 80% of GD cartonboard, which was not concerned by the price increase in question. Moreover, the meeting of the Economic Committee of October 1989 was held approximately eight months before Prat Carton's first proven participation in a meeting of the JMC, the body which, according to the Decision, constituted, together with the PWG, the place where the main discussions with an anti-competitive object took place.*

*211 In the light of those factors, the possibility cannot be ruled out that Prat Carton's representative(s) at the meeting of the Economic Committee of 3 October 1989 might not have been aware of the context in which the discussions on prices took place. Moreover, in the absence of evidence as to its conduct on the market as regards prices during the relevant period, it is possible that Prat Carton might have considered that the discussions did not concern its own individual situation. Consequently, in so far as the discussion at the meeting of the Economic Committee on 3 October 1989 might have been exceptional in nature for Prat Carton, that undertaking cannot be criticised for not having publicly distanced itself from the outcome of the discussions at that meeting.*

*212 Second, there is no passage in appendix 70 to the statement of objections which establishes the real nature of the discussions which led to the programmed plan to collude on plant downtime for the future. All the references which it makes to specific periods of downtime in fact concern past data. It is true that the document contains a passage relating to the future use of plant: `If the poor entry of orders and poor loading of machines continues, it is clear that it will be necessary to consider stopping production according to demand' [`Bei anhaltend schlechtem Auftragseingang und schlechter Belegung ist es naheliegend, entsprechend dem Marktbedarf ein Abstellen zu überlegen']. However, as Prat Carton's participation in the Economic Committee meeting in question does not demonstrate its participation in collusion on prices for the reasons given above, it does not constitute sufficient evidence of its participation in collusion on downtime either. Mere reference to a possible necessity to take downtime in future cannot be regarded as an infringement of the Community competition rules because, at least for undertakings which did not participate in collusion on prices, it may simply reflect on objective observation on prevailing market conditions.*

*213 In the light of the foregoing, Prat Carton's participation in the Economic Committee meeting of 3 October 1989 does not constitute sufficient evidence of its participation in an infringement of Article 85(1) of the Treaty.*

*(c) Stora's statement concerning the transmission of information to undertakings not present at the meetings*

*214 In the statement on which the Commission relies (annex 38 to the statement of objections, p. 2), Stora provides information concerning the producers which were informed of the outcome of the meetings of the PWG: `The Stora Producers believe that the Spanish producers were generally informed by Saffa or by Finnboard. The other Spanish producers who are members of the PG Paperboard are: Papelera del Centra SA, Prat Carton SA, Romani Esteve SA, Sarrió SA and Tampella Espanola SA'.*

*215 As is clearly apparent from the wording of that statement, Stora is merely indicating its belief that Prat Carton was informed of the outcome of the meetings of the PWG. The basis for that belief is not in fact indicated. In those circumstances, that statement cannot constitute proof of Prat Carton's participation in an infringement of Article 85(1) of the Treaty. That conclusion is all the more necessary in view of the fact that Stora's assertions implicate several other member undertakings of the PG Paperboard which were not considered in the Decision to have participated in any infringement.*

*(d) Participation of Prat Carton in meetings of the JMC*

*216 The Commission submits that there is no proof that Prat Carton did not participate in the meetings of the JMC before June 1989 because there is no official record of the participation of the various undertakings in those meetings prior to the Commission's investigations.*

*217 However, the onus of proving that Prat Carton infringed Article 85(1) of the Treaty is on the*

*Commission. Consequently, its mere allegations concerning Prat Carton's possible participation in meetings of the JMC during the period in question are without foundation.*

*(e) Conclusion as regards the period in question*

*218 In view of the whole of the foregoing, the evidence on which the Commission relies, even considered as a whole, does not prove Prat Carton's participation in an infringement of Article 85 (1) of the Treaty from mid-1996 until June 1990.*

*2. Period from June 1990 to February 1991*

*219 It is not disputed that Prat Carton participated in three meetings of the JMC during the period under consideration, namely those of 27 to 28 June 1990, 4 September 1990 and 8 to 9 October 1990. As regards Prat Carton's actual conduct on the market, the Commission considers that it has evidence which shows that that undertaking took part in the concerted price increase of January 1991, the only concerted price increase implemented during that period.*

*220 Having regard to those matters, it is necessary to consider whether Prat Carton's participation in the three constituent elements of the infringement during that period is sufficiently proved by the Commission.*

*(a) Participation of Prat Carton in collusion on prices*

*221 According to the Commission, the main purpose of the JMC was, from the outset:*

*`- to determine whether, and if so how, price increases could be put into effect and to report its conclusions to the PWG,*

*- to work out the details of the price initiatives decided by the PWG on a country-by-country basis and for the major customers with the aim of achieving an equivalent (i.e. uniform) price system in Europe ...' (point 44, last paragraph, of the Decision).*

*222 More specifically, the Commission maintains in the first and second paragraphs of point 45 of the Decision, that:*

*`This committee discussed market-by-market how the price increases agreed by the PWG were to be implemented by each producer. The practicalities of bringing proposed price increases into effect were addressed in "round table" discussions, with each participant having the chance to comment on the suggested increase.*

*Difficulties in the implementation of price increases decided by the PWG, or the occasional refusal to cooperate, were reported back to the PWG, which then (as Stora put it) "sought to achieve the level of cooperation considered necessary". Separate reports were made by the JMC for GC and GD grades. If the PWG modified a pricing decision on the basis of the reports it had received back from the JMC, the steps necessary to implement it would be discussed at the next meeting of the JMC'.*

*223 The Court finds that the Commission was entitled to refer to Stora's statements (appendices 35 and 39 to the statement of objections) as support for those findings as to the object of the meetings of the JMC.*

*224 Moreover, even if the Commission does not possess any official minutes of a meeting of the JMC, it obtained from Mayr-Melnhof and Rena some internal notes relating to the meetings of 6 September 1989, 16 October 1989 and 6 September 1990 (appendices 117, 109 and 118 to the statement of objections). Those notes, the tenor of which is given in points 80, 82 and 87 of the Decision, set forth the detailed discussions held during those meetings relating to concerted price initiatives. They therefore constitute evidence which clearly corroborates the description of the JMC's functions given by Stora.*

*225 In that regard, it suffices to refer by way of example to the note obtained from Rena regarding the JMC meeting of 6 September 1990 (Appendix 118 to the statement of objections), in which it is stated, inter alia:*

*`Price increase will be announced next week in September.*

*F FF 40 NL NLG 14 D DM 12 I LIT 80 B BF 2.50 CH SF 9 GB £ 40 IRL £ 45*

*All grades should be increased equally GD, UD, GT, GC etc.*

*Only 1 price increase a year. For deliveries from 7 Jan. Not later than 31st January. 14 of September letter with price increase (Mayr-Melnhof). 19 Sept. Feldmühle sending its letter.*

*Cascades before end of Sept. All must have sent out their letters before 8 October.'*

*226 As the Commission explains in points 88 to 90 of the Decision, it was also able to obtain internal documents supporting the conclusion that the undertakings, and in particular those named in appendix 118 to the statement of objections, actually announced and implemented the agreed price increases.*

*227 Even though the documents on which the Commission relies concern only a small number of the JMC's meetings held during the period covered by the Decision, all the available documentary evidence corroborates Stora's statement indicating that the main object of the JMC was to determine and plan the implementation of concerted price increases. The almost total absence of minutes, whether official or internal, of the meetings of the JMC must be regarded as sufficient proof of the Commission's assertion that the undertakings which participated in the meetings attempted to hide the true nature of the discussions in that body (see, in particular, point 45 of the Decision). In those circumstances, the burden of proof has been reversed and it is for the addressees of the Decision which participated in the meetings of that body to prove that it had a lawful object. Since such proof was not adduced by those undertakings, the Commission was entitled to consider that the discussions which the undertakings held in the meetings of that body had a principally anti-competitive object.*

*228 As regards the individual position of Prat Carton, its participation in three meetings of the JMC during a period of approximately eight months must, in the light of the foregoing and notwithstanding the lack of documentary evidence relating to the discussions which took place at those three meetings, be regarded as constituting sufficient proof of its participation in collusion on prices during that period.*

*229 That finding is borne out by the documents referred to by the Commission relating to Prat Carton's actual conduct in regard to prices. A price increase for all grades of cartonboard was decided on at the beginning of September 1990 and announced by the various undertakings in September/October 1990, as is apparent from appendix 118 to the statement of objections. That increase was to enter into force, in all countries concerned, in January 1991.*

*230 In a telefax from Prat Carton dated 26 September 1990 (document G-15-8) it is stated, inter alia, as follows:*

*'We are planning to increase prices in all countries in January 1991.*

*For France we think in [sic] an increase of FF 400/T for all qualities'.*

*231 Even though that telefax mentions the precise amount of the envisaged price increase for one country only, it proves that Prat Carton announced price increases in conformity with the decisions adopted, according to appendix 118 to the statement of objections, in the JMC. In that context, the increases referred to in appendix 118 to the statement of objections do not refer to the same sales volumes for all the countries in question and the increase referred to for France, of FF 40, corresponds to a price increase per 100 kg. Moreover, although there is no dispute that documents F-15-9 and G-15-7, consisting of telefaxes exchanged between Prat Carton and a British undertaking at the end of February/beginning of March 1991, show that Prat Carton ultimately increased its prices in the United Kingdom only in April 1991, such a postponement of the implementation date of the price increase in one of the countries concerned is not such as to affect the conclusivity of document G-15-8 as regards Prat Carton's participation in the January 1991 concerted price increase. That reasoning applies all the more since, according to document F-15-9, the price increase implemented by Prat Carton on the British market amounted to UKL 35 to 45 per tonne, approaching that of UKL 40 indicated in appendix 118 to the statement of objections.*

*232 In the light of the foregoing, the Court considers that the Commission has proved that Prat Carton participated in collusion on prices from June 1990 to February 1991.*

*(b) Participation of Prat Carton in collusion on downtime*

*233 It has already been accepted that the Commission proved that the undertakings present at the meetings of the PWG participated, with effect from the end of 1987, in collusion on plant downtime and that downtime was actually taken as from 1990.*

*234 According to the Decision, the undertakings which participated in the meetings of the JMC also took part in that collusion.*

*235 In that regard the Commission states, inter alia: `Besides the Fides procedure which gave globalised figures, it was regular practice for each individual producer to disclose its own order backlog to competitors in JMC meetings.*

*This information on the number of days' orders in hand was relevant for two purposes:*

*- deciding whether conditions were right for introducing a concerted price increase,*

*- determining the downtime necessary to maintain the supply-demand balance ...' (point 69, third and fourth paragraphs, of the Decision).*

*236 The Commission also observes as follows:*

*`However, the PWG did not formally allocate the "downtime" to be taken by each producer. According to Stora there were practical difficulties in reaching a coordinated plan on downtime to cover all the producers. Stora says that for these reasons only "a loose system of encouragement existed" (second Stora statement, p. 15).*

*It seems again that it was the main producers who took upon themselves the burden of reducing output so as to maintain price levels.*

*The unofficial notes made of two JMC meetings, one in January 1990 (see recital 84), the other in September 1990 (recital 87), as well as other documents (recitals 94 and 95) confirm, however, that the major producers kept their smaller competitors closely and continuously informed in the PG Paperboard of their plans to take additional downtime as an alternative to decreasing prices' (point 71 of the Decision).*

*237 The Court finds that the Commission is justified in referring to Stora's second statement (appendix 39 to the statement of objections, point 25) to support its assertion that, although the PWG did not formally indicate the downtime to be taken by each producer, a `loose system of encouragement' existed to that effect.*

*238 As regards the undertakings which participated in the meetings of the JMC, the documentary evidence relating to those meetings (appendices 109, 117 and 118 to the statement of objections, cited above) confirm that discussions on downtime took place in the context of the preparation of concerted price increases. As has already been observed (see paragraph 104 above), appendix 118 to the statement of objections refers to order backlogs for several manufacturers and notes that certain manufacturers were contemplating downtime. Moreover, although appendices 109 and 117 to the statement of objections do not contain information relating directly to the downtime envisaged, they show that the state of order backlogs and order entries were discussed at the meetings in question.*

*239 Those documents, read in conjunction with Stora's statements, constitute sufficient proof of participation in collusion on downtime by the producers represented at the JMC meetings. Since the aim of collusion on announced prices was to increase transaction prices (see paragraphs 48 to 61 above), the undertakings participating in collusion on prices were necessarily aware that the object of examining the state of order backlogs and order entries and discussions on possible downtime was not merely to determine whether the market conditions were favourable to a concerted price increase but also to determine whether downtime was necessary in order to avoid the agreed price level being jeopardised by an excess of supply. In particular, it is apparent from appendix 118 to the statement of objections that the participants in the JMC meeting of 6 September 1990 agreed on the announcement of an imminent price increase, even though several producers had stated that they were preparing to stop production. Consequently, the market conditions were such that the effective application of a future price increase was going to require, in all probability, that (additional) downtime be taken, and this is therefore a consequence which was accepted, at least implicitly, by the producers.*

*240 On that basis, and without the need to consider the other evidence on which the Commission relies in the Decision (appendices 102, 113, 130 and 131 to the statement of objections), the Court finds that the Commission has proved that the undertakings participating in the meetings of the JMC and in the collusion on prices took part in collusion on downtime.*

*241 Prat Carton must therefore be considered to have participated, from June 1990 to February 1991, in collusion on downtime.*

*(c) Participation of Prat Carton in collusion on market shares*

*242 It has already been accepted that the Commission has proved that the undertakings present at the meetings of the PWG participated, from the end of 1987, in collusion on market shares (see paragraphs 84 to 114 above).*

*243 In support of its claim that the undertakings which did not participate in the meetings of the PWG also took part in collusion in that regard, the Commission states in the Decision:*

*`While the smaller cartonboard producers attending meetings of the JMC were not privy to the detailed discussions on market shares in the PWG, they were, as part of the "price before tonnage" policy to which they all subscribed, well aware of the general understanding between the major producers to maintain "constant levels of supply" and no doubt of the need to adapt their own conduct to it' (point 58, first paragraph, of the Decision).*

*244 Although it does not emerge expressly from the Decision, the Commission is in this respect confirming Stora's statements according to which:*

*`Other producers who did not participate in the PWG were not generally informed of the detail of the market share discussions. Nevertheless, as part of the price before tonnage policy in which they participated, they would have been aware of the understanding by the major producers not to undermine prices by maintaining constant levels of supply.*

*As regards the supply of GC grades, in any event, the shares of the producers who did not participate in the PWG were of such an insignificant level that their participation or non-participation in the market share understandings had virtually no impact one way or the other' (appendix 43 to the statement of objections, point 1.2).*

*245 The Commission, like Stora, is therefore proceeding from the assumption that, even in the absence of direct evidence, the undertakings which did not participate in meetings of the PWG but which have been proved to have subscribed to the other constituent elements of the infringement set out in Article 1 of the Decision must have been aware of the existence of collusion on market shares.*

*246 Such a line of reasoning cannot be accepted. First, the Commission does not rely on any evidence to show that the undertakings which were not present at the meetings of the PWG subscribed to a general agreement providing, in particular, for the freezing of the market shares of the main producers.*

*247 Second, the mere fact that those undertakings participated in collusion on prices and collusion on downtime does not demonstrate that they also participated in collusion on market shares. Contrary to the Commission's apparent claim, the collusion on market shares was not intrinsically linked to collusion on prices and/or collusion on downtime. It suffices to point out that the aim of the collusion on market shares by the main producers who met in the PWG was, according to the Decision (see paragraphs 78 to 80 above), to maintain market shares at constant levels, with occasional amendments, even during periods in which market conditions, and in particular the balance between supply and demand, were such that it was unnecessary to control production in order to guarantee the effective implementation of the agreed price increases. It follows that any participation in collusion on prices and/or collusion on downtime does not show that the undertakings which were not present at the meetings of the PWG participated directly in collusion on market shares, or that they were, or necessarily should have been, aware of it.*

*248 Third and lastly, in the second and third paragraphs of point 58 of the Decision, the Commission relies, as additional evidence to support the assertion in question, on appendix 102 to the statement of objections setting out a note obtained from Rena which, according to the Decision, relates to a special meeting of the NPI held on 3 October 1988. It suffices to state that the applicant was not a member of the NPI and that the reference in that document to a possible necessity to take downtime cannot, for the reasons already stated, constitute evidence of collusion on market shares.*

*249 In the light of the foregoing, the Commission has not proved that Prat Carton participated in collusion on market shares in respect of the period from June 1990 to February 1991.*

*3. Conclusions relating to participation of Prat Carton in an infringement of Article 85(1) of the Treaty before its acquisition by the applicant in February 1991*

*250 On the basis of all the foregoing considerations, the Court holds that the Commission has proved that Prat Carton participated, from June 1990 to February 1991, in collusion on prices and*

*collusion on downtime. However, Prat Carton's participation in collusion on market shares during that same period is not sufficiently proven. Finally, as regards the preceding period, namely from mid-1986 to June 1990, the Commission has not shown that Prat Carton participated in the constituent elements of the infringement.*

*The application for annulment of Article 2 of the Decision*

*Arguments of the parties*

*251 The applicant puts forward a plea alleging that the prohibition of future exchanges of information is unlawful. It observes that neither Article 1 nor Article 2 of the Decision concern the first information exchange system of the trade association CEPI-Cartonboard (hereinafter `CEPI'), referred to in points 105, 106 and 166 of the Decision. The prohibition of future exchanges of information would preclude both the future establishment by CEPI and its members, including the applicant, of new information exchange systems and also the specific system notified by CEPI to the Commission at the end of 1993, a system which is, moreover, not mentioned in the Decision.*

*252 Furthermore, information exchange systems which do not seek to achieve prohibited results, such as price fixing or collusion on production volumes, were never considered, in the Commission's previous practice, to be unlawful if they did not include the exchange of individual, confidential data. The applicant states that in its Seventh Report on Competition Policy the Commission explained that it had no fundamental objections to the exchange of statistical information through trade associations or specialised reporting agencies, even where the latter provided a breakdown of the data, if the information exchanged did not permit identification of individual data.*

*253 The plea is then set out in two parts. In the first part, the applicant claims that the terms of the prohibition in Article 2 of the Decision are essentially too vague and general. In particular, it does not specify the circumstances in which an information exchange system unrelated to individual data will be considered to be liable to promote collusion on prices or on production or to control the implementation of an agreement on prices or market sharing.*

*254 Furthermore, Article 2 of the Decision does not specify the characteristics which the system must display in order to satisfy the requirements that it should exclude (a) data in aggregated form from which `the behaviour of individual producers can be identified' (second paragraph), (b) production and sales statistics in aggregated form which could be used `to promote or facilitate common industry behaviour' (third paragraph), and (c) `any exchange of information of competitive significance' and `any meetings or other contact in order to discuss the significance of the information exchanged or the possible or likely reaction of the industry or of individual producers to that information' (fourth paragraph).*

*255 According to the applicant, prohibitions of such a vague and general kind seem to be incapable of implementation and, in any event, are contrary to the principle of legal certainty.*

*256 In the second part of the plea, the applicant disputes the legality of the prohibition of information exchanges (even if aggregated) on the state of order inflows and backlogs contained in the second paragraph of Article 2 of the Decision.*

*257 First, such data provide mere indications of the general trend of general demand and do not enable any producer or country to be identified.*

*258 Second, the exchange of data in question is particularly useful, if not indeed necessary, in the cartonboard sector.*

*259 Third, the Commission has never forbidden the exchange of the information in question. By contrast, it has considered exchange of information on stock levels, present and historic market prices, consumption, transformation capacity and even price trends to be neutral from the point of view of competition (see, in particular, Commission Notice 87/C 339/07 pursuant to Article 19 (3) of Council Regulation No 17/62 concerning a request for a negative clearance or an exemption under Article 85(3) of the EEC Treaty - Case No IV/32.076 - European Wastepaper Information Service (OJ 1987 C 339, p. 7, hereinafter `the EWIS notice') and the Seventh Report on Competition Policy, points 5 to 8).*

*260 The Commission observes that Article 2 of the Decision does not affect the information exchange system notified by CEPI which was being considered by the competent Commission department when the action was brought.*

*261 It also contends that the directions set out in Article 2 of the Decision are normal, given that it has not obtained evidence of the cessation of the infringement and the scope of such directions depends upon the behaviour of the undertakings. Since those directions prohibit participation in a system with an object or effect identical or similar to that in question, they merely apply the general prohibition under Article 85 of the Treaty (Case T-34/92 Fiatagri and New Holland Ford v Commission [1994] ECR II-905). They are also based on Article 3(1) of Regulation No 17 and are in conformity with previous decisions approved by the Court of First Instance.*

*262 In the present case, the information exchange system was considered to be essential by the members of the cartel and it enabled the anti-competitive initiatives to be monitored and implemented (points 61 to 71 and 134 of the Decision). Moreover, it was still susceptible of encouraging the producers to adopt anti-competitive conduct, even after the amendments to the system in 1991 (point 166 of the Decision). It is necessary to take account of those factors, the particular features of the cartonboard market and the situation characterised by the existence of an almost absolute cartel on the European market when assessing the scope of the directions set out in Article 2 of the Decision. In the light of those considerations, the Court should reject the applicant's argument that the information prohibited from being exchanged is general and that Article 2 of the Decision infringes the principle of legal certainty. The prohibition of an information exchange, in particular as regards the information referred to in subparagraphs (a), (b) and (c) of the first paragraph of Article 2, is not general, but concerns solely information intended to facilitate or promote anti-competitive conduct.*

*263 Lastly, the EWIS notice concerned an economic context that was wholly different from that of cartonboard (point 3 of the notice), in particular because EWIS could supply only aggregate data of a sufficient number of members to ensure that the competitive behaviour of any individual member could not be identified (point 7 of the notice).*

*Findings of the Court*

*264 It will be recalled that Article 2 of the Decision provides as follows:*

*`The undertakings named in Article 1 shall forthwith bring the said infringement to an end, if they have not already done so. They shall henceforth refrain in relation to their cartonboard activities from any agreement or concerted practice which may have the same or a similar object or effect, including any exchange of commercial information:*

*(a) by which the participants are directly or indirectly informed of the production, sales, order backlog, machine utilisation rates, selling prices, costs or marketing plans of other individual producers; or*

*(b) by which, even if no individual information is disclosed, a common industry response to economic conditions as regards price or the control of production is promoted, facilitated or encouraged;*

*or*

*(c) by which they might be able to monitor adherence to or compliance with any express or tacit agreement regarding prices or market sharing in the Community.*

*Any scheme for the exchange of general information to which they subscribe, such as the Fides system or its successor, shall be so conducted as to exclude not only any information from which the behaviour of individual producers can be identified but also any data concerning the present state of the order inflow and backlog, the forecast utilisation rate of production capacity (in both cases, even if aggregated) or the production capacity of each machine.*

*Any such exchange system shall be limited to the collection and dissemination in aggregated form of production and sales statistics which cannot be used to promote or facilitate common industry behaviour.*

*The undertakings are also required to abstain from any exchange of information of competitive significance in addition to such permitted exchange and from any meetings or other contact in order to discuss the significance of the information exchanged or the possible or likely reaction of the industry or of individual producers to that information.*

*A period of three months from the date of the communication of this Decision shall be allowed for the necessary modifications to be made to any system of information exchange.'*

*265 As is apparent from point 165 of the Decision, Article 2 was adopted in accordance with Article 3(1) of Regulation No 17. By virtue of that provision, where the Commission finds that there is an infringement, inter alia, of Article 85 of the Treaty, it may require the undertakings concerned to bring the infringement to an end.*

*266 It is settled law that Article 3(1) of Regulation No 17 may be applied so as to include an order directed at bringing an end to certain acts, practices or situations which have been found to be unlawful (Joined Cases 6/73 and 7/73 Istituto Chemioterapico Italiano and Commercial Solvents v Commission [1974] ECR 223, paragraph 45, Case C-241/91 P and C-242/91 P RTE and ITP v Commission [1995] ECR I-743, paragraph 90), and also at prohibiting the adoption of similar conduct in the future (Case T-83/91 Tetra Pak v Commission [1994] ECR II-755, paragraph 220).*

*267 Moreover, since Article 3(1) of Regulation No 17 is to be applied according to the nature of the infringement found, the Commission has the power to specify the extent of the obligations on the undertakings concerned in order to bring an infringement to an end. Such obligations on the part of the undertakings may not, however, exceed what is appropriate and necessary to attain the objective sought, namely to restore compliance with the rules infringed (judgment in RTE and ITP v Commission, cited above, paragraph 93; to the same effect, see Case T-7/93 Langnese-Iglo v Commission [1995] ECR II-1533, paragraph 209, and Case T-9/93 Schöller v Commission [1995] ECR II-1611, paragraph 163).*

*268 In the present case, in order to verify whether, as the applicant claims, the scope of the direction in Article 2 of the Decision is too wide, it is necessary to consider the extent of the various prohibitions it places on the undertakings.*

*269 The prohibition in the second sentence of the first paragraph of Article 2, requiring the undertakings to refrain in future from any agreement or concerted practice which may have an effect which is the same as, or similar to, those of the infringements found in Article 1 of the Decision, is aimed solely at preventing the undertakings from repeating the behaviour found to be unlawful. Consequently, in adopting such directions, the Commission has not exceeded the powers conferred on it by Article 3 of Regulation No 17.*

*270 The provisions of subparagraphs (a), (b) and (c) of the first paragraph of Article 2 are directed more specifically at prohibiting future exchange of commercial information.*

*271 The direction in subparagraph (a) of the first paragraph of Article 2, which prohibits any future exchange of commercial information by which the participants directly or indirectly obtain individual information on competitors, presupposes a finding by the Commission in the Decision that an information exchange of such a nature is unlawful under Article 85(1) of the Treaty.*

*272 It should be noted that Article 1 of the Decision does not state that the exchange of individual commercial information in itself constitutes an infringement of Article 85(1) of the Treaty.*

*273 It states more generally that the undertakings infringed that article of the Treaty by participating in an agreement and concerted practice whereby the undertakings, inter alia, `exchanged commercial information on deliveries, prices, plant standstills, order backlogs and machine utilisation rates in support of the above measures'.*

*274 However, since the operative part of a decision must be interpreted in the light of the statement of reasons for it (Suiker Unie and Others v Commission, cited above, paragraph 122), it should be noted that the second paragraph of point 134 of the Decision states:*

*`The exchanging by producers of normally confidential and sensitive individual commercial information in meetings of the PG Paperboard (mainly the JMC) on order backlog, machine closures and production rates was patently anti-competitive, being intended to ensure that the conditions for implementing agreed price initiatives were as propitious as possible. ...'.*

*275 Consequently, as the Commission duly found in the Decision that the exchange of individual commercial information in itself constituted an infringement of Article 85(1) of the Treaty, the future prohibition of such an exchange of information satisfies the conditions for the application of Article 3(1) of Regulation No 17.*

*276 The prohibitions relating to the exchanges of commercial information referred to in subparagraphs (b) and (c) of the first paragraph of Article 2 of the Decision must be considered in the light of the second, third and fourth paragraphs of that article, which support what is*

expressed in those subparagraphs. It is in this context that it is necessary to determine whether, and if so to what extent, the Commission considered the exchanges in question to be illegal, since the extent of the obligations on the undertakings must be restricted to that which is necessary in order to bring their conduct into line with what is lawful under Article 85(1) of the Treaty.

277 The Decision must be interpreted as meaning that the Commission considered the Fides system to be contrary to Article 85(1) of the Treaty in that it underpinned the cartel (point 134, third paragraph, of the Decision). Such an interpretation is borne out by the wording of Article 1 of the Decision, from which it is apparent that the commercial information was exchanged between the undertakings `in support of the ... measures' considered to be contrary to Article 85 (1) of the Treaty.

278 The scope of the future prohibitions set out in subparagraphs (b) and (c) of the first paragraph of Article 2 of the Decision must be assessed in the light of that interpretation by the Commission of the compatibility, in the present case, of the Fides system with Article 85 of the Treaty.

279 In that regard, first, the prohibitions in question are not restricted to exchanges of individual commercial information, but relate also to certain aggregated statistical data (Article 2, first paragraph, (b), and second paragraph, of the Decision). Second, subparagraphs (b) and (c) of the first paragraph of Article 2 prohibit the exchange of certain statistical information in order to prevent the establishment of a possible support for future anti-competitive conduct.

280 Such a prohibition exceeds what is necessary in order to bring the conduct in question into line with what is lawful because it seeks to prevent the exchange of purely statistical information which is not in, or capable of being put into, the form of individual information on the ground that the information exchanged might be used for anti-competitive purposes. First, it is not apparent from the Decision that the Commission considered the exchange of statistical data to be in itself an infringement of Article 85(1) of the Treaty. Second, the mere fact that a system for the exchange of statistical information might be used for anti-competitive purposes does not make it contrary to Article 85(1) of the Treaty, since in such circumstances it is necessary to establish its actual anti-competitive effect. It follows that the Commission's argument that Article 2 of the Decision is purely declaratory in nature (paragraph 261 above) is unfounded.

281 Consequently, the first to fourth paragraphs of Article 2 of the Decision must be annulled, save and except as regards the following passages:

`The undertakings named in Article 1 shall forthwith bring the said infringement to an end, if they have not already done so. They shall henceforth refrain in relation to their cartonboard activities from any agreement or concerted practice which may have the same or a similar object or effect, including any exchange of commercial information:

(a) by which the participants are directly or indirectly informed of the production, sales, order backlog, machine utilisation rates, selling prices, costs or marketing plans of other individual producers.

Any scheme for the exchange of general information to which they subscribe, such as the Fides system or its successor, shall be so conducted as to exclude any information from which the behaviour of individual producers can be identified.'

The claim for annulment or reduction of the amount of the fine

A - Need to reduce the fine on account of an erroneous definition of the subject-matter and duration of the infringement

282 The applicant, referring to the foregoing pleas and arguments, claims that the infringement was quite different in terms of its actual extent, its duration much shorter and its seriousness much less than the Commission maintains, and that the amount of the fine should therefore be radically reduced.

283 It is apparent from the Court's findings in relation to the preceding pleas that the Commission has correctly established, in regard to the applicant, the existence and duration of the infringement set out in Article 1 of the Decision.

284 It follows that this plea must be rejected.

B - Error of appraisal by the Commission in that it considered that the cartel `was largely

*successful in achieving its objectives' and infringement of the obligation to state reasons in that regard*

*Arguments of the parties*

285 The applicant claims that, when fixing the amount of the fine, the Commission committed an error of appraisal in finding that the cartel was `largely successful in achieving its objectives' (point 168 of the Decision). The Commission did not take account of the evidence adduced by the addressee undertakings and, more specifically, by the applicant.

286 The arrangements for price announcements are normal in the sector and a degree of uniformity and simultaneity in price increase announcements by the different producers is due to market conditions and particularly the transparency of the market. The Commission did not take account of the following factors: (a) transaction prices were always well below announced prices; (b) there were always considerable differences between the prices applied to each customer, so that there was no single price; (c) economic cycles had an effect on price developments and (d) the difference between the prices applied to each customer increased during the period in question, thus demonstrating increased price individualisation.

287 The development of transaction prices was determined solely by the market conditions prevailing during the period in question and in particular by the relatively sustained demand, satisfactory and sometimes optimal capacity utilisation (see points 13 to 15 of the Decision), the considerable increases in costs (see points 16 to 19) and, lastly, the existence of a wholly normal average rate of profitability throughout the period. In those circumstances, the Commission should have concluded that the price increases were normal (see also point 135 of the Decision) and that the increases in transaction prices that could be established were in accordance with fundamental economic variables. It should therefore also have concluded that the alleged cartel had no effect on actual changes in transaction prices.

288 According to the applicant, transaction prices always followed changes in costs. The fall in the cost of raw materials in the second half of 1989 was accompanied by a considerable increase in labour and energy costs, which make up approximately 35% of total costs for cartonboard producers. Nor does the fact that there was a fall in demand in 1991 mean that factors other than market conditions influenced price changes, since the producers had already announced the single price increase in 1991 (January increase) in Autumn 1990 and planned it even earlier.

289 Moreover, the Commission's assertion regarding the effects of the cartel is incorrect as regards the alleged collusion on market shares, since there was never any such collusion or system for monitoring changes in the market shares of the different producers. Furthermore, Sarrió's market shares varied considerably over the period concerned.

290 Lastly, the applicant claims that the statement of reasons is defective in that there is a contradiction between the conclusions as to the cartel's effects on the market and the findings of fact in the Decision itself.

291 The Commission observes that during the period in question prices were always increased at regular intervals and applied in conformity with the collusion of the producers in the committees of the PG Paperboard; that a system to monitor compliance with the decisions imposed by the cartel was established by means of the detailed information exchanged, and that the market shares of the different producers were always maintained more or less at the same level. In those circumstances, and having regard in particular to the abundant documentary evidence of the cartel, the applicant's contention that the cartel did not substantially alter market trends is indefensible.

292 As to changes in prices, the Commission observes that the success of the cartel must be appraised as a whole. The success achieved is in no way belied by the - unproven - fact that the applicant derived less benefit from it than others.

293 As to market shares, the modest changes in market shares of the various producers confirms that the cartel was also highly successful in that regard.

294 Lastly, on the basis of the foregoing arguments, the Commission disputes that the statement of grounds of the Decision is defective as regards the cartel's effect on the market. It refers in particular to the analysis of the conditions of and changes in the market in points 16, 21 and 137 of the Decision and submits that, if the attempt to isolate an assertion from its context is resisted,

*there is no contradiction in the statement of grounds for the Decision.*

*Findings of the Court*

*295 According to the seventh indent of point 168 of the Decision, the Commission determined the general level of fines by taking into account, inter alia, the fact that the cartel `was largely successful in achieving its objectives'. It is common ground that this consideration refers to the effects on the market of the infringement found in Article 1 of the Decision.*

*296 In order to review the Commission's appraisal of the effects of the infringement, the Court considers that it suffices to consider the appraisal of the effects of the collusion on prices. First, it is apparent from the Decision that the finding concerning the large measure of success in achieving objectives is essentially based on the effects of collusion on prices. While those effects are considered in points 100 to 102, 115, and 135 to 137 of the Decision, the question whether the collusion on market shares and collusion on downtime affected the market was, by contrast, not specifically examined in it.*

*297 Second, consideration of the effects of the collusion on prices also makes it possible, in any event, to assess whether the objective of the collusion on downtime was achieved, as the aim of that collusion was to prevent the concerted price initiatives from being undermined by an excess of supply.*

*298 Third, as regards collusion on market shares, the Commission does not submit that the objective of the undertakings which participated in the meetings of the PWG was an absolute freezing of their market shares. According to the second paragraph of point 60 of the Decision, the agreement on market shares was not static `but was subject to periodic adjustment and re-negotiation'. In view of that point, the fact that the Commission took the view that the cartel was largely successful in achieving its objectives without specifically examining in the Decision the success of that collusion on market shares is not therefore open to objection.*

*299 As regards collusion on prices, the Commission appraised the general effects of this collusion. Consequently, even assuming that the individual data supplied by the applicant show, as it claims, that the effects of collusion on prices were, in its case, less significant than those found on the European cartonboard market taken as a whole, such individual data cannot in themselves suffice to call into question the Commission's assessment.*

*300 It is apparent from the Decision, as the Commission confirmed at the hearing, that a distinction was drawn between three types of effects. Moreover, the Commission relied on the fact that the price initiatives were considered by the producers themselves to have been an overall success.*

*301 The first type of effect taken into account by the Commission, and not contested by the applicant, consisted in the fact that the agreed price increases were actually announced to customers. The new prices thus served as a reference point in individual negotiations on transaction prices with customers (see, inter alia, points 100 and 101, fifth and sixth paragraphs, of the Decision).*

*302 The second type of effect consisted in the fact that changes in transaction prices followed those in announced prices. The Commission states that `the producers not only announced the agreed price increases but also with few exceptions took firm steps to ensure that they were imposed on the customers' (point 101, first paragraph, of the Decision). It accepts that customers sometimes obtained concessions in regard to the date of entry into force of the increases or rebates or individual reductions, particularly on large orders, and that `the average net increase achieved after all discounts, rebates and other concessions would always be less than the full amount of the announced increase' (point 102, last paragraph, of the Decision). However, referring to graphs in an economic study produced on behalf of several addressee undertakings of the Decision for the purposes of the procedure before the Commission (hereinafter the `LE report'), the Commission claims that during the period covered by the Decision there was `a close linear relationship' between changes in announced prices and those in transaction prices expressed in national currencies or converted to ecus. It concludes from this that: `the net price increases achieved closely tracked the price announcements albeit with some time lag. The author of the report himself acknowledged during the oral hearing that this was the case for 1988 and 1989' (point 115, second paragraph, of the Decision).*

*303 When appraising this second type of effect the Commission could properly take the view that*

the existence of a linear relationship between changes in announced prices and changes in transaction prices was proof of an effect by the price initiatives on transaction prices in accordance with the objective pursued by the producers. There is, in fact, no dispute that on the relevant market the practice of holding individual negotiations with customers means that, in general, transaction prices are not identical to announced prices. It cannot therefore be expected that increases in transaction prices will be identical to announced price increases.

304 As regards the very existence of a relationship between announced price increases and transaction price increases, the Commission was right in referring to the LE report, which consists of an analysis of changes in the price of cartonboard during the period to which the Decision relates, based on information supplied by several producers, including the applicant itself.

305 However, that report only partially confirms, in temporal terms, the existence of a `close linear relationship'. Examination of the period 1987 to 1991 reveals three distinct sub-periods. At the oral hearing before the Commission the author of the LE report summarised his conclusion as follows: `There is no close relationship, even with a lag, between announced price increase and market prices in the early part of the period, in 1987 through 1988. There is such a relationship in 1988/1989, and then the relationship breaks down and behaves rather oddly over the period 1990/1991' (transcript of the oral hearing, p. 28). He also observed that those temporal variations were closely linked to variations in demand (see, in particular, transcript of the oral hearing, p. 20).

306 Those conclusions expressed by the author at the hearing are in accordance with the analysis set out in his report, and in particular with the graphs comparing changes in announced prices and changes in transaction prices (LE report, graphs 10 and 11, p. 29). The Commission has therefore only partially proved the existence of the `close linear relationship' on which it relies.

307 At the hearing the Commission stated that it had also taken into account a third type of effect of the price collusion, namely the fact that the level of transaction prices was higher than that which would have been achieved in the absence of any collusion. Pointing out that the dates and order of the price increase announcements had been planned by the PWG, the Commission takes the view in the Decision that `it is inconceivable in such circumstances that the concerted price announcements had no effect upon actual price levels' (point 136, third paragraph, of the Decision). However, the LE report (section 3) drew up a model which enabled a forecast to be made of the price level resulting from objective market conditions. According to that report, the level of prices determined by objective economic factors in the period 1975 to 1991 would have evolved, with minor variations, in an identical manner to the level of transaction prices applied, including those during the period covered by the Decision.

308 Despite those conclusions, the analysis in the report does not justify a finding that the concerted price initiatives did not enable the producers to achieve a level of transaction prices above that which would have resulted from the free play of competition. As the Commission pointed out at the hearing, it is possible that the factors taken into account in that analysis were influenced by the existence of collusion. So, the Commission rightly argued that the collusive conduct might, for example, have limited the incentive for undertakings to reduce their costs. However, the Commission has not argued that there is a direct error in the analysis in the LE report nor submitted its own economic analysis of the hypothetical changes in transaction prices had there been no collusion. In those circumstances, its assertion that the level of transaction prices would have been lower if there had been no collusion between the producers cannot be upheld.

309 It follows that the existence of that third type of effect of collusion on prices has not been proved.

310 The above findings are in no way altered by the producers' subjective appraisal, on which the Commission relied in reaching the view that the cartel was largely successful in achieving its objectives. In that regard, the Commission referred to a list of documents which it produced at the hearing. However, even supposing that it could base its appraisal of the success of the price initiatives on documents showing the subjective opinions of certain producers, it must be observed that several undertakings, including the applicant, rightly referred at the hearing to a number of other documents in the file showing the problems encountered by the producers in implementing the agreed price increases. In those circumstances, the Commission's reference to the statements of the producers themselves is insufficient for a conclusion that the cartel was

*largely successful in achieving its objectives.*

*311 Having regard to the foregoing considerations, the effects of the infringement described by the Commission are only partially proved. The Court will consider the implications of that conclusion as part of its exercise of its unlimited powers in regard to fines, when it assesses the seriousness of the infringement found in the present case (see paragraph 334 below).*

*312 Finally, the applicant's contention that the statement of grounds of the Decision is defective in regard to the effects of the infringement is without foundation. As follows from the above examination, the Decision contains a detailed and consistent statement of grounds relating to the effects of the infringement found.*

*C - Error of law by the Commission in holding that concealment of the cartel was an aggravating factor and defective statement of reasons in that regard*

*Arguments of the parties*

*313 The applicant submits that if it is accepted - quod non - that a certain staggering in price increase announcements was the result of collusion, the Commission could not hold that circumstance to be a specific aggravating circumstance, since the `disguising' of a cartel is inherent in the infringement itself.*

*314 The applicant adds that the fact that the Commission was unable to find documentary proof of its allegations relating to the existence of an infringement does not mean that measures were taken to disguise its existence.*

*315 Lastly, it claims that the grounds of the Decision are defective in that the Decision does not explain the reasons for which the concealment of a cartel should be regarded as an aggravating circumstance.*

*316 The Commission contends that the concealment of the existence of a cartel constitutes a factor which should be taken into account when assessing the seriousness of the infringement (judgment in BASF v Commission, cited above, paragraph 273).*

*Findings of the Court*

*317 According to the third paragraph of point 167 of the Decision, `a particularly grave aspect of the infringement is that in an attempt to disguise the existence of the cartel the undertakings went so far as to orchestrate in advance the date and sequence of the announcement of each major producer of the new price increases'. The Decision also states as follows: `the producers could as a result of this elaborate scheme of deception have attributed the series of uniform, regular and industry-wide price increases in the cartonboard sector to the phenomenon of "oligopoly behaviour"' (point 73, third paragraph). Finally, according to the sixth indent of point 168, the Commission, in determining the general level of fines, took into account the fact that `elaborate steps were taken to conceal the true nature and extent of the collusion (absence of any official minutes or documentation for the PWG and JMC; discouraging the taking of notes; stage-managing the timing and order in which price increases were announced so as to be able to claim they were "following", etc.)'.*

*318 The Commission rightly inferred from the evidence obtained that the undertakings pre-arranged the dates and order of letters announcing price increases in an attempt to disguise the existence of the concertation on prices. This pre-arrangement is clear in particular from Stora's statements (appendix 39 to the statement of objections, point 30): `[t]here was no standard procedure for who would announce a price increase first and who would follow. The PWG would discuss and agree on who would announce each price increase first and the dates of announcements of the other main producers. The pattern was not the same each time.' Its existence is also confirmed by the Rena note concerning the JMC meeting of 6 September 1990 (appendix 118 to the statement of objections). That document contains precise indications regarding the dates for the announcement of the January 1991 price increases for certain member undertakings of the PWG (Mayr-Melnhof, Feldmühle and Cascades), dates which correspond exactly to the dates on which those undertakings actually sent their announcement letters (see points 87 and 88 of the Decision).*

*319 The absence of official minutes and the almost total absence of internal notes relating to the meetings of the PWG and of the JMC constitute, having regard to the number of such meetings, to the length of time for which they continued and to the nature of the discussions in question,*

*sufficient proof of the Commission's allegation that the participants were discouraged from taking notes.*

*320 It follows from the foregoing that the undertakings which participated in the meetings of those bodies were not only aware of the unlawfulness of their conduct but also took steps to conceal the collusion. Accordingly, the Commission was fully entitled to hold those steps to be aggravating circumstances when assessing the gravity of the infringement.*

*321 Finally, given that it explained in the Decision precisely what conduct of the undertakings was held to constitute aggravating circumstances, the Commission gave a sufficient statement of reasons for its appraisal in that regard.*

*322 This plea must therefore be rejected.*

*D - Infringement of the principle of equal treatment in that the Commission imposed, without objective reasons, much higher fines than in its previous practice*

*Arguments of the parties*

*323 The applicant claims that the increase in the level of the fine imposed in comparison with those adopted in the Commission's previous decisions constitutes an unjustified difference in treatment.*

*324 Similar cartels have been punished much less severely (see, for example, Commission Decision 86/398/EEC of 23 April 1986 relating to a proceeding under Article 85 of the EEC Treaty (IV/31.149 - Polypropylene, OJ 1986 L 230, p. 1, hereinafter `the Polypropylene decision').*

*325 Likewise, the general level of fines appears unjustified in relation to Commission Decision 92/163/EEC of 24 July 1991 relating to a proceeding pursuant to Article 86 of the EEC Treaty (IV/31.043 - Tetra Pak II, OJ 1992 L 72, p. 1).*

*326 The error in assessing the gravity of the infringement is also confirmed by a comparison with the level of fines adopted in Commission Decision 94/815/EEC of 30 November 1994 relating to a proceeding under Article 85 of the EC Treaty (Cases IV/33.126 and 33.322 - Cement, OJ 1994 L 343, p. 1).*

*327 According to the Commission, each infringement has its own special features. Since the principle of equal treatment presupposes that similar situations be treated in the same way, it is impossible to compare the amount of fines imposed in the present case with those imposed for infringements committed in different ways and at different times. The Commission adds that it is in any event entitled to raise the level of fines if that is necessary in order to ensure the implementation of Community competition policy (Case T-12/89 Solvay v Commission [1992] ECR II-907).*

*Findings of the Court*

*328 Under Article 15(2) of Regulation No 17, the Commission may by decision impose on undertakings fines ranging from ECU 1 000 to 1 000 000, or a sum in excess thereof but not exceeding 10% of the turnover in the preceding business year of each of the undertakings participating in the infringement where, either intentionally or negligently, they infringe Article 85 (1) of the Treaty. In fixing the amount of the fine, regard is to be had to both the gravity and the duration of the infringement. As is apparent from the case-law of the Court of Justice, the gravity of infringements falls to be determined by reference to a number of factors including, in particular, the specific circumstances and context of the case, and the deterrent character of the fines; moreover, no binding or exhaustive list of the criteria which must be applied has been drawn up (order in Case C-137/95 P SPO and Others v Commission [1996] ECR I-1611, paragraph 54).*

*329 In the present case, the Commission determined the general level of fines by taking into account the duration of the infringement (point 167 of the Decision) and the following considerations (point 168):*

*GROUNDS CONTINUED UNDER DOC.NUM: 694A0334.2*

*`- collusion on pricing and market sharing are by their very nature serious restrictions on competition,*

*- the cartel covered virtually the whole territory of the Community,*

- the Community market for cartonboard is an important industrial sector worth some ECU 2 500 million each year,

- the undertakings participating in the infringement account for virtually the whole of the market,

- the cartel was operated in the form of a system of regular institutionalised meetings which set out to regulate in explicit detail the market for cartonboard in the Community,

- elaborate steps were taken to conceal the true nature and extent of the collusion (absence of any official minutes or documentation for the PWG and JMC; discouraging the taking of notes; stage-managing the timing and order in which price increases were announced so as to be able to claim they were "following", etc.),

- the cartel was largely successful in achieving its objectives.'

330 Furthermore, according to the Commission's reply to a written question from the Court, fines of a basic level of 9 or 7.5% of the turnover on the Community cartonboard market in 1990 of each undertaking addressed by the Decision were imposed on the undertakings regarded as the 'ringleaders' of the cartel and on the other undertakings respectively.

331 It should be pointed out, first, that when assessing the general level of fines the Commission is entitled to take account of the fact that clear infringements of the Community competition rules are still relatively frequent and that, accordingly, it may raise the level of fines in order to strengthen their deterrent effect. Consequently, the fact that in the past the Commission applied fines of a certain level to certain types of infringement does not mean that it is estopped from raising that level, within the limits set out in Regulation No 17, if that is necessary in order to ensure the implementation of Community competition policy (see, inter alia, Joined Cases 100/80, 101/80, 102/80 and 103/80 Musique Diffusion Française and Others v Commission [1983] ECR 1825, paragraphs 105 to 108, and ICI v Commission, cited above, paragraph 385).

332 Second, the Commission rightly argues that, on account of the specific circumstances of the present case, no direct comparison could be made between the general level of fines adopted in the present decision and those adopted in the Commission's previous decisions, in particular in the Polypropylene decision, which the Commission itself considered to be the most similar to the decision in the present case. Unlike in the Polypropylene case, no general mitigating circumstance was taken into account in the present case when determining the general level of fines. Moreover, as the Court has already held, the intricate steps taken by the undertakings to conceal the existence of the infringement constitute a particularly serious aspect of it which differentiates it from the infringements previously found by the Commission.

333 Third, the Court notes the lengthy duration and obviousness of the infringement of Article 85 (1) of the Treaty which was committed despite the warning which the Commission's previous decisions, in particular the Polypropylene decision, should have provided.

334 On the basis of those factors, the criteria set out in point 168 of the Decision justify the general level of fines set by the Commission. Admittedly, the Court has already held that the effects of the collusion on prices, which the Commission took into account when determining the general level of fines, are proved only in part. However, in the light of the foregoing considerations, that conclusion cannot materially affect the assessment of the gravity of the infringement found. The fact that the undertakings actually announced the agreed price increases and that the prices so announced served as a basis for fixing individual transaction prices suffices in itself for a finding that the collusion on prices had both as its object and effect a serious restriction of competition. Accordingly, in the exercise of its unlimited jurisdiction, the Court considers that the findings relating to the effects of the infringement do not justify any reduction in the general level of fines set by the Commission.

335 Finally, in setting the general level of fines in the present case, the Commission did not so depart from its previous line of decisions as to oblige it to give a more detailed account of the reasons for its assessment of the gravity of the infringement (see, inter alia, Case 73/74 Groupement des Fabricants de Papiers Peints de Belgique and Others v Commission [1975] ECR 1491, paragraph 31).

336 Consequently, this plea must be rejected.

E - Insufficient statement of reasons and infringement of the rights of the defence as regards calculation of the fine

*Arguments of the parties*

*337 The applicant contends that, in order to assess whether the Commission remained within the limits imposed by Article 15(2) of Regulation No 17 and whether its discretion in regard to fines was exercised correctly and objectively, it is necessary to establish whether the Decision sets out the criteria applied by the Commission. The applicant claims that the Decision does not satisfy those requirements, since it indicates neither the financial year taken into consideration in order to determine fines nor the (percentage) rate applied in order to calculate each fine. It is therefore impossible for the applicant to conduct a proper review of the legality of the Decision, which constitutes a manifest breach of its rights of defence.*

*338 The Commission points out that Article 15(2) of Regulation No 17 does not refer, either expressly or impliedly, to an obligation on the part of the Commission to indicate the method of calculation adopted. Moreover, the statement of reasons in the Decision relating to the factors which determined the general level of fines and the level of fine imposed upon each undertaking is wholly comparable to the statement of reasons given in similar decisions. Furthermore, no previous case has ever placed it under an obligation to indicate the more detailed criteria used to calculate the fines.*

*339 The Commission submits that it is not required to fix the amount of the fines on the basis of a precise mathematical formula. Such an approach might lead undertakings to calculate in advance the benefit which they would derive from participating in an unlawful cartel. It considers that it enjoys a margin of discretion when fixing the amount of fines, since fines constitute an instrument of its competition policy (Case T-150/89 Martinelli v Commission [1995] II-1165, paragraph 59).*

*340 Lastly, it contends that the fact that certain additional details regarding the fines were supplied by a member of the Commission, purely by way of guidance, at a press conference cannot have an impact on the Decision, nor does such guidance mean that the statement of reasons for the Decision was inadequate.*

*Findings of the Court*

*341 It is settled law that the purpose of the obligation to give reasons for an individual decision is to enable the Community judicature to review the legality of the decision and to provide the party concerned with an adequate indication as to whether the decision is well founded or whether it may be vitiated by some defect enabling its validity to be challenged; the scope of that obligation depends on the nature of the act in question and on the context in which it was adopted (see, inter alia, Case T-49/95 Van Megen Sports v Commission [1996] ECR II-1799, paragraph 51).*

*342 As regards a decision which, as in this case, imposes fines on several undertakings for infringement of the Community competition rules, the scope of the obligation to state reasons must be assessed in the light of the fact that the gravity of infringements falls to be determined by reference to a number of factors including, in particular, the specific circumstances and context of the case and the deterrent character of the fines; moreover, no binding or exhaustive list of criteria to be applied has been drawn up (order in SPO and Others v Commission, cited above, paragraph 54).*

*343 Moreover, when fixing the amount of each fine, the Commission has a margin of discretion and cannot be considered obliged to apply a precise mathematical formula for that purpose (see, to the same effect, the judgment in Martinelli v Commission, cited above, paragraph 59).*

*344 In the Decision, the criteria taken into account in order to determine the general level of fines and the amount of individual fines are set out in points 168 and 169 respectively. Moreover, as regards the individual fines, the Commission explains in point 170 that the undertakings which participated in the meetings of the PWG were, in principle, regarded as `ringleaders' of the cartel, whereas the other undertakings were regarded as `ordinary members'. Lastly, in points 171 and 172, it states that the amounts of fines imposed on Rena and Stora must be considerably reduced in order to take account of their active cooperation with the Commission, and that eight other undertakings, including the applicant, were also to benefit from a reduction, to a lesser extent, owing to the fact that in their replies to the statement of objections they did not contest the essential factual allegations on which the Commission based its objections.*

*345 In its written pleas to the Court and in its reply to a written question put by the Court, the*

*Commission explained that the fines were calculated on the basis of the turnover on the Community cartonboard market in 1990 of each undertaking addressed by the Decision. Fines of a basic level of 9 or 7.5% of that individual turnover were then imposed, respectively, on the undertakings considered to be the cartel `ringleaders' and on the other undertakings. Finally, the Commission took into account any cooperation by undertakings during the procedure before it. Two undertakings received a reduction of two-thirds of the amount of their fines on that basis, while other undertakings received a reduction of one-third.*

*346 Moreover, it is apparent from a table produced by the Commission containing information as to the fixing of the amount of each individual fine that, although those fines were not determined by applying the abovementioned figures alone in a strictly mathematical way, those figures were, nevertheless, systematically taken into account for the purposes of calculating the fines.*

*347 However, the Decision does not state that the fines were calculated on the basis of the turnover of each undertaking on the Community cartonboard market in 1990. Furthermore, the basic rates of 9 and 7.5% applied to calculate the fines imposed on the undertakings considered to be `ringleaders' and those considered to be `ordinary members' do not appear in the Decision. Nor does it set out the rates of reduction granted to Rena and Stora, on the one hand, and to eight other undertakings, on the other.*

*348 In the present case, first, points 169 to 172 of the Decision, interpreted in the light of the detailed statement in the Decision of the allegations of fact against each of its addressees, contain a relevant and sufficient statement of the criteria taken into account in order to determine the gravity and duration of the infringement committed by each of the undertakings in question (see, to the same effect, Case T-2/89 Petrofina v Commission [1991] ECR II-1087, point 264).*

*349 Second, where, as in the present case, the amount of each fine is determined on the basis of the systematic application of certain precise figures, the indication in the decision of each of those factors would permit undertakings better to assess whether the Commission erred when fixing the amount of the individual fine and also whether the amount of each individual fine is justified by reference to the general criteria applied. In the present case, the indication in the Decision of the factors in question, namely the reference turnover, the reference year, the basic rates adopted, and the rates of reduction in the amount of fines would not have involved any implicit disclosure of the specific turnover of the addressee undertakings, a disclosure which might have constituted an infringement of Article 214 of the Treaty. As the Commission has itself stated, the final amount of each individual fine is not the result of a strictly mathematical application of those factors.*

*350 The Commission also accepted at the hearing that nothing prevented it from indicating in the Decision the factors which had been systematically taken into account and which had been divulged at a press conference held on the day on which that decision was adopted. In that regard, it is settled law that the reasons for a decision must appear in the actual body of the decision and that, save in exceptional circumstances, explanations given ex post facto cannot be taken into account (see Case T-61/89 Dansk Pelsdyravlerforening v Commission [1992] ECR II-1931, paragraph 131, and, to the same effect, Case T-30/89 Hilti v Commission [1991] ECR II-1439, paragraph 136).*

*351 Despite those findings, the reasons explaining the setting of the amount of fines stated in points 167 to 172 of the Decision are at least as detailed as those provided in the Commission's previous decisions on similar infringements. Although a plea alleging insufficient reasons concerns a matter of public interest, there had been no criticism by the Community judicature, at the moment when the decision was adopted, as regards the Commission's practice concerning the statement of reasons for fines imposed. It was only in the judgment of 6 April 1995 in Case T-148/89 Tréfilunion v Commission [1995] ECR II-1063, paragraph 142, and in two other judgments given on the same day (T-147/89 Société Métallurgique de Normandie v Commission [1995] ECR II-1057, summary publication, and T-151/89 Société des Treillis et Panneaux Soudés v Commission [1995] ECR II-1191, summary publication), that this Court stressed for the first time that it is desirable for undertakings to be able to ascertain in detail the method used for calculating the fine imposed without having to bring court proceedings against the Commission's decision in order to do so.*

*352 It follows that, when it finds in a decision that there has been an infringement of the competition rules and imposes fines on the undertakings participating in it, the Commission must, if it systematically took into account certain basic factors in order to fix the amount of fines, set*

out those factors in the body of the decision in order to enable the addressees of the decision to verify that the level of the fine is correct and to assess whether there has been any discrimination.

353 In the specific circumstances set out in paragraph 351 above, and having regard to the fact that in the procedure before the Court the Commission showed itself to be willing to supply any relevant information relating to the method of calculating the fines, the absence of specific grounds in the Decision regarding the method of calculation of the fines should not, in the present case, be regarded as constituting an infringement of the duty to state reasons such as would justify annulment in whole or in part of the fines imposed. Finally, the applicant has not shown that it was prevented from properly asserting its rights of defence.

354 Consequently, this plea cannot be upheld.

F - Error of appraisal by the Commission in not taking due account of the role played by Sarrió in the cartel and its actual conduct on the market and failure by the Commission to state reasons in that regard

Arguments of the parties

355 The applicant claims that the Commission did not take due account of its particular position on the market and in the PG Paperboard. It gives a detailed description of its position on the market and explains that, from the point of view of production capacity, it was only the fifth and fourth producer in Western Europe in 1990 and 1991 respectively (see the studies referred to in point 9 of the Decision) and that its market share was half of that of the market leader. Moreover, owing to its specialisation in GD grades it did not have the flexibility of those producers with significant production in both the GD grade and GC grade sectors. It was, and is still, exposed to the high degree of aggressiveness of Scandinavian producers, who benefit from direct and integrated access to virgin fibres, and of German and Austrian producers, who benefit from national recycling rules. It was in order to face up to its competitors' dynamism that in 1986 it asked to be allowed to participate in the meetings of the PG Paperboard, with the intention of monitoring its main competitors' conduct.

356 The Commission has not adduced any proof relating to the applicant's actual conduct or put forward any argument to refute its assertion that: (a) its transaction prices were determined autonomously and in accordance with market conditions; (b) there were considerable discrepancies between announced prices and transaction prices; (c) its market shares had fluctuated considerably throughout the period under consideration and (d) in alignment with market conditions, it had never taken downtime. The applicant states that it never took initiatives intended to restrict its competitors' freedom of action. The only evidence of such conduct is a private note from one manager of a competitor to that of another. However, that note is in general terms and the conduct referred to in it is merely attributed to the applicant (appendix 109 to the statement of objections).

357 The applicant claims that an examination of its actual conduct showed that it did not correspond to that of the alleged cartel, and this should have led the Commission to assess the applicant's position much more favourably when determining the amount of the fine. The note discovered at FS Carton, on which the Commission relies as evidence of the actual implementation of the cartel by the applicant, does not in any way relate to its actual conduct on the market, but merely shows its participation in concerted action on announced prices.

358 Lastly, the Decision is vitiated by an inadequate statement of reasons in that, without giving any grounds, the Commission failed to assess the essential evidence adduced by the applicant in regard to its role within the PG Paperboard and its conduct on the market.

359 The Commission contends that in point 169 of the Decision it took account both of the role played by each undertaking in the collusive agreements and the applicant's actual conduct. The Decision contains a correct statement of reasons in that regard.

Findings of the Court

360 It follows from the Court's findings relating to the applicant's pleas in support of its application for annulment in whole or in part of Article 1 of the Decision that the nature of the PWG's functions, as set out in the Decision, has been demonstrated by the Commission.

361 In those circumstances, the Commission was fully entitled to conclude that the undertakings,

*including the applicant, which participated in the meetings of that body had to be regarded as `ringleaders' of the infringement found and that accordingly they had to bear special responsibility (see point 170, first paragraph, of the Decision). The applicant's explanation that it participated in the meetings of the PWG only in order to obtain information which would permit it to monitor the behaviour of its principal competitors merely confirms the essentially anti-competitive purpose of its participation.*

*362 Moreover, the applicant has not in any way proved that it played an essentially passive role in the bodies of the PG Paperboard and that its actual conduct on the market was always determined independently.*

*363 It is not disputed that the applicant actually took part in the concerted price initiatives by announcing the agreed price increases on the market. Furthermore, as the Commission has correctly claimed, it is clear from appendix 109 to the statement of objections (see paragraph 55 above) that the applicant asked other producers to abide by the agreed price increases. Lastly, as to the applicant's actual behaviour in regard to prices, there is nothing to support the conclusion that its transaction prices were significantly lower than those of the other producers participating in the collusion on prices.*

*364 As to the applicant's arguments based on the fluctuations in its market shares during the period of the infringement found by the Decision, it suffices to state that the applicant argues that those fluctuations are explained by the fact that several producers had increased their production capacities in order to meet the strong growth in demand found until 1990. In those circumstances, although it is true that the applicant did not carry out any increase in its production capacities before the acquisition of Prat Carton in February 1991, the fluctuations in its market shares cannot constitute a factor mitigating its responsibility for its unlawful conduct.*

*365 Furthermore, it was only in 1990 that market conditions were such that the undertakings considered that it was necessary to take actual downtime and, according to the Decision itself, there was merely a `loose system of encouragement' in that regard (see paragraphs 96 and 151 above). Consequently, since the applicant took part in meetings at which the question of downtime was dealt with, but did not publicly distance itself from the discussions which took place, the Court considers that, even assuming that the applicant did not take downtime during the period covered by the Decision, that fact cannot prove that its own conduct might have helped to counter the anti-competitive effects of the infringement found.*

*366 In short, in the light of its grounds as a whole, the Decision adequately explains the Commission's appraisal of the applicant's role in the infringement found and of its conduct on the market.*

*367 Consequently, this plea must also be rejected.*

*G - The Commission ought to have taken certain mitigating circumstances into account*

*Arguments of the parties*

*368 The applicant claims that, even assuming that the cartel must be considered, in general, to have affected market conditions, the Commission, when appraising the applicant's situation, should have recognised, as mitigating circumstances, a series of factors which show that the cartel had no, or only insignificant, effect on the segment of the relevant market.*

*369 According to the applicant, the Commission should have taken into account, first, the fact that between 1986 and 1992 the transaction prices secured by the applicant on the Italian market, the main outlet for its products, had always followed changes in the industrial prices index. Second, it should have taken into account the ease with which other types of products, such as all those derived from plastic, may be substituted for cartonboard, which, it claims, means that any form of `exploitation' of the market is precluded or extremely limited. Third and last, the Commission should have taken account of the fact that during the period in question GD grade had lost a large part of its market share to GC grade. Having regard also to the erosion of the applicant's market share and to the level of increases of Italian prices, which was lower than the level of price increases on the other European markets, it should therefore be concluded that the cartel was not successful for the applicant.*

*370 The Commission observes that it is necessary to assess the cartel's impact on the market as a whole and that, from that point of view, the cartel was in fact very successful. In any event, none*

*of the factors invoked by the applicant can be regarded as a mitigating circumstance justifying a reduction of the fine.*

*Findings of the Court*

*371 The Court has already considered the question whether the Commission had correctly assessed the effects of the infringement on the market (see paragraph 295 et seq. above) and whether the applicant's conduct on the market should have been taken into account as a mitigating circumstance when the amount of the fine was set (see paragraph 360 et seq. above).*

*372 Having regard to those findings of the Court, the arguments on which the applicant relies in support of the present plea cannot be upheld.*

*373 Since the collusion on prices concerned both GC cartonboard and GD cartonboard and there is nothing to support the view that the applicant's own conduct helped to counter the anti-competitive effects of the infringement, the Commission was fully entitled not to take into account, when determining the amount of the fine imposed on the applicant, the loss of market share from GD cartonboard to GC cartonboard. Furthermore, the applicant has not shown that there is a link between the infringement and changes in the market shares of the various grades of cartonboard.*

*374 Furthermore, even assuming that the increases in transaction prices found on the Italian market, the applicant's main outlet, were lower than those found on the other Community markets, it suffices to observe that the collusion on prices in which the applicant participated concerned almost the whole of the territory of the Community and that the applicant announced the agreed price increases on all the principal European markets (see tables B to G annexed to the Decision).*

*375 Finally, any high degree of interchangeability between cartonboard and other products cannot affect the findings already made by the Court regarding the effects of collusion on prices (see paragraph 295 et seq. above).*

*376 Consequently, this plea must be rejected.*

*H - Material error in the calculation of the fine imposed on Sarrió*

*Arguments of the parties*

*377 The applicant submits that the Commission committed a material error when it calculated the fine. The Commission took the turnover figure for 1990, which was sent to it in August 1991 in reply to a request for information under Article 11 of Regulation No 17, whereas it should have calculated the fine by reference to the corrected and certified turnover figure sent in 1993 as an annex to the reply to the statement of objections.*

*378 In those circumstances, the Commission not only committed a material error in calculating the fine imposed on Sarrió but it also infringed the principle of equal treatment, because the fines imposed on the other addressees of the Decision were calculated on a correct basis. In calculating the fine on the basis of a turnover figure furnished before Sarrió could have foreseen the imposition of a fine and in ignoring the certified figures provided subsequently, the Commission also infringed Sarrió's rights of defence.*

*379 The Commission counters by stating that it is precisely in order to avoid any dispute that it used the turnover figure supplied in reply to a request for information under Article 11 of Regulation No 17 and that it does not see why the figure sent before the statement of objections is incorrect while the figure sent after it is correct.*

*Findings of the Court*

*380 Having regard to the documents before the Court, the Commission did not commit any error in adopting as its basis for calculating the fine the 1990 turnover figure sent by the applicant in August 1991 and not the corrected figure sent in May 1993. An undertaking which, during the administrative procedure before the Commission, corrects a figure, such as a turnover figure, previously sent to the Commission in reply to one of its requests for information, must set out in detail the reasons for which the figure initially sent should no longer be adopted for the remainder of the procedure.*

*381 The applicant did not do so in the present case. In its reply to the statement of objections the applicant merely stated that the 1990 turnover figure had been corrected by subtracting amounts*

*relating to internal group operations, to sales of products falling outside the scope of the Commission's investigation (boxes and raw cartonboard), complaints, quantity rebates, unsold goods and discounts allowed to customers, but without supporting that rectification by means of a detailed breakdown in figures. Moreover, the rectified turnover figure was not certified by an accountant, and the applicant confirmed at the hearing that its claim in that regard was incorrect. In the result, the Commission acted correctly in rejecting the rectified turnover figure and in calculating the fine on the basis of the turnover figure originally submitted.*

*382 The plea must therefore be rejected.*

*I - Error in the method of calculating the fine*

*Arguments of the parties*

*383 The applicant states that in arriving at the amount of the fine the Commission first converted the turnover for the relevant financial year, namely 1990, into ecus, applying the average rate applicable for that year, and then determined the amount of the fine by applying the previously established percentage, namely 6% in its case. In so doing, the Commission failed to take account of the effects of monetary fluctuations, since both the Spanish peseta and the Italian lira had undergone a substantial devaluation as against the ecu and the other European currencies since 1990. The applicant claims that today, in national currency, it will have to pay approximately PTA 2 452 million in order to discharge the fine. On the basis of the certified turnover figure (PTA 27 256 million) relating to cartonboard sales within the Community in 1990, a fine of 6% of that amount would have been approximately PTA 1 635 million. The fine actually imposed therefore represents an additional financial charge of PTA 817 million. According to the applicant, if the exchange rate applicable at the moment when the Decision was published is used, the amount of the fine in fact corresponds to approximately 9% of its 1990 turnover. It must therefore be concluded that either the Commission did not take account of the one-third reduction which it had nevertheless allowed, or that, before that reduction, the fine corresponds to approximately 13.4% of the relevant turnover figure, thereby exceeding the legal limit of 10% of turnover laid down in Article 15(2) of Regulation No 17.*

*384 The applicant submits, next, that the purpose of the (percentage) rate of the fine is to express the conclusion reached by the Commission as regards the amount, and therefore the impact, which the fine should represent in relation to the turnover of the undertaking concerned. Consequently, the amount of the fine must be determined on the basis of the assessment of the gravity of the infringement and, by contrast, factors such as monetary fluctuations, which are unrelated to the infringement to be punished and which are not imputable to the person responsible for that infringement, must not therefore affect the amount of the fine. The applicant refers to the Opinion of Advocate General Sir Gordon Slynn in Musique Diffusion Française and Others v Commission, cited above, (at p. 1914), according to which, when fixing the amount of fines, it is necessary to take account of the most recent turnover figure, which then best reflects the undertaking's real position.*

*385 It considers that its contention that the amount of the fine should not be affected by exchange rate fluctuations is confirmed by the judgment of the Court of Justice in Joined Cases 41/73, 43/73 and 44/73 - Interpretation - Société Anonyme Générale Sucrière and Others v Commission [1977] ECR 445, paragraphs 12 to 17). As regards that judgment, the applicant in its reply contests the Commission's contention that it confirms that if the unit of account (`u.a.') relevant at that time had been a currency of payment, its conversion into national currency would have been unnecessary.*

*386 The applicant claims that the Decision also leads to unjustified differences in treatment, because the monetary fluctuations completely alter the relationship between the various fines imposed. It states that between 1990 and 1994 the peseta was devalued by 22% as against the ecu, whereas during the same period, the Dutch, German and Austrian currencies were revalued by approximately 7.5% as against the ecu. Consequently, without any obvious grounds, the applicant received a fine which entailed for it a cost approximately 30% more than the cost of fines imposed on other undertakings, and particularly the German undertakings.*

*387 The applicant concludes that nothing requires the Commission to express the amount of the fine in ecus and that it should therefore have expressed that amount in national currency in order to avoid unjustified differences in treatment. Even assuming that the Commission has the power*

to express the amount of the fine in ecus, it should at least have used an exchange rate which ensures equal treatment, namely the exchange rate at the time when the fine was imposed (the day of the publication or of notification of the Decision).

388 The Commission observes that Article 15(2) of Regulation No 17 allows it to impose fines 'not exceeding 10% of the turnover in the preceding business year' of each of the undertakings participating in the infringement. That rate of 10% applied to overall turnover constitutes the upper limit of the fine (Case C-279/87 Tipp-Ex v Commission, summary publication, [1990] ECR I-261, paragraph 38 et seq.). Thus, since the Commission determined the fine by reference to the 1990 financial year, the last complete year during which the cartel operated, and converted all the turnover figures into ecus on the basis of the average exchange rate for that year, it kept within the limits laid down by Regulation No 17.

389 The conversion into ecus on the basis of the exchange rate in the reference year provides the actual turnover expressed in ecus, precisely in order to avoid any discrimination between the addressee undertakings resulting from fluctuations in the national currencies of the various Member States. The judgment in Société Anonyme Générale Sucrière and Others v Commission, cited above, does not support the applicant's contention. It is clear from that judgment that it deals only with the question of whether or not it is necessary to express the fine in national currency owing to the fact that the u.a. was not a currency of payment.

390 As to the allegedly discriminatory effects of the method applied, the Commission states that the risk of monetary fluctuations is inherent in commerce and international trade. It is a factor which is impossible to eliminate and which will in any event affect the amount of the fine at the moment of payment. However, it is precisely by the conversion of the turnover figures into ecus that any discrimination is best eliminated. By that method, the fine is calculated in 'real' terms. The imposition of the fine in national currency would ultimately render it wholly nominal, to the benefit, as the applicant's calculations prove, of undertakings whose turnover is expressed in a weak currency. It should be noted that the value of the ecu is determined on the basis of the value of each national currency and that, since the addressee undertakings of the Decision operate in various Member States and in various national currencies, conversion into ecus is an effective application of the principle of equal treatment.

391 As to the applicant's argument that the Commission should at the very least have used the exchange rate prevailing at the time when the fine was imposed, the Commission counters by stating that the turnover figure for the reference year had a real value at the rate in force at that moment and not at the subsequent rate in force at the moment when the Decision was adopted.

Findings of the Court

392 Article 4 of the Decision provides that the fines imposed are to be payable in ecus.

393 Nothing precludes the Commission from expressing the amount of the fine in ecus, a monetary unit which is convertible into national currency. That also allows the undertakings more easily to compare the amounts of the fines imposed. Moreover, the possibility of converting the ecu into national currency distinguishes that monetary unit from the 'unit of account' referred to in Article 15(2) of Regulation No 17, in regard to which the Court expressly held that, since it was not a currency in which payment was made, it necessarily meant that the amount of the fine had to be determined in national currency (Société Anonyme Générale Sucrière and Others v Commission, cited above, paragraph 15).

394 The Court cannot uphold the applicant's criticism in regard to the legality of the Commission's method of converting into ecus the undertakings' reference turnover at the average exchange rate for that same year (1990).

395 First of all, the Commission should ordinarily use one and the same method of calculating the fines imposed on the undertakings penalised for having participated in the same infringement (see Musique Diffusion Française and Others v Commission, cited above, paragraph 122).

396 Second, in order to be able to compare the different turnover figures sent to it, which are expressed in the respective national currencies of the undertakings concerned, the Commission must convert those figures into a single monetary unit. As the value of the ecu is determined in accordance with the value of each national currency of the Member States, the Commission rightly converted the turnover figure of each of the undertakings into ecus.

*397 The Commission also acted correctly in taking the turnover in the reference year (1990) and converting that figure into ecus on the basis of the average exchange rates for that same year. In the first case, the taking into account of the turnover achieved by each undertaking during the reference year, that is to say, the last complete year of the period of infringement found, enabled the Commission to assess the size and economic power of each undertaking and the scale of the infringement committed by each of them, those aspects being relevant for an assessment of the gravity of the infringement committed by each undertaking (see Musique Diffusion Française and Others v Commission, cited above, paragraphs 120 and 121). In the second place, taking into account, in order to convert the turnover figures in question into ecus, the average exchange rates for the reference year adopted, enabled the Commission to prevent any monetary fluctuations occurring after the cessation of the infringement from affecting the assessment of the undertakings' relative size and economic power and the scale of the infringement committed by each of them and, accordingly, its assessment of the gravity of that infringement. The assessment of the gravity of an infringement must have regard to the economic reality as revealed at the time when that infringement was committed.*

*398 Thus, the argument that the turnover figure for the reference year should have been converted into ecus on the basis of the rate of exchange at the date of adoption of the Decision cannot be upheld. The method of calculating the fine by using the average rate of exchange for the reference year makes it possible to avoid the uncertain effects of changes in the real value of the national currencies which may, and in this case actually did, arise between the reference year and the year in which the Decision was adopted. Although this method may mean that a given undertaking must pay an amount, expressed in national currency, which is in nominal terms greater or less than that which it would have had to pay if the rate of exchange at the date of adoption of the Decision had been applied, that is merely the logical consequence of fluctuations in the real values of the various national currencies.*

*399 In addition, several of the addressee undertakings of the Decision own cartonboard mills in more than one country (see points 7, 8 and 11 of the Decision). Moreover, the addressees of the Decision generally carry out their activities in more than one Member State through the intermediary of local representatives. As a result, they operate in several national currencies. The applicant itself achieves a considerable part of its turnover on export markets. Where a decision like the decision at issue penalises infringements of Article 85(1) of the Treaty and where the addressees of the decision generally pursue their activities in several Member States, the turnover for the reference year converted into ecus at the average exchange rate used during that same year is made up of the sum of the turnovers achieved in each country in which the undertaking operates. It therefore takes perfect account of the actual economic situation of the undertakings concerned during the reference year.*

*400 Lastly, it is necessary to determine whether, as the applicant claims, the ceiling set by Article 15(2) of Regulation No 17, namely `10% of the turnover in the preceding business year', was exceeded by reason of the monetary fluctuations which occurred after the reference year.*

*401 According to the case-law of the Court of Justice, the percentage referred to in that provision refers to the total turnover of the undertaking in question (Musique Diffusion Française and Others v Commission, paragraph 119).*

*402 For the purposes of Article 15(2) of Regulation No 17, `preceding business year' is the one which precedes the date of the decision, namely, in the present case, the last full business year of each of the undertakings concerned as at 13 July 1994.*

*403 In the light of those considerations, the Court holds, on the basis of the information supplied by the applicant in reply to a written question put by this Court, that the amount of the fine converted into national currency at the rate of exchange prevailing at the time when the Decision was published does not exceed 10% of the applicant's total turnover in 1993.*

*404 Having regard to the foregoing, this plea must be rejected.*

*J - Erroneous calculation of the part of the fine corresponding to the infringement imputed to Prat Carton and infringement of the obligation to state reasons in that regard*

*Arguments of the parties*

*405 The applicant claims that the Commission wrongly calculated the part of the fine*

corresponding to the infringement allegedly committed by Prat Carton in that it adopted the same percentage of turnover as that selected for the applicant, namely 9%, reduced by one-third on account of its cooperation during the investigation of the case. However, the limited participation of Prat Carton in the meetings of the JMC from June 1990 to March 1991 and the fact that it was not a `ringleader' were grounds for reducing the amount of the fine.

406 Lastly, the applicant complains of a total lack of transparency and absence of reasons for the calculation of the part of the fine corresponding to the infringement imputed to Prat Carton.

407 The Commission observes that, as it explained in point 154 of the Decision, the applicant, which acquired Prat Carton in February 1991, is responsible for the latter's anti-competitive conduct for the whole of the period of its membership of the cartel. Since the Decision imposed a single fine on the applicant, which was calculated on the basis of its total turnover for cartonboard, and thus included the turnover of Prat Carton, the conduct of the latter undertaking did not give rise to the imposition of a separate fine. According to the Commission, the applicant's argument is therefore at variance with the fact that a fine was imposed on the applicant alone.

408 In those circumstances, any claim of a lack of transparency or incoherency in the statement of reasons of the Decision in that connection is also to be rejected.

Findings of the Court

409 According to the Commission's explanations, the fine imposed on the applicant corresponds to 6% of the turnover achieved in 1990 by the applicant and Prat Carton together (a rate of 9% adopted against `ringleaders', reduced by one-third on account of the applicant's cooperative attitude). Even though in such a case it is desirable that the Decision should contain a fuller explanation of the calculation method applied, for the reasons already stated (see paragraphs 351 to 353 above) the applicant's claim that there has been an infringement of Article 190 of the Treaty must be rejected.

410 Next, it should be observed (see paragraph 250 above) that the Commission has demonstrated Prat Carton's participation in collusion on prices and collusion on downtime between June 1990 and February 1991. On the other hand, it has been held that the Commission has not adequately proved Prat Carton's participation in collusion on market shares during the same period nor its participation from mid-1986 until June 1990 in one of the constituent elements of the infringement set out in Article 1 of the Decision.

411 Because Prat Carton participated in some only of the constituent elements of the infringement and for a much lesser period than that found by the Commission, the amount of the fine imposed on the applicant must be reduced.

412 In the present case, as none of the other pleas on which the applicant relies justifies reducing the fine, the Court, exercising its unlimited jurisdiction, sets the amount of that fine at ECU 14 million.

## Decision on costs

Costs

413 Under Article 87(3) of the Rules of Procedure, the Court may, where each party succeeds on some and fails on other grounds, order costs to be shared or order each party to bear its own costs. As the action has been only partially successful, the Court considers it fair in the circumstances of the case to order the applicant to bear its own costs and to pay one-half of the Commission's costs and to order the Commission to bear the other half of its own costs.

## Operative part

On those grounds,
THE COURT OF FIRST INSTANCE

*(Third Chamber, Extended Composition)*

*hereby:*

*1. Annuls, as regards the applicant, the first to fourth paragraphs of Article 2 of Commission Decision 94/601/EC of 13 July 1994 relating to a proceeding under Article 85 of the EC Treaty (IV/C/33.833 - Cartonboard) save and except the following passages;*

*`The undertakings named in Article 1 shall forthwith bring the said infringement to an end, if they have not already done so. They shall henceforth refrain in relation to their cartonboard activities from any agreement or concerted practice which may have the same or a similar object or effect, including any exchange of commercial information:*

*(a) by which the participants are directly or indirectly informed of the production, sales, order backlog, machine utilisation rates, selling prices, costs or marketing plans of other individual producers.*

*Any scheme for the exchange of general information to which they subscribe, such as the Fides system or its successor, shall be so conducted as to exclude any information from which the behaviour of individual producers can be identified.';*

*2. Sets the amount of the fine imposed on the applicant by Article 3 of Decision 94/601 at ECU 14 million;*

*3. Dismisses the application as regards the remaining claims;*

*4. Orders the applicant to bear its costs and to pay one-half of the Commission's costs;*

*5. Orders the Commission to bear one-half of its costs.*