more innovative apparently because, after all, 64 is more than 32. But the 64-bit attribute had no value to customers during the brief period when AMD offered 64 bits in a PC processor and Intel did not, and even today the 64-bit capability lag far behind other purchasing considerations. In March 2006, the technology journal CNet reported that "[n]early two and a half years have passed since 64-bit processors started going into PCs. But the software to take full advantage of these chips remains scarce, and customers aren't buying much of what's out there."

Unlike Intel, AMD launched its 64-bit processors without laying the groundwork for it. AMD failed to enable an "ecosystem" of 64-bit software to take advantage of its processors, and, according to a senior AMD executive, a "lot of customers told us to come back in a couple of years" when AMD pitched its 64-bit processors to them. Commenting on AMD's 64-bit offering, an industry analyst observed that "[t]he stable image technology and total cost of ownership approach that Intel has been taking recently is more appropriate for large companies."



While AMD was single-mindedly focusing on 64 bits, it was ignoring the numerous other competitive attributes that matter to customers. Some of those, such as the customer preference for platform solutions and not just "point products," have been discussed already. The discussion below summarizes just some of the other competitive attributes that AMD would like to overlook in arguing that it was entitled to instant success that was even greater than the substantial success that it actually did achieve.

### a.   AMD Was Hampered by Its Reputation as an Unreliable Supplier

AMD has a history of unreliability. As BusinessWeek reported in 2000, "[t]he sad fact is that nobody who knows the company's past trusts its word. AMD has a long history of promising great things, only to get snagged by technical glitches, poor management, or Intel's relentless rivalry."

In 2005, after two years of relatively good execution, AMD still suffered from "nagging doubt on the part of potential new customers about its ability to reliably deliver its chips."

AMD earned its reputation for unreliability the old fashioned way – by being unreliable time and again. In the late 1990s, it suffered from manufacturing problems so severe that an industry journal reported as few as 20% of the microprocessors manufactured by AMD were usable. A leading industry analysis firm reported that "[n]ot only was AMD having trouble yielding new higher-speed parts. Now it was having trouble yielding at all . . . ." To cope with supply shortfalls, AMD favored its two largest customers at the expense of all others. AMD itself acknowledged that its policy of favoring "strategic partners" had caused "customers whose needs AMD did not satisfy" to turn to Intel, and that it was subsequently unable to regain those customers' business. An AMD Senior Vice President admitted that AMD had failed "to deliver and meet the commitments we had made to our customers."

AMD raised more doubts about its ability to execute even with what ultimately turned out to be a successful release of its 64-bit "Hammer" microprocessor architecture, on which its Opteron was based. AMD had promised to release its Hammer products in the first quarter of 2002, but did not release its first Hammer product, Opteron, until April 2003. The delay reinforced AMD's reputation as an unreliable supplier, and it had consequences. For example,

 When AMD introduced the first desktop version of Hammer, Athlon 64, more than a year and a half late, customers found that the product was in short supply. As an industry journal reported, "[d]espite a high-profile launch . . . the processor is in short supply and volume shipments of PCs based on the chip are not expected until next year."

Thereafter, AMD did improve its performance greatly and had a period in which it executed well. It was rewarded with 14 consecutive quarters of year-over-year microprocessor revenue increases and overall increased market segment share, although not the unreserved confidence of customers with memories of earlier missteps. Indeed, even during this period,

Reputations for unreliability are not easily overcome, and AMD vividly reinforced its reputation at the end of 2006, when in the face of rising demand, it favored its newest and largest OEM customers at the expense of many longstanding customers. As AMD Chairman Ruiz publicly explained, "we had this anticipation of many of our OEMs wanting to have a significant larger share of our piece of the pie than we had been prepared to serve and so . . . we were not able to serve the channels, the distribution channels." An industry analyst noted that "[w]hen AMD came back in Q1 [2007] and offered processors to its resellers, they answered, 'well, that's ok, but we are using Intel processors now.'" Dr. Ruiz accepted blame for alienating its loyal customer base: "It is our fault, and we'll deal with it."

AMD has also failed to provide reliable "roadmaps" of future technology to enable OEMs to plan future AMD platforms with confidence about availability dates, projected performance attributes, accompanying platforms, and price points. AMD has a history of delivering underdeveloped roadmaps and of failing to meet the targets in its roadmaps.



By contrast, as industry analyst Roger Kay has explained, "Intel can talk, in varying degrees of detail, about five generations of processors, all in motion at the same time. That's quite a technological juggling act. And one that greatly impresses the intended audience."

  Apart from the quality of the roadmaps that it presented to OEMs,



  It should hardly be surprising that OEMs' ability to plan product introductions reliably around Intel's future offerings and lack of confidence in AMD's plans would work to Intel's advantage in the marketplace. AMD's recent "Barcelona" stumble is a case in point. In 2007, AMD promised to wrest the server performance lead from Intel with the introduction of its "Barcelona" microprocessor, claiming extravagantly that Barcelona would deliver a 40% performance advantage over Intel. But AMD released Barcelona more than six months behind schedule and then had to recall the processor because of a bug. As a result, Barcelona microprocessors started showing up in servers more than a year late. To make things worse,

AMD failed to deliver any performance advantage, let alone the hyped 40% advantage. Technical reviews concluded that Barcelona had "fallen significantly short of the hope and hype." As one analyst explained, "we believe Intel will retain performance leadership along with cost advantages in the near term."

Although OEM acceptance of AMD grew in recent years, justifiable doubts about AMD's ability to fulfill its promises continued to affect AMD's market performance. While Intel has not been immune to an occasional stumble, Intel is world renowned for its excellent business execution. It should not be surprising that AMD's track record of unreliability would affect customers' purchasing decisions.

### b.    AMD Lagged Badly Behind Intel in Manufacturing

Intel is widely considered the top semiconductor manufacturer in the world. In 2007, Microprocessor Report affirmed that "Intel has maintained its momentum and position as the leading semiconductor manufacturer through the introduction of new technology and the continued investment in new fabs." Also in 2007, the New York Times reported that "[m]any industry analysts say that Intel retains a six-month to nine-month lead over the rest of the industry." Intel's manufacturing lead gives it a large cost advantage over AMD, as well as enabling it to introduce advanced features earlier.

New manufacturing technologies (called process nodes) are introduced in the microprocessor industry approximately every two years. A process node is usually referred to by the "feature size," which refers to the size of the elements on a chip, and is represented in nanometers. For example, Intel is producing microprocessors using 45-nm technology. Third-party observers place Intel far ahead of AMD in manufacturing technology. For example, Bank of America Securities has stated that "Intel has traditionally led AMD from a manufacturing technology perspective by 1-1.5 yrs."

Intel's manufacturing lead over AMD is a source of competitive advantage for Intel. As illustrated below, at each process node, roughly twice as many transistors can be placed in the

same area of silicon. (The illustration below shows the transition from 90-nm to 65-nm technology, but the same ratio holds for each process transition). That means that twice as many microprocessors can be produced if the microprocessor design is held constant, or that transistor-intensive features that are too costly to introduce at an earlier node become economical as a new process node is deployed.



Source: Banc of America Securities LLC estimates.

With its lead, Intel *always* has a cost advantage because new process nodes are ramped up over a period of many months. Thus, when Intel starts manufacturing at a new node, it alone is producing at that node, and by the time AMD later starts producing in small quantities in the same node, Intel has already ramped up to produce significant volumes in the new node. In addition to leading on process node transitions, Intel led AMD by four years in deploying 300-mm silicon wafers to produce microprocessors. (The older technology used 200-mm wafers). The 300-mm (or 12-inch) wafers produce cost savings in the range of 25-30% relative to the 200-mm (or 8-inch) wafers. As a result, Intel has enjoyed a cost advantage over AMD.

Intel has also invested more aggressively in manufacturing. Intel's SEC filings show that it poured $12 billion into capital expenditures in 2001 and 2002, placing a risky bet on market recovery two years immediately following the bursting of the dot com bubble, while other manufacturers, including AMD, retrenched on their manufacturing investments. As will be discussed below, AMD's investment decisions limited the company's growth.

### c.    AMD's Growth Was Impeded by Capacity Constraints

Although AMD did not achieve instant success across the entire microprocessor marketplace, it was successful enough during the 2003-06 period to triple its sales, and increased its market segment share by 50% over 2002. However, in addition to having the shortcomings discussed above, AMD faced another constraint on its growth – manufacturing capacity limitations. AMD faced chronic capacity constraints during this period, which caused it



The evidence will show that AMD made a series of flawed decisions that contributed to its capacity constraints.

AMD publicly stated on numerous occasions that Fab 30 would be capable of producing 50 million microprocessors annually by the end of 2002 (which would have been an increase of more than 85% over what it sold in 2000, based on data

published by Mercury Research).  Supply caught up with

demand only in 2007, after AMD ramped up production from a new German facility, called Fab

36, which uses the more advanced 300-mm manufacturing technology. The construction of Fab

36 itself was delayed because of a disastrous joint venture with the Taiwanese manufacturer

UMC, which AMD's then-Chairman had described as the "wave of the future" and its current

Chairman as a "benchmark for the industry," but which was unceremoniously abandoned

without producing a single microprocessor. AMD had planned to use the joint venture for

manufacturing microprocessors instead of building its own facility.

After it filed its Complaint, AMD "acknowledged that AMD had seen tight

manufacturing capacity, but said the company was prevented from investing in new factories

because of Intel." However, after Intel filed its Answer, which pointed out that AMD's capacity

constraints limited the company's growth, AMD changed its tune and denied that it was

constrained.

Notably, in July 2005, shortly after AMD filed this lawsuit, AMD Chairman Ruiz told

investors at an earnings conference call that "[o]ur factories are fully utilized." AMD's Chief

Financial Officer reported at the same call that "we're running as much silicon as possible."

The following year, despite large investments in additional capacity, Dr. Ruiz reported that "right

now we have been and we expect to continue to be very challenged by being able to meet the

needs of our microprocessor customers just from the capacity standpoint." And as discussed

previously, later in 2006, AMD chose to shortchange some of its longstanding customers because it did not have a sufficient supply of microprocessors.

Any claim by AMD that the company would have performed even better but for exclusionary conduct by Intel is by its nature highly speculative, and it does not show harm to competition. In this instance, it is apparent that AMD could not have done better, having largely sold out its microprocessor just as it was suing Intel for excluding it from the market.

* * * * *

The discussion above highlighted just some of the many reasons for AMD's marketplace performance. A track record of unreliability, a historically poor reputation, a weak brand, poor roadmaps, lack of platform solutions, poor marketing capabilities, lack of manufacturing capacity, and a higher cost structure are among the many attributes that AMD would like to ignore in its analysis of the market. But customers do not ignore these attributes. AMD did exceptionally well with microprocessor products that met market requirements and which it was able to supply in sufficient quantities. It did less well with products that failed to meet customer requirements. ████████████████████████████████

### D.    Alleged Anticompetitive Conduct

Intel has addressed in its legal section the categories of purported anticompetitive conduct alleged by AMD, and why they fail to support a Section 2 claim. In this section, Intel will address the allegations on either a customer-by-customer or category basis. The discovery, including depositions of AMD and third parties Intel presently expects to rely upon, as well as the topics Intel expects to support with expert testimony will be covered in Section IV.

59

1.    **OEMs**

a.    **U.S. Based OEMs**

(1)    **Dell**

Until the third quarter of 2006, Dell purchased only Intel microprocessors for use in its products and did not buy microprocessors from AMD. AMD claims that Dell's decision to use Intel microprocessors exclusively before 2006 was the result of large payments to Dell and favorable discriminatory treatment, granted in exchange for Dell's commitment to buy exclusively from Intel. (Compl. ¶¶ 38-39.) AMD also alleges that Dell executives have told AMD that Intel threatened Dell with retaliation and loss of favorable treatment if Dell were to purchase AMD microprocessors. *(Id.)*

AMD's allegations are unfounded. Dell sourced microprocessors solely from Intel until 2006 based on its independent business judgment. While Dell received substantial discounts from Intel during this period, as it did after it elected to buy from AMD, Intel's discounts and pricing were not conditioned on Dell's agreement to be exclusive. ███████████████ ████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████ ████████████████████████████████████████████ Intel's pricing to Dell was always above cost.

AMD fundamentally misapprehends the dynamics of Intel's relationship with Dell. Intel does not have the ability to force Dell to act in a manner contrary to its own best interests. Throughout most of the relevant period, Dell was the world's largest computer manufacturer, with a nearly 20% share of the global computer market (although Dell's share has declined recently and today Dell is the second-largest computer maker behind Hewlett-Packard). Dell is also a much larger company than Intel. In 2006, Dell's revenues were $57.4 billion while Intel's were $35.3 billion. As a result of its size and market position, Dell wields enormous negotiating leverage with its suppliers, including Intel. Dell has the power to shift large volumes of

microprocessor purchases between Intel and AMD, and Dell exploits that power to extract lower prices from Intel. ███████████████████████████████████████████████████████

Dell's relentless focus on efficiency and cost reduction is well known. As Dell explained in its 10-K report filed on March 15, 2006, "Dell's highly efficient supply chain management and manufacturing organization, efficient direct business model, and concentration on standards-based technologies allow Dell to maintain one of the lowest cost structures among its major competitors and to pass those savings to its customers." In the same report, Dell stated that it "may establish a working relationship with a single source if it believes it is advantageous due to performance, quality, support, delivery, capacity, or price considerations" and reported that it "maintains several single-source supplier relationships."

Dell constantly negotiates with Intel to receive lower prices and/or better products or support, and it consistently plays Intel against AMD to that end. For many years, Intel and Dell understood Dell's preference for a single microprocessor supplier to further its goal of a streamlined and low-cost supply chain, but they also understood that the relationship could change rapidly if Dell believed adding AMD would be to its competitive advantage or if Intel failed to adequately maintain Dell's competitiveness. As a result, Intel has never behaved as an entrenched supplier whose customer was locked into a long-term exclusive deal. Intel responded to Dell's constant negotiating demands by providing necessary "meet comp" discounts to meet competition from AMD or from AMD-based systems.

Dell's announcement in May 2006 that it would begin using AMD's Opteron microprocessor in its servers confirmed that no exclusivity agreement with Intel existed and Dell was free to use AMD if it so chose. After that announcement in May 2006, Dell rapidly expanded its AMD-based product offerings and soon began to offer server, desktop, and mobile products throughout its lineup with either AMD or Intel microprocessors. Within months of sourcing from AMD, by the first quarter of 2007, ██████████████████████████████ ████████████████████████████

61

Dell's decision to use AMD microprocessors and to shift a large volume of its microprocessor purchases to AMD flatly belies AMD's allegation that Dell feared "retaliation" from Intel if it bought from AMD or that such fear prevented AMD from competing. That Dell's executives did not believe Intel would stop negotiating with Dell on a meeting competition basis is further supported by the economic realities of the industry. It would not make economic sense for a supplier such as Intel to try to punish its largest customer by refusing to continue to provide attractive discounts, which would only increase the attractiveness of AMD products to Dell.



The evidence will show that Dell had many legitimate reasons to source microprocessors solely from Intel before 2006.



AMD has publicly acknowledged that, during the period when Dell was sole sourcing

microprocessors, Dell used AMD as a negotiating lever with Intel to obtain the full benefit of competition. As AMD marketing executive Hal Speed explained, "[w]henever Dell was negotiating with Intel, our phones would light up and we'd do the pilgrimage. But as long as Dell was getting concessions from Intel, and the systems were selling through to their customers, why would they add another supplier?" AMD Vice President Ben Williams explained that dealing with AMD added costs and complexities that Dell could avoid by sole sourcing: "[a]dding another processor supplier increased the complexity of their business. It added complexity to their design and manufacturing processes, as well as to what their salespeople sold. Also, they were comfortable with Intel."



AMD executives have also acknowledged that during the period of alleged exclusivity Dell had serious concerns about AMD's manufacturing capacity, admitting that AMD needed to

63

add capacity sufficient to meet Dell's requirements before Dell would purchase AMD microprocessors. Marty Seyer, Senior Vice President of AMD's commercial segment, admitted that "Dell had other concerns about AMD's ability to supply Dell with a sufficient number of chips. . . .'The message to us (from Dell) two or three years ago was loud and clear: AMD needed to put in place the capacity to meet the expected demand.'" Mr. Seyer's comment was echoed by AMD Board Member Mort Topfer, who said in an interview in 2005, "AMD, if they are ever going to be a supplier, has got to meet all of its needs without compromising Dell's ability to serve the market. If it were to go into the notebook or desktop space, it would take a lot of [AMD] capacity."

Dell senior executives have also publicly cited AMD's lack of sufficient capacity to adequately serve Dell's very substantial volume requirements as the reason for AMD's prior lack of success at Dell. In 2004, Kevin Rollins, Dell's then-CEO, explained, "If we basically sucked up all of AMD's capacity it still would not be enough. They do not have enough capacity as we speak today."

AMD did add substantial manufacturing capacity in 2006. AMD opened a $2.5 billion microprocessor fabrication facility in Dresden, Germany, in October 2005, which made its first microprocessor shipments in March 2006. AMD also supplemented its own capacity by entering into a foundry agreement with another semiconductor manufacturer, Chartered Semiconductor Manufacturing, which began producing revenue shipments of microprocessors for AMD in June 2006. As a result of these and other steps, AMD's manufacturing capacity increased to 60-65 million units at the end of 2006, nearly double the capacity AMD had in 2003 and 2004. It is

apparent that Dell's decision to source from AMD in 2006 reflected AMD's enhanced capacity to serve Dell.[31]

Despite Dell's concerns about AMD's capabilities and capacity during the alleged period of exclusivity, Dell repeatedly evaluated AMD products. Indeed, that Dell undertook the investment to continuously evaluate AMD as a supplier reveals that Dell did not understand that it was under any exclusivity obligation to Intel. Dell's decision to add AMD as a second source in 2006 after AMD increased its manufacturing capacity demonstrates that there never was any exclusive dealing agreement between Intel and Dell.

### (2)    Hewlett-Packard

Hewlett-Packard is now the largest desktop and notebook personal computer manufacturer and it accounts for roughly 30% of all servers sold worldwide. (*E.g.*, Compl. ¶ 30.) HP employs an aggressive dual source strategy, using and promoting both Intel and AMD-based systems. Its annual revenue has increased from roughly $56 billion in 2002, the year it merged with Compaq, to more than $100 billion today. HP is more than twice Intel's size.

The evidence will show that HP has long purchased microprocessors from both AMD and Intel in every segment of its business. HP is a sophisticated purchaser that routinely requires Intel and AMD to bid against each other in order to maximize price concessions. As a result, HP shifts significant amounts of its business back and forth between the companies.

The evidence will demonstrate that AMD has thus been quite successful in winning HP's business across all of its product lines. In fact, HP has been AMD's single largest customer for many years and *AMD has at times won the majority of HP's consumer notebook and desktop business* – as AMD itself concedes. (*E.g.*, Compl. ¶ 64 ["AMD capture[d] nearly 60% of HP's U.S. retail sales" in a specified quarter].) HP publicly touts its role over the last 10 years as the

---

31  Even so, AMD's attempts to serve Dell's needs led to shortages of AMD microprocessors and led AMD to curtail shipments to longstanding customers in order to satisfy Dell.

first major OEM to introduce "a multitude" of AMD-based PCs including the first AMD-based consumer desktop system, the first AMD-based corporate desktop system, the first Athlon 64-based desktop for home and small office users, and the first Athlon 64-based media center PC.

AMD has also won significant amounts of HP's server business since its introduction of the Opteron microprocessor in 2003, and, in a 2006 press release, HP described itself as the world's "leading provider of AMD Opteron-based server systems." This is obviously significant, given HP's status as the world's largest server company. (Compl. ¶ 30.) The only segment in which AMD has not gained a significant share of HP's microprocessor purchases is in the corporate segment. HP has consistently relied on Intel microprocessors for its desktop and notebook systems aimed at corporate customers.

The Complaint ignores AMD's successes in HP's consumer desktop, consumer notebook, and server businesses and ██████████████████████████████████████████ AMD makes five separate allegations about HP in the Complaint, but a careful analysis of those allegations reveals that the only allegation that Intel interfered with AMD's sales to HP of a non-trivial volume of processors concerns the corporate segment, for which AMD did not have suitable offerings.

The Complaint's central allegation is that Intel "pressured" HP in the summer of 2002 as it was about to introduce the first AMD-based corporate desktop system, called the D315. There is no dispute that HP introduced the D315 on August 19, 2002. But AMD alleges that after AMD offered HP one million "free" microprocessors to break into its corporate line, Intel offered discounts on Intel microprocessors of such magnitude that HP decided not to take most of the free microprocessors.

████████████████████████████████████████████████████████
████████████████████████████████████████████████████████
████████████████████████████████████████████████████████ While AMD

has alleged that it offered the "first million microprocessors for free" (Compl. ¶ 48),



Intel intends to

establish through discovery the many valid reasons (in addition to and apart from Intel's

discounts to OEMs) why corporate customers preferred Intel-based systems.

AMD also alleges that Intel convinced HP to withdraw its *offer* to AMD (not an

agreement) to sell the D315 under its "EVO" brand name and "with[e]ld" the desktop from its

network of independent resellers. (Compl. ¶ 48.)

The remaining Complaint allegations regarding HP are of lesser significance and affect a

small volume of sales. Intel believes all the allegations lack merit, but in particular:

(1) AMD alleges that in September 2003 HP supported the launch of AMD's Athlon 64

microprocessor, but not as fully as AMD expected: AMD claims HP committed to support the

67

launch "by producing a promotional video and by sending senior executives to all three launch sites," but that HP, instead, "pulled the video and announced that [it] would only be sending a junior manager, and then only to Europe." (Compl. ¶ 80.)

　　　(2) AMD alleges that during the holiday 2004 season Intel "purchased HP's exclusivity" for a single model of consumer notebook. (*Id.* ¶ 49.)

However, AMD regularly attained a higher share than Intel of HP's consumer business – a fact that flies in the face of any claim that Intel has somehow excluded AMD from dealings with HP.

　　　(3) AMD alleges that during the fourth quarter of 2004 Intel withheld a quarterly rebate from HP after AMD captured 60% of HP's U.S. retail notebook sales. (*Id.* ¶ 64.)

### (3)　IBM

IBM's current business based on x86 microprocessors is limited to the development, manufacture and sale of certain computer servers (generally known by IBM as its xSeries products). IBM sold its business unit that was responsible for the development and sale of desktop and notebook product lines (its Personal Computing Division or "PCD") to Lenovo Group ("Lenovo") in May 2005.

　　　AMD's allegations with respect to Intel's dealings with IBM relate to both servers and PCs. In light of the sale of IBM's Personal Computing Division to Lenovo in 2005, Intel will address in this section only the allegations that relate to IBM's server business. The allegations relating to IBM PCs will be dealt with in the subsequent section relating to Lenovo, which now owns that portion of IBM's business.

Regarding IBM's server business, AMD alleges that, after IBM joined AMD as a launch partner for AMD's Opteron microprocessor in 2003, Intel "dissuaded IBM from aggressively marketing Opteron servers" and "paid IBM to shelve any further Opteron development" beyond "one Opteron computer model to a single target market segment (High Performance and Technical Computing)." (Compl. ¶ 52.) AMD alleges that "IBM also took Intel money in 2004 to scrap plans for a multiple-microprocessor Opteron server." (*Id.*)

AMD further alleges that it had "been engaged with IBM about introducing an Opteron 'blade' server, when IBM suddenly announced that any such product it distributed could not bear an IBM logo" because IBM allegedly feared "Intel retaliation" if IBM were to release the server under the IBM brand. (*Id.* ¶ 76.) A "blade" server is a modular server that is housed in a single chassis with multiple server modules, each of which is a separate server.

The facts will establish that AMD is wrong. In fact, Intel never "paid IBM" to limit IBM's marketing of Opteron-based systems or to "shelve" development of Opteron servers. Nor did Intel enter into any agreements with IBM to "scrap" any plans for IBM to launch a multi-processor server using AMD's Opteron microprocessor. Intel competed to sell its products on the merits, through discounts and technical and marketing support. Throughout the time period covered by AMD's Complaint, IBM launched a series of Opteron-based servers without any resulting "retaliation" from Intel. IBM was the first major OEM to introduce AMD Opteron-based server products in 2003, beginning with IBM's e325 server. Over time, IBM steadily added other AMD Opteron-based products to its server product lineup, including a workstation in 2004, a blade server in 2005, and multiple other server designs beginning in 2006. In fact, IBM was a partner in the launch of the AMD Opteron microprocessor and IBM uses Opteron microprocessors in an array of servers throughout IBM's product lineup. AMD has hardly been "excluded" from IBM's server business.

With respect to IBM's alleged decision to not launch certain AMD Opteron-based server products, such as a multiprocessor ("MP") server in 2004,[32]



Similarly, the evidence will show that AMD's allegations regarding the Opteron-based blade server also lack merit. IBM and AMD announced this project in early 2005 and the product was introduced in June 2005. There is no allegation that Intel delayed IBM's introduction of this product, "punished" IBM for introducing it, or interfered with its sales to end customers. Rather, AMD complains only that Intel induced IBM to refrain from branding the blade server with an IBM logo and claims that "IBM reported that it could not appear overly supportive of AMD server products because it feared Intel retaliation." (Compl. ¶ 76.) The evidence will refute this baseless allegation. IBM even announced the Opteron-based blade server at an AMD press event in early 2005, an act that was "supportive of AMD server products."

---

32  A multiprocessor server uses four or more microprocessors, which share the computing workload by operating in parallel. Such servers are typically used for more demanding computing applications.

### (4)    Gateway

Gateway was a freestanding OEM that merged with eMachines in 2004 and then was acquired by Acer in August 2007. Gateway's business, founded in the mid-1980s, was almost entirely focused on the U.S. retail consumer personal computer segment (primarily through hundreds of "Gateway Country" branded stores and direct over the Internet). Gateway was not a significant player in the large corporate PC or server segments.[33]

Paragraph 45 of AMD's Complaint alleges that Gateway bought only Intel microprocessors from 2001 to 2004. It alleges that Intel obtained a sole source relationship by offering discounts to Gateway which AMD does not allege were below cost. In other words, AMD is complaining about above-cost discounts, which promote competition on the merits and benefit consumers.

After the merger with eMachines, which used AMD microprocessors, Gateway began to purchase AMD microprocessors. While Paragraph 50 alleges that AMD had "limited success" in very narrow pieces of Gateway's business following its merger with eMachines, (*i.e.*, its minuscule server and corporate businesses, and its direct Internet sales), it conspicuously fails to acknowledge AMD's extraordinary success over the last few years in the main focus of Gateway/eMachines's business: its desktop and laptop sales to "Big Box" retailers and consumers.[34]

---

[33]  For example, Complaint ¶ 30 alleges that Gateway had 0.16% of the worldwide server sales. Its desktop and laptop shares were not much bigger: roughly 2.5% and 1.5%, respectively, virtually all aimed at retail U.S. consumers. Gateway had a small "Professional" PC business, aimed small and medium business owners, governments, and schools in the U.S., but it divested that business to MPC Corporation in the fall of 2007 shortly after Gateway was acquired by Acer.

[34]  Paragraph 50 also alleges that unspecified "Gateway executives" (at an unidentified time and context) said that unspecified "retaliation" by Intel had "beaten them into 'guacamole.'" (Compl. ¶¶ 50, 73 [same].) Intel is unable at this time to address the obvious hyperbole of this allegation, other than pointing out its inconsistency with Gateway's frequent purchase of significant quantities of AMD microprocessors for its core consumer segment.

The Gateway allegations have no merit. Gateway decided for its own reasons to source solely from Intel between late 2001 and early 2004. According to the Complaint, Gateway had been unable to turn a profit with AMD-based products. As a result, Gateway placed more emphasis on Intel-based products in order to upgrade its product offerings, appeal to higher-end consumers, and return to profitability. After the eMachines merger, Gateway took a different approach and purchased the majority of its microprocessors for the consumer segment from AMD. This reflects normal competition.

### b.    Foreign OEMs

The Court's ruling on the FTAIA has eliminated these claims. Intel sets forth its position concerning the allegations involving the foreign OEMS (as well as foreign retailers and distributors) without prejudice to its position that the conduct alleged is beyond the jurisdiction of the Court.

### (1)    Toshiba

AMD's claims relating to Toshiba are focused solely on the 2001 time period. AMD alleges that "Toshiba received a very substantial payment from Intel in 2001 not to use AMD processors[]" and "thereupon dropped AMD." (Compl. ¶ 41.) AMD identifies no other specific conduct or time period relating to Toshiba, alleging only generally that Toshiba was "hooked" on "market development funds estimated to be worth $25-30 million per quarter" that would be eliminated if Toshiba used AMD. (Id.)

AMD's allegations have no support. The documents produced to date show that 



Toshiba's decision to drop AMD had nothing to do with Intel rebates.

In May 2007, Toshiba announced that it would reintroduce AMD into its lineup and shifted purchases to AMD.

(2)    <strong>Sony</strong>

AMD's allegations regarding Sony are limited to 2003. According to the Complaint, AMD's share of Sony's purchases increased through 2002, rising as high as 22% in 2002. AMD claims that Intel regained share at Sony thereafter through monetary payments "disguised" as discounts: "[I]n 2003 Intel paid Sony multimillion dollar sums, disguised as discounts and promotional support, in exchange for absolute microprocessor exclusivity . . . [and] Sony abruptly cancelled an AMD Mobile Athlon notebook model." (Compl. ¶ 40.) According to AMD, its share of Sony's business declined from its 22% peak in 2002, to 8% in 2003, and to 0% thereafter. (*Id.*)

The evidence will convincingly show that



---

35  Toshiba's computer division is based almost exclusively on notebooks.



### (3)    Lenovo

Lenovo operates as two primary business units: (a) Lenovo China, which is focused on the development, manufacture and sale of computers within the People's Republic of China and, more recently, in certain emerging markets in South Asia and is a foreign OEM; and (b) Lenovo International, which is based in North Carolina and is the successor to IBM's former Personal Computing Division that Lenovo acquired in May 2005.

AMD's Complaint includes no substantive allegations regarding Lenovo, with the exception of allegations related to IBM's former PC Division. At the time AMD filed its Complaint, AMD enjoyed a substantial relationship with Lenovo, and according to published accounts, Lenovo ranked as AMD's second-largest customer. AMD has consistently sold large volumes of microprocessors to Lenovo China, and Lenovo International now offers AMD microprocessors in parts of its ThinkCentre and Lenovo 3000 desktop product lines in the United

States. As a result, Intel is not aware of any issues in this litigation regarding its relationship with Lenovo.

With respect to the former IBM PC Division now owned by Lenovo, AMD alleges that it had begun negotiations in 2000 with IBM "over a proposed commercial PC business relationship," but that Intel won the business with an "incentive-based program under which Intel would become IBM's 'preferred supplier' for processors in commercial products." (Comp. ¶ 51.) AMD further alleges that "preferred" meant "exclusive." (*Id.*) As a result of this alleged exclusivity commitment, AMD claims that IBM terminated negotiations with AMD. (*Id.*) AMD also alleges more generally that at some undefined point, Intel "purchased IBM exclusivity in its 'ThinkCentre' line of commercial desktops," and that "[w]hen AMD pressed IBM to add an Athlon 64 model to its 'ThinkCentre' roadmap, IBM executives explained that the move would cost them important Intel subsidies, and they declined." (*Id.* ¶ 53.)

AMD's allegations, when stripped of their hyperbole, amount to little more than complaints that Intel, not AMD, won certain microprocessor supply competitions by reducing its prices in response to competitive offers from AMD. There are no allegations that Intel employed below-cost pricing to win the competitions. While it is true that IBM's PC Division used only Intel's microprocessors during much of the time period covered by the Complaint, that does not mean that IBM entered into an exclusive dealing agreement with Intel or was contractually prohibited from purchasing from AMD. There never was any such agreement. AMD was never foreclosed from the opportunity to compete for sales at IBM. The ThinkCentre products, in particular, were aimed at commercial customers, and we have already shown that even AMD's highest ranking executives have admitted that AMD lacked suitable offerings for these customers. It is little wonder that AMD's OEM customers reached the same conclusion.

Similarly, the isolated examples that AMD cites regarding its purported negotiations to supply microprocessors for IBM's ThinkCentre lineup allege nothing more than AMD's dashed hopes that its discussions with IBM would result in microprocessor sales. AMD identifies no conduct by Intel, other than discounting, that induced IBM to select Intel's products over AMD's

offerings. AMD makes no allegations that Intel's pricing to IBM was below any appropriate measure of cost. Absent below-cost pricing, Intel's discounts to IBM are procompetitive and lawful under the antitrust laws.

### (4)    NEC/NECCI

AMD's claims with respect to NEC rest upon an unsustainable characterization of an agreement between NEC and Intel reached following negotiations in May 2002. AMD alleges that under that agreement, "Intel agreed to pay NEC more than 300 million yen per quarter in exchange for . . . at least 90% of NEC's business in Japan[] and . . . an overall worldwide quota on NEC's AMD dealings." (Compl. ¶ 42.)[36] AMD also alleges that "Intel pointed its gun at NEC" to secure a greater share of AMD's business by threatening to "discontinue providing NEC with the technological roadmap of future Intel products" and threatening to "'destroy' NEC-CI [NEC's European subsidiary] for engaging with AMD in the commercial desktop segment." (*Id.* ¶¶ 74-75.) And AMD contends that as a result of these practices, its share of NEC's business "dipped from nearly 40% to around 15%, where it stands today." (*Id.* ¶ 42.)

AMD's allegations mischaracterize the facts. The agreement reached between Intel and NEC in May 2002 was the product of ordinary commercial negotiations between two sophisticated parties,



---

36  AMD's reference to 300 million yen, instead of a dollar amount, is intended to mask the relatively small amount at issue relative to the size of NEC's purchases. 300 million yen is about $3 million.

████████████████████████████████████████ The May 2002 agreement benefited both

Intel and NEC. Intel obtained additional, profitable sales as a result of the agreement and NEC

secured lower costs on its purchases of microprocessors from Intel.

Notably, AMD does not allege that Intel sold any of its microprocessors to NEC at prices

below Intel's costs. Nor does AMD allege that AMD (let alone an equally efficient competitor)

would have been unable to match the discount offer that Intel provided to NEC to hold onto the

sales won by Intel. The allegations in the Complaint with respect to NEC ultimately amount to

no more than a losing competitor's dissatisfaction with being bested in a commercial negotiation

affecting purchases in only two quarters, a complaint for which the antitrust laws provide no

succor and no remedy.

### (5)   Fujitsu

AMD claims that Intel "offered an undisclosed package of financial incentives" in 2003

to persuade Fujitsu to "restrict its dealings with AMD." (Compl. ¶ 43.) AMD further claims that

as a result of these alleged payments, it was and remains "locked out" of Fujitsu's commercial

notebook lines. (*Id.* ¶ 54.) AMD also alleges that Intel "purchased exclusivity" in 2003 in one

of Fujitsu's consumer notebook lines and that Intel maintains this exclusivity to this day. (*Id.*)

None of these allegations will be supported by the evidence. Throughout the period

covered by AMD's Complaint, ████████████████████████████████████

████████████████████████████████████████████████ Fujitsu is able to credibly

threaten to shift volumes of its purchases between Intel and AMD █████████████

████████████████████████████████████ AMD's claim to have been excluded

from portions of Fujitsu's business by Intel's "financial incentives" simply mischaracterizes the

results of individual seasonal negotiations in which Fujitsu determined that Intel's product

offerings (in terms of price, quality, supply, brand strength, etc.) were more competitive than

those offered by AMD. Intel has never had any type of long-term agreement with Fujitsu, nor

has any of Intel's offers to Fujitsu been conditioned on restricting Fujitsu's dealings with AMD. The Complaint contains no allegation that Intel's offers to Fujitsu were below cost, and thus Intel's discounts were procompetitive and beneficial to both Intel and Fujitsu.

The scope of AMD's claims concerning Fujitsu is carefully circumscribed, and for good reason. During the same time period in which AMD claims to have been "excluded" from Fujitsu's notebook lines, AMD consistently maintained the lion's share of Fujitsu's consumer desktop business. It is implausible in the extreme to characterize AMD's success in Fujitsu's consumer desktop line as "competition on the merits" while simultaneously claiming that Intel's comparable success in Fujitsu's notebook lines was "exclusionary." As discussed earlier, AMD's highest ranking executives have admitted that AMD did not have competitive products for notebook PCs.



The Complaint also alleges that Intel "pressured" Fujitsu to remove certain unspecified AMD-powered desktop models from its website in 2002. (Compl. ¶ 43.) This allegation is vague to the point of incomprehensibility – the Complaint fails to identify which models were allegedly subject to "pressure," what type of pressure was allegedly exerted, and whether Fujitsu experienced any adverse consequences from continuing to display AMD models on its website. The Complaint does not even allege that AMD lost any sales as a result of the alleged conduct.



Under no theory of anticompetitive conduct would such a request be unlawful.

### (6)    Hitachi

AMD's Complaint includes a cursory allegation that Intel "purchased an exclusive-dealing arrangement with Hitachi, which had been a substantial AMD customer." (Compl. ¶ 44.) In fact,  The evidence will show that Intel's discounted prices to Hitachi were at all times comfortably above Intel's costs and in most cases were substantially higher than the prices offered to Hitachi by AMD. None of Intel's discounts to Hitachi contained exclusivity requirements or in any other way restricted Hitachi from purchasing from AMD.

### (7)    Acer

AMD does not allege that Intel engaged in improper rebating or pricing practices with Acer, or that there was an exclusive deal. Rather, AMD claims that Intel used threats and financial inducements to coerce Acer into postponing its participation in the September 2003 launch of AMD's Athlon 64 microprocessor. (Compl. ¶ 79.) Specifically, AMD alleges that during a meeting in Taiwan with Acer's senior executives just prior to the planned launch, Intel's then-CEO, Craig Barrett, threatened Acer with "severe consequences" if it publicly supported

AMD's Athlon 64 launch. (*Id.*) AMD claims that as a result of Dr. Barrett's alleged "threats," "Acer withdrew from the launch in the U.S. and Taiwan, pulled its promotional materials, banned AMD's use of [a videotaped endorsement by an Acer executive] and delayed the announcement of its Athlon 64-powered computers." (*Id.*)

AMD's allegations are untrue. In June 2005, after AMD made its allegations regarding the meeting between Dr. Barrett and Acer's senior executives in Taiwan, Acer's then-Chairman, Stan Shih, denied the allegations in articles in the Taiwanese press. Mr. Shih indicated in those press articles that this meeting focused on only general industry trends and that "conversation with Intel's Craig Barrett was focused on high level directions, not on execution matters."

In addition, within days of the AMD Athlon 64 launch in September 2003, Acer publicly announced that it planned to release Athlon 64-based PCs, but was delaying the release of Athlon 64-based PCs until early 2004 due to a shortage of Athlon 64 microprocessors. In an September 29, 2003 article in PC World that was published within a week of AMD's Athlon 64 launch, Acer explained that, in view of a worldwide shortage of Athlon 64 microprocessors, it decided to launch its Athlon 64-based products "when more Athlon 64 chips are expected to be available." According to the PC World article:

> AMD has told PC makers that 100,000 Athlon 64 chips will be available
> worldwide during the fourth quarter, according to James Chen, the head of Acer's
> desktop PC products line. Calling that number "too small," Chen says Acer plans
> to hold off on the introduction of Athlon 64-based PCs until next year. The
> company will roll out its first Athlon 64 systems in Europe during the first
> quarter, with worldwide availability during the second quarter, when more Athlon
> 64 chips are expected to be available, he says.

Thus, based on the statement of Acer executive James Chen in this September 2003 article, as far as consumers were concerned, Acer was fully committed to launching PCs with the new AMD chip in the first quarter of 2004 after an adequate supply of chips was available.

Acer in fact launched its Athlon 64-based notebooks in February 2004, after AMD began alleviating the shortage. Acer was the first major OEM to launch Athlon 64-based notebooks in Europe and the United States. The evidence will show that, even though Acer was the first

major OEM to launch Athlon 64 notebooks, there was no retaliation by Intel against Acer.



### c.    Specialty/Tier 2 OEMs

AMD's Complaint names only one Tier 2 OEMs, Supermicro Computer, Inc., which AMD describes as a "small, specialty OEM." (Compl. ¶ 46.)  AMD's discovery, however, has addressed several other Tier 2 OEMs as well as ODMs (Original Design Manufacturers).

AMD alleges Intel's dealings with Supermicro foreclosed AMD from a part of the server sector not controlled by the Tier 1 OEMs.  (*Id*.)  Additionally, AMD alleges that Supermicro utilized a "secret" development site for developing an Opteron-based server and "forbade" AMD from publicizing or marketing this server prior to its actual release.  Further, AMD alleges that in 2005 Supermicro restricted distribution of its Opteron server and promoted them it as "secret and confidential." (*Id*.)

Intel neither threatened nor pressured Supermicro to enter into exclusive deals with Intel, and no exclusive deals existed.  The reality is that, as AMD alleges, Supermicro is "the preeminent system assembler for servers and other high end computers." (*Id*.)  Supermicro has a reputation for building high quality equipment and its relationship with Intel further enhanced its reputation in the marketplace.                                                                         Supermicro's announcement in April 2005 that it would begin using AMD's Opteron microprocessor in its servers confirmed that no exclusivity agreement with Intel existed and Supermicro was free to use AMD as it saw fit, consistent with the company's business needs and strategies as well as customer demand.

81

The evidence will show that AMD's allegations that Supermicro feared retaliation from Intel for entering into a relationship with AMD are entirely unfounded. Moreover, the allegations speculate as to Supermicro's motivations, not Intel's behavior. Nor are these allegations borne out by Intel's conduct before or after Supermicro released AMD-based systems.

### 2.    Distributors

AMD alleges that Intel engaged in conduct designed to "restrict distributors from carrying AMD processors or selling AMD products into markets it deems strategic." (Compl. ¶ 88.) AMD's Complaint contains specific allegations regarding Intel's interactions with several distributors, focused primarily on the distribution channel in North America. (*Id.* ¶¶ 88-94.) In particular, AMD claims that Intel used a combination of financial incentives and threats of retaliation to limit the extent to which distributors would carry AMD processors and, in one instance, allegedly entered into an "exclusive deal" with a U.S. distributor. These claims are without merit.

AMD can hardly claim it was foreclosed from efficiently bringing its products to market through the distribution channel. Since 2000, AMD has been distributing its products through numerous distributors, including most of the largest distributors in North America (several of which are Fortune 250 companies).



Notwithstanding its obvious success in this segment, AMD alleges that Intel offered special benefits to "distributors who carry Intel microprocessors exclusively," and that Intel engaged in "retaliation" against "distributors who do business with AMD." (*Id.* ¶¶ 90-93.) Intel will show that the benefits Intel provides to its distributors are based on performance, not exclusivity, and are entirely procompetitive. In addition, Intel will show that it has not withheld discounts or other benefits from distributors who carry AMD processors – *a group that for years has included virtually every Intel distributor.* As for AMD's allegation that Intel entered into an "exclusive deal" with Synnex, a U.S. distributor that began carrying AMD products in 2005, Intel will not only show that there was no exclusive deal;



Finally, AMD alleges that Intel employed "retroactive rebates" in order to "inflict economic punishment on those who do too much AMD business." (Compl. ¶ 91). Intel's prices to distributors were above cost and the company's distributor bonus program (which AMD subsequently copied and put in place for AMD distributors) procompetitively promoted the sale

of Intel products. That AMD outsold Intel in the distribution channel for several years itself disproves AMD's allegations. Had the program foreclosed AMD from access to distributors, AMD would not have achieved more than 50% of the sales in this channel.

AMD's share of sales through the distribution channel declined after the commencement of the litigation, but this was entirely due to AMD's own strategic decisions. As AMD Chairman Ruiz explained: "We took our eye off the ball relative to the channel and, unfortunately, that is the result . . . . [W]e were unable to supply the channel. We feel bad about it, and we're disappointed. That gave our competitor an opening to gain some mind share with the channel. It is our fault, and we'll deal with it."

### 3.    Retail

AMD alleges that "Intel's dealings with retailers are unlawfully exclusionary, have no pro-competitive justification, and are intended to maintain its monopoly." (Compl. ¶ 107.) Specifically, AMD claims that Intel has (i) "made exclusive deals with many key retailers around the world"; (ii) instituted rebate programs "similar to what it foisted on OEMs, with similar exclusionary effect"; and (iii) otherwise threatened retailers "to gain preferred treatment." (*Id.* ¶¶ 99-106.) The evidence does not support these claims.

#### a.    U.S. Retail

AMD's claim that it has been excluded from competing in the retail segment of the alleged market highlights the recklessness of AMD's claims. While AMD claims in its Complaint that it had been excluded from the retail market, it touted to the public after the filing of the suit that "around the world we have 40 to 50% of the market on retail space product[s]." AMD's Chairman Ruiz in fact declared that "we are reasonably pleased with our position in consumer" and "don't feel like we need to make huge strides in consumer in the near future." According to Dr. Ruiz, "we have been very strong already in the consumer space . . . ."

AMD's performance in the retail segment belies any claim that it has been foreclosed from competing in this segment. █████████████████████████████████



The evidence will show that retailers make their purchasing decisions based largely on price (*i.e.*, which products will afford them the highest margins). This approach to purchasing and the selection of suppliers is reflective of a highly competitive market, where AMD has every opportunity to compete and succeed. The market research firm Current Analysis provided the following snapshot of this competition in July 2006, a telling look at the competitiveness of this segment:

> Intel regained its lead in the U.S. retail market after a five-month hiatus as the CPU leader. In June 2006, Intel recouped some of its market share loses [sic], just barely surpassing AMD with a 51.2% market share in the U.S. retail channel (for both notebooks and desktops). Intel's overall success in June was derived from a strong push in the notebook segment, which allowed Intel to recover from its 60%-or-below share figures in the U.S. retail notebook market. However, AMD continued to dominate the U.S. retail desktop market.

AMD cannot sustain a claim for monopolization based on alleged foreclosure from the U.S. retail segment of the market. There is no evidence to suggest that the U.S. retail segment is anything but a fully functioning and competitive market.

### b.    European Retail

AMD contends that "AMD has been entirely shut out from Media Markt, Europe's largest computer retailer, which accounts for 35% of Germany's retail sales. . . . In the United Kingdom, Intel has locked up substantially all of the business of DSG (Dixon Services Group), operator of three major chains including Dixon and PC World that collectively account for two thirds of the U.K." (Compl. ¶¶ 100-01.) Alleged conduct involving European retailers is the paradigm of conduct outside the reach of the U.S. antitrust laws. In any event, AMD's claims of exclusion are directly contradicted by the company's public statements regarding the strength of its performance in retail "around the world." Indeed, AMD was able to capture and hold approximately 30% of the European retail segment from 2001 through 2006.

The evidence will show that AMD has had every opportunity to compete and succeed in the European retail segment. There are scores of retailers in this segment of the market. These retailers pick and chose suppliers based on which products will make them most competitive and allow them to make the most money. Some retailers choose to align themselves with Intel, and some chose to align themselves with AMD. And these decisions are made and re-made each quarter. While certain of the major European retailers, such as Media Markt and Dixon's, may have decided to sell mostly or solely Intel-based products during the relevant time period, the evidence will show that these retailers were free at any time to shift their procurement strategies. Moreover, there is no shortage of retailers ready and willing to offer AMD-based products.

### 4.    Compilers

AMD's grievances about Intel's compilers can be reduced to its allegation that "Intel has designed its compiler purposely to degrade performance when a program is run on an AMD platform." (Compl. ¶ 125.) This allegation is groundless. Intel does not purposely degrade the performance of programs running on AMD microprocessors. AMD's true complaint appears to be that Intel has failed to design its compiler products, an area where Intel is a small player relative to most of its competitors, in a manner that best suits the interest of AMD. The antitrust laws do not require a firm to design products that optimally benefit its rivals.

The evidence will show that some of Intel's compilers distinguish between Intel microprocessors and all other manufacturers' microprocessors implementing certain optimizations that were designed around features of Intel's microprocessors. The evidence will also show that Intel has good and reasonable business and technical justifications for making these distinctions. There are additional costs associated with implementing optimizations on non-Intel microprocessors that Intel has elected not to incur except when sound business reasons warrant. Intel has no obligation to incur extra costs to help AMD.



In this same regard, the evidence will show that AMD's claims that Intel's compiler performance is "degraded" on AMD microprocessors (*id.* ¶¶ 125-26), and that Intel has exhibited "deviousness," (*id.* ¶ 126), are not true. In fact, Intel's compilers, far from degrading performance on AMD microprocessors, consistently performed better on AMD microprocessors than all competitors' compilers.

The evidence, including documentary evidence that already has been identified, has confirmed that Intel achieved this goal; it has been documented that AMD has used Intel compilers to achieve its best performance results for its microprocessors. Thus, far from AMD's claims that it has been Intel's strategy to "sacrifice[] its own product quality and integrity" and that Intel has gone out of its way to "compromis[e] performance" of its compilers on AMD microprocessors, (*id.* ¶ 122), the evidence will show that the opposite is actually true.

### 5. Standard Setting

AMD complains that "Intel has employed, and continues to employ, a variety of tactics that have the purpose and effect of excluding and/or hampering AMD's full and active participation in the development of important industry standards. It has also worked to deny

87

AMD timely access to such standards. Its efforts have hampered AMD's ability to vigorously compete in the market." (Compl. ¶ 108.)

AMD identifies two specific examples of Intel's alleged misbehavior in the standard-setting context: (1) Intel's participation in the Advanced DRAM Technology Consortium ("ADT") regarding a next-generation DRAM standard (*id.* ¶¶ 110-13); and (2) Intel's participation in the Joint Electronic Device Engineering Council ("JEDEC") regarding the transition from the DDR2 to the DDR3 standard (*id.* ¶¶ 117-21.) But AMD admits that the standard-setting process did not result in the adoption of the standard that Intel allegedly advocated in either case, meaning that AMD could not have been harmed. Beyond this admission, AMD's allegations betray and the evidence will show that Intel did nothing actionable – the two examples alleged by AMD are nothing more than Intel's routine participation in standard-setting efforts of the type that the Third Circuit has endorsed. In fact, the evidence will show that Intel went out of its way to accommodate AMD in the course of standards development – accommodations that were not legally required but that Intel nevertheless offered.

Beyond these examples, AMD has been vague about its standard-setting allegations and has rebuffed Intel's efforts to seek greater clarity about them. In its Complaint, AMD refers to a "'secret' committee" between Intel and various third parties but has declined to elaborate on how this particular private standard-setting effort in any way violates the antitrust laws. (*Id.* ¶ 114.) Further, AMD's written discovery requests have suggested that Intel's alleged standard-setting conduct is wrongful in other respects. Intel will seek such clarification in the first instance through formal written discovery.

### E.    Damages/Injunction

Even if AMD prevails in the liability phase of this case, it must prove that it is entitled to a remedy. AMD requests two remedies in its Complaint: (a) treble damages "in an amount to be proven a trial"; and (b) injunctive relief prohibiting Intel "from engaging in any further conduct

unlawful under Section 2 of the Sherman Act[.]" (Compl. Prayer for Relief at p. 47.) As AMD has set forth these general statements, Intel can only set out below general principles applicable to the remedy issues in the case.

### 1.    Monetary Damages

A damages analysis under Section 2 of the Sherman Act is grounded on the requirement of causation. "Causation of loss – the nexus between the defendant's illegal activity and injuries suffered must be reasonably proven." *In re Lower Lake Erie Iron Ore Antitrust Litig.*, 998 F.2d 1144, 1176 (3d Cir. 1993). To meet this burden, AMD's damages calculation must disaggregate the effects of all legitimate competition and "reflect only the losses directly attributable to *unlawful* competition." *MCI Commc'ns Corp. v. AT&T Corp.*, 708 F.2d 1081, 1161 (7th Cir. 1983) (emphasis in original). Put another way, AMD's damages calculation "must provide the jury with a reasonable basis upon which to estimate the amount of its losses caused by other factors, such as management problems, a general recession or lawful factors." *U.S. Football League v. Nat'l Football League*, 842 F.2d 1335, 1378-79 (2d Cir. 1988); *see also Coleman Motor Co. v. Chrysler Corp.*, 525 F.2d 1338, 1353 (3rd Cir. 1975) (rejecting damages calculation that was "attributable at least in part to lawful competition of [the defendant]"); *Blue Cross & Blue Shield United v. Marshfield Clinic*, 152 F.2d 588, 593 (7th Cir. 1998) (no damages where plaintiff's expert "fail[ed] to correct for salient factors, not attributable to the defendant's misconduct, that may have caused the harm of which the plaintiff [was] complaining"). In addition, as AMD itself has conceded, the Court's decision "precludes AMD from pursuing damage claims based on lost sales of AMD's German-made microprocessors to foreign customers." (AMD's October 30, 2006 Motion to Compel D.I. 300). Any "export commerce" claim would be limited to damages to the "export business" of AMD, which was entirely discontinued in 2004.

To defend against AMD's damages claims, Intel must obtain discovery of facts relating to AMD that negatively affected its performance in the market. This includes, but is not limited

89

to: (a) the performance, supply, and service of AMD's microprocessors, (b) AMD's capacity constraints, (c) AMD's internal cost structure, (d) the competitiveness of AMD's offers to OEMs; (e) the suitability of AMD's products for specific market segments, and (f) general deficiencies in AMD's management or business strategy. Intel will also challenge AMD's damages calculation to the extent it does not control for the factors that negatively affected its market performance or profits, irrespective of any unlawful conduct by Intel.

### 2.    Injunction

Injunctions and money damages are "complementary remedies for a single set of injuries." *Cargill, Inc.*, 479 U.S. at 113. As with damages, an injunction must address the "threatened loss or damage 'of the type the antitrust laws were designed to prevent. . . .'" *Id.* (quoting *Brunswick Corp.*, 429 U.S. at 489). It should not protect competitors "from the loss of profits due to continued competition, but only against the lost profits from practices forbidden by the antitrust laws." *Id.* at 116.

Even if AMD proves liability for past conduct, a complementary injunction remedy against future conduct is likely to be unnecessary or, worse, harmful to competition. Any injunction that limits Intel's ability to provide above-cost discounts would likely lead to the "perverse result" of higher prices and less competition. *See id.* (denying injunction because antitrust laws should "permit dominant firms to engage vigorous competition, including price competition" (internal quotations omitted)); *see also Brooke Group*, 509 U.S. at 226 ("mistaken interferences" against pricing-cutting are "especially costly because they chill the very conduct the antitrust laws are designed to protect" (internal quotations omitted)). This concern for false positives that led to unfair punishment of procompetitive conduct with treble damages is embedded in the history of antitrust jurisprudence. *See Trinko*, 540 U.S. at 414.

Beside the risk of false positives, an injunction against Intel is inappropriate as a practical matter. As recognized by the Supreme Court in *Trinko*, "[a]n antitrust court is unlikely to be an effective day-to-day enforcer" of the Sherman Act because regulation of above-cost pricing is

"beyond the practical ability of a judicial tribunal to control." *Id.* at 414-15. This problem is particularly acute in highly dynamic industries that reflect the "incessant, complex, and constantly changing interaction" of customers and their suppliers. *Id.* at 414.

Here, there are no standard pricing contracts between Intel and its OEM customers. Each deal is negotiated separately and reflects changing market dynamics and accounts for new and developing technologies. No court should be tasked with controlling the price and terms under which highly sophisticated OEMs purchase microprocessors. *Id.* ("'No court should impose a duty to deal that it cannot explain or adequately and reasonably supervise. The problem should be deemed irremedia[ble] by antitrust law when compulsory access requires the court to assume the day-to-day controls characteristic of a regulatory agency.'" (quoting Phillip Areeda, *Essential Facilities: An Epithet in Need of Limiting Principles*, 58 Antitrust L.J. 841, 853 (1989)). Were this Court to embark on the task of regulating each pricing negotiation, the result would be a limiting of Intel's pricing discretion, to the detriment of consumers. Finally, contracts between Intel and foreign customers, outside the reach of the Sherman Act by the FTAIA, are not subject to any U.S. remedy. *See Empagran*, 542 U.S. at 166.

## IV.    REQUIRED DISCOVERY AND SUBJECTS OF EXPERT TESTIMONY

### A.    Staged Discovery Proposal

AMD contends that it needs discovery of Intel's foreign sales and conduct to develop evidence of Intel's alleged worldwide market power and alleged anticompetitive actions abroad to acquire or maintain that power. Yet under the plain language of the FTAIA, and under *Brunswick*, even if AMD proved global monopolization (which it cannot), AMD can only recover for losses caused by anticompetitive conduct engaged in by Intel in U.S. domestic commerce. In addition, inasmuch as the core issue in AMD's case is the allegation that Intel engaged in pricing practices that were anticompetitive, a critical and potentially dispositive inquiry is whether Intel engaged in below-cost predatory pricing. In light of these converging

considerations, Intel proposes that deposition discovery be staged to focus first on whether plaintiffs can make these critical showings.

Intel believes the most efficient approach would be to have a first stage of deposition discovery focused on party and third-party witnesses associated with the major U.S. OEMs, distributors and retailers. Witnesses that relate solely to foreign conduct, both party and third-party, would be part of a second phase, to the extent that their testimony is necessary. Given the challenges and inconvenience associated with scheduling more than one deposition of the same witness, witnesses that cover both domestic and foreign conduct would be deposed on all issues. The Special Master and the Court can reconvene when the first phase of discovery is nearly complete to determine what substantive issues can then be addressed based on the results of that discovery, and what foreign discovery may be necessary. There is little doubt that the first phase of this staged deposition discovery will require massive effort, and will focus the parties on the critical and potentially dispositive issues in the case.

**B.    Discovery Intel Needs To Take from AMD**

**1.    Overall Proposal**

In its letter brief of February 15, 2008 submitted to Special Master Poppiti, Intel proposed that each party should be allocated (i) 50 depositions of the other party's current and former employees, (ii) 25 depositions of third-party witnesses, and (iii) 10 days (or 70 hours) to conduct 30(b)(6) depositions of the other party and third parties. This proposal is based on Intel's view, framed by the legal discussion above, that the initial and primary deposition discovery should focus on U.S. conduct and effects, and cover the major U.S. OEMs, distributors, and retailers, and as well as party witnesses who can speak to the various aspects of domestic competition. Intel proposes that witnesses focused on foreign conduct would be moved to the second phase. Given the inefficiencies in scheduling more than one deposition of the same witness, Intel recognizes that any deposition taken would cover all topics.

Intel's position is bolstered by AMD's February 22, 2008 letter to the Special Master, at page 4, where AMD identifies by name what it describes as the twelve "key" customers for which it "will have to develop and present evidence . . ." – OEMs, "whitebox manufacturers and value added resellers,' "distributors, and retailers." While AMD adds a tag-on phrase of "and others," it lists the same third-party U.S. companies that Intel believes should be covered in the first phase of discovery, specifically: OEMs Dell, Hewlett-Packard, IBM (including the U.S. operations sold to Lenovo), and Gateway; whitebox manufacturers SuperMicro and Rackable; distributors Ingram, Synnex and Tech Data, and retailers Best Buy, Circuit City, and Fry's.[37] Deposing party witnesses and third-party witnesses as to these twelve AMD-identified third parties, which will necessarily include some foreign-related discovery, should provide ample evidence for the Court to consider in determining what, if any, additional deposition discovery relating to Intel's foreign conduct should follow.

Intel sets forth below the AMD and third-party witnesses it presently contemplates deposing in the first phase. Out of an abundance of caution, it has identified nearly its full complement of individual and 30(b)(6) witnesses. Intel believes, that as it conducts the depositions, it is likely to be able to eliminate some of them, thus reserving some depositions for later foreign discovery if necessary. If both sides follow the same protocol, and engage in double-tracking, there would be enough deposition days to permit the parties to each complete their first phase depositions by early 2009.

If AMD pursues a deposition program including Intel witnesses relevant only to foreign conduct and 70 or more third parties that it had identified (many foreign based), then Intel would need to revisit the list of AMD and third-party witnesses it needs to depose to be defend itself.

---

[37] AMD's letter also lists foreign OEMs Lenovo, Sony, NEC, and Toshiba, but there is no reason why AMD would need to depose party witnesses or third-party witnesses unique to these foreign OEMs in the initial round of depositions. Moreover, since AMD's depositions of Intel witnesses will not be strictly limited to domestic commerce, AMD will be able to obtain some discovery relating to those foreign concerns in the first phase.

2.    **Individual Depositions**

With the caveat above, Intel has identified 50 current or former AMD employees that it

intends to depose; these deponents are readily grouped into the three categories below.

1.    **High-Level Executives:**  Certain high-level AMD executives are or were directly
involved in, or have relevant knowledge of, AMD's decision-making and
execution (or lack thereof) with respect to many, if not all, of the areas in which
Intel and AMD compete against each other, as well as AMD's dealings with the
major U.S. OEMs, distributors, and retailers.  These executives include:



2.    **Product Design, Performance, and Price :**  Certain AMD executives are or were
directly involved in, or have relevant knowledge of, AMD's decision-making and
execution (or lack thereof) with respect to AMD's desktop, notebook, and server
products.  These executives include:



3.    **Manufacturing and Supply:**  Certain AMD executives are or were directly
involved in, or have relevant knowledge of, AMD's decision-making and
execution (or lack thereof) with respect to AMD's manufacturing, assembly, and
other supply and delivery issues (including but not limited to AMD's ill-fated
decisions in 2000 to convert Fab 25 to flash production and in 2002 to enter into a
foundry agreement with UMC).  These executives include:



4.   **Commercial Segment and Platform Development:** Certain AMD executives are or were directly involved in, or have relevant knowledge of, AMD's decision-making and execution (or lack thereof), including AMD's recognition of the need to offer commercial customers a stable platform, with respect to AMD's efforts to sell its products to U.S. commercial accounts and the major U.S. OEMs supplying those accounts. These executives include:



5.   **Sales and Marketing:** Certain AMD executives are or were directly involved in, or have relevant knowledge of, AMD's sales and marketing efforts. These executives include:



6.   **Account-Related Executives and Other Employees:** Certain AMD executives and employees are or were directly involved in, or have relevant knowledge of, AMD's contacts with the major U.S. OEMs, distributors, and retailers. These executives and employees include:





### 3. Rule 30(b)(6) Topics

Intel currently intends to take Rule 30(b)(6) depositions on the following subject areas: compilers; standard setting; AMD's cost structure and total, variable and marginal cost for x86 microprocessors; AMD's x86 manufacturing capacity and production; AMD's efforts to respond to Intel's stable image platform program, including AMD's Commercial Stable Image Platform program; AMD's financial performance; the location of AMD's sales of microprocessors produced at Fab 25 in 2002-2004; AMD's attempts to sell microprocessors to Rackable.

### C. Third Parties

#### 1. Documents

Intel believes that the third-party document production agreements in place are sufficient to prepare its defense. Intel expects the third-party document production to be completed by the fall. It generally expects to use the documents and data to support its contentions, including (1) the scope of merits competition between Intel and AMD; (2) the power of Intel's and AMD's customers to negotiate for lower prices; (3) the lack of anticompetitive effect of Intel's business practices; (4) the procompetitive effect of Intel's competition; (5) the independent business decisions made by customers to buy from Intel or AMD.

2.    **Depositions**

Intel previously proposed the parties each be allocated 25 third-party depositions, with any beyond being subject to a showing of good cause.  As a general matter, Intel believes that a limited number of key depositions at each account will be necessary.  The critical deals were of a significant magnitude and were decided at relatively high levels at each company.

a.    **First Stage**

(1)    **Major U.S. Based OEMs**





     (2)    **Distributors**



     (3)    **U.S. Retailers**



     (4)    **Other Third-Party Depositions**



**b.    Second Stage**

Intel believes it will be very difficult to obtain compulsory third party depositions of foreign residents. Intel lists those that it would consider seeking to take if feasible. Intel does not believe it is feasible to obtain compulsory testimony from foreign distributors or retailers.

**(1)    Foreign OEMs**



### (2)    Tier-Two OEMS

AMD has sought document discovery from a number of other Tier 2 OEMs and foreign manufacturers.  Intel believes any discovery should wait until the second phase.

### D.    Subjects of Expert Testimony

Intel presently believes it will be relying upon expert testimony on the following topics: (1) whether Intel possesses monopoly power; (2) Intel's pricing practices, including whether Intel prices above cost, and whether Intel has engaged in competition other than on the merits; (3) the scope of competition in the microprocessor industry, and Intel's and AMD's performance in that competition; (4) Intel's and AMD's costs and efficiency; (5) marketing and branding; (6) microprocessor manufacturing; and (7) causation and damages.

OF COUNSEL:

Robert E. Cooper
Daniel S. Floyd
Gibson, Dunn & Crutcher LLP
333 South Grand Avenue
Los Angeles, CA 900071
(213) 229-7000

Joseph Kattan, PC
Gibson, Dunn & Crutcher LLP
1050 Connecticut Ave. N.W.
Washington, D.C. 20036-5306
(202) 955-8500

Darren B. Bernhard
Howrey LLP
1299 Pennsylvania Avenue
N.W. Washington, DC 20004
(202) 783-0800

Dated:  May 1, 2008
Public Version Filed:  May 5, 2008

POTTER ANDERSON & CORROON LLP

By:  /s/ Richard L. Horwitz
    Richard L. Horwitz (#2246)
    W. Harding Drane, Jr. (#1023)
    Hercules Plaza, 6th Floor
    1313 N. Market Street
    P.O. Box 951
    Wilmington, DE 19899-0951
    (302) 984-6000
    rhorwitz@potteranderson.com
    wdrane@potteranderson.com

Attorneys for Defendants
Intel Corporation and Intel Kabushiki Kaisha

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

### <u>CERTIFICATE OF SERVICE</u>

I, Richard L. Horwitz, hereby certify that on May 5, 2008, the attached document

was hand delivered to the following persons and was electronically filed with the Clerk of

the Court using CM/ECF which will send notification of such filing(s) to the following

and the document is available for viewing and downloading from CM/ECF:

Jesse A. Finkelstein
Frederick L. Cottrell, III
Chad M. Shandler
Steven J. Fineman
Richards, Layton & Finger
One Rodney Square
920 North King Street
Wilmington, DE  19801

James L. Holzman
J. Clayton Athey
Prickett, Jones & Elliott, P.A.
1310 King Street
P.O. Box 1328
Wilmington, DE 19899

I hereby certify that on May 5, 2008, I have Electronically Mailed the documents

to the following non-registered participants:

Charles P. Diamond
Linda J. Smith
O'Melveny & Myers LLP
1999 Avenue of the Stars, 7th Floor
Los Angeles, CA  90067
cdiamond@omm.com
lsmith@omm.com

Mark A. Samuels
O'Melveny & Myers LLP
400 South Hope Street
Los Angeles, CA  90071
msamuels@omm.com

Salem M. Katsh
Laurin B. Grollman
Kasowitz, Benson, Torres & Friedman LLP
1633 Broadway, 22nd Floor
New York, New York 10019
skatsh@kasowitz.com
lgrollman@kasowitz.com

Michael D. Hausfeld
Daniel A. Small
Brent W. Landau
Cohen, Milstein, Hausfeld & Toll , P.L.L.C.
1100 New York Avenue, N.W.
Suite 500, West Tower
Washington, D.C.  20005
mhausfeld@cmht.com
dsmall@cmht.com
blandau@cmht.com

Thomas P. Dove
Alex C. Turan
The Furth Firm LLP
225 Bush Street, 15th Floor
San Francisco, CA 94104
tdove@furth.com
aturan@furth.com

Guido Saveri
R. Alexander Saveri
Saveri & Saveri, Inc.
111 Pine Street, Suite 1700
San Francisco, CA 94111
guido@saveri.com
rick@saveri.com

Steve W. Berman
Anthony D. Shapiro
Hagens Berman Sobol Shapiro, LLP
1301 Fifth Avenue, Suite 2900
Seattle, WA 98101
steve@hbsslaw.com
tony@hbsslaw.com

Michael P. Lehman
Cohen, Milstein, Hausfeld & Toll , P.L.L.C.
One Embarcadero Center, Suite 526
San Francisco, CA  94111
mlehmann@cmht.com

By:    /s/ Richard L. Horwitz
       Richard L. Horwitz (#2246)
       W. Harding Drane, Jr. (#1023)
       POTTER ANDERSON & CORROON LLP
       Hercules Plaza, 6th Floor
       1313 N. Market Street
       P.O. Box 951
       Wilmington, DE 19899-0951
       (302) 984-6000
       rhorwitz@potteranderson.com
       wdrane@potteranderson.com

738395 / 29282