

Gateway suddenly "phased out" AMD, and in July 1999, Gateway abruptly cancelled its launch of a machine based on AMD's Athlon processor.

Gateway fell woefully short of its fourth quarter 1999 earnings expectations. Gateway publicly blamed Intel for the disaster, and in January 2000, announced that it had chosen the AMD Athlon processor to power its Gateway Select PC Series.

Gateway remained Intel exclusive until its merger with eMachines in 2004.

### 5. Acer

Though not as recognizable as the HP or Dell brands, Taiwan-based Acer has long been an important OEM, supplying both business and consumer systems to computer users around the world. Acer experienced phenomenal growth during the current decade, with revenues increasing almost five-fold, from just over $3 billion in 2000 to $14 billion in 2007. With its

acquisition of Gateway earlier this year, Acer is now the third largest PC manufacturer worldwide.

Although Acer has been a longstanding AMD customer, until recently nearly all of its AMD-based products were in the less profitable consumer sector with the more profitable commercial lines reserved exclusively for Intel. From 2002-2004, for example, while 80% of Acer's Intel-based desktop offerings in Europe were priced over $1,000, one hundred percent of Acer's AMD offerings for the same product line and geography were priced below $1,000. An Acer document production agreement has yet to be finalized.[32] ██████████

██████████████████████████████████████████████

██████████████████████████████████████[33]

████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

██████████████████████                    ████████████████

[33] Intel employees ████████████████████████████████████████

██████████                    among others, appear to have had responsibility for the day-to-day management of the Acer account around the world.  In addition, many key Intel senior executives – including ████████████████████████████████████████████████

███████████████████████████████████████████████████

                    Intel employees ████████████████████████████

███████████████████████████████████████████████████

This much is known: Intel ████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████████████
███████████████████████

Moreover, ████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████████████
██████████
            ████████████████████████████████████
            ████████████████████████████████████
            ████████████████████████████████████

_____

██████████████████████████████████████████████ are
likely deposition candidates.

██████████████████████████████

██████████████████████████████

██████████████████████████████

████

████████████████████████████████████████████

████████

████████████████████████ August 2003 news that Acer intended to support the introduction of AMD's Athlon 64-bit ("K8") chips and had agreed to participate in several launch events with AMD. ████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

██████████████████████

████████████████████████

██████████████

████████████████████████

████████████████████████

When Acer launched an Athlon64 notebook the following year,

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████  And, following the launch of a high-end Acer AMD-based notebook in India in

late 2003, ████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████

### 6.    Japanese OEMs

The Japanese OEMs (Sony, NEC, Toshiba, Fujitsu, and Hitachi) represent a significant force in the PC world, not only in Asia but throughout the world.  Collectively, they account for roughly one out of every five notebooks sold.  Japan is also an "early adopter" of popular technologies, so acceptance of a product in the Japanese market serves as a tremendous marketing boost throughout the world.  Knowing that Japan is another potential chokehold on AMD growth, Intel has deployed there its full array of anti-competitive payments, rebates, and other exclusionary misconduct, including the bribing of Japanese OEMs to boycott AMD and punishing those that didn't.

The numbers bear witness to the effectiveness of Intel's campaign.  From the late 1990's when AMD began selling to the Japan OEM community, it steadily built its business by offering

superior, price-competitive products.  By the second quarter of 2002, it had managed to capture over 22% of microprocessor purchases by the Japanese OEMs.[34]  Future growth seemed assured, since AMD was poised to launch its highly competitive 64-bit processors.

That growth never materialized.  In fact, AMD's Japanese business was gutted in a matter of nine months, plunging from its 22% high to less than 12% three quarters later, and falling to below 8% by the third quarter of 2003.  ████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████  it also crushed

AMD's consumer business, relegating it to only 10%.  ████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████



**AMD x86 Unit Share in Japan Computer Sales 2000–2007**

[34] Measured as an AMD share of microprocessors procured by Japanese OEMs in Japan.

According to the Japan Fair Trade Commission ("JFTC"), which after a three-year investigation found Intel guilty of violating Japanese antitrust law, Intel used all-or-nothing conditional rebates to lock up 100% of the microprocessors purchased by Sony, Toshiba and Hitachi. In exchange for its rebates, NEC agreed to purchase 90% of its Japanese, 70% of its European, and 80% of its worldwide microprocessor requirements from Intel.[35] Intel offered discounts to Fujitsu designed

---

[35] To date, the parties have secured many (but not all) of the documents produced to the JFTC by ███████████████████████. The parties also have entered agreements with ███████ ███████████████ to produce additional documents and expect ███████ to enter a production agreement shortly. Based on the information we know today, the following are the Sony employees with significant involvement in negotiations with Intel:



The following are the NEC employees with significant involvement in negotiations with Intel

The following Fujitsu employees have had significant involvement in negotiations with Intel:

For Toshiba, the following employees had significant involvement in Intel negotiations:

to foreclose AMD from the lion's share of Fujitsu's business.  Intel did not contest the JFTC

charges.  Here are the facts behind two of those deals.[36]

---

████████████████████████████████ AMD expects to identify additional deposition
candidates through review of upcoming Japanese OEM document productions. AMD expects to
identify additional deposition candidates through review of upcoming Japanese OEM document
productions.

[36] A large number of Intel employees engaged in the anticompetitive conduct underlying the
JFTC's findings.  Specifically, the following are Intel Executives with significant involvement
in Japanese OEM negotiations: ██████████████████████████████████████████████████
████████████████████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████████████████ In
addition to these high level executives, the following are Intel employees with significant
involvement in Japanese OEM negotiations: ███████████████████████████████████████
████████████████████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████████████████████
█████████████████████████████████████████ AMD expects to identify additional deposition
candidates through review of upcoming Japanese OEM document productions.

### a)    Sony

Starting in late 2002, Intel's anticompetitive, all-or-nothing "conditional" rebates dropped Sony's AMD purchases for consumer-based systems from approximately 30% to zero within a matter of months.  Intel's efforts were anything but oblique. ███████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

██████████████████

But Intel was not satisfied with gaining exclusivity just in the United States. ████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

███████████████

████████████████████████████████

████████████████████████████████

████████████████████████████████

██████████████████████████████

████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████

By April 2003, Sony's shift to 100% Intel worldwide was all but formalized. ████

████████████████████████████████████████████████

████████████ As a result, Sony has purchased nothing more than nominal AMD volumes since the fourth quarter of 2003, and remains Intel exclusive today. █████████████████

      b)    **Toshiba**

Toshiba was one of the first Japanese OEMs to launch AMD products in 1999.  The following year, ████████████████████████████████████████████

████████████ By 2002, █████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

██████████████████████████

By February 2004, ██████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

██████████[37] AMD did not return to Toshiba until 2007, and then only as a supplier to Toshiba's least profitable consumer segment.

### 7.    European OEMs

Intel has also engaged in a focused strategy to foreclose AMD in Europe. The European Commission launched an investigation of these Intel practices in 2000. Last year it issued a formal Statement of Objections containing its preliminary finding that Intel violated the European counterpart of Section 2. The Commission summarized the three types of illegal Intel conduct it had uncovered:

> First, Intel has provided substantial rebates to various OEMs conditional on them obtaining all or the great majority of their CPU requirements from Intel. Secondly, in a number of instances, Intel made payments in order to induce an OEM to either delay or cancel the launch of a product line incorporating an AMD-based microprocessor. Thirdly, in the context of bids against AMD-based products for strategic customers in the server segment of the market, Intel has offered products on average below cost.

Because the largest worldwide OEMs, like Dell, HP and Lenovo, are also active in Europe, Intel's European exclusionary conduct has to some extent already been detailed. In addition, some regional OEMs operate out of Europe, the largest of which is Fujitsu-Siemens Computers ("FSC"), a joint venture between Fujitsu and Siemens. The operations of FSC are

---

[37] ████████████████████████████████████████████

linked to its parent-company, Fujitsu, and the two companies to some extent share development resources.

Intel has engaged in a host of practices to prevent FSC from broadly adopting AMD's products ███████████████████████████████████████ ███████████████ At the core of Intel's exclusion are conditional, quantity-forcing discounts based on FSC meeting volume and product mix targets. These are coupled with threats of punitive price increases and the loss of marketing funds and other incentives if the targets are not met. ███████████████████████████████████████

███████████████████████████████████████

███████████████████████████████████████

████████████████████████████

████████████████████████████████████

███████████████████████████████████████

███████████████████████████████████████

██████████████████████████████████████

Moreover, ███████████████████████████████

███████████████████████████████████████

███████████████████████████████████████

███████████████████████████████████████

███████████████████████████████[38]

_____

[38] The likely FCS deponents include ████████████████████████ ███████████████████████████████████████

And FSC was not the only European OEM targeted by Intel.  The AMD purchases of
another of the main European regional OEMs, NEC-CI (and its subsidiary Packard-Bell), were
████████████████████████████████████████████████████████ limited it to 30%
AMD in Europe.

**B.    Unlawful Exclusion of AMD from System Builders**

Although most computer users are only familiar with the brand-name computers made by
major OEMs, a significant segment of the overall x86 microprocessor market consists of chips
purchased for use in so-called "whiteboxes."  "Whitebox" is a shorthand term that generally
refers to an unbranded personal computer.  Whiteboxes typically are assembled from individual
components by system builders.

Whitebox companies and system builders play an important role in the computer eco-
system.  At the simplest level, system builders serve two primary market niches.  First, because it
is cheaper to build computers from their component parts than it is to buy them already
assembled, system builders are able to create personal computers, often of high quality, that are
cheaper than any branded alternative.  Second, because system builders build each machine to
order, they have the flexibility to create and equip computers that can meet the specialized
hardware and software performance needs of specific types of individuals (such as gamers) or
industries (such as banks, architects or dentists).  Taken as a whole, whitebox manufacturers and
system builders account for approximately 20% -30% of the computer and server market and

_____

████████████████████████████████████████████████████
████████████████████████████████ Intel employees with relevant knowledge, other than senior
██ executives,  include ██████████

accordingly account for that same share of x86 microprocessor purchases.

Based on the materials it has reviewed to date, Plaintiffs expect to prove that Intel used the same type of anti-competitive strategies with whitebox companies and system builders that it did with the major OEMs — a mix of direct payments, structured incentives and preferences for exclusivity, and threats of disproportionate retaliation for doing business with AMD. We focus here on the two whitebox companies that have produced comparatively large document collections, though we suspect that a dozen others also curtailed their business with AMD for fear of Intel retaliation.[39]

### 1.    Supermicro

Founded in 1993, Supermicro sells servers and high-end motherboards globally and has a significant share of the non-OEM server market.  Historically, Supermicro viewed Intel as a strategic partner as well. In 2001, for example, Supermicro's Vice-President of Sales was quoted

---

[39] The whitebox companies that AMD believes have been adversely affected by Intel's anti-competitive conduct include Alienware, Appro Intl., Atipa, Averatec, Egenera, Micron PC/MPC Computers, Network Appliance, Rackable, Supermicro, and Voodoo. Individuals at some of these companies believed to have relevant information regarding Intel's exclusionary conduct includes:

-56-

in the press as saying that Supermicro would "never ever" sell anything but Intel.

By early 2005, however, Supermicro abandoned its Intel-only status in part because of the compelling price-performance advantage AMD provided to Supermicro's customers.

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

█████████████████████████████████████████████

███████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████

Although the details of those meetings and subsequent discussions must await the depositions of ███████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

_____

[40] Intel participants included ███████████████████████████████████
████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████


████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

█████████████████████████

████████████████████████████████████

████████████████████████████████████████████

████████████████████    Supermicro's behavior reached such a seemingly absurd level that even the press commented that Supermicro "no doubt" was "keeping an eye out for the enforcer men in blue" and wondered aloud "Is Supermicro fearful of being sanctioned?"

### 2.    Rackable

Intel also got tough with Rackable, another system builder which became an early convert to AMD's Opteron server processors and began retreating from its historic "Intel first" philosophy.  ██████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

██████████████████████████    And when Rackable delivered AMD solutions to its customers, ██████████████████████████████████████

████████████████████████████████████████████

█████████████████████████████

_____

██████████████████████████████████████    Supermicro's representatives

-58-

At the same time, ███████████████████████████████████████████████
██████████████████████████████████████████████████████████████████████
██████████████████████████████████████████████████████████████████████
██████████████████████████████████████████████████████████████████████
██████████████████████████████████████████████████████████████████████
██████████████████████████████████████████████████████████████████████
██████████████████████████████████████████████████████████████████████
████████████████    Ultimately, Intel's predatory pricing, when coupled with other coercion,
gutted Rackable's AMD-based business.

### C.    Unlawful Exclusion of AMD from the Distribution Channel

Both AMD and Intel sell microprocessors through "distribution." In simplest terms, a
distributor acts as a middle-man between a manufacturer and a customer.[41] Because AMD and
Intel typically sell directly to only a handful of the largest, most credit-worthy OEMs,
distributors are left to sell microprocessors to a variety of purchasers, including whitebox
companies, small and medium-sized OEMs, and, at times, even first-tier OEMs. Distributors can
also provide specialized technical services, can offer the microprocessors together with
additional component parts, and can otherwise add value that AMD and Intel do not. As large
international companies, distributors constitute an important sales channel, accounting for
roughly 30 – 35% of the microprocessor market by units, 25 – 30% by revenue. Given Intel's
success at foreclosing AMD from selling much to major OEMs, AMD necessarily has relied

_____

were ███████████████████████████████████████████████████████████

disproportionately on the distribution channel to bring its products to market.

Knowing the importance of distribution to AMD, Intel has endeavored to limit AMD's access to this channel as well.  Thus, ██████████████████████████████

████████████████████████████████████████████████████████████████

██████████████████  While discovery in the distribution segment has been limited to date (*i.e.* the parties are still awaiting substantial productions from six of the nine distributors that have been subpoenaed), the following examples of Intel's dealings with two major distributors, Tech Data and Synnex, are illustrative of the exclusionary strategy Intel has deployed.[42]

---

[41] AMD and Intel have subpoenaed Abboud Trading, ASI, Avnet, Ingram Micro, Synnex, Tech Data, Bell Microproducts, D&H and Intcomex.  AMD anticipates additional productions from the first six, and it has reserved the right to request additional documents from the others.

[42] Based on the limited discovery that AMD has received, the following are the important Intel custodians:

██████████████████████████████████████████████████████████████████
██████████████████████████████████████████████████████████████████
██████████████████████████████████████████████████████████████████
██████████████████████████████████████████████████████████████████
██████████████████████████████████████████████████████████████████

The following are the key third party distribution custodians who were involved in key events:

██████████████████████████████████████████████████████████████████
██████████████████████████████████████████████████████████████████
██████████████████████████████████████████████████████████████████
██████████████████████████████████████████████████████████████████

### 1.    Threats to Remove Preferential Treatment.

Intel rewards its most loyal distributors with preferential pricing and supply, and it disciplines customers by threatening to withdraw them for disloyalty. ███████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████████

████████████████████████████████████████

██████████████████████████████████

██████████████████████████████████

██████████████████████████████████

██████████████████████████████████

██████████████████████████████████

██████████████████████████████████

██████████████████████████████████

───────────────────

███████████████████████████████████████████████████
███████████████████████████████████████████████



But a few years later when Synnex was again considering the addition of AMD to its

lineup, ███████████████████████



Although much of the story must await depositions, Intel's ████████████████████

████████████████████████████████████████████

█████████████████████████

Beyond removing benefits, Intel threatens to absolutely boycott distributors who engage

too closely with AMD.  Tech Data provides a good example.  A Fortune 500 company with

approximately 90,000 customers, Tech Data is one of the world's largest distributors.  It does

business in over 100 countries in North America, South America, Europe, and the Middle East.

Intel has also employed one-time cash payments to keep distributors in line.

---

[43] A number of Tech Data employees appear to have been intimately involved in the discussions with Intel's

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

██████████████████

### 2.    Discretionary End-of-Quarter Rebates

But rewarding loyal customers with incremental funding is only a part of Intel's strategy.

More significant are distributor rebates, ████████████████████████████████████████

████████████████████████████████████    In the low-margin distribution

business, these rebates typically spell the difference between a profit and loss for the quarter.

Thus, distributors are loath to do anything that would jeopardize them.  ████████████

████████████████████████████████████████████████████

██████████████

Astoundingly, in the case of distributors that also carry AMD products, ████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████

### D.    Intel's Exclusionary Technical Conduct

Intel has regularly abused its technical muscle to hobble AMD's products and raise

AMD's costs.  While some of Intel's technological misconduct is well known to AMD, other

aspects are only now surfacing in documents.  What follows is a taste of what we expect the evidence, when it is finally assembled, will show.

### 1.    Intel's Compilers

As AMD has continued to prove a worthy competitor, Intel has sought to nullify its technological gains through the redesign of Intel's compilers so as to artificially degrade the performance of AMD microprocessors.  Compilers are software programs that translate "source code," i.e., software code written and understood by human programmers, into object code, code written and understood by computers.

AMD and Intel processors are capable of performing the same computing functions because both companies have adopted the other's instruction sets.[44]  With the release of AMD's Opteron microprocessor in April 2003, and the launch of the Athlon 64 five months later, AMD's processors were technologically superior because they performed these functions faster and more efficiently than Intel's processors.  In 2004, Intel set out to nullify AMD's performance advantage through use of its CPUID function.[45]  New versions of the Intel compilers began embedding a hidden CPUID check in the executable programs they produced.[46]  These caused the finished software program to determine whether or not the executing computer ran on an

---

[44] An instruction set is a set of rudimentary commands a microprocessor is capable of executing. AMD's Opteron and Athlon 64 were capable of executing Intel's SSE (Streaming SIMD Extension) and SSE2 instruction sets, and Intel modified its Pentium 4 to execute AMD's AMD64 instruction set.

[45] A CPUID (CPU Identification) is a piece of code embedded in Intel processors that identifies the processors as either Intel or non-Intel products.

[46] Intel named seventeen employees as persons most knowledgeable about compiler design, development, support, validation, and testing, including ███████████████████████████████████████████████████████████████████

Intel-manufactured microprocessor.  If an AMD microprocessor is detected, the software programs would run using inefficient executing commands, or simply crash.

Recognizing that virtually every Intel compiler customer would switch to a different vendor if Intel's compilers produced software that would not work with AMD processors, Intel devised a plan to hide its scheme from customers.  Intel proclaimed in its marketing material that its compiler offered performance competitive with industry leading compilers for AMD-based systems.  However, these claims were untrue.  ██████████████████████

██████████████████████████████████████████████████████

████████████████████████████████████[47]  The effect was dramatic:

██████████████████████████████████████████████████████

██████████████████████[48]

### 2.     Intel's Tampering with BAPCO Benchmarking Standards

████████████████████████████████████  Intel exploits its stature with the publishers of benchmarking software, which measures the performance of various products. Intel co-founded the Business Applications Performance Corporation ("BAPCo"), an industry

---

██████████████████  It may be necessary to depose many of these Intel employees to understand the design and assess the effects of the CPUID check in Intel's compiler products.

[47] At least ██████████████████ complained of severe performance degradations suffered by AMD-based computers caused by the Intel compilers.  To determine the impact of the Intel compilers on third-party software products, depositions of third-party witnesses from these companies may be necessary.  Further, depositions of Intel technical support personnel, such as compiler PMKs ██████████████ may be necessary to determine the effect of the CPUID feature on third-party software.

[48] █████████████████████████████████████  To assess the full extent by which Intel compilers have artificially distorted the competitive positions of Intel and AMD products during the relevant time period for this litigation, depositions of Intel employees and witnesses from third-party software producers are necessary.

consortium that develops supposedly neutral microprocessor benchmarks.  Since early-2000,

Intel employee Shervin Kheradpir has served as the president of BAPCo.



### 3.    Intel's Manipulation of Industry Standards Setting Activities

Standard-setting organizations are critical in the computer industry because products

manufactured by different companies are useless if they do not employ uniform means to

function together.  Microprocessors must work in multiple products manufactured by various

OEMs.  They also must function with other internal PC components manufactured by other

companies, including memory components and chipsets.  Without this interoperability,

---

[49] Several Intel custodians, including ██████████████████████████ Since it is unlikely that every such instance
is documented, it is necessary to conduct deposition discovery of these Intel employees to
determine the full extent of Intel's misconduct.
[50] In one case, ██████████████████████████████████████

consumers would have to purchase all of their products from a single source.

Properly functioning standard-setting organizations allow companies to work together in choosing a standard to which everyone has access. Intel, however, has subverted the standard setting process by repeatedly manipulating the organizations to put AMD at a competitive disadvantage.

> ### a)    Intel Has Proposed Design Changes for the Sole Purpose of Harming AMD

One way in which Intel has undermined the neutral purpose of standard-setting organizations is by pushing for design choices that cause the greatest disadvantage to AMD while having little, if any, technological justification. An example is found in Intel's role in the design of new memory controller standards.[51] The Joint Electron Device Engineering Council ("JEDEC") is the industry organization responsible for setting the standards governing everything from the way memory chips are physically designed to the way these chips communicate with other hardware components. Both AMD and Intel need access to the latest memory standards as early as possible to ensure that their processors and chipsets remain compatible with other manufacturers' memory devices.

In 2004, JEDEC began developing a standard governing the design of memory modules

---

[51] AMD will need extensive discovery to uncover the full extent of Intel's misconduct in the development of memory controller standards as well as well similar attempts in other design areas. To date, Intel has identified ███████████████████████████████████████
███████ Intel has also identified ██████████████████████████████████████████
████████████████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████████████████
████████████ It will be necessary to depose many, if not all, of these employees to flush out these issues, especially in light of the limited number of documents Intel has produced on these topics.

for DDR3 memory devices.  These modules, or DIMMs, connect the memory chips to the computer's motherboard through a series of metal connectors known as "pins."  Intel proposed that the committee rearrange the placement of the pins even though there was no technological justification for doing so.  Its only purpose was to disadvantage AMD.  Given the way AMD's memory controller works, any change in the design of the memory pins would require that AMD also change the design of its processor.  Intel, however, would not be affected.  Thus, the change would require only AMD to make expensive and time-consuming modifications to its products.

**b)      Intel Has Refused To Give AMD Access to Standard-Setting Work**

Intel has in some instances attempted to exclude AMD from the standard-setting process entirely.  For example, in January 2000, Intel did an end run around JEDEC and formed the Advanced DRAM Technology Consortium ("ADT") to develop a memory standard.[52]  The higher-tier members had access to every stage of development, which allowed them to begin designing their products before the standard was publicly announced.  The lower-tier members would be allowed to use any standard approved by ADT, but they would not be involved in development of the standard and would only receive access to the standard after it was finalized. Intel structured ADT such that the higher level would include itself and the largest memory manufacturers, but not AMD.  When AMD first attempted to join the higher level of ADT in July 2000, it was denied admission.  AMD continued to lobby, without success, for admission to

_____

[52] In addition to the ███ employees Intel has identified as most knowledgeable of Intel's relationship with memory suppliers, Intel has also identified ████████████

████████████████████████████████████████

the design level.

c)    **Intel Has Prevented Other Companies from Working with AMD**

After Intel failed in its attempt to develop a new memory interface standard through its private ADT organization, Intel began to work with memory producers one on one as another way to keep AMD out of the process. All of this work is done under non-disclosure agreements

███████████████████████████████████████[53]    These NDAs do not allow the companies to share any of the design information with AMD until the products are released. Because of this delay in receiving the design information, AMD cannot finalize its own design plans, delaying AMD's product releases and increasing its development costs.

4.    **Intel's Exclusive Dealings with Third-Party Technology Companies.**

Intel has engaged in exclusive deals with third-party technology companies to cause them to offer products that offer degraded performance or limited feature sets when run on computers with AMD processors. For example, Skype is a company that publishes software that allows users to use their computers to place telephone or video conference calls over the internet for no or a nominal charge. ████████████████████████████████████████

█████████████████████████████████████████████

█████████████████████████████████████████████[54]

---

[53] ████████████████████████████████████████████████████████████████████████ To assess the scope and impact of Intel's exclusionary conduct, it may be necessary to conduct deposition discovery of employees from these companies.

████████████████████████ To assess the exclusionary effect of the Intel-Skype agreement fully, depositions of Skype and Intel employees involved in the negotiation, such as ███████████████ ██████████████████████, are necessary.

Specifically, Skype 2.0 allows a voice conference call for up to ten-way conference calls on selected Intel dual-core processors, while users of AMD-based computers with similar processing capability were limited to only five-way conference calls. Both Intel and Skype suggested that the limitation on AMD-based computers had something to do with the capability of the processors – an excuse for public consumption that was simply false. ███████████

███████████████████████████████████████████████████[55]

### 5.    Intel's Bag of Other Dirty Tricks

Intel has engaged in a variety of other tactics to entrench further its microprocessor market dominance. For instance, in late 2005, Microsoft launched the newest version of its Windows operating system known as Microsoft Vista. To ensure that a computer could operate Vista, Microsoft set forth a set of minimum computer hardware requirements that would determine whether a computer was "Vista Capable." Only those computers meeting those requirements qualified to could carry a "Vista Capable" sticker.

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

-------

[55] The following Skype employees appear to have relevant information and are deposition candidates:: ███████████████████
██████      In addition, AMD will need to depose Intel employees involved in ███████████
████████

-71-

██████████████ [56] ████████ AMD provided OEMs with a wide range of chip choices, including many that were capable of meeting the "Vista Capable" requirements.

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████

## III.    STATEMENT OF PRINCIPAL LEGAL AUTHORITIES

AMD and, for injunctive relief purposes, Class Plaintiffs both assert a Sherman Act § 2 claim. Both also assert respective state law claims. Because the guiding legal principles in this case largely are captured by the elements of Section 2, the discussion that follows focuses on how those elements are satisfied in this case.

### A.    Intel Possesses Monopoly Power in the x86 Microprocessor Market.

Section 2 of the Sherman Act makes it unlawful to monopolize, attempt to monopolize, or conspire to monopolize interstate or foreign trade or commerce.[58] A Section 2 offense has two elements: "(1) the possession of monopoly power in the relevant market and (2) the willful

---

[56] ████████████████ In order to assess the benefit Intel enjoyed from ████████████████ and the injury AMD suffered, it is necessary to conduct deposition discovery of witnesses from each of these third-party companies.

[57] Many high level employees from both companies, including ████████████████ ████████████, were involved in ████████████████ ████████████████████ Plaintiffs anticipate depositions from among the following additional Microsoft employees: ████████████████████████████████

-72-

acquisition or maintenance of that power as distinguished from growth or development as a consequence of a superior product, business acumen, or historic accident."[59]

The first step in establishing a Section 2 claim is defining the relevant geographic and product markets.[60] The geographic market is "the area in which the defendant effectively competes with other . . . businesses for the distribution of the relevant product."[61] Here, it is undisputed that the relevant geographic market is worldwide. 2007 WL 137152, at *8 (D. Del. Jan. 12, 2007). A product market consists of "products that have reasonable interchangeability for the purposes for which they are produced—price, use and qualities considered."[62] Interchangeable products are roughly equivalent to each other, so either would work effectively, even if one is preferred over the other.[63] In this case, a relevant product market is microprocessors for personal computers and servers that utilize the x86 instruction set (the "x86 microprocessor market"). 2007 WL 137152, at *8 (D.Del. Jan. 12, 2007). The vast body of x86-based computer users around the world has enormous investments in systems and applications that makes substitution to non-x86 computing impractical and prohibitively expensive.[64]

"Monopoly power is the power to control prices or exclude competition."[65] This case will include evidence of both. Monopoly power also may be inferred circumstantially from a

---

[58] 15 U.S.C. § 2.
[59] *United States v. Grinnell Corp.*, 384 U.S. 563, 570-71 (1966).
[60] *Conwood Co., L.P. v. U.S. Tobacco Co.*, 290 F.3d 768, 782 (6th Cir. 2002).
[61] *Lansdale v. Philadelphia Elec. Co.*, 692 F.2d 307, 311 (3d Cir. 1982) (citation omitted).
[62] *United States v. E. I. Du Pont de Nemours & Co.*, 351 U.S. 377, 404 (1956).
[63] *Queen City Pizza v. Domino's Pizza*, 124 F.3d 430, 437 (3d Cir. 1997).
[64] *Cf. United States v. Microsoft Corp.*, 253 F.3d 34, 52 (D.C. Cir. 2001) (defining the relevant market as "Intel-compatible PC operating systems" because consumers would not switch to the Mac operating system due to the costs associated with acquiring new hardware and compatible software applications and the efforts involved in learning the new system and reformatting files).
[65] E.I. Du Pont de Nemours & Co., 351 U.S. at 392.

market structure in which the defendant is shown to possess a predominant share of the relevant market.[66] Intel's revenue share of the worldwide x86 microprocessor market is more than 85% and its unit share more than 75%. These market shares far exceed what is needed to infer that Intel has monopoly power.[67]

While the size of a firm's market share is central to a determination of whether monopoly power exists, other relevant factors include barriers to market entry, relative size and strength of competing firms, industry pricing practices and trends, consumer ability to substitute comparable goods, and consumer demand. *Dentsply*, 399 F.3d at 187; *see also Los Angeles Land Co. v. Brunswick Corp.*, 6 F.3d 1422, 1427-28 (9th Cir. 1993) (barriers to entry are "factors in the market that deter entry while permitting incumbent firms to earn monopoly returns") (citing Areeda & Hovenkamp, *Antitrust Law*, ¶ 409 at 509-10 (1992 Supp.)). Here, unusually high barriers to entry secure Intel's monopoly power. These include (1) the need to penetrate a virtually impregnable barrier of intellectual property rights; (2) the ongoing need to meet the enormous capital demands necessary to sustain the research and development required to produce each new generation of microprocessors and to build and equip the new fabs needed to manufacture them; and (3) economies of scale that can only be realized by achieving critical levels of penetration into, and product mix with, a broad customer base.

---

[66] *Grinnell Corp.*, 384 U.S. at 571; *Microsoft Corp.*, 253 F.3d at 51; *United States v. Dentsply Int'l, Inc.*, 399 F.3d 181, 187 (3d Cir. 2005).

[67] *See, e.g., Dentsply Int'l, Inc.*, 399 F.3d at 188 (market share between 75 and 80% is "more than adequate to establish a prima facie case of power"); *Image Tech. Servs. v. Eastman Kodak Co.*, 125 F.3d 1195, 1206 (9th Cir. 1997) (65% market share is sufficient); *Heattransfer Corp. v. Volkswagenwerk, A.G.*, 553 F.2d 964, 981 (5th Cir. 1977) (71-76% market share is sufficient); ABA Section of Antitrust Law, *Model Jury Instructions in Civil Antitrust Cases* C-17 (2005) (50% market share is sufficient to support inference of market power); 2 *Von Kalinowski on*

### B.    Intel Has Maintained Its Monopoly Power Through Unlawful Exclusionary Conduct That Has Had an Anticompetitive Effect.

The second element of a Section 2 violation, willful acquisition or maintenance of monopoly power, "must be accompanied by some anticompetitive conduct on the part of the possessor."[68] The Supreme Court has long ordained and consistently maintained as flexible an application of Section 2 as is necessary to counter monopolists' genius in devising new and novel methods of exclusion.[69] "'[T]he means of illicit exclusion, like the means of legitimate competition, are myriad.'"[70] But none escapes the Court's overarching principle that "a monopolist will be found to violate § 2 of the Sherman Act if it engages in exclusionary or predatory conduct without a valid business justification."[71] And recent enforcement in the Third

---

*Antitrust* § 25.03[3] (2nd ed. 2004) ("[l]ower courts have held that a high market share (generally above 70 percent) by itself demonstrates monopoly power").

[68] *Broadcom Corp. v. Qualcomm Inc.,* 501 F.3d 297, 308 (3d Cir. 2007) (citing *Verizon Commc'ns Inc. v. Trinko,* 540 U.S. 398, 407 (2004)).

[69] *See, e.g., American Tobacco Co. v. United States*, 328 U.S. 781 (1946) (condemning defendant who engaged in exclusionary conduct that foreclosed smaller rivals from access to necessary supplies); *Grinnell*, 384 U.S. at 570, 576 (finding defendants who willfully achieved a monopoly through a variety of exclusionary practices, including entering into agreements to maintain minimum resale prices of central service station, forming revenue sharing agreements with their competitors, and implementing increased rates in cities where the defendants had a monopoly, in violation of Section 2); *Otter Tail Power Co. v. United States*, 410 U.S. 366 (1973) (concluding that an electric utility illegally engaged in exclusionary conduct with the intent to prevent towns from establishing municipal systems in its service area); *Eastman Kodak Co. v. Image Technical Servs., Inc.*, 504 U.S. 451, 477 (1992) (condemning defendant's use of its market power in the aftermarket for servicing photocopiers to exclude competitors from the market).

[70] *Verizon Commc'ns Inc.*, 540 U.S. at 414 (quoting *Microsoft*, 253 F.3d at 58).   *See also LePage's Inc. v. 3M*, 324 F.3d 141, 152 (3d Cir. 2003) ("'Anticompetitive conduct' can come in too many different forms, and is too dependent upon context, for any court or commentator ever to have enumerated all the varieties.") (quoting *Caribbean Broad. Sys. Ltd. v. Cable & Wireless PLC*, 148 F.3d 1080, 1087 (D.C. Cir. 1998)).

[71] *LePage's Inc.*, 324 F.3d at 152; *see also Aspen Skiing Co. v. Aspen Highlands Skiing Corp.*, 472 U.S. 585, 605 (1985) (conduct that excludes a rival "on some basis other than efficiency" is predatory"); *Lorain Journal Co. v. United States*, 342 U.S. 143 (1951) (conduct had no valid business justification, other than to exclude the rival radio station, and was anticompetitive).

-75-

and other Circuit Courts is consistent with the Supreme Court's history of unwavering condemnation of a dominant firm's exclusionary abuse.[72] Thus, the anticompetitive conduct element of a Section 2 claim is met whenever a monopolist engages in "[c]onduct that impairs the opportunities of rivals and either does not further competition on the merits or does so in an unnecessarily restrictive way . . . ."[73] Here Intel's relentless exclusion takes numerous forms, but its collective objective is singular: to do whatever is necessary to foreclose AMD's window of special opportunity and to thwart its emergence as a sustainable innovation rival to Intel.

### 1.    Payments for Exclusivity or Near-Exclusivity

Payments for exclusion violate Section 2 if they are structured to preclude new entrants from competing on the merits.[74] For example, in *Dentsply*, the Third Circuit concluded that a monopolist's exclusivity agreements with key dealers harmed competition by keeping its competitors' sales from reaching a level that might pose a genuine threat to the monopolist's overwhelming share of the market.[75] Indeed, even non-monopolists violate the antitrust laws when they enter exclusive or near-exclusive deals that foreclose rivals from a substantial segment of the market. *See Tampa Elec. Co. v. Nashville Coal Co.*, 365 U.S. 320, 327 (1961)

---

[72] *See, e.g., Dentsply*, 399 F.3d at 196-97 (rejecting defendant's "pretextual" justification for exclusionary practices "designed expressly to exclude its rivals from access to dealers"); *Microsoft*, 253 F.3d at 64 (condemning defendant's use of exclusive contracts with key distributors to foreclose its rival from distribution opportunities); *Conwood Co., L.P.*, 290 F.3d 768 (finding a monopolist's pervasive practice of destroying rival's racks and point of sale (POS) materials and reducing the number of rival's facings through exclusive agreements with and misrepresentations to retailers violated Section 2); *Gen. Indus. Corp. v. Hartz Mountain Corp.*, 810 F.2d 79 (8th Cir. 1987) (inferring defendant's intent to destroy competition through a variety of anticompetitive means without legitimate business reasons).

[73] *Broadcom Corp.*, 501 F.3d at 308 (citing *Aspen Skiing Co.*, 472 U.S. at 604-05 & n. 32).

[74] See generally Tom, Balto & Averitt, Anticompetitive Aspects of Market-Share Discounts and Other Incentives to Exclusive Dealing, 67 Antitrust L.J. 615 (2000).

[75] 399 F.3d at 191.

(exclusive dealing arrangements violate antitrust law when they "foreclose competition in a substantial share of the line of commerce affected"). Where engaged in by a monopolist, all competitively significant exclusion is condemned. *See Microsoft*, 253 F.3d at 70 (exclusive and partial exclusive deals entered into by a monopolist can give rise to a Section 2 violation even where the threshold for a Section 1 violation is not met). Moreover, an exclusive deal need not consist of a written contract or be otherwise express to be unlawful. So long as the agreement is implied or the "practical effect" of the pricing arrangement is exclusivity, the agreement is subject to condemnation under Section 2.[76]

In their totality, ████████████████████████████████████████ foreclosed AMD from a substantial portion of the market. Further, ███████████ ████████████████████████ foreclosed AMD from the highly profitable commercial client segment that is essential to generating the cash flow required to sustain AMD's innovation over the long term. They represent the "key" players that a monopolist simply may not exclude. *See Microsoft*, 253 F.3d at 64. And it makes no difference whether such foreclosure is bought through payments and discounts or achieved through threats and coercion. *Compare Le Page's* (foreclosure achieved through bundled discounts) with *Dentsply*, 399 F.3d at 190 (foreclosure achieved through coercion of dealers). Here the evidence will show both.

---

[76] *See Tampa Electric Co. v. Nashville Coal Co.*, 365 U.S. 320, 327 (1961). *See generally* 1 Julian O. von Kalinowski, et al., Antitrust Laws and Trade Regulation § 2.04[5][a] (2004) ("Sometimes a formal agreement between the seller and the purchaser lacks an express exclusionary condition prohibited by the statutes, but the buyer has been made to believe that if he deals with competitors of the seller, he will suffer some kind of reprisal. The fear of reprisal, in such cases, may stem less from what has been said to the purchaser, than from its observation of the seller's general course of conduct. In determining whether an exclusive dealing arrangement exists, courts look at the substance of the conduct; not its form.").

2.    **First Dollar Rebates Offered To Leverage Non-Contestable Demand To Foreclose AMD from the Opportunity To Compete Profitably for Contestable Demand**

In addition to exclusivity secured through payments expressly or implicitly conditioned thereon, Intel achieves similar foreclosure by means of a pricing strategy that leverages an OEM's dependency on Intel for the bulk of its current microprocessor needs. By leveraging its monopoly power over that uncontestable demand, Intel forecloses AMD from any meaningful opportunity to compete for the OEM's far lesser contestable demand. As previously explained, in any given calendar quarter most of an OEM's microprocessor requirements must be obtained from Intel, either because they are for continuing models of Intel-powered computers or essential to meeting end-user demand that is microprocessor specific. Accordingly, only a small share of an OEM's requirements is contestable by AMD at any given time. Intel exploits this demand segregation by offering an OEM a first-dollar rebate on <u>all</u> of its purchases, but only if the OEM satisfies its contestable demand with Intel microprocessors, too. Thus, rather than conditioning a discount or payment on exclusivity, as such, Intel conditions its all-or-nothing rebate on the customer meeting an Intel-established purchase target that reflects all, or virtually all, of the OEM's requirements.

The economic principle at work in this scheme is the same as the one that drives bundled discounts schemes. An "[a]ntitrust policy requires the courts to seek the economic substance of an arrangement, not merely its form." *Weiss v. York Hospital*, 745 F.2d 786, 815 (3d Cir. 1984).[77] In both the present and bundled form of pricing schemes, the monopolist excludes a rival by offering the customer a "discount" on the part of its requirements that the rival cannot

supply, but only if the customer also buys its contestable needs from the monopolist.  As

recognized by the Third Circuit, such pricing schemes can be "viewed as effectuating exclusive

dealing arrangements because of the way in which they were structured."[78]  This is because such

all-or-nothing pricing can "foreclose the opportunities of rivals when a dealer can obtain its best

discount only by dealing exclusively with the dominant firm."[79]  Stated another way, an earlier

Third Circuit opinion observed that to meet a monopolist's three-product "bonus" rebate, a one-

product rival had "to compete three-on-one."[80]  The result was that the monopolist was able to

"sell all three products on a non-competitive basis in what would have otherwise been a

competitive market for [one of the products]."[81]

Here, for AMD to compete for the limited OEM demand contestable at any given time, it

not only has to meet Intel's discount on the microprocessors in contest, but additionally has to

make the OEM whole for its lost "discount" on the larger volumes it would have to buy from

Intel regardless.[82]  Such leveraging of rebates on sales on which Intel faces no competition to

---

[77] AMD will present expert testimony at trial explaining both the commonality of the economic principle involved and the identity of exclusionary effect achieved.

[78] *Lepage's*, 324 F.2d at 154.

[79] 324 F.3d at 158 (quoting 3A Phillip E. Aveeda and Herbert Hovenkamp, *Antitrust Law* ¶ 768 b2, at 148 (2d Ed. 2002).

[80] *SmithKline Corp. v. Eli Lilly & Co.*, 575 F.2d 1056, 1061 (3d Cir. 1978).

[81] *SmithKline Corp.*, 575 F.2d at 1065.

[82] In the Third Circuit, such leveraged discounting constitutes exclusionary conduct in violation of Section 2 without regard to whether or not the discount takes the price of the contestable product below cost. *LePage's*, 324 F.3d at 151-52. In contrast, the Ninth Circuit has adopted a special test in which the entirety of the discount is attributed to the price of the contestable product and a *Brooke Group*-derived cost test is then applied to that price as reconstructed. *Cascade Health Solutions v. PeaceHealth*, 515 F.3d 883 (9th Cir. 2007); *see also Brooke Group Ltd. v. Brown & Williamson Tobacco Corp.*, 509 U.S. 209 (1993) (cost test applicable to price predation).  The present case is, of course, governed by Third Circuit law.  However, the leveraged discounting here in issue would fail the Ninth Circuit's so-called *Ortho* cost test as

secure sales where it confronts competition constitutes "an act of willful acquisition and maintenance of monopoly power" and is prohibited by Section 2.[83]

### 3.    Payments to OEMs To Exclude AMD Solutions from Key Market Segments, Distribution Channels, and New Product Launches

Unfair business practices engaged in by a firm with monopoly power satisfy the conduct element of a Section 2 claim when they have significant harmful effects on competition. For example, in *Conwood*, the Sixth Circuit found that a monopolist's use of illegitimate business tactics to limit a rival's access to the retail channel stifled the rival's growth, restricting output and reducing consumer choice in the market for moist snuff. 290 F.3d 768, 785, 788 (defendant's collection of dirty tricks included destroying competitors' advertising materials in retail stores, using its position as category manager to limit the rival's products introduced by stores, and entering into exclusive arrangements with retailers to reduce the number of plaintiff's facings). A monopolist's practices fall outside of the scope of legitimate merit competition when its success is influenced by unlawful conduct rather than the superiority of its products and services. *See Associated Radio Serv. Co. v. Page Airways, Inc.*, 624 F.2d 1342 (5th Cir. 1980) (finding the defendant's success materially attributable to its predatory conduct, including suspicious payments to customers and government officials, targeted at preventing the success of its rival's competitive products).

Excluding competition from key distribution channels or market segments violates Section 2 when it precludes a rival from accessing the necessary customer base to achieve volumes of distribution necessary to efficiency. For example, in *Dentsply*, the Third Circuit

---

well. *See Ortho Diagnostic Sys., Inc. v. Abbott Laboratories, Inc.*, 920 F. Supp 455 (S.D.N.Y. 1996).

condemned the defendant's use of exclusive contracts to prevent rivals' access to dealers who were the "critical link to end-users."[84]  Such exclusion can violate Section 2 even where other means of distribution exist.  In *Grinell*, the Supreme Court proclaimed that "it is unlawful and exclusionary" for a monopolist to enter into "restrictive agreements" that render certain market segments "free of competition."  384 U.S. at 570, 576.  *See also, e.g., Dentsply*, 399 F.3d at 196 ("mere existence of other avenues of distribution is insufficient without an assessment of their overall significance to the market"); *Microsoft*, 253 F.3d at 64 (anticompetitive tactics violated Section 2 by excluding rivals from the most cost-efficient means of distribution).

In the x86 microprocessor market, the OEM distribution channel is the critical link for reaching end users and expanding market share.  Here, Intel uses its monopoly power in the x86 microprocessor market to preserve its dominant market position by engaging in anticompetitive conduct to control, limit, and delay the OEMs' introduction of products that incorporate AMD microprocessors, and to limit the promotion of such products if and when they are launched.  This does not constitute Intel persuasion of OEMs to reject AMD microprocessors by reason of Intel's technical superiority or lower pricing.  Rather, through the use of threats and payments targeted at disadvantaging AMD, Intel coerces OEMs to delay or terminate long-planned and full engineered launches of AMD-powered products, and to limit the promotion of those they do launch.  Intel's use of such exclusionary tactics forecloses AMD from opportunities it has already won, thereby compounding the exclusion that severely restricts its access to opportunities in the first place.  Intel's exclusion of AMD from the major OEMs' full product

---

[83] *SmithKline*, 575 F.2d at 1065.

mix and promotional mainstream relegates AMD to less efficient and inferior means of distribution and serves to keep AMD's revenue share of the x86 microprocessor market well below 20%.[85]  As a result, Intel's anticompetitive conduct restricts output, raises prices, reduces consumer choice, slows innovation, and precludes AMD from achieving sustainable efficient scale.  *See General Indus. Corp.*, 810 F.2d at 804 (preventing competing products from reaching store shelves deprives consumers of real choice).

<blockquote>

**4.    Subsidization of Below-Cost Bids by Providing "Loyal" OEMs Free Microprocessors with Which To Target "Disloyal" OEMs Bidding AMD Solutions**
</blockquote>

Predatory pricing in violation of Section 2 occurs when a defendant sets its prices below an appropriate measure of its cost but still has a reasonable prospect of recouping its investment in the below cost pricing scheme.[86]  While non-conditional low prices benefit consumers, pricing set at predatory levels can threaten competition.[87]  The definition of the appropriate measure of cost to test for predation has never been addressed by the Supreme Court and is particularly difficult in an industry with high and continuing research and development costs and relatively

---

[84]  399 F.3d at 196 (analogizing Dentsply's authorized dealers to the high-volume retailers in *Le Page's* that were critical of providing competing firms with access to "the widespread locations and strong customer goodwill that prominent retailers provided").

[85]  *See* R. Bork, *The Antitrust Paradox* 156 (1978) ("By disturbing optimal distribution patterns one rival can impose costs upon another, that is, force the other to accept higher costs."); Herbert Hovenkamp, *Antitrust Law* ¶ 1802c, at 64 (2d ed. 2002) ("A set of strategically planned exclusive dealing contracts may slow the rival's expansion by requiring it to develop alternative outlets for its products or rely at least temporarily on inferior or more expensive outlets. Consumer injury results from the delay that the dominant firm imposes on the smaller rival's growth.").

[86]  *Brooke Group Ltd.*, 509 U.S. at 222-224.

[87]  *Brooke Group, Ltd.*, 509 U.S. at 223.

low "next unit" manufacturing costs.[88]  Certain fixed costs become variable over a relatively short period of predation.  While the parties' respective experts will grapple with these issues, there is clear evidence that ███████████████████████████████████████████ ███████████████  Since it is indisputable that the production of a microprocessor involves <u>some</u> cost, such "sales" are necessarily predatory.

In the x86 microprocessor market, AMD is Intel's only remaining rival of consequence. The "foreclosure of 'one significant competitor' from the market," let alone the only competitor, "may lead to higher prices and reduced output."[89]  Given the near insurmountable barriers to industry entry, Intel can readily recoup the costs associated with its targeted predatory pricing scheme through the lessening in innovation rivalry that its suppression of AMD will engender.

> **5.     Range of Non-Price Exclusionary Conduct, Such As Threats, Interferences with AMD Product Launches, and Withholding of Technical Information from Customers That Did "Too Much" Business with AMD**

Conduct that has no rational business purpose other than its adverse effect on competition is exclusionary.  *General Indus. Corp.*, 810 F.2d 795 (defendant engaged in an array of non-price exclusionary conduct in violation of Section 2, including persuading competing manufacturers to terminate a rival's distributorship, threatening customers and forcing them to cancel orders with its rivals, and preventing competing products from reaching store shelves).  Influencing or inducing customers in an improper manner, through bribes, threats, or similar practices, violates

---

[88] In such an industry, the relevant measure of cost should include fixed and sunk capital costs. While a monopolist's prices could be above the marginal short-term cost of producing an additional unit, they may be below an equally efficient competitor's long-term costs of staying in business.  *See* RICHARD POSNER, ANTITRUST LAW: AN ECONOMIC PERSPECTIVE 188, 193 (1976).
[89] *LePage's*, 324 F.3d at 159 (quoting *Roland Mach. Co. v. Dresser Indus., Inc.*, 749 F.2d 380, 394 (7th Cir. 1984)).

Section 2.[90] In *Instructional Sys. Dev. Corp. v. Aetna Casualty & Surety Co.*, 817 F.2d 639 (10th Cir. 1990), the court was quick to infer anticompetitive intent to protect its monopoly where the defendant bribed purchasing officials, caused customers to delay payments to its rival, and disparaged its rival's products to potential customers. *See also Conwood*, 290 F.3d at 786 (defendant engaged in a variety of non-price exclusionary conduct in violation of Section 2 including the destruction of the plaintiff's in-store displays, disparaging the plaintiff's reputation, intimidating customers into purchasing the relevant product solely from the defendant, and threatening suppliers that assisted the defendant's rivals).

Intel engages in a wide array of anticompetitive non-price conduct bearing no justification other than to restrain competition in the x86 microprocessor market. Intel's retaliatory tactics against OEMs who choose to do business with AMD include the delay of earned payments and the withdrawal of discretionary payments, the withholding of competitively important technical information or other forms of support, and discriminatory rationing of high demand products. Intel engages in these and similar anticompetitive practices to engender fear among OEMs that "too much" or the "wrong kind" of business with AMD will brand them "disloyal" and subject them to costly punishment. Intel's reputation for retaliation serves to deter OEMs from doing business with AMD, and thereby materially contributes to the maintenance of Intel's monopoly.

**C.    The Anticompetitive Effects of Intel's Myriad Exclusionary Conduct Must Be Considered Together**

While the forms of Intel's anticompetitive conduct are as diverse as its opportunities for

---

[90] *Associated Radio Servs. Co.*, 624 F.2d at 1354 (condemning a monopolist's use of suspicious payments with customers to steal business from its rival).

-84-

exclusion are varied, the relevant inquiry is their overall effect of a monopolist's practices considered together.[91]  As summarized by the Third Circuit:

> As the Supreme Court recognized in *Cont'l Ore Co. v.* Union *Carbide & Carbon Corp.*, 370 U.S. 690, 699, 82 S.Ct. 1404, 8 L.Ed.2d 777 (1962), the courts must look to the monopolist's conduct taken as a whole rather than considering each aspect in isolation.  The Court stated, "'in a case like the one before us [alleging § 1 and § 2 violations], the duty of the jury was to look at the whole picture and not merely at the individual figures in it.'" *Id.* (citation omitted).  *See also City of Anaheim v. S. Cal. Edison Co.*, 955 F.2d 1373, 1376 (9th Cir. 1992) ("[I]t would not be proper to focus on specific individual acts of an accused monopolist while refusing to *consider their overall combined effect* … We are dealing with what has been called the 'synergistic effect' of the mixture of the elements.") (emphasis added).[92]

So here, early predatory exclusion from would-be "evangelist" buyers of Opteron-powered servers dampened end user demand for other AMD-based solutions.  Absent such suppression, heightened demand would have pressed fearful OEMs sooner and harder to risk Intel's retaliation and to break free of its stick-and-carrot exclusivity.  Thus, each element of

---

[91] 2 Phillip E. Areeda & Herbert Hovenkamp, *Antitrust Law* ¶ 310c7, at 208 (3d ed. 2007).
[92] *Le Page's*, 324 F.3d at 162.

Intel's exclusion reinforces another.[93]  It is that cumulative and synergistic effect on AMD and the x86 microprocessor market that constitutes the pertinent inquiry for this case.

### D.    Anticompetitive Effect

The cumulative effect of Intel's exclusionary conduct has been critically to suppress AMD's market opportunity to achieve a scale that would have sustained its long-term presence as an x86 innovation rival.  That AMD gained some share and revenue is immaterial.  It gained sufficiently <u>less</u> share and sufficiently <u>less</u> revenue so as to suffer a critical diminishment of its innovation roadmap.  As held in *Dentsply*, "the test is not total foreclosure, but whether the challenged practices … severely restrict the market's ambit."[94]  As did Microsoft, Intel "kept usage of its competitor's [product] below 'the critical level necessary for [its rival] to pose a real threat to Microsoft's monopoly.'"[95]

Such strategically planned exclusion may slow the rival's expansion and "[c]onsumer injury results from the delay that the dominant firm imposes on the smaller rival's growth."[96]  The pertinent inquiry is whether Intel's conduct excluded a competitor "from the essential facilities that would permit it to achieve the efficiencies of scale necessary to threaten the monopoly."[97]  Here, AMD's growth was not only slowed, but its best opportunity to achieve innovation sustainability was thwarted.  Where, as here, barriers to entry are high and only one

---

[93] *See* Irwin M. Stelzer, Notes for Presentation at Department of Justice - Federal Trade Commission Hearings on Monopoly Power and Single Firm Conduct (March 7, 2007), at 15-16 ("To examine a firm's pricing practices in isolation from its other practices is to look at one thread in a tapestry. …. [A]n examination of all of the dominant firm's tactics, and on the ebb and flow of its market position, throws light on its pricing practices – on their intent and effect.").
[94] *Dentsply*, 399 F.3d at 191.
[95] *LePage's*, 324 F.3d at 159 (quoting *Microsoft*, 253 F.3d at 69).
[96] *Dentsply*, 399 F.3d at 191.
[97] *LePage's*, 324 F.3d at 159.

viable rival remains, competitive injury to that competitor becomes injury to the competitive process itself.[98] Not only was consumer choice limited by the constrained availability of AMD-based product, but consumers will additionally suffer the higher prices and technological loss that AMD's diminishment as an innovation rival will bring. That loss will include not only less AMD innovation, but the loss as well of the incremental Intel innovation that AMD's lost innovation would have spurred.

### E.    Intel's Exclusionary Conduct Inflicted Antitrust Injury on AMD

AMD will show that Intel's unlawful conduct foreclosed AMD from a multitude of sales opportunities that AMD would have won but for such misconduct. This in itself is more than sufficient to prove antitrust injury: "It is enough that the illegality is shown to be a material cause of the injury; a plaintiff need not exhaust all possible alternative sources of injury in fulfilling his burden of proving injury compensable under § 4 [of the Clayton Act]."[99]

Beyond meeting this minimum burden, AMD will go on to show that the totality of Intel's exclusionary conduct had the synergistic effect of maintaining its monopoly, thereby harming both consumers and the competitive process. Where, as here, only one market rival remains, injury to that rival constitutes injury to the competitive process itself:

> When a monopolist's actions are designed to prevent *one* or more
>
> new or potential competitors from gaining a foothold in the market
>
> by exclusionary, i.e. predatory, conduct, its success in that goal is

---

[98] *LePage's*, 324 F.3d at 162-163.
[99] *Zenith Radio Corp. v. Hazeltime Research Inc.*, 395 U.S. 100, 114 n.9 (1969) (citations omitted) (emphasis in original).

not only injurious to the potential competitor but also to competition in general.[100]

AMD will establish the revenue shortfalls suffered as a result of Intel's misconduct, as well as the manner in which those shortfalls constrain its ongoing innovation. It will then proceed to quantify the revenue levels required to sustain an innovation rival in the X86 microprocessor market. Finally, it will present expert economic analysis that will demonstrate that but for Intel's exclusionary and predatory conduct AMD would have achieved that revenue position during its multi-year window of technological advantage. Thus, the constraint upon AMD's future capacity to innovate is the vehicle by which the injury to the competitive process has been delivered. That AMD's injury accordingly qualifies as recoverable antitrust injury is beyond any basis for serious dispute. *See, e.g., Angelico v. Lehigh Valley Hospital, Inc.*, 184 F.3d 268, 274 (3d Cir. 1999) (Injury "suffered, when shut out of competition for anticompetitive reasons, is indeed among those [injuries] the antitrust laws were designed to prevent."). Here AMD was "shut out" of sufficient business opportunity to prevent its emergence as a sustainable innovation competitor to Intel. That constitutes both antitrust injury and injury in fact, and entitles AMD to relief under Section 2.

## IV.    CATEGORIES OF EVIDENCE ON WHICH PLAINTIFFS EXPECT TO RELY

### A.    Given Factors Unique to This Case, Broad Deposition Discovery Is Appropriate

Before turning to the discovery Plaintiffs will need, four preliminary observations about discovery in this case are in order.

---

[100] *LePages*, 324 F.3d at 159 (emphasis added).

First, the scope of discovery must track the evidentiary burden that the discovery is intended to meet.  Here, Intel will undoubtedly hold Plaintiffs to a burden of establishing material exclusion, quantitatively, geographically (the relevant market is worldwide) and temporally.  To meet it, Plaintiffs will need to develop admissible evidence that, but for Intel's wrongful conduct, quarter-to-quarter over a seven-year period AMD would likely have been able to win a larger share of its customers' business around the world.  Necessarily, Plaintiffs must arm themselves  with evidence of what Intel constraints were in place over those quarters for each of those customers in each of those locations.

Building this record is not something Plaintiffs can achieve with a few dozen depositions.  The customer landscape is panoramic.  In this brief alone, we have discussed fifteen OEMs, ten system builders, and nine distributors whose executives and purchasing agents were deeply involved in negotiating exclusionary deals with Intel.  In annexes to this brief, we identify 206 Intel executives, managers, salespeople and engineers, as well as 280 of their customer counterparts, ███████████████████████████████████████ ███████████  The numbers are great because over time, different people occupied seats at the negotiating table, and we are dealing with a seven-year time horizon.

Second, much of  the testimony Plaintiffs need to elicit, and most of the documents they need to collect, will not be read or shown to the jury.  Instead, this discovery will contribute to an overall admissible record of Intel's misconduct that qualified experts can summarize and upon which they can rely.  In a case of this magnitude, the jury will see only the tip of a much larger iceberg that must be made up of admissible, record evidence.  Accordingly, the scope of discovery cannot be defined, as Intel would prefer, by the number of witnesses likely to be called to testify or the number of exhibits a party may eventually offer into evidence.

-89-

Third, by its conduct and culture, Intel has intentionally increased the difficulty of proving its antitrust violations. As noted earlier, among 140 million pages of discovery produced by Intel, ██████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████

███████████████████████████████████. Going back to the Andy Grove days, Intel has adopted and assiduously enforced an antitrust compliance program that has as its hallmarks the avoidance of a paper trail of its customer dealings and the prompt purging of any written record that might inadvertently appear. ████████████████████████

████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████

██████████████████████████████████████████████

Because of the laconic written deal record Intel has engineered, deposition discovery in this case unavoidably will be somewhat "hit and miss." ████████████████████

████████████████████████████████████████████████████████████████████

████████████ Plaintiffs will require multiple depositions to specifically identify those most materally involved and to stitch together from years-old recollections each episode of AMD exclusion.

-90-

Fourth, as noted earlier, the written record has not yet been fully assembled. ███████

███████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

Other OEMs are in the process of supplementing their production. ███████████

███████████████████████████ Moreover, much of Intel's

production, has yet to be received in usable form. This is particularly so as to ███████

███████████████████████████████████████████████████████████

███████ When ultimately available for review, these documents will undoubtedly shed light on

some additional deposition needs.

### B.    Depositions Needed To Establish the Facts

███████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

For the court's convenience, the names of those individuals (together with identifying

information) are collected in annexes to this Statement. Annex A sets forth ███████████

███████████████████████████████████████████████████████████

███████████████████████████████ Annex B sets forth ███

███████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

███████████████████ All are thus likely deposition candidates.

Obviously, as depositions are conducted, names will fall off these lists, but others are

likely to be added, both because of deposition testimony implicating them or the production of