new documents identifying their roles.  Hence, the lists should be regarded as preliminary.

**C.     Categories of Documents on Which Plaintiffs Expect To Rely**

Documentary evidence on which Plaintiffs expect to reply comes from two broad sources: Intel and its customers.   The Intel materials take the form of email and other correspondence, internal reports and presentation material and spreadsheets culled from approximately 328 Intel custodians.  These materials provide, *inter alia*, ███████████

██████████████████████████████████████████

████████████████████████████████

Additionally, Intel is in the process of producing sales transactional data (e.g., price, quantity, etc.), cost data (cost to manufacture microprocessors at each fab) and other manufacturing data (e.g., yield rates, etc.) from Intel's internal database systems and materials stored for and accessible by Intel work groups in SharePoint servers.  This data will constitute part of the basic source material for economic analysis of the exclusion effects of Intel's conduct.

The third-party productions include documents and transactional data maintained by the various OEMs, system builders, parts distributors and computer retailers, as well as documents maintained by various Intel partners and vendors (e.g., Skype, Microsoft, and Intel's auditors, Ernst & Young).  These materials are being produced from various custodians responsible for their employer's Intel relationship and, as in the case with similar materials from Intel, provide a basic understanding of the respective dealings between Intel and its customers.

Transactional data is also being produced by some of the third parties including all major OEMs (Dell, HP, IBM, Lenovo, Acer, Gateway, Fujitsu, NEC, Sony), major distributors of microprocessors and computer systems (TechData, Avnet, Synnex, Ingram Micro, ASI), system builders (Rackable, Supermicro, Egenera) and major computer retailers (Best Buy, CompUSA,

Staples, Circuit City, Office Depot, Office Max). The data consists either of transactional level detail, or weekly or monthly sales compilations. In the case of distributors, these data show sales of x86 microprocessors, while in the case of OEMs, system builders and retailers they show sales of the computer systems incorporating x86 microprocessors. Producing third parties are also providing data on their cost of goods sold. This third-party data will also constitute part of the source material Plaintiffs' experts will use in analyzing the effect of Intel's exclusionary conduct.

**D.    Expert Testimony**

Plaintiffs currently intend to offer economic and industry expert testimony. The latter will deal with issues such as the structure of the x86 microprocessor and computer markets; demand- and supply-side substitutability of x86 and non-x86 microprocessors; barriers to entry; the existence and extent of, and explanation for, the uncontestable segment of customers' business; the relative importance of different parts of the x86 distribution chain; economies of scale and sustainability in the x86 space; the different development paths taken by AMD and Intel, and the relative superiority of their products.

Economic testimony will establish that the relevant geographic market is global, and a relevant product market is x86 microprocessors ("CPUs") suitable for use in personal computers, workstations and servers. It will also show that Intel had substantial monopoly power in the x86 market, and that AMD's presence in the market acted as a constraint on that power. Existing high entry barriers prevent other actual or potential competitors from constraining Intel's monopoly power. Economists will also analyze the effects of Intel's numerous forms of anticompetitive behavior, show that they foreclosed AMD from a material portion of the market and, if required, show that Intel used conditional financial incentives that effectively priced units that would otherwise have been purchased from AMD below an appropriate measure of cost.

This behavior harmed AMD by foreclosing sales of its products, raising its costs, and constraining its ability to invest in innovation. All of this, in turn, harmed consumers through higher prices, less product variety, and reduced innovation.

Economic analysis will also quantify both lost profits on the sales of CPUs that AMD would have sold but for Intel's misconduct, and additional adverse impacts (such as higher borrowing and production costs) that collectively reduced its enterprise value. AMD's lost profits and impairment to its enterprise value will be estimated separately. Damages arising from direct effects on U.S. commerce (for FTAIA purposes) will also be estimated.

## V.    FORMS OF RELIEF SOUGHT BY PLAINTIFFS

### A.    AMD Seeks Damages For The Injury To Its Business And An Injunction Prohibiting Intel's Exclusionary Conduct

AMD seeks treble damages for the injury to its business and property. *See* 15 U.S.C. § 15 (any person injured in his or her "business or property by reason of anything forbidden in the antitrust laws . . . shall recover threefold the damages by him [or her] sustained . . .") Once fact of injury has been shown, "it is not necessary to show with total certainty the amount of damages sustained, just that the antitrust violation caused the antitrust injury suffered by the plaintiff." *Rossi v. Standard Roofing*, 156 F.3d 452, at 483 (3d Cir. 1998).

AMD's damages include the difference in the business value of AMD as it presently exists and as it would have existed but for Intel's exclusionary conduct. Expert analysis establishing those respective values will be presented.[101] AMD's damages presentation will also take account of Judge Farnan's ruling[102] concerning limitations resulting from the Foreign Trade

---

[101] *See generally Rossi*, 156 F.3d 452, 485-87.
[102] *Advanced Micro Devices v. Intel Corporation*, 452 F. Supp. 2d 555 (D. Del. 2006).

Antitrust Improvements Act.[103]  Evidence will be presented establishing a direct link between AMD's damages and affected U.S. commerce.  That evidence will include a showing both of the "but for" domestic structure of AMD and the locus of the sales opportunities which Intel unlawfully foreclosed.  AMD's damages claim has not yet been fully quantified, but will certainly be measured in billions of dollars.

AMD will also seek injunctive relief.  Indeed, the only realistic prospect for sustainable competition in the X86 market is vitally dependant on such relief.  Unless Intel is hereafter limited to the lawful merits competition that Section 2 permits, its monopoly will forever remain unchallengeable.  Appropriate injunctive relief will necessarily include specific prohibitions directed at each of the exclusionary practices by which Intel forecloses rivals from market opportunities.  Prohibitions against express and implied exclusive dealing arrangements, prohibitions against pricing schemes that achieve exclusion through all-or-nothing leveraging, and prohibitions against payments for dropping, delaying or limiting the manufacture, sale or promotion of rival-based products will all be sought.  Equally important is a prohibition tailored to take away the "stick" half of Intel's "stick-and-carrot" usurpation of customer purchasing freedom.  The crux of Intel's "stick" strategy is the discriminatory disadvantage it imposes on "disloyal" OEMs.  This serves both to punish those targeted OEMs while deterring others from dealing with AMD lest they too incur Intel's wrath.  To lift this dark veil of fear, AMD will seek an injunction that will require transparency in Intel's customer dealings and prohibit

---

[103] 15 U.S.C. § 6a (1997).

discrimination against those who also deal with AMD.[104]

### B.    Class Plaintiffs Seek Recovery of "Pass On" Damages and Injunctive Relief

Class Plaintiffs seek to represent a class of individuals and entities residing in the United States that bought personal computers containing an Intel x86 microprocessor.  The putative class members are individual consumers, businesses and other organizations that use (as opposed to re-sell) Intel's microprocessors.  Occupying the end of the chain of distribution, they are the ones in that chain who have suffered the consequences of Intel's exclusionary behavior because they cannot pass that injury on to others.

The monetary relief being sought by Class Plaintiffs is the recovery of the overcharges resulting from Intel's anticompetitive conduct that were "passed on" to the putative class members during the class period.  Intel's monopoly in the X86 microprocessor market has had a class-wide impact in the form of overcharges, i.e., the difference between the price that was actually paid by the putative class members and the price they would have paid had the anticompetitive conduct not occurred.  *See, e.g. DRAM*; 2006 WL 1530166, at *7-10.

Calculation of these damages will involve expert opinion as to the percentage overcharge imposed by Intel on its direct purchasers and the extent to which that overcharge was passed on to members of the proposed class.  At the direct level, the overcharge estimate will require identification of one or more benchmarks as well as the use of margin data and other information concerning these benchmarks.  Potential benchmarks include any microprocessors sold by Intel at prices that during a particular time period were unaffected or affected less by Intel's

---

[104] *See United States v. Dentsply Int'l, Inc.*, 2006 WL 2612167, *2-3 (injunction banning price discrimination against non-exclusive dealers while permitting volume discounts only where "publicized" and offered to all dealers on a "uniform basis").

challenged conduct, or other products sold by Intel or third parties that were not the subject of Intel's exclusionary conduct.

At the indirect level, the pass-on estimate will require expert analysis of purchase and sales data from Intel and third parties, much of which already has been collected. Class Plaintiffs will also need to have sufficient understanding of the data that are produced so that they and their experts can rely upon this information.

On May 16, 2008, Class Plaintiffs are scheduled to file a motion in which they will seek certification of a nationwide class for damages under California law. Alternatively, they will seek certification of a 26-state subclass for damages under the laws of those states. At this stage of the litigation, Class Plaintiffs have not yet estimated the damages of the proposed class or sub-class, but they expect such damages to measure in the billions of dollars.

Class Plaintiffs also seek injunctive relief pursuant to Section 16 of the Clayton Act, 15 U.S.C. § 26 on behalf of a nationwide class. The putative class members will continue to buy personal computers equipped with Intel x86 microprocessors, and by forcing Intel to stop its anticompetitive conduct, they would benefit from lower-priced PCs in the future. Class members would also benefit in the future from a broader range of microprocessor choices and greater microprocessor innovation in a more competitive environment.

## VI.    CONCLUSION

Intel's illegal maintenance of its x86 monopoly was pervasive, long standing, largely undocumented and below the radar. For these reasons, substantial numbers of depositions will be required – both of Intel witnesses and third-party witnesses – to get to the facts. Plaintiffs renew their request that the Court permit their discovery to proceed along multiple deposition tracks, two for Intel witnesses and a third for third-party witnesses, and a window within which to complete all three.

**RICHARDS, LAYTON & FINGER, P.A.**

*/s/ Frederick L. Cottrell, III*
Frederick L. Cottrell, III (#2555)
Chad M. Shandler (#3796)
Steven J. Fineman (#4025)
One Rodney Square
920 North King Street
Wilmington, DE  19899
(302) 651-7836
cottrell@rlf.com
shandler@rlf.com
fineman@rlf.com

OF COUNSEL:

Charles P. Diamond
Linda Smith
Mark Samuels
O'Melveny & Myers LLP
400 South Hope Street
Los Angeles, CA 90071-2899

*Attorneys for Advance Micro Devices, Inc. and*
*AMD International Sales & Service, Ltd.*

**PRICKETT JONES & ELLIOTT, P.A.**

*/s/ James L. Holzman*
James L. Holzman (#663)
J. Clayton Athey (#4378)
1310 King Street
P. O. Box 1328
Wilmington, DE  19899
(302) 888-6509
jlholzman@prickett.com
jcathey@prickett.com

*Interim Liaison Counsel and Attorneys for Phil*
*Paul, on behalf of himself and all others*
*similarly situated*

## CERTIFICATE OF SERVICE

I hereby certify that on May 5, 2008, I electronically filed the foregoing document with

the Clerk of Court using CM/ECF and have sent by Hand Delivery to the following:

Richard L. Horwitz, Esquire
Potter Anderson & Corroon, LLP
1313 North Market Street
P. O. Box 951
Wilmington, DE 19899

James L. Holzman, Esquire
Prickett, Jones & Elliott, P.A.
1310 King Street
P.O. Box 1328
Wilmington, DE 19899-1328

I hereby certify that on May 5, 2008, I have sent by Federal Express the foregoing

document to the following non-registered participants

Darren B. Bernhard, Esquire
Howrey LLP
1299 Pennsylvania Avenue, N.W.
Washington, DC 20004-2402

Robert E. Cooper, Esquire
Daniel S. Floyd, Esquire
Gibson, Dunn & Crutcher LLP
333 South Grand Avenue
Los Angeles, California 90071-3197

/s/ Chad M. Shandler
Chad M. Shandler (#3796)
shandler@rlf.com

RLF1-3127330-1