## IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF DELAWARE

|  |  |
|---|---|
| IN RE<br>INTEL CORPORATION<br>MICROPROCESSOR ANTITRUST<br>LITIGATION | )<br>)<br>)<br>)<br>)<br>) | C.A. 05-md-1717-JJF |
| ADVANCED MICRO DEVICES, INC., a<br>Delaware corporation, and AMD<br>INTERNATIONAL SALES & SERVICES, LTD.,<br>a Delaware corporation,<br><br>Plaintiffs,<br><br>v.<br><br>INTEL CORPORATION, a Delaware corporation,<br>and INTEL KABUSHIKI KAISHA, a Japanese<br>corporation,<br><br>Defendants. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) | C.A. No. 05-441-JJF |
| PHIL PAUL, on behalf of himself<br>and all others similarly situated,<br><br>Plaintiffs,<br><br>v.<br><br>INTEL CORPORATION,<br><br>Defendants. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) | C.A. No. 05-485-JJF<br><br>CONSOLIDATED ACTION |

## PLAINTIFFS' JOINT RESPONSE TO
## INTEL'S PRELIMINARY PRETRIAL STATEMENT

## REDACTED — PUBLIC VERSION

**RICHARDS, LAYTON & FINGER, P.A.**

Frederick L. Cottrell, III (#2555)
Chad M. Shandler (#3796)
Steven J. Fineman (#4025)
One Rodney Square
920 North King Street
Wilmington, DE 19899
(302) 651-7836
cottrell@rlf.com
shandler@rlf.com
fineman@rlf.com

OF COUNSEL:

Charles P. Diamond
Linda J. Smith
Mark A. Samuels
O'Melveny & Myers LLP
400 South Hope Street
Los Angeles, CA 90071-2899

*Counsel for Advanced Micro Devices, Inc.* and
*AMD International Sales & Services, Ltd.*

Dated: May 12, 2008

**PRICKETT JONES & ELLIOTT, P.A.**

James L. Holzman (#663)
J. Clayton Athey (#4378)
1310 King Street
P. O. Box 1328
Wilmington, DE 19899
(302) 888-6509
jlholzman@prickett.com
jcathey@prickett.com

*Interim Liaison Counsel and Attorneys for Phil Paul, on behalf of himself and all others similarly situated*

Dated: May 12, 2008

**TABLE OF CONTENTS**

Page

TABLE OF AUTHORITIES ....................................................................................................... iii

I.    INTRODUCTION ............................................................................................................. 1

II.   THIS CASE IS NOT ABOUT MERIT-BASED PRICE COMPETITION....................... 1

      A.   Conditioning Discounts On Sales That Intel Will Make Anyway As A
           Means Of Raising A Customer's Cost Of Doing Business With AMD On
           Contestable Sales Is Not Price Competition ........................................................... 1

      B.   Paying Customers On The Condition That They Kill Or Postpone The
           Introduction Of AMD-Based Computers Is Not Price Competition ...................... 2

      C.   Paying Customers On The Condition That They Not Brand Or Advertise
           Their AMD-Based Computers Is Not Price Competition....................................... 3

      D.   Paying Customers On The Condition That They Not Do Business With
           AMD Is Not Price Competition ............................................................................. 4

III.  THE LAW IS CLEAR IN THE THIRD CIRCUIT THAT PAYMENTS BY A
      MONOPOLIST CONDITIONED ON EXCLUSIVITY VIOLATE SECTION 2............ 4

      A.   A Monopolist's Achievement Of Exclusivity Or Near Exclusivity By
           Means Of Such Conditional Payments Or Discounts Violates Section 2.............. 4

      B.   Such Exclusion Is Unlawful Whether Achieved Through An Express
           Condition, An Implicit Condition, Or A Condition Imposed By The
           Structure Of A Pricing Scheme.............................................................................. 6

      C.   Intel's Exclusionary Pricing Schemes Are Not Saved By Reason Of Its
           Total Revenue Being Above Its Total Cost ........................................................... 7

IV.   IT IS BROADLY RECOGNIZED OUTSIDE OF THE THIRD CIRCUIT THAT
      A TOTAL PRICE ABOVE TOTAL COST CAN BE STRATEGICALLY
      STRUCTURED SO AS TO EXCLUDE AN EQUALLY EFFICIENT RIVAL ............. 8

V.    SECTION 2 PREVENTS A MONOPOLIST FROM IMPOSING CONDITIONS
      THAT LIMIT "THE OPPORTUNITIES OF RIVALS" AND DO "NOT
      FURTHER COMPETITION ON THE MERITS," WHICH IS PRECISELY
      WHAT THE EVIDENCE THUS FAR ASSEMBLED PROVES THAT INTEL
      HAS DONE ..................................................................................................................... 11

      A.   IBM-Lenovo ......................................................................................................... 11

      B.   Dell....................................................................................................................... 14

      C.   Hewlett-Packard.................................................................................................... 16

      D.   Fujitsu-Siemens.................................................................................................... 17

      E.   Acer....................................................................................................................... 18

## TABLE OF CONTENTS
## (Continued)

Page

F.   Japanese OEMs ................................................................................................... 19

    1.   NEC.......................................................................................................... 19

    2.   Fujitsu ...................................................................................................... 20

    3.   Sony and Toshiba Revisited..................................................................... 21

G.   Tier Two OEMs, Whitebox Companies and Distributors ................................... 22

VI.   INDEPENDENT PRODUCT EVALUATIONS, INDUSTRY ACCOLADES, AND INTEL'S ADMISSIONS ALL ESTABLISH AMD AS A WORTHY COMPETITOR CAPABLE OF SATISFYING A FAR LARGER SHARE OF THE MARKET THAN INTEL HAS ALLOWED IT ...................................................... 24

A.   AMD Product Performance and Execution ......................................................... 24

B.   AMD Capacity .................................................................................................... 32

VII.   INTEL'S STAGGERED AND STUNTED DEPOSITION PROPOSAL IS CALCULATED TO BLOCK PLAINTIFFS FROM PROVING INTEL'S VIOLATIONS ................................................................................................................. 35

A.   Intel's Proposal That Depositions Be Confined To Those In The Executive Suite Is A Shameful Attempt To Conceal Its Misconduct..................................... 35

B.   The FTAIA Does Not Support The Staged "Domestic" Discovery Intel Proposes ............................................................................................................. 37

VIII.   CONCLUSION.................................................................................................................. 40

# TABLE OF AUTHORITIES

**Page**

**Cases**

*Advanced Micro Devices, Inc. v. Intel Corp.,*
    452 F.Supp.2d 555 (D. Del. 2006) ............................................................. 38

*American Tobacco Co. v. United States,*
    328 U.S. 781 (1946) ................................................................................. 3

*Aspen Skiing Co. v. Aspen Highlands Skiing Corp.,*
    472 U.S. 585 (1985) ................................................................................. 3

*Broadcom Corp. v. Qualcomm Inc.,*
    501 F.3d 297 (3d Cir. 2007) ........................................................... 2, 4, 5, 9

*Brooke Group Ltd. v. Brown & Williamson Tobacco Corp.,*
    509 U.S. 209 (1993) ................................................................................. 8

*Carter Carburetor Corp. v. Fed. Trade Comm'n,*
    112 F.2d 722 (8th Cir. 1940) .................................................................... 6

*Cascade Health Solutions v. PeaceHealth,*
    515 F.3d 883 (9th Cir. 2008) .................................................................. 10

*Concord Boat Corp. v. Brunswick Corp.,*
    207 F.3d 1039 (8th Cir. 2000) ................................................................ 10

*Conwood Co., L.P. v. U.S. Tobacco Co.,*
    290 F.3d 768 (6th Cir. 2002) .................................................................... 3

*Gen. Indus. Corp. v. Hartz Mountain Corp.,*
    810 F.2d 795 (8th Cir. 1987) .................................................................... 3

*LePage's Inc. v. 3M,*
    324 F.3d 141 (3d Cir. 2003) ............................................................ *passim*

*Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,*
    475 U.S. 574 (1986) ................................................................................. 1

*Ortho Diagnostic Sys. v. Abbott Labs, Inc.,*
    920 F. Supp. 455 (S.D.N.Y. 1996) ..................................................... 8, 10

*SmithKline Corp. v. Eli Lily & Co.,*
    575 F.2d 1056 (3d Cir. 1978) ........................................................... 5, 6, 7

*Tampa Electric Co. v. Nashville Coal Co.,*
    365 U.S. 320 (1961) ................................................................................. 6

*U.S. v. Microsoft,*
    353 F.3d 34 (D.C. Cir. 2001) .................................................................... 6

RLF1-3282606-1

## TABLE OF AUTHORITIES
### (Continued)

**Page**

*United States v. Dentsply Int'l, Inc.,*
  2006 WL 2612167 (D. Del. Apr. 26, 2006)...............................................................................1

*United States v. Dentsply Int'l, Inc.,*
  399 F.3d 181 (3d Cir. 2005) ......................................................................................................4

*United States v. Linde Air Prods. Co.,*
  83 F. Supp. 978 (N.D. Ill. 1949)...............................................................................................6

*Virgin Atl. Airways Ltd. v. British Airways PLC,*
  257 F.3d 256 (2d Cir. 2001) ......................................................................................................5

*Weyerhaeuser Co. v. Ross-Simmons Hardwood Lumber Co., Inc.,*
  127 S. Ct. 1069 (2007)...............................................................................................................8


**Statutes**

15 U.S.C. § 14............................................................................................................................6

RLF1-3282606-1

## I.   INTRODUCTION

This case is **not** about "legitimate price competition."[1]  AMD is and always has been

ready, willing, and able to compete, microprocessor-by-microprocessor, on price.  Indeed,

because AMD's prices have been and remain consistently lower than Intel's, AMD would

welcome unfettered price competition.[2]  Nor does AMD object to volume discounts whereby

ever-increasing purchases earn customers ever-increasing discounts (e.g., 10% off on the first

1000 units, 15% off on the next 1000, etc.).  Such forward-looking discounting legitimately

passes on to the customer cost savings resulting from proportionately larger purchases.  Were

these Intel's means of competition, this lawsuit would never have been filed.  We are here not

because of Intel's legitimate price competition but because it has seized on a bundle of

exclusionary tactics precisely to avoid competing against AMD on price.

## II.   THIS CASE IS NOT ABOUT MERIT-BASED PRICE COMPETITION

### A.   Conditioning Discounts On Sales That Intel Will Make Anyway As A Means Of Raising A Customer's Cost Of Doing Business With AMD On Contestable Sales Is Not Price Competition

It is not price competition when Intel offers to discount the price of a chip the customer

must buy from it regardless on the **condition** the customer **not** use a cheaper AMD product for a

platform that could be powered by either company's microprocessor.  Similarly, it is not price

competition when, owning most of the customer's business anyway, Intel offers an all-or-nothing

discount on a customer's purchases **conditioned** on the customer buying all or most of its needs

from Intel.  Such all-or-nothing, quantity-forcing discounts are in effect price penalties that Intel

levies on its uncontestable share of the customer's business in order to ratchet up the customer's

---

[1] *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 594 (1986).

[2] *See, e.g., United States. v. Dentsply Int'l, Inc.,* 2006 WL 2612167, *2-3 (D. Del. Apr. 26, 2006)
(injunction permitting volume discounts where "publicized" and offered to all dealers on a
"uniform basis").

cost of dealing with AMD on that portion that is contestable. In other words, its purpose is to make an AMD offer unattractive even when on a chip-per-chip basis the AMD product is cheaper.

When Intel leverages its "must carry" monopoly power so as to *condition* its discounts on the customer not doing business with AMD, it doesn't engage in price competition: it obliterates it. By denying customers the opportunity to make their purchasing decisions based on the relative price/performance values that Intel and AMD are respectively offering, it substitutes coercion for choice. Consumers are harmed not only by the resulting higher prices and loss of choice. In the longer term, they are also harmed by the erosion of the innovation rivalry that has spurred not only AMD but also Intel to achieve technologically in the manner and at the pace that the free market values.[3] This constitutes harm the antitrust laws were designed to prevent, for as the Third Circuit has affirmed as recently as last September, "[t]he primary goal of antitrust law is to maximize consumer welfare by promoting competition among firms." *Broadcom Corp. v. Qualcomm Inc.*, 501 F.3d 297, 308 (3d Cir. 2007) (citing *LePage's Inc. v. 3M*, 324 F.3d 141, 169 (3d Cir. 2003) (en banc)).

### B.    Paying Customers On The Condition That They Kill Or Postpone The Introduction Of AMD-Based Computers Is Not Price Competition

Through the use of threats and payments *conditioned* on OEMs' postponing or terminating fully engineered launches of AMD-powered products, Intel controls, limits, and delays the introduction of competitive AMD products. Despite Intel's contrary assertions, it is not merely persuading customers to buy and support Intel's products in preference to those offered by AMD. Through the use of conditional payments and other financial incentives, and a

- 2 -

concomitant threat to discriminatorily transfer them to more "loyal" rivals, Intel is coercing customers to abandon their investments in AMD-based platforms.[4] *See Gen. Indus. Corp. v. Hartz Mountain Corp.*, 810 F.2d 795, 804 (8th Cir. 1987) (defendant's "activities did not tend to allow products to compete against each other on their own terms, but rather [the defendant] invoked its considerable market power to cause superior competing products to fail to reach retail shelves, preempting any opportunity for the consumer to make a real choice").

## C. Paying Customers On The Condition That They Not Brand Or Advertise Their AMD-Based Computers Is Not Price Competition

Unlawful exclusionary conduct occurs when a monopolist engages in practices that tend to "impair the opportunities of rivals" and do "not further competition on the merits" or do so "in an unnecessarily restrictive way." *Aspen Skiing Co. v. Aspen Highlands Skiing Corp.*, 472 U.S. 585, 605 n.32 (1985). It is not merits-based price competition when Intel pays OEM customers on the condition they do not advertise their AMD platforms or not offer them under their existing brands. To the contrary, it is naked, exclusionary conduct that not only has an adverse effect on AMD, but on competition generally. *See Conwood Co., L.P. v. U.S. Tobacco Co.*, 290 F.3d 768, 788 (6th Cir. 2002) (upholding finding by jury that the defendant engaged in exclusionary conduct in a concerted effort to shut out its rivals from "the central marketplace battleground" by destroying competitors' advertising materials and entering into exclusive arrangements with retailers to reduce the number of competitors' offerings).

---

[3] *See American Tobacco Co. v. United States*, 328 U.S. 781, 813 (1946) (explaining that "unchallenged economic power deadens initiative," and "immunity from competition is a narcotic, [but] rivalry is a stimulant, to industrial progress") (internal quotations omitted).

[4] For example, ████████████████████████████████

### D.    Paying Customers On The Condition That They Not Do Business With AMD Is Not Price Competition

Intel's exclusive deals with OEMs, system builders, and distributors foreclose AMD from

a material share of the market. Despite Intel's contrary assertions, these exclusive arrangements

do not reflect the independent decisions of its customers to purchase all or nearly all of their

microprocessors from Intel. *See* Intel's Preliminary Pretrial Statement ("Intel Br.") at 60. The

arrangements instead reflect Intel's scheme to keep AMD's sales from reaching a level that

would sustain it as an innovation rival. *See United States v. Dentsply Int'l, Inc.*, 399 F.3d 181,

185 (3d Cir. 2005) (defendant's exclusionary practices were "designed expressly to exclude its

rivals from access to dealers" and from attaining a sustainable level of sales). That such conduct

does not represent merit competition is the central teaching of *LePage's*, 324 F.3d at 141.

As discussed recently by the Third Circuit in *Broadcom*, anticompetitive conduct can

take a "variety of forms, but it is generally defined as conduct to obtain or maintain monopoly

power as a result of competition on some basis other than the merits." *Broadcom*, 501 F.3d at

308. As outlined above, Intel's use of conditional payments and discounts takes a variety of

exclusionary forms, none of which represents legitimate competition based on price, quality, or

business acumen, and none of which is permissible under Section 2.

### III.    THE LAW IS CLEAR IN THE THIRD CIRCUIT THAT PAYMENTS BY A MONOPOLIST CONDITIONED ON EXCLUSIVITY VIOLATE SECTION 2

#### A.    A Monopolist's Achievement Of Exclusivity Or Near Exclusivity By Means Of Such Conditional Payments Or Discounts Violates Section 2

Contrary to Intel's assertion, Section 2 does not automatically bless a monopolist's

conditional transaction simply because its total customer revenue exceeds its total customer cost.

The Third Circuit has consistently found that a monopolist's use of financial inducements to

effect an exclusive or near-exclusive relationship can constitute anticompetitive conduct in

violation of Section 2 regardless of cost. Where a monopolist's conduct "impairs the

- 4 -

opportunities of rivals and either does not further competition on the merits or does so in an unnecessarily restrictive way," it violates Section 2. *Broadcom*, 501 F.3d at 308.

Specifically, in *LePage's* the Third Circuit held that "rebates and discounts" that "were designed to induce [customers] to award business to 3M to the exclusion of LePage's" could form the basis of a claim under Section 2 of the Sherman Act. *LePage's*, 324 F.3d at 158. There, as here, "the foreclosure caused by exclusive dealing practices was magnified by 3M's discount practices, as some of 3M's rebates were 'all-or-nothing' discounts, leading customers to maximize their discounts by dealing exclusively with the dominant market player, 3M, to avoid being severely penalized financially for failing to meet their quota in a single product line." *Id.* at 159.[5]

Similarly, the monopolist in *SmithKline Corp. v. Eli Lily & Co.*, 575 F.2d 1056 (3d Cir. 1978), implemented a "price-related marketing plan[]" that provided rebates on sales of its monopoly products to customers who also purchased qualifying quantities of a third product as to which the plaintiff competed. *Id.* at 1059-1061. Although the scheme gave customers only a 3% extra rebate, its all-or-nothing applicability to the entirety of a customer's three-product purchase volume required the plaintiff to offer discounts on its single product ranging from 16% to 35% to make the customer whole. The court recognized that this program "blatantly revised" the "economic laws of a competitive market" to the material exclusion of the plaintiff and accordingly found it in violation of Section 2. *Id.* at 1062, 1065.

Nor is Third Circuit law somehow out of touch with mainstream antitrust policy. The

---

[5] Unlike Virgin Atlantic Airways, which failed to introduce evidence that the "incentive agreements were coercive," LePage's did and AMD will present evidence that "specific customers felt compelled to purchase products" from the defendant. *See Virgin Atl. Airways Ltd. v. British Airways PLC*, 257 F.3d 256 (2d Cir. 2001).

- 5 -

plain language of Section 3 of the Clayton Act prohibits "fix[ing] a price charged" for goods "or *discount* from, or *rebate* upon, such price, on the *condition*, agreement, or understanding that the lessee or purchaser thereof shall not use or deal in the goods of a competitor . . . ." 15 U.S.C. § 14 (emphasis added).[6]  Surely, if such conduct is prohibited where it may substantially lessen competition in *competitive* markets,[7] it should not be countenanced where used to maintain a monopoly market.  Third Circuit law is clear that Section 2 stands squarely in the way of such blatant monopoly abuse.

### B.  Such Exclusion Is Unlawful Whether Achieved Through An Express Condition, An Implicit Condition, Or A Condition Imposed By The Structure Of A Pricing Scheme

Where a sales arrangement contains a condition of exclusivity it matters not whether that condition results from express agreement, implicit agreement, or is inherent in the arrangement's structure.  As the Supreme Court has admonished, it is the "practical effect" of the arrangement that matters.  *Tampa Electric Co. v. Nashville Coal Co.*, 365 U.S. 320, 327 (1961).

Accordingly, Third Circuit law condemns such arrangements whether they arise from express contract,[8] are implicit in the arrangement,[9] or arise from the very structure of the arrangement itself.[10]  In each instance the controlling test is the same:  Did the totality of the defendant's exclusionary conduct foreclose AMD from a sufficiently material market opportunity to keep it "below 'the critical level necessary for [it] to pose a real threat to

---

[6] Throughout this brief, all emphasis in quoted material has been added unless otherwise indicated.

[7] *See Carter Carburetor Corp. v. Fed. Trade Comm'n*, 112 F.2d 722 (8th Cir. 1940); *United States v. Linde Air Prods. Co.*, 83 F. Supp. 978 (N.D. Ill. 1949).

[8] *Dentsply*, 399 F.3d at 181 (express exclusivity clause in dealer contract violates Section 2).

[9] *LePage's*, 324 F.3d at 158 (rebates "designed" to exclude rival held a violation of Section 2).

[10] *SmithKline*, 575 F.2d at 1061 (practical reality of exclusionary effect rather than nominal form of the arrangement held to violate Section 2).

[defendant's] monopoly?'"[11]  AMD will prove at trial that it did just that.

## C.    Intel's Exclusionary Pricing Schemes Are Not Saved By Reason Of Its Total Revenue Being Above Its Total Cost

There is a fundamental distinction between exclusion of a rival through straight-forward

underselling (price predation) and exclusion by means of a conditional discount that, on a unit-

by-unit basis, is nominally less than the rival's discount.  As discussed above, the *SmithKline*

defendant's conditional 3% rebate on its sales of three antibiotics forced its one-product rival to

offer rebates between 16% and 35% in order to be price competitive.  While there was no

evidence that the defendant's 3% discount took its price below cost, the court recognized that

competition had been distorted to the material disadvantage of the rival and to the detriment of

competition on the merits:  "The result was to [allow the defendant to] sell all three products on a

non-competitive basis in what would have otherwise been a competitive market for [plaintiff's]

Ancef and [defendant's] Kefzol."  *SmithKline*, 575 F.2d at 1065.

Similarly, in *LePage's*, the Third Circuit expressly recognized that in challenging the

monopolist's conditional discount scheme, the plaintiff was "not mak[ing] a predatory pricing

claim," and accordingly rejected the defendant's argument "that it is not unlawful to lower one's

prices so long as they remain above cost."  *LePage's*, 324 F.3d at 151, 155.  Instead, it applied

standard Section 2 law to determine whether the monopolist was competing "on some basis other

than the merits."  *Id.* at 147.  Recognizing that all-or-nothing discounting reflects "an

exploitation of the seller's monopoly power," the court examined the market foreclosure that the

discount's conditional nature visited upon the rival and found such leveraged pricing a violation

of Section 2.  *Id.* at 156, 159.

Seeking to escape this controlling authority, Intel points out that in rejecting the

---

[11] *LePage's*, 324 F.3d at 158 (quoting *U.S. v. Microsoft*, 353 F.3d 34, 70-71 (D.C. Cir. 2001)).

applicability of a cost test, *LePage's* identified *Brooke Group Ltd. v. Brown & Williamson Tobacco Corp.*, 509 U.S. 209 (1993) as a Robinson-Patman Act case. (Intel Br. at 20)  Because the Supreme Court later confirmed in *Weyerhaeuser Co. v. Ross-Simmons Hardwood Lumber Co., Inc.*, 127 S. Ct. 1069 (2007), that its *Brooke Group* cost test applies as well to price predation claims brought under Section 2, Intel argues that *LePage's* "no longer holds any force." (Intel Br. at 20)  But all *Weyerhaeuser* did was to apply *Brooke Group*'s predatory selling test to a case involving predatory buying.  Recognizing that "predatory bidding mirrors predatory pricing," and that "both claims logically require firms to incur short-term losses," the Supreme Court held that both should be subject to a cost test so that such loss could be determined. *Weyerhaeuser*, 127 S. Ct. at 1076-77.

In contrast, conditional discounting does not require the monopolist to incur any short-term loss. *LePage's* accordingly recognized that it was not dealing with "a predatory pricing claim."[12]  And there is nothing in *Weyerhaeuser* that even considers, much less suggests, that a cost test should be applied to the conditional pricing schemes involved here and in *LePage's.* Indeed, the Third Circuit has itself cited and relied upon its decision in *LePage's* subsequent to the Supreme Court's decision in *Weyerhaeuser*,[13] thus validating its continuing vitality.  In view of the totality of these circumstances, Intel's suggestion that this Court is not bound to follow the Third Circuit's *en banc* decision in *LePage's* borders on irresponsibility.  (Intel Br. at 20 n.17)

## IV. IT IS BROADLY RECOGNIZED OUTSIDE OF THE THIRD CIRCUIT THAT A TOTAL PRICE ABOVE TOTAL COST CAN BE STRATEGICALLY STRUCTURED SO AS TO EXCLUDE AN EQUALLY EFFICIENT RIVAL

Courts outside the Third Circuit have likewise recognized the fundamental distinction between price predation and conditional discount schemes. *See, e.g.*, *Ortho Diagnostic Sys. v.*

---

[12] *LePage's,* 324 F.3d at 151.

*Abbott Labs, Inc.*, 920 F. Supp. 455, 467 (S.D.N.Y. 1996). The capacity of such schemes to exclude an equally efficient rival while remaining profitable for the monopolist lies at the heart of the distinction:

> Assume for the sake of simplicity that the case involved the sale of two hair products, shampoo and conditioner, the latter made only by A and the former by both A and B. Assume as well that both must be used to wash one's hair. Assume further that A's average variable cost for conditioner is $2.50, that its average variable cost for shampoo is $1.50, and that B's average variable cost for shampoo is $1.25. B therefore is the more efficient producer of shampoo. Finally, assume that A prices conditioner and shampoo at $5 and $3, respectively, if bought separately but at $3 and $2.25 if bought as part of a package. Absent the package pricing, A's price for both products is $8. B therefore must price its shampoo at or below $3 in order to compete effectively with A, given that the customer will be paying A $5 for conditioner irrespective of which shampoo supplier it chooses. With the package pricing, the customer can purchase both products from A for $5.25, a price above the sum of A's average variable cost for both products. In order for B to compete, however, it must persuade the customer to buy B's shampoo while purchasing its conditioner from A for $5. In order to do that, B cannot charge more than $0.25 for shampoo, as the customer otherwise will find A's package cheaper than buying conditioner from A and shampoo from B. On these

---

[13] *Broadcom*, 501 F.3d at 308.

> assumptions, A would force B out of the shampoo market,
>
> notwithstanding that B is the more efficient producer of shampoo, without
>
> pricing either of A's products below average variable cost.

*Id.* at 467-68. Noting that *Brooke Group* "did not even address package pricing schemes" and "thus cannot have decided the issue," the *Ortho* court proceeded to expressly reject the total-price-total-cost test Intel advances here. *Id.* at 467-68.[14] Instead, the court fashioned an alternative test pursuant to which the plaintiff must show only that the monopolist's bundle price renders an equally efficient rival's competitive single product price unprofitable. *Id.* at 469.

    More recently (and after *Weyerhaeuser*), the Ninth Circuit likewise considered the cost test issue in the context of a bundling case. It too began its analysis with the fundamental recognition that "a bundled discounter can achieve exclusion without sacrificing any short-run profits." *Cascade Health Solutions v. PeaceHealth*, 515 F.3d 883, 897 (9th Cir. 2008). The court accordingly concluded that the Supreme Court's total revenue/total cost predation test could not be meaningfully applied. And it further recognized that "in neither *Brooke Group* nor *Weyerhaeuser* did the Court go so far as to hold that in every case in which a plaintiff challenges low prices as exclusionary conduct the plaintiff must prove those prices were below cost." *Id.* at 901. But rather than adopting the Third Circuit's totality of the circumstances approach, it formulated a slight variant of the *Ortho* test:

---

[14] Nor was Intel's total-price-total-cost test of per se legality adopted in *Concord Boat Corp. v. Brunswick Corp.*, 207 F.3d 1039 (8th Cir. 2000). The court there applied a full rule of reason analysis and determined that plaintiff's evidence was insufficient to demonstrate that the defendant had "foreclosed a substantial share" of the market. *Id.* at 1059. Moreover, *Concord Boat* involved an indivisible, single product market unlike the segmented market involved here or the multiple-product market involved in *LePage's*. Indeed, *Concord Boat* distinguished *LePage's* on that very basis. *Id.* at 1062.

- 10 -

Under this standard, the full amount of the discounts given by the

defendant on the bundle are allocated to the competitive product or

products. If the resulting price of the competitive product or products is

below the defendant's incremental cost to produce them, the trier of fact

may find that the bundled discount is exclusionary for the purpose of § 2.[15]

While the present case is controlled by the law of the Third rather than the Ninth Circuit,

if put to the *Ortho* and *Cascade Health* tests, we are confident that Intel's use of "all-or-nothing"

conditional pricing would fail those as well.[16]

## V.    SECTION 2 PREVENTS A MONOPOLIST FROM IMPOSING CONDITIONS THAT LIMIT "THE OPPORTUNITIES OF RIVALS" AND DO "NOT FURTHER COMPETITION ON THE MERITS," WHICH IS PRECISELY WHAT THE EVIDENCE THUS FAR ASSEMBLED PROVES THAT INTEL HAS DONE

Much as Intel would like to have it otherwise, this case is not about whether or not Intel's

sales to particular customers were profitable overall. Of course they were. Indeed, they were not

only profitable, but super-profitable by reason of Intel's extraction of substantial monopoly rents

on its uncontestable sales.

What this case is instead about is Intel's conditional payments, conditional discounts,

punishments, threats, coercion, and assorted technological chicanery that in combination closed

AMD's heightened window of opportunity and thereby prevented it from achieving

sustainability as a long term innovation rival. Intel is in denial when it says nothing of the sort

happened. The record even at this early and preliminary stage of discovery is replete with

instances of just such misconduct.

---

[15] *Id*. at 906.

[16] While the present case is not a bundling case as such, plaintiffs will show by expert analysis that the economic consequence of Intel's all-or-nothing discounts is identical to bundle pricing.

### A.    IBM-Lenovo

Intel denies that it ever "'paid IBM' to limit IBM's marketing of Opteron-based systems or to 'shelve' development of Opteron servers." (Intel Br. at 69)  Intel further contends that, while "IBM's PC Division used only Intel's microprocessors during much of the time period covered by the Complaint, that does not mean that IBM entered into an exclusive dealing agreement with Intel or was contractually prohibited from purchasing from AMD." (*Id.* at 75)

The facts are otherwise.



In fact, in direct contradiction of Intel's assertions,

So, between 2000 and 2005, Intel committed numerous ████ doing much more than offering IBM "competitive pricing" as Intel blandly asserts.  Rather, Intel conditioned its grant of discounts, rebates, special funds and other consideration on IBM's explicit agreement to maintain its Intel exclusivity and to cancel or defer launches of AMD-based products. ████

In 2000, for example,

In 2001,

And in 2002,

████████████████████████████████████████████

After IBM sold its PC division to Lenovo, Intel continued to pursue its familiar tactics.

████████████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████

██████████████████████████████████████████████

████████████████████████████████████████████████████████

███████████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

███████████████████████████████████████████████████

██████████████████████████████████████████████████

████████████████████████████████████████

███████████████████████████████████████████████████

████████████████████████████████████████████████████████

██████████████████████████████████████████████

████████████████████

The evidence also supports AMD's claim that Intel paid IBM to delay and then to refrain from branding or marketing its AMD blade server. ████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████



**B.    Dell**

Admitting that Dell never purchased a single microprocessor from AMD until well after this lawsuit was filed, Intel flatly asserts that its "discounts and pricing were not conditioned on Dell's agreement to be exclusive." (Intel Br. at 60)

Nonsense.

In Plaintiffs' Opening Brief, we demonstrated the quid pro quo nature of Intel's river of cash, on the one hand, and Dell's long-term exclusivity, on the other. (Plaintiffs' Br. at 19-25) We will not repeat that evidence here.

- 14 -



Against this backdrop, to say as Intel does that its Dell payments were not conditioned on exclusivity assaults common sense.

## C.    Hewlett-Packard

Intel denies having engaged in any exclusionary conduct to keep AMD out of HP's

commercial product lineup in 2002.  Instead, ███████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████

████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

█████

█████████████████

██████████████

████████████████

█████████████████████

███████████████████████████████████████████████

███████████████████████████████████

███████████████████████████████████████████████

█████████████████████████████████

██████████████████████████

██████████████████████

███████████████████

█████████████████████████████



**D.    Fujitsu-Siemens**

The record also shows that Intel extended financial consideration to a giant European

OEM, Fujitsu-Siemens, on the condition that it forebear from introducing AMD-based products.



**E.    Acer**

Although Intel claims that the allegations in AMD's Complaint regarding the

circumstances surrounding Acer's sudden withdrawal from AMD's September 2003 Athlon64

launch are "untrue" (Intel Br. at 80), the documentary evidence to date could scarcely be clearer.



### F.    Japanese OEMs

While Plaintiffs' Opening Brief focused on Sony and Toshiba as examples, evidence

abounds of Intel's exclusionary practices with respect to ***all*** of the major Japanese OEMs.[17]

### 1.    NEC

Intel's conditional discounts foreclosed AMD from the lion's share of NEC's business.



---

[17] Intel does not deny that the Japan Fair Trade Commission (JFTC) brought charges against it
for its exclusionary deals with Sony, NEC, Fujitsu, Hitachi, and Toshiba.  Though Intel has
chosen not to contest those charges before the JFTC, it will apparently attempt to do so here.

███████████████████████████████████████████

████████████████████████████████████████████

█████████████████████████████████████████

████████████████████████████████████████████

███████████████████████████████

Intel attempts to characterize this as a benign "agreement reached between Intel and NEC

in May 2002 [that] was the product of ordinary commercial negotiations between two

sophisticated parties." (*Id*. at 76) ████████████████████████████

████████████████████████████████████████

████████████████████████████████████████████

█████████████████████████████████████████████

█████████████████████████

Indeed, Intel ██████████████████████████████████

██████████████████████████████████████████████

█████████████████████████████████████████████

██████████████████████████████████████

█████████████████████████████████████████████

████████████████████████████████████████████

██████████████████████████

2.    **Fujitsu**

The documentary record is also replete with evidence that Intel extended financial

benefits to Fujitsu conditioned upon its Intel exclusivity. ████████████████████████

█████████████████████████████████████████

██████████████████████████████ Intel's strategy of doling out dollars in exchange

- 20 -

for achieving exclusivity belies its assertion that Fujitsu did not purchase AMD notebook chips because "AMD did not have competitive products for notebook PCs." (Intel Br. at 77-78) The truth is that Intel is wrong; AMD did have "competitive products for notebook PCs," and the record suggests Fujitsu would have bought them but for Intel's conditional discounts.



This evidence flatly contradicts Intel's assertion that none of its "offers to Fujitsu [were] conditioned on restricting Fujitsu's dealings with AMD." (Intel Br. at 78)

### 3.    **Sony and Toshiba Revisited**

Sony and Toshiba were 100% Intel exclusive for five and seven years respectively

18 

19

(although Sony's five year clock continues to tick as it remains exclusive today). Intel denies

that this long term exclusivity had anything to do with the millions of dollars that Intel funneled

into each company. In fact, Intel goes so far as to assert that ███████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████

        In fact, ██████████████████████████████████████

████████ As we pointed out in our opening brief, ████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████

        ████████████ That is no surprise, given Intel's propensity for off-the-record deal terms.

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████

        Toshiba likewise faced the Hobson's choice of giving up large discounts if it chose to

offer its customers any AMD products. In June 2001, for instance, Toshiba seriously considered

adding AMD Athlon microprocessors to its product line, ████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████████

████████████████████████████████████

## G.    Tier Two OEMs, Whitebox Companies and Distributors

Intel's brief says little about Tier 2 OEMs or "whitebox" companies, other than to deny

that Intel ever "pressured or threatened" Supermicro into exclusive deals, or that Supermicro

feared Intel. (Intel Br. at 81-82) Intel's denials notwithstanding, ███████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████

Intel also used conditional pricing to discipline Tier 2 OEMs and whitebox companies.

For example, ████████████████████████████████████████████████

████████████████████████████████████████████

█████████████████████████████████████████████████

█████████████████████████████████████████████████

███████████████████████████████████████████

███████████████████

█████████████████████████████████████████

████████████████████████████████████████   The fact that Intel left

AMD some portion of the market in which to sell its products is hardly evidence of a healthy,

properly-functioning market. The reality is that Intel used exclusionary deals to keep AMD

away from the most efficient means of selling its products.

One efficient means of distribution that should at all times have been accessible by AMD

is the largest North American distributor, Synnex. To rebut AMD's allegation that Intel entered

into an exclusive deal with Synnex, Intel misleadingly points to the fact that Synnex ultimately

became an AMD distributor in 2005. But that ignores the fact that AMD had pursued Synnex as

a distributor for several years prior to 2005. As shown in Plaintiffs' Opening Brief, the reason

Synnex refused to carry AMD prior to 2005 ████████████████████████████████████

████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████

████████████████

Synnex and Tech Data are not outliers, unrepresentative of Intel's "normal" conduct in

the distribution channel. Rather, Intel's anticompetitive conduct has at different times spanned a

large swath of the distribution channel. For example, ████████████████████████████

████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████

Not surprisingly, ██████████████████████████████████████████

## VI.    INDEPENDENT PRODUCT EVALUATIONS, INDUSTRY ACCOLADES, AND INTEL'S ADMISSIONS ALL ESTABLISH AMD AS A WORTHY COMPETITOR CAPABLE OF SATISFYING A FAR LARGER SHARE OF THE MARKET THAN INTEL HAS ALLOWED IT

### A.    AMD Product Performance and Execution

As we showed in our opening statement, computer-makers worldwide, including the

largest and most technically-demanding, were open to AMD products beginning by at least the

late 1990s, and by 2003, most were demanding them. Yet, in the face of those facts Intel still

attempts to characterize AMD as a bumbling competitor beset by lousy products, a poor

reputation, bad planning, and terrible execution; in short, a company nobody would want to do

business with. Not surprisingly, Intel's "blame it on the victim" defense is belied by a mountain

of evidence that we can only hint at here — from contemporaneous comments of independent

industry observers, to industry awards and accolades, ██████████████████████████

- 24 -

But the most compelling rebuttal is Intel's marketplace conduct. If Intel's description of AMD is deserved, why for at least a decade did it pay customers billions of dollars to keep them from defecting to AMD? If AMD were really so inept, why in the world would Intel need to resort to its kit-bag of anti-competitive tactics to protect its monopoly?

The truth is that AMD is and has been a worthy competitor in the x86 microprocessor market, and while it has made its share of mistakes over the years, those mistakes are nothing outside the norm in an industry that designs exceedingly complex devices that must be manufactured under very challenging conditions to painstaking precision. Indeed, Intel has had its share of blunders, and they have been just as severe. Shown here is Intel



Chairman Craig Barrett down on one knee at an industry conference apologizing for execution failures that he condemned in a letter to Intel employees: "There are many reasons for these (product delays and manufacturing issues), but in the end the reasons don't matter because the result is less-satisfied customers and a less-successful Intel. I believe, as you do, that this is not the Intel we all know and that it is not acceptable."

Contrary to Intel's chest-thumping, the truth is that, at least since its introduction of the Athlon processor in 1999, AMD has offered products that have been superior to, or at the very

- 25 -

least competitive with, Intel's offerings. The jury will not need to take AMD's word for it. AMD has earned a reputation for well-made, cost-effective microprocessors that offer some of the most innovative features in the market. Industry analysts have taken notice of AMD's quality products, touting its achievements and honoring it with numerous "best-in-industry" awards. A small sampling:

- *The Microprocessor Report* honored AMD for "Best PC Processor" in 2002. The Athlon XP also won the "CPU of the Year Award" in 1999, 2000 and 2001 from *Maximum PC Magazine*.

- In 2004, AMD's Athlon64FX was named "Product of the Year" by *PC World*, and in 2003, AMD's Athlon64FX received the "Editor's Choice Award" from *CNET* magazine.

- AMD's mobile products received the "2005 Mobility Award" from *MobilityTrax*.

- In 2005, *PC Games Hardware* honored AMD with its "Manufacturer of the Year," "Chip of the Year" and "Technology of the Year" awards.

- IEEE, the prestigious electrical engineering organization, gave AMD "Corporate Innovation Recognition" in both 2004 and 2005 for its innovations in the development of x86 microprocessor technology and 64-bit architecture.

In addition, many hundreds of journal and magazine articles have been written by neutral industry observers, often gushing in their praise of AMD technology, and ranking it ahead of Intel's. Just a few examples:

- In naming AMD's Opteron the "2007 Technology of the Year," *InfoWorld* wrote that "AMD's advantage over Intel is near-constant parallelization, over which IT

has gone nuts, kicking Opteron servers to the top of the food chain, where they will remain."

- Another respected industry trade journal, *The Inquirer*, observed that "Intel's disparate technologies perform well in isolation, but when they're brought together as a whole, ***the total sum doesn't hold a candle to what AMD64 can and will deliver***."

- In 2003, *PC* Magazine reported that it "tested the first 64-bit AMD Opteron processor in April 2003, and were we impressed!  It screamed on our server application performance tests.  Six months later, the Athlon 64 arrived, and again we were amazed by the processor's stellar performance in off-the-shelf 32-bit gaming, content creation, and business applications.  AMD, recognizing that 32-bit applications will be with us for many years to come, has optimized its 64-bit chips to run them fast."

- *Tom's Hardware Guide* raved that AMD's flagship mobile processor, Turion 64, is "unequivocally . . . the fastest notebook we have ever tested; the frame rates are on par with those of a desktop."

Equal praise of AMD and its product roadmap appears ███████████████

███████████████████████████████████████████████████

███████████████████████████████████████████

████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████

████████████ Likewise, while Intel criticizes AMD for having focused on 64-bit

computing having ostensibly "no value to customers," (Intel Br. at 51) Intel's engineers thought

enough of AMD's 64-bit architecture to copy it within months of its release, and to incorporate it

in Intel products so the two companies' architectures were nearly identical.

But of the many Intel testimonials to AMD, ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

In fact, the criticism piled on AMD in Intel's brief is truly a case of the pot calling the

kettle black. Intel's well-known arrogance toward its customers, inefficiency, bloated

bureaucracy, and chronic product shortages and delays ▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

Indeed, Intel's problems ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮



[20]

To neutralize its own admissions, Intel relies principally upon snippets — often wrenched out of context — from interviews and emails of a single AMD employee, Mr. Henri Richard, a passionate, determined and charismatic leader who served with distinction as AMD's head of Sales & Marketing until his departure from AMD late last year.  Mr. Richard's statements must be read mindful of his role at AMD, that of a "Bobby Knight"-like executive who used "tough love" to motivate, cajole and sometimes even shame his colleagues to perform at a higher level in the face of harsh real world competitive conditions, including most especially Intel's exclusionary tactics.

Intel plucks almost all of the Richard sound bites from two interviews conducted by

---

[20] Contrast ████████████████████████████████████ with the blasé assertion in Intel's opening brief that "if Intel failed to out-innovate its competitors, its share of the market would decline rapidly."  (Intel Br. at 39)  Actually, Intel has it inside out.  It (footnote continued on next page)

- 29 -

marketing firms hired to assist AMD in improving its market penetration. The purpose of the interviews was to elicit from Mr. Richard AMD's weaknesses, including marketplace misperceptions, that potentially limited AMD's growth. Intel has ripped quotes from these interviews entirely out of context. For example, in the first interview, which addressed how AMD could better penetrate the enterprise space, Mr. Richard was asked:

> Why has AMD has[stet] been successful in early enterprise accounts?
> How was AMD able to win the business? What's the logic and the
> emotion behind the customer's decision? What drove the initial
> consideration? What's the role and priority of AMD vs. PC Maker brand?

Mr. Richard responded by citing the challenges that AMD had overcome:

> It's an indication of people working really hard to get these things done.
> Unsung heroes. Because its tough for AMD, a traditionally OEM focused
> component company, to really embrace the needs and complexity to be
> successful in enterprise sale. That's essentially because you have one
> decision maker that is probably a little more of a risk taker and more in
> love with technology than the average in this industry willing to take the
> risk and support us even though we aren't an enterprise company. It takes
> a very special type of decision maker. *If I was a decision maker in a*
> *Fortune 500 company, I wouldn't use AMD.* They are taking a big risk.
> They find though that there is a compelling value in AMD technology.

Intel quotes Mr. Richard's comment that he "wouldn't use AMD" as if it were a criticism

---

is *because* "Intel failed to out-innovate" that it has faced unfamiliar and potentially devastating competition from AMD, which in turn supplied the very motivation for its exclusionary tactics.

of AMD, but in reality Mr. Richard simply said that it is more conventional and less risky for an IT manager at a big company to choose the largest supplier, Intel, even when its competitor's technology offers a "compelling value." Unconstrained by the obvious context of Mr. Richard's remarks, Intel shamelessly uses the sentence at least four times to "prove" that AMD's head salesman thought his company's products were unworthy. The jury will meet Mr. Richard, and will draw precisely the opposite conclusion about his view of AMD, its people and its products.

Intel also points to purported weaknesses in AMD's commercial line-up — the lack of a platform solution, the lack of a suitable platform stability program, the lack of a competitive "thin and light" solution for the mobile sector — which it says foreclosed AMD from commercial customers, rather than Intel's actions. But AMD's performance in the market proves otherwise.[21] Granted, Intel's total domination of the commercial sector has enabled it to invest significantly to attract commercial business. But AMD has always been able to provide significant, offsetting price-performance advantages to a group of buyers who increasingly are under pressure from their CFOs to deliver IT solutions more economically.

Most tellingly, however, even when AMD has been able to close a perceived performance gap, Intel's exclusionary stranglehold over commercial business has kept it from reaping any marketshare gains. For example, since 2005, AMD has offered a stable image platform comparable to Intel's, and in 2006 AMD began offering a complete platform solution after acquiring chipset maker ATI. Despite packaging superior chips with features Intel says commercial customers demand (and for a more attractive price), AMD's share in the commercial segment still did not increase perceptibly. The conclusion that Intel's mischief is at work, and

---

not a weakness in AMD's commercial offerings, is confirmed by consideration of what has

happened in the commercial sector when the shoe has been on the other foot. For significant

periods of time, Intel suffered ███████████████████████████████████

███████████████████████████████████████████████████████████████████

███████████████████████████████████. Nonetheless, Intel's commercial

marketshare never significantly decreased.

The same is true in the mobile segment. Even after AMD introduced the Turion64,

which outperformed Intel on several key benchmarks and offered improved battery life over

AMD's previous offerings, AMD's share in the mobile market did not significantly increase as it

should have if power performance were truly the key purchasing factor. And as to both mobile

and commercial offerings — both of which have been focused targets of Intel's segment

exclusivity payments — one must ask why Intel routinely shelled out multimillion dollar sums to

keep customers from buying products that, according to Intel, they wouldn't have touched

anyway.

## B.    AMD Capacity

The second half of Intel's "blame it on the victim" defense rests on the thoroughly

wrongheaded proposition that, regardless of whether Intel artificially limited demand for AMD

products, AMD would still not have done any better because it lacked the capacity to serve more

of the market. Intel supports this argument by quoting statements from AMD executives to the

effect that AMD was utilizing all of its existing capacity. In the first place, those statements do

not prove that AMD could not have sold more. In fact, they show exactly the opposite. Thus,

AMD Chairman Hector Ruiz' statement during a Second Quarter 2005 earnings call that "[o]ur

factories are fully utilized" is followed two sentences later with the qualifier that "[we] built

some planned inventory" during that quarter. Similarly, when Intel reports that AMD's CFO

- 32 -

said in that same call that "we're running as much silicon as possible . . .," it cuts out the rest of

his sentence which explains that much of the output is going into inventory, not to customers (". .

. with high expectations in the second half of the year. If we hit our expectations our inventory

will drift downward as time goes on from that standpoint."). Indeed, the truth of the matter is

that during the entire period in question, AMD produced more microprocessors than it sold (by at

least two million units in its busiest year), and at all times had the ability to make adjustments to

its facilities and processes to enlarge capacity, even in the short run.

Moreover, as in other high-tech areas, where manufacturing facilities are very expensive,

capacity is a function of demand. The relevant question here is not whether AMD could have

serviced a bigger slice of the market with manufacturing capacity that it dialed up in light of

Intel's exclusionary conduct, but whether in the absence of such misconduct, it would have

planned to meet this larger demand by bringing more capacity on stream.[22]

The answer is clearly yes. Throughout the late 1990s and the early part of this decade,

AMD had a number of options for bringing on greater capacity. Anticipating greater success

with its K-7 Athlon chip than it actually achieved, it began actively exploring many of them as

early as 2000. One such option was Fab 25, in Austin, Texas. Although AMD planned to make

the bulk of the K-7 generation in its new Dresden, Germany fab, AMD drew up a plan in 2000 to

---

[22] In the absence of roadblocks to commercial business that Intel set up, AMD could have improved its fortunes significantly without any additional capacity. AMD uses the same machines, processes and people to manufacture everything from high-end Opteron chips for servers to low-end, consumer Semprons; only the photolithographic mask used to imprint circuits on the wafers is different. But, historically, most of AMD's output has ended up as lower-end consumer parts — for example, in 2007, less than 2% of the microprocessors AMD produced were sold as high-margin servers — and, at times, AMD has even been forced to "down bin" some products, packaging higher end, better performing processors as lower-performing parts. Had more of the high-end market been open to it, AMD could have transitioned to it in a matter of months.

upgrade Fab 25 in the event it received more K-7 orders than Dresden would be able to fill.[23]

Together with Dresden, a revamped Fab 25 would have allowed AMD to supply approximately

30% of the microprocessor market.  Granted, when a level of demand for K-7 necessitating Fab

25 production failed to materialize, AMD was forced to find another use for Fab 25 so it

wouldn't sit idle — it pressured its Japanese flash memory partner to forego a Japanese expansion

and to source less profitable flash memory products from Fab 25.[24]  But AMD continued to

operate Fab 25 for two years as a "combo" facility, producing both microprocessors and memory

chips, and it retained the ability at least through First Quarter 2002 to refocus and expand Fab 25

as a source of still more microprocessors. ██████████████████████████████████

████████████████████████████████████████████████████████

██████████████████████

Even after 2002, AMD still had numerous options for expanding capacity.  The Dresden

fab, Fab 30, was designed and built with greater "clean room" space than needed given the actual

demand placed on it, and this space could have quickly been utilized to bring on more

production.  Had there been greater demand, the successor to Fab 30, Fab 36, would undoubtedly

have been built and brought on line earlier.  Moreover, AMD could have more promptly

---

[23] AMD planned on upgrading the equipment in Fab 25 from a 180 nm process (a process in which the smallest feature on a chip is approximately 180 nanometers) to a 130 nm process, and install tools necessary to produce copper interconnections for improved microprocessor speed.
[24] Intel suggests that AMD's Fab 25 conversion decision was unrelated to its conduct and made outside the limitations period.  But the Siegle memo it cites (Intel Br. at 36 n. 25) proves just the opposite.  Mr. Siegle wrote that our "plan indicates we will not have adequate loadings by 2003 for two logic fabs."  Not surprisingly, as a manufacturing guy, Mr. Siegle did not cite Intel or any other reason for the inadequate K-7 demand, but his statement stands uncontradicted that AMD had options, including Fab 25, to bring on more capacity had demand for its products been greater.  And the Fab 25 option was not foreclosed *before* the limitations period, as Intel contends.  As noted above, Fab 25 continued to produce microprocessors through 2002, and it (footnote continued on next page)

concluded the outsourcing arrangements that it currently uses to make some of its products.

AMD also could have more seriously explored producing high-end products in partnership with

IBM, or it could have pursued other foundry relationships — ██████████████████████

██████████████████████████████████████████████████████████

That AMD imposed limits on itself that would have prevented it from taking advantage

of opportunities that Intel foreclosed is, in a word, nonsense. AMD had myriad ways to expand

production of its microprocessors if the market had been permitted to freely demand them, and

but for Intel's exclusionary conduct, AMD would undoubtedly have pursued them.

## VII.   INTEL'S STAGGERED AND STUNTED DEPOSITION PROPOSAL IS CALCULATED TO BLOCK PLAINTIFFS FROM PROVING INTEL'S VIOLATIONS

### A.   Intel's Proposal That Depositions Be Confined To Those In The Executive Suite Is A Shameful Attempt To Conceal Its Misconduct

Intel has no one to blame but itself for the extensive deposition discovery that Plaintiffs

need in this case. Intel has added to the complexity of an already complex case by (1) taking on

virtually every factual allegation in the Complaints; and (2) nurturing and sustaining a culture

where antitrust compliance reduces to conscientiously not reducing to writing customer

arrangements in the first place and then deleting in record time any written record that might

unavoidably be created. The veil thus woven will not likely be raised unless Plaintiffs are

allowed to conduct discovery as any seasoned investigator would, starting with lower-level

employees and working their way up the corporate ladder.

As to the first point, Intel concedes nothing in this case. As is evident from its brief, it

takes on every single factual allegation in order to create a vast array of disputed issues of fact.

---

could have been upgraded for successive generations of production *during* the limitations period
had Intel relaxed its control over the customers' purchasing decisions.

Accordingly, evidence must be adduced regarding all of Intel's dealings with the OEMs, the distributors, the system builders, the retailers, and the standard-setting organizations and consortiums. Moreover, to rebut Intel's attempt to characterize AMD's injuries as self-inflected, evidence must be adduced from Intel and third parties regarding the quality of AMD's products and the efficiency of AMD's production and supply. In their opening brief, Plaintiffs provided a detailed roadmap setting forth those deponents who may be necessary to elicit this evidence. Intel's brief proves that Plaintiffs were not underestimating the magnitude of their task.

Secondly, Intel's pervasive culture of concealment of its customer dealings (compounded by its reckless and irresponsible evidence preservation failures) leaves depositions as the only reliable means to develop admissible evidence of its misconduct. As the Court can glean from this and Plaintiffs' Opening Brief, this is not a case of exclusion that will be proved with a file-folder of Intel contracts. Intel deliberately kept the conditional nature of its customer dealings out of its contracts. ██████████████████████████████████

████████████████████████████████████████████████████████████

██████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████ To prove the entirety of the picture, Plaintiffs will need to coax out the truth from witnesses ██████████████████

████████████████████████████████████ Those depositions will not be easy, short or few in number.[25]

---

[25] It is also impossible to know what information was contained in documents that Intel ordered to be deleted, failed to preserve or instructed its executives not to create. Plaintiffs require, and deserve, a substantial number of depositions of both Intel employees and third parties to ensure that the jury is presented with all the facts, not simply those that Intel elected to preserve.

- 36 -

Intel's proposal that depositions be limited to its very most senior executives and those of its customers, and that Plaintiffs be allowed only to "skim the cream" of the executive suite, comes right out of the defense playbook. Of course Intel would want to keep its lower-level employees out of the deposition room, since they are likely to possess the most information and have the least reason to conceal it. Yet, for this same reason, these witnesses are the most indispensable to fair fact-finding. Plaintiffs are plainly entitled to start at the bottom and work their way up, just as any seasoned prosecutor or investigator would do. That won't happen if Intel gets its way and Plaintiffs' deposition opportunities are limited in number or length as it proposes.

Plaintiffs' deposition roadmap and proposal are soundly grounded in the need to adduce the evidence necessary to prove their case. Plaintiffs' goal is to proceed to trial as expeditiously as possible. No unnecessary depositions will be taken. But just as Plaintiffs cannot be released of their evidentiary burden to prove their case, they should not be deprived of the means of doing so.

## B.    The FTAIA Does Not Support The Staged "Domestic" Discovery Intel Proposes

Intel's proposal for a "staged" discovery plan, which would postpone discovery of witnesses related to foreign conduct to a later phase of the case, is devoid of merit. Intel's proposal essentially ignores the Special Master's December 15, 2006 Report and Recommendation ("R&R"), approved by the Court on January 12, 2007, which makes clear that discovery of foreign witnesses goes to the *heart* of AMD's domestic and export commerce claims. Such witnesses must therefore be subject to full and immediate discovery — not shunted off until later.

As the Special Master held, AMD's proposed foreign discovery is directly relevant to its

- 37 -

foreign and domestic commerce claims in at least three respects. First, it is "axiomatic" that foreign discovery is relevant to AMD's export commerce claim, which alleges that Intel's conduct caused AMD to lose sales of American-made products to foreign customers. Special Master's Report and Recommendation ("R&R") at 14. Second, with respect to AMD's domestic commerce claims, foreign discovery is necessary to demonstrate that Intel possesses monopoly power in the relevant worldwide market: As the Special Master concluded, foreign discovery is plainly relevant to discovering "conduct that would be indicative of monopoly power in the global marketplace." *Id.* at 17. Finally, and most importantly, foreign discovery is necessary to develop evidence demonstrating that Intel improperly maintained its worldwide monopoly in violation of the Sherman Act. As the Special Master noted, because "the undisputed geographic market is global, and approximately 68% of the total worldwide production of computers powered by x86 microprocessors are sold to non-U.S. customers, evidence of foreign exclusionary conduct is essential for AMD to demonstrate that Intel's alleged exclusionary conduct was sufficiently material to the overall relevant market so as to violate U.S. antitrust laws." *Id.* at 19-20.[26]

Intel's various contentions wholly fail to support its staged discovery plan. Intel suggests that evidence of its foreign conduct will be "inadmissible at trial" to establish its anticompetitive

---

[26] Seeking to justify its proposed staged discovery plan, Intel asserts that under the FTAIA, "even if AMD proved global monopolization," it could "only recover for anticompetitive conduct engaged in by Intel in U.S. domestic commerce." (Intel Br. at 91) That assertion is incorrect. First, it ignores AMD's claims for damages in export commerce and, second, it ignores that liability for Intel's monopolization of U.S. domestic commerce is an indivisible subpart of its monopolization of the world-wide market. But in any event, it is wholly irrelevant to the proper scope of discovery in this case. The Court's September 26, 2006 decision did preclude AMD from pursuing *damages* for lost foreign sales of foreign-made products to foreign customers. *See Advanced Micro Devices, Inc. v. Intel Corp.*, 452 F. Supp. 2d 555 (D. Del. 2006). (footnote continued on next page)

conduct. (Intel Br. at 33)[27] That suggestion is implausible on its face: As discussed above, the Special Master has already noted that evidence of foreign conduct may well be "essential" to AMD's monopolization claim. Special Master's R&R at 19-20.[28]

Finally, Intel again argues — as it did before the Special Master — that AMD's allegations regarding lost export commerce are "meritless," and that discovery should therefore be staged to enable Intel to litigate its various threshold objections to this claim (such as its statute of limitations argument) before undergoing full discovery of the relevant evidence. (Intel Br. at 35-37) This argument fails in at least two respects. First, even if Intel's threshold objections were correct — and they are not — they would provide no basis for imposing a staged discovery plan, because the foreign evidence at issue here is equally relevant to AMD's domestic commerce claims. Second, the Special Master has already ruled that AMD's export commerce claim supports discovery, and that he will not "make substantive law determinations" with respect to the "viability" of that claim or Intel's statute-of-limitations argument against it. Special Master's R&R at 8. But that is exactly what Intel seeks to have the Court do: engage in piecemeal discovery that will permit Intel to litigate (and require this Court to adjudicate) its threshold objections to this claim before discovery of all the relevant evidence is obtained. There is no

---

But as discussed above, and as the Special Master expressly recognized, foreign conduct is directly relevant to proving Intel's liability on AMD's U.S. commerce claims.

[27] Intel also asserts that in its September 26, 2006 decision, the Court struck "all allegations relating to foreign conduct." (Intel Br. at 34) That, too, is incorrect: as the Special Master held, the court only struck allegations seeking damages for lost foreign sales of foreign-made products to *foreign customers*. *See* Special Master's R&R at 4-5, 11-13. The Court did not reach the implausible conclusion that AMD must attempt to prove Intel's monopoly power and material exclusionary conduct in a worldwide market with one arm tied behind its back.

[28] In any event, admissibility is not the relevant test for discovery purposes: as the Special Master held, and as Rule 26 squarely provides, "a party may obtain discovery regarding any matter, not privileged, that is *relevant* to the claim or defense of any party." *Id*. at 9. There is no question here that foreign discovery is relevant to AMD's claims.

basis for delaying discovery to accommodate such piecemeal litigation on a piecemeal record.

Moreover, dividing domestic from foreign discovery in a case such as this is impractical. The same senior executives and sales and pricing witnesses are involved in transactions governing sales here and abroad. If Dell negotiates a worldwide exclusive arrangement with Intel in Round Rock, Texas or Santa Clara, California, is that "domestic"? What if Lenovo negotiates with Intel to not launch an AMD notebook product worldwide in Santa Clara, California or at Lenovo's Worldwide Executive Headquarters in Raleigh, North Carolina? What if part of the negotiations take place in meetings at one of Lenovo's centers of principal operations which, in addition to Raleigh, North Carolina, include Beijing, Singapore, and Thailand? Does that convert an agreement not to launch an AMD notebook worldwide into "international conduct?" What if the negotiations and the subsequent actions to carry out the agreement took place in all of these locations?

Because Intel's proffered division of discovery into domestic and foreign components conflicts squarely with the Special Master's holdings, is impractical, and has no basis in law, it should be rejected.

## VIII. CONCLUSION

Intel's illegal maintenance of its x86 monopoly was pervasive, long standing, largely undocumented and below the radar. For these reasons, substantial numbers of depositions will be required – both of Intel witnesses and third-party witnesses – to get to the facts. Plaintiffs renew their request that the Court permit their discovery to proceed along multiple deposition tracks, two for Intel witnesses and a third for third-party witnesses, and a window within which to complete all three.

- 40 -

**RICHARDS, LAYTON & FINGER, P.A.**

*/s/ Frederick L. Cottrell, III*
Frederick L. Cottrell, III (#2555)
Chad M. Shandler (#3796)
Steven J. Fineman (#4025)
One Rodney Square
920 North King Street
Wilmington, DE 19899
(302) 651-7836
cottrell@rlf.com
shandler@rlf.com
fineman@rlf.com

OF COUNSEL:

Charles P. Diamond
Linda J. Smith
Mark A. Samuels
O'Melveny & Myers LLP
400 South Hope Street
Los Angeles, CA 90071-2899

*Attorneys for Advance Micro Devices, Inc. and AMD International Sales & Service, Ltd.*

**PRICKETT JONES & ELLIOTT, P.A.**

*/s/ James L. Holzman*
James L. Holzman (#663)
J. Clayton Athey (#4378)
1310 King Street
P. O. Box 1328
Wilmington, DE 19899
(302) 888-6509
jlholzman@prickett.com
jcathey@prickett.com

*Interim Liaison Counsel and Attorneys for Phil Paul, on behalf of himself and all others similarly situated*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on May 15, 2008, I electronically filed the foregoing document with

the Clerk of Court using CM/ECF and have sent by Hand Delivery to the following:

Richard L. Horwitz, Esquire   James L. Holzman, Esquire
Potter Anderson & Corroon, LLP  Prickett, Jones & Elliott, P.A.
1313 North Market Street    1310 King Street
P. O. Box 951       P.O. Box 1328
Wilmington, DE 19899    Wilmington, DE 19899-1328

I hereby certify that on May 15, 2008, I have sent by Electronic Mail the foregoing

document to the following non-registered participants

Darren B. Bernhard, Esquire   Robert E. Cooper, Esquire
Howrey LLP       Daniel S. Floyd, Esquire
1299 Pennsylvania Avenue, N.W.  Gibson, Dunn & Crutcher LLP
Washington, DC 20004-2402   333 South Grand Avenue
           Los Angeles, California 90071-3197

/s/ *Chad M. Shandler*
Chad M. Shandler (#3796)
shandler@rlf.com