**Legal Authorities cited by AMD in *Advanced Micro Devices, Inc. et al. v. Intel Corporation, et al., C.A. No. 05-441-JJF ; In re Intel Corporation, C.A. No. 05-MD-1717-JJF; and Phil Paul, et al. v. Intel Corporation, C.A. 05-485-JJF-DM 14***

In re Honda American Motor Co., Inc. Dealership Relations Litigation
D.Md.,1996.

United States District Court,D. Maryland.
In re HONDA AMERICAN MOTOR CO., INC. DEALERSHIP RELATIONS LITIGATION.
**MDL 95-1069.**

Aug. 30, 1996.

In action involving automobile dealership relations, Japanese automobile manufacturer moved to quash notices of deposition naming Japanese nationals as deponents and requested protective order. The District Court, Motz, Chief Judge, held that: (1) compelling depositions of Japanese nationals in United States did not violate Japanese sovereignty; (2) general manager of public relations of manufacturer was managing agent of corporation; but (3) former president of American division of foreign manufacturer was not managing agent of corporation.

Motion granted in part and denied in part.

West Headnotes

**[1] International Law 221 ⚷10.1**

221 International Law
221k10.1 k. Public Policy and Comity in General. Most Cited Cases
"International comity" in legal sense, is neither matter of absolute obligation, on the one hand, nor of mere courtesy and good will, upon the other, but it is recognition which one nation allows within its territory to legislative, executive, or judicial acts of another nation, having due regard both to international duty and convenience, and to rights of its own citizens or of other persons who are under protection of its laws.

**[2] International Law 221 ⚷10.1**

221 International Law
221k10.1 k. Public Policy and Comity in General. Most Cited Cases
If foreign sovereignty is in fact implicated in given case, comity analysis requires balancing of competing interests between sovereigns and parties involved.

**[3] Federal Civil Procedure 170A ⚷1323.1**

170A Federal Civil Procedure
170AX Depositions and Discovery
170AX(C) Depositions of Parties and Others Pending Action
170AX(C)1 In General
170Ak1323 Persons Whose Depositions May Be Taken
170Ak1323.1 k. In General. Most Cited Cases

**International Law 221 ⚷10.1**

221 International Law
221k10.1 k. Public Policy and Comity in General. Most Cited Cases
Compelling depositions of Japanese automobile manufacturer's managing agents, who were Japanese nationals, in United States did not infringe on Japanese judicial sovereignty, as would invoke balancing of competing interests between sovereigns and parties involved.

**[4] Federal Civil Procedure 170A ⚷1269.1**

170A Federal Civil Procedure
170AX Depositions and Discovery
170AX(A) In General
170Ak1269 Grounds and Objections
170Ak1269.1 k. In General. Most Cited Cases

**International Law 221 ⚷10.1**

221 International Law
221k10.1 k. Public Policy and Comity in General-

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

al. Most Cited Cases
Comity concerns arise when discovery request requires foreign national to violate his or her country's own laws.

**[5] Federal Civil Procedure 170A 1269.1**

170A Federal Civil Procedure
170AX Depositions and Discovery
170AX(A) In General
170Ak1269 Grounds and Objections
170Ak1269.1 k. In General. Most Cited Cases

**International Law 221 10.1**

221 International Law
221k10.1 k. Public Policy and Comity in General. Most Cited Cases
While "blocking statutes" prohibiting foreign nationals from complying with American discovery requests may implicate foreign sovereignty concerns, these laws are insufficient in and of themselves for district court to restrain its power to compel discovery under comity analysis.

**[6] Federal Civil Procedure 170A 1323.1**

170A Federal Civil Procedure
170AX Depositions and Discovery
170AX(C) Depositions of Parties and Others Pending Action
170AX(C)1 In General
170Ak1323 Persons Whose Depositions May Be Taken
170Ak1323.1 k. In General. Most Cited Cases

**International Law 221 10.1**

221 International Law
221k10.1 k. Public Policy and Comity in General. Most Cited Cases
Fact that named deponents whose depositions were sought in United States were Japanese nationals did not raise, without more, Japanese sovereignty concerns requiring full comity analysis.

**[7] Federal Civil Procedure 170A 1383**

170A Federal Civil Procedure
170AX Depositions and Discovery
170AX(C) Depositions of Parties and Others Pending Action
170AX(C)3 Examination in General
170Ak1383 k. Time and Place of Examination. Most Cited Cases
Even if compelling depositions of Japanese automobile manufacturer's managing agents, who were Japanese nationals, raised Japanese sovereignty concerns requiring full comity analysis, depositions could be conducted in United States, where deponents had conducted extensive business in United States for number of years, and sovereignty concerns of United States were clearly implicated in litigation and would be severely infringed if Japanese officials were allowed to conduct pretrial questioning of named deponents under Japanese procedure. Fed.Rules Civ.Proc.Rule 30(b)(6), 28 U.S.C.A.

**[8] Federal Civil Procedure 170A 1324**

170A Federal Civil Procedure
170AX Depositions and Discovery
170AX(C) Depositions of Parties and Others Pending Action
170AX(C)1 In General
170Ak1323 Persons Whose Depositions May Be Taken
170Ak1324 k. Parties. Most Cited Cases
Only party to litigation may be compelled to give testimony pursuant to notice of deposition.

**[9] Federal Civil Procedure 170A 1325**

170A Federal Civil Procedure
170AX Depositions and Discovery
170AX(C) Depositions of Parties and Others Pending Action
170AX(C)1 In General
170Ak1323 Persons Whose Depositions May Be Taken
170Ak1325 k. Officers and Em-

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

ployees of Corporations. Most Cited Cases
Determining whether individual qualifies as managing agent who may speak on behalf of corporation at deposition must be made at time of deposition. Fed.Rules Civ.Proc.Rule 30(b)(6), 28 U.S.C.A.

**[10] Federal Civil Procedure 170A 1325**

170A Federal Civil Procedure
170AX Depositions and Discovery
170AX(C) Depositions of Parties and Others Pending Action
170AX(C)1 In General
170Ak1323 Persons Whose Depositions May Be Taken
170Ak1325 k. Officers and Employees of Corporations. Most Cited Cases
While burden of proving that individual qualifies as managing agent who may speak on behalf of corporation at deposition rests on party seeking discovery, doubt about individual's status as managing agent, at pretrial discovery stage, is resolved in favor of examining party. Fed.Rules Civ.Proc.Rule 30(b)(6), 28 U.S.C.A.

**[11] Federal Civil Procedure 170A 1325**

170A Federal Civil Procedure
170AX Depositions and Discovery
170AX(C) Depositions of Parties and Others Pending Action
170AX(C)1 In General
170Ak1323 Persons Whose Depositions May Be Taken
170Ak1325 k. Officers and Employees of Corporations. Most Cited Cases
If examining party fails to meet burden of proving that individual it has designated to speak on behalf of corporation qualifies as managing agent of corporation, it must subpoena individual. Fed.Rules Civ.Proc.Rules 30(b)(6), 45, 28 U.S.C.A.

**[12] Federal Civil Procedure 170A 1325**

170A Federal Civil Procedure
170AX Depositions and Discovery
170AX(C) Depositions of Parties and Others Pending Action
170AX(C)1 In General
170Ak1323 Persons Whose Depositions May Be Taken
170Ak1325 k. Officers and Employees of Corporations. Most Cited Cases
Test for determining whether individual qualifies as managing agent who may speak on behalf of corporation at deposition is functional one, made on case-by-case basis. Fed.Rules Civ.Proc.Rule 30(b)(6), 28 U.S.C.A.

**[13] Federal Civil Procedure 170A 1325**

170A Federal Civil Procedure
170AX Depositions and Discovery
170AX(C) Depositions of Parties and Others Pending Action
170AX(C)1 In General
170Ak1323 Persons Whose Depositions May Be Taken
170Ak1325 k. Officers and Employees of Corporations. Most Cited Cases
Factors to consider in deciding whether individual is managing agent who may speak on behalf of corporation at deposition include: whether corporation has invested person with discretion to exercise his judgment, whether employee can be depended upon to carry out employer's directions, whether individual can be expected to identify him or herself with interests of corporation as opposed to interests of adverse party, degree of supervisory authority which person is subject to in given area, and general responsibilities of individual regarding matters at issue in litigation. Fed.Rules Civ.Proc.Rule 30(b)(6), 28 U.S.C.A.

**[14] Federal Civil Procedure 170A 1325**

170A Federal Civil Procedure
170AX Depositions and Discovery
170AX(C) Depositions of Parties and Others Pending Action
170AX(C)1 In General

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

170Ak1323 Persons Whose Depositions May Be Taken
170Ak1325 k. Officers and Employees of Corporations. Most Cited Cases
General manager of public relations of Japanese corporation was "managing agent" who could be designated to speak on behalf of corporation at deposition; manager continued to maintain identity of interest with corporation, he had previously held senior management positions at corporation, he could be depended upon to carry out his employer's direction to give testimony, and he had been imbued with trust. Fed.Rules Civ.Proc.Rule 30(b)(6), 28 U.S.C.A.

**[15] Federal Civil Procedure 170A ⚷1325**

170A Federal Civil Procedure
170AX Depositions and Discovery
170AX(C) Depositions of Parties and Others Pending Action
170AX(C)1 In General
170Ak1323 Persons Whose Depositions May Be Taken
170Ak1325 k. Officers and Employees of Corporations. Most Cited Cases
Generally, former employees cannot be managing agents who may speak on behalf of corporation at deposition. Fed.Rules Civ.Proc.Rule 30(b)(6), 28 U.S.C.A.

**[16] Federal Civil Procedure 170A ⚷1325**

170A Federal Civil Procedure
170AX Depositions and Discovery
170AX(C) Depositions of Parties and Others Pending Action
170AX(C)1 In General
170Ak1323 Persons Whose Depositions May Be Taken
170Ak1325 k. Officers and Employees of Corporations. Most Cited Cases
Examining party may designate former employee of corporation as managing agent who may speak on behalf of corporation at deposition when corporation terminates managing agent in attempt to avoid disclosure in pending or potential litigation, when there is evidence that managing agent has been or might be reappointed to another position in corporation, or when former employee still has ultimate control with ability to utilize entity's organs of communication. Fed.Rules Civ.Proc.Rule 30(b)(6), 28 U.S.C.A.

**[17] Federal Civil Procedure 170A ⚷1325**

170A Federal Civil Procedure
170AX Depositions and Discovery
170AX(C) Depositions of Parties and Others Pending Action
170AX(C)1 In General
170Ak1323 Persons Whose Depositions May Be Taken
170Ak1325 k. Officers and Employees of Corporations. Most Cited Cases
Former president of American division of Japanese corporation was not "managing agent" of corporation and could not be designated to speak on behalf of corporation at deposition, where former president had retired and no longer played any role in the corporation. Fed.Rules Civ.Proc.Rule 30(b)(6), 28 U.S.C.A.

***537** Richard B. McNamara, Wiggin & Nourie, Manchester, NH, William A. Kershaw, Kronick, Moskovitz, Tiedemann & Gerard, Sacramento, CA, Robert B. Green, Baltimore, MD, James Ulwick, Kramon & Graham, Baltimore, MD.
Robert A. Van Nest, Keker & Van Nest, San Francisco, CA.
Jeremiah T. O'Sullivan, Choate, Hall & Stewart, Boston, MA.
Harvey G. Sanders and Tammy McKnew, Leatherwood, Walker, Todd & Mann, P.C., Greenville, SC.
Michael M. Baylson, Duane, Morris & Heckscher, Philadelphia, PA.
Norman C. Hile, Orrick, Herrington & Sutcliffe, Sacramento, CA.
Christopher J. Hunt, Bartko, Zankel, Tarrant & Miller, San Francisco, CA.
Lawrence Silver, Lawrence Silver & Associates, Long Beach, CA.

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Andrew W. Stroud, Orrick, Herrington & Sutcliffe, Sacramento, CA.
Mark P. Rapazzini, Rapazzini & Graham, San Francisco, CA.
Daniel G. Clodfelter, Moore & Van Allen, Charlotte, NC.
Price O. Gielen, Neuberger, Quinn, Gielen, Rubin & Gibber, P.A., Baltimore, MD.
Thomas X. Glancy, Jr., Gordon, Feinblatt, Rothman, Hoffberger & Hollander, LLC, Baltimore, MD.

OPINION

MOTZ, Chief Judge.
Plaintiffs have served notices of deposition on Honda Motor Co., Ltd. ("Honda Japan"), pursuant to Fed.R.Civ.P. 30(b)(6), naming four individuals, Tetsuo Chino, Takeo Okusa, Yoshide Munekuni and Michiaki Shinkai, as deponents. Honda Japan has moved to quash these notices and requests a protective order pursuant to Fed.R.Civ.P. 26(c). It makes essentially two arguments in support of its motion. First, assuming that the named individuals are "directors, officers or managing agents" of Honda Japan (thus resulting in Honda Motor's deposition "through" them), principles of international comity require this Court, in its discretion, to rule that any depositions of the named deponents should be conducted in Japan pursuant to Japanese procedural rules. Second, two of the named deponents, Okusa and Chino, are not "managing agents" of Honda. For the following reasons, the motion will be granted in part and denied in part.

I.

The notices state that the depositions are to take place in Baltimore, Maryland. Honda Japan argues that the depositions of the four named individuals should be taken, if at all, in Japan pursuant to Japanese discovery rules and procedures. The basis for this conclusion rests on notions of international comity; according to Honda, subjecting Japanese nationals who reside in Japan to American-style discovery procedures, and requiring them to travel to the United States in order to give depositions, would be an affront to Japanese sovereignty.[FN1]

FN1. Honda Japan has argued that I should at least stay the depositions until I have ruled on Honda's motion to dismiss. This argument is mooted in light of the fact that today I am issuing a separate opinion in which I hold that Honda Japan is a proper defendant (although requiring plaintiffs to replead their allegations against Honda Japan on technical grounds).

[1][2] International comity refers to the spirit of cooperation in which a domestic tribunal decides cases touching on the interests of other sovereign states. *Societe Nationale Industrielle Aerospatiale v. U.S. Dist. Court,* 482 U.S. 522, 543 n. 27, 107 S.Ct. 2542, 2555 n. 27, 96 L.Ed.2d 461 (1987). " 'Comity,' in the legal sense, is neither a matter of absolute obligation, on the one hand, nor of mere courtesy and good will, upon the other. But it is the recognition which one nation allows within its territory to the legislative, executive or judicial acts of another nation, having due regard both to international duty and convenience, and to the rights of its own citizens or of other persons who are under the protection of its laws." *Hilton v. Guyot,* 159 U.S. 113, 163-64, 16 S.Ct. 139, 143, 40 L.Ed. 95 (1895). If foreign sovereignty is in fact implicated in a given case, comity analysis requires the balancing of competing interests between the sovereigns and the parties involved. *First Nat'l Bank of Cicero v. Reinhart Vertrieb's AG,* 116 F.R.D. 8, 9 (N.D.Ill.1986).

[3] In contending that substantial Japanese sovereignty issues are raised, Honda Japan points out that Japan generally disdains the United States' system of open discovery***538** and compulsory depositions. As evidence, Honda refers to the Japanese system which requires judicial officers to conduct pre-trial questioning of witnesses. *Id.* It also notes that Japan has refused to sign the Hague Convention on the Taking of Evidence Abroad in Civil or Commercial Matters, 23 U.S.T. 2555, and has re-

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

stricted discovery within its territory pursuant to the Consular Convention and Protocol, 15 T.I.A.S. 768, 795, to *voluntary* depositions only. Second, Honda asserts that Japanese nationals would consider a compulsory deposition in the United States deeply offensive and embarrassing, and a violation of their cultural and social norms. *See* Konaka Decl. ¶ 7.

[4][5] While these allegations might demonstrate Japan's animosity towards common law discovery, they are insufficient for me to conclude that compulsory depositions of Japanese nationals, taking place in the United States, violates Japanese sovereignty. Discovery requests implicate foreign sovereignty only in certain contexts. For instance, if a federal court compels discovery on foreign soil, foreign judicial sovereignty may be infringed, but when depositions of foreign nationals are taken on American or neutral soil, courts have concluded that comity concerns are not implicated. *See In re Anschuetz & Co.,* 754 F.2d 602, 608 n. 13 (5th Cir.1985) (court had personal jurisdiction over German corporation and its managing agents; "where the district court's order is an order that [depositions] will be compelled only in the United States, there can be no invasion of German sovereignty"), *vacated,*483 U.S. 1002, 107 S.Ct. 3223, 97 L.Ed.2d 730 (1987); *Work v. Bier,* 106 F.R.D. 45, 51 (D.D.C.1985) ("If [foreign nationals] are subject to the court's jurisdiction, ... then the court may order that they be produced for deposition; violation of the other country's judicial sovereignty is avoided by ordering that the deposition take place outside the country.") (internal quotations omitted); *Slauenwhite v. Bekum Maschinenfabriken, GmbH, C.,* 104 F.R.D. 616, 618 (D.Mass.1985) ("The [taking of depositions in New York City of foreign nationals] does not involve any ... intrusion on French sovereignty or judicial custom. No adverse party will enter on French soil to gather evidence.") (internal quotations omitted), *vacated,*483 U.S. 1002, 107 S.Ct. 3223, 97 L.Ed.2d 730 (1987); *First Nat'l Bank of Cicero,* 116 F.R.D. at 9 ("[A]lthough defendant would presumably compile the documents in Switzerland, the actual discovery process could be performed outside Swiss territory. Any intrusion on Swiss sovereignty will thereby be restricted."). Compelling the depositions of Honda Japan managing agents and Japanese nationals in Baltimore, Maryland, does not, in itself, infringe on Japanese judicial sovereignty.[FN2]

FN2. Comity concerns also arise when a discovery request requires a foreign national to violate his or her country's own laws. *See generally Societe Nationale,* 482 U.S. at 544-45 n. 29, 107 S.Ct. at 2555-57 n. 29. Many countries have passed so called "blocking statutes" in an attempt to prohibit its nationals from complying with American discovery requests, particularly in antitrust litigation. *Id.; see also Anschuetz,* 754 F.2d at 614 n. 29. While such blocking statutes may implicate foreign sovereignty concerns, these laws are insufficient in and of themselves for a district court to restrain its power to compel discovery under a comity analysis. *See Societe Nationale,* 482 U.S. at 544-45 n. 29, 107 S.Ct. at 2555-57 n. 29. Here, Honda makes no argument that any Japanese blocking statute exists prohibiting the named individuals from giving depositions in the United States. Japanese sovereignty is therefore not implicated in this way.

[6] Honda's proffer of Mr. Konaka's Declaration is likewise insufficient to demonstrate that the Japanese government would consider the taking of these depositions an affront to its sovereignty. While Mr. Konaka may have been a respected Japanese judge for the past 12 years, he does not speak on behalf of the Japanese government as whole, or even the Japanese court system. The failure of the Japanese government to weigh in as *amicus curie* on this matter is further evidence that its sovereignty is not implicated by taking depositions of the named individuals who have done business in the United States for a number of years. *See Slauenwhite,* 104 F.R.D. at 619. The fact that the named deponents

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

are Japanese nationals simply does not raise, without more, Japanese sovereignty concerns requiring a full comity analysis. *See In re Messerschmitt Bolkow Blohm,* 757 F.2d 729, 733 (5th Cir.1985) ("[A] district court order that [Japanese] nationals be produced for deposition in the United States might concern [Japan], but ***539** it does not involve alien procedures on [Japanese] soil, is directed to the party-defendant and not the foreign witnesses, and is enforceable only by procedures and sanctions directed to a party to the litigation in the forum court."), *vacated,*483 U.S. 1002, 107 S.Ct. 3223, 97 L.Ed.2d 730 (1987).

[7] Even if I were to conclude that Japanese sovereignty interests were sufficiently strong to require me to apply a balancing test, I would find that the depositions of Honda Japan's managing agents should be conducted in the United States. To the extent Japanese sovereignty is implicated by the compulsory deposition of its nationals in the United States, it is limited due to the lack of intrusiveness of the discovery requested. Again, plaintiffs' request does not call for the inspection of buildings, the collecting of documents, the interviewing of non-party witnesses, or the taking of depositions on Japanese soil. *See Anschuetz,* 754 F.2d at 608-09. Moreover, the named Japanese nationals are not occasional visitors to the United States. They have conducted extensive business in the United States for a number of years, availing themselves of the laws and protections afforded American citizens.FN3

> FN3. While certainly not dispositive, the record indicates that the named deponents, or at least some of them, have given depositions in the United States on prior occasions. The argument that giving a deposition now would be offensive and embarrassing, and would violate their cultural norms, is thus mitigated to some extent.

On the other hand, the sovereignty concerns of the United States are clearly implicated in this litigation, and would be severely infringed if, pursuant to Honda Japan's request, Japanese officials were to conduct the pre-trial questioning of the named deponents under Japanese procedure. The United States has a clear interest in maintaining the integrity of its judicial system and the power of its jurisdiction over persons doing business in the United States. *First Nat'l Bank of Cicero,* 116 F.R.D. at 9; *see Work,* 106 F.R.D. at 55-56. An open discovery process helps maintain this integrity by ensuring that facts necessary for a proper and just adjudication are disclosed. *First Nat'l Bank of Cicero,* 116 F.R.D. at 9. "Thus, solicitude for foreign procedures here would be a particularly significant intrusion upon American sovereignty." *Id.* Furthermore, this litigation does not simply involve issues of common law contract and fraud. It involves questions arising under the antitrust laws and central U.S. policy concerning economic regulation and free-market competition. In *In re Uranium Antitrust Litig.,* 480 F.Supp. 1138, 1154 (N.D.Ill.1979), the court noted:

> [The antitrust laws] have long been considered cornerstones of this nation's economic policies, have been vigorously enforced and the subject of frequent interpretation by our Supreme Court. They are as important to the preservation of economic freedom and our free-enterprise system as the Bill of Rights is to the protection of our fundamental personal freedom.

*Id.* (quoting *United States v. Topco Associates, Inc.,* 405 U.S. 596, 610, 92 S.Ct. 1126, 1134-35, 31 L.Ed.2d 515 (1972)); *see also Laker Airways Ltd. v. Pan American World Airways,* 103 F.R.D. 42, 50 (D.D.C.1984) ("The subject matter of this lawsuit is the American anti-trust laws. This implicates both United States' public policy interests of a special significance and well-established foreign antagonisms to those laws."). Accordingly, United States' concerns with its own judicial sovereignty outweighs Japan's under the circumstances presented here.

As to the litigants themselves, it would be patently unfair to constrain plaintiffs' ability to discover

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

facts necessary to make their case by allowing Honda Japan's managing agents to be deposed in Japan pursuant to Japanese rules. While the scope of plaintiffs' discovery would necessarily be limited under Japanese law, Honda Japan would have free reign to discover all relevant facts pursuant to the Federal Rules of Civil Procedure. *See Anschuetz,* 754 F.2d at 606; *First Nat'l. Bank of Cicero,* 116 F.R.D. at 10; *Messerschmitt,* 757 F.2d at 732. Moreover, the plaintiffs persuasively argue that the travel costs of deposing Honda's four managing agents in Baltimore would be far less than if all plaintiffs and their attorneys (as well as other defendants and their counsel) were required to travel to Japan. Furthermore, most of the relevant documents in this case, which the parties may need to refer to at ***540** deposition, are being held at a depository in Baltimore. Finally, the interest in resolving this litigation in a reasonably expeditious fashion, *see, e.g.,* Civil Justice Reform Act of 1990, 28 U.S.C. § 471*et seq.,* is best served by compelling Baltimore as the situs for these depositions. The added delay in having depositions taken in the Japanese language, of having subsequent English translations made, and in the additional procedural steps necessary for having depositions taken in Japan could unduly prolong this litigation. *See Work,* 106 F.R.D. at 55. Both comity and judicial economy require the deposition of Honda Japan's managing agents in Baltimore, Maryland.

II.

[8][9][10][11] Only a party to the litigation may, of course, be compelled to give testimony pursuant to a notice of deposition. *United States v. Afram Lines (U.S.A.), Ltd.,* 159 F.R.D. 408, 413 (S.D.N.Y.1994). When a party is a corporation, such notice of deposition must be given to it pursuant to Fed.R.Civ.P. 30(b)(6). If the examining party notices the corporation alone, the corporation must designate who will speak on its behalf. Fed.R.Civ.P. 30(b)(6). The examining party has the power itself, however, to designate deponents who will speak for the corporation, but only if the named individuals are "directors, officers, or managing agents." *See id.*(Advisory Committee Note to 1970 amendments); *Founding Church of Scientology of Washington, D.C. v. Webster,* 802 F.2d 1448, 1451 (D.C.Cir.1986) (Advisory Committee Note makes clear that new procedure does not supplant but " 'supplements existing practice whereby the examining party designates the corporate official to be deposed' "), *cert. denied,*484 U.S. 871, 108 S.Ct. 199, 98 L.Ed.2d 150 (1987). Determining whether an individual qualifies as a "managing agent" of a corporation must be made at the time of the deposition. *See, e.g., Curry v. States Marine Corp. of Del.,* 16 F.R.D. 376, 377 (S.D.N.Y.1954). While the burden of proof rests on the party seeking discovery, doubt about an individual's status as a "managing agent," at the pre-trial discovery stage, are resolved in favor of the examining party. *See, e.g., Webster,* 802 F.2d at 1452 n. 4. If an examining party fails to meet its burden, it must resort to Fed.R.Civ.P. 45 for subpoenas on non-party witnesses. *Afram Lines,* 159 F.R.D. at 413. If the witness is overseas, a party must resort to procedures outlined in the Hague Convention or another applicable treaty. *Id.*

Honda Japan contends that even if foreign nationals can be compelled to give depositions in the United States under principles of international comity, Takeo Okusa and Tetsuo Chino, two of the four designated deponents named in the notice of deposition served on Honda Japan, are not "directors, officers, or managing agents" of Honda Japan, and therefore Honda cannot be deposed "through" them.[FN4]

FN4. Honda Japan does not dispute that, principles of comity aside, both Yoshihide Munekuni, Honda Japan's Executive Vice President, and Michiaki Shinkai, a member of its Board of Directors, are directors and/ or officers within the meaning of Fed.R.Civ.P. 30(b)(6).

A. *Takeo Okusa*

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

[12][13] "The law concerning who may properly be designated a managing agent is sketchy." *Webster,* 802 F.2d at 1452. Because the factual circumstances in which the term managing agent must be applied differs greatly among cases, the test must be a functional one and the determination made on a case-by-case basis. *Id.* Courts are generally agreed, however, on the controlling factors used in deciding whether an individual is a managing agent of a corporation. These factors include: (1) whether the corporation has invested the person with discretion to exercise his judgment, (2) whether the employee can be depended upon to carry out the employer's directions, and (3) whether the individual can be expected to identify him or herself with the interests of the corporation as opposed to the interests of the adverse party. *See Reed Paper Co. v. Proctor & Gamble Distrib. Co.,* 144 F.R.D. 2, 4 (D.Me.1992); *Colonial Capital Co. v. General Motors Corp.,* 29 F.R.D. 514, 516-17 (D.Conn.1961); *see also Sugarhill Records Ltd. v. Motown Record Corp.,* 105 F.R.D. 166, 170 (S.D.N.Y.1985); *Afram Lines,* 159 F.R.D. at 413; *Independent Prods. Corp. v. Loew's, Inc.,* 24 F.R.D. 19, 25 (S.D.N.Y.1959). Other factors to consider include the degree ***541** of supervisory authority which a person is subject to in a given area and the general responsibilities of the individual regarding the matters at issue in the litigation. *See Sugarhill,* 105 F.R.D. at 170. The "paramount test" is whether the individual can be expected to identify with the corporation's interests as opposed to an adversary's.

[14] Okusa, as present General Manager of Public Relations at Honda Japan, clearly satisfies the "paramount test:" as a present employee, he continues to maintain an "identity of interest" with Honda. Okusa has previously held senior management positions for Honda Japan and its subsidiaries for a period spanning over 10 years, thus evidencing a long, close relationship with the corporation. He formerly served as an Executive Vice President of American Honda, Honda Japan's domestic subsidiary. His present position as the spokesman for Honda Japan itself suggests that what Okusa says, and what he might say at deposition, will be closely identified with, and in furtherance of, the interests of Honda. Defendant proffers no evidence, and makes no suggestion, that Okusa is no longer loyal to the corporation or does not still identify himself with the its interests. Furthermore, Okusa can be depended upon to carry out his employer's direction to give testimony; as a present employee, Honda Motor can compel his appearance. *See Boston Diagnostics Dev. Corp., Inc. v. Kollsman Mfg. Co.,* 123 F.R.D. 415, 416 (D.Mass.1988).

Honda Japan primarily contends that Okusa's position as General Manager of Public Relations is not senior enough in the corporate hierarchy to have him speak on its behalf. It argues that Okusa has no final authority to bind Honda on issues related to his position or on anything related to Honda Japan's American subsidiaries. However, the issue is not whether Okusa has the power to bind Honda Japan in the contractual sense, but whether Honda has invested him with general powers to exercise his judgment and discretion in a position of trust. *See Colonial Capital,* 29 F.R.D. at 516-17. Clearly, an official spokesman for a major corporation has been imbued with trust. Okusa is not simply a "common employee," but one with "at least a consciousness of the problems of management." *See Loew's,* 24 F.R.D. at 25.

B. *Tetsuo Chino*

[15][16] With respect to Chino, however, Plaintiffs have failed to meet their burden of proof demonstrating that he is presently a managing agent of Honda Japan. The general rule is that former employees cannot be managing agents of a corporation. *Colonial Capital,* 29 F.R.D. at 515 (citation omitted) (recently retired Vice President of General Motors cannot be considered managing agent at time of deposition); *see also Mitchell v. American Tobacco Co.,* 33 F.R.D. 262, 263 (M.D.Pa.1963) (former president of corporation not a managing agent after retirement); *Frasier v. Twentieth Century-Fox Film Corp.,* 22 F.R.D. 194, 197

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

(D.Neb.1958) (corporation not required to produce former officer and director for deposition). Again, the test for determining whether one is a managing agent must be made at the time of deposition. *See Loew's,* 24 F.R.D. at 24-25. There are exceptions to the general rule, however, particularly when a corporation terminates a managing agent in an attempt to avoid disclosure in pending or potential litigation, *see, e.g., Loew's,* 24 F.R.D. at 23-24, when there is evidence that the managing agent has been or might be reappointed to another position in the corporation, *see Curry,* 16 F.R.D. at 377, or when the former employee still has ultimate control with the ability to utilize an entity's organs of communication. *See Webster,* 802 F.2d at 1455-57.

[17] As the record now stands, plaintiffs have failed to produce any evidence that Chino is presently an employee of Honda Japan or otherwise acts as its agent. Formerly the President of American Honda, Chino retired in 1989. Honda Japan concedes that he remained as an advisor to Honda Japan thereafter until June 1993. Defendant contends, with evidence in support, that Chino ended his association with Honda at that time and presently plays no role for the corporation. Yamaoka Supp.Decl. ¶ 2. The only additional evidence that plaintiffs proffer is a 1994 magazine article report which names Chino as a "project contact" and Managing Director at Honda Japan. *See* Pls.' Ex. FF. While the accuracy of this report is persuasively challenged by Honda, the report ***542** still fails to show Chino's *present* status as a managing agent in 1996. Furthermore, Plaintiffs make no proffer that Honda Japan terminated Chino to avoid disclosure, or that he maintains any control over Honda Japan today. While his interests may still be closely identified with the defendant, Honda Japan cannot compel his presence at deposition.

ORDER

For the reasons stated in the memorandum entered herewith, it is, this 30th day of August, 1996,

ORDERED that defendant Honda Japan's motion to quash deposition notices is granted as to Tetsuo Chino, but is otherwise denied.

D.Md.,1996.
In re Honda American Motor Co., Inc. Dealership Relations Litigation
168 F.R.D. 535

END OF DOCUMENT

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Westlaw.

Not Reported in F.Supp.2d Page 1
Not Reported in F.Supp.2d, 2002 WL 1159699 (S.D.N.Y.)
**(Cite as: Not Reported in F.Supp.2d, 2002 WL 1159699 (S.D.N.Y.))**

Dubai Islamic Bank v. Citibank, N.A.
S.D.N.Y.,2002.
Only the Westlaw citation is currently available.
United States District Court, S.D. New York.
DUBAI ISLAMIC BANK, Plaintiff,
v.
CITIBANK, N.A., Defendant.
**No. 99 Civ.1930(RMB)(TH.**

May 31, 2002.

*MEMORANDUM OPINION AND ORDER*

KATZ, Magistrate J.
***1** This case involves a banking relationship gone sour. Plaintiff Dubai Islamic Bank ("DIB") and Defendant Citibank entered an agreement in 1975 that included, *interalia,* the establishment of a correspondent account by DIB in Citibank's New York office. Plaintiff alleges that Citibank had a duty to safeguard DIB's correspondent account by adhering to anti-money laundering procedures and so-called "know your customer" rules. Citibank's alleged dereliction of these and other obligations, DIB claims, led to the unauthorized transfer of more than $151,000,000 from DIB's correspondent account. These fraudulent transfers were, it is alleged, the handiwork of a group of international financial terrorists led by one Foutanga Dit Babani Sissoko, to whose accounts the stolen money was credited. Because Citibank allegedly "slept," as counsel for DIB has put it, the fraud proceeded unchecked for over two years, from late 1995 to early 1998.

The initial Complaint alleged Citibank's liability for DIB's losses on numerous legal grounds, some of which were dismissed for failure to state a claim. The causes of action that survive include those based on negligence, unjust enrichment, and Article 4A of New York's Uniform Commercial Code. In defending the case, Citibank has emphasized the complicity of various high-ranking DIB officers in the alleged scheme to defraud. Citibank points out that criminal investigations in Dubai, conducted by Dubai law enforcement agencies with the assistance of KPMG, which performed an independent audit, led to the convictions of a number of officers and other DIB employees for their active roles in the fraud.[FN1] Apparently, authorizations for many, if not all, of the fraudulent transfers out of DIB's account were issued by DIB's own executives.

FN1. A more complete summary of the nature of this action and the facts alleged in the Complaint may be found in Judge Berman's opinion regarding Citibank's motion to dismiss. *SeeDubai Islamic Bank v. Citibank, N.A.,* 126 F.Supp.2d 659, 662-64 (S.D.N .Y.2000). DIB is currently seeking leave to file an amended complaint.

Presently before the Court is the application of Citibank for an order directing Plaintiff to produce certain witnesses for deposition, and the corresponding application of DIB for a protective order regarding those witnesses. Citibank seeks to depose, in New York, each of ten employees of DIB, whom it contends may be compelled to appear for deposition by virtue of their status as officers, directors, or managing agents of DIB.[FN2] DIB contends that none of the ten employees, all of whom live and work in Dubai, may be compelled to appear for deposition under the Federal Rules of Civil Procedure. DIB also advances numerous equitable concerns that it believes militate against its employees' being required to travel to New York. DIB therefore requests that Citibank be required to take discovery of certain witnesses in Dubai, through letters rogatory or otherwise; that Citibank take depositions of certain other witnesses in Dubai or London (the latter at Citibank's expense, and only "if DIB is able to convince" the witnesses to travel to London); and that Citibank be barred altogether from deposing certain other witnesses. (Letter of Frank C. Welzer, Esq. (an attorney for DIB), May 3, 2002 ("Welzer May 3, 2002 Let."), at 1-2.)

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

http://elibraries.westlaw.com/print/printstream.aspx?prft=HTMLE&destination=atp&sv=F... 5/20/2008

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2002 WL 1159699 (S.D.N.Y.)
**(Cite as: Not Reported in F.Supp.2d, 2002 WL 1159699 (S.D.N.Y.))**

Page 2

FN2. Citibank has issued letters rogatory to depose in Dubai some of these witnesses, as well as other witnesses living in Dubai who are not the subject of the instant motions. Citibank maintains, and the Court agrees, that these letters do not prejudice its right to seek depositions by the more conventional means available under the Federal Rules of Civil Procedure. *SeeSociete Nationale Industrielle Aerospatiale v. U.S. Dist. Court,* 482 U.S. 522, 536, 107 S.Ct. 2542, 2551-52 (1987) ("[T]he [Hague] Convention was intended as a permissive supplement, not a pre-emptive replacement, for other means of obtaining evidence located abroad.") Moreover, whether the letters rogatory will even prove availing remains an open question.

***2** The issue of the deposition of DIB employees in New York has been the subject of several conferences and voluminous submissions to this Court. At the March 29, 2002, conference, the Court determined that it was unable to decide the status of the employees in question based on the record before it, and ordered DIB to produce an affidavit from a high-level employee of DIB detailing the responsibilities and status within DIB of each of the ten proposed deponents, as well as the reasons why each employee could not be compelled to appear for deposition in New York. The Court has received this document (Supplement Declaration of A.R. Ellison in Support of Plaintiff's Motion for a Protective Order ("Ellison Decl ."),[FN3] as well as the parties' subsequent, submissions in response thereto (Letter of D. Scott Tucker, Esq. (an attorney for Citibank), Apr. 25, 2002 ("Tucker Apr. 25, 2002 Let."); Welzer May 3, 2002 Let.) In deciding the instant applications, the Court has also reviewed the parties' earlier submissions and accompanying exhibits.

FN3. Until his recent death, Mr. Ellison was an advisor to the Executive Committee of DIB.

DISCUSSION

*I. Governing Legal Standards*

Under Rule 30(b)(1) of the Federal Rules of Civil Procedure, a specific officer, director, or managing agent of a corporate party may be compelled to give testimony pursuant to a notice of deposition. A corporate employee or agent who does not qualify as an officer, director, or managing agent is not subject to deposition by notice. *See,e.g.,United States v. Afram Lines (USA), Ltd .,* 159 F.R.D. 408, 413 (S.D.N.Y.1994); *Sugarhill Records Ltd. v. Motown Record Corp.,* 105 F.R.D. 166, 169 (S.D.N.Y.1985); *DeNoto v. Pennsylvania R.R. Co.,* 16 F.R.D. 567, 567 (S.D.N.Y.1954). Such an employee is treated as any other non-party witness, and must be subpoenaed pursuant to Rule 45 of the Federal Rules of Civil Procedure; or, if the witness is overseas, the procedures of the Hague Convention or other applicable treaty must be utilized. *SeeAfram Lines,* 159 F.R.D. at 413;*see alsoIn re Honda Am. Motor Co.,* 168 F.R.D. 535, 540 (D.Md.1996) (citing *Afram Lines* ).

"The test for a managing agent is not formulaic."*Boss Mfg. Co. v. Hugo Boss AG,* No. 97 Civ. 8495(SHS)(MHD), 1999 WL 20828, at *3 (S.D.N.Y. Jan. 13, 1999). Rather, the question of whether a person is a managing agent, and therefore subject to a notice of deposition, is answered pragmatically and on a fact-specific basis. *See*8A Charles Alan Wright, Arthur R. Miller & Richard L. Marcus, *Federal Practice and Procedure* § 2103, at 39 (2d ed.1994); *see alsoAfram Lines,* 159 F.R.D. at 413 ("Because of the vast variety of factual circumstances to which the concept must be applied, the standard ... remains a functional one to be determined largely on a case-by-case basis.") (quoting *Founding Church of Scientology of Washington, D.C., Inc. v. Webster,* 802 F.2d 1448, 1452 (D.C.Cir.1986) (citation omitted))."The term 'managing agent' should not be given too literal an

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

http://elibraries.westlaw.com/print/printstream.aspx?prft=HTMLE&destination=atp&sv=F... 5/20/2008

Page 3 of 15

Not Reported in F.Supp.2d
Page 3
Not Reported in F.Supp.2d, 2002 WL 1159699 (S.D.N.Y.)
**(Cite as: Not Reported in F.Supp.2d, 2002 WL 1159699 (S.D.N.Y.))**

interpretation,"*Tomingas v. Douglas Aircraft Co.*, 45 F.R.D. 94, 96 (S.D.N.Y.1968), and "[a]s in all matters appertaining to discovery, it is the ends of justice that are to be served."*Church of Scientology,* 802 F.2d at 1453.

***3** With these principles in mind, courts in this district have generally considered five factors in determining whether an individual is a managing agent:

1) whether the individual is invested with general powers allowing him to exercise judgment and discretion in corporate matters; 2) whether the individual can be relied upon to give testimony, at his employer's request, in response to the demands of the examining party; 3) whether any person or persons are employed by the corporate employer in positions of higher authority than the individual designated in the area regarding which the information is sought by the examination; 4) the general responsibilities of the individual respecting the matters involved in the litigation; and 5) whether the individual can be expected to identify with the interests of the corporation.

*Sugarhill Records,* 105 F.R.D. at 170 (internal quotations and citations omitted); *accordAfram Lines,* 159 F.R.D. at 413;*Zurich Ins. Co. v. Essex Crane Rental Corp.,* No. 90 Civ. 2263(SWK)(JCF), 1991 WL 12133, at *1 (S.D.N.Y. Jan. 29, 1991); *see alsoBoss Mfg.,* 1999 WL 20828, at *3 (recognizing that although the number of factors generally considered by courts ranges from three to five, courts in this district have considered the five factors listed above).

Although typically a corporation cannot be required to produce a former officer or agent for deposition, *see,e.g.,Boss Mfg.,* 1999 WL 20828, at *2 (stating that the rationale for this is that the corporation lacks control over the former agent), this rule is not woodenly applied. Rather, courts within and without this district have adopted a "practical" approach "that focuses not only on the formal connection between the witness and the party at the time of the deposition, but also on their functional relationships."*SeeAfram Lines,* 159 F.R.D. at 414 (adopting flexible approach but finding no managing agent status on facts); *see alsoIndependent Prods. Corp. v. Loew's, Inc.,* 24 F.R.D. 19, 26 (S.D.N.Y.1959) (upholding deposition notices of former officers of plaintiffs who stood "ready to serve plaintiffs" despite severance of formal ties); *Curry v. States Marine Corp. of Del.,* 16 F.R.D. 376, 377 (S.D.N.Y.1954) (upholding deposition notice of master in charge of vessel at time of accident despite his current reduced status as chief mate of another one of defendant's vessels); *Smith v. Shoe Show of Rocky Mount, Inc.,* No. 00-30141, 2001 WL 1757184, at *2 (D.Mass. Aug. 26, 2001) (finding that former district manager, whose conduct as such was "at the heart of Plaintiff's claims," remained a managing agent despite current reduced status as store manager); *Libbey Glass, Inc. v. Oneida, Ltd.,* 197 F.R.D. 342, 351 (N. D.Ohio 1999) ("In any event, it is clear that the deponent need not have a formal association with the corporation to be deemed its managing agent.... Likewise, the deponent need not be associated with the corporation at the time of his deposition."); *Alcan Int'l Ltd. v. S.A. Day Mfg. Co.,* 176 F.R.D. 75, 79 (W.D.N.Y.1996) (requiring deposition of retired officer with unique knowledge of subject matter of litigation); *Calgene, Inc. v. Enzo Biochem, Inc.,* No. Civ. S93-0195, 1993 WL 645999, at *8 (E.D.Cal. Aug. 23, 1993) (holding that consultant and advisory board member who identified with interests of company and who had "power regarding the subject matter of the litigation" was managing agent); *Boston Diagnostics Dev. Corp. v. Kollsman Mfg. Co.,* 123 F.R.D. 415, 416 (D.Mass.1988) (ordering deposition of current employee based on his managing agent status at the time of the transactions at issue in the lawsuit); *but seeReed Paper Co. v. Procter & Gamble Distrib. Co.,* 144 F.R.D. 2, 4-5 nn. 2-3 (D.Me.1992) (criticizing *Boston Diagnostics* ). Summarizing this pragmatic approach, the D.C. Circuit has observed,

***4** Courts have accorded managing agent status to

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

http://elibraries.westlaw.com/print/printstream.aspx?prft=HTMLE&destination=atp&sv=F... 5/20/2008

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2002 WL 1159699 (S.D.N.Y.)
**(Cite as: Not Reported in F.Supp.2d, 2002 WL 1159699 (S.D.N.Y.))**

Page 4

individuals who no longer exercised authority over the actions in question (and even to individuals who no longer held any position of authority in a corporation), so long as those individuals retained some role in the corporation or at least maintained interests consonant with rather than adverse to its interests.

*Church of Scientology,* 802 F.2d at 1456.

Finally, although the examining party bears the burden of establishing the status of the witness, *seeSugarhill Records,* 105 F.R.D. at 170, the exact nature of this burden is not perfectly clear, *seeBoss Mfg.,* 1999 WL 20828, at *4 ("[I]t is not entirely clear whether the burden [of establishing the deponent's status] is one of production or persuasion or both."); *Afram Lines,* 159 F.R.D. at 414 (suggesting that the burden may vary depending on whether the examining party has had complete discovery on the issue or whether the deponent is an employee of the opposing party). In any event, the burden is "modest," *Boss Mfg.,* 1999 WL 20828, at *4, and all doubts are to be resolved in favor of the examining party, *Afram Lines,* 159 F.R.D. at 414;*Sugarhill Records.* 105 F.R.D. at 171. Thus, the examining party satisfies its burden when it produces "enough evidence to show that there is at least a close question whether the proposed deponent is the managing agent."*Afram Lines,* 159 F.R.D. at 413;*accordBoss Mfg.,* 1999 WL 20828, at *4 (citing *Afram Lines* ). This approach permits discovery to proceed, while deferring until trial the ultimate question of whether the witness's testimony is binding on the corporation. *SeeAfram Lines,* 159 F.R.D. at 413-14;*Zurich Ins. Co.,* 1991 WL 12133, at *2;*Sugarhill Records,* 105 F.R.D. at 171;*see alsoFederal Practice and Procedure* § 2103 ("The determination of whether a particular person is a 'managing agent' will be made by the trial court when the deposition is sought to be introduced...."). The witness's deposition testimony itself may well provide the best evidence of his or her status. *SeeAfram Lines,* 159 F.R.D. 413-14 (stating that it is proper to defer final determination of managing agent status until trial since at that time examining party will have had full discovery regarding that status); *Boss Mfg.,* 1999 WL 20828, at *4 ("[A] determination that the witness is a managing agent may be made provisionally ... while awaiting the deposition testimony before determining whether the witness is an agent for purposes of binding the corporation."); *Hughes Bros., Inc. v. Callanan Rd. Improvement Co.,* 41 F.R.D. 450, 454 (S.D.N.Y.1967) (noting that a showing of managing agent status for the purposes of compelling a deposition "might well be overcome by the testimonial evidence produced at th[at] very examination").

*II. Status of the Ten DIB Employees*

Keeping the above principles in mind, the Court will now address *seriatim* the status of the employees Citibank is seeking to depose.

*1. Valiyakatt Ahmed Khalid*

***5** Mr. Khalid's status as a managing agent regarding the events relevant to this litigation is not seriously in doubt. Numerous documents, including DIB's own personnel file, indicate that Mr. Khalid was Head of the Foreign Department during the time period relevant to this litigation. (Tucker Apr. 25, 2002 Let. at 3-4.) DIB disputes that this was his title, but concedes that he was "the person responsible for interbank transfers (foreign exchange) in the foreign section."(Ellison Decl. at 2.) As such, he was seemingly vested with significant enough responsibility and discretion to be considered a managing agent, even if he did not hold the specific title of head of the department. In any event, Citibank has produced more than enough information to make his status as department head, much less his substantial responsibilities "respecting the matters involved in the litigation," a close question that should be resolved in favor of Mr. Khalid's deposition's taking place. The Court further notes that for all its focus on Mr. Khalid's title, DIB does not even appear to dispute that Mr. Khalid's responsib-

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

http://elibraries.westlaw.com/print/printstream.aspx?prft=HTMLE&destination=atp&sv=F... 5/20/2008

Not Reported in F.Supp.2d
Page 5
Not Reported in F.Supp.2d, 2002 WL 1159699 (S.D.N.Y.)
**(Cite as: Not Reported in F.Supp.2d, 2002 WL 1159699 (S.D.N.Y.))**

ilities in his former position rendered him an officer or managing agent.[FN4]

FN4. The Court finds further justification for resolving doubts in favor of Citibank on this issue given the inconsistent representations that have been made by DIB regarding Mr. Khalid's status. As late as last August, counsel for DIB represented to Citibank and to this Court that DIB was actively engaging in both civil and criminal proceedings against Mr. Khalid, when in fact, DIB had issued certificates of release against Mr. Khalid and two others, Messrs. Al Rais and Hassan, a year earlier. (Affidavit of D. Scott Tucker, Esq., in Support of Application for Order Directing Plaintiff to Produce Certain Witnesses for Depositions, Dec. 20, 2001 ("Tucker Aff."), Ex. A at 44, 46.) Only Citibank's independent research led to the correction of this error.

DIB resists producing Mr. Khalid for deposition on the grounds that he is merely a clerk [FN5] in the foreign section of the Operations Department. Mr. Ellison represents that Khalid was demoted from his previous position as "person responsible for interbank transfers" because of his involvement in the fraud and because of the criminal proceedings against him. (Ellison Decl. at 2 .) Mr. Ellison also states that Mr. Khalid no longer has any signature authority (whereas previously he had "B" authority). Mr. Khalid was convicted of fraud in the Dubai Court of First Instance, yet later had his conviction overturned (along with two other DIB employees, whom Citibank also seeks to depose, *seeinfra* ).

FN5. DIB's records indicate that his position was changed to "First Banker" (Tucker Aff., Ex. I), a term that may or may not be synonymous with "clerk," but which Mr. Ellison does not explain.

Although the parties dispute whether DIB posted bail for Mr. Khalid, there is no dispute about the more significant fact that DIB waived its civil case against Mr. Khalid and maintained him in its employ, and that the appellate court relied in part on these circumstances in overturning Mr. Khalid's conviction. Moreover, in addition to retaining Mr. Khalid as an employee, DIB continues to pay him the same salary and to maintain him at the same grade, a fact Mr. Ellison acknowledges, albeit backhandedly. Mr. Ellison states that this rather remarkable situation-the bank's retention, at the same position grade and salary, of an employee admittedly involved in a massive fraud scheme against it-results from DIB's "staff policies," which do not contain "any provision for demotion by way of reduction in grade, or by reduction in salary or allowances."(*Id.*)

The Court is persuaded that Mr. Khalid may be considered a managing agent for the purpose of noticing his deposition. The fact that DIB retained Mr. Khalid in its employ, waived its civil claims against him, and assisted in his escaping criminal liability, despite his undisputed involvement in a quarter-billion dollar fraud against it, strongly suggests that Mr. Khalid is greatly indebted to DIB, and thus remains subject to its control. That his interests remain aligned with DIB is supported by his continuing to draw the same salary and enjoy the same position grade as he did prior to the events in question. Moreover, DIB cannot be heard to claim that Mr. Khalid is not authorized to testify for DIB, when DIB admits that it retains him precisely for that reason. Mr. Ellison explains that DIB retains Mr. Khalid because, as a non-national of the United Arab Emirates, his right to remain in Dubai under his employment visa depends entirely on his sponsorship by DIB. If terminated, "Khalid would return to his home in ... India ... and his testimony would be lost *to DIB,* Citibank, and other interested parties."(Ellison Decl. at 2-3 (emphasis added).) This admission strongly suggests that, even if he no longer retains a position of authority, Khalid, who has been employed by DIB since 1975, remains "ready to serve" DIB, *Loew's,* 24 F.R.D. at 26, and

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

http://elibraries.westlaw.com/print/printstream.aspx?prft=HTMLE&destination=atp&sv=F... 5/20/2008

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2002 WL 1159699 (S.D.N.Y.)
**(Cite as: Not Reported in F.Supp.2d, 2002 WL 1159699 (S.D.N.Y.))**

Page 6

that he has "maintained interests consonant with rather than adverse to [DIB's] interests,"*Church of Scientology,* 802 F.2d at 1456;*see alsoAfram Lines,* 159 F.R.D. at 415 ("[A]n agent's history of cooperating with a party in discovery may be probative of the party's ability to rely on the agent to testify.") The purpose of the general rule against requiring former officers to testify-namely, "to protect the party from the admissions of disgruntled former officers and agents,"Fed. Practice and Procedure § 2103-will thus not be frustrated in this case. As the cases cited above demonstrate, "this principle has been applied in light of its purpose. When the person involved retains such a connection with the corporation as to be loyal to it, his or her deposition has been considered that of the corporation, and the same result had been reached when the person, even though no longer a managing agent, is still in the employee of the party."*Id.*

***6** Accordingly, this Court holds that Mr. Khalid is a managing agent subject to deposition by notice.FN6

FN6. DIB also claims there are several additional problems with taking Mr. Khalid's deposition in New York. These concerns, as well as all such non-status-related objections respecting other witnesses, are discussed below, in the next section.

*2. Mohammed Abdullah Ali Al Rais*

With respect to the current motion, the issues concerning the status of Mohammed Abdullah Al Rais are substantially similar to those concerning Mr. Khalid. Mr. Al Rais was Chief of Cashiers during the period involved in this litigation.[FN7](Ellison Decl. at 4.) Like Mr. Khalid, Mr. Al Rais was subsequently demoted from his position of high authority, to a clerical position, following his involvement in the criminal fraud. (His current position title is apparently "First Banker." (Tucker Aff., Ex. J.)) Like Mr. Khalid, Mr. Al Rais was convicted in the Dubai Court of First Instance but subsequently exonerated on appeal, in part due to DIB's having absolved him of civil liability and maintained him in its employ. Mr. Al Rais also continues to enjoy the same salary and grade as he did prior to the fraud. Finally, as with Mr. Khalid, Citibank has offered significant, apparently unrefuted evidence of Mr. Al Rais's importance to the transactions at issue in this dispute. (Tucker Apr. 25, 2002 Let. at 7-8 & citations therein.) Indeed, Mr. Al Rais's extensive involvement in many of pertinent events in this case is corroborated by Mr. Ellison's representation that Mr. Al Rais has testified more than twenty times in related matters in the Dubai courts.

FN7. In presenting Mr. Al Rais's former position as an undisputed fact, the Court relies on Mr. Ellison's sworn declaration, along with the evidence submitted by Citibank, and not DIB counsel's unsworn, belated, and equivocal statement that "we now understand that Mr. Al Rais did not hold the position of 'Chief Cashier' at DIB, but that the Chief Cashier responsible for the safe and its contents during the period of the fraud was Mohammed Ayyoub."(Welzer May 3, 2002 Let. at 6.) Moreover, as with Mr. Khalid, DIB's perpetually shifting representations concerning Mr. Al Rais raise more questions than they answer, and persuade this Court of the wisdom of resolving doubts regarding the proposed deponents' status in favor of Citibank.

In light of his obvious importance to the matters at issue and his equally clear position of authority, and for substantially the same reasons as stated above with respect to Mr. Khalid, this Court finds Mr. Al Rais is a managing agent of DIB who therefore is subject to deposition by notice. In so ruling, the Court has taken into account the additional reason proffered by Mr. Ellison why Mr. Al Rais may not testify on DIB's behalf, namely, that Mr. Al Rais is attempting to find a new job and "would happily leave DIB tomorrow ... [but] he needs to support his family and to finish funding his pen-

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

http://elibraries.westlaw.com/print/printstream.aspx?prft=HTMLE&destination=atp&sv=F... 5/20/2008

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2002 WL 1159699 (S.D.N.Y.)
**(Cite as: Not Reported in F.Supp.2d, 2002 WL 1159699 (S.D.N.Y.))**

Page 7

sion."(Ellison Decl. at 5.) Putting aside the fact that this hearsay statement is not competent evidence, the Court notes that this is an insufficient ground for defeating managing agent status. The near universal need to earn income and provide for one's retirement does not imply disloyalty to one's employer, and does not change one's status within the organization (just as, conversely, an independently wealthy low-level functionary would not become a managing agent subject to deposition by notice merely because he loved his job).

*3. Sayed Najamul Hassan*

Like Messrs. Khalid and Al Rais, Mr. Hassan was convicted for his apparently significant personal involvement in the fraud,[FN8] exonerated on appeal after being given a release of liability by DIB, and retained as an employee of DIB. Unlike Khalid and Al Rais, however, Mr. Hassan was a mere clerk in the Foreign Department at the time of the events in question (and remains one now). Citibank does not contest this fact, but contends that Mr. Hassan's "role in the fraud transcended that of a clerk because he was actively involved in forging hundreds of fraudulent documents directly related to the transfers at issue in this case."(Tucker Apr. 25, 2002 Let. at 10.) The Court agrees that Mr. Hassan's importance to the events in question appears supported by the record; unfortunately for Citibank, however, this is not the test for managing agent. There is no evidence that Mr. Hassan's position gave him any independent discretion, and even his role in the fraud appears to be that of a facilitator and subordinate. *SeeLibbey Glass,* 197 F.R.D. at 351 (individual who "may well have played an important role" in events giving rise to lawsuit was not managing agent because he "facilitated, but did not control" those events).

FN8. Mr. Ellison states that Mr. Hassan was prosecuted "for criminal breach of trust and practising black magic."(Ellison Decl. at 5.)

*7 Accordingly, Mr. Hassan is not an officer, director, or managing agent, and thereby is not subject to deposition by notice.

*4. Mohammed Abul Quashem Fazar Rahman*

Mr. Rahman is undisputedly Assistant Head or Deputy Head of the Foreign Department, and was so at the time of the fraud. DIB does not contest his high-ranking status in the bank, but seeks to avoid his deposition on the grounds that "it would not be a prudent use of time" because Mr. Rahman allegedly lacks recollection of the events in question. (Welzer May 3, 2002 Let. at 7.) DIB states that he was not "formally" interviewed by either the Dubai authorities or KPMG, and argues that this tends to show his lack of importance to the events in question. Nevertheless, Citibank states that its primary interest in deposing Mr. Rahman does not stem from his alleged direct involvement in the fraud. Rather, Citibank maintains that it seeks to learn of the procedures, operations, and practices of the Foreign Department, of which Mr. Rahman was Deputy Head, and which sent all of the wire transfers at issue in this case. Moreover, there remain questions about Mr. Rahman's direct involvement and knowledge in these transfers, a fact suggested by the independent auditor's report, which concluded that it was "important" to interview him to ascertain his role in the fraud.

Accordingly, DIB's motion for a protective order regarding Mr. Rahman is denied.

*5. Mohammad Sadiq Mohammad Ali*

According to Mr. Ellison, Mr. Sadiq is a "supervisor" in the foreign section. (Ellison Decl. at 8.) The independent auditor's report submitted by Citibank lists Mr. Sadiq as Mr. Khalid's Deputy in the Foreign Department. Mr. Ellison states that Mr. Sadiq merely performs "routine work ... including checking and signing vouchers for incoming and outgoing remittances, checking and signing outward Telexes and SWIFT messages...." (Ellison

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

http://elibraries.westlaw.com/print/printstream.aspx?prft=HTMLE&destination=atp&sv=F... 5/20/2008

Page 8 of 15

Not Reported in F.Supp.2d
Page 8
Not Reported in F.Supp.2d, 2002 WL 1159699 (S.D.N.Y.)
**(Cite as: Not Reported in F.Supp.2d, 2002 WL 1159699 (S.D.N.Y.))**

Decl. at 7.) Mr. Ellison admits that Mr. Sadiq has "B" level signature authority, but downplays the significance of such authority. Mr. Ellison states that "A" and "B" level signatories are "back-office workers empowered to complete the paperwork for transactions approved elsewhere."(*Id.* at 8.) Mr. Ellison notes that Mr. Sadiq signs between 200 and 250 transfer vouchers per day, and that he has no recollection of any particular events or transactions with respect to the fraud. Finally, Mr. Ellison notes that Mr. Sadiq was not interviewed as part of the official criminal investigation in Dubai, nor was he interviewed by KPMG, although KPMG did indicate he might be a useful witness.

Citibank argues that Mr. Ellison's assessment of the significance of signature authority is contradicted by Mr. Ellison's own answers to previous interrogatories, in which he stated, "For persons associated with DIB with duties to act for DIB, *see* signature book to be produced."(Tucker Apr. 25, 2002 Let. at 13.) Citibank also points out that the signature book itself states that officials listed therein are "authorized to sign on behalf of the bank" with respect to "financial commitments or disposal of Dubai Islamic Bank assets."(*Id.*) Additionally, Citibank notes that many of DIB's most important officers and directors, including the chairman of the board and the CEO, are included in the signature book, a fact that obviously undermines the assertion that such signatories are merely "back-office employees." Finally, Citibank also points to evidence that Mr. Sadiq may have been centrally involved in the fraud, inasmuch as he was Khalid's deputy and may also have received instruction from Mr. Ayoub. (*Id.* at 13-14.)

***8** The Court agrees with Citibank that DIB's characterization of the significance of such signature authority is contradictory, if not implausible. From the language of the signature book itself, as well as Mr. Ellison's representation in his interrogatory, the signatories appear to be vested with the type of discretion and authority that come with managing agent status. On the other hand, the fact that Mr. Sadiq signs upwards of 200 transfers a day suggests that each individual act of signing may not entail such a great exercise of judgment and discretion after all. In sum, the record before the Court is sparse and ambiguous on this score. More significant, however, is the fact that Citibank has pointed to little else that tends to show a high level of authority on the part of Mr. Sadiq either in general or with respect to the matters in this litigation. Even the KPMG report, on which Citibank primarily relies, suggests that Mr. Sadiq's role, if any, was likely that of subordinate, both to Mr. Ayoub and to Mr. Khalid, his direct supervisor. Thus, even if Mr. Sadiq had involvement in and recollection of the transactions in question, which he denies having, his status does not appear to be that of officer and managing agent. As stated, the test for managing agent does not turn on one's mere possession of relevant information. Rather, the witness must possess authority to speak and act on behalf of the corporation. The Court is not prepared to find that Mr. Sadiq's signature authority, standing more or less alone, confers him with such authority.

Accordingly, the Court finds Mr. Sadiq is not a managing agent subject to deposition by notice, and grants DIB's motion for a protective order with respect to Mr. Sadiq.[FN9]

FN9. However, the Court notes that if Citibank remains committed to taking discovery from Mr. Sadiq, he apparently remains on good terms with DIB and thus, most likely, is amenable to DIB's directions. DIB has in fact offered to try to persuade Mr. Sadiq to appear for deposition (albeit in London). The Court therefore suggests that, in the interest of compromise, DIB try to make Mr. Sadiq available for deposition in Dubai, in the event counsel for Citibank travels there.

*6. Rafat Karim Ahmed Karim*

According to Mr. Ellison, Mr. Karim is a "supervisor" in the communications section and has

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

http://elibraries.westlaw.com/print/printstream.aspx?prft=HTMLE&destination=atp&sv=F... 5/20/2008

Page 9

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2002 WL 1159699 (S.D.N.Y.)
**(Cite as: Not Reported in F.Supp.2d, 2002 WL 1159699 (S.D.N.Y.))**

"limited decision-making authority." (Ellison Decl. at 8.) Mr. Ellison admits that he has "B" level signature authority, and that he works with the SWIFT and Telex systems apparently at issue in this litigation. Mr. Ellison states that he reports to the department manager, who in turn reports to the Operations Manager. In response, Citibank notes that the auditor's report identifies Mr. Karim as an "officer in [DIB's] Foreign Remittance Department," and indicates that he monitored DIB's correspondent accounts, such as the one that DIB held with Citibank. (Tucker Apr. 25, 2002 Let. at 14.) Citibank also notes that DIB's records indicate that Mr. Karim is a "Senior Banker," and that he signed many of the transfers at issue in this case.(*Id.*) DIB replies that the reference in the KPMG report to Mr. Karim as an "officer" is an example of the inaccuracy of the report (which was critical of DIB), and should thus be discounted. (Welzer May 3, 2002 Let at 9.)

The foregoing persuades this Court that Mr. Karim's status as an officer or managing agent is at least a close call, and that he should thus be subject to deposition by notice. His signature authority and supervisory position indicate that he holds general powers to exercise judgment and discretion, that he can be relied on to give testimony, and that he identifies with the interests of DIB. Although he may not be the highest ranking official in his department, which weighs against his being found a managing agent, this factor is counterbalanced by his seeming direct supervisory authority over many of transactions at issue in this case. Accordingly, under the five-factor test, the Court finds that Mr. Karim is a managing agent who may be required to appear for deposition by notice on DIB's behalf.

*7. Sayed Kamel Mansour*

***9** According to Mr. Ellison, Mr. Mansour is a clerk in the General Accounts department, who has never had signature authority and whose job entails "the purely clerical function of taking figures from the general ledger trial balance and inserting those numbers into slots on the proforma for the U.A.E. Central Bank returns."(Ellison Decl. at 9.) Mr. Ellison also affirms that Mr. Mansour at all relevant times performed his duties solely according to instructions he received from his superior, Mr. El Refaie. In addition, Mr. Ellison states that Mr. Mansour has "absolutely no memory of Mr. El Refaie ever indicating to him that anything should be covered up," despite statements in the KPMG report suggesting otherwise. (*Id.* at 9.)

Citibank states that contrary to Mr. Ellison's assertion, Mr. Mansour is listed in DIB's signature book as having "B" signature authority. Citibank also notes that DIB's July 2001 list of employees describes Mr. Mansour not as a clerk but as an accountant. In addition, Citibank points to portions of the KPMG report suggesting that Mr. Mansour was directly involved in both the fraud and the alleged coverup. Citibank also notes that KPMG indicated that Mr. Mansour "need[ed] to be interviewed" regarding his knowledge of the fraud, inasmuch as he was "one of the signatories" on a particular accounting voucher. (Tucker Apr. 25, 2002 Let at 15-16.)

Other than his disputed signature authority, there is scant evidence suggesting that Mr. Mansour is or was in a position of discretion and significant responsibility. Unlike others with signature authority, Mr. Mansour does not seem to have now, or have had, a managerial role in the company generally, or with respect to the events at issue. Even accepting that his title is "accountant" and not "clerk," this title does not suggest managing agent status. Moreover, it is apparently not contested that his role in the events was a subordinate one, inasmuch as he took orders from Mr. Refaie. Regardless of whether the content of the orders included a direction to cover up the fraud, Mr. Mansour was still acting at Mr. Refaie's behest. As stated above, the mere fact that Mr. Mansour may have been directly implicated in the matters involved in this litigation, and thus have important information, does not alter his status.

Accordingly, the Court finds that Mr. Mansour is

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

http://elibraries.westlaw.com/print/printstream.aspx?prft=HTMLE&destination=atp&sv=F... 5/20/2008

Page 10

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2002 WL 1159699 (S.D.N.Y.)
**(Cite as: Not Reported in F.Supp.2d, 2002 WL 1159699 (S.D.N.Y.))**

not an officer, director, or managing agent subject to notice of deposition. In the interest of compromise, DIB has offered to provide Citibank with a written response to any inquiries it may have of Mr. Mansour. Accordingly, Citibank shall promptly provide DIB with such inquiries if it wishes to avail itself of this procedure, or, alternately, should attempt to arrange for Mr. Mansour's deposition in Dubai.

*8. Ibrahim Eissa Lootah*

Mr. Ellison states that, upon information and belief, Mr. Lootah, "while technically still an 'employee' of DIB, has virtually no responsibilities at DIB. He was demoted from branch manager of DIB's Al Souk branch almost immediately after discovery of the fraud and now he does not have any real responsibilities. He has no signature authority.... [H]e does very little (if any) actual work for DIB...." (Ellison Decl. at 9-10.) Mr. Ellison provides no explanation of why Mr. Lootah remains an employee of DIB despite his having been demoted, apparently on account of involvement in the fraud. On the other hand, Mr. Welzer, one of DIB's attorneys, states that "DIB does not believe that Mr. Lootah was involved in the fraud, although he (like many others) was under the cloud of suspicion that was initially cast following the discovery of the massive fraud in 1998."(Welzer May 3, 2002 Let. at 11.)

***10** Citibank points to the apparently undisputed fact that Mr. Lootah was a high-level officer of the bank during the relevant period. Mr. Lootah had "A" level signature authority, and, according to DIB's counsel's own representation, was "one of eight branch managers who reported to an executive committee made up of the most senior officers at DIB."(Welzer May 3, 2002 Let. at 10.) Though Mr. Welzer offers this as an explanation of why Mr. Lootah was *not* a senior official, it appears to the Court to indicate just the opposite. Regardless of whom he reported to, Mr. Lootah obviously had substantial managerial authority over a significant segment of the bank, given his position as head of a branch. His independent discretion and judgment are further indicated by his having the same level of signature authority as DIB's CEO. (Tucker Apr. 25, 2002 Let. at 16.) Moreover, it is not clear that he did not play some role in the events at issue in this litigation, though what exactly he may have done remains unclear.

Finally, as with Messrs. Al Rais and Khalid, his continued employment with DIB, after coming under a "cloud of suspicion" for involvement in the fraud, indicates an ongoing identity of interest between Mr. Lootah and DIB. As Citibank notes, it is bizarre indeed that DIB would retain an employee, apparently at a high salary, for four years and running, who was demoted because of suspected participation in a quarter-billion-dollar fraud. Such a situation cries out for an explanation, which has not been forthcoming. The Court notes that DIB's explanations for why Mr. Lootah is still employed are contradictory: on one hand, Mr. Ellison asserts that Mr. Lootah was demoted on account of the fraud; on the other, Mr. Welzer claims that DIB does not believe Mr. Lootah was even involved in the fraud. If Welzer's version is in fact the correct one, the Court is left to wonder why, or whether, Mr. Lootah was demoted at all. If he was demoted on account of involvement in the fraud, yet continues to be retained four years later, the Court can only infer that DIB, in light of such extraordinary magnanimity toward Mr. Lootah, continues to exercise control over him, and that it can rely on him to testify at its behest. In any event, the unexplained contradictions surrounding Mr. Lootah's current status, coupled with his previously high-level status, more than suffice to make Mr. Lootah's status a "close call," warranting his being subject to deposition by notice.

*9. Fawzi Mohammed Lootah*

Mr. Ellison states that Mr. Lootah is a "supervisor" in the foreign Murabaha follow-up and collections department, but that he has neither "decision-making discretion" nor signature author-

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

http://elibraries.westlaw.com/print/printstream.aspx?prft=HTMLE&destination=atp&sv=F... 5/20/2008

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2002 WL 1159699 (S.D.N.Y.)
**(Cite as: Not Reported in F.Supp.2d, 2002 WL 1159699 (S.D.N.Y.))**

Page 11

ity for financial transactions. (Ellison Decl. at 10.) Nevertheless, it is undisputed that Mr. Lootah was head of the Foreign Section during the relevant period. Citibank cites testimony of a DIB manager stating that Mr. Lootah supervised Mr. Khalid, and argues that Mr. Lootah therefore has highly relevant information regarding matters central to this litigation. (Tucker Apr. 25, 2002 Let. at 17-18.) Counsel for DIB asserts that Mr. Khalid was not under Mr. Lootah's supervision, a fact not addressed in Mr. Ellison's declaration. (Welzer May 3, 2002 Let. at 11.) In any event, Mr. Ellison states that Mr. Lootah had "very little, if any, actual involvement in the events at issue in this lawsuit" and that "[o]ther witnesses," whom he does not identify, have "specific and better knowledge" regarding the information relevant to this lawsuit. (Ellison Decl. at 10.) Mr. Ellison notes that the Dubai police and public prosecutor did not interview Mr. Lootah.

***11** Regardless of Mr. Lootah's role in the matters at issue, which the Court finds unclear at this point and thus a fact that should be resolved in favor of his examination, the other factors for determining managing agent status suggest that Mr. Lootah is such an agent. His former role as department head clearly gave him substantial authority, and even now he retains a supervisory position. Moreover, even if he was not involved in the fraud, as DIB suggests he was not, the same lack of explanation for his apparent demotion, if indeed one has occurred, exists as in the case of Mr. Ibrahim Eissa Lootah. His continued employment by DIB suggests an identity of interests, and that he may relied on to testify at DIB's behest.

Accordingly, the Court holds that Mr. Fawzi Lootah, as a managing agent, may be deposed on notice pursuant to the Federal Rules. However, given DIB's assertion that Mr. Lootah had little involvement in the events at issue and thus has little relevant information, the Court suggests that Mr. Lootah's deposition be scheduled for a time after the depositions of the other witnesses herein discussed. This Court's suggestion does not excuse DIB of its obligation to produce Mr. Lootah, but simply attempts to accommodate DIB by having Citibank depose Mr. Lootah only after determining that he may have information not otherwise obtained. This suggestion is not binding, and may be disregarded in the event that scheduling Mr. Lootah later rather than sooner becomes impracticable.

*10. Mr. Zohair Al Rabi'i*

Mr. Al Rabi'i was the head of the Computer Department during the relevant time period. Citibank has pointed to documents, including the KPMG report, suggesting both that the computerized accounting systems may have been an important aspect of the fraud, and that Mr. Al Rabi'i may have instructed a subordinate, Chandra Shekar, to assist the former CFO in the fraud. (Tucker Apr. 25, 2002 Let. at 18-19.) Regardless of his role, given his status as department head, it seems relatively clear that his former position qualified Mr. Rabi'i as an officer or managing agent.

As for his current position, Mr. Ellison's declaration simply states that he "works in the compliance department," without providing his title. (Ellison Decl. at 11.) Mr. Ellison states that "he does things like review daily transactions," and "doesn't implement things by his own volition; he merely recommends a course of action."(*Id.*) The Court finds these vague, conclusory assertions, which are sandwiched between a litany of equitable claims of why Mr. Al Rabi'i should not be forced to come to New York, unconvincing. Given his undisputed prior position as a department head, the Court is satisfied that the status of Mr. Al Rabi'i as a managing agent remains at least a close question, and that he can be expected to identify with DIB, and to testify at its request. Accordingly, he is subject to deposition by notice.

DIB also argues that a former subordinate of Mr. Rabi'i, Mr. Shekar, should testify in his stead. Mr. Ellison asserts that Mr. Shekar was the "de facto head" of the IT department, and that he "performed

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

http://elibraries.westlaw.com/print/printstream.aspx?prft=HTMLE&destination=atp&sv=F... 5/20/2008

Not Reported in F.Supp.2d
Page 12
Not Reported in F.Supp.2d, 2002 WL 1159699 (S.D.N.Y.)
**(Cite as: Not Reported in F.Supp.2d, 2002 WL 1159699 (S.D.N.Y.))**

most of the work" there. (Ellison Decl. at 11.) Nevertheless, it is undisputed that he has now left DIB, and thus cannot be deposed as an officer or managing agent. Although DIB has stated that it "might" be able to produce him in New York (*id.* at 11), Citibank correctly points out that his testimony would not constitute a party admission.

***12** As a compromise, the Court offers DIB the following proposal: it may produce Mr. Shekar for deposition in New York, instead of Mr. Rabi'i, on condition that it stipulate to the admissibility at trial, as a party admission of DIB, of Mr. Shekar's deposition testimony. Such a stipulation is appropriate, given Mr. Ellison's representations that Mr. Shekar was the "de facto head" of the department-and thus had de facto managing agent status-and that Mr. Shekar stands ready to serve DIB upon its request. Further, this compromise attempts to accommodate both parties' interest in having the most knowledgeable witness deposed. If DIB does not consent to this procedure, it must produce Mr. Rabi'i for deposition, for the reasons stated above. Moreover, if Mr. Shekar is deposed and his testimony supports the contention that Mr. Rabi'i is a managing agent and may have relevant knowledge that Mr. Shekar lacks, the Court will entertain a renewed application for the deposition of Mr. Rabi'i.

*III. Location of Depositions*

For each proposed deponent, DIB has raised various equitable reasons why it believes he should not be required to appear in New York for a deposition. Citibank insists that any other solution but requiring these deponents to come to New York is both unfair and impracticable. The Court has considered the equities and the practicalities of the situation regarding each proposed witness, and, in its discretion, concludes that DIB has not overcome the presumption that a plaintiff who brings suit in a particular forum should be prepared to send its agents to be deposed there.

As a general rule, a plaintiff who brings suit in a particular forum may not avoid appearing for examination in that forum. *See,e.g.,A.I.A. Holdings, S.A. v. Lehman Bros., Inc.,* 97 Civ. 4978(LMM)(ABP), 2002 WL 1041356, at *1 (S.D.N.Y. May 23, 2002) ("[I]t is well settled that a plaintiff is ordinarily required to make him or herself available for a deposition in the jurisdiction in which the action is brought."); *Daly v. Delta Airlines, Inc.,* No. 90 Civ. 5700(MEL)(MHD), 1991 WL 33392, at *1 (S.D.N.Y. Mar. 7, 1991) (absent showing of substantial hardship, and "in view of the fact that plaintiff chose to file his lawsuit here rather than in Ireland, it is hardly unreasonable to expect that he make himself available in the district where he is litigating his million dollar claim"); *Clem v. Allied Int'l,* 102 F.R.D. 938, 939-40 (S.D.N.Y.1984) (nonresident plaintiff who sues in Southern District of New York must appear for deposition here absent compelling circumstances); *Grotrian, Helfferich, Schulz, Th. Steinweg Nachf. v. Steinway and Sons,* 54 F.R.D. 280, 281 (S.D.N.Y.1971) ("Since plaintiff has chosen this forum, it cannot impose upon defendant the extraordinary expense and burden of traveling to a foreign country to conduct a deposition except on a showing of burden and hardship to the plaintiff."); Michael C. Silberberg, *Civil Practice in the Southern District of New York* § 17.11 (2d ed. 2000) ("[T]he deposition of a plaintiff usually may be taken in the Southern District of New York notwithstanding the plaintiff's residence outside the district. The reason is that the plaintiff selected the Southern District as the forum for trial.") (collecting cases); *cf.Sugarhill Records,* 105 F.R.D. at 171 ("[Defendant] Motown is a large corporation and cannot seriously contend that travel on behalf of the corporation by one of its managing agents is unexpected or that such travel to New York for deposition imposes a severe burden on it."). In the end, the decision as to the location of the deposition lies within the discretion of the court. *SeeSugarhill Records,* 105 F.R.D. at 171;*Federal Practice and Procedure* § 2112.

***13** DIB attempts to avoid the normal rule on several grounds. Some of these grounds are common to

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

http://elibraries.westlaw.com/print/printstream.aspx?prft=HTMLE&destination=atp&sv=F... 5/20/2008

all of the proposed deponents; some are specific to individual deponents. The Court will address the general objections first, then turn to the objections particular to individual deponents.

DIB claims that many of the managing agents in question do not want to travel to the United States in general, and New York City in particular, in light of the perceived dangers related to the aftermath of events on September 11, 2001. Citibank contends that the risk for foreign travelers in New York is minimal, and in any event pales in comparison with the threat posed to Americans traveling in the Middle East.

The Court agrees with Citibank that the dangers to each party are not completely symmetrical. There is no evidence that foreign visitors to New York face any threat-or at least any threat greater than that to New Yorkers in general. *SeeA.I.A. Holdings, S.A. v. Lehman Bros., Inc.,* 97 Civ. 4978(LMM) (ABP), 2002 WL 538833, at *4 (S.D.N.Y. Apr. 10, 2002) ("To the extent that Omaya and Huda assert anxiety concerning traveling to New York, their anxieties are baseless. There is no evidence in the record suggesting that individuals of Middle-Eastern ancestry have been subject to acts of revenge since the mass murders of September 11."). On the other hand, the State Department has issued warnings to Americans traveling abroad in general, and to the Middle East in particular. (Tucker Apr. 25, 2002 Let., Exs. 2-3.) More importantly, the Court agrees with those courts that have concluded that whatever the increased dangers both in the United States and throughout the world, the U.S. judicial system remains open for business, and its normal operations cannot be upset by mere invocation of the tragedy of September 11. *SeeIn re Vitamins Antitrust Litig.,* Misc. No. 99-197, MDL No. 1285, Memorandum Opinion Re: Deposition Locations, attached as Ex. C. to Letter of D. Scott Tucker, Esq., Jan. 10, 2002 ("Tucker Jan. 10, 2002 Let."), at 11 (D.D.C. Nov. 30, 2001) ("[W]orld events do not change the obligations of the foreign defendants with respect to this litigation."); *Dean Foods Co. v. Eastman Chem. Co.,* No. C 00-4379, C 00-4402, Order Re Depositions, attached as Ex. D to Tucker Jan. 10, 2002 Let., at 3 (N. D.Cal. Oct. 10, 2001) ("The business of the United States continues, and part of that business is the conduct of litigation."); *see alsoAmerican Int'l Tel., Inc. v. Mony Travel Servs., Inc.,* 203 F.R.D. 153, 155 (S.D.N.Y.2001) ("The Court can perceive no reason why Duran's alleged fear of flying should require someone else to take to the skies."). In the *Mony Travel* case, the court noted that post-September 11 excuses carried less weight where the party had been seeking to avoid appearing for deposition since before that date. *SeeMony Travel,* 203 F.R.D. at 155. Though not prepared to conclude that DIB has intentionally sought to frustrate Citibank's legitimate discovery demands, the Court notes that Citibank had been attempting to depose many of the individuals in question since well before last September. In any event, the reluctance of nearly all of the proposed deponents to travel to the United States after September 11, 2001, as reported in the Ellison Affidavit, does not defeat DIB's obligation to produce them for deposition in New York.

***14** DIB also claims that many of its witnesses cannot come to New York because of family obligations. In particular, many of its witnesses are fathers of "traditional Muslim famil[ies]" that depend on them not only financially, but also for such services as driving, something most of their wives cannot do. While not unsympathetic to the disruption to daily family life that foreign travel may cause, the Court nonetheless cannot allow the simple fact that the proposed deponents are Muslims with dependent families to overcome DIB's discovery obligations. Permitting such an excuse would effectively insulate an entire segment of the global population from the ordinary rules of discovery, regardless of having availed itself of the U.S. court system. Moreover, each of the deponents need appear in New York for at most a couple of days.

DIB also contends that although it filed its Complaint in New York, it had no choice but to do so,

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Page 14 of 15

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2002 WL 1159699 (S.D.N.Y.)
**(Cite as: Not Reported in F.Supp.2d, 2002 WL 1159699 (S.D.N.Y.))**
Page 14

apparently referring to the forum selection clause in its contract with Citibank. (Letter of Frank C. Welzer, Esq., Jan. 7, 2002, at 7.) However, as Citibank rightly contends, the fact that DIB agreed to such a clause only supports the conclusion that its officers should be required to appear in this forum for deposition. (Tucker Jan. 10, 2002 Let. at 6 n. 6.) Moreover, the Court notes that this is not a case involving an individual plaintiff with limited financial resources, in which being forced to appear in a foreign forum would pose a significant economic hardship. *CompareNormande v. Grippo,* No. 01 Civ. 7441(JSR)(THK), 2002 WL 59427, at *2 (S.D.N.Y. Jan. 16, 2002) (permitting telephonic deposition of Brazilian plaintiff where plaintiff was *prose,* had limited resources, and would have been forced to travel to New York with her infant child, and where case was neither complex nor involved many documents; thus, hardship to plaintiff in coming to New York clearly outweighed any prejudice to defendant from conducting deposition by telephone).

Another common objection raised by DIB is the uncertainty surrounding the ability of some of the deponents to secure travel visas to the United States. However, Citibank has represented its willingness to work with DIB-and, as necessary, the State Department-to help secure the necessary travel documents. FN10

> FN10. Obviously, if visas cannot be secured-after a good faith, diligent, and documented attempt-the Court will be confronted with a new set of circumstances that would require reconsideration of this decision.

In his Declaration, Mr. Ellison asserts that several of the proposed deponents have medical problems that make their traveling to New York unadvisable. Mr. Khalid has asthma (Ellison Decl. at 3); Mr. Rahman has "slightly raised blood pressure" and also risks "deep vein thrombosis" if subjected to long-distance air travel (*id.* at 6-7); Mr. Fawzi Lootah has recently had eye surgery, and "says that he cannot fly anywhere"(*id.* at 10); and Mr. Karim has "a blood pressure problem, which he controls by medication"(*id.* at 8). None of these conditions, except for Mr. Lootah's, is supported by any documentation, and even Mr. Lootah's medical records conspicuously do not contain a doctor's note prohibiting air travel. Indeed, Mr. Lootah's eye surgery took place in India, not Dubai, and thus presumably required his traveling by air. As for the conditions of Messrs. Rahman and Khalid, DIB has been on notice for approximately a year with respect to each witness that Citibank wished to depose him in New York, and has never until now even suggested, despite extensive communication with this Court and Citibank concerning their depositions, that a medical condition might make coming here a problem. Accordingly, these medical objections, based on chronic conditions that presumably could have been raised at any time in the past year, have been waived. *SeeA.I.A. Holdings,* 2002 WL 538833, at *4. Finally, as for Mr. Karim's blood pressure problem, Mr. Ellison himself concedes that this is controlled by medication; merely having a correctable medical condition does not render one unable to travel.

***15** Finally, DIB notes that many of the proposed witnesses have miscellaneous personal obligations, such as the administration of a father's estate or the preparation for a daughter's wedding, that allegedly make travel to the United States undesirable or unfeasible. However, none of these objections appear to this Court to involve a substantial hardship or other compelling grounds for setting aside the normal rule regarding the location of depositions, and none presents an insurmountable practical difficulty. Moreover, Citibank has indicated its willingness to work with DIB to accommodate these personal concerns, such as by arranging the depositions of Mr. Al Rais and Mr. Ibrahim Lootah so as not to conflict with their required court appearances in Dubai. Further, Mr. Al Rais's alleged weariness of testifying about the fraud does not constitute the type of compelling circumstance that would justify his being excused from testifying here; rather, it un-

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

http://elibraries.westlaw.com/print/printstream.aspx?prft=HTMLE&destination=atp&sv=F... 5/20/2008

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2002 WL 1159699 (S.D.N.Y.)
**(Cite as: Not Reported in F.Supp.2d, 2002 WL 1159699 (S.D.N.Y.))**

Page 15

derscores his apparent importance to the matters at hand.

The Court has also considered DIB's various other objections to producing these witnesses in New York, and finds them without merit. Whatever hardship and practical difficulties may attend the appearance in New York of the seven managing agents herein discussed would be multiplied by requiring the taking of discovery in Dubai or elsewhere. Requiring depositions to take place in Dubai, or even London, would entail both sides to send abroad, for a far longer period than any one witness would be required to travel to New York, an entourage of lawyers, reporters, and translators, not to mention countless boxes of relevant documentary materials. The logistical and financial burden of such an operation, not to mention the personal risk to those involved, greatly exceeds that of sending seven witnesses to New York for one or two days each. As for DIB's suggestion that Citibank conduct telephonic or videotaped depositions, this is not a case where financial hardship or other good cause exists for departing from ordinary discovery procedures. Moreover, because of the language barriers and the need for interpreters, telephone depositions would not be practical. *Cf.Daly,* 1991 WL 33392, at *1 (noting that generally it is less cumbersome and more illuminating to conduct a face-to-face deposition). Additionally, the Court notes that given the highly contentious nature of this lawsuit, the availability of the Court to resolve disputes that may arise during depositions counsels in favor of conducting them in New York.

The fact that letters rogatory regarding some of the witnesses are pending in Dubai does not preclude Citibank, the Defendant in this case, from conducting normal discovery in accordance with the Federal Rules. Indeed, as far as this Court is aware, these letters have been pending a long time, and may ultimately prove fruitless. Finally, the Court also notes that DIB's objection that Citibank is seeking to depose an excessive number of witnesses is not well taken; as of January, DIB had deposed seventeen Citibank fact witnesses, versus four DIB witnesses that Citibank had deposed. (Tucker Jan 10, 2002 Let. at 2.) Though several more DIB witnesses have either been deposed or scheduled to be deposed since then, pursuant to this Court's direction, the disparity remains. As the Plaintiff in a quarter-billion-dollar lawsuit, DIB cannot avoid its obligations to furnish Citibank with a meaningful opportunity to take discovery.

CONCLUSION

***16** For the foregoing reasons, DIB's motion for a protective order shielding its employees from being subject to deposition by notice is granted with respect to Sayed Kamel Mansour, Mohammad Sadiq Mohammad Ali, and Sayed Najamul Hassan, and denied with respect to all others. Additionally, DIB may avoid producing Mr. Al Rabi'i for deposition upon the conditions discussed above. Regardless of whether DIB objects to any other portion of this Order, DIB shall immediately begin securing the visas and other travel documents necessary for the witnesses' travel to the United States; DIB shall provide the Court a written report of the status of all outstanding visa applications by June 30, 2002.

SO ORDERED.

S.D.N.Y.,2002.
Dubai Islamic Bank v. Citibank, N.A.
Not Reported in F.Supp.2d, 2002 WL 1159699 (S.D.N.Y.)

END OF DOCUMENT

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

http://elibraries.westlaw.com/print/printstream.aspx?prft=HTMLE&destination=atp&sv=F... 5/20/2008

# FEDERAL PRACTICE

# AND

# PROCEDURE®

LIBRARY
DEC - 2 1994
O'Melveny & Myers

By

CHARLES ALAN WRIGHT
William B. Bates Chair for the Administration of Justice
The University of Texas

ARTHUR R. MILLER
Bruce Bromley Professor of Law, Harvard University

and

RICHARD L. MARCUS
Professor of Law, University of California
Hastings College of the Law

## Federal Rules of Civil Procedure

## Rules 30 to 37

---

## Sections 2101 to 2300

## Volume 8A

[Date First Edition Volume published: 1970]
[Date Second Edition Volume published: 1994]

ST. PAUL, MINN.
WEST PUBLISHING CO.
1994

that the third factor, identification with the interests of the employer, is the "paramount test." [29]

The determination of whether a particular person is a "managing agent" will be made by the trial court when the deposition is sought to be introduced or when sanctions are asked for the person's failure to appear for the taking of his or her deposition.[30] On the tests suggested the court will hold the corporation bound if it determines that the deponent was a "managing agent" [31] but not

pected to identify himself or herself with the interests of the corporation. Reed Paper Co. v. Proctor & Gamble Distrib. Co., D.C.Me.1992, 144 F.R.D. 2, 4, **citing Wright & Miller.**

Terry v. Modern Woodmen of America, D.C.Mo.1972, 57 F.R.D. 141.

Tomingas v. Douglas Aircraft Co., D.C.N.Y.1968, 45 F.R.D. 94, 96.

Newark Ins. Co. v. Sartain, D.C.Cal. 1957, 20 F.R.D. 583, 586.

Seaboard Coastline R. Co. v. Hughes, Tenn.1975, 521 S.W.2d 558, 561, **quoting Wright & Miller.**

**See also**

June T., Inc. v. King, C.A.5th, 1961, 290 F.2d 404, 406 n. 1.

**29. Paramount test**

Independent Productions Corp. v. Loew's, Inc., D.C.N.Y.1959, 24 F.R.D. 19, 25.

Newark Ins. Co. v. Sartain, D.C.Cal. 1957, 20 F.R.D. 583, 586.

**30. Determination later**

Dunn v. Standard Fire Ins. Co., D.C.Tenn.1981, 92 F.R.D. 31, 32, **quoting Wright & Miller.**

When a notice is served to take a party's deposition "by" a named employee and party moves to convert deposition into a witness deposition on ground employee is not a managing agent, party will be required to produce employee and deposition will be directed to proceed without prejudice to contention that employee is not a managing agent, the employee's duties, authority and assignment being a proper topic of inquiry in the deposition. Atlantic Coast Insulating Co. v. U.S., D.C.N.Y.1964, 34 F.R.D. 450.

Any doubt as to whether proposed deponents are "managing agents" through whom discovery depositions of corporation may be taken should be resolved in favor of examining party since ultimate determination as to whether defendant shall be bound by testimony is to be made by trial court. Tomingas v. Douglas Aircraft Co., D.C.N.Y.1968, 45 F.R.D. 94.

Final determination of whether particular person is a "managing agent" cannot be made in advance of taking his deposition. Hughes Bros., Inc. v. Callanan Road Improvement Co., D.C.N.Y.1967, 41 F.R.D. 450.

**31. Managing agent**

See Atlantic Cape Fisheries v. Hartford Fire Ins. Co., C.A.1st, 1975, 509 F.2d 577, 579, **citing Wright & Miller.**

Where from exhibits and allegations, including allegation that life insurer's sales agent represented to applicants, including deceased airman, that coverage would become effective immediately on completion of application form and execution of 90–day irrevocable allotment in favor of insurer, it appeared that agent was in complete charge of negotiation and sale of insurance contracts and had duties and powers of an insurance supervisor, sales agent was a "managing agent" for purpose of taking his deposition, in connection with suit against corporate insurer for breach of life policy, as to

if he or she was merely a subordinate employee.[32]

manner in which he allegedly obtained approval from air base to sell insurance to base personnel and any representations he made to airmen. Terry v. Modern Woodmen of America, D.C.Mo.1972, 57 F.R.D. 141.

Engineers employed by defendant manufacturer of aircraft who had assisted Canadian government in investigation of crash causing death of plaintiff's decedent and who were in charge of identifying pieces of wreckage and who appeared to possess identity of interests with their employer were "managing agents" for purpose of giving testimony regarding accident investigation, and defendant was obliged to produce engineers for depositions. Tomingas v. Douglas Aircraft Co., D.C.N.Y.1968, 45 F.R.D. 94.

Regional manager of a manufacturing division of a large corporation, responsible for transmitting policy decisions and supervising one hundred employees through zone managers, was a "managing agent." Colonial Capital Co. v. General Motors Corp., D.C.Conn.1961, 29 F.R.D. 514.

Chief engineer of corporation. New Rochelle Tool Corp. v. Ohio Crankshaft Co., D.C.Ohio 1960, 25 F.R.D. 20.

**Ship's officers**

Captain, chief officer, or master of a vessel. Shenker v. U.S., D.C.N.Y. 1960, 25 F.R.D. 96.

Wilson v. Trinidad Corp., D.C.N.Y.1951, 11 F.R.D. 191.

Porrazzo v. Royal Mail Lines, Ltd., D.C.N.Y.1944, 13 F.R.D. 320.

See also as to a ship's master, June T., Inc., v. King., C.A.5th, 1961, 290 F.2d 404, 406 n. 1.

On this principle the United States, as defendant in an admiralty case, has been required to produce the captain or chief officer of the vessels concerned at the time of the alleged injuries. Fay v. U.S., D.C.N.Y.1958, 22 F.R.D. 28.

Second mate who was in charge of vessel and had general supervisory authority over it at the time of accident. Klop v. United Fruit Co., D.C.N.Y.1955, 18 F.R.D. 310.

Vessel's chief engineer, who was in charge of engine room where seaman was injured, who had seaman under his general direction and supervision, and who had refused to discuss case with seaman's counsel, thus indicating his identity with interests of corporation. Torres v. U.S. Lines Co., D.C.N.Y.1961, 31 F.R.D. 209.

**32. Subordinate employee**

Employees with no general power to exercise judgment or discretion, whose work was largely routine, were not "managing agents." Nor were secretaries or stenographers. Colonial Capital Co. v. General Motors Corp., D.C.Conn.1961, 29 F.R.D. 514.

Burns Bros. v. The B. & O. No. 177, D.C.N.Y.1957, 21 F.R.D. 142.

Krauss v. Erie R. Co., D.C.N.Y.1954, 16 F.R.D. 126.

Reid v. C.H. Cronin, Inc., D.C.N.Y.1954, 15 F.R.D. 337.

A railroad conductor is not a managing agent within the discovery rules. Seaboard Coastline R. Co. v. Hughes, Tenn.1975, 521 S.W.2d 558.

A distributing agent of a corporation is not an "officer or managing agent" with respect to taking depositions of such agents. Gillam v. A. Shyman, Inc., D.C.Alaska 1958, 17 Alaska 747, 22 F.R.D. 475.

General counsel is not an officer or managing agent. Schilling-Hillier S.A. Industrial E Commercial v. Virginia-Carolina Chem. Corp., D.C.N.Y.1956, 19 F.R.D. 271.

Under Sec. 26-503 of the 1962 Code of Laws of South Carolina, it was held

If the corpo
person examine
agent at the tim
ly in Rule 32(a)(
purpose is to pr
former officers
agents can be ex
with the corpo

that an order di
be examined by a
of train that alleg
was not erroneo
that engineer was
the corporation
general authority
ration. Lewis
Airline Ry. Co., 1
250 S.C. 528.

**Ship's officers**

Officers of a ship,
captain, are no
Duncan v. U.S.
F.R.D. 568. Th
normal circumsta
ing agent. Por
Lines, Ltd., D.C
320; Proseus v.
D.C.N.Y.1960, 26

Chief engineer of d
in control of the
dent occurred, w
amination as a n
testimony could
though in charg
ditioning system
and plaintiff's c
defect in such
American Expor
1962, 30 F.R.D.

**33. Purpose of**

Independent Pr
Loew's Inc., D.
19.

Curry v. States M
1954, 16 F.R.D.

**34. Former off**

Fact that preside
tion might hav

Case 1:05-cv-00441-JJF Document 657-4 Filed 05/21/2008 Page 32 of 66

If the corporation is to be accountable for what was said, the person examined must have been an officer, director, or managing agent at the time the deposition was taken. This is stated explicitly in Rule 32(a)(2) and is fairly to be implied from Rule 37(d). The purpose is to protect the party from the admissions of disgruntled former officers or agents.[33] Thus, usually such former officers or agents can be examined only as any other witness, on subpoena and with the corporation not held accountable for what they say.[34]

that an order directing that railroad be examined by and through engineer of train that allegedly struck decedent was not erroneous, notwithstanding that engineer was neither an officer of the corporation nor an agent with general authority to act for the corporation. Lewis v. Atlanta–Charlotte Airline Ry. Co., 1968, 159 S.E.2d 243, 250 S.C. 528.

**Ship's officers**

Officers of a ship, subordinate to the captain, are not managing agents. Duncan v. U.S., D.C.N.Y.1954, 16 F.R.D. 568. Thus a first mate under normal circumstances is not a managing agent. Porrazzo v. Royal Mail Lines, Ltd., D.C.N.Y.1944, 13 F.R.D. 320; Proseus v. Anchor Line, Ltd., D.C.N.Y.1960, 26 F.R.D. 165.

Chief engineer of defendant's vessel, not in control of the vessel at time accident occurred, was not subject to examination as a managing agent whose testimony could bind defendant, although in charge of repair of air conditioning system aboard the vessel, and plaintiff's claim was based on a defect in such system. Santiago v. American Export Lines, Inc., D.C.N.Y. 1962, 30 F.R.D. 372.

**33. Purpose of rule**

Independent Productions Corp. v. Loew's Inc., D.C.N.Y.1959, 24 F.R.D. 19.

Curry v. States Marine Corp., D.C.N.Y. 1954, 16 F.R.D. 376.

**34. Former officer**

Fact that president of plaintiff corporation might have resigned in part to defeat being deposed as officer of plaintiff would not necessarily make former president's testimony binding on plaintiff if that testimony were essentially hostile to plaintiff's interest. Cameo–Parkway Records, Inc. v. Premier Albums, Inc., D.C.N.Y.1967, 43 F.R.D. 400.

Deposition of former president of corporate defendant could not be taken on basis of his being an officer of the corporation when prior to date set for taking of the deposition he had been retired. Mitchell v. American Tobacco Co., D.C.Pa.1963, 33 F.R.D. 262.

Kolb v. A.H. Bull S.S. Co., D.C.N.Y.1962, 31 F.R.D. 252.

Deposition of corporation could not be taken through former vice president who was no longer an officer, employee or agent of the corporation. Colonial Capital Co. v. General Motors Corp., D.C.Conn.1961, 29 F.R.D. 514.

When it appeared that party of whom plaintiff in civil antitrust action wished to take depositions was no longer an officer, director or employee of corporate defendant, and had been personally served with subpoena by plaintiff, court would not require corporate defendant to produce individual or to permit his examination as an officer, director or employee of corporation. Frasier v. Twentieth Century–Fox Film Corp., D.C.Neb.1958, 22 F.R.D. 194.

**Cf.**

Government is not required to produce a retired employee. O'Toole v. U.S., C.A.2d, 1960, 284 F.2d 792.

However, this principle has been applied in the light of its purpose. When the person involved retains such a connection with the corporation as to be loyal to it, his or her deposition has been considered that of the corporation,[35] and the same result had been reached when the person, even though no longer a managing agent, is still in the employ of the party.[36] The burden is on the party seeking the examination to demonstrate, if the witness is not produced and sanctions are sought, that the witness is a managing agent.[37]

## § 2104. Leave of Court—When Required

Until 1993, leave of court was usually not required to take a deposition. In general that remains true, except that the 1993 amendments to Rule 26(d) impose a moratorium on formal discovery before the Rule 26(f) meet-and-confer session [1] and place numerical limitations on depositions as discussed below. The party seeking the deposition merely gives notice to the other parties and,

**But cf.**

Where person who had failed to appear for his deposition was captain of the ship at time of the loss and at one time was president of the plaintiff corporation, but his status when the action was commenced, when discovery was sought, and when the action was dismissed was unclear, appellate court proceeded on the assumption that his connection with the corporation continued, since the corporation raised no issue on this point. Atlantic Cape Fisheries v. Hartford Fire Ins. Co., C.A.1st, 1975, 509 F.2d 577.

**35. Still loyal**

President and secretary-treasurer of plaintiff corporations, who had resigned their offices but who stood ready to serve corporations should their talents be required and one of whom actually did so after his resignation, and who possessed unique knowledge of relevant matters and who were serving as officers, directors, and managing agent of corporations at time acts of defendant constituting alleged conspiracy occurred, were "managing agents," and corporations were not entitled to an order debarring defendants from taking deposition of former president and secretary-treasurer. Independent Productions Corp. v. Loew's, Inc., D.C.N.Y.1959, 24 F.R.D. 19.

Independent Productions Corp. v. Loew's Inc., D.C.N.Y.1962, 30 F.R.D. 377.

**36. Still employed**

Deposition of a private corporation may be taken by the master of its vessel who was in control of vessel at time of injury for which suit is brought, even though person formerly serving as master is serving as chief mate of another vessel at time deposition is sought. Fay v. U.S., D.C.N.Y.1958, 22 F.R.D. 28.

**37. Burden on discovering party**

Proseus v. Anchor Line, Ltd., D.C.N.Y. 1960, 26 F.R.D. 165.

But cf. U.S. v. The Dorothy McAllister, D.C.N.Y.1959, 24 F.R.D. 316.

**§ 2104**

**1. Rule 26(f) meeting**

See §§ 2046.1; 2051.1.

Westlaw.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 1999 WL 20828 (S.D.N.Y.)
**(Cite as: Not Reported in F.Supp.2d, 1999 WL 20828 (S.D.N.Y.))**

Page 1

H
Boss Mfg. Co. v. Hugo Boss AG
S.D.N.Y.,1999.
Only the Westlaw citation is currently available.
United States District Court, S.D. New York.
BOSS MANUFACTURING COMPANY, Plaintiff,
v.
Hugo Boss AG et al., Defendants.
**No. 97CIV.8495(SHS)(MHD).**

Jan. 13, 1999.

Martin D. Edel, Esq., Miller & Wrubel, P.C., New York.
Robert M. Bruskin, Esq., Howrey & Simon, Washington, D.C.
Wendy L. Adiss, Esq., Coudert Brothers, New York.

MEMORANDUM & ORDER

DOLINGER, Magistrate J.
*1 Plaintiff has served notices of deposition for the testimony of four employees of defendant Hugo Boss AG, all of whom are located in Germany. It seeks to examine each of them in New York, pursuant to Fed.R.Civ.P. 30(b)(1), as managing agents of the defendant.

Defendant has objected to all four proposed depositions. As to one witness, it concedes that he is a managing agent, but insists that he should be deposed in Germany. As to a second witness, who is no longer employed by Hugo Boss, defendant reports that the witness will waive the applicability of the Hague Convention on the Taking of Evidence Abroad in Civil or Commercial Matters, 28 U.S.C.A. § 1781 note (1997), but demands that he too be deposed in Germany. As for the other two, defendant asserts that they are not managing agents and hence are not amenable to deposition by notice under Rule 30. Accordingly, it argues that plaintiff should be required to proceed under the Convention if it wishes their testimony.

We are thus faced with a letter application by plaintiff to enforce their four deposition notices, and by a motion by defendant for a protective order vacating the notices on terms consistent with defendants' contentions. We grant defendants' motion in part and deny that of plaintiff, while requiring defendants to submit additional information concerning the job responsibilities of two of the proposed witnesses. I address the status of each witness separately.

1. *Jorg Viggo Muller*

Mr. Muller is the Chief Financial Officer and a managing Director of Hugo Boss AG. Defendants thus concede that he is a managing agent of the corporation and hence amenable to deposition by notice under Rule 30(b)(1). They argue, however, that his deposition, like that of all other German-based witnesses, should be taken in Germany.

The general rule is that employees of a corporate party should ordinarily be deposed where they work, particularly if the corporation is a defendant. *See, e.g.,* 6 J. Moore, *Moore's Federal Practice* § 26.105[3][b] at 6-267 (3d Ed.1998); 4 J. Moore, *Moore's Federal Practice* ¶ 26.22[1.-4] at 26-369 & n.1 (2d Ed.1995)(citing cases). Although the court certainly has discretion to alter that approach, it should carefully weigh the relative burdens involved, particularly bearing in mind the fact that the corporate defendant has not chosen to litigate, much less chosen the site of the litigation.

In this case, the determination as to the locale of Mr. Muller's deposition cannot be made in a vacuum. The current dispute involves the depositions of four German employees or former employees of the defendant, at least one of which-the deposition of a former employee of the defendant-plainly must take place in Germany. Moreover, it is apparent from plaintiff's arguments in connection with other discovery issues that it is likely to take a number of

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

http://elibraries.westlaw.com/print/printstream.aspx?prft=HTMLE&destination=atp&sv=F... 5/20/2008

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 1999 WL 20828 (S.D.N.Y.)
**(Cite as: Not Reported in F.Supp.2d, 1999 WL 20828 (S.D.N.Y.))**

Page 2

other depositions of witnesses based in Germany. Thus, it is inevitable that depositions will be taken in Germany, and that accordingly an order requiring Mr. Muller to appear here will not avoid trans-Atlantic travel by counsel as part of discovery in this case.

*2 We further note that the relative burdens involved strongly favor taking this and other depositions of German witnesses in Germany. A witness such as Mr. Muller will be made available for a full day of testimony. Necessarily, if he appears in the United States for such testimony he will have to commit two days for travel, as well as an additional day for preparation. Thus his total commitment would be four days. In contrast, if he were deposed in Germany, he would presumably lose only two days.

Although plaintiff's attorney argues that he will be severely burdened if required to travel to Germany, we find his argument unconvincing. First, as we have noted, he will have to make the trip anyway unless he abandons a significant portion of his deposition plans. Second, although he complains of the difficulty of transporting 25,000 documents with him for use at the deposition, this is plainly a strawman. Counsel will obviously neither need nor be able to use anything remotely approaching thousands of documents at this deposition, which is presumptively limited to one day. Moreover, we have no doubt that, as a very competent attorney, plaintiff's counsel will prepare in advance for this and the other depositions and thus set aside for use those documents that he believes will be of assistance to him at the deposition. Furthermore, to the extent that he decides that he may need to refer to large quantities of documents at the deposition, he can obviously ship them by air courier to Germany in advance of the deposition. Also, the availability of facsimile transmission will ensure that even if counsel discovers that he needs any additional documents that he omitted to take with him, they can be provided to him with minimal delay.

Counsel's remaining complaint is the need to bring along a court reporter from the United States. The resulting added cost would presumably be quite small when compared with the expenses currently being absorbed by the plaintiff in this litigation, but in any event we are offered no reason to believe that competent reporters who are fluent in English cannot be obtained in Germany.

In sum, we conclude that the deposition of Mr. Muller, although properly obtained by notice of deposition, should be held in Germany.

2. *Andreas Zubel*

Until December 31, 1998 Andreas Zubel was an assistant product manager for licensed goods at Hugo Boss AG. As of January 1, 1999 he is no longer in the employ of defendant, although he continues to work and reside in Germany.

Defendant argues that, as a former employee, Mr. Zubel cannot be required to appear as a managing agent of Hugo Boss, even if he held that status prior to his resignation. Defendant goes on to argue that in any event Mr. Zubel was not a managing agent while employed by it.

As a general matter, a corporation cannot be required to produce a former officer or agent for deposition since it does not have control over him. *See, e.g., DeLetelier v. Republic of Chile,* 748 F.2d 790, 795 n.2 (2d Cir.1984); *Bon Air Hotel, Inc. v. Time, Inc.,* 376 F.2d 118, 121 (5th Cir.1967), *cert. denied,*393 U.S. 815 (1968); *General Houses, Inc. v. Marloch Mfg. Corp.,* 239 F.2d 510, 513 (2d Cir.1956); *Independent Prods. Corp. v. Loew's Inc.,* 27 F.R.D. 426, 428 (S.D.N.Y.1961). There is some authority for the proposition that that principle governs only in instances in which the managing agent was no longer employed by the corporation at the time when the deposition notice was served, *see* 1 M. Silberberg, *Civil Practice in the Southern District of New York* § 17.04 at 17-10 to 11 (1995), but we infer that such an approach would be defensible only in circumstances in which the departure of the

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

http://elibraries.westlaw.com/print/printstream.aspx?prft=HTMLE&destination=atp&sv=F... 5/20/2008

Not Reported in F.Supp.2d
Page 3
Not Reported in F.Supp.2d, 1999 WL 20828 (S.D.N.Y.)
**(Cite as: Not Reported in F.Supp.2d, 1999 WL 20828 (S.D.N.Y.))**

managing agent was brought about by the corporation for the purpose of frustrating the other side's ability to obtain his testimony. *See, e.g., In re Honda American Motor Co. Inc. Dealership Relations Litigation,* 168 F.R.D. 535, 541 (D.Md.1996); *Independent Prods. Corp. v. Loew's Inc.,* 24 F.R.D. 19, 23 (S.D.N.Y.1959).[FN1]

> FN1. The more commonly articulated rule is that the witness's status, at least for purpose of binding the corporation, is to be determined at the time of the deposition. *See, e.g.,* 7 J. Moore, *Moore's Federal Practice* § 30.03[2] at 30-20 & n.15 (3d Ed.1998) (citing cases).

***3** In this case there is no suggestion that defendant chose to terminate its ties with Mr. Zubel, much less that it did so for the purpose of denying his testimony to plaintiff. (*See* Declaration of Gert-Jurgen Frisch, executed Dec. 23, 1998, at ¶ 4 (Zubel "has given notice")). Indeed, defendant represents that Mr. Zubel is willing to waive the otherwise applicable requirement that plaintiff proceed under the terms of the Hague Convention, and instead will comply with a notice of deposition, provided that the deposition is held in Germany. (*Id.*).

Since there is no question that Mr. Zubel cannot be compelled to travel to the United States, plaintiff will be required to take his deposition, if it wishes his testimony, in his home country. Moreover, for the reasons that we have already noted with respect to Mr. Muller, even if this court had the ability to compel Mr. Zubel to appear in the United States for this purpose, we would not exercise that power. Indeed, the case for conducting this deposition in Germany is still stronger with regard to this witness since he is no longer even affiliated with a party to the lawsuit, and thus will appear solely as a non-party witness.

3. *Aleksandra Amanovic and Sibylle Weller-Theer*

Ms. Aleksandra Amanovic and Ms. Sibylle Weller-Theer are identified as "product managers" for Hugo Boss, one specializing in "bodywear and socks" and the other in "license products". We are told that both report to the "Creative Director", who in turn reports to a corporate officer and Board member. (*Id.* at ¶ 5). Defendant's affiant also recites that "neither has the authority to bind the corporation in its business dealings with others" and that "neither can exercise discretion or judgment in corporate matters; and neither has final authority with respect to significant decisions affecting the products under their supervision."(*Id.*).

These assertions are intended to demonstrate that neither witness is a managing agent, and that therefore their depositions must be taken under the Convention. We conclude that there is insufficient information on the current record to permit us to make this determination, and direct therefore that the record be supplemented.

The test for a managing agent is not formulaic. The generally accepted criteria require the court to look to three or five factors. To qualify as a managing agent, it is generally said that the individual "should possess general powers to exercise judgment and discretion in corporate matters.... [,] should be a person who can be relied upon to give testimony, at the employer's request, in response to the demand of the examining party.... [and] should be a person who can be expected to identify with the interests of the corporation." 7 Moore, *supra,* § 30.03[2] at 30-20. In addition, a number of courts in this district have articulated as separate considerations whether there are other persons "in positions of higher authority than the individual designated in the area for which information is sought by the deposition" and "the general responsibilities of the individual respecting the matters involved in the litigation."(*Id.*) (*citing Sugarhill Records Ltd. v. Motown Record Corp.,* 105 F.R.D. 166, 170-71 (S.D.N.Y.1985)).*Accord, e.g., United States v. Afram Lines (USA), Ltd.,* 159 F.R.D. 408, 413 (S.D.N.Y.1994).

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

http://elibraries.westlaw.com/print/printstream.aspx?prft=HTMLE&destination=atp&sv=F... 5/20/2008

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 1999 WL 20828 (S.D.N.Y.)
**(Cite as: Not Reported in F.Supp.2d, 1999 WL 20828 (S.D.N.Y.))**

Page 4

***4** It is also generally said that the party seeking the deposition carries the burden on this issue, although it is not entirely clear whether the burden is one of production or persuasion or both. *See, e.g., Afram Lines,* 159 F.R.D. at 413-14 (suggesting burden varies depending on whether deposing party has had complete discovery on issue). In any event, the burden is a modest one in that the deposing party need only demonstrate "that there is at least a close question" as to whether the witness is a managing agent. *See id.* at 413.Moreover, under such circumstances it has been suggested-and plausibly so-that a determination that the witness is a managing agent may be made provisionally, that is, for determining whether a subpoena is needed, while awaiting the deposition testimony before determining whether the witness is an agent for purposes of binding the corporation. *See id.* at 413-14.

In any event, in this case plaintiff has not yet had the discovery alluded to concerning the witnesses' job responsibilities and the extent of their managerial duties and powers. Indeed, defendants declined to provide a description of the witnesses' corporate roles in answering plaintiff's second set of interrogatories, and thus plaintiff's only proffer is that they have primary knowledge of the facts pertinent to a variety of issues in this case. We may also infer that, as apparently fairly senior management personnel, they would appear to testify if so instructed by defendant and that they identify with the interests of their employer.

Although this record satisfies two of the key criteria for determining managing agent status, plaintiff has not yet demonstrated that the witnesses possess the requisite status within the company. Knowledge of the evidentiary facts alone is not tantamount to possessing the attributes of a managing agent-particularly the authority to exercise judgment and discretion-although it may be mildly probative of such a status in appropriate circumstances. We note, however, that defendants' responding declaration offers no meaningful factual support to their position that these two witnesses are not managing agents. Mr. Frisch's declaration does little more than parrot the very general legal criteria, while asserting that the two employees do not meet these criteria. This is plainly inadequate for the court to make a meaningful determination of this essentially factual question.

Since plaintiff has not had the discovery necessary to address in a meaningful way these witnesses' role in the company and their job duties, and since that information is exclusively within the possession of the defendants, we deem it appropriate to require defendants to make a supplemental submission of evidence concerning the precise duties, responsibilities and powers of the two witnesses in order to permit us to make the required determination as to their status. In doing so we view plaintiff's initial submission as at least adequate to trigger an obligation on the part of the defendants to come forward with specific information pertinent to the application of the governing criteria. That submission is to be made by declaration or affidavit by no later than January 19, 1999.

CONCLUSION

***5** For the reasons noted, the depositions of Messrs. Muller and Zubel are to be conducted in Germany pursuant to notice, at an agreed upon date and location. As for Ms. Amanovic and Ms. Weller-Theer, we direct defendants to serve and file one or more affidavits or declarations by January 19, 1999 describing in detail the nature of their corporate responsibilities and functions, and the extent of the authority that they exercise in their respective corporate positions. Plaintiff may serve and file responding papers by January 22, 1999.

S.D.N.Y.,1999.
Boss Mfg. Co. v. Hugo Boss AG
Not Reported in F.Supp.2d, 1999 WL 20828 (S.D.N.Y.)

END OF DOCUMENT

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

http://elibraries.westlaw.com/print/printstream.aspx?prft=HTMLE&destination=atp&sv=F... 5/20/2008

Westlaw.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2006 WL 3476735 (S.D.N.Y.)
**(Cite as: Not Reported in F.Supp.2d, 2006 WL 3476735 (S.D.N.Y.))**

Page 1

Malletier v. Dooney & Bourke, Inc.
S.D.N.Y.,2006.
Only the Westlaw citation is currently available.
United States District Court,S.D. New York.
Louis Vuitton MALLETIER, Plaintiff,
v.
DOONEY & BOURKE, INC., Defendant.
**No. 04 Civ. 5316 RMB MHD.**

Nov. 30, 2006.

*MEMORANDUM & ORDER*

DOLINGER, Magistrate J.
*1 The parties are once again locked in a series of disputes about the propriety of their discovery requests and the adequacy of their discovery responses. We now address these disputes in roughly the order in which they have been presented to us.

I. *Defendant's Motion for Preclusion of Secondary Meaning Evidence*

Defendant Dooney & Bourke, Inc. ("DB") has moved for an order precluding plaintiff Louis Vuitton Malletier ("LV") from offering any evidence of secondary meaning. It bases this application on plaintiff's asserted failure to provide a responsive answer to an interrogatory (# 15) posed by defendant in December 2005. According to defendant, plaintiff's refusal to comply with its discovery obligations in this respect persisted in the face of two court orders and finally necessitated the current motion.

The interrogatory in question instructed plaintiff to:

Identify each person involved in preparing or supervising any survey, focus group, or other consumer/market testing conducted by or for LV concerning any trademark or element thereof identified in Interrogatory No. 1 [LV's infringed trademarks], any product identified in Interrogatory No. 3 [LV's S-lock products], or any product identified in Interrogatory No. 7 [Dooney & Burke's infringing products].

(Declaration of Brian D. O'Reilly, Esq., executed Sept. 11, 2006, at Ex. B). In plaintiff's initial response, on February 14, 2006, it listed a series of boilerplate objections, and then offered the following as its complete response:
subject to and without waiving the foregoing objections ... no survey is necessary or relevant concerning the S-Lock Trademark because the PTO Examiner determined that the S-Lock Trademark has acquired secondary meaning and Plaintiff owns an incontestable registration of said mark.

(*Id.*, Ex. C).

The unresponsiveness of this answer, as well as numerous other disputes between the parties, triggered a series of letter motions by both sides, starting in April 2006. While these many controversies were being briefed, plaintiff served amended responses to defendant's interrogatories and document requests on May 11, 2006. In the revised version of its answer to interrogatory 15, LV included its assertion of irrelevance in its objections as well as in its substantive answer. The substantive answer reiterated plaintiff's prior answer and then added one sentence:

Subject to and without waiving the foregoing ... objections, Plaintiff states that no survey is necessary or relevant concerning the S-Lock trademark because the PTO determined that the S-Lock Trademark has acquired secondary meaning and Plaintiff owns an incontestable registration of said mark. To date, Plaintiff has not conducted any survey, focus group, or other consumer/marketing specifically for the S-Lock Trademark concerning DBI's infringing products.

(Declaration of Alison Arden Besunder, Esq., ex-

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

http://elibraries.westlaw.com/print/printstream.aspx?prft=HTMLE&destination=atp&sv=F... 5/20/2008

Not Reported in F.Supp.2d
Page 2
Not Reported in F.Supp.2d, 2006 WL 3476735 (S.D.N.Y.)
**(Cite as: Not Reported in F.Supp.2d, 2006 WL 3476735 (S.D.N.Y.))**

ecuted Sept. 22, 2006, Ex. A). As is apparent from the text of the answer, it did not address at least two of the three items requested in the interrogatory, that is, surveys or other studies pertaining to LV's S-lock products (as distinguished from the S-lock trademark) and surveys or other studies concerning defendant's assertedly infringing products.

*2 After further briefing on this interrogatory and the other discovery imbroglios, the court entered an order on July 20, 2006 disposing of all outstanding issues. With respect to interrogatory 15, it simply directed that LV was "to provide [a] complete textual answer" by August 3, 2006. *Louis Vuitton Malletier v. Dooney & Bourke, Inc.,* 2006 WL 2109472, at *7 (S.D.N.Y. July 20, 2006).

Plaintiff's attempted compliance with the July 20 order came in the form of a letter to defendant's counsel dated August 3, 2006. (O'Reilly Decl., Ex. F). With regard to interrogatory 15, plaintiff's counsel stated that "LV has already provided a complete textual response [apparently referring to the May 11 version of its answer and objections] and reiterates its response to that Interrogatory. LV cannot identify any individuals involved in a consumer survey because, as stated in its existing response to Interrogatory No. 15, no survey has been conducted to date."(*Id.*, Ex. F at 4).

The court conducted a hearing on remaining discovery disputes on August 7, 2006. At that time defendant raised, among other matters, the asserted inadequacy of plaintiff's response to interrogatory 15. In the course of the colloquy the court requested a copy of the interrogatory answer at issue, and plaintiff supplied-albeit inadvertently-a copy of its original (February) response, which the court unsurprisingly noted was entirely unresponsive. The court then directed that plaintiff supply a revised and more forthcoming answer. (Tr. 33).

On August 14, 2006 plaintiff served a modified response. After reciting various objections, it stated:

To date, Plaintiff has not conducted any "survey, focus group, or other consumer/market testing" concerning "any trademark or element thereof identified in Interrogatory No. 1" or "any product identified in Interrogatory NO. 7". Accordingly, Plaintiff cannot identify any "person involved in preparing any survey, focus group, or other consumer/marketing testing" because none has been conducted to date.

Plaintiff is continuing to investigate whether any "survey, focus group, or other consumer/market testing" has been conducted concerning or otherwise related to any of the more than 300 products bearing the S-Lock Trademark which are identified in documents already produced to Dooney & Bourke, Inc. in response to Interrogatory No. 3 and will supplement this response with additional information if, as and when it becomes necessary.

(O'Reilly Decl., Ex. G). Finally, on September 15, 2006 plaintiff supplemented its response. In that supplementation, it added that it had not "yet" undertaken "any 'survey, focus group, or other consumer/market testing' concerning ... any product identified in Interrogatory No. 3." It also included a somewhat cryptic caveat:

Plaintiff further states that although the survey conducted in the action captioned *Louis Vuitton Malletier v. Dooney & Bourke, Inc.,* 04 Civ. 2990(SAS) by Jacob Jacoby PhD involved one photograph that depicted LV "multicolor" product bearing an S-Lock lock, the survey did not "concern" any S-Lock product or ask any question about the S-Lock design itself.

*3 (Besunder Decl., Ex. D).

Shortly before the service of the latest version of plaintiff's response, defendant filed the current motion, seeking to preclude plaintiff from offering any evidence that the trademarks at issue had acquired secondary meaning. Its application is based on the assertion that LV has repeatedly failed to provide a full and truthful response to interrogatory 15, and that its conduct violated both its discovery obligations and two court orders. Plaintiff of course op-

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

http://elibraries.westlaw.com/print/printstream.aspx?prft=HTMLE&destination=atp&sv=F... 5/20/2008

Not Reported in F.Supp.2d
Page 3
Not Reported in F.Supp.2d, 2006 WL 3476735 (S.D.N.Y.)
**(Cite as: Not Reported in F.Supp.2d, 2006 WL 3476735 (S.D.N.Y.))**

poses the motion.

There is no question that LV's original answer to the interrogatory was entirely unresponsive, since all that plaintiff said, in substance, was that the inquiry about surveys, focus groups and the like concerning (a) the trademark, (b) the LV products that carried the lock and (c) the assertedly infringing products of Dooney & Bourke called for information that was irrelevant, supposedly because of LV's registration of the trademark.[FN1]By its July 20 order and the directive it announced at the August 7 hearing, the court rejected that assertion and directed a responsive answer. *SeeLouis Vuitton Malletier,* 2006 WL 2109472, at *7; Aug. 7, 2006 Tr. 33).

FN1. Apart from being unresponsive, this answer ignored the fact that defendant was seeking, by a counterclaim, a declaration that the trademark registration was invalid, hence posing the possibility that secondary meaning would be highly relevant in the litigation.

By its second amended response, on August 14, and its supplementation of that response on September 15, 2006, plaintiff appears to have supplied a fully responsive answer, although its reference to the "multicolor" study leaves one ambiguity. In substance, plaintiff has said that it had not-as of at least September 15-undertaken any of the studies or tests that would be responsive to the defendant's inquiries. If that accurately characterizes plaintiff's intended meaning, then it has finally met its obligation with regard to the interrogatory in question.

In opposing that conclusion, defendant suggests that the truthfulness of the response is in question, not only because of the stated reservation with regard to the "multicolor" survey, but also because the lack of any such studies is entirely implausible, and would seem to put the lie to representations made by LV to the Patent and Trademark Office ("PTO") when seeking trademark registration. (DB Reply Mem. at 4-5, 6-7). Neither argument justifies preclusive sanctions.

To remedy the ambiguity resulting from the recently stated caveat about the "multicolor" survey, we direct that LV supply an affidavit to defendant by a knowledgeable LV employee stating whether its denial of any such tests or studies concerning S-lock products in its September 15 response encompasses all of its products that have an S lock. As for defendant's qualms about the truthfulness of the interrogatory answer, Dooney & Bourke will be permitted-if it so elects-to depose a knowledgeable witness concerning the factual basis for the interrogatory answer. This is to be completed within the next ten days. Insofar as defendant contends that the absence of such studies or testing is arguably inconsistent with any representations that LV made to the PTO, DB is of course free to use such asserted inconsistencies to support its argument, either at trial or on summary judgment, that the trademark should be invalidated.

***4** In view of these conclusions, defendant's demand for preclusion or equivalent sanctions cannot be justified. The record reflects slow and grudging responses by plaintiff, but not the sort of prejudicial misconduct that would justify case or issue-preclusive sanctions.[FN2]In short, this aspect of defendant's motion is denied.[FN3]

FN2. Although we note plaintiff's resistance to full disclosure over a period of months, we do not agree with defendant's assertion that LV's September 15 supplementation was untimely or otherwise in violation of a court directive. Although we did direct that LV supplement its response within one week-that is, by August 14-we also agreed to plaintiff's request that, to the extent that knowledgeable LV personnel were not available because of the August holiday period, responses could be delayed to September 15. (Aug. 7, 2006 Tr. 29-30). Plaintiff represents, without meaningful contradiction, that the individuals who could respond to interrogatory 15 with respect to the 300 or more S-lock products

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

http://elibraries.westlaw.com/print/printstream.aspx?prft=HTMLE&destination=atp&sv=F... 5/20/2008

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2006 WL 3476735 (S.D.N.Y.)
**(Cite as: Not Reported in F.Supp.2d, 2006 WL 3476735 (S.D.N.Y.))**

Page 4

were unavailable in mid-August. (Declaration of Alison Arden Besunder, Esq., executed Sept. 22, 2006, at ¶ 9; LV Mem. in Opp'n at 5).

FN3. Under these circumstances, we need not address the question of whether the scope of the preclusion sought by defendant would be defensible if some form of preclusive sanction were justified.

II. *Defendants' Motion to Compel Production or Listing of Registration-Related Documents*

Defendant has filed a motion that seeks full enforcement of its request for all documents concerning the design of the S-lock trademarks or the prosecution of those trademarks and any renewals, extensions and declarations designed to make the trademarks incontestable. (DB Mem. Supp. at 1, 7). The relief that DB seeks is an order requiring that LV either produce those documents or list them in a privilege log if it deems them privileged. (*Id.* at 7). Because plaintiff represents that it has produced all responsive non-privileged documents in its own possession (LV Mem. Opp'n at 6-7), in substance the defendant's motion targets those documents related to the trademark that are held by outside counsel to LV.[FN4] According to DB, such attorney-held documents are within the custody or control of plaintiff, since the client has a right of access to the documents held by his attorney that were created in representing him. (DB Mem. at 5-6).

FN4. The parties spend much time and ink debating whether defendant asked for these documents in its first document request and whether the court ordered their production in its July 20 order. This dispute appears entirely irrelevant to the relief that defendant seeks. There is no question that DB sought these documents in its second request, and since plaintiff has plainly declined to search for or produce documents held by its outside attorneys, the issue for resolution does not turn on whether there was an order prior to August 7, 2006 that dealt with these documents.

Plaintiff has filed a cross-motion for a protective order and opposes DB's motion, albeit rather half-heartedly. It says that it has produced all of its non-privileged documents, including some documents that were transmitted between counsel and the company, but it concedes the possibility (which DB characterizes as a virtual certainty) that its outside attorneys are in possession of documents that have not been produced or placed on a privilege log. As to those documents, plaintiff says that DB should proceed by subpoenaing the law firm or firms in question rather than pressing its Rule 34 demand. It defends this suggestion by speculating that some of the withheld documents may constitute work product, and by noting that in such a case the attorneys would have a protectible interest in the confidentiality of the documents. (LV Mem. Opp'n at 1 n. 1, 6 & n. 8).

The short answer to LV's argument is that plaintiff has a right of access to documents held by its outside counsel that pertain to work performed for it by those attorneys, *see,e.g.,Martin v. Valley Nat'l Bank,* 140 F.R.D. 291, 320-21 (S.D.N.Y.1991) (citing cases), and hence it has at least constructive control over those documents for purposes of Rule 34. *See,e.g.,MTB Bank v. Federal Armored Exp., Inc.,* 1998 WL 43125, at *4 (S.D.N.Y. Feb. 2, 1998); *Variable-Parameter Fix. Dev. Corp. v. Morpheus Lights, Inc.,* 1994 WL 419830, at *6 (S.D.N.Y. Aug. 10, 1994).*SeegenerallyM.L.C., Inc. v. North Am. Philips Corp.,* 109 F.R.D. 134, 136 (S.D.N.Y.1986). Moreover, plaintiff's argument in favor of the subpoena process proves too much. First, even if the attorneys have an interest in their own work product, so too does the client. *See,e.g.,Polin v. Wisehart,* 2002 WL 1033807, at *2 (S.D.N.Y. May 22, 2002); *Martin,* 140 F.R.D. at 320 (attorney may not withhold work product from client) (citing cases).[FN5] Second, it is still more likely that some of the documents held by the attorneys are protected by the attorney-client privilege,

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

http://elibraries.westlaw.com/print/printstream.aspx?prft=HTMLE&destination=atp&sv=F... 5/20/2008

Not Reported in F.Supp.2d Page 5
Not Reported in F.Supp.2d, 2006 WL 3476735 (S.D.N.Y.)
**(Cite as: Not Reported in F.Supp.2d, 2006 WL 3476735 (S.D.N.Y.))**

and that privilege belongs to the client. *See,e.g.,United States v. Doe,* 429 F.3d 450, 452-53 (3d Cir.2005); *United States v. Amodeo,* 71 F.3d 1044, 1052 (2d Cir.1995). Given that fact, LV's reasoning-that the demand should be made to the party with a legal interest in confidentiality-actually supports the relief demanded by DB. Third, LV's reference to a possible work-product claim is entirely speculative on the current record, [FN6] and in any event plaintiff and its outside lawyers can be expected to work cooperatively together to identify those documents that belong on a privilege list, whether as attorney-client privileged or as work product.

FN5. Indeed, as the court noted in *Martin,* in the event of a conflict between the client and the attorney, the client's interest in the work product is paramount, and the attorney cannot maintain its confidentiality in the face of the client's contrary posture. *Id.* at 321.

FN6. We note that work-product immunity does not ordinarily apply to the *exparte* prosecution of a patent or trademark application. *SeeCommunications, L.P. v. Hewlett-Packard Co.,* 1999 WL 33117227, at *2 (D.D.C. Dec. 3, 1999); *In re Application of Minebea Co.,* 143 F.R.D. 494, 499 (S.D.N.Y.1992). We address this issue more specifically in connection with still another motion by DB. *See* pp. 47-48, *in- fra.*

***5** In short, there is no reason to require defendant to proceed by way of subpoena in this instance. Plaintiff is therefore directed to produce to DB, or list as privileged, the documents held by its outside counsel that pertain to the design of the trademarks or their registration. This is to be done within seven days.[FN7]

FN7. Plaintiff states in passing that the obligation to search for documents cannot extend to attorneys' offices that are overseas. (LV Mem. at 6n.7). It offers no basis for this limitation, and we see none. The documents are within the control of an entity that has chosen to litigate here and that consequently has an obligation to produce responsive documents in its custody or control irrespective of where on the globe they are located. *See,e.g.,Societe Nationale Industrielle Aerospatiale v. United States Dist. Court,* 482 U.S. 522, 539-40 (1987).

III. *Plaintiff's "Cross-Motion" to Determine the Scope of its Future Privilege Waiver*

In response to DB's motion to compel, LV filed what it labels as a cross-motion. In that application, plaintiff invites the court to opine on the scope of the attorney-client privilege waiver that would be occasioned if LV agreed to produce to defendant otherwise privileged documents that pertain to the communications that DB contends constituted a fraud by LV on the PTO. (LV Mem. Opp'n at 7-11).

As characterized by plaintiff, defendant challenges the validity of the S-lock trademark registrations by asserting that two sets of documents submitted by LV to the PTO-an Amendment to Allege Use signed by Audrey Sylvain-Richer in connection with one registration and the Section 8 and 15 Declaration signed by Yves Carcelle in connection with a second registration-constituted a fraud on the PTO. According to plaintiff, it offered to produce to defendant "documents on the privilege log related to these topics *if* DB[ ]'s counsel would agree that such production would not effectuate a broader waiver of the privilege beyond those topics 'at issue." ' (LV Mem. Opp'n at 7) (emphasis in original).

Invoking Fed.R.Civ.P. 26(c), plaintiff asks the court to rule in advance that if it waived its attorney-client privilege for the limited purpose of producing documents in the described categories-which plaintiff views as responsive to those "subject matters that are placed 'at issue' by DB[ ]'s counterclaims alleging fraud" (*id.*)-the waiver will

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

http://elibraries.westlaw.com/print/printstream.aspx?prft=HTMLE&destination=atp&sv=F... 5/20/2008

Not Reported in F.Supp.2d
Page 6
Not Reported in F.Supp.2d, 2006 WL 3476735 (S.D.N.Y.)
**(Cite as: Not Reported in F.Supp.2d, 2006 WL 3476735 (S.D.N.Y.))**

not be deemed to extend beyond those subject matters. The particular concern expressed by LV is that the waiver not be deemed to extend to registrations other than for the specified trademarks, that is, "registrations entirely unrelated to this lawsuit."(*Seeid.* at 8).

Defendant has not specifically taken issue with this application, and we see no problem with responding to plaintiff's request, albeit at an appropriate level of generality, consistent both with the generality of plaintiff's description of the extent of its intended production and with the fact that plaintiff, having not clearly committed to any production, is seeking at least in part what seems to consist of an advisory opinion. The standards for determining the scope of a privilege waiver have been the subject of much judicial authorship in many contexts, and able counsel can read the cases as precisely as we can.

The plaintiff's description of the standards governing the scope of a waiver triggered by the voluntary production of documents in civil litigation-that is, that the waiver is generally limited to the subject matter of the documents for which privilege has been surrendered and that the discovering party would have to justify any broader waiver (*id.* at 9)-appears accurate, although we are obviously not in a position to provide LV with advance immunization from arguments that may be asserted by DB on the basis of facts unknown at the present, particularly those arising from the substance of the documents to be produced. Furthermore, if defendant has other theories of waiver-that is, based on matters other than plaintiff's proposed voluntary production of privileged documents-we cannot exclude them or reject them in the context of this motion.FN8

FN8. We note that in a later motion, which we address below, DB in fact advances a number of alternative waiver theories. *See* p. 43, *infra*.

*6 In sum, plaintiff's motion on this topic is granted to the extent noted. If plaintiff intends to produce documents currently on its privilege log on a voluntary basis, it is to do so within seven days .FN9

FN9. We note that, in addressing DB's later motion to compel production of privileged documents, we reject certain categories of privilege claims by LV. *See* pp. 45-48, *infra*.We assume that those overlap in part or in whole with the log entries at issue on LV's current motion.

IV. *Defendant's Motion to Preclude Regarding Customer Communications*

In December 2005 defendant served its first Rule 34 request, which sought from LV, among other items, "[a]ll documents concerning any customer communications regarding any LV product and/or any return of an LV product...." (Declaration of Brian D. O'Reilly, Esq., executed Sept. 28, 2006, Ex. J at ¶ 14). At plaintiff's request, the due date for responding to the entirety of the request was adjourned from January 9 to 14, then to February 9 and finally to February 14, 2006. No such documents were produced during this period. (DB Mem. Supp. at 6-7).

At a meet-and-confer on March 1, 2006, the subject of item 14 was discussed, and DB agreed to a request by LV to limit this item to customer communications about S-lock products, rather than all LV products, while LV agreed to supplement its production on other items. (O'Reilly Decl. at ¶ 15). On March 10 LV provided additional documents but none reflecting customer communications.(*Id.*). After DB pointed out this omission, plaintiff's counsel represented that "LV is continuing to search for relevant documents reasonably responsive to Request No. 14."(*Id.*, Ex. L at 3).

At an April 6 status conference with the court, LV's attorney represented that the delay was attributable to "a bit of a logistical problem" but that the documents would be produced by April 14. (April 6, 2006 Tr. at 43, 62). Despite the court's directive that it comply with this deadline (*id.* at 63-64), LV

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

http://elibraries.westlaw.com/print/printstream.aspx?prft=HTMLE&destination=atp&sv=F... 5/20/2008

Not Reported in F.Supp.2d
Page 7
Not Reported in F.Supp.2d, 2006 WL 3476735 (S.D.N.Y.)
**(Cite as: Not Reported in F.Supp.2d, 2006 WL 3476735 (S.D.N.Y.))**

produced no customer communications when it produced other documents on that date. (DB Mem. Supp. at 7).

One week later DB initiated a motion to compel production of many categories of documents, including customer communications. As characterized by DB on its motion, document request 14 "seeks documents concerning customer communications regarding any LV product and/or return of any LV product."(O'Reilly Decl., Ex. N at 11). In responding to the motion, LV asserted: "DB seeks 'customer communications' concerning S-Lock (as well as all LV) products.... LV has made a good faith effort to search for any documents responsive to this request and has determined that LV does not have any e-mail or call center communications to LV related to the S-Lock design or S-Lock products. Accordingly, there is nothing to compel and DB[ ]'s motion should be denied on this point." (*Id.*, Ex. O at 15).

In ruling on the parties' various applications by Memorandum and Order dated July 20, 2006, the court relied on LV's representation about customer communications. Thus, it stated that "LV represents that it has no communications from customers about its S lock products. If DB questions this representation, it is free to pursue the matter by deposition."*Louis Vuitton Malletier,* 2006 WL 2109472, at *6. The court also set a deadline of August 3, 2006 for LV to provide additional documents on a host of topics.*Id.* at *7.

*7 Plaintiff did provide additional documents in compliance with the July 20 order. In its August 3 cover letter to DB, however, it referred to customer communications and stated that it was not producing any because "LV has no communications from customers about its S-Lock trademark."(O'Reilly Decl., Ex. P at 2). This statement, of course, was at odds with both parties' prior understanding that the request concerned communications about the S-lock products as well as the S-lock trademark, and it at least implicitly contradicted LV's prior representation to the court about having no communications responsive to that broader understanding of the request.

The court conducted another conference on August 7, at which the subject of customer communications again arose. At that time LV's counsel confirmed for the first time that his client was interpreting its obligation under request 14 to be limited to customer communications about the S-lock trademarks, and not S-lock products, and that plaintiff assumed that the court, in its July 20 order, had meant the same thing.

So I don't think, with all due respect, that you were suggesting customer communications about the product itself, but about the S-Lock that is in question in this lawsuit.

No customer came and said anything about the S-lock, and we have represented that. We have stated it time and time again. We are prepared to state it now. It seems to me that is the intent of the question and the intent of the ruling.

(Aug. 7, 2006 Tr. 27).

In response, the court disabused counsel of that notion: "I used the word product, not trademark. I think there was ample reason for that. In any event, that is what I said and that is what I meant. You are expected to comply with it."(*Id.*). The court did grant plaintiff's request to delay the deadline for final compliance with court-ordered discovery obligations to September 15, 2006. (*Id.* at 29-30).

On September 15, LV failed to provide customer communications and advised DB's counsel that the company, "despite best efforts," had been unable to extract the pertinent e-mails from its "call center." (O'Reilly Decl. at ¶ 23 & Ex. R). In the wake of follow-up correspondence in the following days, LV represented that "there are technical and other issues related to the recovery and collection of available data on this issue."(*Id.* at ¶ 26 & Ex. U). It did not explain these issues, however, or specify a date for production. On September 26, 2006, LV pro-

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

http://elibraries.westlaw.com/print/printstream.aspx?prft=HTMLE&destination=atp&sv=F... 5/20/2008

Not Reported in F.Supp.2d Page 8
Not Reported in F.Supp.2d, 2006 WL 3476735 (S.D.N.Y.)
**(Cite as: Not Reported in F.Supp.2d, 2006 WL 3476735 (S.D.N.Y.))**

duced 17 pages of call center reports, which summarized call center communications, some of which referred explicitly to the S-lock. (*Id.* at Ex. V). It also produced 278 pages of e-mails, but these were all documents that LV had produced to DB in 2004 in the parallel *Multicolor* case in the face of threatened preclusion by the court in that case. (*Id.*). This production did not purport to include any e-mails addressed to non-Multicolor products or to the trademark at issue here.

***8** In the wake of LV's continuing failure to produce customer communications, DB filed the current motion. Noting that LV had refused to produce key documents pertaining to such communications, that it had misrepresented the scope of both the request and the court's order, and that it had done the same in the *Multicolor* case until faced with a threat of preclusion, DB seeks what it describes as targeted preclusion. Specifically, defendant would prevent plaintiff from offering any evidence to demonstrate qualitative differences between plaintiff's and defendant's products, consumer confusion or dilution of plaintiff's trademarks. (DB Mem. Supp. at 14-18).

In LV's response, it relies principally on an affidavit by Sven Dubois, an employee in the information technology department of LV, as well as a briefer declaration of counsel. (Declaration of Sven Dubois, executed Oct. 5, 2006; Declaration of Alison Arden Besunder, Esq., executed Oct. 5, 2006). According to Mr. Dubois-who, in the course of his declaration, never identifies the timing of LV's efforts to search for the communications requested last December-LV has encountered "technical difficulties" in attempting to retrieve e-mails concerning customer communications from its database. (Dubois Decl. at ¶ 1). His explanation starts with the assertion that the database in question, known as Kana Oracle, is not designed for random searching or "specialized e-mail management in the ordinary course of its operations."(*Id.* at ¶¶ 2-4). The principal problem, according to Dubois, is "that it is difficult to write an 'Oracle-SQL' request to search by keyword the e-mails stored in the database...."(*Id.* at ¶ 4).[FN10]

FN10. The reason for this difficulty is that "the e-mails are stored in a raw format which includes both HTML-formatted e-mails as well as e-mails with foreign-language encoding."(*Id.*).

According to Mr. Dubois, despite his long-held belief that it would be necessary to undertake a series of complex steps to extract the e-mails from the Kana Oracle system-requiring the hiring of both a Kana specialist and a Lotus Notes specialist-LV chose not to do so, purportedly because of cost.(*Id.* at ¶ 5).[FN11] Instead, LV at some point used three in-house people who eventually developed a means of extracting some data from the database, although much of what has been obtained is "interspersed with technical coding that does not appear to have been part of the body of the original communication."(*Id.* at ¶¶ 7-10). What has been obtained does not lend itself to printing and hence was reproduced in electronic format. (*Id.* at ¶ 11; Besunder Decl. at ¶ 3).

FN11. The cost estimate by Dubois appears to be less than $15,000.00 for such a process. He does not explain why this expense was viewed as unduly burdensome for LV, which describes itself as enormous and highly profitable. *See,e.g.,* LV Reply Memo in Support of Motion for Protective Order Preventing Depositions at 5-6 (emphasizing that LV "is a *multi-billion* dollar corporation with responsibility for more than 10,000 worldwide employees.") (emphasis by LV).

The fruits of these efforts were apparently turned over to defendant on October 5, 2006. (*Id.* at ¶ 3). It appears that the production was incomplete-LV is silent on this point [FN12]-and at least part of it was not usable. (DB Reply Mem. at 8-11).

FN12. At one point Dubois says, "We have

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

http://elibraries.westlaw.com/print/printstream.aspx?prft=HTMLE&destination=atp&sv=F... 5/20/2008

Not Reported in F.Supp.2d
Page 9
Not Reported in F.Supp.2d, 2006 WL 3476735 (S.D.N.Y.)
**(Cite as: Not Reported in F.Supp.2d, 2006 WL 3476735 (S.D.N.Y.))**

> extracted the data in the only manner in which it can be performed," but at another he refers to having, "to date," "extracted 'rows' of data evidencing certain communications with customers."(*See* Dubois Decl. at ¶¶ 12, 10).

Defendant seeks broad preclusion of any evidence relating to public confusion, comparative product quality and dilution. (DB Mem. at 1). Preclusion is one of the weapons in the court's armory for ensuring that the parties comply with their discovery obligations and that the discovering party is not prejudiced by virtue of an adversary's failure to meet these obligations. *See,e.g.,*Fed.R.Civ.P. 37(b)(2)(B) (sanctions for violation of court order). Among the considerations that the court must take into account in assessing a request for preclusion are (1) whether the discovered party has failed to comply with the discovery rules and with a court order, (2) whether that failure was attributable to "willfulness or bad faith, or is otherwise culpable,"*Daval Steel Prods. v. M/V Fakredine,* 951 F.2d 1357, 1367 (2d Cir.1991), (3) whether the discovering party has been prejudiced by the other side's failures and, if so, the degree of such prejudice and whether it is otherwise remediable, and (4) the prejudice that would be occasioned to the discovered party's case by the proposed preclusion. *SeegenerallySoftel, Inc. v. Dragon Med. & Scientific Communications, Inc.,* 118 F.3d 955, 961 (2d Cir.1997); *Outley v.. City of New York,* 837 F.2d 587, 590-91 (2d Cir.1988). We address each factor *seriatim.*

***9** There is no question that LV has failed to comply with its discovery obligations, misled its adversary and the court, and flouted a court order. The defendant's original request, from December 2005, was for customer communications for all LV products. Although this formulation was unquestionably overbroad, DB agreed in a March 1 meet-and-confer to narrow the demand to communications concerning LV's S-lock products, and LV in its turn gave no indication that it would resist that request; indeed, it welcomed the modification and indicated that it was searching for the documents. (*See* O'Reilly Decl., Ex. L at 3). LV nonetheless failed to produce the requested documents and did not offer DB any reason for not doing so, much less suggest that it had attempted to retrieve them from its database and had been stymied in that effort. Indeed, it actually indicated at first that, despite some technical complications, it would produce the documents by mid-April 2006. Ultimately, LV simply ignored the request, thus prompting one element of DB's April 2006 motion to compel.

That application triggered a representation by LV that it had undertaken an appropriate search for customer communications about S-lock products and had no such communications. It is evident that this representation was false, and in the absence of any explanation by LV for this misstatement, we have no reason to infer that it was other than knowingly false.

Following entry of our July 20 order, which relied on this false representation, LV disclosed in an indirect and misleading fashion-by its August 3 cover letter-that it was withholding responsive documents. It did so by changing its stated definition of the scope of the request, limiting it to communications regarding the S-lock trademarks rather than including communications about the S-lock products, despite the fact that the request as amended by DB in March, plaintiff's response to that amendment and to DB's motion, and the court's July 20 order all made crystal clear that the request at issue covered the products as well as the trademark.

The inconsistency of LV's approach was apparent at the August 7 hearing, when its counsel sought to persuade the court that the dispute, and the court's prior ruling, had concerned only communications about the trademark. This prompted our August 7 order that all the communications (including those concerning the S-lock products) be produced, and our directive giving LV-as it had requested-until September 15 to comply. Plaintiff again failed to comply. Indeed, LV waited until September 26 to

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

http://elibraries.westlaw.com/print/printstream.aspx?prft=HTMLE&destination=atp&sv=F... 5/20/2008

Not Reported in F.Supp.2d Page 10
Not Reported in F.Supp.2d, 2006 WL 3476735 (S.D.N.Y.)
**(Cite as: Not Reported in F.Supp.2d, 2006 WL 3476735 (S.D.N.Y.))**

provide any documents, and the only production that it made turned out to consist almost entirely of the same documents as it had produced to DB in the parallel *Multicolor* litigation more than two years before.

As for LV's purported effort to comply with the court's August 7 order, even by LV's vague and ambiguous description it appears that plaintiff chose to eschew the most direct means of attempting to extract e-mails from its database-by turning to outside specialists in the Kana Oracle system-and instead it relied on its in-house personnel, who report that they have been unable to produce a usable and complete set of documents, regardless of format, for defendant. Moreover, we note that plaintiff carefully avoids a proffer of any evidence as to when it undertook these efforts-efforts that were required to begin upon receipt of defendant's request in December 2005, or at the very latest after the March 1 meet-and-confer. In short, we cannot credit plaintiff's implicit argument that it has done all that was possible to comply with its discovery obligations and with the court's order.

***10** As for whether the plaintiff engaged in culpable conduct, the unavoidable conclusion is evident from the preceding summary. But there is more that supports this finding.

First, in the *Multicolor* litigation DB sought the same type of documents from LV, and in that case LV engaged in the same sort of behavior, triggering a warning from Magistrate Judge Peck that the customer communications in question had to be provided within one week or preclusion would follow. (*See* Declaration of Roger G. Brooks, Esq., executed Sept. 28, 2006, at ¶¶ 4-9 & Ex. 6; O'Reilly Decl. at Exs. C-G). That warning triggered immediate compliance, although LV apparently failed to provide translations for all documents, as ordered by the court. (Brooks Decl. at ¶ 10). This experience not only provides helpful context in assessing LV's behavior in this case, but also raises the very serious question-never answered by LV-as to why, if it was able to retrieve customer communications in the *Multicolor* case, it was unable to do so here. Also left unanswered is the question of why LV was not alerted at the outset here to any technical problems with retrieving such communications from its Kana database.

Second, LV carefully avoids any indication as to when it turned its attention to the specific procedures necessary to determine whether it had responsive e-mails. Avoidance of that detail strongly suggests that it made no effort to do so until the proverbial eleventh hour, after it had made false representations to the court about the non-existence of responsive documents (the explanation of which it also never provides) and sometime after the August 7 order.

Third, LV's current motion papers reflect a continued reluctance to address the facts accurately when seeking to justify its behavior. Thus it contends that its delay in producing the e-mails requested by DB was due in substantial part to the court having ordered production of a broader array of documents than DB had ever requested. (LV Mem. Opp'n at 4-6). This argument is so transparently false as to raise questions about every other representation in LV's papers. As noted, DB originally sought customer communications about all of LV's products and then narrowed the request to the S-lock products and trademarks, a scope that LV itself acknowledged in writing. Moreover, in briefing DB's motion LV again recognized the scope of DB's amended request as encompassing communications about the S-lock products, and it made the representation that it had no such documents. (O'Reilly Decl., Ex. O at 15) (no documents "related to the S-Lock design or S-Lock products"). In the July 20 order the court simply reiterated the scope of the dispute as both parties had acknowledged it and relied upon LV's specific representation that it had no responsive documents. Again, in our August 7 order we simply reiterated the obligation in the same terms.

In sum, there is no question on the current record that LV has acted with fault. Notwithstanding this

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

http://elibraries.westlaw.com/print/printstream.aspx?prft=HTMLE&destination=atp&sv=F... 5/20/2008

Page 11 of 19

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2006 WL 3476735 (S.D.N.Y.)
**(Cite as: Not Reported in F.Supp.2d, 2006 WL 3476735 (S.D.N.Y.))**

Page 11

conclusion, however, in assessing DB's demand for broad preclusion we must confront questions concerning prejudice and the availability of means to alleviate such prejudice.

***11** In seeking to demonstrate irremediable prejudice, DB points out that in the *Multicolor* case the District Court relied on customer communications in concluding that LV had failed to demonstrate that defendant's allegedly infringing product was inferior, that the public had actually been confused and that LV's trademark had been diluted. (DB Mem. at 5-6) (citing *Louis Vuitton Malletier v. Dooney & Bourke, Inc.,* 340 F.Supp.2d 415, 441-42 (S .D.N.Y.2004), *rev'd on other gds.,*454 F.3d 108 (2d Cir.2006)). Defendant implies therefore that LV has deliberately sought to withhold such potentially damaging communications in this case and that its doing so has deprived DB of potentially valuable evidence.

There is less to this contention than meets the eye, at least as a justification for the broad issue preclusion that defendant seeks. The ruling in the *Multicolor* case that defendant cites denied a preliminary injunction based on the court's conclusion that LV had not shown a likelihood of success on its trademark-infringement and dilution claims. *SeeLouis Vuitton Malletier,* 340 F.Supp.2d at 447-48, 452-53. In discounting these claims, the court relied in part on its finding that the record-including the customer communications with LV-did not reflect evidence of consumer confusion or differences in quality in the competing products or any indication of blurring or tarnishment. *Id.* at 441-42, 446, 449, 452-53.

By providing only partial production of customer communications in this case, LV has arguably handicapped DB in making an equivalent set of arguments here. That difficulty, however, may be readily surmounted by deeming as true the contentions that none of LV's customer communications evidenced any confusion as to origin and that none involved a complaint about the quality of a product distributed by defendant or evidenced any form of dilution. Such a remedy is specifically authorized by Rule 37(b)(2)(A) ("designated facts shall be taken to be established"), and it appropriately rights the balance that has been distorted by LV's failure to produce the requested communications. At the same time it avoids broad preclusion on key issues, the assessment of which can fairly be made in light of all the discovery and the more limited preclusion that we have outlined.

Finally, in view of the evident baselessness of the position taken by LV on this motion and its inexcusable non-performance in connection with the production of customer communications, we conclude that DB is entitled to the expenses of this motion, including an award of reasonable fees. Fed.R.Civ.P. 37(b)(2). Unless the parties agree on an appropriate figure, defendant is to serve and file its expense application, including contemporaneous time records, by December 4, 2006. Responding papers will be due by December 7, 2006.

V. *LV's Motion to Preclude Depositions of Messrs. Carcelle and Stalla-Bourdillon*

Plaintiff has moved for a protective order to avoid having to produce for deposition the Chairman and CEO of LV, Mr. Yves Carcelle, and LV's former general manager, Mr. Bertrand Stalla-Bourdillon. Proffering declarations from both men, plaintiff asserts that neither has any personal knowledge of pertinent facts or any non-personal knowledge beyond what has already been testified to by LV's Intellectual Property Director, Ms. Nathalie Moulle-Berteaux. (*See* LV Mem. Supp. at 1-7; Declaration of Yves Carcelle, executed Oct. 10, 2006; Declaration of Bertrand Stalla-Bourdillon, executed Oct. 10, 2006; Reply Declaration of Yves Carcelle, executed Oct. 23, 2006). Defendant opposes the motion, contending that each of the proposed witnesses has knowledge of pertinent evidence that was not known by Ms. Moulle-Berteaux. (DB Mem. Opp'n at 6-17).[FN13]

FN13. We note that our brief characteriza-

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

http://elibraries.westlaw.com/print/printstream.aspx?prft=HTMLE&destination=atp&sv=F... 5/20/2008

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2006 WL 3476735 (S.D.N.Y.)
**(Cite as: Not Reported in F.Supp.2d, 2006 WL 3476735 (S.D.N.Y.))**

Page 12

tion of this motion does not do justice to the overheated, and generally irrelevant, rhetoric that each side chooses to use to accuse its adversary of wrongdoing in their assertion of claims and counterclaims and their conduct during the litigation. For sheer bizarreness, we especially recommend footnote 1 of LV's reply memorandum, which somehow finds a basis for comparing defendant's approach to that of North Korea when it invaded the South in 1950.

***12** As a general matter, senior corporate and governmental executives are subject to being deposed in litigation, just as any other employee may be. The limitation on that principle finds its source in the concern that litigants may be tempted to use such depositions-and the disruption that they may occasion-as a form of leverage or harassment by forcing senior officials to spend time in preparing for and attending a deposition when they have little or no pertinent testimony to offer. Accordingly, the courts have agreed that if a party seeks to depose a very senior official of an adversary entity, the adversary may obtain an order vacating the deposition notice if it can demonstrate that the proposed deponent has no personal knowledge of the relevant facts and no unique knowledge of those facts. *See,e.g.,In re Ski Train Fire,* 2006 WL 1328259, at *10 (S.D.N.Y. May 16, 2006); *Treppel v.. Biovail Corp.,* 2006 WL 468314, at *2-3 (S.D.N.Y. Feb. 28, 2006); *Consolidated Rail Corp. v. Primary Indus. Corp.,* 1993 WL 364971, at *1 (S.D.N.Y. Sept. 10, 1993).

In this case DB seeks to depose both the former general manager of LV and its current CEO and Chairman. We address each separately.

Mr. Stalla-Bourdillon is no longer serving in LV itself, but has responsibility for two businesses, at least one of which is related to LV. (Stalla-Bourdillon Decl. at ¶ 2 (CEO of Berluti and of Marc Jacobs)). Defendant's rationale for deposing him appears to be that he had overall responsibility for numerous departments at LV, including sales and intellectual-property enforcement. Hence, according to DB, he is likely to have knowledge of why LV pursued enforcement against DB and not against other infringers, and of the impact (if any) of DB's alleged infringement on LV's business. (DB Mem. Opp'n at 10-12).

To the extent that these questions may have any relevance, DB fails to justify a deposition of Mr. Stalla-Bourdillon. There is no suggestion that he actually participated in any of the events at issue in this case, nor has DB presented a basis for suspecting that his necessarily generalized knowledge of the business of LV [FN14] is either unique or directly relevant to the issues in this case. Moreover, DB fails to show that Ms. Moulle-Berteaux was unable to answer questions that DB proposes to ask Mr. Stalla-Bourdillon. (*E .g.,* DB Mem. at 10-11 & n. 3). Finally, the fact that he participated in settlement talks with a principal of DB concerning this case (Stalla-Bourdillon Decl. at ¶ 7) offers no justification for deposing him. Such talks are not a proper subject of discovery, and there is no indication that his knowledge of the case, presumably acquired for purposes of that discussion, is anything but second-hand. Accordingly, plaintiff is granted a protective order with respect to this deposition.

FN14. Given the breadth of his responsibilities at LV, his representation of ignorance as to the specifics of this case (Stalla-Bourdillon Decl. at ¶ 8) is entirely credible.

The situation with regard to Mr. Carcelle is somewhat different. There is no question that he signed a declaration that LV submitted to the PTO, and that it forms one basis for defendant's counterclaim to declare LV's trademark registration invalid as a fraud on the PTO. In pressing for a deposition, DB emphasizes that Ms. Moulle-Berteaux could not testify about Mr. Carcelle's knowledge of what was said in the declaration or even as to whether he had read it before signing it. (*See* DB Mem. at 6-7). In response LV offers two declarations by Mr. Car-

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

http://elibraries.westlaw.com/print/printstream.aspx?prft=HTMLE&destination=atp&sv=F... 5/20/2008

Page 13 of 19

Not Reported in F.Supp.2d
Page 13
Not Reported in F.Supp.2d, 2006 WL 3476735 (S.D.N.Y.)
**(Cite as: Not Reported in F.Supp.2d, 2006 WL 3476735 (S.D.N.Y.))**

celle, averring that he has no memory of signing the document or of what it contained or of whether he knew anything at the time about the facts pertinent to the accuracy of the statements that it contained. (Carcelle Decl. at ¶ 6-8; Carcelle Reply Decl. at ¶¶ 2-4).[FN15]

FN15. LV also argues that DB's claim of fraud on the PTO is meritless, an assertion that is at best premature and certainly not a basis for precluding discovery directed to that claim.

***13** From the declarations proffered by Mr. Carcelle, it appears that a deposition may produce little in the way of useful information. Nonetheless, that is not a proper basis for refusing to allow a party to question a witness who has participated in events directly pertinent to at least one of the claims in the case. There is simply no basis for compelling DB to take at face value an assertion of lack of memory made in an affidavit by a witness. This scenario is simply not equivalent to those encountered in cases in which a senior executive has not participated in any activity relevant to the issues in the case. *See,e.g.,Treppel,* 2006 WL 468314, at *2;*Six West Retail Acquisition, Inc. v. Sony Theatre Mgt. Corp.,* 203 F.R.D. 98, 104 (S.D.N.Y.2001). Mr. Carcelle has concededly participated directly in a pertinent event, and hence he is appropriately subject to questioning about his participation.

That said, it is equally appropriate to place significant limitations on such a deposition. *See,e.g.,Yholman v. ICN Pharms., Inc.,* 1999 WL 1267459, at *1-2 (S.D.N.Y. Dec. 29, 1999). Those limitations follow from both Mr. Carcelle's senior position in, and responsibility for business affairs at, LV and the narrowness of the inquiries that may be appropriately directed to him. Accordingly, the deposition is to be limited to no more than three hours and is to be conducted at Mr. Carcelle's place of business unless DB chooses to take the deposition by telephone.[FN16]

FN16. In setting this time limit, we do not impose any subject-matter restriction on DB's questioning of the witness.

VI. *LV's Motion to Compel The Deposition Of DB Italia by Maurizio Nottoli*

Plaintiff has moved to compel DB to produce in New York for deposition a resident of Italy named Maurizio Nottoli. According to plaintiff, Mr. Nottoli is knowledgeable about the procurement of bags for DB, the disposition at the outset of this litigation of the bags that allegedly infringed LV's S-lock trademark and the design of bags for DB, possibly including the bags at issue here. (LV Mem. Supp. at 3-4). Plaintiff contends that it may use a Rule 30(b)(1) deposition notice to compel Nottoli's appearance here either because he is a managing agent of DB or because he is within the custody or control of DB. (*Id.* at 6-12). Defendant opposes the motion, contending that Nottoli is not a party to the litigation nor a managing agent of DB and that he may therefore be deposed only pursuant to the provisions of the Hague Convention. (DB Mem. Opp'n at 7-15).

Nottoli's formal link to DB is through an entity known as DB Italia, which is based in Florence, Italy. Although the record is not pristine on the exact relationship between DB and DB Italia, a Dun & Bradstreet report reflects that DB owns 98 percent of the shares of DB Italia and Nottoli apparently owns the balance. (*See* Declaration of Alison Arden Besunder, Esq., executed Sept. 29, 2006, Ex. M).[FN17] DB Italia has only one employee other than Nottoli (*id.*), and there is no indication that she plays any non-ministerial role in the affairs of the company. The directors of DB Italia consist of Peter Dooney and Mr. Nottoli. (*Id.*, Ex. M).

FN17. An alternative version of the relationship-offered by DB-is that the 98-percent share of DB Italia is held by two other entities apparently controlled by DB (Declaration of Jessica Selb, Esq., executed Oct. 10, 2006,, Ex. 2), but there is no public record of the existence of these

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

http://elibraries.westlaw.com/print/printstream.aspx?prft=HTMLE&destination=atp&sv=F... 5/20/2008

Page 14 of 19

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2006 WL 3476735 (S.D.N.Y.)
**(Cite as: Not Reported in F.Supp.2d, 2006 WL 3476735 (S.D.N.Y.))**

Page 14

> entities. (Reply Declaration of Alison Arden Besunder, Esq., executed Oct. 16, 2006, Ex. W). Moreover, DB's own attorneys have several times characterized DB Italia as a subsidiary of DB, and Peter Dooney has described it as DB's Italian office. (Besunder Decl., Ex N at 38 & Ex. P at 13; Selb Decl., Ex. 1; Reply Declaration of Alison Arden Besunder, Esq., executed Oct. 16, 2006, Ex. CC).

***14** There is no indication that DB Italia undertakes any significant business other than to serve as a vehicle for the design and acquisition of product for DB. Indeed, DB provides the accounting and payroll services for DB Italia and supplies its funding. (*Id.*, Ex. O at 53-54). Thus, although DB Italia pays Nottoli, it appears to be with funds supplied for that purpose by DB.

Similarly, Nottoli performs essential services directly for DB. Thus Nottoli and Dooney are described as working collaboratively in determining the design of DB bags, and Nottoli appears to be responsible for outsourcing the manufacture of those bags on behalf of DB. (Besunder Decl., Ex. P at 55-56, 105-07178-79). Similarly, when DB pulled the allegedly infringing bags from the market early in this lawsuit and arranged for them to be retrofitted with new locks, it appears that Nottoli handled these transactions. (*Id.*, Ex. R). Dooney speaks almost daily with Nottoli and travels to Italy to meet him every few months. (*Id.*, Ex. P at 58). Nottoli himself travels periodically to the United States-most recently several weeks ago (Oct. 31, 2006 letter to the Court from Michael A. Grow, Esq.; Nov. 8, 2006 letter to the Court from Steven Kimelman, Esq.)-where he spends much of his time with Mr. Dooney. (Besunder Decl., Ex. P at 57; *id.*, Ex. Q at 26-27).

With this record in mind, we turn to LV's arguments. We conclude that Nottoli is to be made available by DB for deposition at his place of business in Italy.

We first reject LV's argument that Nottoli may be subjected to a deposition by notice because he is within the "custody or control" of DB. (LV Mem. at 10-12). That term is found in Rule 34, and refers to the production of documents held by, or available to, a litigant. The appropriateness of deposing a non-party witness pursuant to notice is governed by a separate rule, which uses different language, and is properly interpreted by somewhat different standards. Specifically, Rule 30(b)(1) refers to depositions of a corporation by its officers, directors or managing agents.

On the current motion, the central question concerns Nottoli's asserted status as a managing agent of DB. The party seeking the deposition bears the burden-whether of production or persuasion is uncertain-but that burden is "modest," since the movant need only demonstrate " 'that there is at least a close question' as to whether the witness is a managing agent."*Boss Mfg. Co. v. Hugo Boss AG*, 1999 WL 20828, at *4 (S.D.N.Y. Jan. 13, 1999) (citing *United States v. Afram Lines (USA), Ltd.*, 159 F.R.D. 408, 413 (S .D.N.Y.1994)).*AccordDubai Islamic Bank v. Citibank, N.A.*, 2002 WL 1159699, at *3-4 (S.D.N.Y. May 31, 2002). Moreover, for purposes of this analysis all doubts should be resolved in favor of the discovering party. *Seeid.* at *4; *Afram Lines*, 159 F .R.D. at 413. In this manner, discovery may proceed on the basis of a provisional determination of managing-agent status, with the final resolution of that question left for post-discovery proceedings, when the trial court or fact-finder determines whether the testimony of the witness is binding on the party. *See,e.g.,Dubai Islamic Bank*, 2002 WL 1159699, at *4;*Boss Mfg.*, 1999 WL 20828, at *4;*Afram Lines*, 159 F.R.D. at 413-14;*Hughes Bros., Inc. v. Callanan Road Improvement Co.*, 41 F.R.D. 450, 454 (S.D.N.Y.1967).

***15** In assessing whether a proposed deponent is potentially a managing agent, we look to a variety of factors, none of which is necessarily controlling. *See,e.g.,Boss Mfg.*, 1999 WL 20828, at *3. As typ-

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

http://elibraries.westlaw.com/print/printstream.aspx?prft=HTMLE&destination=atp&sv=F... 5/20/2008

Page 15 of 19

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2006 WL 3476735 (S.D.N.Y.)
**(Cite as: Not Reported in F.Supp.2d, 2006 WL 3476735 (S.D.N.Y.))**

Page 15

ically articulated, the individual "should possess general powers to exercise judgment and discretion in corporate matters, ... [,] should be a person who can be relied upon to give testimony, at the employer's request, in response to the demand of the examining party, ... [and] should be a person who can be expected to identify with the interests of the corporation."*Id.* at *3 (quoting 7 J. Moore, *Moore's Federal Practice* § 30.03[2] at 30-20 (3d ed.1998)). Other factors recognized by some courts focus on "whether there are other persons 'in positions of higher authority than the individual designated in the area for which information is sought by the deposition' and 'the general responsibilities of the individual respecting the matters involved in the litigation." ' *Id.* at *3 (citing *Moore* & cases).

In this case the record on the pertinent facts is sparse, consisting principally of snippets of testimony proffered by LV from depositions that it has taken in this litigation and in the *Multicolor* case.FN18Obviously LV cannot be expected to provide testimony from Nottoli as to the nature of his duties and the degree of judgment that he exercises in carrying them out. As for DB, it has not proffered any affidavits from either Dooney or Nottoli.

FN18. DB protests that LV should be precluded from using evidence obtained in the *Multicolor* case because a protective order there provides that confidential information supplied in that case may be used only for that litigation. (DB Mem. Opp'n at 4-7). Since, however, both parties have represented that they agree that the discovery obtained in each case should be utilized in both cases, there is no occasion to address this matter (other than to note that DB itself freely uses helpful information from the *Multicolor* case on this motion).

The limited record reflects that Mr. Nottoli performs functions for DB that seem to involve some degree of discretion, as we infer that he uses judgment not only in the design of bags for DB but also in the acquisition of products from other companies. He also appears to have played a central role in the return of the S-lock bags for retrofitting, and we infer that some degree of discretion was afforded him in handling this matter. The record also supports the inference that Mr. Nottoli would comply with a request or direction by DB to appear for a deposition; indeed, DB's counsel has implied as much, suggesting that defendant would arrange for a deposition of him in Italy in exchange for LV submitting Messrs. Carcelle and Stalla-Bourdillon to deposition in New York. (Besunder Decl., Ex. F). The record is equally clear that Mr. Nottoli, who is employed by DB's subsidiary and paid, in effect, by DB, and who works hand-in-glove with Mr. Dooney, can be expected to identify with the interests of DB.

As for the remaining factors, DB makes the point that Peter Dooney has a position of superior authority in the pertinent areas (DB Mem. Opp'n at 11), an observation that we infer is correct, although not dispositive. Finally, there is no question that Nottoli's responsibilities are relevant to issues posed by this case. These include the procurement and possibly the design of the DB bags that are in issue here, and the retrofitting process for the unsold bags that were removed from the market by DB.

***16** The record on a number of the key managing-agent considerations is admittedly sketchy. That is largely attributable to the decision of DB not to proffer any meaningful evidence pertinent to the relevant considerations, and it underscores the wisdom of leaving the definitive determination of managing-agent status to the post-discovery stage of the case. LV has certainly demonstrated that the question of Mr. Nottoli's status is at least a close question, and hence we conclude that DB is obligated to make him available for deposition based on LV's notice of deposition.

There remains the question of the location of the deposition. LV notes that Nottoli periodically comes to the New York area, and indeed he did so while this motion was pending. Nonetheless, since

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

http://elibraries.westlaw.com/print/printstream.aspx?prft=HTMLE&destination=atp&sv=F... 5/20/2008

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2006 WL 3476735 (S.D.N.Y.)
**(Cite as: Not Reported in F.Supp.2d, 2006 WL 3476735 (S.D.N.Y.))**

Page 16

he apparently travels here only once or twice a year, it is highly unlikely that he will be back in the next few weeks, when all other discovery may be expected to be completed.

The ordinary rule is that the deposition of corporate employees is to be conducted where they work, particularly when the corporation is a defendant. *See,e.g.,Boss Mfg.,* 1999 WL 20828, at *1. In this case we see no compelling reason to alter that presumption, and accordingly we direct that any deposition of Mr. Nottoli be taken in Italy.

VII. *DB's Second Motion on Privilege Issues*

DB has moved for an order compelling LV to produce certain documents listed on its privilege log. DB focuses on claims of privilege invoked by LV for communications with its in-house attorneys Nathalie Moulle-Berteaux and Emmanuel Barbault,FN19 and its work-product claim for documents prepared in anticipation of registration proceedings before the PTO. It also argues that LV has waived any privilege by virtue of deposition testimony by Ms. Moulle-Berteaux and that any privilege or work-product immunity should be invaded based on the crime-fraud exception.[FN20]LV opposes the motion while stating-in what amounts to an elaboration of its prior motion for a protective order-that it is willing to produce most of the previously withheld documents and that this intention moots DB's current motion to compel. (LV Mem. Opp'n at 2-5). We understand LV to be saying that it would produce most, though not all, of the documents in the prosecution files for registrations of its S-lock trademarks, and that it would withhold a small number of documents as work product, provided that the court rules in plaintiff's favor on its hypothesis as to the scope of the waiver that such a production would entail.[FN21]

FN19. Prompted by a comment in LV's responding memorandum, DB mentions documents involving Benjamin Dubuis, also an in-house attorney, for the first time in its reply memorandum. (DB Reply Mem. at 6). This is inadequate to present the issue of Mr. Dubuis's status on this motion, and we therefore do not address that question. In any event, for reasons to be noted, the question appears to be a moot one.

FN20. DB also suggests that several items listed on plaintiff's privilege log are not described with sufficient particularity to justify invocation of the privilege or work-product immunity.

FN21. LV refers to its intention to revise its privilege log to limit it to a few work-product-protected documents, but it does not specify which, other than indicating that they all date from 2004 or later. (LV Mem. Opp'n at 8). LV has never indicated that it has actually prepared a new version of its log.

LV states that it is prepared to waive any attorney-client privilege for documents in the prosecution files for its three S-lock trademarks and one pending application. (*Id.* at 3-5). If correct, that would moot any argument about the validity of the privilege claim asserted for these documents. Nonetheless, LV then proceeds to brief the applicability of the privilege-whether as a matter of caution or because there are other, unlogged documents that LV is withholding is unclear. In perhaps an excess of caution, we do likewise, and then turn to the work-product issue.

***17** As we understand it, LV has asserted an attorney-client privilege for documents representing communications between its in-house counsel (Ms. Moulle-Berteaux, who is based in France, and Mr. Barbault, who practices in the United States) and other LV personnel concerning applications for registration of trademarks by the PTO. Both sides agree that American, rather than French, law governs the privilege. (*See* LV Mem. Opp'n at 12; DB Mem. Supp. at 3). Were it otherwise, the answer would be straightforward, since it is conceded that

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

http://elibraries.westlaw.com/print/printstream.aspx?prft=HTMLE&destination=atp&sv=F... 5/20/2008

Page 17 of 19

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2006 WL 3476735 (S.D.N.Y.)
**(Cite as: Not Reported in F.Supp.2d, 2006 WL 3476735 (S.D.N.Y.))**

Page 17

under French law these communications are not protected by any privilege. (*Seeid.* at 3 (quoting J. Copeman & K. Hurford, "Practical Considerations in Maintaining Privilege," J. Int'l Banking L. & Reg. 360, 364 (2005)).

The most obvious difficulty for LV's privilege claim is that neither Ms. Moulle-Berteaux nor Mr. Barbault are members of any bar (French or American), and they apparently have never been. (Declaration of Brian D. O'Reilly, Esq., executed Oct. 25, 2006, Ex. D at 56-57; *id.,* Ex. E). American courts have, with some consistency, held that the attorney-client privilege does not apply to communications with a law school graduate unless he or she is admitted to practice at the bar of a state or federal court (or possibly a foreign court), *see,e.g.,In re Rivastigmine Patent Litig.,* 274 F.R.D. 69, 74 (S.D.N.Y.2006); *AIA Holdings, S.A. v. Lehman Bros., Inc.,* 2002 WL 31385824, at *4 (S.D.N.Y. Oct. 21, 2002)(citing cases), thus leaving in serious question the availability of a privilege in this case.

To overcome this obstacle, LV notes that both Ms. Moulle-Berteaux and Mr. Barbault have full-and indeed advanced-legal training, and carry out the responsibilities of an in-house attorney that are the equivalent of what American in-house lawyers do. Arguing this functional equivalence as a basis for recognizing the privilege, they cite the decision in *Renfield Corp. V.E. Remy Martin & Co.,* 98 F.R.D. 442 (D.Del.1982), which adopted the conclusion that they press here. (LV Mem. Opp'n at 10-13).

As defendant properly points out, *Renfield* has not been followed elsewhere; indeed, a coordinate court in the Third Circuit explicitly disagreed with it and noted that Third Circuit law was inconsistent with its analysis. *SeeHoneywell, Inc. v. Minolta Camera Co.,* 1990 WL 66182, at *2-3 (D.N.J. May 15, 1990). Plaintiff offers no compelling reason for deviating from the consistent line of authority that holds to the contrary. Moreover, it would seem that there is particularly little reason to do so here when the law under which Ms. Moulle-Berteaux and Mr. Barbault were practicing-French and American, respectively-did not protect their communications with their client.

It also bears noting that one key premise for assertion of the privilege is that the participants in the assertedly protected communication expect it to be treated as confidential. *See,e.g.,United States v. Construction Prods. Research, Inc.,* 73 F.3d 464, 473 (2d Cir.1996)(communication must have been intended to be confidential). Given the fact that communications of Ms. Moulle-Berteaux that are at issue apparently took place in France and the absence of any indication in the record that the participants in the communications nonetheless expected that they would be protected, the justification for an equivalence analysis is far less compelling since there is no reason to believe that there was any expectation by the participants that confidentiality could be maintained in the face of French law. As for Mr. Barbault, he was practicing in the United States, and hence was directly subject to American law, which gives no protection to the communications of an unlicensed attorney.

***18** The difficulty with LV's equivalence argument surfaces in plaintiff's own analysis. Thus LV asserts that the protection it seeks should be afforded in deference to the fact that the French legal system operates in a somewhat different manner from the American, an apparent reference to the fact that in-house counsel in France may not belong to the Bar. (*See* LV Mem. Opp'n at 11 (referring to "the differences between the French and American legal systems")). This type of comity argument-at least with regard to Ms. Moulle-Berteaux-might well have some force if the communications in question were protected under French law. Since they are not, however, the proposed analysis amounts to cherry-picking segments of French law in support of a legal protection afforded by neither French nor American law.

In sum, we conclude that LV cannot assert an attorney-client privilege for communications between its in-house counsel and the client. On that basis we

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

http://elibraries.westlaw.com/print/printstream.aspx?prft=HTMLE&destination=atp&sv=F... 5/20/2008

Not Reported in F.Supp.2d
Page 18
Not Reported in F.Supp.2d, 2006 WL 3476735 (S.D.N.Y.)
**(Cite as: Not Reported in F.Supp.2d, 2006 WL 3476735 (S.D.N.Y.))**

need not address the impact of DB's argument for waiver by disclosure on the attorney-client privilege and its brief assertion of the crime-fraud exception to the privilege.[FN22]

FN22. We do note in passing, however, that in asserting its crime-fraud argument DB fails to offer any evidence going to the fraudulent intent that it must show to establish that there is probable cause to believe that LV was seeking to mislead the PTO. Simple reliance on its own pleadings is simply not sufficient for this purpose.

As for the work-product question, although LV initially asserted this form of immunity for all of its logged documents (O'Reilly Decl ., Ex A), it now concedes that such immunity does not extend to documents prepared solely for the *exparte* proceeding before the PTO. (LV Mem. Opp'n at 7). It does assert-correctly, we believe-that documents prepared with a view to specific anticipated or ongoing litigation or substantially altered by the expectation or pendency of such litigation may be covered by work-product protection, subject to a showing of need by the other side. (*Id.* at 8).

LV indicates that it seeks to protect only a handful of documents on this basis, all of which were drafted in the context of either this lawsuit or the contested trademark cancellation proceeding pending before the PTO. (*Id.* at 8-9). Given this representation, LV is required to produce to DB all other documents listed on its privilege log and all documents (if any) not listed on a log but withheld as privileged within seven days. For any remaining asserted work product, LV is to submit the documents for *incamera* review within seven days, with a appropriate accompanying evidentiary submission demonstrating the factual basis for the work-product claim for each document.

VIII. *LV's Deposition Motions*

Plaintiff has filed two motions seeking sanctions for asserted misconduct by DB in connection with four depositions. Alternatively it seeks the scheduling of those depositions.

For reasons specified in part at a telephone conference on November 21, 2006, no sanctions are warranted. The disputes are in part based on scheduling disputes occasioned by orders entered in the *Multicolor* litigation and in part are premised on disagreements as to whether plaintiff has been afforded sufficient time to depose two senior DB officers, Peter Dooney and Philip Kinsley.

***19** The depositions of two of the witnesses, Ms. Armenise and Ms. Kopp, were finally scheduled by the parties for November 30 and 27, 2006, respectively. In our telephone conference, we ordered that they be conducted on those dates. As for Mr. Kinsley, although LV has had two deposition sessions with him, at the same telephone conference we authorized plaintiff to continue the deposition for no longer than two hours. This addition was justified only by the fact that defendant produced a quantity of invoices and related documents the day before the witness's last deposition session and has since produced a few e-mails that involve or concern him.

As for Mr. Dooney, who was named as a Rule 30(b)(6) witness and separately noticed for deposition in his personal capacity, LV has had one session with him that totaled somewhat more than six hours. Although DB complains that LV spent a large amount of time at the first session on marginal or irrelevant matters, the breadth of his involvement in DB's affairs and the events at issue here amply justify requiring him to return for one more deposition session, not to exceed seven hours.

*CONCLUSION*

For the reasons noted, the discovery and sanctions motions of the parties are granted in part and denied in part, to the extent indicated. To facilitate the completion of outstanding discovery proceed-

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

http://elibraries.westlaw.com/print/printstream.aspx?prft=HTMLE&destination=atp&sv=F... 5/20/2008

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2006 WL 3476735 (S.D.N.Y.)
**(Cite as: Not Reported in F.Supp.2d, 2006 WL 3476735 (S.D.N.Y.))**

Page 19

ings, we extend the deadline for fact discovery to December 31, 2006.

S.D.N.Y.,2006.
Malletier v. Dooney & Bourke, Inc.
Not Reported in F.Supp.2d, 2006 WL 3476735 (S.D.N.Y.)

END OF DOCUMENT

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

http://elibraries.westlaw.com/print/printstream.aspx?prft=HTMLE&destination=atp&sv=F... 5/20/2008

RUBIN v. GENERAL TIRE & RUBBER CO.
S.D.N.Y., 1955

United States District Court S. D. New York.
Herbert RUBIN, doing business as New York Toy & Game Mfg. Co., Plaintiff,
v.
The GENERAL TIRE & RUBBER CO., Inc., Defendant.
July 19, 1955.

Contract action against a corporate defendant. On defendant's motion to vacate notice of taking depositions of its employees, the District Court, Palmieri, J., held that employees who had negotiated contracts and supplementary agreements between parties and who were responsible for production of goods to be furnished under contracts were 'managing agents' whom corporate defendant would be required to produce for examination.

Order accordingly.

West Headnotes

**[1] Federal Courts 170B 101**

170B Federal Courts
170BII Venue
170BII(B) Change of Venue
170BII(B)1 In General; Venue Laid in Proper Forum
170Bk101 k. In General; Convenience and Interest of Justice. Most Cited Cases
(Formerly 106k277.1)
Under statute authorizing transfer of civil actions, relevant factors for court to consider are convenience of parties, convenience of witnesses, and interests of justice. 28 U.S.C.A. § 1404(a).

**[2] Federal Courts 170B 105**

170B Federal Courts
170BII Venue
170BII(B) Change of Venue
170BII(B)1 In General; Venue Laid in Proper Forum
170Bk105 k. Plaintiff's Choice of Forum; Forum Shopping. Most Cited Cases
(Formerly 106k277.1)
Although federal statute authorizing transfer of civil actions allows transfer upon lesser showing of inconvenience to parties and witness than theretofore required, statute did not change criteria for transfer, among which is plaintiff's choice of forum. 28 U.S.C.A. § 1404(a).

**[3] Federal Courts 170B 101**

170B Federal Courts
170BII Venue
170BII(B) Change of Venue
170BII(B)1 In General; Venue Laid in Proper Forum
170Bk101 k. In General; Convenience and Interest of Justice. Most Cited Cases
(Formerly 106k277.1)
Under federal statutes permitting transfer of civil actions, where plaintiff has sued in district in which he resides, defendant to be granted transfer should show that his own convenience and that of his witnesses and the interest of justice outweigh convenience of plaintiff and his witnesses, and little weight should be given to defendant's assertions that some other district would be more convenient for plaintiff and his witnesses. 28 U.S.C.A. § 1404(a).

**[4] Federal Courts 170B 143**

170B Federal Courts
170BII Venue
170BII(B) Change of Venue
170BII(B)4 Proceedings and Effect of Change
170Bk143 k. Affidavits and Evidence in General. Most Cited Cases
(Formerly 106k277.1)
On defendant's motion to transfer contract action

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

from district in which plaintiff resided, evidence failed to sustain defendant's contentions that his own convenience and that of his witnesses, and interests of justice in allegedly obtaining trial sooner, and in permitting defendant to implead its suppliers, outweighed convenience to plaintiff and its witnesses so as to justify transfer. 28 U.S.C.A. § 1404(a).

**[5] Federal Civil Procedure 170A ⚷1333**

170A Federal Civil Procedure
170AX Depositions and Discovery
170AX(C) Depositions of Parties and Others Pending Action
170AX(C)1 In General
170Ak1333 k. Compensation of Deponent. Most Cited Cases

**Federal Civil Procedure 170A ⚷1432.1**

170A Federal Civil Procedure
170AX Depositions and Discovery
170AX(C) Depositions of Parties and Others Pending Action
170AX(C)5 Suppression; Use and Effect
170Ak1432 Use
170Ak1432.1 k. In General. Most Cited Cases
(Formerly 170Ak1432)

**Federal Civil Procedure 170A ⚷1455**

170A Federal Civil Procedure
170AX Depositions and Discovery
170AX(C) Depositions of Parties and Others Pending Action
170AX(C)6 Failure to Appear or Testify; Sanctions
170Ak1455 k. Striking Out Defaulting Party's Pleading. Most Cited Cases
Effect, for discovery purposes, of determination that employee of corporation is "managing agent" are (1) that corporation must produce employee at own expense, (2) that employee's deposition may be used for any purpose at trial, and (3) that corporation's pleadings may be stricken if employee willfully fails to appear before officer taking deposition. Fed.Rules Civ.Proc. rules 26(a), (d)(2), 37(d), 28 U.S.C.A.

**[6] Federal Civil Procedure 170A ⚷1325**

170A Federal Civil Procedure
170AX Depositions and Discovery
170AX(C) Depositions of Parties and Others Pending Action
170AX(C)1 In General
170Ak1323 Persons Whose Depositions May Be Taken
170Ak1325 k. Officers and Employees of Corporations. Most Cited Cases
Criteria for determining, for discovery purposes, who is "managing agent" of corporate party are (1) employee should be person invested by corporation with general powers to exercise judgment and discretion in dealing with corporate matters, (2) employee should be person who could be depended upon to carry out employer's direction to give testimony at demand of party engaged in litigation with employer, and (3) employee should be person who can be expected to identify himself with the interests of corporation rather than with those of other parties. Fed.Rules Civ.Proc. rules 26(a), (d)(2), 37(d), 28 U.S.C.A.

**[7] Federal Civil Procedure 170A ⚷1325**

170A Federal Civil Procedure
170AX Depositions and Discovery
170AX(C) Depositions of Parties and Others Pending Action
170AX(C)1 In General
170Ak1323 Persons Whose Depositions May Be Taken
170Ak1325 k. Officers and Employees of Corporations. Most Cited Cases
In determining whether employee of corporate party to action is to be classified as managing agent, for discovery purposes, criterion that he should be person who identifies himself with interest of corporation rather than with those of other

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

parties should be liberally interpreted since determination that corporation is or is not bound by testimony of person examined is to be made by trial court. Fed.Rules Civ.Proc. rules 26(a), (d)(2), 37(d), 28 U.S.C.A.

**[8] Federal Civil Procedure 170A ⚷1325**

170A Federal Civil Procedure
170AX Depositions and Discovery
170AX(C) Depositions of Parties and Others Pending Action
170AX(C)1 In General
170Ak1323 Persons Whose Depositions May Be Taken
170Ak1325 k. Officers and Employees of Corporations. Most Cited Cases
For purposes of taking depositions in contract action against corporate defendant, persons who negotiated contracts and supplementary agreements between parties and who were responsible for production of goods to be furnished under contracts were "managing agents" whom corporate defendant would be required to produce for examination. Fed.Rules Civ.Proc. rules 26(a), (d)(2), 37(d), 28 U.S.C.A.

**[9] Federal Civil Procedure 170A ⚷1333**

170A Federal Civil Procedure
170AX Depositions and Discovery
170AX(C) Depositions of Parties and Others Pending Action
170AX(C)1 In General
170Ak1333 k. Compensation of Deponent. Most Cited Cases
(Formerly 170Ak1325)
Where trial court, in action against corporate defendant, required defendant to produce a managing agent for depositions it would not require production of managing agent's assistant in his department where it appeared that agent could answer any questions regarding department, but if, after taking managing agent's deposition, plaintiff believed that there was additional information which only assistant could supply he would be permitted to move for deposition of assistant. Fed.Rules Civ.Proc. rules 26(a), (d)(2), 37(d), 28 U.S.C.A.

**[10] Federal Civil Procedure 170A ⚷1333**

170A Federal Civil Procedure
170AX Depositions and Discovery
170AX(C) Depositions of Parties and Others Pending Action
170AX(C)1 In General
170Ak1333 k. Compensation of Deponent. Most Cited Cases

**Federal Civil Procedure 170A ⚷1349**

170A Federal Civil Procedure
170AX Depositions and Discovery
170AX(C) Depositions of Parties and Others Pending Action
170AX(C)2 Proceedings
170Ak1346 Notice of Examination or Motion for Leave to Examine
170Ak1349 k. Time and Place. Most Cited Cases
Where, in action against corporate defendant, depositions were ordered taken of two of corporate defendant's managing agents who were not in area where depositions were to be taken, court would require that both managing agents not be noticed at same time, unless corporate defendant had no objection to both being called from work at same time, and would require that plaintiff, if he did not prevail in action, pay expenses of transporting agents for depositions. Fed.Rules Civ.Proc. rules 26(a), (d)(2), 37(d), 28 U.S.C.A.

***53** Irving K. Rubin, New York City, for plaintiff.
Sullivan & Cromwell, New York City, John F. Dooling, Jr. and Jack G. Clarke, New York City, of counsel, for defendant.
PALMIERI, District Judge.
This action arises out of a commercial transaction between plaintiff and defendant and involves an allegedly unjustifiable delay in defendant's delivery to plaintiff of plastic fishing rod handles. Plaintiff is an individual who is a citizen and resident of the

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

State of New York. He is engaged in the business of making and selling toys and fishing tackle. His office is located in New York, and his workshop is located in Lawrence, Massachusetts. Plaintiff entered into the contracts which underlie this dispute with a Massachusetts corporation which has since been merged into the defendant, an Ohio corporation that is doing business in New York and Massachusetts. Defendant moves for (1) an order under 28 U.S.C. § 1404(a) transferring the action to the United States District Court for the District of Massachusetts and (2) an order under Rule 30(b) of the Federal Rules of Civil Procedure, 28 U.S.C., vacating the plaintiff's notice to take defendant's deposition in New York, New York, by three of its employees.

[1]Section 1404(a) provides: 'For the convenience of parties and witnesses, in the interest of justice, a district court may transfer any civil action to any other district or division where it might have been brought.'Thus the relevant factors for the Court to consider in determining whether to exercise its power to transfer a civil action are the convenience of parties, the convenience of witnesses, and the interests of justice.

In trying to show that the convenience of parties and witnesses would be served by the transfer of this action to the District Court for the District of Massachusetts defendant affirms that all of the plaintiff's present and former employees who are familiar with the relevant facts, and all of its own employees who are familiar with the relevant facts reside within 40 miles of Boston, Massachusetts, where the case would be tried if the action were transferred. The defendant also states that all of its relevant records are in Lawrence, Massachusetts, that many of plaintiff's records relative to this action are 'undoubtedly located at the plaintiff's factory in Lawrence,' and that plaintiff 'undoubtedly visits his factory in Lawrence, Massachusetts, regularly and frequently.'Defendant also states that the interests of justice would be served by the transfer of this action because it could then implead certain mold manufacturers which it cannot sue outside of Massachusetts and because the 'Median time in months from joinder of issue to disposition: as of end of the Fiscal Year 1954 for: all civil cases' was 45.0 in this District and only 14.5 in the District of Massachusetts.

Plaintiff denies that its convenience or that of the defendant will be served by transfer of the case to the District ***54** Court for the District of Massachusetts. Plaintiff emphasizes that his business is essentially a 'one man' operation and that it would be seriously disrupted if he were required to travel to Boston for the taking of depositions or for the trial. Moreover, he points out that since none of the witnesses reside in Boston they would have to travel whether the trial is held in Boston or New York. As for defendant's statement that it cannot implead the mold manufacturers unless the case is tried in Massachusetts, plaintiff states that defendant had penalty arrangements with the mold manufacturers and that the arrangements 'presumably measure the liability of the tool makers and the damages collectible from them.'

Defendant cites Norwood v. Kirkpatrick, 1955, 349 U.S. 29, 75 S.Ct. 544, in which the Supreme Court said, 'When Congress adopted § 1404(a), it intended to do more than just codify the existing law on *forum non conveniens*. * * * (W)e believe that Congress, by the term 'for the convenience of parties and witnesses, in the interest of justice,' intended to permit courts to grant transfers upon a lesser showing of inconvenience. This is not to say that the relevant factors have changed or that the plaintiff's choice of forum is not to be considered, but only that the discretion to be exercised is broader.'349 U.S. at page 32, 75 S.Ct. at page 546.

[2] I understand these words to mean that I have the power to order a transfer under section 1404(a) upon a lesser showing of inconvenience to parties and witnesses than has been required heretofore. But, as the Supreme Court indicated, the factors which must be considered in determining whether I should exercise that power have not changed.

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

[3] One of the factors is the plaintiff's choice of forum. By instituting suit in this district plaintiff shows that he believes that his own convenience and those of his witnesses are best served by a trial in this district. Certainly, when plaintiff cannot be accused of 'shopping for a forum' because he is a resident of this district, the Court should give little, if any, weight to defendant's assertions that some other district would be more convenient for the plaintiff and his witnesses. In such a case defendant should show that his own convenience and that of his witnesses, and the interests of justice outweigh the convenience of plaintiff and his witnesses and call for transfer of the case to another district.

[4] Defendant has failed to make such a showing. While it would be more convenient for defendant to have the trial held in Boston rather than New York, I do not believe that the inconvenience is of such a nature as to justify overruling the plaintiff's choice of forum. Since most of defendant's witnesses are employed by it, they will travel to New York when and if defendant directs them to do so. And if defendant wishes to use the testimony of witnesses who are not its employees and they refuse to travel to New York, it can do so by deposition under Rule 26(d)(3) of the Federal Rules of Civil Procedure. It is also extremely unlikely that the documents which defendant may wish to use at the trial are voluminous, and it is therefore unlikely that defendant will incur any appreciable expense in bringing those documents to New York from Lawrence, Massachusetts.

Furthermore, I do not believe that the interests of justice would be served by transferring this case. Plaintiff should not be compelled to bring suit in a district other than that in which he does business because defendant may have a right to recover against third parties. And defendant need not fear that it will be deprived of a speedy trial if the case remains in this district because the calendar on which this case would appear for trial is up to date.

Defendant's motion to transfer this case to the District Court for the District***55** of Massachusetts is therefore denied.

Defendant has also moved to vacate plaintiff's notice to take its deposition in this district by three of its employees, F. J. Blum, Carl E. Holch, and C. J. McCarthy. Defendant contends that none of the three named men is its officer or managing agent. Plaintiff contends that the three are managing agents of the defendant because they exercised general supervisory authority over the making of the contracts between the parties and the performance of those contracts.

Rule 26(a) provides, 'Any party may take the testimony of any person, including a party, by deposition upon oral examination or written interrogatories for the purpose of discovery or for use as evidence in the action or for both purposes. * * *'Fed.R.Civ.P., Rule 26(a). The Rules do not contain any special procedure for taking the deposition of a corporation that is a party upon oral examination, although they provide that 'any party may serve upon any adverse party written interrogatories to be answered by the party served or, if the party served is a public or private corporation or a partnership or association, by any officer or agent, who shall furnish such information as is available to the party. * * *'Fed.R.Civ.P., Rule 33. But the Courts have inferred from Rule 37(d) that the deposition of a corporation that is a party may be taken through its officers or managing agents. See Krauss v. Erie R. Co., D.C.S.D.N.Y.1954, 16 F.R.D. 126;Campbell v. General Motors Corp., D.C.S.D.N.Y.1952, 13 F.R.D. 331.

[5] There can be little dispute over whether a person is or is not an officer of a corporation, but the question of which persons are 'managing agents' of a corporation has been the cause of many disputes. The practical effects of a determination that an employee of the corporation is a 'managing agent' are (1) that the corporation must produce the employee for oral examination at its own expense, (2) that the employee's deposition may be used for any purpose at the trial, and (3) that the corporation's pleadings may be stricken if the employee wilfully fails to ap-

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

pear before the officer who is to take his deposition. See Fed.R.Civ.P. 26(d)(2) and 37(d); Curry v. States Marine Corp. of Delaware, D.C.S.D.N.Y.1954, 16 F.R.D. 376.

As one would expect corporate parties have argued for a restrictive definition of 'managing agent.' See, e. g., Krauss v. Erie R. Co., supra;Garshol v. Atlantic Refining Corp., D.C.S.D.N.Y.1951, 12 F.R.D. 204;Wilson v. Trinidad Corp., D.C.S.D.N.Y.1951, 11 F.R.D. 191. In this case, too, defendant contends that the named employee who hold the positions of Export Manager of one of defendant's divisions, and Manager and Assistant Manager of the Custom Molding Department of the same division, are not 'managing agents,' even though the affidavit submitted in its behalf in support of its motion to transfer this case to the District Court for the District of Massachusetts is executed by one of these employees. Defendant states that only one John Bolten, Sr., General Manager of the division involved in this case, is its managing agent for the purposes of this case and that 'no purpose would be served by an examination of John Bolten, Sr., because he is not familiar with the facts relevant to this action.'

Defendant's argument offers a graphic reason for holding against the restrictive meaning for which it contends. A party's right to use the deposition of a managing agent of a corporation that is a party for any purpose at the trial would in many cases be an empty right indeed if only those persons came within the category of 'managing agent' whose rank in the corporate hierarchy was so exalted that they would be extremely unlikely to have any knowledge of the day to day dealings of the corporation with its customers and suppliers. Similarly, a party's right to take the deposition ***56** of a corporation litigant would in many cases be singularly empty if no person whose rank was lower than General Manager of a division of the corporation could be considered a 'managing agent' of the corporation.

[6][7] Since the restrictive view urged by defendant is not to prevail, what criteria can be used in determining whether a given employee of a corporation is its 'managing agent?' The criteria are set out in the cases or can be inferred from the Rules. First, the employee should be 'a person invested by the corporation with general powers to exercise his judgment and discretion in dealing with corporate matters.'Krauss v. Erie R. Co., D.C.S.D.N.Y.1954, 16 F.R.D. 126, 127. Second, the employee should be a person who 'could be depended upon to carry out his employer's direction to give testimony at the demand of a party engaged in litigation with the employer.'Bernstein v. N.V. Nederlandsche-Amerikaansche Stoomvaart-Maatschappij, D.C.S.D.N.Y.1953, 15 F.R.D. 37, 38. Third, the employee should be a person who can be expected to identify himself with the interests of the corporation rather than with those of the other parties. This requirement is necessary because the testimony of a managing agent can be used by the other parties for any purpose at the trial, and the corporation should not be bound by the testimony of persons who may not be loyal to its interests. See Fed.R.Civ.P. 26(d)(2). But this requirement should be liberally interpreted because the determination that the corporation is or is not bound by the testimony of a person who was examined as its managing agent is to be made by the trial court. See Curry v. States Marine Corporation of Delaware, D.C.S.D.N.Y.1954, 16 F.R.D. 376; 4 Moore's Federal Practice 1191 (2d Ed.1950). If the corporation wishes to limit the admissibility of the testimony at the trial, it can present its reasons to the trial judge and he will decide whether the admissibility of the testimony should be limited.

[8] In this case it is clear that two of the persons whom the plaintiff wishes to examine are managing agents under the criteria set forth above. Messrs. Blum and Holch negotiated the contracts and supplementary agreements between the parties. They were responsible for the production and delivery of the goods ordered by plaintiff and for the returns of allegedly defective merchandise. They participated in conferences concerning claims under the contract

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

and made decisions regarding the details connected with the performance of the contracts. Moreover, defendant has not denied that they are its supervisory officials who are most familiar with the transaction involved in this dispute. Under these circumstances defendant should produce them for examination as its managing agents. See Fruit Growers Co-Op v. California Pie & Baking Co., Inc., D.C.E.D.N.Y.1942, 3 F.R.D. 206, 208.

[9] But plaintiff has not at this time shown that Mr. McCarthy should be produced by the defendant. Since it appears that Mr. McCarthy is Mr. Holch's assistant in the custom molding department, Mr. Holch should be able to answer any questions that the plaintiff might put to him about the activities of that department. If, after examining Mr. Holch, plaintiff believes that there is information that only Mr. McCarthy can supply, he can renew his notice to examine Mr. McCarthy at that time.

[10] Finally, certain safeguards seem desirable. The examination of Messrs. Blum and Holch should not be noticed for the same time unless defendant has no objection to both of these men being called from their work to New York at the same time. And the expense of bringing these men to New York for the examination shall be taxable against the plaintiff, if he does not prevail.

***57** The parties should arrange the time and place for the oral examination of the defendant by Messrs. Blum and Holch.

Settle order on notice by July 25, 1955.

S.D.N.Y., 1955
Rubin v. General Tire & Rubber Co.
18 F.R.D. 51

END OF DOCUMENT

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.