# EXHIBIT L

# GIBSON, DUNN & CRUTCHER LLP

### LAWYERS

A REGISTERED LIMITED LIABILITY PARTNERSHIP
INCLUDING PROFESSIONAL CORPORATIONS

333 South Grand Avenue  Los Angeles, California 90071-3197
(213) 229-7000
www.gibsondunn.com

RPlevy@gibsondunn.com

March 4, 2008

*Via E-Mail and U.S. Mail*

Direct Dial

(213) 229-7556
Fax No.

(213) 229-6556

Client No.

C 42376-00830

David Herron
O'Melveny & Myers LLP
400 South Hope Street
Los Angeles, CA 90071-2899

Re:    *AMD v. Intel:  AMD Document Production*

Dear David:

Following up on our call yesterday, in your November 27, 2007 letter to me, you said that AMD was prepared to provide Intel with several written summaries and documents.  In looking back through our records, it appears that we either never received them or can't readily locate them.  Would you mind assembling and getting to us the following (or confirming when you supplied them to us):

1. The date on which each AMD custodian's documents were harvested in this litigation.

2. The date on which each AMD's custodian was placed on the email journaling system.

3. The identification of known losses of data (relevant or irrelevant) from an AMD custodian's hard drive due to file corruption, lost laptop or other similar means of "loss"; and

4. The months on which AMD's custodian has been preserved on monthly backups or "complaint freeze tapes" (which is the term Intel uses for the backup tapes created in the first instance when it was known or reasonably anticipated that an action was going to be filed by AMD).

5. The Litigation Hold Notice that AMD gave to its IT personnel.

GIBSON, DUNN & CRUTCHER LLP

David Herron
March 4, 2008
Page 2

     You produced Exemplary Litigation Hold Notices on November 30. We would like to receive from AMD, a list of the date(s) on which each custodian received the first and any subsequent Litigation Hold Notice or reminder (and if the forms we have are the only ones sent, an indication which custodian received what notice). Your earlier letter is also not clear to us concerning whether the exemplars constitutes the "universe" of such notices, because you used the phrase "principal" and refer to "other versions" and "others." We would like a copy of every Litigation Hold Notice sent to every custodian.

     After you have had an opportunity to review this letter, please let us know whether or not in fact you have presented us with any of the information requested (in which case I would appreciate a "heads up" as to the date on which it was produced so I could better locate it). For all other information, please let us know how long it will take you to get this information to us. We would like to receive it as it becomes available; there is no need to hold parts until all of the information is available. We will review it and may have some additional questions and concerns, which we will raise with you at a later time. We will have some additional questions and follow-up shortly, and depending on the timing of your production, we can consider whether it is more efficient to send it after we look at your production or before.

     Thanks very much for your prompt attention to these matters.

        Yours very truly,

        Richard P. Levy

RPL/shv/100401796_1.DOC

cc:    Robert E. Cooper
       Kay E. Kochenderfer

# EXHIBIT M



# O'MELVENY & MYERS LLP

BEIJING

BRUSSELS

CENTURY CITY

HONG KONG

LONDON

NEWPORT BEACH

400 South Hope Street
Los Angeles, California 90071-2899

TELEPHONE (213) 430-6000
FACSIMILE (213) 430-6407
www.omm.com

NEW YORK

SAN FRANCISCO

SHANGHAI

SILICON VALLEY

TOKYO

WASHINGTON, D.C.

OUR FILE NUMBER
008,346-163

WRITER'S DIRECT DIAL
(213) 430-6230

WRITER'S E-MAIL ADDRESS
dherron@omm.com

March 11, 2008

**VIA E-MAIL AND U.S. MAIL**

Richard Levy, Esq.
Gibson Dunn & Crutcher
333 South Grand Avenue
Los Angeles, California 90071

                    Re:    *AMD v. Intel*

Dear Rich:

This responds to your letter to me of March 4, 2008.

AMD has not yet completed compiling all of the information requested in your letter but, as to most of the listed items, it will be in a position to provide it shortly. In my November 27, 2007 letter to you, however, we proposed that certain information should be part of a mutual exchange. For example, we proposed a mutual exchange of harvest dates. And while we said that AMD would be willing to produce the March 11, 2005 litigation hold notice it issued to its IT personnel, Intel has not produced any litigation hold notice that it issued to its own IT staff. That exchange should also be concurrent. You have not yet responded to these proposals.

In addition, your March 4 letter substantially broadens prior inquiry by now requesting that AMD produce an elaborate report showing when each AMD custodian received a litigation hold notice or reminder, and indicating which version of notice was sent to each custodian on each such occasion. This was never part of our agreement, and your request is especially surprising since Intel has not provided remotely equivalent information to AMD or ever suggested that it is willing to do so. I discuss this more below but, if this sort of exchange is to occur at all, it will have to be mutual.

I now address your requests in the order you presented them.

1.     Harvest Dates: As you correctly stated in your March 5 email to me, AMD has already provided harvest dates for its party-designated custodians. Your email appears to ask now for dates of reharvest for those same custodians. We are unclear why Intel would need or want that information. The short answer is that AMD reharvested data for those custodians as

Richard Levy, Esq., March 11, 2008 - Page 2

required to supplement prior productions through the agreed June 1, 2006 cutoff, in compliance with Case Management Order No. 3. That response seems sufficient.

AMD is prepared to produce harvest date information with respect to adversely-designated and "free throw" custodians, as applicable. As noted in my November 27 letter (at page 3), however, this exchange should be mutual. Intel's last disclosure on harvest dates occurred on April 23, 2007. By our count, however, Intel did not at that time provide any harvest date information regarding 397 of its custodians. You have also informed us that Intel conducted further harvesting in May 2007, but the specific dates of that harvesting have not been disclosed. AMD has also adversely designated a number of Intel custodians since then. We therefore suggest that we agree upon a mutually-convenient date to exchange this information.

2.    Journal Dates: Attached hereto at Tab 1 is a table showing the dates on which AMD custodians were journaled. The notation "term'd" signifies that the custodian terminated his/her employment with AMD prior to being placed on journal.

We request that Intel now respond in kind. On April 5, 2007, Kay Kochenderfer represented via email that "all the currently employed custodians on [Intel's] June 1, 2006 Custodian list are on the Exchange journaling system." We assume, as you suggested in discussions in February and March 2007, that Intel custodians were migrated to Intel's Exchange journaling system over time. Please provide the dates on which each Intel custodian was migrated to its Exchange journaling system.

3.    Known losses of relevant data from an AMD custodian's hard drive due to file corruption, lost laptop or other, similar means of loss: We will, within the next week or so, make any necessary disclosures, consistent with the agreement we reached on December 7, 2007.

4.    Back-up Tapes:   Attached hereto at Tab 2 is a description of AMD's back-up tape regimen.

5.    AMD's March 11, 2005 litigation hold notice to its IT personnel: As we have stated, AMD is prepared to produce this notice at the same time that Intel produces its IT-directed notices. There are, in fact, several litigation hold notices that Intel appears to be withholding. Specifically, as stated in my November 27, 2007 letter:

"[T]horough searches through the documents Intel has produced in remediation and culpability discovery have not uncovered any litigation hold notices delivered by Intel to its IT personnel (as referenced by Intel in its various filings with the Court concerning its evidence preservation issues). For instance, while we have found emails sent among Intel IT personnel, we have not located any litigation hold notice directed by Intel (or its in-house counsel) to IT personnel with respect to Intel's "complaint freeze" effort that Intel said it undertook in June and July 2005, or any litigation hold notice issued by Intel to its IT personnel at the time of the discovery of Intel's evidence preservation issues in October 2006." (*See* my November 27, 2007 letter at page 2.)

Richard Levy, Esq., March 11, 2008 - Page 3

One of following three things must be true: (1) Intel has, in fact, already produced the litigation hold notices it directed to its IT personnel, but we have not located them; (2) Intel has not yet produced these IT-directed litigation hold notices; or (3) Intel did not issue litigation hold notices to its IT personnel at the times and for the purposes indicated in the foregoing paragraph. If (1), please direct us to the documents; if (2), let's please set a date for a mutual exchange; and if (3), please so state in writing so that we can have a written record of this fact.

The last issue your March 4 letter raises has two parts, and I respond to them separately. First, your letter requests that AMD produce "every Litigation Hold Notice sent to every Custodian." My November 27 letter explained that we already have produced all the litigation hold notices within the scope of our agreed exchange, and I further represented that any differences with other forms sent from time to time are slight and immaterial. You appear to doubt my representation. If Intel believes a further exchange is necessary, we are prepared to do so, but only on the conditions that Intel concurrently produces to AMD all such notices and reminders directed to its own personnel, and that all privileges are preserved in connection with that exchange. (If Intel has in fact produced all of its hold notices and reminders, please provide all bates numbers so that we can be certain which documents comprise Intel's complete set of notices and reminders.)

Second, you request that AMD prepare and provide "a list of the date(s) on which each custodian received the first and any subsequent Litigation Hold Notice or reminder (and if the forms we have are the only ones sent, an indication which custodian received what notice)." This strikes us as both an unnecessary and non-trivial compilation undertaking, and most certainly not one which AMD can reasonably be asked to undertake unilaterally.

As with many of your requests, this one requires AMD to undertake an assignment that Intel itself has not undertaken or agreed to. Exhibit D to Intel's April 27, 2007 Report to Court about Intel's preservation lapses did, of course, identify the 316 Intel custodians who did not receive any litigation hold notice until 2007, and provided the approximate date on which those belated notices were issued. Intel's Paragraph 8 disclosures provide litigation hold notice dates for a limited handful of custodians -- apparently, fewer than 10. For approximately 700 Intel custodians, however, Intel has simply stated that by certain dates a certain number of custodians received litigation hold notices. Intel neither identified specific dates of those notices, dates of any follow-up reminders, nor which form of notice was sent on which occasion.

AMD is, therefore, disinclined to accede to this particular request. We nevertheless invite your response to the issues outlined above, and will consider it.

Sincerely,

David L. Herron
of O'MELVENY & MYERS LLP

LA3:1145519.1

# EXHIBIT N

**From:** Herron, David
**Sent:** Friday, November 16, 2007 11:28 AM
**To:** Levy, Richard P.
**Cc:** Herron, David
**Subject:** RE: AMD V. INTEL

Rich:  Thank you.  The written summary is attached.  David

**From:** Levy, Richard P. [mailto:RPLevy@gibsondunn.com]
**Sent:** Friday, November 16, 2007 10:00 AM
**To:** Herron, David
**Subject:** RE: AMD V. INTEL

Thanks Dave. After encouraging you to enter into some non-waiver agreements, I'd be hard pressed to deny your request--and I won't. We agree that your production of a written summary to Deposition Topic 8 will not constitute a privilege waiver. As for your written response, last time I used the phrase "early next week" with Mark, I didn't get him anything until late in the day on the following Wednesday. Accordingly, you don't exactly have a difficult standard to meet and I am sure my family won't mind me excusing myself during Thanksgiving dinner to read your missive. I will look forward to receiving something and, hopefully, resolving the issues I raised.

**From:** Herron, David [mailto:DHerron@OMM.com]
**Sent:** Thursday, November 15, 2007 6:18 PM
**To:** Levy, Richard P.
**Cc:** Herron, David
**Subject:** AMD V. INTEL

Rich:  I'm writing about your letter of November 7.  As we discussed the other day, AMD will produce a written summary of the havesting-related information responsive to Deposition Topic No. 8 tomorrow, November 15.  I believe it is understood and agreed -- but request that you confirm -- that AMD's production of this information shall not constitute or be construed as a waiver of any privilege, including the attorney-client privilege, or of work product protection.

We would like to respond to the balance of your letter in writing, and will plan on getting that to you early next week.  Thanks Rich.  David

**David L. Herron**
**O'Melveny & Myers LLP**
400 South Hope Street
Los Angeles, CA  90071-2899
213.430.6230
dherron@omm.com

*This message and any attached documents contain information from the law firm*
*of O'Melveny & Myers LLP that may be confidential and/or privileged. If you are*
*not the intended recipient, you may not read, copy, distribute, or use this*
*information. If you have received this transmission in error, please notify the*
*sender immediately by reply e-mail and then delete this message.*

"MMS <Gibsondunn.net>" made the following annotations.
---------------------------------------------------------------------------

This message may contain confidential and privileged information. If it has been sent to you in error,
please reply to advise the sender of the error and then immediately delete this message.
=============================================================================

6/10/2008

# EXHIBIT O



# O'MELVENY & MYERS LLP

BEIJING

BRUSSELS

CENTURY CITY

HONG KONG

LONDON

NEWPORT BEACH

400 South Hope Street
Los Angeles, California 90071-2899

TELEPHONE (213) 430-6000
FACSIMILE (213) 430-6407
www.omm.com

NEW YORK

SAN FRANCISCO

SHANGHAI

SILICON VALLEY

TOKYO

WASHINGTON, D.C.

OUR FILE NUMBER
008,346-163

WRITER'S DIRECT DIAL
(213) 430-6230

WRITER'S E-MAIL ADDRESS
dherron@omm.com

March 19, 2008

**VIA E-MAIL AND U.S. MAIL**

Richard Levy, Esq.
Gibson Dunn & Crutcher
333 South Grand Avenue
Los Angeles, California 90071

Re:    *AMD v. Intel*

Dear Rich:

As promised in my letter of March 11, this will respond to your March 4 inquiry regarding "known losses of relevant data from an AMD custodian's hard drive due to file corruption, lost laptop or other, similar means of loss." Based on our investigation to date, and consistent with our agreement of December 7, 2007, we describe below the apparent loss of relevant data by one of AMD's custodians during the preservation period.

Kazuyuki Oji experienced an inadvertent loss of email dated during the period October 1, 2005 through March 2007. As described more fully below, AMD has attempted to recover this lost data by obtaining all of Mr. Oji's email from all sources identified by AMD as reasonably likely to contain it. AMD currently is in the process of reviewing that data for production.

AMD hired Mr. Oji as a Regional Sales Manager on October 1, 2005. Mr. Oji has worked on the Toshiba account since joining AMD. From October 1 through December 1, 2005, Mr. Oji reported directly to Akihiro Nakamura, Director of Sales, who in turn reported to David Uze, then-President of AMD Japan. On December 1, 2005, Mr. Oji began reporting directly to Keisuke Matsumoto (who reported to Mr. Uze). Masatoshi Morishita began his tenure as President of AMD Japan on November 22, 2006, at which time Mr. Matsumoto -- Mr. Oji's then and current supervisor -- began reporting to Mr. Morishita. During the course of his employment, Mr. Oji's regular practice was to copy his supervisors on important emails related to Toshiba business, and he believes that he did so with respect to a predominant majority of such emails. Mr. Oji also copied Shunsuke Yoshizawa, AMD Japan Director of Marketing, on certain of his emails.

Mr. Oji preserved email principally on his laptop computer hard drive. He also periodically backed up files to his personal external hard drive. The loss of email occurred while

Richard Levy, Esq., March 19, 2008 - Page 2

he was attempting such a back up procedure. Specifically, during the weekend of March 24-25, 2007, Mr. Oji attempted to back-up .pst files containing his email covering the time period of October 2005 to March 2007 to an external hard drive in order to preserve them. Mr. Oji estimated that the total size of these .pst files was approximately three gigabytes. In attempting this back up procedure, it appears that Mr. Oji was working with two separate folders, one of which was empty and another of which contained the subject .pst files. It appears that Mr. Oji mistakenly transferred the empty file to the external hard drive and then deleted the folder containing his email .psts. When Mr. Oji realized what had occurred, he attempted to recover the deleted files but was unsuccessful.

Mr. Oji reported this data loss to AMD Japan IT on the next business day, Monday, March 26, 2007. AMD Japan IT personnel attempted to recover Mr. Oji's data in several ways.

First, IT personnel tried to locate a copy of that data that had been created when exchanging Mr. Oji's old laptop computer for a new laptop computer in November 2006. Pursuant to AMD Japan IT's standard procedures, the process for creating such a copy is to transfer the data from the old computer to an alternate storage location, transfer the data from that location to the new computer's hard drive and, after confirming successful transfer, to delete the image from the temporary storage location. This process was followed in Mr. Oji's case, such that IT's copy of Mr. Oji's data no longer existed. Second, IT personnel located and checked Mr. Oji's pre-November 2006 computer, but found that the data had been removed from the hard drive after it had been transferred to the new computer. Third, AMD Japan IT personnel purchased what they believed to be the best commercially-available data recovery software for the specific purpose of recovering Mr. Oji's lost files and ran it on Mr. Oji's laptop hard drive. Although some data was recovered (approximately 335 megabytes), the subject .psts were not. Finally, AMD Japan IT checked the file server but found no .pst files from the end of December 2006 (which would have been the date that such files possibly could have been temporarily copied to a file server when switching out Mr. Oji's old computer). In sum, despite these many efforts, IT personnel were unable to recover the inadvertently-deleted email files.

Intel adversely designated Mr. Oji on September 2007. AMD's counsel learned about Mr. Oji's inadvertent loss of data in November 2007. Given the fact and nature of the loss, AMD then immediately collected Mr. Oji's data from all of the sources on which he stored data as well as all back up or subsidiary sources that AMD identified as containing Mr. Oji's data.

First, consistent with its harvesting protocols, AMD obtained an image of Mr. Oji's laptop computer. AMD also obtained and extracted files from his personal external hard drive; obtained files from the personal network space assigned to Mr. Oji; and obtained files from Mr. Oji's home computer that were work-related.

Second, AMD obtained the 18 monthly back up tapes applicable to Mr. Oji covering the time period from October 2005 through March 2007. These back up tapes were made pursuant to AMD's back up tape protocols for this litigation. The applicable back up tapes were restored by an outside vendor, and the Exchange mailbox items related to Mr. Oji were extracted.

Richard Levy, Esq., March 19, 2008 - Page 3

Third, AMD conducted a search across its journaling system and vault repository for emails sent or received by Mr. Oji. This search captured emails sent or received by Mr. Oji for the AMD employees, some of whom were on those systems as early as November 2005.

Finally, AMD created a data repository of hard drive images of the laptop computers and, as applicable, the personal network space of the five supervisors whom Mr. Oji regularly copied on work-related email, Messrs. Nakamura, Uze, Matsumoto, Morishita and Yoshizawa. This material was searched for Mr. Oji's emails, which were exported for review.

On February 15, 2008, AMD produced 21,345 of Mr. Oji's files to Intel. Both the data collected from Mr. Oji's own computer and storage devices as well as the additional data referenced above contain a significant amount of Japanese language text. That material is currently under review for anticipated production by March 31, the date by which each side is to supplement productions with foreign language documents. AMD will make its best efforts to produce all of Mr. Oji's responsive data by that date, but it is possible that review and production of some portion of the recovered data will not be concluded by that time. Should that be the case, we will keep you apprised of our progress.

Given the significant document production on February 15, AMD continues to assess and monitor document preservation and possible data losses, and we assume Intel is doing so as well. AMD will make additional disclosures promptly, if any become necessary.

If you have questions, please feel free to contact me.

Sincerely,

David L. Herron
of O'MELVENY & MYERS LLP

LA3:1145562.1

# EXHIBIT P

# GIBSON, DUNN & CRUTCHER LLP

LAWYERS

A REGISTERED LIMITED LIABILITY PARTNERSHIP
INCLUDING PROFESSIONAL CORPORATIONS

333 South Grand Avenue  Los Angeles, California 90071-3197
(213) 229-7000
www.gibsondunn.com

RPlevy@gibsondunn.com

March 28, 2008

*Via E-Mail and U.S. Mail*

Direct Dial

(213) 229-7556
Fax No.

(213) 229-6556

Client No.

C 42376-00830

David L. Herron
O'Melveny & Myers LLP
400 South Hope Street
Los Angeles, CA 90071-2899

Re:    *AMD v. Intel:  AMD Document Production*

Dear David:

    This responds to your March 11, 2008 letter to me.  I will use the same numbering system you have, and add number 6 to address the three middle paragraphs on page 3 of your letter. This letter also addresses some initial questions about the information enclosed in your March 11 letter, as well as AMD's disclosure, on March 19, of the loss of data for its custodian Mr. Oji.

    1.    In Exhibit C to its remediation report, Intel provided AMD with initial and subsequent harvest dates for each of its own designated custodians, plus the 22 adverse party custodians AMD had then designated.  We also provided you, in Ex. F to the remediation report, the e-harvest dates of each of the more than 1000 Intel custodians.  We updated that information through August 31, 2007, in a letter of that date from Kay Kochenderfer to Bo Pearl.

    In contrast, it appears that AMD (in November 2006) provided Intel only with initial harvest dates, and only for its own party-designated custodians (and not the larger list of 470 AMD custodians, nor for the adverse and free throw designees).  AMD should provide Intel with a list of all initial and subsequent electronic document harvest dates for each of the AMD custodians (all 470 of them).  We enclose Intel's updated information regarding electronic harvest dates since August 31, 2007 and through December 31, 2007.  (Attachment 1)

    We are asking for this information for reasons beyond the fact that Intel and AMD should be on equal footing.  First, having harvest data will assist Intel in making additional adverse and free throw designations.  Second, based on some of the information you have provided, we have noticed what appear to be irregularities in AMD's retention efforts (a fact acknowledged by the

LOS ANGELES   NEW YORK   WASHINGTON, D.C.   SAN FRANCISCO   PALO ALTO
LONDON   PARIS   MUNICH   BRUSSELS   ORANGE COUNTY   CENTURY CITY   DALLAS   DENVER

# GIBSON, DUNN & CRUTCHER LLP

David L. Herron
March 28, 2008
Page 2

recent disclosure about Mr. Oji's lost data), and the additional information will help us analyze those issues more carefully and determine what course to take.

      2.     We will provide you a list of the dates each Intel custodian was moved to journaling (or for those who terminated before they moved, an indication to that effect). It will take us some time to provide you a precise list, though, because the Intel employee most knowledgeable on that subject is on vacation.

      3.     We are not surprised that a case of this magnitude would create significant data retention and preservation challenges. However, given AMD's repeated representations to the Court and to us, we were surprised to learn of issues with Mr. Oji, which issues your March 19 cover letter indicates that AMD IT has known about since March 2007, and AMD's counsel has known about since November 2007.

      In order to understand and begin to address this issue more completely, we would like more precise information about exactly how and when AMD's counsel became aware of this issue. Was it before or after the November 27, 2007 letter in which you repeated your assertions that there were no identified lapses, and said "[i]f AMD learns information . . . that require[s] modification to these representations [that there have been no lapses] please be assured that AMD will so notify Intel"? In addition, the delay in notifying Intel is especially surprising in light of the fact that Intel has been specifically inquiring of AMD about the dearth of Toshiba-related documents since January, and yet we have received no response, even though we now are told that AMD had discovered this issue (with a Toshiba-related custodian) months earlier.

      The identification of this problem and the length of time it took AMD to discover and, ultimately, disclose it, notwithstanding prior representations, leads us to request that we get additional information and assurances from AMD similar or identical to those which AMD sought and received from Intel.

      First, as you have asked Intel, we would like to know how it took this problem so long to be reported to AMD's counsel. In that connection, we would like AMD to locate and produce to Intel all documents that relate to the discovery and attempted remediation of Mr. Oji's problems (subject to the same non-waiver agreements the parties have reached for Intel's documents).

      Second, it appears that Mr. Oji routinely backed up his files to an external drive, then deleted the originals (but in this instance, mistakenly deleted the originals first). Is that correct? If so, was Mr. Oji's practice (or the same practice by other custodians) known to AMD, or its IT Department, or its counsel, and was it authorized? Were employees given instructions or training on how to do this and what files to copy? If so, please explain or produce pertinent documents.

GIBSON, DUNN & CRUTCHER LLP

David L. Herron
March 28, 2008
Page 3

Third, Intel would like to know the basis for the decision to place Mr. Oji on journaling on April 9, 2007, and whether it was prompted by AMD IT's discovery of the .pst deletion two weeks earlier. If not, what led AMD to place Mr. Oji (and a number of other custodians) on journaling for the first time in April 2007, and not earlier? And, why were the documents of many of those custodians not harvested earlier?

Fourth, we would like AMD to restore the backup tapes for each of Mr. Oji's frequent correspondents among the AMD custodians (listed in your letter), and produce his correspondence from those backups, as well as from the journaling of those custodians (to the extent not already done). This is, of course, what Intel has done for over 300 of its custodians. It appears in this instance that production from those custodians' journaling will not do, since the information you have provided suggests none was on journaling until at least mid--2006, and some never were.

Fifth, we would like assurances that AMD has spoken with each of its 470 custodians (not just the party-designated custodians) to determine whether they have any document retention or data preservation issues, and a description of any other efforts AMD has made to ensure that its custodians have complied with the litigation holds communicated to them.

And sixth, given what increasingly appears to have been careful wording in prior correspondence, we would like AMD's unequivocal assurance that it has informed us of any actual or possible responsive data loss—relevant or not, by any means whatsoever, intentional or inadvertent, of data lost during any timeframe, whether or not subsequently remedied in whole or part—with respect to any of its 470 custodians, or potentially responsive corporate data. That assurance should be given both now (if it is accurate), and again after AMD has undertaken the inquiries mentioned in the previous paragraph.

4.    We have a substantial number of questions about your written description of backup tape retention protocols. At a minimum, we would like you to tell us whether you have confirmed (by physical inspection) that you have monthly Exchange tapes for each AMD custodian from March 2005 to the present (with the exception of people who started at AMD after March 2005 or have since left). As you know, Intel has already provided you such information. Related to this, we would appreciate either an informal interview or supplement to your narrative response, which will respond to our earlier discovery (e.g. Request for Production No. 9) describing the relevant AMD IT infrastructure.

We also would like details on what is captured on each monthly backup tape. Is it a copy of whatever happened to be on the server at the point in time the backup was made? For Exchange servers, what folders and types of items are included in the backup, and what is not? For example, is each custodian's entire current inbox backed up and stored on the monthly backup tapes each month? Deleted items? Sent items? All personal folders? All public folders? Are .pst files located on the Exchange servers, and are they included on the monthly

**GIBSON, DUNN & CRUTCHER LLP**

David L. Herron
March 28, 2008
Page 4

backups?  You have received this information from Intel already either via written
representations or deposition testimony.

       5.      We have already provided you with all of Intel's IT litigation hold notices with the
exception of a single one, which is enclosed.  (Attachment 2)  Please provide AMD's.  We would
also appreciate the identification of the individuals (AMD IT or otherwise) who are responsible
for design and implementation of AMD's document retention plan.

       6.      We have produced to AMD every hold notice given to every Intel custodian
through July 2007.  In contrast, AMD has produced "exemplars" and said the remainder are
similar.  The hold notices that Intel provided AMD, in addition to being a complete set rather
than exemplars, with a single exception, have the list of Intel addressees intact, whereas AMD's
do not contain address information.  (The lone exception is 69412DOC0006583, which was sent
to the list of custodians on the enclosed list [Attachment 3] at the date and time indicated on the
email we produced some time ago.)  The consequence is that AMD has the exact date, time,
recipient and content of each such notice through July 2007, but Intel has nothing but AMD's
representation that each of AMD's custodians received some form of hold notice at some point.
Thus, we believe you are mistaken when you suggest that we are asking AMD for something
Intel has not already produced.  We suggest resolving the discrepancy in one of two ways—
either you can give us every hold notice, complete with date, time and recipient (as we have
done), or you can give us an exemplar of every one that was sent and a chart identifying which
custodian got which one and when.

       You also mentioned in August 2007 that you were aware of two AMD-designated
custodians who did not get litigation holds until September 2006.  Presumably, we will be able to
figure out who those custodians were when you provide this information, and confirm that all
others did receive such notice.  But perhaps you can provide us the names of the two you have
discovered and confirm that you are unaware of any custodians (not just party-designated
custodians) who received notice for the first time after March 20, 2005.

       Finally, we have asked AMD in formal and informal discovery about its own auto-delete
policies.  Your April 23, 2007, letter is unclear to us about whether AMD has any such policies
in its current or past Exchange environment, and if so, whether it disabled them on a system-
wide basis or asked individual employees to do so.  When we interviewed Mr. Meeker, he said
he was not very familiar with auto-delete, but said his understanding was that AMD had an auto-
delete function in its Exchange environment and that AMD users could activate auto-delete on an
individual basis.  Assuming that to be the case, please confirm that fact in writing, let us know
which of the AMD custodians, if any, used the auto-delete function at any time since
March 2005, and describe how AMD determined which users used that feature.  We would
appreciate clarification regarding what efforts were made to inform AMD custodians of the auto-
delete system and whether and how to disable it.  We would also appreciate information about

GIBSON, DUNN & CRUTCHER LLP

David L. Herron
March 28, 2008
Page 5

whether auto-delete could have been disabled at a system level, rather than requiring individual users to do so.

We recognize that we have included a number of questions in this letter that you can respond to directly, and others that might require resort to AMD witnesses or other personnel. These questions were encompassed in the formal discovery we sent last fall, or are caused by AMD's recent disclosures. We would prefer to get the readily available information as soon as you can provide it rather than waiting until the end for a complete response. Let's schedule a call in the next few days to discuss any clarifications you may need to our questions, and to work out a schedule by which you will agree to either provide us responses to our inquiries or tell us you will not do so.

Thanks for your consideration of these matters.

Yours very truly,

Richard P. Levy

cc:    Robert E. Cooper
       Kay E. Kochenderfer