# EXHIBIT 1

# GIBSON, DUNN & CRUTCHER LLP

### LAWYERS

A REGISTERED LIMITED LIABILITY PARTNERSHIP
INCLUDING PROFESSIONAL CORPORATIONS

333 South Grand Avenue  Los Angeles, California 90071-3197
(213) 229-7000
www.gibsondunn.com

RCooper@gibsondunn.com

April 11, 2007

Direct Dial
(213) 229-7179

Fax No.
(213) 229-6179

Client No.
T 42376-00764

David L. Herron
Jeffrey J. Fowler
O'Melveny & Myers LLP
400 South Hope Street
Los Angeles, CA 90071-2899

Re:     *AMD v. Intel - eDiscovery Issues*

Gentlemen:

In the last several weeks, Intel has shared with AMD detailed information with regard to the steps it designed to retain all documents, including emails, relevant to this litigation, the implementation of those steps, and some lapses that Intel has discovered with regard to that implementation. We are now engaged in a Court supervised accounting of those lapses and the creation of a remediation plan to deal with them. It is thus reasonable and timely for Intel to ask AMD for certain updated information with regard to its document retention activities so that Intel will be in a position, as the parties go forward in discovery, to understand whether there might be any lapses in AMD's document retention. We assume the information Intel is seeking should not be burdensome since we are merely seeking to update and confirm representations that AMD has made to Intel about its retention practices.

We do not mean to suggest that AMD has not undertaken its preservation obligations. The spirit of the Amended Federal Rules, however, contemplate that the parties will continue to keep each other apprised on the status of preservation, especially in case of this complexity and length.

## A.     Document Retention In General.

Is AMD aware of the loss of any documents potentially relevant to this litigation, and/or any non-compliance with all hold instructions issued to AMD employees, either as a result of human conduct, the operation of a computing system, or otherwise? If so, please provide a full

# GIBSON, DUNN & CRUTCHER LLP

David L. Herron
Jeffrey J. Fowler
April 11, 2007
Page 2

description of the loss or non-compliance, including: (i) the custodian(s) involved; (ii) the nature of the loss or non-compliance; (iii) when AMD first discovered the loss or non-compliance; and (iv) all remedial steps undertaken by AMD to address the loss or non-compliance.

Whether or not AMD is aware of any loss or non-compliance, has AMD made any efforts to determine whether any loss or non-compliance has occurred? Please describe AMD's efforts in detail.

### B.    Enterprise Level Preservation.

**"March 11, 2005, AMD sent preservation letters to its IT personnel in its various offices. The oldest full backup of the Exchange servers and Windows environment, network servers were located and preserved."**

Please describe, in detail, why AMD chose March 11, 2005, to send these letters. Please also confirm that the oldest full backup of the Exchange and Windows, network servers are being preserved. In this regard, we would appreciate a list of the location of the Exchange servers and the individual custodians subject to the legal hold that is on those servers. With respect to the windows environment and network shared files servers, we would appreciate a list of those servers, a general description of their content and the date upon which the backup was created.

**"Beginning March 19, 2005, full backups were made and retained. Over the next several weeks the backup schedules were coordinated; going forward, full backups are taken and retained every month." (10/24/05 AMD Letter at 1)**

Please confirm, as represented, that full backups were being made and retained beginning on March 19, 2005, and on a monthly basis thereafter. In particular, confirm the location and storage of the backups, including whether the backups have or are being indexed. In this regard, are there any servers that were initially part of the March 19, 2005 backups that have been taken off the monthly backup process or added to the monthly backup process? In addition, is there a person or group of people responsible for this backup process at AMD? If so, please identify that individual(s).

**"The monthly full backups are retained in secure locations. Most of these sites send their tapes to Austin, although a few offices retain their backups locally. Compliance is tracked and monitored on a weekly basis." (10/24/05 AMD Letter at 1)**

## GIBSON, DUNN & CRUTCHER LLP

David L. Herron
Jeffrey J. Fowler
April 11, 2007
Page 3

Have each of these backups been retained?  With respect to these backup tapes, are any of these tapes lost or missing or not readable?  In addition, has AMD attempted or restored any of these backup tapes and, if so, for what purpose?

> **"AMD's document retention and destruction policies were suspended to prevent inadvertent description of documents that may be relevant to this lawsuit." (10/24/05 AMD letter at 1-2)**

It is unclear what you mean by the policies were "suspended."  Was this suspension limited to categories of potentially relevant records to this litigation or to all records.  And was the suspension ever lifted for any custodian or corporate groups?  Please confirm that each of the custodians subject to the legal hold has, in fact, complied with this suspension directive?  Please state whether AMD's computer system has an auto-delete process

### C.    Custodian Level Presentation And Legal Holds.

> **"On April 1, 2005, AMD issued its first wave of document preservation notices to approximately 150 custodians likely to have relevant information.  The custodians were instructed to preserve all documents and data relevant to the lawsuit.  This includes, of course, e-mail." (10/24/05 AMD Letter at 2)**

> **"As additional custodians are identified, preservation notices are sent to them and they are put on the litigation hold.  To date, the list of custodians includes approximately 440 people.  Appropriate follow-up is conducted as needed to ensure custodian understanding and continued compliance with that hold." (10/24/05 AMD Letter at 2)**

> **"The current count of custodians to whom a litigation hold has been issued is roughly 440.  AMD continues to assess the propriety of maintaining that hold with respect to all of these employees, some of whom AMD does not believe have any relevant information or involvement with any issue relevant to this lawsuit.  Accordingly AMD currently is in the process of reviewing its hold list and is considering paring that list, as appropriate." (10/24/05 AMD Letter at 3)**

Please provide a list of the 440 custodians originally issued a legal hold, and the date they were issued the legal hold.  To the extent any custodians were added, please identify them by

## GIBSON, DUNN & CRUTCHER LLP

David L. Herron
Jeffrey J. Fowler
April 11, 2007
Page 4

name, job title and office location, and indicate the day they were issued legal hold notices. If AMD has identified and removed from hold custodians that "it does not believe has any relevant information or involvement with any issues relevant to this lawsuit," please identify those custodians, the date they were removed from hold and the rationale as to why they were removed?

For each witness identified on AMD's Rule 26 disclosure, provide the date on which they were provided a legal hold notice, the date on which they were placed on journaling, and whether their emails are preserved on any monthly backup tapes. Please also identify each witness on AMD's Rule 26 disclosure who, at the time of the disclosure, had not been provided a legal hold notice, and an explanation of why they had not been provided a notice.

AMD has previously suggested that the parties exchange the content of their legal hold orders, and that the production of these orders will not constitute a waiver of any privilege, including a subject matter waiver. We accept this proposal. Please provide a copy of the legal hold order sent to AMD custodians (and any differing versions) and Intel will do the same.

> **"When a custodian is terminated during the pendency of the litigation hold, AMD harvests that custodian's potentially relevant data and documents. AMD either retains or makes a forensic copy of that custodian's hard drive; segregates and preserves data and documents on Exchange and Windows-environment, shared network servers; and paper documents and other physical storage media are collected as appropriate." (10/24/05 AMD Letter at 3).**

Please identify any custodian that was originally subject to the legal hold notice, but was terminated. As to those employees, please confirm that AMD has undertaken the preservation obligations described above. With respect to AMD's efforts, what is meant by a forensic copy (e.g., bit-by-bit). Please identify any terminated employee, whose data has been lost.

### D.    E-mail Preservation

> **"AMD also is in the process of moving its custodians subject to the hold notice to a new Exchange server on which e-mail can be more easily stored." (10/24/05 AMD Letter at 1).**

We remain confused regarding the steps that AMD has undertaken to preserve the potentially relevant e-mails in this action. In the course of our preservation discussions in the summer of 2005, AMD represented that it was relying upon the individual custodians to preserve the relevant e-mails by the issuance of the written legal hold notice. You further indicated, and

# GIBSON, DUNN & CRUTCHER LLP

David L. Herron
Jeffrey J. Fowler
April 11, 2007
Page 5

confirmed in writing, that "AMD was in the process of moving custodians to a new Exchange server on which e-mail could be more easily stored" and, presumably, backed up per the representations described in your October 2005 letter.

In the meeting in Los Angeles in February 2007, AMD indicated that it had implemented a "journaling system" to preserve potentially relevant e-mails. It is unclear what AMD means by a "journaling system." Are you merely describing using MS Exchange Journaling of all sent and received e-mails that are then written off to backup tapes or has AMD implemented an archive solution where the e-mail is written off to some type of a storage area network drive? We would appreciate a full description of what AMD has implemented, including its configuration, when it was implemented when specific custodians subject to the legal hold in this matter where added to the system and whether AMD has experienced an issues or problems with this system.

## E.    Harvesting of Drives

Please identify the dates upon which each custodian's drive was harvested or reharvested. With respect to those drives, please identify any drive that AMD has been unable to harvest for any reason.

## F.    One-Time Backup

**"AMD is extracting monthly full backups of its Exchange and Windows-environment, shared network servers. Roughly 200 tapes are collected in these backups." (10124/05 AMD Letter at 2).**

**"The oldest, full backup in existence as of March 11, 2005, was preserved and full backups were to be taken on and in the few weeks immediately after March 19, 2005. The exact date varied by a week or two depending on the sites' backup schedules. Since about May 2005, backup schedules were (and arc now) coordinated worldwide." (10/24/05 AMD Letter at 2).**

We are concerned about the low number of tapes taken as part of this "one-time backup." Your letter suggests that for each server, there should be two tapes: (i) the oldest full backup in rotation at that time; and (ii) a new backup taken on or about March 19, 2005. Accordingly, this would mean that only 100 potential servers were backed-up.

It would also be helpful if AMD could identify the specific severs that were backed up and the general purpose of that server (e-g., Exchange, NT shared drive). With respect to these tapes, please confirm that they have been preserved as indicated in your October 2005 letter. In

# GIBSON, DUNN & CRUTCHER LLP

David L. Herron
Jeffrey J. Fowler
April 11, 2007
Page 6

addition, are any of these tapes lost or missing or not readable? In addition, has AMD attempted to restore or restored any of these backup tapes and, if so, for what purpose?

On a separate matter, your October 2005 letter indicates that the "oldest, full backup in existence as of March 11, 2005, was preserved. This would obviously mean that AMD was contemplating litigation as early as March 11, 2005. However, we are concerned that the first legal hold notices to custodians were not issued until April 1, 2005. (10/24/05 AMD Letter at 2). Accordingly, we would like to know when AMD first contemplated litigation, who was involved in the decision to file the instant action, when that decision was made, the specific dates of any communications or meetings in which the topic of potential litigation was discussed, when did the issue of preservation of potentially relevant records first arise, whether there was any discussion about the timing of the issuance of the legal hold records and who was involved in such discussions? To the extent you are asserting privilege around these communications, we would anticipate that you will provide us with log from which we can evaluate the claim of privilege.

Finally, to the extent AMD has information about any other issues relating to the preservation of its documents, please provide us with a full report. We look forward to hearing from you on the above issues. Of course, we will be happy to discuss our requests with you and respond to any questions you may have.

Very truly yours,

Robert E. Cooper

KEK:REC/lsj

100203202_1.DOC

# EXHIBIT 2

# O

## O'MELVENY & MYERS LLP

BEIJING
BRUSSELS
CENTURY CITY
HONG KONG
LONDON
NEWPORT BEACH

400 South Hope Street
Los Angeles, California 90071-2899

TELEPHONE (213) 430-6000
FACSIMILE (213) 430-6407
www.omm.com

NEW YORK
SAN FRANCISCO
SHANGHAI
SILICON VALLEY
TOKYO
WASHINGTON, D.C.

April 23, 2007

OUR FILE NUMBER
008346-163

**VIA E-MAIL & U.S. MAIL**

WRITER'S DIRECT DIAL
(213) 430-6230

Robert E. Cooper
Gibson, Dunn & Crutcher LLP
333 South Grand Avenue
Los Angeles, California 90071

WRITER'S E-MAIL ADDRESS
dherron@omm.com

Re:    ***AMD v. Intel: eDiscovery Issues***

Dear Bob:

This will respond to your April 11 letter.

Your letter begins by noting that, as a result of "some lapses that Intel has discovered" with respect to its document preservation efforts, Intel recently shared with AMD certain information about "the steps it designed to retain" documents relevant to this litigation. As your letter itself states, however, Intel has provided that information about its preservation program solely as part of the "court supervised accounting" of its document retention lapses. While acknowledging that you "do not mean to suggest" that AMD has experienced any similar lapses, your letter nevertheless proceeds to ask AMD to provide very detailed information similar to -- and in many instances far exceeding -- what Intel is providing as part of its Court-ordered accounting.

We question whether, in the absence of any evidence whatsoever of any systematic failure to preserve documents on AMD's part, Intel is entitled to conduct the searching inquiry your letter seems to contemplate. Indeed, the timing and scope of your letter might lead a cynic to conclude that Intel is trying to distract attention from its own evidence preservation lapses by attempting to "gin up" problems on AMD's side, while at the same time diverting AMD from the real task at hand -- analyzing and preparing a response to Intel's imminent disclosures and remediation plans. Nevertheless, because we agree that the "spirit" of the Amended Federal Rules supports transparency and disclosure, we will provide appropriate information concerning AMD's document preservation activities.

Your letter poses a series of detailed questions about numerous aspects of AMD's retention program. In order to respond appropriately, we have commenced a thorough follow-up review of AMD's preservation program to date, on a custodian by custodian basis, to ensure that

O'MELVENY & MYERS LLP
Robert E. Cooper, April 23, 2007 - Page 2

its preservation processes are working as previously described to you, and as intended. When our review is complete, we will provide an appropriate report to Intel, and we believe that that report will address many of the areas about which your letter inquires. For now, as we work to gather the type of detailed information necessary to our analysis, we wanted to respond to three of the questions (or, more accurately, series of questions) posed in your letter.

First, you asked whether AMD is aware of any loss of documents relevant to this litigation or any non-compliance with any instructions to retain documents. We can represent that AMD's overall preservation program appears to be working as intended and that, at this time, we are aware of no systemic failure in the execution of that preservation plan, much less a systemic destruction of evidence in any sense comparable to what Intel has disclosed to date. We are able to make this representation mainly because AMD's multi-layered preservation plan was designed to ensure that evidence would be preserved even if one aspect of the plan failed. Because of that multi-layered preservation plan, we do not expect to find any systemic data loss issues. However, should we learn of any such issues in the course of our review, we will so advise you in our follow-up letter.

Second, your letter poses a series of questions about AMD's "enterprise level" retention efforts, focusing on email retention and backup tapes. Because AMD, unlike Intel, did not employ a routine program of automatic email deletion, AMD does not face the same move-it-or-lose-it data loss issues currently facing Intel. In short, AMD's email communications were being systematically preserved at the same time Intel's were being systematically destroyed. AMD continues to make monthly backups of all Exchange Servers and to preserve those backup tapes as a fail-safe measure. Even those backup tapes are not the only fail-safe for deleted emails, however, because, beginning in November 2005, AMD activated an email journaling system that is used to ensure that even email deleted by a journaled custodian nevertheless would be preserved. AMD also obtained and implemented the use of the Enterprise Vault.

Third, your letter asks about AMD's document preservation or "hold" notices. As we have previously advised, beginning in April 2005, AMD began distributing preservation notices to employees it believed might possess documents relevant to contemplated litigation. In an abundance of caution, AMD instructed over 800 employees to preserve documents that relate to the x86 microprocessor business. AMD also directed suspension of its ordinary document retention and destruction policies to ensure that relevant evidence was not being systematically destroyed pursuant to a pre-existing policy.

As noted, we currently are undertaking a thorough review of AMD's preservation program. We will appreciate Intel's patience while we conduct this review. Although it took Intel nearly six months to investigate, analyze, disclose, and propose a fix for its massive data loss, we will endeavor to complete our review with significantly greater dispatch.

O'MELVENY & MYERS LLP
Robert E. Cooper, April 23, 2007 - Page 3

Please feel free to call if you have any questions.

Sincerely,

David L. Herron
of O'MELVENY & MYERS LLP

DLH:ad

LA2:829501.3

# EXHIBIT 3

O

## O'MELVENY & MYERS LLP

BEIJING
BRUSSELS
CENTURY CITY
HONG KONG
LONDON
NEWPORT BEACH

400 South Hope Street
Los Angeles, California 90071-2899

TELEPHONE (213) 430-6000
FACSIMILE (213) 430-6407
www.omm.com

NEW YORK
SAN FRANCISCO
SHANGHAI
SILICON VALLEY
TOKYO
WASHINGTON, D.C.

OUR FILE NUMBER
8,346-163

WRITER'S DIRECT DIAL
(213) 430-6340

WRITER'S E-MAIL ADDRESS
msamuels@omm.com

August 10, 2007

### VIA E-MAIL AND U.S. MAIL

Robert E. Cooper, Esq.
Gibson Dunn & Crutcher LLP
333 South Grand Avenue
Los Angeles, California 90071-3197

       Re:   *AMD v. Intel*

Dear Bob:

     This is to follow up on David Herron's letter to you of April 23, 2007. It also addresses the portion of your August 1, 2007 letter to Chuck Diamond in which you suggest that there may be lapses in AMD's own document preservation effort.

     We have now completed a review of AMD's preservation program with respect to each of the 108 AMD party-designated production custodians. We are pleased to report that our preservation program appears to be operating as designed and intended; no lapses in that program have been identified.

     During our review, we identified a small number of custodians (including Messrs. Ruiz and Colandro) whose initial productions did not include all available .pst files. In some cases, this was because the files were corrupted and required repair. In others, some .pst's were apparently not located during the initial harvest of the custodian's data. In any event, these files are now being processed and reviewed for production, and the supplemental productions should be in your hands shortly. There are also responsive materials that are still in privilege review, and to the extent ultimately determined to be nonprivileged, they will be released to you in due course. I understand that some such materials were released earlier this week together with the privilege log for Mr. Rivet, and that Mr. Ruiz's privilege log is not due until mid-September. Finally, let me say that while we cannot verify the so-called "discrepancies" you cite in your letter, and putting aside the fact that the supplemental productions are still in process, it is hardly surprising that different reviewers looking at multiple copies of the same email might reach different conclusions as to responsiveness. We are sure the same phenomenon pervades the Intel production. This does not in any respect suggest a breakdown in AMD's document preservation, and as noted above, we are currently aware of none.

O'MELVENY & MYERS LLP

Robert E. Cooper, Esq., August 10, 2007 - Page 2

Let me also add that we have found two instances in which party-designated custodians do not appear to have received formal written preservation instructions until September 2006; in both instances, it is clear that the custodians were nonetheless aware of their preservation obligations, and understood and complied with them.

We have previously agreed to provide you with exemplar preservation notices on a "no waiver" basis. We stand ready to do so once we have received Intel's, which were to have been provided to us long ago under the July 10 Remediation Discovery Order.

A review of the 71 adverse party designated production custodians is under way, and we will advise you when it has been completed, as well as any issues identified.

Should you have any questions, please do not hesitate to call.

Very truly yours,

Mark A. Samuels
of O'MELVENY & MYERS LLP

LA2:838030.3

# EXHIBIT 4

O

---

## O'MELVENY & MYERS LLP

BEIJING
BRUSSELS
HONG KONG
LONDON
LOS ANGELES
NEWPORT BEACH

1999 Avenue of the Stars
Los Angeles, California 90067-6035

TELEPHONE (310) 553-6700
FACSIMILE (310) 246-6779
www.omm.com

NEW YORK
SAN FRANCISCO
SHANGHAI
SILICON VALLEY
TOKYO
WASHINGTON, D.C.

OUR FILE NUMBER
8,346-163

WRITER'S DIRECT DIAL
(310) 246-6789

WRITER'S E-MAIL ADDRESS
ediamond@omm.com

August 23, 2007

**VIA E-MAIL AND U.S. MAIL**

Robert E. Cooper, Esq.
Gibson Dunn & Crutcher LLP
333 South Grand Avenue
Los Angeles, California 90071-3197

Re:    *AMD v. Intel*

Dear Bob:

I am in receipt of your August 22 letter and Rule 30(b)(6) deposition notice concerning AMD's document preservation efforts.

As you might imagine, we were surprised and disappointed to receive a deposition notice served without prior discussion, especially one as facially improper as this one. The notice appears to us to be just the latest in a string of Intel tactics calculated to divert attention from Intel's self-confessed document preservation failings, and, perhaps, to fend off the court-ordered discovery we will imminently be commencing into Intel's culpability for them.

In any event, we request a "meet and confer" regarding the propriety and scope of this deposition notice. Please let me know if you are available on Monday or Tuesday in our downtown office. In advance of the meeting, we would like to see the legal authority upon which you claim an entitlement to conduct discovery of this kind so that we can consider it in deciding whether to seek a protective order.

In Mark Samuels' August 10 letter to you, a copy of which is attached, we advised that we had completed a review of AMD's document preservation program with respect to each of our 108 party-designated custodians, and determined that the program is operating as designed and intended and that no lapses have been identified. In your August 1 letter to me, you asserted that Mr. Ruiz "retained only a fraction of his sent emails as evidenced by the number of his emails found in other mailboxes during the same time period." You made similar assertions regarding Messrs. Calandro and Rivet. While you did not cite us to even a single email so as to enable us to investigate these charges, Mr. Samuels' letter explained that any such conclusion would be premature until production for these custodians was complete. He also pointed out that it would not be surprising to find that reviewers looking at the same document in the files of

O'MELVENY & MYERS LLP

Robert E. Cooper, Esq., August 23, 2007 - Page 2

multiple custodians might come to different judgments as to responsiveness, and that such circumstance in no way suggested a document preservation issue.

Rather than acknowledge or respond to either of these points, your August 22 letter again vaguely alludes to "problems with AMD's production." Once again, you cite to no particular documents but refer instead to unspecified "similar problems with numerous other AMD Custodians." You then identify three of them - Messrs. Donnelly, Williams and Wright.

We are more than happy to investigate any such supposed "problems" if you will be specific and complete as to what you perceive them to be. To that end, we ask that at the "meet and confer" you identify <u>all</u> AMD Custodians you are concerned about, and cite us to the specific documents that are giving rise to concern on Intel's part. That will permit us to investigate.

Once Intel's production is complete, we will conduct our own investigation into Intel's production for anomalies of the same kind, and trust that we can count on you to do what we have offered to do: investigate and report back to you.

Please let me know if you are available on Monday or Tuesday.

Very truly yours,

Charles P. Diamond
of O'MELVENY & MYERS LLP

CC1:769586.1

# EXHIBIT 5



# O'MELVENY & MYERS LLP

BEIJING

BRUSSELS

CENTURY CITY

HONG KONG

LONDON

NEWPORT BEACH

400 South Hope Street
Los Angeles, California 90071-2899

TELEPHONE (213) 430-6000
FACSIMILE (213) 430-6407
www.omm.com

NEW YORK

SAN FRANCISCO

SHANGHAI

SILICON VALLEY

TOKYO

WASHINGTON, D.C.

OUR FILE NUMBER
008,346-163

WRITER'S DIRECT DIAL
(213) 430-6230

WRITER'S E-MAIL ADDRESS
dherron@omm.com

November 27, 2007

**VIA E-MAIL AND U.S. MAIL**

Richard Levy, Esq.
Gibson Dunn & Crutcher
333 South Grand Avenue
Los Angeles, California 90071

    Re:  *AMD v. Intel*

Dear Rich:

   On November 16, 2007, we delivered to you a written summary of AMD's document collection protocols. This letter responds to the remainder of the issues raised in your November 7 letter concerning AMD document preservation.

   Your letter raises seven items, which we address mostly in the order that you did. First, you raise AMD's email journaling system, stating that Intel is interested "simply in learning how the system worked both from an AMD user's perspective and from AMD's IT perspective." As you know, on September 28, 2007, we did make AMD's Jerry Meeker available to you for an informal interview on the subject of AMD's email journaling system. We did not artificially limit the length of that interview, and it appears that the general topics you now raise were discussed then and could have been discussed even more fully, had you desired to do so.

   We are nevertheless amenable to providing further relevant information if you need it. We cannot tell from your letter whether Mr. Meeker ought to be produced a second time, whether someone else would be better able to answer your questions, whether a written summary would suffice or, indeed, precisely what information you seek beyond that already disclosed. Let's please discuss this in person or, if you prefer, please detail your further inquiries in writing. We can then agree on the means and scope of a further exchange, as necessary. We believe that a written summary would be sufficient.

   The second issue you raise is the written summary of AMD's document collection protocols, which has since been provided.

   Third, you raise AMD's litigation hold notices and at least three questions related to them. You also ask for our suggestion on how best to proceed to answer these questions, which

Richard Levy, Esq., November 27, 2007 - Page 2

include: (1) whether AMD delivered to its custodians more litigation hold notices than the three AMD already has produced to Intel; (2) which of the notices we've provided was delivered to AMD's IT personnel (i.e., the hold notice dated March 11, 2005); and (3) the approximate distribution dates of the various litigation hold notices that AMD has produced to Intel.

Let me answer your questions in part now and suggest a further, mutual production of litigation hold notices. The litigation hold notices that AMD produced are exemplars of the principal notices delivered by AMD to its custodians in this case, and all of the material terms set forth in these notices are replicated in other versions sent by AMD from time-to-time. Any differences between the notices produced and others sent at various times are slight and non-material (e.g., changing the renamed CPG group to MSS, and changing "[i]n light of the scope of information it appears Intel may seek in discovery, we are expanding our ongoing efforts to preserve documents . . . ." to "[a] critical part of the discovery process requires that we take all reasonable steps to preserve documents . . . ."). These custodian-directed exemplars of litigation hold notices are what we believe the parties agreed to exchange, and are similar to what we appear to have received from Intel as attachments to a letter from Kay Kochenderfer. AMD has not yet produced the litigation hold notice dated March 11, 2005, that was directed to AMD IT personnel, as we did not understand this to be part of the agreed-upon exchange.

Nor, apparently, have we received IT-related litigation notices from Intel. Indeed, other than those notices attached to Kay's letter, thorough searches through the documents Intel has produced in remediation and culpability discovery have not uncovered any litigation hold notices delivered by Intel to its IT personnel (as referenced by Intel in its various filings with the Court concerning its evidence preservation issues). For instance, while we have found emails sent among Intel IT personnel, we have not located any litigation hold notice directed by Intel (or its in-house counsel) to IT personnel with respect to Intel's "complaint freeze" effort that Intel said it undertook in June and July 2005, or any litigation hold notice issued by Intel to its IT personnel at the time of the discovery of Intel's evidence preservation issues in October 2006.

While AMD is not opposed to producing its March 11, 2005 notice, subject again to an agreement that by doing so no privilege will be deemed waived, we would like the exchange to be mutual. If Intel already has produced the litigation hold notices it delivered to its IT personnel, we would appreciate your identifying those documents by bates number. If Intel has not produced those documents, let's please set a date for mutual exchange.

Finally on litigation hold notices, AMD is prepared to reproduce the litigation hold notices already produced, this time with their dates evident. This ought to answer many or all of the questions your letter poses. If there are additional questions about litigation hold notices that need to be answered after this production, they can be answered promptly.

Fourth, your letter (items 4, 5 and 7) inquires about document retention failures by AMD custodians, including non-compliance with litigation hold notices. As we have previously advised, AMD has already conducted a review of AMD's preservation program with respect to its 108 AMD party-designated production custodians. While your letter mentions use of the word "systemic" in prior correspondence, Mark Samuels' August 10, 2007 letter reporting on the

Richard Levy, Esq., November 27, 2007 - Page 3

results of that review did not use that term but, instead, provided Intel with AMD's "report that our preservation program appears to be operating as designed and intended; no lapses in that program have been identified." That same letter discussed the further production of .psts for certain custodians, and identified two instances in which litigation notices were sent out in September 2006. If AMD learns information with respect to these (or any other) AMD production custodians or as to AMD's preservation program more generally that require modification of these representations, please be assured that AMD will so notify Intel.

At present, however, AMD reiterates the representations regarding its preservation program made in Mr. Samuels' prior letter. AMD also acknowledges its duties to monitor compliance with litigation hold notices and to report instances where AMD has identified losses of relevant data that require disclosure. We also believe that disclosures in response to item 6 in your letter (as discussed below) will provide Intel with responsive information. In addition, and as you know, AMD (like Intel) is in the process of harvesting, reviewing and producing documents from adversely-designated custodians. In that process, AMD remains mindful of the disclosure obligations imposed as outlined above and will adhere to them.

Finally, your letter's item 6 asks for a large variety of information, some of which AMD already has produced in part. We agree with your suggestion that information responsive to the topics raised in item 6 are best supplied in written summaries, and are prepared to assemble and produce to Intel the following:

  *     The date on which AMD's custodian's documents were harvested in the litigation. As you know, AMD already has produced these dates for the AMD party-designated production custodians. AMD is in the midst of "reharvesting" these custodians' data through the June 1, 2006 cutoff date agreed to by the parties, and is in the process of harvesting, reviewing and producing data of the AMD custodians recently designated adversely by Intel. We can supply an interim update to the prior harvest date list supplied already, but think that it may be more efficient to pick a later date for exchange of this information -- with both Intel and AMD updating and producing this harvesting information -- after all such harvesting has been completed. Late December or early January seem like appropriate times for this exchange.

  *     The date on which AMD's custodians were put on the email journaling system.

  *     Identification of known losses of relevant data from an AMD custodian's harddrive due to file corruption, lost laptop or other, similar means of loss.

  *     The months for which AMD custodian data has been preserved on monthly backup tapes and "complaint freeze tapes." This is best described, we believe, by way of written summary, perhaps to be accompanied with a spreadsheet of relevant data.

AMD already is in the process of preparing this information for disclosure. We suggest disclosing this information to Intel on a rolling basis as it is assembled. We should be able to begin production in the next few weeks.

Richard Levy, Esq., November 27, 2007 - Page 4


We trust that this is responsive to your requests. There is, obviously, some detail we ought to discuss, so please call me for that purpose.

Sincerely,

David L. Herron
of O'MELVENY & MYERS LLP


LA3:1141891.1

# EXHIBIT 6

Conference

Page 1

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

ADVANCED MICRO DEVICES, INC.,   :
a Delaware corporation, and     :
AMD INTERNATIONAL SALES &       :
SERVICE, LTD., a Delaware       :
corporation,                    :
                                : Civil Action
        Plaintiffs,             : No. 05-441-JJF
                                :
        vs.                     :
                                :
INTEL CORPORATION, a Delaware   :
corporation, and INTEL          :
KABUSHIKI KAISHA, a Japanese    :
corporation,                    :
                                :
        Defendants.             :
                                :   MDL NO. 05-1717-JJF
IN RE INTEL CORPORATION         :
MICROPROCESSOR ANTITRUST        :
LITIGATION                      :
                                :
PHIL PAUL, on behalf of         :
himself and all other           :
similarly situated,             :
                                : Civil Action
        Plaintiffs,             : No. 05-485-JJF
                                :
        vs.                     :
                                :
INTEL CORPORATION,              :
                                :
        Defendant.              :

                A status conference was taken
before The Honorable Vincent J. Poppiti on Thursday,
May 24, 2007, beginning at approximately 11:00 a.m.

        Gail Inghram Verbano, CSR, RMR, CLR
                CORBETT & WILCOX
230 N. Market Street - Wilmington, Delaware 19801
                (302) 571-0510

        Corbett & Wilcox is not affiliated with
            Wilcox & Fetzer, Court Reporters

Conference

Page 2

```
 1    Attorneys for the Class Plaintiff:

 2                 Brent W. Landau, Esq.
                   COHEN, MILSTEIN, HAUSFELD & TOLL
 3
                   James L. Holzman, Esq.
 4                 PRICKETT JONES & ELLIOTT

 5    Attorneys for AMD:

 6                 Frederick L. Cottrell, III, Esq.
                   Steven Fineman, Esq.
 7                 RICHARDS LAYTON & FINGER

 8                 Chuck Diamond, Esq.
                   Mark Samuels, Esq.
 9                 James Pearl, Esq.
                   David Herron, Esq.
10                 O'MELVENY & MYERS

11    Attorneys for Intel:

12                 W. Harding Drane, Esq.
                   POTTER ANDERSON & CORROON LLP
13
                   Robert Cooper, Esq.
14                 Daniel Floyd, Esq.
                   Kay Kochenderfer, Esq.
15                 Richard Levy, Esq.
                   BINGHAM, McCUTCHEN
16
      ALSO PRESENT:
17
                   Beth Ozmun, Esq.
18                 Advanced Micro Devices

19                 Mary Mullaney, Esq.
                   BLANK ROME
20
                   Eric Friedberg,
21                 Jennifer Martin
                   STROZ, FRIEDBERG, LLC
22

23

24
```

Conference

1           MR. SAMUELS:  Your Honor, may I

2    address that?  It's Mark Samuels.

3           JUDGE POPPITI:  Please,

4    Mr. Samuels.

5           MR. SAMUELS:  Intel is apparently

6    subscribing now to the school that the best defense

7    is a strong offense.

8           After Intel came forward six months

9    after discovery of its problems and revealed what may

10    be the most massive document preservation failure of

11    all time, we get a lengthy letter from Mr. Cooper

12    asking us all sorts of intrusive questions, many of

13    them seeking plainly privileged information about

14    AMD's own document preservation program.

15           The letter was clearly intended, by

16    Mr. Cooper, to deflect attention from Intel's own

17    shortcomings that had been just recently been

18    revealed.

19           We responded promptly, told

20    Mr. Cooper in no uncertain terms that we are unaware

21    of any systemic failure or lapse of AMD's

22    preservation plans or efforts.  We have

23    double-checked.  That remains the case today.

24           There is absolutely no basis for

Conference

Page 12

1    concern on Intel's part about AMD's document

2    preservation activities.  There has been no privilege

3    waiver on our part, and there is no reasonable cause

4    to think that AMD has been derelict in the slightest.

5              If Mr. Cooper has some basis, he

6    can come forward with it.  But in the meantime, we

7    don't believe it's reasonable or appropriate to ask

8    AMD outside counsel to undertake a preservation

9    program with respect to their documents on this sort

10   of tit-for-tat basis.

11             There's no issue as to them.  There

12   is no reasonable cause, and we regard it as

13   unreasonable and burdensome and simply a sideshow.

14             JUDGE POPPITI:  Let me just say

15   this:  My focus, by virtue of what Intel brought to

16   the Court's attention, is to focus on the process

17   that we established to make every effort to

18   understand what was supposed to have occurred with

19   document preservation; of what the process was in

20   that respect; what went wrong; why it went wrong;

21   what impact that may have had ultimately on documents

22   that were not preserved; what, if any, remediation

23   program may put everyone in the position of saying,

24   We have full faith and confidence in what has been

# EXHIBIT 7

O

## O'MELVENY & MYERS LLP

BEIJING
BRUSSELS
CENTURY CITY
HONG KONG
LONDON
NEWPORT BEACH

400 South Hope Street
Los Angeles, California 90071-2899

TELEPHONE (213) 430-6000
FACSIMILE (213) 430-6407
www.omm.com

NEW YORK
SAN FRANCISCO
SHANGHAI
SILICON VALLEY
TOKYO
WASHINGTON, D.C.

September 14, 2007

OUR FILE NUMBER
8,346-163

WRITER'S DIRECT DIAL
(213) 430-6340

WRITER'S E-MAIL ADDRESS
msamuels@omm.com

**VIA EMAIL**

Kay Kochenderfer, Esq.
Gibson, Dunn & Crutcher LLP
333 South Grand Avenue
Los Angeles, CA  90071-3197

Re:    _**AMD v. Intel Corporation**_

Dear Kay:

This letter is written with reference to your letters of September 4 and 10, which allege that nine AMD Custodians failed to preserve as Sent Items a total of 5,384 emails authored by them that have been produced out of the "In Boxes" of other AMD Custodians who received them. Those Custodians are Chris Calandro, Bob Rivet, Hector Ruiz, Ted Donnelly, Ben Williams, Tim Wright, Andrew Buxton, Linda Starr and Annie Flaig,

Based on our investigation thus far, your claim is totally unfounded, and we are offended at having been put to the time and expense to debunk it.

Your September 4 letter was written following my August 10 letter to Bob Cooper in which I informed you that in the course of our review, we discovered that a number of our 108 party-designated Custodians had corrupted .pst files that were being repaired, or other .pst files that had not yet been harvested or processed. I told Bob that those .pst's were being processed and reviewed, and that the responsive data from them would be in your hands shortly. Since that time, and as I promised, we have made supplemental productions from a number of those custodians' files, and more will be on its way soon. Your September 4 letter and its 109 page list of "missing" items did not take into account any of these materials, as you acknowledged when we met in your office on September 7.

As you also acknowledged during our September 7 meeting, your list also included thousands of items (3,434 of them by our count) where the "missing" email was not the top item in the chain you identified. Rather, it was some unidentified email message buried within the

Kay Kochenderfer, Esq. - 9/14/2007 - Page 2

O'MELVENY & MYERS LLP

chain. I wrote to you that day confirming this, pointing out that we had no ability to ascertain which item in the chain you were inquiring about, and asking you to identify it for us by date and time so we could search for it in the Custodian's data. Inexplicably, you refused, although the information was obviously available to you.

As a consequence of your September 4 letter (in which you knowingly failed to take into account all of the Custodian data that had been produced to you since August 10) and your September 10 letter (in which you declined to point us to the specific email in a chain about which you were inquiring), you have forced us to devote substantial and largely unnecessary efforts to investigating your questions, at considerable expense to AMD.

We have now concluded our work with respect to the first custodian on your September 4 letter, Mr. Calandro. Of the 593 supposedly missing items you attributed to him, Mr. Calandro preserved each and every one.

The attached spreadsheet accounts for each of the DCNs in one of five ways: Produced to Intel; Being Reviewed for Production; Deemed Non-Responsive; De-Duplicated; or Calandro DCNs. I elaborate on each of these categories below.

**Produced to Intel**: This table lists the DCN from your letter and then the DCN for the same item produced from Mr. Calandro's data. In some instances, there are multiple DCNs listed, each of which is included in and/or inclusive of the DCN on your list.

**Being Reviewed for Production**: This table lists the DCN from your letter where we have confirmed that the same item exists in Mr. Colandro's data and is in the cue for review and production to Intel. I expect that these items, where responsive, will be produced to you within the next several weeks. If for some reason you require inspection of these items before then, we will oblige you.

**Deemed Non-Responsive**: This table lists the DCN from your letter where the reviewer of the same item from Mr. Colandro's data deemed it non-responsive. As you acknowledge in your September 10 letter, different reviewers looking at the same item in different custodians' data can sometimes come to different judgments as to responsiveness, and that was the case with these items.

**De-Duplicated**: This table lists the DCN from your letter where the item in question (a portion of a larger email string) exists in Mr. Colandro's data but was suppressed as being a "near duplicate." In each instance, the item in question was in fact produced from Mr. Colandro's data as part of a larger email chain, identified in the second column. A textual explanation of the way the software defines and suppresses near duplicates is set forth below.[1]

---

[1] To identify near duplicates, Attenex Patterns Workbench makes a copy of each email, and "normalizes" the e-mail content by removing reply identification characters such as ">" and condensing consecutive white spaces to a single space. It then groups e-mail based on the "subject thread," which is a normalized version of the subject field of the e-mail, and compares

Kay Kochenderfer, Esq. - 9/14/2007 - Page 3

O'MELVENY & MYERS LLP

To satisfy you that the email chain fragment was in fact preserved in Mr. Calandro's data, but was simply suppressed, at your request we will on a one-time basis retrieve the items and make them available for your inspection. If for some reason Intel has an issue with our de-duplicating protocol (which provides Intel with every bit of the content while at the same time reducing both side's processing and review burden), we are happy to discuss it with you.

     **Calandro DCNs:** This table lists DCNs identified in your letter that did, in fact, come from Mr. Calandro's data. The assertion on page 1 of your letter that these items were produced out of some *other* custodian's data is simply incorrect.

     As I noted earlier, Intel's refusal to identify the specific email chain fragment of interest, as I reasonably requested in my September 7 letter, inflicted upon AMD considerable programming effort and expense, as well as extensive manual review, to conduct the investigation. We do not intend to conduct a similar "treasure hunt" now for the other eight custodians. Rather, when our document exchange is complete on February 15, 2008, should you so desire, we can each flyspeck one another's productions looking for items received from a designated custodian whose documents do not include the "sent" counterpart. I am confident that in virtually all instances, any AMD disconnect will be the result of entirely proper de-duping or differing reviewer judgments about responsiveness. Rest assured, however, that if you request us to engage in such a wasteful exercise, we will make the same request of you. Frankly, we do not think this is how either of us should be spending our clients' money.

     If you disagree, in the meantime you can resolve some similar questions abut Intel's production. For example, we have received production of a large number of email messages sent by Mr. Steve Dallman (Intel's Director of North American Distribution & Channel Marketing) that do not appear to have been retained by him. The list attached to this letter contains a sampling of such messages, and there are many similar Intel custodians. Perhaps you care to explain?

---

the normalized content of each e-mail to other emails within its subject thread group. If the exact content of a normalized e-mail is contained within another e-mail, then the contained email is identified as a near duplicate. Source e-mail files in Attenex Patterns Workbench are not altered in this process. An e-mail with attachments will only be identified as a near duplicate of another if all of its text and all of its attachments are completely contained in another e-mail that has the exact same attachments, as determined by MD5 hash value.

Kay Kochenderfer, Esq. - 9/14/2007 - Page 4

O'MELVENY & MYERS LLP

 

 

I will respond separately with respect to your Rule 30(b)(6) notice concerning AMD document preservation. The exercise you have put us through, coupled with your inexplicable effort to make it as onerous and expensive for AMD as possible, convinces us that your discovery is largely unjustified (and, at the very least, premature).

Very truly yours,

Mark A. Samuels
of O'MELVENY & MYERS LLP

Enclosures

Kay Kochenderfer, Esq. - 9/14/2007 - Page 5

O'MELVENY & MYERS LLP

| Dallman | |
|---|---|
| 67382-006308 | |
| 67382-006277 | |
| 66381-004388 | |
| 67382-006228 | |
| 67382-006345 | |
| 67382-006344 | |
| 66619-001886 | |
| 67382-006254 | |
| 67382-006319 | |
| 67652-006611 | |
| 67382-006332 | |
| 67530-003633 | |
| 67382-006261 | |
| 66381-004393 | |
| 66381-001668 | |
| 67652-003699 | |
| 66165-004966 | |
| 66358-000304 | |
| 66682-001624 | |
| 67652-003721 | |
| 67652-003678 | |
| 67382-006267 | |
| 66709-000333 | |
| 67382-006346 | |
| 66619-001778 | |
| 67382-006229 | |
| 67379-005010 | |
| 66682-001771 | |
| 67382-006305 | |
| 67382-006320 | |
| 67382-006310 | |
| 66165-005599 | |
| 66358-000463 | |
| 66650-000808 | |
| 66682-001875 | |
| 66709-000348 | |
| 67382-006231 | |
| 66358-003313 | |
| 66062-014096 | |
| 66381-002191 | |

Kay Kochenderfer, Esq. - 9/14/2007 - Page 6

O'MELVENY & MYERS LLP

| |
|---|
| 66682-001874 |
| 66619-002137 |
| 67382-006255 |
| 67539-001278 |
| 67382-006257 |
| 67382-006222 |
| 67382-006296 |
| 67382-006299 |
| 66062-013870 |
| 67382-006342 |
| 66682-001626 |
| 67524-018550 |
| 67652-004638 |
| 67652-003482 |
| 67652-006326 |
| 66036-003948 |
| 67382-006274 |
| 67382-006275 |
| 67382-006215 |
| 67382-006286 |
| 67382-006263 |
| 67652-003716 |
| 67382-006301 |
| 66682-001993 |
| 66682-001674 |
| 67382-006237 |
| 67382-006223 |
| 67382-006236 |
| 67382-014456 |
| 66682-001920 |
| 67666-001077 |
| 66682-001988 |
| 67382-006260 |
| 67382-006219 |
| 67382-006220 |
| 66682-001625 |
| 67382-006224 |
| 67652-003740 |
| 67382-006268 |
| 67382-006239 |
| 67382-006273 |
| 67382-006238 |

Kay Kochenderfer, Esq. - 9/14/2007 - Page 7

O'MELVENY & MYERS LLP

| |
|---|
| 67652-006321 |
| 66358-001683 |
| 66381-008947 |
| 67539-001280 |
| 67765-000180 |
| 67382-006269 |
| 67382-006306 |
| 66682-002024 |
| 67382-006249 |
| 67382-006300 |
| 66381-007942 |
| 67539-002025 |
| 67382-006241 |
| 67382-006281 |
| 66375-003492 |
| 67788-001564 |
| 67382-006270 |
| 67382-006243 |
| 67666-000731 |
| 67382-006347 |
| 67652-006329 |
| 66657-005726 |
| 67382-006322 |
| 66381-003052 |
| 67382-006288 |
| 66619-001585 |
| 67382-006329 |
| 67382-006282 |
| 66682-001730 |
| 67382-006304 |
| 67382-006318 |
| 67382-006284 |

# EXHIBIT 8

O

## O'MELVENY & MYERS LLP

BEIJING

BRUSSELS

CENTURY CITY

HONG KONG

LONDON

NEWPORT BEACH

400 South Hope Street

Los Angeles, California 90071-2899

TELEPHONE (213) 430-6000

FACSIMILE (213) 430-6407

www.omm.com

NEW YORK

SAN FRANCISCO

SHANGHAI

SILICON VALLEY

TOKYO

WASHINGTON, D.C.

OUR FILE NUMBER

008,346-163

WRITER'S DIRECT DIAL

(213) 430-6230

WRITER'S E-MAIL ADDRESS

dherron@omm.com

March 19, 2008

## VIA E-MAIL AND U.S. MAIL

Richard Levy, Esq.
Gibson Dunn & Crutcher
333 South Grand Avenue
Los Angeles, California 90071

Re:    *AMD v. Intel*

Dear Rich:

As promised in my letter of March 11, this will respond to your March 4 inquiry regarding "known losses of relevant data from an AMD custodian's hard drive due to file corruption, lost laptop or other, similar means of loss." Based on our investigation to date, and consistent with our agreement of December 7, 2007, we describe below the apparent loss of relevant data by one of AMD's custodians during the preservation period.

Kazuyuki Oji experienced an inadvertent loss of email dated during the period October 1, 2005 through March 2007. As described more fully below, AMD has attempted to recover this lost data by obtaining all of Mr. Oji's email from all sources identified by AMD as reasonably likely to contain it. AMD currently is in the process of reviewing that data for production.

AMD hired Mr. Oji as a Regional Sales Manager on October 1, 2005. Mr. Oji has worked on the Toshiba account since joining AMD. From October 1 through December 1, 2005, Mr. Oji reported directly to Akihiro Nakamura, Director of Sales, who in turn reported to David Uze, then-President of AMD Japan. On December 1, 2005, Mr. Oji began reporting directly to Keisuke Matsumoto (who reported to Mr. Uze). Masatoshi Morishita began his tenure as President of AMD Japan on November 22, 2006, at which time Mr. Matsumoto -- Mr. Oji's then and current supervisor -- began reporting to Mr. Morishita. During the course of his employment, Mr. Oji's regular practice was to copy his supervisors on important emails related to Toshiba business, and he believes that he did so with respect to a predominant majority of such emails. Mr. Oji also copied Shunsuke Yoshizawa, AMD Japan Director of Marketing, on certain of his emails.

Mr. Oji preserved email principally on his laptop computer hard drive. He also periodically backed up files to his personal external hard drive. The loss of email occurred while

Richard Levy, Esq., March 19, 2008 - Page 2

he was attempting such a back up procedure. Specifically, during the weekend of March 24-25, 2007, Mr. Oji attempted to back-up .pst files containing his email covering the time period of October 2005 to March 2007 to an external hard drive in order to preserve them. Mr. Oji estimated that the total size of these .pst files was approximately three gigabytes. In attempting this back up procedure, it appears that Mr. Oji was working with two separate folders, one of which was empty and another of which contained the subject .pst files. It appears that Mr. Oji mistakenly transferred the empty file to the external hard drive and then deleted the folder containing his email .psts. When Mr. Oji realized what had occurred, he attempted to recover the deleted files but was unsuccessful.

Mr. Oji reported this data loss to AMD Japan IT on the next business day, Monday, March 26, 2007. AMD Japan IT personnel attempted to recover Mr. Oji's data in several ways.

First, IT personnel tried to locate a copy of that data that had been created when exchanging Mr. Oji's old laptop computer for a new laptop computer in November 2006. Pursuant to AMD Japan IT's standard procedures, the process for creating such a copy is to transfer the data from the old computer to an alternate storage location, transfer the data from that location to the new computer's hard drive and, after confirming successful transfer, to delete the image from the temporary storage location. This process was followed in Mr. Oji's case, such that IT's copy of Mr. Oji's data no longer existed. Second, IT personnel located and checked Mr. Oji's pre-November 2006 computer, but found that the data had been removed from the hard drive after it had been transferred to the new computer. Third, AMD Japan IT personnel purchased what they believed to be the best commercially-available data recovery software for the specific purpose of recovering Mr. Oji's lost files and ran it on Mr. Oji's laptop hard drive. Although some data was recovered (approximately 335 megabytes), the subject .psts were not. Finally, AMD Japan IT checked the file server but found no .pst files from the end of December 2006 (which would have been the date that such files possibly could have been temporarily copied to a file server when switching out Mr. Oji's old computer). In sum, despite these many efforts, IT personnel were unable to recover the inadvertently-deleted email files.

Intel adversely designated Mr. Oji on September 2007. AMD's counsel learned about Mr. Oji's inadvertent loss of data in November 2007. Given the fact and nature of the loss, AMD then immediately collected Mr. Oji's data from all of the sources on which he stored data as well as all back up or subsidiary sources that AMD identified as containing Mr. Oji's data.

First, consistent with its harvesting protocols, AMD obtained an image of Mr. Oji's laptop computer. AMD also obtained and extracted files from his personal external hard drive; obtained files from the personal network space assigned to Mr. Oji; and obtained files from Mr. Oji's home computer that were work-related.

Second, AMD obtained the 18 monthly back up tapes applicable to Mr. Oji covering the time period from October 2005 through March 2007. These back up tapes were made pursuant to AMD's back up tape protocols for this litigation. The applicable back up tapes were restored by an outside vendor, and the Exchange mailbox items related to Mr. Oji were extracted.

Richard Levy, Esq., March 19, 2008 - Page 3

Third, AMD conducted a search across its journaling system and vault repository for emails sent or received by Mr. Oji. This search captured emails sent or received by Mr. Oji for the AMD employees, some of whom were on those systems as early as November 2005.

Finally, AMD created a data repository of hard drive images of the laptop computers and, as applicable, the personal network space of the five supervisors whom Mr. Oji regularly copied on work-related email, Messrs. Nakamura, Uze, Matsumoto, Morishita and Yoshizawa. This material was searched for Mr. Oji's emails, which were exported for review.

On February 15, 2008, AMD produced 21,345 of Mr. Oji's files to Intel. Both the data collected from Mr. Oji's own computer and storage devices as well as the additional data referenced above contain a significant amount of Japanese language text. That material is currently under review for anticipated production by March 31, the date by which each side is to supplement productions with foreign language documents. AMD will make its best efforts to produce all of Mr. Oji's responsive data by that date, but it is possible that review and production of some portion of the recovered data will not be concluded by that time. Should that be the case, we will keep you apprised of our progress.

Given the significant document production on February 15, AMD continues to assess and monitor document preservation and possible data losses, and we assume Intel is doing so as well. AMD will make additional disclosures promptly, if any become necessary.

If you have questions, please feel free to contact me.

Sincerely,

David L. Herron
of O'MELVENY & MYERS LLP

LA3:1145562.1

# EXHIBIT 9

O

## O'MELVENY & MYERS LLP

BEIJING
BRUSSELS
CENTURY CITY
HONG KONG
LONDON
NEWPORT BEACH

400 South Hope Street
Los Angeles, California 90071-2899

TELEPHONE (213) 430-6000
FACSIMILE (213) 430-6407
www.omm.com

NEW YORK
SAN FRANCISCO
SHANGHAI
SILICON VALLEY
TOKYO
WASHINGTON, D.C.

OUR FILE NUMBER
008,346-163

WRITER'S DIRECT DIAL
(213) 430-6230

WRITER'S E-MAIL ADDRESS
dherron@omm.com

May 14, 2008

### VIA E-MAIL AND U.S. MAIL

Richard Levy, Esq.
Gibson Dunn & Crutcher
333 South Grand Avenue
Los Angeles, California 90071

Re:    *AMD v. Intel*

Dear Rich:

This responds to your March 28, 2008 letter, and provides additional information about AMD's evidence preservation program and efforts.

We begin by recounting the status of AMD's disclosures and the parties' agreements about them. As you know, at AMD's request, the parties exchanged information about their respective evidence preservation plans early in the case. On April 11, 2007 -- which, not coincidentally, was right before Intel's disclosure and proposed plan to remediate its own acknowledged evidence preservation failures was due by Court order -- Intel launched a broad, intrusive and unwarranted inquiry into AMD's preservation efforts. Despite AMD's subsequent responsive disclosures to the extent appropriately called for, Intel then served a document request and deposition notice under Rule 30(b)(6). AMD responded by objecting, but also by agreeing to supply further information wholly sufficient for Intel's professed desire to assess AMD's preservation program.

Meet and confer efforts culminated in your letter of November 7, 2007, which professes Intel's intent to "narrow, or even eliminate, the issues that might be open for discovery." Your letter goes on to "outline the areas that we propose to now pursue," represents that Intel had "reduced considerably the number of topics for which we are requesting information," and states that your proposal, if accepted, would "result in what we view, as an appropriate exchange of information." In response, our November 27 letter then outlined the reciprocal disclosures which AMD agreed to make. That letter exchange constituted, in our view, agreement on the AMD disclosures that would fully satisfy Intel's Rule 30(b)(6) discovery, and agreement that the parties' exchanges of litigation hold notices and harvest dates would occur simultaneously.

O'MELVENY & MYERS LLP

Richard Levy, Esq., May 14, 2008 - Page 2

Your March 4, 2008 letter reconfirmed this agreement by defining the information Intel was requesting in precisely the same order and using almost precisely the same language as set forth in my November 27 letter to you. On March 11, 2008, AMD produced more information, including a summary of AMD's Backup Tape Retention Protocols, and AMD's custodian journaling dates. Our March 19 letter then disclosed in detail the now-remediated loss of data related to Mr. Oji.

We view your next letter of March 28, 2008, as Intel's attempt to seize upon the isolated data loss of a single AMD custodian, Mr. Oji, to substantially broaden inquiry already properly narrowed by agreement. In particular, AMD does not agree that this loss means that "Intel and AMD should be on equal footing," or somehow justifies your "request that [Intel] get additional information and assurances from AMD similar or identical" to those the Court required of Intel as a consequence of its wide-spread evidence preservation failures.

In short, Intel's attempt to equate a single, isolated mishap of an AMD custodian with Intel's institutional-level failure to implement and monitor a proper preservation program is unjustified and inappropriate. Despite our several requests, Intel has not cited any authority or facts that would even begin to justify the vastly expanded, intrusive and burdensome discovery Intel apparently contemplates and which goes well beyond what was agreed upon last year. Instead, your March 28 and April 24, 2008 letters refer only to still-unexplained supposed "irregularities" in AMD's preservation efforts, or attempt to leverage Mr. Oji's loss. We must assume that if Intel truly believed there were "irregularities in AMD's retention efforts" that somehow justified this attempted broadening of preservation discovery, it surely would have said something to us long ago.

As you know, AMD has committed itself to producing the information reasonably necessary to Intel's ability to assess AMD's preservation program and efforts, and we have also repeatedly acknowledged AMD's commitment to inform Intel of data loss. To that end, this letter and the attached materials provide the information AMD has previously agreed to supply. And in an effort to reach a compromise on the remaining items requested in your March 28 letter, we also supply additional information which we think should be more than sufficient.

These disclosures are made by AMD in keeping with our agreements on these topics, and on the understanding that they are made in full and complete satisfaction of Intel's Rule 30(b)(6) deposition notice and document request. After these disclosures and other limited disclosures (as outlined below) that the parties may agree to are completed, we expect Intel to formally withdraw that discovery and bring this costly, burdensome and largely unnecessary exercise to a close. In addition, AMD's disclosures in this and all prior letters, as well as the attachments thereto and any other disclosures AMD has made to Intel regarding preservation issues, are made without waiver of the attorney-client privilege or work product protection.

We now respond to the specific issues raised in your March 28 letter.

1.    <u>Harvest Dates</u>: We appreciate Intel's March 28, 2008 disclosure of harvest dates for its custodians over the time period between August 2007 to December 31, 2007, which AMD

O'MELVENY & MYERS LLP

Richard Levy, Esq., May 14, 2008 - Page 3

has been requesting for some time. (*See* our letters to you dated November 27, 2007, and March 11, 2008.) Attached at Tab 1 are all of the harvest dates for designated AMD production custodians that have not previously been provided. We also provide a list of "deposition reharvest" dates for all AMD custodians for whom Intel has thus far requested such reharvests. We do not believe that Intel has produced deposition reharvest dates for its custodians. Please do so now.

You will see that the list at Tab 1 does not include the party-designated custodian "reharvest" dates, i.e., the dates on which additional harvesting was conducted of party-designated custodians in order to bring their production forward to the June 1, 2006 production date as called for by Case Management Order No. 3. We are willing to discuss whether that information should be provided, but do not believe that it is important or necessary to any assessment of AMD's preservation or production.

Here's why. Judge Farnan signed Case Management Order. No. 3 on September 19, 2007. That order, of course, required each side to supplement party-designated custodians' productions through June 1, 2006. At that time, AMD began conducting any reharvests that were necessary to fill any data "gaps" between the prior production and the June 1, 2006 cut-off date. AMD's harvesting protocols -- including those followed in regard to party-designated custodian reharvesting through June 1, 2006 -- are described in the six-page disclosure titled "Summary of AMD's Document Collection Protocols" that AMD produced to you on November 16, 2007. To reiterate, in connection with that reharvesting, AMD obtained custodial data for each custodian from all appropriate sources to assemble a full and complete collection for review and production. This included re-imaging of computer hard drives and harvesting from AMD's journal and vault, in addition to harvesting from other data sources. That harvesting occurred after September 19, 2006, and obviously before all relevant documents were produced to Intel on February 15, 2008. Given AMD's prior disclosures and the information supplied here, we do not believe that a request for each subsequent harvest date serves a legitimate purpose. If you believe this information nevertheless should be provided, please explain.

Finally with respect to harvesting dates, your March 28, 2008 letter requests such dates for all custodians on AMD's "master custodian list," rather than merely those custodians who are "in-play" by reason of having been designated as a production custodian by AMD or Intel, or a free throw custodian. AMD declines to produce that information. Whether and to what extent AMD has harvested data from non-production custodians is irrelevant to any issue in the case, and also constitutes our work product. In any event, AMD declines to undertake this unnecessary and undue burden and expense.

2.     Journaling Dates:  AMD has provided its journaling dates to Intel. Intel has not reciprocated. We have requested this information repeatedly. Your March 28 letter promises it, but we still do not have it. Please tell us the date by which Intel will provide this information.

3.     Mr. Oji's Data Loss Issues:  Your March 28 letter poses seriatim a long list of questions concerning issues purportedly relevant to Mr. Oji's loss of data. Other than to try to equate Mr. Oji's loss to Intel's own catastrophic preservation failings, we are at a loss to

O'MELVENY & MYERS LLP

Richard Levy, Esq., May 14, 2008 - Page 4

understand why Intel would attempt to seize on this isolated loss of a defined, limited and now-remediated set of data with such stridency. Nor do we believe most of the additional inquiries you have made are reasonable.

AMD has already disclosed the details concerning Mr. Oji's inadvertent loss of data, including: When the loss occurred; detailed facts about how the loss occurred; the probable volume of data that was lost; when AMD's IT department learned of the loss; the precise sources of replacement data AMD identified and why those sources seemed likely to yield the most responsive data; who Mr. Oji regularly sent emails to; and the backup tapes containing the files that AMD obtained, restored and extracted. We urge you to identify *any* disclosure made by Intel with respect to *any* of its custodians that contains even remotely this range of information or level of detail, or *any* indication of the estimated volume of lost data. We are aware of none.

The vast majority of the questions posed in your March 28 letter also are best answered by Mr. Oji himself. On April 11, 2008, we offered in writing to bring Mr. Oji to the United States for deposition so that you could ask him whatever you like about his accidental loss. Intel has declined that offer. We renew that offer now.

In addition, we note that Intel is asking for information that Intel has itself refused to provide under claims of privilege and work product. You are directed, for example, to pages 186-87, 193, 315 and 420 from Ms. Almirantearena's deposition. There, Intel instructed the witness not to answer questions concerning the timing and circumstances of Intel's counsel's discovery of Intel document preservation lapses.

We assume you agree that AMD cannot reasonably be asked to provide information Intel simultaneously asserts to be privileged and work product. Again in the spirit of compromise, however, in addition to our offering Mr. Oji for deposition, AMD will supply you with the following, which should adequately resolve any bona fide issues concerning Mr. Oji. First, you have asked for documents showing what AMD did in order to recover Mr. Oji's files. Attached at Tab 2 are three emails between Mr. Oji and AMD Japan's IT personnel that are dated as of the first several business days after Mr. Oji experienced the accidental loss. These are written in Japanese. For your convenience, we have attached a non-certified translation. These emails demonstrate that Mr. Oji reported the loss immediately, and that AMD Japan IT personnel tried every conceivable means to recover the lost data immediately after the loss occurred.

Second, you have asked that AMD restore the backup tapes for each of Mr. Oji's "frequent correspondents" as identified in our March 19, 2008 letter to you. AMD agrees to this, and is in the process of restoring the tapes now. All relevant, non-duplicative material that is recovered, if any, will be produced by AMD as soon as reasonably possible. We will keep you apprised of our progress.

4.   Intel Inquiries Regarding Back-Up Tapes and AMD's IT Infrastructure: Your March 28 letter raises four issues on these topics. First, you now ask that AMD provide a narrative "describing the relevant AMD IT infrastructure." AMD agrees to do so.

O'MELVENY & MYERS LLP

Richard Levy, Esq., May 14, 2008 - Page 5

Second, you state that you have a number of questions with respect to AMD's written disclosure about its backup tape protocols, but do not identify those questions. Please send us a list of your questions so that we can answer them if appropriate.

Third, you ask AMD to confirm that it has conducted a physical inspection of each and every backup tape generated for each and every server for each and every month since March 2005, and to confirm that AMD has all information for every AMD custodian on such backup tapes. AMD declines to do this. Our prior written disclosure clearly and adequately explained that AMD has retained monthly backups for all relevant Exchange and file servers since March 2005 in 19 separate AMD locations across the United States and around the world. This regimen has worked and is working well, and AMD has no indication of any problems with it.

Compliance with your proposal would impose undue burden and expense on AMD and serve no legitimate purpose. This proposed audit would entail a world-wide adventure at huge expense. It also would entail restoring all those tapes simply in order to be able to represent with absolute specificity and certainty that each custodian's data was captured by backup tapes at each location and at all times. There is no good reason we can think of for you to ask this of us. If you disagree, please explain to us why you think this is justified,

Finally, you ask 10 separate questions about what data is captured on backup tapes. Our question to you is: Why does Intel need this information? We are prepared to discuss this. But many of the questions posed are of such a technical nature that Intel's own IT professionals or consultants ought to be able to answer them, and the balance of them strike us as requesting information that would be expensive and time-consuming to develop, for no apparent legitimate purpose. Please explain, and we will take the issue from there.

5.   Intel's and AMD's Litigation Hold Notices:  We raise two issues about Intel's production of its hold notices and how that impacts the agreed-upon reciprocal exchange.

First, we are perplexed why it took Intel so long to produce its hold notices. We first asked Intel to produce them in March 2007. They were also the subject of AMD's first set of document requests regarding Intel's preservation failures. On May 15, 2007, AMD served its remediation discovery, Document Request No. 2 of which again requested production of "Intel's Litigation Hold Notices." On June 20, 2007, Special Master Poppiti ordered Intel to complete its production of these documents by *September 28, 2007*. On November 27, 2007, and again on March 11, 2008, we requested by letter that Intel complete its production of litigation hold notices, and we told you that AMD was prepared to provide a reciprocal exchange at that time.

On March 28, 2008, Intel finally produced what it now represents is the last of its custodian litigation hold notices. The hold notice produced is, quite incredibly, dated September 27, 2007 -- that is, one day before the Court-ordered production cut-off date and six months before the date it was produced. The second litigation hold-related item is a list from April 2007 of recipients of a litigation hold notice you previously delivered. We cannot fathom why it took Intel so long to produce this oft-requested information, or why Intel believes that it is free to

O'MELVENY & MYERS LLP

Richard Levy, Esq., May 14, 2008 - Page 6

disregard not only our repeated requests but also the Court's order. What we do know is that Intel's conduct has unnecessarily delayed the reciprocal exchange that AMD proposed long ago.

Second, Intel has still refused to respond to AMD's very specific questions about, or to produce, the litigation hold notices delivered by Intel to its IT personnel. As stated in both our November 27, 2007, and March 11, 2008 letters to you, here again is the issue:

"[T]horough searches through the documents Intel has produced in remediation and culpability discovery have not uncovered any litigation hold notices delivered by Intel to its IT personnel (as referenced by Intel in its various filings with the Court concerning its evidence preservation issues). For instance, while we have found emails sent among Intel IT personnel, we have not located any litigation hold notice directed by Intel (or its in-house counsel) to IT personnel with respect to Intel's "complaint freeze" effort that Intel said it undertook in June and July 2005, or any litigation hold notice issued by Intel to its IT personnel at the time of the discovery of Intel's evidence preservation issues in October 2006. (See my November 27, 2007 letter at page 2.)

One of following three things must be true: (1) Intel has, in fact, already produced the litigation hold notices it directed to its IT personnel, but we have not located them; (2) Intel has not yet produced these IT-directed litigation hold notices; or (3) Intel did not issue litigation hold notices to its IT personnel at the times and for the purposes indicated in the foregoing paragraph. If (1), please direct us to the documents; if (2), let's please set a date for a mutual exchange; and if (3), please so state in writing so that we can have a written record of this fact."

If Intel issued a litigation hold notice to its IT personnel to take the so-called "complaint freeze," AMD surely is entitled to its production. If Intel did not do so, we expect Intel to so state in writing.

More important, however, is the issue of whether Intel issued instructions or hold notices of some kind to its IT personnel when Intel discovered its preservation failures -- which occurred as early as January 2006 and certainly no later than October 2006. At that time, Intel indisputably had only a limited number of its custodians on dedicated email servers backed up on a weekly basis; hundreds more had not been migrated to any such server; many custodians were already known not to be complying with Intel's litigation hold notices; and hundreds of other custodians had never been provided with litigation hold notices at all. Again, if Intel issued any such litigation hold notice(s) to its IT personnel at that time, AMD is entitled to their production; if not, Intel should so state in writing.

AMD has promised to produce the litigation hold notice issued to its IT personnel in March 2005 in exchange for Intel's production of the same material. We stand by that offer and agreement, and will comply as soon as Intel does. At this time, AMD produces at Tab 3 the remaining litigation hold notices, not already produced, that AMD issued to its document production custodians during the course of this litigation. AMD's now-completed productions, taken together, constitute a complete set of such litigation hold notices.

6.    **Litigation Hold Notice Dates:** You have asked that AMD prepare a chart showing when each of its custodians received litigation hold notices. AMD agrees to do so with respect to its designated production custodians in exchange for Intel's production of the same chart for its designated production custodians. We are prepared to exchange these charts whenever you would like.

7.    **Litigation Hold Dates for Particular AMD Custodians:** On August 10, 2007, we advised you that two party-designated custodians did not receive written litigation hold notices until September 2006. Anticipating that Intel will agree to our proposal to exchange charts of litigation hold notice dates for production custodians, we inform you that those individuals are Fanny Chan (who received a written litigation hold notice on September 19, 2006), and Stan Lublin (who received a written litigation hold notice on September 18, 2006).

As to adversely-designated custodians, Kazuyuki Oji received a written litigation hold notice on November 10, 2006. During Mr. Oji's new-hire orientation conducted on or immediately after October 1, 2005, however, Mr. Oji was advised by Shunsuke Yoshizawa, AMD Japan Director of Marketing, about the existence of this lawsuit, and was instructed to preserve all information related to it.

Finally, Makoto Kato, located in AMD's Tokyo, Japan, office, received a written litigation hold notice on November 10, 2006. Mr. Kato began his employment on April 1, 2006. Like Mr. Oji, Mr. Kato was advised by Mr. Yoshizawa immediately after his hire date about the existence of this lawsuit, and was instructed to preserve all information related to it.

8.    **Auto-Delete:** You have asked about auto-delete functions applicable within AMD. As stated previously, AMD has not implemented or used an auto-delete function within its Exchange environment. Individual employees are able to set up an auto-delete function on their own Outlook account, which would operate only as to their own email account. As you know from prior productions, the first and subsequent litigation hold notices delivered by AMD contained a "FAQ" section. With regard to electronic documents, the FAQ section instructs, in relevant part, that: "Also, please be sure to disable any auto-delete features on email (e.g., auto-delete of 'sent' email messages)."

AMD has identified a designated custodian who used an auto-delete setting on his Outlook account: Nick Kepler. AMD delivered a litigation hold notice to Mr. Kepler which included the foregoing instruction to disable "auto-delete" on July 5, 2005, and followed that with numerous reminders. On November 21, 2005, AMD IT migrated Mr. Kepler's email box into AMD's journal and vault archiving systems. During the time period between the July 5 and November 21, 2005, Mr. Kepler's Outlook account was set to not save "sent" items. Mr. Kepler, however, copied himself on relevant "sent" items and preserved those emails.

9.    **Possible Custodian Data Loss:** AMD discloses a possible data loss with respect to Michael Soares, a document custodian adversely designated by Intel. AMD provided Mr. Soares with a litigation hold notice on February 21, 2006. AMD IT migrated Mr. Soares' email account to its journal and vault archiving systems on March 30, 2006. It appears that after Mr. Soares'

O'MELVENY & MYERS LLP

Richard Levy, Esq., May 14, 2008 - Page 8

email account was placed into AMD's email archiving system, he experienced a problem with his laptop computer, shipped it to AMD for repair, but the computer was lost or stolen during transit. In May 2007, AMD imaged for purposes of this litigation the computer Mr. Soares was then using. The hard drive used to make that acquisition failed. AMD sent that hard drive to an outside vendor, NDCI, to attempt to recover the data. NDCI was unable to recover any data from that failed hard drive.

Mr. Soares was on leave from AMD from June 2007 to January 2008, at which he separated from his AMD employment. He did not perform work for AMD during that time period. AMD obtained Mr. Soares' laptop computer upon his separation, but it does not seem to be the same computer of which an image was taken in May 2007. It thus appears that AMD was not able to obtain images of two separate laptop computers that Mr. Soares used during the same time period his email account was maintained on AMD's journal and vault archiving systems.

We have now advised you about all of the data losses of which AMD is aware with respect to its production custodians. We again acknowledge our professional obligation to make such disclosures in the future if and as we learn of them.

If you have questions about the foregoing, please feel free to call me.

Sincerely,

David L. Herron
of O'MELVENY & MYERS LLP

LA3:1146399.1

# EXHIBIT 10

# THIS EXHIBIT HAS BEEN
# REDACTED IN ITS ENTIRETY