# EXHIBIT 3

**IMPORTANT LEGAL NOTICE** - The information on this site is subject to a disclaimer and a copyright notice.

JUDGMENT OF THE COURT OF FIRST INSTANCE (Fourth Chamber)

30 March 2000 (1)

(Competition - Float glass - Rights of defence and procedural rights of the complainant - Product market and geographical market - Article 86 of the EC Treaty (now Article 82 EC))

In Case T-65/96,

**Kish Glass & Co. Ltd,** established in Dublin (Ireland), represented by M. Byrne, Solicitor, with an address for service in Luxembourg at the Chambers of Arendt and Medernach, 8-10 Rue Mathias Hardt,

applicant,

v

**Commission of the European Communities,** represented initially by R. Lyal, of its Legal Service, and R. Caudwell, national civil servant on secondment to the Commission, and subsequently, in the oral procedure, by B. Doherty, of its Legal Service, acting as Agents, with an address for service in Luxembourg at the Chambers of Carlos Gómez de la Cruz, of its Legal Service, Wagner Centre, Kirchberg,

defendant,

supported by

**Pilkington United Kingdom Ltd,** established in Saint Helens, Merseyside (United Kingdom), represented by J. Kallaugher, Solicitor, A. Weitbrecht, Berlin and M. Hansen, Brussels, with an address for service in Luxembourg at the Chambers of Loesch & Wolter, 11 Rue Goethe,

intervener,

APPLICATION for annulment of the Commission Decision of 21 February 1996 (IV/34.193 - Kish Glass) rejecting the complaint made by the applicant on 17 January 1992 pursuant to Article 3(2) of Council Regulation No 17 of 6 February 1962, First Regulation implementing Articles 85 and 85 of the Treaty (OJ, English Special Edition 1959-1962, p. 87) alleging an infringement of Article 86 of the EC Treaty (now Article 82 EC),

THE COURT OF FIRST INSTANCE

OF THE EUROPEAN COMMUNITIES (Fourth Chamber),

composed of: R.M. Moura Ramos, President, V. Tiili and P. Mengozzi, Judges,

Registrar: J. Palacio González, Administrator,

having regard to the written procedure and further to the hearing on 28 April 1999,

gives the following

# Judgment

**Background to the dispute**

1.  On 17 January 1992 Kish Glass & Co Ltd (hereinafter 'Kish Glass or the 'applicant), a company incorporated under Irish law which supplies glass, lodged a complaint with the Commission

pursuant to Article 3(2) of Council Regulation No 17 of 6 February 1962, First Regulation implementing Articles 85 and 86 of the Treaty (OJ, English Special Edition 1959-1962, p. 87, hereinafter 'Regulation No 17), alleging that Pilkington United Kingdom Ltd (hereinafter 'Pilkington) and its German subsidiary, Flabeg GmbH, abused their dominant position on the Irish market in 4 mm float glass, in applying different conditions from those offered to other purchasers for equivalent transactions and in refusing to supply it with this type of glass beyond a certain limit, thereby placing the applicant at a competitive disadvantage.

2. On 14 February 1992 the Commission sent a request for information, pursuant to Article 11 of Regulation No 17, to the applicant, to which the applicant replied on 10 March 1992.

3. When requested to comment on that complaint by the Commission, Pilkington stated that it did not hold a dominant position on the market in float glass and that it applied a system of discounts based on the size of the customer, the time allowed for payment and the quantity purchased.

4. The applicant submitted its comments on Pilkington's observations to the Commission on 1 July 1992. It maintained that the system of customer classification used by Pilkington was discriminatory, and that that company, with a market share of more than 80%, was the major supplier of 4 mm float glass in Ireland, which was the relevant geographical market for assessing whether it held a dominant position.

5. The Commission replied to the applicant on 9 July 1992, stating that a system of discounts based on a classification of customers by category and on quantity was not discriminatory. The applicant submitted its observations on that statement on 10 August 1992.

6. On 18 November 1992 the Commission sent a letter to the applicant pursuant to Article 6 of Commission Regulation No 99/63/EEC of 25 July 1963 on the hearings provided for in Article 19(1) and (2) of Council Regulation No 17 (OJ, English Special Edition 1963-1964, p. 47, hereinafter 'Regulation No 99/63), informing it that it considered that there were not sufficient grounds for upholding its complaint and requesting it to submit any further observations it might have so that it could formulate its definitive position. Kish Glass complied with that request.

7. Following an informal meeting of 27 April 1993, the Commission informed the applicant, by letter of 24 June 1993, that its observations disclosed no matters of fact or of law liable to affect the conclusions in the letter of 18 November 1992. However, the Commission stated that it intended to send to Pilkington a request for information under Article 11 of Regulation No 17 and that the applicant would be kept informed of the procedure.

8. On 3 December 1993 the Commission sent to the applicant a non-confidential version of Pilkington's response to that request for information.

9. By letters to the Commission of 16 February 1994 and 1 March 1994 Pilkington clarified its position with regard to the definition of the relevant geographical market and its alleged dominant position on that market.

10. In two letters to the Commission dated 8 March 1994, Kish Glass reaffirmed its position regarding the definition of the relevant geographical market, which it argued to be the Irish market, and Pilkington's alleged abuse of its dominant position on the specific market for 4 mm float glass. It also provided the Commission with information on the prices charged by Pilkington on the Irish market.

11. On 24 and 27 May 1994, the applicant submitted to the Commission further evidence to show that the transport costs from continental Europe to Ireland were far higher than those from the United Kingdom to Ireland and that there was a local geographical market.

12. By letter of 10 June 1994 Pilkington informed the Commission that it disputed the transport-cost data provided by the applicant.

13. Having obtained information from other manufacturers of glass in the Community, on 19 July 1995 the Commission sent a second letter to the applicant pursuant to Article 6 of Regulation No 99/63 confirming that the relevant product market was the sale of float glass of all thicknesses to dealers, that the geographical market was the whole of the Community and that Pilkington did not hold a dominant position on that market.

14. On 31 August 1995 the applicant submitted its observations regarding that second letter pursuant to Article 6 of Regulation No 99/63, again disputing both the definition of the geographical and product market adopted by the Commission and its appraisal of the dominant position held by Pilkington.

15. Between 31 October and 3 November 1995, the Commission obtained information by telephone and by fax from eight importers of glass established in Ireland on methods of purchasing 4 mm float glass.

16. On 14 November 1995 the Commission sent a request for information pursuant to Article 11 of Regulation No 17 to certain companies operating on the Irish market, including the applicant and Pilkington, to obtain data on the quantity of 4 mm float glass sold in Ireland, on the dimensions of the glass sold and on the transport costs to the Dublin area.

17. On 18 December 1995 the Commission sent to the applicant five replies from glass companies, which were received on 22 December 1995. On 7 February 1996 the Commission sent to the applicant five further replies from glass companies, which reached it on 12 February 1996.

18. By decision of 21 February 1996, received by the applicant on 1 March 1996, the Commission definitively rejected the complaint lodged by Kish Glass (Case IV/34.193 - Kish Glass, hereinafter 'the contested decision'). The Commission maintained its previous position that the relevant product market was the sale of float glass of all thicknesses to dealers, that the relevant geographical market was the Community as a whole, or at least the northern part of the Community, and that Pilkington did not hold a dominant position on that market.

Procedure

19. By application lodged at the Registry of the Court of First Instance on 11 May 1996, Kish Glass brought this action.

20. By application lodged at the Registry of the Court of First Instance on 30 September 1996, Pilkington United Kingdom Limited applied for leave to intervene in support of the form of order sought by the defendant. By order of 30 June 1997 the President of the Third Chamber of the Court of First Instance granted it leave to intervene.

21. Upon hearing the report of the Judge-Rapporteur, the Court of First Instance (Fourth Chamber) decided to open the oral procedure without any preparatory inquiry. It requested the Commission, however, to answer a number of written questions, to which the Commission replied on 22 March 1999.

22. The parties presented oral argument and answered the questions put by the Court at the hearing on 28 April 1999.

Forms of order sought

23. The applicant claims that the Court should:

    - annul the Decision adopted by the Commission on 21 February 1996 in Case IV/34.193 - Kish Glass;

    - order the Commission to pay the costs.

24. The defendant, supported by the intervener, contends that the Court should:

    - dismiss the application;

    - order the applicant to pay the costs.

Law

25. The applicant raises five pleas in law in support of its application. In the first plea, which is in two

parts, it alleges both that the Commission infringed its right to be heard and that it breached the principle of legal certainty and misused its powers. In its second plea it claims that the defendant disregarded procedural rules. Its third plea alleges breach of essential procedural requirements and of the principle of legal certainty. In its fourth and fifth pleas it alleges that the Commission committed a manifest error of assessment in its definition, on the one hand, of the relevant product market and, on the other, the geographical market.

*The first plea, alleging infringement of the applicant's right to be heard and of the principle of legal certainty and misuse of powers*

Arguments of the parties

26. The applicant argues, first, that the Commission did not allow it enough time to put its point of view, thus infringing its right to be heard. It submits, second, that the Commission misused its powers and infringed the principle of legal certainty in obtaining information by methods not provided for by Regulation No 17.

- Infringement of the applicant's right to be heard

27. The applicant points out, first, that the Commission asked the Irish companies by letter of 14 November 1995 to provide information on the quantity, dimensions and thicknesses of float glass sold on the Irish market and the markets of continental Europe. The applicant received a copy of the responses from the Irish companies on 22 December 1995 and 12 February 1996, on which the contested decision adopted on 21 February 1996 was based. The tenor of the responses was such as to provide valuable support for its arguments but the Commission allowed it too little time (nine days) to comment on all the responses of the Irish companies, thus preventing it from exercising its right to be heard.

28. The applicant points out, second, that the Court of Justice has established, in its case-law, that respect for the right to be heard in all proceedings which are liable to culminate in a measure adversely affecting a person is a fundamental principle of Community law which must be guaranteed, even in the absence of specific rules. Moreover, the Commission, in implementing the principle that the rights of the defence must be guaranteed, established rules for access to files both for the defending party and for the complainant. Furthermore, the case-law of the Court of First Instance both in the area of competition and of dumping has established that the right to comment on documents on the file is implicit in the right of access to it.

29. The Commission contends that documents annexed to the application show that, during the investigation of its complaint, the applicant had numerous opportunities to put its point of view; in particular between the lodging of the complaint and the letter sent to it on 19 July 1995 the applicant made use of nine opportunities to submit its comments. In that connection the Commission points out that non-confidential copies of the responses of Pilkington and of four Irish importers of glass were sent on 18 December 1995 to the applicant, that is to say two months before the adoption of the contested decision; two of the four undertakings were amongst the three main importers and the two others were amongst the smallest glass importers. What is more, non-confidential copies of five other responses were sent to the applicant on 7 February 1996; those responses corroborated the information which the Commission had obtained at the time of its telephone inquiries between 31 October and 3 November 1995, information of which the applicant had been informed. The applicant had two further weeks to submit its observations on those responses. The applicant was fully informed of its right to make known its views on the documents placed on the file to which it had access and it was therefore not necessary for the Commission to issue a formal invitation to that effect.

- Misuse of powers and breach of the principle of legal certainty

30. The applicant points out that, during the written procedure, the Commission explained that the requests for information sent on 14 November 1995 to the Irish companies sought only to obtain documentary evidence of the responses which those companies had already given by fax and by telephone. It argues that the method chosen by the Commission to obtain the information it needed, that is to say, by telephone and subsequently in writing, is not provided for by Article 11(2) to 11(6) of Regulation No 17 and is, therefore, incompatible with those provisions. The Commission has thus misused its powers and undermined the principle of legal certainty.

31. The Commission contends that Article 11 of Regulation No 17 does not rule out the possibility of

obtaining information orally and subsequently making official requests for information.

Findings of the Court

– Infringement of the applicant's right to be heard

32. According to settled case-law, respect for the right to be heard is, in all proceedings initiated against a person which are liable to culminate in a measure adversely affecting that person, a fundamental principle of Community law which must be guaranteed even in the absence of specific rules. That principle requires that the undertaking concerned be afforded the opportunity during the administrative procedure to make known its views on the truth and relevance of the facts, charges and circumstances relied on by the Commission (see, in particular, Case C-301/87 *France* v *Commission* [1990] ECR I-307, paragraph 29, Joined Cases C-48/90 and C-66/90 *Netherlands and Others* v *Commission* [1992] ECR I-565, paragraph 37, Case C-135/92 *Fiskano* v *Commission* [1994] ECR I-2885, paragraphs 39 and 40, and Case C-48/96 P *Windpark Groothusen* v *Commission* [1998] ECR I-2873, paragraph 47).

33. However, it must be observed that this principle concerns the rights to be heard of those in respect of whom the Commission carries out its investigation. As the Court of Justice has already observed, such an investigation does not constitute an adversary procedure as between the undertakings concerned but a procedure commenced by the Commission, upon its own initiative or upon application, in fulfilment of its duty to ensure that the rules on competition are observed. It follows that the companies which are the object of the investigation and those which have submitted an application under Article 3 of Regulation No 17, having shown that they have a legitimate interest in seeking an end to the alleged infringement, are not in the same procedural situation and that the latter cannot invoke the right to be heard as defined in the cases relied on (see, to that effect, judgment of the Court of Justice in Joined Cases 142/84 and 156/84 *BAT and Reynolds* v *Commission* [1987] ECR 4487, paragraph 19, and judgment of the Court of First Instance in Case T-17/93 *Matra Hachette* v *Commission* [1994] ECR II-595, paragraph 34).

34. Since the right of access to the file is also one of the procedural guarantees intended to safeguard the right to be heard, the Court of First Instance has held, similarly, that the principle that there must be full disclosure in the administrative procedure before the Commission in matters concerning the competition rules applicable to undertakings applies only to undertakings which may be penalised by a Commission decision finding an infringement of Articles 85 or 86 of the EC Treaty (now Articles 81 EC and 82 EC), since the rights of third parties, as laid down by Article 19 of Regulation No 17, are limited to the right to participate in the administrative procedure. In particular, third parties cannot claim to have a right of access to the file held by the Commission on the same basis as the undertakings under investigation (judgment in *Matra Hachette* v *Commission*, cited above, paragraph 34).

35. As regards the rights of the applicant as a complainant, the Court of First Instance points out that, in the present case, the investigation of the complaint lasted more than four years and that the applicant had the opportunity to put its point of view on several occasions. In particular, the last five replies of the Irish companies of which the applicant was notified did not alter the essential points with which the procedure was concerned so that the fact that the Commission only allowed the applicant nine days to comment on the replies before adopting the contested decision did not prevent it from making its views known.

36. In the circumstances the applicant's rights cannot be said to have been infringed.

– Misuse of powers and breach of the principle of legal certainty

37. As regards the argument that the Commission misused its powers in seeking information from Irish glass companies by telephone or fax even though Article 11 of Regulation No 17 provides that such requests must be made in writing, it must be borne in mind to begin with that, according to consistent case-law, the adoption by a Community institution of a measure with the exclusive or main purpose of achieving an end other than that stated constitutes a misuse of powers (see Case C-84/94 *United Kingdom* v *Council* [1996] ECR I-5755, paragraph 69, and Case T-77/95 *SFEI and Others* v *Commission* [1997] ECR II-1, paragraph 116).

38. In the present case, it must be observed both that Article 11 of Regulation No 17 does not prevent the Commission from obtaining information by means of oral requests followed by requests in the proper form and that the applicant has not furnished evidence that the collection of information

orally had any purpose other than that envisaged by that article.

39. It follows that the first plea must be rejected as unfounded in its entirety.

*The second plea, alleging breach of procedural rules*

Arguments of the parties

40. The applicant submits that the Commission breached the procedural guarantees provided for by Community law in sending Pilkington a request for information which was not drawn up objectively.

41. In support of its submission the applicant points out that the Commission sent Pilkington a request for information on 14 November 1995, the same day as it sent requests for information to the Irish companies. In its request for information, the Commission wrote: 'In its response Kish maintains that 4 mm clear float glass forms a distinct market in Ireland ... Kish further maintains that Pilkington alone is able to supply the dimensions demanded by the Irish market. The Commission has investigated this point and it appears to be poorly founded. Nevertheless, in order to have on the file all the evidence necessary to reject the complaint, it has proved necessary to make a further request for information. Thus the Commission had informed Pilkington that the complaint was poorly founded even though the issue in question had not been considered, given that it had not yet received the responses to the questions put by letter of 14 November 1995. It follows that the Commission could have had no idea of the evidence which might be revealed pursuant to its requests for information but it none the less indicated to the party against which the complaint was directed that it proposed to reject the complaint and asked it to provide the evidence that would make this possible.

42. The Commission observes that Article 11(3) of Regulation No 17 requires it to indicate the purpose of the request for information. At the time when the Commission wrote its letters it knew that the claims by Kish Glass were probably not founded since it had already received, by telephone and by fax, the responses of the undertakings to which it was writing. It had therefore considered thearguments of Kish Glass with the requisite seriousness and diligence but had found that they were erroneous.

43. According to the intervener, to prevent a breach of the duty of impartiality, it is essential that, in pursuing its inquiries, the Commission should not prejudge the action to be taken on a complaint; but that does not mean that the officials of the Commission cannot form an initial opinion on the issues raised by a complaint. The duty of impartiality requires, at the very least, that until the complainant has exercised his right to present observations pursuant to Article 6 of Regulation No 99/63, the Commission should remain open to any discussion liable to make it change its mind. However, there is no legal obstacle, once the Commission officials have formed an initial opinion, to their informing the undertaking subject to the investigation of that opinion. In the present case, the Commission had already informed Kish Glass in its letter pursuant to Article 6 of Regulation No 99/63 of its view that no action should be taken on its complaint. Moreover, Kish Glass had already had an opportunity to comment on the Commission's position. When it sent the request for information at issue the Commission had already formed an initial opinion and its communication to Pilkington does not constitute a breach of the principle of objectivity and impartiality.

Findings of the Court

44. First, it must be borne in mind that, under Article 11(3) of Regulation No 17, when the Commission sends a request for information to an undertaking or an association of undertakings, it is to state the legal bases and the purpose of the request and also the penalties laid down for supplying incorrect information. Consequently, the Commission was required to inform Pilkington, in its letter of 14 November 1995, of the reasons which led it to request further information.

45. Second, according to settled case-law, once the Commission decides to proceed with an investigation, it must, in the absence of a duly substantiated statement of reasons, conduct it with the requisite care, seriousness and diligence so as to be able to assess with full knowledge of the case the factual and legal particulars submitted for its appraisal by the complainants (Case T-7/92 *Asia Motor France and Others* v *Commission* [1993] ECR II-669, paragraph 36).

46. In the present case, it is clear from the documents before the Court that the Commission's investigation was carried out over a period of more than four years, during which the Commission

collected comments from a significant number of undertakings in the sector, analysed them and gave the complainant an opportunity to put forward, on several occasions, all such information as could be taken into account. In so doing, the Commission carried out all its activities with the requisite care, seriousness and diligence. In confining itself to observing that, in its letter of 14 November 1995, the Commission had expressed the view that its complaint was poorly founded and asked for further information from Pilkington in order to reject it, the applicant has not proved the contrary.

47. Accordingly, the second plea must be rejected as unfounded.

*The third plea, alleging breach of essential procedural requirements and of the principle of legal certainty*

Arguments of the parties

48. The applicant submits that the decision of the Commission is vitiated by formal defects and breaches the principle of legal certainty.

49. In that regard, it states that decisions rejecting complaints usually take the form of a reasoned letter signed by the Commissioner responsible for competition matters. In the present case that Commissioner merely signed a covering letter which, after summarising the procedure, rejected the complaint, referring to a separate document for the reasoning. That document contains no indication (such as a signature or even an initial) that the Commissioner responsible had seen it. Given this unusual manner of proceeding, the applicant has no way of knowing whether the Commissioner responsible saw or approved the arguments for the rejection of the complaint. What is at issue in this case is therefore a matter of form rather than a matter of inadequate reasoning.

50. The Commission observes, first, that the contested decision is not in an unusual form and, second, refers expressly to the annex containing the reasons for which it decided to reject the complaint.

Findings of the Court

51. It should be borne in mind that, according to case-law, a reference in a document to a separate document must be considered in the light of Article 190 of the EC Treaty (now Article 253 EC) and does not breach the obligation to state reasons incumbent on the Community institutions. Thus, in its judgment in Case T-504/93 *Tiercé Ladbroke* v *Commission* [1997] ECR II-923, paragraph 55, the Court of First Instance held that a Commission decision sent to the author of a complaint that gave rise to an investigation, which referred to a letter sent pursuant to Article 6 of Regulation No 99/63, disclosed with sufficient clarity the reasons for which the complaint was rejected, and thus fulfilled the obligation to state reasons under Article 190 of the Treaty. Regardless of whether such a reference is described as a matter of reasoning or of form, that finding applies *a fortiori* where reference is made to a document annexed to a decision and, therefore, contained in it. Moreover, the applicant has in no way substantiated its suspicions that the Commissioner responsible was unaware of the reasoning for the contested measure.

52. The reference in question is sufficient to meet the requirements of legal certainty under Community law.

53. It follows that the third plea must also be rejected as unfounded.

*The fourth plea, alleging a manifest error of assessment in the definition of the relevant product market*

Arguments of the parties

54. The applicant submits that the Commission committed a manifest error of assessment in defining, in point 19 of the contested decision, the relevant product market not as that for 4 mm float glass but as that for the sale of raw or primary float glass of all thicknesses to dealers in view of the fact that the persons active in the market, both on the supply side and the demand side, are the same for all thicknesses of glass. Where products of different types and dimensions are not interchangeable from the point of view of the user, it is insufficient merely to examine whether the persons active in the market are the same, but it is also necessary to take into consideration, as the Court of Justice did in its judgment in Case 322/81 *Michelin* [1983] ECR 3461, the competitive

55. The applicant submits, as regards the conditions of competition, that given that a significant percentage of the market is effectively reserved for one manufacturer, producers who do not sell imperial sheet sizes (2 440 mm x 1 220 mm) are unlikely to be competitive in the remainder of the market and may choose not to operate or attempt to maintain competition on it. This has a significant knock-on effect on the conditions of competition in the remainder of the market, as is borne out by the fact that a very large share (84%) of the 4 mm float glass market is held by Pilkington. In that connection, it points out that so far as it is aware, Pilkington is the only manufacturer of 4 mm float glass to use trays of certain dimensions on which the glass is cooled ('lehr-ends) which permit the glass to be cut into imperial sizes without wastage. It believes that other producers, producing metric glass, use lehr-ends which enable them to manufacture only metric-sized sheets (3 210 mm x 2 250 mm). Finally, it is likely that there are only two dealers on the Irish market which have the equipment required to cut metric sizes down to imperial sizes, and moreover, one of those customers still continues to import 30% of its requirement in imperial sizes from Pilkington.

56. It submits, moreover, as regards the structure of supply, that, as was confirmed by the replies of the Irish companies, more than 27% of 4 mm float glass sold in Ireland is in imperial sizes. Pilkington has a near monopoly in respect of the size in question (95% of sales) and, moreover, holds 84% of the Irish market in 4 mm float glass. Supply on the float glass market is affected as a result: because of the structure of the market, customers buying sheets in imperial sizes are obliged to deal, for all sizes, with that manufacturer, who is well placed to meet their other requirements for 4 mm float glass.

57. It states, further, that the market in 4 mm float glass must be considered to be the relevant product market as that product cannot be substituted by float glass of other thicknesses: the cross-elasticity of demand between 4 mm float glass and float glass of other thicknesses is zero; increases in the price of 4 mm float glass are unlikely to have any effect on demand for other float glass products. In that regard, although there is significant fluctuation in the price charged for 4 mm float glass in Ireland, demand for other float glass products has remained constant. According to both the case-law of the Court of Justice and Court of First Instance and the decisions of the Commission (Commission Decision 88/138/EEC of 22 December 1987 relating to a proceeding under Article 86 of the EEC Treaty (IV/30.787 and 31.488 - Eurofix - Bauco/Hilti) (OJ 1988 L 65, p. 19); Commission Decision 92/163/EEC of 24 July 1991 relating to a proceeding pursuant to Article 86 of the EEC Treaty (IV/31.043 - Tetra Pak II) (OJ 1992 L 72, p. 1); judgment in Case C-53/92 P *Hilti* v *Commission* [1994] ECR I-667; judgment in Case T-30/89 *Hilti* v *Commission* [1991] ECR II-1439; judgment in Case T-83/91 *Tetra Pak* v *Commission* [1994] ECR II-755), there is a relevant product market when cross-elasticity with other products, which may be considered interchangeable, is low: it follows that a product market is *a fortiori* distinct from another where the cross-elasticity between them is zero.

58. Finally, it adds that the fact that one of Pilkington's four manufacturing sites specialises in the production of 4 mm float glass implies that it is not possible to convert rapidly to production of other thicknesses.

59. The Commission contends that in the *Michelin* case, the Court of Justice found that products of different types and dimensions, that are not interchangeable from the point of view of the user, may nevertheless be considered as forming part of a single product market where they are technically similar or complementary and are supplied through dealers who must meet demand for the whole range of products. This clearly holds true for the raw float market, where at the first stage of distribution the persons active in the market on the supply side and on the demand side are identical for all thicknesses of glass. It points out that the applicant does not produce any evidence to support its statement that conditions of competition are affected when, first, a significant percentage of the market is effectively reserved for one producer and, second, producers who do not sell imperial sheet size 4 mm float glass are unlikely to be competitive on the remainder of the market and may choose not to compete in that part of the market.

60. In response to the assertion by Kish Glass that a near monopoly position on the part of the float glass market sold in imperial sizes gives Pilkington an insurmountable advantage on the market as a whole, the Commission maintains that glass of one thickness sold in one set of dimensions may be substituted by glass of the same thickness sold in different dimensions, given that all wholesalers are in a position to cut down larger sizes to obtain the size required by processors and end users. Float glass in imperial dimensions is used for exactly the same economic purposes as float glass in metric dimensions.

61. Finally, it observes that the applicant has adduced no evidence in support of its assertion that the operation of the 4 mm float glass market in Ireland is independent, because of its alleged specific character, from that of the market for other thicknesses of glass. In fact, 4 mm float glass is technically almost identical with float glass of other sizes and a producer's float line can be rapidly adapted without excessive cost to change from one thickness to another.

Findings of the Court

62. According to settled case-law, for the purposes of investigating the possibly dominant position of an undertaking on a given market, the possibilities of competition must be judged in the context of the market comprising the totality of the products which, with respect to their characteristics, are particularly suitable for satisfying constant needs and are only to a limited extent interchangeable with other products (see, in particular, the judgment in Case 31/80 *L'Oréal* [1980] ECR 3775, paragraph 25, and in *Michelin* v *Commission*, cited above, paragraph 37). Moreover, according to the same case-law (*Michelin* v *Commission*, cited above, paragraph 44), the absence of interchangeability between different types and dimensions of a product from the point of view of the specific needs of the user does not imply that, for each of those types and dimensions, there is a distinct market for the purposes of determining whether there is a dominant position. Furthermore, since the determination of the relevant market is useful in assessing whether the undertaking concerned is in a position to prevent effective competition from being maintained and behave to an appreciable extent independently of its competitors and customers and consumers, an examination to that end cannot be limited to the objective characteristics only of the relevant products but the competitive conditions and the structure of supply and demand on the market must also be taken into consideration (*Michelin* v *Commission*, cited above, paragraph 37).

63. In the present case, the Court of First Instance must consider whether the conditions of competition and the structure of supply on the market in float glass precluded the Commission from finding, on the basis of *Michelin* v *Commission*, cited above, that even if glass of different thicknesses is not interchangeable for final users, the relevant product market must be considered to be that for raw floatglass of all thicknesses, as distributors must meet demand for the whole range of products.

64. As a preliminary point, the Court of First Instance observes that, according to consistent case-law, although as a general rule the Community judicature undertakes a comprehensive review of the question whether or not the conditions for the application of the competition rules are met, its review of complex economic appraisals made by the Commission is necessarily limited to verifying whether the relevant rules on procedure and on stating reasons have been complied with, whether the facts have been accurately stated and whether there has been any manifest error of assessment or a misuse of powers.

65. The applicant contends that the fact that continental producers do not produce glass in imperial dimensions prevents them from competing effectively with Pilkington. On that point, it must be observed that, at point 15 of the contested decision, the Commission considered that question and arrived at the opposite conclusion to that reached by the applicant. On the basis of information provided by nine Irish importers it found that wholesalers did not have a clear preference for imperial sizes in so far as they were able to cut - without too much wastage - glass in metric sizes down to imperial sizes. During the proceedings before the Court of First Instance, the applicant confined itself, with regard to that point, to stating that, so far as it was aware, Pilkington was the only manufacturer of 4 mm float glass able to adapt the glass to imperial sizes without wastage, that it believed that the other manufacturers used 'lehr ends allowing them to manufacture only sheets of different sizes and that it was unlikely that wholesalers would be able to cut metric sizes without wastage. Not only does the applicant furnish no evidence in support of its argument, but it puts forward nothing to invalidate the Commission's assessment of the matter, which was based on information obtained directly from operators on the market.

66. The applicant also maintains, essentially, that, in view of the near monopoly enjoyed by Pilkington in the market for 4 mm glass in imperial sizes, that company enjoys a privileged position in commercial relations with glass importers. Moreover, it submits that 4 mm glass cannot be replaced by float glass of other thicknesses.

67. In that regard, it must be observed that the applicant has not established that any preference importers have for Pilkington's products is not the result of their pursuing their own economic interest or exercising their freedom of contract. Accordingly such preferences cannot be interpreted as being indicative of a deterioration in the structure of supply on the market. It must be observed, next, that it is clear from the data given in the replies of the Irish companies, which are not

contested by the applicant, that sales in Ireland of 4 mm float glass in imperial sizes account for 27% of the market. Even if it is accepted that Pilkington holds a near monopoly in the sector of 4 mm glass in imperial sizes, that percentage is clearly not in itself a sufficient ground for claiming, as the applicant has done, that the majority of purchases of 4 mm float glass in Ireland are processed by Pilkington. About 73% of demand for the product is made up of purchases of glass in metric sizes which cannot be affected by Pilkington.

68. Finally, in point 18 of the contested decision, the Commission explained that production of 4 mm glass is technically almost identical to production of glass of other thicknesses and that glass manufacturers can convert production rapidly without excessive cost. In that connection, it must be observed that the fact that one of Pilkington's four production sites specialises in the manufacture of a certain type of glass does not mean that the technical processes for manufacture of the glass are different and does not demonstrate that an economic operator with only one production site cannot convert his production rapidly, so that the applicant's argument on the basis of the lack of cross-elasticity between supply of 4 mm glass and glass of other thicknesses cannot be upheld either.

69. The Court of First Instance finds, therefore, that the applicant has not established that the position of the Commission, set out in point 19 of the contested decision, that the relevant product market is the sale of glass of all thicknesses, was vitiated by a manifest error of assessment. It follows that that argument cannot be upheld by the Court.

70. The fourth plea must, therefore, be rejected as unfounded.

*The fifth plea, alleging a manifest error of assessment of the geographical market*

Arguments of the applicant

71. The applicant points out that the Commission, in point 23 of the contested decision, while conceding that certain features of the float glass market in Ireland do distinguish it from that in continental Europe (that is to say the absence of production facilities and the fact that all float glass has to be transported there by sea), took the view that the analysis of transport costs and the level of prices of glass in the different parts of the Community point to the conclusion that the relevant geographical market is the Community or the northern part of the Community. It submits that the Commission has committed a manifest error of assessment and should have taken the view that the relevant geographical market was Ireland or Ireland and the United Kingdom.

72. It sets out, essentially, three objections to the definition of the geographical market in the contested decision.

- The first objection

73. The test which the Commission applied to define the relevant geographical market is not in conformity with that defined by the Court of Justice in its judgment in Case 27/76 *United Brands* v *Commission* [1978] ECR 207. Rather than defining the glass market on the basis of transport costs to Ireland only, it should have determined the zone in which other objective conditions of competition for the product in question are similar for all economic operators. Application of that test would have led it to conclude that the relevant geographical market was Ireland (or Ireland and the United Kingdom). The determination of Ireland as the relevant geographical market finds support in the fact that, in that country, continental exporters have no competitive weight as regards sales of 4 mm float glass as their combined market share is approximately 16% compared with Pilkington's market share which is 84%.

- The second objection

74. The Commission committed a manifest error of assessment in finding that two northern European producers had higher transport costs to Ireland than those of Pilkington, to the extent of 7 to 8%, and that only one producer from that part of Europe had lower transport costs to Ireland than Pilkington's. On that point, an analysis contained in the letter to the Commission of 24 May 1994 shows that the costs of sea and land transport to Ireland for continental producers are in fact far higher than they are for Pilkington: glass manufactured by a continental producer has a greater distance to travel by road and by sea and does not enjoy the significant discounts on road and sea transport from which Pilkington can benefit.

75. In that regard, the approach which resulted in that analysis is in keeping with that followed by the Commission in certain decisions: Commission Decision 94/359/EC of 21 December 1993, declaring a concentration to be compatible with the common market (Case No IV/M/358 - Pilkington Techint/SIV, OJ 1994 L 158, p. 24, hereinafter 'Pilkington-Techint/SIV Decision'), in which the Commission considered that raw float glass is a bulky heavy product, which is therefore expensive to transport over great distances; Commission Decision 89/93/EEC of 7 December 1988 relating to a proceeding under Articles 85 and 86 of the EEC Treaty, (Case IV/31.906 - 'Flat glass, OJ 1989 L 33, p. 44, hereinafter 'Flat Glass Decision), in which the geographical location of production facilities was considered to be a vital factor in the transport of flat glass; Commission Decision 89/22/EEC of 5 December 1988 relating to a proceeding under Articles 85 and 86 of the EEC Treaty (Case IV/31.900 - BPB Industries, OJ 1989 L 10, p. 50, hereinafter 'BPB Decision), in which, in view of the costs of transport and advantages of placing production facilities close to markets, it was considered that it was not economically possible to supply the market in Britain or Ireland on a large scale and for prolonged periods from abroad.

76. Moreover, the significance of transport costs in determining the geographical market is confirmed by the replies of the Irish companies, which reveal that the glass companies established in the Dublin area (near the Pilkington factory) or in places easily accessible by road from Dublin (Galway) are supplied almost entirely by Pilkington (98%), whilst companies which are further away (in the towns of Tipperary, Limerick and Wexford) buy lower quantities of glass from Pilkington (77%, 62% and 66% respectively).

   - The third objection

77. An analysis of FOB (free on board) and CIF (cost, insurance, freight) prices for 4 mm float glass between 1990 and 1992 from the United Kingdom to other Member States shows that the Irish market does not have characteristics in common with the other European markets and that it is an independent market; according to that analysis, in the period under consideration, the average CIF price to Ireland was ECU 470 per tonne; it varied between ECU 500 and 540 per tonne to the Northern European countries (Germany, Netherlands, Belgium and Luxembourg), and varied between ECU 330 and 430 per tonne to the countries of Southern Europe (France, Italy, Portugal, Spain and Greece); in contrast, in the period under consideration, the average FOB price to Ireland was ECU 370 per tonne, the price to the countries of Northern Europe varied between ECU 300 and 330 per tonne and the price to the countries of Southern Europe varied between ECU 300 and 370 per tonne.

   Arguments of the Commission

   - The first objection

78. The Commission denies not having applied the test established by the Court of Justice in *United Brands*, cited above. It points out that, in point 24 of the contested decision, it maintained that the area in which dominance should be assessed must be an area where 'the objective conditions of competition applying to the product in question must be the same for all traders; on the basis of that test it found that transport costs did not isolate Ireland from the continental market.

   - The second objection

79. It maintains that the conclusions it drew from its analysis of transport costs are correct. On the basis of information supplied in response to its letters pursuant to Article 11 of Regulation No 17 by the producers concerned, it found that one Northern European producer's costs were marginally lower than Pilkington's and that two other producers had to bear costs, as a proportion of the value of the load, no more than 7 to 8% higher than Pilkington's. It even found that the Southern European producers had to bear costs which were significantly higher as a proportion of the value of the load. Taking account of the fact that the additional cost tolerated by a manufacturer for transport towards the edge of its domestic market was a maximum of 10% of the value of the product, it concluded that the transport costs to Ireland of Northern European producers fell within the range they tolerated on their domestic markets. Moreover, as it finds that the applicant has not produced any evidence to show that the information obtained in response to the letter sent to a number of impartial undertakings pursuant to Article 11 of Regulation No 17 was erroneous, it states that it is not convinced of the unreliability of the information supplied to it.

   - The third objection

80. The Commission states that the information on prices on the basis of which it adopted the contested decision was obtained directly from producers, whilst the figures given by the applicant were unreliable; in the course of its investigation it obtained a detailed breakdown of Pilkington's prices and they bore no relation to the prices submitted by the applicant. In the period 1990-1992 the average price charged by Pilkington in Ireland was very close to that charged in every country in Northern Europe. It added that the FOB and CIF prices used by the applicant are not a reliable indicator. The term FOB refers to the price of the product as it is loaded onto a ship and does not include any of the subsequent costs of transport, while float glass is sold on a 'delivered basis whereby the cost of transport is borne by the producer. CIF prices do not indicate the real market price as they do not take into account any discounts given.

Findings of the Court

- The first objection

81. In its judgment in *United Brands* v *Commission*, cited above, the Court of Justice stated that the opportunities for competition must be considered, in regard to Article 86 of the Treaty, having regard to the particular features of the product in question and with reference to a clearly defined geographic area in which it is marketed and where the conditions of competition are sufficiently homogeneous for the effect of the economic power of the undertaking concerned to be able to be evaluated (paragraph 11). Furthermore, in the same judgment, in order to ascertain whether the conditions of competition were sufficiently homogeneous in that case the Court of Justice referred primarily to transport costs, taking the view that, where such costs do not in fact stand in the way of the distribution of the products, they are factors which go to make the relevant market a single market (*United Brands* v *Commission*, paragraphs 55 and 56).

82. It follows that, in the present case, the definition of the relevant geographical market, in the light, in particular, of the costs of transporting glass borne by continental producers, is justified. It must be observed, moreover, that in order to determine the conditions of competition on European markets, the Commission did not, in the contested decision, only consider the costs mentioned above but also verified that the volume exported to Ireland between 1988 and 1994 by continental producers was about one-third of the volume of the demand for float glass in that country, that the differences between prices charged in Ireland and in five other European countries by the five main continental producers did not indicate the existence of separate markets and that the existence of obstacles of a technical or regulatory nature to entry to the Irish market could be ruled out. Finally, it must be observed that, although the applicant disputes that the criteria laid down by the judgment in *United Brands* v *Commission*, cited above, were applied correctly, it does not indicate how they should be applied in order to define the geographical market in the light of the impact of transport costs on the conditions of competition.

83. It follows from the foregoing that the first objection must be dismissed.

- The second objection

84. As regards the objection concerning the accuracy of the analysis of transport costs carried out by the Commission, it must be observed that that analysis takes account of the information supplied by the operators in the sector at the time of the investigation of the Pilkington-Techint/SIV merger and of the decision made following that investigation. In that decision the Commission observed that: (1) 80-90% of a plant's production is sold within a radius of 500 km; that distance is sometimes exceeded and can reach 1 000 km, beyond which the cost of transport becomes prohibitive, that is to say uncompetitive; (2) in its natural supply area with a 500 km radius a glass-producing undertaking is in competition with other undertakings whose supply areas overlap with its own; (3) since each of those undertakings has its own radius of supply, competition by an undertaking with those within its radius tends to extend to their natural supply area; (4) consequently, it is appropriate to consider the Community as a whole to be the geographical reference market.

85. It must first be determined whether the argument set out by the Commission in the contested decision for the purpose of defining the geographical market is contradictory. In the course of the hearing it became apparent that at several points in the contested decision the Commission was making reference to its decision in Pilkington-Techint/SIV, point 16 of which appears to be inconsistent with point 33 of the contested decision. In that connection, it should be borne in mind that a contradiction in the statement of the reasons on which a decision is based constitutes a breach of the obligation laid down in Article 190 of the Treaty such as to affect the validity of the measure in question if it is established that, as a result of that contradiction, the addressee of the

measure is not in a position to ascertain, wholly or in part, the real reasons for the decision and, as a result, the operative part of the decision is, wholly or in part, devoid of any legal justification (see in particular the judgment of the Court of Justice in Case T-5/93 *Tremblay and Others* v *Commission* [1995] ECR II-185, paragraph 42).

86. In point 16 of the preamble to the decision in Pilkington-Techint/SIV, the Commission states that raw float glass is a bulky, heavy product, 'expensive to transport over great distances, for example, the cost of transportation by lorry amounts to between 7.5 and 10% of the selling price at a distance of 500 km. In point 33 of the contested decision the Commission states that transport costs towards the edge of a plant's natural supply area ('domestic market) exceed those within its near vicinity by up to 10% of the value of the product.

87. Following careful examination of those two decisions, the Court must observe, first, that the contested decision refers to the Pilkington-Techint/SIV decision without referring specifically to the percentages given in brackets in point 16 of the preamble to that decision, second, that the percentages given in point 16 are given by way of illustration and their significance is weakened by the conclusions the Commission reaches in that decision, which are the same as those it reached in the contested decision, in finding that it seems appropriate to consider the Community as a whole to be the geographical reference market and, third, that the true reason for the definition of the geographical reference market contained in the Pilkington-Techint/SIV decision is to be found in the second paragraph of point 16 of its preamble where it is stated that 'given the dispersion of the individual float plants and the varying degrees of overlap for the natural supply areas, so that effects can be transmitted from one circle to another, it seems appropriate to consider that the geographical reference market is the Community as a whole.

88. It must be observed that the Commission in no way contradicts itself in that, first, in its decision in Pilkington-Techint/SIV it defined the geographical reference market essentially on the basis of the concept of the natural geographical area of supply from a given float-glass production plant, represented by concentric circles with a radius determined by the relative transport cost and, second, it arrived at the same definition in the contested decision, having found that the transport costs which are tolerated by a producer in the natural supply area of its plant exceed those within the near vicinity of that plant by up to 10% of the value of the product. The concepts of natural supply area and near vicinity of the plant, on the basis of which the Commission concluded that transport costs did not exceed 10%, are compatible. Both concepts enable the relevant geographical market to be determined for an undertaking on the basis of the cost of transport by measuring that market not from the factory but from a number of points on the edge of a circle or series of circles surrounding it which constitute its natural supply area or the area in its near vicinity.

89. It follows that, contrary to what appeared to emerge from the hearing, the contested decision is not vitiated by contradiction in referring in point 33 to the Pilkington-Techint/SIV decision.

90. The applicant, for its part, does not contest, in themselves, the criteria which were used by the Commission to define the natural supply area ('domestic market) and on which the contested decision was based. In claiming that the Commission made a manifest error of assessment in its determination of the relevant geographical market, it is merely disputing the reliability of the replies of the glass producers on which that determination was based.

91. The Court observes, in that regard, that the third-party undertakings requested to supply information pursuant to Article 11 of Regulation No 17 may have penalties imposed on them if they supply incorrect information, with the result that they cannot as a general rule be considered not to have supplied accurate and reliable information in the absence of evidence to the contrary. The applicant cannot purport to deny that the data supplied in those replies are of any value simply by referring to the analysis of transport costs which it put forward during the administrative procedure in its letter of 24 May 1994 and which was not accepted by the Commission in the contested decision.

92. In its letter of 24 May 1994, the applicant refers to the report commissioned by the Dublin Port and Docks Board from Dublin City University Business School (hereinafter 'the Dublin Port Report) on transport costs in the port of Dublin. On the question of the advantages said to be enjoyed by Pilkington in terms of transport costs, the applicant bases its argument on data which do not specifically refer to Pilkington but are merely inferred from its presumed commercial activity. For example, on page 4 of its letter, it states: '[Pilkington] is not constrained by any particular sailing and will therefore ship by the most cost effective sailing. The Dublin Port Report (pages 172-173)

indicates that discounts of 15% to 18% are available for volume or guaranteed units. As Pilkington imports considerable amounts of glass to the Irish market (and maintains an office in Dublin), it would be guaranteed the highest discount. In addition, the 18% discount is granted for transport by day, whereas 15% is the maximum discount for night transport. Due to the proximity of Liverpool, Pilkington can benefit from the higher 18% discount. Finally, Kish estimates that Pilkington may have as many as 40 units per week and would benefit from favoured customer status and be at the low end of the price range, particularly if space is block-booked. Moreover, in that letter the applicant does not give precise figures for continental transport costs and, again on page 4 of the letter, states: 'The Dublin Port Report does not indicate the percentage of the available 20 containers which are open-top, but it is certainly very small as only two shipping lines provide such specialised form of transport.

93. The applicant's argument based on the significance of transport costs as it emerges from the replies of the Irish glass companies is not sufficient to establish that the relevant geographical market is Ireland alone. The fact that the glass companies established in the Dublin and Galway areas obtain almost all their supplies from Pilkington merely indicates that, in view of the cost of transport, the latter has a competitive advantage in the geographical area close to its factory, but an advantage of that kind must be considered to be normal on most markets. Moreover, as the applicant itself points out, many other Irish companies buy significant quantities of glass from continental producers. In that regard, it must be observed that the company based in Limerick, which is as far away from Dublin as that based in Galway is, purchases only 62% of its supplies from Pilkington. It is thus clear that the data concerning glass imports derived from the replies of the Irish companies do not support the inference drawn by the applicant that the Irish market is separate from the Northern European market.

94. Finally, the Court observes that the applicant's argument finds no support in the decisions it cites. For instance, whilst it is clear from point 77 in the preamble to the Flat Glass Decision that the cost of transport is a very significant factor in marketing flat glass beyond national frontiers and that the proportion of production intended for export is limited compared with the quantities sold on the home market, that does not mean that the analysis of costs that is made in the contested decision is erroneous. Second, the situation on the plasterboard market in the case which gave rise to the BPB decision was quite different from that on the float glass market. In that decision, unlike the situation in the present case, BPB Industries, which was charged with an abuse of a dominant position, had a factory in Ireland which supplied the national market and a factory in Great Britain which did not export to Ireland. In that connection, the Commission made the point that the prices of the factory located in Great Britain were not competitive with those in Ireland (see point 21 of the preamble to the BPB decision). The Commission concluded that Great Britain and Ireland were the relevant geographical market since those countries were 'the only areas in the Community where BPB is both the sole producer and has a near monopoly position in the supply of plasterboard (point 24 of the preamble to the BPB decision). It therefore determined the geographical market on the basis of factors quite different from those relied on by the applicant in the present case.

95. It follows from the foregoing that the second objection must be dismissed.

– The third objection

96. The Court finds that the analysis of the differences in the FOB and CIF prices for 4 mm float glass from the United Kingdom sold in other countries of the Community is not such as to invalidate the conclusions which the Commission drew from it in the contested decision.

97. As regards the FOB prices, it must be observed that, as the Commission pointed out, they refer to the price of the product as loaded on board and do not include the costs of subsequent transport, which on this type of market are normally borne by the producers. Consequently, such prices cannot be considered to give appropriate information on the real market prices.

98. On the other hand, the CIF price, which includes production and insurance costs, and every type of transport costs, can be taken into account for determining the real market prices. However, it must be observed that the data furnished by the applicant do not support its submission that the relevant geographical market is Ireland. Those data show that the discrepancy between the average prices charged in Ireland and the average prices charged in the Netherlands (470/500; ECU 30 per tonne) is less than that between the average prices charged in the Netherlands and the average prices charged in Germany, Belgium or Luxembourg (500/540; ECU 40 per tonne). On the basis of that consideration alone, it should be concluded that Ireland forms part of the same geographical market as the Netherlands and not, as the applicant argues, that Ireland constitutes a separate market

from the rest of Northern Europe.

99. It follows from the foregoing that the third objection must be dismissed.

100. It also follows that the fifth plea must be dismissed as unfounded.

101. The application must, therefore be dismissed in its entirety.

**Costs**

102. Under Article 87(2) of the Rules of Procedure of the Court of First Instance, the unsuccessful party is to be ordered to pay the costs if they have been applied for in the successful party's pleadings. Since the applicant has been unsuccessful and the Commission has applied for costs, the applicant must be ordered to pay the costs.

On those grounds,

THE COURT OF FIRST INSTANCE (Fourth Chamber)

hereby:

**1. Dismisses the application;**

**2. Orders the applicant to pay the costs.**

Moura Ramos
  Tilli
   Mengozzi

Delivered in open court in Luxembourg on 30 March 2000.

H. Jung                                                                                                  V. Tilli

Registrar                                                                                               President

---

1: Language of the case: English. </HTML