# EXHIBIT 10

No. 02-572

IN THE

## Supreme Court of the United States

INTEL CORPORATION,

*Petitioner,*

v.

ADVANCED MICRO DEVICES, INC.,

*Respondent.*

**On Writ of Certiorari
to the United States Court of Appeals
for the Ninth Circuit**

**BRIEF OF *AMICUS CURIAE*
THE COMMISSION OF THE EUROPEAN
COMMUNITIES SUPPORTING REVERSAL**

CARTER G. PHILLIPS*
VIRGINIA A. SEITZ
RICHARD WEINER
GENE C. SCHAERR
MARINN F. CARLSON
SIDLEY AUSTIN BROWN &
  WOOD LLP
1501 K Street, N.W.
Washington, D.C. 20005
(202) 736-8000

*Counsel for Amicus Curiae*

December 23, 2003         * Counsel of Record

TABLE OF CONTENTS

Page

TABLE OF AUTHORITIES ............................................ ii

BRIEF OF *AMICUS CURIAE* ........................................ 1

INTERESTS OF *AMICUS CURIAE* ................................ 1

SUMMARY OF ARGUMENT ........................................ 3

ARGUMENT ................................................................ 5

   I. THE EUROPEAN COMMISSION IS NOT A "TRIBUNAL" WITHIN THE MEANING OF SECTION 1782 ............................................................. 5

      A. The Commission's Investigation Of Competition Law Complaints Is Not An Adjudicative Process ........................................................... 5

      B. A Narrow Interpretation Of "Tribunal" Is Appropriate In The Section 1782 Context.......... 10

      C. A Broad Interpretation Of "Tribunal" Is Affirmatively Harmful To The Commission's Sovereign Interests .......................................... 11

  II. THE COURT SHOULD STRICTLY CONSTRUE SECTION 1782 TO AVOID INAPPROPRIATELY BURDENING THE COMMISSION AND OTHER FOREIGN SOVEREIGNS.............. 16

CONCLUSION................................................................ 18

(i)

ii

## TABLE OF AUTHORITIES

CASES                                                    Page

*Heckler* v. *Chaney*, 470 U.S. 821 (1985) ................     9
*Malev Hungarian Airlines* v. *United Techs. Int'l Inc.*, 964 F.2d 97 (2d Cir. 1992) ...........................    10
*McCulloch* v. *Sociedad Nacional de Marineros de Honduras*, 372 U.S. 10 (1963).............................    16
*In re Murchison*, 349 U.S. 133 (1955) ....................     9
*Raygor* v. *Regents of the Univ. of Minn.*, 534 U.S. 533 (2002)............................................................    17
*Withrow* v. *Larkin*, 421 U.S. 35 (1975)...................     9

STATUTES

Act of March 2, 1855, ch. 140, 10 Stat. 630 ..........    11
15 U.S.C. § 2 ............................................................     6
28 U.S.C. § 1782 ....................................................    2, 5

LEGISLATIVE HISTORY

S. Rep. No. 88-1580 (1964), *reprinted in* 1964 U.S.C.C.A.N. 3782 ..............................................    11

INTERNATIONAL TREATIES AND AGREEMENTS

Agreement Between the Government of the United States of America and the Commission of the European Communities Regarding the Application of Their Competition Laws, 1995 O.J. (L 95) 47, *as amended by* Exchange of Letters Dated 31 May 1995 and 31 July 1995, 1995 O.J. (L 132) 38..........................................    12
Agreement Between the Government of the United States of America and the European Communities on the Application of Positive Comity Principles in the Enforcement of Their Competition Laws, 1998 O.J. (L 173) 28 ............    12

iii

TABLE OF AUTHORITIES—continued

Page

Convention on the Taking of Evidence Abroad in
Civil or Commercial Matters, *opened for signa-
ture* Mar. 18, 1970, 23 U.S.T. 2555, T.I.A.S.
No. 7444................................................................. 11

The Treaty Establishing the European Commun-
ity, 2002 O.J. (C 325) 33 ..................................... 1, 2

INTERNATIONAL CASES

Case 53/85, *AKZO Chemie BV* v. *Comm'n of the
European Communities*, 1986 E.C.R. 1965......... 14

Case T-24/90, *Automec Srl* v. *Comm'n of the
European Communities*, 1992 E.C.R. II-2223..... 8

Case C-209/78, *Heintz van Landewyck SARL* v.
*Comm'n of the European Communities*, 1980
E.C.R. 3125...................................................... 10, 13

Case T-65/96, *Kish Glass & Co.* v. *Comm'n of
the European Communities*, 2000 E.C.R. II-
1885 .................................................................... 8

Case T-17/93, *Matra Hachette SA* v. *Comm'n of
the European Communities*, 1994 E.C.R. II-
595 ...................................................................... 13

Case T-11/89, *Shell Int'l Chem. Co.* v. *Comm'n of
the European Communities*, 1992 E.C.R. II-
757 ...................................................................... 9

Case T-241/97, *Stork Amsterdam B.V.* v. *Comm'n
of the European Communities*, 2000 E.C.R. II-
309 ...................................................................... 8

INTERNATIONAL REGULATIONS

Council Regulation 17/62, 1959-1962 O.J. Spec.
Ed. 87 .......................................................... 6, 7, 8, 13

Council Regulation 2842/98, 1998 O.J. (L 354)
18 ........................................................................ 7

iv

TABLE OF AUTHORITIES—continued

Page

Council Regulation 1/2003, 2003 O.J. (L 1) 1 ........    6

SCHOLARLY AUTHORITIES

Brian Eric Bomstein & Julie M. Levitt, *Much Ado About 1782*, 20 U. Miami Inter-Am. L. Rev. 429 (1989).............................................................    11

Lucien R. LeLievre, *Address, in Letters Rogatory* (Bernard A. Grossman ed., 1956) ........................    10

OTHER AUTHORITIES

*Twenty-First Annual Report from the Commission to the European Parliament on the Community's Anti-Dumping, Anti-Subsidy and Safeguard Activities*, COM (2003)481 final, *available at* http://trade-info.cec.eu.int/doclib/html/11368.htm .............................................................    15

Letter from A. Tradacete, Director, European Commission, to B. Amory, Counsel for Aventis (June 6, 2002), *filed in A.L. Gilbert* v. *Rhone-Poulenc S.A. (In re Methionine Litig.)*, No. 3:99cv3491, M:00-CV-1311 (N.D. Cal.).............    15

Press Release, European Comm'n, MEMO/03/33, Statement on Inspections at Producers of Heat Stabilisers as well as Impact Modifiers and Processing Aids—International Cooperation on Inspections (Feb. 14, 2003), *available at* http://www.europa.eu.int/rapid/cgi/guesten.ksh............    12

Press Release, European Comm'n, MEMO/03/107, Spokesperson's Statement on Dawn Raids in the Copper Concentrate Sector (May 14, 2003), *available at* http://www.europa.eu.int/rapid/cgi/guesten.ksh ...........................................    12

## BRIEF OF *AMICUS CURIAE*

Pursuant to Supreme Court Rule 37.3(a) on written consent of all parties, the Commission of the European Communities (the "European Commission" or the "Commission") hereby respectfully submits this brief as *amicus curiae*.[1]    The Commission supports reversal of the decision of the United States Court of Appeals for the Ninth Circuit, *Advanced Micro Devices, Inc.* v. *Intel Corp.*, Pet. App. 1a-9a.

## INTERESTS OF *AMICUS CURIAE*

The European Commission is the executive and administrative organ of the European Communities. The Treaty Establishing the European Community, 2002 O.J. (C 325) 33 (consolidated version), creates a unique tripartite structure in which the Commission is the institutional "Guardian of the Treaty," see *id.* at 119-20, art. 211, while the Council of the European Union represents the national governments of the Member States, and the European Parliament is directly elected by citizens of those Member States, see *id.* at 113, 117, arts. 189, 202. The European Court of Justice and Court of Auditors round out the Communities' key institutions. See *id.* at 126, 129, arts. 220, 246.

The Commission's responsibilities within this structure extend to a wide range of subject areas, including not only competition (antitrust) law, but also international trade, foreign aid, and environmental protection among other areas. Functionally, the Commission's role includes proposing

---

[1] Pursuant to Supreme Court Rule 37.6, the Commission states that no counsel for any party authored this brief in whole or in part, and no person or entity, other than the Commission or its counsel, made any monetary contribution to the preparation or submission of this brief. The parties' written consent to the filing of *amicus curiae* briefs is on file with the Court.

2

legislation, managing and implementing European Union policy and budgets, and representing the European Union on the international stage—including in contexts like this case, where the Commission's (and by extension the Communities') interests are directly at stake. In several areas, the Commission has been granted powers to enforce directly the Treaty and European regulations promulgated pursuant to it.

With regard to competition law and policy, the Commission, through the Directorate-General for Competition ("DG Competition"), enforces, *inter alia*, the Treaty's provisions relating to competition. These include in particular Articles 81 (relating to anti-competitive agreements, including cartels), 82 (relating to abuse of dominant position), and 87 (relating to market-distorting state aid). See *id.* at 64-65, 67. The Commission also has enforcement responsibilities under regulations such as the Merger Regulation, which provides for merger review.

The European Commission is taking the highly unusual (for it) step of appearing as an *amicus curiae* in this case because it is deeply concerned that 28 U.S.C. § 1782 ("Section 1782") could be interpreted and applied in a manner—like that embraced by the Ninth Circuit below—that would directly threaten the Commission's enforcement mission in competition law and possibly interfere with the Commission's responsibilities in other areas of regulatory concern as well. Far from its intended, laudable purpose of aiding the tribunals of foreign sovereigns, Section 1782 could become a threat to foreign sovereigns if interpreted expansively by this Court.

More specifically, the Commission perceives a serious threat to European Union competition law and policy and to the European Commission's ability to carry out its governmental responsibilities if Section 1782 is read (i) to treat the Commission as a "tribunal" in connection with competition law and other enforcement actions, and (ii) to delegate to district courts discretion merely to weigh the

3

Commission's interests in considering Section 1782 requests relating to such enforcement actions. Deeming the Commission a "tribunal" poses a serious threat to the Commission's law enforcement functions, in particular the operation of its cartel-related Leniency Policy. Leaving Section 1782 requests to a multi-factor balancing test within the discretion of district courts would place heavy and inappropriate burdens on the Commission and other foreign governments to monitor and appear in such actions to defend their sovereign interests on a case-by-case basis.

In the Commission's view, respectfully, such an interpretation would be misguided. An accurate understanding of the European Commission's nature and functions should rule out any application of the term "tribunal" to it, and principles of comity should guide the Court away from a freewheeling balancing approach and toward a bright-line rule. The Commission files this *amicus* brief in order to provide the Court with a fuller explanation of both.[2]

## SUMMARY OF ARGUMENT

Section 1782 is intended to facilitate the collection of evidence in aid of proceedings before foreign tribunals, so that those tribunals can readily obtain the information necessary to carry out their adjudicative functions. However, no such proceeding before a "tribunal" was underway or forthcoming when Advanced Micro Devices, Inc. ("AMD") invoked Section 1782 to obtain discovery from its commercial competitor, Intel Corp. ("Intel"). The European

---

[2] The European Commission wishes to be clear that this filing in no way reflects Commission support with respect to the merits of the underlying claims made by either party to this proceeding. Rather, it reflects the Commission's judgment that reversal of the Ninth Circuit's decision and appropriate limiting interpretations of Section 1782 are essential to the continued proper fulfillment of the Commission's enforcement responsibilities.

4

Commission is engaged in a preliminary investigation of Intel that was triggered by AMD's complaint alleging violations of European competition laws. But in that role, the Commission is not an adjudicative "tribunal"—it is an investigative entity fulfilling its responsibilities to enforce the competition laws in the public interest.

The European Commission respectfully submits that Section 1782 should be read to exclude discovery requests predicated on the Commission's investigation and evaluation of alleged infringement of competition laws. The nature of the Commission and its responsibilities make clear that the Ninth Circuit's characterization of its competition law proceedings as involving a "tribunal" cannot stand.

A contrary reading would have serious adverse consequences for the Commission, and thus should also be rejected in the interests of comity. Permitting discovery requests on the grounds endorsed by the court below would undermine the European Community's carefully balanced policies regarding the disclosure of confidential information, by allowing complainants to obtain via Section 1782 documents that they are not permitted to review under European law. Notably, the discovery sought by AMD is information that the Commission has thus far declined to seek on its own behalf. Such a rule could encourage companies to file pretextual complaints with the Commission solely in order to use Section 1782, wasting the Commission's scarce resources. In addition, characterizing the Commission as a "tribunal" poses serious threats to its anti-cartel Leniency Program by jeopardizing the Commission's ability to maintain the confidentiality of documents submitted to it.

In the Commission's view, it would not be appropriate to leave such concerns to be balanced by district courts in case-by-case evaluations of Section 1782 requests. Such an approach would greatly burden the Commission and other foreign sovereigns by requiring them to monitor and appear in district court proceedings throughout the United States in

5

order to explain their interests in blocking such requests. On the other hand, a proper, narrow construction of Section 1782 would avoid subjecting the United States' foreign policy partners to such burdens and indignities. This approach fully satisfies the manifest purpose of Section 1782 without needlessly interfering with the Commission's enforcement responsibilities.

## ARGUMENT

### I. THE EUROPEAN COMMISSION IS NOT A "TRIBUNAL" WITHIN THE MEANING OF SECTION 1782.

The parties have and will set forth legal arguments employing methods of statutory interpretation with respect to Section 1782. The Commission will not repeat those arguments here. Rather, it wishes to draw the Court's attention to an additional and independent interpretive question of special significance to it: whether the Commission can properly be designated a "tribunal" for purposes of Section 1782. The correct answer is no, and that answer requires reversal of the decision below.[3]

#### A. The Commission's Investigation Of Competition Law Complaints Is Not An Adjudicative Process.

Respondent AMD requested the district court's assistance in obtaining discovery from Petitioner Intel under Section 1782 on the premise that the documents sought were "for use in a proceeding in a foreign or international tribunal." The requisite "proceeding in a foreign ... tribunal," 28 U.S.C. § 1782(a), AMD contended, was the European Commission's investigation of Intel under Article 82 of the Treaty for

---

[3] Likewise, of course, a determination in Intel's favor as to whether Section 1782 incorporates either a discoverability requirement or a "pending or ... imminent" proceeding requirement, Pet. i, would mandate reversal.

6

alleged abuse of a dominant position (a charge akin to a claim of monopolization under Section 2 of the Sherman Act, 15 U.S.C. § 2, in the United States). That investigation, in turn, had been automatically triggered by AMD's own filing of an Article 82 complaint against Intel, one of its chief commercial competitors. AMD encouraged the Commission to seek for itself the documents specified in AMD's Section 1782 request; the Commission, exercising its investigative discretion, has declined to do so.

Reversing the district court's refusal to issue the order sought by AMD, the Ninth Circuit held that the Commission's investigation constituted, or was at least "related to," a "'proceeding before a [foreign] tribunal'" within the meaning of Section 1782. Pet App. 7a. That holding, however, rests on a fundamentally mistaken—and potentially very harmful—understanding of the nature of the Commission's responsibilities in enforcing competition law.

The European Commission's overriding responsibility in this area is to conduct *investigations* into alleged violations of the European Union's competition laws. The Commission's staff (namely, DG Competition) may do so in response to a complaint like that filed by AMD, or it may do so on its own initiative. DG Competition may take into account information provided by a complainant, and it may seek information directly from the target of the complaint. See Council Regulation 17/62, art. 11, 1959-1962 O.J. Spec. Ed. 87. It is authorized, for example, to conduct "dawn raids," in which it enters and searches for information on the premises of the alleged infringer's business. See *id.* at art. 14.[4]

---

[4] DG Competition's investigative powers will be further enhanced under a new "modernisation" regulation due to take effect May 1, 2004, that will replace and expand upon Regulation 17/62. DG Competition will have powers, for example, to interview individuals during inspections, to enter private homes, and to seal raided premises and books or records, as well as enhanced powers to impose fines for noncompliance with its investigations. *See* Council Regulation 1/2003, arts. 19-21, 23-24, 45,

7

Ultimately, DG Competition's preliminary investigation results in a formal written decision whether to pursue the complaint. If it declines to proceed, that decision is subject to judicial review. Should it pursue the matter further, DG Competition moves into a more formal investigative mode. Typically, DG Competition initiates proceedings by serving the target with a formal "statement of objections" that outlines DG Competition's preliminary views that infringement of the competition laws has occurred, and advises the target of DG Competition's intention—subject to hearing out the target—to recommend a decision adverse to it. If the target so requests, an independent hearing officer will hold a non-adversarial hearing to engage in further information-gathering from the target of the complaint, and will report his or her conclusions. See *id.* at art. 19; Council Regulation 2842/98, arts. 10-14, 1998 O.J. (L 354) 18, 21. DG Competition then faces another decision point—*viz.*, whether to recommend a finding of infringement against the target. No matter what action the Commission then takes on that recommendation—whether it dismisses the complaint, or issues a decision finding infringement and imposing penalties as appropriate—that action is again subject to judicial review.

What this process plainly reveals is that neither DG Competition nor the Commission as a whole is ever engaged in adjudicating rights as between private parties. It never performs the functions of a tribunal, because it never decides the merits of any dispute between the complainant and the target. The Commission's actions are directed against the target of its investigations, *i.e.* the addressee of the statement of objections and of any Commission decision. The complainant is not a party to the Commission's investigations. A complainant does have certain procedural

---

2003 O.J. (L 1) 1, 14-18, 25. These features all reinforce the Commission's capacity to enforce the competition laws.

8

rights that give it an onlooker's role in the proceedings.[5]  But the complainant does not have any right to confront the target, and the Commission does not act on its behalf.  The limited, observer's role conferred on the complainant in no way marks the Commission's proceedings as adjudicative.

As the Court of Justice has explained, a Commission investigation "does not constitute an adversary procedure as between the [companies] concerned but a procedure commenced by the Commission … in fulfillment of its duty to ensure that the rules on competition are observed."  See Case T-65/96, *Kish Glass & Co.* v. *Comm'n of the European Communities*, 2000 E.C.R. II-1885, ¶ 33.  The Commission acts solely to protect the public interest and solely to investigate and, as necessary, to enforce the competition laws.  It is by assessing where the public interest lies that the DG Competition and the Commission decide at each step whether or not to proceed further with investigations and decisions.[6]

By far the greatest part of the Commission's activities, therefore, is not in any sense adjudicative.  Rather, the Commission functions as an executive agency investigating and determining whether to initiate proceedings concerning a

---

[5] For example, a complainant has opportunities to present information in support of its allegations, *see* Council Regulation 17/62, art. 19(3), 1959-1962 O.J. Spec. Ed. 87, as well as the right to seek judicial review of Commission decisions not to proceed with investigation or action on its complaint, *see* Case T-241/97, *Stork Amsterdam B.V.* v. *Comm'n of the European Communities*, 2000 E.C.R. 309, ¶¶ 51-53.  The complainant does not, however, have access to confidential information. *See infra* at note 15.

[6] *See* Case T-24/90, *Automec Srl* v. *Comm'n of the European Communities*, 1992 E.C.R. II-2223, ¶ 85 (explaining that "unlike the civil courts, whose task is to safeguard the individual rights of private persons in their relations inter se, an administrative authority must act in the public interest.  Consequently, the Commission is entitled to refer to the Community interest in order to determine the degree of priority to be applied to the various cases brought to its notice.").

9

violation of European competition law. Only at the very end of the process, when the Commission acts on DG Competition's final recommendation to abandon the investigation or to make a finding of infringement, does the investigative function blur into decisionmaking. But while the line between prosecutorial and adjudicative functions in the last stage of the proceeding may be less sharp than that which exists in United States practice,[7] that modest convergence in no way converts the Commission into a "tribunal" of the sort contemplated in Section 1782.[8]

Nor is the prospect of judicial review of the Commission's prosecutorial decisions sufficient to warrant Section 1782 discovery in connection with competition law investigations. To be sure, judicial review of decisions *not* to proceed with further investigation or prosecution is not familiar in connection with enforcement activities undertaken by United States agencies. See *Heckler* v. *Chaney*, 470 U.S. 821, 831 (1985). But if that feature were sufficient for a Section 1782 petitioner to claim that discovery is "for use in a foreign ... tribunal," it would open the statute to discovery requests in connection with virtually *every* administrative agency action, regulation, investigation, license or permit anywhere in the world, so long as the action is ultimately subject to judicial review. Congress cannot have intended such an extreme result.

---

[7] United States courts nevertheless have considerable experience in differentiating between prosecutorial and adjudicative functions and in wrestling with the consequences of governmental and quasi-governmental schemes that blur the two. *See, e.g., Withrow* v. *Larkin,* 421 U.S. 35, 49-55 (1975); *In re Murchison,* 349 U.S. 133, 137-38 (1955).

[8] *See* Case T-11/89, *Shell Int'l Chem. Co.* v. *Comm'n of the European Communities,* 1992 E.C.R. II-757, ¶¶ 39-40 (holding that "the fact that certain Commission officials acted in the administrative procedure both as investigators and rapporteurs" [prosecutors] does not violate target's rights of defense; Commission is not a tribunal and its conduct is governed by appropriate regulations).

10

## B. A Narrow Interpretation Of "Tribunal" Is Appropriate In The Section 1782 Context.

The Commission believes that the preponderance of law enforcement functions in its competition law responsibilities makes clear that it is not a "tribunal" within the meaning of Section 1782 and that the federal courts lack power to order discovery in connection with the Commission's activities. Indeed, that is also the conclusion of the European Court of Justice. *See* Case C-209/78, *Heintz van Landewyck SARL* v. *Comm'n of the European Communities*, 1980 E.C.R. 3125, ¶¶ 80-81 (holding that Commission in competition law investigation is not "tribunal" triggering rights for target under European Convention for the Protection of Human Rights).[9]  In any event, even if there were any question as to the (in)applicability of the term "tribunal" to the Commission, the Court should construe that term restrictively.

That rule of construction is eminently appropriate in light of the historical roots of Section 1782. It is universally acknowledged that the intent of Section 1782 is to further international comity, and to inspire reciprocal assistance from foreign countries, by assisting foreign tribunals in developing the evidence needed to adjudicate disputes before them. See, *e.g.*, Pet. App. 8a; *Malev Hungarian Airlines* v. *United Techs. Int'l Ins.*, 964 F.2d 97, 100 (2d Cir. 1992). International law has long provided for the device of letters rogatory, or letters of request, from the courts of one country to the courts of another seeking their assistance in obtaining evidence for use in proceedings in the requesting courts. This practice, which originally depended solely on each country's courts' attitude of comity toward the courts of the other, *see* Lucien R.

---

[9] Under that Convention, a hallmark of a "tribunal" is the separation of an adjudicative body from the executive. *See Heintz*, 1980 E.C.R. 3125, ¶ 80 (noting Commission argument that it cannot be a tribunal under Convention because Commission embodies, rather than being separate from, the Community's executive power).

11

LeLievre, *Address, in Letters Rogatory* 9, 10-11 (Bernard A. Grossman ed., 1956), has been codified in international agreements such as the Hague Convention on the Taking of Evidence Abroad,[10] and in domestic statutes like Section 1782. Section 1782 itself has been in existence in some form since 1855, see Act of March 2, 1855, § 2, ch. 140, 10 Stat. 630, 630.[11]

However, throughout this history—including in the liberalizing amendments that transformed Section 1782 into its current form—it has always been clear that the intent is to serve the interests of *adjudication*.[12] While the statute's present use of "tribunal" encompasses a wider range of entities than courts alone, Section 1782's deep roots in court-to-court practice should not be disregarded. Rather, the statute should be construed to be faithful to that purpose, by applying the term "tribunal" solely to adjudicative bodies and not to bodies, like the Commission, that are entrusted principally with investigative rather than adjudicative functions.

### C. A Broad Interpretation Of "Tribunal" Is Affirmatively Harmful To The Commission's Sovereign Interests.

The term "tribunal" in Section 1782 should be read narrowly for practical as well as for legal reasons.

At the threshold, it is worth noting that such a reading in no way impairs the Commission's ability to carry out its

---

[10] Convention on the Taking of Evidence Abroad in Civil or Commercial Matters, *opened for signature* Mar. 18, 1970, 23 U.S.T. 2555, T.I.A.S. No. 7444.

[11] *See also* Brian Eric Bornstein & Julie M. Levitt, *Much Ado About 1782*, 20 U. Miami Inter-Am. L. Rev. 429, 430-32 (1989) (recounting statutory evolution).

[12] *See* S. Rep. No. 88-1580 (1964), *reprinted in* 1964 U.S.C.C.A.N. 3782, 3788.

12

investigative functions.    Other channels exist for the European Commission, as a governmental actor, to obtain information located in the United States if the Commission considers it necessary to do so.  It is the Commission's clear preference, for example, to rely on the formal mechanisms that it has carefully negotiated with the United States specifically for the purpose of cooperation in competition law enforcement.  The Community entered into a cooperation agreement in 1995 with the United States Department of Justice and the United States Federal Trade Commission to share information, including information about current enforcement activities, and to conduct parallel investigations, as well as a subsequent 1998 agreement deepening that cooperative relationship.[13]  That cooperation is extremely effective in practice, as demonstrated, for example, by investigations coordinated among the Commission, the United States antitrust agencies, and even competition authorities in other countries.[14]  Similarly, while the European

---

[13] Agreement Between the Government of the United States of America and the Commission of the European Communities Regarding the Application of their Competition Laws, 1995 O.J. (L 95) 47, *as amended by* Exchange of Letters Dated 31 May 1995 and 31 July 1995, 1995 O.J. (L 132) 38; Agreement Between the Government of the United States of America and the European Communities on the Application of Positive Comity Principles in the Enforcement of Their Competition Laws, 1998 O.J. (L 173) 28.  Even the Commission's filing of this brief will be the subject of an informational exchange between the Commission and the United States, pursuant to Article II(5) of the 1995 Agreement, 1995 O.J. (L 95) at 48.

[14] *See, e.g.,* Press Release, European Comm'n, MEMO/03/107, Spokesperson's Statement on Dawn Raids in the Copper Concentrate Sector (May 14, 2003) (describing raids coordinated with United States Department of Justice and Canadian Competition Bureau), *available at* http://www.europa.eu.int/rapid/start/cgi/guesten.ksh; Press Release, European Comm'n, MEMO/03/33, Statement on Inspections at Producers of Heat Stabilisers as well as Impact Modifiers and Processing Aids— International Cooperation on Inspections (Feb. 14, 2003) (describing raids coordinated with United States Department of Justice, Canadian

13

Union itself does not have one in place, several Member States have entered into treaties with the United States providing for mutual legal assistance in criminal matters, should alleged anticompetitive conduct rise to that level.

Far more important, however, is the very real risk that unless its preferred, narrow reading of "tribunal" prevails, the Commission's competition law enforcement programs will be placed in jeopardy.

First, the Commission objects to the potential subversion of limits that the European Union has imposed, in the exercise of its sovereign regulatory powers, on access by an antitrust complainant to the information that the Commission gathers in its investigation, including confidential business information of the target company. As a general rule, the Commission is bound by an obligation of confidentiality, as a result of which there are many elements of the Commission's files (including commercial information and business secrets) to which the complainant is denied access.[15]  The Court of Justice has mandated in no uncertain terms that "a third party who has submitted a complaint may not in any circumstances be given access to documents containing business secrets."

---

Competition Bureau and Japan Fair Trade Commission), *available at* http://www.europa.eu.int/rapid/start/cgi/guesten.ksh.

[15] *See generally* Council Regulation 17/62, art. 20, 1959-1962 O.J. Spec. Ed. 87 (prohibiting disclosure). If the Commission dismisses a complaint, the complainant has access only to the non-confidential parts of the file on the basis of which the Commission rejects the complaint. If the Commission proceeds with a case, the complainant again has access only to a summary and non-confidential version of the statement of objections. *See also Heintz*, 1980 E.C.R. 3125, ¶ 46 (complainant's rights do not include right to receive confidential information); Case T-17/93, *Matra Hachette SA* v. *Comm'n of the European Communities*, 1994 E.C.R. II-595, ¶ 34 ("In particular, contrary to the applicant's contention, third parties cannot claim a right of access to the file compiled by the Commission on the same basis as the [companies] under investigation ....").

14

Case 53/85, *AKZO Chemie BV* v. *Comm'n of the European Communities*, 1986 E.C.R. 1965, ¶ 28.

As the Court of Justice explained, "[a]ny other solution would lead to the unacceptable consequence that [a competitor] might be inspired to lodge a complaint with the Commission solely in order to gain access to its competitors' business secrets." *Id.* Of course, a broad reading of "tribunal" in Section 1782 would directly undermine the Court of Justice's effort to protect the investigation process from abuse. Under the Ninth Circuit's decision, a complainant in Europe may use the Commission investigation that his complaint triggers to obtain access in the United States to confidential documents describing his competitor's business practices. This situation provides a powerful incentive to file pretextual complaints at the Commission, in order to be eligible to employ Section 1782—an incentive that is perhaps even more powerful than that feared by the Court of Justice in the European context, given the uniquely liberal discovery standards that govern in United States courts. Thus, deeming the Commission to be a "tribunal" for Section 1782 purposes not only facilitates circumvention of the European Union's considered policies on access to information, but also may cause a co-equal competition authority to waste precious time and resources on unfounded antitrust complaints. Indeed, those consequences are so grave that the Commission could be forced to rethink the very structure and future existence of the complaint procedure under European law. Comity is sorely lacking in such a scheme.

Second, the Commission is profoundly concerned that characterizing it as a "tribunal" within the meaning of Section 1782 will have adverse collateral consequences for its ability to protect its prosecutorial and law enforcement prerogatives in other proceedings. The European Commission has needed to invoke the law enforcement investigative privilege in civil actions in the United States to

15

protect from disclosure documents that it gathers in its antitrust law enforcement capacity.[16]    Of paramount importance are documents submitted to the Commission under its Leniency Program by cartel participants who confess their own wrongdoing.  If the Commission were deemed a "tribunal" in the competition context, it could find itself no longer able to guarantee the confidentiality of those Leniency Program confessions by, *inter alia*, resort to the law enforcement privilege wherever necessary.  Companies make delicate balancing judgments in deciding to come forward under the Leniency Program, and any enhanced risk of public disclosure of their confessions will deter their participation. Section 1782 as read by the Ninth Circuit thereby threatens to undercut the effectiveness of the Commission's Leniency Program.

Third, there is no reason to believe that these adverse consequences of an overbroad interpretation of "tribunal" will be limited to the antitrust context.  "Interested parties" who might benefit from fishing expeditions under United States discovery rules abound in Commission proceedings.  For example, private industry complaints can also trigger Commission investigations in the international trade arena, such as in anti-dumping and anti-subsidy enforcement.[17]

In sum, vital Commission interests—in the protection of confidential information, in the rational deployment of its

---

[16] *See, e.g., Amicus* Br. of the Comm'n of the European Communities at 7, *In re Vitamin Antitrust Litig.*, Misc. No. 99-197 (D.D.C. filed May 20, 2002); Letter from A. Tradacete, Director, DG Competition, European Comm'n to B. Amory, Counsel for Aventis (June 6, 2002), *filed in A.L. Gilbert* v. *Rhone-Poulenc S.A. (In re Methionine Litig.)*, No. 3:99cv3491, M:00-CV-1311 (N.D. Cal.).

[17] *See Twenty-First Annual Report from the Commission to the European Parliament on the Community's Anti-Dumping, Anti-Subsidy and Safeguard Activities*, COM (2003)481 final at 17-19 (outlining complaint and investigation procedures), *available at* http://trade-info.cec. eu.int/doclib/html/113638.htm.

16

competition enforcement resources, in the viability of its Leniency Program, and in the effective administration of other areas of Commission responsibility—are jeopardized by characterizing the Commission as a "tribunal" under Section 1782.

## II. THE COURT SHOULD STRICTLY CONSTRUE SECTION 1782 TO AVOID INAPPROPRIATELY BURDENING THE COMMISSION AND OTHER FOREIGN SOVEREIGNS.

In the European Commission's view, a construction of "tribunal" that excludes the Commission necessarily follows from the nature of the Commission's responsibilities; in the event of any doubt, the serious adverse policy consequences noted above should weigh strongly in favor of that construction. However, the Commission anticipates an argument that the statute should not be interpreted to establish clear limits, and that concerns such as those expressed by the Commission are appropriately left for district courts to take into account in exercising discretionary authority to rule on Section 1782 requests. That is, some may argue against any clear, limiting interpretations (such as a narrow construction of "tribunal") that restrict resort to Section 1782 from the outset, and instead favor case-by-case assessments of the propriety of each Section 1782 request.

The latter approach, however, offends principles of comity by placing heavy and inappropriate burdens on foreign countries and their agencies. Where a statute implicates sovereign interests and is intended to foster international cooperation, it should be construed to further, not frustrate, those interests. Indeed, in construing a statute in this sensitive inter-sovereign context, the federal courts should apply a strong presumption against any interpretation that undermines international comity. See *McCulloch* v. *Sociedad Nacional de Marineros de Honduras*, 372 U.S. 10, 19-21 (1963) (favoring statutory construction that avoided disturbance in United States international relations and conflicts with

17

international and foreign law); cf. *Raygor* v. *Regents of the Univ. of Minn.*, 534 U.S. 533, 543-44 (2002) (requiring a clear statement to infer waiver of state sovereign immunity).

For two reasons, the case-by-case approach ill serves comity. First, a district court can only weigh fairly the complex interests of a foreign sovereign in aiding or blocking a Section 1782 discovery request if it is made aware of those interests. Private litigants cannot speak with authority to the policy interests of the European Commission. But so far as the Commission is aware, there is no system for providing it with notice of Section 1782 cases in which its interests are at stake, much less any regular procedure through which the Commission might appear and make those interests known. More important, even if it were feasible for the Commission to appear in every such proceeding, that very notion—that a sovereign government should be obliged to appear regularly in courts across the United States to explain itself and its objections to Section 1782 discovery—is contrary to principles of comity. And each adverse decision by an individual district court will be a potential irritant in relations between these important allies, and will risk interference with the normal conduct of international cooperation between the Commission and United States law enforcement authorities. Section 1782 applied in this fashion will promote international friction, not international comity.

Second, under the case-by-case approach, each of the scores of United States district courts will have discretion to conduct a balancing process to determine whether discovery is warranted in connection with a specific international proceeding. Each district court could develop its own approach, and each would be free to differ with other district courts with respect to both the appropriate balance in a given set of circumstances and the general rules to apply to the balancing process. The inevitable unpredictability and inconsistency simply exacerbate the problems already inherent in requiring a foreign sovereign to monitor United

18

States litigation to determine when it should appear and explain its interests in a United States tribunal. In this setting, clear rules are required.

Where two interpretations of a statute are available to it, the Court should favor the interpretation that does not offend the sovereign interests of the United States' foreign policy partners. Here, that interpretation—namely, that the European Commission in its antitrust capacity is not a "tribunal" on whose nominal behalf Section 1782 can be invoked—not only has clear factual and legal support, but also avoids a host of harms to the Commission and the competition law programs for which it is responsible.

### CONCLUSION

For the foregoing reasons, *amicus curiae* the European Commission respectfully suggests that the decision below should be reversed.

> Respectfully submitted,
>
> CARTER G. PHILLIPS*
> VIRGINIA A. SEITZ
> RICHARD WEINER
> GENE C. SCHAERR
> MARINN F. CARLSON
> SIDLEY AUSTIN BROWN &
>     WOOD LLP
> 1501 K Street, N.W.
> Washington, D.C. 20005
> (202) 736-8000

*Counsel for Amicus Curiae*

December 23, 2003        * Counsel of Record

# EXHIBIT 11

European Commission
The Director-General

Brussels,
COMP/C-3/TK/hcD(2006)*D190

Cleary Gottlieb Steen & Hamilton
Att. Mr. Maurits Dolmans
Rue de la Lei 57
1040 Bruxelles

Subject:     Case COMP/C-3/37.792     Microsoft; Microsoft's discovery requests
            with US courts

Dear Mr. Dolmans:

By letter of 6 March 2006 you informed us of discovery requests filed with the U.S. District Court for the Southern District of New York by Microsoft Corporation addressed to your client IBM and Cleary Gottlieb Steen & Hamilton. You also informed us of an *ex parte* order issued by the said court on 3 March 2006 and the related subpoenas served on IBM and Cleary Gottlieb Steen & Hamilton by Microsoft.

Following your request and in view of the fact that DG Competition considers that the discovery requests in this case raise issues of considerable importance in relation to the Commission's rules on access to file, I am sending you herewith observations (in annex) that have been prepared by DG Competition with regard to these requests.

I should like to point out that the annexed document reflects the views of DG Competition, which is a service of the European Commission. Should this be deemed necessary and appropriate, the European Commission would like to be able to seek leave to intervene as *amicus curiae*. I should be grateful therefore if you would keep us informed in a timely way of developments in this proceeding.

As specified in the attached statement, the present observations do not seek to support, intervene in favour of or otherwise assist any of the parties involved in the proceeding.

Yours sincerely,

Philip Lowe

EUROPEAN COMMISSION
DG Composition

**Annex to the letter of 9 March 2006**
**addressed to Cleary Gottlieb Steen & Hamilton**

**Subject:**     **Discovery requests *in re* Microsoft Corporation before the United States**
**District Court for the Southern District of New York**

## I.     INTRODUCTION

### 1.1     The pending litigation before the US District Court for the Southern District of New York

1.     The Directorate-General for Competition ("DG COMP") of the European Commission ("Commission") has been informed that Microsoft Corporation on 3 March 2006 has made an application for discovery pursuant to 28 U.S.C. § 1782 with the US District Court for the Southern District of New York and asked for the authorisation to serve subpoenas on international Business Machines Corporation ("IBM") and Cleary Gottlieb Steen & Hamilton LLP ("Cleary"). The Commission has also been informed that an *ex parte* order has been issued on 3 March 2006 by the said court ordering IBM and Cleary to essentially produce:

    a.     *All documents that contain, constitute, reflect, evidence, or refer to any communication or correspondence between IBM or Cleary and the Commission, the Monitoring Trustee or OTR relating to the Interoperability Information or to the proper interpretation of the terms "Interoperability" or "Interoperability Information" as used in the 2004 Decision.*[1]

    b.     *All documents that contain, constitute, reflect, evidence, or refer to any communication or correspondence between IBM or Cleary and any other third party, relating to the Interoperability Information or to the proper interpretation of the terms "Interoperability" or "Interoperability Information" as used in the 2004 Decision.*[2]

    c.     *All documents that contain, constitute, reflect, evidence, or refer to any communication between IBM or Cleary and the Commission, the Monitoring Trustee or OTR about Microsoft's compliance or alleged failure to comply with European Community competition laws, including without limitation the 2004 Decision, the Article 24(a)(1) Decision, or the SO.*[3]

---

[1] Points 1, 2 and 3 of Microsoft's request.

[2] Point 4 of Microsoft's request.

[3] Points 5, 6, 7 of Microsoft's request.

    d.    *All documents that contain, constitute, reflect, evidence, or refer to any communication between IBM or Cleary and any other third party about Microsoft's compliance or alleged failure to comply with European Community competition laws, including without limitation the 2004 Decision, the Article 24(a)(1) Decision, or the SO.*[4]

    2.    Given the importance of the policy issues that this matter raises, the Directorate-General for Competition of the European Commission wishes to state its position on these issues. The Commission may seek leave from the Court to intervene at a later date by filing an *amicus curiae* brief, should this be deemed necessary and appropriate, after following its decision making procedures.

    3.    DG COMP wishes to underline that it does not intend to support or otherwise assist any of the parties to the pending litigation.

### 1.2.  The framework within which the Commission carries out its antitrust investigations

    4.    The Commission is the institution entrusted within the European Union with the enforcement of the competition provisions of the Treaty establishing the European Community ("the EC Treaty"), notably Articles 81 ("agreements in restraint of trade") and 82 ("abuse of dominance").[5] The Commission's powers of competition enforcement are stated in Council Regulation 1/2003 (previously in Council Regulation No. 17/62) which provides for specific means for investigating infringements of European antitrust rules, notably issuing formal requests for information, taking oral statements and conducting on-site inspections. Commission Regulation No. 773/2004 provides for more precise rules governing Commission procedures.

    5.    As the European Court of Justice points out in its Hoffman-La Roche judgment the *"observance of the right to be heard is in all proceedings in which sanctions, in particular fines or penalty payments, may be imposed a fundamental principle of Community Law which must be respected* [....]."[6]

    6.    In line with this judgment the Commission has established a number of procedural rules which are intended to guarantee the application of the principle of equality of arms and the protection of the rights of defence in proceedings before the Commission. In particular, the rules on access to file are intended to enable the effective exercise of the rights of defence by defendants in a Commission proceeding.

---

[4] Point 8 of Microsoft's request.

[5] Articles 81 and 82 provide for provisions comparable to those of Sections (1) and (2) of the Sherman Act.

[6] Judgment of the Court of 13 February 1979 in Case 85/76 Hoffman-La Roche & Co. AG v. Commission [1979] [ECR-461.

7.  The "Commission file" in a competition investigation (hereinafter also referred to as "the file") consists of all documents, which have been obtained, produced and/or assembled by DG COMP, during the investigation.[7] Access to file is granted to defendants in proceedings before the Commission to all documents making up the Commission file with the exception of internal documents, business secrets of other undertakings, or other confidential information after a Statement of Objections has been addressed to them.[8]

8.  Access is obviously only granted to those documents of the administrative procedure which relate to the objections raised by the Commission. The European Court of Justice confirmed that "*the Commission is allowed to preclude from the administrative procedure evidence which has no relation to the allegations of fact and of law in the Statement of Objections and which therefore has no relevance to the investigation*".[9]

9.  In case a defendant believes that the Commission services have erroneously withheld documents which are necessary for its defence it can make a request for a decision of the Hearing Officer, who is responsible for safeguarding the rights of defence in Commission proceedings."[10]

10.  A decision by the Hearing Officer not to disclose certain documents to a defendant can be reviewed by the European Court of First Instance ("CFI"). Similarly, an undertaking which deems that certain of its business secrets on the Commission file should not be disclosed to the defendant pursuant to a decision by the Hearing Officer can appeal to the CFI."[11]

11.  Documents obtained through access to file may only be used for the purpose of the Commission's proceedings. This is underlined in Article 15 of Regulation 773/2004, which stipulates that documents obtained through access to file may only be used "[...] *for the purposes*

---

[7]  See Commission Notice on the rules for access to the Commission file in cases pursuant to Articles 81 and 82 of the EC Treaty, Articles 53, 54 and 57 of the EPA Agreement and Council Regulation (EC) No. 139/2004, OJ 2005/C 325/07 of 22/12/2005 ("Notice on access to file"), at paragraph 7. This notice replaces an earlier but similar Commission Notice of 1997 on access to file, OJC 23 of 23.01.1997.

[8]  Notice on access to file, at paragraph 10.

[9]  Judgment of the Court of 7 January 2004 in Joined Cases C-204/00 P, C-205/00 P, C-213/00 P, C-217/00 P and C-219/00 P, Aalborg Portland, not yet reported, at paragraph 126.

[10]  See Articles 1 and 8 of the Commission Decision of 23 May 2001 on the terms of reference of hearing officers in certain competition proceedings, OJ 200[ ] 62/21 of 19.6.2001.

[11]  See Article 9 of the Commission Decision of 23 May 2001 on the terms of reference of hearing officers in certain competition proceedings.

4

*of judicial and administrative procedures for the application of Articles 81 and 82 of the Treaty".* Furthermore, the Notice on access to file states "*Should the information be used for a different purpose, at any point in time, with the involvement of an outside counsel, the Commission may report the incident to the bar of that counsel, with a view to disciplinary action.*"[12] Lastly, the Commission makes that obligation clear in a standard letter to the parties when addressing to them a Statement of Objections and providing access to file.

### 1.3.    The proceedings against Microsoft pursuant to Article 24 of Regulation 1/2003

12.    On 24 March 2004, the Commission adopted a decision in Case COMP/C-3/37.792 Microsoft ("the Decision") in which it concluded that Microsoft had abused its dominant position in PC operating systems by (i) refusing to provide interoperability information necessary for competitors to be able to effectively compete in the work group server operating system market and (ii) tying its Windows Media Player with the Windows PC operating system. The Commission imposed a €497,196,304 fine on Microsoft and ordered it to bring the above-mentioned infringements of Article 82 EC to an end (Article 4 of the Decision).

13.    In particular, the Commission ordered Microsoft to supply interoperability information to interested undertakings on reasonable and non-discriminatory terms ("the interoperability remedy", Article 5 of the Decision) and to offer a full-functioning version of its Windows PC operating system which does not incorporate Windows Media Player ("the tying remedy", Article 6 of the Decision). The Decision also provided for the establishment of a monitoring mechanism, including a Monitoring Trustee, whose role is to provide expert advice to the Commission on Microsoft's compliance with the Decision. Microsoft was granted a deadline of 120 days to implement the interoperability remedy and a deadline of 90 days to implement the tying remedy. The obligations imposed by the Decision were suspended pending the Court of First Instance's consideration of Microsoft's request for interim measures. This application for interim measures was dismissed by the President of the Court of First Instance on 22 December 2004.[13]

14.    On 28 July 2005, the Commission adopted a decision on the monitoring mechanism foreseen in Article 7 of the Decision.[14] This decision sets out *inter alia* the framework under which the Monitoring Trustee, whose role is to provide expert advice to the Commission on Microsoft's compliance with the Decision, will work. Subsequently, the

---

[12]  Commission Notice on the rules for access to the Commission file in cases pursuant to Articles 81 and 82 of the EC Treaty, Articles 53, 54 and 57 of the EEA Agreement and Council Regulation (EC) No. 139/2004, in OJ 2005/C 325/07 cf 22/12/2005.

[13]  Order of the President of the Court of First Instance of 22 December 2004 in Case T-201/04 R, Microsoft, not yet reported.

[14]  C(2005) 2988 final.

5

Commission invited Microsoft to put forward candidates for the position of Monitoring Trustee. After a selection procedure, on 4 October 2005, on the basis of a shortlist of candidates submitted by Microsoft, the Commission appointed as Monitoring Trustee Professor Neil Barrett, a British computer science expert.

15.    Article 24 of Regulation 1/2003 grants the Commission the power to impose on undertakings daily penalty payments not exceeding 5% of the average daily turnover in the preceding business year in order to compel them to put an end to an infringement of Article 81 or 82 EC, in accordance with a prohibition decision taken pursuant to Article 7 of Regulation 1/2003 (Article 24(i)(a)).

16.    On the basis of an opinion from its outside technical experts OTR on the Technical Documentation, the Commission decided to open proceedings against Microsoft in order to compel it to comply with its obligations stemming from the Decision.. Consequently, on 10 November 2005, the Commission adopted a decision pursuant to Article 24(1) of Regulation 1/2003 ("the Art 24(1) Decision"). This decision is the first step in a procedure pursuant to Article 24 of Regulation 1/2003. By means of this decision, a periodic penalty payment of €2 million per day was imposed on Microsoft as from 15 December 2005 in the event that it were not to comply with Article 5(a) and (c) of the Decision, i.e. its obligations to (i) supply complete and accurate Interoperability information; and (ii) to make that information available on reasonable terms.

17.    In the light of the Monitoring Trustee's reports on the state of the Technical Documentation provided to the Commission by Microsoft in response to the Art 24(1) Decision, the Commission, on 21 December 2005, adopted a Statement of Objections in which it took the preliminary view that Microsoft had not yet complied with its obligation to supply complete and accurate interoperability information. A hearing on the objections raised by the Commission is scheduled for 30-31 March 2006.

## 2.    DG COMP'S POSITION WITH REGARD TO MICROSOFT'S REQUEST FOR DISCOVERY

### 2.1.    Microsoft's request to obtain all documents exchanged between the Commission, the Monitoring Trustee, OTR and third parties relating to the Interoperability Information or to the proper interpretation of the terms "Interoperability" or "Interoperability Information"

18.    After the issuance of the Statement of Objections Microsoft has requested access to the documents identified in the annex to the Statement of Objections, including to all documents exchanged between the Commission services and the Trustee and all documents exchanged between the Commission services and OTR in relation to all matters covered by the

Statement of Objections.[15]  By letter of 30 January 2006 Microsoft requested access to documents on the Commission's file pertaining to the correspondence between the Commission on the one hand and third parties such as Sun, Oracle, IBM and Novell on the other as well as access to documents reflecting discussions that have taken place between third parties, in particularly Sun, IBM and OTR and the Trustee.[16]

19.    Following Microsoft's request the hearing Officer took the position that the correspondence between the Commission services and the Trustee constitutes internal documents which are inaccessible to Microsoft whilst, after confidentiality waivers had been provided by third parties; Microsoft was given access to the communication between the Commission and third parties that relates to the issues raised in the Statement of Objections of 21 December 2005.[17]

20.    The Commission has therefore given Microsoft access to all third party documents in its possession.  However, by letter of 2 March 2006 Microsoft specifically requested to have access to "*any material submitted by its adversaries to the Trustee and OTR.*"[18]

21.    This request is currently under scrutiny by the Hearing Officer.  In order to verify whether Microsoft's request is well founded the Commission has asked OTR and the trustee to disclose and transmit to the Commission any documents they have directly, without the Commission's knowledge, received from third parties or Microsoft in carrying out their duties as well as any minutes they have taken as regards communications with third parties or Microsoft.

22.    It came as a surprise to DG COMP that Microsoft decided to turn to a US court for assistance under 28 U.S.C. §1782 in order to gain access to documents which it had one day before sought to obtain from the Commission and on the disclosure of which a proceeding is currently pending before the Commission's Hearing Officer.

23.    DG COMP takes the position the Microsoft's rights of defence in relation to the objections raised in the Statement of Objections of 21 December 2005 are adequately protected by the European rules on access to file.  Therefore an application by Microsoft on the basis 28 U.S.C. § 1782 is not objectively necessary but rather an attempt to circumvent the established rules on access to file in proceedings before the Commission.

---

[15]  E-mail from Jean-Yves Art, Microsoft's Director of Competition EMEA, of 23 December 2005.

[16]  Letter from Microsoft's counsel Ian Forrester to the Hearing Officer of 30 January 2005.

[17]  Letter from the Hearing Officer to Ian Forrester of 8 February 2006.

[18]  Letter from Georg Berrisch, Microsoft's counsel, of 2 March 2006.

**2.2.    Microsoft's request to obtain all documents exchanged between the Commission, the Monitoring Trustee or OTR and third parties about Microsoft's compliance or alleged failure to comply with European Community competition laws, including without limitation the 2004 Decision, the Article 24(1)(a) Decision**

24.    With regard to Microsoft's request to get access to documents which are not related to the Statement of Objections of 21 December 2005 the Commission would like to stress that such documents are not necessary for Microsoft to defend itself as the Commission has not a this stage raised any objections vis-a-vis Microsoft on these other issues. Microsoft will be given proper access to file once and if the Commission issues a Statement of Objections related to these matters.

25.    Microsoft's request to get access to such documents before a Statement of Objections has been issued is therefore unduly intrusive and totally at odds with the European rules on access to file which such a request would circumvent and undermine.

26.    The European Court of First Instance has indeed recognised that *"there is no right under Community law to be informed of the state of the administrative procedure before the statement of objections is formally issued"* and that, if I there were *"a right to be informed of an investigation in circumstances where suspicions exist in respect of an undertaking,"* this would *"seriously hamper the work of the Commission."*[19]

27.    Therefore a premature request by Microsoft for disclosure under 28 U.S.C. § 1782 in order to find out if a company has filed a document pertaining to Microsoft's compliance or alleged failure to comply with European Community competition laws, or more specifically on an issue where a Statement of Objections has not yet been adopted is apt to seriously harm the Commission's investigation process and circumvent the European rules on access to file.

**3.    CONCLUSION**

28.    In sum, DG COMP is of the opinion that the described European access to file rules properly protect Microsoft's rights of defence and that the discovery requests presented by Microsoft are an attempt to circumvent these well established rules. DG COMP therefore sees no necessity for Microsoft to avail itself of the assistance of US courts pursuant to 28 U.S.C. § 1782.

*Brussels, 8 March 2006*

100429913_1 (2).DOC

---

[19]  Judgment of the Court of First Instance of 8 July 2004 in Case T-50/00 Dalmine v. Commission, not yet reported, paragraphs 83 and 110.

8

# EXHIBIT 12



COMMISSION OF THE EUROPEAN COMMUNITIES

Brussels, 2.4.2008
COM(2008) 165 final

**WHITE PAPER on**

**Damages actions for breach of the EC antitrust rules**

{SEC(2008) 404}
{SEC(2008) 405}
{SEC(2008) 406}

**EN**                                                                                          **EN**

## WHITE PAPER on

## Damages actions for breach of the EC antitrust rules

1.    PURPOSE AND SCOPE OF THE WHITE PAPER

### 1.1.    Why a White Paper on damages actions for breaches of the EC antitrust rules?

Any citizen or business who suffers harm as a result of a breach of EC antitrust rules (Articles 81 and 82 of the EC Treaty) must be able to claim reparation from the party who caused the damage. This **right of victims to compensation** is guaranteed by **Community law**, as the European Court of Justice recalled in 2001 and 2006.[1]

Despite the requirement to establish an effective legal framework turning exercising the right to damages into a realistic possibility, and although there have recently been some signs of improvement in certain Member States, **to date in practice victims of EC antitrust infringements only rarely obtain reparation** of the harm suffered. The amount of compensation that these victims are forgoing is in the range of several billion euros a year.[2]

In its 2005 Green Paper, the Commission concluded that this failure is largely due to **various legal and procedural hurdles** in the Member States' rules governing actions for antitrust damages before national courts. Indeed, such antitrust damages cases display a number of particular characteristics that are often insufficiently addressed by traditional rules on civil liability and procedure. This gives rise to a great deal of **legal uncertainty**.[3] These particularities include the very complex factual and economic analysis required, the frequent inaccessibility and concealment of crucial evidence in the hands of defendants and the often unfavourable risk/reward balance for claimants.

The **current ineffectiveness of antitrust damages actions** is best addressed by a combination of measures at both Community and national levels, in order to achieve effective minimum protection of the victims' right to damages under Articles 81 and 82 in every Member State and a more level playing field and greater legal certainty across the EU.

The European Parliament[4] concurred with the findings in the Green Paper, as did other stakeholders, and called upon the Commission to prepare a White Paper with detailed proposals to address the obstacles to effective antitrust damages actions.

### 1.2.    Objectives, guiding principles and scope of the White Paper

This White Paper considers and puts forward proposals for policy choices and specific measures that would ensure, more than is the case today, that **all victims** of infringements of

---

[1]    Case C-453/99, *Courage and Crehan*, [2001] ECR I-6297, and Joined Cases C-295−298/04, *Manfredi*, [2006] ECR I-6619.

[2]    See section 2.2 of the Impact Assessment Report (IAR).

[3]    See *ibid.*, section 2.3.

[4]    Resolution of 25 April 2007 (2006/2207(INI)).

**EN**                                          2                                          **EN**

EC competition law **have access to effective redress mechanisms so that they can be fully compensated** for the harm they suffered.

This White Paper is to be read in conjunction with two Commission staff working documents: (a) a Commission staff working paper on EC antitrust damages actions ("the SWP") which explains in greater detail the considerations underlying the White Paper and also provides a concise overview of the already existing *acquis communautaire*; and (b) an Impact Assessment Report (the "IAR") analysing the potential benefits and costs of various policy options, and an executive summary of this report.

The **primary objective** of this White Paper is to improve the legal conditions for victims to exercise their right under the Treaty to reparation of all damage suffered as a result of a breach of the EC antitrust rules. **Full compensation** is, therefore, the first and foremost guiding principle.

More effective compensation mechanisms mean that the costs of antitrust infringements would be borne by the infringers, and not by the victims and law-abiding businesses. Effective remedies for private parties also increase the likelihood that a greater number of illegal restrictions of competition will be detected and that the infringers will be held liable.[5] Improving compensatory justice would therefore **inherently** also produce beneficial effects in terms of **deterrence** of future infringements and greater compliance with EC antitrust rules. Safeguarding undistorted competition is an integral part of the internal market and important for implementing the Lisbon strategy. A competition culture contributes to better allocation of resources, greater economic efficiency, increased innovation and lower prices.

The Commission followed the further guiding principle that the legal framework for more effective antitrust damages actions should be based on a genuinely European approach. The policy choices proposed in this White Paper therefore consist of **balanced measures** that are rooted in **European legal culture** and **traditions**.

Another important guiding principle of the Commission's policy is to **preserve strong public enforcement** of Articles 81 and 82 by the Commission and the competition authorities of the Member States. Accordingly, the measures put forward in this White Paper are designed to create an effective system of private enforcement by means of damages actions that complements, but does not replace or jeopardise, public enforcement.

In view of the foregoing and in line with the requirement set out by the Court of Justice that *any* victim of antitrust infringements must be able to exercise his right to compensation effectively, the issues addressed in the White Paper concern, in principle, **all categories of victim**, **all types of breach** of Articles 81 and 82 and **all sectors of the economy**. The Commission also considers it appropriate that the policy should cover both actions for damages which do, and actions which do not, rely on a prior finding of an infringement by a competition authority.

---

[5]    See the IAR, section 2.1.

## 2.    THE PROPOSED MEASURES AND POLICY CHOICES

### 2.1.    Standing: indirect purchasers and collective redress

In the context of legal standing to bring an action, the Commission welcomes the confirmation by the Court of Justice that **"any individual"** who has suffered harm caused by an antitrust infringement must be allowed to claim damages before national courts.[6] This principle also applies to **indirect purchasers**, i.e. purchasers who had no direct dealings with the infringer, but who nonetheless may have suffered considerable harm because an illegal overcharge was passed on to them along the distribution chain.

With respect to **collective redress**, the Commission considers that there is a clear need for mechanisms allowing aggregation of the individual claims of victims of antitrust infringements. Individual consumers, but also small businesses, especially those who have suffered **scattered and relatively low-value damage**, are often deterred from bringing an individual action for damages by the costs, delays, uncertainties, risks and burdens involved. As a result, many of these victims currently **remain uncompensated**. At the rare occasions where a multitude of individual actions are brought in relation to the same infringement, **procedural inefficiencies** arise, for claimants, defendants and the judicial system alike.

The Commission therefore suggests[7] a combination of two complementary mechanisms of collective redress to address effectively those issues in the field of antitrust:

- **representative actions**, which are brought **by qualified entities**, such as consumer associations, state bodies or trade associations, on behalf of identified or, in rather restricted cases, identifiable victims. These entities are either (i) officially designated in advance or (ii) certified on an *ad hoc* basis by a Member State for a particular antitrust infringement to bring an action on behalf of some or all of their members; and

- **opt-in collective actions**, in which victims **expressly decide** to combine their individual claims for harm they suffered into one single action.

Considering that qualified entities will not be able or willing to pursue every claim, it is necessary that these two types of action **complement** each other to ensure effective collective redress for victims of antitrust infringements. In addition, it is important that victims are not deprived of their right to bring an individual action for damages if they so wish. However, safeguards should be put in place to avoid that the same harm is compensated more than once.

These suggestions on damages actions in the field of antitrust are part of the Commission's wider initiative to strengthen collective redress mechanisms in the EU and may develop further within this context.

### 2.2.    Access to evidence: disclosure *inter partes*

Competition cases are particularly fact-intensive. Much of the **key evidence** necessary for proving a case for antitrust damages is often **concealed** and, being **held by the defendant** or by third parties, is usually not known in sufficient detail to the claimant.

---

[6]    *Manfredi* (see footnote 1), point 61.
[7]    For the underlying reasons see Chapter 2 of the SWP.

Whilst it is essential to overcome this structural **information asymmetry** and to improve victims' access to relevant evidence, it is also important to **avoid the negative effects** of **overly broad** and burdensome disclosure obligations, including the **risk of abuses**.

The Commission therefore suggests that across the EU a **minimum level of disclosure** *inter partes* for EC antitrust damages cases should be ensured. Building on the approach in the Intellectual Property Directive (Directive 2004/48/EC), access to evidence should be based on **fact-pleading** and **strict judicial control** of the plausibility of the claim and the proportionality of the disclosure request. The Commission therefore suggests[8] that:

- national courts should, under **specific conditions**, have the power to order parties to proceedings or third parties to **disclose precise categories of relevant evidence**;

- **conditions** for a disclosure order **should include** that the claimant has:

    – **presented all the facts** and **means of evidence** that are **reasonably available** to him, provided that these show **plausible grounds** to suspect that he suffered harm as a result of an infringement of competition rules by the defendant;

    – shown to the satisfaction of the court that he is **unable**, applying all efforts that can reasonably be expected, **otherwise to produce the requested evidence**;

    – specified sufficiently **precise categories** of evidence to be disclosed; and

    – satisfied the court that the envisaged disclosure measure is both **relevant** to the case and **necessary** and **proportionate**;

- adequate protection should be given to corporate statements by leniency applicants and to the investigations of competition authorities;

- to prevent **destruction of relevant evidence** or **refusal** to comply with a disclosure order, courts should have the power to impose sufficiently **deterrent sanctions**, including the option to draw adverse inferences in the civil proceedings for damages.

## 2.3.    Binding effect of NCA decisions

Whenever the **European Commission** finds a breach of Article 81 or 82 of the EC Treaty, victims of the infringement can, by virtue of established case law and Article 16(1) of Regulation 1/2003, rely on this decision as binding proof in civil proceedings for damages. For **decisions** by national competition authorities (**NCAs**) finding a breach of Article 81 or 82, similar rules currently exist in only some Member States.

The Commission sees no reason why a final decision[9] on Article 81 or 82 taken by an NCA in the European Competition Network (ECN), and a final judgment by a review court upholding

---

[8]    For the underlying reasons see Chapter 3 of the SWP.

[9]    In all Member States, NCA decisions are subject to judicial review. NCA decisions are considered *final* when they can no longer be reviewed, i.e. decisions that were not appealed within the applicable time limits and thus accepted by their addressees, and those that were confirmed by the competent review courts.

**EN**                                                5                                                **EN**

the NCA decision or itself finding an infringement, should not be accepted in every Member State as irrebuttable proof of the infringement in subsequent civil antitrust damages cases.

A rule to this effect would ensure a more **consistent application** of Articles 81 and 82 by different national bodies and increase **legal certainty**. It would also significantly increase the **effectiveness** and **procedural efficiency** of actions for antitrust damages: if defendants can call into question their own breach of Article 81 or 82 established in a decision by an NCA and, possibly, confirmed by a review court, the courts seized with an action for damages are required to re-examine the facts and legal issues already investigated and assessed by a specialised public authority (and a review court). Such duplication of factual and legal analysis leads to considerable extra costs, duration and imponderability for the victim's action for damages.

The Commission therefore suggests[10] the following rule:

- national courts that have to rule in actions for damages on practices under Article 81 or 82 on which **an NCA** in the ECN has already given a **final decision** finding an infringement of those articles, or on which **a review court** has given a **final judgment** upholding the NCA decision or itself finding an infringement, **cannot take decisions running counter** to any such decision or ruling.

This obligation should apply without prejudice to the right, and possible obligation, of national courts to seek clarification on the interpretation of Article 81 or 82 under Article 234 of the EC Treaty.

The rule set out above confers binding effect only on decisions that are final, i.e. where the defendant has **exhausted all appeal avenues**, and relates only to the **same practices and same undertaking(s)** for which the NCA or the review court found an infringement.

## 2.4.    Fault requirement

If the breach of Article 81 or 82 **has been proven**, Member States take diverse approaches concerning the requirement of **fault** to obtain damages.

Some Member States require no fault at all as a condition for an antitrust damages claim, or irrebuttably presume the existence of fault once an infringement has been proven. The Commission sees no policy grounds against such an approach.

As regards the other Member States, the Court's case law on the conditions of civil liability for breaches of directly applicable Treaty rules, such as Articles 81 and 82, and the principle of effectiveness suggest that any fault requirements under national law would have to be limited. The Commission sees no reasons to relieve infringers from liability on grounds of absence of fault other than in cases where the infringer made an excusable error.

The Commission therefore suggests[11] a measure to make it clear, for Member States that require fault to be proven, that:

---

[10]    For the underlying reasons see Chapter 4 of the SWP.
[11]    For the underlying reasons see Chapter 5 of the SWP.

- once the victim has **shown a breach of Article 81 or 82**, the **infringer should be liable for damages caused unless he demonstrates** that the infringement was the result of a genuinely **excusable error**;

- an error would be **excusable** if a reasonable person applying a high standard of care could not have been aware that the conduct restricted competition.

## 2.5.    Damages

The Commission welcomes the confirmation by the Court of Justice of the **types of harm** for which victims of antitrust infringements should be able to obtain compensation.[12] The Court emphasised that victims must, as a minimum, receive **full compensation** of the **real value of the loss suffered**. The entitlement to full compensation therefore extends not only to the **actual loss** due to an anti-competitive price increase, but also to the **loss of profit** as a result of any reduction in sales and encompasses a **right to interest**.

For reasons of legal certainty and to raise awareness amongst potential infringers and victims, the Commission suggests **codifying** in a Community legislative instrument the **current** *acquis communautaire* on the scope of damages that victims of antitrust infringements can recover.

Once the scope of damages is clear, the *quantum* of these damages must be **calculated**. This calculation, implying a comparison with the economic situation of the victim in the **hypothetical scenario** of a competitive market, is often a very cumbersome exercise. It can become **excessively difficult** or even practically impossible, if the idea that the exact amount of the harm suffered must always be precisely calculated is strictly applied. Moreover, far-reaching calculation requirements can be disproportionate to the amount of damage suffered.

To **facilitate** the **calculation of damages**, the Commission therefore intends:[13]

- to draw up a framework with pragmatic, non-binding guidance for **quantification** of damages in antitrust cases, e.g. by means of **approximate methods of calculation** or **simplified rules on estimating** the loss.

## 2.6.    Passing-on overcharges

If the direct customer of the infringer fully or partially passed on the illegal overcharge to his own customers (the indirect purchasers), several legal issues can arise. At present, these create a great degree of legal uncertainty and difficulties in antitrust damages actions.

Problems arise, on the one hand, if the **infringer** invokes the passing-on of overcharges **as a defence** against a damages claimant, arguing that the claimant suffered no loss because he passed on the price increase to his customers.

The Commission recalls the Court's emphasis on the **compensatory principle** and its premise that **damages** should be **available to any injured person** who can show a sufficient causal link with the infringement. Against this background, infringers should be allowed to invoke the possibility that the overcharge might have been passed on. Indeed, to deny this defence

---

[12]    *Manfredi* (see footnote 1), points 95 and 97.
[13]    For the underlying reasons see Chapter 6 of the SWP.

could result in **unjust enrichment** of purchasers who passed on the overcharge and in undue **multiple compensation** for the illegal overcharge by the defendant. The Commission therefore suggests[14] that:

- **defendants** should be **entitled to invoke the passing-on defence** against a claim for compensation of the overcharge. The standard of proof for this defence should be not lower than the standard imposed on the claimant to prove the damage.

Difficulties also arise, on the other hand, if an **indirect purchaser** invokes the passing-on of overcharges as a basis **to show the harm suffered**. Purchasers at, or near the end of the distribution chain are often those most harmed by antitrust infringements, but given their **distance from the infringement** they find it particularly difficult to produce sufficient proof of the existence and extent of passing-on of the illegal overcharge along the distribution chain. If such claimants are unable to produce this proof, they will **not be compensated** and the infringer, who may have successfully used the passing-on defence against another claimant upstream, would retain an **unjust enrichment**.

To avoid such scenario, the Commission therefore proposes to lighten the victim's burden and suggests[15] that:

- indirect purchasers should be able to rely on the rebuttable presumption that the illegal overcharge was passed on to them in its entirety.

In the case of joint, parallel or consecutive actions brought by purchasers at different points in the distribution chain, national courts are encouraged to make full use of all mechanisms at their disposal under national, Community and international law in order to avoid under- and over-compensation of the harm caused by an infringement of competition law.

## 2.7.    Limitation periods

While limitation periods play an important role in providing **legal certainty**, they can also be a considerable **obstacle** to recovery of damages, both in stand-alone and follow-on cases.

As regards the **commencement of limitation periods**, victims can face practical difficulties in the event of a continuous or repeated infringement or when they cannot reasonably have been aware of the infringement. The latter occurs frequently in relation to the most serious and harmful competition law infringements, such as cartels, which often remain covert both during and after their lifespan.

The Commission therefore suggests[16] that the limitation period should **not start to run**:

- in the case of a **continuous or repeated infringement,** before the day on which the **infringement ceases;**

- before the victim of the infringement can **reasonably** be expected to **have knowledge of the infringement** and **of the harm** it caused him.

---

[14]    For the underlying reasons see Chapter 7 of the SWP.
[15]    For the underlying reasons see *ibid.*
[16]    For the underlying reasons see Chapter 8 of the SWP.

To keep open the possibility of follow-on actions, measures should be taken to avoid limitation periods expiring while **public enforcement** of the competition rules by competition authorities (and review courts) is **still ongoing**. To this end, the Commission prefers the option of a **new limitation period,** which starts once a competition authority or a review court adopts an infringement decision, over the option of **suspending the limitation period** during the public proceedings.

In the latter case, claimants (and defendants) will sometimes find it **difficult** to **calculate** the remaining period **precisely**, given that the opening and closure of proceedings by competition authorities are not always publicly known. Moreover, if a suspension were to commence at a very late stage of the limitation period, there may **not be enough time** left to prepare a claim.

The Commission therefore suggests[17] that:

- a **new limitation period** of at least **two years** should start once the **infringement decision** on which a follow-on claimant relies has become **final**.

### 2.8.    Costs of damages actions

The **costs** associated with antitrust damages actions, and also the **cost allocation rules**, can be a decisive disincentive to bringing an antitrust damages claim, given that these actions may be particularly costly and are generally more complex and time-consuming than other kinds of civil action.

The Commission considers that it would be useful for Member States to reflect on their cost rules and to examine the practices existing across the EU, in order to **allow meritorious actions** where costs would otherwise prevent claims being brought, particularly by claimants whose financial situation is significantly weaker than that of the defendant.

Due consideration should be given to mechanisms fostering **early resolution of cases**, e.g. by settlements. This could significantly reduce or eliminate litigation costs for the parties and also the costs for the judicial system.

Member States could also consider introducing, where appropriate, limits on the level of **court fees** applicable to antitrust damages actions.

Finally, Member States are invited to reflect on their **cost allocation rules** in order to reduce the uncertainty for potential claimants about the costs for which they may be liable. The "loser pays" principle, which prevails in the EU Member States, plays an important function in filtering out unmeritorious cases. However, under certain circumstances, this principle could also discourage victims with meritorious claims. National courts may therefore have to be empowered to derogate from this principle, for example by guaranteeing that an unsuccessful claimant will not have to bear the defendants' costs that were unreasonably or vexatiously incurred or are otherwise excessive.

The Commission therefore encourages[18] Member States:

- to design procedural rules fostering **settlements**, as a way to reduce costs;

---

[17]    For the underlying reasons see *ibid.*
[18]    For the underlying reasons see Chapter 9 of the SWP.

- to set **court fees** in an appropriate manner so that they do not become a disproportionate disincentive to antitrust damages claims;

- to give national courts the possibility of issuing **cost orders** derogating, in certain justified cases, from the normal cost rules, preferably upfront in the proceedings. Such cost orders would guarantee that the claimant, even if unsuccessful, would not have to bear all costs incurred by the other party.

### 2.9.    Interaction between leniency programmes and actions for damages

It is important, for both public and private enforcement, to ensure that leniency programmes are attractive.

Adequate **protection against disclosure in private actions for damages** must be ensured for **corporate statements** submitted by a leniency applicant in order to avoid placing the applicant in a less favourable situation than the co-infringers. Otherwise, the threat of disclosure of the confession submitted by a leniency applicant could have a negative influence on the quality of his submissions, or even dissuade an infringer from applying for leniency altogether.

The Commission therefore suggests[19] that such protection should apply:

- to all **corporate statements** submitted **by all applicants for leniency** in relation to a breach of Article 81 of the EC Treaty (also where national antitrust law is applied in parallel);

- regardless of whether the application for leniency is accepted, is rejected or leads to no decision by the competition authority.

This protection applies where disclosure is ordered by a court, be it **before or after adoption of a decision** by the competition authority. Voluntary disclosure of corporate statements by applicants for immunity and reduction of fines should be precluded at least until a statement of objections has been issued.

A further measure to ensure that leniency programmes continue to be fully attractive could be to limit the civil liability of successful immunity applicants. The Commission therefore puts forward for further consideration[20] the possibility of limiting the **civil liability of the immunity recipient to claims by his direct and indirect contractual partners**. This would help to make the scope of damages to be paid by immunity recipients more predictable and more limited, without unduly sheltering them from civil liability for their participation in an infringement. The immunity recipient would have to bear the burden of proving the extent to which his liability would be limited. However, consideration should be given, in particular, to the need for such a measure and the impact it would have on the full compensation of victims of cartels and on the position of the co-infringers, especially other leniency applicants.

---

[19]    For the underlying reasons see Chapter 10, section B.1 of the SWP.
[20]    For the underlying reasons see Chapter 10, section B.2 of the SWP.

The Commission invites comments on this White Paper. They may be sent, by 15 July 2008, either by e-mail to:

comp-damages-actions@ec.europa.eu

or by post to:

European Commission
Directorate-General for Competition, Unit A 5
Damages actions for breach of the EC antitrust rules
B-1049 Brussels.

It is standard practice within DG Competition to publish submissions received in response to a public consultation. However, it is possible to request that submissions, or parts thereof, remain confidential. Should this be the case, please indicate clearly on the front page of your submission that it should not be made public and also send a non-confidential version of your submission to DG Competition for publication.

**EN**

**EN**