**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| IN RE: INTEL CORPORATION MICROPROCESSOR ANTITRUST LITIGATION | ) ) ) ) )    MDL No. 05-1717-JJF |
| ADVANCED MICRO DEVICES, INC. and AMD INTERNATIONAL SALES & SERVICE, LTD., <br><br> Plaintiffs, <br><br> v. <br><br> INTEL CORPORATION and INTEL KABUSHIKI KAISHA, <br><br> Defendants. | ) ) ) ) ) ) ) ) ) ) ) )    Civil Action No. 05-441-JJF |
| PHIL PAUL, on behalf of himself and all others similarly situated, <br><br> Plaintiffs, <br><br> v. <br><br> INTEL CORPORATION, <br><br> Defendant. | ) ) ) ) ) ) ) ) ) ) )    Civil Action No. 05-485-JJF <br><br> CONSOLIDATED ACTION |

**REPLY BRIEF IN SUPPORT OF:**

**1) MOTION OF UNION FEDERALE DES CONSOMMATEURS – QUE CHOISIR TO INTERVENE FOR THE LIMITED PURPOSE OF SEEKING MODIFICATION TO PROTECTIVE ORDERS; AND**

**2) APPLICATION PURSUANT TO 28 U.S.C. § 1782 FOR AN ORDER REQUIRING INTEL AND THIRD PARTIES TO PROVIDE ACCESS TO DOCUMENTS AND DEPOSITION TESTIMONY FOR USE IN FOREIGN PROCEEDINGS**

387265.1

PRICKETT JONES & ELLIOTT, P.A.
James L. Holzman (#663)
J. Clayton Athey (#4378)
Laina M. Herbert (#4717)
Melissa N. Donimirski (#4701)
1310 King Street
P.O. Box 1328
Wilmington, DE 19899
jlholzman@prickett.com
jcathey@prickett.com
lmherbert@prickett.com
mndonimirski@prickett.com
Telephone:    (302) 888-6500
Facsimile:    (302) 658-8111

*Counsel for Union Federale des
Consommateurs - Que Choisir*

Of Counsel:

Jon T. King
COHEN MILSTEIN HAUSFELD &
  TOLL, P.L.L.C.
One Embarcadero Center
Suite 2440
San Francisco, CA 94111
Telephone: (415) 229-2080
Facsimile: (415) 986-3643
jking@cmht.com

Dated: July 16, 2007

TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................................. ii

I.    INTRODUCTION ............................................................................... 1

II.   QC'S REQUEST RELATING TO THE EC PROCEEDINGS ............................. 4

III.  QC'S PRIVATE DAMAGES ACTION IN EUROPE ......................................... 7

      A.   QC's Intended Proceedings in England or Portugal ...................... 7

      B.   QC Has Met the Requirements and Discretionary Factors Relevant
           to 28 U.S.C. § 1782 ................................................................. 10

           1.    Intel and Numerous Third Parties are Found in This District ................ 11

           2.    QC'S Intended Action is "In Reasonable Contemplation" .................. 13

           3.    The Discretionary Factors Weigh in Favor of QC ................. 14

      C.   Intel's Improper Emphasis on Foreign Discoverability ............................. 15

      D.   Reliance on the Protective Order Does Not Bar Relief ............................. 18

      E.   QC Has Consented to Jurisdiction, Will Limit Access to
           Documents, and Will Enter Into a Foreign Protective Order ..................... 20

      F.   There is No Need for Unusual "Monitoring" By Third Parties ................... 24

      G.   QC's Request is Not Overbroad ................................................. 24

IV.  QC'S ALTERNATIVE OR SUPPLEMENTAL REQUESTED RELIEF ........................... 28

V.    CONCLUSION ................................................................................. 30

# TABLE OF AUTHORITIES

## Cases

*Comes v. Microsoft Corp.*,
   709 N.W.2d 114 ........................................................................................... 27

*In re Application for an Order Permitting Metallgesellschaft AG to take Discovery*,
   121 F.3d 77 (2d Cir. 1997) ............................................................... 17, 18, 25

*In re Application of Godfrey*,
   526 F. Supp. 2d 417 (S.D.N.Y. 2007) ........................................................ 12

*In re Application of Hill*,
   2005 WL 1330769, (S.D.N.Y. June 3, 2005) .............................................. 13

*In re Application Pursuant to 28 U.S.C. Section 1782 for an Order Permitting
   Christen Sveaas to Take Discovery from Dominique Levy, L & M Galleries
   and other non-participants for use in Actions Pending in the Norway*,
   249 F.R.D. 96 (S.D.N.Y. 2008) .................................................................. 25

*In re Bayer AG*,
   146 F.3d 188 (3d Cir. 1998) ................................................................. 10, 15

*In re Intel Corp. Microprocessor Antitrust Litig.*,
   403 F. Supp. 2d 1356 (2005) ...................................................................... 12

*In re Linerboard Antitrust Litig.*,
   333 F. Supp. 2d 333 (E.D. Pa. 2004) ................................................... 10, 21

*In re Malev Hungarian Airlines*,
   964 F.2d 97 (2nd Cir.1992) ........................................................................ 17

*In the Matter of Application of Euromepa v. Esmerian, Inc.*,
   51 F.3d 1095 (2d Cir.1995) ................................................................ 10, 17, 18

*Intel Corp. v. Advanced Micro Devices, Inc.*,
   542 U.S. 241 (2004) ........................................................................ 10, 11, 13

*John Deere Ltd. v. Sperry Corp.*,
   754 F.2d 132 (1985) ............................................................................. 10, 16

*Weber v. Finker*,
   2007 WL 4285362, (M.D. Fla. 2007) .................................................... 17, 25

## Statutes

28 U.S.C. § 1782 ................................................................................... passim

## I.    INTRODUCTION

Union Federale des Consommateurs - Que Choisir ("QC") hereby submits this Reply in support of its Motion to Intervene for the Limited Purpose of Seeking Modification to Protective Orders and Application Pursuant to 28 U.S.C. § 1782 (the "Motion") (D.I. 853).[1]  QC is sensitive to the concerns expressed and questions raised by certain third parties that filed oppositions.[2] QC addresses those concerns herein, including the observation that QC has not provided details regarding its intended litigation against Intel in Europe.  Although it was unable to do so at the time it filed the Motion, QC does so now.  QC intends to initiate litigation against Intel in a collective action in either London, England or Lisbon, Portugal on behalf of French consumers (and either English or Portuguese consumers), as soon as possible after an expected adverse European Commission ("EC") decision against Intel.  Such a decision is expected to issue this year.[3]

Although Intel now claims the Protective Order should not be modified to allow QC access to documents, two years ago Intel recommend to this Court the use of third parties' (and

---

[1]     Unless otherwise specified herein, all references to "D.I. ___" pertain to the MDL No.05-1717-JJF.

[2]     In addition to defendant Intel Corporation's Opposition ("Intel Opp.") (D.I. 1052), QC is in receipt of Oppositions and/or Joinders filed by the following entities:  Acer America Corporation ("Acer Opp.") (D.I. 1032; and D.I. 1031, joining in various oppositions); Best Buy Co., Inc. (not electronically filed; emailed to Special Master on June 27, 2008); the "Third Parties Opposition" filed by Dell Inc., Hewlett-Packard Company, and Microsoft Corporation ("Third Parties (Dell, HP, Microsoft) Opp.") (D.I. 1027); Fry's Electronics (D.I. 1030); Fujitsu Limited (D.I. 1039); the "Joinder of Third Party Distributors" filed by Ingram Micro Inc., Avnet, Inc. and Tech Data Corporation (the "Third-Party Distributors Opp.") (D.I. 1029); LG Electronics USA, Inc. and LG Electronics Inc. (filed in docket 05-441, D.I. 744); Sony Corporation, NEC Corporation, and Toshiba Corporation, and Sony Electronics, Inc. (collectively, the "Japanese OEMs") (D.I. 1028; D.I. 1036, joinder of Sony Electronics Inc.). Various of these third parties have indicated that they join in Intel's and other third parties' oppositions.  QC also is in receipt of an opposition from Micro Electronics Inc. (D.I. 991, attachment 1), that the Special Master subsequently indicated would not be considered due to the lack of retention of Delaware counsel (D.I. 991).

[3]     QC previously informed Intel that it would not oppose the submission of a supplemental opposition in order to provide the Court with a complete record on this matter.  Intel indicated that it would not know whether it needed to request leave to file a supplemental opposition until after QC filed its reply brief.  Intel and QC agreed that should Intel file a supplemental opposition, Intel would not oppose a supplemental reply by QC.  QC will not oppose the submission of supplemental oppositions/joinders by any of the third parties that initially filed oppositions/joinders, presuming that QC can submit a supplemental reply if needed.

its own) documents in Japanese litigation. Additionally, many of the third parties that have now filed oppositions did not object to Intel's proposal two years ago.[4]  In support of its argument, Intel noted, among other things, that because of "the anticipated gains in efficiency and ease of administration, Intel believes that the 'Japan Litigation' also should be covered by the Protective Order" and that a lack of coordination would "create significant additional burden and expense for the parties and third parties."[5]  QC's proposal is nearly identical to Intel's proposal two years ago, and QC's European damages litigation should be covered by the Protective Order. Although the Special Master declined to adopt Intel's recommended protective order, QC highlights Intel's prior proposals because (1) they are practical solutions to issues now facing this Court regarding foreign litigation; and (2) they demonstrate that Intel, despite its current alleged concern for third parties, previously rejected their position.  QC urges that the Court, should it find that certain arguments of third parties are meritorious, make distinctions between the third parties and Intel in crafting a form of relief.

QC addresses other concerns, which are largely directed at questions about a mechanism for *how* the Court can give QC its requested relief.  Subject to the Court's approval, QC has proposed in its Motion a protocol similar to the one outlined by Intel two years ago and endorsed by numerous third parties, and describes this protocol in more detail herein.[6]

---

[4.]    Those third parties are: Hewlett-Packard Company (*see* D.I. 102); Microsoft (*see* D.I. 94); Acer America Corporation (*see* D.I. 91); Ingram Micro Inc., Avnet, Inc., and Tech Data Corporation (*see* D.I. 92); Best Buy Company, Inc. (*see* D.I. 87); and Fry's Electronics, Inc. (*see* D.I. 98).

[5.]    Response of Defendants Intel Corporation and Intel Kabushiki Kaisha to the Comments and Objections of the Third Parties Regarding the Proposed Protective Order, at 5 (D.I. 111).  Compare Intel's words now regarding efficiency: "[T]he vast majority of the documents produced in the U.S. litigation would have no connection at all to damages claims by any European consumers – an issue on which this litigation is not focused.  Under these circumstances, there is no basis to conclude that it would be more efficient to grant QC's Application than if QC were required to pursue the discovery available to it under European law."  Intel Opp. at 28; *see also* Intel Opp. at 34 ("QC's assertions about efficiencies are questionable, at best.").

[6.]    QC is amenable at any point to engaging in a meet/confer process with Intel and any of the opposing third parties to determine if any progress can be made, and further suggests that the most appropriate time may be after the conclusion of briefing, and prior to the hearing on this matter.

For reasons including the EC's indication two weeks ago that it does not desire any assistance from QC in obtaining information pursuant to 28 U.S.C. § 1782,[7] QC requests that the focus of this Court's inquiry center on QC's private litigation against Intel and not on QC's EC-related request. QC previously submitted to the EC the public version of Class Plaintiffs' class certification expert report from this case in May. QC also participated in the EC's hearing in Brussels in March. In light of the EC's July 2, 2008 letter to Intel's counsel, QC has likely reached the limits of its participation in the EC proceedings absent additional EC hearings.

Policies of efficiency and comity favor granting QC's motion to intervene. The applicable precedent requires the Court to consider the motion in the context of broader issues about international efficiency, and the trend towards coordination across national borders in the context of both public and private enforcement of competition laws. As Intel notes, the EC requested that Intel provide it the documents referenced in Intel's and AMD's preliminary pretrial statements and replies. This demonstrates the relevance of materials in this case to the European marketplace. QC's requested relief also furthers the policies and goals of the international judicial system and competition laws. Documents produced in the underlying litigation are relevant to Europe just as foreign materials are relevant to this litigation, as evidenced by this Court ordering the production of foreign materials, including European materials.[8] It would be extremely inefficient to ignore that these materials exist and have been produced here.

QC proposes a targeted method of identifying the documents pertaining to Europe that its counsel will review, thereby assuaging any concerns of Intel and third parties that QC is seeking the equivalent of "the formula for Coca-Cola." QC is not interested in sensitive technical

---

[7].    Exhibit A to the Declaration of James S. Venit ("Venit Supp. Decl.") (D.I. 1055).

[8].    Special Master's Report and Recommendations on Plaintiffs' Motions to Compel, entered December 15, 2006 (D.I. 365). The Special Master's Recommendations were adopted by this Court on January 12, 2007 (D.I. 380).

documents or materials related to patents. The EC's Statement of Objections, transmitted to Intel in July 2007, states: "First, Intel has provided substantial rebates to various Original Equipment Manufacturers (OEMs) conditional on them obtaining all or the great majority of their CPU requirements from Intel. Secondly, in a number of instances, Intel made payments in order to induce an OEM to either delay or cancel the launch of a product line incorporating an AMD-based CPU."[9] QC thus is focused on *who* in Europe got *what* payments, *where*, *when*, and *why*, and *how* such conduct impacted European consumers.

Although Intel and the third parties argue "reliance on the Protective Order" in opposition to the Motion, Intel and the third parties had notice back in 2006 that others might someday seek access to the documents they produced in this litigation. The Special Master specifically alerted them to the possibility of a future application pursuant to 28 U.S.C. § 1782, as QC has made. Moreover, the third parties were aware of the "staleness" issue as referenced by the Special Master, *i.e.*, that documents that at one point may arguably have been confidential rapidly lose that character in the quickly-evolving world of high-technology. Additionally, Intel and the third parties cannot realistically contend that they would have ignored their discovery obligations and not produced documents had they known that the Protective Order would eventually be amended.

QC also proposes herein an alternative or supplemental form of relief, namely, a process by which certain documents categorically designated as confidential could be de-designated.

## II.    QC'S REQUEST RELATING TO THE EC PROCEEDINGS

With respect to QC's request pertaining to the EC proceedings, the landscape has changed substantially since QC filed its Motion on April 9, 2008. Notwithstanding the EC's

---

9.    European Commission Press Release, "Commission confirms sending of Statement of Objections to Intel," July 27, 2007, attached hereto as Exh. 1 to the Supplemental Declaration of Jon T. King ("Supp. King Decl.").

position with respect to QC's 28 U.S.C. § 1782 application, QC still has an important need for the discovery materials in connection with its impending European damages litigation.

Intel has stated its intention to pursue an appellate strategy, which would force QC to potentially wait years before gaining access to these documents. On May 15, 2008, at a hearing on the QC intervention briefing schedule, Intel's counsel stated: "When Intel has had to fight this issue before, as you know, from our prior conversations with AMD, it went all the way to [the United States] Supreme Court . . . [I]f things happen to not go our way, I think that we would consider that same path all the way." Reporter's Transcript ("R.T."), May 15, 2008, at 6-7. In view of Intel's stated appellate strategy, QC would be faced with waiting several years for documents to become available for transmission to the EC, at which point the EC's proceedings likely would be long-since concluded.

Additionally, Intel provided this Court with a July 2, 2008 letter from Per Hellström, of the EC's Directorate General for Competition, to Intel's counsel James Venit. *See* Venit Supp. Decl., Exh. A. This letter refers to a copy of Mr. Venit's June 6, 2008 letter "concerning the current proceedings before the US District Court for the District of Delaware," and notes that Intel "request[s] that the Commission should intervene in these proceedings to oppose the recent discovery motion of [QC] . . . ." *Id.* at 1. Mr. Hellström stated that, while he did not see a need for the EC to intervene, the EC would stand on its position that it did not need assistance via 28 U.S.C. § 1782, as expressed with respect to AMD in previous amicus curiae briefs filed with the United States Supreme Court. *See id.*[10]

In a provision not referenced by Intel, Mr. Hellström makes a distinction between the EC proceedings and QC's intended damages litigation:

---

[10]    The day before the filing of this brief, Intel provided under seal to the Special Master and QC a copy of Mr. Venit's letter to the EC. This twenty-two page letter is, unfortunately, rife with misstatements and constitutes a one-sided, secretive attempt to influence the EC as to QC's requested relief regarding private damages litigation.

> Insofar as [QC]'s discovery motion is filed also for the purpose of obtaining evidence for private damage actions before EU Member States' civil courts, I wish to clarify that this issue has obviously not been addressed in the above-mentioned amicus curiae briefs in the *AMD v. Intel* case and that consequently different considerations may have to be taken into account by the US Courts in this regard.

*Id.* Mr. Hellström concluded that "should the Commission receive a direct question from the competent judge in the present proceedings concerning our position on either of these two distinct issues, we will naturally reply as appropriate." *Id.* at 2.

Intel's Opposition and certain third party oppositions reveal new information that bears upon QC's prior EC-related request, as well as its damages litigation request. Specifically, Intel stated:

> "[I]n May of 2008 the EC served a formal discovery request on Intel asking it to produce 'a copy of all documents authored by Intel employees or received by Intel employees which are quoted or referred to' in (i) Intel's Preliminary Pretrial Statement filed in this Court, (ii) the Plaintiffs' Joint Preliminary Case Statement, (iii) Intel's Response to the Plaintiffs' Joint Preliminary Case Statement, and (iv) the Plaintiffs' Joint Response to Intel's Preliminary Pretrial Statement. Presumably, the EC concluded that these documents were important to the prosecution of its case against Intel." Intel Opp. at 16 (citation omitted).

The EC has also obtained information from numerous third parties, including HP, Dell, and Acer. *See* Third Parties (Dell / HP / Microsoft) Opp. at 8; Acer Opp. at 11-12.

Moreover, QC transmitted to the EC a copy of the Class' *redacted* class certification expert report on May 28, 2008, shortly after it become publicly available on May 23, 2008. QC does not know whether the EC will request, or has already requested, related information from Intel or third parties, including the Class Plaintiffs' motion for class certification and/or the documents cited therein.

Finally, in May 2008, press reports indicated that the EC had reached an adverse decision against Intel that would be published in late summer.[11] Although the EC subsequently

---

[11]    Forbes.com, Thomson Financial News, "EU says Intel antitrust case 'active'; no provisional decision made," May 28, 2008, attached as Exh. 2 to the Supp. King Decl.

announced that the investigation is "active and ongoing,"[12] a decision seems imminent, as various government investigations around the world are reaching important stages.[13]   In June 2008, the South Korean Fair Trade Commission announced that it will fine Intel $25 million for its unlawful practices.[14] Also in June 2008, the United States Federal Trade Commission opened a formal investigation into Intel's alleged anticompetitive practices.[15]

QC is now satisfied that it has done all it can productively do at this time with respect to the EC proceedings, in view of its presentation at the EC hearing in Brussels in March, its submission of the redacted class certification expert report to the EC, and the EC's efforts to obtain documents from this case.

## III.     QC'S PRIVATE DAMAGES ACTION IN EUROPE

Intel's stated appellate strategy with its attendant delay reinforces QC's desire to intervene *now* in furtherance of its intended private damages litigation.  Although Intel and various third parties have indicated that QC's request for access to documents is premature, Intel and third parties potentially can delay QC's access to any documents for several years.  If QC is forced to wait to begin the intervention process until *after* finality has been achieved as to any EC ruling (meaning Intel had exhausted all appellate remedies in Europe), QC could have to wait a *decade* before it can review documents produced in the United States.

### A.     QC's Intended Proceedings in England or Portugal

Intel states that QC "has not specified the courts, countries within the EU, or time frame in which it may seek to bring any such 'future judicial proceedings' against Intel." Intel Opp. at

---

12.     *Id.*

13.     QC previously highlighted the time-sensitivity issue regarding the EC proceedings in a submission on establishing a briefing schedule. *See* QC's Letter Brief dated April 28, 2008, at 4 (D.I. 863) ("It is therefore unlikely that the EC would wish to consider any evidence put to it after approximately mid-July of this year.").

14.     *The New York Times*, "South Korea to Fine Intel $25.4 Million for Trade Violations," June 5, 2008, attached as Exh. 3 to the Supp. King Decl.

15.     *The New York Times*, "In Turnabout, Antitrust Unit Looks at Intel," June 7, 2008, attached as Exh. 4 to the Supp. King Decl.

7; *see also* Third Parties (Dell / HP / Microsoft) Opp. at 7, 12-15; Acer Opp. at 12, 14. As QC stated previously, "[i]t was only when QC learned of the [EC's] February 12, 2008 raid [of French retailing group PPR] in France and the accompanying Intel raid in Germany, that it felt that a sufficient critical mass of information was in the public record, in particular regarding potential harm to consumers, to require of it an effort to participate in the EC proceedings." QC's April 28, 2008 Letter Brief, at 2. Within two weeks of the EC raids, QC applied to the EC and was invited to participate in the EC's March 11 hearing in Brussels. *See id.*

On April 2, 2008, just a week before QC moved to intervene, the EC issued its "WHITE PAPER on Damages actions for beach of the EC antitrust rules." The EC suggested "two complementary mechanisms of collective redress" in antitrust cases, including "representative actions, which are brought by qualified entities, *such as consumer associations*, state bodies or trade associations, on behalf of identified or, in rather restricted cases, identifiable victims." White Paper, at 4 (emphasis added) (attached as Exhibit 12 to the Declaration of James Venit; D.I. 1053).

Since mid-February of this year, in addition to focusing on its EC participation, QC has considered legal advice regarding its options for a consumer damages collective action, including on issues such as venue, the timing of its intended filing, and the impact of the EC's April 2008 White Paper.

After careful consideration, QC intends to bring proceedings in a competent European court as soon as possible after the EC has reached an expected adverse decision in its case against Intel. Although the binding effect of that decision may be suspended pending any appeal by Intel against the EC's finding, nevertheless, QC is advised that it will be able to commence proceedings in a European court after the EC's decision has been reached. These proceedings may – depending on the scope of any appeal – be wholly or partially stayed pending the final

outcome of any appeal against the EC's decision.[16]

Under EC Regulation 44/2001, a defendant (here Intel) shall be sued (with some significant exceptions) in the courts of the place of his legal domicile if he is domiciled in the European Union.[17] A company or other legal person is (for the purposes of Regulation 44/2001) domiciled where it has its statutory seat, principal place of business or central administration. Where (as may well be the case for Intel) the defendant is not domiciled within the European Union, the question of whether the court is competent to hear a claim against it is left to the national laws of each individual member State of the EU.

QC believes that Intel has places of business in a substantial number of member States of the EU and, accordingly may have a wide choice of available jurisdictions in which to bring a claim. Having considered the information available to it carefully, QC has narrowed down the possible European venues for the claim to either the courts of London, England or of Lisbon, Portugal (under an acçaõ popular – a popular action). It is taking final advice on the advantages and disadvantages of bringing a claim in each of those two venues. In each venue, QC would represent via a collective action the interests of French consumers, i.e. French purchasers of computers containing Intel's microprocessors, as well as English or Portuguese consumers in the respective venues.[18]

---

[16]    Intel incorrectly states that QC indicated in its Motion that QC intended to proceed with a private damages action only when an EC decision adverse to Intel "has been rendered final on appeal." *See* Intel Opp. at 11 ("QC has indicated in its brief that it intends to proceed in this manner. *See* [Brief in Support of QC's Motion] at 9.") In fact, QC stated only that "[i]n many Member States of the EU, a decision of the European Commission finding an infringement is (after any applicable appeals have been exhausted) conclusive proof in the civil courts of the participation of the addressees of the decision in the unlawful conduct described in the decision." Opening Brief in Support of QC's Motion ("QC Br.", D.I. 854) at 9.

[17]    A true and correct copy of EC Regulation 44/2001 is attached hereto as Exh. 5 to the Supp. King Decl.

[18]    As Intel notes, there may be significant difficulties in bringing a claim of this nature in France in the current legislative context. QC has decided that for purposes of its Intel case, such an action is not the most appropriate option in the interests of its members and those that it will represent.

In both prospective forums, the use of the equivalent of protective orders is common, and they provide a level of protection similar to that provided in US courts.

**B.    QC Has Met the Requirements and Discretionary Factors Relevant To 28 U.S.C. § 1782**

Intel and the third parties contend that QC has not met the threshold requirements of 28 U.S.C. § 1782, and that even if it did, all of the factors that guide the Court's discretion weigh against granting relief to QC. QC disagrees. The Supreme Court, along with numerous other courts, has recognized "§ 1782(a)'s twin aims of 'providing efficient assistance to participants in international litigation and encouraging foreign countries by example to provide similar assistance to our courts.'" *Intel Corp. v. Advanced Micro Devices, Inc.*, 542 U.S. 241, 252 (2004) ("*Intel v. AMD*"). QC's requested relief comports with both of these goals.[19]

In *In re Linerboard Antitrust Litig.*, 333 F. Supp. 2d 333, 342 (E.D. Pa. 2004), the court, in granting a foreign plaintiff's motion to intervene to modify a protective order, analyzed the efficiency goals of Section 1782 as follows:

> [T]his Court concludes defendants will suffer no prejudice from granting movant access to materials that have already been produced to plaintiffs in MDL 1261. *United Nuclear Corp.*, 905 F.2d at 1428 ("[d]efendants desire to make it more burdensome for intervenors to pursue their collateral litigation is not legitimate prejudice"); *Wilk*, 635 F.2d at 1301 (there is "no reason to erect gratuitous roadblocks in the path of a litigant who finds a trial [sic] blazed by another").

> Finally, the Court notes that although McCormick has not moved pursuant to Section 1782, one of the goals of that legislation is to provide "efficient means of assistance to participants in international litigation in our federal courts and encourage foreign countries by example to provide similar means of assistance to our courts ..." *In the Matter of Application of Euromepa v. Esmerian, Inc.*, 51 F.3d 1095, 1097 (2d Cir.1995). The Court concludes that granting McCormick's motion promotes that end. As the Seventh Circuit explained in *Wilk:*

> access in such cases materially eases the tasks of courts and litigants and speeds up what may otherwise be a lengthy process. Particularly in litigation of this

---

[19]     *See also John Deere Ltd. v. Sperry Corp.*, 754 F.2d 132, 134, 35 (3d Cir. 1985) (discussing legislative history of Section 1782); *In re Bayer AG*, 146 F.3d 188, 191-92 (3d Cir. 1998) ("the amendment to § 1782 was designed to facilitate the conduct of litigation in foreign tribunals, improve international cooperation in litigation, and put the United States into the leadership position among world nations in this respect.").

magnitude, we ... are impressed with the wastefulness of requiring the [collateral litigant] to duplicate discovery already made."

As discussed herein, Intel made a similar efficiency argument with respect to foreign litigation in Japan. That argument carries equal force with respect to QC's requested relief.

In *Intel v. AMD*, the Supreme Court made several holdings that are relevant here, including that "the 'proceeding' for which discovery is sought under §1782(a) must be within reasonable contemplation, *but need not be 'pending' or 'imminent.'*" *Id.* at 243 (emphasis added). Additionally, the Court held that "§1782(a) contains no threshold requirement that evidence sought from a federal district court would be discoverable under the law governing the foreign proceeding." *Id.* at 247. The Court also examined the requirements of Section 1782 that the party seeking access to evidence be an "interested person" and that the evidence be sought for use in a "foreign or international tribunal." With respect to QC's intended damages action in either London or Lisbon, QC does not believe that there is any dispute here that QC is an "interested person" or that a "foreign or international tribunal" is at issue.

### 1. Intel and Numerous Third Parties Are Found In This District

A small fraction of the entities opposing QC's Motion -- Intel and one third party, Acer -- make a threshold argument that QC has not shown that the third parties "reside or [are] found" in this District. QC notes that Section 1782 is not the exclusive means by which it seeks access to evidence for use in the European damages litigation. QC has separately and independently moved to intervene to modify the protective order. As QC acknowledged in its Motion, "[e]ven where foreign third parties only file a motion to intervene, courts look to the policy of 28 U.S.C. § 1782," namely, the spirit of providing international cooperation. *See* QC Br. at 17. The technical requirements of 28 U.S.C. § 1782, however, as opposed to the general policy guidance, are in no way applicable to a motion to intervene to modify a protective order.

11

Additionally, the Judicial Panel on Multidistrict Litigation, in its Transfer Order centralizing the various related actions in this District, without question intended for this Court to handle all pretrial matters. *See In re Intel Corp. Microprocessor Antitrust Litig.*, 403 F. Supp. 2d 1356, 1357 (Jud. Pan. Mult. Lit. 2005). It would be inefficient and inappropriate for district courts around the country to address the exact same issue, potentially resulting in conflicting decisions. *See id.* Intel has already recognized the improvidence of developing conflicting standards that will govern various matters in this case. *See* Reporter's Transcript, Hearing, June 12, 2006, at 38 (AMD counsel Mr. Diamond: "This is a nationwide case. It demands a single standard, and the appropriate one, we believe, is the venue that the MDL resides in, which is the Third Circuit." Intel counsel Mr. Moll: "We have nothing to add, Your Honor.").

Moreover, Intel admits that it is found or resides in Delaware, as it is incorporated here. *See* Intel Opp. at 13 n.4. With respect to Acer, it certainly is engaged in "systematic and continuous local activities," as the interpretative caselaw cited below equates with a corporation being "found" in a district for purposes of Section 1782.[20] None of the other opposing third parties have made this contention, and Intel and Acer do not have standing to raise it on behalf of those third parties, let alone the dozens that did not file any opposition.

Moreover, numerous of the opposing third parties are found here as well. In *In re Application of Godfrey*, 526 F. Supp. 2d 417, 422 (S.D.N.Y. 2007), the court noted that "Professor Hans Smit, the drafter of § 1782, has explained that insofar as the word 'found' is applied to corporations, 'it may safely be regarded as referring to judicial precedents that equate

---

[20]    Acer's opposition purports to assert opposition on behalf of Acer America Corporation, and, apparently, Acer, Inc. *See* Acer Opp. at 5 ("The issues as to whether . . . Acer, Inc. [a Taiwanese company headquartered in Taipel, Taiwan] is subject to the jurisdiction of this Court . . . have been hotly contested."). Even a cursory search of Acer, Inc.'s website shows that both it and Acer America Corporation are engaged in systematic and continuous contact with this District. As the materials compiled as Exh. 6 to the Supp. King Decl. indicate, Acer states that "Acer America . . . sells its systems exclusively through . . . a network of over 5,000 authorized resellers located throughout the U.S." Acer further provides details on its authorized reseller in Bear, Delaware. Acer, Inc. also advertises and sells computers into this District via its website's use of "Online Partners," including Walmart.com, CircuitCity.com, as well as numerous others.

12

systematic and continuous local activities with presence.'" *Citing* Hans Smit, *American Assistance to Litigation in Foreign and International Tribunals: Section 1782 of Title 28 of the U.S.C. Revisited*, 25 Syracuse J. Int'l L. & Com. 1, 10 (1998) ("*Smit*"). Professor Smit also noted in his article that "[t]he purpose of Section 1782 is to liberalize the assistance given to foreign and international tribunals. [footnote omitted]. The language defining its in personam reach must therefore be given a liberal construction commensurate with that purpose." *Smit*, at *10 (footnote omitted) (attached as Exh. 7 to the Supp. King Decl.). As noted below, Professor Smit was also quoted by the Supreme Court in *Intel v. AMD* regarding Section 1782.

There is no real dispute here that the world's largest computer manufacturers and other high-technology powers that are third parties here are engaged in systematic and continuous business in Delaware. In fact, many are either incorporated here, or registered as foreign corporations licensed to do business in Delaware. *See* Supp. King Decl., Exh. 8 (compiling materials showing Delaware incorporation or registration as a foreign corporation to do business in Delaware).

### 2.    QC'S Intended Action Is "In Reasonable Contemplation"

In *Intel v. AMD*, the Court expanded on its holding that the proceedings for which discovery is sought need not be "pending" or even "imminent," but only "in reasonable contemplation." The Court quoted with approval the following language: "*It is not necessary ... for the [adjudicative] proceeding to be pending at the time the evidence is sought, but only that the evidence is eventually to be used in such a proceeding.*" *Intel v. AMD*, 542 U.S. at 259 (citation to Professor Smit omitted, emphasis added). In *In re Application of Hill*, 2005 WL 1330769, at *5 n.4 (S.D.N.Y. June 3, 2005), the court applied *Intel v. AMD*, and stated:

> Even if the requested evidence is not used specifically in either the Hong Kong or Bermuda liquidation proceedings, the Supreme Court has noted that a broad range of discovery under § 1782 is available in civil investigations so long as a proceeding is "within reasonable contemplation." *Intel Corp.,* 124 S.Ct. at 2480. Despite Ernst & Young USA's position that the Liquidators must identify, at this

time, their proposed claims, legal theories and the pending or imminent proceeding in which they plan to bring any resultant causes of action, the Court declines to graft such restrictive requirements onto § 1782.

In the present case, QC's damages action clearly is "within reasonable contemplation," and the evidence examined and marshaled in the present case by QC will be used by it in its anticipated litigation on behalf of consumers.

### 3.    The Discretionary Factors Weigh In Favor Of QC

The Court in *Intel v. AMD* noted that, once an applicant satisfies the threshold, facial requirements of section 1782, there are certain "factors that bear consideration in ruling on a § 1782(a) request." 542 U.S. at 264. Those factors are as follows:

> "First, when the person from whom discovery is sought is a participant in the foreign proceeding (as Intel is here), the need for § 1782(a) aid generally is not as apparent as it ordinarily is when evidence is sought from a nonparticipant in the matter arising abroad . . . .
>
> Second, . . . a court presented with a § 1782(a) request may take into account the nature of the foreign tribunal, the character of the proceedings underway abroad, and the receptivity of the foreign government or the court or agency abroad to U.S. federal-court judicial assistance. . .
>
> [Third], a district court could consider whether the § 1782(a) request conceals an attempt to circumvent foreign proof-gathering restrictions or other policies of a foreign country or the United States.
>
> [Fourth], unduly intrusive or burdensome requests may be rejected or trimmed."

*Id.* (citations omitted).

With respect to the first factor, the fact that Intel will be a party to QC's damages litigation is not dispositive, as the numerous third parties here will not be parties in the foreign proceedings.[21] Even as to Intel, the substantial efficiencies to be gained favor allowing access to

---

21.      *See In re Application Pursuant to 28 U.S.C. Section 1782 for an Order Permitting Christen Sveaas to Take Discovery from Dominique Levy, L & M Galleries and other Non-Participants for use in Actions Pending in the Norway,* 249 F.R.D. 96, 107 (S.D.N.Y. 2008) ("Martinez's status as a non-party in the foreign actions weighs in favor of granting Sveaas' application.").

Intel's evidence, just as Intel previously recommended to this Court regarding foreign litigation in Japan.

### C.    Intel's Improper Emphasis on Foreign Discoverability

With respect to the second and third factors, the Supreme Court detailed the exact grounds to reject Intel's and certain third parties' contentions here. For example, Intel contends that "[t]here is simply no basis to suggest that France – or any other EU Member State – would be any more receptive to § 1782 discovery than is the European Commission itself" and that "France (like other EU Member States) has actively resisted the importation of U.S.-style litigation and discovery into its national courts." Intel. Opp. at 25. *See also* Third Parties (Dell / HP / Microsoft) Opp. at 13 ("QC's request is a thinly veiled attempt to circumvent these procedures" of European courts regarding third party discovery). The Supreme Court, in rejecting Intel's contentions on this point, stated that "nothing in § 1782's text limits a district court's production-order authority to materials that could be discovered in the foreign jurisdiction if the materials were located there." *Intel v. AMD*, 542 U.S. at 243. The Court further stated that "[n]or does § 1782(a)'s legislative history suggest that Congress intended to impose a blanket-foreign discoverability rule on § 1782(a) assistance." *Id.*

The Court continued that "[w]hile comity and parity concerns may be important as touchstones for a district court's exercise of discretion in particular cases, they do not permit our insertion of a generally applicable foreign-discoverability rule into the text of § 1782(a)." *Id.* at 261. The Court provided even more rationale for its holding as follows:

> We question whether foreign governments would in fact be offended by a domestic prescription permitting, but not requiring, judicial assistance. A foreign nation may limit discovery within its domain for reasons peculiar to its own legal practices, culture, or traditions-reasons that do not necessarily signal objection to aid from United States federal courts. See *Bayer,* 146 F.3d, at 194 ("[T]here is no reason to assume that because a country has not adopted a particular discovery procedure, it would take offense at its use.")

*Id.* The Court also quoted with approval the following: "The drafters [of § 1782] were quite aware of the circumstance that civil law systems generally do not have American type pretrial discovery, and do not compel the production of documentary evidence." *Id.* at 262 n.12.

The Court continued on to address issues of non-discoverability in regards to English law, in language entirely applicable to QC here, as follows:

> A foreign tribunal's reluctance to order production of materials present in the United States similarly may signal no resistance to the receipt of evidence gathered pursuant to § 1782(a). See *South Carolina Ins. Co. v. Assurantie Maatschappij "De Zeven Provincien" N.V.*, [1987] 1 App. Cas. 24 (House of Lords ruled that nondiscoverability under English law did not stand in the way of a litigant in English proceedings seeking assistance in the United States under § 1782). When the foreign tribunal would readily accept relevant information discovered in the United States, application of a foreign-discoverability rule would be senseless. The rule in that situation would serve only to thwart § 1782(a)'s objective to assist foreign tribunals in obtaining relevant information that the tribunals may find useful but, for reasons having no bearing on international comity, they cannot obtain under their own laws.(footnote omitted).[22]

The Third Circuit similarly has held that trial courts must not contravene the purpose of Section 1782 by engaging in speculation about the approaches of foreign tribunals. In *John Deere Ltd. v. Sperry Corp.*, 754 F.2d 132, 136-38 (3d Cir. 1985), the court stated:

> To require that a district court undertake a more extensive inquiry into the laws of the foreign jurisdiction would seem to exceed the proper scope of section 1782. Indeed, to condition issuance of a section 1782 order upon the trial court's estimate of the foreign jurisdiction's likelihood of granting letters rogatory not only would force American courts to predict the actions of another country's tribunal, but also would contradict the express purpose of section 1782.
> . . .
> Moreover, other courts, when confronted with letters rogatory, have concluded that federal courts should neither decide technical questions of foreign law relating to the subject-matter jurisdiction of foreign tribunals, nor determine the admissibility before such tribunals of the evidence sought. A similar policy

---

[22]    In the present case, Third Parties Dell, HP, and Microsoft expressly acknowledge in their Opposition that third party discovery is available in the United Kingdom in circumstances certainly applicable here. *See* Third Parties (Dell / HP / Microsoft) Opp. at 13 ("Civil Procedure Rules 31.17 (U.K.)" allows "discovery from a third party in the United Kingdom if (a) the documents sought are likely to support the case of the applicant or adversely affect the case of one of the other parties to the proceedings; and (b) disclosure is necessary in order to dispose fairly of the claim or to save costs.").

applies here.

Nor can concern for the ultimate admissibility of the discovered material be argued as a limit on section 1782 orders. The Canadian tribunal must necessarily decide the use to which such evidence is put. As long as the discovered information is intended for use in a foreign proceeding which comports with notions of due process, the requirements of 28 U.S.C. § 1782 have been met and an appropriate order should issue. (citation omitted).

In *In re Application for an Order Permitting Mettallgesellschaft AG to take Discovery*, 121 F.3d 77, 78-80 (2d Cir. 1997) ("Metallgesellschaft"), the court, in reversing the trial court's denial of an application to compel discovery pursuant to 28 U.S.C. § 1782, addressed the "foreign discoverability" argument at length with respect to European proceedings, and stated:

[E]ven if the district court were animated by a concern that permitting discovery in this jurisdiction would alter the balance created by the procedural rules of the German court, recently, we have made the point that although American-style discovery for one party may skew foreign litigation, "it is far preferable for a district court to reconcile whatever misgivings it may have about the impact of its participation in the foreign litigation by issuing a closely tailored discovery order rather than by simply denying relief outright." *Euromepa*, 51 F.3d at 1101. The district court did not follow this guidance. Instead of tailoring discovery pursuant to its authority under Fed.R.Civ.P. 26 or imposing reciprocal discovery obligations, the district court denied discovery outright.

We can understand how a district court might conclude, almost instinctively, that "it is better to have these discovery issues come up on the 18th of April in the German court and be decided by the German court." Joint Appendix at 160. After all, that foreign tribunal has the greatest interest in the case. However, through § 1782 Congress has seen fit to authorize discovery which, in some cases, would not be available in foreign jurisdictions, as a means of improving assistance by our courts to participants in international litigation and encouraging foreign countries by example to provide similar means of assistance to our courts. *See Malev*, 964 F.2d at 100. If district courts were free to refuse discovery based upon its unavailability in a foreign court or because the foreign court had not first passed on the discoverability of the material sought, § 1782 would be irrelevant to much international litigation, frustrating its underlying purposes.[23]

---

23.    *See also Weber v. Finker*, 2007 WL 4285362, at *5 (M.D. Fla. 2007) ("Respondents argue that Petitioner's failure to attempt to obtain any documents through the Swiss discovery process indicates Petitioner may be attempting to circumvent Swiss proof-gathering restrictions or other policies. However, as Petitioner points out, she is not required to exhaust all Swiss discovery avenues before seeking discovery through § 1782(a). *Euromepa*, 51 F.3d at 1098 (noting that there is no "quasi-exhaustion requirement" in § 1782 "that would force litigants to seek 'information through the foreign or international tribunal' before requesting discovery from the district court.") (quoting, *In re Malev Hungarian Airlines*, 964 F.2d 97, 100 (2nd Cir. 1992), *cert. denied*, 506 U.S. 861, 113 S.Ct. 179, 121 L.Ed.2d 125 (1992))).

17

Intel, in contrast, would urge the Court to reject categorically the aims of section 1782. *See* Intel Opp. at 36 ("If QC, or any other foreign entity, wishes to pursue claims in other jurisdictions, it should be required to pursue those claims under the applicable . . . procedural laws of such jurisdictions."). The Supreme Court's teachings are directly at odds with Intel's preferences here.

The court in *Metallgesellschaft* further addressed the circumstances here, i.e., where a party resisting application of the policies of 1782 urges the trial court to wallow in the intricacies and details of foreign procedural law. Specifically, the court stated:

> To require the district court to determine [issues regarding foreign discoverability] would involve it in a "speculative foray[ ] into legal territories unfamiliar to federal judges." *Euromepa,* 51 F.3d at 1099. Such a foray would result in " 'an unduly expensive and time-consuming fight about foreign law,' " *id.* (quoting Hans Smit, *Recent Developments in International Litigation,* 35 S. Tex. L.Rev. 215, 235 (1994)), undermining the twin aims of the statute. Thus, absent "authoritative proof that a foreign tribunal would reject the evidence obtained with the aid of section 1782," *id.* at 1100-in this instance presumably because of a violation of the alleged privilege-a district court should not refrain from granting the assistance afforded under the Act based simply on allegations to that effect.

*Metallgesellschaft*, 121 F.3d at 80. This reasoning is applicable here.

### D.    Reliance on the Protective Order Does Not Bar Relief

Intel and the third parties contend that the Special Master's ruling more than two years ago on certain Protective Order issues should be controlling, as Intel and the third parties relied on the Protective Order. *See* Intel Opp. at 4, 6, 32; Sony Electronics, Inc. Opp. at 1; Third-Party Distributors Opp. at 2; LG Electronics Opp. at 1; Japanese OEMs Opp. at 2; Acer Opp. at 16. The Protective Order currently shields information going at least as far back as January 1, 2000, (the initial date for various document requests), more than eight and a half years ago. In view of Intel's professed appellate strategy of delaying implementation of any adverse order, QC may not see its first document in this case for years, even further widening the temporal gap between

document creation and QC access. The Protective Order simply cannot be controlling for all time, for all documents, and the Special Master recognized the Third Circuit's guidance on this.[24]

Intel and these large third parties, all represented by sophisticated in-house and outside counsel from some of the largest law firms in the world, recognized the temporal limitations of confidentiality designations and protective orders. Moreover, there was express discussion of the rapid obsolescence of trade secrets in the high-technology world.[25]  Additionally, it was foreseeable that, in a case of this worldwide importance and magnitude, the press would eventually seek access to sealed filings containing information designated as confidential, as has now happened (*see* discussion, *infra*.). It also was clearly foreseeable to all of those in the high-technology industry that, given AMD and Intel's bitter rivalry and history, this case stood a much better chance than most of proceeding to a trial, where the public's right to open access to courtrooms would require vast de-designation of documents previously marked confidential.

Additionally, the Special Master expressly referenced Section 1782 in his Report and Recommendations Regarding Proposed Protective Order, and unmistakably flagged that future applications under that statute could be made that may result in document sharing with respect to foreign proceedings. The Special Master stated as follows:

> The Special Master concludes, therefore, that it would be *premature* on this record to recommend that discovery obtained in the captioned litigations be made available in the Japan Litigation in the context of considering the Proposed Protective Order, especially without the safeguard of providing both the Parties and the Third Parties an opportunity to be fully heard for the purpose of

---

[24].    Special Master's Report and Recommendations Regarding Proposed Protective Order at 104 (D.I. 221) ("Report").

[25].    Response of Advanced Micro Devices, Inc., AMD International Sales & Services, Ltd. and Plaintiffs in the MDL Class Litigation to the Comments and Objections of Third Parties Regarding the Proposed Protective Order, filed May 30, 2006, D.I. 112, at 14 n.6 ("According to Third Party IBM, in information technology "the nature of innovation is at a pace unheard of in modern history." [citation omitted].  Given the rate of change in microprocessor design and function, as well as the resultant rate of change in downstream products, the information contained within the requested documents is likely to change significantly on an annual, or even semi-annual, basis. Therefore, a large proportion of Third Party confidential commercial information requested in this litigation will become stale well within two years of its development, and no longer deserving of confidentiality protection.").

developing the evidentiary record contemplated under the Supreme Court's decision in *Intel*.

Report, at 116 (emphasis added).

### E.    QC Has Consented To Jurisdiction, Will Limit Access to Documents, and Will Enter Into a Foreign Protective Order

Intel and the third parties raise the following issues regarding whether QC's requested relief is workable: "QC has not explained how this Court would have the power to enforce the terms of the Protective Order against QC – a foreign consumer association that is not a natural person and apparently has no assets in the United States – or its 124,000 members." Intel Opp. at 2, 22; *see also* Third Parties (Dell / HP / Microsoft) Opp. at 12, 16; Sony Electronics, Inc. Opp. at 1; Japanese OEMs Opp. at 1; Acer Opp. at 17. Intel additionally states that "QC [has not] explained how confidential materials would be kept confidential if QC used such materials in a foreign tribunal, or how this Court would have any power to ensure the confidentiality of information in the possession of a foreign tribunal." Intel Opp. at 2, 23.

QC already stated in its Motion that it submits to the jurisdiction of this Court for purposes of enforcement of the Protective Order. *See* QC Br. at 15. There is no reason to speculate that QC, a highly-visible consumer organization (*see* QC Br. at 3-6), represented by reputable law firms in this matter, will breach the terms of the Protective Order.[26] In addition, Intel crafted a proposed protective order, which it submitted to this Court that explained how confidential information could be utilized in foreign litigation in Japan.[27]

Despite its unexplained about-face now on the issue of document sharing involving foreign litigation, Intel at the time fully endorsed and recommended to the Court provisions that

---

[26]    AMD's counsel essentially summarized this point at the June 2006 hearing on Intel's Proposed Protective Order as follows: "I think at some point, Judge, the judiciary just has to trust that the lawyers involved in case preparation take seriously their ethical responsibilities and their legal responsibilities under an order like this, and that we're not going to be waiving confidential material around indiscriminately to people who have no business seeing it." Hearing, June 12, 2006, Reporter's Transcript, at 116-17.

[27]    *See* Stipulation and Order Regarding Protective Order Approval Process (D.I. 60), attaching as Exhibit A a Stipulated Confidentiality Agreement and [Proposed] Protective Order ("Intel's Proposed Protective Order").

are useful here, such as the one that stated that confidential material (including Intel's and that of third parties) produced in the present litigation may only be used in Japanese litigation "if the Japan court institutes procedures to protect the confidentiality of the information at a level of protection comparable to that provided in this Order." Intel's Proposed Protective Order, at 10. QC agrees, just as Intel did with respect to the foreign litigation in Japan, that confidential information could only be used in foreign proceedings "if the Japanese Court [here, a European court] imposed a protective order or restrictions on the use or protections on the use that were at least as restrictive – at least as restrictive as those here." Reporter's Transcript, Hearing, June 12, 2006, at 72-74 (statement of Intel counsel).

Another exemplar provision in Intel's Proposed Protective Order stated that before any confidential materials (including its own and that of third parties) produced in the present case were disclosed to a "Japan Expert / Consultant" (defined broadly at page 5 as "experts or other consultants and their assistants and staff") for use in Japanese litigation, such person must agree to various conditions including that he/she would "submit to the jurisdiction of this Court for purposes of enforcing the Protective Order." Intel's Proposed Protective Order, at 12-13. Now, Intel contends that "QC has not explained how this Court might enforce a breach of the Protective Order by QC" (Intel Opp. at 22) and "QC has not explained how any persons retained by QC in connection with the EC investigation or a future damages claim – such as consultants or European counsel – might be bound by the terms of the Protective Order or subject to enforcement of the Order by this Court." (Intel Opp. at 23).[28]

Voluntary consent to jurisdiction was entirely satisfactory to Intel with respect to the Japanese litigation, and it should remain so now. *See In re Linerboard Antitrust Litig.*, 333 F.

---

[28]    Compare also Intel's statement now regarding "QC's hollow promise to be bound by the terms of the Protective Order." Intel Opp. at 30.

Supp. 2d 333, 340 (E.D. Pa. 2004) (factor weighing in favor of access is where, as here, "movant has, in its filings in this Court, expressly submitted to the personal jurisdiction of this Court for the purpose of enforcement of the Confidentiality Order.").

With respect to Intel's speculation about other consultants, any consultants and European counsel would execute the exact type of agreement that entirely satisfied Intel with respect to the Japanese litigation.

Intel's Proposed Protective Order continued as follows:

> In the event that any Confidential Discovery Material is also made available for use in the Japan Litigation (as contemplated by this Order), the material shall remain subject to all terms of this Protective Order and the Party desiring to use or file papers containing such information shall identify it to the appropriate Japanese Court as Confidential, inform that Japanese Court that the information is subject to the terms of this Protective Order entered by this Court, furnish a copy of the Protective Order to the Japanese Court and request that the Japanese Court or other authority respect the terms of this Protective Order and maintain the confidentiality of the material so produced.

Intel's Proposed Protective Order at 17. Those were excellent, workable suggestions then, and they remain so now, particularly as to Intel, which proposed these standards, and the various third parties that did not oppose them at the time.

Moreover, at the hearing on Intel's Proposed Protective Order on June 12, 2006, Intel's counsel stated the following to the Court in words equally applicable here:

> [W]e are not asking this Court to exercise jurisdiction over a Japanese Court or to tell a Japanese Court what to do. The provision permits counsel, who is representing Intel and AMD in Japan, who are working closely together, to have access to confidential information that, assuming that they submit themselves to the jurisdiction of this Court for enforcement of this protective order, they've read the protective order and they signed onto it.

> And the same thing goes for experts that may or may not be used in the Japan litigation. Those experts would have to read the protective order, sign on to the protective order, and agree to submit themselves to the jurisdiction of this Court, so this Court could protect the information of AMD, Intel, and any third parties.

> Intel and AMD have agreed and we've written into the protective order that to the extent some of this may be relevant in Japan, it is not automatically produced in Japan. It's not what we're talking about as some automatic production here.

But assuming a Court in Japan determines that it is appropriate, then the only way it could actually be used in Japan as – if it's produced by either AMD or Intel in that litigation is if the Japanese Court imposed a protective order or restrictions on the use or protections on the use that were at least as restrictive – at least as restrictive as those here.

And, again, as to Intel and AMD, we have agreed to this as far as our materials are concerned. And we would hope that the Court would endorse this provision.

Reporter's Transcript, Hearing, June 12, 2006, at 72-74.

QC recognizes that certain third parties did not agree with Intel's positions regarding foreign litigation when Intel executed its Proposed Protective Order. At the time of the June 2006 hearing, however, the Special Master stated that with respect to the Japanese proceedings issue, "I am inclined to accept the proposal as proposed" by Intel, AMD, and the Class. *Id.* at 80.

QC requests that the Court reject Intel's attempt to backtrack on its prior positions, and suggests that the Court need not treat Intel and all third parties the same in its consideration of this matter. If the Court is inclined to rule against QC as to some or all third parties, QC suggests that Intel should not receive the same treatment in view of its prior positions in this case.

QC agrees to a similar limitation on access to evidence as have the parties in the Protective Order, such as allowing only outside counsel and certain in-house counsel to review confidential information upon execution of the Acknowledgement of Protective Order form. None of QC's 124,000 members will be entitled to see confidential information (just as the Protective Order does not entitle Intel's tens of thousands of employees world-wide to see the information), nor will QC's constituent or affiliated entities be entitled to see the information (the exact same limitation in place with respect to Intel's various subsidiaries and affiliated entities world-wide).

In both of QC's prospective forums, the use of the equivalent of protective orders is common, and they provide a level of protection similar to that provided in United States courts.

23

### F.     There Is No Need for Unusual "Monitoring" By Third Parties

Several third parties refer to a concern about purported unusual "monitoring" that they will need to do with respect to QC's compliance with the Protective Order. *See* Sony Electronics, Inc. Opp. at 2; LG Electronics Opp. at 1; Japanese OEMs Opp. at 2; Third Parties (Dell / HP / Microsoft) Opp. at 12-13, 17-18; Fry's Opp. at 1; Acer Opp. at 14-15. QC will file one case, and Intel unmistakably will be the defendant there. As such, it will have a "front-row seat" to ensure that any necessary restrictions are put in place. With respect to the third parties, QC commits to providing them with adequate notice should QC seek to de-designate any documents, and to meet/confer with them regarding any resulting issues (as it would need to do so under the Protective Order here, and under the protective order that would be entered into in the European litigation).

To the extent that the third parties' objections are meant to imply that QC would breach the Protective Order in some way, there is no reason to hypothesize about a breach. QC notes that such a risk is already borne by Intel, AMD, and the third parties in this case, as any of the myriad of consultants, experts, attorneys, and entities involved could theoretically breach the Protective Order. Therefore, third parties must already "monitor their compliance" with the Protective Order. In fact, the risk of breach is present in *any* litigation involving a Protective Order; there is nothing unusual here.

### G.     QC's Request Is Not Overbroad

Intel contends that QC's request is vastly overbroad and not tailored to issues in Europe. *See* Intel Opp. at 28. It also contends that there is no need for full-scale discovery on liability issues in Europe, and that it should be limited according to the EC's White Paper. *See id.* at 26. Courts have cautioned against excessive trial court evaluation of what evidence might be "relevant" in foreign proceedings. In *re Application Pursuant to 28 U.S.C. Section 1782 for an Order Permitting Christen Sveaas to Take Discovery from Dominique Levy, L & M Galleries*

24

*and other non-participants for use in Actions Pending in the Norway*, 249 F.R.D. 96, 107 (S.D.N.Y. 2008), the court stated:

> Given the broadly permissive standard by which a court evaluates the relevance of discoverable material, and the parties' presentation of a factual dispute regarding the relevance of the discovery sought, it is inappropriate to deny Sveaas' discovery requests on the ground that the requested discovery is irrelevant to Sveaas' foreign claims. Further, because the Court is called upon only to resolve a discovery issue that arises from underlying litigation in foreign jurisdictions, the court should be particularly wary of denying discovery on relevance grounds. *See In re Honeywell Int'l*, 230 F.R.D. at 301 (stating that a court "'whose only connection with a case is supervision of discovery ancillary to an action in another district should be especially hesitant to pass judgment on what constitutes relevant evidence thereunder'") (citation omitted).

Even where a court determines that a Section 1782 application may be overly broad, the solution is not to deny the application, but rather, to require a more narrowly tailored request. *See Metallgesellschaft*, 121 F.3d at 80 (reversing trial court's denial of Section 1782 application for failure to engage in "tailoring discovery pursuant to its authority"); *Weber v. Finker*, 2007 WL 4285362, at *6 (M.D. Fla. 2007) ("[t]he Court agrees the discovery requests may be overly broad and therefore, may need to be more narrowly tailored, however, Respondents have not convinced the Court that the requests are so unduly intrusive or burdensome to deny the discovery altogether. Accordingly, the Court believes the discovery pursuant to § 1782 should be permitted.").[29]

Intel presented to the Court the following simplified, self-selecting standard for AMD and Intel to decide what materials of theirs and third parties would be used in Japanese litigation:

> To the extent that discovery properly conducted in the AMD Litigation, the Class Litigation, or the California Class Litigation *is relevant* to issues pending in the Japan Litigation, the Receiving Party may, subject to the terms and limitations of this Protective Order, disclose the Confidential Discovery Material to its Japan Counsel and Japan Experts/Consultants. Nothing herein shall be deemed to create an independent discovery right for purposes of the Japan Litigation, nor limit the rights of a Party or Class Party to object to discovery propounded in the AMD

---

[29]     With respect to Intel's reference to the EC's White Paper, QC notes that it expressly purports to only set a "minimum level of disclosure" for antitrust damages cases, not a maximum or ceiling. *See* White Paper at 5.

Litigation, the Class Litigation, the Japan Litigation, or the California Class
Litigation.

*See* Intel's Proposed Protective Order at 17 (emphasis added).  The Court can adopt the same
standard here.

QC proposes that its counsel (who already have access to the productions of Intel and
third parties), search only for (1) documents sent to or from Europe; (2) documents in the
possession of European custodians of records; (3) documents referencing European countries; or
(4) documents relating to European countries but not expressly referencing them (*e.g.*, as a
hypothetical example, documents detailing "global strategy" on Intel's efforts to limit AMD's
growth by paying or granting rebates to computer manufacturers or retailers).  As detailed in the
Introduction, no documents detailing sensitive technical matters or patent information will be
segregated by QC's counsel for use in Europe.  QC's counsel will only focus on the *who, what,
where, when, why,* and *how.*  Intel's payments and rebates scheme has been reported extensively
in the press as a result of the numerous government proceedings against it and AMD's present
case in this Court.  QC simply seeks further details and material relevant to evaluating impact on
European consumers.  Intel previously endorsed a similar self-selecting "relevance" standard to
this Court in its Proposed Protective Order with respect to foreign litigation in Japan.

Additionally, QC requests access via its counsel to any currently existing and future
deposition transcripts that may contain relevant evidence as detailed above, and any filings under
seal that may contain relevant evidence, namely, the preliminary pretrial statements and replies,
and documents cited therein, the class certification briefing and expert reports and documents
cited therein, and summary judgment papers and expert reports and documents cited therein, any
further pretrial statements and documents cited therein, and any trial transcripts and evidence
used at trial.

QC recognizes that as of the date of this Reply, some third parties may not have produced

documents or data that is expressly relevant to the European market. Fry's Electronics, in its Opposition, makes this point with respect to itself. However, QC cannot categorically agree that any particular third party should not be subject to the instant Motion. It is possible that these third parties, despite not selling products into Europe, still have produced, or will produce, information obtained from Intel or others that bears on the European market. It is also possible that the parties' experts in the present case may reference documents or data from such third parties in expert reports or testimony in the present case, which may be useful for experts and the relevant tribunal in the European damages litigation to examine for comparison purposes.

With respect to Intel's contention that QC is not entitled to any evidence on liability, as opposed to damages, Intel clearly is likely to contest any adverse EC decision, as well as contend in QC's action that the EC decision is not applicable in whole or in part. This is similar to the heavily-contested collateral estoppel issues that have been litigated in the United States in consumer damages actions with respect to monopolization findings, for example, regarding Microsoft and the U.S. Smokeless Tobacco Company, manufacturer of moist snuff tobacco. *See Comes v. Microsoft Corp.*, 709 N.W.2d 114 (Iowa 2006); Supp. King Decl. Exh. 9 (California Smokeless Tobacco Cases I - IV, "Decision on Phase I Trial re: Collateral Estoppel"). QC cannot now say that it has no need for liability evidence, and as a practical matter, it can be exceedingly difficult, if not impossible, to draw sharp distinctions between liability and damages evidence.

QC's counsel will only segregate and set aside for potential use in QC's damages litigation documents that will be relevant to those proceedings. As described herein, any documents from that slimmed-down universe could only then be used in QC's damages litigation following the entry of a protective order in that litigation granting similar protections as currently exists in these proceedings.

IV.    **QC'S ALTERNATIVE OR SUPPLEMENTAL REQUESTED RELIEF**

QC is not the only third party that seeks access to information in this case. Attorneys for *The New York Times*, *The Washington Post*, Dow Jones & Co., Inc. (publisher of *The Wall Street Journal*), and various other entities recently notified the parties and at least some third parties of their position that "the amount of sealing in this litigation has been excessive," including the sealing of "stale information," and that they plan to file a motion to intervene to gain access to various sealed filings and transcripts in this case if certain information is not de-designated. *See* Supp. King Decl., Exh. 10.

Should the Court conclude that it will not grant QC its requested relief, QC alternatively requests that its counsel (who already has access to the confidential material via its participation in the class action proceedings here), be allowed to meet/confer with counsel for Intel and/or the third parties about de-designating certain material that may be of interest to QC for use in European damages litigation, similar to the process contemplated by the Protective Order (*see* D.I. 277, ¶16 at pp. 13-15). Certainly substantial portions of the information, which covers time periods going back at least as early as the beginning of 2000, are no longer entitled to confidentiality protection due to staleness concerns, among other reasons. Indeed, the Special Master has already recognized the staleness issue as follows:

> The Special Master's review of the case law submitted by the Parties makes clear that the issue of staleness, as it relates to the designation of documents as "confidential," has been consistently determined on a fact-specific basis. Moreover, the proposed provisions of Paragraph 16 address a procedure whereby materials previously designated as "confidential" can be de-designated as such by either agreement of the producing and receiving parties or by determination of the Court. The Special Master concludes that these provisions are adequate to address any issues of "staleness" on a case-by-case basis . . . .

Special Master's Report and Recommendations Regarding Proposed Protective Order, at 104. Moreover, Intel, in presenting to the Court Intel's Proposed Protective Order, recommended to the court a 24-month standard, after which confidential documents would be entitled to less

protection. *See* Intel's Proposed Protective Order. Should the relevant parties be unable to reach agreement regarding de-designation, they could present any disputes to the Special Master for adjudication.

In short, there are several tools available for the Court to achieve the efficiencies regarding foreign litigation that Intel has already recommended. Should the Court find that QC should have access to some or all of the Intel's confidential materials, but not those of the third parties, it could utilize a hybrid approach by implementing the de-designating process with respect to the third parties that have objected here (or a subset, making distinctions between those that did not object to Intel's Proposed Protective Order regarding foreign litigation, and those that did).

QC also notes that numerous third parties have not objected in any way to QC's request for access to documents by filing oppositions or joinders. These third parties include some who participated in the Protective Order hearing more than two years ago, such as IBM and Lenovo, who have manufactured personal computers sold in Europe. QC believes that its Motion should be granted (i.e. access should be allowed pursuant to the European search protocol described *supra*) with respect to these third parties.

## V.    CONCLUSION

For the foregoing reasons, QC respectfully requests that the Court grant its Motion to Intervene, grant its application pursuant to 28 U.S.C. § 1782, and modify the Protective Order as described in the Motion and herein.

PRICKETT JONES & ELLIOTT, P.A.

By: _____
James L. Holzman (#663)
J. Clayton Athey (#4378)
Laina M. Herbert (#4717)
Melissa N. Donimirski (#4701)
1310 King Street
P.O. Box 1328
Wilmington, DE  19899
jlholzman@prickett.com
jcathey@prickett.com
lmherbert@prickett.com
mndonimirski@prickett.com
Telephone: (302) 888-6500
Facsimile: (302) 658-8111

*Counsel for Union Federale des Consommateurs - Que Choisir*

Of Counsel:

Jon T. King
COHEN MILSTEIN HAUSFELD &
  TOLL, P.L.L.C.
One Embarcadero Center
Suite 2440
San Francisco, CA  94111
Telephone:  (415) 229-2080
Facsimile:  (415) 986-3643
jking@cmht.com

Dated: July 16, 2008

30