# EXHIBIT 1

EUROPA - Rapid - Press Releases

http://europa.eu/rapid/pressReleasesAction.do?reference=MEMO/07/314



Important legal notice

English

EUROPA > Press Room > Press Releases

Contact | Search on EUROPA

Search

RSS · Midday Express · Recent Press Releases | Select a topic



## Competition: Commission confirms sending of Statement of Objections to Intel

+ Login

+ Register

+ Documentation

+ What's New

+ Poll

+ About

Reference: MEMO/07/314   Date: 27/07/2007

HTML: EN
PDF: EN
DOC: EN

MEMO/07/314

Brussels, 27 July 2007

**Competition: Commission confirms sending of Statement of Objections to Intel**

*The European Commission can confirm that it has sent a Statement of Objections (SO) to Intel on 26th July 2007. The SO outlines the Commission's preliminary view that Intel has infringed the EC Treaty rules on abuse of a dominant position (Article 82) with the aim of excluding its main rival, AMD, from the x86 Computer Processing Units (CPU) market.*

In the SO, the Commission outlines its preliminary conclusion that Intel has engaged in three types of abuse of a dominant market position. First, Intel has provided substantial rebates to various Original Equipment Manufacturers (OEMs) conditional on them obtaining all or the great majority of their CPU requirements from Intel. Secondly, in a number of instances, Intel made payments in order to induce an OEM to either delay or cancel the launch of a product line incorporating an AMD-based CPU. Thirdly, in the context of bids against AMD-based products for strategic customers in the server segment of the market, Intel has offered CPUs on average below cost.

These three types of conduct are aimed at excluding AMD, Intel's main rival, from the market. Each of them is provisionally considered to constitute an abuse of a dominant position in its own right. However, the Commission also considers at this stage of its analysis that the three types of conduct reinforce each other and are part of a single overall anti-competitive strategy.

Intel has 10 weeks to reply to the SO, and will then have the right to be heard in an Oral Hearing. If the preliminary views expressed in the SO are confirmed, the Commission may require Intel to cease the abuse and may impose a fine.

**Background**

A Statement of Objections is a formal step in Commission antitrust investigations in which the Commission informs the parties concerned in writing of the objections raised against them. The addressee of a Statement of Objections can reply in writing to the Statement of Objections, setting out all facts known to it which are relevant to its defence against the objections raised by the Commission. The party may also request an oral hearing to present its comments on the case.

The Commission may then take a decision on whether conduct addressed in the Statement of Objections is compatible or not with the EC Treaty's antitrust rules. Sending a Statement of Objections does not prejudge the final outcome of the procedure.

# EXHIBIT 2

  

 Search  **Forbes.com**  Quotes  Video  Web  Blogs  Advanced  Go 

HOME PAGE FOR THE WORLD'S BUSINESS LEADERS     Free Trial Issue

U.S.   EUROPE   ASIA

HOME   BUSINESS   TECH   MARKETS   ENTREPRENEURS   LEADERSHIP   PERSONAL FINANCE   FORBESLIFE

Video   Blogs   E-mail Newsletters   Org Chart Wiki   People Tracker   Portfolio Tracker   Special Reports   Widgets   CEO

E-Mail  |  E-mail Newsletters  |  RSS                     ADVERTISEMENT

Thomson Financial News

# EU says Intel antitrust case 'active'; no provisional decision made UPDATE

05.28.08. 8:42 AM ET

**Popular Videos**
Dr. Vino's July Fourth Finds
Small Beers, Big Business
Doctors On Demand
Billionaire Dropouts
Groovy No More

**Most Popular Stories**
Young Billionaires
Easily Overlooked Tax Deductions
The No-Tech Hacker
Job Hunting In A Downturn
How To Tap Lenders When Credit Is Tight

(Updates with further European Commission comment)

BRUSSELS (Thomson Financial) - The European Commission said its antitrust case against **Intel Corp.** (nasdaq: INTC - news - people ) is 'active' and dismissed press reports that the EU executive had already made a provisional decision finding against the U.S. computer chip manufacturer.

A spokesman for EU competition commissioner Neelie Kroes said: 'The commission has an ongoing antitrust case concerning possible abuse of a dominant market position by Intel. That investigation is very much active.'

The spokesman also said a Financial Times Deutschland report was misleading in suggesting that a provisional decision against the group had been made.

'It is misleading of the article to suggest that any provisional, internal decision has already been taken on this case'.

The spokesman said the commission would take a decision on the file 'as soon as possible'.

Earlier, Financial Times Deutschland reported, citing sources in Brussels, that the commission is planning to bar some of Intel's sales practices to curb the company's market power in Europe.

Commissioner Kroes has already made a 'factual' decision, the paper said, to be published in late summer.

According to the EU plans, Intel will have to stop marketing its processors at discount prices to PC manufacturers.

In addition, the EU intends to ban Intel from paying marketing cost subsidies to retailers, if Intel demands exclusivity in return, it said.

Apart from the barring of sales practices, Intel could also face a fine as high as 10 percent of its annual revenue, which would amount to about 2.6 billion euros, the paper added.

In July last year, six years after the inquiry opened, the commission sent charges to Intel for alleged abuse of its market dominance over rival **Advanced Micro Devices Inc.** (nyse: AMD - news - people ) (AMD) in the computer processing units (CPU) sector.

The EU executive said then that it believes Intel provided substantial rebates to various original equipment manufacturers (OEM) on the condition that they obtain all, or the great majority, of their CPU requirements from Intel.

The commission claimed Intel made payments to induce an OEM to either delay or cancel the launch of a product line incorporating an AMD-based CPU.

In addition, the commission believes Intel offered CPUs at below-average cost.

Intel has denied all the charges.

simon.zekaria@thomsonreuters.com

sz/nes/sz/rw

COPYRIGHT

Copyright Thomson Financial News Limited 2008. All rights reserved.

The copying, republication or redistribution of Thomson Financial News Content, including by framing or similar means, is expressly prohibited without the prior written consent of Thomson Financial News.

*Neither the Subscriber nor Thomson Financial News warrants the completeness or accuracy of the Service or the suitability of the Service as a trading aid and neither accepts any liability for losses howsoever incurred. The content on this site, including news, quotes, data and other information, is provided by Thomson Financial News and its third party content providers for your personal information only, and neither Thomson Financial News nor its third party content providers shall be liable for any errors, inaccuracies or delays in content, or for any actions taken in reliance thereon.*

Eight Costly Investment Mista (and How to Avoid

If you have a $50( portfolio, you knov making money isn about picking stoc It's also about avo mistakes that can your portfolio. A br new report by *For* columnist and mor manager Ken Fish called **"The Eight Biggest Mistakes Investors Make a How to Avoid Th** Read it now befor problems start.

Click Here to Dow Your Report!

FISHER INVESTMENTS

Your Rating

Overall Rating

**Reader Comments**

Post A Comment

Make Forbes.com My Home Page

**News by E-mail Get stories by E-Mail on**

**Companies**

Advanced Micro

# EXHIBIT 3

| HOME PAGE | MY TIMES | TODAY'S PAPER | VIDEO | MOST POPULAR | TIMES TOPICS |

**The New York Times**

# World Business

WORLD   U.S.   N.Y. / REGION   BUSINESS   TECHNOLOGY   SCIENCE   HEALTH   SPORTS   OPINION   ARTS

**Search Business**
Name, Company                    Go

**Financial Tools**
Select a Financial Tool

**More in Business »**
World Business    Markets    DealBook



**Refinance Now and Save!**
I need...
$150,000 for $841/month   $175,000 for $749/month   $200,000 for $855/month   $275,000 for $1,175/month

## South Korea to Fine Intel $25.4 Million for Trade Violations

By THE ASSOCIATED PRESS
Published June 5 2008

SEOUL, South Korea (AP) — South Korea's antitrust regulator said Thursday that it would order the Intel Corporation to pay 26 billion won ($25.4 million) for violating fair trade rules.

The Korea Fair Trade Commission said in a statement that it was issuing the order because the semiconductor giant offered rebates to South Korean computer companies and undercut a competitor, Advanced Micro Devices.

Intel, based in Santa Clara, Calif., criticized the ruling and said it would consider its options, including a possible appeal.

"We're disappointed, and we completely disagree with the findings," D. Bruce Sewell, Intel's senior vice president and general counsel, said in Seoul.

The Korea Fair Trade Commission charged Intel with violating South Korean antitrust laws last year after completing a two-year investigation.

The commission said Intel provided rebates to the Samsung Electronics Company and other South Korean computer makers that agreed to use Intel microprocessors over those manufactured by A.M.D., based in Sunnyvale, Calif.

Intel has been scrutinized by regulators in several countries and the European Union over accusations that it abused its market dominance to pressure computer makers and undermine rivals.

More Art

Today'

SIGN IN TO E-MAIL
OR SAVE THIS

PRINT

REPRINTS

SHARE

ARTICLE TOOLS
SPONSORED BY
FIGHT CLUB

Rate Marketplace

Intel, which dominates the world market for microprocessors, has faced numerous legal battles over how it maintains its market position. The company has repeatedly denied breaking any laws.

Mr. Sewell said Intel would wait for the issuance of an official notice from the commission, which could take 30 to 60 days, before deciding on a course of action.

He said Intel had the option to request a reconsideration to the commission, though it could also seek a court ruling.

**More Articles in Business »**

**Need to know more? 50% off home delivery of The Times.**

**Tips**
To find reference information about the words used in this article, double-click on any word, phrase or name. A new window will open with a dictionary definition or encyclopedia entry.

**Past Coverage**
F.T.C. Chief Balks AT INTEL INQUIRY (October 22, 2007)
WORLD BUSINESS BRIEFING; South Korea: Intel Trade Inquiry Is Completed (September 12, 2007)
World Business Briefing | Asia: Korea: For Intel, Antitrust Inquiry (August 9, 2005)
Technology Briefing | Hardware: Intel Opens Research Center In Korea (March 9, 2004)

**Related Searches**
South Korea                              Add Alert
Intel Corp                               Add Alert
Antitrust Actions and Laws               Add Alert
Computer Chips                           Add Alert

**INSIDE NYTIMES.COM**

8.   Sto
9.   Str
10.  Ap
Go to Co


The N

Yaho
Also in
Anheu
Wal-M
Harley

ADVERTI

Need to
Get 50%
Times.

Ads by

Mari
Limite
Collec
www.

HEALTH »



Drugs to Build Bones May Weaken Them

SCIENCE »



Farms in the Sky Gain New Interest

OPINION »

## The Animated Life

The filmmaker Jeff Scher recreates the choreography of insects flying around a light.

U.S. »




Places Captured in Time, but Not Frozen There

OPII

Edit
Priv



**Browse**

Find busi
Services I

**Advertisi**

**Business**

**Legal Se**

**Miscellar**

**Public Re**

Copyright 2008 The New York Times Company     Privacy Policy     Search     Corrections     RSS  ⋮  First Look  ⋮  He

# EXHIBIT 4

**The New York Times**
nytimes.com

PRINTER-FRIENDLY FORMAT
SPONSORED BY 

June 7, 2008

# In Turnabout, Antitrust Unit Looks at Intel

By **STEPHEN LABATON**

WASHINGTON — A global legal battle between the two largest makers of computer processors took an abrupt turn this week when the Federal Trade Commission opened a formal antitrust investigation of the Intel Corporation.

For years, Advanced Micro Devices, a smaller rival of Intel, has been scouring the world in search of regulators in Europe, Asia and the United States who would agree to prosecute Intel for what A.M.D. maintains are anticompetitive pricing practices.

The worldwide campaign — over a market that generates more than $225 billion in global sales each year — has cost both companies tens of millions of dollars in legal and public relations expenses. A.M.D. has met with considerable success in Europe, Japan and Korea.

In the United States, however, the quest had not gained much ground among state authorities or federal regulators appointed by President Bush, who have taken a less aggressive antitrust approach than their foreign counterparts.

But on Friday the federal approach toward the case began to change — and those changes could accelerate depending on the antitrust stance of the next administration and its regulatory appointees.

The investigation, into accusations that Intel's pricing is intended to maintain a near monopoly on the microprocessor market, was authorized by William E. Kovacic, the new chairman of the trade commission, and has the support of the agency's other commissioners, officials said.

It reversed a decision by his predecessor, Deborah P. Majoras, who had been blocking the formal inquiry for many months, frustrating other senior commission officials and some lawmakers on Capitol Hill.

Ms. Majoras, a former senior official in the antitrust division at the Justice Department, where she was an architect of the Bush administration's antitrust settlement with Microsoft in 2001, left the commission two months ago, and the seat remains vacant.

Since it will almost certainly be many months before the commission decides whether to make a case against Intel, as European and Asian regulators have already done, the investigation could mark an important early test for the next administration on antitrust policy.

Among the states, only the New York attorney general, Andrew M. Cuomo, has publicly signaled his intention to review the matter. Other states have declined to take action. When the attorney general of California, Jerry Brown, rejected A.M.D.'s complaint this year, he said in The San Francisco Chronicle that he was "not

barking at every truck that comes down the street."

A.M.D. has accused Intel of systematically giving its customers — the world's leading personal computer makers — large discounts, at times below Intel's own manufacturing costs, in exchange for commitments not to do business with competitors. Intel has responded that its discounts were legitimate incentives, not offered below cost, and benefiting customers who can buy computers at lower prices.

Intel has also maintained that A.M.D. tried to make up in the courts for its failures in the marketplace.

While Intel has denied the allegations, A.M.D. executives are hoping the case will present an easy opportunity for the next administration to take a noticeably more aggressive approach to competition issues. Technically independent of the White House, the trade commission is led by appointees of the president.

D. Bruce Sewell, Intel's senior vice president and general counsel, said that because American and foreign antitrust law are fundamentally different, the company is confident of vindication, regardless of the leadership of the Federal Trade Commission next year, when the new president can fill the vacant seat and name its own chairman.

Still, Intel has been planning to increase the size of its Washington operations, a move that could be helpful both for the antitrust case and a variety of other issues before Congress and the regulators that are important to the company.

The official signs of the heightened scrutiny by the commission came in recent days when Intel, Advanced Micro Devices, and several of the world's largest personal computer makers that buy semiconductors from the two companies began to receive subpoenas from the agency.

Commission officials have also been working closely with their foreign counterparts, and have had access to the same evidence that is being used abroad to make the cases against Intel.

Mr. Sewell said that Intel had been working closely with the trade commission on a less formal review that had been under way since 2006. He said the company would continue to cooperate with authorities.

A.M.D. executives said they were pleased with the commission's decision.

"Intel must now answer to the Federal Trade Commission, which is the appropriate way to determine the impact of Intel practices on U.S. consumers and technology businesses," said Tom McCoy, executive vice president for legal affairs at A.M.D. "In every country around the world where Intel's business practices have been investigated, including the decision by South Korea this week, antitrust regulators have taken action."

The fight between the two companies is among the largest antitrust matters pending before American and foreign regulators, and is considered to be among the most important since the antitrust cases brought against Microsoft in the 1990s.

A.M.D.'s latest success abroad came just this week, when the Korean Fair Trade Commission said it would order Intel to pay more than $25 million for violating its fair trade laws.

The Korean commission found that Intel had violated antitrust law when it offered $37 million in rebates to the personal computer makers, Samsung Electronics and the Trigem Company, from 2002 to 2005 in return for a pledge not to buy microprocessors from A.M.D. Intel responded by saying it was disappointed with the decision and would probably appeal.

Lawyers involved in the proceedings say they expect that later this year European regulators will expand their statement of objections, or official charge sheet, against Intel. Last year, the European Commission said the company had engaged in anticompetitive conduct by providing rebates to customers that limit their business with rivals and by paying computer makers to either delay or cancel the release of products that used A.M.D. microprocessors.

The European complaint said that Intel had abused its market dominance "with the aim of excluding its main rival from the market." The complaint was the culmination of a six-year investigation.

A.M.D. has also sued Intel in Federal District Court in Delaware. As a result of the crushing amount of evidence being gathered by both sides, a special master in that case this week delayed the start of the trial to early 2010. The trial had originally been scheduled for next spring.

Intel, which was founded by engineers who were leaders in developing and advancing computer chip technology, controls 80 to 90 percent of the microprocessor market. American antitrust law permits a company to hold a monopoly, but it forbids a company from leveraging its dominance to restrict competition.

A.M.D. has asserted that Intel offers rebates and discounts that, in effect, result in its chips' being sold at prices below the cost of production, a practice that some courts in cases involving other companies have said can be a violation of antitrust law.

Intel denies that its discounts and rebates drive its prices below cost, or to predatory levels. Intel has said that it offers legitimate discounts based on the volume of chips that have been purchased by companies, and that consumers benefit when personal computer manufacturers — using the discounts — are able to lower the cost of their products.

Intel executives have also said that, to the extent the foreign antitrust regulators have come down harder on the company than American officials, it was a reflection of the different approach toward antitrust law. The American approach toward antitrust has been historically aimed at protecting competition, while the others use antitrust often to protect rival companies.

Copyright 2008 The New York Times Company

# EXHIBIT 5

Avis juridique important

ES CS DA DE ET EL EN FR IT LV LT HU MT NL PL PT SK SL FI SV

Site map | LexAlert | FAQ | Help | Contact | Links

## 32001R0044

**Council Regulation (EC) No 44/2001 of 22 December 2000 on jurisdiction and the recognition and enforcement of judgments in civil and commercial matters**

*OJ L 12, 16.1.2001, p. 1–23 (ES, DA, DE, EL, EN, FR, IT, NL, PT, FI, SV)*
*Special edition in Czech Chapter 19 Volume 04 P. 42 - 64*
*Special edition in Estonian Chapter 19 Volume 04 P. 42 - 64*
*Special edition in Hungarian Chapter 19 Volume 04 P. 42 - 64*
*Special edition in Lithuanian Chapter 19 Volume 04 P. 42 - 64*
*Special edition in Latvian Chapter 19 Volume 04 P. 42 - 64*
*Special edition in Maltese Chapter 19 Volume 04 P. 42 - 64*
*Special edition in Polish Chapter 19 Volume 04 P. 42 - 64*
*Special edition in Slovakian Chapter 19 Volume 04 P. 42 - 64*
*Special edition in Slovenian Chapter 19 Volume 04 P. 42 - 64*

| ES | CS | DA | DE | ET | EL | EN | FR | IT | LV | LT |
|------|------|------|------|------|------|------|------|------|------|------|
| html | html | html | html | html | html | html | html | html | html | html |
| pdf | pdf | pdf | pdf | pdf | pdf | pdf | pdf | pdf | pdf | pdf |

MORE

INFO

Council Regulation (EC) No 44/2001

of 22 December 2000

on jurisdiction and the recognition and enforcement of judgments in civil and commercial matters

THE COUNCIL OF THE EUROPEAN UNION,

Having regard to the Treaty establishing the European Community, and in particular Article 61(c) and Article 67(1) thereof,

Having regard to the proposal from the Commission(1),

Having regard to the opinion of the European Parliament(2),

Having regard to the opinion of the Economic and Social Committee(3),

Whereas:

(1) The Community has set itself the objective of maintaining and developing an area of freedom, security and justice, in which the free movement of persons is ensured. In order to establish progressively such an area, the Community should adopt, amongst other things, the measures relating to judicial cooperation in civil matters which are necessary for the sound operation of the internal market.

(2) Certain differences between national rules governing jurisdiction and recognition of judgments hamper the sound operation of the internal market. Provisions to unify the rules of conflict of jurisdiction in civil and commercial matters and to simplify the formalities with a view to rapid and simple recognition and enforcement of judgments from Member States bound by this Regulation are essential.

(3) This area is within the field of judicial cooperation in civil matters within the meaning of Article 65 of the Treaty.

(4) In accordance with the principles of subsidiarity and proportionality as set out in Article 5 of the Treaty, the objectives of this Regulation cannot be sufficiently achieved by the Member States and can therefore be better achieved by the Community. This Regulation confines itself to the minimum required in order to achieve those objectives and does not go beyond what is necessary for that purpose.

(5) On 27 September 1968 the Member States, acting under Article 293, fourth indent, of the Treaty, concluded the Brussels Convention on Jurisdiction and the Enforcement of Judgments in Civil and Commercial Matters, as amended by Conventions on the Accession of the New Member States to that Convention (hereinafter referred to as the "Brussels Convention")(4). On 16 September 1988 Member States and EFTA States concluded the Lugano Convention on Jurisdiction and the Enforcement of Judgments in Civil and Commercial Matters, which is a parallel Convention to the 1968 Brussels Convention. Work has been undertaken for the revision of those Conventions, and the Council has approved the content of the revised texts. Continuity in the results achieved in that revision should be ensured.

(6) In order to attain the objective of free movement of judgments in civil and commercial matters, it is necessary and appropriate that the rules governing jurisdiction and the recognition and enforcement of judgments be governed by a Community legal instrument which is binding and directly applicable.

(7) The scope of this Regulation must cover all the main civil and commercial matters apart from certain well-defined matters.

(8) There must be a link between proceedings to which this Regulation applies and the territory of the Member States bound by this Regulation. Accordingly common rules on jurisdiction should, in principle, apply when the defendant is domiciled in one of those Member States.

(9) A defendant not domiciled in a Member State is in general subject to national rules of jurisdiction applicable in the territory of the Member State of the court seised, and a defendant domiciled in a Member State not bound by this Regulation must remain subject to the Brussels Convention.

(10) For the purposes of the free movement of judgments, judgments given in a Member State bound by this Regulation should be recognised and enforced in another Member State bound by this Regulation, even if the judgment debtor is domiciled in a third State.

(11) The rules of jurisdiction must be highly predictable and founded on the principle that jurisdiction is generally based on the defendant's domicile and jurisdiction must always be available on this ground save in a few well-defined situations in which the subject-matter of the litigation or the autonomy of the parties warrants a different linking factor. The domicile of a legal person must be defined autonomously so as to make the common rules more transparent and avoid conflicts of jurisdiction.

(12) In addition to the defendant's domicile, there should be alternative grounds of jurisdiction based on a close link between the court and the action or in order to facilitate the sound administration of justice.

(13) In relation to insurance, consumer contracts and employment, the weaker party should be protected by rules of jurisdiction more favourable to his interests than the general rules provide for.

(14) The autonomy of the parties to a contract, other than an insurance, consumer or employment contract, where only limited autonomy to determine the courts having jurisdiction is allowed, must be respected subject to the exclusive grounds of jurisdiction laid down in this Regulation.

(15) In the interests of the harmonious administration of justice it is necessary to minimise the possibility of concurrent proceedings and to ensure that irreconcilable judgments will not be given in two Member States. There must be a clear and effective mechanism for resolving cases of lis pendens and related actions and for obviating problems flowing from national differences as to the determination of the time when a case is regarded as pending. For the purposes of this Regulation that time should be defined autonomously.

(16) Mutual trust in the administration of justice in the Community justifies judgments given in a Member State being recognised automatically without the need for any procedure except in cases of dispute.

(17) By virtue of the same principle of mutual trust, the procedure for making enforceable in one

Member State a judgment given in another must be efficient and rapid. To that end, the declaration that a judgment is enforceable should be issued virtually automatically after purely formal checks of the documents supplied, without there being any possibility for the court to raise of its own motion any of the grounds for non-enforcement provided for by this Regulation.

(18) However, respect for the rights of the defence means that the defendant should be able to appeal in an adversarial procedure, against the declaration of enforceability, if he considers one of the grounds for non-enforcement to be present. Redress procedures should also be available to the claimant where his application for a declaration of enforceability has been rejected.

(19) Continuity between the Brussels Convention and this Regulation should be ensured, and transitional provisions should be laid down to that end. The same need for continuity applies as regards the interpretation of the Brussels Convention by the Court of Justice of the European Communities and the 1971 Protocol(5) should remain applicable also to cases already pending when this Regulation enters into force.

(20) The United Kingdom and Ireland, in accordance with Article 3 of the Protocol on the position of the United Kingdom and Ireland annexed to the Treaty on European Union and to the Treaty establishing the European Community, have given notice of their wish to take part in the adoption and application of this Regulation.

(21) Denmark, in accordance with Articles 1 and 2 of the Protocol on the position of Denmark annexed to the Treaty on European Union and to the Treaty establishing the European Community, is not participating in the adoption of this Regulation, and is therefore not bound by it nor subject to its application.

(22) Since the Brussels Convention remains in force in relations between Denmark and the Member States that are bound by this Regulation, both the Convention and the 1971 Protocol continue to apply between Denmark and the Member States bound by this Regulation.

(23) The Brussels Convention also continues to apply to the territories of the Member States which fall within the territorial scope of that Convention and which are excluded from this Regulation pursuant to Article 299 of the Treaty.

(24) Likewise for the sake of consistency, this Regulation should not affect rules governing jurisdiction and the recognition of judgments contained in specific Community instruments.

(25) Respect for international commitments entered into by the Member States means that this Regulation should not affect conventions relating to specific matters to which the Member States are parties.

(26) The necessary flexibility should be provided for in the basic rules of this Regulation in order to take account of the specific procedural rules of certain Member States. Certain provisions of the Protocol annexed to the Brussels Convention should accordingly be incorporated in this Regulation.

(27) In order to allow a harmonious transition in certain areas which were the subject of special provisions in the Protocol annexed to the Brussels Convention, this Regulation lays down, for a transitional period, provisions taking into consideration the specific situation in certain Member States.

(28) No later than five years after entry into force of this Regulation the Commission will present a report on its application and, if need be, submit proposals for adaptations.

(29) The Commission will have to adjust Annexes I to IV on the rules of national jurisdiction, the courts or competent authorities and redress procedures available on the basis of the amendments forwarded by the Member State concerned; amendments made to Annexes V and VI should be adopted in accordance with Council Decision 1999/468/EC of 28 June 1999 laying down the procedures for the exercise of implementing powers conferred on the Commission(6),

HAS ADOPTED THIS REGULATION:

CHAPTER I

SCOPE

Article 1

1. This Regulation shall apply in civil and commercial matters whatever the nature of the court or tribunal. It shall not extend, in particular, to revenue, customs or administrative matters.

2. The Regulation shall not apply to:

(a) the status or legal capacity of natural persons, rights in property arising out of a matrimonial relationship, wills and succession;

(b) bankruptcy, proceedings relating to the winding-up of insolvent companies or other legal persons, judicial arrangements, compositions and analogous proceedings;

(c) social security;

(d) arbitration.

3. In this Regulation, the term "Member State" shall mean Member States with the exception of Denmark.

CHAPTER II

JURISDICTION

Section 1

General provisions

Article 2

1. Subject to this Regulation, persons domiciled in a Member State shall, whatever their nationality, be sued in the courts of that Member State.

2. Persons who are not nationals of the Member State in which they are domiciled shall be governed by the rules of jurisdiction applicable to nationals of that State.

Article 3

1. Persons domiciled in a Member State may be sued in the courts of another Member State only by virtue of the rules set out in Sections 2 to 7 of this Chapter.

2. In particular the rules of national jurisdiction set out in Annex I shall not be applicable as against them.

Article 4

1. If the defendant is not domiciled in a Member State, the jurisdiction of the courts of each Member State shall, subject to Articles 22 and 23, be determined by the law of that Member State.

2. As against such a defendant, any person domiciled in a Member State may, whatever his nationality, avail himself in that State of the rules of jurisdiction there in force, and in particular those specified in Annex I, in the same way as the nationals of that State.

Section 2

Special jurisdiction

Article 5

A person domiciled in a Member State may, in another Member State, be sued:

1. (a) in matters relating to a contract, in the courts for the place of performance of the obligation in question;

(b) for the purpose of this provision and unless otherwise agreed, the place of performance of the obligation in question shall be:

- in the case of the sale of goods, the place in a Member State where, under the contract, the goods were delivered or should have been delivered,

- in the case of the provision of services, the place in a Member State where, under the contract, the services were provided or should have been provided,

(c) if subparagraph (b) does not apply then subparagraph (a) applies;

2. in matters relating to maintenance, in the courts for the place where the maintenance creditor is domiciled or habitually resident or, if the matter is ancillary to proceedings concerning the status of a person, in the court which, according to its own law, has jurisdiction to entertain

those proceedings, unless that jurisdiction is based solely on the nationality of one of the parties;

3. in matters relating to tort, delict or quasi-delict, in the courts for the place where the harmful event occurred or may occur;

4. as regards a civil claim for damages or restitution which is based on an act giving rise to criminal proceedings, in the court seised of those proceedings, to the extent that that court has jurisdiction under its own law to entertain civil proceedings;

5. as regards a dispute arising out of the operations of a branch, agency or other establishment, in the courts for the place in which the branch, agency or other establishment is situated;

6. as settlor, trustee or beneficiary of a trust created by the operation of a statute, or by a written instrument, or created orally and evidenced in writing, in the courts of the Member State in which the trust is domiciled;

7. as regards a dispute concerning the payment of remuneration claimed in respect of the salvage of a cargo or freight, in the court under the authority of which the cargo or freight in question:

(a) has been arrested to secure such payment, or

(b) could have been so arrested, but bail or other security has been given;

provided that this provision shall apply only if it is claimed that the defendant has an interest in the cargo or freight or had such an interest at the time of salvage.

Article 6

A person domiciled in a Member State may also be sued:

1. where he is one of a number of defendants, in the courts for the place where any one of them is domiciled, provided the claims are so closely connected that it is expedient to hear and determine them together to avoid the risk of irreconcilable judgments resulting from separate proceedings;

2. as a third party in an action on a warranty or guarantee or in any other third party proceedings, in the court seised of the original proceedings, unless these were instituted solely with the object of removing him from the jurisdiction of the court which would be competent in his case;

3. on a counter-claim arising from the same contract or facts on which the original claim was based, in the court in which the original claim is pending;

4. in matters relating to a contract, if the action may be combined with an action against the same defendant in matters relating to rights in rem in immovable property, in the court of the Member State in which the property is situated.

Article 7

Where by virtue of this Regulation a court of a Member State has jurisdiction in actions relating to liability from the use or operation of a ship, that court, or any other court substituted for this purpose by the internal law of that Member State, shall also have jurisdiction over claims for limitation of such liability.

Section 3

Jurisdiction in matters relating to insurance

Article 8

In matters relating to insurance, jurisdiction shall be determined by this Section, without prejudice to Article 4 and point 5 of Article 5.

Article 9

1. An insurer domiciled in a Member State may be sued:

(a) in the courts of the Member State where he is domiciled, or

(b) in another Member State, in the case of actions brought by the policyholder, the insured or a beneficiary, in the courts for the place where the plaintiff is domiciled,

(c) if he is a co-insurer, in the courts of a Member State in which proceedings are brought

against the leading insurer.

2. An insurer who is not domiciled in a Member State but has a branch, agency or other establishment in one of the Member States shall, in disputes arising out of the operations of the branch, agency or establishment, be deemed to be domiciled in that Member State.

Article 10

In respect of liability insurance or insurance of immovable property, the insurer may in addition be sued in the courts for the place where the harmful event occurred. The same applies if movable and immovable property are covered by the same insurance policy and both are adversely affected by the same contingency.

Article 11

1. In respect of liability insurance, the insurer may also, if the law of the court permits it, be joined in proceedings which the injured party has brought against the insured.

2. Articles 8, 9 and 10 shall apply to actions brought by the injured party directly against the insurer, where such direct actions are permitted.

3. If the law governing such direct actions provides that the policyholder or the insured may be joined as a party to the action, the same court shall have jurisdiction over them.

Article 12

1. Without prejudice to Article 11(3), an insurer may bring proceedings only in the courts of the Member State in which the defendant is domiciled, irrespective of whether he is the policyholder, the insured or a beneficiary.

2. The provisions of this Section shall not affect the right to bring a counter-claim in the court in which, in accordance with this Section, the original claim is pending.

Article 13

The provisions of this Section may be departed from only by an agreement:

1. which is entered into after the dispute has arisen, or

2. which allows the policyholder, the insured or a beneficiary to bring proceedings in courts other than those indicated in this Section, or

3. which is concluded between a policyholder and an insurer, both of whom are at the time of conclusion of the contract domiciled or habitually resident in the same Member State, and which has the effect of conferring jurisdiction on the courts of that State even if the harmful event were to occur abroad, provided that such an agreement is not contrary to the law of that State, or

4. which is concluded with a policyholder who is not domiciled in a Member State, except in so far as the insurance is compulsory or relates to immovable property in a Member State, or

5. which relates to a contract of insurance in so far as it covers one or more of the risks set out in Article 14.

Article 14

The following are the risks referred to in Article 13(5):

1. any loss of or damage to:

(a) seagoing ships, installations situated offshore or on the high seas, or aircraft, arising from perils which relate to their use for commercial purposes;

(b) goods in transit other than passengers' baggage where the transit consists of or includes carriage by such ships or aircraft;

2. any liability, other than for bodily injury to passengers or loss of or damage to their baggage:

(a) arising out of the use or operation of ships, installations or aircraft as referred to in point 1(a) in so far as, in respect of the latter, the law of the Member State in which such aircraft are registered does not prohibit agreements on jurisdiction regarding insurance of such risks;

(b) for loss or damage caused by goods in transit as described in point 1(b);

3. any financial loss connected with the use or operation of ships, installations or aircraft as

referred to in point 1(a), in particular loss of freight or charter-hire;

4. any risk or interest connected with any of those referred to in points 1 to 3;

5. notwithstanding points 1 to 4, all "large risks" as defined in Council Directive 73/239/EEC(7), as amended by Council Directives 88/357/EEC(8) and 90/618/EEC(9), as they may be amended.

Section 4

Jurisdiction over consumer contracts

Article 15

1. In matters relating to a contract concluded by a person, the consumer, for a purpose which can be regarded as being outside his trade or profession, jurisdiction shall be determined by this Section, without prejudice to Article 4 and point 5 of Article 5, if:

(a) it is a contract for the sale of goods on instalment credit terms; or

(b) it is a contract for a loan repayable by instalments, or for any other form of credit, made to finance the sale of goods; or

(c) in all other cases, the contract has been concluded with a person who pursues commercial or professional activities in the Member State of the consumer's domicile or, by any means, directs such activities to that Member State or to several States including that Member State, and the contract falls within the scope of such activities.

2. Where a consumer enters into a contract with a party who is not domiciled in the Member State but has a branch, agency or other establishment in one of the Member States, that party shall, in disputes arising out of the operations of the branch, agency or establishment, be deemed to be domiciled in that State.

3. This Section shall not apply to a contract of transport other than a contract which, for an inclusive price, provides for a combination of travel and accommodation.

Article 16

1. A consumer may bring proceedings against the other party to a contract either in the courts of the Member State in which that party is domiciled or in the courts for the place where the consumer is domiciled.

2. Proceedings may be brought against a consumer by the other party to the contract only in the courts of the Member State in which the consumer is domiciled.

3. This Article shall not affect the right to bring a counter-claim in the court in which, in accordance with this Section, the original claim is pending.

Article 17

The provisions of this Section may be departed from only by an agreement:

1. which is entered into after the dispute has arisen; or

2. which allows the consumer to bring proceedings in courts other than those indicated in this Section; or

3. which is entered into by the consumer and the other party to the contract, both of whom are at the time of conclusion of the contract domiciled or habitually resident in the same Member State, and which confers jurisdiction on the courts of that Member State, provided that such an agreement is not contrary to the law of that Member State.

Section 5

Jurisdiction over individual contracts of employment

Article 18

1. In matters relating to individual contracts of employment, jurisdiction shall be determined by this Section, without prejudice to Article 4 and point 5 of Article 5.

2. Where an employee enters into an individual contract of employment with an employer who is not domiciled in a Member State but has a branch, agency or other establishment in one of the Member States, the employer shall, in disputes arising out of the operations of the branch, agency or establishment, be deemed to be domiciled in that Member State.

Article 19

An employer domiciled in a Member State may be sued:

1. in the courts of the Member State where he is domiciled; or

2. in another Member State:

(a) in the courts for the place where the employee habitually carries out his work or in the courts for the last place where he did so, or

(b) if the employee does not or did not habitually carry out his work in any one country, in the courts for the place where the business which engaged the employee is or was situated.

Article 20

1. An employer may bring proceedings only in the courts of the Member State in which the employee is domiciled.

2. The provisions of this Section shall not affect the right to bring a counter-claim in the court in which, in accordance with this Section, the original claim is pending.

Article 21

The provisions of this Section may be departed from only by an agreement on jurisdiction:

1. which is entered into after the dispute has arisen; or

2. which allows the employee to bring proceedings in courts other than those indicated in this Section.

Section 6

Exclusive jurisdiction

Article 22

The following courts shall have exclusive jurisdiction, regardless of domicile:

1. in proceedings which have as their object rights in rem in immovable property or tenancies of immovable property, the courts of the Member State in which the property is situated.

However, in proceedings which have as their object tenancies of immovable property concluded for temporary private use for a maximum period of six consecutive months, the courts of the Member State in which the defendant is domiciled shall also have jurisdiction, provided that the tenant is a natural person and that the landlord and the tenant are domiciled in the same Member State;

2. in proceedings which have as their object the validity of the constitution, the nullity or the dissolution of companies or other legal persons or associations of natural or legal persons, or of the validity of the decisions of their organs, the courts of the Member State in which the company, legal person or association has its seat. In order to determine that seat, the court shall apply its rules of private international law;

3. in proceedings which have as their object the validity of entries in public registers, the courts of the Member State in which the register is kept;

4. in proceedings concerned with the registration or validity of patents, trade marks, designs, or other similar rights required to be deposited or registered, the courts of the Member State in which the deposit or registration has been applied for, has taken place or is under the terms of a Community instrument or an international convention deemed to have taken place.

Without prejudice to the jurisdiction of the European Patent Office under the Convention on the Grant of European Patents, signed at Munich on 5 October 1973, the courts of each Member State shall have exclusive jurisdiction, regardless of domicile, in proceedings concerned with the registration or validity of any European patent granted for that State;

5. in proceedings concerned with the enforcement of judgments, the courts of the Member State in which the judgment has been or is to be enforced.

Section 7

Prorogation of jurisdiction

Article 23

1. If the parties, one or more of whom is domiciled in a Member State, have agreed that a court or the courts of a Member State are to have jurisdiction to settle any disputes which have arisen or which may arise in connection with a particular legal relationship, that court or those courts shall have jurisdiction. Such jurisdiction shall be exclusive unless the parties have agreed otherwise. Such an agreement conferring jurisdiction shall be either:

(a) in writing or evidenced in writing; or

(b) in a form which accords with practices which the parties have established between themselves; or

(c) in international trade or commerce, in a form which accords with a usage of which the parties are or ought to have been aware and which in such trade or commerce is widely known to, and regularly observed by, parties to contracts of the type involved in the particular trade or commerce concerned.

2. Any communication by electronic means which provides a durable record of the agreement shall be equivalent to "writing".

3. Where such an agreement is concluded by parties, none of whom is domiciled in a Member State, the courts of other Member States shall have no jurisdiction over their disputes unless the court or courts chosen have declined jurisdiction.

4. The court or courts of a Member State on which a trust instrument has conferred jurisdiction shall have exclusive jurisdiction in any proceedings brought against a settlor, trustee or beneficiary, if relations between these persons or their rights or obligations under the trust are involved.

5. Agreements or provisions of a trust instrument conferring jurisdiction shall have no legal force if they are contrary to Articles 13, 17 or 21, or if the courts whose jurisdiction they purport to exclude have exclusive jurisdiction by virtue of Article 22.

Article 24

Apart from jurisdiction derived from other provisions of this Regulation, a court of a Member State before which a defendant enters an appearance shall have jurisdiction. This rule shall not apply where appearance was entered to contest the jurisdiction, or where another court has exclusive jurisdiction by virtue of Article 22.

Section 8

Examination as to jurisdiction and admissibility

Article 25

Where a court of a Member State is seised of a claim which is principally concerned with a matter over which the courts of another Member State have exclusive jurisdiction by virtue of Article 22, it shall declare of its own motion that it has no jurisdiction.

Article 26

1. Where a defendant domiciled in one Member State is sued in a court of another Member State and does not enter an appearance, the court shall declare of its own motion that it has no jurisdiction unless its jurisdiction is derived from the provisions of this Regulation.

2. The court shall stay the proceedings so long as it is not shown that the defendant has been able to receive the document instituting the proceedings or an equivalent document in sufficient time to enable him to arrange for his defence, or that all necessary steps have been taken to this end.

3. Article 19 of Council Regulation (EC) No 1348/2000 of 29 May 2000 on the service in the Member States of judicial and extrajudicial documents in civil or commercial matters(10) shall apply instead of the provisions of paragraph 2 if the document instituting the proceedings or an equivalent document had to be transmitted from one Member State to another pursuant to this Regulation.

4. Where the provisions of Regulation (EC) No 1348/2000 are not applicable, Article 15 of the Hague Convention of 15 November 1965 on the Service Abroad of Judicial and Extrajudicial Documents in Civil or Commercial Matters shall apply if the document instituting the proceedings

or an equivalent document had to be transmitted pursuant to that Convention.

Section 9

Lis pendens - related actions

Article 27

1. Where proceedings involving the same cause of action and between the same parties are brought in the courts of different Member States, any court other than the court first seised shall of its own motion stay its proceedings until such time as the jurisdiction of the court first seised is established.

2. Where the jurisdiction of the court first seised is established, any court other than the court first seised shall decline jurisdiction in favour of that court.

Article 28

1. Where related actions are pending in the courts of different Member States, any court other than the court first seised may stay its proceedings.

2. Where these actions are pending at first instance, any court other than the court first seised may also, on the application of one of the parties, decline jurisdiction if the court first seised has jurisdiction over the actions in question and its law permits the consolidation thereof.

3. For the purposes of this Article, actions are deemed to be related where they are so closely connected that it is expedient to hear and determine them together to avoid the risk of irreconcilable judgments resulting from separate proceedings.

Article 29

Where actions come within the exclusive jurisdiction of several courts, any court other than the court first seised shall decline jurisdiction in favour of that court.

Article 30

For the purposes of this Section, a court shall be deemed to be seised:

1. at the time when the document instituting the proceedings or an equivalent document is lodged with the court, provided that the plaintiff has not subsequently failed to take the steps he was required to take to have service effected on the defendant, or

2. if the document has to be served before being lodged with the court, at the time when it is received by the authority responsible for service, provided that the plaintiff has not subsequently failed to take the steps he was required to take to have the document lodged with the court.

Section 10

Provisional, including protective, measures

Article 31

Application may be made to the courts of a Member State for such provisional, including protective, measures as may be available under the law of that State, even if, under this Regulation, the courts of another Member State have jurisdiction as to the substance of the matter.

CHAPTER III

RECOGNITION AND ENFORCEMENT

Article 32

For the purposes of this Regulation, "judgment" means any judgment given by a court or tribunal of a Member State, whatever the judgment may be called, including a decree, order, decision or writ of execution, as well as the determination of costs or expenses by an officer of the court.

Section 1

Recognition

Article 33

1. A judgment given in a Member State shall be recognised in the other Member States without

any special procedure being required.

2. Any interested party who raises the recognition of a judgment as the principal issue in a dispute may, in accordance with the procedures provided for in Sections 2 and 3 of this Chapter, apply for a decision that the judgment be recognised.

3. If the outcome of proceedings in a court of a Member State depends on the determination of an incidental question of recognition that court shall have jurisdiction over that question.

Article 34

A judgment shall not be recognised:

1. if such recognition is manifestly contrary to public policy in the Member State in which recognition is sought;

2. where it was given in default of appearance, if the defendant was not served with the document which instituted the proceedings or with an equivalent document in sufficient time and in such a way as to enable him to arrange for his defence, unless the defendant failed to commence proceedings to challenge the judgment when it was possible for him to do so;

3. if it is irreconcilable with a judgment given in a dispute between the same parties in the Member State in which recognition is sought;

4. if it is irreconcilable with an earlier judgment given in another Member State or in a third State involving the same cause of action and between the same parties, provided that the earlier judgment fulfils the conditions necessary for its recognition in the Member State addressed.

Article 35

1. Moreover, a judgment shall not be recognised if it conflicts with Sections 3, 4 or 6 of Chapter II, or in a case provided for in Article 72.

2. In its examination of the grounds of jurisdiction referred to in the foregoing paragraph, the court or authority applied to shall be bound by the findings of fact on which the court of the Member State of origin based its jurisdiction.

3. Subject to the paragraph 1, the jurisdiction of the court of the Member State of origin may not be reviewed. The test of public policy referred to in point 1 of Article 34 may not be applied to the rules relating to jurisdiction.

Article 36

Under no circumstances may a foreign judgment be reviewed as to its substance.

Article 37

1. A court of a Member State in which recognition is sought of a judgment given in another Member State may stay the proceedings if an ordinary appeal against the judgment has been lodged.

2. A court of a Member State in which recognition is sought of a judgment given in Ireland or the United Kingdom may stay the proceedings if enforcement is suspended in the State of origin, by reason of an appeal.

Section 2

Enforcement

Article 38

1. A judgment given in a Member State and enforceable in that State shall be enforced in another Member State when, on the application of any interested party, it has been declared enforceable there.

2. However, in the United Kingdom, such a judgment shall be enforced in England and Wales, in Scotland, or in Northern Ireland when, on the application of any interested party, it has been registered for enforcement in that part of the United Kingdom.

Article 39

1. The application shall be submitted to the court or competent authority indicated in the list in Annex II.

2. The local jurisdiction shall be determined by reference to the place of domicile of the party against whom enforcement is sought, or to the place of enforcement.

Article 40

1. The procedure for making the application shall be governed by the law of the Member State in which enforcement is sought.

2. The applicant must give an address for service of process within the area of jurisdiction of the court applied to. However, if the law of the Member State in which enforcement is sought does not provide for the furnishing of such an address, the applicant shall appoint a representative ad litem.

3. The documents referred to in Article 53 shall be attached to the application.

Article 41

The judgment shall be declared enforceable immediately on completion of the formalities in Article 53 without any review under Articles 34 and 35. The party against whom enforcement is sought shall not at this stage of the proceedings be entitled to make any submissions on the application.

Article 42

1. The decision on the application for a declaration of enforceability shall forthwith be brought to the notice of the applicant in accordance with the procedure laid down by the law of the Member State in which enforcement is sought.

2. The declaration of enforceability shall be served on the party against whom enforcement is sought, accompanied by the judgment, if not already served on that party.

Article 43

1. The decision on the application for a declaration of enforceability may be appealed against by either party.

2. The appeal is to be lodged with the court indicated in the list in Annex III.

3. The appeal shall be dealt with in accordance with the rules governing procedure in contradictory matters.

4. If the party against whom enforcement is sought fails to appear before the appellate court in proceedings concerning an appeal brought by the applicant, Article 26(2) to (4) shall apply even where the party against whom enforcement is sought is not domiciled in any of the Member States.

5. An appeal against the declaration of enforceability is to be lodged within one month of service thereof. If the party against whom enforcement is sought is domiciled in a Member State other than that in which the declaration of enforceability was given, the time for appealing shall be two months and shall run from the date of service, either on him in person or at his residence. No extension of time may be granted on account of distance.

Article 44

The judgment given on the appeal may be contested only by the appeal referred to in Annex IV.

Article 45

1. The court with which an appeal is lodged under Article 43 or Article 44 shall refuse or revoke a declaration of enforceability only on one of the grounds specified in Articles 34 and 35. It shall give its decision without delay.

2. Under no circumstances may the foreign judgment be reviewed as to its substance.

Article 46

1. The court with which an appeal is lodged under Article 43 or Article 44 may, on the application of the party against whom enforcement is sought, stay the proceedings if an ordinary appeal has been lodged against the judgment in the Member State of origin or if the time for such an appeal has not yet expired; in the latter case, the court may specify the time within which such an appeal is to be lodged.

2. Where the judgment was given in Ireland or the United Kingdom, any form of appeal available in the Member State of origin shall be treated as an ordinary appeal for the purposes of paragraph 1.

3. The court may also make enforcement conditional on the provision of such security as it shall determine.

Article 47

1. When a judgment must be recognised in accordance with this Regulation, nothing shall prevent the applicant from availing himself of provisional, including protective, measures in accordance with the law of the Member State requested without a declaration of enforceability under Article 41 being required.

2. The declaration of enforceability shall carry with it the power to proceed to any protective measures.

3. During the time specified for an appeal pursuant to Article 43(5) against the declaration of enforceability and until any such appeal has been determined, no measures of enforcement may be taken other than protective measures against the property of the party against whom enforcement is sought.

Article 48

1. Where a foreign judgment has been given in respect of several matters and the declaration of enforceability cannot be given for all of them, the court or competent authority shall give it for one or more of them.

2. An applicant may request a declaration of enforceability limited to parts of a judgment.

Article 49

A foreign judgment which orders a periodic payment by way of a penalty shall be enforceable in the Member State in which enforcement is sought only if the amount of the payment has been finally determined by the courts of the Member State of origin.

Article 50

An applicant who, in the Member State of origin has benefited from complete or partial legal aid or exemption from costs or expenses, shall be entitled, in the procedure provided for in this Section, to benefit from the most favourable legal aid or the most extensive exemption from costs or expenses provided for by the law of the Member State addressed.

Article 51

No security, bond or deposit, however described, shall be required of a party who in one Member State applies for enforcement of a judgment given in another Member State on the ground that he is a foreign national or that he is not domiciled or resident in the State in which enforcement is sought.

Article 52

In proceedings for the issue of a declaration of enforceability, no charge, duty or fee calculated by reference to the value of the matter at issue may be levied in the Member State in which enforcement is sought.

Section 3

Common provisions

Article 53

1. A party seeking recognition or applying for a declaration of enforceability shall produce a copy of the judgment which satisfies the conditions necessary to establish its authenticity.

2. A party applying for a declaration of enforceability shall also produce the certificate referred to in Article 54, without prejudice to Article 55.

Article 54

The court or competent authority of a Member State where a judgment was given shall issue, at the request of any interested party, a certificate using the standard form in Annex V to this

Regulation.

Article 55

1. If the certificate referred to in Article 54 is not produced, the court or competent authority may specify a time for its production or accept an equivalent document or, if it considers that it has sufficient information before it, dispense with its production.

2. If the court or competent authority so requires, a translation of the documents shall be produced. The translation shall be certified by a person qualified to do so in one of the Member States.

Article 56

No legalisation or other similar formality shall be required in respect of the documents referred to in Article 53 or Article 55(2), or in respect of a document appointing a representative ad litem.

CHAPTER IV

AUTHENTIC INSTRUMENTS AND COURT SETTLEMENTS

Article 57

1. A document which has been formally drawn up or registered as an authentic instrument and is enforceable in one Member State shall, in another Member State, be declared enforceable there, on application made in accordance with the procedures provided for in Articles 38, et seq. The court with which an appeal is lodged under Article 43 or Article 44 shall refuse or revoke a declaration of enforceability only if enforcement of the instrument is manifestly contrary to public policy in the Member State addressed.

2. Arrangements relating to maintenance obligations concluded with administrative authorities or authenticated by them shall also be regarded as authentic instruments within the meaning of paragraph 1.

3. The instrument produced must satisfy the conditions necessary to establish its authenticity in the Member State of origin.

4. Section 3 of Chapter III shall apply as appropriate. The competent authority of a Member State where an authentic instrument was drawn up or registered shall issue, at the request of any interested party, a certificate using the standard form in Annex VI to this Regulation.

Article 58

A settlement which has been approved by a court in the course of proceedings and is enforceable in the Member State in which it was concluded shall be enforceable in the State addressed under the same conditions as authentic instruments. The court or competent authority of a Member State where a court settlement was approved shall issue, at the request of any interested party, a certificate using the standard form in Annex V to this Regulation.

CHAPTER V

GENERAL PROVISIONS

Article 59

1. In order to determine whether a party is domiciled in the Member State whose courts are seised of a matter, the court shall apply its internal law.

2. If a party is not domiciled in the Member State whose courts are seised of the matter, then, in order to determine whether the party is domiciled in another Member State, the court shall apply the law of that Member State.

Article 60

1. For the purposes of this Regulation, a company or other legal person or association of natural or legal persons is domiciled at the place where it has its:

(a) statutory seat, or

(b) central administration, or

(c) principal place of business.

2. For the purposes of the United Kingdom and Ireland "statutory seat" means the registered

office or, where there is no such office anywhere, the place of incorporation or, where there is no such place anywhere, the place under the law of which the formation took place.

3. In order to determine whether a trust is domiciled in the Member State whose courts are seised of the matter, the court shall apply its rules of private international law.

Article 61

Without prejudice to any more favourable provisions of national laws, persons domiciled in a Member State who are being prosecuted in the criminal courts of another Member State of which they are not nationals for an offence which was not intentionally committed may be defended by persons qualified to do so, even if they do not appear in person. However, the court seised of the matter may order appearance in person; in the case of failure to appear, a judgment given in the civil action without the person concerned having had the opportunity to arrange for his defence need not be recognised or enforced in the other Member States.

Article 62

In Sweden, in summary proceedings concerning orders to pay (betalningsföreläggande) and assistance (handräckning), the expression "court" includes the "Swedish enforcement service" (kronofogdemyndighet).

Article 63

1. A person domiciled in the territory of the Grand Duchy of Luxembourg and sued in the court of another Member State pursuant to Article 5(1) may refuse to submit to the jurisdiction of that court if the final place of delivery of the goods or provision of the services is in Luxembourg.

2. Where, under paragraph 1, the final place of delivery of the goods or provision of the services is in Luxembourg, any agreement conferring jurisdiction must, in order to be valid, be accepted in writing or evidenced in writing within the meaning of Article 23(1)(a).

3. The provisions of this Article shall not apply to contracts for the provision of financial services.

4. The provisions of this Article shall apply for a period of six years from entry into force of this Regulation.

Article 64

1. In proceedings involving a dispute between the master and a member of the crew of a seagoing ship registered in Greece or in Portugal, concerning remuneration or other conditions of service, a court in a Member State shall establish whether the diplomatic or consular officer responsible for the ship has been notified of the dispute. It may act as soon as that officer has been notified.

2. The provisions of this Article shall apply for a period of six years from entry into force of this Regulation.

Article 65

1. The jurisdiction specified in Article 6(2), and Article 11 in actions on a warranty of guarantee or in any other third party proceedings may not be resorted to in Germany and Austria. Any person domiciled in another Member State may be sued in the courts:

(a) of Germany, pursuant to Articles 68 and 72 to 74 of the Code of Civil Procedure (Zivilprozessordnung) concerning third-party notices,

(b) of Austria, pursuant to Article 21 of the Code of Civil Procedure (Zivilprozessordnung) concerning third-party notices.

2. Judgments given in other Member States by virtue of Article 6(2), or Article 11 shall be recognised and enforced in Germany and Austria in accordance with Chapter III. Any effects which judgments given in these States may have on third parties by application of the provisions in paragraph 1 shall also be recognised in the other Member States.

CHAPTER VI

TRANSITIONAL PROVISIONS

Article 66

1. This Regulation shall apply only to legal proceedings instituted and to documents formally

drawn up or registered as authentic instruments after the entry into force thereof.

2. However, if the proceedings in the Member State of origin were instituted before the entry into force of this Regulation, judgments given after that date shall be recognised and enforced in accordance with Chapter III,

(a) if the proceedings in the Member State of origin were instituted after the entry into force of the Brussels or the Lugano Convention both in the Member State or origin and in the Member State addressed;

(b) in all other cases, if jurisdiction was founded upon rules which accorded with those provided for either in Chapter II or in a convention concluded between the Member State of origin and the Member State addressed which was in force when the proceedings were instituted.

CHAPTER VII

RELATIONS WITH OTHER INSTRUMENTS

Article 67

This Regulation shall not prejudice the application of provisions governing jurisdiction and the recognition and enforcement of judgments in specific matters which are contained in Community instruments or in national legislation harmonised pursuant to such instruments.

Article 68

1. This Regulation shall, as between the Member States, supersede the Brussels Convention, except as regards the territories of the Member States which fall within the territorial scope of that Convention and which are excluded from this Regulation pursuant to Article 299 of the Treaty.

2. In so far as this Regulation replaces the provisions of the Brussels Convention between Member States, any reference to the Convention shall be understood as a reference to this Regulation.

Article 69

Subject to Article 66(2) and Article 70, this Regulation shall, as between Member States, supersede the following conventions and treaty concluded between two or more of them:

- the Convention between Belgium and France on Jurisdiction and the Validity and Enforcement of Judgments, Arbitration Awards and Authentic Instruments, signed at Paris on 8 July 1899,

- the Convention between Belgium and the Netherlands on Jurisdiction, Bankruptcy, and the Validity and Enforcement of Judgments, Arbitration Awards and Authentic Instruments, signed at Brussels on 28 March 1925,

- the Convention between France and Italy on the Enforcement of Judgments in Civil and Commercial Matters, signed at Rome on 3 June 1930,

- the Convention between Germany and Italy on the Recognition and Enforcement of Judgments in Civil and Commercial Matters, signed at Rome on 9 March 1936,

- the Convention between Belgium and Austria on the Reciprocal Recognition and Enforcement of Judgments and Authentic Instruments relating to Maintenance Obligations, signed at Vienna on 25 October 1957,

- the Convention between Germany and Belgium on the Mutual Recognition and Enforcement of Judgments, Arbitration Awards and Authentic Instruments in Civil and Commercial Matters, signed at Bonn on 30 June 1958,

- the Convention between the Netherlands and Italy on the Recognition and Enforcement of Judgments in Civil and Commercial Matters, signed at Rome on 17 April 1959,

- the Convention between Germany and Austria on the Reciprocal Recognition and Enforcement of Judgments, Settlements and Authentic Instruments in Civil and Commercial Matters, signed at Vienna on 6 June 1959,

- the Convention between Belgium and Austria on the Reciprocal Recognition and Enforcement of Judgments, Arbitral Awards and Authentic Instruments in Civil and Commercial Matters, signed at Vienna on 16 June 1959,

- the Convention between Greece and Germany for the Reciprocal Recognition and Enforcement of Judgments, Settlements and Authentic Instruments in Civil and Commercial Matters, signed in Athens on 4 November 1961,

- the Convention between Belgium and Italy on the Recognition and Enforcement of Judgments and other Enforceable Instruments in Civil and Commercial Matters, signed at Rome on 6 April 1962,

- the Convention between the Netherlands and Germany on the Mutual Recognition and Enforcement of Judgments and Other Enforceable Instruments in Civil and Commercial Matters, signed at The Hague on 30 August 1962,

- the Convention between the Netherlands and Austria on the Reciprocal Recognition and Enforcement of Judgments and Authentic Instruments in Civil and Commercial Matters, signed at The Hague on 6 February 1963,

- the Convention between France and Austria on the Recognition and Enforcement of Judgments and Authentic Instruments in Civil and Commercial Matters, signed at Vienna on 15 July 1966,

- the Convention between Spain and France on the Recognition and Enforcement of Judgment Arbitration Awards in Civil and Commercial Matters, signed at Paris on 28 May 1969,

- the Convention between Luxembourg and Austria on the Recognition and Enforcement of Judgments and Authentic Instruments in Civil and Commercial Matters, signed at Luxembourg on 29 July 1971,

- the Convention between Italy and Austria on the Recognition and Enforcement of Judgments in Civil and Commercial Matters, of Judicial Settlements and of Authentic Instruments, signed at Rome on 16 November 1971,

- the Convention between Spain and Italy regarding Legal Aid and the Recognition and Enforcement of Judgments in Civil and Commercial Matters, signed at Madrid on 22 May 1973,

- the Convention between Finland, Iceland, Norway, Sweden and Denmark on the Recognition and Enforcement of Judgments in Civil Matters, signed at Copenhagen on 11 October 1977,

- the Convention between Austria and Sweden on the Recognition and Enforcement of Judgments in Civil Matters, signed at Stockholm on 16 September 1982,

- the Convention between Spain and the Federal Republic of Germany on the Recognition and Enforcement of Judgments, Settlements and Enforceable Authentic Instruments in Civil and Commercial Matters, signed at Bonn on 14 November 1983,

- the Convention between Austria and Spain on the Recognition and Enforcement of Judgments, Settlements and Enforceable Authentic Instruments in Civil and Commercial Matters, signed at Vienna on 17 February 1984,

- the Convention between Finland and Austria on the Recognition and Enforcement of Judgments in Civil Matters, signed at Vienna on 17 November 1986, and

- the Treaty between Belgium, the Netherlands and Luxembourg in Jurisdiction, Bankruptcy, and the Validity and Enforcement of Judgments, Arbitration Awards and Authentic Instruments, signed at Brussels on 24 November 1961, in so far as it is in force.

Article 70

1. The Treaty and the Conventions referred to in Article 69 shall continue to have effect in relation to matters to which this Regulation does not apply.

2. They shall continue to have effect in respect of judgments given and documents formally drawn up or registered as authentic instruments before the entry into force of this Regulation.

Article 71

1. This Regulation shall not affect any conventions to which the Member States are parties and which in relation to particular matters, govern jurisdiction or the recognition or enforcement of judgments.

2. With a view to its uniform interpretation, paragraph 1 shall be applied in the following manner:

(a) this Regulation shall not prevent a court of a Member State, which is a party to a convention on a particular matter, from assuming jurisdiction in accordance with that convention, even where the defendant is domiciled in another Member State which is not a party to that convention. The court hearing the action shall, in any event, apply Article 26 of this Regulation;

(b) judgments given in a Member State by a court in the exercise of jurisdiction provided for in a convention on a particular matter shall be recognised and enforced in the other Member States in accordance with this Regulation.

Where a convention on a particular matter to which both the Member State of origin and the Member State addressed are parties lays down conditions for the recognition or enforcement of judgments, those conditions shall apply. In any event, the provisions of this Regulation which concern the procedure for recognition and enforcement of judgments may be applied.

Article 72

This Regulation shall not affect agreements by which Member States undertook, prior to the entry into force of this Regulation pursuant to Article 59 of the Brussels Convention, not to recognise judgments given, in particular in other Contracting States to that Convention, against defendants domiciled or habitually resident in a third country where, in cases provided for in Article 4 of that Convention, the judgment could only be founded on a ground of jurisdiction specified in the second paragraph of Article 3 of that Convention.

CHAPTER VIII

FINAL PROVISIONS

Article 73

No later than five years after the entry into force of this Regulation, the Commission shall present to the European Parliament, the Council and the Economic and Social Committee a report on the application of this Regulation. The report shall be accompanied, if need be, by proposals for adaptations to this Regulation.

Article 74

1. The Member States shall notify the Commission of the texts amending the lists set out in Annexes I to IV. The Commission shall adapt the Annexes concerned accordingly.

2. The updating or technical adjustment of the forms, specimens of which appear in Annexes V and VI, shall be adopted in accordance with the advisory procedure referred to in Article 75(2).

Article 75

1. The Commission shall be assisted by a committee.

2. Where reference is made to this paragraph, Articles 3 and 7 of Decision 1999/468/EC shall apply.

3. The Committee shall adopt its rules of procedure.

Article 76

This Regulation shall enter into force on 1 March 2002.

This Regulation is binding in its entirety and directly applicable in the Member States in accordance with the Treaty establishing the European Community.

Done at Brussels, 22 December 2000.

For the Council

The President

C. Pierret

(1) OJ C 376, 28.12.1999, p. 1.

(2) Opinion delivered on 21 September 2000 (not yet published in the Official Journal).

(3) OJ C 117, 26.4.2000, p. 6.

(4) OJ L 299, 31.12.1972, p. 32.

(c) the seizure by the plaintiff of property situated in the United Kingdom.

ANNEX II

The courts or competent authorities to which the application referred to in Article 39 may be submitted are the following:

- in Belgium, the "tribunal de première instance" or "rechtbank van eerste aanleg" or "erstinstanzliches Gericht",

- in Germany, the presiding judge of a chamber of the "Landgericht",

- in Greece, the "Μονομελές Πρωτοδικείο",

- in Spain, the "Juzgado de Primera Instancia",

- in France, the presiding judge of the "tribunal de grande instance",

- in Ireland, the High Court,

- in Italy, the "Corte d'appello",

- in Luxembourg, the presiding judge of the "tribunal d'arrondissement",

- in the Netherlands, the presiding judge of the "arrondissementsrechtbank";

- in Austria, the "Bezirksgericht",

- in Portugal, the "Tribunal de Comarca",

- in Finland, the "käräjäoikeus/tingsrätt",

- in Sweden, the "Svea hovrätt",

- in the United Kingdom:

(a) in England and Wales, the High Court of Justice, or in the case of a maintenance judgment, the Magistrate's Court on transmission by the Secretary of State;

(b) in Scotland, the Court of Session, or in the case of a maintenance judgment, the Sheriff Court on transmission by the Secretary of State;

(c) in Northern Ireland, the High Court of Justice, or in the case of a maintenance judgment, the Magistrate's Court on transmission by the Secretary of State;

(d) in Gibraltar, the Supreme Court of Gibraltar, or in the case of a maintenance judgment, the Magistrates' Court on transmission by the Attorney General of Gibraltar.

ANNEX III

The courts with which appeals referred to in Article 43(2) may be lodged are the following:

- in Belgium,

(a) as regards appeal by the defendant: the "tribunal de première instance" or "rechtbank van eerste aanleg" or "erstinstanzliches Gericht",

(b) as regards appeal by the applicant: the "Cour d'appel" or "hof van beroep",

- in the Federal Republic of Germany, the "Oberlandesgericht",

- in Greece, the "Εφετείο",

- in Spain, the "Audiencia Provincial",

- in France, the "cour d'appel",

- in Ireland, the High Court,

- in Italy, the "corte d'appello",

- in Luxembourg, the "Cour supérieure de Justice" sitting as a court of civil appeal,

- in the Netherlands:

(a) for the defendant: the "arrondissementsrechtbank",

(b) for the applicant: the "gerechtshof",

- in Austria, the "Bezirksgericht",

- in Portugal, the "Tribunal de Relação",

- in Finland, the "hovioikeus/hovrätt",

- in Sweden, the "Svea hovrätt",

- in the United Kingdom:

(a) in England and Wales, the High Court of Justice, or in the case of a maintenance judgment, the Magistrate's Court;

(b) in Scotland, the Court of Session, or in the case of a maintenance judgment, the Sheriff Court;

(c) in Northern Ireland, the High Court of Justice, or in the case of a maintenance judgment, the Magistrate's Court;

(d) in Gibraltar, the Supreme Court of Gibraltar, or in the case of a maintenance judgment, the Magistrates' Court.

ANNEX IV

The appeals which may be lodged pursuant to Article 44 are the following

- in Belgium, Greece, Spain, France, Italy, Luxembourg and the Netherlands, an appeal in cassation,

- in Germany, a "Rechtsbeschwerde",

- in Ireland, an appeal on a point of law to the Supreme Court,

- in Austria, a "Revisionsrekurs",

- in Portugal, an appeal on a point of law,

- in Finland, an appeal to the "korkein oikeus/högsta domstolen",

- in Sweden, an appeal to the "Högsta domstolen",

- in the United Kingdom, a single further appeal on a point of law.

ANNEX V

Certificate referred to in Articles 54 and 58 of the Regulation on judgments and court settlements

(English, inglés, anglais, inglese, ...)

1. Member State of origin

2. Court or competent authority issuing the certificate

2.1. Name

2.2. Address

2.3. Tel./fax/e-mail

3. Court which delivered the judgment/approved the court settlement(1)

3.1. Type of court

3.2. Place of court

4. Judgment/court settlement(2)

4.1. Date

4.2. Reference number

4.3. The parties to the judgment/court settlement(3)

4.3.1. Name(s) of plaintiff(s)

4.3.2. Name(s) of defendant(s)

4.3.3. Name(s) of other party(ies), if any

4.4. Date of service of the document instituting the proceedings where judgment was given in default of appearance

4.5. Text of the judgment/court settlement(4) as annexed to this certificate

5. Names of parties to whom legal aid has been granted

The judgment/court settlement(5) is enforceable in the Member State of origin (Articles 38 and 58 of the Regulation) against:

Name:

Done at ... , date ...

Signature and/or stamp ...

(1) Delete as appropriate.

(2) Delete as appropriate.

(3) Delete as appropriate.

(4) Delete as appropriate.

(5) Delete as appropriate.

ANNEX VI

Certificate referred to in Article 57(4) of the Regulation on authentic instruments

(English, inglés, anglais, inglese ............)

1. Member State of origin

2. Competent authority issuing the certificate

2.1. Name

2.2. Address

2.3. Tel./fax/e-mail

3. Authority which has given authenticity to the instrument

3.1. Authority involved in the drawing up of the authentic instrument (if applicable)

3.1.1. Name and designation of authority

3.1.2. Place of authority

3.2. Authority which has registered the authentic instrument (if applicable)

3.2.1. Type of authority

3.2.2. Place of authority

4. Authentic instrument

4.1. Description of the instrument

4.2. Date

4.2.1. on which the instrument was drawn up

4.2.2. if different: on which the instrument was registered

4.3. Reference number

4.4. Parties to the instrument

4.4.1. Name of the creditor

4.4.2. Name of the debtor

5. Text of the enforceable obligation as annexed to this certificate

The authentic instrument is enforceable against the debtor in the Member State of origin (Article 57(1) of the Regulation)

Done at ..., date ...

Signature and/or stamp ...

**Haut**

# EXHIBIT 6

Home | Contact us | Product Registration

—Select a site—

acer

Empowering technology

United States

About Acer

Products
Acer Technology
About Acer
  • Executive Team
  • Acer America Fact Sheet
  • Acer Milestones
  • Employment
Where to buy
Service & Support
Partner
News

## About Us

Founded in 1976, Acer ranks among the world's top five branded



PC vendors. In 2000, Acer spun-off its manufacturing operation to focus its resources on developing technologically advanced, user-friendly solutions. The decision to support the sales of its product lines

through specific marketing activities that best utilise distribution channels, has allowed Acer to achieve excellent results worldwide.

**Overcoming the barriers between people and technology:** This is Acer's long-term mission, to allow anyone to use and benefit from technology. Acer is renowned for the development and manufacture of sophisticatedly and intuitively designed, easy to use products.

With its 100% indirect sales model and innovative product designs, Acer has become the fourth largest worldwide PC vendor and the fastest growing. Acer is the EMEA region leader in the notebook sector, holding over 20% market share during 2006. Confirming its leadership in the EMEA notebook market, Acer ranks first in 13 countries: Italy, Spain, Austria, Holland, Switzerland, The Czech Republic, Russia, Portugal, Belgium, Denmark, Poland, Hungary and The Slovakian Republic.

Acer's product range includes PC notebooks and Desktops, servers and storage systems, monitors, peripheral devices, digital devices, LCD TVs and e-business solutions for business, Government, Education and home users. Acer employs 5,400 people throughout the world and has created a consolidated sales and service network in more than 100 countries. Revenues reached US $11.32 billion in 2006.

## Gianfranco Lanci



Gianfranco Lanci has been President of Acer Inc. since 1st January 2005. Starting as Acer Italy Managing Director he was selected as President of Acer EMEA (Europe, Middle East & Africa) in 2003. Also in 2003, he was nominated as President of Acer Inc. OBG (International Operation Business Group), coordinating sales & marketing activities in Europe, MEA and the Americas.

Gianfranco Lanci's recent promotion to President of Acer Inc. is recognition of the excellent performance results on the European market, his distinguished managerial style, superior business model and efforts to extend these elements to the Acer group around the world.

Born in 1954 in Turin, Italy he received his degree in Civil Engineering from the Turin Polytechnic University, and immediately began working at Texas Instruments Italia in 1981, becoming the Systems Division sales and marketing manager at age 35. In 1991 he became the country manager for the Portable computers and Printers Division (PPD) in Italy, the Middle East and Africa, established in 1989 to market notebooks and printers, leading Texas Instruments Italia to the top of the "portable" sector. At the beginning of 1995 he headed Texas Instrument's Personal Productivity Products division for Southern Europe (Italy, France, Spain, Portugal, Greece and Turkey), the Middle East and Africa from the Agrate Brianza headquarters. In 1996 he became the EMEA manager for this division.

From 1997, as Acer Italy's Managing Director, Gianfranco Lanci created a strong organisation, expanding and consolidating relationships with channel partners on all levels. His continued efforts, aimed to promote the company's brand, have helped Acer to become the Italian market leader. In 2000, after being nominated the President of Acer Europe, Gianfranco Lanci expanded the winning strategy employed in Italy to help in creating a strong European organisation and, following his nomination as

President of Acer EMEA, in the Middle East and South Africa, European market profits have reached record highs since his nomination in 2002.

## Awards





reddot design award

The Acer TravelMate 3000 received one of the world's most sought-after design awards – the Red Dot – for design quality and innovation. This award confirms the global recognition Acer has received for its high quality products and "customer-centric" philosophy.

This year, out of the 1,857 products considered, 421 received the "Red Dot" for high quality design. The TravelMate 3000 won the Media & Home Electronics category. The selection criteria included: the level of innovation, functionality, ergonomics, working life, function simplicity and eco-compatibility.

The Design Zentrum Nordrhein Westfalen in Germany is the founder of the Red Dot award. With over fifty years of activities, the Centre is one of the oldest and most famous design institutes in Europe. Winning products, including the TravelMate 3000, will be on display at the Red Dot design museum in Essen during the "Design Innovations 2005 – Red Dot Award: Product Design" exhibition to be held from 5th July to 7th August 2005.

Acer is proud to announce that the Acer LCD AL2032 W monitor won the iF Design Award 2005 (International Forum Design). The iF Design Award, one of the world's most famous design contests, has become a prestigious brand that distinguishes the best designs and represents a company's efforts in innovation.

This year the iF Award jury, including world famous designers, assessed about 1900 products from 740 participants from 31 different countries. The evaluation criteria included design quality, workmanship, choice of materials, degree of innovation, environmental compatibility, functionality, ergonomics, security, brand value and branding.

## About Acer America

Acer America, headquartered in San Jose, Calif., in the Silicon Valley, sells its systems exclusively through the channel and has a network of over 5,000 authorized resellers located throughout the U.S. and Canada.

Because customer service is a top priority, Acer America has a dedicated facility in Temple, Texas, that

houses a support call center, repair depot, and spare parts warehouse. Calls are taken here 24 hours a day by a team of highly trained Acer Advantage Technical Specialists.

For press inquiries, please contact: Alison Williams, 408-533-7746, alison_williams@acer.com

Copyright© 2008 Acer Inc. All Rights Reserved

Legal Notices    Privacy Guidelines



Home | Contact us | Prod

—Select

Where to buy

**United States**

**Find an Acer® Authorized Reseller**





**Products**

**Acer Technology**

**About Acer**

**Where to buy**
- Government Contracts
- Corporate Contracts
- Acer Resellers Near You
  » Alabama
  » Alaska
  » Arizona
  » Arkansas
  » California
  » Colorado
  » Connecticut
  » Delaware
  » District of Columbia
  » Florida
  » Georgia
  » Hawaii
  » Idaho
  » Illinois
  » Indiana
  » Iowa
  » Kansas
  » Kentucky
  » Louisiana
  » Maine
  » Maryland
  » Massachusetts
  » Michigan
  » Minnesota
  » Mississippi
  » Missouri
  » Montana
  » Nebraska
  » Nevada
  » New Hampshire
  » New Jersey
  » New Mexico
  » New York
  » North Carolina
  » North Dakota
  » Ohio
  » Oklahoma
  » Oregon
  » Pennsylvania
  » Rhode Island
  » South Carolina
  » South Dakota
  » Tennessee
  » Texas
  » Utah
  » Vermont
  » Virginia
  » Washington
  » West Virginia
  » Wisconsin
  » Wyoming

**Service & Support**

**Partner**

**News**

Acer America resellers and service providers are located throughout the U.S. and Canada, for you to purchase and get support for Acer products. To find an Acer authorized reseller i click a state on the left menu.

Copyright© 2008 Acer Inc. All Rights Reserved                    Legal Notices   F



Home | Contact us | Prod

—Select

**United States**

**Where to buy**

**Delaware**

*empowering technology*

*acer ADVANCE*

Bear  **Map**  **AFFORDABLE COMPUTER SERVICE**
26 Fox Hunt Drive
Bear DE 19701
Phone: (302) 292-3660

**Products**

**Acer Technology**

**About Acer**

**Where to buy**
- Government Contracts
- Corporate Contracts
- Acer Resellers Near You
  - Alabama
  - Alaska
  - Arizona
  - Arkansas
  - California
  - Colorado
  - Connecticut
  - Delaware
  - District of Columbia
  - Florida
  - Georgia
  - Hawaii
  - Idaho
  - Illinois
  - Indiana
  - Iowa
  - Kansas
  - Kentucky
  - Louisiana
  - Maine
  - Maryland
  - Massachusetts
  - Michigan
  - Minnesota
  - Mississippi
  - Missouri
  - Montana
  - Nebraska
  - Nevada
  - New Hampshire
  - New Jersey
  - New Mexico
  - New York
  - North Carolina
  - North Dakota
  - Ohio
  - Oklahoma
  - Oregon
  - Pennsylvania
  - Rhode Island
  - South Carolina
  - South Dakota
  - Tennessee
  - Texas
  - Utah
  - Vermont
  - Virginia
  - Washington
  - West Virginia
  - Wisconsin
  - Wyoming

**Service & Support**

**Partner**

**News**

Copyright© 2008 Acer Inc. All Rights Reserved

Legal Notices  F



Home | Contact us | Prod

--Select

**Where to buy**

**United States**

*empowering technology*

*acer
ADVANTAGE*

Products
Acer Technology
About Acer
Where to buy
● Government Contracts
● Corporate Contracts
● Acer Resellers Near
You
Service & Support
Partner
News

## Featured Product

**Aspire 6920-6621**
Explore the edges of mobile computing with an **Aspire® Gemstone blue** notebook from
**Aspire® 6920** delivers incredible style, power, control, high-definition and sound.



❯ Purchase from CircuitCity.com

## Acer Online Partners

| CircuitCity.com | CDW | CDW-G |
|---|---|---|
| MicroCenter | TigerDirect.Com | Buy.com |
| NewEgg | PC Connection | Insight |
| CompUSA | Walmart.com | Best Buy For Business |

Copyright © 2008 Acer Inc. All Rights Reserved

Legal Notices   F

# EXHIBIT 7

Westlaw.

25 SYRJILC 1
25 Syracuse J. Int'l. L. & Com. 1
(Cite as: 25 Syracuse J. Int'l. L. & Com. 1)

Page 1

C Syracuse Journal of International Law and Commerce
Spring 1998

**\*1 AMERICAN ASSISTANCE TO LITIGATION IN FOREIGN AND INTERNATIONAL TRIBUNALS: SECTION 1782 OF TITLE 28 OF THE U.S.C. REVISITED**

Hans Smit[FNa1]

Copyright (c) 1998 Syracuse Journal of International Law and Commerce; Hans Smit

I. Introduction

In 1964, the United States Congress enacted a revised version of section 1782 of Title 28 of the United States Code, entitled "Assistance to foreign and international tribunals and to litigants before such tribunals." [FN1] This revision had been prepared by the Columbia Law School Project on International Procedure, of which I was the Director, and the U.S. Commission and Advisory Committee on International Rules of Judicial Procedure, to which I functioned as the Reporter. [FN2] It was part of an overall revision of American rules for obtaining and giving of assistance to litigants involved in international adjudication undertaken by the Columbia Project and the U.S. Commission and Advisory Committee. [FN3]

The 1964 revision of Section 1782 was a drastic one. It substituted one succinct section for a number of sections in the United States Code that had rarely found practical application. [FN4] The revised section 1782 greatly liberalized assistance given to foreign and international litigants and tribunals and, in the thirty-five years that followed its enactment, has been applied in scores of cases. [FN5] All too frequently, the development\*2 of considerable case law bears testimony to deficiencies in statutory text. But, as I hope to demonstrate, that is not the case here. The statutory text is straightforward and clear. The case law it has spawned has been caused by judicial unwillingness to give it the meaning that an unbiased reading requires. The reasons for this unwillingness have not always been clearly expressed. They include a reluctance to add to the burdens of already overtaxed courts, [FN6] a lack of understanding of adjudicatory processes in foreign and international tribunals, [FN7] and, in some measure, a distrust of those processes. [FN8]

Now that thirty-five years have passed, it seems appropriate that we evaluate in greater detail the developments under a provision that has led to a good deal of litigation and evoked widespread comment. [FN9]

It is a fortuitous circumstance that this time span of thirty-five years is the same in which I have had the great pleasure and privilege of collaborating with Peter Herzog, to which this article, and the issue in which it appears, are dedicated. When, in 1960, I returned to Columbia to direct the Project on International Procedure, Peter had just completed his work towards a Master's Degree under the direction of W.L.M. Reese, the Reporter of the Restatement (Second) of Conflict of Laws and one of this nation's greatest scholars and teachers, who had also been my mentor. When I was asked to direct the Project, I thought that what we then called "international judicial assistance" was too limited a subject and that the Project should undertake comparative studies of selected foreign systems of civil procedure. In the first instance, we selected French, Italian, and Swedish procedures as suitable for comparative treatment. Professor Reese, who described Peter as one of the brightest men he knew, urged that we seek to persuade him to take \*3 on the French system and, in due course, Peter produced his opus magnificum, entitled "Civil Procedure in France." [FN10]

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

25 SYRJILC 1
25 Syracuse J. Int'l. L. & Com. 1
(Cite as: 25 Syracuse J. Int'l. L. & Com. 1)

When the work on the Columbia Project on International Procedure had been completed, we organized a Project on European Legal Institutions under a Ford Foundation grant. Again, we turned to Peter to seek his collaboration on a multi-volume work on the European Economic Community that bears his and my name. [FN11]

Having worked with Peter on projects in the areas of international law and international procedure, it would appear appropriate that I deal, in a volume dedicated to him, with a subject that has always remained the focus of his intellectual and academic endeavors: the interaction of laws on the multi-state level. [FN12]

## II. The Precursor of Section 1782 and Its Present Version

The present version of Section 1782 deals in one section with what had previously been the subjects of separate treatments: The assistance to international tribunals had been addressed in Sections 270 through 270C of the Title 22 of the United States Code, [FN13] while that rendered for foreign courts and litigants had been covered by Sections 1782 and 1785 of Table 20 of the United States Code. [FN14] The 1964 Revision deals with both types of assistance in one encompassing section. As may become clear, this amalgamation does have a bearing on the proper construction of new Section 1782. [FN15]

I will not deal here with the details of the changes that new Section 1782 brought. They have been described in earlier publications. [FN16] In the following, primary consideration will be given to the constructions given to Section 1782 by the courts. My conclusion will be that, on the whole, Section 1782 has served its intended purpose, that, on occasion, some courts have given it a construction that is at odds with both its clear text and evident purpose, but that it is reasonable to expect that, over time, *4 the courts and commentators will fall into line and will apply Section 1782 in a manner consistent with its purpose of facilitating the conduct of litigation with international aspects.

## III. The Principal Elements of Section 1782

Section 1782 provides:

Assistance to foreign and international tribunals and to litigants before such tribunals
(a) The district court of the district in which a person resides or is found may order him to give his testimony or statement or to produce a document or other thing for use in a proceeding in a foreign or international tribunal, including criminal investigations conducted before formal accusation. The order may be made pursuant to a letter rogatory issued, or request made, by a foreign or international tribunal or upon the application of any interested person and may direct that the testimony or statement be given, or the document or other thing be produced, before appointed by the court. By virtue of his appointment, the person appointed has power to administer any necessary oath an take the testimony or statement. The order may prescribe the practice and procedure, which may be in whole or part the practice and procedure of the foreign country or the international tribunal, for taking the testimony or statement or producing the document or other thing. To the extent that the order does not prescribe otherwise, the testimony or statement shall be taken, and the document or other thing produced, in accordance with the Federal Rules of Civil Procedure.

A person may not be compelled to give his testimony or statement or to produce a document or other thing in violation of any legally applicable privilege.

(b) This chapter does not preclude a person within the United States from voluntarily giving his testimony or statement, or producing a document or other thing, for use in a proceeding in a foreign or international tribunal before any person and in any manner acceptable to him.

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

25 SYRJILC 1
25 Syracuse J. Int'l. L. & Com. 1
(Cite as: 25 Syracuse J. Int'l. L. & Com. 1)

The elements that deserve more detailed consideration are the following:

(1) on behalf of which tribunals and litigants may the evidence be sought;
(2) when is assistance to be rendered to arbitral tribunals;

(3) to which persons may the court's order be addressed;

(4) must the evidence be located in the United States;

(5) what is the relevance of foreign rules of evidence;

*5 (6) what must be the intended use of the evidence;

(7) how should the court exercise its discretion;

(8) what is the procedure under Section 1782;

(9) what are the applicable privileges;

(10) what is the significance of Subsection (b);

(11) what is the relation to The Hague Evidence Convention?

IV. The Tribunals and Litigants to Which Assistance May Be Granted

The precursor of Section 1782 provided for the taking of a deposition "to be used in any judicial proceeding pending in any court." [FN17] Under that version, the assistance to be rendered therefore had to be in aid of a judicial proceeding in a court. However, the present version of Section 1782 provides for assistance for use in "a foreign or international tribunal." The substitution of the word "tribunal" for "court" was deliberate, for the drafters wanted to make the assistance provided for available to all bodies with adjudicatory functions. [FN18] Clearly, private arbitral tribunals come within the term the drafters used. [FN19] This is also confirmed by the legislative history. New Section 1782 was expanded also to cover the assistance provided for in Sections 270-270C of Table 22 of the United States Code. This assistance was available to international tribunals established pursuant to an international agreement to which the United States was a party. Clearly those tribunals included international arbitral tribunals. Indeed, sections 270-270C of 22 United States Code were enacted especially for the purpose of providing for assistance to an international arbitral tribunal. [FN20] New Section 1782 not only intended to continue the provision for this assistance, but eliminated the requirement that the international tribunals be established by agreement to which the United States is a party. Indeed, the broad term "international tribunal" was intended to cover all international arbitral tribunals.

Notwithstanding this fulsome support for giving a broad reading to the term "tribunal" as it appears in Section 1782, some courts have failed to do so. In In re Letters Rogatory Issued by the Director of *6 Inspection of the Government of India, [FN21] Judge Friendly, writing for the Second Circuit, ruled that Section 1782 could not be used to obtain evidence for use in an Indian proceeding to fix a tax assessment that could be appealed to appellate tribunals. [FN22] More recently, Judges Duffy and Sweet, of the Southern District, have ruled that the term "tribunal" does not include an international arbitral tribunal. [FN23] These decisions are most regrettable. They run counter not only to the plain meaning of the term, to Section's 1782 legislative history, and to the clear purpose of that Section to facilitate evidence gathering in foreign and international adjudication.

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

25 SYRJILC 1
25 Syracuse J. Int'l. L. & Com. 1
(Cite as: 25 Syracuse J. Int'l. L. & Com. 1)

As will be explained below, special caution is appropriate in regard to requests for assistance in adjudication by arbitral tribunals, but that is because of the special concern courts should show for not interfering with the arbitral process. [FN24] In the case decided by Judge Duffy, however, it was the arbitrator who requested assistance. Compliance with the request would therefore further, rather than frustrate, the arbitral process. Judge Duffy's decision not only does not take this circumstance into account, but also fails to consider the desirability of promoting international arbitration by extending to international arbitral tribunals the same assistance that is granted to other international tribunals. Leading decisions by the U.S. Supreme Court, like those in Scherck [FN25] and Mitsubishi, [FN26] leave no doubt that international arbitration is a specially favored institution. The decisions by Judges Duffy and Sweet fail to give consequence to this judicially pronounced favor. On the contrary, they put international arbitral tribunals in a disfavored position.

While the term "tribunal" in Section 1782 includes an arbitral tribunal created by private agreement, [FN27] another question is what tribunals are "international" within the sense of Section 1782. Judge Duffy, in his Medway opinion, [FN28] advanced the argument that, if Section 1782 were construed to reach privately formed international arbitral tribunals, it *7 would provide for assistance to foreign arbitrations that is not extended to domestic arbitrations and that that would be improper. This argument fails for a variety of reasons.

First, Section 1782 seeks to deal only with assistance to foreign and international tribunals, not with assistance to purely domestic tribunals. The latter subject lay without the purview of the task assigned to the Commission and the Columbia Project. Indeed, when I prepared the revision to Rule 4 of the Federal Rules of Civil Procedure for the Commission and the Project relating to service of judicial documents abroad and provided for service by a non-party over eighteen years of age, [FN29] I was firmly convinced that a provision to that effect would also be most desirable in the domestic context. I decided, however, that proposal of a provision to that effect would carry us beyond our bailiwick and that, if our proposal would work well in the international context, it would in due course also be adopted in the domestic context. My expectation in that regard proved to be well-founded, and the Federal Rules of Civil Procedure now provide for such service across the board. [FN30]

I similarly believe that the assistance provided to international and foreign tribunals should also be extended to domestic tribunals and that, if it is not, it should be. [FN31] But the possible absence of desirable assistance to domestic arbitration tribunals may not reasonably be used as an argument for giving an unduly narrow construction to a statutory provision that, on its face, does grant such assistance to international arbitral tribunals.

Second, Section 1782 is not, as Judge Duffy erroneously assumes, limited to foreign, as distinguished from domestic, arbitrations. It provides for assistance to an "international tribunal". An international arbitral tribunal may . also conduct its business in the United States. When it does, recourse to Section 1782 is available to it. Of course, this raises the question of what renders a tribunal international in the sense of Section 1782. In line with the purpose of Section 1782 to provide broad and liberal assistance, the term "international" should be given the broadest possible construction. Accordingly, a tribunal is international in the sense of Section 1782 when any of the parties before it, or any of the arbitrators, is not a citizen or resident of the United States. Similarly, a tribunal should be regarded as foreign within the purview of Section *8 1782 when it is held anywhere outside the United States or is created under the law of a foreign country.

## V. When Assistance to Arbitral Tribunals is to be Rendered

As stated above, Section 1782 does apply to international arbitral tribunals created by private agreement. [FN32] But this does not mean that assistance to international arbitral tribunals should be provided in the same circumstances in which it is extended to foreign courts. The purpose of Section 1782 is to provide liberal assistance to foreign and international tribunals, but this assistance should not be provided when it would interfere with the orderly processes of the foreign or international tribunal. This, of course, raises a question of foreign law that, in the generality of cases, should be left for the foreign or international tribunal to decide. [FN33] The reason for this is that an application under Section 1782 should not burden the American court with the ordinarily difficult task of

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

determining the relevant foreign law. Recourse to Section 1782 should be left as simple as possible in order to keep the provision of assistance to foreign and international speedy and efficient. The American court should refrain from passing on questions of foreign law [FN34] when these can quite properly be left to the foreign or international tribunal which is necessarily the ultimate judge of whether the evidence can properly be used in its own forum. [FN35] And it may also safely be assumed that a litigant before a foreign or international tribunal will carefully consider whether it will be able to use the evidence in the foreign or international tribunal before it expends the effort and expense involved in seeking evidence pursuant to Section 1782.

These considerations do not apply with the same force to international arbitral tribunals. One of the great advantages of arbitration is that it leaves a great deal of freedom to the tribunal and the litigants to tailor the procedure to the needs of the particular case. This procedure will normally not be known before the tribunal and the litigants have had an opportunity to lay down the particular procedure they wish to be followed. The parties can therefore not make any judgment as to whether recourse to Section 1782 would be compatible with the tribunal's procedure. And once the tribunal has determined what procedure is to be followed, the parties can easily address the tribunal with the request that *9 it approve of a proposed application under Section 1782. Accordingly, the rule in relation to international arbitral tribunals should be that American court should honor an application under Section 1782 only if the application is approved by the arbitral tribunal. Judge Griesa, in an admirably reasoned decision, so ruled in In re Technostroyexport, [FN36] in which he also properly stressed that the parties, by agreeing to arbitration, had agreed to abide by the arbitrator's rules.

A different result was reached by Judges Duffy and Sweet, [FN37] who ruled that private arbitral tribunals were not covered by Section 1782 at all. [FN38] The result reached by Judge Sweet is compatible with the analysis defended here, since in the case he adjudicated the arbitral tribunal had not approved the application. [FN39] The same is not true of the application addressed to Judge Duffy, which had been made upon a ruling by the arbitrator that "directed that GE's documents are relevant and necessary for the fair determination of the dispute." [FN40] As already indicated, Judge Duffy's ruling disregards the plain text, the legislative history, and the evident purpose of Section 1782. [FN41]

VI. Persons Reached by Section 1782

Section 1782 provides for a district court of a district "in which a person resides or is found" to order the production of evidence for use in a foreign or international tribunal. Thus far, the precise meaning of the quoted terms has not occasioned controversy. But, in a future case, a person addressed by an order to produce evidence may raise the question of whether it is subject to the district court's authority. The answer to that question is not immediately clear. There are no generally prevailing rules of in personam competence to which Section 1782 might be argued to refer. The quoted language must therefore be given its own meaning.

The purpose of Section 1782 is to liberalize the assistance given to foreign and international tribunals. [FN42] The language defining its in personam reach must therefore be given a liberal construction commensurate with that purpose. This means that a person should be regarded as *10 residing in the district not only when it is domiciled there, but also when it is resident there in the sense of residing in the district for some not insignificant period of time. Indeed, if the relationship of the person addressed to the district is such as to warrant the exercise of in personam authority under the due process clause, it should be regarded as "resident" there. [FN43]

The same is true of the term "found." The evident statutory purpose is to create adjudicatory authority based on presence. [FN44] Insofar as the term applies to legal rather than natural persons, it may safely be regarded as referring to judicial precedents that equate systematic and continuous local activities with presence. [FN45]

VII. The Location of the Evidence

25 SYRJILC 1
25 Syracuse J. Int'l. L. & Com. 1
(Cite as: 25 Syracuse J. Int'l. L. & Com. 1)

The question has arisen whether Section 1782 can be used to compel production of tangible evidence located outside the district and, more particularly, in a foreign country and to compel testimony by witnesses outside of the district or in a foreign country. Section 1782 does not address this question in explicit terms. However, by creating adjudicatory authority over persons who may possess tangible evidence abroad [FN46], Section 1782 might be argued to provided a statutory basis for production of evidence located abroad.

The issue arose in In re Sarrio S.A., involving an action before a Spanish court between Spanish parties, in which the plaintiff sought an order in the United States Court for the Southern District of New York to compel Bank America and "its direct and indirect subsidiaries and *11 affiliates" to produce documents, and testimony by witnesses, located in Spain and Great Britian. [FN47]

The drafters of Section 1782 did not anticipate recourse to Section 1782 for this purpose. Furthermore, there are potent reasons for not giving Section 1782 the extraterritorial effect sought in this case. [FN48]

First, the evident purpose of Section 1782 is to make available to foreign and international tribunals and litigants evidence to be obtained in the United States. Thus, a harmonious scheme is established: Evidence in Spain is obtained through proceedings in Spain, evidence in Great Britian is obtained through proceedings in Great Britain, and evidence in the United States is obtained through proceedings in the United States.

Second, Section 1782 was not intended to enable litigants to obtain in Spain evidence located in Spain that could not be obtained through proceedings in Spain. [FN49] Section 1782 should not be used to interfere with the regular court processes in another country. Furthermore, such use would produce its effects haphazardly, because recourse to it would be available only to a party that could find a person resident or "found" in the United States, which controlled, directly or indirectly, evidence located abroad.

Third, if Section 1782 could be used for this purpose, American courts would become clearing houses for requests for information from courts and litigants all over the world in search of evidence to be obtained all over the world. And the burden to produce that information would be imposed on persons in the United States who have operations abroad. With American banks and financial institutions doing business all over the world, finding such a person would be relatively simple. [FN50] It is no coincidence that most of the cases concerning the production of evidence to be produced or to be obtained abroad have involved banks doing business in the United States and abroad. [FN51]   Federal courts and *12 American business should not be saddled with such significant burdens in the absence of a legislative intent clearly expressed. [FN52]

Fourth, if American courts were to assume the role of clearing houses for world-wide information gathering, conflicts with foreign countries would inevitably arise. These conflicts have already arisen when American courts and litigants seek information abroad for use in American courts. [FN53] They would be substantially aggravated if American courts were to seek to impose their information gathering procedures, generally unknown in foreign countries that do not belong to the family of common law systems. It is one thing for American court to insist that its procedures be used in aid of American litigation but quite another to impose them on actions brought in foreign courts.

In In re Application of Sarrio S.A., [FN54] Judge Paterson denied an application under Section 1782 made for the purpose of obtaining evidence in Spain for use in Spanish proceedings. The Second Circuit, per Judge Leval, reversed, but on the ground that the bank that was asked to produce the evidence did not object to doing so. Noting that "there is reason to think that Congress intended to reach only evidence located within the United States" Judge Leval ruled that, since the bank was prepared to produce the evidence, it is "unnecessary for us to decide... the geographical reach of Section 1782." Essentially, therefore, the case became one involving application of subsection (b) which provides that any person within the United States may voluntarily give testimony or produce tangible evidence before any person and in any manner acceptable to him. [FN55]

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

25 SYRJILC 1                                                                                         Page 7
25 Syracuse J. Int'l. L. & Com. 1
(Cite as: 25 Syracuse J. Int'l. L. & Com. 1)

Of course, even if Section 1782 were read to apply to the situation addressed in Sarrio, the court asked to compel the production of the evidence should, for the reasons detailed above, exercise the discretion that Section 1782 indubitably gives it to refuse to comply with the request. [FN56]

*13 VIII. The Extent of the Relevance of Foreign Rules Relating to the Production of Evidence

Without any warrant or support that can be found in the text of Section 1782, some courts have ruled that Section 1782 does not authorize production of evidence that cannot be compelled under the law of the foreign or international tribunal. [FN57] It should be stressed that the courts that have so ruled have not drawn sharp distinctions between non-discoverability and non-admissibility under foreign law. [FN58] Whatever the criterion used, it should be regarded as irrelevant. Section 1782 does not make discoverability or admissibility under foreign law a prerequisite to proper recourse to Section 1782, and the court should not seek to render less liberal the assistance the legislator so clearly prescribed. Fortunately, the Second Circuit, which is likely to be most frequently addressed with requests for assistance under Section 1782, has ruled discoverability or admissibility under foreign law not to be a general prerequisite to assistance under Section 1782. [FN59]

It should be noted that this does not mean, that a court, asked to provide assistance under Section 1782, should never consider non-discoverability or non-admissibility under foreign law. For example, in order to create equality of treatment, an American court, when asked to compel production by a litigant before a foreign or international tribunal, may condition discovery on that litigant's agreeing to make the same extent of discovery available to its opponent. [FN60] In addition, an American court may properly take into account a foreign or international tribunal's ruling that the evidence sought should not be produced. [FN61] I have dealt with these questions in greater detail in earlier publications. [FN62] I should note, however, that foreign courts are increasingly recognizing that non-discoverability under their own laws should not preclude recourse to Section 1782. Both English and Dutch courts have so ruled. [FN63] However,*14 when a foreign or international tribunal has ruled that production of the evidence pursuant to Section 1782 would not be appropriate, an American court should heed that ruling and deny the application. [FN64]

IX. The Intended Use of the Evidence Sought

Section 1782 requires that the evidence be sought "for use in a proceeding in a foreign and international tribunal." In two cases, the Second Circuit, in other respects a paragon of liberal construction of Section 1782, has given the quoted words an unduly limited interpretation. In the first, [FN65] Judge Friendly reversed a lower court's order appointing a commissioner to take evidence sought by an Indian inspector of taxes. Judge Friendly stressed that the inspector did not come within the statutory terms. I have already criticized this decision as paying insufficient attention to the adjudicatory nature of the proceedings before the inspector and its disregard of the possible use of the evidence sought in proceedings before appellate tribunals. [FN66] In the second case, [FN67] Judge Newman, rejecting my views, ruled that Section 1782 is applicable only if the foreign proceeding is "imminent, i.e., very likely to occur within a brief interval..." [FN68]

Fortunately, Judge [now Justice] Ginsburg, writing for the District of Columbia Circuit Court of Appeals, rejected an attempt to put an unduly constraining construction on Section 1782 by upholding a lower court's holding that an English prosecutor could have recourse to Section 1782, even though no proceedings before an English court were pending, as long as such proceedings were "within reasonable contemplation." [FN69] Indeed, the 1964 revision of Section 1782 deliberately eliminated the requirement that the proceedings in the foreign tribunal be "pending." This was done in recognition of the fact that the proper gathering of evidence before a proceeding is commenced may serve the wholesome purpose of avoiding litigation altogether.

*15 X. The Court's Discretion Under Section 1782

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

25 SYRJILC 1                                                                                          Page 8
25 Syracuse J. Int'l. L. & Com. 1
(Cite as: 25 Syracuse J. Int'l. L. & Com. 1)

Section 1782 provides that a district court "may" order the production of evidence in aid of a proceeding in a foreign or international tribunal. The term "may" was used deliberately to afford the court the opportunity of refusing assistance, or conditioning it upon compliance with conditions, when this was deemed appropriate. As already indicated, a district court should normally exercise its discretion to refuse assistance to a private international arbitral tribunal, unless a request for such assistance is approved by the tribunal. [FN70] In addition, a district court should exercise its discretion to ensure that a litigant not obtain a one-sided advantage from the fortuitous circumstance that relevant evidence favorable to that litigant is under the control of a person residing or found in the United States. [FN71] And a district court should also use its discretion to refuse assistance to compel production of evidence located in a foreign country under the control of a person in the United States in an action between foreign litigants in a foreign country. [FN72]

A refusal to grant assistance under Section 1782 may also be based on the district court's finding that, in some way, the foreign proceedings are unfair or incompatible with domestic notions of propriety. But caution in that regard is warranted, because American courts should not condemn foreign proceedings merely because they are different from those conducted in, or unknown to, American courts.

XI. Procedure under Section 1782

Section 1782 provides that the district court may prescribe the procedure to be followed in the production of the evidence and that, unless the court prescribes otherwise, the procedure prescribed by the Federal Rules of Civil Procedure shall be followed. Taken literally, Section 1782 prescribes only the procedure to be followed in taking testimony and producing tangible evidence and does not address the procedure to be followed in obtaining the order directing the production of the evidence. On reflection, it would have been better to provide that, unless the court directs otherwise, all procedures under Section 1782 are to *16 conform to the Federal Rules of Civil Procedure. That, clearly, was the intention of the drafters. [FN73]

The reported cases reflect that, in actual practice, application for assistance under Section 1782 are frequently filed ex parte. This may result in an order's being issued without notice to either adverse parties or contemplated parties in the foreign or international tribunal or to the person to whom the order is to be directed. Normally, this will cause no substantial harm, since, when the order is brought to the attention of the person ordered to produce the evidence, that person can move to vacate the order if it has been improperly issued. And that person may also inform adverse parties in the foreign or international tribunal of the order's issuance. However, the person against whom the order has been issued will then have the burden of filing a motion to vacate the order rather than merely oppose the initial application. And that person may, but also may not, inform parties adverse to the applicant.

Since it is an elementary precept of due process that a person on whom an obligation is to be judicially imposed should have an opportunity to defend before the obligation is imposed, [FN74] ex parte applications are improper, and adequate notice of the application should be given both to the person who is to produce the evidence and to adverse parties. [FN75]

In actual practice, courts appear to have overlooked the impropriety of recording to ex parte applications, perhaps on the ground that, by the time an application to vacate the order is being considered, it would involve duplication of time and effort to force the refiling of the original application for assistance. But that is not an adequate reason for overlooking an unconstitutional error. At the least, the court should consider assessing costs and attorney's fees against the party that made the original application. [FN76]

*17 It may be questioned whether notification of adverse parties, as distinguished from the person to whom the order is to be directed, is necessary. After all Subsection (b) of Section 1782 provides that the person from whom the evidence is sought may voluntarily produce it, regardless of the wishes of adverse parties. Subsection (b), however,

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

25 SYRJILC 1                                                                      Page 9
25 Syracuse J. Int'l. L. & Com. 1
(Cite as: 25 Syracuse J. Int'l. L. & Com. 1)

is written for the situation in which a person voluntarily, and without a court order, produces the evidence. In that case, notice to adverse parties is not required. [FN77]   But the situation is different when a court order is sought. It cannot be denied that the issuance of such an order imposes an obligation on the person to whom the order is addressed and that compliance with that obligation may affect the interests of adverse parties in the proceeding before the foreign or international tribunal. That being so, the adverse parties should be notified. [FN78] Such notification may also alleviate the burdens of the person from whom the evidence is sought. In the generality of cases, that person can rely on the adverse party's contesting the application and need not expend the money and effort to contest the application itself.

## XII. Applicable Privileges

The last sentence of Section 1782(a) provides that a person may not be required to produce evidence" in violation of any legally applicable privilege." The quoted language is deliberately open-ended. It refers to any legally applicable privilege, but does not specify what that privilege may be. The drafters wished to leave it to the district court to determine which privileges, under pertinent conflict of laws rules, were to be applied. Whenever a plea of privilege is raised under Section 1782, the court must therefore determine which evidence is allegedly shielded from disclosure and whether, in applying appropriate choice of law rules, there is an applicable privilege rule precluding production of the evidence. [FN79]

In the Sarrio case, Judge Leval did not follow the analysis indicated by Section 1782. The evidence of which production was sought were documents under the control of the bank in Spain and Great Britain. The bank caused these documents to be transported to New York to enable the bank's counsel to evaluate whether they should be produced. Judge Leval's analysis focused on whether the evidence was covered by the *18 attorney-client privilege under American law. The appropriate analysis would have focussed on whether the documents that were located in Spain and Great Britain were covered by a privilege extended by Spanish or English law. After all, the bank should not be able to bring the documents within the reach of an American privilege by bringing them to New York. Whether the bank was free to produce the documents could therefore have been decided under the law of the place that had the most significant relationship to the issue, which would appear to be the place where the evidence was located at the time its disclosure was sought. [FN80] Of course, the prevailing choice of law rule in the United States is that American courts apply the law of the forum in determining whether the attorney client privilege applies. [FN81] But in the Sarrio case, the claim that the attorney-client privilege stood in the way of production could hardly be regarded as serious, since the documents were put in the hands of the bank's attorney in New York after their production was sought. [FN82] A more respectable argument would have been that the bank was obligated to maintain confidentiality under the agreement with its customer. That question had to be decided under the law of the place where the relationship was created and existed at the time production was sought. If, under the applicable foreign law, the information was privileged or covered by an obligation of confidentiality, the district court should not order its production.

## XIII. Subsection (b)

Subsection (b) of Section 1782 provides that any person may voluntarily produce evidence for use in a foreign or international tribunal. Of course, this does not give a person the freedom to produce evidence that, under applicable law, it may not produce. [FN83] Its purpose is to make clear that the United States creates no obstacles, such as undue reliance on sovereignty, to the voluntary production of evidence. [FN84] Nor does Subsection (b) mean that an interested party may not seek to preclude a *19 person from giving evidence that, under applicable law, the person seeking the evidence is precluded from seeking. [FN85]

As already indicated, Subsection (b) is not applicable when a district court orders the production of evidence pursuant to Subsection (b), for that production cannot properly be regarded as voluntary. [FN86]

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

XIV. The Relation to the Hague Evidence

It might be argued that, in relations with foreign countries that have ratified The Hague Convention on the Taking of Evidence Abroad in Civil or Commercial Matters, that Convention provides the exclusive procedures for obtaining evidence in the United States for use in a court located in a Convention country. The analogous argument has been advanced by a number of states that have ratified The Hague Evidence Convention when American litigants have tried to obtain evidence located in those states. [FN87] Indeed, it may be regarded as somewhat surprising that no case has yet been decided in which that argument has been advanced. Fortunately, the Supreme Court has ruled that The Hague Evidence Convention is not exclusive. [FN88] It is therefore reasonable to assume that it will rule similarly when the evidence is to be obtained in the United States.

In any event, The Hague Evidence Convention should not be construed to stand in the way of recourse to Section 1782. The purpose of Section 1782 is to provide liberal assistance. It would be anomalous, to say the least, if a Convention that purports to facilitate international judicial assistance were construed to impede it.

XV. Conclusion

All in all, Section 1782 has largely served the purposes for which it was enacted. American courts have, upon occasion, given it a more restricted construction than warranted by either its text or the legislative *20 history, but there appears to be no reason for seriously considering, at this time, any statutory amendments. [FN89]

[FNa1]. Copyright by Hans Smit, Fuld Professor of Law, Columbia University.

[FN1]. 28 U.S.C. § 1782 (1996).

[FN2]. On the co-operation between the Project and the Commission, see Hans Smit, Assistance Rendered by the United States in Proceedings Before International Tribunals, 62 Colum. L. Rev. 1264-65, n.7 [hereinafter Smit, Assistance].

[FN3]. On the work of the Project and Commission generally, see International Co-Operation in Litigation: Europe, col. 1 (Hans Smit, ed., The Hague, 1965).

[FN4]. On the precursors of § 1782, see Smit, Assistance, supra note 2, at 1264; Hans Smit, International Litigation Under the United States Code, 65 Colum. L. Rev. 1015, 1026-35 (1965)[hereinafter Smit, International Litigation].

[FN5]. For commentatorial treatment of these cases, see Hans Smit, Recent Developments in International Litigation, 35 S. Tex. L. Rev. 215 (1994) [[[hereinafter Smit, Recent Developments ]; Lawrence W. Newman & Michael Burrows, The Practice of International Litigation 251 (1993); Robert H. Smit, The Sarrio Decision, 12 IBA Civ. Litig. Newsl. No. 5 (1996); Peter D. Troobof & Bradford L. Smith, Judicial Assistance-Foreign Criminal Investigations. Evidence "For Use in a Proceeding", 3 Am. J. Int'l L. 929 (1989); Walter B. Stahr, Discovery Under 28 U.S.C. Section 1782 For Foreign and International Proceedings, 30 Va. J. Int'l. L. 597 (1990); Edward C. Weiner, In Search of International Evidence: A Lawyer's Guide Through the United States Department of Justice, 58 Notre Dame L. Rev. 60 (1982); Brian E. Bomstein & Julie M. Levitt, Much Ado About 1782; A Look at Present Problems in the Discovery in the United States for Use in Foreign Litigation Under 28 U.S.C. Section 1782, 20 U. Miami Inter-Am. L. Rev. 429 (1989); Eileen P. McCarthy, A Proposed Litigation Standard for U.S. Courts in Granting Requests for International Judicial Assistance, 15 Fordham Int'l L. J. 772 (1992).

[FN6]. See Judge Feinberg in Malev Hungarian Airlines v. United Technologies, Inc., 964 F. 2d 97 105 (2d Cir. 1992) (dissenting in the case by noting that the liberal assistance sought would unduly add to the burdens of already overtaxed courts).

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

[FN7]. Civil law courts generally do not provide for American-style discovery and do not rule on admissibility of evidence, particularly documentary evidence, at the time it is submitted. Furthermore, foreign procedural systems permit recourse to other ways of inducing a party or witness to produce the evidence. See Smit, Recent Developments, supra note 5, at 236-37, n. 96.

[FN8]. This may have played a role in Judge Friendly's decision in In The Matter of Letters Rogatory Issued by the Director of Inspection of the Government of India, 385 F.2d 1017 (2d Cir. 1967). See also text accompanying notes 21-22 infra.

[FN9]. See supra note 5.

[FN10]. Peter Herzog, Civil Procedure in France (with Martha Weser, 1967). It remains the only work in English on the subject. In the same series, the Project published Mauro Cappelletti & Joseph Perillo, Civil Procedure in Italy (1965); Ruth Bader Ginsburg & Anders Bruzelius, Civil Procedure in Sweden (1965); Takaaki Hattori & Dan Fenno Henderson, Civil Procedure in Japan (1983, loose-leaf).

[FN11]. Hans Smit & Peter Herzog, The Law of the European Economic Community (loose-leaf, 7 volumes).

[FN12]. For many years, Peter published his annual reviews of decisions by New York courts in conflict of laws cases, which rank among the best publications in the area.

[FN13]. On these sections, see Smit, Assistance, supra note 2, at 1264.

[FN14]. On the precursors of § 1782, see Smit, International Litigation, supra note 4, at 1026-35.

[FN15]. See the text accompanying notes 18-26 infra.

[FN16]. See Smit, International Litigation, supra note 4, at l.c.

[FN17]. See id. at 1026-27, n.72.

[FN18]. See id. at 1021, n.36.

[FN19]. Accord Smit, Assistance, supra note 2, at 1264.

[FN20]. Id.

[FN21]. In re Letters Rogatory Issued by the Director of Inspection of the Government of India, 385 F. 2d 1017 (2d Cir. 1967).

[FN22]. On this case, see also Smit, Recent Developments, supra note 5, at 233.

[FN23]. In re Medway Power Ltd., 1997 U.S. District LEXIS 18553 (Judge Kevan T. Duffy, S.D.N.Y., Nov. 20, 1997); In re National Broadcasting Co., 1998 U.S. Dist. LEXIS 385 (Judge Robert Sweet, S.D.N.Y., Jan. 16, 1998).

[FN24]. See text accompanying notes 32-41 infra.

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

[FN25]. Scherk v. Alberta-Culver Company, 417 U.S. 506, 94 S. Ct. 2449, 41 L. Ed. 2d 170 (1974).

[FN26]. Mitsubishi Motors Corporation v. Soler Chrysler-Plymouth, Inc., 473 U.S. 614, 105 S. Ct. 3346, 7 L. Ed. 2d 444 (1985). On this decision, see Hans Smit, Mitsubishi: It's Not What It Seems To Be, 4 J. Int. Arb. 7 (1987)

[FN27]. See text at notes 18-26 infra.

[FN28]. In re Medway Power Ltd., 1997 U.S. District LEXIS 18553.

[FN29]. On the 1963 revision of Rule 4 of the Federal Rules of Civil Procedure, see International Co-Operation in Litigation: Europe, supra note 3, at 10-11 (Nijhoff, 1965).

[FN30]. Fed. R. Civ. P. 4 (i).

[FN31]. Section 1782 does extend to international arbitral tribunals sitting in the United States. See text following this footnote. In purely domestic cases, courts may well be argued to possess inherent power to issue subpoenas in aid of arbitral tribunals sitting in sister states.

[FN32]. See text accompanying notes 23-26 supra.

[FN33]. See text accompanying notes 57-59 infra.

[FN34]. For a more detail justification for this judicial abstention, see Smit, Recent Developments, supra note 5, at 235-36.

[FN35]. See Smit, International Litigation, supra note 4, at l.c.

[FN36]. An opinion to that effect by the author was submitted in the NBC case. In re National Broadcasting Co., 1998 U.S. Dist. LEXIS 385.

[FN37]. In re Technostroyexport, 853 F. Supp. 695 (S.D.N.Y.1994).

[FN38]. See cases cited supra note 23.

[FN39]. In the Medway case, I had provided an opinion to the effect that the application should be denied on that ground.

[FN40]. Medway, 1997 U.S. District LEXIS 18553, at *3.

[FN41]. See supra text accompanying notes 18-22.

[FN42]. Smit, International Litigation, supra note 4, at 1026-27.

[FN43]. The United States Code, after its 1948 revision, speaks of "residence" and "residents" whenever the pertinent criterion is either domicile or residence. The revision of § 1783 and 1784 of Title 28 added residence as a basis for in personam adjudicatory authority on the assumption that the courts would exercise in personam adjudicatory authority whenever the physical relationship to the United States of the person subpoenaed was such as to render it constitutional to exercise such authority over him or her.

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

[FN44]. But mere transient presence is not sufficient. Whatever one may think of the propriety of using transient presence as a basis for in personam adjudicatory authority in an ordinary action to recover on a personal obligation. Cf. Burnham v. Superior Court of California, 495 U.S. 604, 110 S. Ct. 2105, 109 L. Ed. 2d 631, (U.S. Cal., May 29, 1990) (NO. 89-44) mere transient presence is not a reasonable basis for exercising adjudicatory authority on behalf of a foreign and international tribunal.

[FN45]. For such cases, see Maurice Rosenberg, et al, Elements of Civil Procedure 255-57 (5th ed. 1990)

[FN46]. Persons resident or found within the United States may have in their possession or under their control evidence located abroad. It has long been recognized that such persons may be required to produce such evidence in actions in courts in the United States. See, e.g., Société Nationale Industrielle Aérospatiale v. U.S. District Court of Southern District Iowa, 482 U.S. 522, 107 S. Ct. 2542, 96 L. Ed. 2d 461 (1987); United States v. First National City Bank, 396 F. 2d 97 (2d Cir. 1968)

[FN47]. In re Sarrio S.A., 1995 WL 598988 (S.D.N.Y. Oct. 11, 1995) rev'd 119 F. 3d 43 (2d Cir. 1997). On this case, see Robert H. Smit, The Sarrio Decision, supra note 5.

[FN48]. The analysis that follows is drawn from an expert opinion I submitted in the Sarrio case.

[FN49]. A sharp distinction should be made between recourse to § 1782 to obtain evidence located in the United States for use in a proceeding abroad and recourse to § 1782 to obtain evidence located in a foreign country for use in that action. It is the latter situation that was addressed in Sarrio.

[FN50]. In fact, since probably all of the major banks in the world can be "found" in the United States, it would be most likely that in any proceeding in any foreign country evidence located in that country could be sought by recourse to § 1782 if that section were given extraterritorial effect.

[FN51]. See, e.g., United States v. The Bank of Nova Scotia, 691 F. 2d 1384 (11th Cir. 1982), cert. denied, 462 U.S. 1119,103 S. Ct. 3086, 77 L. Ed 2d (1348 (1983); United States v. First National City Bank, 379 U.S. 378, 85 S. Ct 520, 13 L. Ed 2d 365 (1965). See further Louis Henkin et al, International Law 1098-1108 (3d ed. 1993).

[FN52]. It should be acknowledged that the statutory text does not provide explicitly that § 1782 has no extraterritorial effect. See Robert H. Smit, The Sarrio Decision, supra note 5. However, the statutory text does not preclude the construction advocated here either. In any event, the court may use its discretion to reach the same result. See infra text accompanying notes 70-72.

[FN53]. See supra cases cited in note 51.

[FN54]. See supra note 47.

[FN55]. See also infra text accompanying notes 83-86.

[FN56]. See infra text accompanying notes 71-72.

[FN57]. See, e.g., In re Asta Medica, S.A., 981 F. 2d 1 (1st Cir. 1992); 15. Lo Ka Chun v. Lo To, 858 F.2d 1564 (11th Cir.(Fla.), Nov 08, 1988) (NO. 87-6098); Smit, Recent Developments, supra note 5, at 236-38.

[FN58]. On this distinction, see Smit, International Litigation, supra note 4, at l.c.

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

[FN59]. Malev Hungarian Airlines v. United Technologies, Inc., 964 F. 2d 97 (2d Cir.), cert. denied, 113 S. Ct. 179 (1992); Foden v. Aldunate, 3 F. 3d 54 (2d Cir.), cert. denied, 114 S. Ct. 443 (1993).

[FN60]. Of course, this requirement can be imposed only on a party, not on witnesses not subject to the American court's adjudicatory authority.

[FN61]. This aspect arose in the Enron Litigation, in which the English High Court upheld an injunction issued by a lower English court. On this decision, see Enron Corp. v. Amoco Corp., Case No. 96-20735 (5th Cir. 1997).

[FN62]. See Smit, Recent Developments, supra note 5 at 236-38.

[FN63]. The leading English case is South Carolina Ins. Co. v. Assurantie Maatschappij De Zeven Provincien N.V., (1987) 1 App. Cas. 24, in which the House of Lords ruled that the non-discoverability under English law did not stand in the way of an English court's or litigant's seeking assistance in the United States under § 1782. A similar decision was rendered by the President of the Amsterdam District Court.

[FN64]. See supra text accompanying note 61.

[FN65]. See supra note 21.

[FN66]. See Smit, Recent Developments, supra note 5, at 233

[FN67]. In re Request for International Judicial Assistance (Letter Rogatory) for the Federal Republic of Brazil, 936 F. 2d 702 (2d Cir. 1991).

[FN68]. 936 F. 2d. at 703. For additional commentaries on this decision, see authorities cited in Smit, Recent Developments, supra note 5, at 234, n 92.

[FN69]. In re Letter of Request From the Crown Prosecution Service of the United Kingdom (Ward), 879 F. 2d 686 (D.C. Cir. 1989). For a comment on this case, see Peter D. Troobofs & Bradford L. Smith, supra note 5, at 929. I submitted an expert opinion to the same effect in this case.

[FN70]. See supra text accompanying notes 32-41.

[FN71]. It may be argued that a disadvantage of conditioning recourse to § 1782 on making discovery available to the opposing party is that it may need an inquiry into what discovery is available under foreign law. This argument must fail, because the court can impose the condition, regardless of whether foreign law permits the discovery.

[FN72]. See supra text accompanying notes 46-56.

[FN73]. This intention may be found in the statutory text by reading § 1782 as requiring that the Federal Rules of Civil Procedure apply broadly to all steps that are necessary in order to achieve the production of the evidence.

[FN74]. See, e.g., Goldberg v. Kelly, 397 U.S. 254, 90 S. Ct. 1011, 25 L. Ed. 2d 287 (1970); Sniadach v. Family Finance Corp. of Bay View, 395 U.S. 337, 89 S. Ct. 1820, 23 L. Ed. 2d 349 (1969).

[FN75]. The legal interest of adverse parties to receive notice of the application was underlined by Judge Leval, in

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

the Sarrio case, who affirmed their standing to oppose recourse to § 1782. In re Sarrio S.A., 1995 WL 598988 (S.D.N.Y. Oct. 11, 1995) rev'd 119 F. 3d 43 (2d Cir. 1997). To the same effect, In re Letter Rogatory from Justice Court, Montreal, 523 F. 2d 562 (6th Cir. 1975).

[FN76]. The assessment of attorney's fees can be justified on the ground of reckless disregard of constitutional guarantees. For support of the notion that violation of constitutional norms provides a special argument for assessing attorney's fees, see Serrano v. Priest, 20 Cal. 3d. 25, 141 Cal. Rptr. 315, 569 P. 2d. 1303 (1977). But cf. Alyeska Pipeline Serv. Co. v. Wilderness Society, 421 U.S. 240, 95 S. Ct. 1612, 44 L. Ed. 2d 141 (1975), recognizing, in dictum, that imposition of attorney's fees may be proper to punish vexatious conduct.

[FN77]. But it may be required by the procedural or ethical rules prevailing in the foreign or international tribunal.

[FN78]. See supra text accompanying notes 74-75.

[FN79]. See Smit, International Litigation, supra note 4, at 1033-34.

[FN80]. The law of that place might well regard the adverse party as having a protected interest in precluding disclosure of confidential information. Significantly, Judge Leval ruled that, under American law, the adverse party could not assert the privilege.

[FN81]. Restatement (Second), Conflict of Laws §139 (2) (1971).

[FN82]. If a privilege were recognized in such circumstances, an easy way of frustrating discovery would be to transmit the documents to one's attorney.

[FN83]. See supra text accompanying notes 80-82.

[FN84]. Many foreign countries invoke sovereignty as an obstacle to discovery in aid of foreign litigation. See Hans Smit, International Cooperation in Litigation: Some Observation on the Role of International Law and Reciprocity, 9 Neth. Int'l. L. Rev. 137 (1962).

[FN85]. See supra note 77. See also Jack B. Weinstein, Recognition in the United States of the Privileges of Another Jurisdiction, 56 Colum. L. Rev. 535 (1956).

[FN86]. See supra text accompanying note 55.

[FN87]. Société Nationale Industrielle Aerospatiale v. U.S. District Court of Southern District Iowa, 482 U.S. 522, 107 S. Ct. 2542, 96 L. Ed 2d 461 (1987).

[FN88]. However, the Supreme Court stressed the desirability of the district courts' being especially concerned about the comity due to foreign countries.

[FN89]. Indeed, the only amendment that might arguably deserve consideration is one that would make explicit that the Federal Rules of Civil Procedure apply to all procedures under § 1782. See supra text accompanying note 73. The only amendment made to § 1782 since enactment of the 1964 revision consists of addition of the words "..., including criminal investigations before formal accusation." in the first sentence of Subsection (a). This amendment was both unnecessary and undesirable: unnecessary, because the leading appellate court decision on the issue had already held in favor of assistance in such investigations (see supra text accompanying note 73); and undesirable, because this unneeded particularization may lead to the argument that other similar situations are not covered by §

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

25 SYRJILC 1                                                    Page 16
25 Syracuse J. Int'l. L. & Com. 1
**(Cite as: 25 Syracuse J. Int'l. L. & Com. 1)**

<u>1782</u> (for an example of such a situation, see supra text accompanying notes 21-22).

25 Syracuse J. Int'l. L. & Com. 1

END OF DOCUMENT

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

# EXHIBIT 8

# *State of Delaware*
# *Annual Franchise Tax Report*

| CORPORATION NAME | | | | | | TAX YR. |
|---|---|---|---|---|---|---|
| DELL INC. | | | | | | **2007** |

| FILE NUMBER | INCORPORATION DATE | RENEWAL/REVOCATION DATE | | | | |
|---|---|---|---|---|---|---|
| 2141541 | 1987/10/22 | | | | | |

**PRINCIPAL PLACE OF BUSINESS**
ONE DELL WAY                                                    PHONE NUMBER
512/728-2460

ROUND ROCK TX 78682 United States

**REGISTERED AGENT**
CORPORATION SERVICE COMPANY                              AGENT NUMBER
9000014

2711 CENTERVILLE ROAD
SUITE  400

WILMINGTON               DE 19808

| AUTHORIZED STOCK | | DESIGNATION/ | NO. OF SHARES | PAR VALUE/ SHARE |
|---|---|---|---|---|
| BEGIN DATE | END DATE | STOCK CLASS | | |
| 2006/02/01 | | COMMON | 7,000,000,000 | .010000 |
| | | PREFERRED | 5,000,000 | .010000 |

| OFFICER | NAME | STREET/CITY/STATE/ZIP | TITLE |
|---|---|---|---|
| JAMES L FITZGERALD | | | |
| ONE DELL WAY | | | VP, TAX |
| ROUND ROCK TX 78682 United States | | | |

| DIRECTORS | NAME | STREET/CITY/STATE/ZIP |
|---|---|---|
| THOMAS L WELCH, JR. | | |
| ONE DELL WAY | | |
| ROUND ROCK TX 78682 United States | | |

==================================================
Total number of directors:1

*NOTICE: Pursuant to 8 Del. C. 502(b), If any officer or director of a corporation required to make an annual franchise tax report to the Secretary of State shall knowingly make any false statement in the report, such officer or director shall be guilty of perjury.*

**AUTHORIZED BY (OFFICER, DIRECTOR OR INCORPORATOR)**                    DATE        TITLE
JAMES L FITZGERALD

ONE  DELL WAY                                                              VP, TAX
2008-02-20

ROUND ROCK TX 78682 United States

# State of Delaware

# Annual Franchise Tax Report

| CORPORATION NAME | | TAX YR. |
|---|---|---|
| HEWLETT-PACKARD COMPANY | | 2007 |

| FILE NUMBER | INCORPORATION DATE | RENEWAL/REVOCATION DATE |
|---|---|---|
| 2858384 | 1998/02/11 | |

**PRINCIPAL PLACE OF BUSINESS**
3000 Hanover Street

**PHONE NUMBER**
650/857-1501

Palo Alto CA 94304 United States

**REGISTERED AGENT**
THE CORPORATION TRUST COMPANY

**AGENT NUMBER**
9000010

CORPORATION TRUST CENTER
1209 ORANGE STREET

WILMINGTON          DE 19801

| AUTHORIZED STOCK | | DESIGNATION/ | NO. OF SHARES | PAR VALUE/ SHARE |
|---|---|---|---|---|
| BEGIN DATE | END DATE | STOCK CLASS | | |
| 2001/02/28 | | COMMON | 9,600,000,000 | .010000 |
| | | PREFERRED | 300,000,000 | .010000 |

| OFFICER | NAME | STREET/CITY/STATE/ZIP | TITLE |
|---|---|---|---|
| Paul T. Porrini | | | |

3000 Hanover Street                                    VicePresident

Palo Alto CA 94304 United States

| DIRECTORS | NAME | STREET/CITY/STATE/ZIP |
|---|---|---|

Lawrence T Babbio Jr
3000 Hanover Street
Palo Alto CA 94304 United States

Sari M Baldauf
3000 Hanover Street
Palo Alto CA 94304 United States

John H Hammergren
3000 Hanover Street
Palo Alto CA 94304 United States

Mark Hurd
3000 Hanover Street
Palo Alto CA 94304 United States
===================================================================
Total number of directors:10

*NOTICE: Pursuant to 8 Del. C. 502(b), If any officer or director of a corporation required to make an annual franchise tax report to the Secretary of State shall knowingly make any false statement in the report, such officer or director shall be guilty of perjury.*

| AUTHORIZED BY (OFFICER, DIRECTOR OR INCORPORATOR) | DATE | TITLE |
|---|---|---|
| Paul T. Porrini | | |

3000 Hanover Street                                    VicePresident
                                        2008-02-12

Palo Alto CA 94304 United States

# State of Delaware
# Annual Franchise Tax Report

| CORPORATION NAME | | TAX YR. |
|---|---|---|
| HEWLETT-PACKARD COMPANY | | 2007 |

| FILE NUMBER |
|---|
| 2858384 |

| DIRECTORS | NAME | STREET/CITY/STATE/ZIP |
|---|---|---|

G Kennedy Thompson
3000 Hanover Street
Palo Alto CA 94304 United States

Joel Hyatt
3000 Hanover Street
Palo Alto CA 94304 United States

Lucille Salhany
3000 Hanover Street
Palo Alto CA 94304 United States

Richard A Hackborn
3000 Hanover Street
Palo Alto CA 94304 United States

John R Joyce
3000 Hanover Street
Palo Alto CA 94304 United States

Robert L Ryan
3000 Hanover Street
Palo Alto CA 94304 United States

# State of Delaware
# Annual Franchise Tax Report

| CORPORATION NAME | | | TAX YR. |
|---|---|---|---|
| INGRAM MICRO INC. | | | 2007 |

| FILE NUMBER | INCORPORATION DATE | RENEWAL/REVOCATION DATE | |
|---|---|---|---|
| 2607570 | 1996/04/29 | | |

**PRINCIPAL PLACE OF BUSINESS**
1600 E. St. Andrew Place

**PHONE NUMBER**
714/566-1000

Santa Ana CA 92705 United States

**REGISTERED AGENT**     **AGENT NUMBER**
THE CORPORATION TRUST COMPANY     9000010

CORPORATION TRUST CENTER
1209 ORANGE STREET

WILMINGTON     DE 19801

| AUTHORIZED STOCK | | DESIGNATION/ | NO. OF SHARES | PAR VALUE/ SHARE |
|---|---|---|---|---|
| BEGIN DATE | END DATE | STOCK CLASS | | |
| 2001/06/06 | | COMMON | 500,000,000 | .010000 |
| | | COMMON | 135,000,000 | .010000 |
| | | PREFERRED | 25,000,000 | .010000 |

| OFFICER   NAME | STREET/CITY/STATE/ZIP | TITLE |
|---|---|---|
| Lily Y. Arevalo | | |
| 1600 E. St. Andrew Place | | AssistantSecretary |
| Santa Ana CA 92705 United States | | |

**DIRECTORS**   NAME     STREET/CITY/STATE/ZIP

Howard I. Atkins
1600 E. St. Andrew Place
Santa Ana CA 92705 United States

Leslie S. Heisz
1600 E. St. Andrew Place
Santa Ana CA 92705 United States

Martha R. Ingram
1600 E. St. Andrew Place
Santa Ana CA 92705 United States

Linda Fayne Levinson
1600 E. St. Andrew Place
Santa Ana CA 92705 United States

============================================================

Total number of directors:11

*NOTICE: Pursuant to 8 Del. C. 502(b), If any officer or director of a corporation required to make an annual franchise tax report to the Secretary of State shall knowingly make any false statement in the report, such officer or director shall be guilty of perjury.*

AUTHORIZED BY (OFFICER, DIRECTOR OR INCORPORATOR)     DATE     TITLE
Lily Y. Arevalo

1600 E. St. Andrew Place     AssistantSecretary
2008-02-27

Santa Ana CA 92705 United States

# State of Delaware
# Annual Franchise Tax Report

| CORPORATION NAME | TAX YR. |
|---|---|
| INGRAM MICRO INC. | 2007 |

| FILE NUMBER | |
|---|---|
| 2607570 | |

| DIRECTORS | NAME | STREET/CITY/STATE/ZIP |
|---|---|---|

John R. Ingram
1600 E. St. Andrew Place
Santa Ana CA 92705 United States

Dale R. Laurance
1600 E. St. Andrew Place
Santa Ana CA 92705 United States

Gerhard Schulmeyer
1600 E. St. Andrew Place
Santa Ana CA 92705 United States

Orrin H. Ingram
1600 E. St. Andrew Place
Santa Ana CA 92705 United States

Michael T. Smith
1600 E. St. Andrew Place
Santa Ana CA 92705 United States

Gregory M.E. Spierkel
1600 E. St. Andrew Place
Santa Ana CA 92705 United States

Joe B. Wyatt
1600 E. St. Andrew Place
Santa Ana CA 92705 United States

# State of Delaware

# Annual Franchise Tax Report

| CORPORATION NAME | | | | TAX YR. |
|---|---|---|---|---|
| LG ELECTRONICS U.S.A., INC. | | | | 2007 |

| FILE NUMBER | INCORPORATION DATE | RENEWAL/REVOCATION DATE | | |
|---|---|---|---|---|
| 0858252 | 1978/08/07 | 1985/06/19 | | |

PRINCIPAL PLACE OF BUSINESS
920 Sylvan Avenue

PHONE NUMBER
201/408-9012

Englewood Cliffs NJ 07632 United States

REGISTERED AGENT
UNITED STATES CORPORATION COMPANY

AGENT NUMBER
9000013

2711 CENTERVILLE ROAD
SUITE 400

WILMINGTON          DE 19808

| AUTHORIZED STOCK | | DESIGNATION/ | NO. OF SHARES | PAR VALUE/ SHARE |
|---|---|---|---|---|
| BEGIN DATE | END DATE | STOCK CLASS | | |
| 2004/05/25 | | COMMON | 40,000 | |

| OFFICER | NAME | STREET/CITY/STATE/ZIP | TITLE |
|---|---|---|---|
| Jae Il Hwang | | | |
| 1000 Sylvan Avenue | | | President |
| Englewood Cliffs NJ 07632 United States | | | |

| DIRECTORS | NAME | STREET/CITY/STATE/ZIP |
|---|---|---|
| DH Lee | | |
| 920 Sylvan Avenue | | |
| Englewood Cliffs NJ 07632 United States | | |
| Myeong Kyu Ahn | | |
| 1000 Sylvan Avenue | | |
| Englewood Cliffs NJ 07632 United States | | |
| Jong Ho Park | | |
| 920 Sylvan Avenue | | |
| Englewood Cliffs NJ 07632 United States | | |
| Soon Seop Jung | | |
| 920 Sylvan Avenue | | |
| Englewood Cliffs NJ 07632 United States | | |

=============================================================
Total number of directors:4

NOTICE: Pursuant to 8 Del. C. 502(b), If any officer or director of a corporation required to make an annual franchise tax report to the Secretary of State shall knowingly make any false statement in the report, such officer or director shall be guilty of perjury.

| AUTHORIZED BY (OFFICER, DIRECTOR OR INCORPORATOR) | DATE | TITLE |
|---|---|---|
| DH LEE | | |
| 920 Sylvan Avenue | | DIRECTOR |
| | 2008-02-07 | |
| Englewood Cliffs NJ 07632 United States | | |

# State of Delaware
# Annual Franchise Tax Report

| CORPORATION NAME | | | | | | TAX YR. |
|---|---|---|---|---|---|---|
| MICRO ELECTRONICS, INC. | | | | | | 2007 |

| FILE NUMBER | INCORPORATION DATE | RENEWAL/REVOCATION DATE | | |
|---|---|---|---|---|
| 2165060 | 1988/06/27 | | | |

**PRINCIPAL PLACE OF BUSINESS**
4055 LEAP RD

**PHONE NUMBER** 614/850-3400

HILLIARD OH 43026 United States

**REGISTERED AGENT**
REGISTERED AGENTS, LTD.

**AGENT NUMBER** 9019982

1220 N. MARKET STREET
SUITE 804

WILMINGTON          DE 19801

| AUTHORIZED STOCK | | DESIGNATION/ | NO. OF SHARES | PAR VALUE/ SHARE |
|---|---|---|---|---|
| BEGIN DATE | END DATE | STOCK CLASS | | |
| 1993/05/18 | | COM VOTING | 600,000 | |
| | | COM NON-VO | 900,000 | |

| OFFICER | NAME | STREET/CITY/STATE/ZIP | TITLE |
|---|---|---|---|
| T. JAMES KOEHLER | | | |
| 4055 LEAP RD | | | CFO |
| HILLIARD OH 43026 United States | | | |

| DIRECTORS | NAME | STREET/CITY/STATE/ZIP |
|---|---|---|
| JOHN BAKER | | |
| 4055 LEAP RD | | |
| HILLIARD OH 43026 United States | | |

======================================================================
Total number of directors:1

*NOTICE: Pursuant to 8 Del. C. 502(b), If any officer or director of a corporation required to make an annual franchise tax report to the Secretary of State shall knowingly make any false statement in the report, such officer or director shall be guilty of perjury.*

| AUTHORIZED BY (OFFICER, DIRECTOR OR INCORPORATOR) | DATE | TITLE |
|---|---|---|
| T. JAMES KOEHLER | | |
| 4055 LEAP RD | | CFO |
| | 2008-01-25 | |
| HILLIARD OH 43026 United States | | |



**CSC**

Tax Hotline: 1-888-690-2468                          Fax: (302) 636-5454

CORPORATION SERVICES COMPANY™

MICROSOFT CORPORATION

MICROSOFT CORPORATION  LEGAL DEPARTMENT
ATTN: ~~NO. SHYLA MARTINEZ~~ Ms. Angela Walker
BLDG. 8
One Microsoft Way
Redmond, WA 98052 - 6399

MARCH    2008

CSC Company ID:    1827583

DE File Number:    2357303

FOREIGN ANNUAL REPORT AND PAYMENT DUE JUNE 30, 2008

Thank you for choosing Corporation Service Company as your
Registered Agent. Go to www.cscglobal.com/calendar to sign up
for Compliance Calendar, a convenient online monitoring service
to help keep your entities in good standing in all 51
jurisdictions, Canada, and key international jurisdictions.

Any questions, call our Tax Hotline at 1-888-690-2468.

YOUR TAX PAYMENT MUST BE RECEIVED (NOT POSTMARKED) ON OR BEFORE
JUNE 30, 2008 by the State of Delaware, Division of Corporations
PO Box 11728, Newark, NJ  07101-4728.

## Fold twice at the perforation before tearing !!

## Please use caution when detaching the perforated tax bill !!

## DETACH AT THE PERFORATION

000291

# FOREIGN ANNUAL REPORT
# STATE OF DELAWARE



DO NOT ALTER FILE NUMBER

| FILE NUMBER | CORPORATION NAME | | | | | YEAR | PHONE NUMBER |
|---|---|---|---|---|---|---|---|
| 2857583 | MICROSOFT CORPORATION | | | | | 2007 | (425) 882.8080 |

| QUALIFICATION DATE | RENEWAL DATE | INCORPORATION STATE | FEDERAL EMPLOYER ID. NO. | COUNTY OF REGISTERED AGENT | |
|---|---|---|---|---|---|
| 10/29/1995 | | WASHINGTON | 91-1144442 | NEW CASTLE | |

| ST LOC (CITY, ST AND NUM) OF THE PLACE OF BUSINESS OUTSIDE DELAWARE | | DESIG OR STK CLASS | NO. OF SHARES | PAR VALUE/SHARE | NO. SHARES ISSUED |
|---|---|---|---|---|---|
| One Microsoft Way | | Common | 24,000,000,000 | 0.00000625 | 9,306,999,746 |
| Redmond, WA 98052-6399 | | Preferred | 100,000,000 | 0.01 | |

| STATE THE AMOUNT OF CAPITAL INVESTED IN REAL ESTATE AND OTHER PROPERTY IN DELAWARE | PENALTY | PREV. CR OR BAL DUE | FILING FEE | TOTAL PAYMENT DUE |
|---|---|---|---|---|
| STATE THE TAX PAID THEREON | .00 | .00 | 60.00 | $    60.00 |

REGISTERED AGENT  9000014
CORPORATION SERVICE COMPANY
2711 CENTERVILLE ROAD
SUITE  400
WILMINGTON, DE 19808

## MAKE CHECK PAYABLE TO:
## DELAWARE SECRETARY OF STATE

| CHECK NO. | AMOUNT ENCLOSED |
|---|---|
| | |

APPOINTED DATE OF NEXT ANNUAL MEETING OF STOCKHOLDERS TO ELECT DIRECTORS    (MM/DD/YY) 11 / 19 / 2008

STATE EXEMPT FROM TAXATION FOR ANY CAUSE THE SPECIFIC FACTS ENTITLING SUCH CORPORATION TO EXEMPTION

| DIRECTORS | NAME | STREET/CITY/STATE/ZIP | DATE TERM EXPIRES |
|---|---|---|---|
| William H. Gates | | One Microsoft Way, Redmond, WA 98052-6399 | 11-19-08 |
| David F. Marquardt | | One Microsoft Way, Redmond, WA 98052-6399 | 11-19-08 |
| Jon A. Shirley | | One Microsoft Way, Redmond, WA 98052-6399 | 11-19-08 |
| Steven A. Ballmer | | One Microsoft Way, Redmond, WA 98052-6399 | 11-19-08 |

| OFFICERS | NAME | STREET/CITY/STATE/ZIP | DATE TERM EXPIRES |
|---|---|---|---|
| a) PRESIDENT  CEO | Steven A. Ballmer | One Microsoft Way, Redmond WA 98052-6399 | 11-19-08 |
| b) VICE-PRESIDENT | J. Allard | One Microsoft Way Redmond WA 98052-6399 | 11-19-08 |
| c) SECRETARY | Bradford L. Smith | One Microsoft Way Redmond WA 98052-6399 | 11-19-08 |

DO NOT WRITE IN THIS SPACE - FOR BANK USE ONLY

| d) TREASURER | George Zinn | One Microsoft Way Redmond WA 98052-6399 |
|---|---|---|
| e) OTHER OFFICERS | Asst. Secretary | One Microsoft Way Redmond WA 98052-6399 |

ORIGINAL SIGNATURE (OFFICER, DIRECTOR OR INCORPORATOR)    TITLE    DATE

X

# State of Delaware

# Annual Franchise Tax Report

| CORPORATION NAME | | TAX YR. |
|---|---|---|
| SONY ELECTRONICS INC. | | 2007 |

| FILE NUMBER | INCORPORATION DATE | RENEWAL/REVOCATION DATE |
|---|---|---|
| 2156016 | 1988/03/25 | |

| PRINCIPAL PLACE OF BUSINESS | PHONE NUMBER |
|---|---|
| 1 Sony Drive | 212/833-4580 |
| Park Ridge NJ 07656 United States | |

| REGISTERED AGENT | AGENT NUMBER |
|---|---|
| CORPORATION SERVICE COMPANY | 9000014 |
| 2711 CENTERVILLE ROAD SUITE 400 | |
| WILMINGTON          DE 19808 | |

| AUTHORIZED STOCK | | DESIGNATION/ | NO. OF SHARES | PAR VALUE/ SHARE |
|---|---|---|---|---|
| BEGIN DATE | END DATE | STOCK CLASS | | |
| 1988/03/25 | | COMMON | 1,000 | 1.000000 |

| OFFICER | NAME | STREET/CITY/STATE/ZIP | TITLE |
|---|---|---|---|
| Karen L. Halby | | | Sr. VP & Asst. Secy. |
| 1 Sony Drive | | | |
| Park Ridge NJ 07656 United States | | | |

| DIRECTORS | NAME | STREET/CITY/STATE/ZIP |
|---|---|---|
| Hideki Komiyama 1 Sony Drive Park Ridge NJ 07656 United States | | |
| Ryoji Chubachi 1 Sony Drive Park Ridge NJ 07656 United States | | |
| Stanford L. Glasgow 1 Sony Drive Park Ridge NJ 07656 United States | | |
| Nobuyuki Oneda 1 Sony Drive Park Ridge NJ 07656 United States | | |

Total number of directors:5

*NOTICE: Pursuant to 8 Del. C. 502(b), If any officer or director of a corporation required to make an annual franchise tax report to the Secretary of State shall knowingly make any false statement in the report, such officer or director shall be guilty of perjury.*

| AUTHORIZED BY (OFFICER, DIRECTOR OR INCORPORATOR) | DATE | TITLE |
|---|---|---|
| Timothy Boehm | | Sr. VP & Asst. Secy. |
| 1 Sony Drive | 2008-02-12 | |
| Park Ridge NJ 07656 United States | | |

# State of Delaware
# Annual Franchise Tax Report

| CORPORATION NAME | TAX YR. |
|---|---|
| SONY ELECTRONICS INC. | 2007 |

FILE NUMBER
2156016

| DIRECTORS | NAME | STREET/CITY/STATE/ZIP |
|---|---|---|
| Howard Stringer | | |
| 1 Sony Drive | | |
| Park Ridge NJ 07656 United States | | |

001613
SOSCTF

# FOREIGN ANNUAL REPORT
## STATE OF DELAWARE

DO NOT ALTER FILE NUMBER

| FILE NUMBER 1003314 | CORPORATION NAME  INTERNATIONAL BUSINESS MACHINES CORPORATION | | YEAR 2007 | PHONE NUMBER |
|---|---|---|---|---|
| QUALIFICATION DATE  9/21/1937 | RENEWAL DATE | INCORPORATION STATE  NEW YORK | FEDERAL EMPLOYER ID. NO.  130871985 | COUNTY OF REGISTERED AGENT  NEW CASTLE |

| ST LOC (CTY, ST AND NUM) OF THE PLACE OF BUSINESS OUTSIDE DELAWARE  Throughout U.S. and its possessions | DES OR STK CLASS  Common | NO. OF SHARES  4,687,500,000 | PAR VALUE/SHARE  $0.20 | NO. SHARES ISSUED  2,057,607,421 |
|---|---|---|---|---|

| STATE THE AMOUNT OF CAPITAL INVESTED IN REAL ESTATE AND OTHER PROPERTY IN DELAWARE  10,066,046 | PENALTY  .00 | PREV. CR OR BAL DUE  .00 | FILING FEE  60.00 | TOTAL PAYMENT DUE  $        60.00 |
|---|---|---|---|---|
| STATE THE TAX PAID THEREON  Pers. Prop. not subject to tax | | | | |

REGISTERED AGENT  9000010
THE CORPORATION TRUST COMPANY
CORPORATION TRUST CENTER
1209 ORANGE STREET
WILMINGTON, DE 19801

**MAKE CHECK PAYABLE TO:**
**DELAWARE SECRETARY OF STATE**

| CHECK NO. | AMOUNT ENCLOSED  $60.00 |
|---|---|

MUST be RECEIVED (not postmarked) by Delaware
Franchise Tax ON OR BEFORE  JUN 30, 2008

3    063008    1003314    000006000 0    4



APPOINTED DATE OF NEXT ANNUAL MEETING OF STOCKHOLDERS TO ELECT DIRECTORS          (MM/DD/YY)

STATE EXEMPT FROM TAXATION FOR ANY CAUSE THE SPECIFIC FACTS ENTITLING SUCH CORPORATION TO EXEMPTION

| II. DIRECTORS | NAME | STREET/CITY/STATE/ZIP | DATE TERM EXPIRES |
|---|---|---|---|
| See Attached Listing of Directors | | | |

| II. OFFICERS | NAME | STREET/CITY/STATE/ZIP | DATE TERM EXPIRES |
|---|---|---|---|
| a) PRESIDENT | See Attached Listing of Officers | | |
| b) VICE-PRESIDENT | | | |
| c) SECRETARY | | | |

DO NOT WRITE IN THIS SPACE - FOR BANK USE ONLY

d) TREASURER

e) OTHER OFFICERS

III. ORIGINAL SIGNATURE (OFFICER, DIRECTOR OR INCORPORATOR)   M.D. Fleischer   TITLE   Director of Tax   DATE

x _____   POA by Signature   6/3/2008



Weekly Ad    Store Locator    Outlet Center    Gift Center    Small Business Cent

Gift Cards    Credit Cards    Reward Zone®    Customer Service    Wish List    Order Status    My Acco

0 Items

SEARCH FOR  Keyword or Item #          IN  All Categories           GO          Welcome. Please create ar

LOOK FOR THE LOGOS: Be sure to look for the GEEK Squad, Magnolia Home Th
for Business logos. These logos will display when these services are available at your chos

**STORE LOCATOR**

# Find a Best Buy Store

We have found several Best Buy stores near **DE**. Please see the store listings in the search results below.

## Modify Your Search



Most stores have extended hours Friday and Saturday. Call your local store for more details.

**ENTER \*Required fields**

**\*ZIP Code**

**SELECT STORE SERVICES:**
Refine your search by selecting these additional services:

☐ Mobile electronic installation
☐ Large appliances on display
☐ Professional appliance installation

**AND/OR**
Street Address

**City**

**\*State**
Select a State...          **FIND STORE**

## Preferred Stores

**Find stores easier with Preferred Stores**
By adding up to 3 Preferred Stores to Your Account, you'll save yourself time and avoid shipping and handling when you can pick up in-store. If you already have Preferred Stores, view them by signing in. If you do not have an account, it takes only a few moments to create one.

**What are Preferred Stores?**
Preferred Stores are a great way to quickly check in-store merchandise availability. Plus, you eliminate all shipping and handling costs when you can pick up your purchase at one of our stores. During checkout, you can easily make your final store choices for pickup or delivery.

## Search Results

See Map of All Listed Stores

WEEKLY AD

**Dover DE (Store 842)**
1165 N Dupont Hwy
Dover, DE  19901-2008
**Phone:** 302-677-0200
**Hours:** Mon-Sat 10:00am-9:00pm
Sun 11:00am-7:00pm

This store also features:
- Mobile electronics installation
- Professional appliances installation

Map & Directions | Add to Preferred Stores

**Also available at this store**

  

WEEKLY AD

**Vineland NJ (Store 692)**
3809 S Delsea Dr
Vineland, NJ  08360
**Phone:** 856-765-1880
**Hours:** Mon-Sat 10:00am-9:00pm
Sun 11:00am-7:00pm

This store also features:
- Mobile electronics installation
- Large appliances on display
- Professional appliance installation

Map & Directions | Add to Preferred Stores

**Also available at this store**

Featuring Microsoft MapPoint Technology. Review Terms of Use and Privacy Statement.



**Salisbury MD (Store 772)**
109 E North Pointe Dr
Salisbury, MD 21804
Phone: 410-334-6771
Hours: Mon-Sat 10:00am-9:00pm
Sun 11:00am-7:00pm

This store also features:
- Mobile electronics Installation
- Professional appliances Installation

Map & Directions | Add to Preferred Stores

Also available at this store



**Christiana DE (Store 1480)**
1551 Churchmans Rd
Newark, DE 19713-2149
Phone: 302-369-7015
Hours: Mon-Sat 10:00am-9:00pm
Sun 11:00am-7:00pm

This store also features:
- Mobile electronics Installation
- Large appliances on display
- Professional appliances Installation

Map & Directions | Add to Preferred Stores

Also available at this store

 





**Gift Cards**
• Buy a Gift Card
• Check your balance



**Credit Cards**
• Learn more
• Apply now
• Make a payment



**Reward Zone Pro**
• Le
• Ch

**Your Order**
Order Status
Shipping & Delivery
Store Pickup
Find a Rebate
Returns

**Product Support**
Installation & Repairs
Warranties & Performance Plans
Order Parts
Product Recalls
Trade-in Center
Tech Support – by Fixya

**Safe & Secure Shopping**
Conditions of Use
Legal Policies
Privacy Policy
California Privacy Rights
Price Guarantee

**More Best Buy**
Select a Site

RSS - (V

About Best Buy  |  News Center  |  Careers  |  For Our Investors  |  Responsibi  Community Relations  |  Affiliate Program  |  Site

**Need help? We're available 24/7 at 1-888-BEST BUY (1-888-237-8289)**
Online prices and selection generally match our retail stores, but may vary. Prices and offers are su  t to change. © 2003-2008 Best Buy. All rights reserved. Best Buy, BestBuy.com and the tag design are trademarks of Be  Buy. For personal, noncommercial use only.

We'll call you now   

# EXHIBIT 9

IMAGED

APR 0 5 2006

# FILED
San Francisco County Superior Court

APR 0 5 2006

GORDON PARK-LI, Clerk

BY: _Althea Dixion_ 391
Deputy Clerk

SUPERIOR COURT OF THE STATE OF CALIFORNIA

COUNTY OF SAN FRANCISCO

DEPARTMENT 304

| | |
|---|---|
| COORDINATION PROCEEDING | ) J.C.C.P. Nos. 4250, 4258, 4259 & 4262 |
| SPECIAL TITLE (Rule 1550(b)) | ) |
| | ) |
| SMOKELESS TOBACCO CASES I – IV | ) DECISION ON PHASE I TRIAL |
| | ) RE: COLLATERAL ESTOPPEL |
| | ) |
| | ) The Honorable Richard A. Kramer |
| | ) |

## INTRODUCTION

Pursuant to Stipulation, the issue of whether certain findings made by a jury in previous federal antitrust litigation known as *Conwood Co., L.P. et al. v. United States Tobacco Co., et al.,* No. 5:98-CV-108-R (W.D. Ky.) ("*Conwood*") are entitled to collateral estoppel against defendants was bifurcated for trial as Phase I of this case.

Defendant U.S. Smokeless Tobacco Company, formerly known as United States Tobacco Company ("U.S. Tobacco"), manufactures various brands of moist snuff tobacco products. The other defendants in this case are entities related to U.S. Tobacco. All defendants in this case except for U.S. Smokeless Tobacco Manufacturing Company, Inc. ("USSTMLP") and U.S. Smokeless

-1-
*Phase I Decision, Smokeless Tobacco Cases I –IV*

findings above:

-2-
*Phase I Decision, Smokeless Tobacco Cases I –IV*

*Company v. United States Tobacco Company* (6th Cir. 2002) 290 F.3d 768 (Exhibit 2).

The third element is a bit more problematic. Plaintiffs seek collateral estoppel against all defendants in this case. All defendants except USSTMLP and USSTBI were parties in the *Conwood* action. The instructions given to the *Conwood* jury, however, identified only "United States

-3-
*Phase I Decision, Smokeless Tobacco Cases I –IV*

1    Tobacco Company" as the party against which plaintiff sought damages. (Exhibit 8, Instruction No.

2    1), and the Verdict Form recites that "U.S. Tobacco" did the acts and had the intentions that were

3    found to be established by a preponderance of the evidence. There is no specification in the jury

4    form as to whether "U.S. Tobacco" was meant to include the other related entities in that case. It

5    does appear from the jury instruction, however, that "U.S. Tobacco" in the verdict form was meant to

6    refer to United States Tobacco Company, named as a defendant in *Conwood* and apparently the same

7    entity as defendant U.S. Smokeless Tobacco Company in this case (see, Master Consolidated

8    Coordinated Class Action Complaint filed herein on March 26, 2003, par. 6).

9        Further confounding the question as to what entities were parties against which the verdict

10    was directed is the fact that the judgment entered pursuant to the jury verdict (Exhibit 10) recites that

11    it is in favor of the plaintiffs but does not state which defendants are covered. Also, it appears that

12    all of the defendants made various motions for a new trial or to modify the jury verdict, which

13    motions were denied in an order that combines all of the U.S. Tobacco related entity defendants as

14    "UST" and uses that collective term to refer to the perpetrator of the wrongful acts (Exhibit 11). The

15    permanent injunction that was issued pursuant to the jury verdict enjoined all of the U.S. Tobacco

16    related defendants from further committing certain anti-competitive acts (Exhibit 14).

17        From this evidence, it appears that defendant U.S. Tobacco was a party in *Conwood* against

18    which the jury verdict was directed and that this identity of party satisfies the third element of the

19    collateral estoppel test. It does not appear that any of the other defendants in the *Conwood* case were

20    parties against which the jury findings were made, but somehow all were enjoined from perpetrating

21    anti-competitive acts. No evidence submitted by the parties appears to clarify this apparent

22    discrepancy. Be that as it may, it is the jury verdict and not the permanent injunction that the

23    plaintiffs seek to be given a collateral estoppel effect here.

24        Even though the other U.S. Tobacco related defendants here do not appear to have been

1   parties against which the jury verdict in *Conwood* was directed, it is possible for them to be bound by

2   collateral estoppel.  This result would require that such parties had an identity or community of

3   interest with, and adequate representation by, the losing party in the first action, and the

4   circumstances must have been such that the party to be estopped should reasonably have been

5   expected to be bound by the prior adjudication.  *Garcia v. Rehrig International, Inc.* (2002) 99

6   Cal.App.4[th] 869, 877.  This issue was not adequately identified, briefed or argued during Phase I

7   trial. At the case management conference held herein on March 24, 2006 after the Tentative Decision

8   on Phase I was issued, the parties advised the court that they would be presenting a stipulation to the

9   effect that all defendants would be bound by this Phase I Decision to the same degree as U.S.

10  Smokeless Tobacco Company, formerly known as Untied States Tobacco Company (referred to in

11  the *Conwood* verdict and here as "U.S. Tobacco").  Therefore collateral estoppel will be applied to

12  defendant U.S. Tobacco as set forth below and to the other defendants in this case in accordance with

13  the parties' stipulation.

14          The next issue is whether the first element for collateral estoppel is satisfied here.  That is,

15  whether the issues decided in *Conwood* are identical to those presented in this case.  In *Conwood,* the

16  injured plaintiffs were corporate competitors of U.S. Tobacco in the moist snuff business; the

17  antitrust allegations against U.S. Tobacco were made under the federal Sherman Antitrust Act (15

18  U.S.C. § 1 *et seq.*); the evidence presented of U.S. Tobacco's actions concerned a period of time

19  ending no later than April 22, 1998 (the date the *Conwood* complaint was filed); and the market that

20  U.S. Tobacco was found to have monopolized encompassed the entire United States.

21          In this case, the allegedly injured plaintiffs are individual consumers (that is, "indirect

22  purchasers") of moist snuff products.  The antitrust allegations against the defendants are made under

23  California common law and California's Cartwright Act (Cal. Bus. & Prof. Code § 16720 *et seq.*).

24

1  The alleged Class Period is from "January 1, 1990 through the present",[1] and the relevant market

2  includes only the State of California.

3      Despite those distinctions, however, *Conwood* and this case appear to share an identity of

4  some issues regarding U.S. Tobacco's asserted market dominance and activities and effects related

5  thereto.  More specifically, the market behavior found to have existed in *Conwood* might logically

6  tend to prove or disprove factual and legal issues involved in this case.  Whether or not this turns out

7  to be the case remains to be seen, but for now it appears that there is a sufficient nexus between the

8  *Conwood* findings and the issues here so that the identity of issues element for collateral estoppel is

9  satisfied.

10 2.  What did the *Conwood* jury find?

11     There is a problem with determining what the *Conwood* findings mean.  Each finding will be

12 discussed separately.

13     Finding number 1 is that "the relevant market consists only of all moist snuff brands sold in

14 the United States."  This finding is used as a definition in three other findings and thus its

15 significance is that it affects the import of those other findings.  Finding 1 is straightforward and can

16 only mean that the market that was relevant in *Conwood* was that of all moist snuff brands sold in

17 the United States.

18

19

20

21

22

23

24     [1]  Defendants allege that the earliest complaint filed in this coordinated action (*Hart, et al. V. United States Tobacco Company,* L.A. County Superior Court No. BC275460) was filed on June 10, 2002, and that a four-year statute of limitations bars all claims arising prior to June 9, 1998.

1    Finding number 2 is that U.S. Tobacco *possesses* monopoly power over the market for all

2  moist snuff brands sold in the United States.  The use of the present tense ("possesses") means that at

3  the time of the finding, such was the situation.  Since the finding was obviously based upon facts

4  presented at trial, it is axiomatic that the monopoly power existed for some period before the date of

5  the verdict.  The *Conwood* jury, however, was not asked to specify when such market power was

6  achieved or how long it existed.  Thus, all that can be gleaned from this finding is that at the time of

7  the verdict and for some indeterminate period before that, U.S. Tobacco had the specified monopoly

8  power.  There is no finding as to how long this had been the case.

9    Finding number 3 is that U.S. Tobacco maintained its monopoly power through restrictive or

10  exclusionary conduct.  The verdict does not say when this conduct took place, against whom it was

11  directed, or specifically what this conduct was.  It only finds that such conduct occurred.

12    Finding number 4 is that U.S. Tobacco had a specific intent to monopolize the relevant

13  market.  When and for how long such intent existed is not specified.

14    Finding number 5 is the same as finding number 3.

15    Finding number 6 is that there was a dangerous probability that U.S. Tobacco would achieve

16  its goal of acquiring monopoly power in the market for all moist snuff brands sold in the United

17  States.  The finding does not specify when or for how long such dangerous probability existed.  This

18  finding as a factual matter is somewhat inconsistent with the proposed Finding number 2, which is

19  that U.S. Tobacco did achieve its goal of monopoly power.  This apparent inconsistency is resolved

20  in the context of *Conwood* because that case asserted a claim for actual monopolization and a

21  separate claim for attempted monopolization.  The "dangerous probability" finding was made as an

22  element of the claim for attempted monopolization (Exhibit 8, Instruction 3.3).  It does not appear to

23  be relevant to any of the issues raised in this case.  Because this finding is so imprecise and also does

24  not appear to relate to any issue involved in the claims in this case, it is not appropriate to give it

1  collateral estoppel effect here.

2      Finding number 7 is that U.S. Tobacco's restrictive or exclusionary conduct caused Conwood

3  Company injury. The nature or extent of such injury was not specified in the finding.

4  3.. The three additional facts.

5      As is set forth above, the plaintiffs assert that three additional facts were necessarily decided

6  by the jury in *Conwood.* These are that U.S. Tobacco caused harm to competition in the relevant

7  market, that United States consumers were harmed thereby, and that therefore California consumers

8  were harmed as well.

9      Plaintiffs bear the burden of establishing that these additional facts were actually litigated and

10 decided by the jury in *Conwood.* "If anything is left to conjecture as to what was necessarily

11 involved and decided, there can be no collateral estoppel. *Dunkin v. Boskey* (2000) 82 Cal.App.4[th]

12 171. 181-82.

13     The parties have submitted transcripts of expert witness' testimony and other evidence

14 presented in *Conwood* from which the plaintiffs argue that the jury must have determined the three

15 additional facts in order to reach their verdict, and the defendants argue that such conclusions do not

16 necessarily follow from the evidence presented. This court has reviewed the evidence of what was

17 presented to the *Conwood* jury and does not believe that it is sufficient to establish that plaintiffs

18 have met their burden of proof that the jury must have reached conclusions relative to the existence

19 of harm to competition in the relevant market, harm to United States consumers, or harm to

20 California consumers.

21     The jury instructions in *Conwood,* however, do shed light on what the jury must have found

22 and what it might not have found. As to plaintiffs' additional fact that U.S. Tobacco cause harm to

23 competition in the relevant market, the court instructed the jury "The antitrust laws were for the

24 protection of competition, not competitors. Therefore, Conwood must prove that U.S. Tobacco's

1    acts injured not only Conwood itself, but injured competition in the relevant markets" (Exhibit 8,

2    Instruction 1).  By finding that antitrust violations occurred, the jury must have concluded that U.S.

3    Tobacco cause harm to competition in the relevant market.

4         As for plaintiffs' argument that the jury must have found that United States consumers and

5    California consumers were harmed by U.S. Tobacco's anticompetitive behavior, the jury was

6    instructed "[t]o establish the possession of monopoly power, Conwood need not prove that prices

7    were raised or that competition actually was excluded, but only that U.S. Tobacco had the power to

8    raise prices or exclude competition" (Exhibit 8, Instruction 2.1).  No other instruction requiring a

9    finding of raised prices or other harm to consumers was given.  Accordingly, the idea that the jury

10   necessarily found harm to United States and California consumers is pure speculation, and cannot be

11   a basis for collateral estoppel.

CONCLUSION

13        Upon the foregoing, the following facts decided by the jury in *Conwood* are given collateral

14   estoppel effect against defendant U.S. Tobacco and, in accordance with the stipulation refered to

15   above, the other defendants in this case:

16        1.   The relevant market in *Conwood* consisted only of all moist snuff brands sold in

17             the United States.

18        2.   As of March 28, 2000 and for some indeterminate period before that, U.S.

19             Tobacco possessed monopoly power over the market for all moist snuff brands

20             sold in the United States.

21        3.   U.S. Tobacco willfully maintained its monopoly power through restrictive or

22             exclusionary conduct.  The nature, target or time of such conduct is not

23             established for this case.

24        4.   At some time not determined, U.S. Tobacco had a specific intent to monopolize

-9-

the market for all moist snuff brands sold in the United States.

5. U.S. Tobacco's restrictive or exclusionary conduct caused the *Conwood* plaintiffs' injury. The nature or extent of such injury is not established.

6. U.S. Tobacco caused harm to competition in the market for all moist snuff brands sold in the United States.

This court has not determined that any of these findings are relevant to any particular issue in this case, only that at this point it appears that one or more of them could be. Therefore, the relevance of these facts to the issues in this case, if any, remains to be determined.

The remainder of the findings have no collateral estoppel effect against the defendants.

Dated: April 3, 2006

RICHARD A. KRAMER
Judge of the Superior Court

**Superior Court of California**
County of San Francisco

| | |
|---|---|
| Coordination Proceeding<br>Special Title (Rule 1550(b))<br><br>SMOKELESS TOBACCO CASES I,<br>II, III, IV | Judicial Council Coordination<br>Proceeding JCC 4250, 4258, 4259,<br>4262<br><br>**Certificate of Mailing**<br>(CCP 1013a (4) ) |

I, Felicia Green, a Deputy Clerk of the Superior Court of the City and County of San Francisco, certify that I am not a party to the within action.

On April 5, 2006, I served the attached DECISION ON PHASE I TRIAL RE: COLLATERAL ESTOPPEL by placing a copy thereof in a sealed envelope, addressed as follows:

Daniel Mogin
MOGIN LAW FIRM PC
110 Juniper Street
San Diego, CA 92101-1502

Frederick P. Furth
Michael P. Lahmann
THE FURTH FIRM, LLP
225 Bush Street, 15th Floor
San Francisco, CA 94104

Charles H. Samel
LATHAM & WATKINS, LLP
633 West Fifth Street, Suite 4000
Los Angeles, CA 90071

Michael J. Guzman
KELLOG, HUBER, HANSEN, TODD,
EVANS & FIGEL, P.L.L.C.
Summer Square
1615 M Street, N.W.
Suite 400
Washington, D.C. 20036

Guido Saveri
R. Alexander Saveri
Cadio Zirpoli
SAVERI & SAVERI, INC.
111 Pine Street, Suite 1700
San Francisco, CA 94111

Craig Corbitt
ZELLE, HOFFMANN, VOELBEL, MASON
& GETTE
44 Montgomery St., Suite 3400
San Francisco, CA 94104

Anthony Shapiro
Craig Spiegel
HAGENS BERMAN, LLP
700 South Flower St., Suite 2940
Los Angeles, CA 90017

Terry Gross, Esq.
GROSS & BELSKY, LLP
180 Montgomery Street, Suite 2200
San Francisco, CA 94104

Bruce L. Simon
COTCHETT PITRE SIMON & McCARTHY, LLP
840 Malcolm Road, Suite 200
Burlingame, CA 94010

and, I then placed the sealed envelopes in the outgoing mail at 400 McAllister Street, San Francisco,

CA. 94102 on the date indicated above for collection, attachment of required prepaid postage, and

mailing on that date following standard court practices.

April 5, 2006

GORDON PARK LI, Clerk

By: _Felicia Green_____

Felicia Green, Deputy Clerk

# EXHIBIT 10

| | |
|---|---|
| **From:** | David L. Finger [dfinger@delawgroup.com] |
| **Sent:** | Monday, July 07, 2008 10:01 AM |
| **To:** | Athey, J. Clayton; Horwitz, Richard L.; wdrane@potteranderson.com; dgattuso@proctorheyman.com; jgoddess@rmgglaw.com; Rob Goldberg; pcollins@morrisjames.com; thanson@morrisjames.com; rjones@ashby-geddes.com; Adam Balick; cottrell@rlf.com; Fineman, Steven; shandler@rlf.com; mkelly@mccarter.com; bankserve@bayardlaw.com; david.primack@dbr.com; seaman@abramslaster.com |

**Subject:** AMD v. Intel

Dear Counsel:

I have been retained by The New York Times Company, Situation Publishing Ltd., Dow Jones & Co., Inc., The Washington Post, The Reporters Committee for Freedom of the Press, and the Computer & Communications Industry Association, for the purpose of gaining access to documents filed in the above-referenced litigation.

My clients take the position that the amount of sealing in this litigation has been excessive, and I am contacting you in advance of (and hopefully instead of) filing a motion with the Court to see if we can resolve this issue without the need for litigation. Specifically, my clients are interested in the parties' preliminary case statements/pretrial memoranda (Docket Items 625, 627, 628, 629, 634, 635, 645, 646, 648) and certain hearing transcripts (Docket Items 633, 647 and 683).

Therefore, I ask whether you are willing to review these docket items and advise whether you are willing to provide further disclosure, limiting sealing to only that which is truly entitled to sealing (such as valid current trade secrets and confidential commercial information, and excluding stale information).

Please advise by this Friday, July 11, 2008, whether you are amenable to further disclosure as requested. If you are not so willing, or you elect not to respond, my clients have instructed me to file a motion to intervene and to unseal on Monday, July 14.

Thank you for your kind attention to this matter.

David L. Finger
Finger & Slanina, LLC
One Commerce Center
1201 Orange Street, Suite 725
Wilmington, DE 19801-1155
(302) 884-6766
dfinger@delawgroup.com
www.delawgroup.com