

Frederick L. Cottrell, III
302-651-7509
cottrell@rlf.com

July 24, 2008

**BY ELECTRONIC MAIL**
**AND HAND DELIVERY**

The Honorable Vincent J. Poppiti      **REDACTED**
Blank Rome LLP                         **PUBLIC VERSION**
Chase Manhattan Centre, Suite 800
1201 Market Street
Wilmington, DE 19801-4226

    Re:    *Advanced Micro Devices, Inc., et al. v. Intel Corporation, et al.*, C.A. No. 05-441-JJF; *In re Intel Corporation*, C.A. No. 05-MD-1717-JJF; and *Phil Paul, et al. v. Intel Corporation*, C.A. 05-484-JJF; DM 15

Dear Judge Poppiti:

    Intel's response to AMD's motion to quash perpetuates the tale that Intel never agreed to narrow its broad discovery into AMD preservation, which Intel now characterizes as "routine." (Intel Opp. at 7.) AMD and the Court are left to wonder then what Intel meant when it agreed to "narrow, or even eliminate" its "greatly reduced . . . original requests" to reach "what we view, as an appropriate exchange of information." (Herron Decl., Exh. J.) Intel doesn't explain, except to say it did not waive discovery rights. After procuring AMD's disclosures, Intel simply pretends that it was appropriate to serve even broader discovery that neither accounts for AMD's prior productions nor narrows inquiry one whit. Taking without giving, particularly after suggesting an agreement to reciprocate, is not a hallmark of fair play.

    Beyond waiver, the Court must decide whether broad, unbounded discovery is appropriate under Rule 30(b)(6) of a party that has faithfully fulfilled its preservation obligations. AMD surely has. Intel succeeds in raising just one issue with respect to AMD's custodians, **REDACTED** which were captured by a safety net put in place by AMD's IT manager. But in this and its other attempts to stoke a discovery backfire, Intel is unable to advance a single significant *custodian* retention concern that we can't explain and dispel. And despite its best efforts, Intel has been unable to identify any *systemic* flaw in AMD's preservation program.

    No one contends that preservation discovery is off limits. But neither is it unbounded. The path through this discovery thicket requires first deciding an issue the parties dispute: What constitutes "routine" preservation discovery that is required in the ordinary course. It cannot be,

as Intel contends, so unduly broad, burdensome or irrelevant that it serves as a Court-sanctioned tactical bludgeon. Instead, in the absence of evidence of preservation breakdown, a party is obliged to produce information that describes its preservation program in detail sufficient for the opposing party to assess it. AMD's numerous productions about its preservation system satisfy this duty -- and go well beyond it. Intel does not honestly contend otherwise.

Intel can thus justify additional discovery only if it meets its burden of producing competent evidence of AMD preservation breakdown, and tethers its discovery to those issues. Intel has done neither. We will dispense below with Intel's argument that preservation miscues of a few AMD custodians justify a full-range discovery fusillade. But Intel had another trick up its sleeve that it has carefully hidden -- until now.

With its Opposition, Intel submits the surprise analysis of a previously-undisclosed expert, John Ashley, whose self-described "preliminary" opinions about unsubstantiated AMD preservation calamity obviously have been formulated after many months of mucking about in the metadata. His smear of AMD's preservation program is baseless. And his credibility is impugned by assertions of "systemic" failure based on analysis that ignores facts Intel already knows -- or easily could have learned had Intel accepted AMD's invitations to identify its concerns and allow AMD to respond.

Regrettably, Intel chose to sandbag AMD with the Ashley issues and data requests that it did not raise before and are not specified at all or with any precision in its discovery. But Intel has finally and comprehensively defined the "irregularities" it contends exist, and thus defined the outer limit of data it wants. That is not coextensive with Intel's overbroad discovery, and Intel does not need everything on Mr. Ashley's wish list. The Court should so hold.[1]

**Overview of AMD's Preservation System**: AMD launched its preservation efforts more than three months before it filed suit when the Japan Fair Trade Commission announced its March 2005 decision that Intel had violated Japan's anti-monopoly laws. (Fowler Decl. ¶¶ 3-17, Exh. A.) AMD first retained the oldest full backup of Exchange or file servers utilized by employees involved in AMD's x86 business and, a week later, took a snapshot of those servers. (*Id.*, Exh. C.) AMD also suspended its backup tape recycling procedures and, since March 19, 2005, has retained 30-day backups of these servers. (*Id.*) On April 1, 2005, AMD issued its first round of litigation hold notices to employees, and continued to issue notices as relevant employees were identified. (*Id.*, Exhs. D and E.) On November 2, 2005, AMD implemented and began migrating custodian email accounts to a Symantec Vault (which stores email and "sweeps" custodian mailboxes every 30 days) and an Exchange Journal (which retains all sent and received emails). (*Id.*, Exh. G.) Starting in October 2006, AMD began a broad, forensically-sound data collection effort. (*Id.*, Exhs. I and J.) AMD obtained forensic, bit-by-bit images of custodian hard drives -- both before and after Vault and Journal implementation -- and collected and produced email and other electronic documents maintained in its Journal, Vault, custodians' personal network space, and on external storage media. (*Id.*, Exh. I) AMD produced all this preservation information, and more, to Intel. (*See, e.g., id.*, Exh. B.)

---

[1] This brief is AMD's reply on its Motion to Quash and opposition to Intel's Motion to Compel. It exceeds by one-half page the 6 pages allotted. AMD requests that the Court permit this page limit extension. Intel does not oppose.

RLF1-3305633-1

**Intel Is Using AMD's Disclosures As A Pretext To Justify Unnecessary Discovery:**
Intel has set a hutch of preservation rabbits loose in the field on the hope that one will find its way into the carrot patch of unrestrained discovery. None go anywhere:

<u>Mr. Oji's Loss</u>:  AMD advised Intel about this issue promptly (*see* Herron Decl. ¶ 17), produced data far more detailed than any Intel disclosure (*id.*, Exh. O), and twice offered Mr. Oji for deposition. Intel has Mr. Oji's production, and has raised no deficiency. AMD willingly remediated Mr. Oji's loss, and is prepared to do so as necessary for other custodians. Doing so -- or having to do so -- for select custodians does not mean that AMD's preservation system failed. Instead, Mr. Oji's remediation shows that it works. Without waiving work product or the attorney-client privilege, AMD is willing to produce a spreadsheet detailing Mr. Oji's total and unique pre-review message counts and data volumes obtained from each remedial data source, and to answer Intel's questions about it. This will dispel any lingering concerns Intel may have.

<u>Messrs. Kepler and Soares</u>:  Mr. Kepler set an Outlook auto-delete rule on "sent items" contrary to AMD's preservation hold instructions, but neutralized any effect by copying himself on relevant email. Mr. Kepler's document production will be robust. Mr. Ashley's speculation that this is "suggestive of a broader systemic retention failure" (Ashley Decl. ¶ 27) ignores AMD's disclosure that Mr. Kepler is the only known individual out of the 164 designated custodians who applied such a rule. (Fowler Decl. ¶ 28.) Likewise, AMD sent Mr. Soares a preservation notice on February 21, 2006, and migrated his account to the Journal on March 30, 2006. Thereafter, his laptop was stolen and a hard drive failed. While unfortunate, the loss, if any, should be limited to loose files he maintained only on his hard drives. (*Id. ¶* 29.)

<u>AMD's Journaling System</u>:  In a pot-kettle-black assertion that is charitably described as duplicitous, Intel claims that AMD was delinquent in migrating its custodians' email accounts to its Vault and Journal. (Intel Opp. at 4-5.) While it is Intel that thrusts AMD's preservation system into issue, AMD does not shy from comparison:

- By November 2005, AMD had migrated 65% of all designated custodians' email accounts to its Vault and Journal; by March 2006, that number was 76%, increasing to 85% by August 2006. (Fowler Decl., Exh. G.) *How about Intel?* Its percentage was exactly *zero* on all these dates. Other than some custodians migrated to Intel's archive in late 2006 and after, it remained at *zero* until March 2007 -- *21 months* after the lawsuit began and over *16 months* after AMD implemented these tools. (*Id.*, Exh. H.)

- *Before* AMD implemented the Vault and Journal, AMD had a thorough backup tape regimen in place. *How about Intel?* In November 2005, it migrated several hundred custodians' email accounts to Exchange servers backed up weekly, failed to migrate hundreds of others, and backed up nothing else. Intel implemented an electronic sieve.

<u>Hold Notices</u>:  Among other things, Intel complains that AMD did not deliver "a few" hold notices until "*later in 2006*." (Intel Opp. at 5.) But both parties issued notices to custodians as they were identified, including through June 1, 2006, when the parties exchanged custodian lists. (*Id.,* Exhs. E and F.) The striking statistic is that     % of Intel's custodians were not placed on hold (or subject to any known backup) until *late February 2007*. (*Id.*, Exh. F.)

REDACTED

**Intel's Newly-Baked Assertions Of "Systemic" Preservation Failure Are Baseless:** Intel appears to have charged its newly-revealed expert, Mr. Ashley, to search every nook and cranny of AMD's 1.1 terabyte production for any possible irregularity. He attempts to sully AMD's preservation program by characterizing as nefarious or "systemic failure" common-place occurrences, speculates wildly about "loss," ignores data AMD produced, and always reaches the most sinister conclusion, ignoring equally or more plausible -- and innocuous -- explanations.

But Intel's and Mr. Ashley's most egregious mistake is this: They did not ask AMD to provide an explanation. The parties, their eDiscovery liaisons, and vendors have established an effective practice of information exchange on eDiscovery issues that often facilitates disclosure without the need for formal discovery. Depositions and written discovery are not always avoidable. But despite AMD's offers to answer Intel's preservation questions, Intel stayed purposely mum about the Ashley issues until AMD moved for a protective order, which hardly reflects good faith. As we show next, the Ashley issues are well-suited to this type of exchange:

REDACTED

2. <u>Preserved Deleted Items (Ashley Decl. ¶¶ 13-15)</u>: Mr. Ashley focuses on 53,000 files preserved in "deleted items" folders to suggest preservation failure by AMD custodians REDACTED Custodian deletion of emails was a serious problem in Intel's system because its standard "auto-delete" setting REDACTED (Fowler Decl. ¶ 19, Exh. K.) AMD did not have system-wide auto-delete. As such, custodian retention of files in a deleted items folder does not suggest non-compliance or intent to destroy documents. When Intel deposes REDACTED it will learn that they in fact preserved email using their deleted items folders as convenient repositories.[3] (*Id.* ¶¶ 19-26, 39.) Mr. Ashley's suspicions of loss also are belied by a document he himself submits, in which REDACTED states: "*I keep everything* . . . ." (Ashley Exh. 11.)

3. <u>AMD's Global Harvesting (Ashley Decl. ¶¶ 16-17)</u>: Mr. Ashley worries that AMD

REDACTED

---

[3] AMD restored the Exchange Server dumpster for these two custodians as well. (Fowler Decl. ¶ 26.)

did not collect email in Deleted Items folders from its custodians. AMD did. The "Summary of AMD's Document Collection Protocols" -- which Mr. Ashley neither references nor attaches to his declaration -- shows this. Mr. Ashley also fails to mention that AMD in fact produced email from Deleted Items folders of 112 custodians. And Mr. Ashley's selective statistics ignore that 6.8% of AMD's initial production is made up of such email, which is not materially different than the 5.6% of such items in Intel's own "organic" production. (Fowler Decl. ¶¶ 19-21.)

4. <u>Purportedly Undisclosed Remediation and Forensic Recovery (Ashley Decl. ¶¶ 17, 20-23)</u>: Mr. Ashley opines that AMD engaged in "undisclosed and selective remediation," and that "Lost Files" notations in file paths for      REDACTED
     mean that AMD used "specialized forensic software" to recover deleted items from their hard drives. Not true. AMD conducted a remediation only for Mr. Oji. The "Lost Files" folders for    REDACTED       were exported by an EnCase tool while decrypting the original hard drive images and, for    REDACTED        those files were generated automatically by EnCase as result of a non-standard export protocol. AMD did not conduct any forensic recovery on these or any other custodians' hard drives. (Fowler Decl. ¶¶ 30-33.)

5. <u>Vault Migration (Ashley Decl. ¶¶ 37-45)</u>: While conceding that "the Vault should prevent loss of emails," Mr. Ashley claims "systemic failure" based on supposedly faulty migration protocols and "migration fail" messages for 15 AMD custodians. He apparently is not familiar with how the Symantec system migrates copies of "historic" .psts to the Vault. Through early May 2006, the Vault in fact was enabled to "sweep" and retain email from Deleted Items folders, a setting AMD altered in light of Journal redundancy. This process resulted in migration of such data. The Vault also served as simply one repository of historic custodian email. AMD also redundantly harvested this email -- both before and after it enabled the Vault and Journal -- from hard drives, personal network space, and external storage media. In addition, Symantec "migration fail" messages do not imply a breakdown in migration, which was accomplished for the 15 custodians Mr. Ashley identified. (Fowler Decl. ¶¶ 35-42.) Notably, AMD produced a witness for an informal technical exchange about archiving over *10 months ago*, and Intel declined AMD's offer to produce him again. (Herron Decl. ¶¶ 10-11.) AMD now has answered questions it could have answered before -- had Intel asked.

6. <u>"Lost and Found" Messages (Ashley Decl. ¶¶ 46-49)</u>: Mr. Ashley says he detected corrupt .psts for 36 AMD custodians that he identified by "lost" and "found" notations in folder structure, and opines that AMD should "re-harvest" or restore backup tapes. Mr. Ashley errs again. Traces of ScanPST exist because, as its regular protocol, AMD's eDiscovery vendor runs that tool on .psts prior to data processing as a preventative measure to improve processing efficiency, as recommended by AMD's software provider, Attenex. This does not show known corruption that AMD remedied. Mr. Ashley's suggestion that "best practices would require AMD to reharvest" also again ignores that, unlike Intel, AMD obtained bit-by-bit forensic images and, thus, reharvesting is unnecessary, as he should know. And AMD is not alone in using ScanPST-like software: Intel or its vendor seem to have used such a tool on emails for 91 Intel custodians. (Fowler Decl. ¶¶ 43-46.)

7. <u>Deduplication and File Path Information (Ashley Decl. ¶¶ 35, 43-44, 51)</u>: In an informal exchange, AMD provided Intel with information about its deduplication protocols *over nine months ago*. (Ashley Exh. 15.) Intel hasn't asked one question about deduplication since

then.  (Fowler Decl. ¶ 52.)  Mr. Ashley also complains about "file paths," and both wrongly contends that AMD has not properly preserved them and insists on a massive re-production of already-produced files.  AMD has produced file paths for almost *two years*, but Intel has not raised a peep.  (*Id.* ¶¶ 47-51.)  And Intel's file path issues certainly exceed AMD's.  (*Id.*)

**Intel's Discovery Must Be Circumscribed**:  While AMD is obliged to show that Intel's discovery goes too far, Intel as a movant must demonstrate that its discovery is relevant.  *Paluch v. U.S. Dist. Ct.*, 2007 WL 4375937, at *1-2 (M.D. Pa. Dec. 12, 2007).  But requests and deposition topics that do not "identify the outer limits of the area of inquiry" are by definition overbroad.  *Heartland Surgical Specialty Hosp., LLC v. Midwest Div., Inc,* 2007 WL 1054279, at *3-4 & n.8 (D. Kan., Apr. 9, 2007) (discovery also overbroad when information available through less burdensome means).  Intel's discovery is not narrowed to exclude requests about information AMD already produced, and does not specify at all or with any precision the data on Mr. Ashley's wish list.  And Intel expends little effort to substantiate need.  That is why courts in the cases Intel cites take a hard look at, and narrow or deny, discovery that "is far too broad" or burdensome.  *See, e.g., Tulip Computers Int'l B.V. v. Dell Computer Corp.*, 2002 WL 818061, at *6-8 (D. Del., Apr. 30, 2002) (narrowing discovery and allowing "short deposition" of party that failed "its basic discovery obligations"); *Powell v. South Jersey Marina, Inc.*, 2007 WL 2234513, at *5-6 (M.D. Pa., Aug. 1, 2007) (denying motion to compel deposition).

"Routine" preservation discovery is far more limited than Intel pretends.  This Court's Ad Hoc eDiscovery rules require only initial, preservation-related exchanges.  *Delaware Ad Hoc Comm. for Electronic Discovery*, § 2 at p. 2-6; *see also* Fed R. Civ. P. 26(b)(1).  Other authority is consistent.  *See Managing Discovery of Electronic Information – A Pocket Guide for Judges*, at 4-6 (advocating disclosure of systems, storage and retention protocols); *Manual for Complex Litigation, Fourth Edition*, § 11.13 (similar).  And AMD is perfectly aware of Judge Farnan's order permitting a deposition "into the completeness of production (including electronic discovery)," but doubts the Court meant to pre-sanction Intel's escapade.  The rule that emerges is that, in the ordinary course and absent demonstrated preservation breakdown, a party must apprise its opponent -- through discovery or voluntarily -- of the key elements of its preservation program to allow assessment of it.  Intel cites, and we find, no case setting a broader standard.

AMD's productions go well beyond this.  Having faithfully implemented a thorough preservation program, AMD voluntary produced far more "discovery into discovery" than any reported case where preservation breakdown is absent.  The burden is now Intel's to justify more.  Unsubstantiated suspicions of failure won't do.  Instead, the unifying rule of the case law is that Intel must present competent evidence of preservation failure and tether its discovery to those issues.  *Alexander v. F.B.I.*, 188 F.R.D. 111, 117-19 (D.D.C. 1998) (discovery circumscribed to demonstrated preservation issues); *Doe v. Dist. of Columbia*, 230 F.R.D. 47, 55-56 (D.D.C. 2005) (similar); *Tulip Computers*, 2002 WL 818061, at *6-8 (similar, and badly misconstrued in Intel's Opp. at 6-7); *Powell*, 2007 WL 2234513, at *5-6.  Intel has not done so.

This Court has "broad discretion to tailor discovery narrowly" to meet the needs of this case.  *Bowers v. NCAA*, 2008 WL 1757929, at *4-6 (D.N.J. Feb. 27, 2008); Fed. R. Civ. P. 26(b)(2)(C).  AMD's productions and the information provided in this brief and attached materials satisfy both "routine" preservation inquiry and satisfactorily answer the new questions

that Intel and Mr. Ashley belatedly raised.  If Intel wants to test this -- and in order to bring this matter to closure -- AMD is prepared to produce the following additional information including, as necessary, through deposition:  (1) without waiver of work product or the attorney-client privilege, a raw file count spreadsheet and explanatory information about Mr. Oji's remediation, and additional necessary data regarding the "losses" of Messrs. Kepler and Soares; (2) data regarding collection of    REDACTED            and about AMD IT efforts to preserve his email files; (3) informal exchanges about AMD's collection protocols; (4) further informal exchanges, as necessary, to describe the "Lost Files," "lost" and "found" notations, and vendor deduplication processing protocols; and (5) information describing the Symantec Vault and historic .pst migration process.

       This additional discovery should be more than adequate to quell debate about AMD's preservation program.  AMD also invites the participation of the Special Master and his expert, Mr. Friedberg, in this process.  For all the foregoing reasons, the Court should so order.

                                              Respectfully,

                                              */s/ Frederick L. Cottrell, III*

                                              Frederick L. Cottrell, III (#2555)

FLC,III/afg
cc:     Clerk of the Court (By Electronic Filing)
           Richard L. Horwitz, Esquire (Via Electronic Mail)
           James L. Holzman, Esquire (Via Electronic Mail