IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| IN RE | ) | |
| INTEL CORP. MICROPROCESSOR | ) | |
| ANTITRUST LITIGATION | ) | MDL Docket No. 05-1717-JJF |
| | ) | |
| ADVANCED MICRO DEVICES, INC., a | ) | |
| Delaware corporation, and AMD | ) | |
| INTERNATIONAL SALES & SERVICE LTD, | ) | |
| a Delaware corporation,, | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | Civil Action No. 05-441-JJF |
| v. | ) | |
| | ) | |
| INTEL CORPORATION, a Delaware | ) | |
| corporation, and INTEL KABUSHIKI KAISHA, | ) | |
| a Japanese corporation, | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |
| | ) | |
| PHIL PAUL, on behalf of himself | ) | |
| and all others similarly situated, | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | Civil Action No. 05-485-JJF |
| v. | ) | |
| | ) | CONSOLIDATED ACTION |
| INTEL CORPORATION, | ) | |
| | ) | |
| Defendant. | ) | |

**REDACTED -- PUBLIC VERSION**
**DECLARATION OF JEFFREY J. FOWLER**

Of Counsel:                                    Jesse A. Finkelstein (#1090)
Charles P. Diamond                             Frederick L. Cottrell, III (#2555)
Linda J. Smith                                 Chad M. Shandler (#3796)
O'Melveny & Myers, LLP                         Steven J. Fineman (#4025)
1999 Avenue of the Stars                       Richards, Layton & Finger, P.A.
7th Floor                                      One Rodney Square
Los Angeles, CA 90067-6035                     P.O. Box 551
(310) 553-6700                                 Wilmington, Delaware 19899
                                               (302) 651-7700
Mark A. Samuels                                Finkelstein@rlf.com
O'Melveny & Myers, LLP                         Cottrell@rlf.com
400 South Hope Street                          Shandler@rlf.com
Los Angeles, 90071                             Fineman@rlf.com
(213) 430-6340                                 Attorneys for Plaintiffs Advanced Micro
                                               Devices, Inc. and AMD International Sales &
                                               Service, Ltd.


Dated:  July 24, 2008

## DECLARATION OF JEFFREY J. FOWLER

I, Jeffrey J. Fowler, declare and state as follows:

1.    If called as a witness in this matter, I could and would testify competently to the following facts, which are within my personal knowledge. I am Counsel with the law firm of O'Melveny & Myers LLP, and am one of the attorneys responsible for representing plaintiff Advanced Micro Devices, Inc. ("AMD") in this matter. I make this declaration in support of AMD's Motion to Quash and for a Protective Order with respect to discovery propounded by defendant Intel Corporation ("Intel") under Fed. R. Civ. P. 30(b)(6).

2.    My principal responsibilities in this case relate to electronic discovery, including AMD's preservation, collection and production-related protocols. This declaration outlines these protocols. It also addresses the factual inaccuracies and issues raised in the Declaration of John Ashley that Intel filed in opposition to AMD's Motion to Quash.

## OVERVIEW OF AMD's PRESERVATION SYSTEM

3.    Although it did not commence litigation for another three and a half months, AMD's preservation efforts began immediately after the Japan Fair Trade Commission announced its March 2005 decision that Intel had violated Japan's anti-monopoly laws. (Attached hereto as Exhibit A is a true and correct copy of AMD's March 11, 2005 litigation hold notice that sets forth AMD's initial preservation instructions to its IT personnel, a copy of which was previously produced to Intel.) AMD thereafter designed and implemented a preservation plan that included, among others, the following steps: (1) immediate cessation of routine backup tape recycling procedures and the indefinite retention of 30-day backup tapes for all relevant email and file servers; (2) issuance of litigation hold notices to employees identified

as relevant in the first instance, and the continued issuance of such hold notices as additional

employees were identified; (3) the design and implementation of a plan to migrate the email

accounts of hundreds of relevant custodians to an Enterprise Vault and Journal archiving system;

and (4) a thorough, forensically-sound harvesting process designed broadly to capture through

bit-by-bit imaging all potentially-relevant electronic materials in the possession of AMD

custodians.

4.    The following paragraphs detail each of these steps, which AMD has previously

described to Intel.  AMD first described its protocols in a series of telephone conferences and in

correspondence with Intel's counsel John Rosenthal in September and October 2005.  (*See*

Declaration of David L. Herron ¶ 2; *see also* a true and correct copy of AMD's counsel's letter to

Intel's counsel dated October 24, 2005, describing AMD's preservation protocols, which is

attached hereto as Exhibit B.)   AMD later provided this information to Intel through document

productions, informal technical exchange and written summaries, which I reference below.

**Backup Tape Retention**

5.    On March 11, 2005, AMD instructed its IT personnel to retain the oldest full

backup of Exchange email and file servers utilized by employees involved in AMD's general

purpose x86 microprocessor business.  (*See* Exh. A.)  AMD also instructed that a one-time full

backup of these servers be made on or around March 19, 2005.  In addition, AMD indefinitely

suspended its backup tape recycling procedures and, since March 19, 2005, has retained 30-day

backups of relevant email and file servers.

6.    AMD first described its backup tape protocol to Intel in its October 19, 2005

correspondence referenced above.  (*See* Exh. B.)  During preservation discovery, AMD then

produced to Intel a written summary titled "AMD's Backup Tape Retention Protocols" which details and describes AMD's backup tape regimen. (A true and correct copy of AMD's Backup Tape Retention Protocols summary is attached hereto as Exhibit C.)

### Litigation Hold Notices

7.    On April 1, 2005, AMD issued its first round of litigation hold notices to approximately 150 employees, and has put many hundreds of additional individuals under hold since then. In the course of preservation discovery, AMD produced to Intel every litigation hold notice that AMD delivered to any designated custodian. (As an example, attached hereto as Exhibit D is a true and correct copy of AMD's April 1, 2005 litigation hold notice, which did not materially change over time.) ████████████████████████████

████████████████████████████████████████████████

████████████████████████ (*Id.* at 1.) AMD also distributed an explanatory set of Frequently Asked Questions that further define a hold recipient's obligations. (*Id.* at 3-5.)

8.    As the case progressed, as Intel served its initial rounds of document requests, and as new factual issues became injected into the litigation, AMD continued to identify new document custodians to whom it issued litigation hold notices. AMD has disclosed to Intel both the date on which it delivered a litigation hold notice to each designated AMD custodian and identified the version of the litigation hold notice delivered. (Attached hereto as Exhibit E is a true and correct copy of the list setting forth this litigation hold-related information.) In fact, both parties continued to issue litigation hold notices to custodians as they were identified, including through and after June 1, 2006, when the parties exchanged lists of custodians pursuant to the Stipulation and Proposed Order Regarding Document Production entered in this case. (Attached hereto as Exhibit F is a list of the dates upon which Intel delivered litigation hold

notices to its custodians.)  Analysis of the information Intel has produced shows that, as of June

1, 2006, Intel had not delivered litigation hold instructions to ██% of its custodians.  (*Id.*)  From

Intel disclosures regarding its preservation system, I understand that Intel did not subject these

late-noticed custodians' email accounts to any backup retention mechanism (such as backup

tapes or an email archive) until late February 2007.

**Implementation of the Enterprise Vault/Journal**

9.      On November 2, 2005, AMD commenced the process of configuring custodians'

email accounts to an email archiving tool known as the Enterprise Vault.  The Vault archive is

designed to preserve large volumes of email from multiple employees in a central, searchable

location.  The Vault is a commercially-available product offered by Symantec Corporation.

Information regarding its basic configurations is public and, therefore, generally available.

10.     One of the principle purposes of the Enterprise Vault is to improve performance of

email servers by serving as a secondary location for large volumes of email.  AMD's Enterprise

Vault is configured to make a daily "sweep" of email that is 30 days old, storing it safely in a

separate server.  (This server is commonly referred to as the "Vault.")  I understand that, through

early May 2006, the Vault swept all email, including email located in Deleted Items folders.  In

this respect, AMD's Vault is the exact antithesis of an auto-delete function:  It is configured to

archive (rather than delete) emails that would otherwise affect server performance.

11.     Email users have complete access to their emails stored in the Vault, although I

understand that, with some exceptions, the Vault is configured so that custodians are not able to

delete email once it resides there.  In fact, from the Microsoft Outlook interface, it is hardly

noticeable that emails reside in the Vault.  Emails remain in the same folders that exist in

Outlook. For example, Sent Items remain in the Sent Items folder even after they move to the Vault. The Vault also permits the user to archive emails in folders and subfolders similar to Outlook PST files. All active email that is not manually moved to the Vault is swept into the Vault after 30 days. I understand that Intel obtained information about AMD's email archiving solutions during an informal technical exchange with one of AMD's IT representatives in September 2007.

12. A major advantage to the Vault is that it discourages users from saving email in various locations on hard drives and networks. Instead, the email is stored in a single, controlled location. The Vault is also capable of storing PST files that users created prior to the implementation of the Vault through a process known as "migration." Among other reasons, AMD migrated custodians' old PST archives into the Vault in order to encourage email users to both utilize the Vault and to cease the use of the decentralized, less stable PST archives. AMD's data collection protocol envisioned harvesting these "historic" Outlook PST files for this litigation not only by means of Vault exports, but also by obtaining bit-by-bit images of custodians' hard drives and harvesting personal network space where copies of the data might also reside.

13. In addition to enabling the Vault, AMD also enabled "journaling" on custodians' Exchange email boxes. The "Journal" is a setting in the Microsoft Exchange email system that, once enabled, makes a copy of every email -- sent or received -- for the enabled email user. Copies of these emails are stored in a separate, searchable archive. I understand that, with some exceptions, AMD typically enabled the Journal function for a custodian either concurrent with or within a few days of the migration of the custodian's email account to the Vault.

14.    By the end of November 2005, AMD had migrated the email accounts of 65% of all AMD custodians designated so far during document discovery in this case to its Journal; by March 2006, that number was 76%, increasing to 85% by August 2006. (Attached hereto as Exhibit G is a true and correct copy of a list AMD produced to Intel that identifies the dates upon which each designated AMD custodian's email account was configured to the Journal.) I understand from the representations made by Intel that, with the exception of a limited number of Intel custodians, Intel did not adopt and fully implement an email archiving system until March 2007 -- approximately 21 months after the lawsuit began and over 16 months after AMD implemented these tools. (Attached hereto as Exhibit H is a true and correct copy of the list of dates on which Intel migrated its custodians' email accounts to Intel's email archiving tool.)

**Forensic Harvesting**

15.    In October 2005, AMD commenced a comprehensive, forensically-sound data collection effort. (Attached hereto as Exhibit I is a true and correct copy of the "Summary of AMD's Document Collection Protocols" that AMD produced to Intel.) AMD utilized qualified consultants and IT professionals to obtain forensically-sound, bit-by-bit images of custodian hard drives. AMD's electronic discovery vendor, Forensics Consulting Solutions (hereafter "FCS"), maintains the images of the computer hard drives and external storage media that were collected (or "harvested") from AMD custodians.

16.    AMD harvested custodian data on more than one occasion, including both before and after Vault and Journal implementation. AMD also collected email and other electronic documents from redundant sources, including each custodian's Journal, Vault, personal network space, and external storage media. (Attached hereto as Exhibit J are true and correct copies of the lists of "harvest" dates for AMD's designated custodians that AMD produced to Intel.)

17.    During this case, the parties, their eDiscovery Liaisons, and the parties' vendors have established an effective practice of information exchange on electronic discovery issues that has often facilitated disclosure of eDiscovery-related information without need for formal discovery.  For instance, the parties' eDiscovery Liaisons communicate frequently, certainly weekly if not more often, about technical production issues, among many other things.  In addition, each side has participated in a number of "informal technical exchanges" in which party IT personnel and eDiscovery vendor personnel have provided technical data, thus obviating the need for deposition or document discovery.  In connection with discovery related to Intel's evidence preservation issues and productions, the parties and their counsel also have both produced written summaries in lieu of document production and depositions, and have exchanged information in face-to-face informal meetings or telephone conferences that likewise served as substitutes for formal discovery.

## ISSUES RAISED IN THE DECLARATION OF JOHN ASHLEY

18.    The information set forth below addresses the issues Mr. Ashley raises in his declaration.

### Deleted Items (Ashley Declaration ¶¶ 11-21)

19.    Mr. Ashley's accusations of email deletion appear to confuse emails stored in Deleted Items folders with emails that were actually irretrievably deleted, intentionally or otherwise.[1]  There is a distinct difference, particularly at AMD where there is no system-wide automatic deletion function for emails contained in the Deleted Items or any other folders.  This contrasts with Intel, which had a standard "auto-delete" setting that ████████████████████

---

[1] *See, e.g.*, Ashley Decl. ¶ 18: "I discovered that an overwhelming majority of all emails produced for ████████████ ████████████████ … were initially deleted before they were produced."

██████████████████████ (Attached hereto as Exhibit K are true and correct copies of relevant excerpts of the deposition testimony of Intel's Eva Almirantearena and Exhibit 11 thereto, which describe Intel's standard auto-delete rule.)  At AMD, emails maintained in Deleted Items folders are preserved and not subject to automatic expunging.  Thus, contrary to Mr. Ashley's apparent assumption, an AMD custodian's preservation of email in a Deleted Items folder is not evidence of a failure to comply with preservation protocols.  Email files preserved in, and produced from, Deleted Items folders are no different than items preserved in, and produced, from an Inbox, Sent Items, or any other folders.  In fact, both AMD custodians ██████ ██████████████████ whom Mr. Ashley highlights for having large volumes of deleted items, routinely used their Deleted Items folders as a location to preserve emails they wanted to retain.

20.    AMD's preservation and harvesting protocols were designed to capture all emails maintained by each custodian, regardless of storage location (*e.g.*, on hard drives, in the Vault or Journal, on personal network space, or on external storage media) and regardless of the folder name in which those emails were stored.  (*See* Exhs. D and I, *supra*.)  This includes emails in Deleted Items folders.  I understand from FCS (AMD's eDiscovery vendor) that AMD's production contains emails from Deleted Items folders for 112 AMD custodians during the time period that Mr. Ashley examined, March 1, 2005 through November 2, 2005.

21.    Mr. Ashley contends that the total percentage of emails from Deleted Items folders produced by AMD custodians during the timeframe he examined is "nearly seven percent." (Ashley Decl. ¶ 13.)  FCS has calculated the percentage of AMD's production of deleted items as 6.8%, whereas the percentage of emails from Deleted Items folders found in Intel's "organic" production (i.e., its native file production for Intel custodians, not including any Intel deposition reharvest or "remedial" file productions) is approximately 5.6% of the total files it produced.

The point here is not that this proves failure on Intel's part to properly preserve; rather, it shows that there is nothing suspect about producing emails from Deleted Items folders.

### Harvests of Recovered Items (Ashley Declaration ¶¶ 14-21)

22.  Mr. Ashley notes that AMD harvested email from Deleted Items folders for several custodians, including ██████████████████████████████████████████ ████████ (*See* Ashley Decl. ¶¶ 14-21.)  This is explained both by individual retention habits and the fact that each of these individuals was subject to preservation and data collection involving a function in Microsoft Outlook identified in the Tools menu as "Recover Deleted Items."

23.  The "Recover Deleted Items" command permits a user to review and recover items that were "double-deleted" and now reside in a repository known as the "dumpster."  By opening the Deleted Items folder and clicking the "Recover Deleted Items" command, a user may review a list of all emails that reside in the dumpster.  A user may then select these items and return them to their Deleted Items folder.  AMD's IT department controls the functionality of the dumpster, including the setting for how long recoverable items are maintained in it.  AMD's typical dumpster setting retains items for 7 days.

24.  After the AMD Law Department issued its first set of preservation instructions to its IT personnel in March 2005, Jerry Meeker -- a senior IT manager who has assisted the AMD Law Department with preservation issues -- decided to change certain custodians' dumpster settings so that the Exchange server would preserve any emails in the dumpster for approximately one year.  The objective was to provide the AMD Law Department with the option to restore these items as necessary during the litigation.  ██████████████████ ██████████████████████████████████████████████████████████████████

███████████████████████████████████████

███████████████████████████████████████████

███████████████████

25. ████████████████████████████████

███████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

████████████████████████████████████████

███████████████████████████████████

26.    Mr. Meeker also collected email files from the dumpsters of other AMD custodians immediately prior to the migration of their mailboxes to the Vault and Journal. The objective was to perform the collection from dumpsters at a time that would leave no significant gap between the dumpster collection and the Vault and Journal migration. AMD's initial Vault and Journal migrations were set to occur on November 2, 2005. In what proved to be a time-consuming process over the weekend of October 29-30, 2005, Mr. Meeker collected email files maintained in the Exchange dumpsters for █████████████████████████

████████████ Mr. Meeker also restored and collected email files for ███████ on November 1, 2005, the day before the Vault and Journal were enabled for him. Mr. Meeker migrated the files obtained from these restore exercises to the Vault on December 10, 2005. Given the

consumption of time entailed in the restoration process (which, for example, took approximately five hours of Mr. Meeker's time for just ████████████ ), and in order to not delay the prompt migration of the custodian mailboxes to the Vault and Journal, Mr. Meeker did not restore the Exchange dumpster for any other AMD custodians.

████████████ **(Ashley Declaration ¶¶ 29-32)**

27. ████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████

**AMD Custodians Nick Kepler and Michael Soares (Ashley Declaration ¶¶ 26-27)**

28.    As described in Exhibit S to the previously-submitted Declaration of David L. Herron, AMD custodian Nick Kepler enabled a feature in Microsoft Outlook that prevented his email box from automatically saving his Sent Items.  Instead, Mr. Kepler saved emails by copying himself, i.e., placing his name in the "cc" field of the email so that his sent emails would appear in his Inbox.  Mr. Kepler is the only known individual of the 164 designated AMD custodians whose mailbox was configured this way.

29.    Exhibit S to Mr. Herron's declaration also describes a preservation issue involving AMD custodian Michael Soares.  AMD sent Mr. Soares a preservation notice on February 21, 2006 and enabled his email account for the Vault and Journal on March 30, 2006.  Mr. Soares believes that, subsequent to the Vault and Journal enabling, his laptop was stolen and, as AMD

has disclosed, another of Mr. Soares' computer hard drives failed. As a result of the Vault and

Journal -- which maintain a copy of every email Mr. Soares sent or received since March 30,

2006 -- the loss, if any, should be limited to any unique "loose" files that Mr. Soares maintained

on these hard drives.

### Purported "Undisclosed Remediation" (Ashley Declaration ¶¶ 22-24)

30.    Contrary to Mr. Ashley's suspicions, AMD has not utilized any forensic tools to

recover deleted items or engaged in other remediation. The only exception is AMD's

remediation efforts on behalf of its custodian, Kazuyuki Oji, which AMD disclosed to Intel.

31.    I next address Mr. Ashley's questions and apparent confusion regarding the "Lost

Files" notations in file paths for ███████████████████████████████████████████

Contrary to Mr. Ashley's suspicions, these notations are not evidence of selective remediation.

32.    █████████████████████    AMD imaged certain custodians' hard drives using a

well-known forensics tool called EnCase Enterprise ("EnCase"). In some instances, including

the hard drives of █████████████████ the EnCase images that AMD provided to FCS

(AMD's eDiscovery vendor) were not accessible to FCS because FCS's version of EnCase could

not view images of hard drives that were "encrypted." (Encryption is a common data security

measure that AMD often employed to protect its hard drives.) FCS returned the inaccessible

hard drive images of █████████████████ to AMD, and requested that AMD decrypt the

hard drives and provide new images. To accomplish this, AMD restored the original EnCase

images to new hard drives, decrypted the hard drives, and then imaged the new drives. AMD

then delivered the image of the new, decrypted drive to FCS. I am informed that, when FCS

opened the new image of the decrypted hard drives for █████████████████ FCS's version

of EnCase automatically generated a "Lost Files" folder and placed all contents of the hard drive

into the folder. Apparently, the presence of this "Lost Files" folder has led Mr. Ashley to suspect

that AMD was engaged in a secret forensic effort to recover deleted files. (*See* Ashley Decl. ¶

20.) It was not. Instead, I understand that EnCase automatically generates "Lost Files" folders

under a variety of circumstances and that the data contained in those folders is not always

deleted. As concerns ██████████████████ it is unclear precisely why EnCase generated the

"Lost Files" notation as it did. But the presence of the Lost Files folder at the root of these hard

drive images most certainly was not the result of an effort by AMD or FCS to recover deleted

files.

      33. ████████████████ The hard drives for ████████████ were

not encrypted, but the FCS personnel conducting the data export assumed that they were. I am

informed that the FCS employee conducting the export did not follow FCS's standard export

protocol. As a result, FCS inadvertently exported data found in "Lost Files" folders. As

described above, Lost Files folders are not part of the actual hard drive that is imaged, but are

instead automatically generated by EnCase. "Lost Files" folders typically store varieties of

inactive data found on the hard drive, such as files generated by program installations, inactive

copies of files left over from computer error, as well as deleted files. It is not part of FCS'

regular protocol to collect files from the "Lost Files" folder. AMD did not instruct FCS to export

items in "Lost Files" folders; it was, instead, the result of inadvertent error on the part of the FCS

employee conducting the export of the data from those hard drives. I understand that none of the

data produced from the Lost Files folders for Steel and Edwards was identified by EnCase as

"deleted." Mr. Ashley incorrectly assumes that it was. (Ashley Decl. ¶ 22.)

**AMD's Litigation Hold Notice (Paragraphs 33-36)**

34.    Early versions of AMD's litigation hold notices provided directions for how custodians could create a special "Preservation Notice" folder to store potentially relevant material. (*See, supra*, Exh. D.)  Creating this folder was not mandatory and, as a result of the Vault and Journal, eventually became unnecessary.  Whether or not custodians created or named folders as suggested, as discussed above, AMD's data collection processes were designed to capture all potentially-relevant data regardless of whether a custodian decided to utilize a special folder for preservation purposes.  That comprehensive collection effort, and AMD's production to date of approximately 1.1 terabytes of information, apparently was not considered by Mr. Ashley in his critique.

**Enterprise Vault Migrations (Ashley Declaration ¶¶ 37-45)**

35.    I will hereafter describe my general understanding of AMD IT's migration of PST files into the Enterprise Vault.

36.    It is common knowledge that email users can and typically do create PST files to store emails outside of their active email box, and often save them on laptop hard drives, external hard drives, and other locations that are not immediately accessible to corporate IT personnel. To my knowledge, this practice is becoming increasingly less desirable for large corporations because of the expense and risk associated with locating and collecting these decentralized archives of company email.  As mentioned above, one of the objectives of an Enterprise Vault system is to free a corporation from decentralized PST archives and create a single, searchable repository of all corporate email.  Accomplishing this objective thus requires the collection and "migration" into the Vault all of the PST files that an employee has created.  Therefore, in

addition to enabling the Vault to "sweep" future emails from custodians' active email boxes, AMD also attempted to move custodians' pre-existing PST files into the Vault using the Vault's automated "migration" process.

37.    It is my understanding from Intel's disclosures that Intel itself had not migrated historic PSTs of its custodians into Intel's own email archiving system.

38.    Although some AMD employees were involved with their Vault migrations, AMD IT representatives were principally responsible for migrations of custodians' PST files into the Vault. In a typical case, an AMD IT representative would contact a custodian and obtain permission to access the custodian's email account and network space. The IT representative then worked with the custodians to identify PST files. This included running searches for PST files on a custodian's hard drive and network space, as well as confirming with the custodian that all PST files had been gathered. The IT representative then made a copy of the PST files and loaded those copies into a "staging area" on the network. From this staging area, the IT representative would perform the migration of PSTs to the Vault.

39.    Emails from Deleted Items folders were not automatically migrated to the Vault. Typically, however, if the AMD IT representative noticed a large Deleted Items folder, I understand that the IT representative would contact the custodian to determine whether items in that folder should be migrated into the Vault. Mr. Ashley has provided a copy of an email between AMD IT and AMD custodian ▬▬▬▬ that is an example of the sort of exchange that AMD IT had with custodians who maintained such email stores. (*See* Ashley Decl., Exh. 11 at page 1.) In that instance, AMD's IT representative, ▬▬ ▬▬, inquired whether email in ▬▬▬▬'s Deleted Items folder should be migrated. ▬▬▬▬ responded affirmatively,

and explained that "I keep everything . . . ." (*Id.*) I understand that the Deleted Items folder

from ███████████ PST file was then migrated into the Vault by ███████████.

40.    The Vault migration software is designed to capture all emails eligible for

migration, including those which fail initially to migrate.  If the Vault is unable to migrate certain

items, the Vault automatically creates a "migration failure" subfolder in a custodian's mailbox,

and moves a copy of these items from the PST to this new subfolder.  The purpose of this

automatic protocol is to attempt to later sweep the emails contained in these "migration failure"

folders into the Vault once they are over 30 days old.  I understand that these "migration failure"

subfolders were contained in AMD's production because the messages that failed migration were

later successfully swept into the Vault through the normal course of the 30-day sweep.  These

"migration failure" notations were in the productions of 14 of the 15 custodians that Mr. Ashley

identified in Paragraph 40 of his declaration as purportedly having migration problems.  The

presence of these folders in AMD's production, however, suggests that the PST migrations were

in fact successful and operating pursuant to the Vault's configurations, not that there was some

"systemic" or other failure to either migrate or collect relevant email files.

41.    FCS (AMD's eDiscovery vendor) was not able to locate a "migration failure" folder

for the fifteenth AMD custodian Mr. Ashley identifies, ███████████ It is unclear from Mr.

Ashley's declaration what evidence he is relying on to suggest a migration failure for ███

███████ AMD believes that, like the other 14 custodians identified in Mr. Ashley's declaration,

███████████ migration was successful.  In any event, as noted above and as described in

documents produced to Intel, AMD was not relying solely on the Vault to collect historic PST

files.  AMD also redundantly harvested this email -- both before and after it enabled the Vault

and Journal -- from hard drives, personal network space, and external storage media. (*See, supra,* Exh. I.)

42.    It is accurate that AMD instructed custodians to delete PST files after confirming that migrations of those PSTs to the Vault were successful. The reason was to prevent custodians from continuing to store email offline in these files, and to encourage custodians instead to rely on the same archives located in the highly-effective and corporate-controlled Vault for future storage.

### Evidence of ScanPST in AMD's Production (Ashley Declaration ¶¶ 46-48)

43.    ScanPST is an application that Microsoft provides as part of its Microsoft Outlook email software package. It is designed to cure defects that occur in email PST archives. I am aware that individual email users, corporate IT departments, and eDiscovery vendors alike routinely utilize ScanPST. I understand that it is thus not unusual to find traces of ScanPST or similar software in large populations of email produced in litigation.

44.    When ScanPST is used on a PST file, I understand that Scan PST will generate a "Lost & Found" subfolder in the PST if repairs are made. Traces of these repairs -- whether conducted by the user, an IT department, or an eDiscovery vendor -- exist in both parties' productions. In fact, I understand that 91 Intel custodians have traces of ScanPST (or similar products) in their production.

45.    Mr. Ashley points to traces of ScanPST in AMD's production to suggest that AMD failed to disclose losses of data from PST files. (Ashley Decl. ¶ 47.) That is incorrect. It is not surprising that Mr. Ashley found traces of ScanPST in AMD's production, but this is not because there were known losses that that AMD failed to disclose. As part of its regular eDiscovery

"best practices," FCS uses ScanPST on every PST it receives prior to processing the PST into its

Attenex review tool, regardless of whether there is evidence that the PST is corrupt. FCS uses

ScanPST as a preventative measure to improve the likelihood that PSTs will be processed

efficiently. FCS is not alone: The support team for FCS' processing software provider, Attenex,

recommends that vendors like FCS run ScanPST on all PST files prior to loading them into the

Attenex/Workbench system that FCS uses. Contrary to Mr. Ashley's surmise, using ScanPST

does not entail a "high likelihood of data loss during the repair process." (Ashley Decl. ¶ 47.)

Indeed, Microsoft's support website for ScanPST states that data losses from ScanPST are

"probably very rare." The traces of ScanPST that exist in AMD's production are thus merely

indicative of production-wide efforts that were made by AMD's processing vendor to proactively

cure potential defects in PSTs prior to processing them. I am informed that ScanPST's repair

efforts were successful and did not reveal that any particular PST suffered data loss.

46.    Mr. Ashley is also incorrect that "best practices would require AMD to re-harvest

the corrupt PST file." (*See* Ashley Decl. ¶ 48.) AMD obtained bit-by-bit images of the media

where PSTs were located. I understand that bit-by-bit images are exact copies and are not

materially different than the original. As such, there is nothing to "reharvest."

**The Parties' Naming Conventions and AMD's Deduplication Protocols (Ashley
Declaration ¶¶ 35, 43-44, 51)**

47.    AMD's harvest protocols were designed to capture exact copies of PST files and

retain folder structure and file paths. Copies of emails from the Journal archive do not contain

any folder-level meta data because they obviously were never maintained in an Inbox, Sent

Items, or Deleted Items folder. Similarly, emails exported from the Vault may not contain

elaborate folder structure. As a result, many of the emails in AMD's production do not have the

type of folder information that Mr. Ashley wrongly contends should have been part of AMD's productions. (*See* Ashley Decl. ¶ 43.)

48.    When FCS exports emails from Attenex for production to Intel, Attenex automatically inserts a unique file id into the newly created PST file and adds "*_Out*" to the file name. For example, messages produced from a PST file named "*Intel.pst*" would result in a PST file entitled, "*Intel982333_Out.pst.*" In this example, the software automatically adds the number 982333 and '*_Out*' to the PST file.

49.    This is not a material alteration of the file path and, indeed, the original file path is retained as part of the production path. For example, the document produced as DCN AMDN-013-00000173 Filename 'Engage MS Project Q404 NA Timelines (Revised).ppt' was produced on volume AMDN0002 at a path of '\**P002701\18\1**\Documents and Settings\rfuller\Desktop\Engage\Engage Planning Documents\'. The bolded portions of the path are attributable to processing.

50.    While Mr. Ashley speculates that AMD has somehow failed to comply with the Second Amended Stipulation Regarding Electronic Discovery and Format of Document Production (the "Native Stipulation") entered by this Court, we are presently unable to understand on what evidence he bases this broad assertion and do not believe it is accurate. In addition, Intel seems to have its own file path issues. Here are four examples from Intel's production:

      a.   DCN 67072-009217 \NATIVE\606301-109_Riedle, Gerhard_EMAIL\000001\67072-009217.msg

      b.   DCN 66678-001294 \0041 - Pat Gelsinger_Email\Outlook\archive3.pst\Top of Personal Folders\Lost & Found\Recovered Folder 90A2\PCOMP Weekly Status

Report - WW18_2002.msg_66678-001294.msg

   c.   DCN 66377-007310 \0008 - Matthew Kurko_Efiles\My Documents\HP\HP CSA\Misc 4\Oct Chipset Demand.xls_66377-007310.xls

   d.   DCN 67554-018666 \NATIVE\606301-057_Barrett, Carol_EFILE\000001\67554-018666.ppt

In the last example above, Intel did not preserve the original file path or the original file name as appears to be required by the Native Stipulation but, instead, provided that information in a field in their load file.

     51.   Indeed, I understand that Intel has produced files that do not appear to follow normal file pathing conventions, and this is particularly true with respect to Intel's productions of "remedial" files taken from its so-called "global database." While AMD has not fully assessed the extent or gravity of Intel's departure from normal file pathing protocols, it is my present understanding that this issue may in fact affect a substantial portion of Intel's productions to date. In any event, AMD has been producing files and file path information to Intel since early December 2006. To my knowledge, Mr. Ashley's assertions represent the first time that Intel has taken issue with file paths or file pathing information produced by AMD, other than as may possibly have been raised in the ordinary course of communications between AMD's and Intel's eDiscovery Liaisons.

52.   In an informal exchange, AMD provided Intel with information about its deduplication protocols over nine months ago.  (*See* Ashley Exh. 15.)  To my knowledge, Intel has not asked AMD another question about deduplication since that time.

I declare under the penalty of perjury under the laws of the United States that the foregoing is true and correct.


Dated: July 24, 2008

_____
Jeffrey J. Fowler

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on July 24, 2008, I electronically filed the foregoing document with

the Clerk of Court using CM/ECF and have sent by Hand Delivery to the following:

Richard L. Horwitz, Esquire          James L. Holzman, Esquire
Potter Anderson & Corroon, LLP       Prickett, Jones & Elliott, P.A.
1313 North Market Street             1310 King Street
P. O. Box 951                        P.O. Box 1328
Wilmington, DE 19899                 Wilmington, DE 19899-1328


I hereby certify that on July 24, 2008, I have sent by Electronic Mail the foregoing

document to the following non-registered participants

Darren B. Bernhard, Esquire          Robert E. Cooper, Esquire
Howrey LLP                           Daniel S. Floyd, Esquire
1299 Pennsylvania Avenue, N.W.       Gibson, Dunn & Crutcher LLP
Washington, DC 20004-2402            333 South Grand Avenue
                                     Los Angeles, California 90071-3197




                                     /s/ *Frederick L. Cottrell, III*
                                     Frederick L. Cottrell, III (#2555)
                                     cottrell@rlf.com