## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| IN RE<br>INTEL CORPORATION<br>MICROPROCESSOR ANTITRUST<br>LITIGATION | MDL No. 05-1717-JJF |
| ADVANCED MICRO DEVICES, INC., a<br>Delaware corporation, and AMD<br>INTERNATIONAL SALES & SERVICES, LTD.,<br>a Delaware corporation,<br><br>Plaintiffs,<br><br>v.<br><br>INTEL CORPORATION, a Delaware corporation,<br>and INTEL KABUSHIKI KAISHA, a Japanese<br>corporation,<br><br>Defendants. | C.A. No. 05-441-JJF<br><br>DM-4 di.3 |

## <u>ORDER</u>

WHEREAS, on April 24, 2009, defendants Intel Corporation and Intel Kabushiki Kaisha (hereafter jointly, "Intel"), filed an opening letter brief moving to compel further testimony in response to 130 questions it posed to plaintiffs' Advanced Micro Devices, Inc. and AMD International Sales & Service, Ltd. (hereafter jointly, "AMD") Fed. R. Civl. P. 30(b)(6) witness regarding evidence preservation issues ("Motion to Compel");

WHEREAS, the parties completed briefing on Intel's Motion to Compel on May 26, 2009;

WHEREAS, a telephonic hearing (the "Hearing") on Intel's Motion to Compel was held before Special Master Vincent J. Poppiti (the "Special Master") on June 15, 2009;

WHEREAS, two discrete issues were raised by counsel at the Hearing with respect to the attorney-client privilege and the restoration of tapes of certain AMD custodians;

NOW, THEREFORE, IT IS HEREBY ORDERED, AS FOLLOWS:

A.    **Attorney-Client Privilege**

Intel moved the Court to compel AMD's Rule 30(b)(6) deponent to answer questions 93, 96, 97, and 99.[1]  AMD objected to each of these questions based upon the attorney-client privilege and attorney work product.  After reviewing the questions and conducting the Hearing, the Special Master concludes that questions 96, 97, and 99 implicate the attorney-client privilege, and Intel's Motion to Compel is therefore denied with respect to these questions.  However, the Special Master also concludes that question 93 does not implicate the attorney-client privilege.  AMD is therefore ordered to respond to question 93 via interrogatory.  None of these questions implicates the attorney work-product doctrine.  The attorney-client privilege protects communications between an attorney and his client related to a fact of which the attorney was informed by his client without the presence of a third party for the purpose of securing primarily either a legal opinion or legal services, where the privilege has not been waived.  See Pfizer Inc. v. Ranbaxy Laboratories, Ltd., 2004 U.S. Dist. LEXIS 20948, at \*\*2-3 (Oct. 7, 2004).  "Only communications made for the purpose of obtaining or giving legal advice are protected."  Id. at \*4.

Questions 96, 97, and 99 implicate the attorney-client privilege because each of these questions ask AMD to disclose its reasons for commencing litigation, which in the Special Master's view necessarily implicates AMD's communications with its attorneys for the purpose of securing legal advice.  For example, question 96 states:

---

[1] Numbers herein correspond to the parties' chart titled "Intel's and AMD's Positions On The Remaining Questions."

> Was one of the circumstances leading to AMD's decisions to
> commence this litigation Intel's steamroller business practices?

See Ozmun Tr. at 188:11-20.

Questions 97 and 99 similarly deal with AMD's communications with counsel regarding its decision to commence this litigation.[2]  See 3V, Inc. v. CIBA Specialty Chems. Corp., 587 F. Supp. 2d 641, 647 (D.Del. Nov. 20, 2008) ("In general, the attorney-client privilege protects attorney-client communications made for the purpose of obtaining or giving legal advice").

On the other hand, Question 93 is not protected by the attorney-client privilege, because in the Special Master's view it is simply a factual question.  Question 93 states:

> Q:  When did AMD learn that Intel paid Sony in 2003 multimillion
> dollar sums disguised as discounts and promotional support in
> exchange for absolute microprocessor exclusivity as alleged in
> paragraph 30 – as paragraph 40 [of AMD's civil complaint in this
> action]?

See Ozmun Tr. 177:20-178:4.

Question 93 seeks factual information regarding when AMD learned that a certain event occurred, and does not reveal confidential attorney-client communications.  See Cobell v. Norton, 2003 U.S. Dist. LEXIS 1487, at *16 (D.D.C. 2003) (holding that answer to simple factual question that does not reveal any confidential communications with attorney for the purpose of securing legal advice or services is not protected by the attorney-client privilege).

---

[2] Question 97 states:

> Was one of the circumstances leading to AMD's decision to commence this
> litigation Intel's alleged use of its ability to offset margins across multiple
> business units?

See Ozmun Tr. at 188:21-189:2.

Question 99 states:

> What conduct led to AMD's decision to commence this litigation?

See Ozmun Tr. at 190:5-8.

Alternately, even if AMD objects because the Fed. R. Civ. P. 30(b)(6) deponent, Beth

Ozmun, is an attorney, AMD's objection is without merit in this instance. See Honeywell Int'l v.

Nikon Corp., C.A. No. 04-1337-JJF, DM-13, D.I. 1481 (D.Del. Nov. 25, 2008) (holding that

party may not avoid its obligation under Fed. R. Civ. P. 30(b)(6) by putting forward an attorney

as its witness).

### B.    Restoration of Tapes

Intel poses a number of questions regarding tape restoration performed by AMD.[3] The

Notice of Deposition of AMD's witness pursuant to Fed. R. Civ. P. 30(b)(6) (the "Notice of

Deposition") states, in pertinent part:

> 14.  AMD's attempts (successful or unsuccessful) to recover,
> restore or produce documents related to any Custodian (including
> but not limited to the Custodians identified in Topic 14 above),
> from backup tapes, other employees' electronic files, and/or from
> data previously harvested but suppressed by AMD's near-
> deduplication protocols.

See Notice of Deposition of AMD at ¶ 14.

Intel moves the Court to Compel Intel to answer questions 26, 27, 28, 29, 30, 31, 32, 144,

145, 148, 149, 151, 152, and 153-158.  After consideration of the parties' arguments on this

issue, the Special Master concludes that questions 26, 32, 144, 145, 148, 149, 152, and 153 are

not protected by the attorney-client privilege and fall within the scope of topic 14 of the Notice

of Deposition. See 3V, Inc. v. CIBA Specialty Chems. Corp., 587 F. Supp. 2d at 647 ("In

general, the attorney-client privilege protects attorney-client communications made for the

purpose of obtaining or giving legal advice").  Significantly, AMD did not object to to the scope

of deposition topic 14 during the hearing before the Special Master on January 9, 2009. See Tr.

of Hr'g Before Special Master dated Jan. 9, 2009 at 67:5-7.  Intel is entitled to know whether

---

[3] See Questions 26, 27, 28, 29, 30, 31, 32, 144, 145, 148, 149, 151, 152, and 153-158.

restoration efforts occurred beyond Messrs. Ruiz and Oji based on the broad scope of deposition topic 14.

For example, question 26 asks what else was restored, other than "Mr. Ruiz and Ms. Ng-Lim's mailbox?". See Halle Tr. at 121:9-21.  AMD interposed an attorney-client privilege and attorney-work product objection.  If mailboxes for other custodians were restored, AMD is required to disclose such information because it falls within the broad scope of topic 14, which refers to restoration efforts for any Custodian, to which AMD agreed, and does not reveal confidential attorney-client communications.

Questions 144, 152 and 153[4] similarly ask what restoration efforts were performed with respect to Messrs. Ruiz and Oji, and if restoration efforts beyond those two custodians occurred. The Special Master concludes that these restoration efforts are not protected by the attorney-client privilege or attorney work product.  Thus, whether AMD is able to search Mr. Seyer's data (question 144) and whether NDCI restored all of the tapes it received from AMD to find Mr. Ruiz's tapes (question 153) fall within deposition topic 14, and are proper.

---

[4] Question 144 states:

> Q: Does AMD have the ability, itself, then to search Mr. Seyer's data on those for that set that you just discussed? . . .
>
> Q: Was that done in connection with any restoration activities for this particular lawsuit?
>
> A: Objection, work product, attorney client privilege.

See Smith Tr. at 175:9-176:13.

Question 152 states: "Were there other restoration activities for this litigation performed besides Mr. Oji and Mr. Ruiz?" and question 153 states "Did NDCI have to restore all the tapes it received from AMD to find the tapes for Mr. Ruiz?". See Smith Tr. at 194:6-11 and 194:12-19.

In questions 32, 145, 148 and 149, Intel asked about the specific technology that was used to restore Messr. Ruiz and Oji's tapes.[5]  Although Walter Smith ("Smith") was designated by AMD to testify upon topic 10, which concerns "backup tape policies and procedures", including "restoration activities for this litigation," he was unable to answer these questions.  See Notice of Deposition at ¶ 10.  Questions 32, 145, 148, and 149 fall within the scope of deposition

---

[5] Question 32 states:

> You mentioned before the break that you were aware of technology that was available to pull individual custodians' data from the backup tapes.  Do you whether that technology was used for the Ruiz remediation?

See Halle Tr. at 127:1-17.

Question 145 states:

> Q:  Regarding Mr. Ruiz and Mr. Oji, same question?
>
> A:  You know I am aware – I know that we did restore data for Mr. Oji and Mr. Ruiz, restored data for those two individuals as part of this litigation.  I am not aware of the specific mechanisms for those two individuals.  I don't know.

See Smith Tr. at 176:12-18.

Question 148 states:

> Q:  Do you know anything about the restoration activities related to Mr. Ojii and Mr. Ruiz?
>
> A:  Yeah.  As we previously discussed, right, I know that tapes were – were pulled back from storage vaults, as we would call them, right for the restoration.  I know that the data was restored from those tapes and produced for this litigation.  The specific data center operations, individual technique used for restoring the data, I am not – I am not familiar with the specific details of how the restoration of that restoration was done.

See Smith Tr. at 177:25-178:13.

Question 149 states:

> Q:  Do you know any of the details about how the restoration was done? . . .
>
> A:  As for the specifics of the individual, the set of tapes for the two instances we are talking about, no, I actually have no knowledge of the specific IT technique used and whether that was done by IT or an outside party.

See Smith Tr. at 178:14-179:1.

topic 10, and AMD should adequately prepare Smith or another witness regarding these three questions.

Questions 27, 28, 29, 30, 31, 151, 154, 155, and 156 relate directly to the cost and/or burden to AMD of restoring data on backup tapes.  During the Hearing, counsel for Intel represented that these questions deal specifically with Intel's future motion for further remediation.  See Tr. of Hr'g at 44:1-19.  The Special Master concludes that Intel's possible motion for future remediation is not ripe for decision at this time.  These questions were not contemplated within the allowed sixteen (16) hours of deposition time allotted to Intel.  However, the Court will consider further argument on the issue if Intel files a motion for further remediation in the future.

Lastly, the Special Master denies follow-up with respect to questions 157 and 158 at this time.  Question 157 states:

> Did AMD receive back from NDCI all of the mailboxes on the tapes that it sent?

See Smith Tr. at 195:16-20.

AMD amended the transcript to answer "No" to this question.  Intel's request to follow-up regarding the location of the tapes and burden to access the tapes for additional remediation relates solely to a future motion for further remediation.  This issue is not ripe for decision.  As a result, the Special Master finds that question 157 has been answered and additional follow-up will not be allowed at this time.

Question 158 asks:

> Did NDCI restore the exchange dumpster when it restored the tapes?

See Smith Tr. at 195:21-23.

AMD amended the transcript to add "Yes" in response to this question.  Intel's request to follow-up regarding the status of the dumpster is moot.  The dumpster has been restored.  With respect to Intel's request to follow-up regarding the burden to access the dumpster for additional remediation, this issue relates to a future motion for further remediation, and is not ripe for decision at this time.  Thus, the Special Master concludes that question 158 has been answered and additional follow-up will not be allowed at this time.

However, AMD may renew its application with respect to questions 27, 28, 29, 30, 31, 151, 154, 155, 156, 157 and 158 when filing its motion for further remediation.

C.    **Meet and Confer**

With respect to all other rulings made by the Special Master at the Hearing, the parties shall meet and confer as to whether either party intends to take a Fed. R. Civ. P. 53(f)(2) objection.  If either party intends to object, Intel shall prepare a form of Order, which shall be stipulated to by AMD for form only, and submitted to the Special Master no later than close of business on Monday, June 29, 2009.  If neither party intends to object, the transcript of the Hearing shall be the the record of the rulings made.

Additionally, the parties shall advise of their meet and confer discussion regarding additional Fed. R. Civ. P. 30(b)(6) time that will be necessary as a result of the Special Master's Rulings.

THE SPECIAL MASTER'S OPINION AND ORDER WILL BECOME A FINAL

ORDER OF THE COURT UNLESS OBJECTION IS TAKEN IN ACCORDANCE WITH THE

ANTICIPATED ORDER OF THE COURT WHICH SHORTENS THE TIME WITHIN

WHICH AN APPLICATION MAY BE FILED PURSUANT TO FED. R. CIV. P. 53(f)(2).


Entered this
22nd day of June, 2009

_____
Vincent J. Poppiti (DSBA No. 100614)
Special Master